### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MEXICAN AMERICAN** | § | |
| **LEGISLATIVE CAUCUS, TEXAS** | § | |
| **HOUSE OF REPRESENTATIVES** | § | |
| **(MALC)** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **C.A. No. 11-cv-0361 OLG-JES-XR** |
| | § | |
| **STATE OF TEXAS, RICK PERRY,** In | § | |
| **His Official Capacity as Governor of the** | § | |
| **State of Texas, DAVID DEWHURST,** | § | |
| **In His Official Capacity as Lieutenant** | § | |
| **Governor  of** the State of Texas, and | § | |
| JOE STRAUS, In His Official Capacity | § | |
| as Speaker of the Texas House of | § | |
| Representatives. | § | |
| | § | |
| **Defendant** | § | |

### <u>DECLARATION OF PROFESSOR J. MORGAN KOUSSER</u>

I, J. Morgan Kousser, under penalty of perjury, do declare: I have been retained by the

plaintiffs in this action to analyze racially polarized voting in recent Texas elections, the extent of

compliance of the redistricting plan for the Texas House of Representatives with the "one person,

one vote" principle and the possible reasons for deviations from the equal population standard;

and the impact of the plans for the Texas House and Congress on minority voters.  The summary

below sets out my conclusions in their briefest form, and the rest of this report explains them in

more detail and provides extensive evidence for them.

# Redistricting in Texas, 2011: Racially Polarized Voting, Racially Biased Population Deviations, and Racially Gerrymandered Maps

## Table of Contents

I.  Summary — p. 3
II.  Credentials — p. 4
III.  Defining Racially Polarized Voting — p. 7
IV.  Statistical Methods for Assessing Racially Polarized Voting — p. 9
    A.  The Aggregation or "Ecological Inference" Problem — p. 9
    B.  Ecological Regression — p. 11
    C.  Weighted Ecological Regression — p. 17
    D.  King's Ecological Inference — p. 19
V.  Racially Polarized Voting in Recent Texas Elections — p. 26
VI.  Violations of the "One-Person, One-Vote" Principle
    A.  The *Larios v. Cox* Standard — p. 54
    B.  Other State and Federal Laws Governing Redistricting
        1.  Population Equality and the Voting Rights Act — p. 59
        2.  The "County Line Rule" and Compactness — p. 60
    C.  The Fact of Population Disparities in H.B. 150
        and Objective Indicators of Bias — p. 61
VI.  *Larios*, the Voting Rights Act, and H.B. 150
    A.  Evidence of Bias in the Legislative Process — p. 70
    B.  What Sorts of Districts Give Minorities
        an "Equal Opportunity to Elect" in Texas Today? — p. 73
    C.  H283 Has Fewer Minority Opportunity Districts
        and Larger Deviations,
        and Is Less Compact Than Alternative Plans — p. 78
    D.  Inconsistent Application of Standards and
        Other Indications of Bias  in H283 — p. 87
    E.  Maps as Evidence of Intent — p. 92
    F.  The State House Plan: A Short Summary — p. 106
VII.  S.B. 4: Packing, Dilution, Retrogression — p. 108
    A.  Biased Process — p. 108
    B.  Alternative Plans and the "*Gingles* Preconditions" — p. 109
    C.  Packing Minority Opportunity Districts — p. 114
    D.  Cracking Minority Areas and "Tacking" Them onto
        Anglo Counties to Create Safe Anglo Districts — p. 117
    E.  Justifications for S.B. 4
        and for Not Adopting Alternatives — p.131
    F.  S.B. 4: A Short Summary — p. 132

# I.  Summary

1.  First, using the statistical methods conventionally employed in voting rights cases to determine racially polarized voting, I find that voting has been markedly racially polarized in recent general and Democratic primary elections in Texas, and that Latino voters in the state overwhelmingly choose to vote for Democratic candidates, even when Republicans nominate candidates with Spanish surnames.   In general elections, African-Americans almost unanimously support Democratic candidates, regardless of whether Republicans nominate Anglos or Latinos. A majority of Asian-Americans supported Latino Democratic statewide candidates in the 2010 general election.  Second, I find that the extensive population disparities in the redistricting plan for the State House of Representatives (H.B. 150) tend to disadvantage Latinos and have no other plausible explanations except partisanship, which is difficult to separate from ethnicity in Texas. Third, I find that despite the massive growth of the Latino population in Texas, which was largely responsible for the addition of four congressional seats to the state, the largest population growth of any state in the country, the number of minority opportunity districts in the adopted plans did not increase, and probably decreased, compared to the previous apportionment plan. Fourth, evidence from maps of both State House and congressional districts, as well as the patterns of the racial composition of districts and remarks during legislative debates makes clear an intent to discriminate against minorities during redistricting.  Fifth, the existence of polarized voting and of alternative plans to those adopted that are more or equally compact and that offer minorities many more opportunities to elect candidates of their choice demonstrates that a challenge under Section 2 of the Voting Rights Act at least passes the threshold "*Gingles* factors."

## II.  Credentials

2.  I am a professor of history and social science at the California Institute of Technology. Educated at Princeton and Yale, I have been a visiting professor at Michigan, Harvard, and Claremont.  In 1984-85, I was Harmsworth Professor of American History at Oxford.  As my curriculum vitae, attached, shows, I've published three books and edited another, in addition to 42 scholarly articles, 79 book reviews, and 24 entries in reference works.   My work has focused on minority voting rights, educational discrimination, race relations, the legal history of all of the foregoing subjects, political history, and quantitative methods.  I have been executive editor of the journal *Historical Methods*, which specializes in interdisciplinary and quantitative history, since 2001.  My 1999 book, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction*, was co-winner of the annual Lillian Smith Award of the Southern Regional Council for the best book on the South and co-winner of the annual Ralph J. Bunche Award of the American Political Science Association for the best scholarly work in political science which explores the phenomenon of ethnic and cultural pluralism.  One of my most recent articles, "The Strange, Ironic Career of Section Five of the Voting Rights Act, 1965-2007," published in the *Texas Law Review*, is the first comprehensive history of the Act's first 42 years. My *curriculum vitae* is appended to this report as Attachment C.

3.  I have previously testified or consulted in 35 federal voting rights or redistricting cases and five state cases (in Alaska and California).  Many, such as the key case of *City of Mobile v. Bolden,*  concerned whether at-large systems of voting were adopted or maintained with a racially

4

discriminatory intent or whether they had discriminatory effects.  Others, such as *Garza v. Los Angeles County Board of Supervisors*, involved questions of "racial gerrymandering."  My testimony on the racial intent of those who redistricted the Los Angeles County Board served as the basis for the district and appeals court decisions on that issue in *Garza*, and their opinions on intent provided the framework for the Justice Department's standard objection letter on the grounds of discriminatory intent under Section 5 of the Voting Rights Act during the 1990s.   In some cases, such as *Bolden*, *Garza*, and the 2003 Texas "re-redistricting" case, *LULAC v. Perry*, the sources of my testimony were primarily qualitative.  During the 1990s round of redistricting, I wrote expert reports for the cases of *Shaw v. Hunt* (North Carolina) and *Bush v. Vera* (Texas) examining the history of redistricting in those states from 1970 on.  Revised for publication in *Colorblind Injustice*, those reports take up two chapters totaling 74 pages with numerous citations to newspapers, depositions, and governmental documents, as well as to secondary sources.  A revised version of my *Garza* report, based on similar sources, comprises a 69-page chapter of the same book.  In six other federal cases, such as the 2002 California state redistricting case, *Cano v. Davis*, and five cases brought under the California Voting Rights Act, the sources of my testimony were primarily quantitative.

4.  My first published article was the earliest extensive introduction to "ecological regression" analysis for the historical profession.  Throughout my career, in scholarly books and articles, as well as in legal testimony, I have written about and employed ecological regression, which has been the chief statistical means of determining whether voting is racially polarized. Even before ecological regression was employed by any expert witness in a voting rights case, I used it in my

1971 doctoral dissertation to estimate the patterns of voting of southern blacks in the late 19th and early 20th centuries.  Previous historians had only been able to guess how African-Americans voted and whether they voted, and they could therefore not tell when blacks were disfranchised or make valid inferences about how they were disfranchised – by violence, fraud, or the passage of laws – or why – for merely racial, or for both racial and partisan purposes.  The development of ecological regression in sociology and political science, and my close study of that method and related ones in graduate school and afterwards made it possible for me to answer those questions much more systematically.  Thirty-two tables in *The Shaping of Southern Politics* were based on ecological regression – the first widespread use of ecological regression by a historian. Ecological regression was later extensively used in voting rights cases (by others, as well as by me), for example, in *Thornburg v. Gingles* (1986), the first major U.S. Supreme Court case to interpret the 1982 amendments to Section 2 of the Voting Rights Act.  In 2001, I published a lengthy article examining issues in several models of ecological inference, including ecological regression and Gary King's "EI," which have been used to determine the extent of racially polarized voting in recent federal voting rights cases. That article is appended to this report as Appendix B.

# III.  Defining Racially Polarized Voting

5.  The federal case law definition of racially polarized voting derives from the federal district court's opinion in *Gingles v. Edmisten*, 590 F.Supp. 345, 367-78 (EDNC 1984) and the Supreme Court's decision in *Thornburg v. Gingles*, 106 S.Ct. 2752, 2767-73 (1986).  It must be admitted that the Supreme Court did not establish a very bright line, remarking that "the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district. . . . .there is no simple doctrinal test for the existence of legally significant racial bloc voting."[1]

But Justice Brennan did offer two more specific definitional statements in *Gingles*: "And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting."[2]  He also adopted definitions offered during the district court trial by Prof. Bernard Grofman, who declared that racially polarized voting exists where there is "a consistent relationship between [the] race of the voter and the way in which the voter votes . . . black voters and white voters vote differently."[3]

6.  Although subsequent discussions in federal cases and the political science literature have not

---

[1]*Thornburg v. Gingles*, at 2769-70.

[2]*Thornburg v. Gingles*, at 2770.

[3]*Thornburg v. Gingles*, at 2768, n. 21.

7

added much more clarity to the discussion,[4] the two basic operational definitions that are used

track Grofman's comments quoted in *Gingles*.  One simply asks whether a majority of one group

votes differently from a majority of another – for example, it would find racially polarized voting

if 51 percent or more of Latinos voted for Linda Chavez-Thompson for Lieutenant Governor in

2010, while 49 percent or fewer non-Latinos did.  The second asks whether the relationship

between ethnicity and voting is statistically significant at conventional levels.  In the second

definition, elections could be said to be racially polarized even if majorities of both groups – or

minorities of both groups – voted for the same candidate or proposition, so long as there were a

statistically significant difference between their voting patterns.  Depending on the number of

precincts, there might, for instance, be a statistically significant difference between non-Latino

and Latino voting if, as in Texas, between 67 and 71 percent of the Latinos are estimated to have

voted for Blake Bailey, the Democratic nominee for position 9 on the Supreme Court, in the

2010 general election, and only 29-31 percent of  non-Latinos backed him.  It has always seemed

to me that both definitions contribute to the general assessment of racial polarization in a

jurisdiction, and I have found no convincing argument or legal authority for choosing between

them.

---

[4]See, e.g., J. Gerald Hebert, Donald B. Verrilli, Jr., Paul M. Smith, and Sam Hirsh, *The Realists' Guide to Redistricting: Avoiding the Legal Pitfalls* (Chicago: American Bar Assn., 2000), 41-44; Bernard Grofman, Lisa Handley, and Richard G. Niemi, *Minority Representation and the Quest for Voting Equality* (New York: Cambridge University Press, 1992), 82-108.

# IV.  Statistical Methods for Assessing Racially Polarized Voting

7.  Although political scientists began as early as the 1930s to use regression analysis to study

elections, and although statistical methods have been used since the 1970s to estimate the degree

of ethnically polarized voting in federal voting rights cases, the techniques are less familiar in

state litigation.  An intuitive explanation of the three different statistical methods used in this

report may assist judges and others in weighing the evidence.  It is not necessary to understand all

of the mathematics behind these methods to grasp their essential natures.  Visual aids will guide

intuitions.

## A.  The Aggregation or "Ecological Inference" Problem

8.  Social scientists would often like to know how individuals with certain characteristics (race,

class, gender, etc.) voted in particular elections, or whether they turned out at all.  But in the pre-

survey era and in most elections below the presidential level even more recently, we have no

direct evidence about individual voting choices.  Instead, we often have election returns in which

individuals have been grouped into precincts, townships, counties, etc.  We may also have

information, for example, from censuses, on the socioeconomic traits of these precincts,

townships, and/or counties.

9.  If voters or potential voters were perfectly segregated in these aggregate or "ecological" units

9

(e.g., precincts) on the basis of the trait we were particularly interested in (e.g., ethnicity), then it would be simple to determine how individuals voted.  For instance, we could just look at all of the 100 percent Latino precincts and determine how every Latino voted, because we would know that only Latinos lived in those precincts, and that no Latinos lived elsewhere.  Fortunately for society, but unfortunately for social scientists, living patterns are more mixed, and inference is more difficult.

10.  The precinct-level data that we usually are presented with shows some, but not perfect ethnic segregation.  Many precincts and even state House districts in Texas have almost no Latino registered voters, some are about a quarter Latino, and in a large number, Latinos currently make up over half of the electorate.  But there are not many 100 percent Latino precincts, and there are no 100 percent Latino districts in the state House of Representatives.  Generally speaking, the greater the range of ethnically different precincts and the larger the proportion of an ethnic group in a community, the more solid the inferences about that group's voting behavior.  We are lucky that Texas collects and makes available a profusion of electoral and census data at the precinct level and that a sizable proportion of the state's voters come from different ethnic groups and reside in relatively homogeneous precincts. Data for this report was provided to me by the Mexican-American Legislative Caucus.  The Caucus staff originally received the data from the Texas Legislative Council.   Plentiful data and considerable socioeconomic diversity make Texas an ideal place to study racial bloc voting.

## B.  Ecological Regression

11.  How do we estimate individual voting behavior if we have only precinct-level data?  In 1959, statistician Leo Goodman introduced what he called "ecological regression," and that has been the dominant method used since then by historians and political scientists.[5]  It was in effect endorsed by Justice William Brennan in the leading federal Voting Rights Act case on racially polarized voting, *Thornburg v. Gingles* (1986), since that is what Prof. Bernard Grofman, the principal expert witness in the case, used to estimate racial polarization.[6]

12.  The easiest way to comprehend ecological regression (which I will hereafter refer to as "ER") is to consider some graphs.  Figure 1 plots the percentages in each district of the Texas State House for Linda Chavez-Thompson, the only Spanish-surnamed candidate for Lieutenant-Governor in the 2010 Democratic primary election, against the percentage of the registered voters in each State House district[7] who had Spanish surnames (whom I will hereafter refer to as

---

[5]Leo A. Goodman, "Some Alternatives to Ecological Correlation," *American Journal of Sociology* 64 (1959), 610-24.  For the first extensive article on the subject in a historical journal, see my  "Ecological Regression and the Analysis of Past Politics," *The Journal of Interdisciplinary History* 4: 237-62 (1973).

[6]106 S.Ct. 2752, 2767-73.  Justice Brennan explicitly rejected an effort to use multiple regression to "control for" other traits of individuals or candidates in estimating the degree of racial polarization.  Defendant North Carolina and the U.S. Department of Justice in an *amicus* brief had suggested that if one controlled for such variables as party or which candidates were incumbents, the effect of race on candidate choice might be reduced or eliminated statistically. Justice Brennan accepted the plaintiffs' argument that it was the pattern of racial polarization *per se* that mattered, not what motivated black voters to vote differently from white voters.

[7]Texas has over 8000 precincts in the state as a whole.  While I calculated coefficients in several of the tables below using data from all of those precincts, the large amount of data creates

"Latinos" for convenience).[8]  It shows that as the percentage of Latinos went up, the percentage

for Chavez-Thompson went up dramatically, as well.  The straight line (the "regression line")

tells us how the "dependent variable" – in this case, the percentage for Chavez-Thompson --

changed, on average, as the "independent variable" – in this case, the percentage Latino –

changed.

13.  ER estimates voting by each ethnic group by asking, in effect, how precincts that were 100

percent Non-Latino or 100 percent Latino would have voted, on average.  At least in this simple

model, ER attributes the same propensity to vote for Chavez-Thompson to every Latino or every

Non-Latino in the jurisdiction.  Graphically, a 100 percent Non-Latino (Non-Hispanic white,

black, and/or Asian-American) precinct would fall on the left vertical axis, so ER determines

where the regression line intersects that axis – at 37.4 percent in this instance –  and concludes

that 37.4 percent of the non-Latino Democrats in Texas voted for Chavez-Thompson.   Likewise,

ER estimates Latino voting behavior by asking where the regression line would intersect a line

---

a swarm of points that obscures, rather than illuminates the pattern in a graph.  I therefore present
graphs only for data encompassing the 150 House districts.

