# Congressional Plan C185 and the Voting Rights Act:
## A Consideration of General Relevant Factors, with a Specific Focus on the Deficiencies of the Enacted Plan in the Dallas/Fort Worth and Houston Areas

A report by

**Richard Murray,**
**Professor of Political Science, University of Houston\***
**August 7, 2011**

*[signature]*

\*Vita Attached

1

## I.  Racial and Ethnic Discrimination in Texas Elections and the Continuing Need for the State to Be Covered by the Special Provisions of the Voting Rights Act

### A.  Barbara Jordan Leads the Fight to Bring Texas under Section Five of the Voting Rights Act

When Congresswoman Barbara Jordan returned to Washington, D.C. in January 1975 to begin her second term in the United States House of Representatives, her top priority was to ensure that the second reauthorization of the Voting Rights Act would include extending the special provisions of the Voting Rights Act to Texas.[1]   Jordan, whose eloquence and passion during the 1973 House Judiciary Committee hearings on Watergate had brought her considerable national acclaim, also supported expanding the Voting Rights Act to language minorities – a provision of great consequence for Texas with its large and fast-growing Latino population.

Barbara Jordan knew a lot about the electoral problems Blacks and Hispanics had experienced throughout the state's history.  That knowledge was rooted in her own personal experience in Houston, Texas.  When the young attorney returned to her hometown after finishing law school in Boston, she ran for a seat in the Texas House of Representatives in the 1962 Democratic Primary, then the effective election in the Lone Star State.  She rolled up huge majorities in the north side neighborhood where she had grown up,[2] but was handily defeated because the 12 Texas House seats in Harris County were all filled in an *at-large place* election – one of the many devices the state's elected officials utilized to make sure the political process was dominated by non-Hispanic Whites (usually called "Anglos" in Texas). So while Barbara Jordan could amass 46,363 total votes, that was far less than the 66,353 votes received by Willis Whatley, her Anglo opponent for Position 10 on the county-wide ballot.  Whatley won every white precinct in the county – often by margins exceeding 90% - save for one box in the then Deer Park, where a bitter strike at the Shell Oil refinery apparently led enough union members to break ranks and vote for the Black candidate endorsed by the AFL-CIO.   When Barbara Jordan ran again for the Texas House in 1964, she was again defeated by Willis Whatley, and this time she lost every white voting precinct in the county (the Deer Park strike had been settled).

The Congresswoman's personal experience was part of a long-standing discriminatory pattern dating from the Anglo settlement of Texas in the 1820s and 1830s.  Prominent among the 10,000 or so early white settlers were slave owners eager to exploit the rich river bottoms in the eastern part of the then Mexican territory.  Mexico had outlawed slavery after securing its independence from Spain, a fact that fueled growing tensions with the growing number of Anglos moving to Texas.  When those tensions led to an open rupture and Texas independence in 1836, the new nation immediately approved slavery and encouraged planters in the adjoining "Cotton Kingdom" states to emigrate to the sparsely eastern quarter where plantation agriculture could yield huge profits for slave owners.  This effort was quite

---

[1] The 1965 Voting Rights Act applied the Special Provisions of Section Five, which included preclearance of all electoral changes in covered states or areas before such could take affect, to all of six southern states -Louisiana, Mississippi, Alabama, Georgia, Florida,  South Carolina, and part of North Carolina.  Texas was not included under the original act because it did not have a literacy test for voting.

[2] In Houston's Fifth Ward northeast of downtown, Ms. Jordan got 583 of 594 votes (98.1%) in Precinct 47, 529 of 531 votes (99.6%) in Precinct 48, and 607 of 610 votes (99.5%) in Precinct 157.  (Source:  Office of the Harris County Clerk).

successful.  Just after independence, estimates put the Republic of Texas' white population at about 30,000, compared to 5,000 African American slaves.    By 1847, when a census of the newly admitted American state was taken, the white population had more than tripled to 102,961 (including an estimated 12,000 to 14,000 persons of Mexican descent), but the black population had increased seven-fold to 39,048 of whom 38,753 were slaves and 295 free persons.[3]  By 1860, the slave population had soared to 182,566 and cotton production totaled 420,000 bales.

Given the state's huge dependence on slave labor, it is not surprised that the white male voters of Texas voted 46,129 to 14,697 to join six other Deep South states in leaving the union in the wake of Republican Abraham Lincoln's victory in the November 1860 presidential election. The military failure of the Confederacy forced Texas back into the union, but while Anglo Texans reluctantly accepted that fact, and the accompanying abolishment of slavery, there was adamant opposition to extending meaningful political rights to the freed blacks.

T. R. Fehrenbach, a noted conservative historian of the state, summed up the post-Civil War mindset of Anglo Texans thusly:

> There was complete agreement in Texas that slavery was dead.  *But it was politically impossible  for Texans to consider giving the freedmen full citizen rights.*  (My emphasis)        The remembrance of slavery was one factor, but the actual class status of the blacks was equally, or more important.  The horde of Negroes, through no fault of their own, were impoverished, illiterate, and unskilled.  They were a bottom group, the lowest of the low, who had never participated in society or government.  If Dr. W. E. B. DuBois later wrote that in 1861 not one white American in a hundred believed that Negroes could ever become an integral part of American democracy, the percentage in Texas was probably just as high in 1866.[4]

That being the reality, the political and electoral rights of blacks in Texas after the Civil War were only secured by direct congressional action backed by occupying federal troops. According to Fehrenbach, it was this hated Reconstruction forced on conquered white Texans from 1866 to 1875 that would leave them bitterly resentful for generations and determined to reassert their prewar political dominance once they had the opportunity.  That opportunity gradually emerged with the withdrawal of federal troops from the South as part of the political deal that resolved the disputed 1876 presidential election, but it was held in check in the 1880s and 1890s by black voters' ability to form fairly effective populist coalitions with poor whites in supporting candidates backed by the Greenback Party and the Farmers Alliance in the 1880s and the People's Party nominees in the 1890s.  This black-poor white populist coalition reached its peak in 1896, when their gubernatorial candidate officially received 44 percent of the vote, although Chandler Davidson concludes that "in the absence of voter fraud that year, the figure would have probably exceeded the 50 percent mark."[5]

The near defeat of the white, conservative dominated, Texas Democratic Party by a coalition that included many black voters led to a major effort at the end of the 19th century and the beginning of the 20th century to eliminate the threat posed by a biracial populist coalition.  The

---

[3] These numbers are from *Lone Star Politics: Tradition and Transformation in Texas,* 2nd ed.,  by Ken Collier, Steven Galatas, and Julie Harrelson-Stephens, (Washington, D.C., CQ Press, 2012), p. 12.
[4] T. R. Fehrenbach, *Lone Star:  A History of Texas and the Texans,* lNew York, Macmillan, 1968), p. 398.
[5] Chandler Davidson, *Race and Class in Texas Politics*, (Princeton, N.J.:  Princeton University Press, 1990), p. 20.

remedy was to enact some of the toughest anti-minority election laws in the United States. The principal engineer of these repressive measures was Alexander Watkins Terrell, a former slaveholder and Confederate officer who had married the daughter of a Texas plantation owner.  Terrell, who served off-and-on in the Texas Legislature from 1876 to 1906, characterized the Fifteenth Amendment prohibiting the denial of black voting rights as "the political blunder of the century."[6]

Terrell was a fierce advocate of a "poll tax," not only because it would get rid of many black voters, but also because it would also eliminate "the thriftless, idle, and semi-vagrant element of both races."[7]   In fact, by the time the poll tax came up for a vote in a 1902 referendum, most blacks had already been pushed out of the electorate by a combination of intimidation and physical violence along with other restrictive electoral practices.  The net result of these was to virtually totally disenfranchise African Americans in Texas by 1910, as well as greatly reduce the number of poor whites registering and voting.  It should also be noted that the restrictive practices adopted in Austin also worked to deny the growing Mexican American majorities in South Texas any effective political power in their home counties.[8]  That was not accidental.  Terrell, according to Evan Anders, had "a racist distrust of black *and* Mexican American participation in politics."[9]

Although the black and Mexican American vote was small in Texas after 1900, it continued to stir controversy and produce periodic efforts by conservative Anglos to make it even less of a factor.  Typical was the reaction after a prohibitionist amendment to the Texas Constitution failed in 1911 by a margin of 6,297 votes out of 468,000 total ballots.  Thomas Ball, the state chairman of the temperance campaign, blamed its defeat on "the poor, ignorant negroes, deluded by designing white men, inspired by the liquor interests, and the Mexican vote, which Texas in 1836 declared unfit to govern this country."[10]

The hostility toward minority voter interests in Texas thus continued to manifest itself in the 20th century.  For example, in 1923 Texas formally adopted a white primary law legally excluding blacks from voting in the critical Democratic Party Primaries – this was overkill, since the other legal rules, informal threats, and racial violence of the time had already effectively eliminated any meaningful African American primary presence.  Apparently, the Texas Legislature just wanted to make it very clear that Lone Star politics was a white man's affair, not to be disturbed by their lesser fellow residents.  The state continued to defend the

---

[6] Ibid., p. 21.

[7] Ibid,

[8] The Texas poll tax was particularly effective in keeping poor voters off the rolls not just because of its cost (typically $1.75 per year – which might approximate $50 in 2011 dollars compared to 1920) but also because it had to be paid annually *in advance* months before the crucial Democratic primaries and nearly a year before the November General Elections.  And by setting the enrollment period in December, low income voters were forced to choose between holiday spending for their families, and investing in an election long before the candidates or issues had been defined.

    The effect of the poll tax in South Texas not only greatly lowered overall voting levels, but was also a key element in boss rule and machine politics in the region because most Mexican Americans on the voter rolls had their tax paid by Anglo politicians like Jim Wells or George Parr who then literally rounded up these voters on election days and instructed them for whom to cast their ballots.  See Evan Anders, *Boss Rule in South Texas*, (Austin, University of Texas Press, 1979).

[9] Anders, ibid., p. 91.

[10] *Dallas Morning News,* July 30, 1911.

exclusory primary in the face of a series of successful court challenges until the definitive 1944 U.S. Supreme Court decision, *Smith v. Allwright*,  struck down this practice.[11]

The success of these anti-minority electoral practices is evident in election data from the 1950s and 1960s.  Table One compares the percent of the potential Texas electorate voting in the presidential elections from 1952 to 1964.  Even in the later year when a native Texan, President Lyndon B. Johnson was on the ballot, the state vote was far below the national level.

### Table One:  Voter Turnout in Presidential Elections in Texas Compared to the United States:  1952 to 1964

| Year | Turnout as a % of Voting Age Population in Texas | Turnout as a % of Voting Age Population in U.S. |
|------|--------------------------------------------------|-------------------------------------------------|
| 1952 | 42.8 | 62.0 |
| 1956 | 38.1 | 60.1 |
| 1960 | 41.8 | 63.8 |
| 1964 | 45.4 | 63.0 |

Source:  Adapted from Clifton McCleskey, *The Government and Politics of Texas*, (Boston:  Little, Brown, 1969), p. 38.

Clifton McCleskey, a leading scholar of Texas politics looked at these numbers and concluded, at the end of the 1960s, that gap between voter participation in Texas and the nation was primarily reflective of the reality that "Texas politics is still predominately white, Anglo-Saxon, and Protestant in its candidates and its issues.  The very sizeable Mexican-American and Negro minorities in Texas are less politically involved, and their turnout reflects this."[12]

---

[11] See *Nixon v. Herndon,* 273 U.S. 536 (1927), holding unconstitutional the state law excluding African Americans from the Democratic Primary; *Nixon v. Condon*, 286 U.S. 73 (1932), holding unconstitutional a state law authorizing political parties in Texas to adopt a policy of racial exclusion; *Grovey v. Townsend,* 295 U.S. 45 (1935), holding constitutional a segregation rule adopted by the Texas Democratic Party in the absence of any state legislation; and *Smith v. Allwright,* 321 U.S. 649 (1944), reversing *Grovey v. Townsend* and holding unconstitutional racial segregation on any basis in the Democratic Primary.

Even after that clear ruling, some white Texas conservatives still refused to give up the white primary device.  In Fort Bend County, where a slave-based plantation economy had left blacks a majority after the Civil War, local Anglos set up a preprimary primary in the 1940s where all the white Democrats for local office would participate in a "private poll" with the losers all dropping out of the official party primary a few weeks later.  The U.S. Supreme Court did not buy this subterfuge in *Terry v. Adams* 345 U.S. 461 (1953), and declared this device unconstitutional.

[12] Clifton McCleskey, *The Government*

It was this pattern of low minority participation and very limited opportunities for minority-backed candidates to win in Texas that was the driving motivation for the young Congresswoman from the 18th District of Texas, to lead the fight to bring the state under Section Five of the Voting Rights Act reauthorization.  She succeeded, despite very strong opposition from most of the Anglo political establishment in Texas.[13]

### B.  From 1975 to 2007:  The VRA and Political Change in Texas

Barbara Jordan retired from Congress at the end of her third term in 1978, but the periodic extensions of the Voting Rights Act have continued to include Texas under the Section Five provisions.  Has that made any difference?  Are the minority populations now able to elect representatives of their choice to local, state, and national offices in Texas?

In my opinion, the Voting Rights Act has made a major and positive contribution in the empowerment of African American and Hispanic Texans.  This was somewhat evident in the redistricting that followed the 1980 census, the first after Texas was fully subject to the Voting Rights Act.  Pre-clearance pressure from the U.S. Department of Justice helped restore and effective black state senate district in Houston, added a few state house seats with black or Hispanic majorities, and encouraged the Legislature to make one of the three new congressional seats (the 27th) Texas gained from reapportionment a Hispanic dominated-district running from Corpus Christi to Brownsville.  On balance, however, electoral opportunities for minority voters only improved marginally as most districts were redrawn to protect Anglo incumbents.

