**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| SHANNON PEREZ, et al. | ) | |
|     *Plaintiffs,* | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 11-CA-360-OLG-JES-XR |
| | ) | [Lead case] |
| STATE OF TEXAS, et al. | ) | |
|     *Defendants.* | ) | |

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES (MALC) | ) ) ) | |
|     *Plaintiffs,* | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | SA-11-361-OLG-JES-XR |
| | ) | [Consolidated case] |
| STATE OF TEXAS, et. al. | ) | |
|     *Defendants.* | ) | |

| | | |
|---|---|---|
| TEXAS LATINO REDISTRICTING TASK FORCE, et. al. | ) ) | |
|     *Plaintiffs,* | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | SA-11-CA-490-OLG-JES-XR |
| | ) | [Consolidated case] |
| RICK PERRY, et al. | ) | |
|     *Defendants.* | ) | |

| | | |
|---|---|---|
| MARGARITA V. QUESADA, et. al. | ) | |
|     *Plaintiffs,* | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | SA-11-CA-592-OLG-JES-XR |
| | ) | [Consolidated case] |
| RICK PERRY, et al. | ) | |
|     *Defendants.* | ) | |

| | |
|---|---|
| JOHN T. MORRIS )<br>   *Plaintiff,* )<br> )<br>v. )<br> )<br>STATE OF TEXAS, et al. )<br>   *Defendants.* ) | CIVIL ACTION NO.<br>SA-11-CA-615-OLG-JES-XR<br>[Consolidated case] |
| EDDIE RODRIGUEZ, et al. )<br>   *Plaintiffs,* )<br> )<br>v. )<br> )<br>RICK PERRY, et al. )<br>   *Defendants.* ) | CIVIL ACTION NO.<br>SA-11-CA-635<br>[Consolidated case] |

## PLAINTIFFS' MEXICAN-AMERICAN LEGISLATIVE CAUCUS (MALC), LATINO REDISTRICTING TASK FORCE, LULAC, PEREZ, QUESADA, AND RODRIGUEZ BRIEF ON REMEDY

On October 4, 2011, this Court issued an amended order directing the parties to file briefs that would advise and guide the Court on the process for devising any interim court-drawn plans, including but not limited to:

 a. Any citations to cases in which a court drew interim plans under circumstances similar to those herein;

 b. How the legal parameters for interim plans differ from the standards for drawing remedial maps after a plan has failed to meet requirements under the Constitution or §2 or §5 the Voting Rights Act or any other applicable law;

 c. Whether there is any precedent for a court's implementation of the legislatively-adopted plan or the current benchmark plan for the State House of Representatives as an interim plan; and

 d. The estimated time that it may take to devise two interim plans (Congressional and State House of Representatives).

Plaintiffs MALC, the LATINO REDISTRICTING TASK FORCE, LULAC, PEREZ, QUESADA, and RODRIGUEZ respectfully submit this brief to advise the Court on the matters identified in that order.

1. <u>**Cases In Which A Court Drew Interim Plans Under Circumstances Similar To Those Herein**</u>

As this Court has observed in its recent orders, neither the congressional nor the State House of Representatves redistricting plan has received the requisite preclearance under the Voting Rights Act. This Court has also correctly observed that "a resolution of the Section 5 preclearance issues prior to the upcoming election deadlines is becoming more unlikely." See Amended Order of October 4, 20911 at 5.[1]

It is now axiomatic that "[a] new reapportionment plan enacted by a State, including one purportedly adopted in response to invalidation of the prior plan by a federal court, will not be considered 'effective as law,' *Connor v. Finch*, 431 U.S., at 412 *Connor v. Waller*, 421 U.S. 656 (1975), until it has been submitted and has received clearance under § 5. Neither, in those circumstances, until clearance has been obtained, should a court address the constitutionality of the new measure. *Connor v. Finch, supra; Connor v. Waller, supra*." *Id.*, at 542, 98 S.Ct., at 2498 (footnote omitted)." *McDaniel v. Sanchez*, 452 U.S. 130, 146 (1981). Moreover, as *McDaniel v. Sanchez* makes clear, federal courts cannot approve plans enacted by State or local governments that are

