IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SHANNON PEREZ, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 11-CA-360-OLG-JES-XR |
| STATE OF TEXAS, et al., | § | [Lead Case] |
| Defendants. | § | |

| | | |
|---|---|---|
| MEXICAN AMERICAN | § | |
| LEGISLATIVE CAUCUS, TEXAS | § | |
| HOUSE OF REPRESENTATIVES, | § | |
| Plaintiffs, | § | CIVIL ACTION NO. |
| v. | § | SA-11-CA-361-OLG-JES-XR |
| | § | [Consolidated Case] |
| STATE OF TEXAS, et al., | § | |
| Defendants. | § | |
| | § | |

| | | |
|---|---|---|
| TEXAS LATINO REDISTRICTING | § | |
| TASK FORCE, et al., | § | |
| Plaintiffs, | § | CIVIL ACTION NO. |
| v. | § | SA-11-CA-490-OLG-JES-XR |
| | § | [Consolidated Case] |
| RICK PERRY, | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| MARGARITA V. QUESADA, et al., | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. |
| | § | SA-11-CA-592-OLG-JES-XR |
| RICK PERRY, et al., | § | [Consolidated Case] |
| Defendants. | § | |

1

JOHN T. MORRIS,                          §
      Plaintiff,                     §
v.                                       §              CIVIL ACTION NO.
                                         §              SA-11-CA-615-OLG-JES-XR
STATE OF TEXAS, et al.,                  §              [Consolidated Case]
      Defendants.                    §

_____

EDDIE RODRIGUEZ, et al.,                 §
      Plaintiffs,                    §
v.                                       §              CIVIL ACTION NO.
                                         §              SA-11-CA-635-OLG-JES-XR
RICK PERRY, et al.,                      §              [Consolidated Case]
      Defendants.                    §

## POST-TRIAL BRIEF OF RODRIGUEZ PLAINTIFFS

The Rodriguez plaintiffs—identified in the stipulations contained in the Joint Final Pretrial

Order (#277) at 17-18, ¶¶27-41—submit the following post-trial brief.

## I.

## Scope of Brief and Summary of Positions

The interim remedy issues on which the Court has requested briefing are addressed in a

separate brief, jointly filed with the Perez and Quesada plaintiffs. This brief is directed at the

liability-phase issues arising from the trial evidence on Plan C185's validity under Section 2 of

the Voting Rights Act and the Fourteenth Amendment to the United States Constitution.[1]

## A.  Claims largely left to briefing by other plaintiffs

The Rodriguez plaintiffs raise statutory and constitutional claims that substantially overlap

with the claims of other groups of plaintiffs in this case. For example, the Rodriguez plaintiffs

claim that Plan C185 constitutes an unconstitutional, deliberate diminution of minority voting

---

[1] The Rodriguez plaintiffs have not abandoned their claims under the Fifteenth Amendment. However, they are not briefed here because the Court dismissed all Fifteenth Amendment claims prior to trial. The Fourteenth Amendment claims largely mirror the Fifteenth Amendment claims.

opportunities across the geographical spectrum of the state. In numerous instances, the congressional map enacted into law by the Texas Legislature purposely fragments minority populations and voters—both Hispanic and Black—and isolates them in overwhelmingly Anglo-dominated districts. Examples of this deliberate mechanism are found in Nueces County (where 200,000 Hispanics are removed from their historic base in South Texas and attached at the tail-end of the overwhelmingly Anglo CD27), in Travis County (where 60% of the Hispanic population and essentially all of the Black population are fragmented into four Anglo-dominated districts that have no significant base in the county but, rather, are based in far-flung urban areas), and in Tarrant County (where a significant portion of Hispanic voters are surgically removed from Fort Worth and isolated in a suburban, Anglo-dominated district to the north).

The Rodriguez plaintiffs also have pressed and proved claims under Section 2 of the Voting Rights Act. Plan C185's CD23 has been illegally removed from the category of minority opportunity districts, an action which should be held invalid under Section 2. CD27's removal of Nueces County and its large proportion of Hispanic voters had the effect of preventing the establishment of an additional Hispanic opportunity district—in addition to a restored CD23—in the south and west Texas area. At least one, and possibly two, minority opportunity districts could have been, but were not, established in the Dallas-Tarrant County area, a violation of Section 2 which could have been avoided if the minority populations in the area had not been fragmented among such Anglo-dominated districts as CD6, CD12, and CD26. And an additional minority opportunity district could have been created in Harris County, but which was prevented (in violation of Section 2) by the combined effect of the placement of Nueces County in a north and west-oriented CD27 (thereby forcing a rotation of largely suburban districts around the northern tier of Harris County into minority areas of Harris County in order to gather in the

necessary populations) and the fragmentation of those Harris County minority voting communities in Anglo-dominated districts.

These claims are seriously pressed by the Rodriguez plaintiffs; however, other groups of plaintiffs also have pressed them and will be briefing them in great detail. Rather than offer repetitive briefing, the Rodriguez plaintiffs will defer to the other post-trial briefing of these issues, as well as some of the broader principles of law and fact that must be established under Section 2.[2] While the discussion of issues and facts below may touch upon some of these other issues because the various claims sometimes unavoidably overlap, the focus will be on the issues delineated in the next part of this brief.

**B.   Focus of this post-trial brief**

This post-trial brief will focus on three matters confronting the Court. First, in Part II below, the Rodriguez plaintiffs address the issue of citizen voting age population and the lagging nature of the ACS 2005-2009 survey. This discussion goes to issues concerning the first *Gingles* factor.[3]

Second, in Part III below, the Rodriguez plaintiffs address the proposition floated by the state that the second and third *Gingles* factors have not been established because partisan voting patterns overwhelm the racially polarized voting conclusions of the various plaintiff group experts.

Third, in Part IV below, the Rodriguez plaintiffs address the serious constitutional and statutory issues raised by the Legislature's deliberate attack on the geographic and electoral integrity of Travis County, the City of Austin, and their citizens and voters. This issue is unique

---

[2] The Rodriguez plaintiffs will submit a supplemental post-trial brief shortly after the post-trial brief filings are complete. In this supplement, the Rodriguez plaintiffs will more specifically identify the parts of those other post-trial briefs which it is incorporating by referenced into this brief. This supplement will be limited to that one purpose.

[3] *Gingles*, of course, refers to *Thornburg v. Gingles*, 478 U.S. 30 (1986).

4

to the Rodriguez plaintiffs, and that is because, as the undisputed evidence establishes, the voting patterns in Travis County and Austin are unique in the context of the State of Texas as a whole.

## II.

### CVAP and *Gingles* One

In making a determination under *Gingles* precondition one, the Court need not be limited by the American Community Survey ("ACS") data regarding citizen voting age population ("CVAP"), as this survey does not tell the fully story. Rather, undisputed evidence from Rodriguez Plaintiffs' expert, Dr. Stephen Ansolabehere, proves that the Hispanic CVAP totals for Dallas, Harris, and Tarrant counties are significantly greater than the ACS estimate indicates, and therefore creation of additional majority-minority districts is entirely possible.

