IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SHANNON PEREZ, et al., § | |
| Plaintiffs § | |
| § | |
| and § | |
| § | |
| EDDIE BERNICE JOHNSON, et al., § | CIVIL ACTION NO. 11-CA-360 |
| § | OLG-JES-XR |
| TEXAS CONFERENCE OF NAACP § | (Lead Case) |
| BRANCHES, et al., § | |
| Plaintiff-Intervenors § | |
| § | |
| v. § | |
| § | |
| STATE OF TEXAS, et al., § | |
| Defendants § | |
| _____ | |
| | |
| MEXICAN AMERICAN LEGISLATIVE § | |
| CAUCUS, TEXAS HOUSE OF § | |
| REPRESENTATIVES (MALC), § | |
| Plaintiff § | |
| § | |
| and § | |
| § | |
| THE HONORABLE HENRY CUELLAR, § | CIVIL ACTION NO. 11-CA-361 |
| Member of Congress, CD 28, § | OLG-JES-XR |
| § | [Consolidated Case] |
| and § | |
| § | |
| THE TEXAS DEMOCRATIC § | |
| PARTY, et al. § | |
| § | |
| and § | |
| § | |
| LEAGUE OF UNITED LATIN § | |
| AMERICAN CITIZENS (LULAC), et al., § | |
| Plaintiff-Intervenors § | |
| § | |
| v. § | |
| § | |
| STATE OF TEXAS, et al., § | |

1

<table>
<tr><td>Defendants</td><td>§</td><td></td></tr>
</table>

——————————————————————

|  |  |  |
|---|---|---|
| TEXAS LATINO REDISTRICTING | § | |
| TASK FORCE, et al., | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 11-CA-490 |
| | § | OLG-JES-XR |
| RICK PERRY, in his official capacity | § | [Consolidated Case] |
| as Governor of the State of Texas, | § | |
| Defendants | § | |

——————————————————————

|  |  |  |
|---|---|---|
| MARGARITA QUESADA, et al., | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 11-CA-592 |
| | § | OLG-JES-XR |
| RICK PERRY, et al., | § | [Consolidated Case] |
| Defendants | § | |

——————————————————————

|  |  |  |
|---|---|---|
| JOHN T. MORRIS, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 11-CA-615 |
| | § | OLG-JES-XR |
| STATE OF TEXAS, et al., | § | [Consolidated Case] |
| Defendants | § | |

——————————————————————

|  |  |  |
|---|---|---|
| EDDIE RODRIGUEZ, et al., | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 11-CA-635 |
| | § | OLG-JES-XR |
| RICK PERRY, et al., | § | [Consolidated Case] |
| Defendants | § | |

## PLAINTIFF MALC'S POST TRIAL BRIEF

Plaintiff MALC files this post trial brief in accordance with this Court's Order and in

support of its claims against the State of Texas for violations of federal voting rights protections

2

in its plans for election of members of the State House of Representatives and Texas Congressional delegation.

Plaintiff MALC filed this action on May 9, 2011, alleging that the State's 2011 redistricting plan for the Texas House violates the United States Constitutional requirement for equality of population among districts, commonly referred to as the one person, one vote principle.  In addition, Plaintiff MALC alleges that the Texas House plan is a racial gerrymander and violates Section 2 and Section 5 of the Voting Rights Act and the Fourteenth Amendment.

Plaintiff's complaint also challenged the Texas redistricting plan for Congressional districts, alleging it is a racial gerrymander in violation of Section 2 and Section 5 of the Voting Rights Act and the Fourteenth Amendment.

After an abbreviated discovery period, trial was held in San Antonio from September 6, 2011, through September 16, 2011, for live evidentiary presentation and an additional week for evidentiary proffers through September 23, 2011.

I.      Texas House, Plan H283, HB 150

A.      One Person, One Vote – Legal Requirements

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.  Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

*Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964).  In *Reynolds v. Sims*, 377 U.S. 533, 577-78 (1964), the United States Supreme Court held that the Fourteenth Amendment required both houses of a state legislature to be apportioned on a basis of as nearly equal population among districts as practicable.   The Court recognized that complete mathematical population equality was not required and variations were permissible to account for legitimate state interests. *Id.*

Nevertheless, the Court determined that the overriding objective must be substantial equality of population among the districts so that the weight of a person's vote remained equal – that is, one person, one vote. *Reynolds*, 377 U.S. at 578-79.

More recently the Court reaffirmed the importance of the one person, one vote principle, determining that compliance is measured by whether the state has made a good faith effort to achieve population equality among districts and unequivocally rejecting the notion that state legislatures could rely on a 10% deviation "safe harbor." *Cox v. Larios*, 542 U.S. 947 (2004). Where, as here, state legislatures make no serious effort to achieve population equality between districts and where population deviations are used to disadvantage a racial or political group, top to bottom deviations that approach 10% are unconstitutional and violate the Fourteenth Amendment of the United States Constitution. *Cox*, 542 U.S. at 949-50 ("In challenging the District Court's judgment, appellant invites us to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than 10 percent, within which districting decisions could be made for any reason whatsoever. The Court properly rejects that invitation.").

In *Cox*, the Court described some of the indicia considered by the District Court in determining that the population deviations were not justified in the challenged Georgia legislative redistricting plans:

> The District Court found that the population deviations did not result from any attempt to create districts that were compact or contiguous, or to keep counties whole, or to preserve the cores of prior districts. …. Rather, the court concluded, "the population deviations were designed to allow Democrats to maintain or increase their representation in the House and Senate through the underpopulation of districts in Democratic-leaning rural and inner-city areas of the state and through the protection of Democratic incumbents and the impairment of the Republican incumbents' reelection prospects." …. The District Court correctly held that the drafters' desire to give an electoral advantage to certain regions of the State and to certain incumbents (but not incumbents as such)

> did not justify the conceded deviations from the principle of one
> person, one vote.

*Cox*, 542 U.S. at 949 (internal citations omitted).

