# In the United States District Court
## for the
## Western District of Texas

| | | |
|---|---|---|
| SHANNON PEREZ, ET. AL. | § | |
| | § | |
| v. | § | SA-11-CV-360 |
| | § | |
| RICK PERRY, ET. AL. | § | |

## ORDER

The court, by majority, adopts PLAN H302 as the interim plan for the districts used to elect members in 2012 to the Texas House of Representatives. A map showing the redrawn districts in PLAN H302 is attached to this Order as Exhibit A. The textual description in terms of census geography for PLAN H302 is attached as Exhibit B. The statistical data for PLAN H302 is attached as Exhibit C. This plan may also be viewed on the DistrictViewer website operated by the Texas Legislative Council (http://gis1.tlc.state.tx.us/) under the category "Court-ordered interim plans." Additional data on the interim plan can be found at the following website location maintained by the TLC under the "Announcements" banner: http://www.tlc.state.tx.us/redist/redist.htm

This interim map is not a ruling on the merits of any claims asserted by the Plaintiffs in this case, any of the other cases consolidated with this case, or the case pending in the United States District Court for the District of Columbia

("D.C. Court").

The decennial census was conducted last year, pursuant to Article I, § 2 of the United States Constitution.  After the census figures were released, it became clear that the current apportionment plan for the Texas House of Representatives violates the one person, one vote principle under the United States Constitution as a result of the dramatic population growth in the last decade.  Thus, the State of Texas undertook redistricting efforts to apportion seats in the Texas House of Representatives.  See U.S. CONST. ART. I, § 2; see also TEX. CONST. ART. III, § 26.

The 82nd Texas Legislature enacted House Bill 150 ("H.B. 150"), which established a new redistricting plan for the Texas House of Representatives. ("Plan H283").  House Bill 150 was signed in the Texas House and Texas Senate on May 2, 2011 and signed into law on June 17, 2011.  A lawsuit for preclearance of the State's enacted plan was filed on July 19, 2011 and is currently pending in the United States District Court for the District of Columbia.  In that case, the United States has stated that it believes the State's enacted House plan was "adopted with a discriminatory purpose" and "has a retrogressive effect"on the voting strength of minority voters.  The D.C. Court, hearing this argument, concluded that "the State of Texas used an improper standard or methodology to determine" if its maps would adversely affect minority voters. The D.C. Court therefore denied the State's request for summary judgment, electing to conduct a trial to determine factual issues related to the alleged discrimination by the Texas Legislature.

The D.C. Court's refusal to approve the State's map places this Court in the unwelcome position of having to "designate a substitute interim plan for the 2012 election cycle by the end of November."[1]  Because the current plan is malapportioned and the State's enacted plan has not been precleared, the Court prepared a court drawn plan so that the 2012 elections could proceed in a timely manner.[2]  With the invaluable technical assistance of the staff at Texas Legislative Council, the Court was able to draw a redistricting plan that met with the approval of a majority of the Court.

Despite the allegations of intentional discrimination and widespread constitutional violations in the enacted House plan, the State objects to issuance of a court-drawn map and insists that this Court must adopt the enacted plan "[b]ecause unelected federal judges possess neither the constitutional power nor the political competence to make the policy choices essential to redistricting[.]" While redistricting is generally a task for legislatures, a legislature's powers are not unbounded.  Here, Texas failed to receive the necessary Voting Rights Act approval for the House plan before the 2012 elections.  In such cases, federal

---

[1] As this Court noted in its order denying summary judgment, because the State's enacted House plan has not been precleared, it is unenforceable and cannot be implemented. *Clark v. Roemer*, 500 U.S. 653, 646 (1991) (failure to obtain either judicial or administrative preclearance renders the voting change unenforceable).  Plaintiffs in this Court also have challenged the legality of the State's enacted House plan and sought to enjoin the State from implementing the plan.

[2] When an enacted plan is not in place in time for the upcoming election, the Court must step in and craft an independently drawn court plan for the upcoming election.  *See Branch v. Smith*, 538 U.S. 254, 266 (2003) (upholding injunction of state court plan because "it had not been precleared and had no prospect of being precleared in time for the 2002 election"); *Lopez v. Monterey County*, 519 U.S. 9, 24 (1996) (where Section 5 preclearance requirements have not been satisfied the remedial court must determine "what remedy, if any, is appropriate.").

courts are required to step in to create a lawful map that will allow free and fair elections to go forward.[3]

In crafting an interim map, this Court may not simply fix the problematic parts of the enacted map as the State suggests.[4]  Doing so would interfere with the lawsuit currently pending in the D.C. Court, a lawsuit initiated by the State of Texas.  Rather, this Court is tasked with drafting an independent map that will enable elections for the 2012 election cycle.  Once the D.C. Court rules, and if the State receives preclearance for its enacted plan, this Court would then remedy any constitutional defects while deferring to State policy for the rest of the map.[5]  If the D.C. Court denies preclearance, the enacted plan will be null and the Legislature will be required to enact a new plan.  But until that time comes, this Court's hands are tied and it must draft an interim map.

The Court's primary goal in crafting its map was to preserve the status quo as much as possible.  All proposed maps, including the State's enacted map, were considered.[6]  But ultimately, the Court was obliged to adopt a plan that complies with the United States Constitution and also embraces neutral principles that advance the interest of the collective public good, as opposed to

---

[3] *See Lopez*, 519 U.S. at 24.

[4] Despite the State's argument that this Court should adopt the State's enacted plan wholesale, the State recently requested a trial in the D.C. Court to occur in early December, thereby implicitly acknowledging that this Court is not free to remedy defects in the enacted plans until there is a ruling from the D.C. Court.

