# In the United States District Court
## for the
## Western District of Texas

| | | |
|---|---|---|
| SHANNON PEREZ, ET AL. | § | |
| | § | |
| v. | § | SA-11-CV-360 |
| | § | |
| RICK PERRY, ET AL. | § | |

## ORDER

The court adopts PLAN C220 as the interim plan for the districts used to elect members in 2012 to the United States House of Representatives. A map showing the redrawn districts in PLAN C220 is attached to this Order as Exhibit A. The textual description in terms of census geography for PLAN C220 is attached as Exhibit B. The statistical data for PLAN C220 is attached as Exhibit C. This plan may be also viewed on the DistrictViewer website operated by the Texas Legislative Council (http://gis1.tlc.state.tx.us/) under the category "Court-ordered interim plans." Additional data on the Court's interim plan can be found at the following website maintained by the Texas Legislative Council under the "Announcements" banner: http://www.tlc.state.tx.us/redist/redist.htm The Court thanks the staff at the Texas Legislative Council for their assistance in preparing this map.

This interim map is not a ruling on the merits of any claims asserted by

the Plaintiffs in this case, any of the other cases consolidated with this case, or the case pending in the United States District Court for the District of Columbia.

## Background

The decennial census was conducted last year, pursuant to Article I, § 2 of the United States Constitution. The census data showed that the population of Texas had increased from the 2000 population of 20,851,820 to 25,145,561 for 2010, an increase of about 20.6%.[1]  It is undisputed that minority population growth, especially in the Hispanic community, accounted for much of the population increase. Specifically, the Hispanic population in Texas grew by 2,791,255 and the African-American population grew by 522,570, while the Anglo population increased by fewer than 465,000 people.[2]  The population changes mean that the current congressional districts are malapportioned and in violation of the one-person, one-vote principle,[3] and the population increase entitles the State of Texas to four additional seats in the House of Representatives.  Thus, the State of Texas undertook redistricting efforts to reapportion seats.  See U.S. CONST. ART. I, § 2.

The 82nd Texas Legislature, during a special session, enacted S.B. 4 on June 24, 2011.  Governor Rick Perry signed the bill into law on July 18, 2011.

---

[1]  http://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf

[2]  Texas State Data Center:
http://txsdc.utsa.edu/Data/Decennial/2010/Redistricting/Profiles.aspx

[3]  *See Connor v. Finch*, 521 U.S. 74, 98 (1977) (the constitutional guarantee of one person, one vote requires congressional districts to achieve population equality "as nearly as is practicable") (quoting *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964)).

The State's enacted plan drew one new minority opportunity district – district 35 – along the I-35 corridor between Travis County and Bexar County, but drew no other additional minority opportunity districts.

A number of constitutional and statutory challenges have been asserted against the State's enacted map.  Plaintiffs assert that the State failed to draw additional required minority opportunity districts in the Dallas-Fort Worth metroplex, the Houston area, and West/South Texas, despite the substantial minority population growth there and satisfaction of the requirements for drawing such districts under Section 2 of the Voting Rights Act.  Plaintiffs allege that the State racially gerrymandered districts to avoid drawing new minority opportunity districts.  Plaintiffs further complain that the State intentionally weakened district 23, a minority opportunity district, to protect a Republican incumbent, and that the new configuration of district 27 dilutes Hispanic voting strength.  In addition, the Rodriguez Plaintiffs complain that the enacted map intentionally dismantled a functioning "tri-ethnic coalition" district in Travis County.

Plaintiffs further challenge and seek to enjoin implementation of the State's enacted plan under Section 5 of the Voting Rights Act because it has not received preclearance.  It is undisputed that Texas, as a jurisdiction with a history of racial discrimination in voting, is subject to the preclearance requirements of Section 5 of the Voting Rights Act, as amended and codified at

42 U.S.C. § 1973c.[4]  Until a legislative plan obtains such preclearance, it cannot be effective as law and cannot be implemented.[5]

The Stated filed a lawsuit to obtain preclearance of its enacted plan on July 19, 2011, and that suit is currently pending before a three-judge court in the United States District Court for the District of Columbia (hereinafter "the D.C. Court").[6]  In that lawsuit, the State of Texas has asked the D.C. Court to declare that the enacted plan complies with Section 5 of the Voting Rights Act, meaning that it "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" and that it may be

---

[4]  As the Supreme Court observed in its recent opinion concerning prior redistricting efforts in Texas, "The District Court recognized 'the long history of discrimination against Latinos and Blacks in Texas,' and other courts have elaborated on this history with respect to electoral processes:

'Texas has a long, well-documented history of discrimination that has touched upon the rights of African–Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions.'"

