FILED

# Supreme Court of the United States

JAN 2 0 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

No.    11-713, 11-714, 11-715

*5A 11CV 360 OLG-JES-XR*

**RICK PERRY, GOVERNOR OF TEXAS, ET AL.,**

Appellants

v.

**SHANNON PEREZ, ET AL.;**

**RICK PERRY, GOVERNOR OF TEXAS, ET AL.,**

Appellants

v.

**WENDY DAVIS, ET AL.;**

and

**RICK PERRY, GOVERNOR OF TEXAS, ET AL.,**

Appellants

v.

**SHANNON PEREZ, ET AL.**

**APPEAL FROM** the United States District Court for the Western District of Texas.

**THESE CAUSE** came on to be heard on the transcripts of the records and were argued by counsel.

**ON CONSIDERATION WHEREOF**, it is ordered and adjudged by this Court that the orders implementing the interim maps are vacated with costs, and the cases are remanded to the United States District Court for the Western District of Texas for further proceedings consistent with the opinion of this Court.

**IT IS FURTHER ORDERED** that the appellants Rick Perry, Governor of Texas, et al. recover from Shannon Perez, et al. and Wendy Davis, et al.  Eighteen Thousand Eight Hundred Eighty-four Dollars and Forty-one Cents ($18,884.41) for costs herein expended.

January 20, 2012

**Printing of record:**       $18,884.41



A True Copy WILLIAM K. SUTER

Test

Clerk of the Supreme Court of the United States

By:

(Slip Opinion)          Cite as: 565 U. S. ___ (2012)          1

Per Curiam

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 11–713, 11–714 and 11–715

RICK PERRY, GOVERNOR OF TEXAS, ET AL.,
APPELLANTS
11–713                    *v.*
SHANNON PEREZ ET AL


RICK PERRY, GOVERNOR OF TEXAS, ET AL.,
APPELLANTS
11–714                    *v.*
WENDY DAVIS ET AL.


RICK PERRY, GOVERNOR OF TEXAS, ET AL.,
APPELLANTS
11–715                    *v.*
SHANNON PEREZ ET AL.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

[January 20, 2012]

PER CURIAM.

The 2010 census showed an enormous increase in Texas' population, with over four million new residents. That growth required the State to redraw its electoral districts for the United States Congress, the State Senate, and the State House of Representatives, in order to comply with the Constitution's one-person, one-vote rule. See *Georgia* v. *Ashcroft*, 539 U. S. 461, 488, n. 2 (2003). The State also had to create new districts for the four additional congres-

2                        PERRY v. PEREZ

Per Curiam

sional seats it received.

Texas is a "covered jurisdiction" under Section 5 of the Voting Rights Act of 1965. See 79 Stat. 439, 42 U. S. C. §1973c(a); 28 CFR pt. 51, App. (2011). Section 5 suspends all changes to a covered jurisdiction's election procedures, including district lines, until those changes are submitted to and approved by a three-judge United States District Court for the District of Columbia, or the Attorney General. See *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 198 (2009). This process, known as preclearance, requires the covered jurisdiction to demonstrate that its proposed change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." §1973c(a). This Court has been emphatic that a new electoral map cannot be used to conduct an election until it has been precleared. See, *e.g.*, *Clark* v. *Roemer*, 500 U. S. 646, 652 (1991).

The day after completing its new electoral plans, Texas submitted them to the United States District Court for the District of Columbia for preclearance. The preclearance process remains ongoing. Texas was unsuccessful in its bid for summary judgment, and a trial is scheduled in the coming weeks. Meanwhile, various plaintiffs—appellees here—brought suit in Texas, claiming that the State's newly enacted plans violate the United States Constitution and §2 of the Voting Rights Act.[1] Appellees alleged, *inter alia*, that Texas' enacted plans discriminate against Latinos and African-Americans and dilute their voting strength, notwithstanding the fact that Latinos and African-Americans accounted for three-quarters of Texas'

---

[1] Section 2 prohibits "any State or political subdivision" from imposing any electoral practice "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U. S. C. §1973(a).

