**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| SHANNON PEREZ, et al., | § | |
| Plaintiffs | § | |
| | § | |
| | § | CIVIL ACTION NO. 11-CA-360 |
| v. | § | OLG-JES-XR |
| | § | (Lead Case) |
| | § | |
| | § | |
| STATE OF TEXAS, et al., | § | |
| Defendants | § | |

## <u>PLAINTIFF MALC'S MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS</u>

Pursuant to 42 U.S.C. §§ 1973l(e) and 1988, Plaintiff Mexican American Legislative

Caucus, Texas House of Representatives ("MALC") moves this Court for an award of attorneys'

fees and costs.  This action was brought pursuant to the Section 2 of the Voting Rights Act, 42

U.S.C. § 1973 *et seq*., Section 5 of the Voting Rights Act of 1965 (as amended), 42 U.S.C.

§ 1973c (challenging the failure of Defendants to secure the necessary preclearance required by

the Act for voting changes), and the Fourteenth and Fifteenth Amendments to the United States

Constitution.  Plaintiff MALC also sought declaratory and injunctive relief against the

Defendants to challenge the redistricting plans adopted by the State of Texas for the Texas House

of Representatives and the United States House of Representatives.  As set forth below, the

Court's granting of Plaintiff MALC's Motion for Temporary Restraining Order (Order, Dkt.

#380) and, more significantly, its issuance of Orders on interim plans (Orders, Dkt. #681 and

#682) clearly make Plaintiff MALC a "prevailing party," entitling it to interim attorneys' fees and costs.[1]

## I.
## BACKGROUND

On or about February 17, 2011, the United States Department of Commerce and the United States Census Bureau released to the State of Texas the population data gathered as a result of the conduct of the 2010 Census. According to the 2010 Census, the State of Texas had a total population of 25,145,561 persons. (Tr. Exhibit P20, p.4) Texas gained 4 congressional seats as a result of its population growth from 2000 to 2010. (Kousser Decl., Tr. Exhibit P.19,p. 109). Between 2000 and 2010, the growth rate of the Hispanic population in Texas outpaced that of the Anglo, Black and "other" populations. (*Perez* Tr. Pl. Ex. 336).

On May 23, 2011, the Texas Legislature passed House Bill 150, containing a new redistricting plan for the Texas House of Representatives based on the 2010 Census, and the Governor signed it on June 17, 2011.

Plaintiff MALC filed this suit on May 9, 2011 and filed its Second Amended Complaint on July 19, 2011.  As amended, Plaintiff MALC's Complaint challenged the State's redistricting plans for the Texas House of Representatives and United States House of Representatives (Congressional districts) as well as the at-large system used to elect members of the Texas Railroad Commission.  Plaintiff MALC also alleged minority vote dilution violating MALC's rights as protected by Section 2 of the Voting Rights Act and the Fourteenth Amendment with regard to the newly adopted plans for the Texas House of Representatives and Congressional districts.   Further, Plaintiff MALC alleged a Section 5 violation with regard to the Texas House

---

[1] Plaintiff MALC reserves its right to file additional attorneys' fee applications on fees and costs from the date of the filing of this interim fee application.

and Congressional plans since no preclearance has been secured.[2]  (Plaintiff MALC, thus, included a Section 5 enforcement action in its Second Amended Complaint.)  Finally, Plaintiff alleged a Fourteenth Amendment one person, one vote violation with regard to the old Texas House and Congressional districts and as to the newly enacted Texas House plan.

On July 6, 2011, the Court issued an expedited Scheduling Order (Dkt. # 24).  During  an abbreviated discovery period, dozens of depositions were taken, written discovery was exchanged and responded to, experts' reports were prepared and filed, discovery and dispositive motions were briefed and ruled upon, and meetings with numerous witness for trial were held. Numerous pretrial issues were raised during the months following the filing of this action.  The State for example filed a motion to dismiss and challenged Plaintiff's standing in this case. MALC successfully opposed these efforts.  Efforts were also initiated to change the venue of the case, which MALC also successfully opposed.  In addition, since no action had been completed with regard to the challenged plans under Section 5, there were disputes about whether the case should proceed with an evidentiary hearing on the merits of the case and the timing of such hearings.  Again, MALC's position for an expedited process carried the day with this Court, and trial was scheduled for the first weeks of September.

Trial was held in San Antonio from September 6, 2011 through September 16, 2011 for live evidentiary presentation and an additional week for evidentiary proffers through September 23, 2011.

---

[2] On July 19, 2011, instead of seeking administrative preclearance of S.B. 4 and H.B. 150, Defendants opted for judicial preclearance, which this Court has noted "likely has delayed a final decision on preclearance, possibly causing delays in the 2012 electoral process."  (Court's Order, Dkt. #385).