[8]The list of Spanish surnames, originally compiled by the U.S. Bureau of the Census, has
been widely used in Texas and California for decades to match against lists of voting registrants
and those who turned out at the polls.  During the statewide and local redistricting processes of
the 1990s and 2001, for example, the list was considered authoritative by politicians, scholars,
and judges alike om California.  See, for example, my articles on these two redistrictings, which
made extensive use of statistics based on the Spanish surname list.  "Reapportionment Wars:
Party, Race, and  Redistricting in California, 1971-1992," in Bernard Grofman, ed.,  *Race and
Redistricting in the 1990's* (New York: Agathon Press, 1998), 134-90; "Has California Gone
Colorblind?", in Frederick Douzet, Thad Kousser, and Kenneth P. Miller, eds., *The New Political
Geography of California* (Berkeley: Institute of Governmental Studies, 2008), 267-90.

drawn vertically above the point on the right of the graph corresponding to a 100 percent Latino precinct.  In this case, the regression line would intersect with that vertical line at 89.4 percent.  Because the "standard errors" in parenthesis below the equation in Figure 1 are low, we can be sure that the difference between the two estimates (37 percent and 89 percent) is "statistically significant" at virtually any level of confidence.  That is to say, the voting behavior of Spanish-surnamed voters and the rest of the electorate was strikingly different and was strongly racially polarized by either of the two definitions given earlier.

14.  Below this and other graphs, I have placed the "ordinary least squares" or "OLS" regression equation that determines the regression line.  This simplest version of a regression equation takes the form

(1)   $Y = a + b\,X + e,$

where Y is the dependent variable, in this case, the percentage for Chavez-Thompson;

a is the "intercept," the point at which the regression line crosses the Y axis, in this case 37.4 percent;

b is the slope of the regression line, which in this case is the amount the line differs in two precincts, one of which had no Latinos, and the other of which was all-Latino; as the Latino proportion rose from 0 percent to 100 percent, the regression line rose by 52.1

13

percent;

X is the independent variable, the percentage Latino of the registrants, in this instance;

and e is an error term, an indication that we are somewhat uncertain about our estimate.

How uncertain we are may be gauged by the "standard errors" for each coefficient, which are placed in parentheses underneath the respective a and b coefficients in the equations below the graphs in this paper.  A coefficient that is twice or more its standard error is considered statistically significant at the conventional 0.05 level of statistical significance, which means that we would only observe a coefficient this different from zero (or any other particular number) five times out of a hundred, if the variables were actually completely unrelated to each other.  Here, the coefficients are many times their standard errors, so we can be quite certain that they measure relationships that are different from zero in the population.  Standard errors can also give indications about whether two different estimates are approximately equivalent.  If one estimate is that 10 percent of a group voted for a particular candidate, and the standard error of that estimate is 2 percent, and another estimate is that 14 percent of the same group voted for that candidate, and the standard error is 3 percent, then the standard errors overlap a high percentage of the time, and the two estimates cannot be safely distinguished.  The $R^2$ or percentage of variance in the dependent variable explained by the independent variable tells us how well one variable explains the other – how strongly the two are related and how tightly the points are clustered around the regression line.  Here, Latino turnout alone explains 66.3 percent of the

variation in the percentages for Chavez-Thompson in the Democratic primary – a very high level

for social science.

**Figure 1: 2010 Democratic Primary for Lieutenant-Governor: Ordinary Least-Squares Estimate of Ethnicity and Vote for Chavez-Thompson**



Estimating Equation:   % for Chavez-Thompson =     0.374     + 0.521 (% Latino)

                                                    (0.010)      (0.030)

$R^2$   =   0.663

## C.  Weighted Ecological Regression

15.  But the precincts are not all the same size in Texas, and turnout varied somewhat from State House district to district.  Weighted regression allows one to count larger precincts or districts that turned out more heavily than smaller precincts or districts with fewer votes in calculating the coefficients, and STATA can produce graphs in which each precinct is represented by a circle that is proportional to the number who voted (or registered, or any other appropriate weighting quantity) in the precinct or district, rather than by dots of equal size.  Figure 2 is one such graph, a version of the same data as in Figure 1 on the 2010 primary for Lieutenant-Governor, but with a slightly different regression equation and circles of different sizes.  Readers will note that the pattern of the points and the coefficients that are estimated are close to those in Figure 1.  Several of the districts with the highest turnout, and therefore the largest circles, are in quite heavily Latino constituencies, and the $R^2$ is even higher than in Figure 1, explaining more than three-quarters of the variance in votes for Chavez-Thompson.  The similarity in coefficients in the unweighted and unweighted estimates is quite reassuring, because it means that the judgment that the primary contest was a racially polarized election was not merely the product of a particular weighting scheme, one that gave less emphasis to larger precincts or districts with more votes than it might have.

17

**Figure 2: Weighted Ecological Regression Graph of Racial Polarization in the 2010 Democratic Primary for Lieutenant-Governor**



Estimating Equation: % for Chavez-Thompson =   0.355   +   0.545 (% Latino)
                                              (0.011)     (0.025)

$R^2$ =   0.755

## D.  King's Ecological Inference

16.  As I have shown elsewhere, ER is more sophisticated and flexible than it is often considered to be.[9]  Nonetheless, ER has two major deficiencies.  First, it sometimes produces estimates outside the 0-100 percent logical bounds.  Second, it does not make use of all of the available aggregate information.  Gary King, a political scientist at Harvard, sought to overcome these difficulties with his celebrated "ecological inference" or "EI" technique.[10]

17.  The first problem may be illustrated by looking at the relationship between ethnicity and votes for Vilma Luna, the Democratic candidate for state representative from district 33, in the 2002 general election , which is pictured in Figure 3.  This election was so ethnically polarized, resulting in a very steep regression line for the relationship between the percentage of votes for Luna and the percentage of voters in each precinct who had Spanish surnames, that the line would intersect the right-hand axis above 100 percent, which is outside the logical zero-one bounds.  In the analogous graph (not shown here) for Lauro Cuellar, Luna's Republican opponent, the regression line slants so steeply down from left to right that it would  intersect the right-hand line at negative 2.2 percent, implying that a negative number of Spanish-surnamed voters cast ballots for the Spanish-surnamed Republican.  Out-of-bounds estimates are most common when the relationship between two variables is very strong and/or when one group whose behavior we are investigating represents a small part of the electorate.

---

[9]Kousser, "Ecological Inference from Goodman to King," *Historical Methods* 34 (2001), 123.

[10]King, *A Solution to the Ecological Inference Problem: Recovering Individual Behavior from Aggregate Data* (Princeton, N.J.: Princeton University Press, 1997).

Figure 3: An Out-of-Bounds ER Estimate



Estimating Equation: % for Luna =   0.324  +   0.696  (% Latino)
                                     (0.018)     (0.297)


R$^2$   =   0.927

18.  The second deficiency of ER is a bit more complicated.  Consider Table 1, which gives the election results and ethnic percentages in a hypothetical Texas precinct in 2010.  The figures on the right-most column tell us that the precinct was 73 percent non-Latino and 27 percent Latino.  Those on the bottom row inform us that the precinct voted for David Dewhurst, the 2010 Republican nominee for Lieutenant-Governor, by a 60-40 margin.  What we are trying to estimate are the P's (for "probabilities") in the cells in the middle of the table, which are subscripted to indicate which row and column they occupy.   $P_{11}$ signifies that the entry is in the first row, first column, $P_{12}$ means first row, second column, and so on.

19.  Note that the values of the columns on the edges of the table set some limits on the P's.  Assuming for the purposes of the example that everyone in the precinct voted and that they all voted for one of the two major-party candidates, no more than 55 percent (40/73) of the non-Latinos could have voted for Linda Chavez-Thompson in this precinct, because non-Latinos comprised 73% of the voters, and only 40% of the votes were cast for Chavez-Thompson.  On the other hand, if all of the Latinos voted for Chavez-Thompson, then at least 18 percent of the Non-Latinos must have, as well, because the maximum Latino vote was 27 percent, leaving 13 percent of the pro-Chavez-Thompson votes that had to have been cast by non-Latinos.  Since non-Latinos comprised 73 percent of the voters, 18 percent of them (13/73) at a minimum must have favored the Spanish-surnamed candidate.

20.  Figure 4 provides a geometric version of  the above algebraic argument.   Observe that the axes are different from those in Figures 1 to 3.  In Figure 4, the horizontal axis depicts the

proportion of Non-Latinos who voted for Chavez-thompson, and the vertical axis reflects the proportion of Latinos who did so.  The line across the square represents the bounds for this precinct calculated above from Table 1.  It shows that the estimate of non-Latino voting for Chavez-Thompson in this precinct must mathematically range from 18 percent to 55 percent (and conversely, that the percentage of non-Latinos who voted for Dewhurst had to be between 45 and 82 percent).  Unfortunately, the voting behavior in this precinct puts no constraints on our estimate of Latino voting on the proposition, which could have potentially varied from no support of Chavez-Thompson to unanimity behind her candidacy.

**Table 1: The Relationship Between the Vote in 2010 Lieutenant-Governor Race and Ethnicity in a Hypothetical Precinct**

|  | Vote in 2010 Lieutenant-Governor's Contest | | Ethnic % |
|---|---|---|---|
|  | **Chavez-Thompson** | **Dewhurst** |  |
| **Ethnicity** |  |  |  |
| **Non-Latino** | $P_{11}$ | $P_{12}$ | $X_1 = 0.73$ |
| **Latino** | $P_{21}$ | $P_{22}$ | $X_2 = 0.27$ |
| **Vote %** | $Y_1 = 0.40$ | $Y_2 = 0.60$ |  |

**Figure 4: A "Bounds Plot" for the Data in Table 1**



21.  More generally, such bounds are most informative when a group comprises a large proportion of a particular precinct.  If every precinct were composed of close to 50 percent of each of two groups (as is the case for gender, for example), the bounds would tell us almost nothing, for the line in Figure 4 would go from the northwest to the southeast corner or close to it, indicating that each group's minimum vote for a measure or candidate could have been close to zero, and its maximum, close to 100 percent.

22.  King's technique of ecological inference or "EI" makes use of the fact that precinct totals usually put some limits on possible voting behavior, as well as of the increased power and speed of current computers.  To avoid the technicalities: what EI does is first to run something like an ER, and then, using that information, estimate where on "bounds lines" like that in Figure 4 a point is most likely to lie.  It calculates the estimate by generating, through computer simulation, a "normal" or bell-shaped curve in a third dimension on top of each bounds line.  Unlike a usual bell curve, however, this one is forced to stop at the edges of a square like that in Figure 4. The values of the points generated in the simulation (usually of 100 points per bounds line) are then averaged, giving us the most likely point on the line – for example, the most likely combination of Latinos and Non-Latinos who favored Chavez-Thompson –  for that precinct.   The bell curve need not have its apogee at the center of the line; indeed, it will usually be skewed toward one end or the other.  Every precinct will have its corresponding bounds line and its corresponding estimate of what are referred to in Table 1 as $P_{11}$ and $P_{21}$, the proportions of non-Latinos and Latinos, respectively, who favored Chavez-Thompson.  EI then multiplies the estimate for each precinct by the population of the precinct and averages these to get a jurisdiction-wide estimate.

25

23.  In brief, the chief advantages of EI over ER for estimating racially polarized voting are that it makes use of the information in the precinct bounds, which ER ignores, and that it has interesting diagnostic tests (which will not be presented or discussed in this paper).  EI is guaranteed to produce estimates that are within the 0-100 percent logical bounds.  Its principal deficiencies are that it does not accommodate multiple independent or dependent variables.  In addition, unlike ER or weighted ER, EI does not guarantee that voting estimates add to 100 percent of each ethnic group in elections in which there are more than two choices – e.g., three candidates or two candidates and abstention.[11]

## V.  Racially Polarized Voting in Recent Texas Elections

24.  Tables 2-16 which follow may look complicated, but they demonstrate four simple points: First, voting in recent Texas elections has been ethnically polarized.  Latinos and non-Latinos vote differently.  Second, that pattern is not simply a function of partisanship.  Ethnic polarization is often even more stark within Democratic primaries when Latino candidates run against non-Latino candidates than it is in general elections.  Third, Latino voters in Texas overwhelmingly favor Democratic nominees, even when Republican nominees have Spanish surnames.  Indeed, some non-Latino Democratic nominees have received more than 85 percent of Latino votes in general elections when running against Spanish-surnamed Republicans.  Fourth, and less substantively, these results hold across three methods of estimation (ER, weighted ER, and EI)

---

[11]This is because there is a constraint on each choice, but not on the sum of all of the choices.  For instance, the estimate of the Latino vote for each candidate must be between zero and a hundred percent in EI, but the estimates of the Latino votes for all candidates need not sum to one hundred percent.

and two levels of aggregation (all the precincts in the state or in individual congressional and State House races, and all 150 State House districts).  The patterns inhere in the data, not in the methods or the ways voters were grouped into districts.

25.  Table 2, which is based on all of the precincts in the state (approximately 8400, with missing data for tens or hundreds of precincts in each of the statewide contests in the general and primary elections), can serve as a convincing and representative sample.  In the three statewide contests which involved Spanish-surnamed candidates, Lieutenant-Governor, Land Commissioner, and Position 9 of the State Supreme Court, Democratic candidates, whether Spanish-surnamed or not, received from 71 to nearly 80 percent of the votes of Latinos who voted, but only 26.6 to 29.7 percent of the votes of non-Latino voters.  By contrast, Republican candidates received only 18-25.6 percent of the votes of Latinos, but 65.8 to 70.1 percent of the votes of non-Latinos.  These results are very comparable to two statewide contests, for the State Supreme Court, Positions 3 and 5, that did not involve any Spanish-surnamed candidates.  And while the only Spanish-surnamed Republican, Eva Guzman, did somewhat better among Latino voters (and somewhat worse among non-Latinos) than the other Republican candidates, she still received only about a quarter of the Latino votes.  This was a very polarized election, as racially polarized as black/white contests in the Deep South during the 1980s and 90s.

## Table 2:  2010 General Election, Ordinary Least Squares, % of Voters, by Precincts (n = 8400)

| Candidate, Party | Latino | Non-Latino |
|---|---|---|
| **Lieutenant Governor** | | |
| Chavez-Thompson, D* | 75.9 (0.8) | 27.0 (0.3) |
| Dewhurst, R | 19.6 (0.8) | 69.8 (0.3) |
| Jameson, Lib | 1.6 (0.1) | 2.7 (0.0) |
| Gonzales, Green | 2.9 (0.0) | 0.4 (0.0) |
| | | |
| **Land Commissioner** | | |
| Uribe, D* | 79.8 (0.8) | 26.6 (0.3) |
| Patterson, R | 18.0 (0.8) | 70.1 (0.3) |
| Holdar, Lib | 2.2 (0.0) | 3.3 (0.0) |
| | | |
| **Supreme Court, Position 3** | | |
| Sharp, D | 77.9 (0.7) | 30.4 (0.3) |
| Lehrmann, R | 19.3 (9.7) | 66.6 (0.3) |
| Strange, Green | 2.7(0.0) | 2.9 (0.0) |
| | | |
| **Supreme Court, Position 5** | | |
| Moody, D | 78.6 (0.7) | 29.3 (0.3) |
| Green, R | 18.7 (0.7) | 67.6 (0.3) |
| Oxford, Green | 2.7 (0.0) | 3.1 (0.0) |
| | | |

| Supreme Court, Position 9 | | |
|---|---|---|
| Bailey, D | 71.0 (9.7) | 29.7 (0.3) |
| Guzman, R | 25.6 (0.7) | 65.8 (0.3) |
| Armstrong, Green | 3.4 (0.1) | 4.5 (0.0) |

26.  Table 3, which gives the results of the same elections for all of the precincts statewide, but this time, weights the precincts by the total number of votes cast in each contest, mirrors the results of Table 2, in fact, showing somewhat more pronounced racial polarization by party. Tables 4 and 5 are directly parallel to Tables 2 and 3, but based on the 150 observations of the different State House districts, instead of the roughly 8000 precincts without missing data in the state.  Substantively, the estimates of voting behavior by Latinos and non-Latinos are extremely close to those in the previous tables.  The estimates based on the more complicated Ecological Inference procedure corroborate the ER and weighted ER estimates from Tables 2-5.[12]  At least in these contests, the general election of 2010 in Texas was markedly racially polarized.

---

[12]As mentioned earlier, there are many missing precincts in the statewide dataset.  Stata handles missing data without difficulty, but Ezi, the form of King's EI program that I used to calculate the EI coefficients, does not.  Editing over 8000 cases manually to delete missing data for each of the variables would have added hours and hours of drudgery to the process with very little likelihood of producing different results, so I refrained.