The redistricting following the 1990 census was considerably more productive for minority voting rights in Texas and the VRA was a substantial contributing factor.  But two other things were also important.  The first of these was the continuing surge in minority populations.  Table Two compares the 1980 and 1990 census data for Texas by race/ethnicity.  All population groups grew in Texas, but the Anglo percentage gain of 10.1% lagged behind Blacks at 16.8% and was far below the 45.4% increase among Hispanics and the 88.8% growth in the Asian/Other category.  Overall, almost half  (49.1%) the total growth in Texas over the decade was Hispanic, about a third (34.1%) was among Anglos, and a tenth (10.3%) was non-Hispanic blacks.  Obviously, with 60% of the growth in Texas due to black and Hispanic increases, these populations would have better potential for improving their electoral opportunities than was the case ten years earlier.

### Table Two:  Racial/Ethnic Population Change in Texas:  1980 to 1990

---

[13] Congresswoman Jordan's success in overcoming strong opposition from her home state on the VRA renewal rested on three factors.  First, her personal status after the Watergate hearings had given her enormous credibility with her Democratic House colleagues.  Few Democrats in Congress wanted to be called out by the "Voice of God" on the Texas/VRA issue.  Second, the post-Watergate 1994 House elections brought in a super-sized Democratic majority so Ms. Jordan needed little help from the minority Republican members.  The big freshman class helped stripped several of the Texas congressional "old Bulls" of their seniority-based committee power, which neutered them on the VRA issue.  And finally, the Congresswoman was extremely fortunate that Texas Democratic United States Senator Lloyd Bentsen, was getting ready to run for president in 1975.  As a southern moderate conservative, Bentsen needed to shore up his flank with national liberals and minorities, so he broke with Texas Governor Dolph Briscoe and other establishment Democrats and helped move the Texas addition to Section Five through the Senate.

|                              | 1980       | 1990       | Change      |         |
|------------------------------|------------|------------|-------------|---------|
| Non-Hispanic Whites          | 9,350,297  | 10,291,680 | +  941,383  | 10.06%  |
| Non-Hispanic Blacks          | 1,692,542  | 1,976,360  | +  283,818  | 16.77%  |
| Hispanics                    | 2,985,824  | 4,339,905  | +1,354,081  | 45.35%  |
| Non-Hispanic Asian/Other     | 200,528    | 378,565    | +  178,037  | 88.78%  |
| TOTAL                        | 14,229,191 | 16,986,510 | +2,757,319  | 19.37%  |

Source:  U. S. Census Bureau

The second factor was the competitive partisan balance in Texas.  After Republican Bill Clements upset Democratic gubernatorial nominee John Hill in 1978, the GOP steadily moved toward becoming a force in state and local elections, not just presidential contests. Texas seemed destined to finally realize the dream of reformers and become a true two-party state when Democrats and Republicans swapped victories in the successive governor elections of 1978, 1982, 1986, and 1990.  At the same time, Republicans were cutting into the large Democratic legislative and congressional majorities.   And with the smaller Democratic majorities in the Texas House and Senate more and more dependent on Hispanic and black voters, the white leadership of these bodies had to give considerably more weight to their minority supporters than had been the case ten years earlier.

And finally, as mentioned, there was the Voting Rights Act.  In 1991 the Voting Rights Division of the U.S. Department of Justice was headed by George H. W. Bush appointee John Dunne.  As the 1991 redistricting cycle began the DOJ signaled that departmental approval of new maps under the VRA would in part hinge on a maximum effort to create majority-minority districts in the South and other areas under the special provisions of the Voting Rights Act.   This reflected the national party's overall strategy of undermining the still numerous white incumbent Democrats in the South by stripping out minority neighborhoods often vital to the survival of these veteran congress members and state legislators.  But whatever the partisan reasons, minority voting rights would be advantaged in the post-1990s redistricting.

Across the South the G. H. W. Bush Justice Department's strategy worked well in states like North Carolina and Georgia where Republicans made sizeable gains at the expense of white Democrats.  The plan worked less well in Texas, mainly because legislative Democrats proven very accommodating to minority voter interests by out-bidding Republicans in drawing favorable new districts for minority voters while protecting most of their Anglo incumbents.  The bottom line, as Houston city councilmember Ben T. Reyes, a longtime Hispanic leader on redistricting issues put it, was "The Republicans wanted too much.  We got a better deal by working with the Democrats."[14]

---

[14] From Alexander Lamis, Ed., *Southern Politics in the 1990s* (Baton Rouge:  LSU Press, 1999)*, p. 316.

After the notable gains of the 1990s in the Texas Legislature and U.S. Congress delegations, the census numbers from the 2000 count seemed to bode well for African American and Hispanic voters in Texas.  As Table Three shows, Anglo growth slowed notably from the 1980s, with an increase of just 8.1% between 1990 and 2000.  At the same time, black, Hispanic, and Asian/Other growth rates rose significantly compared to the previous ten years.

| Table Three:  Racial-Ethnic Population Change in Texas:  1990 to 2000 | | | | |
|---|---|---|---|---|
| | **1990** | **2000** | **Change** | |
| **Non-Hispanic Whites** | 10,291,680 | 11,121,317 | +  829,637 | 8,06% |
| **Non-Hispanic Blacks** | 1,976,360 | 2,429,966 | +  453,606 | 22.95% |
| **Hispanics** | 4,339,905 | 6,669,666 | +2,329,761 | 53.68% |
| **Non-Hispanic Asian/Other** | 378,565 | 630,871 | +  252,306 | 66.65% |
| **TOTAL** | 16,986,510 | 20,851,820 | +3,865,310 | 22.76% |

Source:  U.S. Census Bureau

The net result was a decline in the overall Anglo population share in Texas from 60.6% in 1990 to 53.3% in 2000.  Hispanics, who had accounted for less than half the state's population growth in the 1980s, made up 60.3% of the net growth in the 1990s, while the African-American contribution rose from 10.3% to 11.7%.

Despite the population shifts, the net effect of the post-2000 redistricting was to increase Anglo congressional representation, and dramatically slow the growth of minority representation in the Texas Legislature and Congress.  What accounted for the very different result in this cycle compared to ten years earlier?

Three major factors worked to the detriment of minority voters.  First, the Anglo Democratic legislative leaders who had been responsive (for reasons for self-interest) to Hispanic and African-American interests in 1991 were cut out of the process in 2001.  Republicans used their majority in the Texas Senate and control of the governorship to block all legislative plans, neutering the Democratic majority in the Texas House of Representatives.

Second, the removal of the Texas Legislature from the initial redistricting process meant that the 2001 Texas House and Senate plans were drawn by the Texas Redistricting Board, whose three statewide elected Republicans – the Attorney General, Comptroller, and Land Commissioner – accepted plans drawn by U.S. House of Representatives Majority Leader Tom Delay that maximized Republican seats in both chambers of the state legislature.  And because the state Republican Party had become almost entirely a conservative Anglo entity by 2001, drawing seats to give minority voters the opportunity to elect candidates of their choice

8

was not an option.  The Delay maps worked very well in the 2002 legislative elections and the Majority Leader was then able to use the large Republican majorities in the Texas House and Senate to push through a radical redrawing of the Texas congressional lines to get rid of all or most of the surviving Anglo incumbents.[15]    While the Delay congressional redistricting was successful in getting rid of seven of ten Anglo Democrats, it resulted in minimal improved opportunities for minority voters.  One Anglo Democratic district, the 25th, was redrawn and renumbered (the 9th) to make it an effective African American district in the 2004 elections, but that was balanced off by reducing the Hispanic voting strength in the 23rd District represented by Henry Bonilla, a Republican who had been winning largely due to support from Anglo voters.   The addition of conservative Anglo voters into the 23rd District was eventually disallowed by the U.S. Supreme Court in 2005 as a prohibited dilution of its Latino majority, and the court order remap restored it as an effective Hispanic district in 2006.

Third, the dog that did not bark in 2001 and 2003 was the U.S. Department of Justice.  In sharp contrast to the previous cycle, the DOJ signed off on all the Texas plans despite counter recommendations from senior staff in the Voting Rights Division.  Why did the Bush Justice Department under Bush 43 take a very tack than had been the case with Bush 41?   The simple answer is that after the 1990 census, the creation of additional minority opportunity districts in the South could reduce the overall number of Democrats in Congress and state legislatures.  By 2001, the situation was different.  There were fewer incumbent Anglo Democrats to get rid of, and, with the greater minority population growth in Texas, adding new opportunity districts would likely result in a net loss of Republican seats.

In looking over the quarter-century that followed the inclusion of Texas under Section Five of the Voting Rights Act, it is undeniable that minority opportunities in the electoral process improved.  Some of that had little to do with redistricting and just reflected changing demographics.  El Paso is a good case in point.  As the Hispanic population grew and the Anglo percentage plunged, Anglo incumbent Democrats retired from office and were succeeded by Latinos.

And, for a time at least, the regular legislative process worked to the advantage of minority voting interests.  With Republicans winning more and more of the conservative Anglo voters (and seats), Texas Democrats like House Speakers Gib Lewis and Pete Laney, and Lt. Governor Bob Bullock, necessarily became more responsive to minority members.  As a result the number of minority opportunity districts was expanded after the 1980 and 1990 censuses.

Finally, the Voting Rights Act has been of unquestioned benefit to the protection of minority voting rights in Texas. Legislative leaders' knowledge that, after 1975, their redistricting work had to pass muster in Washington D.C. has surely tempered efforts to reverse the hard-won gains for  Hispanic and African-American voters.  Of course, more could have been done. That was especially the case after the population gains measured by the 2000 census were not reflected in the political maps drawn by the 2001 Legislative Redistricting Board and the 2003 Texas Legislature.

---

[15] Since the Texas Legislature also failed to pass a congressional map, a three judge federal panel produced the map used in the 2002 elections.  The panel followed Texas's traditional redistricting practice for Congress and protected the core constituencies of the 30 incumbents, including all 17 Democrats.  The two new seats Texas gained were placed in heavily Republican areas.  With the reelection of all incumbents, the state's delegation in the U.S. House was 17 Democrats and 15 Republicans.

## C. *The 2010 Census and the 2011 Redistricting Process*

The 2010 Census showed Texas, as expected, had grown much faster than any other populous state in the union.  The net population gain of 4,293,741 resulted in four congressional districts being added to the 32 existing seats, the largest gain in Texas history.  As in other recent censuses, minority population growth accounted for the great majority of change, with Hispanics contributing 65.0% and African Americans 13.7%.  For the first time in state history, non-Hispanic black growth (589,352) exceeded non-Hispanic white growth (547,955).

**Table Four:  Racial/Ethnic Composition of Texas Population:  2000 and 2010**

|  | 2000 | 2010 | Change | |
|---|---|---|---|---|
| **Non-Hispanic Whites** | **11,121,317** | **11,669,272** | **547,955** | **4.92%** |
| **Non-Hispanic Blacks** | **2,429,966** | **3,019,318** | **589,352** | **24.25%** |
| **Hispanics** | **6,669,666** | **9,460,921** | **2,791,255** | **41.85%** |
| **Asian/Other** | **630,871** | **996,050** | **365,179** | **57.88%** |
| **TOTAL** | **20,851,820** | **25,145,561** | **4,293,741** | **20.59%** |

Source:  U.S. Census Bureau

The legislative redistricting process in 2011 could hardly have been more different than 10 years earlier.  With super-sized Republican majorities in both the Texas House and Senate, redistricting maps were constructed in private and revealed very late in the regular session.  Public hearings were minimal, and minority members had little opportunity to preview the House and Senate maps that were passed in the regular session, or the congressional map approved in a special session called by Governor Perry.

The resulting legislative maps (H283 for the House and S148 for the Senate) and the congressional map (C185) repeated the bottom-line results from 2001 and 2003 in that there was no reflection in the end products of the enormous demographic changes that have occurred in Texas.  If these current maps go into effect for the 2012 elections, it will mean that VRA-protected minorities in Texas will have seen virtually no improvement in their opportunities to elect representatives of their choice since the maps produced in the early 1990s when the combined black and Hispanic populations state totaled 6,316,265 out of 16,986,510 (37.2%), compared to 12,480,239 out of 25,145,561 (49.6%) in April 2010.

10

This legislative failure to improve protected-minority voting opportunities in Texas despite huge population gains relative to the already over-represented Anglos is rooted in several profound changes in American and Texas politics  The most notable of these is the return to what has become statewide an effective one-party system in Texas.  And that one party is dominated by very conservative Anglos who have no interest in improving opportunities for minority voters to elect candidates of their choice.  In fact, quite the opposite is true.  Any gains by VRA-protected minorities are now going to come at the direct expense of the dominant Anglo political establishment in Texas.  For much of the 20th century, that dominant establishment was rooted in the Democratic Party.  Now, the new Republican Party plays that role.

This reality makes it more critical than ever that the protections afforded for Hispanic and black Texans under the Voting Rights Act not be abandoned.  The ills that Barbara Jordan experienced in the 1960s have not been cured, and the remedies she supported are still needed.