---

[1] Preclearance is indeed unlikely. In its answer to the State of Texas' complaint in the D.C. preclearance action, the United Sates Attorney General has denied that the proposed Congressional and House plans are entitled to preclearance under Section 5 of the Voting Rights Act. U.S. Answer at paragraph 3. The United States Department of Justice has opposed preclearance of the Congressional and House maps in the DC Court, expressing the view that those maps are motivated by a racially discriminatory intent, and with regard to the congressional map, retrogress Latino voting strength in congressional districts 23, 27, and in the plan overall. The United States has also identified a number of State House Districts that it believes have suffered retrogression of minority voting strength.

subject to the preclearance requirements of Section 5 of the Voting Rights Act because such plans ""reflect[ ] the policy choices of the elected represntatives of the people[." *Id*. at 153.   The Court's later decision in *Lopez v. Monterey County*, 519 U.S. 9 (1996), confirms *McDaniel*, holding that it was error for a district court to order an election under a proposed legislative plan before the plan was precleared and made permanent.  See also *infra* at 9-10.

In *White v. Weiser*, 412 U.S. 783, 794-795 (1973), the Supreme Court noted that in fashioning a remedy in redistricting cases, adherence to state policy choices should not prevent or constrain federal courts from affording relief to redress fully the violations of the Constituion or federal law.  The Court noted:  "Of course, the District Court should defer to state policy in fashioning relief only where that policy is consistent with constitutional norms and is not itself vulnerable to legal challenge. The District Court should not, in the name of state policy, refrain from providing remedies fully adequate to redress constitutional violations which have been adjudicated and must be rectified."  412 U.S. at 797.

A few years later, in *Connor v. Finch*, 431 U.S. 407 (1977), the Supreme Court had another occasion to address the remedial issues in a redistricting lawsuit. The Court in *Connor* explained how court-ordered plans are subject to "stricter standards" than a legislatively-enacted plan:

> "Although every state reapportionment plan is fraught with its own peculiar factual difficulties, …[w]e have made clear that in two important respects a court will be held to stricter standards in accomplishing its task than will a state legislature: '[U]nless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of

> population equality with little more than *de minimis* variation.' *Chapman v. Meier*, 420 U.S. at 26-27." *Connor, supra*, at 414.

The Supreme Court in *Connor v. Finch* went on to articulate principles that should guide courts as they fashion remedies in redistricting cases:

> In the wake of a legislature's failure constitutionally to reconcile … conflicting state and federal goals, however, a federal court is left with the unwelcome obligation of performing in the legislature's stead, while lacking the political authoritativeness that the legislature can bring to the task. In such circumstances, the court's task is inevitably an exposed and sensitive one that must be accomplished circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.' *Roman v. Sincock*, 377 U.S. 695, 710.

*Connor supra*, at 414-415.

Five years later, in *Upham v. Seamon*, 456 U.S. 37 (1982), the Court had yet another occasion to address how a three-judge court should approach the issue of remedy in a congressional redistricting case following preclearance review. In *Upham*, *supra*, the State of Texas enacted a congressional redistricting plan and submitted the plan to the United States Attorney General for preclearance under the Voting Rights Act, who interposed a timely objection to the plan.