### A.  ACS Data Underestimates Hispanic CVAP

There is no credible dispute that the ACS data used by the Texas Legislature in drawing district lines understates the number of Hispanic citizens of voting age and their share of the citizenship voting age population in the State. *See, e.g.,* Stephen Ansolabehere, Response to Professor Rives Rebuttal Report on the Use of the American Community Survey and Estimates of the Citizen Voting Age Population (Aug. 30, 2011) ("Rebuttal Report"), Dkt. # 272, Ex. 1; Jorge Chapa, Expert Report on Hispanic Demographics and the Estimated Citizen Voting Age Population of Potential Voting Districts in Texas (Aug. 8, 2011), Dkt. # 128, Ex. 5 at 10-11; Tr. at 714: 6-7 (LULAC expert George Korbel saying he "wouldn't place very much reliance on [ACS data] because it's so far out of date").

While the Census Enumeration was conducted in 2010, the ACS estimate reflects the average of surveys conducted between 2005 and 2009. Rebuttal Report ¶ 2. "Hence one may interpret [the ACS data] as an estimate of the population in 2007." *Id*. A side-by-side

comparison of the ACS and census figures reveals that the ACS underestimates the total population of Texas by 1.3 million persons, a difference that "exceeds the margin of error of the survey, and thus reflects a systematic error or bias in the estimate, rather than a sampling error," *id*. ¶ 3.  Dr. Ansolabehere explains that this error "appears to be due to population trends and the different time frames of the Enumeration and of the 5-year average of the ACS 2005-2009 study." *Id*. ¶ 4.  The population growth reflected in the ACS data is almost exactly what one would expect in 2007 based on annual population growth between 2000 and 2010.  *See id*.; Tr. at 1100-01 (Dr. Ansolabehere: "[I]f I take the total population and voting age population estimates that ACS provides, they look like they are exactly 70 percent of the way through the decade, comparing the 2000 and 2010 enumerations."); *id*. at 1103: 9-17.  In other words, the ACS data lags the enumeration data by three years and therefore fails to account for three years' worth of growth in the Texas population.

For purposes of Section 2 of the Voting Rights Act, this lag becomes critical when assessing the size of the minority voter population in a potential district.   Dr. Ansolabehere's report explains that, due to this three-year lag, the ACS underestimates Hispanic voting age population by 590,000 persons, which is 10.6% below the actual number, and underestimates the Black voting age population by 150,000, which is 7.8% below the actual number.  *Id*. ¶¶ 7-8.  But "even though the ACS underestimates the Total and Voting Age population in Texas, especially of Blacks and Hispanics, the percentages of each group who are citizens are stable."  *Id*. ¶ 11; *see also* Tr. at 1105: 13-15 ("[T]he . . . percent of each groups who are citizens of voting age did not change.  That was constant."); *id*. at 1104: 15-19 ("What I looked at was the percentage of people who are citizens within each of the years of the ACS, '05, '06, '07, '08, '09.  I saw that was constant among Hispanics; actually, among all of the groups.  Among Hispanics, it was 43

6

percent in every year.").  This means that one can apply the ACS data to the 2010 Enumeration to estimate the actual black and Hispanic CVAP for 2010.  *Id*. ¶ 12 ("In other words, we simply rescale the ACS figures so that they are consistent with the population counts in 2010 and the linear trends that we have observed.").  Dr. Ansolabehere's calculations in this regard reveal that the ACS "substantially underestimates [] the Black and Hispanic CVAP."  *Id*.  In fact, the 2010 figure for Hispanic CVAP in the State is approximately 390,000 above the ACS's estimate of 3,674,800.  *Id*. ¶ 12 & tbl. 5.  In particular, when analyzed on the county level, this trend reveals that Hispanics and Blacks "are a much higher share of CVAP" in Harris, Dallas, and Tarrant counties than the ACS data indicates.  *Id*. ¶ 14 & tbl. 6.

## B.  Application to *Gingles* One

The question of how to calculate citizen voting age population was a central issue during trial, particularly in the major urban areas of Harris, Dallas, and Tarrant Counties.  The State asserted it was impossible to draw additional majority-Hispanic districts in which Hispanics comprise over 50% of the CVAP, *see, e.g.*, Tr. at 942: 1-5 (Ryan Downton testimony), based solely on its analysis of the ACS data, *see* Tr. at 1488: 8-12 (Gerardo Interiano: "That is what the legislative council provided to us and that's it."); Tr. at 1669: 18-21 (Dr. Rives: "[S]tarting with the 2010 round of the census, citizenship . . . was relegated to the American Community Survey.").  But while the State made no effort to determine the accuracy of the ACS data, Tr. at 1489: 17-19, it has offered no reason why the Court should similarly turn a blind eye to the ACS's limitations.

In fact, the Court is not bound by ACS estimates when probative evidence demonstrates that Hispanic CVAP numbers in Texas are substantially higher.  In *Valdespino v. Alamo Heights Independent School District*, 168 F.3d 848, 850 (5th Cir. 1999), the Fifth Circuit considered

evidence that "demographic changes between the 1990 census and the 1997 trial had eliminated" the Hispanic CVAP majority in plaintiffs' demonstration district. The Court noted that plaintiffs "'unable to produce hard data' on voting-age population because of the way census data are collected and reported would be able to submit 'other probative evidence' to prove voting-age population." *Id*. at 853 (quoting *Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1045 n.3 (5th Cir. 1990)); *id*. ("In context, *Westwego II*'s statements did not alter what must be proved, only what can be used to prove it."). The Fifth Circuit made clear that courts may consider evidence that census data is out of date: "'[C]ensus figures are presumed accurate until proven otherwise. Proof of changed figures must be thoroughly documented, have a high degree of accuracy, and be clear, cogent and convincing to override the presumptive correctness of the prior decennial census.'" *Id*. at 853-54 (quoting district court opinion).

Here, the State's Hispanic CVAP calculations were based not on the census, but on the ACS data, which the State admits are "not part of the decennial census," Tr. at 1673: 16-17 (Dr. Rives testimony), and instead provide just an "estimate" of race and citizenship, *id*. at 1673: 22-25; *see also id*. at 1673: 15 ("The ACS doesn't count people."); *id*. at 1673: 20-21 (ACS "is completely separate from the decennial census"). The State provides no reason why ACS estimates, used for the first time this redistricting cycle, should be given the same "presumptive correctness" as census data. *Valdespino*, 168 F.3d at 854. The bar for proving those estimates have changed, therefore, presumably is substantially lower.

In fact, the State's only basis for relying on ACS data is that it was the only data available. Tr. at 1488: 11-12; 1682: 1-4. While one may question the State's strict adherence to data it knew was out of date and out of sync with the census, the Court, in any event, is not similarly constrained. Dr. Ansolabehere has provided a "simple estimate of the numbers of Hispanics, of

8

Blacks, and of Whites who are Citizens of Voting Age" based on the ACS data.  Rebuttal Report ¶ 12.  As in *Valdespino*, Dr. Ansolabehere's methodology for scaling ACS figures to be consistent with the population counts in 2010 does "not involve any complicated statistical formulae or tests of significant that might bedazzle or bamboozle an unwary district court."  168 F.3d at 854.  Rather, "[t]he data here [are] relatively simple; their manipulation involve[s] only rudimentary arithmetic."  *Id*.  Because Dr. Ansolabehere's analysis demonstrates linear population growth since 2000 with citizenship rates remaining constant across the decade, his projections simply follow the linear trends and apply the same citizenship rates to current population totals.  Not only has the State failed to disprove Dr. Ansolabehere's methodology, it has failed to provide any better estimation of Hispanic CVAP as of 2010.