In addition to the indices described by the Supreme Court, the district court in *Cox* looked at: the use of odd shaped districts to advance the partisan goals of the drafters; the lack of correlation between county splits and attempts to achieve population equality; the relative influence or lack thereof of the Republican members of the legislature; the assumption by the legislature that 10% top to bottom deviation was a safe harbor that did not require explanation; the fact that the overriding goal in the redistricting was not traditional redistricting criteria such as compactness or preserving communities of interest, but rather protecting Democratic members and protecting rural Georgia and inner-city Atlanta against a relative decline in their populations compared with other areas of the state; the fact that the map drawers sought to please Democrats to secure the 91 votes necessary to pass the redistricting bill; that at no time did the drafters consider attempting to draw districts with population equality as a goal; that the total deviation in the Georgia House plan was 9.98%; that most of the districts were at the far ends of the deviation limits and few approached the ideal; that most of the overpopulated districts were Republican and most of the underpopulated districts were Democratic; that plans with smaller deviations were offered and rejected; that the drafters used pairings to disadvantage Republicans; and, as described by the district court, the most striking example of use of population variances to advance partisan advantage was that the drafters overpopulated Georgia House District 137 at +4.45%, although it was located in the southern part of the state, where the vast majority of districts are underpopulated, and was bordered by Districts 132, 133, 135, 136, 138, 139, 140, 141, and 144, which had population deviations of -4.78%, -4.63%, -4.60%, -4.68%, +3.10%, -

3.11%, -4.77%, -4.94%, and +2.21%, respectively. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1325-34 (N.D. Ga. 2004).

A review of the record in this case clearly establishes that the State's redistricting plan for the Texas House violates the one person, one vote principle under the Fourteenth Amendment.

### B.  One Person, One Vote – Factual Record

Plaintiff MALC presented substantial evidence of the racial and partisan taint behind the population deviations contained in the challenged Texas House plan.

#### 1.  Latino Majority Districts Disproportionately Overpopulated

The Court in *Cox* found that the Democratic-controlled legislature in Georgia overpopulated Republican-leaning districts more frequently than Democratic-leaning districts. *Cox*, 542 U.S. at 947-48.  The Texas House plan systematically overpopulates Latino majority districts while generally underpopulating majority Anglo districts. Plaintiff MALC Exhibit No. 19 (Kousser Report, p. 64).  Plaintiff's expert Dr. Kousser testified that of the 80 Anglo majority districts in the Texas House plan, 34 are overpopulated and 46 are underpopulated. *Id.* By contrast, of the 37 Latino majority districts, 22 are overpopulated and 15 are underpopulated. *Id.* Moreover, of the 15 Latino majority districts that are underpopulated in the Texas House plan, 5 are in El Paso County, where the State had no discretion but to underpopulate the districts. *Id.* Discounting the districts in El Paso, more than twice as many Latino majority districts are overpopulated than underpopulated or, stated another way, almost 70% of Latino majority districts are overpopulated. *Id.* Moreover, the Texas Legislature was aware of the systematic overpopulation of Latino and minority-majority districts since the Chairman of the Redistricting Committee was confronted during floor debate on the State House plan regarding that issue. *Id.* at 66.

2.   Texas Assumed 10% Safe Harbor

In *Cox,* Georgia proceeded with redistricting as if no explanations for population

variances were needed so long as the top to bottom deviation remained below 10% and asked the

Supreme Court to validate its understanding of the "safe harbor" rule. *Cox,* 542 U.S. at 949. ("In

challenging the District Court's judgment, appellant invites us to weaken the one-person, one-

vote standard by creating a safe harbor for population deviations of less than 10 percent, within

which districting decisions could be made for any reason whatsoever. The Court properly rejects

that invitation.")  Similarly, the drafters of the State House plan operated on the notion that a

"safe harbor" of 10% shielded the State from any inquiry regarding population deviations. Trial

Transcript, Vol. 6, p. 1473, line 18 to page 1474, line 18. (Interiano testimony); Solomons

Deposition, pp. 115-117; Tr. Vol. 7, p. 1596, lines 2-6 (Solomons testimony).

3.   Relative Lack of Influence of Minority House Members

The *Cox* court found that Republican legislators had little influence in the redistricting

process. *Cox*, 542 U.S. at 947-48; *Larios v. Cox*, 300 F. Supp. 2d 1320, 1324 (N.D. Ga. 2004).

For instance, Republicans submitted alternative plans during the committee process and on the

floor, and these plans were summarily rejected; Republicans tried to work with some Democrats

to reach compromise on plans, and these efforts failed; and while Republicans were appointed to

the Redistricting Committee, they did not have the same access to the process as Democrats.

*Larios*, 300 F. Supp. 2d at 1324-25. Similarly, in this case Latino members of the Redistricting

Committee submitted alternative plans in committee that were summarily rejected, Tr. Vol. 1,

pp.71-73,    Plaintiff MALC's Exhibit No. 19, p. 70; submitted alternative plans during floor

debate on the adopted plans that were also summarily rejected, Tr. Vol. 1, pp. 71-73, 87-88, 96-

97, Plaintiff MALC's Exhibit 19, p. 70; submitted an alternative plan that adhered to the stated

goals of the Redistricting Chairman but still produced additional Latino opportunity districts, and

this plan was also summarily rejected, Tr. Vol. 1, p. 87-88; and were not provided with the same

access to the process as Anglo and Republican members. Tr.  Vol. 1, pp. 87, 97 (alternatives

submitted by minority legislators summarily rejected), Plaintiff MALC's Exhibit 19, p. 70-72,

Tr. Vol. 4, p. 934-35 (Downton testimony on conditions placed on access for Democrats).

> JUDGE RODRIGUEZ:  I want to make sure I understand.
> The instructions that the Democrats received, if I heard
> you correctly, they were told they could not touch the
> Republican districts?
> THE WITNESS:  That is correct.
> …
> JUDGE RODRIGUEZ:  Well, what I am curious about is,
> your testimony makes it seem like there was acquiescence
> by the Democrats to this, and what I am trying to
> understand is, was there acquiescence or was there
> acquiescence after the instruction that they couldn't
> tamper with the Republican lines?
> THE WITNESS:  There was acquiescence after the
> instruction.