[5] *See Upham v. Seamon*, 456 U.S. 37 (1982).

[6] *Smith v. Cobb County*, 314 F. Supp. 2d 1274 (N.D. Ga. 2002) ("That a court must not act as a rubber stamp does not mean, however, that the court cannot consider the proposed legislative plan, just as it considers any other plans submitted to it.")

the interests of any political party or particular group of people. The Court therefore declined to adopt any of the Plaintiffs' proposed plans, and has instead crafted a plan that embraces the neutral districting principles required of court-drawn plans.

In determining the standards, principles, and criteria to follow in drawing this plan, the Court carefully considered the parties' briefs, the relevant case law, and the approach taken by other district courts.[7] The legal standards and neutral redistricting criteria employed by the Court in drawing the House map are based on clearly established principles and ensure the fairness and impartiality expected in any judicially crafted redistricting plan. Those neutral principles-- including primarily compactness, contiguity, and respect for county and municipal boundaries-- place the interests of the citizens of Texas first.

In drawing the map, the Court began by considering the uncontested districts from the enacted plan that embraced neutral districting principles. Although the Court was not required to give any deference to the Legislature's enacted plan, the Court attempted to embrace as many of the uncontested districts as possible. After inserting those districts into the map, the Court

---

[7] When it became clear that the Court would need to craft a court-drawn plan, it sought the parties' comments on the standards that would govern its task. The State appears to completely ignore the legal standards applicable to an independent court-drawn plan. Instead, the State insists that the Court take the State's enacted plan, make only minimal changes, if any, to "cure" any "defects" in the plan, leave the rest untouched, and implement the plan as a court-drawn plan. This approach would be a clear contravention of Section 5 preclearance requirements and would require the Court to rule on the merits of the State's enacted plan, which it is not permitted to do at this juncture. *See McDaniel v. Sanchez*, 452 U.S. 130, 153 (1981) ("But where a court adopts a proposal 'reflecting the policy choices . . . of the people [in a covered jurisdiction]' . . . the preclearance requirement of the Voting Rights Act is applicable.").

adjusted them to achieve *de minimis* population deviations.[8]  When asked for comments on the proposed map, the Plaintiffs did not object to the Court's use of the enacted map for those districts.

In his dissent, Judge Smith[9] argues that the Court should have given more deference to the State's enacted plan in crafting an independent court-drawn plan.  However, the Court embraced as many of the uncontested districts as possible.  The myriad of significant legal challenges to the State's enacted plan under the Voting Rights Act and the United States Constitution made it impossible to give substantial deference to the State's plan as the dissent has suggested.[10]  Those challenges include: Districts 26, 27, 31, 32, 33, 35, 36, 39, 40, 41, 54, 78, 90, 93, 95, 102, 103, 104, 105, 107, 112, 113, 114, 117, 137, 139, 144, 145, 146, 147, and 149.  With the border-to-border challenges to the State's enacted map, the Court was forced to undertake the delicate task of creating an independent map, giving as much consideration to the State's enacted map as possible without compromising the legal standards and neutral redistricting

---

[8] When a court is called upon to draw districts, it has less latitude than a legislative body might have when it comes to equality in population.  "Court-ordered districts are held to higher standards of population equality than legislative ones. A court-ordered plan should 'ordinarily achieve the goal of population equality with little more than *de minimis* variation.'" *Abrams v. Johnson*, 521 U.S. 74, 98 (1997); *Chapman v. Meier*, 420 U.S. 1, 26-27 (1975); *Connor v. Finch*, 431 U.S. 407, 414 (1977).

[9] The two undersigned judges likewise respect Judge Smith's work ethic and professionalism, and thank him for his service.  Nothing in this opinion is intended to personally or professionally impugn his judgment in this case.  As Judge Smith notes in his dissenting opinion, these are difficult issues and reasonable minds can disagree.

[10] *See Abrams v. Johnson*, 521 U.S. 74, 86 (1997) (stating that *Upham* deference is not appropriate where "the constitutional violation [] affects a large geographic area of the State" because 'any remedy of necessity must affect almost every district.'").

criteria that it set out to follow.

Thus, after incorporating as many of the uncontested districts as possible into the interim map, the Court turned to the districts that are challenged as unconstitutional and attempted to return them to their original configuration in the benchmark. The dissent states that in doing so the Court has made "radical alterations in the Texas political landscape." The reality is that demographics, not this Court's actions, have changed the landscape. Since the 2000 census, the population of Texas has grown by 4,293,741.[11] The vast majority of that growth is attributable to growth in the Latino and African American communities. Specifically, the Hispanic population in Texas grew by 2,791,255 and the Black population grew by 522,570, while the Anglo population increased by less than 465,000 people.[12]

Despite the population growth stated above, the challenged enacted plan reduced minority opportunity districts from 50 to 45. The Court's interim map merely restores the minority opportunity districts to their original configuration in the benchmark. The result of this restoration is a map that includes the original 50 minority districts, while "creating" three additional performing minority districts that emerged naturally once neutral districting principles were used. Indeed, the dissent's own map creates two additional minority districts– one in Tarrant County and one in Hidalgo County. The majority

---

[11] http://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf

[12] Texas State Data Center:
http://txsdc.utsa.edu/Data/Decennial/2010/Redistricting/Profiles.aspx

interim map also creates the district in Hidalgo County, but excludes the one in

Tarrant County and instead adds the second one in Harris County and a third

in El Paso. The district in Harris County sprang naturally from the population

growth in the region. Similarly, the El Paso district had been gerrymandered

in the enacted plan so that it ended up configured into the shape of a deer with

antlers.