*LULAC v. Perry*, 548 U.S. 399, 439-40 (2006) (citations omitted).

[5]  *Clark v. Roemer*, 500 U.S. 653, 646 (1991) (failure to obtain either judicial or administrative preclearance renders the voting change unenforceable); *see also White v. Lipscomb*, 437 U.S. 535, 542 (1978) ("A new reapportionment plan enacted by a State . . . will not be considered 'effective as law' until it has been submitted and has received clearance under § 5. Neither, in those circumstances, until clearance has been obtained, should a court address the constitutionality of the new measure.") (citations omitted).

[6]  *State of Texas v. United States of America & Eric Holder*, Civ. A. No. 1:11-CV-1303 (D.D.C.).

implemented.[7]  The State of Texas moved for summary judgment on its preclearance request on September 14, 2011.[8]  After receiving briefing and hearing oral argument, the D.C. Court denied the motion for summary judgment on November 8, 2011.[9]  The D.C. Court's order states the following:

> Having carefully considered the entire record and the parties' arguments, the Court finds and concludes that the State of Texas used an improper standard or methodology to determine which districts afford minority voters the ability to elect their preferred candidates of choice and that there are material issues of fact in dispute that prevent this Court from entering declaratory judgment that the three redistricting plans meet the requirements of Section 5 of the Voting Rights Act.  *See* 42 U.S.C. 1973c.

*Texas v. United States*, Civ. A. No. 1:11-CV-1303 (D.D.C.), docket no. 106 (Order on State's Motion for Summary Judgment) at 2.  The D.C. Court further noted that, without preclearance, this Court "must designate a substitute interim plan for the 2012 election cycle by the end of November."  *Id.*  This Court is therefore faced with the "unwelcome obligation of performing in the legislature's stead."[10]

## Discussion

In drawing this Congressional map, all proposed maps, including the

---

[7]  *Id.*, docket no. 1 (Original Complaint) at ¶ 48.

[8]  *Id.*, docket no. 41 (Motion for Summary Judgment).

[9]  *Id.*, docket no. 106 (Order on State's Motion for Summary Judgment).

[10]  *Connor v. Finch*, 431 U.S. 407, 415 (1977); *White*, 437 U.S. at 542 ("Pending such [Section 5] submission and clearance, if a State's electoral processes are not to be completely frustrated, federal courts will at times necessarily be drawn further into the reapportionment process and required to devise and implement their own plans.").

State's enacted map, were considered.[11]  The Court sought to create a plan that maintains the status quo pending resolution of the preclearance litigation to the extent possible, complies with the United States Constitution and the Voting Rights Act, and embraces neutral principles such as compactness, contiguity, respecting county and municipal boundaries, and preserving whole VTD's.[12]  The Court also sought to balance these considerations with the goals of state political policy.

Although a court-drawn plan is not subject to Section 5 preclearance, "in fashioning the plan, the court should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases."[13]  The purpose of Section 5 "has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the

---

[11]  *Smith v. Cobb County*, 314 F. Supp. 2d 1274 (N.D. Ga. 2002) ("That a court must not act as a rubber stamp does not mean, however, that the court cannot consider the proposed legislative plan, just as it considers any other plans submitted to it.")

[12]  Of course, population changes and the need to draw four new districts required altering the status quo to some degree.  The Court notes that all population shifts were done in terms of VTD's.  A "VTD" is a voter tabulation district and is the functional equivalent of a voting precinct.  The Court minimized splits to VTD's and precincts as much as possible.  *See Vera v. Bush*, 933 F. Supp. 1341, 1347 (S.D. Tex. 1996) ("Moreover, the Court's remedial plan addresses the single most troubling and realistic hurdle, the potential splitting of voter tabulation districts ('VTD's'), by avoiding that consequence in all but a small handful of voting precincts.").