Per Curiam

population growth since 2000. A three-judge panel of the
United States District Court for the Western District of
Texas was convened. See 28 U. S. C. §2284. That court
heard argument and held a trial with respect to the plain-
tiffs' claims, but withheld judgment pending resolution
of the preclearance process in the D. C. court. Cf. *Branch*
v. *Smith*, 538 U. S. 254, 283–285 (2003) (KENNEDY, J.,
concurring).

As Texas' 2012 primaries approached, it became increas-
ingly likely that the State's newly enacted plans would not
receive preclearance in time for the 2012 elections. And
the State's old district lines could not be used, because
population growth had rendered them inconsistent with
the Constitution's one-person, one-vote requirement. It
thus fell to the District Court in Texas to devise interim
plans for the State's 2012 primaries and elections. See
*Connor* v. *Finch*, 431 U. S. 407, 414–415 (1977). After
receiving proposals from the parties and holding extensive
hearings, that court issued its interim plans. The court
unanimously agreed on an interim State Senate plan, but
Judge Smith dissented with respect to the congressional
and State House plans. Texas asked this Court to stay the
interim plans pending an appeal, arguing that they were
unnecessarily inconsistent with the State's enacted plans.
This Court granted the stay and noted probable jurisdic-
tion. 565 U. S. ___ (2011).

Redistricting is "primarily the duty and responsibility
of the State." *Chapman* v. *Meier*, 420 U. S. 1, 27 (1975).
The failure of a State's newly enacted plan to gain pre-
clearance prior to an upcoming election does not, by
itself, require a court to take up the state legislature's task.
That is because, in most circumstances, the State's last
enacted plan simply remains in effect until the new plan
receives preclearance. But if an intervening event—most
commonly, as here, a census—renders the current plan
unusable, a court must undertake the "unwelcome obliga-

4                       PERRY v. PEREZ

tion" of creating an interim plan. *Connor, supra,* at 415.
Even then, the plan already in effect may give sufficient
structure to the court's endeavor.   Where shifts in a
State's population have been relatively small, a court may
need to make only minor or obvious adjustments to the
State's existing districts in order to devise an interim plan.

But here the scale of Texas' population growth appears
to require sweeping changes to the State's current dis-
tricts.  In areas where population shifts are so large that
no semblance of the existing plan's district lines can be
used, that plan offers little guidance to a court drawing an
interim map.   The problem is perhaps most obvious in
adding new congressional districts: The old plan gives no
suggestion as to where those new districts should be
placed.  In addition, experience has shown the difficulty of
defining neutral legal principles in this area, for redistrict-
ing ordinarily involves criteria and standards that have
been weighed and evaluated by the elected branches in the
exercise of their political judgment.   See, *e.g., Miller* v.
*Johnson,* 515 U. S. 900, 915–916 (1995); *White* v. *Weiser,*
412 U. S. 783, 795–796 (1973).  Thus, if the old state dis-
tricts were the only source to which a district court could
look, it would be forced to make the sort of policy judg-
ments for which courts are, at best, ill suited.

To avoid being compelled to make such otherwise stand-
ardless decisions, a district court should take guidance
from the State's recently enacted plan in drafting an
interim plan.  That plan reflects the State's policy judg-
ments on where to place new districts and how to shift
existing ones in response to massive population growth.
This Court has observed before that "faced with the neces-
sity of drawing district lines by judicial order, a court, as a
general rule, should be guided by the legislative policies
underlying" a state plan—even one that was itself unen-
forceable—"to the extent those policies do not lead to
violations of the Constitution or the Voting Rights Act."