On September 27, 2011, after the trial on the merits, Plaintiff MALC[3] filed a Motion for Temporary Restraining Order ("TRO") to enjoin the implementation in the upcoming 2012 election cycle of redistricting plans for the Texas House of Representatives, House Bill 150 ("H.B. 150," also identified as plan H283), and the United States House of Representatives, Senate Bill 4 ("S.B. 4," also referenced as plan C185).

On September 29, 2011, the Court issued an Order granting Plaintiff's TRO[4] and **permanently enjoined** the implementation of the unprecleared redistricting plans for the State House and Texas Congressional districts.

On November 17, 2011, realizing that the resolution of the Section 5 preclearance issues prior to the upcoming election deadlines was unlikely and agreeing with the merits of Plaintiff's claims in this suit, the Court issued an Order offering H298[5] and H299[6] "as the proposed interim plan for the districts used to elect members in 2012 to the Texas House of Representatives."[7] Shortly thereafter, the Court adopted Plan H302 as an interim plan for the Texas House of Representatives (Order, Dkt. #528) and Plan C220 as an interim plan for the United States House of Representatives (Order, Dkt. #544). Defendants appealed from these Orders to the United States Supreme Court (Dkt. #547 and #548). On January 20, 2012, the Supreme Court vacated

---

[3] Plaintiffs Texas Latino Redistricting Task Force, et al., Perez et al., LULAC et al., Quesada et al., Texas Democratic Party, and Cuellar joined in the TRO motion. The Rodriguez Plaintiffs joined in the TRO motion to the extent it seeks injunctive relief; and Plaintiffs Johnson et al., and the Texas Conference of the NAACP Branches et al. did not oppose the TRO.

[4] In its Order granting the TRO, the Court turned the TRO into a permanent injunction because the "parties [] agreed that the relief granted herein will be effective as a permanent injunction, subject to being lifted by order of the Court as appropriate."

[5] Judge Garcia and Judge Rodriguez offered plan H298 as the proposed interim plan for the districts used to elect members in 2012 to the Texas House of Representatives.

[6] The Order states that "Judge Smith may offer plan H299 as an alternate in dissent." (Dkt. #517).

[7] (Dkt. #517).

the Court's Orders and remanded these consolidated cases for further proceedings (Order, Dkt. #575).

Applying the new standards as directed by the Supreme Court, this Court issued Orders on February 28, 2012, adopting Plan H309 as the interim plan for the Texas House of Representatives (Order, Dkt. # 682) and Plan C235 as the interim plan for the United States House of Representatives (Order, Dkt. #681). The Court announced that each of these interim plans "is a result of preliminary determinations regarding the merits of the Section 2 and constitutional claims … and application of the 'not insubstantial' standard for the Section 5 claims, as required by the Supreme Court's decision in *Perry v. Perez*." (Orders, Dkt. # 681 and #682). Many of the Court's modifications to the unprecleared plans incorporated in the new interim plans for Texas House and Texas Congressional districts were as a result of this Court's determination that Plaintiff had shown a likelihood of success on its claims challenging the unprecleared plans.

For instance, MALC submitted to the court and during the legislative session putative districts that are compact, contiguous and are over 50% HCVAP that are not contained in the challenged enacted plan for the Texas House of Representatives. (*Perez* Tr. Exhibit. 1, 2, 5, 6; MALC Interim plan Exh. 8 and 9). MALC HD 144 in plans H205, and H295 is a compact, contiguous and majority HCVAP district in Harris County, Texas. The creation of HD144 did not adversely impact on the viability and continued performance of existing minority opportunity districts in Harris County. *Id.* This district does not exist in the enacted plan, but is included in this Court's interim remedy plan.

MALC HD 72 in plan H205, HD 35 in H295 and HD 144 in plan H201 are compact, contiguous and majority HCVAP districts in Hidalgo and Cameron Counties, Texas. The creation of HD 72 in H205, HD 35 in H295 and HD144 in H201 did not adversely impact on the viability and continued performance of existing minority opportunity districts in Hidalgo and Cameron Counties. *Id.* Similar districts do not exist in the enacted plan, but such a district is included in this Court's interim remedy plan. Also, as was advocated by Plaintiff MALC, population variances in Hidalgo House districts were more balanced in the interim plan than in the challenged plan.

In addition, MALC plans submitted to this Court and during the legislative session increased Latino opportunity districts in El Paso by one and in Bexar County maintained Latino voting strength in HD 117. The enacted plan did not provide for an additional Latino opportunity district in El Paso and reduced the Latino voting strength in HD 117 in Bexar County. This Court's interim remedy plan included the additional El Paso Latino opportunity district and maintained HD 117's Latino voting strength in Bexar County. Finally, with regard to Texas House seats, Plaintiff MALC argued that population variations in Hidalgo, Bexar, and Harris County under HB 150 were not justified and submitted plans balancing population in those and other counties. This Court's interim remedy plan also better balanced population in those counties.