**Table 3:  2010 General Election, Least Squares Weighted by Votes,**

**% of Voters, by Precincts (n = 8400)**

| Candidate, Party | Latino | Non-Latino |
|---|---|---|
| **Lieutenant Governor** | | |
| Chavez-Thompson, D* | 77.8 (0.9) | 26.0 (0.3) |
| Dewhurst, R | 17.6 (0.9) | 70.9 (0.3) |
| Jameson, Lib | 1.7 (0.1) | 2.6 (0.0) |
| Gonzales, Green | 3.0 (0.0) | 0.5 (0.0) |
| | | |
| **Land Commissioner** | | |
| Uribe, D* | 81.8 (0.9) | 25.6 (0.3) |
| Patterson, R | 15.8 (0.9) | 71.2 (0.3) |
| Holdar, Lib | 2.3 (0.1) | 3.2 (0.0) |
| | | |
| **Supreme Court, Position 3** | | |
| Sharp, D | 80.0 (0.9) | 28.4 (0.3) |
| Lehrmann, R | 17.1 (0.9) | 68.8 (0.3) |
| Strange, Green | 2.9 (0.1) | 2.9 (0.0) |
| | | |
| **Supreme Court, Position 5** | | |
| Moody, D | 80.7 (0.9) | 27.9 (0.3) |
| Green, R | 16.5 (0.9) | 69.1 (0.3) |
| Oxford, Green | 2.8 (0.1) | 3.0 (0.0) |
| | | |

| Supreme Court, Position 9 | | |
|---|---|---|
| Bailey, D | 72.8 (0.9) | 27.8 (0.3) |
| Guzman, R | 23.5 (0.9) | 68.1 (0.3) |
| Armstrong, Green | 3.7 (0.1) | 4.1 (0.0) |

**Table 4:  2010 General Election, Ordinary Least Squares, % of Voters, by House Districts (n = 150)**

| Candidate, Party | Latino | Non-Latino |
|---|---|---|
| **Lieutenant Governor** | | |
| Chavez-Thompson, D* | 73.0 (4.5) | 28.4 (1.9) |
| Dewhurst, R | 22.4 (4.4) | 68.5 (1.9) |
| Jameson, Lib | 1.7 (0.2) | 2.6 (0.1) |
| Gonzales, Green | 2.8 (0.0) | 0.5 (0.0) |
| | | |
| **Land Commissioner** | | |
| Uribe, D* | 76.9 (4.6) | 28.1 (1.9) |
| Patterson, R | 20.8 (4.5) | 68.8 (1.9) |
| Holdar, Lib | 2.3 (0.2) | 3.1 (0.0) |
| | | |
| **Supreme Court, Position 9** | | |
| Bailey, D | 67/9 (4.4) | 30.6 (1.9) |
| Guzman, R | 28.2 (4.1) | 65.5 (1.8) |
| Armstrong, Green | 3.8 (0.4) | 4.0 (0.2) |

**Table 5:  2010 General Election, Least Squares Weighted by Votes,
% of Voters, by Districts (n = 150)**

| Candidate, Party | Latino | Non-Latino |
|---|---|---|
| **Lieutenant Governor** | | |
| Chavez-Thompson, D* | 71.0 (5.5) | 26.6 (1.7) |
| Dewhurst, R | 24.5 (5.4) | 70.3 (1.7) |
| Jameson, Lib | 1.7 (0.3) | 2.7 (0.1) |
| Gonzales, Green | 2.8 (0.1) | 0.5 (0.0) |
| | | |
| **Land Commissioner** | | |
| Uribe, D* | 74.9 (5.6) | 26.2 (1.8) |
| Patterson, R | 22.8 (5.5) | 70.6 (1.8) |
| Holdar, Lib | 2.3 (0.3) | 3.2 (0.1) |
| | | |
| | | |
| **Supreme Court, Position 9** | | |
| Bailey, D | 66.4 (5.4) | 28.6 (1.7) |
| Guzman, R | 29.6 (5.2) | 67.4 (1.7) |
| Armstrong, Green | 4.0 (0.5) | 4.0 (0.2) |

**Table 6: 2010 General Election, King's EI, % of Voters, by Districts**

| Candidate, Party | Latino | Non-Latino |
|---|---|---|
| **Lieutenant Governor** | | |
| Chavez-Thompson, D* | 70.7 (1.6) | 26.6 (0.4) |
| Dewhurst, R | 23.6 (1.4) | 70.5 (0.3) |
| Jameson, Lib | 1.4 (0.1) | 2.7 (0.0) |
| Gonzales, Green | 2.8 (0.0) | 0.5 (0.0) |
| | | |
| **Land Commissioner** | | |
| Uribe, D* | 74.3 (1.6) | 26.3 (0.4) |
| Patterson, R | 22.2 (1.5) | 70.7 (0.3) |
| Holdar, Lib | 1.7 (0.1) | 0.0 (0.0) |
| | | |
| **Supreme Court, Position 9** | | |
| Bailey, D | 67.9 (1.3) | 28.2 (0.3) |
| Guzman, R | 27.6 (1.1) | 67.8 (0.3) |
| Armstrong, Green | 4.0 (0.2) | 4.1 (0.1) |

27.  Although there was little polarization along Latino/non-Latino lines within the Republican primaries in 2010, presumably because there were so few Latino voters who identified with the Republican party, Table 7 and subsequent tables demonstrate that racial-identity voting in Texas is not just a proxy for party.  In the two statewide Democratic primary contests in 2010 that featured Spanish-surnamed candidates, voting was more polarized along Latino/non-Latino lines than in the general election.  In the contest for Land Commissioner, Hector Uribe received more than 90 percent of the franchises of Latinos who voted, while his opponent, Bill Burton, received nearly 7 out of 10 non-Latino votes.  For Lieutenant-Governor, Linda Chavez-Thompson was nearly as strongly a favorite of Latino voters as Uribe was, and she gathered between 5 and 9 percent more non-Latino votes than Uribe did.  Again, the results of Tables 7-11 are very similar, although each uses a different estimating equation or is computed on the basis of a different numbers of aggregate units.  Race in Texas elections goes deeper than partisanship.

28.  Tables 12-14, which were estimated using precinct-level election returns from the appropriate state representative and congressional districts, make clear that the candidates of choice of Latino voters are Democrats, not Republicans, even if the Republican candidates have Spanish surnames. In only 2 of 12 contests did Latino support for the Democratic nominee drop below 80 percent, and then, not by much.  Conversely, two-thirds or more of non-Latinos supported the Republican candidate in each general election.  Latino Republicans' support was the same color as Anglo Republicans' support.

**Table 7:  2010 Primary, Unweighted Ordinary Least Squares, % of Vote, by Precincts (n = 8400)**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **Democratic Lieutenant Governor** | | |
| Chavez-Thompson* | 87.5 (0.6) | 38.3 (0.2) |
| Earle | 5.3 (0.6) | 46.2 (0.2) |
| Katz | 7.2 (0.3) | 15.4 (0.1) |
| | | |
| **Democratic Land Commissioner** | | |
| Uribe* | 90.8 (0.6) | 29.4 (0.3) |
| Burton | 9.2 (0.6) | 70.6 (0.3) |
| | | |
| **Republican Supreme Court Position 9** | | |
| Guzman | 51.8 (0.6) | 66.0 (0.2) |
| Vela | 48.2 (0.6) | 34.0 (0.2) |
| | | |
| **Republican Supreme Court Position 3** | | |
| Brown | 15.2 (0.4) | 16.9 (0.2) |
| Green | 17.2 (0.4) | 19.7 (0.2) |
| Lehrmann | 17.1 (0.4) | 18.1 (0.2) |
| Moseley | 13.5 (0.4) | 18.8 (0.2) |
| Simmons | 25.0 (0.4) | 17.2 (0.2) |
| Strange | 12.0 (0.3) | 9.3 (0.1) |

**Table 8: 2010 Primary, Ordinary Least Squares Weighted by Votes,
% of Vote, by Precincts (n = 8400)**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **Democratic Lieutenant Governor** | | |
| Chavez-Thompson* | 87.8 (0.3) | 36.2 (0.1) |
| Earle | 4.8 (0.3) | 49.3 (0.2) |
| Katz | 7.4 (0.1) | 14.5 (0.0) |
| | | |
| **Democratic Land Commissioner** | | |
| Uribe* | 91.4 (0.4) | 32.1 (0.2) |
| Burton | 8.6 (0.4) | 67.9 (0.2) |
| | | |
| **Republican Supreme Court Position 9** | | |
| Guzman | 49.6 (0.7) | 67.5 (0.2) |
| Vela | 50.4 (0.7) | 32.5 (0.2) |
| | | |
| **Republican Supreme Court Position 3** | | |
| Brown | 15.0 (0.5) | 17.0 (0.1) |
| Green | 18.3 (0.5) | 19.1 (0.1) |
| Lehrmann | 13.2 (0.6) | 18.9 (0.1) |
| Moseley | 12.6 (0.5) | 18.9 (0.1) |
| Simmons | 24.9 (0.5) | 17.0 (0.1) |
| Strange | 15.7 (0.5) | 9.0 (0.1) |

**Table 9:  2010 Primary, Unweighted Ordinary Least Squares, % of Vote,
by State House Districts (n = 150)**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **Democratic Lieutenant Governor** | | |
| Chavez-Thompson* | 89.4 (2.4) | 37.4 (1.0) |
| Earle | 3.8 (2.5) | 47.5 (1.1) |
| Katz | 6.8 (0.8) | 15.2 (0.3) |
| | | |
| **Democratic Land Commissioner** | | |
| Uribe* | 94.2 (3.0) | 31.2 (1.3) |
| Burton | 5.8 (3.0) | 68.8 (1.3) |
| | | |
| **Republican Supreme Court Position 9** | | |
| Guzman | 51.5 (2.4) | 68.5 (1.0) |
| Vela | 48.5 (2.4) | 31.5 (1.0) |
| | | |
| **Republican Supreme Court Position 3** | | |
| Brown | 15.9 (1.8) | 17.9 (0.8) |
| Green | 17.9 (1.5) | 19.6 (0.6) |
| Lehrmann | 14.9 (1.7) | 18.1 (0.7) |
| Moseley | 14.1 (1.1) | 18.7 (0.5) |
| Simmons | 25.0 (1.6) | 17.1 (0.7) |
| Strange | 12.1 (1.5) | 8.7 (0.6) |

**Table 10:  2010 Primary, Ordinary Least Squares Weighted by Votes,
% of Vote, by State House Districts (n = 150)**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **Democratic Lieutenant Governor** | | |
| Chavez-Thompson* | 90.0 (1.9) | 35.5 (1.1) |
| Earle | 2.9 (2.0) | 49.9 (1.2) |
| Katz | 7.2 (0.6) | 14.6 (1.3) |
| | | |
| **Democratic Land Commissioner** | | |
| Uribe* | 94.7 (2.2) | 30.4 (1.3) |
| Burton | 5.3 (2.2) | 69.6 (1.3) |
| | | |
| **Republican Supreme Court Position 9** | | |
| Guzman | 48.7 (4.1) | 68.3 (1.0) |
| Vela | 51.3 (4.1) | 31.7 (1.0) |
| | | |
| **Republican Supreme Court Position 3** | | |
| Brown | 15.6 (3.1) | 16.9 (0.7) |
| Green | 16.9 (2.7) | 19.4 (0.7) |
| Lehrmann | 10.1 (3.3) | 19.7 (0.8) |
| Moseley | 12.5 (2.0) | 19.2 (0.5) |
| Simmons | 25.6 (2.6) | 16.7 (0.6) |
| Strange | 19.2 (2.9) | 9.2 (0.7) |

## Table 11:  2010 Primary, King's EI, % of Vote, by Districts (n = 150)

| Candidate | Latino | Non-Latino |
|---|---|---|
| **Democratic Lieutenant Governor** | | |
| Chavez-Thompson* | 88.3 (0.8) | 36.3 (0.4) |
| Earle | 5.3 (0.6) | 48.8 (0.3) |
| Katz | 7.1 (0.3) | 14.6 (0.1) |
| | | |
| **Democratic Land Commissioner** | | |
| Uribe* | 92.1 (0.8) | 31.7 (0.4) |
| Burton | 7.8 (1.0) | 68.3 (0.5) |
| | | |
| **Republican Supreme Court Position 9** | | |
| Guzman | 50.7 (2.2) | 67.9 (0.4) |
| Vela | 48.6 (2.0) | 32.3 (0.4) |
| | | |
| **Republican Supreme Court Position 3** | | |
| Brown | 15.8 (0.6) | 16.9 (0.1) |
| Green | 17.3 (1.0) | 19.3 (0.2) |
| Lehrmann | 16.2 (0.7) | 18.6 (0.1) |
| Moseley | 14.1 (0.8) | 18.9 (0.1) |
| Simmons | 25.2 (1.2) | 16.7 (0.2) |
| Strange | 14.0 (1.3) | 9.1 (0.2) |

41

**Table 12:  Congressional and State Representative General Elections in which Spanish-surnamed Republicans Ran against Democrats, 2002-10: Ordinary Least Squares, % of Voters, by Precinct**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **State Rep. 33, 2002** | | |
| Luna, D | 101.9 (1.5) | 32.4 (1.8) |
| Cuellar, R | -1.9 (1.5) | 67.6 (1.8) |
| | | |
| **State Rep. 33, 2008** | | |
| Ortiz, D | 94.8 (1.6) | 21.6 (2.1) |
| Torres, R | 3.8 (1.6) | 68.3 (2.1) |
| Garrett, L | 1.3 (0.4) | 10.1 (0.6) |
| | | |
| **State Rep. 33, 2010** | | |
| Ortiz, D | 92.0 (2.3) | 3.5 (3.1) |
| Torres, R | 8.0 (2.3) | 96.5 (3.1) |
| | | |
| **State Rep. 35, 2004** | | |
| Gonzalez-Toureilles, D | 88.8 (1.6) | 11.0 (1.3) |
| Opiela, R | 11.2 (1.6) | 89.0 (1.3) |
| | | |
| **State Rep. 35, 2006** | | |
| Gonzalez-Toureilles, D | 82.3 (1.7) | 22.4 (1.4) |
| Esparza, R | 17.2 (1.7) | 67.1 (1.4) |
| Elmer, L | 0.5 (0.6) | 10.6 (0.5) |

| State Rep. 35, 2010 | | |
|---|---|---|
| Gonzalez-Toureilles, D | 78.0 (2.3) | 19.6 (2.0) |
| Aliseda, R | 22.0 (2.3) | 80.4 (2.0) |
| | | |
| State Rep. 78, 2008 | | |
| Moody, D | 82.7 (2.5) | 26.4 (2.4) |
| Margo, R | 14.2 (2.7) | 70.2 (2.5) |
| Collins, L | 3.1 (0.4) | 3.5 (0.4) |
| | | |
| State Rep. 78, 2010 | | |
| Moody, D | 79.3 (2.7) | 23.4 (2.5) |
| Margo, R | 20.7 (2.7) | 76.6 (2.5) |
| | | |
| State Rep. 117, 2008 | | |
| Leibowitz, D | 85.7 (1.8) | 31.9 (1.9) |
| Garza, R | 14.3 (1.8) | 68.1 (1.9) |
| | | |
| State Rep. 117, 2010 | | |
| Leibowitz, D | 87.5 (2.2) | 16.8 (2.3) |
| Garza, R | 12.5 (2.2) | 83.2 (2.3) |
| | | |
| Congressional District 23, 2010 | | |
| Rodriguez, D | 82.8 (1.5) | 15.7 (1.5) |
| Canseco, R | 12.3 (1.5) | 76.0 (1.5) |
| Nietschke, L | 1.5 (0.2) | 2.1 (0.2) |
| Scharf, G | 1.0 (0.2) | 1.1 (0.2) |

| | | |
|---|---|---|
| Stephens, Indep. | 2.4 (0.3) | 5.0 (0.3) |
| | | |
| **Congressional District 27, 2010** | | |
| Ortiz, D | 84.9 (1.2) | 8.0 (1.7) |
| Farenthold, R | 13.4 (1.4) | 80.9 (2.1) |
| Mishou, L | 4.0 (0.3) | 5.4 (0.4) |