## II.  The Polarization of the American Electorate Along Racial and Ethnic Lines and Its Consequences for Texas Politics

### A.  The Breakdown of the New Deal Coalition and the Polarization of the American Electorate

During his twelve plus years in office, President Franklin Roosevelt forged an electoral coalition that dominated American politics for nearly 40 years.  As Alan Abramowitz has pointed out, that coalition:

> … was based primarily on group loyalties, some of whose origins could be traced back to events that took place long before the New Deal, and secondarily on the widespread association of the Democratic Party with prosperity and the Republican Party with economic hardship in the aftermath of the Great Depression.[16]

The principal components of the New Deal coalition were white Southerners and white ethnic working class voters in the North.  That coalition began to fray in the 1960s and had largely disappeared by the 1980s.  Key to its  collapse was the shift of white southern conservatives from the party of Roosevelt to the party of Reagan.  Republican hopes of building a comparable large and durable coalition to the New Deal combination have been frustrated over the last 20 years as a new political realignment based much more on political ideology has emerged.  Issues that were either unknown or ignored in the 1930s like gun rights, abortion, and gay marriage have assumed great importance in guiding voters' partisan leanings in the 21st century.   As economic voting faded, new political lines were drawn.  White men, especially blue-collar workers, became more conservative and women, especially single women, became more Democratic.  Republican gains with less-well educated, church-attending adults were partly offset by losses among better educated, more secular whites.

---

[16] See "Ideological Realignment among Voters," in *New Directions in American Political Partue*, ed. by Jeffrey Stonecash (New YorK:  Rutledge, 2010), p. 126.

The racial/ethnic base of the parties has also shifted greatly since New Deal days.  Blacks began to move toward the Democratic Party during the Roosevelt years, but the Republicans continued to get a decent share of the black vote through the Nixon-Kennedy election in 1960. That changed when GOP nominee Barry Goldwater adopted the "Southern strategy" and appealed to conservative whites opposed to African American empowerment in the region. The black vote swung to the Democrats, and has remained there for over 45 years.  The black vote share of the national electorate has been relatively stable around 10 percent, so Democrats still had to depend on substantial white support to win elections in the 1980s and 1990s.

That need has lessened somewhat in the 21st century as Anglo growth has leveled off, while non-black minority populations, especially Latinos, have surged.  These Hispanic voters, and to a lesser extent Asian Americans, have not only been voting in larger numbers, but have also tended to identify more with the Democratic Party in recent years.  But as minorities have moved toward the Democrats, more whites have shifted to the Republicans, especially in rural and small towns.  Exit polls show no Democratic presidential candidate since Jimmy Carter in 1976 has captured as much as 45 percent of white vote, nor have Democratic congressional candidates won a majority of these voters since 1992.

These counter trends became strikingly apparent in the historic 2008 presidential election. For the first time in 56 cycles the serious presidential contenders included a white woman and a black man.  After Senator Obama edged out Senator Clinton for the Democratic nomination, he faced Senator McCain in the first black-on-white presidential General Election.  Obama won only 43 percent of the white vote, yet captured a larger share of the overall vote (53 percent to McCain's 46 percent) than any Democrat since Lyndon Johnson in 1964.  Obama's margin is explained by the fact that the combined minority vote in 2008 was 26 percent, versus just 12 percent in 1992, and the Illinois senator got 80 percent of those voters.

In summary, what we saw in the 2008 election was a combination of two patterns.  There was a strong ideological split in the electorate, with those persons taking conservative positions on abortion, gay rights, support for the military, gun rights, etc., voting Republican, while those on the liberal side supported Democrats.  Added to that was the clear racial/ethnic cleavage, with minorities going heavily Democratic and whites over fifty voting strongly Republican.

### B.  Post 2008:  The Rise of the Tea Party and the 2010 Elections

We now know the election of a black president did not lessen the polarization along ideological and racial/ethnic lines.  Quite the reverse, as we see in the emergence of the Tea Party movement within a month after Barack Obama took office in January 2009.

Vanessa Williamson, Theda Skocpol, and John Coggin published the most intensive scholarly analysis, to date, of this phenomenon in their March 2011 article, "The Tea Party and the Remaking of Republican Conservatism,"  (Perspectives on Politics, published by the American Political Science Association, pp. 25 – 43).

 Their principal findings include the following:

- Tea Party supporters tend to be older, white, and middle class, with men accounting for 55 – 60 percent of supporters.
- The vast majority are conservative Republicans, many of whom have been politically active in the past.
- The conservative media, led by Fox News, have played a crucial role in forging the shared beliefs and identity around which Tea Partiers have united.
- Tea Party supporters share a general hostility to "government spending," but they make a major distinction between programs such as Social Security, Medicare, and Veterans benefits, which they see as going to deserving recipients (like themselves), as opposed to programs going to "freeloaders" who have not worked to earn such.
- This "free-loader" hostility is strongly coupled with anger at unauthorized or illegal immigrants, and their fear of immigrants is strongly associated with the ethnic identity of the immigrants in question. Immigration from Mexico is a far greater concern than people coming into the U.S. via Canada.
- And, finally, there is the matter of President Barack Obama. Only five percent of Tea Party identifiers recall voting for Senator Obama, and much larger numbers of identifiers see him, compared to Americans in general, as a dangerous agent of changes in the country they do not recognize as the one they grew up in. The authors conclude:

> At a fundamental level, Obama's policies and his person are not within the Tea Party conception of America, so his election seems like a threat to what they understand is their country.[17]

The principal effect of the Tea Party has been to move the already ideological Republican Party much farther to the right than was the case just a few years ago. It is unimaginable today, for example, that a sitting Republican president could call for comprehensive immigration reform today as George W. Bush did in 2005.

The electoral impact of the Tea Party was dramatically evident in the November 2010 General Election. Overall, turnout was slightly higher than in 2006, but the makeup of the electorate was decidedly older, whiter, and more conservative than is typical for midterm elections. Turnout in midterm elections usually declines modestly among minorities and sharply among young people compared to presidential voting levels, and that was the case in 2010. But what was different in the 2010 midterm was that the older white conservative voters – the heart of the Tea Party coalition – voted at near presidential levels. As Williamson, Skocpol, and Coggin noted, "the midterm election of 2010 was unusually favorable terrain for the Tea Party, and Tea Party activists had an undeniable impact on the election results."[18] Importantly, they go on to point out:

> The Tea Party's impact was clearer within the Republican Party. Tea Party mobilizations enabled insurgent candidates to overtake and defeat a number of officially endorsed GOP candidates, including incumbents. Many mainstream Republicans, including Bob Bennett in Utah, Charlie Crist in Florida, Lisa Murkowski in Alaska, Sue Lowdon in Nevada, and Mike Castle in Delaware, lost their primaries to Tea Party candidates.[19]

---

[17] Ibid., p. 35.
[18] Ibid.
[19] Ibid., pp. 27-28.

13

On balance, the authors conclude the Tea Party's mobilizing effect likely helped Republicans gain control of the U.S. House and make large gains in state legislative seats, while hurting the GOP's chances of taking over the U.S. Senate by nominating extreme and inexperienced candidates in states like Nevada, Colorado, and Delaware that had little appeal to independent voters in those competitive states.

If the election of America's first Black president and the following Tea Party movement has transformed American politics in general and the 2010 election in particular, their effects have been even more profound in Texas and on the Texas Republican Party.  I turn to that subject in the following section.

### C. Texas

#### The "Obama Effect"

If the 2008 presidential election illustrated major changes nationally, it also had quite important effects in Texas.  Attached to my statement is an article I wrote on that subject in 2009, but I would like to summarize some of the key findings from that study.

- While Senator Obama was a much stronger candidate nationally where he won 53 percent of the vote compared to 44 percent in Texas, the Democrat did much better than recent nominees of his party in the five largest metropolitan counties than included nearly 44 percent of the 2010 state population.  He also increased the Democratic vote share in the five biggest suburban counties from 31 percent in 2004 to 38 percent in 2008.  And he carried the majority Hispanic border counties by 64 percent, and 11 point increase compared to 2004.
- The big downside to the Obama candidacy was in rural and small town Texas where he ran behind Senator John Kerry's anemic 2004 performance.
- Obama's nomination drove up turnout in heavily African American areas, but his greatest impact was in the *fast-growing mixed suburban neighborhoods where the Democratic vote was dramatically higher.*
- In summary, Senator Obama lost Texas by nearly 12 percentage points, but he not only improved Democratic performance overall, but did far better than any nominee of his party in the suburban areas around the state's cities – the fastest growing part of the Lone Star State.  Obama did poorest in the rural and small towns and cities – the slowest growing part of the state.

#### The Tea Party in Texas and the 2010 Primaries and General Election

Nationally, most observers date the Tea Party movement to mid-February 2009 when CNBC reporter Rick Santelli burst into a tirade against the new Obama administration's economic policies while reporting from the floor of the Chicago Mercantile Exchange.  Mr. Santelli invited America's "capitalists" to a "Chicago Tea Party" to protest the outrageous actions being taken in Washington, D.C..  Word quickly spread through the Internet and conservative media like the *Drudge Report* and a first wave of  protests occurred across the country on February 27, 2009.  Small crowds showed up at these events, but Fox News and other media

began highlighting the movement, and momentum built toward a national Tax Protest day, in mid-April.

One of those protests was in Austin, Texas.  And one of the attendees was Governor Rick Perry.  Governor Perry, now the longest serving chief executive in Texas history, was generally viewed as politically vulnerable at that time.  He had won reelection in 2006 with just 39 percent of the vote, the smallest plurality since F.R. Lubbock's 38 percent in 1861.  Perry's vulnerability was not to Democrats, who had not won any statewide office since 1994, but rather because of unhappiness of conservatives within the Republican Party for policies like the Trans Texas Corridor plan that deeply angered these folks.  The Governor had run especially poorly in rural and small town areas in 1996 compared to the usual Republican performance, even losing his home county, Haskell to a virtually unknown and underfunded Democrat, Chris Bell from Houston.  And, in 2009, Perry faced the likely prospect of having to fend off United States Senator Kay Bailey Hutchison for the 2010 gubernatorial nomination.  The popular senior senator had mused for years about running for governor, very nearly challenging Rick Perry in 2006, but this time she seemed to really mean it.

But things began to turn around for the Governor at the Austin rally, as he fired up the crowd with a rousing anti-Washington message.  Whether through foresight of good fortune, Governor Perry – a long-serving professional politician that voters in Texas seemed to have tired of (polls in early 2009 showed him badly trailing Senator Hutchison if they ran against each other in the 2010 gubernatorial primary) – was the first prominent elected official in the United States to get out in front of the Tea Party movement.  He would reap huge benefits.

What Governor Perry seemed to instinctively sense, long before most of the Republican establishment, was that with the coming to President Obama and the congressional Democrats to power in Washington, a full-throated attack on the national capital was now possible in sharp contrast to the days when President George W. Bush and Majority Leader Tom Delay were the most powerful people in the national government.

Texas was an especially great place to get out in front of the Tea Party pitchforks and torches.  The Lone Star State had been John McCain's best state among the top ten in electoral votes so there was no down-side to coming out swinging against Barack Obama early.[20]  Texas has a long tradition of opposing taxes, especially taxes on business and wealthy individuals, so the Tea Party's anti-tax, cut spending, get government off our back mantra was surely going to be welcomed in the Lone Star State.  Hostility toward immigration, especially illegal immigration from *Mexico*, was a no-brainer that the governor had already exploited in previous campaigns.  Given that Texas has the longest American border with Mexico, add to that the very rapid growth of Hispanics in Texas, and you have an even more potent issue than most places in the country, save possibly Arizona.  Then, on top of the black president in Washington, Texas was seeing both a surge of population growth and participation by the state's African American and Hispanic populations.  These developments gave real force to the "take our country back" rhetoric of the Tea Party.  And, of course, the fact that Governor Perry, as a long-serving state official, could more easily distance himself from the "mess in Washington" than many elected politicians.

---

[20] John McCain lost eight of the top ten electoral vote states, and only carried Georgia by five percent, versus his 12 percent margin in Texas.

The impact of the Tea Party within the national Republican Party that Williamson, Skocpol, and Coggin described, was even more profound within Texas.  The fate of two incumbents in the March 2010 primary makes that clear.  Senator Hutchison, the most popular Republican in Texas in March 2009, was crushed by Governor Perry 51% to 30% in the gubernatorial primary, with the remaining 19 percent going to Debbie Medina, a far right Libertarian. Senator Kay Bailey Hutchison, who had supported the Troubled Asset Relief Program in 2008 at the behest of her party leader and president, George W. Bush, was renamed Kay "Bailout" Hutchison by her more nimble fellow career politician.

Down ballot, little attention was paid to the Republican Primary contest for Railroad Commissioner.  Incumbent Victor G. Carrillo had originally been appointed to the Commission by Governor Perry, continuing the Texas Republican Party's efforts begun by George W. Bush to avoid Governor Pete Wilson's anti-Latino stance in California that had alienated Hispanics and other minority citizens to the great detriment of the state party. Carrillo drew three Anglo opponents in the March 2004 Republican Primary, and almost avoided a runoff with 49.6% of the vote.  Carrillo, with Governor Perry and the party establishment's backing, crushed Robert Butler in the April 2004 runoff, 62.8% to 37.2%. That victory, plus his incumbency, led to the expectation that he would have little trouble with an unknown opponent, David Porter, in the March 2010 primary.   But besides having no name ID and no money, David Porter crushed Victor Carrillo 60.7% to 39.3% in March 2010.

Why did Porter v. Carrillo turn out so different from Butler v. Carrillo?  The 2004 Republican primary and runoff were "normal" low-turnout events where party establishment choices did well.  But in 2010, 1,484,542 votes were cast for governor in the GOP primary, more than twice the total vote in the 2004 election.  The same Tea Party activated voters – primarily older Anglos – were obviously much less willing to vote for an establishment-backed *Latino* Republican when a perfectly good Anglo name was also on the ballot than had been the case six years earlier.