It is critical to note that the Court's opinion in *Upham, supra*, dealt with the scope of the remedy that a district court may impose when there has been a Section 5 objection. That is not the situation present here, where there has been no preclearance determination and a timely Section 5 preclearance decision is unlikely.[2]

The most recent lower court case we have found may be instructive to this Court, since it involved a district court in the predicament of having to impose a new election

---

[2] Similarly, in *Terrazas v. Clements*, 537 F. Supp. 514 (D.C. Tx 1982), a three-judge court imposed an interim remedial plan following objections by the Department of Justice to the plan in the Bexar and El Paso County areas. The court's interim remedial plan in that case included changes to the state's House map proposed by the MALDEF plaintiffs.

plan in the absence of a precleared plan and an approaching election schedule. In *Smith v. Cobb County Board of Elections*, 314 F.Supp.2d 1274 (N.D. Ga. 2002), the district court was faced with a situation similar to the one likely to face this Court: the necessity of ordering interim implementation of a redistricting plan in time for an election in the absence of any preclearance action on a legislative plan. The court determined that it could not, and would not, defer to a plan (unprecleared) that had at least *some* legislative blessing, though it could "consider" the plan. Rather, the court evaluated what was necessary to comply with Section 2, Section 5, and constitutional requirements as revealed by the facts in the case. 314 F.Supp.2d at 1301 (court expected to comply with non-retrogression principle of § 5); *Id.* at 1302 (court expected to meet strict requirements of population equality); *Id.* at 1299 (courts adopting remedial plans must address Section 2 concerns). Against that backdrop, the court devised its own plan, with the technical assistance of a court-appointed expert. In doing so, the court gave considerable attention to traditional districting principles. 314 F.Supp.2d at 1300.

The most recent Texas-based decision of a three-judge court in a redistricting case in which a court drew interim plans under circumstances similar to those present here is *Balderas v. State of Texas*, Civ. Action No. 6:01CV158 (E.D. Tex., Nov. 14, 2001) *(per curiam), summarily aff'd*, 536 U.S. 919 (2002). In *Balderas*, a three-judge federal court was "left with the 'unwelcome obligation of performing in the legislature's stead'" when the State failed to enact a congressional plan in 2001.

At the outset, the *Balderas* three-judge court noted that "although a court must defer to legislative judgments on reapportionment as much as possible, it is forbidden to do so when the legislative plan would not meet the special standards of population

6

equality and racial fairness that are applicable to court-ordered plans." *Balderas*, slip opinion at 4-5 (quoting *Upham v. Seamon*, 456 U.S. 37, 39 (1982) (*per curiam*)). The three-judge court noted too that "[o]ur decisional process accepted the reality that, as with so many decisional processes, the sequence of decisions is critical." *Balderas*, slip op. at 5. "Starting with a blank map," the *Balderas* court "first drew in the existing Voting-Rights-Act-protected majority-minority districts." *Id*. The court then decided to draw the two new congressional seats that had been allocated to Texas and it decided to locate those seats "where the population growth that produced the new additional districts had occurred." *Id*., at 5-6. The three-judge court in *Balderas* noted that placing new districts in the areas of growth was "supported by the circumstance that the Texas legislature previously located new districts in the areas of greatest population growth." *Id*., at 6 (footnote omitted).[3] The court then drew the remaining congressional districts "look[ing] to general historic locations of districts in the state[.]" *Ibid.* At this latter stage, the court observed that it had "emphasiz[ed] compactness, while observing the contiguity requirement." Id. at 7. After the plan was drawn, the three-judge court then did a "check" of its plan to see how it affected incumbents and the partisan outcome of the plan. *Id*., at 8-9. Finally, the *Balderas* court made clear that, in drawing its map, it "endeavored to ensure that the court-drawn plan complied with the goals of Sections 2 and 5 of the Voting Rights Act." *Id*., at 11 (footnotes omitted).

---

[3] As this Court is well aware, Texas gained four new congressional seats and nearly 90% of the population growth in Texas between 2000 and 2010 was among Latino and African American populations. If new districts should be placed in the areas of "greatest population growth", it would appear that three of the four new congressional districts should be minority opportunity districts.

7

In *Balderas, supra*, the three-judge court decided to draw its own map and started with a clean slate. That certainly is one approach, but it is not the only method of fashioning relief, for as the Supreme Court made clear in *McDaniel v. Sanchez*, *supra*, the court is also free to choose a remedial plan proposed by one of the litigants. What the court may not do is approve any legislative plan proposed by the State of Texas because such a plan "reflects the policy choices of elected representatives" and is, therefore, subject to Section 5 review.