Dr. Ansolabehere's unrefuted testimony certainly provides "probative evidence," *Valdespino*, 168 F.3d at 853 (quoting *Westwego II*, 906 F.2d at 1045 n.3), that Plaintiffs' demonstration district in Dallas-Forth Worth contains a Hispanic CVAP greater than 50 percent. Dr. Ansolabehere testified that CD 35 in Plan 166 "is almost surely over 50 percent."  Tr. at 1140-41; *id*. at 1143-44 ("I recall that when I used the county level figures and adjusted upward that the district was right at 50 percent HCVAP.").  Dr. Ansolabehere further testified that the trends in Tarrant and Dallas counties "looked sufficient to create enough population in the county."  *Id*. at 1142: 16-19; *see also* Rebuttal Report ¶ 14 ("Hispanics and Blacks are a much higher share of CVAP in [Harris, Dallas, and Tarrant] counties than the 2005-2009 ACS indicates."); *id*. at 5 ("The report further shows that the Hispanic and Black CVAP in Harris, Dallas, and Tarrant counties is sufficient to create majority Hispanic and Black CVAP districts in those counties.").[4]

---

[4] When blacks and Hispanics vote cohesively, Section 2 law recognizes them as a "single minority group" for purposes of forming a *Gingles* I district. *See Clements*, *infra*, 999 F.2d at 864. So, in these major urban areas,

In fact, Dr. Ansolabehere's report and testimony suggest that the Hispanic CVAP in those areas continues to follow this linear trend.  *See* Rebuttal Report ¶ 13; Tr. at 1144: 2-3.  But instead of drawing districts that recognize both the growth in Hispanic CVAP since 2007 and the continuing growth of the Hispanic voter population, the State ended its inquiry at the ACS data and used those out-of-date estimates to justify its failure to create additional majority-minority districts.  "Since the redistricting prevented the immediate success of the emergent Latino majority . . ., there was a denial of opportunity in the real sense of that term."  *LULAC v. Perry*, 548 U.S. 399, 428-29 (2006).

At bottom, there is no question that the ACS data the State relied upon fails to provide an up-to-date estimate of Hispanic CVAP as of 2010.  Accordingly, it deserves none of the deference accorded the census enumeration.  Plaintiffs have presented a reasoned basis and methodology for scaling those estimates to 2010, providing more than probative evidence that Hispanic CVAP is substantially higher than the ACS indicates, particularly in those three counties where Plaintiffs' claim additional majority-minority district should be drawn.  It hardly seems reasonable—let alone fair—to use 2010 data for purposes of enumeration, gaining the State four congressional seats based on minority population growth over ten years, and then penalize that minority population by adhering to stale data for purposes of Section 2 of the Voting Rights Act.

## III.

### Racially polarized voting, *Clements*, *Teague*, and the partisanship question

The second and third *Gingles* factors require proof based on analysis of whether racially polarized voting is present in the relevant electorate. *See, e.g.*, *Clark v. Calhoun County*, 21 F.3d

---

reaching the 50% threshold can be even more readily met when considering whether a coalition district can be formed.

92, 94-95 (5th Cir. 1994). The second *Gingles* factor goes to the issue of whether the relevant minority group is politically cohesive; the third, to whether white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the preferred candidates of minority voters. *Id*. As Dr. Ansolabehere testified, this inquiry is essential to analyzing whether district lines as drawn are consistent with Section 2's mandate that minority voters are provided equal electoral opportunities. Tr. of Sept. 10 at 1115-16 (Testimony of S. Ansolabehere).

Every plaintiff group had an expert who performed a technical analysis of the issue of racially polarized voting, and every one of those experts (Ansolabehere, Kousser, Engstrom, Kousser) concluded that legally significant racially polarized voting existed across the geographic range of Texas (but for the Travis County exception discussed in Part IV.A, below).

The state's legal response to this is succinctly stated by its attorney in closing arguments, who argued that, due to an *en banc* decision by the Fifth Circuit, it was his view that the plaintiffs' Section 2 case was over when their expert reports were submitted. Tr. of Sept. 16, at 2190. The *en banc* decision being referred to is obviously *LULAC Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993), *cert. denied*, 510 U.S. 1071 (1994) ("*Clements*"). It is inapplicable to the facts of this case, and the state's counsel is wrong.[5]

Part III of the *Clements* opinion, 999 F.2d at 849-61, contains the bulk of the discussion of the racial bloc voting issue. There, the court discusses the racial bloc voting issue in the context

---

[5] *Clements* is inapplicable for an additional reason, not covered in the lengthy textual discussion. It was important to the *Clements* discussion of the partisanship versus race issue that "white voters constitute the majority" of the Democratic Party as well as the Republican Party. 999 F.2d at 861. The evidence in that case concerned elections in the 1980s. Things have changed in the last two and a half decades. As the expert for the NAACP plaintiffs, Dr. Burton, testified: "[D]ramatic change is in the Democratic primary in the urban areas, the minorities sort of control the Democratic party, that is, in Houston, the Dallas-Fort Worth area in particular." Depo. of O. Burton (Exh. J-65), at 71. At trial, Dr. Alford testified that such a situation—minority dominance in the Democratic primaries in these major urban areas—would not surprise him. Tr. of Sept. 14 at 1909 (Testimony of Dr. Alford). In this additional sense, then, *Clements* is inapplicable to this case's facts.

of at-large elections (those being county-wide Texas judicial elections for district judgeships in major urban counties in the state). This part of the discussion ends with the statement that the racial bloc voting hurdle had not been cleared in "most, *but not all*, of the counties." *Id*. at 861 (emphasis added). The court had agreed that, "when *the record indisputably proves* that partisan affiliation, not race best explains" divergent voting patterns among minority and white citizens, Section 2 liability may not be established. *Id*. at 850 (emphasis added). Later, the court repeated the rule that, in Section 2 liability cases, there must be a searching and practical evaluation of past and present reality. *Id*. at 860.

This discussion in *Clements* boils down to a point essential to resolution of the polarized voting inquiry in this case: the facts of the case at hand matter greatly. The *Clements* discussion of racially polarized voting in Section 2 cases, and the role that partisanship analysis might play, turns in large part on its understanding of the role of Justice O'Connor's concurrence in *Gingles*. This, too, points to matters of proof concerning the underlying facts as the focal point of a court's evaluation of the case before it. Justice O'Connor's *Gingles* concurrence, quoted in *Clements*, shows how: "Evidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clearly relevant in answering the question whether bloc voting by white voters will consistently defeat minority candidates." *Gingles*, 478 U.S. at 100 (O'Connor concurring), quoted at 999 F.2d at 856 (emphasis removed).

This crucial quote indicates that, not only does the factual proof in the record matter on the racially polarized voting issues, the burden of disproving statistically established racially polarized voting rests with those resisting the assertion. That is, Justice O'Connor framed this part of the *Gingles* inquiry as placing the burden on the state (in this case) to establish a non-

racial explanation for defeat of a candidate preferred by minority voters and rejected by a significant bloc of white voters. *Clements* suggests a rule far different from the one suggested by the state's counsel at closing argument. Rather than the case being "over" when the plaintiff experts submitted their reports on racially polarized voting, it had just begun as far as the state's effort was concerned. At that point, the burden shifted to the state, and it had the job of establishing facts which proved that the minority-candidates defeated by white bloc voting across the state were defeated for "reasons other than that which made" them the preferred choice of minority voters.