4.   Latino and Minority District Deviations Within Whole Counties Were
Maximized and Incumbency Protection Unevenly Applied

In *Larios,* the district court was particularly disturbed by unexplainable variations

between adjacent districts and the uneven protection of incumbents.  *Larios*, 300 F. Supp. 2d at

1330.  Here even within a whole county, the State without explanation overpopulated minority

majority districts while underpopulating adjacent Anglo and Republican districts. P's Exhibit 19,

pp. 66-69. Tr. Vol. 7, p. 1596 (Solomons' testimony: "Q.  Chairman Solomons, you have

testified that you know of no legal justification for the varied deviations within a county between

the districts; isn't that correct?   A.  Yes.")

Of particular note were adjacent districts in Harris County, where the State reduced the Latino population in an emerging Latino majority district (HD 149) to make it safer for the Anglo Republican incumbent, substantially underpopulating the district while adjacent Latino majority districts (HD 145 and 147) were substantially overpopulated, Tr. Vol. 7, pp. 1596-98 (Solomons' testimony) and in Hidalgo County, where incumbency protection was used as an excuse for not only severely underpopulating HD 41, but also dramatically and unnecessarily altering the constituency of the district while adjacent districts, HD 39 and 40, were also drastically altered and overpopulated.  Plaintiff MALC's Exhibit 19, pp.92-95 (Kousser Report); Tr. Vol. 1, pp. 246-7 (Kousser Testimony); Tr. Vol. 6 p. 1478 (Interiano Testimony)("Q. District 36 in Hidalgo County is over 4,000 overpopulated. District 39 in Hidalgo County is over 7,700 overpopulated. District 40 in Hidalgo County is over 5,800 overpopulated. And the district that you drew for Mr. Pena, District 41, is 7,399 underpopulated. Was that intentional? A. Yes, sir.")

     5.   No Legitimate State Rational Explains the Deviations Found in the State's New House plan.

Finally, Dr. Kousser examined other potential non-discriminatory redistricting criteria that might explain the population variances found here.  He reviewed the so called whole county rule to see if compliance with Article III, Section 26 of the Texas Constitution explained the variances found here. Tr. Vol. 1, pp. 242-244; Plaintiff MALC's Exhibit 19, p. 81-84. However, Dr. Kousser found and the record shows that large deviation variances exist even within whole counties such as Harris and Dallas, and so he concluded that population variances were not explained by attempts to comply with the Texas Constitution. Tr. Vol. 1, pp. 236-237; Plaintiff MALC's Exhibit 19, p. 66-69.  Moreover, Dr. Kousser found that the whole county rule was not

evenly applied and that alternative plans with the same number of county cuts, had a lower deviation that the State's new plan. Plaintiff MALC's Exhibit No. 19, p. 81-83.

Dr. Kousser also examined whether attempts at drawing compact districts might justify the population variances found here. Tr. Vol. I, p. 242-244; Plaintiff MALC's Exhibit 19, pp. 81-84.  However, as Dr. Kousser examined the various plans submitted during the legislative process, the plan adopted here was among the least compact. Plaintiff MALC's Exhibit 19, pp. 82-86. Dr. Kousser also examined whether on average the deviations in H283 were lower than other alternatives, but found that the State's new plan had larger average deviations than all but three of the eight other plans examined. Plaintiff MALC's Exhibit 19, pp. 82-83.  Sometimes population variances are necessitated by the desire to keep voting precincts intact.  Here, plan H283 split more precincts than any other plan examined by Dr. Kousser – 412 precinct – which should have facilitated lower population deviations and cannot justify or explain the 9.92% deviation in plan H283. Plaintiff MALC's Exhibit 19, pp. 82-83; *See also*: Tr. Vol. 3 p. 674 (Korbel testimony).

Finally, Dr. Kousser examined plan H283 to see if perhaps the deviations could be explained by efforts of the State to create more minority electoral opportunities. Plaintiff MALC's Exhibit 19, pp. 78-81.  Alas, that was not the case: all the other alternative plans compared to H283 afforded minorities greater electoral opportunities. *Id.*

The evidence on population disparities has gone virtually unchallenged by the Defendants.[1]  While Dr. Kousser thoroughly examined deviations, the impact of the deviations

---

[1] The one area that the Defendants point as evidence of the lack of partisan bias is the lack of pairings among Democrats and minorities in Texas, while the *Cox* case refers to pairings as an effective tool used to secure partisan advantage in Georgia.  Yet, in Texas Republicans out number Democrats 101 to 49, and most of the 49 Democrats are elected from Section 5 protected districts. This is unlike Georgia in *Larios,* where partisan balance is much closer – of the 180 Georgia House members 74 were Republican during the redistricting and of the 56 Georgia Senate members 24 were Republican – and thus a strategy seeking partisan advantage is much more feasible in

on minority voters, and the various potential explanations for the deviations found in H283, the Defendants have not really offered any explanation other than the obvious: the State was seeking political advantage.  Yet, this is the very purpose found to be unacceptable by the Supreme Court in *Cox*.  On this record this Court should find for Plaintiff MALC on its one person, one vote claim regarding the State's new Texas House redistricting plan, H283.