  

**Benchmark (Plan H100)   Enacted (Plan H283)   Interim Plan (H302)**

While the dissent includes this deer-shaped district despite allegations

that it was unconstitutional, the interim map merely restores the district to its

original configuration while making adjustments for population growth. The

ultimate inclusion of one additional minority district compared to the dissent

hardly seems like "radical alterations in the Texas political landscape." Indeed,

it is the dissent's Tarrant County district that is the result of an intentional

effort to create a minority district, unlike the Court's attempt to merely maintain

the status quo.

Likewise, although acknowledging that neither this Court nor the D.C.

Court has made any rulings regarding the merits of the cases, and that this

Court is precluded from making such rulings until the D.C. Court rules on the

Section 5 claims,[13] the dissent proceeds to conclude that the plaintiffs have failed to demonstrate a substantial likelihood of success on the merits and that accordingly the Legislature's judgments should be respected.

The dissent argues that "the majority seems to take the plaintiffs' complaints as true for purposes of interim relief on every colorable claim." The dissent apparently ignores the fact that it interprets many of the Plaintiffs' and Department of Justice's objections as baseless. The dissent does so while simultaneously acknowledging that "the Legislature created substantial population disparities in Dallas and Harris Counties in a manner that may raise concerns of racial or partisan gerrymandering in violation of *Larios v. Cox*." Remarkably, after that concession, the dissent states: "Nothing in the State's enacted plan will hinder, in the slightest, Hispanic opportunity to register and vote in greater numbers than before." The dissent further discounts that the D.C. Court concluded that the State "used an improper standard or methodology to determine" if its map would adversely affect minority voters.

An excellent example of the dissent's interference with the D.C. Court's preclearance proceedings is seen in House District 117, which is located in the southwest corner of Bexar County. In the D.C. Court, the Department of Justice has alleged that HD117 was intentionally reconfigured by the State in an effort to trade out mobilized Hispanic voters who regularly vote for Hispanic voters who do not regularly vote. The dissent simply tosses this issue aside as being

---

[13] *See Lopez*, 519 U.S. at 24.

"without foundation," and adopts HD117 into the dissenting map.  However by doing so, the dissent has done "[w]hat is foreclosed" to this Court because "Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color.'"[14]

The Court's map in contrast merely returns HD117 to its original configuration in the benchmark in order to maintain the status quo until the D.C. Court rules.  When viewed in the images below, this hardly seems like the "radical alterations in the Texas political landscape" alleged by the dissent:

  

**Benchmark (Plan H100)     Enacted (Plan H283)     Interim Plan (H302)**

The dissent also wrongly alleges that the interim map "creates" coalition districts that are not required by the Voting Rights Act.  Once again, the dissent misstates the Court's approach to drawing the interim map.  This Court has not

---

[14] *U.S. v. Board of Sup'rs of Warren County, Miss.*, 429 U.S. 642, 645 (1977); *see also Smith v. Clark*, 189 F. Supp. 2d 529, 534 (S.D. Miss. 2002) ("A three-judge court does not have jurisdiction to determine whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color.'").

made any merits determinations as to whether coalition districts are required under the Voting Rights Act.  Rather, like the minority opportunity districts discussed above, when these districts were restored to their baseline configuration and population shifts were taken into account, these districts resulted quite naturally.

For example, House District 26, situated in Fort Bend County to the southwest of Houston, increased from 44 percent minority population to 60.6 percent minority in 2010.  The image below shows that the enacted plan substantially reconfigured HD26 in a way that made it irregularly shaped. Evidence presented at trial indicates that this reconfiguration may have been an attempt by the State to intentionally dismantle an emerging minority district.  As the images below demonstrate, the interim plan attempts to take this district back to its original configuration in the benchmark while making slight adjustments for population changes.

  

**Benchmark (Plan H100)    Enacted (Plan H283)    Interim Plan (H302)**

The dissent's incorporation of the State's bizarrely shaped House District 26, despite alleged constitutional violations, constitutes an improper merits determination regarding the validity of that claim. In contrast, the Court's decision to return the challenged district to its original configuration is simply

11

a method of preserving the status quo until the D.C. Court has made a preclearance determination.

The State's objections to the Court's interim map suffer from even greater flaws. During the course of these proceedings the State has acknowledged that it separated a number of Latino and African American communities from their benchmark districts. It was also apparent from these proceedings that the Legislature started from the presumption that it could have population deviations as high as ten percent, and from that presumption it began to gerrymander districts to meet its goal of creating or maintaining as many Republican districts as possible. The State insists that it did not engage in racial gerrymandering, but rather only engaged in these actions to make various districts more Republican. Accordingly, the State argues that any discrimination by the Legislature was directed against Democrats, not minorities. The State argued to the D.C. Court that it was entitled to summary judgment in that case, but the D.C. Court found that a fact issue existed as to whether the State engaged in racial discrimination. Having failed to secure preclearance from the D.C. Court, the State fails to comprehend that this Court undertakes an interim map process, not a remedial map process. It is clear the State fails to understand the difference when it has statements such as "the Court has not identified any particular Voting Rights Act (VRA) or constitutional violation that would provide a compelling or narrowly tailored explanation for the proposed revisions." This Court is precluded from making any rulings on the merits at this juncture. When it became apparent that the Court would be

required to draw an interim map, the Court provided all parties (including the State) an opportunity to submit a proposed map. The State refused to do so, arguing that the Court was required to adopt its non-precleared map in its entirety. For the reasons stated above, the Court cannot adopt the State's unprecleared map. After arguing throughout these proceedings that its entire map was legal, the State then proceeds to attack the Court for failing to merely correct any "perceived legal defects in the recently-adopted redistricting plan," without detailing what "limited" legal defects should have been corrected.