[13]  *Abrams v. Johnson*, 521 U.S. 74, 95-96 (1997) (quoting *McDaniel v. Sanchez*, 452 U.S. 130, 149 (1981)).  This exception applies to judicial plans devised by the Court, and thus this Court is not permitted to simply implement the Legislature's enacted plan because it has not received preclearance.  *See Abrams*, 521 U.S. at 95.

electoral franchise."[14]

It is undisputed that the appropriate benchmark for determining retrogression under Section 5 is the plan currently in effect. Thus, to comply with Section 5 by ensuring that no minority voters suffer a retrogression in their voting strength as compared to the benchmark and to generally maintain the status quo pending resolution of the preclearance litigation in the D.C. Court, the Court aimed to maintain the current minority opportunity districts from the benchmark plan. The Court accomplished this goal with regard to the existing districts in Houston and Dallas, but large population changes and the need to draw four additional districts nevertheless required significant changes in other districts.

In accordance with the goal of maintaining the status quo and avoiding retrogression, districts 9, 18, and 29, the three existing minority districts in the Houston metropolitan area, were drawn as they are in the benchmark, with only the necessary modifications to account for population inequality.[15]  Because drawing an additional district in the Houston metropolitan area would have

---

[14]  *Id.* (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976)).

[15]  Excess population was moved out of districts 9 and 18.  14,785 people were moved from district 9 to district 7, and 420 people were moved from district 9 to 22.  No people were moved into district 9, and no people were moved out of district 29.  21,421 people were moved from district 18 into district 29, and 1,212 people were moved from district 18 into district 2.  No people were moved into district 18.

In its objections, the State asserts that the Court has reduced the number of African-American plurality districts because the Hispanic voting age population (38%) in district 9 would slightly exceed the African-American voting age population (37%).  However, the African-American *citizen* voting age population ("CVAP"), which is the relevant measure for voting opportunity, still largely exceeds the Hispanic voting age population in district 9 – African-American CVAP is 49% and Hispanic CVAP ("HCVAP") is 18.8%.

significantly upset these districts rather than maintain them, the Court elected to draw new districts 34 and 36 around Houston to reflect population growth, as the Legislature did, while keeping districts 9, 18, and 29 substantially unchanged from the benchmark and drawing districts 2, 22, and 14 similar to the enacted plan.[16]

Thus, as noted, the placement and configuration of the Court's new districts 34 and 36 are similar to the placement of two new districts in the Legislature's enacted plan. New district 36 closely resembles the Legislature's enacted district 36 geographically, and there is a 76.7% population overlap. Much of the difference between the Court's plan and the enacted plan is attributable to maintaining district 29 as in the benchmark to avoid retrogression and maintain the status quo.[17]

The Court's placement of new district 34 is also similar to the Legislature's placement of a new district, labeled 27 in the enacted map. The Legislature took what was previously district 27, removed Nueces County and extended the district to the North, renaming it district 34. District 27, which was actually the new district in the State's enacted map, was placed between Houston and Austin to the south of district 10, the same general area in which the Court has placed

---

[16]  The Court could have drawn a new district in the Houston metropolitan area based on population growth and pushed the existing districts outward. However, the Court chose the less disruptive route of maintaining the current districts as much as possible. This choice also resulted in more overlap between the Court's plan and the State's enacted plan. For example, district 2 in the Court's plan has a 73% population overlap with the enacted plan; district 22 has a 84.9% population overlap; and district 14 has a 97.2% population overlap.

[17]  The addition of district 36 necessarily pushed former district 8 to the west and accounts for most of the change to that district.

its new district 34.[18]  By creating the new district 34 that extends north, the Court was able to restore district 27 to its benchmark configuration as a South Texas district, extending south from Nueces County with Cameron County as its anchor at the border.

Further consistent with Section 5 and the goal of maintaining the status quo, existing Latino opportunity districts in South and West Texas[19] were generally drawn with their benchmark configurations as a starting point, but due to population changes and the addition of new districts 34 and 35, significant changes were necessary.

To begin, district 16 in the El Paso area was overpopulated, and that excess population (58,937 people) had to be moved into district 23 to the east because it is the only adjoining district.[20]  As discussed below, this population shift, the addition of new districts, and other changes in Central and South Texas resulted in more significant changes to district 23.

Further, it is undisputed that much of Texas's overall population growth occurred in Bexar County and Travis County and areas along the I-35 corridor. Even the Legislature's enacted map placed a new minority opportunity district in that area.  Accordingly, consistent with the Legislature's choice to create a

---

[18]  District 10 was pushed somewhat north as a result of the addition of district 34. District 17 was kept substantially similar to benchmark.