Per Curiam

*Abrams* v. *Johnson*, 521 U. S. 74, 79 (1997) (holding that
the District Court properly declined to defer to a pre-
cleared plan that used race as a predominant factor). For
example, in *White, supra,* an equal population challenge,
this Court reversed a District Court's choice of interim
plan, and required the District Court to choose a plan
more closely resembling an enacted state plan, even
though the state plan itself had been held to violate the
one-person, one-vote principle. Similarly, in *Upham* v.
*Seamon,* although the state plan as a whole had been
denied §5 preclearance, this Court directed a District
Court to "defer to the legislative judgments the [state]
plans reflect," insofar as they involved districts found to
meet the preclearance standard. 456 U. S. 37, 40–41
(1982) *(per curiam).* See also *Whitcomb* v. *Chavis,* 403
U. S. 124, 160–161 (1971) (equal protection challenge).

Section 5 prevents a state plan from being implemented
if it has not been precleared. But that does not mean that
the plan is of no account or that the policy judgments it
reflects can be disregarded by a district court drawing an
interim plan. On the contrary, the state plan serves as a
starting point for the district court. It provides important
guidance that helps ensure that the district court appro-
priately confines itself to drawing interim maps that
comply with the Constitution and the Voting Rights Act,
without displacing legitimate state policy judgments with
the court's own preferences.

A district court making such use of a State's plan must,
of course, take care not to incorporate into the interim
plan any legal defects in the state plan. See *Abrams,
supra,* at 85–86; *White, supra,* at 797. Where a State's
plan faces challenges under the Constitution or §2 of the
Voting Rights Act, a district court should still be guided by
that plan, except to the extent those legal challenges are
shown to have a likelihood of success on the merits. Plain-
tiffs seeking a preliminary injunction of a statute must

6                              PERRY *v.* PEREZ

normally demonstrate that they are likely to succeed on
the merits of their challenge to that law.  See *Winter* v.
*Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20
(2008).  There is no reason that plaintiffs seeking to defeat
the policies behind a State's redistricting legislation
should not also have to meet that standard.  And because
the local district court—here, the District Court for the
Western District of Texas—will ultimately decide the
merits of claims under §2 and the Constitution, it is well
equipped to apply that familiar standard.

   The calculus with respect to §5 challenges is somewhat
different.  Where a State has sought preclearance in the
District Court for the District of Columbia, §5 allows only
that court to determine whether the state plan complies
with §5.  Consistent with that design, we have made clear
that other district courts may not address the merits of §5
challenges.  See, *e.g.*, *Perkins* v. *Matthews*, 400 U. S. 379,
385 (1971).  The local district court drafting an interim
plan must therefore be careful not to prejudge the merits
of the preclearance proceedings.  The court should pre-
sume neither that a State's effort to preclear its plan will
succeed nor that it will fail.

   The need to avoid prejudging the merits of preclearance
is satisfied by taking guidance from a State's policy judg-
ments unless they reflect aspects of the state plan that
stand a reasonable probability of failing to gain §5 pre-
clearance.  And by "reasonable probability" this Court
means in this context that the §5 challenge is not insub-
stantial.  That standard ensures that a district court is not
deprived of important guidance provided by a state plan
due to §5 challenges that have no reasonable probability of
success but still respects the jurisdiction and prerogative
of those responsible for the preclearance determination.
And the reasonable probability standard adequately bal-
ances the unique preclearance scheme with the State's
sovereignty and a district court's need for policy guidance

Cite as: 565 U. S. ___ (2012)          7

Per Curiam

in constructing an interim map.  This Court recently noted the "serious constitutional questions" raised by §5's intrusion on state sovereignty.  *Northwest Austin*, 557 U. S., at 204.   Those concerns would only be exacerbated if §5 required a district court to wholly ignore the State's policies in drawing maps that will govern a State's elections, without any reason to believe those state policies are unlawful.

Appellees, however, contend that §5 demands exactly that.  In their view, this Court's precedents require district courts to ignore any state plan that has not received §5 preclearance.   But the cases upon which appellees rely hold only that a district court may not adopt an unprecleared plan as its own.  See *Lopez* v. *Monterey County*, 519 U. S. 9 (1996); *McDaniel* v. *Sanchez*, 452 U. S. 130 (1981).  They say nothing about whether a district court may take guidance from the lawful policies incorporated in such a plan for aid in drawing an interim map.  Indeed, in *Upham* this Court ordered a District Court to defer to the unobjectionable aspects of a State's plan even though that plan had already been *denied* preclearance.