With regard to the Congressional plans, MALC challenged among other aspects of the enacted plan, the reduction of Latino voting strength in CD 23, and this Court's interim remedy plan increased the Latino performance in CD 23 to almost the same level as in the benchmark district. In Dallas and Tarrant County, Plaintiff MALC challenged the manner in which minority

populations were fractured, in an obvious racial gerrymander.  This Court's interim remedy plan eliminates the gerrymander, resulting in a district in which minority voters will likely elect a candidate of choice that is not included in the enacted plan.

## II.
## Authority

The Supreme Court has determined that civil rights plaintiffs are prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Texas State Teachers Assoc. v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *Hanrahan v. Hampton*, 446 U.S. 754, 756-58 (1980).  In other words, "the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between [it] and the defendant." *Texas State Teachers Assoc.*, 489 U.S. at 792; *see also Buckhannon Bd. & Care Home, Inc. v W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) (recognizing that a party prevails and is entitled to attorney's fees when that party obtains a "material alteration of the legal relationship of the parties").

Also, the Supreme Court has held that such fee awards are available before the litigation is final, and **that fees can be awarded on an interim basis**.  *Id*. at 791 ("Congress cannot have meant 'prevailing party' status to depend entirely on the time of a request: A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation."); *Hutchinson v. Patrick*, 636 F.3d 1, 8 (5th Cir. 2011) ("The Supreme Court has made it transparently clear that an award under a federal fee-shifting statute may sometimes be appropriate prior to the entry of a final judgment).  "Such an award is proper, *pendente lite*, where a party has established his entitlement to *some relief* on the merits of his claims.  Thus, prevailing party status is not

restricted to a party who has secured a favorable final judgment." *Hutchinson*, 363 F.3d at 8 (internal citations and quotations omitted) (emphasis added). The district court's discretion to order interim attorney's fees serves "to further the goal of ensuring effective access to the judicial process for those aggrieved of their civil rights." *Allen v. La. State Bd. of Dentistry*, 948 F.2d 946, 947 (5th Cir. 1991).

In this case, this Court granted Plaintiff's motion to enjoin the implementation of the unprecleared redistricting plans for the State House and Texas Congressional districts, which is precisely the relief requested in Plaintiff MALC's Second Amended Complaint. In addition, and more significantly, the Court issued interim remedial plans effective for the 2012 election cycle. The Court's interim plans remedy most of the legal defects in both the plans enacted by the Texas Legislature and in the former maps that were required to be reapportioned following the Census.   The Court's interim plans are the "result of preliminary determinations regarding the merits of the [Plaintiffs'] Section 2 and constitutional claims … and application of the 'not insubstantial' standard for the Section 5 claims, as required by the Supreme Court's decision in *Perry v. Perez*."  (Orders, Dkt. # 681 and #682). As discussed above, this Court's plans addressed many of MALC's legal objections to the plans. This Court's orders and including the orders on interim plans for the 2012 election cycle, materially alter the legal relationship of the parties and grant Plaintiff significant and substantial relief, even if a final judgment has not been rendered. Plaintiffs thus have prevailed on important issues in this litigation and are entitled to an award of interim attorney's fees.

### A.  Johnson Factors[8] --The Lodestar Analysis

---

[8] The *Johnson* factors are as follows: (1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the

The Fifth Circuit has provided the following guidance for district courts to determine an appropriate award of attorneys' fees:

> In *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974), we established twelve factors which district courts must consider in deciding the amount of attorney's fees to award to a prevailing plaintiff. The twelve factors are considered within the framework outlined in *Copper Liquor, Inc. v. Adolph Coors*, 684 F.2d 1087 (5th Cir. 1982) [*Copper Liquor* III]. Under *Copper Liquor* the district court should: (1) ascertain the nature and extent of the services supplied by the attorney; (2) value the services according to the customary fee and quality of the legal work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance, 684 F.2d at 1092. The product of factors (1) and (2) is called the "lodestar." *See Nisby v. Commissioners Court,* 798 F.2d 134, 136-37 (5th Cir. 1986).

Subsequent to the opinion in *Johnson*, the Supreme Court held that an award of attorneys' fees under section 1988 should normally be based on multiplying a reasonable number of hours worked by a reasonable rate of compensation. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct.1541, 1548, 79 L.Ed.2d 891, 895 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939-40, 76 L.Ed.2d 40, 50 (1983). The Court noted, however, that the calculation of the lodestar does not end the inquiry and that other considerations may persuade the district court to increase or decrease a fee award. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940, 76 L.Ed.2d at 51. In *Brantley v. Surles,* 804 F.2d 321 (5th Cir. 1986), another panel of the court upheld a fee award where the district court did not evaluate each *Johnson* factor because the overall award "me[t] the Supreme Courts guidelines in *Blum and Hensley*. " *Id.* at 326.

---

attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relations with the clients, and (12) awards in similar cases. *Johnson,*  488 F 2d. at 717.  These factors are discussed in the affidavits filed in support of this motion for fees and costs.