**Table 13:  Congressional and State Representative General Elections in which
Spanish-surnamed Republicans Ran against Democrats, 2002-10:
Least Squares Weighted by Votes, % of Voters, by Precinct**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **State Rep. 33, 2002** | | |
| Luna, D | 102.2 (1.4) | 31.6 (1.4) |
| Cuellar, R | -2.2 (1.4) | 68.4 (1.4) |
| | | |
| **State Rep. 33, 2008** | | |
| Ortiz, D | 94.2 (1.4) | 21.7 (1.5) |
| Torres, R | 4.6 (1.5) | 68.4 (1.6) |
| Garrett, L | 1.2 (0.5) | 10.0 (0.5) |
| | | |
| **State Rep. 33, 2010** | | |
| Ortiz, D | 90.1 (2.1) | 4.8 (2.1) |
| Torres, R | 9.9 (2.1) | 95.1 (2.1) |
| | | |
| **State Rep. 35, 2004** | | |
| Gonzalez-Toureilles, D | 91.2 (1.4) | 8.9 (1.4) |
| Opiela, R | 8.8 (1.4) | 91.1 (1.4) |
| | | |
| **State Rep. 35, 2006** | | |
| Gonzalez-Toureilles, D | 84.2 (1.5) | 20.7 (1.5) |
| Esparza, R | 15.2 (1.5) | 69.2 (1.5) |
| Elmer, L | 0.6 (0.5) | 10.1 (0.5) |
| | | |

| State Rep. 35, 2010 | | |
|---|---|---|
| Gonzalez-Toureilles, D | 80.5 (2.1) | 14.1 (2.1) |
| Aliseda, R | 19.5 (2.1) | 85.9 (2.1) |
| | | |
| State Rep. 78, 2008 | | |
| Moody, D | 81.8 (3.0) | 26.3 (2.5) |
| Margo, R | 14.7 (3.2) | 70.5 (2.7) |
| Collins, L | 3.5 (0.5) | 3.2 (0.4) |
| | | |
| State Rep. 78, 2010 | | |
| Moody, D | 79.3 (3.4) | 22.1 (2.8) |
| Margo, R | 20.7 (3.4) | 87.9 (2.8) |
| | | |
| State Rep. 117, 2008 | | |
| Leibowitz, D | 86.9 (1.8) | 30.2 (1.7) |
| Garza, R | 13.1 (1.8) | 69.8 (1.7) |
| | | |
| State Rep. 117, 2010 | | |
| Leibowitz, D | 89.1 (2.1) | 14.0 (1.8) |
| Garza, R | 10.9 (2.1) | 86.0 (1.8) |
| | | |
| Congressional District 23, 2010 | | |
| Rodriguez, D | 86.5 (1.1) | 10.8 (1.0) |
| Canseco, R | 8.5 (1.0) | 82.2 (0.9) |
| Nietschke, L | 1.6 (0.1) | 1.6 (0.0) |
| Scharf, G | 0.9 (0.0) | 1.0 (0.1) |

| | | |
|---|---|---|
| Stephens, Independent | 2.6 (0.2) | 4.4 (0.2) |
| | | |
| **Congressional District 27, 2010** | | |
| Ortiz, D | 81.9 (0.9) | 9.3 (1.0) |
| Farenthold, R | 13.2 (0.9) | 85.5 (1.0) |
| Mishou, L | 4.9 (0.3) | 5.2 (0.3) |

**Table 14:  Congressional and State Representative General Elections in which Spanish-surnamed Republicans Ran against Democrats, 2002-10: EI, % of Voters, by District**

| Candidate | Latino | Non-Latino |
|---|---|---|
| **State Rep. 33, 2002** | | |
| Luna, D | 97.3 (0.7) | 36.4 (0.7) |
| Cuellar, R | 2.7 (0.7) | 63.5 (0.7) |
| | | |
| **State Rep. 33, 2008** | | |
| Ortiz, D | 93.2 (0.9) | 22.7 (1.0) |
| Torres, R | 6.3 (0.9) | 66.6 (0.9) |
| Garrett, L | 1.0 (0.1) | 10.2 (0.1) |
| | | |
| **State Rep. 33, 2010** | | |
| Ortiz, D | 86.3 (0.8) | 8.7 (0.8) |
| Torres, R | 15.4 (0.5) | 89.6 (0.5) |
| | | |
| **State Rep. 35, 2004** | | |
| Gonzalez-Toureilles, D | 89.1 (0.8) | 11.1 (0.8) |
| Opiela, R | 11.0 (0.8) | 88.8 (0.8) |
| | | |
| **State Rep. 35, 2006** | | |
| Gonzalez-Toureilles, D | 82.4 (1.1) | 22.6 (1.1) |
| Esparza, R | 16.9 (1.1) | 67.4 (1.1) |
| Elmer, L | 0.8 (0.3) | 9.9 (0.3) |
| | | |

| | | |
|---|---|---|
| **State Rep. 35, 2010** | | |
| Gonzalez-Toureilles, D | 76.9 (1.6) | 17.7 (1.6) |
| Aliseda, R | 23.1 (1.5) | 82.4 (1.5) |
| | | |
| **State Rep. 78, 2010** | | |
| Moody, D | 81.0 (1.4) | 27.0 (1.2) |
| Margo, R | 15.9 (1.2) | 69.5 (1.0) |
| Collins, L | 6.0 (0.2) | 1.2 (0.1) |
| | | |
| **State Rep. 78, 2010** | | |
| Moody, D | 78.2 (1.5) | 23.0 (1.2) |
| Margo, R | 21.8 (1.8) | 77.1 (1.4) |
| | | |
| **State Rep. 117, 2008** | | |
| Leibowitz, D | 86.4 (1.4) | 30.7 (0.7) |
| Garza, R | 13.8 (0.7) | 69.2 (0.6) |
| | | |
| **State Rep. 117, 2010** | | |
| Leibowitz, D | 88.7 (1.7) | 14.4 (1.4) |
| Garza, R | 11.3 (1.8) | 85.7 (1.5) |
| | | |
| **Congressional District 23, 2010** | | |
| Rodriguez, D | 83.5 (0.5) | 13.2 (0.4) |
| Canseco, R | 10.4 (0.7) | 80.7 (0.5) |
| Nietschke, L | 1.4 (0.0) | 1.9 (0.0) |

| | | |
|---|---|---|
| Scharf, G | 0.8 (0.0) | 1.0 (0.0) |
| Stephens, Independent | 1.8 (0.2) | 5.1 (0.1) |
| | | |
| **Congressional District 27, 2010** | | |
| Ortiz, D | 80.6 (0.4) | 10.7 (0.4) |
| Farenthold, R | 12.4 (0.6) | 86.4 (0.6) |
| Mishou, L | 4.6 (0.2) | 5.5 (0.2) |

29.  Tables 15 and 16 examine support for Latino candidates in statewide races in 2010, using census data on the voting-age population (not the citizen voting-age population, which was not made available to me at the precinct level) to estimate whether African-Americans and others (chiefly Asian-Americans) supported Latino candidates in the general election.  The tables also allow one to gauge Latino voter support for Latino candidates with another (though inferior) measure.[13]

30.  The most important fact from the table is that African-Americans supported Latino Democratic – but not Republican – candidates in the general election almost unanimously. Majorities of "other" ethnic groups supported Latino candidates, regardless of party, in the general election.  About two-thirds of Latinos, by this measure, also supported Democratic candidates, regardless of whether they ran against Latino Republicans or not.  In general elections in Texas today, a black-Hispanic coalition in favor of Democratic candidates is a fact of life.

---

[13]The voting-age population (VAP)is two steps removed from voting registration.  For populations with significant immigrant percentages, chiefly Latinos and Asian-Americans in the U.S. today, the citizen VAP (CVAP)of the group is generally a smaller percentage of the whole than its percentage of the VAP is.  And registration rates as a percentage of CVAP are generally lower for immigrant than for native-born groups.

**Table 15:  General Election, 2010, Ordinary Least Squares, % of Vote, by Precincts (n = 8400)**

| Candidate | Anglo | Black | Hispanic | Other |
|---|---|---|---|---|
| **Lieutenant Governor** | | | | |
| Dewhurst, R | 89.5 | -2.1 | 28.0 | 40.3 |
| Chavez-Thompson,D | 6.9 | 100.7 | 67.1 | 54.7 |
| Jameson, L | 3.1 | 0.5 | 1.8 | 3.2 |
| Gonzales, G | 0.4 | -0.1 | 2.5 | 0.9 |
| **Land Commissioner** | | | | |
| Patterson, R | 89.8 | -1.9 | 26.8 | 42.0 |
| Uribe D | 6.4 | 100.3 | 70.2 | 53.6 |
| Holdar L | 3.8 | 0.6 | 2.5 | 3.6 |
| **Supreme Court, Position 9** | | | | |
| Guzman, R | 83.0 | -3.6 | 32.1 | 56.2 |
| Bailey, D | 11.2 | 102.7 | 63.6 | 43.2 |
| Armstrong L | 5.8 | 0.0 | 3.7 | -0.2 |

**Table 16:  General Election, 2010, Least Squares, Weighted by % of Vote, by Precincts (n = 8400)**

| Candidate | Anglo | Black | Hispanic | Other |
|---|---|---|---|---|
| **Lieutenant Governor** | | | | |
| Dewhurst, R | 88.1 | -1.4 | 28.8 | 48.8 |
| Chavez-Thompson,D | 8.3 | 100.4 | 66.1 | 47.4 |
| Jameson, L | 3.1 | 0.3 | 2.0 | 2.5 |
| Gonzales, G | 0.5 | -0.2 | 2.5 | 0.6 |
| **Land Commissioner** | | | | |
| Patterson, R | 88.5 | -1.5 | 27.4 | 50.4 |
| Uribe D | 7.7 | 100.1 | 69.3 | 46.4 |
| Holdar L | 3.7 | 0.4 | 2.7 | 2.5 |
| **Supreme Court, Position 9** | | | | |
| Guzman, R | 83.5 | -3.4 | 32.8 | 60.8 |
| Bailey, D | 11.2 | 102.6 | 62.7 | 38.9 |
| Armstrong L | 5.2 | -0.1 | 4.0 | -0.5 |

# VI.  Violations of the "One-Person, One-Vote" Principle

## A.  The *Larios v. Cox* Standard

31.  In its announcement of the one-person, one-vote principle in *Reynolds v. Sims*, 377 U.S. 533, at 579 (1964), the U.S. Supreme Court declared that the "overriding objective" of districting "must be substantial equality of population among the various districts" and that deviations from the equal population principle are permissible only if "incident to the effectuation of a rational state policy."  As the case law developed, courts allowed some leeway from absolute population equality, particularly in state legislative districts, and the Georgia legislature in 2001 believed that deviations of plus or minus 5 percent in State House and Senate districts could not be successfully questioned in court.  A three-judge court in *Larios v. Cox*, 300 F.Supp. 2d 1320 (2004), however, rejected the idea that any deviations under 5 percent fell within a "safe harbor," sheltering the plan from legal attack.  If districts that were under-populated often shared partisan or regional traits, and if facts about the process of redistricting suggested that systematic biases underlay the pattern of under- and over-population of districts, then the harbor was no longer safe, the district court concluded, and *Reynolds* had been violated.  The Supreme Court denied Georgia's appeal, without a majority opinion, and with an instructive dissent by Justice Scalia that suggested that even he would have affirmed if the lower court had found a systematic bias against minority voters.[14]

---

[14]Justice Scalia noted pointedly that "Appellees do not contend that the population deviations -- all less than 5% from the mean -- were based on race or some other suspect classification." (*Cox v. Larios*, 542 U.S. 947, at 951 (2004))

(*Cox v. Larios*, 542 U.S. 947 (2004).)

32.  The Larios decision and the necessity to justify population deviations of any magnitude, not just those over five percent above or below the target population, were widely noted in guides to redistricting in preparation for the 2011 redistricting.  For example, *The Realist's Guide to Redistricting*[15] states that

> The 10 percent rule is not, however, a safe harbor.  Rather, it is a threshold that allocates the burden of proof for one-person, one-vote claims.  State legislative plans with total population deviations below 10 percent still may be struck down if the population deviation resulted from some unconstitutional, irrational, or arbitrary state policy, such as intentionally discriminating against certain groups of voters, certain cities, or certain regions of the state.[16]

An article published by the Pew Center for the States just as discussions of the 2011 redistricting were shifting into high gear cites Republican redistricting lawyer E. Mark Braden, who litigated both the *Larios* case and a parallel New York case that ruled on population deviations in state senate districts[17] as advising that "the case that he thinks states should pay attention to [in] this

---

[15]J. Gerald Hebert, Paul M. Smith, Martina E. Vandenberg, and Michael B. DeSanctis, *The Realist's Guide to Redistricting, Avoiding the Legal Pitfalls, Second Edition* (Chicago: American Bar Assn. Publishing, 2010).

[16]Id, at 13, footnotes suppressed.

[17]*Rodriguez v. Pataki*, 308 F.Supp. 2d 346 (S.D.N.Y. 2004).

55

cycle" is *Larios*.[18]  State legislators were on notice that in the 2011 round of redistricting, they had

to justify any deviations from population equality.

33.  These considerations were brought home in Texas in a Texas Legislative Council (TLC)

report prepared for the legislature in February, 2011 and available on the TLC's redistricting

website.[19]  Although the report noted that the U.S. Supreme Court had established a general "ten

percent population deviation" rule for state legislative redistricting in *White v. Regester* and

*Gaffney v. Cummings*, it cautioned that *Larios v. Cox* and other federal court decisions had made

clear that a range of deviation of ten percent or less was not a "safe harbor."  As the report

summarized the state of the law on the eve of the Texas legislature's consideration of redistricting

in 2011:

> The 10 percent rule established in the supreme court's legislative equal population cases
>
> does not guarantee that the population deviations within a plan with a total range of
>
> population deviation under 10 percent will not be subject to a legal challenge on a basis
>
> other than one person, one vote. Even if a legislative plan has an overall range of
>
> population deviation of less than 10 percent, a pattern of population deviation within that
>
> range to further invidious intentional discrimination or that inadvertently results in the
>
> systematic underrepresentation of a racial or ethnic group may be held invalid on other

---

[18]Josh Goodman, "'One person, one vote' still an unsettled question for states," *Stateline*, Feb. 11, 2011 <http://www.stateline.org/live/printable/story?contentId=549681>.

[19]Texas Legislative Council, "State and Federal Law Governing Redistricting in Texas" (Preliminary Draft, Feb., 2011), available at <http://www.tlc.state.tx.us/pubspol/redlaw01/redlaw01.pdf>.

grounds. . . .

After *Larios*, total deviations under 10 percent in plans for legislative districts will be the subject of substantial scrutiny. . . .To minimize the chance of a successful challenge under the somewhat amorphous *Larios* standard, mapmakers may want to consider, in a legislative redistricting plan with an overall deviation of less than 10 percent, avoiding deviations that consistently advantage or disadvantage a particular political, racial, or ethnic group or region of the state.[20]

34.  Since the *Larios* district court's review of the evidence for illegal population deviations is the most extensive of any court's to this time, it is worth a brief summary.  The court first examined the process by which the plans were adopted.  The redistricting committees were overwhelmingly Democratic, and the plans were developed in Democratic-only subcommittees; Republican plans and amendments were rejected; and the stated principles of the committees revealed no aim to minimize population deviations.  Second, the court noted that more Democratic than Republican incumbents were paired – i.e., their homes were placed in new districts containing the homes of other incumbents.  Third, the court declared  – without giving any exact counts – that "The most

---

[20]Id., at 15-17.  It is noteworthy that the March, 2011 draft of this report shortened the discussion of population deviations in state legislative districts from three pages to one paragraph.  The first paragraph above was repeated, but the specific discussions of cases were eliminated.  The section of the report (Chapter 2, Section D) did end with the following sentence: "However, the legislature must be wary of assuming that a plan deviation of less than 10 percent is safe from attack if the population deviation appears to consistently reduce the voting strength of an identifiable group, particularly on the basis of race, ethnicity, or party affiliation." (Unpaginated) In any event, the legislature had both versions available to it, and both made clear that any deviations that had effects that discriminated against racial, ethnic, or partisan groups should not be assumed to be legal, even if they fell within the ten percent limits. <http://www.tlc.state.tx.us/pubspol/redlaw01/Archive%20March%202001/redlaw01.pdf>

underpopulated districts are primarily Democratic-leaning, and the most overpopulated districts are primarily Republican-leaning."   Fourth, the court observed that plans with lower deviations had been proposed, so that the legislature must have chosen higher deviations for some reason. Fifth, the court counted the number of counties split under the redistricting plans adopted.  Sixth, the court recounted the extensive testimony (note that the opinion came three years after the adoption of the plans) about the intention of the legislature to under-populate districts in South Georgia (then a Democratic stronghold) and the inner-cities of the urban areas (still Democratic strongholds).  Seventh, the court noted that some of the most over-populated districts were "oddly shaped."  Although the opinion did not display any indices of compactness or otherwise systematically compare the shapes of too-large or too-small districts, it did list 10 of the 236 districts in the state that it believed were "oddly shaped."  Eighth, the court pointed to one over-populated district that bordered on several under-populated districts.

35. The *Larios* district court then turned to four possible rational state policies that might have justified the deviations, and it rejected each: incumbent protection (because it was inconsistently followed), compactness (because the plan was less compact than its predecessor), keeping counties whole (because the plan did not), and keeping the cores of present districts (because the legislature did that more for Democratic than for Republican districts).

36.  In my consideration of population deviations in H.B. 150, I will examine the same or similar factors as the judges did in *Larios*, and I will attempt to pattern my analysis upon that in the *Larios* opinion.