In November 2010 the Tea Party surge continued across Texas, as it built on virulent opposition to President Obama, bitter hostility to administration policies like the 2010 health care reform act,[21] growing Anglo support for tough immigration laws, and a strong anti-tax, anti-spending sentiment that took hold as a looming state budget crisis took shape in Austin for the coming biennium.  The Texas result was even more profound than the national "shellacking" Democrats took on November 3, 2010.  Republicans easily won all statewide offices, continuing a winning streak stretching back to 1996, with Governor Perry's 55% to 43% win over Democratic nominee Bill White being the only instance where a Democrat cam within 20 points of a Republican.  In Congress, Chet Edwards, the last of the "Blue Dog" rural/small city Democrats was handily defeated, as were two Latino Democrats in majority Hispanic districts in South Texas, where Anglo turnout was near presidential election year levels.  In the Texas House, all opposed Anglo Democrats lost outside major metropolitan areas (and the unopposed member switched parties after the election).  Democrats also lost more than a dozen urban House seats, most by narrow margins, and saw a previous Republican majority of 76 – 74 end up as 101 – 49.   The Texas Senate, with half the seats not up and few incumbents facing funded challengers, remained 19 Republicans to 12 Democrats.

---

[21] On the health care issue, the national board of the American Medical Association supported passage of The Affordable Health Care Act of 2010.  The Texas Medical Association came out in strong opposition.

The rise of the Tea Party in Texas helped bring back some of the discriminatory electoral strategies from earlier years aimed at minority voters in Texas.   Leading the charge in Houston was the King Street Patriots, a Tea Party affiliate that reprised some of the same "ballot security" programs aimed at suppressing black and Hispanic voting in October and November 2010 that Chandler Davidson had described in the 1980s.[22]   The local group mobilized several hundred "patriots" to monitor early and in-person voting at Harris County polling places, to make sure that the election was not being stolen.  Of course, all the stealing was taking place in inner city minority neighborhoods, so that is where the all-white, older patriotic brigades needed to be deployed.  The racist element of these efforts was evident in a photo posted in October on the King Street Patriots website showing a black man holding a sign with the words "I only got to vote once," with a white woman behind him holding a second sign saying "I'm with stupid."   The patriots did not turn up any specific examples of vote fraud, but they did create a number of confrontations with voters and election officials at minority polling places across the county.

It should be pointed out that minority suppression at the polls did not start with the emergence of the Tea Party in Texas.  The Harris County Tax Assessor-Collector and Registrar of Voters, Paul Bettencourt, used his position in 2008 to slow the dramatic rise in voter registrations that year among younger, mostly minority, applicants.  The Houston Chronicle documented his office's practice of rejecting thousands of applications because of minor errors that were not disqualifying in other large counties.[23]  Bettencourt's office, claiming to be over-whelmed by the surge in applications in the fall, also created a massive backlog of unprocessed voter registration cards that prevented voters who had legally registered from casting regular ballots in 2008.[24]  That failure resulted in thousands of provisional ballots being cast in 2008 by persons who had filled out registration cards before the early October deadline, but whose names were not on the rolls when they showed up to vote several weeks later.  These actions resulted in the Texas Democratic Party suing Mr. Bettencourt in federal court, alleging, among other charges, that he had violated the Voting Rights Act.  With depositions scheduled before a January court date, Mr. Bettencourt abruptly resigned in early December 2008, despite having just been reelected to a four year term a month earlier.

Of course, underlying the efforts of elected Republicans such as Paul Bettencourt and activists like the King Street Patriots is the reality that Texas Republicans wrote the African American vote off in 1964 with the Goldwater-Johnson election. And with the rise of the extreme right in the 21st century the state's majority party seems hell-bent on driving Hispanics, who have traditionally given about a third of their votes to GOP candidates, in the same direction.  If you are not going to compete for the votes of folks who make up half the total population of Texas, 45 percent of the voting age population, and a third of the total registered vote, it makes very good sense to both keep down the *size of the minority vote in general elections*, and, and we shall see, to make sure the *impact of those minorities who do vote is limited by how representative districts are drawn.*

---

[22]Davidson, ibid., p. 243.
[23] The Houston Chronicle, July 28, 2008.
[24] The Houston Chronicle, October 18, 2008.  Mark Greenblatt, an investigative reported for the local CBS affiliate, KHOU Channel 11, filed a series of stories in October 2008 on Mr. Bettencourt's office's failure to get tens of thousands of timely applications processed before the polls opened.

**Revisiting Racial and Ethnic Polarization in Texas as Reflected in the Party Primaries**

The 2010 General Election results showed an intensification of the racial-ethnic lines of division in Texas voting.   But it should be stressed that polarization is evident well before the November vote occurs.  It is starkly evident in the extremely different patterns of participation in the party primaries in March of even-numbered years.

**Table Five:  Primary Vote Participation in Texas:  A Comparison of A Predominately Anglo, Black, and Hispanic Precincts in Harris County in 2008 and 2010**

**Precincts with a Black VAP Above 85%**

| Pct | March 2010 Primary | | | | March 2008 Primary | | |
|-----|------|------|-------|--|------|------|------|
|     | Dem. | Rep. | Dem % | | Dem. | Rep. | Dem% |
| 031 | 422 | 7 | 98.4 | | 833 | 9 | 98.9 |
| 068 | 374 | 15 | 96.1 | | 837 | 3 | 99.6 |
| 136 | 509 | 8 | 98.5 | | 997 | 8 | 99.2 |
| 156 | 626 | 10 | 98.4 | | 1458 | 5 | 99.7 |
| 158 | 458 | 4 | 99.1 | | 987 | 6 | 99.4 |
| 294 | 468 | 1 | 99.8 | | 1012 | 5 | 99.5 |
| **Mean %** | | | **98.4** | | | | **99.2** |

**Precincts with a Hispanic VAP Above 85%**

| Pct | Dem. | Rep. | Dem % | | Dem. | Rep. | Dem% |
|-----|------|------|-------|--|------|------|------|
| 011 | 107 | 24 | 81.7 | | 487 | 13 | 97.4 |
| 062 | 135 | 43 | 75.8 | | 607 | 58 | 91.3 |
| 065 | 144 | 54 | 72.7 | | 618 | 34 | 94.7 |
| 079 | 183 | 26 | 87.6 | | 868 | 22 | 97.5 |
| 530 | 54 | 18 | 75.0 | | 318 | 30 | 91.3 |
| 560 | 70 | 10 | 87.5 | | 357 | 6 | 98.3 |
| **Mean %** | | | **80.1** | | | | **95.1** |

**Precincts with an Anglo VAP Above 80%**

| Pct | Dem. | Rep. | Dem % | | Dem. | Rep. | Dem% |
|-----|------|------|-------|--|------|------|------|
| 040 | 206 | 327 | 38.6 | | 982 | 206 | 82.7 |
| 130 | 63 | 633 | 9.1 | | 393 | 619 | 38.8 |
| 213 | 111 | 792 | 12.3 | | 612 | 779 | 44.0 |
| 303 | 103 | 753 | 12.0 | | 463 | 817 | 36.2 |
| 420 | 103 | 629 | 14.1 | | 590 | 751 | 44.0 |
| 442 | 40 | 431 | 8.5 | | 286 | 528 | 35.1 |
| 451 | 50 | 756 | 6.2 | | 315 | 815 | 27.9 |
| **Mean %** | | | **14.4** | | | | **44.1** |

Source:  Harris County Clerk Website:  HarrisVotes!

Texas does not have voter registration by party, so all qualified electors can choose to participate in either primary.  These 2010 and 2008 data from Harris County show almost zero black voting in the Republican Primaries, and very, very little Hispanic participation.  A

18

sizeable minority of Harris County Anglos voted in the 2008 Democratic Primary when there was a heated match between Senators Clinton and Obama for the Democratic presidential nomination while the Republican race had largely been sewn up by Senator McCain.[25] However, in 2010 with no presidential contests on the ballot and the Perry/Hutchison/Medina contest on the Republican Primary ballot, Anglo GOP voting hugely outpaced Democratic voting save for one precinct.

The Harris County primary vote pattern is mirrored in Dallas, Bexar, and Tarrant Counties, and the heavily Hispanic areas along the border.  There are a shrinking number of rural Anglo counties where whites still vote in the Democratic Primary, and Travis County continues to be a predominately Democratic County in the March primaries.  There are also some upscale inner-city white areas like the Heights and Precinct 040 (see Table Five) near Rice University in Houston that have significant Democratic voting in the primaries, but overall participation on the Democratic primary side is now heavily skewed toward minority voters.  Conversely, there are virtually no black and very few Hispanic voters in the Republican primaries.

There is one other interesting aspect about recent primary voting in Texas compared to past patterns.  When Democrats were dominant in Texas after 1900, voting in the majority party primary was robust, despite the poll tax.  In 1964, for example, 1,630,297 votes were cast in the May primary, representing more than 50 percent of registered voters in the state.[26]  While conservative Anglos were the largest segment of the Texas Democratic electorate, the diversity of the voter base was sufficient than, under favorable circumstances, liberals like Ralph Yarborough could win the primary and be elected in November.

In very sharp contrast, The Republican statewide dominance since 1994 has not produced a larger primary electorate.  Even with a hotly contested gubernatorial primary in 2010 with more than 40 million dollars spent, the total GOP vote for governor was 1,484,542, representing *less than 12 percent of the thirteen million Texans registered to vote.*  To put this number in perspective, if the same vote percentage of registered voters in Texas had participated in the party primary that nominated the eventual governor in 2010 as participated in 1964, the Republican Primary turnout would have been about seven million voters, not 1.5 million.

### Racially Polarized Voting in Recent General Elections in Texas

Voting rights cases usually involve a good deal of scrutiny of the degree of racially polarized voting in relevant elections.  In Texas this results in focusing primarily on the General Elections because, as we have noted, there are virtually no minority voters in the Republicans Primaries, making racial/ethnic polarization impossible to measure in these contests. And in Democratic Primaries, the shrunken white vote is much more racially and ethnically tolerant of minority candidates than was the case in past decades simply because Anglos who have problems supporting black or Hispanic candidates either vote in the GOP contests, or – more often - simply skip voting in March primaries.

[25] Some of the Anglo Democratic Primary vote was due to "raiding,"  as radio talk show host Rush Limbaugh urged Republicans to cross over and vote for Senator Clinton to keep the Democratic race going.  Limbaugh labeled this "operation chaos."
[26] Texas Almanac, 1968-1969, published by The Dallas Morning News, p. 597.

That leaves us with the General Elections as the key test of racial polarization, because these are the only partisan contests that reflect the racial and ethnic diversity of the state's population.  Table Six looks at the same three sets of precincts in Harris County that we used to compare differences in party primary participation in 2008 and 2010.

**Table 6:**

**General Election Partisan Voting Patterns in Texas:  A comparison of Anglo, Black, and Hispanic Precincts in Harris County in 2008 and 2010**

### Precincts with a Black VAP Above 85%

| Pct | 2010 Governor Vote | | | 2010 Straight Party Vote | | | 2008 President Vote | | | 2008 St. Party Vote | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dem | Rep | Dem% | Dem | Rep | Dem% | Dem | Rep | Dem% | Dem | Rep | Dem% |
| 031 | 849 | 17 | 98.0 | 735 | 7 | 99.1 | 1463 | 18 | 98.8 | 1216 | 12 | 99.0 |
| 068 | 847 | 22 | 97.5 | 743 | 11 | 98.5 | 1371 | 9 | 99.3 | 1163 | 5 | 99.6 |
| 136 | 902 | 36 | 96.2 | 695 | 13 | 98.2 | 1462 | 47 | 96.9 | 1026 | 16 | 98.5 |
| 156 | 1265 | 43 | 96.7 | 1008 | 18 | 98.2 | 2080 | 56 | 97.4 | 1570 | 27 | 98.3 |
| 158 | 952 | 22 | 97.7 | 823 | 7 | 99.2 | 1666 | 22 | 98.7 | 1407 | 10 | 99.3 |
| 294 | 883 | 13 | 98.5 | 772 | 5 | 99.4 | 1348 | 17 | 98.8 | 1075 | 7 | 99.4 |
| Mean % | | | 97.4 | | | 98.8 | | | 98.3 | | | 99.1 |

### Precincts with a Hispanic VAP Above 85%

| Pct | 2010 Governor Vote | | | 2010 Straight Party Vote | | | 2008 President Vote | | | 2008 St. Party Vote | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dem | Rep | Dem% | Dem | Rep | Dem% | Dem | Rep | Dem% | Dem | Rep | Dem% |
| 011 | 388 | 93 | 80.7 | 275 | 58 | 80.2 | 496 | 185 | 72.8 | 391 | 69 | 85.0 |
| 062 | 477 | 124 | 79.4 | 323 | 88 | 78.6 | 619 | 277 | 69.1 | 445 | 113 | 79.7 |
| 065 | 489 | 111 | 81.5 | 376 | 75 | 83.4 | 610 | 236 | 72.1 | 472 | 116 | 80.3 |
| 079 | 634 | 138 | 82.1 | 443 | 89 | 83.3 | 855 | 343 | 71.4 | 649 | 136 | 82.7 |
| 530 | 259 | 60 | 81.2 | 219 | 45 | 83.0 | 323 | 134 | 70.7 | 268 | 57 | 82.5 |
| 560 | 212 | 54 | 79.7 | 159 | 35 | 82.0 | 339 | 113 | 75.0 | 236 | 43 | 84.6 |
| Mean % | | | 80.8 | | | 81.8 | | | | | | 82.5 |

### Precincts with an Anglo VAP Above 80%

| Pct | 2010 Governor Vote | | | 2010 Straight Party Vote | | | 2008 President Vote | | | 2008 St. Party Vote | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dem | Rep | Dem% | Dem | Rep | Dem% | Dem | Rep | Dem% | Dem | Rep | Dem% |
| 040 | 1010 | 529 | 65.6 | 388 | 349 | 52.6 | 1238 | 851 | 59.3 | 550 | 419 | 56.8 |
| 130 | 435 | 1015 | 30.0 | 132 | 803 | 14.1 | 501 | 1331 | 27.3 | 242 | 865 | 21.9 |
| 213 | 621 | 1440 | 30.1 | 137 | 1079 | 11.3 | 616 | 1922 | 24.3 | 225 | 1185 | 16.0 |
| 303 | 513 | 1459 | 26.0 | 154 | 1119 | 12.1 | 570 | 1911 | 23.0 | 235 | 1233 | 16.0 |
| 420 | 484 | 1795 | 21.2 | 167 | 1391 | 10.7 | 578 | 2626 | 18.0 | 348 | 1547 | 18.4 |
| 442 | 347 | 1141 | 23.3 | 110 | 909 | 10.8 | 345 | 1569 | 18.0 | 174 | 996 | 14.9 |
| 451 | 355 | 1382 | 20.4 | 110 | 1117 | 9.0 | 377 | 1718 | 18.0 | 199 | 1197 | 14.3 |
| Mean % | | | 30.9 | | | 17.2 | | | 26.8 | | | 22.6 |

Source:  Harris County Clerk website, HarrisVotes!