2. **How The Legal Parameters For Interim Plans Differ From The Standards For Drawing Remedial Maps After A Plan Has Failed To Meet Requirements Under The Constitution Or §2 Or §5 The Voting Rights Act Or Any Other Applicable Law**

There is legally significant difference between how a court should draw an interim plan (where no plan has been enacted or precleared) and how it should draw a plan after the plan is found to be unconstitutional or violative of the Voting Rights Act. In the former case, the Court can order a plan into effect and cannot approve any proposed map proposed by state officials (without ordering such plan to undergo Section 5 preclearance). The Court can either draw its own plan, as the court did in *Balderas,* or choose a plan proposed by one of the litigants. *See McDaniel, supra.* In either instance, the court should also ensure that its plan complies with the United States Constitution and the Voting Rights Act, 42 U.S.C. §1973 (Section 2) and §1973c (Section 5).

Similarly, if the D.C. Court finds the State's plan is a product of intentional discrimination *in its entirety*, or this Court determines that any of the plans in their entirety are the result of *intentional* discrimination violative of the United States Constitution and the Voting Rights Act, then the entire map is a nullity and legally unenforceable. In such a case, this Court would then be in the same position as if no plan

8

had ever been enacted by the State and it could "start with a blank map" in crafting a remedy or it could pick a map proposed by one of the plaintiff litigants. In such a circumstance, there is no legitimate legislative policy that the court would be duty bound to follow, since the entire map would be tainted by invidious racial discrimination.

Where a court has found certain districts in a plan to be unconstitutional or violative of the Voting Rights Act, or where there has been a preclearance determination either by the United States Attorney General or the District Court for the District of Columbia under Section 5 of the Voting Rights Act, the court's remedial authority is more limited. The court is not free to disregard state policy choices in those parts of the map that are neither unconstitutional nor violative of the Voting Rights Act. For example, if the state's maps are precleared in this case, but this Court finds districts or certain parts of the map are the product of unconstitutional discrimination, violative of Section 2 or violative of the equipopulation requirements, this Court's remedial authority extends to redrawing those districts that the product of the discrimination. As the Court explained in *Upham, supra*: "An appropriate reconciliation of [constitutional and legal requirements with state political and policy goals] can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." 456 U.S. at 43.

3. **Whether There Is Any Precedent For A Court's Implementation Of The Legislatively-Adopted Plan Or The Current Benchmark Plan For The State House Of Representatives As An Interim Plan**

The Supreme Court's decision in *Lopez v. Monterey County*, 519 U.S. 9 (1996) makes clear that a federal court may not permit an unprecleared plan go into effect on an interim basis or otherwise. In *Lopez, supra*, a three-judge district court "authorized

Monterey County to conduct judicial elections under an election plan that has not received federal approval pursuant to § 5 of the Voting Rights Act." 519 U.S. at 11. The Supreme Court reversed that decision, stating as follows: "The District Court's order that the County conduct elections under the unprecleared, at-large judicial election plan conflicts with these principles and with our decision in *Clark [v. Roemer*, 500 U.S. 646 (1991)]." *Lopez, supra*, at 20.

Interestingly, in *Lopez, supra*, the State made the novel argument that the decision of the three-judge court below should not be viewed as allowing an unprecleared plan to go into effect, but rather was a situation where the lower court simply exercised its equitable remedial authority and imposed a map. The Supreme Court flatly rejected this distinction. The Court observed that its cases made clear that where a court independently draws a remedial map, no preclearance is required. "But", the Court said, "where a court adopts a proposal "reflecting the policy choices ... of the people [in a covered jurisdiction] ... the preclearance requirement of the Voting Rights Act is applicable." The Court in *Lopez*, *supra* at 22, went on to say:

> "The at-large, countywide system under which the District Court ordered the County to conduct elections undoubtedly "reflect[ed] the policy choices" of the County; it was the same system that the County had adopted in the first place. It was, therefore, error for the District Court to order elections under that system before it had been precleared by either the Attorney General or the United States District Court for the District of Columbia.