This is not a convenient reading of *Clements* on this issue. It is the law of the Fifth Circuit. In *Teague v. Attala County*, 92 F.3d 283 (5th Cir. 1996), *cert. denied*, 522 U.S. 807 the court (in a panel that included the author of *Clements*) squarely held that it was error for the trial court to have placed the burden on plaintiffs to "disprove that factors other than face affect voting patterns" in the county. *Id*. at 290. Once racially polarized voting is established under accepted retrogression analysis (precisely the kind proffered by all the plaintiffs' groups here), it is up to the defendants (the state here) to "rebut" that evidence by "showing that no such bias exists in the relevant voting community." *Id*. If there is a lack of evidence in the record in such a situation, it favors the plaintiffs, *not* the defendants. *Id*. The court went on to hold that the results of the statistical analysis (if they reveal racially polarized voting patterns) "create a strong presumption" in favor of the second and third *Gingles* factors being present. *Id*. at 291.

The crucial distinction between this case and *Clements* is one based on facts. In *Clements*, the state met the factual burden that had been shifted to it. Here, there was no effort by the state to shoulder its burden. It chose to rest its case on an abstract legal principle, not on proving the facts essential to its defense. For example, in *Clements*, the state presented expert testimony

about how straight-ticket voting supported the partisanship theory, especially as to the low profile, at-large judicial elections at issue in that case. 999 F.2d at 878-79 (discussing testimony of Dr. Champagne). But, as a colloquy between the Court and Dr. Alford reveals, the state independently performed no such analysis in this case. Tr. of Sept. 14, at 1852-53.

And, while the state's expert opined in broad terms about his view that partisanship trumped race, there is no evidence of a systematic, fact-intensive inquiry on his part. His expressed opinions were either couched so broadly that they could say little about the specific area under consideration or, sometimes, downright equivocal. *See, e.g.*, Tr. of Sept. 14 at 1789 (Testimony of J. Alford) (concerning a particular election, says his "guess" is the blacks are voting on partisanship not on basis of supporting Hispanic candidate over Anglo). He even testifies that he does not question the factual information coming out of the racially polarized voting analysis, only its interpretation. *Id*. at 1761-262. Furthermore, he appears to either have hedged his bets or switched to the more traditional racially polarized voting analysis approach in his testimony on the *level* of racially polarized voting that should be considered legally significant. *Id*. at 1846. In fact, Dr. Alford testified that "*race still matters*, in terms of the connection between voters and candidates." *Id*. at 1851 (emphasis added).

More fundamentally, the state's expert could not offer the Court a methodology for addressing the issues raised by what he described as "this conflated partisan and racial voting." *Id*. at 1917. In response to a cross-examination question,[6] he suggested that one possibility might be to switch the burden imposed by the law (in, for example, *Teague*) and leave things as they are if the "significant impact of race" could not be shown. *Id*. at 1917-18. He saw the dilemma

---

[6] The question asked Dr. Alford to assume that the legislature "had the intent to racially discriminate and to lessen minority voting opportunity." Then, it asked him to assume that, causation aside, the result of the racially polarized voting analysis was that "the effect was to lessen the minority voting opportunities." Then, under his approach, "there could not be a Section 2 violation in that situation because" causation analysis could be injected and the response would be that "partisanship explains it"? *Id*. at 1916-17 (Questioning by Mr. Hicks).

created by his approach as, not a "factual issue," but a legal or legislative issue. *Id*. at 1918. He thought that, given his suggested approach, he could not see how the Voting Rights Act could be made to work, without some "evolution and some work on the part of the Court." *Id*. at 1919.

This Court need not engage in such evolutionary doctrinal work to rescue Section 2 from the dead-end down which the state would lead it. In *LULAC v. Perry*, 548 U.S. 399 (2006), the Supreme Court has already held that the very same racially polarized voting analysis performed by the plaintiffs' group of experts in this case suffices to meet the second and third prongs of *Gingles*. The Court upheld the district court's finding that there was racially polarized voting, within the meaning of the second and third *Gingles* factors, in south and west Texas and "indeed 'throughout the State.'" 548 U.S. at 427. There is not the slightest suggestion that the racially polarized voting across the state of Texas in that legal dispute—which originated in this decade, in 2003—involved any different methodologies or results or theories than are present in this case. Indeed, the principal expert analysis cited is that of Dr. Lichtman who performed the same analysis in this case. *Id*.

*Clements* is no impediment to the plaintiffs' evidentiary satisfaction of the second and third *Gingles* factors. Neither the facts of this case nor governing law point in the direction the state seems to think it points. And the 2006 Supreme Court decision in *LULAC* makes the conclusion unavoidable that the methods and proof offered through the expert racially polarized voting analysis suffices under governing law.

## IV.

## Travis County, Austin, and CD25

**A.  Dismemberment of the voting communities in Travis County and the City of Austin**

Plan C185 accomplishes a major insult to the geography, demographics, and minority voters of Travis County and the City of Austin. With a 2010 census population of 1,024,266, Travis County has more than enough population—325,778 excess, to be exact—to form a congressional district wholly contained within the county.  The City of Austin, with population of 790,390, has 91,902 people more than enough to form a congressional district wholly contained within the city. State Answer ¶ 4. As succinctly stated by Professor Ansolabehere, the Rodriguez plaintiffs' expert, there is enough Travis County population to have one and a half congressional districts "comfortably." Tr. of Sept. 10 at 1137.

Yet, Plan C185 divides the county and its voters among five congressional districts, none with more than 35% of their population in the county and, hence, none firmly anchored in the county. *See* State Answer ¶ 23.  The City of Austin is similarly balkanized, with its population divided among six congressional districts. State Answer ¶22.  As stated by Dr. Ansolabehere with regard to Plan C185, "[a]lthough Travis has enough population to be a majority of 2 districts, the county is sufficiently divided that is a majority of no districts." S. Ansolabehere Report at 25.

None of the other major urban areas of Texas is the target of such an evisceration at the hands of the Texas Legislature. Depo. of D. Dukes (Exh. J-64) at 21.  There are eight counties with populations in excess of the ideal size of a congressional district, and Travis County is the only one of those without at least one congressional district firmly anchored in it under Plan

C185.  In contrast, under the current congressional plan, C100, 60% of CD25 is in Travis County. State Answer ¶ 26.

The legal question is whether this evisceration of the voting communities in the county and city is barred by any constitutional or statutory rules. And the answer is that, given the voting patterns in the county, the location of minority populations there, and the linkage of this evisceration to illegal action in the Legislature's undermining of CD23 as a viable minority opportunity district, Plan C185's treatment of Travis County and its voters is illegal and should be remedied. The requirement of a remedy stems fundamentally from the interaction of the facts established at trial as to Travis County under Plan C185 and two recent Supreme Court decisions: *Bartlett v. Strickland*, 129 S.Ct. 1231 (2009); and *LULAC v. Perry*, *supra*, 548 U.S. 399. Each of the two cases—*Bartlett* an d *LULAC*—erects an independent legal barrier to the validation of Plan C185 insofar as it targets Travis County, and Austin (and CD25 largely situated there). Together, though, they cement the legal invalidity of the congressional plan's dismemberment of the county and city.