      C.  Section 2 (Effects) – Legal Analysis

      In 1982 Congress substantially revised § 2 of the Voting Rights Act to clarify that a violation requires evidence of discriminatory effects alone, and to "'make clear that proof of discriminatory intent is not required to establish a violation of Section 2.'" *League of United Latin Am. Citizens # 4434 (LULAC) v. Clements, 986 F.2d 728, 741 (5th Cir. 1993)* (quoting S. Rep. No. 417, 97th Cong., 2d Sess. at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 178 ("*Senate Report*")).  The Supreme Court first construed the amended version of *§ 2* of the Voting Rights Act, 42 U.S.C. § 1973, in *Thornburg v. Gingles,* 478 U.S. 30, (1986). In *Gingles*, the plaintiffs were African-American residents of North Carolina who alleged that multimember districts diluted minority voting strength by submerging black voters into the white majority, denying them an opportunity to elect a candidate of their choice. The Court identified three "necessary preconditions" for a claim that the use of multimember districts constituted actionable vote dilution under *§ 2*: (1) The minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Id.* at 50-51,

---

Georgia than in Texas. *See Larios*  300 F. Supp. at 1326-7.  Interestingly, in the first election after redistricting Republicans gained control of the Senate in Georgia, regardless of the partisan gerrymander. *Id.*

The Court later held that the three *Gingles* requirements apply equally in § 2 cases involving single-member districts, such as a claim alleging vote dilution because a geographically compact minority group has been split between two or more single-member districts. *Growe v. Emison,* 507 U.S. 25, 40-41, (1993).  The first of the *Gingles* preconditions is commonly referred to as *Gingles I.*

### 1.  *Gingles I*

With regard to *Gingles I*, the Supreme Court recently established that only by presenting a majority-minority district could minority plaintiffs satisfy the first *Gingles* precondition. *Bartlett v. Strickland,* 129 S. Ct. 1231, 1244 (2009). ("We find support for the majority-minority requirement in the need for workable standards and sound judicial and legislative administration").  The Court defined majority-minority district as those that contain at least a majority of minority **voting age population**.  *Strickland,* 129 S. Ct. at 1242 ("In majority-minority districts, a minority group composes a numerical, working majority of the **voting age population**.  Under present doctrine, § 2 can require creation of these districts.")( emphasis added). In the Fifth Circuit "a working majority of the voting age population" has been determined to mean a district in which the minority group is at least 50% of the citizen voting age population of a single member district. *Valdespino v. Alamo Heights I.S.D.*, 168 F.3d 848 (5th Cir. 1999) cert. denied, 528 U.S. 1114 (2000).

### 2.  *Gingles II and III*

Whether the minority group demonstrates it is politically cohesive embodies a similarly functional focus. "If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests."

*Gingles,* 478 U.S. at 51. Like the first *Gingles'* precondition, however, the Court does not expressly define political cohesiveness. Other courts have elaborated.

In *Gomez v. City of Watsonville,* 863 F.2d 1407, 1415 (9th Cir. 1988), *cert. denied,* 489 U.S. 1080, 103 L. Ed. 2d 839, 109 S. Ct. 1534 (1989), the Ninth Circuit observed, "the inquiry is essentially whether the minority group has expressed clear political preferences that are distinct from those of the majority." Thus, political cohesiveness is determined by looking at the "voting preferences expressed in actual elections." *Id.* Necessarily, when we examine the evidence of political cohesiveness as voting preferences, we look to the same statistical evidence plaintiffs must offer to establish vote polarization. Indeed, political cohesiveness is implicit in racially polarized voting.[2]

**Racial Bloc Voting**

*Gingles* adopted a straightforward definition of racial bloc voting provided by the expert witness upon whom the district court had relied. Racial polarization or bloc voting "exists where there is a consistent relationship between the race of the voter and the way in which the voter votes ... or to put it differently, where black voters and white voters vote differently." *478 U.S. at 53, n.21* (internal quotation marks omitted). The Court's focus was twofold: to determine whether the minority group votes cohesively and "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles,* 478 U.S. at 56. The extent to which this bloc voting impairs the minority's ability to elect candidates of their choice, however, must be "legally significant," a sliding scale that varies with the district and a variety of factual circumstances and may emerge more distinctly over a period of time. *Id.* While the Court offered no "simple doctrinal test for the existence of legally significant racial bloc voting,"

---

[2] *Gingles* stated that one purpose of determining the existence of racially polarized voting is "to ascertain whether minority group members constitute a politically cohesive unit ...." *478 U.S. at 56.*

*Gingles*, 478 U.S. at 58, it urged a flexible approach, noting that the isolated success of a minority candidate in a district that usually exhibits vote polarization will not alone negate plaintiffs' showing.

In *Gingles*, the district court had relied on expert testimony offered by Dr. Bernard Grofman, who used two methods of analysis of voting patterns, "bivariate ecological regression analysis" and "homogeneous precinct analysis," also called "extreme case analysis." Bivariate ecological regression analysis determines the degree of relationship between two variables - the relationship between the racial composition in each political unit (the independent variable) and the support provided a particular candidate within that political unit (the dependent variable). *Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.*, 4 F.3d 1103, 1119 n.10 (3d Cir. 1993), *cert. denied*, 129 L. Ed. 2d 891, 114 S. Ct. 2779 (1994).  In an ecological regression analysis, the correlation coefficient shows which data points fall on the straight line. The linear relationship created by the two variables ideally then will pack closely together on a line.  The inferences that arise from the analysis are often graphically demonstrated by the statistical method.  P's Exhibit 19, pp. 11-16 (Kousser report).

While these three pre-conditions are necessary to establish a vote dilution claim, they are not alone sufficient. *Johnson v. De Grandy,* 512 U.S. 997, 129 L. Ed. 2d 775, 114 S. Ct. 2647, 2657 (1994).

The Court in *De Grandy*, determined that a court's examination of relevant circumstances is not complete  "once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution." *Id.* This is so "because the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Id.* Failure

14

to prove the totality of circumstances establishes the minority is not harmed by the challenged practice and rebuts the inference of discrimination arising from proof of the three preconditions. *Uno v. City of Holyoke,* 72 F.3d 973, 980 (1st Cir. 1995).