In sum, the Court's map simply maintains the status quo as to the challenged districts pending resolution of the preclearance litigation, while giving effect to as much of the policy judgments in the Legislature's enacted map as possible. Not everyone will get what they want from the Court's interim map. But, the Court concludes by stating expressly what is implicit in the Court's explanation of how it drafted the interim map: the plan was developed without regard to political considerations or the interests of particular groups of people.

The Legislature's enacted plan is by the State's own admission a radical partisan gerrymander. By asking the Court to adopt it, the State is asking the Court to conspire with the Legislature to enact a partisan agenda. This a court cannot do. As Judge Higgenbotham noted in *Balderas*:

> political gerrymandering, a purely partisan exercise, is inappropriate for a federal court drawing a [] redistricting map. Even at the hands of a legislative body, political gerrymandering is much a bloodfeud, in which revenge is exacted by the majority against its rival. We have left it to the political arena, as we must and wisely should. We do so because our role is limited and not because we see gerrymandering as other than what it is: an abuse

13

of power that, at its core, evinces a fundamental distrust of voters, serving the self-interest of the political parties at the expense of the public good.[15]

A more comprehensive opinion addressing additional legal issues will follow.

SIGNED this 23rd day of November, 2011.


_____/s/_____

ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE



_____/s/_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE




JERRY E. SMITH, Circuit Judge, dissenting:


When a three-judge court is forced into the unwanted position of fashioning interim redistricting plans, the focus should be on practicality, balance, and moderation, albeit with unbending adherence to the Voting Rights Act ("VRA") and the Constitution. The judges in the majority, with the purest of intentions, have instead produced a runaway plan that imposes an extreme redistricting scheme for the Texas House of Representatives, untethered to the

---

[15] *Balderas v. State of Texas*, No. 6:01cv158, 2001 U.S. Dist. LEXIS 25740, at *19-20 (E.D. Tex. Nov. 14, 2001) (*per curiam*), *summarily aff'd,* 536 U.S. 919 (2002).

applicable caselaw.  The practical effect is to award judgment on the pleadings in favor of one side—a slam-dunk victory for the plaintiffs[1]—at the expense of the redistricting plan enacted by the Legislature, before key decisions have been made on binding questions of law.  Because this is grave error at the preliminary, interim stage of the redistricting process, I respectfully dissent.[2]

Unless the Supreme Court enters the fray at once to force a stay or a revision, this litigation is, for most practical purposes, at an end.  This three-judge court is at the point of having to draw interim maps now because the Texas Election Code sets extremely early deadlines to file for office; this panel has extended the dates so that filing for office begins November 28 and ends December 15, subject to further extension by this court or the Supreme Court. The sweeping decision by this panel majority affects most of the State map and will result in the election of new incumbents in 2012.  The plaintiffs then predictably will claim that the interim map ratchets in their favor by constituting a new benchmark for preclearance by the D.C. Court, remedial action by this court, or future action by the Legislature.[3]  This reality warrants caution in

---

[1]  The majority's plan creates more minority or coalition districts than the Latino Taskforce plan (H292), as many as the NAACP plan (H202), and only slightly fewer than the MALC (H295) and Perez Plaintiffs (H297) plans.  After the court published the draft plan on November 17, directing the parties to respond, the comments were predictable.  The plaintiffs know a win when they see it: The Perez plaintiffs and Mexican American Legislative Caucus, for example, advised that "the majority's H298 should be adopted as the Court's interim court ordered plan for the 2012 Texas election cycle."  It opined that "the plan offered by the Court majority [ ] offers the best overall approach to meeting the Court's obligations for Court ordered interim plans."

[2]  Nothing I say here is intended as personal or professional criticism of my two panel colleagues, who serve this court and this country with integrity, dedication, and skill.  These are difficult and complex issues, and the caselaw is not always as helpful as we might hope, so substantial disagreement as to the result should not be surprising.

I compliment, as well, all of the attorneys from both sides.  They have shown an exemplary level of cooperation, candor, flexibility, and hard work in presenting, orally and in writing, the legal and factual issues that this court must consider.  They have made the court's work easier with the quality of their submissions.

[3]  *See Mississippi v. United States*, 490 F. Supp. 569, 582 (D.D.C.1979), *aff'd*, 444 U.S. 1050 (1980).  *But see White v. City of Belzoni*, 854 F.2d 75, 76 (5th Cir. 1988).

15

drawing an interim map and especially in creating new minority opportunity districts at this early stage.

There has been no determination by the three-judge court in the District of Columbia (the "D.C. Court") that is considering the issues arising under section 5 of the VRA. Nor has this court formally taken under submission any issues with the enacted plan regarding the Constitution or section 2 of the VRA. Depending on what the D.C. Court decides, this court will need to conduct extensive evidentiary hearings on the remedial stage of this litigation. Only then will it be appropriate for us to determine, as a final matter, whether the enacted redistricting plans violate the VRA or the Constitution.

Whenever a district court engages in the unwelcome obligation of drawing a reapportionment plan, the starting point is always the recognition that "reapportionment is primarily a matter for legislative consideration and determination." *White v. Weiser*, 412 U.S. 783, 794 (1973) (citations omitted). Accordingly, district courts are bound to "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions *or in the reapportionment plans proposed by the state legislature*, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *Id.* at 795 (emphasis added). The aim of giving such due regard to plans proposed by the State is so the court will "not pre-empt the legislative task nor intrude upon state policy any more than necessary." *Id.* (citation and internal quotation marks omitted).