[19]  Districts with HCVAP in excess of 50% included districts 15 (South Texas), 16 (El Paso), 20 (San Antonio), 23 (Southwest Texas), 27 (South Texas), and 28 (South Texas).

[20]  Although objections have been raised to the fact that the City of El Paso is split in the Court's map, the Court notes that the City of El Paso is also split in both the State's enacted map and C216, the map proposed by the dissent (though to a lesser degree).

new Latino opportunity district and with its general choice of location in the enacted plan, the Court drew new district 35 as a Latino opportunity district, anchored in Bexar County and generally extending northeast along the I-35 corridor to reflect the population growth in that area.[21]

Southern Bexar County was removed from district 23 to accommodate the creation of new district 35. This was a very large population loss for district 23 (269,784 people), which was largely offset with population from district 20. Further, district 23 was extended to the east into Frio and LaSalle Counties, as well as to the north into Loving, Winkler, Ward, Crane, Upton, Reagan, and Schleicher Counties, and Sutton County was united into district 23.

Despite the significant changes to district 23's population, the Court sought to maintain its demography and election performance at the benchmark levels in keeping with the principle of maintaining the status quo.[22] The State contends that the Court has decreased the performance of district 23, but the Court respectfully disagrees. Reports run by the Texas Legislative Council for the Court in preparing the map and in response to the State's comments demonstrate that district 23 maintains its benchmark performance level. Further, although the dissent apparently accepts the State's position that the performance of CD23 has declined, he argues that "the court redraws the district to ensure that it qualifies as a Latino opportunity district, relying on

---

[21] District 35 includes Atascosa County, southern Bexar County, parts of Guadalupe, Comal, and Hays County along I-35, and Caldwell County.

[22] District 23 has only a 61.2% population overlap with its benchmark population.

'performance' (*i.e.*, probability of electing a Democrat) rather than HCVAP as the factor defining a Latino opportunity district." However, the Court has not relied on performance to define this or any other Latino opportunity district. Rather, the Court has maintained the HCVAP in district 23 above 50% and close to benchmark levels, without decreasing the percent of Spanish-surname voter registration ("SSVR") and without lowering performance.[23] This is consistent with the Court's goal of generally maintaining the status quo. The Court has nowhere expressly sought to increase the performance of any opportunity district above benchmark. Nor has the Court engaged in partisan gerrymandering as suggested.

The significant population growth in the northwestern part of district 25, anchored in Travis County, allowed that district to be pulled back from its benchmark configuration to the northwest in Travis County and western Hays County. This in turn allowed Caldwell and eastern parts of Hays County to be placed into the new district 35. Further, this pulling back of district 25 allowed Bastrop, Fayette, Gonzales, Lavaca, and Colorado Counties to be placed into the new district 34.[24]

---

[23] In the benchmark, district 23 was 62.8% Hispanic VAP, 58.4% HCVAP, and 52.0% SSVR, and the Court's district 23 is 62.6% HVAP, 57.3% HCVAP, and 52.2% SSVR. The Texas Latino Redistricting Task Force recognizes in its comments that "[t]he district provides Latino voters the same opportunity to elect the candidates of their choice that they had in the benchmark plan." Docket no. 537.

[24] The Court makes no ruling on the merits of the Rodriguez Plaintiffs' claims based on the intentional dismantling of the "tri-ethnic" coalition (based in Travis County) in district 25. The Court acknowledges that Section 2 of the Voting Rights Act does not mandate preserving crossover districts. *Bartlett v. Strickland*, 556 U.S. 1, __, 129 S. Ct. 1231, 1248 (2009) (Kennedy, J.). However, preservation of such an already existing district by the Court

The downtown core and much of the population from the existing Latino opportunity district 20 was maintained, but as noted, a significant part of its western population was shed into district 23 to offset district 23's loss of southern Bexar County. Further, 29,922 people were moved from district 20 into the new district 35. In addition, district 20 was pushed a little to the north and picked up population from district 21. Despite its population changes, district 20 maintains its character as a performing Latino opportunity district.[25]

The creation of districts 34 and 35 affected the South Texas districts (15, 27, and 28) to some degree, but they were maintained as close to benchmark as possible. District 27 was maintained very closely to benchmark geographically, although Cameron County was united into district 27, while part of Nueces County was removed and placed into the new district 34. District 27 derives 86.2% of its population from its prior population, and maintains its character as a performing Latino opportunity district.