In this case, the District Court stated that it had "giv[en] effect to as much of the policy judgments in the Legislature's enacted map as possible."  1 App. 182.  At the same time, however, the court said that it was required to draw an "independent map" following "neutral principles that advance the interest of the collective public good."  *Id.*, at 169–170.  In the court's view, it "was not required to give any deference to the Legislature's enacted plan," and it instead applied principles that it determined "place the interests of the citizens of Texas first."  *Id.*, at 171.  To the extent the District Court exceeded its mission to draw interim maps that do not violate the Constitution or the Voting Rights Act, and substituted its own concept of "the collective public good" for the Texas Legislature's determination of which policies serve "the interests of the

8                            PERRY *v.* PEREZ

Per Curiam

citizens of Texas," the court erred.

In proclaiming its ability to draw an interim map "without regard to political considerations," the District Court relied heavily on *Balderas* v. *Texas*, No. 6:01cv158, 2001 U. S. Dist. LEXIS 25740 (ED Tex., Nov. 14, 2001) *(per curiam)*, summarily aff'd, 536 U. S. 919 (2002).   1 App. 182.  But in *Balderas* there was no recently enacted state plan to which the District Court could turn.  Without the benefit of legislative guidance in making distinctly legislative policy judgments, the *Balderas* court was perhaps compelled to design an interim map based on its own notion of the public good.  Because the District Court here had the benefit of a recently enacted plan to assist it, the court had neither the need nor the license to cast aside that vital aid.

Some specific aspects of the District Court's plans seem to pay adequate attention to the State's policies, others do not, and the propriety of still others is unclear.  For example, in drawing State House districts in North and East Texas, the District Court closely followed the State's policies.  See 1 App. 173; 5 *id.*, at 25–26.  Although Texas' entire State House plan is challenged in the §5 proceedings, there is apparently no serious allegation that the district lines in North and East Texas have a discriminatory intent or effect.  1 *id.*, at 187, n. 4.  The District Court was thus correct to take guidance from the State's plan in drawing the interim map for those regions.  But the court then altered those districts to achieve *de minimis* population variations—even though there was no claim that the population variations in those districts were unlawful. *Id.*, at 171, and n. 8.  In the absence of any legal flaw in this respect in the State's plan, the District Court had no basis to modify that plan.[2]

_____

[2] This Court has stated that court-drawn maps are held to a higher standard of acceptable population variation than legislatively enacted

Per Curiam

The District Court also erred in refusing to split voting precincts (called "voter tabulation districts" in Texas) in drawing the interim plans. *Id.*, at 90, 102–103. That choice alone prevented the District Court from following the lead of Texas' enacted plan—which freely splits precincts—in many areas where there were no legal challenges to the plan's details. See *id.*, at 102–103, 116, n. 24. The District Court was apparently motivated by a well-intentioned desire to save Texas the time and expense of reconfiguring precincts, and to ensure that the court's interim plan could be implemented in time for the upcoming election. *Id.*, at 90, 102–103, 109. But the State's plan accepted the costs of splitting precincts in order to accomplish other goals, and Texas law expressly allows recasting precincts when redistricting. See Tex. Elec. Code Ann. §42.032 (West 2010). If a State has chosen to accept the burden of changing its precincts, and its decision to do so is otherwise lawful, there is no warrant for a district court to ignore the State's decision. Of course, in this case it may well be that Texas will reexamine this issue in light of the exigencies caused by the impending election.