**B.    Determination of Amount of Fees**

In determining the amount of fees, a court should "(1) ascertain the nature and extent of the services supplied by the attorney, (2) value the services according to the customary fee and quality of the legal work, and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance in the particular case." *Alberti v. Klevenhagen*, 927 F.2d 927, 930 (5th Cir. 1990) (quoting *Leroy v. City of Houston*, 831 F.2d 576, 583 n.11 (5th Cir. 1987), *cert. denied*, 486 U.S. 1008 (1988)).

First, the Court determines the reasonable number of hours that the attorneys spent on the case by reviewing the attorneys' time records. *Alberti*, 927 F.2d at 930. Attached as Exhibits to this motion are the Declarations and Affidavits Plaintiff's counsels', detailed time records that demonstrate the reasonableness of the hours documented in this case and resumes of the counsel detailing their experience. These hours reflect the difficult legal and factual issues present in the case and the extensive resources required to prosecute this case. In addition, MALC's lead counsel, Jose Garza, often acted as coordinating counsel for the diverse set of plaintiffs in this case and was often called upon by this Court to present the plaintiffs' factual and legal claims in an efficient and cogent manner. Plaintiff MALC believes that to some degree, this Court relied on Mr. Garza's expertise to assist with the Court's analysis of the issues raised in the case.

The courts have given a broad reading to the types of tasks for which compensation will be allowed. For instance, the courts have determined that, among other things, the following are fully compensable activities:

1) Time spent prior to the filing of the lawsuit on development of the theory of the client's case and on drafting initial pleadings. *Webb v. Bd. of Educ. of Dyer County*, 471 U.S. 234, 242-44 (1985); *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993) (acknowledging that "prevailing parties may be compensated for time spent preparing

to file suit" when that work is useful and necessary to the litigation); *Dowdell v. Apopka, Fla.*, 698 F.2d 1181 (11th Cir. 1983);

2) Travel time. *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381 (8th Cir. 1987);

3) Time spent in conference with other lawyers and on organizing and reorganizing the case file. *Blum v. Witco Chem. Corp.*, 829 F.2d 367 (3d Cir. 1987);

4) Legal research, even by experienced counsel. *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992);

5) Appellate time. *Hutto v. Finney*, 437 U.S. 678 (1978);

6) Time spent on compliance matters, even where post judgment. *Miller v. Carson*, 628 F.2d 346 (5th Cir. 1980); and

7) Time spent preparing a fee application, negotiating fees, and litigating fees. *Johnson v. Mississippi*, 606 F.2d 635 (5th Cir. 1979).

After determining the number of compensable hours, the court "selects an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Id.* at 938 (quoting *Sims v. Jefferson Downs Racing Ass'n.*, 778 F.2d 1068, 1084 (5th Cir. 1985)).

In this case, one of the biggest challenges imposed on the attorneys and this Court was the time constraints. In addition, this Court was dealing with the challenge of the interplay between Section 5 and other legal challenges, all with an impending election looming. As this Court recognized, "[n]ot only were the merits of the claims challenging, but the time frame in which the claims needed to be resolved was challenging." (Dkt. #385). Several of the attorneys for Plaintiff MALC had to substantially stop all other work and dedicate themselves to this case due to the expedited trial schedule and pending election process. The exigent circumstances were created by the Defendants as they failed to promptly seek Section 5 preclearance, which this Court recognized caused delays in the 2012 electoral process. *See id.* In addition, time requirements for briefing and argument at the Supreme Court were extremely compressed, requiring substantial time and requiring complete and exclusive focus, to the exclusion of other

endeavors.  Finally, this case was the critical element of a move in the Supreme Court to  modify the scope and reach of Section 5 of the Voting Rights Act.  Plaintiff's counsel played a key role in shaping the design of Section 5 enforcement process embodied in the Supreme Court's opinion in this case.

In that regard, the State argued in its appeal of this Court's initial interim plan orders, that this Court was a "run away" court engaged in racial gerrymanders to benefit minority voters. *See* Emergency Application for Stay to the United States Supreme Court, at 2,5,10, *Perry v. Perez*, Nos. 11-713, 11-714, 11-715. The State also argued that its legislatively enacted plans should be used without modification in the impending elections.  Brief for Appellants to United States Supreme Court, p. 31, *Perry v. Perez*, Nos. 11-713, 11-714, 11-715,. ("In light of these exigencies, this Court should **vacate the interim orders and remand to the district court with instructions to impose Texas' legislatively enacted map as the interim plan** while preclearance is pending.")(emphasis added).