## B.  Other State and Federal Laws Governing Redistricting

### 1.  Population Equality and the Voting Rights Act

37.   Although the House and Senate Redistricting Committees apparently did not adopt explicit goals for the redrawing of the districts, members were advised by the TLC of the applicable state and federal legal frameworks.  In its July, 2010 "Guide to 2011 Redistricting"[21] the TLC announced that

> Two primary requirements govern all redistricting decisions in the state. First, districts of a given type (senate, house, congressional, SBOE) must have equal or nearly equal populations, and second, districts must be drawn in a manner that neither has the purpose nor will have the effect of denying or abridging the right to vote on the basis of race, color, or language group. . . . Exceptions to the 10 percent deviation limitation have been allowed if based on consistent application of rational state policy such as the preservation of whole counties. In some cases, plans with districts within the 10 percent limitation have been held invalid if the population deviations show a pattern of discrimination.[22]

Note that the TLC ranked population equality and compliance with the Section 2 of the Voting Rights Act (from which the "effect of denying or abridging" language is drawn) ahead of all other requirements.

---

[21]Austin, TX: Texas Legislative Council.

[22]Id., at 5.

## 2. The "County Line Rule" and Compactness

38.  Ranked lower was the requirement of Section 26, Article III, of the Texas State Constitution, which the TLC summarized as follows:

(1) a county with suffi cient population for exactly one district must be formed into a single district;

(2) a county with a population smaller than the population needed for a whole district must be kept whole and combined with one or more contiguous counties to form a district;

(3) a county that has sufficient population for two or more whole districts must be divided into that number of districts, with no district extending into another county; and

(4) each county with a population suffi cient for one or more whole districts plus a fraction of another district must be divided into that many whole districts, with the excess population added to one or more contiguous counties to form an additional district.

In practice, it is sometimes impossible to draw a statewide plan that completely satisfies these rules while maintaining districts with equal populations. *The Texas courts have allowed a house plan to violate these rules to the extent necessary to draw a plan that complies with the one-person, one-vote requirement*.[23]

39.  The TLC publication on state and federal law governing redistricting noted that **"The Texas Constitution does not require house districts to be compact. . . . Federal law does not require**

---

[23]Id., at 6.  My italics.  There is a more detailed discussion in Texas Legislative Council, "State and Federal Law Governing Redistricting in Texas," <http://www.tlc.state.tx.us/pubspol/redlaw01/Archive%20March%202001/redlaw01.pdf>, at Chapter 7, Section V (unpaginated).

compact districts, but failure to draw reasonably compact districts may be viewed as evidence that the districts have been illegally gerrymandered.**"[24]**

40.  Did the legislature in redistricting the Texas State House follow federal and state law, as summarized in the TLC's redistricting guidelines and in the more detailed discussion of *Larios* above?[25]

## C.  The Fact of Population Disparities in H.B. 150 and Objective Indicators of Bias

41.  Figure 5b is a histogram of the population deviations for the 150 State House districts under H.B. 150.  If the legislature had been trying to minimize deviations, the histogram would have resembled a normal curve, with the largest number of districts clustered around zero deviations.  Instead, it is more U-shaped, with the largest number of districts between 4 and 5 percent under-populated and between 4 and 5 percent over-populated.  Compared to the previous plan, shown

---

[24]"State and Federal Law Governing Redistricting in Texas," <http://www.tlc.state.tx.us/pubspol/redlaw01/Archive%20March%202001/redlaw01.pdf>, at Chapter 7, Section V (unpaginated). Footnote omitted.

[25]When Rep. Burt Solomons, the chair of the House Redistricting Committee, presented the committee's bill on the House floor, he began by proclaiming the population equality and county line criteria as aims of the committee, but he did not mention compliance with the Voting Rights Act or the fifteenth amendment, and he made no direct or indirect reference to non-discrimination considerations drawn from *Larios*. "In order to meet the equal representation requirements under the U.S. Constitution, we need to apportion a 23 percent growth in the states among 150 districts. We also need to comply with the county line rule under Article III, Section 26 of the Texas Constitution, which forbids us from breaking county lines." *House Journal*, April 27, 2011, at S99.

here in Figure 5a with the original 2000 population census numbers, H.B. 150 is more skewed.  In the previous plan, 37 of the 150 districts had deviations greater than 4 percent; in H.B. 150, 45 districts do.

**Figure 5: Population Disparities in the 2000 Plan Compared with H.B. 150**

**A. 2000 Plan Deviations**



**B.  H.B. 150 (Proposed 2011 Plan)**



42.  If we separate out the House districts in which a majority of the population was Anglo (non-Hispanic white) and those districts where a majority of the population was Latino (leaving out districts with black population majorities or those where no group had a majority), we find a pattern that suggests bias against Latinos.  Figure 6a charts population disparities in Anglo districts.  Of the 80 Anglo-majority districts, 34 are over-populated and 46 are under-populated.  By contrast, of the 37 Latino-majority districts in Figure 6b, 22 are over-populated, and just 15 are under-populated.  And of the 15 under-populated Latino districts, 5 are in El Paso County, where the "county line rule" requires that 5 and only 5 districts be drawn, a rule which, applied to the population total in El Paso in the 2010 census, guarantees that the districts must be under-populated.  If these 5 districts were excluded, then more than twice as many Latino-majority districts would be over-populated as under-populated.

**Figure 6: Population Deviations in Majority Anglo
and Majority Latino Districts in H.B. 150
A.  Majority Anglo Districts**



**B.  Majority Latino Districts**



43.  Figure 7 demonstrates the partisan, as well as ethnic bias in the process perhaps even more clearly, because it shows that the different patterns of over- and under-population in the proposed districts cannot be explained by any interaction of population patterns with the "county line rule." This figure compares over- and under-population in the proposed House districts corresponding to those now represented by Republicans, all Democrats, and just Latino Democrats in the seven most urban counties in the state - Bexar, Dallas, El Paso, Harris, Hidalgo, Tarrant, and Travis. Compared to districts in rural and suburban/exurban counties, districts in urban counties were generally overpopulated.[26]  Even districts currently represented by Republicans tend to have slightly more than the statewide average House district population under H.B. 150: 19 are overpopulated and 15 are underpopulated, with an average deviation of 0.47.  But districts now represented by Democrats are more overpopulated under H.B. 150: 22 to 17, with an average deviation of 0.94.  And Latino Democratic districts are even more overpopulated: 13 to 6, with an average deviation of 1.17.[27]  The legislature did this self-consciously, for during debate on the second reading of the bill, Rep. Armando Walle asked Redistricting Committee Chair Burt Solomons: "Why do we choose to over populate nearly every minority majority district in Harris

---

[26]Overpopulating urban counties may well be evidence of discrimination in itself. According to the 2010 census, 50.0% of Texas's whole population resides in these seven counties, but 64.0% of its African-Americans and 61.0% of its Hispanics do.  If the county line rule, as instituted by the legislature, results in fewer urban members of the House than rural and urban members, proportionate to the population in those areas, then it disadvantages African-Americans and Latinos, unless the plan balances the anti-urban bias by giving them proportionately more seats within those counties.  But as the statistics in the text shows, the legislature gave minorities *fewer* seats than it gave others within the urban counties.

[27]If El Paso, three of whose five representatives are Latino Democrats, is eliminated, the ratio of overpopulated to underpopulated districts currently represented by Latino Democrats becomes 13 to 3, with an average deviation of 2.27.

County?"[28]  If the legislature had been aiming at population equality across districts, it could surely have shifted some blocks, apartment complexes,[29] or parts of housing tracts within urban counties to attain it more precisely.  Instead, the clear pattern of more overpopulated districts in areas currently represented by Democrats and especially, by Latino Democrats in the seven urban counties indicates that the legislature acted with a partisan and especially racially discriminatory intent.

---

[28]*House Journal*, April 27, 2011, at S235.

[29]As Rep. Scott Hochberg pointed out, H283 did split a single apartment complex between his and another district, but not for the purpose of equalizing populations.  Id., at S255.

**Figure 7: Population Deviations in Urban Districts Must Reflect Partisan and Ethnic Bias**

### A.  Republican Districts in Urban Counties



### B.  Democratic Districts in Urban Counties



### C.  Latino Democratic Districts in Urban Counties



# VII.  Larios, The Voting Rights Act, and H.B. 150

## A.  Evidence of Bias in the Legislative Process

44.  The legislative process that produced the Texas districts was similar to that in Georgia in 2001, with the political parties reversed.  The House committee on redistricting consisted of 12 Republicans (11 Anglo, 1 Latino) and 5 Democrats (1 Anglo, 3 Latino, 1 African-American).  The committee plan for the House was constructed almost entirely by the Republican majority, and all amendments by Democratic members aimed at increasing minority representation were rejected both in committee and on the House floor.[30]  The simplest, most objective way to demonstrate the lack of influence of minority Democrats on the final plan is to compare the percentages of Hispanic citizens over 18, usually referred to as "HCVAP" (Hispanic Citizen Voting Age Population) in each district in the initial Republican committee plan and the final plan..  Table 17 looks at the 8 districts in the state in which the HCVAP changed by more than one percent between the initial committee plan, H113, and the plan that finally passed the House, H283.  Two districts, 40 and 41, essentially swapped population, one becoming more Latino and one, less, but both were overwhelmingly Latino before and after.[31]  In five districts, there were small changes of little political significance.  In only one district, district 148, was there a significant increase in the HCVAP percentage, one that moved it from a minority (42.4%) to a bare majority (51.4%).  But that district was overwhelmingly Democratic:  In the 2010 gubernatorial election, a very good

---

[30]Rep. Burt Solomons acknowledged during second reading debate that neither he nor his staff met with the Black Caucus or any other groups that represented African-Americans in drawing up the Committee's plan, though he boasted of meeting generally with many House members and groups.  *House Journal*, April 27, 2011, at S114.

[31]The swap was more complicated than is presented here.  See below, paragraph 58.

Republican year, incumbent Gov. Rick Perry received only 34.5% of the votes under the lines then in effect (H100), and 34.8% of the votes within the bounds of the district under plan H283. In fact, the major Democratic candidate in every general election from 2002 through 2010 carried district 148, and this Houston district has been represented by a Latino Democrat, Jessica Farrar, now the leader of the Democratic Caucus, since 1994.[32]  So the only change that might be thought to have increased Latino representation between the initial committee plan as introduced and the plan passed by the legislature merely further packed a district in which Latino voters had been able to elect their candidates of choice for at least a generation.[33]

---

[32]<http://jessicafarrar.org/Biography.aspx>.

[33]Rep. Farrar vigorously pointed this out to Rep. Solomons in a colloquy on the House floor, challenging his contention that the change in her district represented an increase in the number of "performing" Hispanic districts: "But I'm glad you brought up my district because I'm below 50 percent and yet it elects—not just at the state legislature but in local elections, the coalition there has elected Hispanic representatives. So are you aware that the DOJ guideline says, quote, "there is no specific demographic percentage that determines effectiveness. You have to do a functional analysis of the individual district including turnout and election results," end quote. Are you aware of that DOJ guideline?"  *House Journal*, April 27, 2011, at S112.

**Table 17: The Minimal Impact of Minority Democrats**
**on the Final House Plan:**
**House Districts in which the Hispanic Voting Age Population**
**Changed by more than One Percent**
**from the Initial Committee Plan (H113) to the Plan Finally Adopted (H283)**

| District Number | % HCVAP, H113 | % HCVAP, H283 |
|:---:|:---:|:---:|
| 34 | 67.3 | 64.6 |
| 40 | 72 | 89.0 |
| 41 | 89.3 | 72.1 |
| 74 | 67.7 | 69.4 |
| 140 | 57.7 | 58.5 |
| 143 | 58.5 | 57 |
| 145 | 64.5 | 56.2 |
| 148 | 42.4 | 51.4 |

## B.  What Sorts of Districts Give Minorities an "Equal Opportunity to Elect" in Texas Today?

45.  To assess the plans offered during the course of the legislature's consideration of redistricting, we must first review and establish some facts about voting in Texas today.  First, the reader should recall the patterns of polarized voting: Latinos vote overwhelmingly for Latino Democratic candidates in both primary and general elections, but against Latino Republicans.  Anglos vote overwhelmingly against Latino Democratic candidates in both primary and general elections. African-Americans vote almost unanimously for Latino Democratic candidates in general elections, but not in Democratic primaries, at least in the statewide contests in 2010. Asian-Americans support Latino and other Democratic candidates in general elections, but they split their votes in statewide Democratic primaries involving Latinos. As a consequence of these facts, it makes sense to combine African-American and Latino voters in districts in order to assess districting plans.  In general elections, as Tables 15 and 16 above show, they reliably coalesce. African-Americans and Latinos also support Anglo Democratic nominees in general elections when Anglos win primaries, both in statewide elections and in predominately-minority state House contests.

46.  Table 18 displays the ethnic and partisan characteristics of successful candidates for the State House of Representatives in two very different election years, 2008, a presidential election year with high turnout and a good showing for Democrats, and 2010, a landslide for Republicans.  In 2008, Democrats won 74 of 150 seats in the House, while in 2010, they won only 51.  After 2008, MALC had 44 members; after 2010, only 39.  Since turnout and to a lesser extent, voters'

allegiance may shift over a decade, it is important to assess the consequences of redistricting plans by considering elections that took place in different political climates.  2008 and 2010 in Texas qualify.

47.  Table 18 considers four different definitions of "majority-minority" districts: those in which a majority of the voting-age population (VAP) was Hispanic, referred to as HVAP in the table; those in which a majority of the citizen voting-age population (CVAP) was Hispanic, referred to as HCVAP in the table; those in which a combination of the African-American VAP (BVAP) and the HVAP formed majority of the population, referred to as BHVAP; and those in which a combination of the BVAP and HCVAP formed a majority of the population.  Because not all Latinos of voting age are citizens, HVAP is somewhat larger than HCVAP in each district, and BHVAP is somewhat larger than BHCVAP.

## Table 18: Outcomes in "Majority-Minority" State House Districts, 2008 and 2010

| District Definition | Party and Ethnicity of Legislators Elected | | | | |
|---|---|---|---|---|---|
| | Democrats | | | | Republicans* |
| | Latino | African-American | Asian-American | Anglo | |
| A. 2008 | | | | | |
| HVAP>50%[34] | 30 | 0 | 0 | 5 | 1 |
| HCVAP>50%[35] | 27 | 0 | 0 | 2 | 0 |
| BHVAP>50%[36] | 31 | 14 | 1 | 8 | 3 |
| BHCVAP>50%[37] | 31 | 13 | 0 | 4 | 0 |
| | | | | | |
| B. 2010 | | | | | |
| HVAP>50% | 26 | 0 | 0 | 4 | 6 |
| HCVAP>50% | 23 | 0 | 0 | 2 | 5 |
| BHVAP>50% | 26 | 15 | 1 | 4 | 11 |
| BHCVAP>50% | 26 | 14 | 0 | 3 | 5 |

* Republicans of various ethnicities, but overwhelmingly Anglo

---

[34]Hispanic Voting-Age Population

[35]Hispanic Citizen Voting-Age Population

[36]Black Voting-Age Population plus Hispanic Voting-Age Population

[37]Black Voting-Age Population plus Hispanic Citizen Voting-Age Population

48.  Nonetheless, the striking feature of part A of the table is how successful black and Latino voters were in electing their candidates of choice across all four definitions of "majority-minority" in 2008.  In districts with an HCVAP majority, Latino Democrats won 93% of the elections, and Republicans carried not a single district.  But if one also includes the six other districts with HVAP majorities, Latino Democrats still won 83%, and Republicans took but one (and that in a bare-majority HVAP district).  Likewise, Democratic candidates won every contest with BHCVAP percentages of greater than 50%, but also 95% of the races in which the BHVAP was higher than half of the population.  It is therefore obligatory to assess redistricting plans not only by the number of HCVAP districts they include, but also by the number of BHCVAP and BHVAP districts.

49.  Part B of Table 18 witnesses a downshift, as it were, in the success of minority voters in each of the four kinds of districts in 2010.  Even in the HCVAP-majority districts, the general election choices of Latinos and African-Americans lost five seats to the Republicans, and in the BHVAP-majority districts, they lost 11, compared to only 3 two years earlier.  Still, in this landslide election, Republicans won fewer than 20% of the seats in the districts with the most expansive definition of "majority-minority," BHVAP.  A BHVAP majority offers protected minorities not just an equal opportunity to elect candidates of choice, but four chances out of five in even the most adverse political circumstances.  At these odds, retrogression from a benchmark number of BHVAP-majority seats would raise Section 5 issues, and the failure to draw BHVAP-majority seats when it is demonstrated that they could be drawn would invite a challenge under Section 2.