These homogeneous precinct data confirm the statewide exit poll from 2008 which showed black voters in Texas supported Barack Obama by a margin of 98% to 2%, and Hispanic voters favored the Illinois senator by a margin of 63% to 35%.  Anglos supported Senator McCain by a 73% to 26% margin.  Clearly, General Election voting in Texas is highly polarized along racial-ethnic lines with sizeable majorities of Anglos voters opposing the candidates favored by black and Latino voters.

It should be noted, however, that there are some important differences within the overall Anglo voting population.  As has been the case nationally, the candidates supported by minority voters in Texas like Senator Obama in 2008 and former Houston Mayor Bill White in 2010, can also win majorities from well-educated, inner-city Anglo voters.  Note Harris County Precinct 040 in Table 6.  This precinct, part of affluent neighborhood near Rice University is one of 40 or so inner-city Anglo precincts in Harris County that support the same candidates that protected minority voters in Houston back.  There are similar Anglo urban precincts in Dallas County, and a sizeable part of Travis County shares this pattern.  So, while most of the Anglo dominated areas in Texas now vote in a highly polarized manner against the candidates preferred by black and Hispanic voters, there are important exceptions in selected areas in metropolitan Texas.

## Polarization and the 2011 Legislative Session

With the Texas electorate now sharply polarized along racial/ethnic lines, it was not surprising to see the 2011 Texas Legislature was similarly divided.  The 2010 tsunami that swept across Texas and much of the nation brought to Austin, as noted, huge Republican majorities in the House and Senate.  The surviving Democrats include a few urban white Democrats from coalition districts, but 90 percent of the party's members were minorities.  On the other side, the Republican majority ranks were 98 percent Anglo.

This unprecedented partisan division along racial-ethnic lines had many consequences in the regular and special sessions of 2011.  In basic policy, perhaps the most important was the severe cuts in education and health care funding – cuts that will disproportionately impact black and Hispanic Texans and were unanimously opposed by the Democrats, but with little overall impact on the final results.  Much of the rest of the sessions focused on "red meat" conservative issues including further restrictions on abortion, civil lawsuits, and expanding gun rights.  The Anglo Republican majorities also pushed hard on a voter ID bill bitterly opposed by both black and Hispanic Texans (it passed) and a "sanctuary cities" bill that Hispanics saw as moving Texas toward Arizona-type discrimination in law enforcement (it failed, largely because of procedural factors).

Throughout the session, Governor Perry and the Tea Party House members drove the show, enabling the former to firm up his credentials with social conservatives nationally if he pursues a presidential race this year.  And the latter made sure there were no meaningful compromises with the most minority Democratic side of the aisle.  The same pattern held on redistricting, as the 2011 Legislature passed plans for the Board of Education, the Texas House and Senate, and the United States Congress – all four plans diminished the political opportunities for black and Hispanic voters in Texas.

## The Increasing Unity between Black and Hispanic Voters in Texas

African American and Latino Texans have usually found themselves on the same side in Texas politics, but this pattern has become much more evident in recent years.  Some of the reasons have been touched on, but because it is an important factor in Voting Rights Act

cases, this increasing unity of Hispanic-black interest should be examined more closely.  The common cause of the two large minority populations in Texas is rooted in the following facts:

- Historic discrimination that deprived both populations of their political rights through devices like the poll tax and at-large elections.
- Similar economic interests in the areas of education, health care, and criminal justice. Black and Hispanic Texans have far lower median family income than Anglos, much less formal education, higher current dropout rates, and much higher levels of incarceration than Anglo Texans.  Recent studies show the Great Recession has harmed black and Hispanic Americans far more than non-Hispanic whites.
- The national Democratic Party has become much more dependent on support from both minority groups, and this is even more true in Texas where the white Democratic vote has shrunken to less than ten percent in some counties.[27]  On the other hand, we have seen the Texas Republican Party has made no effort to garner black support since the 1960s and, with the retirement of George W. Bush from office, the state Republican Party has pulled back from Hispanic outreach in the 21st century.
- The rise of the Tea Party in the last 18 months, and its huge impact within the Republican Party, has driven Hispanic and black Texans toward an even closer alliance.  The Tea Party harsh rhetoric of "taking our country" back (who took it away, one wonders?) and hostility to spending on safety net programs that are enormously important to Hispanic and black Texans has made mutual minority interests crystal clear.
- That unity was on full display in Austin, Texas from January to June 2011 when black and Hispanic members stood together on substantive issue after issue eing pushed by Anglo conservative members.

This strengthening of the bonds between black and Hispanic voters in Texas in the 21st century is particular evident in the major metropolitan areas of the state where a) most of the state's population growth has been occurring, and b) where almost of that new growth is accounted for by Hispanics and African Americans.  This unity is critical to both minority populations in the largest metropolitan areas of Dallas-Fort Worth and greater Houston. The majority of Anglos in these urban centers have polarized in support of candidates not favored by black and Hispanic voters, so uniting behind the same candidates in November General elections is essential, and that has in fact been the case.

## III.  The 2011 Redistricting Process in Texas and the Resulting Congressional Plan C185

### A.  Revisiting Demographic Changes in Texas and Its Political Consequences

---

[27] Senator Obama got just 7.9% of the 2008 two-party vote in Roberts County, 9.6% in Glasscock County, and 5.0% in King County.

We have previously noted the interesting fact that despite huge protected minority population growth in Texas since the 1990 census, the plans passed by the Texas Legislature in 2001, 2003, and 2011 have not reflected that growth.  It is particularly interesting that this happened in the most recent session, given the notable slowing of Anglo growth in Texas to just 4.9% compared to a 24.3% increase in the African American population, and a 41.9% gain among Hispanics in Texas.   With four new congressional seats shifted to Texas after the 2010 census numbers were released – and minority growth accounting for all of the apportionment gains – one would expect to see the 1991 pattern repeated, with the new seats reflecting the huge minority growth.  Of course, that did not occur.

Aside from this disparity in population growth over the decade, two other demographic factors were very relevant to the most recent redistricting.  First, *growth was very uneven across the state*.  Much of rural and small town Texas experienced little if any growth, or even population losses over the decade, with the exception of Hispanic areas along the border.  With almost all the population gains in Texas in the three "megapolitan" areas of Dallas/Fort Worth, Austin-San Antonio, and Houston, followed by majority Hispanic counties along the Mexican border, inventive ways were going to have to be used to preserve Anglo dominance because these areas now included far more minority residents than whites of non-Hispanic origin, minorities that have lately been voting together against the candidates supported by most Anglo voters.  An additional complication was the presence in the big urban core counties of Harris, Dallas, Tarrant, and Travis of fairly sizable Anglo populations – young, better educated, more affluent – more likely to vote for candidates like Barack Obama or Bill White that minorities were supporting.

The second general factor of great importance to redistricting was *the very rapid suburbanization of the minority populations in Texas*.  White flight to the suburbs dominated the demographic shifts in Texas from 1960 to 2000, making these areas increasingly Republican and more and more a force in statewide elections.  After 2000 that process greatly slowed.  There were now comparably fewer Anglos left in the older urban centers – they had already left, and fewer non-Hispanic whites were moving to Texas than had been the case in earlier decades.  Meantime, minority immigration to Texas continued, and with low Anglo birth rates plus higher death rates compared to the minority populations, suburban growth is increasingly driven by black, brown, and Asian flight from central cities.  This produced a very large number of racially and ethnically mixed neigborhoods in Texas over the decade, and these areas are key to the 2011 redistricting process.  If plans are produced that gave the large, and growing, Hispanic and black populations in these areas reasonable opportunities to elect candidates of their choice, the legislative and congressional delegates from 2012 to 2020 would reflect this new Texas.  Conversely, if plans are drawn that marginalize the fastest growing segment of the Texas population – suburban Hispanics and blacks – then the elected representatives of the people over the next decade will look more like Texas in 1990 than the present reality.

Before looking at Plan C185, it is useful to look closely at the new racial mixedmixed suburbs, and how the growth of protected minority populations areas has changed the local voting results.  Table 7 summarizes population and vote data for 6 suburban voting precincts

**Table 7:  Population Change and Presidential Vote Patterns in Mixed Precincts in Harris County:  2000 – 2010**

| Pct | Year |  | **Total Population** | | | | | **Voting Age Population** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  | Anglo% | Hisp% | Black% | Other% |  |  | Anglo% | Hisp% | Black% | Other% |
| 599 | 2000 | 3,324 | 62.8 | 16.4 | 14.4 | 6.5 |  | 2,368 | 66.8 | 14.7 | 12.8 | 5.5 |
|  | 2010 | 13,237 | 19.4 | 39.7 | 36.5 | 4.4 |  | 8,904 | 23.8 | 37.0 | 34.3 | 4.9 |
|  |  |  | Rep | Dem | Dem% |  |  |  |  |  |  |  |
|  | Pres Vote in 2000…… | | 849 | 457 | 35.0 |  |  |  |  |  |  |  |
|  | 2004……. | | 936 | 676 | 41.9 |  |  |  |  |  |  |  |
|  | 2008……. | | 1049 | 1855 | 63.9 |  |  |  |  |  |  |  |
| 553 | 2000 | 7,367 | 43.6 | 36.1 | 13.2 | 7.1 |  | 4,652 | 46.7 | 33.3 | 12.4 | 7.6 |
|  | 2010 | 11,303 | 22.6 | 52.7 | 16.4 | 8.3 |  | 7,512 | 26.4 | 49.1 | 15.5 | 9.0 |
|  |  |  | Rep | Dem | Dem% |  |  |  |  |  |  |  |
|  | Pres Vote in 2000…….. | | 903 | 702 | 43.7 |  |  |  |  |  |  |  |
|  | 2004…….. | | 1161 | 866 | 42.5 |  |  |  |  |  |  |  |
|  | 2008…….. | | 1051 | 1219 | 53.7 |  |  |  |  |  |  |  |
| 600 | 2000 | 6,835 | 38.6 | 31.7 | 16.6 | 13.0 |  | 4,680 | 41.7 | 29.9 | 14.5 | 13.9 |
|  | 2010 | 7,920 | 20.8 | 43.1 | 22.3 | 13.8 |  | 5,728 | 24.6 | 39.5 | 21.3 | 14.6 |
|  |  |  | Rep | Dem | Dem% |  |  |  |  |  |  |  |
|  | Pres Vote in 2000……… | | 840 | 641 | 43.3 |  |  |  |  |  |  |  |
|  | 2004……… | | 952 | 1103 | 53.7 |  |  |  |  |  |  |  |
|  | 2008……… | | 830 | 1363 | 62.2 |  |  |  |  |  |  |  |
| 605 | 2000 | 8,169 | 23.4 | 37.6 | 33.3 | 5.7 |  | 5,108 | 26.4 | 35.5 | 31.9 | 6.3 |
|  | 2010 | 13,431 | 10.2 | 59.5 | 27.1 | 3.2 |  | 8.537 | 12.5 | 55.7 | 28.1 | 3.7 |
|  | Pres Vote in 2000……… | | 668 | 1323 | 66.4 |  |  |  |  |  |  |  |
|  | 2004……… | | 871 | 1640 | 63.9 |  |  |  |  |  |  |  |
|  | 2008……… | | 745 | 2297 | 75.5 |  |  |  |  |  |  |  |
| 614 | 2000 | 7,321 | 36.3 | 20.1 | 24.3 | 19.3 |  | 5,204 | 39.8 | 18.4 | 22.2 | 19.6 |
|  | 2010 | 8,433 | 15.5 | 39.3 | 28.3 | 16.9 |  | 6,010 | 18.5 | 35.2 | 28.4 | 17.9 |
|  |  |  | Rep | Dem | Dem% |  |  |  |  |  |  |  |
|  | Pres Vote in 2000………. | | 1124 | 946 | 45.7 |  |  |  |  |  |  |  |
|  | 2004………. | | 1150 | 1261 | 52.3 |  |  |  |  |  |  |  |
|  | 2008………. | | 886 | 1554 | 64.7 |  |  |  |  |  |  |  |
| 765 | 2000 | 7,876 | 36.7 | 21.9 | 20.8 | 20.6 |  | 5,745 | 39.3 | 21.1 | 18.7 | 20.9 |
|  | 2010 | 7,570 | 23.8 | 30.0 | 31.5 | 14.7 |  | 5,725 | 27.2 | 28.0 | 28.9 | 15.9 |
|  | Pres Vote in 2000………. | | 988 | 761 | 43.5 |  |  |  |  |  |  |  |
|  | 2004………. | | 934 | 985 | 51.3 |  |  |  |  |  |  |  |
|  | 2008………. | | 853 | 1295 | 60.3 |  |  |  |  |  |  |  |

Source:  Voting data from Harris County Clerk.