The Supreme Court's decision in *Lopez* thus stands squarely for the proposition that none of the state's enacted plans may be implemented in the forthcoming elections because none has received the requisite Section 5 preclearance.

In a few rare cases, courts handling one-person, one-vote cases (not Voting Rights Act cases) have been faced with election deadlines so extreme that there was no alternative but to permit elections to go forward under an unconstitutional malapportioned plan.  In *Bullock v. Weiser,* 404 U.S. 1065 (1972), for example, the Supreme Court granted a stay of a district court's remedial order, thereby permitting Texas's invalidated congressional map to go into effect for the 1972 elections. (The district court had invalidated the map on one-person, one-vote grounds).  Similarly, in *Whitcomb v. Chavis*, 396 U.S. 1055 (1970), the Supreme Court permitted elections to go forward pursuant to a redistricting plan that did not meet one-person, one-vote constitutional requirements.[4]

Both the *Bullock* and *Whitcomb* cases raised malapportionment claims and did not involve claims under the Voting Rights Act.  Indeed, *Bullock v. Weiser* was decided before Texas was even subject to the preclearance requirements of the Act.  Furthermore, these cases were decided long before the current state of the art computerized redistricting software.  Drawing new maps in the modern era takes hours, not weeks.  Today, the exigencies of an election schedule can be accommodated by courts with more flexibility.

---

[4] As the Court itself has explained, "[n]ecessity has been the motivating factor in these situations."  *Upham v. Seamon, supra*, at 44.  Indeed, in *Upham*, the Court vacated the district court's remedial plan but remanded the case to the three-judge court to decide whether to modify its judgment "[b]ecause we are not now as familiar as the District Court with the Texas election laws and the legal and practical factors that may bear on whether the primary elections should be rescheduled[.]" *Ibid*.  Our research has not produced any cases where a court has found a violation of the Voting Rights Act and the Court has allowed elections to go forward under the illegal plan.

11

4. **The Estimated Time That It May Take To Devise Two Interim Plans (Congressional and State House Of Representatives)**

Plaintiffs estimate that given the various remedial maps that will be before the Court (plans are due October 17, 2011), and given the high level of expertise possessed by the court-appointed technical advisors of the Texas Legislative Council (Mr. David Hanna and Ms. Clare Dyer), remedial maps for the Texas congressional districts and the State House of Representatives can be drawn in less than a week.

Respectfully submitted,

*/s/ David R. Richards*
David R. Richards
RICHARDS RODRIGUEZ & SKEITH, LLP
816 Congress, Suite 1200
Austin, TX 78701
(512) 476-0005
Fax: (512) 476-1513

Richard Edwin Gray , III
GRAY & BECKER, P.C.
900 West Avenue, Suite 300
Austin, TX 78701-0001
(512) 482-0061
Fax: (512) 482-0924

COUNSEL FOR PLAINTIFFS SHANNON PEREZ, HAROLD DUTTON, JR., GREGORY TAMEZ, NANCY HALL, DOROTHY DEBOSE, CARMEN RODRIGUEZ, AND SERGIO SALINAS

*/s/ Jose Garza*
Jose Garza
TEXAS RIOGRANDE LEGAL AID
1111 North Main
San Antonio, TX 78212
(210) 212-3701
Fax: (210) 212-3774

Mark W. Kiehne

Ricardo G. Cedillo
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza
755 E. Mulberry, Suite 500
San Antonio, TX 78212
(210) 822-6666
Fax: (210) 822-1151

COUNSEL FOR PLAINTIFFS MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES (MALC)