## B.   Deliberate destruction of a viable crossover district

### 1.   Legal backdrop (*Bartlett*)

In *Bartlett*, the lead opinion  addressed a constitutional concern about statutory rules which might be read to entrench majority-minority districts. 129 S.Ct. at 1248. The focus of this concern was about the fate of electoral districts the Court identified as "crossover districts," which the Court defined to be "the result of white voters joining forces with minority voters to elect their [that is, minority voters'] preferred candidate." *Id*. at 1249. The Court noted that the very purpose of the Voting Rights Act was to "foster" precisely the kind of electoral cooperation found in crossover districts. *Id*. In a previous decision, *Johnson v. DeGrandy*, 512 U.S. 997

(1994), the Court had rejected a reading of Section 2 which would have a "tendency to . . . perpetuate" legislative construction of majority-minority districts where they are not "necessary" to achieve equal political and electoral opportunity, which it noted has been called the "politics of second best." *Id*. at 1019-20. The Court's discussion in *DeGrandy* was focused on what *Bartlett* later defined to be a crossover district: "There are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." 512 U.S. at 1020.

The facts in the case before this Court establish that, unique to Texas, Travis County and the City of Austin, in the form of their long-operative, robust tri-ethnic voting coalition centered on current CD25, fall precisely into the *Bartlett-DeGrandy* construct for crossover districts. And, while *Bartlett* avoided announcing the requirement that such districts must be created,  it did express of legal rule crucial to consideration of what the Legislature did in Travis County and Austin: "[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." 129 S.Ct. at 1249.

Plan C185, and its treatment of Travis County and current CD25, accomplished what Bartlett shows to be a constitutional violation.  In Plan C185, the Legislature intentionally drew congressional district lines to destroy what it knew was an effective crossover district in the form of CD25 and its locus in the heart of the tri-ethnic voting coalition that has been effective over the last three decades in the election of minority-preferred candidates through the combined efforts of Hispanic, Black, and a significant contingent—crossover—of Anglo voters.

2.  **Facts**

The electoral openness, racially speaking, of Austin and Travis County elections has already been the focus of Fifth Circuit decision in the context of both partisan and non-partisan elections. In the late 1980s, that court addressed a Section 2 challenge to at-large elections in the City of Austin and concluded that the facts demonstrated that the city "has repeatedly elected black and Mexican-American council members during the last 17 years." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989). The court further determined that "the winning minority candidates frequently received well over fifty percent (50%) of the Anglo vote and were also the preferred candidate of minorities." *Id*. Additionally, the court concluded: "Minority candidates have routinely been elected to other posts in Austin and the surrounding Travis County." *Id*. Half a decade later, the court, sitting *en banc* in a major Section 2 lawsuit involving the system for electing Texas district judges, reached the same conclusion about Anglo cross-over voting in Travis County, determining that "the undisputed facts indicate that Travis County's political system is open to Hispanic and white candidates alike." *Clements*, *supra*, 999 F.2d at 888. This and other facts detailed in the opinion resulted in the court characterizing the evidence in the Section 2 challenge as "minimal" and "plainly insufficient to prove illegal vote dilution." *Id*.

This judicially-recognized, decades-long pattern continued through the past decade. The county and city remained majority Anglo,  but, since 2000, as shown in P. Exh. 901, minority candidates—both Hispanic and Black—have been elected forty-one times to public positions in county- and city-wide elections in Travis County and Austin.  Tr. of Sept. 10 at 1188-90 (D. Butts testimony). This same testimony details other examples of operation of the tri-ethnic coalition in the county and city electing minority-preferred candidates (who themselves are minorities) to school district and state senate races in Anglo-dominated districts, including a

Hispanic state senator elected, with minority and Anglo support, over a twenty-two year time span. *Id*. at 1189-191.

Concerning Travis County, there was essential unanimity among the experts in this case who analyzed racially polarized voting across the state: Travis County was different because there were significant levels of Anglo crossover voting for the same candidates preferred by minority voters. Dr. Ansolabehere, the Rodriguez plaintiffs' expert, found racially polarized voting across the state, but for one place: "Travis County, where whites show a high rate of cross-over voting, is a notable exception to this pattern of racial polarization." S. Ansolabehere Report at 7; ***see also id***. at 33 ("Travis County breaks the pattern observed elsewhere in the state"); Tr. of Sept. 10 at 1120-21 (Testimony of S. Ansolabehere) (Travis County an exception to rest of state in the level of Anglo crossover voting, concluding that, in Travis County, "[v]ery low level of block voting by whites and a fairly high number of crossover voting," so that "whites in Travis County appear to . . . vote for the same candidates preferred by black and Hispanic" voters at significant levels). He concludes that "[w]hites do not appear to vote as a cohesive bloc in opposition to minorities in this county." *Id*. at 34. Using two different methods (ecological regression and homogeneous precinct analysis),  Dr. Ansolabehere concluded that the White crossover vote in Travis County is in the 47%-52% range. *Id*. at 55 (Table 5). This compares to the predicted statewide crossover White vote as being only about 28%. *Id*.

Other experts echoed the basic point made by Dr. Ansolabehere. Dr. Lichtman, the expert for the Quesada plaintiffs, found a 52% Anglo crossover level in Travis County, compared to about 26% for the rest of the state. A. Lichtman Report at 8 (Table 2). He concluded that "[i]n every county with the exception of Travis County a substantial majority of Anglo voters voted against the candidates of choice of African-American and Latino voters." *Id*. at 7 (emphasis

added); *see also* Tr. of Sept. 10 at 1221-22 (Travis County exception to Anglo block voting pattern across rest of state); 1260 (same) (Testimony of A. Lichtman). Dr. Engstrom, the expert for the Latino Redistricting Task Force plaintiffs, reported an Anglo cross-over rate for Travis County in a range from 41.3% to 49.89%, which is significantly higher cross-over than in the other counties he analyzed. Engstrom Report at 35-36.  Dr. Kousser, MALC's expert, characterized Plan C185 in relation to Travis County as "part of an effort to break up the long-successful tradition of coalition politics in Travis County, in which Latinos, African-Americans, and liberal Anglos had often joined together in both partisan and non-partisan contests." M. Kousser Report at 129. Dr. Murray, the NAACP plaintiffs' expert, found that "a sizeable part of Travis County shares" the pattern in which Anglo voters crossover in significant numbers to support the same candidates supported by minority voters. R. Murray Report at 21. Even the state's expert, Dr. Alford, saw the distribution of Anglo votes in Travis County to be "unique." Depo. of J. Alford (Exh. J-43) at 271. At trial, he testified that, in Travis County, "Anglo crossover is substantially higher than it is in the other counties in Texas." Tr. of Sept. 14, at 1787 (Testimony of J. Alford).

The analysis of the experts, reporting an Anglo cross-over vote roughly two times higher in Travis County than in the rest of the state,  is buttressed by the on-the-ground experience of those who operate in the Travis County political realm. Representative Eddie Rodriguez, a plaintiff (in his capacity as a voter) in this lawsuit and former executive director of the Travis County Democratic Party, explained in detail the operation of the tri-ethnic (that is, Hispanic, Black, and a significant component of White) voting coalition in Travis County in recent years in both the Democratic primary and general elections. Depo. of E. Rodriguez (Exh. J-54), at 18-20. "I just know  . . . the coalition exists here in Travis County." *Id*. at 18. He testified, for example, about

two victories of an Hispanic judicial candidate over Anglo opponents in the Democratic primary, and about the "very strong coalition" of Blacks, Hispanics, and Whites that formed to help get former Senator Gonzalo Barrientos elected in an Anglo-dominant district. *Id*. at 19-20. As he explained, the situation is "unique" in the state: "you don't see this as often in other places." *Id*. at 19. He also explained that, in current CD25, the non-Latino voters support the Latino-preferred candidate in the Democratic primary. *Id*. at 46.