In a review of the totality of circumstances the court should be guided by the factors identified by Congress commonly referred to as the Senate factors.  The Senate Report accompanying the 1982 amendments elaborates on the proof for a § 2 analysis, specifying a "variety of relevant factors, depending  upon the kind of rule, practice, or procedure called into question." S. Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982), *reprinted in*  1982 U.S.C.C.A.N. 177, 206-07.  The Senate Report added that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 207. Moreover, "while the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles,* 478 U.S. at 45 (citation omitted) (footnote omitted). Most importantly, "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process." *Id.* (quoting S. Rep. No. 417, 1982 U.S.C.C.A.N. 177, 208). The lack of electoral *opportunity* is the key. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Gingle.*478 U. S. at 47.  The Senate Report lists the following factors to be considered in the analysis of the totality of circumstances:

> "1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution."

Sen. Report *supra.*

D. Section 2 (Effects) Factual Record

1. *Gingles I*

With regard to the ability to develop redistricting plans for the Texas House of Representatives with more Latino opportunity districts than were created in the new Texas House plan, H283 (regardless of the measure used to determine how a "Latino opportunity district" is characterized) the record is not seriously disputed. Plaintiff MALC presented two plans that showed alternative plans with more: Spanish Surnamed Voter Registration (SSVR) majority districts than H283, more Hispanic Voting Age Population (HVAP) majority districts

than H283, and more Citizen Voting Age Population (HCVAP) majority districts than H283. Plaintiff MALC's Exhibit 70, p.3.

Plaintiff MALC's witness Representative Trey Martinez Fischer testified regarding the goals of the plans submitted by MALC. Tr. Vol. 1, pp. 72-91. The two plans on which MALC focused, plans H201 and 205, showed viable alternatives that produced additional Latino opportunity districts above those produced in H283. *Id.*; Plaintiff MALC's Exhibits 1, 2, 5, 6. Plan 205 for instance developed two districts in west Texas HD 81 and 84. Tr. Vol. I, pp. 81-84. (Martinez Fischer testimony)  Of these west Texas districts, at least HD 81was reasonably compact, and had 51.8% SSVR, 61.1 HVAP, and 51.2 HCVAP. Tr. Vol. 1, p.84; Plaintiff MALC's Exhibits 1 and 2. Although district 84 was less compact it nevertheless had 54% SSVR, 58% HVAP and 53% HCVAP. Plaintiff MALC's Exhibit 1 and 2; Tr. Vol. 1, p. 83.  No comparable districts exists in the State's new plan, H283.

Plan 205 also created a new Latino opportunity district, HD 72, in the Hidalgo County/Cameron County area. Plaintiff MALC's Exhibits 1 and 2. HD 72 in plan 205 is reasonably compact and has an 88% HVAP, 82% SSVR, and 83% HCVAP. Tr. Vol. I, pp. 85; Plaintiff MALC's Exhibit 1 and 2.  District 72 in Plan H205 was created without impacting the other Latino opportunity districts in Hidalgo and Cameron County and no comparable district exists in H283.  In addition, plan 205 restored a Latino opportunity district in Nueces County eliminated by the state in Plan H283. Tr. Vol. I, pp. 79-80; Plaintiff MALC's Exhibits 1 and 2. In MALC's plan H205 district 33 in Nueces County contains 60.3% HVAP,  56% SSVR, and 58% HCVAP. *Id.*  In the state's plan H283 district 33 is removed from Nueces County and transferred to Rockwall County in north Texas and is no longer a Latino opportunity district.

In Harris County plan 205 maintains the current Latino opportunity districts, but also enhances the Latino population in district 144 so that it goes from an emerging Latino district to a true Latino opportunity district. Tr. Vol. I, pp. 79-81; Plaintiff MALC's Exhibits 1 and 2. In MALC's plan 205, Harris County district 144 contains 72% HVAP, 53% HCVAP and 51.3 % SSVR. Plaintiff MALC's Exhibits 1 and 2. In the state's plan H283, Defendants no new Latino opportunity districts in Harris County are created.  Instead, the Defendants suggest that their obligation under the Voting Rights Act was met when they raised the SSVR numbers of an existing Latino opportunity district HD 145.  Tr. Vol. I, pp. 80-81; Plaintiff MALC's Exhibit 19, p. 71 n. 33; Farrar supplemental proffer declaration, Docket # 331-3 (Exhibit C).  Thus no comparable district to MALC's plan H205, district 144, exists in Harris County under H283.

In El Paso MALC's plan 205 creates 5 reasonably compact districts with majority SSVR, majority HVAP, and majority HCVAP districts compared to only 4 in the Defendants' plan H283.

Defendants dispute that the Voting Rights Act compels the six new Latino opportunity districts submitted by Plaintiff in MALC plan H 205. First, Defendants challenge only district 84 as not sufficiently compact, but challenge the new districts in west Texas, Hidalgo County and Nueces County as not required under section 2 because of the requirements of Article III, Section 26 of the Texas Constitution. Finally, as to Harris County Defendants point to the increase in existing Latino opportunity district 148's SSVR numbers to avoid the development of a new Latino opportunity district in Harris County.  The Defendants are wrong.

First, with regard to the use of Article III, Section 26 of the Texas Constitution as a shield from its obligations to draw any new Latino opportunity districts that involve cutting county lines, Defendant's misconstrue the law. The chairman of the Redistricting Committee, Chairman Solomons was unequivocal that in a conflict with the Voting Rights Act obligations the Texas constitutional requirement would control.  R. Vol. 7, pp. 1592-95. Only a ruling from the United States Supreme Court would alter his judgment on this point. R. Vol. 7, p. 1593  Similarly, the main architect of the State's redistricting strategy, Mr. Interiano, testified that unless the county lines could be maintained, Latino opportunity districts would not be drawn. Tr. Vol. 6, p. 1447. Yet, the United States Supreme Court has clearly set out that state election-law requirements such as the whole county line provision may be superseded by federal law. *Bartlett v. Strickland*, 129 S. Ct. 1231, 1239 (2009).   In an analogous situation federal courts developing court ordered interim plans, are instructed to follow state redistricting principles so long as they do not conflict with federal constitutional or statutory requirements. *Abrams v. Johnson*, 521 U.S. 74, 79 (1997) (citing Upham, 456 U.S. at 43)( "When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.")  Here, when faced with the choice of complying with Section 2 of the Voting Rights Act and the development of viable, reasonably compact Latino opportunity districts or maintaining a county line, the State chose the county line.