The parties sharply disagree about how much deference should be given to the maps validly enacted by the Legislature and that are pending preclearance before the D.C. Court. At one end, the State argues that, under *Upham v. Seamon*, 456 U.S. 37 (1982), this court is bound to defer to the enacted plan except in geographical areas where the court makes a specific finding of statutory or constitutional violation. At the other extreme, the plaintiffs argue that, under *Lopez v. Monterey County*, 519 U.S. 9 (1996), we should give no deference whatsoever to the legislative plans, not even considering them in

16

drawing an interim map, because there has been no final ruling on preclearance.

Because we are not in a circumstance squarely controlled by either *Seamon* or *Lopez*, this court should take a moderate route between the two extremes in crafting an interim map. Unlike the court in *Seamon*, we are not in a position to defer blindly to the State's map, because there has been no valid determination of which districts have been precleared. *See Seamon*, 456 U.S. at 38. And unlike the court in *Lopez*, we are not faced with a situation in which the State has deliberately obstructed and tried to circumvent the preclearance process. *See Lopez*, 519 U.S. at 24. Therefore, recognizing that under *Lopez* we should not act as a rubber stamp for the State where its enacted plan has not been precleared, but also cognizant that, under *White* and *Seamon*, we must give due regard to the will of the Legislature unless the VRA or Constitution requires otherwise, the correct approach for an interim map involves respecting legislative choices while seriously evaluating the plaintiffs' alleged violations.

The exigent circumstances in formulating an interim plan preclude this court from plenary review of all the legal issues. In view of these considerations, a proper interim map should begin with drawing, as the State enacted them, the districts that have not been specifically challenged in this court or the D.C. Court.[4] That respects the myriad political choices reflected in the legislative plan instead of substituting the court's preferences for the Legislature's.[5]

---

[4] Although it is true that plaintiffs have alleged that the entire map was drawn with a discriminatory purpose, no plaintiff can substantially show that the rural and suburban districts in north and east Texas themselves were drawn with a discriminatory intent or are evidence of discriminatory intent.

[5] Creating an interim map is an art, not a science. It is a chore unfortunately required because of the impending deadlines of the Election Code and the necessity of drawing lines that can be used for the 2012 elections, which must proceed under some sort of plan. Because it is to be used only in the short term, before the pertinent legal and constitutional questions are formally decided, and because the court has only a brief time in which to fashion the complex plan, an interim plan must be somewhat indeterminate as compared to what a legislature, or on the other hand a court devising a final remedial plan, would issue.

In that sense, an interim map is like the sheet of plywood a merchant puts over his storefront the morning after a damaging storm: It is not especially pretty, but it keeps the

(continued...)

17

The plaintiffs and, apparently, the majority rely on *Balderas v. Texas* to justify an approach that gives no consideration to the legislatively enacted plan.[6] First of all, the applicability of *Balderas* is questionable, because it involved a district court's drawing a new interim map from a *tabula rasa* on account of the legislature's *failing* to pass any reapportionment plan and further in light of the parties' having conceded that the existing scheme was unconstitutional. But even assuming its applicability, *Balderas* accorded substantially more deference to the State's legislative decisions, and assessed the plaintiffs' claims more critically, than does the majority here. For example, the *Balderas* court took the following approach to drawing an interim congressional map:

> Once the panel had left majority-minority districts in place and followed neutral principles traditionally used in Texas . . . *the drawing ceased*, leaving the map free of further change except to conform it to one-person, one-vote . . . . The results of this court's plan did ameliorate the gerrymander and placed the two districts gained by Texas in the census count; however, *doing more necessarily would have taken the court into each judge's own notion of fairness*. The practical effect of this effort was to leave the 1991 Democratic Party gerrymander largely in place as a "legal" plan.[7]

And when confronted with requests that more minority opportunity districts be drawn, *Balderas*, rather than taking the majority's approach of merely acquiescing to virtually all those requests, evaluated whether section 2 *required* those districts be drawn, employing the full totality-of-the-circumstances test. *Balderas*, No. 6:01-CV-158, at *10-*16. The *Balderas* court

---

[5] (...continued)
rain out and allows the store to stay open for business until better repairs can be made. "*Le mieux est l'ennemi du bien*," "The perfect is the enemy of the good." Voltaire, *Dictionnaire Philosophique*.

[6] *See Balderas v. Texas*, No. 6:01-CV-158 (E.D. Tex., Nov. 14, 2001) (per curiam), *aff'd*, 536 U.S. 919 (2002).

[7] *Henderson v. Perry*, 399 F. Supp. 2d 756, 768 (E.D. Tex. 2005) (emphasis added). Because the *Henderson* court consisted of two of the same judges as did the *Balderas* court, *Henderson* provides us "the benefit of their candid comments concerning the redistricting approach taken in the *Balderas* litigation." *LULAC v. Perry*, 548 U.S. 399, 412 (2006).

ultimately rejected those requests, reasoning,

> The matter of creating such a permissive district is one for the legislature. As we have explained, such an effort would require that we abandon our quest for neutrality in favor of a raw political choice. . . . Such arranging of voting presents a large and complex decision with profound social and political consequences. . . . We have no warrant to impose our vision of "proper" restraints upon the political process beyond the constraints imposed by the Constitution or the Voting Rights Act.

*Id.* at \*13-\*14 (citation omitted).  *Balderas* quoted the Supreme Court's explanation of the three-judge district court's role: "[T]he federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law." *Id.* at \*14 (quoting *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993)).

This court's next step, then, should be to consider seriously the plaintiffs' claims and the status of the action pending in the D.C. Court and, taking a cautious and restrained approach, to modify the State's districts where plaintiffs have shown a substantial likelihood of success on the merits, rather than ratifying the plaintiffs' requests merely because they have alleged violations. In challenged districts where the plaintiffs' case is relatively weak, the Legislature's judgments should again be respected.