District 15, which derives 85% of its population from its prior population, is narrowed. It no longer extends into Cameron County and swaps out some portions of Hidalgo County with district 28. Further, Duval County, Live Oak

---

when drawing an interim plan is certainly permissible. Further, under the more stringent requirements of Section 5, the presence of such districts is relevant for the Section 5 retrogression analysis. *See id.* at 1249 (citing *LULAC v. Perry*, 548 U.S. 399, 446 (2006) (Kennedy, J.) (noting that the presence of districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process" is relevant to the Section 5 analysis). In keeping with the goals of maintaining the status quo and complying with Section 5 in drawing this map, the Court has preserved district 25 as a crossover district.

[25]  District 20 pulls 76.8% of its population from its prior population.

County, Karnes County, and Dewitt County were moved from the western part of district 15 into district 28.  District 15 maintains its character as a performing Latino opportunity district.

District 28 no longer extends into Bexar County, since that population was placed into the new district 35, and, as described above, district 28 was generally shifted to the east.  District 28 pulls 86.1% of its population from its prior district and maintains its character as a performing Latino opportunity district.

In the Dallas-Fort Worth area, to maintain the status quo and comply with Section 5, the Court maintained the current minority opportunity district in Dallas County – district 30 – at its benchmark configuration except to equalize population.[26]  The Court kept the general shapes of surrounding districts 5, 6, 24, and 32 similar to the State's enacted plan.  The fourth new district – district 33 – was drawn in the Dallas-Fort Worth metroplex to reflect population growth in that area.  That is also generally where the Legislature added its new district 33, but the Court's new district 33 is more compact and located within Tarrant County, where the growth in urban population occurred.

Because much of the growth that occurred in the Dallas-Fort Worth metroplex was attributable to minorities, the new district 33 was drawn as a minority coalition opportunity district.[27]  United States Representative (and

---

[26] District 30 draws 100% of its population from its prior population, while 7,763 people were moved from district 30 to district 6 to equalize population.

[27] African Americans and Hispanics account for approximately 60.7% of the voting age population and 50.5% of the citizen voting age population of new district 33.

House Judiciary chair) Lamar Smith suggested that the Legislature draw a new minority opportunity district in the Dallas-Fort Worth area.  The State argues that the Legislature attempted to do so but was allegedly unable.  According to 2010 census figures, African-Americans and Hispanics account for at least 41% of the current total population of Tarrant County, and accounted for approximately 77% of the population increase in the County between 2000 and 2010.[28]  The creation of district 33 required changes to the surrounding districts, including pushing district 12 to the west.[29]

The Court notes that, after maintaining current minority districts and adding in the new districts, it inserted a number of districts with minimal change from the enacted plan where possible.  These include districts 1, 3, 4, 5,8, 11, 13, 14, and 19.[30]  Thus, nine of thirty-six districts (25% of the districts) are substantially similar to those in the enacted plan.

The dissent's comments come as some surprise to the Court, and are

_____

[28]  Census data can be viewed at http://factfinder.census.gov. In addition, the Texas State Data Center website shows that there are 482,977 Hispanics and 262,522 African-Americans (alone), and the total population of Tarrant County is 1,809,034.  The African-American population numbers do not include persons of more than one race.  This data can be viewed at:
http://txsdc.utsa.edu/Resources/Decennial/2010/Redistrict/pl94-171/profiles/county/table2.txt

[29]  With regard to complaints that the Court's map splits the City of Arlington, the City was split in the benchmark plan.

[30]  Based on 2010 census data as shown in the Red-340 report, district 1 has a 97.2% population overlap with district 1 in the enacted plan.  District 3 has a 97.8% population overlap with the enacted plan.  District 4 has a 96.5% population overlap with the enacted plan.  District 5 has a 94% population overlap with the enacted plan.  District 8 has a 92.7% population overlap with the enacted plan.  District 11 has a 96.7% population overlap with the enacted plan.  District 13 has a 98.6% population overlap with the enacted plan.  District 14 has a 97.2% overlap with the enacted plan.  District 19 has a 99.2% population overlap with the enacted plan.

clearly a last-minute gathering of public comments that were submitted to the Court after the plan, to which the dissent agreed at the time, was released for comments and objections.  Many of the dissent's comments do not appear to be based on any kind of independent analysis, and the dissent simply accepts each of the objections without any apparent verification or confirmation.