The District Court also appears to have unnecessarily ignored the State's plans in drawing certain individual districts. For example, the District Court drew an interim District 77 that resembles neither the State's newly enacted plan, nor the previous plan in effect prior to the 2010 census. The court said that it did so in response to alleged constitutional violations. 1 App. 174–175. But the court did not say that those allegations were plausible, much less likely to succeed. Nor did the District Court rely on a finding that the relevant aspects of the state plan stood a

---

maps. See, *e.g.*, *Abrams* v. *Johnson*, 521 U. S. 74, 98 (1997). But this Court has also explained that those "stricter standard[s]" are not triggered where a district court incorporates unchallenged portions of a State's map into an interim map. *Upham* v. *Seamon*, 456 U. S. 37, 42–43 (1982) *(per curiam)*.

Per Curiam

reasonable probability of failing to gain §5 preclearance, see *supra,* at 6. Without such a determination, the District Court had no basis for drawing a district that does not resemble any legislatively enacted plan.

The court's approach in drawing other districts was unclear. The interim plan's Congressional District 33, for example, disregards aspects of the State's plan that appear to be subject to strong challenges in the §5 proceeding. See 3 *id.,* at 600–601; 5 *id.,* at 12–14. That much seems appropriate, but there are grounds for concern with the path the District Court followed from there. The court's order suggests that it may have intentionally drawn District 33 as a "minority coalition opportunity district" in which the court expected two different minority groups to band together to form an electoral majority. 1 *id.,* at 147. The order is somewhat ambiguous on this point—some portions suggest that the court deliberately designed such a district, other parts suggest that it drew the district solely as a response to population growth in the area. Compare *id.,* at 146–147 ("Because much of the growth that occurred in the Dallas-Fort Worth metroplex was attributable to minorities, the new district 33 was drawn as a minority coalition opportunity district"), with *id.,* at 144 ("The Court has nowhere expressly sought to increase the performance of any opportunity district above benchmark"). If the District Court did set out to create a minority coalition district, rather than drawing a district that simply reflected population growth, it had no basis for doing so. Cf. *Bartlett* v. *Strickland,* 556 U. S. 1, 13–15 (2009) (plurality opinion).

Because it is unclear whether the District Court for the Western District of Texas followed the appropriate standards in drawing interim maps for the 2012 Texas elections, the orders implementing those maps are vacated, and the cases are remanded for further proceedings consistent with this opinion.

Cite as: 565 U. S. \_\_\_\_ (2012)                    11

Per Curiam

The judgment shall issue forthwith.

*It is so ordered.*

Cite as: 565 U. S. ____ (2012)                    1

THOMAS, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

Nos. 11–713, 11–714 and 11–715

RICK PERRY, GOVERNOR OF TEXAS, ET AL.,
APPELLANTS
11–713                          *v.*
SHANNON PEREZ, ET AL


RICK PERRY, GOVERNOR OF TEXAS, ET AL.,
APPELLANTS
11–714                          *v.*
WENDY DAVIS, ET AL.


RICK PERRY, GOVERNOR OF TEXAS, ET AL.,
APPELLANTS
11–715                          *v.*
SHANNON PEREZ, ET AL.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

[January 20, 2012]

JUSTICE THOMAS, concurring in the judgment.

The Court proceeds from the premise that court-drawn interim plans are necessary in part because Texas' newly enacted redistricting plans are unenforceable for lack of preclearance under §5 of the Voting Rights Act of 1965. *Ante*, at 1–3. In my view, Texas' failure to timely obtain §5 preclearance of its new plans is no obstacle to their implementation, because, as I have previously explained, §5 is unconstitutional. See *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 212 (2009) (THOMAS, J., concurring in judgment in part and dissenting in part). Although Texas' new plans are being chal-

2                          PERRY v. PEREZ

THOMAS, J., concurring in judgment

lenged on the grounds that they violate the Federal Con-
stitution and §2 of the Voting Rights Act, they have not
yet been found to violate any law.   Accordingly, Texas'
duly enacted redistricting plans should govern the upcom-
ing elections.   I would therefore vacate the interim orders
and remand for the United States District Court for the
Western District of Texas to consider appellees' constitu-
tional and §2 challenges in the ordinary course.