In contrast, Plaintiffs argued that this Court's orders could not be read to show that the resulting minority opportunity districts were purposefully designed as racial districts, and if the Court had uncertainty on this issue it should remand with instructions.  Transcript from Oral Argument, at 52-54, 58, 64, *Perry v. Perez*, Nos. 11-713, 11-714, 11-715. Moreover, although the Plaintiffs' surely argued that the State's unprecleared plans simply could not be used without Section 5 approval- at the argument, MALC' s lead counsel arguing for all the Plaintiffs, asserted that , rather than allow their use without modification, the Court should established standards that the trial court could use to determine  likely violations of Sections 2, 5 and other constitutional objections. Id. at 63, and 64. Thus, while the fee requested is substantial, the circumstances

involved and importance of the questions at issue required counsel for Plaintiff to devote their time and energy almost exclusively to this case and resulted in a significant achievement.

C.      Costs

It is also appropriate to require Defendants to reimburse Plaintiff's attorneys for reasonable costs.  An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, for example, includes an award of "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client."  *Neufeld v. Searle Labs.*, 884 F.2d 335, 342 (8th Cir. 1989) (citing *Laffey v. Nw. Airlines, Inc.*, 746 F.2d 4, 30 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985)); *see also Rendon v. AT&T Techs.*, 883 F.2d 388, 399 (5th Cir. 1989) (timely request for fees and expenses is appropriate).   Here, Plaintiff has included in the supporting affidavits a detailed accounting requesting compensation for such out of pocket expenses as travel, exhibit preparation, copies, postage, map production, deposition costs, printing costs, and the like.  These are the sorts of expenses generally charged to a fee paying client and should be reimbursed fully.

**D.      Expert Fees**

The fee shifting provision authorizing an award of attorneys' fees in this case specifically authorizes the award of fees for expert costs. 42 U.S.C. § 1973l(e).  The history behind the inclusion of the expert fee provision in the fee shifting provision of the Voting Rights Act helps explain how important compensating successful plaintiffs for expert fees is.

In 1987, a three-judge panel reversed and remanded to district court in an attorney's fee award in part because it included compensation for expert fees beyond standard per diem and mileage costs. *Leroy v. Houston*, 831 F.2d 576 (5th Cir. Tex. 1987). While expert fees had long

been compensated in previous voting rights cases, the United States Supreme Court held that "when a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of § 1821(b), absent contract or explicit statutory authority to the contrary." *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 439 (U.S. 1987). Given this Supreme Court precedent, the *Leroy* panel refused to allow expert's fee recovery without explicit statutory authorization. *Leroy v. Houston*, 831 F.2d 576, 584 (5th Cir. Tex. 1987)("The Voting Rights Act does not specifically allow recovery of expert witness fees, and we must reverse this portion of the district court's award")

In the years following *Crawford*, expert-centered litigation in which there was no specific statutory allowance for exert fees recovery was severely hampered in jurisdictions without a multiplier.[9]  This chilling effect on litigation was investigated by the members of the U.S. House Committee on the Judiciary in relation to the reauthorization of the Voting Rights Act.[10]  The committee took extensive testimony from civil rights lawyers, experts, and litigants in the autumn of 2005 in preparation for the formulation of the reauthorization. In these eight committee hearings, the failure to recover expert's fees played a prominent role in the testimony of the invited witnesses. Specifically, several witnesses implored the committee to amend the

---

[9] *See generally* 48 Hastings L.J. 197, 229-230 ("In cases that are expert-intensive and in which expert witness fees are not recoverable, however, the lack of a multiplier can be devastating. **The primary example, cited by numerous attorneys, is voting rights litigation**. There, even ascertaining the viability of a claim prior to filing suit can cost between fifteen and twenty-five thousand dollars in expert fees. Without multipliers, even full compensation at lodestar rates cannot possibly cover the costs of litigation. The attorney mentioned earlier, whose practice focuses exclusively on voting rights, expressed doubts that his practice will survive Dague. Indeed, this attorney recently opened a color printing business to try to subsidize his law practice. He stated that the other private practitioners who used to litigate voting rights cases will not take them now and predicted that no new lawyers will enter the market in California.")(emphasis added)

[10] "Fannie Lou Hamer, Rosa Parks, And Coretta Scott King Voting Rights Act Reauthorization And Amendments Act Of 2006 (Part I)," before the Subcommittee on the Constitution of the U.S. House Committee on the Judiciary, 109th Cong., p. 65, (May 4, 2006)(Scott, Bobby opening statement to the committee concerning expert fees)

Voting Rights Act to include specific cost recovery for expert's fees because of the financial hardship that the lack of recovery placed on civil rights litigants.[11] In the final committee hearing in the fall of 2005 dealing with the reauthorization of the voting rights act, Congressman Melvin Watt responded to the testimony that had been laid out by experts in the previous seven committee hearings by stating his intention to seek the inclusion of the permissive allowance of expert's fees from litigation stemming from the voting rights act. In his words:

> "[o]ne final thing I want to deal with--that's--really we haven't had a hearing on yet, but there's been some testimony about over the course of our hearings, and **that's we need to make sure that the award of expert fees to prevailing parties in litigation is put into the reauthorization.**
>
> The fees of experts in these cases are just--have become a real burden for everybody. I understand that prior to the 1982 reauthorization, there was an agreement to put this provision in, and because of the crunch at the last minute, the provision actually just never got put into the law.
>
> And I don't think there's really any controversy about it. Prior testimony has already established the incredible expense imposed on bona fide victims of voting rights violations to assemble the necessary evidence to sustain their burden of proof in a private action.
>
> By allowing expert fees to prevail in parties, we would bring the Voting Rights Act into conformity with other Civil Rights legislation and promote the continued partnership between individual and Government enforcement that has made the act the success it is today." [12](emphasis added)

Ultimately, Mr. Watt's intention and the subcommittee's findings regarding the expert fee

---

[11] "Voting Rights Act: The Judicial Evolution Of The Retrogression Standard," before the Subcommittee on the Constitution of the U.S. House Committee on the Judiciary, 109th Cong., p. 69, (November 9, 2005) (Laughlin McDonald, Director, Voting Rights Project, American Civil Liberties Union,  answer to Congressman John L. Lewis' questioning) ( "And then I think that the Supreme Court has ruled that in successful voting rights cases plaintiffs are not entitled to recover attorneys' fees. That really makes it almost impossible for minority communities to bring voting rights lawsuits, because they don't have the ability to hire lawyers, they don't  have the ability to pay for experts. And in a typical voting rights case, you need probably three experts: a demographer, to draw plans; a statistician, to analyze voting patterns; and a political scientist or historian, to talk about what, you know, the present-day impact of race is in a jurisdiction.")

[12] "Voting Rights Act: Sections 6 And 8--The Federal Examiner And Observer Program," before the Subcommittee on the Constitution of the U.S. House Committee on the Judiciary, 109th Cong., p. 6-7, (November 15, 2005)(Watt, Melvin opening statement to the committee)

provisions were codified in every version of the reauthorization bill filed in the spring of 2006. During the subcommittee's discussion of H.R. 9, Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Sub Committee Chairman Chabot highlighted the inclusion of the expert fees provision as necessary to "ensure that … Voting Rights Act remain[s] effective".[13] Testifying witnesses before the subcommittee, reiterated the necessity and need for expert's fees.[14]

During the floor debate concerning H.R. 9, the inclusion of expert's fees was cited as an improvement bringing "in line with current civil rights laws, which already allow for the recovery of such costs." 152 Cong Rec H 5149. The provision was never amended, altered, or removed. In the Senate, it received similar treatment. The addition of the provision faced no opposition and was listed as one of the many reasons to vote for the bill.[15]

In the end, in response to vigorous testimony of leading experts, the Congress included this fee-shifting provision in order to ensure that civil rights plaintiffs still had access to the

---

[13] "Fannie Lou Hamer, Rosa Parks, And Coretta Scott King Voting Rights Act Reauthorization And Amendments Act Of 2006 (Part I)," before the Subcommittee on the Constitution of the U.S. House Committee on the Judiciary, 109th Cong., p. 2, (May 4, 2006)(Chabot, Steve opening statement to the committee citing the need to once again allow federal observers, provide for the recovery of expert costs as part the additions needed to the act)

[14]"Fannie Lou Hamer, Rosa Parks, And Coretta Scott King Voting Rights Act Reauthorization And Amendments Act Of 2006 (Part I)," before the Subcommittee on the Constitution of the U.S. House Committee on the Judiciary, 109th Cong., p. 65, (May 4, 2006)(Hebert,Gerald questioned by Con. Bobby Scott pertaining to the necessity of expert's fees)( **"Mr. Scott**: If an area has been victimized by an illegal  scheme, are there circumstances where they cannot come up with the money to get themselves out of that situation? **Mr. Hebert:** Bringing vote dilution cases, Congressman Scott, is a very, very costly enterprise. You need expert witnesses, you need skilled lawyers, because the other side is going to lawyer up big time, usually. I would estimate that the cost of a vote dilution case, to bring a vote dilution case through trial and appeal, runs close to a half million dollars in costs. **Mr. Scott:** And much of that, under present law, is not reimbursable?  **Mr. Hebert:** That's correct. **Mr. Scott:** Under the bill, would most of the costs be recoverable? **Mr. Hebert:** Yes, they would."); [14]"Fannie Lou Hamer, Rosa Parks, And Coretta Scott King Voting Rights Act Reauthorization And Amendments Act Of 2006 (Part II)," before the Subcommittee on the Constitution of the U.S. House Committee on the Judiciary, 109th Cong., p.40-41, (May 4, 2006)(Narasaki, Karen, President and Executive Director, Asian American Justice Center, questioned by Chairman Chabot)

[15] 152 Cong Rec S 7996, (Senator Robert Menendez's remarks during the consideration of H.R. 9)

court. This new fee-shifting provision was present in each version of the bill and was featured prominently as a rationale to vote for the reauthorization of the Voting Rights Act. There can be no dispute or ambiguity about this language. Congress intended that courts may award experts fee to prevailing parties in litigation stemming from the Voting Rights Act.