50.  This "functional analysis of the electoral behavior" within Texas is patterned on the Section 5

76

guidelines of the United States Department of Justice.  According to those guidelines,

> A proposed plan is retrogressive under Section 5 if its net effect would be to reduce minority voters' ''effective exercise of the electoral franchise'' when compared to the benchmark plan. *Beer* v. *United States* at 141. In 2006, Congress clarified that this means the jurisdiction must establish that its proposed redistricting plan will not have the effect of ''diminishing the ability of any citizens of the United States'' because of race, color, or membership in a language minority group defined in the Act, ''to elect their preferred candidate of choice.'' 42 U.S.C. 1973c(b) & (d). In analyzing redistricting plans, the Department will follow the congressional directive of ensuring that the ability of such citizens to elect their preferred candidates of choice is protected. That ability to elect either exists or it does not in any particular circumstance.

> In determining whether the ability to elect exists in the benchmark plan and whether it continues in the proposed plan, the Attorney General does not rely on any predetermined or fixed demographic percentages at any point in the assessment. Rather, in the Department's view, this determination requires a functional analysis of the electoral behavior within the particular jurisdiction or election district.[38]

---

[38]Department of Justice, "Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act," *Federal Register* / Vol. 76, No. 27 / Wednesday, February 9, 2011 / Notices, at 7471.

## C.  H283 Has Fewer Minority Opportunity Districts and Larger Deviations, and Is Less Compact Than Alternative Plans

51.  Because there was considerable similarity among many of the whole-state plans that were introduced in the House Redistricting Committee or offered as amendments during the second or third readings of the state house plan or those developed as alternatives and proffered in this litigation, it is possible to compare plans offered by Latino and African-American members of the House with the committee-majority plan for the House in two fairly simple tables.  Significant ethnic statistics for ten plans are listed in Table 19.  Each was either offered in the House redistricting committee, on the House floor, or in the course of the consideration of redistricting, as well as in the current litigation.

**Table 19: Comparison of "Majority-Minority" Districts in State House Plans**

| Plan Id | Plan # | Roll Call Vote[39] | HCVAP[40] > 50% | HVAP >50% | BHCVAP > 50% | BHVAP > 50% |
|---|---|---|---|---|---|---|
| Current | H100 | - | 30 | 36 | 48 | 57 |
| | H111 | - | 33 | 41 | 51 | 60 |
| Committee | H113 | - | 29 | 34 | 47 | 53 |
| Alonzo sub | H115 | 4-12-0 | 35 | 38 | 51 | 57 |
| Veasey sub | H130 | 4-12-0 | 29 | 35 | 47 | 56 |
| Committee final | H153 | 11-5-0 | 30 | 34 | 47 | 53 |
| MALC sub | H195, amended by H269 | 46-96-5 | 34 | 42 | 53 | 62 |
| MALC whole county plan | H201 | - | 31 | 37 | 50 | 59 |
| | H205 | - | 34 | 42 | 53 | 62 |
| Final passage | H283 | 92-55-3 | 30 | 34 | 47 | 54 |

---

[39]Smaller numbers in House committee; larger numbers on House floor

[40]Definitions of "majority-minority" districts given in Table 18.

52.  The table demonstrates how much more opportunity <u>every other plan</u>, including the plan in effect from 2002 through 2010 (referred to here as the "current" plan, H100) offered to minorities to elect their candidates of choice than do the plans introduced by the committee, reported to the House, and enacted.[41]  H283, the enacted plan, contains only 47 BHCVAP-majority districts, while H195 and H205, the chief MALC substitutes, contain 53.  H283 includes only 54 BHVAP-majority districts, compared to 62 for H195 and H205.  In this and other respects, H283 represents a retrogression from the benchmark or status quo plan, which had 57 BHVAP-majority seats – and this despite the fact that 65% of Texas's population growth from 2000 to 2010 was Hispanic and 89% was non-Anglo.[42]  As Jessica Farrar put it during the debate on the second reading of H283 in the House, "In other words, the minority population that drove the growth in the state was not used [by the Redistricting Committee] in a way that actually promoted minority representation. In fact, it's gone the other way, . . ."[43] By any definition, H283 does not provide Latinos and African-Americans "an equal opportunity . . . to elect" candidates of their choice.

53.  What rational bases or compelling state interests might the legislature offer for choosing a redistricting plan with population deviations that discriminate against Latinos and district configurations that contain markedly less opportunity for Latinos and African-Americans to elect

---

[41]House Redistricting Committee Chair Burt Solomons implicitly recognized this during the second reading debate in the House: "You know, we didn't create five or six or seven or eight or 10 [new majority-minority districts], but we did try to beef that up and meet what we thought we needed to do under the Voting Rights Act."  *House Journal*, April 27, 2011, at S112.

[42]Michael E. Young, "Hispanic surge, metro area growth could reshape Texas' political future," *Dallas Morning News*, Jan. 29, 2011, <http://www.dallasnews.com/news/state/headlines/20110129-hispanic-surge-metro-area-growth-could-reshape-texas-political-future.ece>.  *House Journal*, April 27, 2011, at S247.

[43]*House Journal*, April 27, 2011, at S113.

candidates of their choice?  Table 20 attempts to assess quantitative indices that might answer

those questions.  It could be that other plans had larger total (largest - smallest) or average (mean)

population deviations than H283.  It is possible that other plans might have more districts whose

boundaries cross county lines, though as the TLC guidelines pointed out, the "county line rule" is

a less important legal constraint to observe than population equality or adherence to the VRA and

non-discrimination criteria, and during the debate on the third reading of the bill in the House,

Rep. Yvonne Davis pointed out that the Supreme Court decision of *Bartlett v. Strickland* – a

decision of which Chairman Solomons professed to be unaware, allowed splitting counties to

create majority-minority districts.[44]  Perhaps the other plans were less compact, though

compactness is not a state-mandated criterion in Texas.  Or perhaps the other plans split fewer

precincts (voter tabulation districts or vtd's in the table), minimizing voter confusion and

administrative inconvenience as people used to voting at a local school, fire house, or other

community facility might suddenly discover on election day that they had a different polling place

than their usual one.[45]  Table 20 makes clear than none of these potential explanations justifies the

legislature in choosing H283.

---

[44]Id., April 28, 2011, at S260.  Solomons said ". . . we didn't know that
case law . . ."

[45]Chairman Burt Solomons, at least, thought the number of split vtd's important.
Appealing to his colleagues to oppose an amendment to the Redistricting Committee's map,
Chairman Burt Solomons objected because it "increases the split of precincts and increases the
number of split VTDs. ."*House Journal*, April 27, 2011, at S134.

**Table 20: Comparison of Deviations, County Breaks, and Compactness Scores in State House Plans**

| Plan Id | Plan # | Total Dev.[46] % | Average Dev.[47] % | county breaks[48] | area rubber band[49] | area to peri-meter[50] | split vtds |
|---------|--------|------------------|--------------------|-----------------|----------------------|----------------------|------------|
| Current | H100 | 9.74[51] | 2.67 | 16 | .7176 | .2762 | n.a.[52] |
| | H111 | 9.50 | 1.85 | | .7097 | .2588 | 166 |
| Committee | H113 | 9.99 | 2.68 | | .7081 | .2628 | 345 |
| Alonzo sub | H115 | 9.98 | 3.32 | | .7041 | .2593 | 234 |
| Veasey sub | H130 | 9.93 | 2.82 | 16 | .7268 | .2836 | 101 |

[46](District with largest population - district with smallest population)/average district pop

[47]Sum of deviations from average distict population/150

[48]Number of districts that cross county lines

[49]A compactness measure defined by the TLC as follows: "Area Dispersion: This measure examines the relative degree to which a district's area is compact when compared with the area of a similar compact figure. It is the ratio of the area of the district to the area of the smallest convex polygon that can enclose the district (imagine a rubber band stretched around the district). A district in the shape of a square would receive a perfect score of one using this measure. This measure penalizes a district that has long "fingers" or extensions, making it less compact because it requires a larger convex polygon to enclose the entire district, yet much of that polygon is empty." The higher the score, the more compact the district. <http://www.tlc.state.tx.us/redist/glossary.html>

[50]A compactness measure defined by the TLC as follows: "Perimeter: This measure compares the relative length of the perimeter of a district to its area. It is the ratio of the area of the district to the area of a circle with the same perimeter as the district. A perimeter-to-area measure penalizes a district's compactness score whenever the boundaries are uneven or irregular: the more the boundary zigzags (for example, a river), the less compact the district using this measure." The higher the score, the more compact the district.  Id.

[51]Based on 2000 population; all others based on 2010 population

[52]Precinct lines were presumably redrawn over the decade.  I have not been able to locate the number of precincts originally split by the 2001 plan.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Committee final | H153 | 9.90 | 2.68 | 16 | .7056 | .2599 | 400 |
| MALC sub | H195, amended by H269 | 9.69 | 2.69 | 89 | .7091 | .2569 | 284 |
| MALC whole county plan | H201 | 9.70 | 2.22 | 16 | .7068 | .2606 | 343 |
| | H205 | 9.70 | 2.65 | | .7090 | .2546 | 269 |
| Final passage | H283 | 9.92 | 2.75 | 16 | .7052 | .2567 | 412 |

54.  The total deviation of H283 is 9.92%; the MALC plans range from 9.50 to 9.70%.  The total

deviation of the 2001 plan, based on the 2000 population used as its basis, was 9.74 percent.  The

average deviation in a district is 2.75% in H283, while the MALC plans have lower average

deviations that range from 1.85% to 2.69%.  The 2001 plan averaged a 2.67% deviation when

computed on the basis of the 2000 population.  Except for H205, which put together pieces of 89

counties, the county break statistics are a wash: all split portions of 16 counties. The TLC made

available two distinct compactness measures, which measure different aspects of a district's

density and are explained in footnotes to Table 20.  By the "area rubber band" measure, districts

in H283 are, on average, less compact than those in any of the other plans, and considerably less

compact than the 2001 plan.  By the "area to perimeter" measure, H283 is more compact than one

of the four MALC plans listed.  Clearly, H283 was not chosen because its districts looked

"prettier" on a flat, featureless map.  Nor was it picked because it split fewer existing precincts,

because in fact, as the table shows, it split considerably more than did any other plan.  Splitting so

many precincts is an indication of an intent to pursue some aim other than administrative

convenience, and as a comparison of the number of split precincts in the House and Senate plans

demonstrates, it was not necessary to split precincts to attain population equality.  The final Senate

plan, S148, split only 10 precincts; the final House plan, H283, split 412.  Moreover, the split

precincts were concentrated in heavily minority areas.  Two hundred and fifty-two, or 61% of the

precincts that were split in H283 had BHVAP populations of more than 50%, yet only 3154 of the

state's 8400 precincts, or 37.5%, had such concentrations of Latinos and African-Americans.  It

was a difficult task for those who drew the lines to confine a rapidly-growing minority population

into as few districts as possible.  The disproportionate concentration of split precincts in minority

areas make clear that the line-drawers accomplished their task with considerable precision.

55.  It is conceivable that the legislature rejected the larger numbers of minority opportunity districts in alternative plans because the majority-minority districts in the other plans had bizarre shapes, while those in H283 were neat and compact.  From another standpoint, perhaps the House Redistricting Committee anticipated that H283 could not lose a Section 2 Voting Rights Act lawsuit because other districts could not satisfy the "first *Gingles* factor" because additional "compact" minority opportunity districts could not be drawn.  Table 21 speaks to the issue, focusing only on the districts where majorities of the voting population were African-American or Latino (citizen and non-citizen).  It shows that far from being more compact, the majority-minority districts in H283 were *less* compact than eight other plans and the current plan by one measure of compactness, and that they were less compact than seven other plans and the current one by another compactness measure.  In *Shaw v. Reno*, as I have argued elsewhere,[53] a lack of compactness was used as an index of an intent to favor African-Americans over whites.  An analogous argument indicates that the Texas legislature in H283 intended to discriminate against minorities.

---

[53]Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill, NC: University of North Carolina Press, 1999), 390-91.

**Table 21:  Compactness Scores for House Plans, BHVAP Districts Only**

| Plan ID | rubber band | area to perimeter |
|---|---|---|
| H100 (current) | .680 | .231 |
| H111 | .676 | .234 |
| H113 | .666 | .216 |
| H115 | .656 | .217 |
| H130 | .697 | .251 |
| H153 | .661 | .211 |
| H195, amended by H269 | .673 | .236 |
| H 201 | .681 | .233 |
| H205 | .672 | .235 |
| H283 | .664 | .209 |

## D.  Inconsistent Application of Standards and Other Indications of Bias in H283

56.  Certain other details of H283 give further indications of discriminatory purposes.  In discussing the criteria for drawing seats, House Redistricting Committee Chair Burt Solomons not only put extraordinary weight on the county line rule,[54] but he also implicitly admitted, in a colloquy with Rep. Trey Martinez Fischer, chair of MALC, during the House debate on the second reading of the Committee bill, that the Committee employed that rule inconsistently.  In Nueces County, which is heavily Latino, the 2001 plan contained two state House districts that elected Latino Democrats in all except the Republican landslide election of 2010 (districts 32 and 33).[55]  The Committee plan packed Latinos into one of these districts, making the other a district that Latinos could no longer control.  It is worth quoting the Solomons/Martinez Fischer conversation at some length to spotlight the inconsistencies and lack of a rational, articulated policy to explain why some county lines were cut and why districts were drawn to curtail, instead of to preserve the opportunities for minorities to elect candidates of their choice:

> SOLOMONS: So why didn't we create two Hispanic majority seats in Nueces County?
> The overall population in Nueces has an SSVR [Spanish-surname voting registration] of 49 percent; as a result it is impossible to draw two Hispanic majority seats within Nueces.
> We decided to draw only one strongly Hispanic district to allow the Hispanic community in Nueces to elect a representative of their choice . . .

---

[54]*House Journal*, April 27, 2011, at S213.

[55]As Tables 12-14, above, show, the contests in State House district 33, which pitted Latino Democratic against Latino Republican candidates, were starkly racially polarized, with Latino voters overwhelmingly supporting the Democratic candidates.  District 34, which crossed county lines in the 2001 redistricting, was anchored in Nueces county.

MARTINEZ FISCHER: . . .it appears to me that district [*sic* county] had two performing minority opportunity districts, and they seemed to be working quite fine. . . . [I]f  I'm not mistaken your map makes about 17 cuts. And I guess what I'm saying is that why couldn't one of those . . .cuts could have been in the Coastal Bend that would have resulted in there being not just one minority opportunity district [in Nueces County] but two?

SOLOMONS: I don't know. My response is we didn't unnecessarily cut any county line where it didn't absolutely need to be done. Not just to do it to create new districts but because it absolutely had to be done in the context of what was being accomplished in that area.

MARTINEZ FISCHER: So when you took a district in South Texas and you took a member's district out of Webb County and put it in Hidalgo County, what was the justification for that?

SOLOMONS: I'm reminded that we only cut in one area and everything else was spill overs. Spill overs are not cuts in county lines. Spill overs are not.

MARTINEZ FISCHER: Well, I think they break a county line.

SOLOMONS: Well, they don't cut them intentionally to go—they're because of the population numbers. It's not because you're going around to do that.

MARTINEZ FISCHER: Right. So why didn't the district that currently spilled over into Webb continue to go into Webb and instead made the decision to veer into Hidalgo?

SOLOMONS: I don't know. The committee—this is the map the committee proposed based on what we were advised and how we have to abide by the law, and that's what we did. . . .

MARTINEZ FISCHER: . . .it's curious to me that we can spill over into Hidalgo County and justify it, but we can't spill over outside Nueces County and justify it by maintaining two minority opportunity districts that are currently there today.[56]

57.  In the largest urban counties, the Committee used an extremely strict interpretation of the county line rule and ingenious reconfigurations of district boundaries to counteract the decline in Anglo population and the increases in the proportions of Latinos, African-Americans, and Asians. As State Representative Armando Walle pointed out during the second reading debate, Harris County (Houston) had been cut from 25 seats in the 2001 plan to 24 in H283, even though it had the same proportion of the state's population in both 2000 and 2010.  This decline in the number of seats made it possible to prevent an increase in the number of minority opportunity districts, despite population growth in Harris County of 552,000 Latinos, 135,000 African-Americans, and 77,000 Asians, and a decrease of 82,000 Anglos.  Even though Chairman Solomons pointed out that the county's population entitled it to only 24.41 seats, he admitted that the legislature had the discretion, as the 2001 Legislative Redistricting Board had done, to round up the county's representation to 25.[57]  Of course, it could also have "spilled over" part of an adjacent county's

---

[56]*House Journal*, April 27, 2011, at S121-22.  My underlining.  Debating an amendment to create two new Latino opportunity districts in West Texas, Rep. Lon Burnam similarly charged that H283 treated the county line rule inconsistently:  ". . .we are being very hypocritical in this process because we are willing to violate the county line rule when it's convenient to undermine and contribute to retrogression of representation of Hispanics. But apparently we are not willing to consider violating the county line rule when it would enhance Hispanic representation."  Id., at S209.