In Harris County, Texas.  The total population and voting age population for each precinct are shown from the 2000 and 2010 censuses.  These precincts are the new "landing zone" for the massive out-migration of Hispanic and black residents of Houston.  As such, the precincts were growing, and their Anglo population percentages were dropping sharply.  In 2000 there

were 40,892 people in these precincts.  By 2010 that number had risen to 61, 894, a 51.4%
increase.  Given that the state of Texas and Harris County were growing about a 20% over the
decade, it is clear these mixed areas were accounting for a much larger share if the overall
growth than most parts of the county or state.

Not only were these areas growing, but all of that growth was from minorities.  In 2000, the
mean Anglo percentage in these precincts was 40.2, the Hispanic percentage was 27.3, and
the black mean was 20.4%.  By 2010 the Anglo mean had dropped to 18.7%, while the
Hispanic percentage rose to 44.1%, and the black mean was 27.0%.

With rapid minority growth, the vote patterns in the precincts also changed.  In 2000, the
Democratic presidential nominee, Al Gore, got 4,830 votes in these precincts, or 46.3% of the
two-party vote, to 5,372 votes for George W. Bush lead in five of the six boxes.  In 2004,
John Kerry, the Democratic nominee got 6,531 votes, or 52.1% of the two-party vote in these
same precincts.  Kerry won four precincts, Bush two.  In 2008, Senator Obama received 9,583
votes in these same precincts, to 5,414 for Senator McCain, a 63.9% share of the two-party
vote.   With strong support from minority voters, Obama carried all six precincts.

One might hypothesize that as upward-mobile minority voters moved into suburbs dominated
by Anglos who favored Republicans, they would adopt the voting habits of the local residents.
That did not happen in Harris County, nor in Dallas, nor Tarrant County, where the same out-
migration of minorities was transforming suburban areas.

In summary, when one looks at the overall pattern of protected minority population and
voting growth in metropolitan areas, almost all occurred in the suburbs.  The inner-city wards
and barrios had little population growth, and voting levels declined.  But the surging suburban
vote, coupled with Anglo declines, drove up the overall Democratic vote.

### B.  *Analyzing Plan C185*

**Overall Considerations**

After their electoral sweep in November 2010, legislative Republicans totally controlled the
2011 redrawing of maps for the state Board of Education, the U.S. Congress, the Texas Senate
and the Texas House of Representatives.  As we have mentioned earlier, the map-drawers this
year faced several challenges.  These included the following:

- Many incumbents to protect
- Little if any population growth in rural Anglo areas completely
  represented by Republicans
- Strong growth in Hispanic areas that traditionally vote Democratic
- Metropolitan area growth was due to non-Anglos, with 90%
  accounted for by blacks and Hispanics with protected status under
  the Voting Rights Act
- Having to draw maps that would be tested in a presidential election
  year with much higher turnout among black and Hispanic voters
  than occurred in the 2010 midterm election.

- Little ability to reach out to minorities as is 1991, or even 2003 and make the case that enhancing Republican opportunities could be beneficial to minority voters at the expense of white Democrats.

Because of the last point, a major difference in the 2011 redistricting cycle in Texas compared to earlier years was that the combination of great GOP success with Anglo voters, and the accompanying polarization of black and Hispanic voters toward Democratic nominees in recent general elections, created essentially a zero-sum game.  Minority gains in representation opportunities would have to be to the expense of Republicans, and any further Republican gains would have to be at the expense of protected minority voters.  That sharp reality has brought the Voting Rights Act into play.  This is because while the 2011 map-drawers will likely say that their changes this year were nothing more than the usual partisan gerrymander like the Democratic maps in 1981 and 1991, or their own maps in 2001 and 2003, and thus should pass muster with the Department of Justice and the federal courts, the reality is that the 2011 maps in question have violated the voting rights of protected minorities.  How was this done?

First, by the overall conduct of the 2011 districting process which was almost entirely done out of public view, especially with respect to C185, which was made public late in the 2011 special session and quickly enacted with no meaningful opportunity for protected minorities to have their reservations to the proposed map taken seriously.  These actions provide evidence of intentional discrimination in congressional redistricting.

Second, Plan C185 does not reflect the reality that 82% of the state's growth was Hispanic and African American, which entirely accounted for the four new Texas seats.  But rather than using that surplus to enhance minority voter opportunities, the new map actually reduces the opportunity for black and Hispanic voters to elect persons to represent them in Washington, D.C..  Under the map used in the 2010 elections, 11 of 32 districts gave minorities the opportunity to elect congress members.  Because of the unusual nature of turnout in that election year (very high voting by older conservative Anglos, and average turnout by minorities for a midterm election), in the 23rd and 27th opportunity districts, candidates were elected in 2010 who did not have the support of protected Hispanic voters.  However, with the next cycle being a presidential year, both existing districts would once again give minority voters an effective opportunity to elect candidates of their choice.  But plan C185 lessens that possibility in the 23rd District, by substantially increasing the Anglo vote percentage in Bexar County where there is a well documented history of polarized voting in General Elections against candidates supported by Hispanics.  This effectively cancels out the new opportunity district running from Austin to San Antonio.    The enacted Plan 185 also does some fancy switching with the 27th District, by shifting it north into the heavily Anglo Coastal Bend Counties instead of its historic alignment south to Cameron County.  That maroons 206,293 Nueces County Hispanics in an Anglo district while removing them from an effective minority district.

With no new net opportunities elsewhere on the state map, C185 produces a map very likely to have 26 districts dominated by Anglo voters in 2012 (72 percent) compared to 10 (28%) by protected minorities.  That is more than a little out of line with the overall state population which Hispanics and Blacks outnumbered Anglos 12,480,239 to 11,669,272 in April, 2010 – a gap that will certainly have widen even further by November 2012.

Finally, there is considerable evidence many Republicans were concerned about the discriminatory effect of the congressional map being developed out of public view.  On April 4, 2011, the online political website *Politico* ran an article by John Bresnahan entitled "Lamar Smith, Joe Barton in Texas map dust-up."[28]  According to Mr. Bresnahan,

> "A bitter, behind-the-scenes fight has broken out among Texas Republicans over redistricting, pitting Rep. Lamar Smith against longtime colleague Rep. Joe Barton….
>
> Smith, chairman of the House Judiciary Committee and the point man on redistricting for Texas Rdepublicans, is pushing for Texas Republicans to evenly split four new districts between Republicans and Democrats, *acknowledging that Texas's surging Hispanic population will gain minority-majority seats in the Dallas and Houston areas.*  (My emphasis)
>
> … Smith brought in an official from the Texas Supreme Court last week to tell GOP lawmakers that there is no way to craft solid GOP districts that would meet Justice Department or federal court approval….[29]

Given the C185 map it is quite clear that Congressman Smith and the Texas Supreme Court official were ignored.  A maximalist plan that actually further reduces the already limited opportunities for protected minorities to elect representatives was passed into law by the Texas Legislature.


While there are numerous problems across the state with Plan C185, I focus my attention on the largest metropolitan areas of Texas, Dallas-Fort Worth and greater Houston.  Specifically, I look at how the map works in Harris and Fort Bend Counties in metropolitan Houston, and in Dallas and Tarrant Counties in north Texas.

### Plan C185 and Harris and Fort Bend Counties

Table 8 shows Harris and Fort Bend Counties added about 920,000 people between 2000 and 2010, and all of that growth was among minorities, as the two-county Anglo population declined by 42,422 in the area.  Hispanic growth in the two counties was 615,885, and with a black increase of 209,375, for a combined gain of 824,260.  Given that the ideal population for a congressional district in 2011 is just 698,488 it would seen obvious that opportunities for black and Hispanic voters in Harris and Fort Bend Counties ought to be significantly enhanced by a new map, especially with four additional districts coming to Texas. Furthermore, black and Hispanic growth in the metropolitan region tended to occur in the same areas, as happened in the eastern half of Fort Bend County and southwest Harris County.  Coupled with the strong recent unity of General Election voting by blacks and Hispanics in the region, it would be easy to create a second local district, in addition to the existing 29th District, that would give Latino voters the opportunity to elect candidates of their choice while maintaining the effective African American opportunity districts Nine and Eighteen.  Plan C185 obviously fails with respect to creating a new Hispanic district, and violates a number of traditional redistricting principles in dealing with the 9th and 18th which are effective opportunity districts for African American voters.

### *The Ninth District*

---

[28] http://www.politico.com/news/stories/0411/52451.html
[29] Ibid., pp. 1, 2.

The existing 9th District is a compact district in south central Harris County with a small part of Fort Bend County added.  The district was very near the required population, with a surplus of  35,508, or 5.05%.  That meant little alteration was required, but the enacted plan unnecessarily carves out the center of the district, and moves the 9th much deeper into new suburban areas in Fort Bend County.   And while C185 does not make significant changes in population and VAP percentages initially, the addition of a large and relatively undeveloped area in Fort Bend County makes this a quite different district that the current one, with its future population makeup much more uncertain than is the case with the existing 9th which is largely made up of mature urban neighborhoods that are unlikely to see great democratic or racial/ethnic changes over the next ten years.

That last point is important because Plan C185 also leaves a Hispanic plurality (271,030 to 259,045 Non-Hispanic blacks) in the new district.  With the sizeable territory added in Fort Bend County and the overall much faster growth of the Latino population in the area, C185 increases the possibility that, over the decade when such a plan would be in effect, competition between Hispanics and blacks in the Democratic Primary could threaten the status of the 9th as an African American opportunity district.  Plan C185 also removes a number of important economic assets from District 9, including a number of facilities in the Texas Medical Center.  This diminishes the member's opportunity to leverage such assets for the benefit of a district that contains a high percentage of persons below the poverty line and families without health insurance.

To sum up, while the 9th remains a minority opportunity district in 2011, a number of traditional redistricting factors were ignored in the C185 plan.  The existing compact and slightly over-populated district was carved up by mapmakers that ignored existing communities of interest, member constituent relations, and the population dynamics of the area.   And, by adding a large swath of undeveloped suburbia to an inner city district, C185 creates an unnecessary risk that the Ninth District will cease being a viable African American opportunity district.

**Table 8:  Population Change in Harris and Fort Bend Counties:  2000 to 2010**

**Harris County Population**

|  | **2000** | **2010** | **Change** |
|---|---|---|---|
| **Non-Hispanic Whites** | 1,432,264 | 1,349,826 | -82,438 |
|  | 42.1% | 33.0% | -  9.1% |
| **Hispanics**................ | 1,119,751 | 1,671,540 | +551,789 |
|  | 32.9% | 40.8% | +  7.9% |
| **Non-Hispanic Blacks** | 631,780 | 775,345 | +143,565 |
|  | 18.6% | 18.9% | +  0.3% |
| **Asians/Others**......... | 216,783 | 296,928 | +  80,145 |
|  | 6.4% | 7.3% | +  0.9% |
| **TOTAL**................. | 3,400,578 | 4,092,459 | +  691,881 |

**Fort Bend Population**

|  |  |  |  |
|---|---|---|---|
| **Non-Hispanic Whites** | 163,788 | 211,680 | +  40,016 |
|  | 46.2% | 36.2% | -11.4% |
| **Hispanics**................ | 74,871 | 138,967 | +  64,096 |
|  | 21.1% | 23.7% | +  2.6% |
| **Non-Hispanic Blacks** | 71,026 | 126,836 | +  55.810 |
|  | 20.0% | 21.7% | +  1.7% |
| **Asians/Others**.......... | 44,767 | 107,892 | +  63,125 |
|  | 12.6% | 18.4% | +  5.8% |
| **TOTAL** ................... | 354,452 | 585,375 | +230,923 |

Source:  U.S. Census

*The 18th District*

Plan C185 treats District Eighteen in a similar fashion to District Nine.  As with the Ninth District, the existing 18th is moderately over-populated (22,503 or +3.22%), so only minor changes were required to meet the one-person/one-vote requirement.  But once again we see major disruptive changes were needless made to the 18th District.  First, the Central Business District of Houston was removed.  The CBD had been in the 18th District since Barbara Jordan represented Houston, but C185 pulls this most valuable economic asset out of the 18th District for no good political purpose since it has few people or voters.  Congresswoman Jackson-Lee has spent over 16 years working on a wide range of issues for major economic

players based in downtown Houston, including major energy companies, the Metropolitan Transit Authority, the Federal Detention Center, and a wide range of public infrastructure projects.  Arbitrarily severing the relationship between the 18th District's representative and these key economic players will do serious injury to the district's residents, may of whom live and/or work near downtown.

Second, the new district not only pushes deep into the center of the Ninth District, but extends a corridor into the Fondren Southwest area that has nothing in common with the existing district residents.  On the other hand, the Third Ward-MacGregor area is split, dividing a traditional black community that has been in the 18th District since 1972.  Black voters are not monolithic, and have a strong sense of identity with longtime neighborhoods and supporting institutions and political representatives.  The Third Ward-MacGregor area is one of the most important traditional communities in Houston.  To split it, again without reason or justification shows an arrogance, if not contempt, for its longtime residents and a complete disregard for any sense of preserving communities of interest in the black neighborhoods.

Finally, a large group of fast-gentrifying precincts in the Montrose area are added to the 18th District, pushing up the Anglo VAP in the new district from 19.3% to 22.1 and the Asian/Other VAP to 6.2% from 4.1%.  Since the inner city African American areas are likely to continue losing black residents over the next ten years, this new territory with a growing Anglo population will contribute to a declining black population in the redrawn 18th.  As with the 9th, the 18th is thus put at risk of no longer being an effective African American opportunity district over course of the decade, especially if the incumbent Congresswoman Jackson-Lee does not seek reelection.

If there were measurable improvements for black and Hispanic voters elsewhere in Texas under Plan C185, perhaps these disruptive and unnecessary changes in Districts 9 and 18 might be justified.  But since the map adopted by the Texas Legislature does effectively nothing for protected minority voters statewide, and actually harms them in the Houston area, there is good reason the federal court to put this map aside and start with a new and fair plan for Texas.