/s/ *Nina Perales*
Nina Perales
Marisa Bono
Rebecca M. Couto
MALDEF
110 Broadway Street, #300
San Antonio, TX 78205
(210) 224-5476
Fax: (210) 224-5382

Robert W. Wilson
Mark Anthony Sanchez
Gale, Wilson & Sanchez, PLLC
115 East Travis, 19th Floor
San Antonio, TX 78205
(210) 222-8899
Fax: (210) 222-9526

COUNSEL FOR PLAINTIFFS TEXAS LATINO REDISTRICTING TASK FORCE, RUDOLFO ORTIZ, ARMANDO CORTEZ, SOCORRO RAMOS, GREGORIO BENITO PALOMINO, FLORINDA CHAVEZ, CYNTHIA VALADEZ, CESAR EDUARDO YEVENES, SERGIO CORONADO, GILBERTO TORRES, RENATO DE LOS SANTOS, JOEY CARDENAS, ALEX JIMENEZ, EMELDA MENENDEZ, TOMACITA OLIVARES, JOSE OLIVARES, ALEJANDRO ORTIZ, AND REBECCA ORTIZ

...

/s/ J. Gerald Hebert
191 Somervelle Street, #405
Alexandria, VA 22304
(703) 628-4673


Gerald Harris Goldstein
Donald H. Flanary, III
GOLDSTEIN, GOLDSTEIN & HILLEY
Tower Life Building
310 S. St. Mary's, 29th Floor
San Antonio, TX 78205
(210) 226-1463
Fax: (210) 226-8367

COUNSEL FOR PLAINTIFFS
MARGARITA V. QUESADA, MARC
VEASEY, ROMEO MUNOZ, JANE
HAMILTON, JOHN JENKINS, AND
LYMAN KING


/s/ M. Renea Hicks
Max Renea Hicks
LAW OFFICE OF MAX RENEA HICKS
101 West Sixth Street, Suite 504
Austin, TX 78701
(512) 480-8231
Fax: (512) 480-9105

S. Abraham Kuczaj, III
Sam Johnson
Stephen E. McConnico
SCOTT DOUGLASS & MCCONNICO, LLP
600 Congress Avenue, 15th Floor
Austin, TX 78701
(512) 495-6300
Fax: (512) 474-0731

Karen M. Kennard
2803 Clearview Drive
Austin, TX 78703
(512) 974-2177
Fax: (512) 974-2894

David Escamilla
TRAVIS COUNTY ATTORNEY
P.O. Box 1748
Austin, TX 78767
(512) 854-9416

COUNSEL FOR PLAINTIFFS EDDIE RODRIGUEZ, CITY OF AUSTIN, TRAVIS COUNTY, CONSTABLE BRUCE ELFANT, DAVID GONZALEZ, MILTON GERARD WASHINGTON, ALEX SERNA, SANDRA SERNA, BETTY F. LOPEZ, BEATRICE SALOMA, JOSEY MARTINEZ, LIONOR SOROLA-POHLMAN, BALAKUMAR PANDIAN, NINA JO BAKER, JUANITA VALDEZ-COX, AND ELIZA ALVARADO


/s/ Luis R. Vera, Jr.
Luis Roberto Vera , Jr.
LAW OFFICES OF LUIS ROBERTO VERA & ASSOCIATES, P.C.
111 Soledad, Suite 1325
San Antonio, TX 78205-2260
(210) 225-3300
Fax: (210) 225-2060

George Joseph Korbel
TEXAS RIOGRANDE LEGAL AID, INC.
1111 North Main
San Antonio, TX 78213
(210) 212-3600

COUNSEL FOR PLAINTIFF INTERVENOR LULAC

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2011, a copy of the foregoing was served on all counsel of record, by filing his Brief in the ECF filing system of the western District of Texas, as well as on those attorneys who have not registered with ECF system in the western District of Texas and who do not receive service via ECF filing.

/s/ J. Gerald Hebert
J. GERALD HEBERT