Another state representative from the Austin area, Representative Dawnna Dukes, testified about the tri-ethnic coalition in the county and how that coalition worked to help the CD25 incumbent (Congressman Doggett) get elected in the district. Depo. of D. Dukes at 35-36. And she recounted how she had testified to the House redistricting committee about this tri-ethnic coalition before passage of Plan C185, putting the legislature on notice that what it was doing to Travis County and current CD25 would be the destruction of a viable crossover district. *Id*. at 36-37.

At trial, David Butts, a long-time political operative in the county and one of the moving forces in the origination of the tri-ethnic coalition, testified in detail about how the tri-ethnic coalition works in city and county politics. He identified the geographic "heart" of the coalition, Tr. of Sept. 10 at 1191-92, and he explained how the substantial portion of current CD25 which is in Travis County overlays probably 70% of the coalition's core area, *id*. at 1192. He further explained how the CD25 incumbent "absolutely" had the support of the coalition, had the support of minority voters in the part of Travis County where the district lies, and how he would have been defeated in the last election but for the minority voters of Travis County. *Id*. at 1192-93. Mr. Butts further detailed how Plan C185 effectively eviscerates the operation of the coalition in the county. *Id*. at 1193-95. In that testimony, he detailed how the division of the

county into five congressional districts scattered minority voters in a way that diminishes their ability to form coalitions as they historically have done. The difference in voting patterns and electoral coalitions in Travis County as compared to the rest of the state was succinctly stated by Mr. Butts on cross-examination:

> Well, you can look at polarized voting in the state of Texas and see, you know, where those forces don't come together. And they do and they're present in today's Texas, I assure you. But it's not – I said they're present in today's Texas, but in Travis County, you know, there is a working coalition. It's not that we always agree. It's politics we're dealing with here.

Tr. of Sept. 10 at 1200.

Further supporting Mr. Butts's observations, the incumbent County Judge of Travis County, Sam Biscoe, testified about the existence and operation of the tri-ethnic coalition in the county and how he took advantage of it in his successful runs for county-wide office. David Butts had previously testified about the contest between Judge Biscoe, who is Black, and an Anglo opponent for the position of Travis County Judge in the 2002 general election. Tr. of Sept. 10 at 1185-1187 (explaining that Judge Biscoe won most or all of the minority voters' support, but could not have won without Anglo support, which he got). Judge Biscoe testified about that contest, but also about his first effort to seek the county judgeship, in which he was opposed in the Democratic primary by a formidable Anglo opponent. *Id*. at 1203-05. As explained by Judge Biscoe, he won because of the tri-ethnic coalition, which he had been cultivating since his days as a county commissioner in a precinct that was predominantly white. And he further testified that he would not have been able to win without a significant percentage of the Anglo vote. *Id*. at 1205. The coalition among Anglo, Hispanic, African American, and now Asian voters, Judge Biscoe explained, still exists. *Id*. at 1206. But, as he also testified, Plan C185 does damage to the coalition's functioning by the way it carves up the county: "[F]rom an African American's

23

perspective if you started out with us being 10 percent of Travis County and cut us into five pieces we really are very, very small. And I think the same thing would be true for Hispanics and Asians. Not so much the case but they would be adversely affected to some degree." *Id*. at 1208.

This testimony, both expert and fact, went unrefuted at trial. There can be no doubt that the evidence establishes the current, robust operation of a tri-ethnic voting coalition in Travis County, not to mention a tradition of such a coalition stretching over the last several decades. Furthermore, it is clear that the Texas Legislature was: (1) on notice about the existence and operation of this tri-ethnic coalition in the county and in the major component of current CD25 which is in the county; and (2) engaged in a deliberate effort to so eviscerate the county that the coalition could not be effective in congressional elections for the next decade. In short, the Legislature undertook to do precisely what Justice Kennedy warned in *Bartlett* would present a serious constitutional problem: purposefully destroy an operative crossover district, while trying to hide behind a sham voting rights excuse which it cynically invoked to divide voters along racial lines in the one situation in the state of Texas where racial voting patterns did not actually require it. The politics of the "second-best," *DeGrandy*, 512 U.S. at 1020, was impermissible in the crossover district context of Travis County and current CD25.

### C. The swap of CD23 for a non-compact CD35

#### 1. LULAC v. Perry warned the Legislature not to engage in this kind of swap.

A key component of the Legislature's design was the ostensible replacement of an existing Hispanic opportunity district which the policymakers decided to destroy—that is, CD23—with the new CD35 in Plan C185. In *LULAC v. Perry*, the Supreme Court held that a "noncompact district cannot . . . remedy a violation elsewhere in the State." 548 U.S. at 430. As the opinion further details:

> [T]he state's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right. And since there is no § 2 right to a district that is not reasonably compact, . . . the creation of a noncompact district does not compensate for the dismantling of a compact opportunity district.

*Id*. at 430-31.

Based on this analysis, the Supreme Court in *LULAC* concluded that the 2003 version of CD23 was illegal (because it deprived Hispanic voters of equal voting opportunities) and could not be validated by the non-compact 2003 version of CD25, which ran from Austin to the Rio Grande River. On remand, the district court acted on the Supreme Court's direction and redrew both CD23 and CD25 to the configuration now found in Plan C100.

The Legislature has now repeated itself. It has violated Section 2 by deliberately undermining CD23 as a viable Hispanic opportunity district and suggesting it has remedied that violation somehow by the latest incarnation of the 2003 CD25: the new CD35, which runs from South San Antonio along a three-mile wide, fifty-mile long strip along Interstate 35 to north central Austin. And, to top things off, it has (as already discussed) gutted the Travis County tri-ethnic voting coalition at the same time and with essentially the same click of the computer mouse in the state's redistricting software.

### 2.   Facts

Other briefing addresses, and establishes, the Section 2 violation in what Plan C185 does to CD23. For present purposes, that briefing is incorporated here.

As to the new CD35, the state's experts are unanimous: it is not a reasonably compact district. Todd Giberson, the expert proffered by the state on compactness issues, ranked CD35 the least compact district in the C185 plan by each of the three technical compactness measures he used. T. Giberson Report at App. "Compactness Measures" for Plan C185.  In his testimony.

Mr. Giberson further expanded on the compactness measures for CD35. He testified that he did not consider the compactness scores for CD35 to be compact. Depo. of T. Giberson, at 33.  He testified that "if that district were just drawn in by itself or someone was trying to propose that that district should be drawn like that, I would say no." *Id*. He did not believe its shape was such that a court would compel the state to actually create such a district. *Id*. at 64.

The state's principal expert, Dr. Alford, also concluded that CD35 is not a reasonably compact district. As to it, he stated: "[I]t's definitely not a compact district." Depo. of J. Alford (Exh. J-43), at 43. He continued: "[T]hat district caught my eye as being a non compact district." Id. at 44. And, further as to CD35, he admitted that "if I was drawing districts, it's not a district I would be proud of." *Id*. at 97. Even the main map drawer in the House for congressional districts could go no closer to it being compact than testifying that it was, in his view, "borderline." Tr. of Sept. 9, at 988 (R. Downton testimony). Mr. Downton also testified that he had his doubts that CD35 was required under Section 2. *Id*. at 987.  And the mapdrawer on the Senate side described CD35 as "not particularly compact." Depo. of D. Davis (Exh. J-58), at 90.