Moreover, the Defendants chose to enforce the county line rule in a manner that was inconsistent with the State Supreme Court's interpretation of that rule, in order to justify the failure to create a new Latino opportunity district.  *See Clements v. Valles*, 620 S. W. 2d 112, 114-5 (Tex. 1981).  According to the *Clements* analysis, in Hidalgo and Cameron Counties the

State's plan, H283, cuts four county lines and creates no new Latino opportunity districts. Yet, had the Defendants recognized and respected the rapid growth of the Latino population of the area, a new district could have been created between Hidalgo and Cameron Counties with only two county line cuts. Plaintiff MALC's Exhibits 5 and 6, Tr. Vol. 1, pp. 88. The inconsistent use of the whole county line rule to avoid drawing new Latino opportunity districts, in this case, is pretextual and simply does not shield the Defendants from their obligations under Section 2.

In using the increase of Latino population in District 148, a district that the State itself has characterized as a performing Latino opportunity district, to avoid the development of a real new Latino opportunity district in Harris County is not evidence of compliance with Section 2, but rather evidence of intentional discrimination Tr. Vol. I, pp. 80-81; Plaintiff MALC's Exhibit 19, p. 71 n. 33; Farrar supplemental proffer declaration, Docket # 331-3 (Exhibit C).

Even when alternative plans more strictly adhere to the requirements of Article III, Section 26, and contain no more county cuts than the plan H283, such as Plaintiff MALC's plan 201 shows, more Latino opportunity districts could have been developed than were developed under the State's new Texas House redistricting plan. Plaintiff MALC's Exhibits 5 and 6; Tr. Vol. 1, pp. 87-91.

Clearly, Plaintiff MALC met the requirements of *Gingles I.*

2. *Gingles II and III*

Plaintiff MALC presented evidence of racial polarized voting using the traditional statistical methods approved by the United States Supreme Court in *Gingles.* Plaintiff MALC's Exhibit 19, pp. 7-53. Dr. Kousser, Plaintiff MALC's expert reviewed a number of state-wide and local elections employing ecological regression statistical methodologies in three different ways: least squares, weighted least squares and ecological inference or King's EI. Plaintiff

20

MALC's Exhibit 19, pp. 26-53 ; Tr. Vol. 1, pp. 214-217.   Regardless of the method employed Dr. Koussers' conclusion was that the data was driving the result, so regardless of the method employed the same results were achieved – elections in Texas continue to be polarized and Latinos are politically cohesive and Anglos vote sufficiently as a bloc to defeat the Latino preferred candidate in Texas General Elections. Tr. Vol. 1, pp. 217, 229, 249-250; Plaintiff MALC's Exhibit 19, pp. 26-52.   Moreover, Latinos and African American voters vote together and are politically cohesive in the General Elections in Texas.  Tr. Vol. I, pp. 229; Plaintiff MALC's Exhibit 19, pp. 51-52.  All of the other Plaintiffs' experts on polarized voting came to the same conclusions since the results of their statistical analysis were remarkably similar.

The Defendants suggested two counter points to the evidence presented by the Plaintiffs' experts: one that levels of voting together did not approach the 90% level and therefore were not statistically significant  and even if they were partisan voting more clearly explained the voting behavior.  Tr. Vol. 7, pp 1796, 1846.  (Alford testimony).

On the first question raised by Dr. Alford, that levels of cohesion in the 70% to 80% for Latino voters together with Anglo and non-Latino voter cohesion of 80% to 60% were insufficient to show legally significant polarized voting, he offered no scholarly support for this limit; such a limit is inconsistent with the levels of polarization found in *Gingles* and *LULAC v. Perry*; and was inconsistent with the testimony of every other expert in the case.

On the second question raised by Dr. Alford, that voting behavior had more to do with partisan voting than racial voting was not based on any empirical analysis and ignores the analysis done by Dr. Kousser that eliminated partisan voting as an explainer of voting behavior in Texas elections.  Dr. Kousser examined primary elections for the existence of racial bloc voting and determined that the levels of Latino voter cohesion exceeded the Latino voter

cohesion found in the General Elections, found elections in the Democratic Primary to be racially polarized and that since all the candidates and all the voters were Democrats, partisanship simply could not explain the voting behavior. Tr. Vol. 1, p. 230; Plaintiff MALC's Exhibit 19, pp. 36-40.

The clear weight of the evidence establishes that elections in Texas continue to be polarized; that Latinos are politically cohesive and that non-Latinos and in particular Anglo voters vote sufficiently as a bloc to usually defeat Latino preferred candidates and that in General Elections Latinos and African Americans are politically cohesive. Plaintiff MALC has met its burden with regard to the three *Gingles* pre-conditions.

### 3.   Totality of Circumstances

Plaintiffs jointly presented a significant record on the factors generally identified as relevant to the inquiry of the totality of circumstances. Most of this evidence went without rebuttal or contradiction. The Task Force Plaintiffs presented both expert and lay witness evidence of the history of discrimination in Texas. As has been well documented in numerous civil rights cases, Texas has a shameful history of discrimination in voting, educations, housing, employment, and other areas with regard to Mexican American and African American citizens. Dr. Tijerina, Dr. Bernal and other witnesses provided the court with substantial examples of this history and their testimony was largely uncontested. Dr. Chapa, MALC's demographic expert produced evidence of the continuing impact of this discrimination on minority citizens of Texas. P's Exhibit 20. Dr. Koussers evidence, discussed in detail above, regarding the use of population variances in the Texas House plan to disadvantage Latino voters demonstrates modern day example of how the political process is used to deny Latino voters an equal opportunity to participate it the political process even today. Elections continue to be polarized and Latinos

continue to be underrepresented in the Texas legislature.  Moreover, the evidence showed that despite accounting for almost 90% of the growth in Texas, leading to an increase in the Texas Congressional delegation, minorities received no new opportunity districts in the two challenged plans before this Court.  A review of the evidence in this case and in a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process together with an assessment of *Gingles I, II, and* III leads to the inescapable conclusion that in the totality of circumstances, plan H283 violates Section 2 of the Voting Rights Act.