Under these standards, the interim phase is not the time for this court to impose the radical alterations in the Texas political landscape that the majority has now mandated. In almost every instance in which one or more plaintiffs ask for a substantial change that would upset a legislative choice, the majority has elected to order that revision, immediately, in the interim redistricting plans that are effective for the 2012 elections. The majority makes no apparent effort to decide which, if any, violations are most likely to be found on plenary consideration after full hearing and the benefit of a ruling from the D.C. Court. Instead, the majority enacts an ambitious and aggressive redistricting plan that mimics what the plaintiffs have requested in almost every significant respect.

There is a much more moderate and fair way to draw interim districts for

19

the 2012 elections while adhering to the VRA and the Constitution. In our role as a statutory three-judge court, we are empowered to make certain policy decisions, in the absence of an enforceable legislative plan, that resemble choices a legislature might make. But those rulings by an unelected court should be grounded in recognition of a reasonable chance of success on the merits by plaintiffs as to specific claims.

Instead, the majority seems to take the plaintiffs' complaints as true for purposes of interim relief on every colorable claim. At almost every turn, where a decision is to be made as to whether to disturb a settled district in favor of one asked for by plaintiffs, the majority chooses the latter. The result is a redistricting scheme that awards the plaintiffs for their assertive pleadings and grants no meaningful recognition to the legitimate, nondiscriminatory choices that are a part of any comprehensive redistricting process.

There is a balanced way to satisfy our obligation––given the current impasse––to produce interim plans with an order that is much more evenhanded than what the majority has announced. I have identified specific areas of the State as to which the plaintiffs have presented colorable claims of statutory or constitutional infirmity in the plans enacted by the Legislature. As to those, it can fairly be argued that plaintiffs can show a likelihood of success on the merits, although any final decision must await a full hearing after a decision by the D.C. Court. Also where needed, in the process of fashioning those changes, I have made adjustments to reduce population disparities among districts.

The map I offer, Plan H299[8], which I have prepared with the invaluable and untiring expert assistance of the Texas Legislative Council, addresses a limited number of concerns that are the only ones appropriate for tentative adjustment at this preliminary, interim stage, because they show a substantial

---

[8] A map showing the redrawn districts in PLAN H299 is attached as Exhibit D. The textual description in terms of census geography for PLAN H299 is attached as Exhibit E. The statistical data for PLAN H299 is attached as Exhibit F. This plan may also be viewed on the DistrictViewer website operated by the Texas Legislative Council (http://gis1.tlc.state.tx.us/) under the category "Exhibits for Perez, et. al."

chance of success. Given the considerable latitude afforded this court at the interim stage, I recognize the propriety of correcting those potential violations for the 2012 elections.

First, in an effort to reward and protect an Hispanic legislator in the Rio Grande Valley (Hidalgo County) who changed from Democrat to Republican after being re-elected in 2010, the Republican-dominated Legislature moved well over 90% of the constituents out of his district (District 41) and added, for him, a more reliable voter base, accomplished by an extreme gerrymander and palpable population disparities with neighboring districts. The result is ripe for a viable challenge as offending the one-person-one-vote principle of the Equal Protection Clause. The problem is easily corrected without upheaval of other parts of the State, and I have fixed that, by a change in a few adjoining districts, in the interest of fairness and to avoid any legal deficiencies.

Second, this panel is unanimous in leaving untouched the Legislature's decision to reduce the number of Harris County representatives from 25 to 24, adhering to Texas's well-respected and neutral County Line Rule and to the fact that plain arithmetic shows Harris County is entitled to only 24 districts. In deciding which district to eliminate from the county, the Legislature deleted a coalition district (District 149) whose incumbent is the only Asian member of the House, and it paired that Democrat incumbent with a Democrat in abutting District 137. That raises possible section 5 concerns and potentially reeks of racial gerrymandering. Because of the fortuitous retirement of a Republican incumbent in Harris County, the problem is handily repaired by restoring the district of the Asian member and disbursing into nearby districts the population of the district that now has no incumbent.

Third, the Legislature dismantled a minority opportunity district in Nueces County, raising possible concerns under section 5. The State has persuasive justifications: Nueces County grew more slowly than did the rest of the State as a whole and now has only enough population to support 2.02 districts. Instead of violating the Texas Constitution by cutting the county line

21

twice, the State drew two districts wholly contained within Nueces County, requiring the elimination of one minority opportunity district. Still, in an abundance of caution because of a possible section 5 retrogression claim, I have restored the minority opportunity district in Nueces County, though that unfortunately requires splitting the county three ways.

Fourth, the Legislature created substantial population disparities in Dallas and Harris Counties in a manner that may raise concerns of racial or partisan gerrymandering in violation of *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004). The map I have proffered largely evens out the variations and reduces the number of precinct cuts.

In fairness, I should mention that the majority, also, addresses these four concerns in the adjustments it has made. Not content, however, with making these justified changes, the majority ventures into other areas of the State and, as though sitting as a mini-legislature, engrafts its policy preferences statewide despite the fact that no such extreme modifications are required by the caselaw or by the facts that are before this court at this early stage before preclearance and remedial hearings.

For example, the majority changes the districts in Bexar County, where the Hispanic Citizen Voting Age Population ("HCVAP") is high enough in all the protected districts that there is no cognizable violation of the law. The entire bipartisan legislative delegation from that county approved the lines, constituting what is commonly known as a "drop in" plan affecting only the districts in that county. Any purported challenge to the Bexar County districts is without foundation.

Though the plaintiffs claim that the State impermissibly reduced the "performance" of House District 117 in Bexar County, there is no caselaw supporting the notion that what matters is election performance instead of opportunity to elect. Rather, "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).