The dissent claims that plan C216 is a better redistricting plan because it is "bipartisan."[31]  But plan C216 was largely driven by political ambition and raises various constitutional concerns.  First and foremost, the map drawer for C216 testified that he used the State's unprecleared map as a template to draw the map even though the Department of Justice has claimed that the State's enacted map was drawn with discriminatory intent.  Because plan C216 is largely based on the State's enacted plan, Plaintiffs have argued that it is, in essence, a legislative plan that should be subject to preclearance.  *Lopez v. Monterey County*, 519 U.S. 9, 22, 117 S. Ct. 340, 348 (1996) ("[W]here a court adopts a proposal 'reflecting the policy choices . . . of the people [in a covered jurisdiction] . . . the preclearance requirement of the Voting Rights Act is applicable.")(quoting *McDaniel v. Sanchez*, 452 U.S. 130, 153, 101 S. Ct. 2224, 2238 (1981)).  Plan C216 is a thinly disguised version of the State's unprecleared plan, which is challenged as being discriminatory in both purpose and effect.

---

[31] Calling the map "bi-partisan" goes a bit far.  It was proposed by two members of Congress, a Republican and a Democrat, who both sought changes to their own districts.  Some other members of Congress whose districts were slightly improved under C216 as opposed to the enacted plan supported C216 based on the improvements to their districts, but that does not mean that they supported C216 over other plans offered by the Plaintiffs, nor does it mean that they had any interest in C216's treatment of areas other than their districts.

The Court further notes that the new district 35 in plan C216, which purports to be a Latino opportunity district, has less than 50% HCVAP and therefore is not a Latino opportunity district. Despite the obvious inconsistency, the dissent criticizes the Court's map on the basis of LULAC's assertion that it dilutes Latino voting strength by not increasing the number of Latino opportunity districts, yet espouses adoption of a plan that creates *fewer* Latino opportunity districts than the Court's plan.

### Summary

In sum, the Court has taken on the "unwelcome obligation" of drawing this interim plan solely because the State has failed to obtain the necessary preclearance of its enacted plan. In drawing an independent plan consistent with the Constitution and the Voting Rights Act, the Court nevertheless utilized portions of the enacted map where it could do so, and placed the four new congressional districts consistent with population growth and in generally the same locations as the Legislature placed them. One of the new districts was drawn as a Latino opportunity district similar to the one created by the Legislature, and the other was drawn as a minority coalition district in Tarrant County based on the significant minority population growth occurring in the area.[32]

---

[32] Under the benchmark, there were 7 Latino opportunity districts, 3 African American opportunity/influence districts, and 1 crossover district (*i.e.*, 11 out of 32 districts). Although minority growth accounts for most of the growth in the State that has entitled Texas to four additional seats in the House of Representatives, the Court's map is conservative and draws only two additional minority districts out of the four. This reflects only a slight increase in the percentage of minority influence/opportunity districts – from 11/32 (34.4%) to 13/36 (36%).

In other portions of the map, the Court sought to maintain the status quo and to avoid retrogression by maintaining the character of existing opportunity districts. Although the Court has not achieved absolute population equality, the population disparities are a result of both exigent circumstances (candidates will start filing for office on Monday, November 28, 2011) and a desire to avoid VTD and precinct cuts to facilitate the imminent election process with minimal delay and expense.[33]

SIGNED on this 26th day of November, 2011.


_____/s/_____

ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE


_____/s/_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE


JERRY E. SMITH, Circuit Judge, dissenting:

I joined in the order submitting proposed interim Congressional Plan C220 for comment by interested parties. It was worthy of submission for that purpose and reflected a good deal of concentrated effort by this panel and Texas Legislative Council to fashion a map that is appropriate for an interim plan

---

[33] The Court's map splits only 3 VTD's. (Further, the Court's map splits 10 precincts, while C216 appears to have over 500 precinct splits). The Court notes that no Plaintiffs/voters have objected to the population disparities in the Court's map.

under the specific situation faced here, where the preclearance court in the District of Columbia has not yet acted and where this court has not made final decisions on the remaining statutory and constitutional issues that have been raised regarding Texas's congressional redistricting. Plan C220 is an honest and diligent effort to achieve what an interim plan should do, and I have considered it carefully in light of the comments and responses that have been received from the various parties.