Plaintiff MALC, therefore includes in this fee motion, a request for compensation for its expert fees.  In the development of this case MALC, retained and provided expert testimony from Dr. Jorge Chapa and Dr. Morgan Kousser.  Their testimony formed the foundation for plaintiff's claims and helped this Court with the evaluation of the evidence with regard to potential Section 2 and Constitutional violations in the challenged plans.

Plaintiff MALC is required to present evidence showing the reasonableness of its fee application, including evidence of the prevailing market rate for attorneys of their experience and reputation.  As discussed below, Plaintiff has presented the declarations of Jose Garza and Ricardo Cedillo as expert testimony on the relevant issues on attorneys' fees and has also included declarations from Joaquin G. Avila, Cynthia Jones and Martin Golando detailing their work on the case.  Included in the declarations are detailed and contemporaneous time records detailing the activity in the case.

**<u>Appropriate Fee Award</u>**

As discussed above, the starting point in an appropriate fee award is determining the number of reasonable hours that attorneys spent on the case by reviewing the attorneys' time records.  Here the case was being developed as early as November of 2010 as discussions regarding the issues that would surely give rise to this litigation were being formulated.  For example the need to explore population growth in the state and its impact on the apportionment

of congressional seats across the country, was critical in developing a legislative and litigation

strategy for this case.  In addition, as census data was being released, the State of Texas was

encouraging litigation by the *Teuber* plaintiffs that could impact on the MALC goals both in the

legislative process and the litigation.  MALC'S involvement with *Teuber* was both related to this

case but also necessary in order to insure that's MALC's interests would be protected.  Moreover,

MALC and its counsel's involvement in the legislative process was critical in the development of

a record and the evidence necessary to show what the State' intent in developing and adopting

the final plans challenged in this case.  Once plans were adopted, and this case filed, the case

included extensive procedural fights on issues dealing with standing, venue and timing.  On all

these issues MALC's positions prevailed.  In addition the case as mentioned before raised serious

and difficult issues about the interplay between Plaintiff's claims under the Constitution and

Section 2 of the VRA and Section 5 of the VRA.  This case played an important role in the

evolution of voting rights jurisprudence and the use of interim court order plans.  Finally, this

case involved these important issues that required resolution before the United State Supreme

Court. The fact that the impact of this litigation is far reaching, supports the claim for fees made

here by the Plaintiff.

 Plaintiff MALC has included and attached as exhibits the declarations and time records of

Plaintiff's attorneys Jose Garza, Joaquin G. Avila, Ricardo G. Cedillo, Cynthia Jones and Martin

Golando.  A review of these exhibits shows the following hours devoted to the case by Plaintiff

MALC's attorneys:

   **<u>Attorneys</u>**
   Jose Garza - 2,071.12[16]  hours
   Joaquin G. Avila – 321.7 hours

---

[16] Hours claimed represents a 20% billing judgment discount .

Martin Golando - 1010.56[17] hours
Ricardo G. Cedillo - 116.60 hours
Mark W. Kiehne – 470.40 hours
Laura Clark - 290.00 hours
Cynthia Jones - 22.00 hours
Pamela Karlan - 50.0 hours

**Paralegals**
Daniel Dominguez - 109.00 hours

After determining the number of reasonable hours, the court then determines the appropriate hourly rate based on prevailing market rates. Here, Plaintiff has submitted declarations from the lawyers claiming fees setting out their opinion of their market rates and testifying that an appropriate hourly rate for attorneys of the experience and expertise of Plaintiff's counsel, ranges from $250 per hour to $750.00 per hour and specifically testifying that in their opinion the rates requested for the lawyers in this case are appropriate. In addition, recently, in a different and less significant voting rights case, litigants have requested fees and submitted the affidavits of attorneys' fees experts that have testified that in cases in the Western District of Texas, the prevailing market rates are as follows:

5 years of experience - $340.00 per hour;
6 years of experience - $390.00 per hour;
7 years of experience - $410.00 per hour;
11 years of experience - $520.00 per hour; and
18 years of experience - $700.00 per hour.

*LULAC V. City of Boerne,* Civ. Action # 96-cv-808, Doc. 80-2 and Doc. 80-3 (Affidavits of Reagan Simpson and Scott A. Brister.) The testimony of these witnesses together with the testimony of the lawyers in this case, shows that the rates requested by Plaintiff here are very reasonable and within the range of the prevailing market rates in the Western District of Texas.

---

[17] Hours claimed represents a 20% billing judgment discount.