[57]Id., at S124-25.

population into Harris's to make the population numbers add up.  According to Rep. Walle, reducing the number of districts in Harris County by one and packing minority members into existing minority opportunity districts enabled the Committee to collapse two existing "coalition districts" (137 and 149) in which combinations of Latinos, African-Americans, and Asian-Americans had been able to elect candidates of their choice, Scott Hochberg and Hubert Vo, resulting in a reduction in the existing opportunities of minority voters to elect candidates of choice.[58]

58.  The facts were similar in Dallas and Tarrant Counties, as State Rep. Marc Veasey, an African-American member of the Redistricting Committee, pointed out:

> . . .in Dallas County the Anglo population decreased by 198,000 people between 2000 and 2010[.] [T]hat is a negative growth rate of 20.2 percent. The Hispanic population grew by 243,000 plus, the African American population grew by 73,000 plus, and the Asian population grew by 30,000 plus. Anglos now only make up about a third of the city, about 33 percent of Dallas County. And so with these numbers in mind, why didn't you create anymore new opportunity districts in Dallas? You still allow Anglo voters to control 68 percent of the district[s].[59]

In Tarrant County, Veasey charged, there had been retrogression in the number of districts that African-Americans could win, and he proposed a plan to restore the status quo (it lost):

> . . . most of the growth in Tarrant County, and in the city of Fort Worth over the last

---

[58]Id., at S231-36.

[59] Id., at S116.

decade, has been Hispanic and African American. Under my amendment, this creates a

new minority opportunity district in District 96. It wouldn't be a shoo-in, but it would be a

new minority opportunity district. Under the current plan that we're in right now, we have

four out of ten districts that are majority black and Hispanics. Under the Solomons

plan—under the amendment that was voted out—only three of those districts are now

minority opportunity.[60]

Veasey's amendment lost.  Citing *Larios*, Rep. Roberto Alonzo charged that minority districts in

Dallas County had been deliberately overpopulated, in violation of the Voting Rights Act and the

equal protection clause, and he moved an amendment to equalize the populations of districts and

draw a new minority opportunity district by combining areas in Dallas and Tarrant Counties.  It

was defeated.[61]


59.  The House Redistricting Committee also broke with legislative convention to disadvantage

minorities.  In the multimember counties, as is evidenced in the floor debates,[62] it was usual for

the local delegations to draw or at least approve the districts from their counties by consensus.

This convention seems to have been adhered to only partially in the 2011 redistricting, as Marc

Veasey pointed out about his own county of Tarrant:

> All 10 of us signed off on our individual districts. . . .but the district that I represent
>
> and the district that Lon Burnam represents, the two districts that are the most

---

[60]Id, at S160.

[61]Id., at S220-30.

[62]E.g., id., at S174 , S177 (Fort Bend), S216 (Harris).

minority in the entire plan, when it came back to the committee those were the two that were changed. Every other district that is represented by the rest of you stayed the same. Our districts changed. . . .But if you look at the major changes that took place from after the point in which we signed off, the big change that has happened in the districts were represented by the minorities, and we didn't approve them.[63]


## E.  Maps as Evidence of Intent

60. A prime example of the interconnections between partisan politics, ethnic discrimination, and the deliberate under- and over-population of districts took place in the legislature's shifting of populations in House Districts 40 and 41 in Hidalgo County, an overwhelmingly Latino county in South Texas.  After being elected to the District 40 seat as a Democrat in 2010, Rep. Aaron Pena switched to the Republican party.  According to District 41 Rep. Veronica Gonzales, "... basically the two districts have been swapped. They have been swapped and the [D]emocratic precincts have been lopped off Representative Pen~a's district. So they tried to make it a [R]epublican district. . . .my district bec[a]me dismantled in the process. . . .I'm left with 1.5 percent of my district. . . .The VTDs which are my precincts in my old district, 14 of them were split.[64] . . .

_____

[63]Id., at S162.  The changes that Rep. Veasey referred to packed more minorities into his and Rep. Burnam's district.  Id., at S163.  It is unusual, to say the least, for a politician to object to changes that make his district safer.

[64]Note that the fourteen split precincts necessary to draw District 41 were more than in the whole State Senate plan throughout the state!  Altogether, there were 20 precincts in Hidalgo County that were split by H283.  88.3% of the population in those precincts was African-American or Latino.

Hispanics have been packed and cracked in this map. In fact, my current district has an SSVR [Spanish surname voting registration] that we've been talking about today of 69 percent. It would now have 87.4 percent packing Hispanics into the new district. Whereas Representative Pen~a would go from 88.3 percent to 63.9 percent. A dilution of Hispanic voters of 24.4 percent."[65] And this was accomplished, as Rep. Gonzales went on to say, by overpopulating one district and underpopulating the adjacent district.  In H283, the new District 41 (where Pena lives) is 4.40% under the ideal population size, while the new District 40 is 3.50% over it.  Asked what role he played in shaping his new district, Rep. Pena replied that he met with Republicans from the Rio Grande Valley and told them "there's a conservative district here, I would expect . . . [R]epublicans to maximize their seats and be protected."[66]

61.  Three pictures graphically illustrate Rep. Gonzales's words and the dry statistics.  The first is a simple map of District 41 with nothing else on the page, giving the reader a sense of its distinctive form.[67]  The second superimposes the district's boundaries on a grid of the precinct lines, showing how many had to be cut to trace the district's shape.  If ever slices in vtd's were an indication of intent, this is that case.  The darker shadings are more heavily Anglo precincts.  Part C of Figure 8 floats the district boundaries on a sea of dots, where each dot represents 20 Anglos,

---

[65] Id, April 27, 2011, at S186.  (The order of one sentence was changed for clarity.)

[66] Id., April 27, 2011, at S198.  An attempt to modify the configurations of districts in Hidalgo County failed on a largely party-line vote, 99-45.  *House Journal*, April 27, 2011, at 2307.

[67] According to Rep. Joaquin Castro, the 41st looks like "a Transformer Cartoon."  Id, April 27, 2011, at S198.

to illustrate more clearly the racial gerrymandering of the district.  Nearly all of the most heavily Anglo areas of the county were captured for the new district 41, and as pointed out above, almost as many Latinos as possible were shed.

**Figure 8: The Underpopulated, Racially Gerrymandered 41st House District, Home of the Split Precinct**

## A.  Suspect Shape



## B.  Split Precincts: A Different Kind of "Narrow Tailoring"



**Figure 8 C:  Capturing as Many Anglos as Possible**



62.  H283's overall treatment of the adjacent counties of Hidalgo and Cameron also illustrates the inconsistency with which the Committee employed the county line rule.  As Rep. Rene Oliviera pointed out during the debate on the second reading, together, Cameron and Hidalgo were due 7.05 representatives.  If they had been simply combined, instead of splitting both to add population from other counties, it is possible that a new minority opportunity district could have been drawn.[68]  Indeed, the MALC plans drew four districts in Hidalgo, two in Cameron, and one shared by both, and they created a new minority opportunity district.  An amendment on the House floor to H283 to create seven seats between the two counties was beaten.[69]  Speaking of H283 in the course of the debate, Mike Villarreal, the vice-chair of the Redistricting Committee, asserted that "I believe that another Hispanic district can be drawn with a combination of population in Cameron County, Hidalgo County, and Willacy County, and we failed to do that.  For that reason I believe this map is compromised legally."[70]

63.  Another district with an instructive shape is State House District 90 in Tarrant County.  As noted during the floor debate, District 90 was already a Latino opportunity district in the previous plan,[71] with a Latino VAP of 64.9%, a Latino CVAP of 47.9%, and an SSVR of 47.2%.  H283 raised its Latino VAP to 71%, its Latino CVAP to 49.7%, and its SSVR to a bare majority, 50.1%,

---

[68]Id, at S191-92.

[69]Id., at S217-18.

[70]Id., at S195.

[71]Id., at S120.

a change trumpeted with great fanfare as generous to Latinos by Chairman Solomons.[72]  It accomplished these increases by subtracting non-Latino population,[73] making the district the smallest in the state[74] and giving it the second lowest area-to-perimeter compactness score in the state, 0.079 (compared to a statewide average of 0.257).

64.  Figure 9 illustrates the story graphically, showing in Part A the gaping hole in the center of the district, the tangential connections between parts of the district, and the various ungainly appendages.  Part B superimposes the district lines over a map of Latino population concentration, with orange representing the most heavily Latino concentrations.  The map lassoed Latinos, wherever they were, and fenced out others.  Part C exhibits the excision from District 90 by outlining the interlocking 95th district, before and after the redistricting a "performing" African-American district with a black VAP of 45%.[75]  Overconcentrating Latinos in District 90 and African-Americans in District 95, according to the representatives from those districts, diminished the influence of minorities in surrounding districts.[76]  As District 90 Rep. Lon Burnam remarked in a debate over an amendment to restore to District 90 some of the communities he had previously represented, the majority on the Redistricting Committee only opposed his amendment

_____

[72]Id., at S100.  Raising a legally or politically highlighted percentage just over a bright line is in itself evidence of intent.  For a political motive in driving a Dallas district over 50% African-American in 1991, see my *Colorblind Injustice*, at 297.

[73]Id., at S163-64, 173.

[74]Id., at S99 (Solomons).

[75]Id., at S118.

[76]Id., at S161, S166,

because "they are trying to artificially suggest that they created a Hispanic opportunity district. That opportunity exists, has existed since the creation of the district by a federal judge in 1978, and will continue to exist."[77]

---

[77]Id., at S168.

**Figure 9:  State House District 90 in Tarrant County**
### A.:  The Basic Outline of the Hollowed-Out District



**Figure 9 B:  Latinos Carefully Drawn in, Others Excluded from District 90**



65.  Another interesting example of interlocking districts is State House Districts 104 and 105 in Dallas County, depicted separately in Figures 10a and 10b.  District 104 has an HVAP of 69.2%, while District 105's is 39.2%.  Both are overpopulated, 104 by 3.1 % and 105 by 4.8%.  Both have BHVAP majorities – 82.1 % in 104 and 50.7% in 105.  104 has a suspicious 50.1% SSVR majority, enabling the Committee to claim it as a "Hispanic District,"while 105 has an SSVR minority of 18.3%. Both had population to spare if some of their appendages had been truncated, population that could have increased minority influence in surrounding districts.

**Figure 10:  Packing Latinos into One District, Minimizing them in Another in Dallas State House District 104**



**Figure 10 B:  District 105, the Missing Sliver in District 104**



## F.  The State House Plan: A Short Summary

66.  Although other maps could be presented, they would be largely redundant.  Both quantitative and qualitative evidence casts doubt on the legality of H.B. 150 (H283) under both the *Larios v. Cox* equal protection standard and Sections 2 and 5 of the Voting Rights Act.  First, the process was controlled exclusively by Republicans, and all Democratic and minority amendments were defeated.  The Committee Chair did not meet with any representatives of African-American groups or legislators, and the Committee did not compromise with MALC or any Latino group.  The only arguably pro-minority change from the Committee's initial plan merely further packed a district that Latino voters had been able to control for a generation.  Second, the districts have wide population disparities that are strongly correlated with partisan and racial concentrations.  More minority than Anglo districts are overpopulated, both in the state as a whole and within the large urban counties.  Third, districts with lower average and total deviations were proposed, so that the legislature must have deliberately chosen districts farther from the equal population standard.  Fourth, disregarding the TLC's published legal advice that the "county line rule" had to give way to population equality under *Larios* and to the Voting Rights Act, and rejecting widespread and repeated criticisms of its elevation of the county line rule above most other concerns, the majority in the legislature refused to adopt plans that recognized the minority proportion (89%) of Texas's 20% population growth over the decade.  Fifth, the Redistricting Committee and the House employed the county line rule inconsistently – for example, to condemn the Texas Legislative Black Caucus plan,[78] but not to prevent Hidalgo County territory from being added to a Webb

---

[78]*House Journal*, April 27, 2011, at S241.

County district – and in any event, the county line rule would not explain racially discriminatory population disparities within the urban counties.  Sixth, no other rational legislative or administrative policy considerations explain the disparities.  The H283 districts are <u>less</u> compact, split many <u>more</u> precincts, and split the same number of counties as almost all of the alternative plans.  As the discussion of districts in Dallas, Hidalgo, and Harris Counties above especially emphasizes, H283 only inconsistently protected incumbents or the cores of previous districts, at least in those counties, and was especially unlikely to do so for districts in which minorities had been able to elect candidates of choice.  The debate on the House floor reveals no offsetting rationale for the disparities.  Seventh, as in *Larios*, there were overpopulated districts in H283, for instance, in Hidalgo and Dallas Counties, that were adjacent to underpopulated districts.  Eighth, if an 80 percent probability of electoral success in the face of the least favorable partisan tide for minority voters in a decade is a proper definition of an "equal opportunity to elect candidates of choice," then H283 is retrogressive under Section 5 of the Voting Rights Act.  Ninth, several other plans, including the MALC plans, draw considerably more districts with minority concentrations that enable minority voters to elect candidates of choice, as judged by the results of the 2008 and 2010 State House contests.  The failure of H283 to draw as many districts is a likely violation of Section 2 of the Voting Rights Act.  Tenth, detailed investigations of individual districts, including revealing boundaries, especially when those boundaries are superimposed on ethnic maps, indicate both bias against minorities and racial gerrymandering.

## VIII.  S.B. 4: Packing, Dilution, Retrogression

## A.  Biased Process

67.  The congressional story is much simpler.  Because the legislature believed that the U.S. Supreme Court allowed no population deviations for congressional districts, there were none, at least if one considers the short-form census totals correct for the decade.  So there were no *Larios* considerations.  Although rumors flew for months, the redistricting committees did not agree on a congressional plan during the regular session, and there was speculation that the legislators would let federal judges draw up a plan, as they had a decade earlier.[79]  Instead, the leadership came to an agreement, the plan was fully divulged only three days before it was considered by the legislature, and instead of holding hearings around the state to invite comments on the plan to facilitate revisions, the legislature held but a single hearing in Austin.[80]  No Republican amendments formally offered for a vote in committee or on the legislative floor were rejected, and every amendment proposed by a Democrat was rejected, most by straight party-line votes.  As Sen Kel Seliger, the nominal author of S.B. 4, admitted, no minority member of the legislature, and specifically no Latino member, was involved in drawing the plan, and all minority organizations opposed it.[81]  Voting Rights Act considerations were dealt with so privately that lawyers hired by

---

[79]Ross Ramsey, "Even With New Congressional Seats, Tricky Redistricting Work Isn't a Priority," *New York Times*, May 21, 2011.

[80]Id, at A11-15.

[81]*Senate Journal*, 82nd Legislature, First Called Session, Proceedings, Addendum (June 6, 2011), at A2-3, 12-15, 17, hereinafter *SJ Special*.  Sen. Judith Zaffirini asked Seliger "I want to know from you if any Hispanics were involved at any stage of developing this plan in the Senate? Sen. Seliger: No, not in the Senate." (A17)

the Senate Redistricting Committee were not shown S.B. 4 until the day it was introduced, and they could not offer opinions on whether it complied with the Voting Rights Act during the one committee hearing on S.B. 4.[82]  Consideration in the redistricting committees and on the legislative floor was much briefer and more perfunctory than the consideration of the House plan was, and both attacks and defenses were much more limited and much less detailed.  Instead of a debate, there were discussions of the plan that everyone knew would be adopted by a partisan majority and of other plans offered to demonstrate that plans more favorable to minorities could be drawn.  The artificial drama was admittedly staged to "make a record" for the inevitable legal proceedings, and the record and the statistics available on each plan admirably succeeded in accomplishing this purpose.

## B.  Alternative Plans and the "*Gingles* Preconditions"

68.  Because Texas gained four congressional seats as a result of its population growth from 2000 to 2010, 89% of it African-American, Asian-American, or Latino (65% of it Latino alone), it would have amounted to an act of open defiance of the Voting Rights Act to subtract minority opportunity districts in C185, the congressional redistricting plan that the legislature passed.  As Table 22 shows, the legislature was not <u>that</u> willing to defy the federal government.  Its 36-district plan created one more district than the current 32-district plan with a majority of Hispanic voting-age

---

[82]Id, at A-11, A20-21.

persons (HVAP) and the same one more with a majority of Hispanic voting-age citizens (HCVAP).
Likewise, it added one more district with a combination of African-American voting-age persons
(BVAP) and HCVAP.   There were also three more BHVAP-majority districts.   Compared to seven
competing MALC and Black Legislative Caucus plans, however, C185 offered much less
opportunity for minority citizens to elect candidates of choice.   Plan 188 contained another
HCVAP-majority district, and all of the MALC plans contained two or three more HVAP-majority
and BCHVAP districts than C185 did.   Five of the MALC and BLC plans contained two more
BHVAP-majority districts than C185 contained.   As Table 18 showed, in Texas State House
contests, BHVAP-majority seats elected the minority candidate of choice 95% of the time in 2008
and 81% in 2010.   On that evidence, C185, the legislatively-adopted plan, denied minorities quite
good opportunities to elect two more candidates of choice.   Seven other plans showed that there
were a variety of ways to satisfy the language of Section 2 of the Voting Rights Act.   The
legislature chose none of them.