**Plan C185: Dallas and Tarrant County**

As Table 9 on the following page shows, population growth in Dallas County slowed markedly after 2000, mostly because of massive out-migration of Anglos, whose population fell from 983,693 to 784,693 over the 10 year period.  Black growth picked up compared to the 1990s, resulting in the African American population share county-wide rising from 20.5 to 22.5 percent.  But Hispanic growth far outpaced this, with a gain of 243,211 people.  In 2000, Anglos were a plurality of the county population with 44.3%.  By 2010, they had fallen to second at 33.1%, with Hispanics now the largest population group in the county at 38.3.  Dallas County has changed quite a bit since J.R. Ewing was scheming down on the Southfork Ranch in the 1980s.  Unfortunately, when it comes to Dallas congressional politics, the Ewings are still in the saddle, and Plan C185 will keep them there another ten years.

**Table 9:  Population Change in Dallas and Tarrant Counties:  2000 to 2010**

| | **Dallas County Population** | | **Change** |
|---|---|---|---|
| | **2000** | **2010** | **2000 – 2010** |
| **Non-Hispanic Whites** | 983,307 | 784,693 | -198,614 |
| | 44.3% | 33.1% | -10.2% |
| **Hispanics**............... | 662,729 | 905,940 | +243,211 |
| | 29.9% | 38.3% | +8.4% |
| **Non-Hispanic Blacks** | 455,278 | 533,018 | +77,740 |
| | 20.5% | 22.5% | +2.0% |
| **Asian/Other**............ | 117,575 | 144,488 | +26,913 |
| | 5.3% | 6.1% | +0.8% |
| **TOTAL** | 2,218,899 | 2,368,139 | +149,240 |

| | **Tarrant County Population** | | **Change** |
|---|---|---|---|
| | **2000** | **2010** | **2000 – 2010** |
| **Non-Hispanic Whites** | 895,253 | 937,135 | +  41,882 |
| | 61.9% | 51.8% | -10.1% |
| **Hispanics**............... | 285,290 | 482,977 | +197,687 |
| | 19.7% | 26.7% | +  7.0% |
| **Non-Hispanic Blacks** | 188,858 | 275,864 | +  87,006 |
| | 13.1% | 15.2% | +  2.1% |
| **Asians/Others**.......... | 77,018 | 113,058 | +  36,040 |
| | 5.3% | 6.2% | +  0.9% |
| **Total** | 1,446,419 | 1,809,034 | +362,615 |

Source:  U.S. Census Bureau.

Table 9 also shows the population data for Tarrant County, which grew at a faster pace than its eastern neighbor.  Almost all that growth was due to minority increases.  As a consequence, Tarrant's non-Hispanic white population share dropped ten points over the 2000 – 2010 period and the county will be a majority-minority county by 2012.

When we look at the combined population data in Table 10 for the two big north Texas counties and compare these to the numbers for Harris and Fort Bend Counties we see a

31

number of close parallels.   Dallas and Tarrant Counties have a higher Anglo population, but they are also losing Non-Hispanic whites at a faster rate than Harris and Fort Bend, so this difference is rapidly closing.  The north Texas counties have somewhat smaller Hispanic and Asian/Other populations than the Houston area counties, but they have almost exactly the same African American population share.

**Table 10:  Dallas/Tarrant Counties Compared to Harris/Fort Bend Counties**

|  | **Dallas/Tarrant** | | | **Harris/Fort Bend** | | |
|---|---|---|---|---|---|---|
| **Total Population……** | 4,177,173 | | | 4,672,834 | | |
| **Non-Hispanic Whites** | 1,721,828 | 41.2% | -156,732 | 1,561,506 | 33.4% | -  42,422 |
| **Hispanics……………** | 1,388,917 | 33.3% | +440,89 | 1,810,507 | 38.7% | +615,885 |
| **Non-Hispanic Blacks** | 808,882 | 19.4% | +164,786 | 902,181 | 19.3% | +199,375 |
| **Asians/Others……….** | 257,546 | 6.2% | +  62,953 | 404,820 | 8.7% | +143,270 |

Source:  2010 U.S. Census

What the combined counties do not have is *comparable congressional representation.*  There are three congressional districts in the Houston area that are minority opportunity districts – the 9th, the 18th, and the 29th.  There is only one such district in Dallas/Tarrant County.  What accounts for this?

Several explanations are possible.  Maybe protected minorities do not vote together in Dallas/Tarrant Counties the way they do in Harris/Fort Bend.  Not true.  Black registration, turnout, and General Election partisanship is essentially the same in both areas, as is the case with Hispanics.  Table 11 shows the voting pattern in 20 Dallas County precincts in the November 2008 and 2010 General Elections.  The table reports the vote percentage received by Lupe Valdez in her successful Sheriff contest in 2008, and the vote percentage received by District Attorney Craig Watkins, an African American, in 2010. The five heavily African American precincts gave overwhelming support to Ms. Valdez (mean of 95.7%) and Mr. Watkins (97.8%).  In precincts that contain large numbers of Hispanic and blacks – the second grouping in the table – we again see very large majorities for both Lupe Valdez and Craig Watkins.  Obviously both populations in these precincts are supporting the same candidates. The third grouping is of precincts with large Hispanic majorities, and here again we see large majorities of voters backed Valdez and Watkins.   The last set of precincts has a combined protected minority population of less than 10 percent.  They gave, on average, less than a quarter of their votes to the candidates supported by minority voters.

Another possibility for the big difference in minority voter representation iu Dallas and Tarrant Counties compared to Harris and Fort Bend is that the north Texas minorities are more dispersed and thus not easily fitted into compact opportunity districts.  Again, that is not the case.  The heavily black and Hispanic neighborhoods in the Dallas/Fort Worth area were

**Table 11:  General Election Voting Patterns in Selected Dallas County Precincts in Elections for Sheriff (2008) and District Attorney (2010)**

| Pct | Black | 2010 Population % | | Percentage of Vote Received by | |
| | | Hispanic | Combined | Lupe Valdez<br>Sheriff – 2008 | Craig Watkins<br>District Attorney – 2010 |
|---|---|---|---|---|---|
| 3347 | 89.1 | 9.2 | 98.3 | 97.4 | 97.5 |
| 3533 | 90.2 | 7.5 | 97.7 | 98.0 | 99.7 |
| 3540 | 89.4 | 6.0 | 95.4 | 96.8 | 99.5 |
| 3545 | 89.8 | 7.2 | 97.0 | 95.4 | 98.3 |
| 3806 | 85.4 | 8.0 | 93.4 | 90.8 | 94.1 |
| **Mean** | **88.8** | **7.6** | **96.4** | **95.7** | **97.8** |
| 3216 | 35.0 | 61.2 | 96.5 | 89.9 | 96.5 |
| 3354 | 42.1 | 54.7 | 96.8 | 95.4 | 92.5 |
| 3502 | 57.7 | 40.2 | 97.9 | 98.3 | 96.3 |
| 3538 | 44.6 | 48.4 | 93.0 | 92.5 | 93.2 |
| 4417 | 36.0 | 71.2 | 97.2 | 81.8 | 83.9 |
| **Mean** | **43.1** | **55.1** | **98.2** | **91.6** | **92.5** |
| 1103 | 2.4 | 92.4 | 94.8 | 72.9 | 65.1 |
| 1106 | 3.6 | 93.2 | 96.8 | 81.5 | 66.0 |
| 1125 | 5.9 | 91.8 | 97.7 | 75.2 | 70.7 |
| 3322 | 7.7 | 85.2 | 92.9 | 77.4 | 79.8 |
| 4445 | 2.5 | 94.9 | 97.4 | 80.2 | 71.9 |
| **Mean** | **4.4** | **91.5** | **95.9** | **77.4** | **70.7** |
| 1114 | 1.8 | 7.7 | 9.5 | 29.0 | 28.3 |
| 1135 | 5.0 | 2.0 | 7.0 | 24.5 | 23.2 |
| 1208 | 0.0 | 3.0 | 4.0 | 12.4 | 10.2 |
| 1216 | 0.2 | 4.4 | 4.6 | 18.9 | 16.1 |
| 1231 | 0.8 | 9.1 | 9.9 | 35.4 | 32.4 |
| **Mean** | **1.6** | **5.2** | **6.8** | **24.0** | **22.0** |

Sources:  Population data is from 2010 U.S. Census.  Vote percentages are taken from Dallas
County Election Archives for 2008 and 2010.

fairly close together in 2000.  Since then, the combination of out-migration of Anglos and the
rapid growth of mixed neighborhoods like the second set to precincts in Table 11 has
consolidated a broad swath of territory in over half of Dallas County and a third of Tarrant
County that provides ample population for three compact minority opportunity districts.  It is
now easier, in my opinion, to draw three minority opportunity districts in Dallas and Tarrant
Counties in 2011 than was the case in Harris and Fort Bend Counties in 2003 when three such
districts were produced by the Texas Legislature.

The reason for the lack of minority representation in Dallas and Tarrant Counties is simply a matter of a discriminatory congressional map that has been used to dilute minority voters' impact for 20 years.  In 1991 the Democratic map-makers created a single new opportunity district for African Americans, but used the remaining minority growth to shore up incumbent white Democrats.  In 2003, the Republican map-makers packed as many minorities as possible into the 30th District, and then craved up the large remaining, and now much larger minority populations to minimize their electoral opportunities.  That was hard to do in 2003, and is even harder in 2011, but the authors of C185 have pulled it off.  The enacted map brings 11 congressional districts into the Metroplex.  Ten of them are dominated by conservative Anglos voters with a history of polarized voting against minorities.  That leaves the lonely 30th as the only opportunity district for protected minorities.  So here in an area where Senator Obama won 45 percent of the metropolitan area vote with overwhelming support from black and Hispanic voters, these same voters, now more numerous than in 2008, will have an opportunity to elect a candidate of their choice in one of eleven congressional districts in the area.  To achieve this result, Plan C185 creates a tangle of districts like the 5th and 6th that start out in rural and small town communities and cut into Tarrant and Dallas Counties to get enough people to reach the 698,488 required, but not enough minority voters to give them an opportunity to elect a representative of their choice.  Other districts like the 24th combine enough low participation/high population minority precincts with high participation/low population Anglo neighborhoods to effectively deprive minorities of the opportunity to elect candidates of their choice.

The slicing and dicing of the Dallas/Fort Worth area raises, in my opinion, the issue of whether a partisan gerrymander can be so extreme as to deprive local citizens of their 14th Amendment right to equal protection of the laws.  The U.S. Supreme Court in *Davis v. Bandemer* (1986) held that such a claim might be justified but defined no manageable standard to adjudicate such and in *Vieth v. Judelirer* (2004) could not agree as to whether partisan gerrymanders could be adjudicated.  The Texas congressional map provides a good opportunity to revisit this issue, given the unequal treatment of citizens in the Dallas.Fort Worth area (and their fellows in Travis County, Texas who were split among five very odd-shaped districts).   All Texans may be equal, but some are far more equal than others under Map C185.

Map C185 makes uses a number of very clever maneuvers in the Dallas/Fort Worth area to thwart the great demographic changes moving across the area.  One way to look at how those demographic changes have impacted local election outcomes between 2000 and 2010 is to take a fixed unit that is not subject to human design, and track what happened in the last six General Elections.  The unit I focus on is Dallas County, whose necessarily compact boundaries (it is a square) have not been altered since it was organized out of Nacogdoches and Robertson Counties in 1846.[30]

Table 12 looks at this fixed district – Dallas County – that is experienced very rapid population change over the last decade.  This population change, we previously noted, was driven by a  declining Anglo population accompanied by the increasing population of protected minorities, minorities that have had minimal opportunities to elect candidates of their choice to Congress.   Because we have shown that the Anglo and protected minority populations in Texas – always somewhat polarized – have become even more so in days of

---

[30] *Texas Almanac,1968-1969*, p. 265.

President Obama and the Tea Party, we would expect that the population changes would be reflected in General Elections in Dallas County as a whole because redistricting to dilute minority voting opportunities is not possible.

Let us look at the evidence.  In 2000, the combined voting age population (VAP) of blacks and Hispanics in Dallas County was 729,367, or 93.1% of the 2000 Anglo VAP of 783,657.  By 2010, the combined minority VAP in the county was 946,841, or 143.9% of the Anglo VAP, which had fallen to 657,889.  Assuming the change was linear, we can estimate what the minority VAP percentage was in each general election between 2000 and 2010 which is done in Table 11.  We can then look at the contested county-wide General Election races in the county to see how candidates supported by protected minorities fared to the polls each November of even-numbered years.

In 2000, few Democrats were on the county-wide ballot, reflecting the accepted wisdom that running in Dallas County was a waste of time, especially with a local resident, George W. Bush, as the Republican presidential nominee.  The conventional wisdom was on spot – Republicans swept the seven contested county contests while losing the black and Hispanic vote.  In 2002, the Democrats nominated their first Hispanic candidate for governor, Tony Sanchez, and former Dallas Mayor Ron Kirk, an African American, won the nomination for an open U.S. Senate seat.  That combination inspired 50 contested races in 2002.  Ron Kirk narrowly carried the county, as did three other candidates supported by minorities, but 92 percent were defeated.  In 2004 just 12 races were contested.  President Bush carried the county, but by only 10,000 votes and the minority-supported Democratic nominees won six of the other 11 contests, for a 50% success rate.

That relative success in a traditionally Republican county resulted in 56 contests in 2006.  Candidates supported by Hispanic and African American voters won 52 of these, a 93 percent success rate.  In 2008, minority supported candidates in Dallas County lead in all 19 contested elections.  We noted earlier that 2010 was a great year for the mostly Anglo Tea Party movement, especially in Texas.  Minority voting dropped, while older whites voted at near presidential levels.  But even with these strong headwinds blowing, minority supported candidates like District Attorney Craig Watkins won 47 of 48 local contests.  Long-term demographics trumped short-term political trends.