As to the relation between CD23 and CD35, Dr. Alford testified that he considered it a "swap" and, further, that as to whether it was a legal swap or not: "I don't know." Depo. of J. Alford, at 194. At trial, Dr. Alford testified that CD35 was created as an intended "offset" to the Legislature's reformation of CD23 to make it less likely to elect the candidate of choice of Hispanic voters. Tr. of Sept. 14, at 1840 (Testimony of J. Alford); *see also id*. at 1875 (agreeing that CD35 was a "swap" for CD23).

Beyond the compactness issue (but related to it), Plan C185's CD35 is an attenuated, and tenuous, district in terms of the way it links different communities of interest, as well as the way it disregards traditional districting criteria.  The configuration linking Austin and San Antonio is

26

itself unusual. Tr. of Sept. 8, at 725 (Testimony of G. Korbel).  And it is unusual in that it spans two of the most expensive media markets in the country. *Id*. at 725. In its Travis County extension, the district was drawn in such a way as to require 55 precinct splits, apparently mostly in minority precincts. *Id*. at 675, 689, 708. In all, CD35 has the largest number of split precincts in Plan C185: 100. *Id*. at 685.

On the Travis County end of the district, the Legislature went to extreme lengths to gather in Hispanic population. It cuts off part of the black population in East Austin to reach Hispanic population, splitting precincts to reach more heavily Hispanic precincts (but low voting) in north central Austin about two and a half miles north of the State Capitol. Tr. of Sept. 10 at 1194-97 (Testimony of D. Butts).  In another part of Austin, the mapdrawers split a precinct to isolate the dormitories of St. Edward's University from the university's administration building in order to place the significant Hispanic population of students in CD35. *Id*. at 1197-99. In yet another area, they split another precinct to separate Hispanic population into CD35, with Anglos going into CD21. Id. at 1199. Representative Eddie Rodriguez, whose state legislative district lies largely in the part of Travis County brought into new CD35, sees CD35 as a "potential dissolution of the community" in Travis County, diluting the "growing Latino strength" in the county. Depo. of E. Rodriguez (Exh. J-54), at 11-12.

On the Bexar County end of the district (where CD35 and its swap-mate, CD23, literally come together), the Legislature divided longstanding communities of interest in south San Antonio in order to buttress its CD35 design. As expressed by an expert in this case, who is intimately familiar with San Antonio, Plan C185 cracks "a traditional voting community on the South Side of San Antonio" by cracking it three ways and moving the "vast majority" of its population into new CD35 and a nearly configured CD20. H. Flores Report at 10-11. Former

27

Congressman Ciro Rodriguez also testified about Plan C185's fracturing of the South Side community in San Antonio, explaining how the Harlandale school district was cut into three pieces, part of it due to CD35's southern extension into that part of the community. Tr. of Sept. 8 at 784 (Testimony of C. Rodriguez). Historically, this high performing Hispanic voting area in the Harlandale district had been kept unified. *Id*. at 784-85. He further testified to the importance of keeping that community of interest intact. *Id*. at 786.

In addition to the disruption of Hispanic-centered communities of interest at each end of the non-compact new CD35, the mechanism for linking them was likewise questionable. The key link between South San Antonio and north central Austin was a 50-mile long, 3-mile wide strip running along Interstate 35 between the two extremities of the district. As characterized by MALC's expert, CD35 runs between Latino population concentrations in San Antonio and Austin "with not much in between." M. Kousser Report at 129. As to this connecting strip along the interstate, the House's principal congressional map drawer testified that "[i]f you wanted a district that included part of San Antonio and part of Travis, you had to connect them somewhere." Tr. of Sept. 9, at 992 (Testimony of R. Downton). Representative Solomons, Chair of the House redistricting committee, thought the I-35 linkage strip was fine, but acknowledged that, despite that being the basis for the linkage, the principal part of CD35 in San Antonio was not even along I-35. Depo. of B. Solomons (Exh. J-60), at 145.

The Fifth Circuit has questioned the *bona fides* of using such connectors to link two different areas of highly-concentrated minority voters. *See Sensley v. Albritton*, 385 F.3d 591, 597 & n.4 (5th Cir. 2004) (questioning linkage through 15-mile "narrow corridor" of land in district resembling an "electoral barbell").

There was an additional disruption from the legislative design of the non-compact CD35. It was to CD20. The incumbent in that district is Congressman Charlie Gonzalez, who is the current Chair of the Congressional Hispanic Caucus. Decl. of W. Wilson ¶ 5. As Professor Wilson's declaration explains, Plan C185 "removes the heart of [CD20] and divvies it up among surrounding districts." *Id*. ¶ 8. This reconfiguration includes removing not only the bulk of downtown San Antonio, but also historic high schools (Louis Fox High School and Sydney Lanier High School) which provided education to Hispanic students during segregation. *Id*. Such disruption of current CD20 was unnecessary and occurred only because of what the Legislature determined to do to CD23 and with the new CD35. *See* Tr. of Sept. 9 at 946 (Testimony of R. Downton) (moving only three or four precincts in CD20 would have remedied the equal population problem there); *id*. at 985 (south San Antonio changes involved trio of districts and manipulation of them).

Thus, against this factual backdrop, recognition of the parallel between Plan C185's handling of reworking current CD23 and the creation of new CD35 with what happened in the 2003 congressional redistricting with regard to reworking then CD23 and the former CD25 is unavoidable. Again, the Legislature has engaged in a legally flawed swap, trading a viable opportunity district for an ostensible new opportunity district that has a only thinly-threaded link between two disparate Hispanic communities. This time, though, the trade is even more legally flawed because it includes the unconstitutional disruption of the tri-ethnic "crossover" coalition in Travis County and current CD25 in violation of the strictures laid down by Justice Kennedy in *Bartlett*.

**Conclusion**

For the foregoing reasons, and based on the evidence at trial, the Court should enter

judgment against the state in these challenges to Plan C185, enjoining Plan C185's

implementation. This relief is appropriate even if Plan C185 ultimately receives preclearance in

the Section 5 proceedings in *Texas v. United States* in the District Court for the District of

Columbia.

Respectfully submitted,


/s/ Renea Hicks
Renea Hicks
Attorney at Law
State Bar No. 09580400
Law Office of Max Renea Hicks
101 West 6th Street
Austin, Texas 78701
(512) 480-8231 - Telephone
(512) 480-9105 - Facsimile
rhicks@renea-hicks.com

SCOTT, DOUGLASS & MCCONNICO, L.L.P.


/s/ Steve McConnico
Steve McConnico
State Bar No. 13450300
smcconnico@scottdoug.com
S. Abraham Kuczaj, III
State Bar No. 24046249
akuczaj@scottdoug.com
Sam Johnson
State Bar No. 10790600
sjohnson@scottdoug.com
600 Congress Avenue, Suite 1500
Austin, Texas 78701-2589
(512) 495-6300 – Telephone
(512) 474-0731 – Facsimile

ATTORNEYS FOR PLAINTIFFS EDDIE

RODRIGUEZ, *ET AL*., TRAVIS COUNTY,
AND CITY OF AUSTIN

PERKINS COIE LLP

Marc Erik Elias
Admitted *Pro Hac Vice*
700 Thirteenth Street N.W., Suite 600
Washington, DC 20005-3960
(202) 434-1609
(202) 654-9126 FAX
MElias@perkinscoie.com

Abha Khanna
Admitted *Pro Hac Vice*
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
(206) 359-8312
(206) 359-9312 FAX
AKhanna@perkinscoie.com

ATTORNEYS FOR PLAINTIFFS EDDIE
RODRIGUEZ, *ET AL*.,

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of October, 2011, I electronically filed the foregoing using the CM/ECF system which will send notification of such filing to all counsel of record.