E.   Section 2 and 14th Amendment Intent

Defendants assert that Plaintiffs' claims of intentional discrimination are not supported by any evidence and that the only evidence proffered by the Plaintiffs shows partisan bias not racial bias.  First, Defendants seem to assert that only purposeful denial of the vote is legally recognized under the Fourteenth Amendment to the United States Constitution.  That of course is not the case.

The Fourteenth and Fifteenth Amendments protect against purposeful vote dilution generally and minority vote dilution in particular.  *Reynolds v. Sims,* 377 U.S. 533, (1964); *White v. Regester,* 412 U. S. 755 (1973); *Rogers v. Lodge,* 458 U.S. 613, 617 (1982).  The Defendants also assert that no evidence exists of intentional discrimination.  Defendants simply ignore the evidence offered by the Plaintiffs.

The standard of proof required for determining intent or discriminatory purpose is the same as that used in resolving cases under the Fourteenth Amendment's Equal Protection Clause. *Rogers v. Lodge,* 458 U.S. 613, 617 (1982); *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 265 (1977).  Discriminatory purpose may be inferred from the totality of the relevant facts, including the fact that the law bears more heavily on one race than another.

*Washington v. Davis,* 426 U.S. 229, 240, (1976).  Factors that may be probative of a discriminatory purpose include: (1) impact of the official action; (2) historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes"; (3) specific sequence  of events leading up to the challenged decision; (4) departures from normal procedural sequences; (5) substantive departures . . . "particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 266-67.

In *Rybicki v. State Board of Elections,* 574 F. Supp. 1082, 1109 (N.D. Ill. 1982), the court found that where the requirements of incumbency "were so closely intertwined with the need for racial dilution that an intent to maintain a safe, primarily white, district for Senator Joyce is virtually coterminous with a purpose to practice racial discrimination," is indicative of an intent to discriminate. *See Garza v. County of Los Angeles*, 918 F. 2d 763, 771-2 (9th Cir. 1990) *cert. denied* 111 S. Ct. 681 (1991).

The evidence in this case, as set out by Dr. Kousser, establishes facts regarding intent and establishes and supports a finding of intentional discrimination in the development of the challenged plans.

First, the Defendants acknowledge that Dr. Kousser's assessment concludes that racial motive was behind the development of the challenged plans. (Defendants' Motion for Partial Summary Judgment, page 9 )("In his report, Dr. Kousser reaches the following conclusions: ….[E]vidence from maps of both State House and congressional districts, as well as patterns of racial composition of the districts, and remarks during the legislative debates makes clear an intent to discriminate against minorities during the redistricting.")  In addition, Dr. Kousser's 134-page report details facts that establish discriminatory motive both in the adoption of the

Texas House plan as well as the Texas Congressional plan, with 25 tables and 13 figures - many with multiple graphs or maps - as well as his extensive citations of comments indicating discriminatory intent drawn from the debates on the redistricting plans in both houses of the Texas legislature.  The State fails to confront this extensive direct and circumstantial evidence of the discriminatory intent of the legislature and the discriminatory effect of its State House and Congressional redistricting plans should be taken as an admission that it cannot refute that evidence.

Rather the record shows an extensive examination of the plans, evidence and record of the adoption of the challenged plans, voting patterns of Texas voters and other evidence that supports Dr. Kousser's assessment.  Dr. Kousser provided evidence that:

      1. Using various statistical methodologies, voting in recent statewide and selected state House and Congressional elections was markedly racially polarized: Latinos voted overwhelmingly for Latino candidates in Democratic primaries; majorities of all others voted for non-Latino candidates.  In general elections, African-Americans joined Latino voters in overwhelmingly supporting Latino Democratic candidates, even when Republicans nominated candidates who had Spanish surnames. Plaintiff MALC's Exhibit 19, pp. 9-54, Figures 1-4; Tables 1-16.

      2.  The Texas Legislative Council and other publications about redistricting made clear that since the 2004 case of *Larios v. Cox*, brought by Georgia Republicans to overturn a Democratic redistricting, population disparities among state legislative districts

had to be justified by a rational state policy, and that a pattern of overpopulating districts on the basis of race or party was legally questionable.  The TLC also set out the generally understood principle that in redistricting, equal population and adherence to the Voting Rights Act take precedence over all other goals.  In particular, it reminded legislators in papers and presentations that according to decisions of the Texas Supreme Court, the "county line rule" should be waived when it conflicted with equal population requirements.  And indeed, the legislature split county lines 17 times in H283, the plan for the State House that was finally adopted. Plaintiff MALC's Exhibit 19, pp. 54-57, 59.

3.  Nonetheless, across the State, H283 overpopulated a higher proportion of districts containing a majority of Latinos than it did districts containing a majority of Anglos. Plaintiff MALC's Exhibit 19, pp.64-69, Figures 5 and 6.

4.  As in *Larios*, there was considerable evidence in Texas in 2011 of bias against minorities and Anglo Democrats in the legislative process.  Minority legislators were not proportionately represented on redistricting committees, they were not consulted about redistricting by the legislative leadership, and their plans were uniformly rejected.  Their criticisms of the majority's plans were unceremoniously rejected, when they were deemed worthy of any attention whatsoever.  Analysis of the debates on the

26

redistricting plans and of maps of particular districts show that the legislature applied strikingly inconsistent principles when drawing districts, protecting incumbent and other districts that are extremely unlikely to elect the candidates of choice of minority voters, but splitting or packing districts where the candidates of choice of minority voters could be elected.  Tables of statistics about these plans on the State House and Congressional levels substantiate the comments on the legislative floor.  Maps make the racially discriminatory – not just partisan -- intentions of the legislature graphically apparent. Plaintiff MALC's Exhibit 19, pp. 70-134.