22

Similarly, in *LULAC v. Perry*, 548 U.S. 399, 428 (2006), the Court applied the *De Grandy* quotation, saying, "Furthermore, to the extent the District Court suggested that District 23 was not a Latino opportunity district in 2002 simply because Bonilla [a Republican] prevailed, it was incorrect. The circumstance that a group does not win elections does not resolve the issue of vote dilution." Instead, in order that courts and legislatures can operate on the basis of clear, predictable standards, the Supreme Court has adopted a bright-line rule of defining a *Gingles* district as one with a majority-minority of eligible voters. *See Bartlett v. Strickland*, 556 U.S. 1, __, 129 S. Ct. 1231, 1244-45 (2009).

We should not use, as the majority apparently does, past elections as a crystal ball to predict how future elections will turn out, for this court is prevented from making such complex political predictions tied to race-based assumptions. *Id.* Nothing in the State's enacted plan will hinder, in the slightest, Hispanic opportunity to register and vote in greater numbers than before. Election performance in this context is relevant only if plaintiffs can show that the State is causing lower turnout by some electoral device that violates the VRA, then packing those low-turnout voters into a VRA-protected district.

The plaintiffs make no such showing. The question is thus whether the State is causing minorities not to elect candidate of their choice, or whether instead that is caused by other factors unrelated to state action. Even if election performance were relevant to a VRA claim, any such relevance would be a novel interpretation of the VRA that would be inappropriate during this interim stage.

The VRA therefore does not prevent this court from adopting the State's proposal for District 117, because nothing in that enactment would mean that Hispanics "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986).

The majority repeats its Bexar County mistake in El Paso County, another "drop in" county, as to which no member of the El Paso delegation––which is 80%

23

Democrat and 80% Hispanic––raised any objection before enactment. The enacted plan maintains the *status quo* in El Paso: five minority opportunity districts, with one of them likely to elect a Republican. The worst that can be said of the enacted El Paso County districts is that they are possibly the result of partisan gerrymandering—a questionable claim given *Vieth v. Jubelirer*, 541 U.S. 467 (2004)—but the HCVAP in all five El Paso County districts is high enough to escape meaningful challenge under the VRA.

Additionally, the majority equalizes the populations of the districts in Tarrant County, where the plaintiffs had offered no evidence that the slight population deviations were the result of racial gerrymandering. The only challenge to the Tarrant County map is a vague allegation of packing, with no evidence to support it. Indeed, the majority took minority voters away where it matters most: As a result of the majority's evening out of the populations, the new coalition district that the State had enacted in Tarrant County contains fewer minority voters in the majority's plan. If the Legislature used population deviation to racially gerrymander the county, it did not do so to favor whites. This claim was not likely to succeed and does not merit a radical redrawing of Tarrant County.

Additionally, the majority creates a new coalition minority opportunity district in Dallas County (District 107). Even leaving aside the question whether courts can ever mandate minority "coalition" districts, the majority seems to draw this district merely because it *can* be drawn. But no such district is required under section 2, and the State's plan creates no retrogression under section 5. Thus, the majority's meddlings in Dallas County stem solely from the majority's policy preferences, which are not an appropriate justification for judicial action.

Contrary to what seems to be the majority's approach, merely because the plaintiffs can satisfy the *Gingles* factors (which require a showing that a compact majority-minority district can be drawn and that voter polarization exists), section 2 requires the drawing of new minority opportunity districts in only the

24

most limited circumstances. Such districts are permitted only where the totality of the circumstances shows that minorities have less of an opportunity than do other members of the electorate to participate in the political process and to elect representatives of their choice *absent the drawing of that new district.* *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986). Courts are forbidden from drawing new minority opportunity districts without that type of section 2 finding. *Voinovich*, 507 U.S. at 156.

Indeed, the majority's general approach of maximizing the drawing of minority opportunity districts that satisfy the *Gingles* preconditions was specifically rejected in *Johnson v. De Grandy*, 512 U.S. 997, 1016-17 (1994):

> It may be that the significance of the facts under § 2 was obscured by the rule of thumb apparently adopted by the District Court, that anything short of the maximum number of majority-minority districts consistent with the *Gingles* conditions would violate § 2, at least where societal discrimination against the minority had occurred and continued to occur. But reading the first *Gingles* condition in effect to define dilution as a failure to maximize in the face of bloc voting (plus some other incidents of societal bias to be expected where bloc voting occurs) causes its own dangers, and they are not to be courted.
>
> . . . [R]eading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast. . . . Failure to maximize cannot be the measure of § 2.

Given the fact-intensive analysis required to find a section 2 violation and the sensitive and constitutionally questionable judgments involved in drawing––as the majority does––a new district based primarily on race, the creation of such a district should be left to the Legislature (or, some would argue, to a three-judge court at the remedial stage after full consideration of the evidence). In no event is such a district justified by court order as part of an interim plan.