After reviewing the comments to C220 that point out its statutory, constitutional, and policy deficiencies, I respectfully dissent from the imposition of it as an interim plan for the 2012 Congressional elections in Texas. A better plan is C216, the one submitted by a bipartisan pair of Congressmen seeking the sort of compromise that was unsuccessful in the 2011 Legislature. That plan has the support of at least eleven current Members of Congress from Texas. Although far from perfect, it goes a long way toward achieving a fair and legally defensible plan for the 2012 elections.

Irrespective of the advantages and disadvantages of C216 or any of the other myriad plans submitted by the various parties, C220 suffers from at least the following infirmities:

1. Although the Department of Justice objected to only two districts in the State's enacted plan (C185), C220 changes all thirty-six districts from their configuration in C185 (some of them in only a minor way, I acknowledge).

2. District 27 is changed dramatically so that Nueces County will be the

18

largest county in Texas that does not control its own congressional district. Harris County will greatly outweigh Nueces County and will control District 34. Plan C220 also splits the Port of Corpus Christi into two districts. Lastly, C220's configuration of Nueces County would require using a boat to travel from the southern part of the district to the northern part without entering an adjoining district.

3. Plan C220 creates District 33 as a new "coalition" district, yet as even some of the plaintiffs recognize, there is no evidence of voting cohesion, heightened or otherwise, among Latino, Black, and Asian minority groups so as to justify creation of a coalition district, even if such districts could be created by a court. Latinos and Blacks do not vote cohesively in the Democratic primaries in the area of proposed District 33.

4. The proposed District 23 in C220 does not meaningfully improve the performance for Latino candidates: The Latino candidate of choice will be elected in only two of ten elections. The only permissible justification for a radical redrawing of District 23 would be to improve electoral chances, even assuming that any measure other than Hispanic Citizen Voting Age Population ("HCVAP") is an appropriate test. That purpose fails in C220.

5. In District 23, Plan C220 decreases the HCVAP from 58.5% in the enacted plan to 57.3%. Yet the court redraws the district to ensure that it qualifies as a Latino opportunity district, relying on "performance" (i.e., probability of electing a Democrat) rather than HCVAP as the factor defining a

Latino opportunity district.  Ironically, the court increases the "performance" of this Latino district by making it less Latino––doubling the black population and trading Republican-leaning Anglos for Democratic-leaning Anglos.   The contradiction that decreasing HCVAP makes a district more Latino demonstrates the error in using "performance" as the defining factor of a Latino opportunity district.

6.   The proposed District 23 in C220 does not meaningfully improve the performance for Latino candidates:  The Latino candidate of choice will be elected in only two of ten elections.  The only permissible justification for a radical redrawing of District 23 would be to improve electoral chances, even assuming that any measure other than Hispanic Citizen Voting Age Population ("HCVAP") is an appropriate test.  That purpose fails in C220.

7.   Plan C220 protects District 25, without justification in voting rights law.  It is a crossover district that a court promulgating an interim plan is not authorized to implement.  Crossover districts are not protected under section 2, and the Department of Justice did not challenge District 25 under section 5.  It is therefore questionable as to what authority this court would have at either the remedial stage or the interim stage to redraw this crossover district.

8.   There are serious dislocations in the Dallas-Fort Worth area wrought by C220. The City of Arlington is split three ways (whereas it was unified in the enacted plan), effectively destroying its political voice in any district.  District 6, which was never targeted for attack under the Voting Rights Act, has been

changed to become a Dallas-based district, contrary to history and to any unavoidable shifts in population over the past decade.

9.   Plan C220 unnecessarily splits the City of El Paso between Congressional districts.

10.   In District 23, Plan C220 moves the lines by swapping Republican-leaning Anglo voters in northwest Bexar County for Democrat-leaning Anglo voters in west-central San Antonio.  The Legislature is entitled to engage in partisan gerrymandering not inspired by ethnic motive.  This court-ordered change is impermissible in an interim plan.

11. LULAC charges, in its response, that "C220 dilutes the Latino voting strength in Texas by not increasing the number of Congressional districts in which Latinos have an opportunity to elect candidates of their choice."

In sum, C220, though a forthright attempt to fashion an interim plan that meets the requirements of the Voting Rights Act while not intruding unnecessarily on legislative prerogative, fails that test.  I respectfully dissent from the imposition of C220 as the plan to be used for the 2012 Congressional elections in Texas.