Based on the evidence presented and the record of this case, Plaintiff seeks an award from this Court as follows:

Attorneys' Fees requested:

| | | | | |
|---|---|---|---|---|
| Jose Garza[18] | 2,071.12[19] hrs. x | $450.00 = | $932,004.00 |
| Joaquin G. Avila[20] | 321.7  hrs.      x | $725.00 = | $233,232.50 |
| Martin Golando[21] | 1,010.56[22] hrs. x | $250.00 = | $252,640.00 |
| Ricardo Cedillo[23] | 116.60 hrs.    x | $750.00 = | $87,450.00 |
| Mark Kiehne[24] | 470.40 hrs.    x | $350.00 = | $164,640.00 |
| Laura Clark [25] | 290.00 hrs.    x | $275.00 = | $79,750.00 |
| Cynthia Jones | _22.00 hrs.    x | $250.00 = | $5,500.00 |
| Pamela Karlan[26] | 50.00  hrs.    x | $725.00 = | $36,250.00 |

Total Fees Requested – $1,791,466.50

Paraleg al Fees Requested:

Daniel Dominquez     109.00 hrs. @     $150.00 = $16,350.00

As discussed above, Plaintiff is also entitled to the costs of litigation, including expert witness costs. In this case, costs included such items as filing fees, deposition costs, and travel expenses.  The following are the reasonable costs associated with prosecuting this case:

Non-expert Costs:

---

[18] Jose Garza has been licensed in Texas and the Federal Courts for over 33 years.  His experience has focused on voting rights litigation.

[19] After 20% billing judgment discount.

[20] Joaquin G. Avila, a Harvard Law and Yale University graduate, has over 39 years of experience as a licensed attorney.  His practice has almost exclusively focused on voting rights litigation.

[21] Martin Golando, a University of Texas Law School graduate, has been licensed for 5 years.

[22] After 20% billing judgment discount.

[23] Ricardo Cedillo, a Harvard Law graduate, has over 33 years of experience as a licensed attorney, with a focus on complex federal and state court actions.

[24] Mark Kiehne, a 2001 graduate of St. Mary's University Law School, has been licensed for about 11 years.  Mr. Kiehne has been involved in complex federal and state litigation for the firm of Davis Cedillo and Mendoza.

[25] Laura Clark, a 2010 graduate of St. Mary's University, has been licensed for over 2 years.

[26] Professor Pam Karlan graduated from Yale Law School in 1984 and has been a practicing attorney for over 27 years.  Professor Karlan has been the Kenneth and Harle Montgomery Professor of Public Interest Law  at Stanford University since 1999 and the Co-Director, Supreme Court Litigation Clinic since 2004.  She has litigated numerous voting rights cases at the district court and at the United States Supreme Court.

MALC -              $76,667.18
Joaquin G. Avila -   $21,030.95
Jose Garza -         $2,133.82
DCM -               $1,782.44
                          Total Out of Pocket expenses – $101,614.39

Expert Costs

MALC -              $186,966.47
                          Total Costs - $288,580.86

**Conclusion**

Based on the foregoing and the exhibits and declarations attached to this Motion, Plaintiff

MALC respectfully asks this Court for an award of reasonable attorneys' fees and costs as

follows:

Attorneys' fees and paralegal fees– $1,807,816.50
Out of pocket costs - $101,614.39
Expert witness cost - $186,966.47

**Total fees and costs -                        $2,096,397.36**

Plaintiff also requests this Court order Defendants to tender to Plaintiff said amount

within 30 days of this court's order with interest from the date of entry of the Court's order, at a

rate equivalent to the prime rate as published by the Board of Governors of the Federal Reserve

System on the date of the Court's order on fees or 5% which ever rate is higher. *See Tex. Fin.*

*Code*, Section 304.003(c) (1).

DATED:       June 18, 2012

                              _____/s/ Jose Garza_____
                              JOSE GARZA
                              Texas Bar No. 07731950
                              Law Office of Jose Garza
                              7414 Robin Rest Dr.
                              San Antonio, Texas 78209
                              (210) 392-2856

garzpalm@aol.com

JOAQUIN G. AVILA
LAW OFFICE
P.O. Box 33687
Seattle, Washington 98133
Texas State Bar # 01456150
(206) 724-3731
(206) 398-4261 (fax)
jgavotingrights@gmail.com

Ricardo G. Cedillo
State Bar No. 04043600
Mark W. Kiehne
State Bar No. 24032627
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, Texas  78212
Tel.: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com
mkiehne@lawdcm.com

**ATTORNEYS FOR MEXICAN
AMERICAN LEGISLATIVE CAUCUS,
TEXAS HOUSE OF REP. (MALC)**

<u>**CERTIFICATE OF SERVICE**</u>

 I hereby certify that on June 19, 2012, I electronically served the foregoing via ECF on all other parties in this litigation.

<u>/s/ Jose Garza</u>

<u>**CERTIFICATE OF CONFERENCE**</u>

 I have conferred with counsel for Defendants, Mr. David Mattox, and have been informed that Defendants oppose this motion.

<u>/s/ Jose Garza</u>