**Table 22: Ethnic Statistics for Congressional Plans**

| Plan Number | HCVAP | HVAP | BHCVAP | BHVAP |
|---|---|---|---|---|
| Current (32 districts) | 7 | 7 | 10 | 10 |
| 121 (West "Fair Texas Plan") | 8 | 9 | 13 | 13 |
| 131 (Gallegos Plan) | 8 | 10 | 13 | 13 |
| 163 (MALC plan) | 8 | 10 | 13 | 15 |
| 164 (MALC plan) | 8 | 10 | 13 | 15 |
| 165 (MALC plan) | 8 | 10 | 13 | 15 |
| 185 (adopted plan) | 8 | 8 | 11 | 13 |
| 187 (Black Leg Caucus Plan) | 8 | 9 | 14 | 15 |
| 188 (MALC plan) | 9 | 11 | 14 | 15 |

69.  On the score of compactness, each of the current plans is inferior to the current 32-district plan, at least by the two indices presented here.  But C163 is more compact than C185 overall and in just the BHVAP districts, and C164 is better or just as good using the "rubber band" compactness scores.  C121 is more compact than C185 overall, though not in its minority opportunity districts.  The conclusion from this table is that districts in at least one alternative plan are compact, both overall and with respect to minority opportunity districts, compared to the plan that was adopted, and that other plans are more compact overall by certain indices.  If compactness is comparative, the so-called "first *Gingles* prong" is satisfied by alternative plans.

**Table 23: Compactness Scores for Congressional Plans**

| Plan Number | Whole Plan | | BHVAP > 50% | |
|---|---|---|---|---|
| | rubber band | area to perimeter | rubber band | area to perimeter |
| Current (32 districts) | .718 | .276 | .680 | .231 |
| 121 (West "Fair Texas" Plan) | .675 | .206 | .600 | .149 |
| 131 (Gallegos Plan) | .663 | .192 | .596 | .152 |
| 163 (MALC plan) | .702 | .213 | .652 | .172 |
| 164 (MALC plan) | .673 | .180 | .626 | .148 |
| 165 (MALC plan) | .671 | .182 | .616 | .145 |
| 185 (adopted plan) | .673 | .191 | .618 | .171 |
| 187 (Black Leg Caucus/MALC blend) | .   .666 | .179 | .606 | .145 |
| 188 (MALC plan) | .655 | .182 | .587 | .129 |

## C.  Packing Minority Opportunity Districts

70.  During the House debate on S.B. 4, Redistricting Committee Chair Burt Solomons boasted of

having increased the SSVR in congressional district 20 in San Antonio to 56.3%.  "We needed to

sort of do that and try to maintain the performing nature of this Hispanic majority district in South

Texas," he explained.[83]  He did not mention that the district, long represented by Henry B.

Gonzalez, had been a "performing district" since 1961, when Solomons was 11 years old.

71.  As Table 24 shows, congressional district 20 was not the only minority opportunity district to

have its minority percentage raised by S.B. 4.  In fact, of the ten districts with BHVAP majorities

in the current plan, all but one had its African-American plus Latino majority raised by S.B. 4, and

District 18 only lost half a percentage point.  Specific instances of packing were repeatedly noted

during the debates on S.B. 4.  Rep. Marc Veasey, for example, introduced the "Fair Texas Plan"

into the House with the comment that "The [Dallas-Ft. Worth] metroplex has 2.1 million Latino

and African American residents.  Under the Solomons plan [S.B. 4], they are mainly packed into

one district, which is illegal," and he later pointedly asked Chairman Solomons "Why didn't you

draw a Section 2 African American district in the metroplex when you could have easily done so,

instead of trying to pack all of those African American residents into one district?"[84]  Similarly,

Rep. Roberto Alonzo charged in a memorandum that he inserted into the record that "The

[83]*House Journal*, 82nd Legislature, First Called Session, Supplement. CSSB 4 Debate, at S2, hereinafter HJ, Special Session.

[84]Id., at S12, S63.  He referred to District 30, represented since 1993 by Congresswoman Eddie Bernice Johnson.

Republican Plan Packs District 30 and Cracks the Rest of the DFW Minority Population."[85]

---

[85]Id., at S54.  Note that in Table 24, the new district 34 has been substituted for the old district 27, which it effectively replaced.  As a comparison of Tables 24 and 25 shows, the old district 27 lost 22.7 percentage points of HCVAP, preserving the district for Republican incumbent Farenthold.

## Table 24:  Packing "Minority Opportunity Districts"
### A. Current Plan

| Districts | HVAP | HCVAP | BVAP | BHCVAP | BHVAP |
|-----------|------|-------|------|--------|-------|
| 15 | 73.1 | 71.9 | 2.3 | 74.2 | 75.2 |
| 16 | 74.8 | 74.5 | 3.4 | 77.9 | 77.8 |
| 20 | 63.6 | 63.8 | 7.1 | 70.9 | 70.3 |
| 23 R* | 61.2 | 58.4 | 3.3 | 61.7 | 64.3 |
| 27 R* | 64.2 | 63.8 | 2.8 | 66.6 | 66.8 |
| 28 | 74 | 68.3 | 1.5 | 69.8 | 75.3 |
| 29** | 61.8 | 56 | 9.9 | 65.9 | 71.3 |
| 9 | 30.3 | 19.1 | 36.5 | 55.6 | 66.2 |
| 18 | 32.2 | 22.3 | 40.3 | 62.6 | 72.2 |
| 30 | 30.7 | 19.8 | 41 | 60.8 | 71.4 |

* Currently represented by Republican
** Currently represented by Anglo Democrat

### S.B. 4 (H185, Plan Passed by Legislature)

| Districts | HVAP | HCVAP | BVAP | BHCVAP | BHVAP |
|-----------|------|-------|------|--------|-------|
| 15 | 77.2 | 71 | 2.1 | 73.1 | 79 |
| 16 | 77.6 | 72.7 | 3.8 | 76.5 | 80.9 |
| 20 | 66 | 62.9 | 5.7 | 68.6 | 71.1 |
| 23 R* | 63.8 | 58.5 | 2.7 | 61.2 | 66.2 |
| 27 R* (34) | 79.0 | 71.7 | 1.7 | 73.4 | 80.4 |
| 28 | 73.6 | 65.9 | 5.6 | 71.5 | 78.8 |
| 29 | 71.7 | 56.3 | 12.4 | 68.7 | 83.5 |
| 9 | 35.8 | 18.3 | 37.6 | 55.9 | 72.4 |
| 18 | 31.9 | 17.4 | 40.5 | 57.9 | 71.7 |
| 30 | 35.6 | 20.6 | 46.5 | 67.1 | 81.5 |

## D. Cracking Minority Areas and "Tacking" Them onto Anglo Counties to Create Safe Anglo Districts

72.  The packing of minorities, along with the "cracking" of other minority areas and the extension of districts based in suburban and rural counties into central cities or other heavily minority regions, made it possible to deny minorities the opportunity to elect or influence the election of other candidates of choice.  Table 25 gives the same statistics as Table 24 for six congressional districts in the immediate vicinity of the minority opportunity districts in Table 24.  Four of the six have BHVAP percentages below 50, and the other two barely pass that mark.  None has a BHCVAP percentage over 50, while all ten of the districts in Table 24 had BHCVAP percentages over 55.

**Table 25: Stacking Districts Close to Minority Opportunity Districts**

**S.B. 4 (H185)**

| District | HVAP | HCVAP | BVAP | BHCVAP | BHVAP |
|----------|------|-------|------|--------|-------|
| 6 | 39.6 | 25.3 | 12.3 | 37.6 | 51.5 |
| 12 | 21 | 12.7 | 14.8 | 27.5 | 35.5 |
| 24 | 20.3 | 12.2 | 10.3 | 22.5 | 30.3 |
| 26 | 24.7 | 14.7 | 7.5 | 22.2 | 32 |
| 33 (new) | 19.8 | 11.6 | 15.5 | 27.1 | 34.9 |
| 27 | 45.1 | 41.1 | 5.6 | 46.7 | 50.4 |

73.  As in the State House plan, maps for Congress tell stories about discrimination and racial gerrymandering.  One of the most blatant tales involves Congressional District (CD) 12 in Tarrant County and CD 26 in Denton and Tarrant Counties.  To keep the HVAP of CD12 to 21% and its BHVAP to 35.5%, planners drew a jagged lightning bolt down the center of the district.  Part A of Figure 11 shows that the bolt almost cleaves the district in half.  Whom did the bolt strike?  Part B of Figure 11, in which the green dots represent Latino population concentrations, make clear who the electrocuted victims were: Latinos.  Finally, Part C tells what happened to them: They were joined to the overwhelmingly Anglo suburban/exurban county of Denton, diluting their vote by placing them in a 26th district with an HVAP proportion of 24.7% and a BHVAP proportion of 32%.  Had the 12th CD not been sundered, it could well have had a BHVAP majority, perhaps a substantial one, and another minority opportunity district could have been created.

119

**Figure 11: Congressional District 12 in Tarrant County**

### A.  Who is Being Avoided?



**Part B:  Latinos Are Being Avoided**



**Part C:  Fort Worth Latinos Are Being Diluted in a Sea of Denton County Anglos**



74.  Similar tactics – diluting central city minority political power by thrusting long arms of

districts from suburban and rural counties into urban counties – account for the tell-tale shapes of

congressional districts 6 and 33.  Figure 12a depicts CD6, anchored in Ellis and Navarro Counties,

pushing jagged arms into Dallas and Tarrant, and Figure 12b superimposes the district outlines on

the concentrations of African-American and Latino population in the area.  Darker portions of

Figure 12b represent higher percentages of blacks and Hispanics.  It is clear from the maps that

CD6 cracked the minority areas, but was carefully drawn not to take in so many minorities as to

threaten Anglo control of the district.  Figure 12c shows District 33 putting a fist into Tarrant

County from the Parker County west, and Figure 12d again superimposes the district on the black

and Hispanic population concentrations.  Here, the evident purpose was to avoid minority areas to

keep the new district very safely Anglo Together, the maps make clear how carefully CD6 added,

but diluted Latinos and how precisely CD33 avoided them.  The result was that CD6 had a bare

BHVAP majority of 51.5% and CD33, a BHVAP minority of 34.9%.

**Figure 12:  Congressional Districts 6 and 33:
Two Other Suburban Incisions into the Metroplex**

**Part A:  CD 6: Outline**



**Part B: CD 6: Black + Latino Concentrations**



**Part C:  CD 33 Outline**



**Part D: CD 33: Black + Latino Concentrations**



75.  From the 1960s through the nationally-noticed mid-decade redistricting circus of 2003, Texas redistricting has been repeatedly litigated, and those lawsuits have always centered on racial and ethnic issues: whether at-large elections for the state legislature and city councils discriminated against African-Americans and Latinos, whether the particular lines drawn did, whether there were unconstitutional racial gerrymanders in favor of or against racial minorities.  Again and again, Texas redistricting has produced major U.S. Supreme Court decisions: *White v. Regester*, *Bush v. Vera*, *LULAC v. Perry*.  Each of these decisions and more, as well as numerous books and chapters, have charted the history of discrimination in Texas, as well as the specific history of racial discrimination in redistricting.  For instance, in his opinion of the court in *LULAC*, Justice Kennedy noted that "State legislators changed District 23 specifically because they worried that Latinos would vote Bonilla out of office."[86]  As Tables 12-14, above, show, the Spanish-surnamed Republican, Canseco, who barely won in time for this decade's redistricting, was no more the choice of Latino voters than Bonilla had been in 2002.  As Rep. Harvey Hildebrand, a rural Republican, noted during the House debate, SB 4 altered the 23rd District from one in which John McCain won 48% of the votes in 2008 to one in which his vote total would have been 52%.[87]  Kennedy and the majority of the Court overturned the earlier redefined District 23 as a violation of Section 2 of the Voting Rights Act, and he did not accept the 2003 legislature's effort to substitute a majority-Latino district that ran from Austin 300 miles south to McAllen, a barbell district with a large majority of the population concentrated in population bulbs at each end of the district, connected by a narrow strip, as a substitute.  The current legislature has tried a close variation on

---

[86]*LULAC v. Perry*, slip opinion at 22.

[87]*House Journal*, Special Session, at S42.

the same idea in District 35, which runs from a Latino population concentration in Austin to one in San Antonio, with not much in between.  The new 35th district represented not only an attack on Lloyd Doggett, whose defeat had been the object of the Austin-to-McAllen district in 2003, but part of an effort to break up the long-successful tradition of coalition politics in Travis County, in which Latinos, African-Americans, and liberal Anglos had often joined together in both partisan and non-partisan contests.  The heavily-minority eastern section of Travis was split into five districts in what Austin representatives charged was a blatant effort to discriminate against minorities and squash a vital trans-racial tradition.[88]  In creating such a district, the legislature seemed to be deliberately evoking the state's history of racial discrimination in redistricting that has been overturned by judges.

---

[88]*House Journal*, Special Session, at S30, 38.

**Figure 13: Travis Sliced, Appended to San Antonio: Congressional District 35**

**A Narrow Rivulet Joins Austin and the Alamo**



## E.  Justifications for S.B. 4 and for Not Adopting Alternatives

76.  In this, as in earlier debates on redistricting in Texas, the authors of the adopted plans avoided

the cant that usually festoons such debates.[89]  Burt Solomons and Kel Seliger offered little in the

way of justification for their plans and nothing in detail.  They did not claim to be protecting

incumbents, and in fact, that would have been difficult, considering their frontal assault on the

most prominent Anglo Democratic member of Congress from the state and their substantial

rearrangement of other districts.[90]  Solomons's boasts of improving the chances of minorities to

elect their candidates of choice in districts where they already could amounts to packing, and

changes in congressional district 23, making it more Republican, decrease the opportunity for

Latino voters, only 8-12% of whom backed the Republican incumbent, to choose their favorite.

When Solomons criticized plans that contained more BHVAP-majority districts, he repeatedly

contended that they did not contain SSVR or HCVAP majorities in their additional districts,

refusing to address proponents' empirical demonstrations that minorities had won elections in

similar districts or in elections for other offices in those areas.[91]  As the Chairman remarked in

criticizing C163, a MALC plan, ". . .neither the new District 35 in North Texas, nor the new

District 36 in Harris County are Hispanic majority districts.  Neither one reaches 50 percent

---

[89]Toward the end of the debate, Chairman Solomons did insert a statement that he described as "legislative intent on the record," in which he mentioned "communities of interest, cores of existing districts, incumbency, compactness, continuity, and other traditional redistricting principles."  Id, at S63-64.  His perfunctory, formulaic statement gave no examples, and the plan itself undercut his rhetoric.

[90]Id., at S56.

[91]Id., at S9-15, S19, S23, S26, S36.

threshold."[92]  Interestingly, he did not apply the same standard to the three congressional districts currently represented by African-Americans, none of which have black voting majorities currently or under S.B. 4.  He could not apply the same bright-line standard without reducing the number of effective African-American districts, which would be politically and legally problematic.  But if African-American districts can be justified as coalition districts, as the Republican refusal to criticize or eliminate them seemed to imply, then why not Latino-black, Latino-black-Anglo, or Latino-black-Asian-American districts?  The Solomons-Seliger justifications were as inconsistently applied as their criticisms of alternative districts were.

## F.  S.B. 4: A Short Summary

76.  Tables 2-16 document the racially polarization of Texas elections and the cohesiveness of minority voters in general elections and Latino voters, in favor of Latino candidates, in primary elections, as well.  The tables also show that where minority voters are in a minority, they generally lose.  Table 23 demonstrates that more compact congressional districts than the state drew can be drawn, and Table 22 shows that other plans produce substantially more districts that offer minority voters more opportunities than C185 does to elect candidates of choice.  Tables 24 and 25 demonstrate the packing of minorities into already demonstrably "performing" districts and the consequences of that careful packing and the precise line-drawing for surrounding districts: They

---

[92]Id., at S23.

became safer for Anglos and made it almost impossible in those districts for Latinos, African-

Americans, or coalitions between them and, in some places, Asian-Americans, to elect candidates

of their choice.  The maps demonstrate intentional racial gerrymandering at least as clearly as

anything in *Shaw v. Reno* or *Miller v. Johnson* or *Bush v. Vera*, although this time, racial minorities

were the victims, rather than the beneficiaries of that line-drawing.  The U.S. Supreme Court has

repeatedly found that Texas has discriminated against minorities in its election laws and

specifically in its redistricting plans, most recently in a decision that condemned a district based

very much on the same principles as C185's District 35, and there is much more evidence of such

discrimination in the scholarly literature.[93]  At least the beginnings of a case against the

congressional plan under Section 2 and an intent case under Section 2 and the fourteenth

amendment have been laid out.

---

[93]See my *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill, N.C.: Univ. of North Carolina Press, 1999), chapter 6, "Traditional Districting Principles, Texas Style."