What Table 12 clearly demonstrates in Dallas County is that over the period from 2000 to 2012 the combined dramatic increase in protected minority populations, coupled with the decline of Anglo voters polarized against the former, turned the county upside-down politically.  In 2000 almost no minority-supported candidates even bothered to file for office.  By 2010, virtually every county office was held by persons like Sheriff Lupe Valdez and District Attorney Craig Watkins – candidates elected by a coalition of black and Hispanic voters, with a little help from inner-city Anglos.  They enjoyed this great success because they operated under a fair map – drawn by Texans in 1846 and never altered – that gave these protected minorities the opportunity to elect candidates of their choice.  Congressional map C185 denies the majority of these same voters, and their counterparts in Tarrant County that opportunity.  As such, it should not be allowed to go into effect.

**Table 12.  A Natural Experiment in Dallas County:  Observing How Change in the Black  and Hispanic Voting Age Population Is Reflected in Their Ability to Elect Candidates of Their Choice:  2000 to 2010**

| | 2000 | 2002 | 2004 | 2006 | 2008 | 2010 |
|---|---|---|---|---|---|---|
| **Black + Hispanic VAP** | 729,367 | | | | | 946,841 |
| **Non-Hisp. White VAP** | 783,657 | | | | | 657,889 |
| **Black + Hisp. As a % of Anglos** | 93.1% | Est. 103.3% | Est. 113.5% | Est. 123.7% | Est. 135.8% | 143.9% |
| **Number of County-Wide Candidates Supported by Protected Minorities Who Won County** | 0 of 7 | 4 of 50 | 6 of 12 | 52 of 56 | 19 of 19 | 47 of 48 |
| **Percent** | 0.0 | 8.0 | 50.0 | 92.9 | 100.0 | 97.9 |

Note:  The 2000 Census counted 307,467 Non-Hispanic Voting Age Blacks and 421,900 Voting Age Hispanic for a combined VAP of 729,367.  The Non-Hispanic White VAP in 2000 was 783,657, so combined minority population was 93.1% of the Anglo VAP.  By 2010, the Anglo VAP had declined to 657,889 and the combined minority VAP had risen to 946,841, or 143.9% of the Non-Hispanic White total.  The interim percentages assume a linear trend, with the combined minority VAP rising 10.2% every two years.

### The Map Recommended by the NAACP and the Congresspersons Alexander Green, Sheila Jackson-Lee, and Eddie Bernice Johnson

Almost all of my focus in this report has been on broad historical patterns, partisan and demographic changes, and the grave problems with Congressional Plan C185 that was passed by the Texas Legislature.  I have had the opportunity, however, to review an alternative map supported by the NAACP and the three African American Congressmembers from Texas, Alexander Green, Sheila Jackson-Lee, and Eddie Bernice Johnson.

While I support the overall changes recommended in the map, I would like to briefly stress how this alternative effectively addresses the serious problems I detailed for minority voters

in the Houston and Dallas/Fort Worth metropolitan areas.  In Harris and Fort Bend Counties, the NAACP plan restores the traditional cores of Districts 9 and 18 that were unnecessarily dismembered by Plan C185.  Not only are communities of interest respected, and key economic assets like Downtown Houston and the Texas Medical Center – vitally important to low-income minority voters in the inner city – but the reconfigured populations keep these districts as effective opportunity districts for black voters, not only in 2012 but also for the rest of the decade, which C185 fails to do.

Not only does the NAACP plan better protect the two existing African American opportunity districts in the Houston area, but it also provides an opportunity to create a second Hispanic opportunity district in the area, which Plan C185 deliberately fails to do.

The alternative plan has even greater positive benefits for protected minorities in the Dallas/Fort Worth area in that it corrects the glaring failures in 2003 and 2011 to recognize the tremendous minority population growth in the area.  That growth, coupled with the increasing unity of black and Hispanic voters in Dallas and Tarrant Counties in recent years in the face of polarized opposing Anglo voters, and the greater concentration of the combined minority populations as measured by the 2010 census, provides the basis for a new map that provides three effective minority opportunity districts in the area, rather than the single district that was drawn 20 years ago.  The map proposed by the NAACP also improves on C185 in another important way.  The Texas Legislature's map left the 30th District as an effective opportunity district for Congresswoman Eddie Bernice Johnson, but the map also undermines the long-term viability for non-incumbent African American candidates to win the redrawn district by adding suburban growth areas not likely to support the same candidates as black voters.  The state plan also cut through existing communities of interest, and damaged opportunities for the low-income inner city residents by removing key economic assets from the district.  The alternative NAACP map corrects these defects with a more compact district, while also given most of the regions' minority population outside the 30th District the opportunity to elect candidates of their choice.

In light of these considerations, I strongly endorse this map as a vast improvement over the plan enacted by the Legislature this summer.

## IV.  Conclusion

In this report I have focused on several factors that are, in my opinion, relevant to the question before this federal court as to whether Plan C185 should be sustained and used for upcoming elections in Texas.

I have first made the case that Texas has a long and sad tradition of discriminating against its African American and Hispanic residents.  One place this has been most manifest is the electoral process.  Because of that discriminatory pattern, Congresswoman Barbara Jordan led a successful fight 36 years ago to bring Texas under the full provisions of the Voting Rights Act.  That inclusion, coupled with growing electoral power of the protected minorities, resulted in significant progress for minority voters since the 1970s.  Many more blacks and Latinos hold public office than was the case 20 years ago, and a good deal of that is accounted

for by the VRA because majority Anglos have continued to use a variety of means to hold unto power in the state.

The significant though incomplete progress blacks and Latinos have made in Texas is threatened by disturbing national trends that have been magnified in the Lone Star State. The electoral coalitions of the dominant national parties have shifted very far away from the old New Deal alignment that defined partisan attachments for the latter two-thirds of the 20th century.  In the 21st century we have seen a great "sorting out" into very different party coalitions.  White southerners and ethnic, blue collar whites, both critical bases of the old Democratic coalition have moved toward the Republicans.   Older whites have become more supportive of the GOP, while younger voters trend more Democratic.   Politics has become more ideological, with the Republican Party now clearly a party of conservative and very conservative voters.  Democrats are largely a party of moderates and liberals.

The new party alignment has a strong racial/ethnic component.  Whites are now much likely to align with the Republican Party while minority voters have become more supportive of Democrats.  The election of President Obama in 2008 and the emergence of the Tea Party in 2009 have widened and sharpened this racial/ethnic gap.  An obvious consequence is more racial/ethnic vote polarization.

These trends are especially evident in Texas.  Texas whites are more conservative and are considerably more Republican than is the case in the nation.  Blacks and Hispanics are both more numerous here than in the country, and more supportive of Democratic nominees.  This realignment has worked well for the Republicans in Texas who have control of all levers of power in Austin and hold both U.S. Senate seats and a 23 – 9 advantage in the state's congressional delegation.  But that power is threatened by the rapid growth of minority populations and the slower, but sure growth, of minority voting power.  The Anglo population is approaching stability, and is expected to decline in absolute numbers after 2020 while non-Anglo growth is almost certain to continue.

May of the electoral means the Anglo Democrats used for much of the 20th century (poll taxes, at-large elections, etc.) have now been invalidated, but one great power remains for a majority party – the ability to craft new political districts after a census.  Texas has a tradition of partisan gerrymanders, and Republicans have quickly mastered the art since taking power in the 1990s.  But partisan gerrymandering in Texas is complicated today because the partisan political polarization along racial/ethnic lines creates the real possibility that the overwhelmingly Anglo Republican Party will now use its power in the redistricting process to maintain its overwhelming dominance of the state's congressional delegation – a dominance not warranted by the declining Anglo population share in Texas.

That possibility became a certainty with the enactment of Plan C185 for congressional districts in Texas.  Even in the face of clear warnings from Republicans like Representative Lamar Smith that the huge minority growth necessitated some accommodation in the new congressional map, the authors of C185 opted for a map that, in my opinion, clearly violates the Voting Rights Act.  And that violation, again in my opinion, is so egregious that it provides very strong evidence why minorities in Texas still need the protection of the Voting Rights Act.  Barbara Jordan's life experience led her to right very hard to fully apply the VRA to Texas in 1975.  The Congress of the United States and President George W. Bush, a Texan, extended the Voting Rights Act in 2003, leaving this state subject to the full protection of the

law.  The 2011 redistricting process in Texas and Congressional Plan C185 shows the wisdom of their decision.  Plan C185 does not come anywhere close to passing muster under the VRA, in my opinion, and, as such, should be struck down by this court.

.

# Vita

# Richard Murray

**Contact Information**

Office:      Department of Political Science
             University of Houston
             Houston, Texas   77204-3474

             Office Phone:  (713) 743-3909
             Office Fax:      (713) 743-3927
             Office Email:   rmurray@uh.edu

Home:        3110 Underwood
             Houston, Texas   77025
             Phone:  (713) 667-2006

Education:

B.A.         Government, Louisiana State University, 1962
M.A.         Government, Louisiana State University, 1963
Ph.D.        Political Science, University of Minnesota, 1967

**Academic Appointments**

Director of Surveying, Center for Public Policy, University of Houston, 1984 - 1996, 2006 -      )

Director, Center for Public Policy, University of Houston, 1996 – 2006

Bob Lanier Professor of Public Policy, Dept. of Political Science, University of Houston, 2003 -

Professor, Department of Political Science, 1981 –

Associate Professor, Political Science, University of Houston, 1971 – 1981

Assistant Professor, Political Science, University of Houston, 1967 – 1971

Instructor, Political Science, University of Houston, 1966 – 1967

**Selected Publications**

*Books*

**The Houston Metropolitan Study:  An Entrepreneurial Community Looks Ahead** (co-author),  Houston:  UH Center for Public Policy/Rice University: Baker Institute for Public Policy, 1998.

**Progrowth Politics:  Change and Governance in Houston** (co-author), Berkeley:  Institute of Governmental Studies, University of California, 1991.

**Texas Politics:  An Introduction,** 6th ed., (co-author), New York:  Harper-Collins, 1992.

*Chapters in Books*

"Texas:  Republicans Gallop Ahead" (co-author) in **Southern Politics in the 1990s**, edited by Alexander P. Lamis, Baton Rouge, LSU Press, 1999.

"Power in the City:  Patterns of Political Influence In Houston, Texas," in **Perspectives on American and Texas Politics,** 5th ed., edited by Kent L. Tedin, Donald S. Lutz, and Edward P. Fuchs, Dubuque, Iowa:  1998.

"The Politics of Judicial Selection in Texas," in **Perspectives on American and Texas Politics,** 5th ed., 1998.

"Texas:  Ann Richards, Taking on the Challenge,"  (co-author), in **Governors and Hard Times,** ed. By Thad Beyle, Washington, D.C.:  Congressional Quarterly, 1992.

"The 1988 Presidential Election:  A Campaign that Mattered," in **Do Elections Matter?**  ed. by Alan Stone and Benjamin Ginsberg, Armouk, N.Y.:  M. E. Sharpe, 1990.

"The Emergence of Two-Party Competition in the Sunbelt," (co-author) in **Political Parties in Local Areas,** ed. by William Crotty, Knoxville:  University of Tennessee Press, 1986.

"Texas:  A Primary State," in **Proportional Representation in Presidential Nomination Politics,** ed. by Paul T. David and James W. Ceasar, Charlottesville, University of Virginia Press, 1980.

*Journal Articles*

"Orthopedic Patients' Satisfaction With Their Health Care Plan:  A Study Performed by the Research and Education Committee of the Texas Orthopaedic Association," (co-author) in **The American Journal of Orthopedics,**" August, 1999.

"Support for Biracial Political Coalitions Among Blacks and Hispanics,"  (co-author) in **The Social Science Quarterly**, December, 1994.

"Minority Vote Dilution Suits and the Problem of Two Minority Groups:  Can a 'Rainbow Coalition' Claim the Protection of the Voting Rights Act/"  (co-author) in **The Pacific Law Journal,** No. 3, 1990.

"Applying the Voting Rights Act in Houston, Texas,"  (co-author) in **Publius,** Winter, 1987.

"Dynamics of Candidate Choice in a State Election,"  (co-author) in **The Journal of Politics,** May, 1981.

"Party Voting in Lower Level Electoral Contests,"  (co-author) in **The Social Science Quarterly,** March, 1979.

"Public Awareness of Congressional Representatives:  Recall Versus Recognition," (co-author) in **The American Politics Quarterly,** October, 1979.

"Racial Voting Patterns in the South:  An Analysis of Major Elections from 1960 to 1977 in Five Cities,"  (co-author) in **The Annals of the American Academy of Political and Social Science,** September, 1978.

"Race, Socioeconomic Status, and Voting Participation in Major Southern Cities," (co-author) in **The Journal of Politics,** August, 1977.

"Coalition Formation in the Texas Legislature:  Issues, Payoffs, and Winning Coalition Size,"  (co-author) in **Western Political Quarterly,**  June, 1975.

"Redistricting Decisions in the American States:  A Test of Riker's Minimum Winning Coalition Hypothesis,"  (co-author) in **The American Journal of Political Science,** May, 1974.

**Professional Activities**

Member, American Association for Public Opinion Research, American Political Science Association, Southern Political Science Association, Western Political Science Association, Southwestern Political Science Association.

Reviewer:  Social Science Quarterly, Journal of Politics.

**Academic Interests**

Political Parties and Elections
Political Interest Groups
Urban Politics
State and Local Electoral Politics
Public Opinion

**Consultant Activities**

Public Opinion/Survey Research
Demographics
Redistricting
Election Analysis