DAVID RICHARDS
Texas Bar No. 1684600
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
512-476-0005
davidr@rrsfirm.com

RICHARD E. GRAY, III
State Bar No. 08328300
Gray & Becker, P.C.
900 West Avenue, Suite 300
Austin, TX 78701
512-482-0061
512-482-0924 (facsimile)

Rick.gray@graybecker.com

ATTORNEYS FOR PLAINTIFFS PEREZ, DUTTON, TAMEZ, HALL, ORTIZ, SALINAS, DEBOSE, and RODRIGUEZ

JOSE GARZA
Texas Bar No. 07731950
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
210-392-2856
garzpalm@aol.com

JOAQUIN G. AVILA
P.O. Box 33687
Seattle, WA  98133
206-724-3731
206-398-4261 (facsimile)
jgavotingrights@gmail.com

MARK W. KIEHNE
mkiehne@lawdcm.com
RICARDO G. CEDILLO
rcedillo@lawdcm.com
Davis, Cedillo & Mendoza
McCombs Plaza
755 Mulberry Ave., Ste. 500
San Antonio, TX 78212
210-822-6666
210-822-1151 (facsimile)

ATTORNEYS FOR MEXICAN AMERICAN LEGISLATIVE CAUCUS

NINA PERALES
Texas Bar No. 24005046
nperales@maldef.org
MARISA BONO
mbono@maldef.org
REBECCA MCNEILL COUTO
rcouto@maldef.org
Mexican American Legal Defense
and Education Fund

110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
(210) 224-5382 (facsimile)

MARK ANTHONY SANCHEZ
masanchez@gws-law.com
ROBERT W. WILSON
rwwilson@gws-law.com
Gale, Wilson & Sanchez, PLLC
115 East Travis Street, Ste. 1900
San Antonio, TX  78205
210-222-8899
210-222-9526 (facsimile)

ATTORNEYS FOR PLAINTIFFS TEXAS LATINO REDISTRICTING TASK FORCE,
CARDENAS, JIMENEZ, MENENDEZ, TOMACITA AND JOSE OLIVARES, ALEJANDRO
AND REBECCA ORTIZ


JOHN T. MORRIS
5703 Caldicote St.
Humble, TX 77346
(281) 852-6388

JOHN T. MORRIS, PRO SE

KAREN M. KENNARD
2803 Clearview Drive
Austin, TX 78703
(512) 974-2177
512-974-2894 (fax)

ATTORNEY FOR PLAINTIFF CITY OF AUSTIN

DAVID ESCAMILLA
Travis County Asst. Attorney
P.O. Box 1748
Austin, TX 78767
(512) 854-9416

ATTORNEY FOR PLAINTIFF TRAVIS COUNTY

CHAD W. DUNN
chad@brazilanddunn.com

K. SCOTT BRAZIL
scott@brazilanddunn.com
Brazil & Dunn
4201 FM 1960 West, Suite 530
Houston, TX  77068
281-580-6310
281-580-6362 (facsimile)

ATTORNEYS FOR INTERVENOR-DEFENDANTS TEXAS DEMOCRATIC PARTY and
BOYD RICHIE

DAVID SCHENCK
Special Counsel to the Attorney General
P.O. Box 1254A
Capitol Station
Austin, TX  78711

ATTORNEY FOR DEFENDANTS
GOVERNOR RICK PERRY,
LIEUTENANT GOVERNOR DAVID
DEWHURST, SPEAKER JOE STRAUS,
SECRETARY OF STATE HOPE ANDRADE
AND THE STATE OF TEXAS

GERALD H. GOLDSTEIN
State Bar No. 08101000
ggandh@aol.com
DONALD H. FLANARY, III
State Bar No. 24045877
donflanary@hotmail.com
Goldstein, Goldstein and Hilley
310 S. St. Mary's Street
29th Floor, Tower Life Bldg.
San Antonio, TX  78205-4605
210-226-1463
210-226-8367 (facsimile)

PAUL M. SMITH
MICHAEL B. DESANCTIS
JESSICA RING AMUNSON
Jenner & Block LLP
1099 New York Ave., NW
Washington, D.C. 20001
202-639-6000

J. GERALD HEBERT

191 Somervelle Street, # 405
Alexandria, VA 22304
703-628-4673
hebert@voterlaw.com

JESSE GAINES
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988

ATTORNEYS FOR PLAINTIFFS QUESADA, MUNOZ, VEASEY, HAMILTON, KING and
JENKINS

LUIS ROBERTO VERA, JR.
Law Offices of Luis Roberto Vera, Jr. & Associates
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205-2260
210-225-3300
irvlaw@sbcglobal.net

GEORGE JOSEPH KORBEL
Texas Rio Grande Legal Aid, Inc.
1111 North Main
San Antonio, TX 78213
210-212-3600
korbellaw@hotmail.com

ATTORNEYS FOR INTERVENOR-PLAINTIFF LEAGUE OF UNITED LATIN AMERICAN
CITIZENS

ROLANDO L. RIOS
Law Offices of Rolando L. Rios
115 E Travis Street
Suite 1645
San Antonio, TX 78205
210-222-2102
rrios@rolandorioslaw.com

ATTORNEY FOR INTERVENOR-PLAINTIFF HENRY CUELLAR

GARY L. BLEDSOE
State Bar No.: 02476500
Law office of Gary L. Bledsoe
316 W. 12th Street, Ste. 307
Austin, TX 78701

512-322-9992
512-322-0840 (facsimile)
garybledsoe@sbcglobal.net

ATTORNEY FOR INTERVENOR- PLAINTIFFS TEXAS STATE CONFERENCE OF
NAACP BRANCHES, TEXAS LEGISLATIVE BLACK CAUCUS, EDDIE BERNICE
JOHNSON, SHEILA JACKSON-LEE, ALEXANDER GREEN, HOWARD JEFFERSON,
BILL LAWSON, and JUANITA WALLACE

JOHN TANNER
3743 Military Road NW
Washington, DC 20015
(202) 503-7696
john.k.tanner@gmail.com

ATTORNEY FOR INTERVENOR-PLAINTIFF TEXAS LEGISLATIVE BLACK CAUCUS

VICTOR L. GOODE
Asst. Gen. Counsel, NAACP
4805 Mt. Hope Drive
Baltimore, MD  21215-5120
410-580-5120
410-358-9359 (facsimile)
vgoode@naacpnet.org

ATTORNEYS FOR INTERVENOR-PLAINTIFF THE TEXAS STATE CONFERENCE OF
NAACP BRANCHES

ROBERT NOTZON
State Bar No. 00797934
Law Office of Robert S. Notzon
1507 Nueces Street
Austin, TX  78701
512-474-7563
512-474-9489 (facsimile)
robert@notzonlaw.com

ALLISON JEAN RIGGS
ANITA SUE EARLS
Southern Coalition for Social Justice
1415 West Highway 54, Ste. 101
Durham, NC  27707
919-323-3380
919-323-3942 (facsimile)
anita@southerncoalition.org

36

ATTORNEYS FOR INTERVENOR-PLAINTIFFS TEXAS STATE CONFERENCE OF
NAACP BRANCHES, EARLS, LAWSON, WALLACE, and JEFFERSON

　　/s/ Renea Hicks
Renea Hicks