5.  Texas is a state with two substantial, underrepresented minorities who sometimes live in close proximity to each other and who regularly vote together in general elections. To consider their proportions separately, distorts the realities of state politics and society and would deprive minorities of an equal opportunity to elect candidates of their choice.  Election returns from State House districts in 2008 and 2010 show that over 80 percent of the districts in which African-Americans and Latinos together composed the majority of voting age persons (not just citizens) elected Latino, African-American, or Anglo Democratic candidates, even in an election that was a landslide for the Republicans. Plaintiff MALC's Exhibit 19, pp. 73-77, Tables 18-20.

6.  Plans proposed by minority legislators or offered during the legislative session are equally or more compact, have no more "county cuts," and split fewer precincts than the plans finally adopted.  The legislature could not have chosen H283 or C185 because they were more aesthetically pleasing or because they caused voters less confusion or registrars, less administrative inconvenience.  And compared to the alternative plans, H283 and C185 offer markedly fewer districts where combined minorities can elect candidates of their choice. Plaintiff MALC's Exhibit 19, pp.  80-83, Tables19-23.

7.  Traditional racial gerrymandering techniques such as packing, cracking and stacking were used to fence in or fence out in minority voters to avoid providing districts that would afford an equal opportunity to elect candidates of their choice. Plaintiff MALC's Exhibit 19, pp. 92- 105, 117-123.

8.  The process used to enhance the electoral opportunities of some incumbent state house and congressional members while knowingly diminishing Latino voting strength in those districts is strong evidence of racial bias. Plaintiff MALC's Exhibit 19, p. 95-98 (HD 41); Tr. Vol. 6, pp. 1456-58 (CD 23)

This record and this evidence is the type of evidence that has been recognized as probative on the issue of intent in a minority vote dilution and redistricting case. *White v. Regester,* 412 U. S. 755 (1973); *Rogers v. Lodge,* 458 U.S. 613, 617 (1982); *Arlington Heights v.*

*Metropolitan Housing Corp.,* 429 U.S. 252, 265 (1977); *Garza v. County of Los Angeles*, 918 F.

2d 763, 771-2 (9th Cir. 1990) *cert. denied* 111 S. Ct. 681 (1991).  Taken together with the

evidence of continued effects of discrimination presented by Plaintiffs' experts Chapa and

Gonzales-Baker and with the evidence of the history of discrimination presented by Plaintiffs'

expert Tijerina, Dr. Kousser's evidence establishes the existence of intentional discrimination in

the development of the challenged plans.

II.     Texas Congressional Plan

A.  Section 2 (Effects) Factual Record[3]

1.   *Gingles I*

Plaintiff MALC submitted to the Court demonstration plans that produced additional

Latino opportunity districts in a 36 member plan. P's Exhibits 7-18.  Plaintiff's witness

Representative Trey Martinez Fischer and Dr. Kousser testified that with regard to each of these

plans additional, reasonably compact Latino opportunity districts were created above and beyond

those created in the state's plan C 185. Tr. Vol. I, pp. 93-97; Plaintiff MALC's Exhibit 70,

Plaintiff MALC's Exhibit 19, pp. 111.

These plans went largely unchallenged and Plaintiff MALC has met its burden as to

*Gingles I.*

2.   *Gingles II and III*

The evidence described above regarding polarized voting is incorporated by reference

and shows that Plaintiff MALC has met its burden with regard to showing that Latino voters are

politically cohesive, that non-Latinos and in particual Anglo voters usually vote as a bloc to

---

[3] The legal analysis described above applies equally to the Plaintiff's challenge of Texas Congressional districts and
will not be repeated here.

defeat the Latino preferred candidates, and that Latino and African American voters are cohesive in Texas General Elections.

### 3.   Totality of Circumstances

Here again Plaintiff incorporates by reference the discussion of the totality of circumstances evidence presented in this case. A review of the evidence in this case and in a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process together with an assessment of *Gingles I, II, and* III leads to the inescapable conclusion that in the totality of circumstances, plan C185 violates Section 2 of the Voting Rights Act.

### B.  Section 2 and Fourteenth Amendment (Intent)

Plaintiff's discussion on the intent issue was discussed above with regard to both the State House and State Congressional plans and is incorporated by reference here.

## III.   <u>CONCLUSION</u>

On the record of this case the Plaintiff MALC is entitled to Judgment on all of the claims presented in this case.  Plaintiff MALC has presented evidence establishing that the new Texas House plan H283 violates the 14th Amendments requirements of one person, one vote; that plan H283 and plan C185 violate Section 2 of the Voting Rights Act, 42 U.S.C. §1973 both as to effect and intent and Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c; that the challenged plans were adopted with the intent to discriminate against and disadvantage Latino voters in violation of the 14th Amendment of the United States Constitution.  Plaintiff MALC should be granted Judgment in this case and the challenged plans permanently enjoined.

DATED:       October 7, 2011                    Respectfully submitted,

_____/s/ Jose Garza_____
JOSE GARZA
Texas Bar No. 07731950
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
(210) 392-2856
garzpalm@aol.com

JOAQUIN G. AVILA
LAW OFFICE
P.O. Box 33687
Seattle, Washington 98133
Texas State Bar # 01456150
(206) 724-3731
(206) 398-4261 (fax)
jgavotingrights@gmail.com

Ricardo G. Cedillo
State Bar No. 04043600
Mark W. Kiehne
State Bar No. 24032627
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, Texas  78212
Tel.: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com
mkiehne@lawdcm.com

**ATTORNEYS FOR MEXICAN
AMERICAN LEGISLATIVE CAUCUS,
TEXAS HOUSE OF REP. (MALC)**

**CAUSE NO. 5:11-CV-361-OLG-JES-XR**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been sent by the Court's electronic notification system October 7, 2011, to counsel of record registered with

the court to receive same and to those not so registered the foregoing document has been sent by email as agreed by the parties for each of the cases referenced above, .

_____/s/ Jose Garza_____
Jose Garza