The majority creates a new Hispanic opportunity district (District 144) in Harris County. For the same reasons as with District 107 in Dallas County, that

district should await, at least, the remedial phase or a future legislative session. Nevertheless, the plaintiffs argue that the State's alterations to District 144 were intended to dismantle an "emerging" minority opportunity district. Although it is true that states are forbidden from modifying districts in which minorities are poised to elect the candidate of their choice because of natural population growth, *LULAC v. Perry*, 548 U.S. 399, 440-42 (2006), District 144 is nowhere near that point. Eastern Harris County is not an area of particularly rapid growth, and Hispanics represent less than 35% of the citizen voting age population—a stark contrast with *LULAC v. Perry*, where the challenged district had already reached majority HCVAP under the benchmark plan and was located in a rapidly growing area. Thus, at this interim stage, the court is not justified in creating a new Hispanic opportunity district in Harris County, nor can it be said that it has restored an "emerging" one.[9]

The majority creates a new coalition district, also, in Fort Bend County (District 26). Even if a court could validly require the drawing of coalition districts, this particular district is impermissible, because it fails to meet the *Gingles* preconditions. As proposed, it has a combined HCVAP and BCVAP of only 30.2%, meaning that the sizeable Asian community (with a CVAP of 24.1%) would need to vote cohesively with blacks and Hispanics to elect their candidate of choice. *LULAC v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc). But the plaintiffs have presented scant hard statistical evidence that Asians in Texas reliably vote cohesively with other minorities. That lack of cohesion is supported by the fact that new District 26 elects the minority candidate of choice in only a few reconstituted elections. Thus the majority, in an honest attempt to comply with section 2, instead engages in unconstitutional racial gerrymandering without section 2 as an even colorable legal justification. If a "coalition district" in District 26 is a good idea, but not required, it must be implemented by the

---

[9] The majority's insertion of the new opportunity district also forces changes in myriad other districts in Harris County, producing unintended consequences, in those districts, unrelated to the VRA or the Constitution.

legitimate policymakers and not the courts.

The same is true in Bell County, where the majority fashions a new minority coalition district out of whole cloth (District 54). Again, this district relies on a sizeable (albeit smaller) Asian community to raise minority CVAP levels over 50%, but also again there is little to no hard statistical evidence that cohesion exists among Asians and blacks and Hispanics, and reconstituted election analyses show that minorities will only sometimes elect their candidate of choice in this new district. There is no legal requirement to create coalition districts (and certainly not one like this), even for the Legislature, and it is surely not appropriate for a court that is fashioning only interim relief.

And finally, even in uncontested rural areas, such as those in Northwest and East Texas, as to which no plaintiffs have brought specific challenges, the majority meddles with the enacted plan. This affront to the many small political judgments made by the Legislature in drawing the details of those districts cannot be justified by anything in the VRA or by slight reductions in population deviation, which are required only in a remedial stage after a court has formally found definite violations of federal law. *See Seamon*, 456 U.S. at 42-43.

In summary, it is difficult to overstate what the majority––with the purest of intentions––has wrought in ordaining its ambitious scheme. Its plan is far-reaching and extreme. It expands the role of a three-judge interim court well beyond what is legal, practical, or fair.

The majority should also consider the long-term implications of its interim plan and, in particular, the down-the-road political effects of drawing a map that casts aside legislative will. Once the D.C. Court and this court have ruled on the VRA and constitutional issues, we are bound by *Upham* to defer to the legislatively-enacted plan for districts that are found to comport with federal law. Thus, in all likelihood, Texas will eventually conduct elections under the State's enacted plan for the vast majority of its districts.

If this court had chosen substantially to respect the state-enacted plan in drawing an interim map, there would have been great continuity between the

27

2012 elections and those that will take place for the rest of the decade. To the contrary, however, the majority's approach of readily accepting the plaintiffs' allegations yields the result that only a handful of the 150 districts in the Texas House of Representatives will remain the same between the 2012 elections and those that follow. Instead of requiring only a few districts to change, the majority has forced the State to move the lines of scores of districts twice in only four years, creating large administrative costs, forcing incumbents to campaign in new, unfamiliar areas, preventing long-term relationships between representatives and their constituents, and reducing political accountability.

In the end, my proposed map does not create any section 2 or section 5 problems, and it is true to the Fourteenth Amendment. And, under my approach, the plaintiffs by no means go away empty-handed. In addition to creating a new minority opportunity district in Tarrant County, as did the State, my map restores a minority opportunity district in Nueces County and another in western Harris County, for a total of fifty-two minority opportunity districts. Additionally, a new Hispanic district is created wholly within Hidalgo County, and another Hidalgo County district is restored to its previous configuration, as the plaintiffs request.

In the plan I present, both average and top-to-bottom population deviations are under 10%, and, in response to the plaintiffs' allegations of discrimination in Dallas and Harris Counties, I eliminate any deviations correlated with partisan or racial demographics. The County Line Rule is respected unless federal law dictates otherwise, and, as a pragmatic concern, many precincts that were split in the enacted plan have been restored. My plan also pairs ten fewer incumbents into the same district than does the majority's. All this is accomplished without unnecessary intrusions into legislative enactments, unlike the majority's scheme, which, among other things, draws many districts not mandated by section 2 and does so using race as a primary motivating factor.

Justice Samuel Alito, in a recent debate discussing "activist judges,"

28

explained that judges are not theorists or social reformers. "Judging is a craft," he said. "It's not a science. It cannot be reduced to an algorithm."[10] That sentiment could not be more true for a three-judge court necessarily thrust into the role of issuing an interim redistricting plan.[11] At the present stage of this complex litigation, this panel should be modest and restrained in doing justice and should engage in the "craft" of fashioning an interim plan that, instead of baldly adopting the allegations in the complaints, does justice by taking into account all the considerations I have described.

I have offered a moderate approach that recognizes and remedies the most potent claims brought against the legislative plan while leaving any more ambitious tinkering to a later judicial phase or to future legislative enactments. Because the conscientious and well-intentioned majority has ventured far beyond its proper role in announcing an interim redistricting plan for the Texas House of Representatives, I respectfully dissent, and I offer this alternate plan in response, in the hope that on appeal, the Supreme Court will provide appropriate and immediate guidance.

---

[10] *The Star-Ledger*, Nov. 15, 2011, available at http://blog.nj.com/ledgerupdates_impact/-print.html?entry=/2011/11/us_supreme_court_justice_to_ru.html.

[11] *See* note 5, *supra.*