# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

|  |  |
|---|---|
| SHANNON PEREZ, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> STATE OF TEXAS, *et al.*, <br><br> *Defendants.* | CIVIL ACTION NO. <br> SA-11-CA-360-OLG-JES-XR <br> [Lead case] |

## DEFENDANTS' RESPONSE TO PLAINTIFFS AND THE UNITED STATES REGARDING SECTION 3(C) OF THE VOTING RIGHTS ACT

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JAMES D. BLACKLOCK
Deputy Attorney General
for Legal Counsel

J. REED CLAY, JR.
Special Assistant and Senior
Counsel to the Attorney General

JONATHAN F. MITCHELL
Solicitor General
Texas Bar No. 24075463

PATRICK K. SWEETEN
Division Chief
Special Litigation Division

MATTHEW H. FREDERICK
Assistant Solicitor General

ANGELA V. COLMENERO
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
jonathan.mitchell@texasattorneygeneral.gov

COUNSEL FOR DEFENDANTS

TABLE OF CONTENTS

Table of Authorities.......................................................................................... iii

I.    This Court Lacks Jurisdiction To Consider A Bail-In Remedy
      Based On The 2011 Redistricting Plans............................................3

      A.    DOJ Is Wrong About the Effect of Section 3(c)'s Bail-In
            Remedy On the Question of Justiciability....................................... 3

      B.    Texas's Adoption Of New Redistricting Maps In 2013 Bears
            No Resemblance To The 1960s-Era Tactics Employed By
            Southern States To "Stay One Step Ahead Of The Federal
            Courts." ..................................................................................... 14

II.   Section 3(c) Does Not Permit A-Bail-In Remedy In This Case.........................19

      A.    DOJ And The Plaintiffs Have Failed To Prove That The 2011
            Maps Harmed Minority Legislators And Voters Because Of
            Their Race Rather Than Their Political Party............................ 20

      B.    Even If This Court Concludes That The 2011 Plans
            Contained    Intentional    Racial    Discrimination,    No
            Constitutional Violations "Have Occurred" Because The
            Maps Never Went Into Effect. ................................................... 32

      C.    Even If This Court Concludes That The 2011 Plans Were The
            Product Of Intentional Racial Discrimination, This Case
            Does Not Present The Threat Of Pervasive, Flagrant,
            Widespread, and Rampant Constitutional Violations Needed
            To Justify Preclearance.............................................................. 33

      D.    The Remaining Allegations of Race Discrimination Are Not
            Constitutional Violations And Cannot Be Used To Support
            Bail-In. ..................................................................................... 37

III.  Bail-In Will Impose Enormous Burdens On The State Of Texas
      And This Court. .........................................................................39

Conclusion........................................................................................... 42

Certificate of Service ........................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

*Alaska v. United States,*
    545 U.S. 75 (2005) ........................................................................... 6

*Am. Gas & Elec. Co. v. SEC,*
    134 F.2d 633 (D.C. Cir. 1943) ......................................................... 6

*Beer v. United States,*
    425 U.S. 130 (1976) ....................................................................... 16

*Blackmoon v. Charles Mix County,*
    505 F. Supp. 2d 585 (D.S.D. 2007) ............................................... 4

*Brown v. Colegio de Abogados,*
    613 F.3d 44 (1st Cir. 2010) ........................................................... 17

*Burns v. Pa. Dep't of Corr.,*
    544 F.3d 279 (3d Cir. 2008) ......................................................... 17

*Charleston Hous. Auth. v. USDA,*
    419 F.3d 729 (8th Cir. 2005) ......................................................... 17

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ......................................................................... 13

*City of Mesquite v. Aladdin's Castle, Inc.,*
    455 U.S. 283 (1982) ....................................................................... 17

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ......................................................................... 4

*Easley v. Cromartie,*
    532 U.S. 234 (2001) ....................................................................... 22

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades*
    *Council,* 485 U.S. 568 (1988) ......................................................... 9

*Ellis v. Ry. Clerks,*
    466 U.S. 435 (1984).................................................................................4

*Fawn Mining Corp. v. Hudson,*
    878 F. Supp. 240 (D.D.C. 1995)...........................................................6

*Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,*
    570 F.3d 1210 (11th Cir. 2009).............................................................21

*Golden v. Zwickler,*
    394 U.S. 103 (1969)...............................................................................13

*Graves v. Barnes,*
    343 F. Supp. 704 (W.D. Tex. 1972).......................................................37

*Growe v. Emison,*
    507 U.S. 25 (1993).................................................................................11

*Henschen v. City of Houston,*
    959 F.2d 584 (5th Cir. 1992).................................................................11

*Hersh v. United States ex rel. Mukasey,*
    553 F.3d 743 (5th Cir. 2008)...................................................................9

*Hunt v. Cromartie,*
    526 U.S. 541 (1999).............................................................19, 23, 24, 27

*INS v. St. Cyr,*
    533 U.S. 289 (2001)...............................................................................9

*Jeffers v. Clinton,*
    740 F. Supp. 585 (E.D. Ark. 1990) ........................................................7

*Jones v. Diamond,*
    636 F.2d 1364 (5th Cir. 1981) (en banc)...............................................17

*Khakhn v. Holder,*
    371 F. App'x 933 (10th Cir. 2010) .........................................................5

*Kikumura v. Turner,*
    28 F.3d 592 (7th Cir. 1994)....................................................................18

*League of United Latin Am. Citizens, Council No. 4434 v. Clements,*
    999 F.2d 831 (5th Cir. 1993) (en banc)........................................................20

*Lewis v. Casey,*
    518 U.S. 343 (1996)........................................................................................12

*Lopez v. City of Houston,*
    617 F.3d 336 (5th Cir. 2010)................................................................11, 12

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................................................12

*McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders,*
    264 F.3d 52 (D.C. Cir. 2001) .........................................................................4

*Memphis Light, Gas & Water Div. v. Craft,*
    436 U.S. 1 (1978)............................................................................................11

*Meza v. Livingston,*
    607 F.3d 392 (5th Cir. 2010) .......................................................................17

*Miller v. Johnson,*
    515 U.S 900 (1995)..................................................................22, 23, 26, 32

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville,*
    508 U.S. 656 (1993) .......................................................................................18

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
    557 U.S. 193 (2009).....................................................................................9-10

*Perry v. Perez,*
    132 S. Ct. 934 (2012)....................................................................................32

*Radio-Television News Dirs. Ass'n v. FCC,*
    229 F.3d 269 (D.C. Cir. 2000)..................................................................17-18

*Seamon v. Upham,*
    536 F. Supp. 931 (E.D. Tex. 1982)........................................................37, 38

*Shaw v. Reno,*
    509 U.S. 630 (1993) .......................................................................................27

*Shelby County v. Holder,*
    133 S. Ct. 2612 (2013)..............................................................................*passim*

*Smith v. Craddick,*
    471 S.W.2d 375 (Tex. 1971) .............................................................37

*Sossamon v. Texas,*
    560 F.3d 316 (5th Cir. 2009)...........................................................16

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ..........................................................................14

*Storie v. Randy's Auto Sales, LLC,*
    589 F.3d 873 (7th Cir. 2009).............................................................6

*Terrazas v. Clements,*
    537 F. Supp. 514 (N.D. Tex. 1982) ................................................38

*Texas v. United States,*
    887 F. Supp. 2d 133 (D.D.C. 2012)...............................20, 21, 22, 25

*Thomas v. Bush,*
    No. 1:95-CV-186-SS (W.D. Tex. Sept. 15, 1995) ...........................38

*Tollett v. City of Kemah,*
    285 F.3d 357 (5th Cir. 2002)...........................................................21

*United States v. Brazos County,*
    No. 4:06-cv-2165 (S.D. Tex. June 29, 2006) ..................................39

*United States v. Ector County,*
    No. 7:05-cv-131 (W.D. Tex. Aug. 23, 2005) ...................................39

*United States v. Fort Bend County,*
    No. 4:09-cv-1058 (S.D. Tex. April 9, 2009)....................................38

*United States v. Galveston County,*
    No. 3:07-cv-00377 (S.D. Tex. July 16, 2007) .................................38

*United States v. Hale County,*
    No. 5:06-cv-0043 (N.D. Tex. Feb. 27, 2006) ..................................39

*United States v. Hull,*
    456 F.3d 133 (3d Cir. 2006) .............................................................................6

*United States v. Windsor,*
    133 S. Ct. 2675 (2013).............................................................................20-21

*United Transp. Union v. Mich. Bar,*
    401 U.S. 576 (1971)........................................................................................8

*White v. Regester,*
    412 U.S. 755 (1973).....................................................................................36

*White v. Weiser,*
    412 U.S. 783 (1973)...............................................................................32, 37

**Statutes**

U.S. CONST. amend. XIV ....................................................................................33

U.S. CONST. amend. XV.......................................................................................33

U.S. CONST. art. III, § 2 .......................................................................................5

28 C.F.R. § 51.13.................................................................................................41

42 U.S.C. § 1973a(c) ................................................................................*passim*

42 U.S.C. § 1973c(a) ..........................................................................................41

TEX. CONST. art. III, § 26.....................................................................................36

**Other Authorities**

Act of May 10, 1983, 68th Leg., R.S., Ch. 185, 1983 Tex. Gen. Laws 756 ......38

Act of May 28, 1983, 68th Leg., R.S., Ch. 531, 1983 Tex. Gen. Laws 3086 ....38

Act of May 31, 1975, 64th Leg., Ch. 537, 1975 Tex. Gen. Laws 1390 .............38

Act of May 8, 1997, 75th Leg., R.S., 1997 Tex. Gen. Laws 258 .......................38

H.R. REP. NO. 109-478 (2006) ...........................................................................36

Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*,
  62 STAN. L. REV. 1209 (2010) ........................................................................ 33

Tim Murphy, *Top Obama Organizer Wants To Turn Texas Blue*,
  MOTHER JONES (Jan. 24, 2013) .................................................................... 11

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| SHANNON PEREZ, *et al.*,<br><br>     *Plaintiffs,*<br><br>v.<br><br>STATE OF TEXAS, *et al.*,<br><br>     *Defendants.* | CIVIL ACTION NO.<br>SA-11-CA-360-OLG-JES-XR<br>[Lead case] |

### DEFENDANTS' RESPONSE TO PLAINTIFFS AND THE UNITED STATES REGARDING SECTION 3(C) OF THE VOTING RIGHTS ACT

The request by the plaintiffs and the Department of Justice for this Court to order the extraordinary remedy of bail-in in the context of an otherwise moot case is staggering. Just a few weeks ago, the Supreme Court invalidated the legislatively imposed preclearance requirement, calling it an "extraordinary" "departure from the fundamental principle of equal sovereignty" of the states. *Shelby County v. Holder*, 133 S. Ct. 2612, 2618 (2013) (citation omitted). A judicially imposed preclearance requirement is no less extraordinary and no less constitutionally suspect. Yet now the plaintiffs and DOJ want to turn *Shelby County* on its head by asking this Court to impose a preclearance regime in a case in which the underlying claims of racial discrimination are moot, the allegations of unconstitutional race discrimination are meritless, and the State has adopted new

redistricting plans that address all potential legal deficiencies identified by either this Court or the D.C. district court.

The Supreme Court's decision in *Shelby County* makes clear that the extreme sovereignty-infringing remedy of preclearance is constitutionally suspect and may be applied only in response to rampant, widespread, recalcitrant discrimination akin to what originally justified the preclearance regime in 1965. Only in cases where more traditional judicial remedies have proven demonstrably inadequate, as in the south in 1965, would the bail-in remedy even be arguably congruent and proportional to the underlying constitutional violations. Yet this case demonstrates that traditional litigation is more than adequate to identify and enjoin alleged violations of the Constitution and the Voting Rights Act before the offending provision can be enforced. Bail-in cannot possibly be a congruent and proportional response to alleged constitutional violations that can be adequately remedied by traditional litigation.

This Court must reject the plaintiffs' and DOJ's request for bail-in for at least three independent reasons.

First, this Court lacks jurisdiction to consider a bail-in remedy because the plaintiffs' claims for declaratory and injunctive relief against the 2011 plans are moot. Second, section 3(c) does not permit a bail-in remedy because

no violations of the Fourteenth and Fifteenth Amendments have occurred as a result of Texas's 2011 redistricting plans.   Third, even if violations occurred, they bear no resemblance to the "pervasive," "flagrant," "widespread," and "rampant" discrimination that originally justified preclearance in 1965. *See Shelby County*, 133 S.Ct at 2629.  Under *Shelby County*, bail-in could be a congruent and proportional remedy for intentional discrimination, but only in response to the kind of ever-changing discriminatory machinations that gave rise to the preclearance regime in the first place.  Because nothing remotely like that has occurred in modern-day Texas, this Court cannot impose preclearance on Texas while remaining faithful to *Shelby County* and the constitutional principles on which it relies.

I.    THIS COURT LACKS JURISDICTION TO CONSIDER A BAIL-IN REMEDY BASED ON THE 2011 REDISTRICTING PLANS.

    A. DOJ Is Wrong About The Effect Of Section 3(c)'s Bail-In Remedy On The Question Of Justiciability.

Texas has already established that the plaintiffs' claims for declaratory and injunctive relief against the 2011 plans are moot.  *See* Texas's Opp'n to Pls.' Mot. to Amend, *Perry v. Perez*, No. 5:11-cv-360, at 2–8 (W.D. Tex. July 19, 2013) (Doc. 786) (hereinafter "Texas's Opp'n").  DOJ does not contest this point.  *See generally* Statement of Interest of the United States, *Perry v.*

3

*Perez*, No. 5:11-cv-360 (W.D. Tex. July 25, 2013) (Doc. 827) (hereinafter "Statement of U.S."). But DOJ nevertheless contends that mootness does not entirely dispose of this litigation, due to the plaintiffs' request for section 3(c) bail-in relief. *See id.* at 8–11. "This case is not moot," the argument goes, "because the availability of the Section 3(c) remedy allows this Court to grant relief to the Plaintiffs if they prevail on their claims." *Id.* at 9. DOJ is mistaken.[1]

The Court's mootness analysis must proceed independently for each form of relief sought by the plaintiffs in this litigation. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006); *Ellis v. Ry. Clerks*, 466 U.S. 435, 441–42 (1984); *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders*, 264 F.3d 52, 55 (D.C. Cir. 2001). That means that the plaintiffs' claims for declaratory and injunctive relief against

---

[1] DOJ points to *Blackmoon v. Charles Mix County*, 505 F. Supp. 2d 585 (D.S.D. 2007), but that opinion's treatment of *section 3(a)* does nothing to aid this Court's analysis of *section 3(c)* and mootness. *See* Statement of U.S. at 10. The district court there concluded that mootness did not obtain because federal observers might be appointed under section 3(a). *See Blackmoon*, 505 F. Supp. 2d at 593. The *Blackmoon* Court made no effort to interpret the statutory phrase "justifying equitable relief," which section 3(a) happens to share in common with section 3(c), and failed to explain how appointment of federal observers would redress a particularized injury to the plaintiffs. *See id.* An opinion from the District of South Dakota has only the power to persuade in this Court. There is nothing persuasive about *Blackmoon*, which in no way responds to the arguments Texas has put forth here.

the 2011 plans must stand or fall without regard to their claims for section 3(c) bail-in relief.  As Texas has explained, *see* Texas's Opp'n at 2–7, the claims for declaratory and injunctive relief must be dismissed as moot because the 2011 plans, having been replaced by the 2013 plans, will never be used in any election.  This leaves only the claims for section 3(c) bail-in relief, and the question is whether these alone can sustain a live "Case[]" or "Controvers[y]."  U.S. CONST. art. III, § 2.

Section 3(c) relief cannot be considered absent constitutional violations "*justifying* equitable relief."  42 U.S.C. § 1973a(c) (emphasis added).  The plaintiffs can satisfy this statutory precondition only by pointing to an *existing* constitutional violation that demands the exercise of the Court's equitable powers to stop it.  DOJ is wrong to assert that the plaintiffs need only identify past violations that may have once justif*ied* "equitable relief," and it is even more wrong to suggest that these past violations may have been found by a court in a distant jurisdiction, or torn from the pages of history.

The statute's use of the present participle "justifying" equitable relief, rather than the past tense "justified," makes this clear.  *Cf. Khakhn v. Holder*, 371 F. App'x 933, 937 (10th Cir. 2010) ("Congress' use of the present participle is unambiguous.").  A statute's use of the present participle

5

"connotes present, continuing action," *United States v. Hull*, 456 F.3d 133, 145 (3d Cir. 2006), because "the present participle [is] a verb form that carries action forward in the present tense," *Fawn Mining Corp. v. Hudson*, 878 F. Supp. 240, 243 (D.D.C. 1995).  *See also Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 876 (7th Cir. 2009) ("[B]eing a present participle, 'acquiring' implies that the legislature envisioned some form of simultaneity."); *Am. Gas & Elec. Co. v. SEC*, 134 F.2d 633, 648 (D.C. Cir. 1943) (Stephens, J., dissenting) (explaining that the present participle connotes "present continuing action").  DOJ seeks a result that may obtain only if the Court rewrites section 3(c) to read "justified" instead of "justifying."

The rest of section 3(c) confirms that bail in may be considered only in response to an existing constitutional violation before the Court.  Section 3(c) authorizes the Court to retain jurisdiction "in addition to *such relief* as it may grant."  42 U.S.C. § 1973a(c) (emphasis added).  The only logical antecedent to the word "such" is the phrase "justifying equitable relief," which appears earlier in the sentence, and is the only mention of "relief" in section 3(c).  *See Alaska v. United States*, 545 U.S. 75, 115 (2005).  So the statute plainly anticipates that a federal court would have before it an existing constitutional violation demanding an injunction, and that the court might

6

then grant a bail-in remedy "in addition to" that injunction.    42 U.S.C. § 1973a(c).

The district-court opinion in *Jeffers*, on which DOJ relies, agrees that the phrase "justifying equitable relief" requires *existing* constitutional violations. *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990) (three-judge court).  At the pretrial conference, the *Jeffers* plaintiffs announced that they would prove a litany of existing constitutional violations.  *Id.* at 591.  The district court examined each of these alleged violations in turn, county by county,[2] and rejected several of the plaintiffs' attempts to bail in Arkansas based on constitutional violations that were no longer live:

- Lee County: "[W]e are not persuaded that there *now exist* constitutional violations justifying equitable relief.  The report . . . describes a situation that is more than 15 years old, and *the most recent constitutional violation . . . has been remedied both by a preliminary injunction issued by this Court* and by the subsequent withdrawal of the charges.  *Id.* at 596 (emphases added).

- Crittenden County: "While we could wish for more trust among citizens, we do not find any *present* violations of the Fifteenth Amendment justifying equitable relief in Crittenden County."  *Id.* at 597 (emphasis added).

---

[2] The *Jeffers* court's reliance on local constitutional violations to bail in an entire state cannot be justified after *Northwest Austin* and *Shelby County*, which require a preclearance remedy that is congruent and proportional to the constitutional violations.  Indeed, any example of section 3(c) bail-in that predates *Shelby County* is of little use to this Court because past courts applying section 3(c) were not compelled by Supreme Court precedent—as this Court is—to subject any bail-in request to the rigorous congruence-and-proportionality analysis that the Supreme Court applied to section 4's coverage formula.  *See Shelby County*, 133 S. Ct. at 2627–31.

- Chicot County: "[W]e conclude that no *present* constitutional violations with respect to voting rights, justifying equitable relief, have been proved in Chicot County." *Id.* at 598 (emphasis added).

- Desha County: "There is, however, no evidence of any specific incident more recent than 1976. . . . The issue is whether the constitutional violations proved justify equitable relief *in the present-day situation*." *Id.* at 599 (emphasis added).

The plaintiffs and DOJ cannot point to a single present-day constitutional violation justifying equitable relief. The 2011 plans do not qualify because they are repealed.[3]  Moreover, even if some violations existed in those repealed plans, they cannot qualify as violations "justifying equitable relief" because the plans never will be implemented, and therefore equitable relief is unjustifiable under Supreme Court precedent. *See, e.g., United Transp. Union v. Mich. Bar*, 401 U.S. 576, 584 (1971) ("An injunction can issue only after the plaintiff has established . . . that the defendant, if not enjoined, will engage in such conduct."); Texas's Opp'n at 7–8.

DOJ also claims that "to the extent that Section 3(c) requires a court to find that equitable relief is justified, the preclearance remedy in Section 3(c) can be that relief." *See* Statement of U.S. at 5–6. DOJ's attempt at bootstrapping is foreclosed by the text of section 3(c). As explained above, the

---

[3] They also do not qualify because they contain no proven violations of the Fourteenth or Fifteenth Amendments. *See* Part II, *infra*.

Court may award a bail-in remedy "in addition to" any equitable relief on existing constitutional violations. The statute does not allow a bail-in remedy to make its own gravy by standing in for the equitable relief on which its issuance depends.

Even if the text of section 3(c) were ambiguous on this point, DOJ's backward-looking interpretation would be foreclosed by constitutional-avoidance principles: "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, [the federal courts] are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (citations and internal quotation marks omitted); *accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 753–54 (5th Cir. 2008).

If the Court bails in Texas based on constitutional violations from its past, rather than insisting on constitutional violations existing in the present, then the Court will commit the same constitutional error that the Supreme Court exposed in *Northwest Austin* and condemned in *Shelby County*. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("[T]he [Voting Rights Act] imposes current burdens and must be

justified by current needs."); *Shelby County*, 133 S. Ct. at 2629 ("[T]he coverage formula that Congress reauthorized in 2006 . . . keep[s] the focus on decades-old data relevant to decades-old problems, rather than current data reflecting current needs.").

Section 4(b)'s coverage formula was struck down in part because it was "based on 40-year-old facts having no logical relation to the present day." *Shelby County*, 133 S. Ct. at 2629. This Court cannot allow DOJ to replicate that unconstitutional coverage formula by deploying section 3(c) and relying on the same 40-year-old transgressions. *See, e.g.*, Statement of U.S. at 18–20 (citing Texas's use of a "poll tax[]" in 1966); *id.* at 20 n.20 (citing the Texas Democratic Party's use of "all white" primaries from 1927 to 1953); *id.* (citing the Texas Democratic Party's exclusion of black voters from its 1935 primary election). DOJ knows its reliance on past instances of discrimination is a problem under *Shelby County*, as evidenced by an atextual hedge in its brief. *See* Statement of U.S. at 6 ("The trigger is . . . dependent on a judicial finding of a *recent* constitutional violation." (emphasis added)). Where in the text of section 3(c) did DOJ discover this temporal limitation on its theory that federal courts may use the past to trigger bail in? DOJ invents this

10

limitation out of whole cloth to try to avoid the reality that the text of section 3(c) is forward-looking, demanding constitutional violations in the present.[4]

Section 3(c)'s language of limitation shows why this case is moot. Once the plaintiffs' claims for declaratory and injunctive relief against the 2011 plans are dismissed as moot, their request for section 3(c) bail-in relief will be foreclosed by the fact that nothing "justifying equitable relief" remains before the Court. A patently insubstantial request for section 3(c) relief (or any other type of relief) cannot prolong the life of an otherwise moribund case. *See Henschen v. City of Houston*, 959 F.2d 584, 588 (5th Cir. 1992) (holding that, under *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978), a plaintiff cannot ward off mootness with a request for pecuniary relief unless she "advance[s] a viable, not insubstantial damage claim"). Consider *Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010), which held that a claim to

---

[4] DOJ's interpretation also would exacerbate the equal-sovereignty concerns raised in *Shelby County. See* 133 S. Ct. at 2618 (holding that a preclearance regime applying unevenly among States is a "dramatic departure from the principle that all States enjoy equal sovereignty" and can be justified only under "extraordinary" circumstances). Because no State is without sin in its past, allowing the DOJ's Civil Rights Division to pick-and-choose its targets vests a presidential administration with discretion to impede redistricting in elector-rich States it perceives as political battlegrounds, *see, e.g.*, Tim Murphy, *Top Obama Organizer Wants To Turn Texas Blue*, MOTHER JONES (Jan. 24, 2013), while leaving smaller, friendlier States unmolested—even if one happens to suffer the worst ratio of white voter turnout to African-American voter turnout in the nation. Oral Argument at Tr. 32:3–7, *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) (No. 12-96) ("CHIEF JUSTICE ROBERTS: Do you know which State has the worst ratio of white voter turnout to African American voter turnout? GENERAL VERRILLI: I do not. CHIEF JUSTICE ROBERTS: Massachusetts."); *see also Growe v. Emison*, 507 U.S. 25, 33 (1993) (instructing courts to avoid the "highly political" process of redistricting where possible).

11

enjoin an election under the Voting Rights Act and the Fourteenth and Fifteenth Amendments became moot when that election occurred during the pendency of the suit.  The plaintiffs argued that mootness was forestalled by the availability of "a viable remedy for their injury," namely, "invalidation of the [completed] election and [compulsion of] a new election."  *Id.*  But the Fifth Circuit rejected this argument, and dismissed the plaintiffs' claim as moot, because the request for invalidation of the completed election was not a "viable" or "appropriate remedy" on the record before it.  *Id.*  *Lopez* compels the same result here:  The plaintiffs cannot use their request for bail in to avoid mootness because, under the terms of section 3(c), they do not have a viable claim to bail-in relief.

By invoking section 3(c)'s bail-in remedy in its attempt to stave off Texas's mootness argument, DOJ runs into an additional, and more fundamental, justiciability problem.  "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), so the plaintiffs lack Article III standing to pursue a claim for section 3(c) relief unless they can show that it is "likely, as opposed to merely speculative," that a bail-in remedy will redress "an injury in fact" that is "concrete and particularized," as well as "actual or imminent," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 556, 560–61 (1992) (internal quotation marks omitted).   DOJ claims that "the

12

availability of the Section 3(c) remedy allows this Court to grant relief to the Plaintiffs if they prevail."  Statement of U.S. at 9.  Even if that statement were true (and it is not), it would fail to establish standing because it does not connect the grant of section 3(c) relief to the redress of some particularized injury suffered by these plaintiffs.  It is not enough for the plaintiffs (or their allies from the federal government) to allege past harm and then point to some judicial decree for which they have a generalized desire.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that plaintiff who had been placed in a chokehold by LAPD officers lacked Article III standing to seek an injunction barring such chokeholds); *Golden v. Zwickler*, 394 U.S. 103, 108–09 (1969) (holding that the constitutionality of a law prohibiting distribution of anonymous literature in connection with election campaigns did not present an Article III controversy sufficient to support declaratory relief because the plaintiff sought to distribute handbills about a congressman who had resigned and was unlikely to seek reelection).

At bottom, the plaintiffs and DOJ are asking this Court to impose the extraordinary remedy of bail-in in a case where DOJ agrees that ordinary remedies of declaratory and injunctive relief are not even within the Court's power to grant due to mootness.  The text of section 3(c) cannot support this reading.  Nor can such an expansive interpretation of section 3(c) withstand

13

constitutional scrutiny under *Shelby County*.  *See* Part III, *infra*.  Bail-in cannot be a congruent and proportional remedy for injuries that no longer require any remedy at all.  This Court lacks jurisdiction to consider a request for bail-in based on claims against the 2011 redistricting plans.  All that is left to be done is to dismiss those claims.

> ### B. Texas's Adoption Of New Redistricting Maps In 2013 Bears No Resemblance To The 1960s-Era Tactics Employed By Southern States To "Stay One Step Ahead Of The Federal Courts."

DOJ closes its justiciability discussion with this doctrinally shaky ghost story:

> Texas's interpretation of when Section 3(c) relief would become moot would render the provision a nullity, effectively permitting a defendant to avoid bail-in by abandoning a challenged practice at any time up to the moment of final judgment.  The jurisdiction could then adopt a slightly modified discriminatory practice, necessitating the filing of a new complaint.  This cycle of discrimination would create the type of gamesmanship the preclearance requirements embodied in both Section 5 and Section 3(c) were designed to end.

Statement of U.S. at 11 (citation omitted); *cf. South Carolina v. Katzenbach*, 383 U.S. 301, 314 (1966) ("Even when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests

14

designed to prolong the existing disparity between white and Negro registration.").

DOJ's scare tactic falls flat for several reasons. To begin with, the Texas Legislature did not enact a "slightly modified discriminatory practice." Even assuming that the allegations of discrimination against the 2011 redistricting plans had merit, Texas responded to these allegations not by enacting a "slightly modified discriminatory practice" but by adopting plans patterned after court-ordered plans designed to correct potential legal problems. The Texas Legislature passed maps that represented this Court's best guess as to legal and constitutional redistricting plans. And most of the interim changes ordered by this Court and later adopted by the Legislature were based on "not insubstantial" section 5 claims—a standard far beneath the preponderance-of-evidence standard required to prove a constitutional violation. The only evidence before this Court of how Texas responds even to mere interim findings of possible discrimination is the State's enactment of the 2013 plans. Yet DOJ asks this Court to adopt an atextual, expansive reading of section 3(c) on the assumption that Texas will behave like recalcitrant southern jurisdictions of the 1960s. Just as DOJ's justifications for the section 4 coverage formula were stuck in the past in *Shelby County*, so too do its justifications for section 3(c) bail-in reflect a preoccupation with

15

decades-old patterns of discrimination that do not exist under current conditions. To suggest that Texas has engaged in or will engage in the 1960s-style "common practice of staying one step ahead of the federal courts by passing new discriminatory voting laws" is absurd on its face. *Cf. Beer v. United States*, 425 U.S. 130, 140 (1976).[5]

DOJ's concern that the 1960s will return if the Court follows the plain text of section 3(c) also falls flat because it is based on an ill-informed view of mootness doctrine. First, DOJ overlooks the fact that the voluntary-cessation doctrine incorporates a *rebuttable* presumption that government officials act in good faith when they replace an allegedly illegal policy during litigation. *See Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009). Under the voluntary-cessation doctrine, a defendant who claims mootness has the burden of making absolutely clear that its voluntary cessation of the challenged behavior leaves no reasonable likelihood that the plaintiff will be injured by a recurrence of the challenged behavior. See *id.* at 324–25. Texas has carried that burden because the 2011 plans now have no chance of being enforced. A governmental defendant usually has a "lighter burden" in this

---

[5] Unlike the "slightly modified discriminatory practice" feared by DOJ, Texas's adoption of the 2013 plans was a significant modification to the 2011 plans. Every claim this court found to have a likelihood of success under section 2 or the constitution, and every claim this Court found to be "not insubstantial" under the now-defunct section 5 standard, was addressed by the 2013 plans.

16

regard, because a federal court will presume that voluntary cessation on the part of the government is undertaken in good faith. *See id.* at 325–26. This presumption of good faith, however, is a rebuttable one. *See id.* at 325. Texas has a winning mootness argument because its replacement of the 2011 plans with the 2013 plans was undertaken in good faith, and this Court must so hold unless the plaintiffs and DOJ can rebut the presumption with evidence of bad faith.

If a nefarious State employed the one-step-ahead-of-the-federal-courts tactic hypothesized by DOJ, however, its bad-faith action would preclude reliance on the voluntary-cessation doctrine. *See, e.g.*, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *Jones v. Diamond*, 636 F.2d 1364, 1375 (5th Cir. 1981) (en banc); *see also Brown v. Colegio de Abogados*, 613 F.3d 44, 48–49 (1st Cir. 2010); *Meza v. Livingston*, 607 F.3d 392, 399–400 (5th Cir. 2010); *Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 283–85 (3d Cir. 2008); *Charleston Hous. Auth. v. USDA*, 419 F.3d 729, 740 (8th Cir. 2005); *Radio-Television News Dirs. Ass'n v. FCC*, 229 F.3d 269, 270–71 (D.C. Cir. 2000); *Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994). Thus, adopting the reading of section 3(c) advocated by the State would not open the door to gamesmanship by discriminating jurisdictions because, under the voluntary-cessation doctrine, those jurisdictions cannot benefit from mootness if

17

mootness is alleged to arise from a change in the law undertaken in bad faith. There is no justification for DOJ's request to disregard the mootness doctrine by invoking a hypothetical that is capably addressed by existing voluntary-cessation doctrine.

Second, even apart from the voluntary-cessation doctrine, a State's adoption of "slightly modified discriminatory practice[s]," Statement of U.S. at 11, is not sufficient to create mootness. *See Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (rejecting the proposition that "a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect"). So DOJ is wrong to assert that a mootness finding will "render [section 3(c)] a nullity," and nothing that Texas has argued will open the door to the gamesmanship that DOJ fears.

II.   **SECTION 3(C) DOES NOT PERMIT A BAIL-IN REMEDY IN THIS CASE.**

A.   **DOJ And The Plaintiffs Have Failed To Prove That The 2011 Maps Harmed Minority Legislators And Voters Because Of Their Race Rather Than Their Political Party.**

A bail-in remedy cannot be ordered unless the court "finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision." 42

U.S.C. § 1973a(c).  DOJ admits that this Court has not made any such findings regarding the 2011 plans.  *See* Statement of U.S. at 7.  But it asks this Court to find that "constitutional violations" occurred during Texas's 2011 redistricting.  *See id.* at 11–17.

DOJ's accusations of racial discrimination are baseless.  In 2011, both houses of the Texas Legislature were controlled by large Republican majorities, and their redistricting decisions were designed to increase the Republican Party's electoral prospects at the expense of the Democrats.[6]  It is perfectly constitutional for a Republican-controlled legislature to make partisan districting decisions, even if there are incidental effects on minority voters who support Democratic candidates.  *See Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 854 (5th Cir. 1993) (en banc) ("[Section 2 of the Voting Rights Act] is implicated only where Democrats lose because they are black, not where

---

[6] *See, e.g.*, Trial Tr. Vol. 4, 997:8–14 (testimony of Ryan Downton that the 2011 House redistricting plan was drawn with the goal to reelect as many Republican members as possible); Joint Ex. J-62 at 139:6–13 (testimony of Ryan Downton that the congressional plan was intended to increase the number of Republican districts by three).

blacks lose because they are Democrats."). The redistricting decisions of which DOJ complains were motivated by partisan rather than racial considerations, and the plaintiffs and DOJ have zero evidence to prove the contrary.

DOJ's "evidence" of racial discrimination comes from a vacated opinion of the U.S. District Court for the District of Columbia, in a preclearance proceeding that violated the Constitution and never should have been held in the first place. *See Shelby County*, 133 S. Ct. at 2629; *see also Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated*, 133 S. Ct. 2885 (2013). There are many problems with United States' reliance on this vacated district-court opinion. First, when an opinion is vacated, "its ruling and guidance" are "erased." *See United States v. Windsor*, 133 S. Ct. 2675, 2688 (2013).[7] That means DOJ cannot use the D.C. district court's opinion as evidence of constitutional violations; it must produce evidence independent of the district court's findings to support its claims.

---

[7] *See also, e.g.*, *Tollett v. City of Kemah*, 285 F.3d 357, 366 (5th Cir. 2002) ("It goes without saying that, as a result of the revised sanctions [order] being vacated, the findings of fact and conclusions of law in the district court's post-remand orders, . . . are vacated as well."); *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009) ("Parts of decisions that are vacated and have not been reinstated 'have no legal effect whatever. They are void.'").

Second, the D.C. district court never made any findings that Texas had violated the Fourteenth or Fifteenth Amendments.   Instead, it denied preclearance based on the State's "fail[ure] to carry its burden to show that it acted without discriminatory purpose."  *See Texas v. United States*, 887 F. Supp. 2d at 162; *see also id.* at 151–52 (holding that Texas must prove the absence of discriminatory purpose); *id.* at 163 (considering "whether Texas has met its burden of disproving discriminatory intent").   In this proceeding, however, DOJ and the plaintiffs must prove that the Texas Legislature's redistricting decisions were motivated by unconstitutional racial animus rather than a desire to maximize the Republican Party's electoral prospects. That is no small task.  As the Supreme Court has explained:

> The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.

*Miller v. Johnson*, 515 U.S 900, 916 (1995); *see also Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (emphasizing that "[c]aution is especially appropriate" before finding a discriminatory purpose when "the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly

21

correlated").  In the D.C. district court, any doubts or uncertainties or lack of evidence regarding whether the Legislature's motivations were partisan or race-based were resolved against Texas.  *See Texas v. United States*, 887 F. Supp. 2d at 166 ("[U]nder the VRA and *Arlington Heights*, it is not enough for Texas to offer a plausible, nonracial explanation that is not grounded in the record."); *cf. id*. at 168 n.37 (resolving "a close and very difficult case" against Texas because "Congress has allocated the burden to prove lack of discriminatory effect to the State").  The D.C. district court even acknowledged that there was no direct evidence of purposeful race-based discrimination in the Texas redistricting plans,[8] but the lack of direct evidence regarding the Legislature's purpose led the court to hold that Texas failed to *disprove* the possibility of racial animus.  In this proceeding, those doubts or uncertainties or lack of evidence are resolved against the plaintiffs. *See Miller*, 515 U.S. at 916.

Finally, the D.C. district court opinion ignored the Supreme Court's rulings that distinguish partisan redistricting decisions from racially motivated decisions.  The D.C. district court never even cited *Hunt v.*

---

[8] *See Texas v. United States*, 887 F. Supp. 2d at 159 ("There is no direct evidence that the enacted plan was motivated by discriminatory purpose; no emails, letters, or testimony about conversations between those members involved in congressional redistricting disclose such an intent."); *id*. at 163 ("There is no direct evidence that the Texas legislature acted with a racially discriminatory purpose in its reconfiguration of SD 10 . . . .").

*Cromartie* or *Miller v. Johnson*, even though the State relied extensively on those cases throughout the proceeding. Because the D.C. district court refused to acknowledge that the Constitution permits legislatures to use partisan line-drawing—even when those lines diminish the electoral prospects or voting power of minority Democrats—its analysis is unreliable. Even DOJ has conceded that the D.C. district court's discriminatory-purpose ruling regarding the 2011 Texas Senate redistricting plan "amounts to clear error based on the explanation provided by the district court." Mot. to Affirm in Part, *Texas v. United States*, No. 12-496, 2012 WL 6131636, at *28 (U.S. Dec. 7, 2012). Yet DOJ asks this Court to *assume* that the D.C. district court's remaining analysis of discriminatory purpose is unassailable.

DOJ's specific accusations of unconstitutional racial discrimination are specious. Each of them describes a partisan decision designed to help Republicans at the expense of Democrats, some of whom happen to be minorities. That is perfectly constitutional under *Hunt*. There is no evidence—or even an allegation—that the 2011 plans adversely affected minority Republican voters or elected officials; indeed, the Texas Legislature went to great lengths to buttress the electoral prospects of Hispanic Republicans who had been elected in 2010 in Hispanic-majority districts. Without any evidence that the 2011 plans diminished the voting power or

electoral prospects of minority Republicans, DOJ cannot prove that minority Democrats were harmed because of their race rather than their political party.

Consider first DOJ's accusation that Texas performed "substantial surgery" on the congressional districts of black incumbents. Statement of U.S. at 13. All of these legislators were Democrats, and they were far from the only Democratic incumbents adversely affected by the 2011 maps. The district of Congressman Lloyd Doggett—the only white Democrat in the Texas congressional delegation elected in a majority-white district—was *completely dismantled* in an attempt to drive him from office. *See* Order (Doc. 691) at 40. The district of state Senator Wendy Davis—another white Democrat—was also altered significantly in an effort to unseat her. Yet the D.C. district court proclaimed that "[n]o such surgery was performed on the districts of Anglo incumbents"—even though Doggett and Davis were treated *worse* than the black incumbent members of Congress. *See Texas v. United States*, 887 F. Supp. 2d at 160.

The treatment of Congressman Doggett and Senator Davis proves that the 2011 congressional plan adversely affected incumbent Democrats of *all* races. That is both constitutional and entirely to be expected in a redistricting process controlled by Republicans. Neither DOJ nor the

24

plaintiffs can show that anything other than partisanship motivated these decisions.

Everything else DOJ cites is a similar attempt to equate partisanship with racism. The supposed "exclusion" of minority legislators "from effective participation in the redistricting process" is an exclusion of *Democrats*. Minority Republican legislators were not at all excluded from the process. Far from it, the Legislature went out of its way to boost the re-election prospects of newly elected Hispanic Republican legislators. And white Democratic legislators (such as Wendy Davis) were as excluded from the process as any minority Democratic legislators. There is no evidence that any legislator was "excluded" from the redistricting process on account of race as opposed to political party.

The changes made to congressional district 23, for example, were an attempt to protect incumbent Hispanic Republican Quico Canseco by making his district more Republican, while ensuring that the district maintained a sufficient Hispanic voting majority to retain its status as an "ability" district under section 5 of the Voting Rights Act and an "opportunity" district under section 2.[9] Whatever effects those changes had on the racial makeup of the

---

[9] *See, e.g.*, Texas Latino Redistricting Task Force Proposed Findings of Fact (Doc. 415) at 327–328, ¶ 1833 ("Mr. Downton's goals with respect to drawing CD 23 were to improve Rep. Canseco's chances for reelection and to maintain or increase all of the Hispanic population

district were incidental to the goals of incumbent protection and compliance with the Voting Rights Act.  Texas cannot be deemed to have violated the Constitution when section 5 *required* it to draw race-conscious district lines to avoid a finding of "non-retrogression."  *See, e.g., Miller*, 515 U.S. at 916 ("Redistricting legislatures will . . . almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process.").

The congressional district lines in the Dallas Fort-Worth Metroplex area were also drawn with the purpose of ensuring a Republican district. That is a constitutionally permissible goal under *Hunt*, and it necessarily reduces the clout of Democratic voters—some of whom will be minorities. DOJ apparently believes that partisan districting decisions are permissible only when the affected Democratic voters are white.

DOJ is also wrong to say that the 2011 plans "prevent[ed] the emergence of a new district in the Metroplex in which minority voters would have the ability to elect representatives of their choice."  Statement of U.S. at 14.  No reasonably compact Hispanic citizen-voting-age-majority district

---

percentages, such as HCVAP and SSVR. (Ex. J-62-I, at 73:18-74:2, 96:10-15.)"); *id.* at 336, ¶ 1890 ("According to Mr. Interiano, there were two concurrent goals with respect to the redistricting of Congressional District 23—maintain or increase Hispanic demographic percentages and provide an opportunity for Representative Canseco to be reelected. (Tr. 1454:23-1455:3; Ex. J-61, Vol.1, 102:5-11.)").

could be drawn in the DFW Metroplex,[10] and creating an oddly shaped
Hispanic-majority district would have subjected Texas to lawsuits under
*Shaw v. Reno*, 509 U.S. 630 (1993).  So Texas opted to draw an additional
Republican seat in the Metroplex instead.   And the creation of this new
Republican district did not deprive "minority voters" of the ability to elect
representatives of their choice.   More than 25% of Hispanic voters in Texas
support Republicans,[11] and the new district drawn in the Metroplex ensured
that Hispanic Republican voters will have the ability to elect representatives
of *their* choice.

As for the state house map, DOJ complains that Texas had "failed to
create any new House districts in which minority voters would have the
ability to elect their preferred candidates of choice [read: Democrats], despite
dramatic growth in the State's Hispanic population in the decade preceding
redistricting."   Statement of U.S. at 15.   Somehow DOJ overlooks (or
deliberately ignores) the fact that Hispanic voters who support Republicans
would have indeed been able to elect their preferred candidates of choice in

---

[10] *See* Joint Ex. J-62 at 67:15–69:10, 126:12–128:6 (testimony of Ryan Downton).

[11] Most experts in this case agreed that Hispanic Texas voters tend to support Democratic
candidates in general elections at a rate somewhere between 60% and 75%.  *See, e.g.*, Alford
Rebuttal Rep. tbl. 1 (Joint Expert Ex. E-17); Testimony of John Alford, Trial Tr. 1782:20–23
(Sept. 14, 2011).

27

the new state house districts created by the 2011 maps. DOJ's argument must rest on at least one of the following propositions: (a) Hispanic voters always vote for Democrats; (b) Hispanic voters who support Republicans are not protected by the Voting Rights Act; or (c) the fact that substantial numbers of Hispanic voters support Republicans should be ignored when determining whether a State has violated the Fourteenth or Fifteenth Amendments. None of these propositions is tenable. If DOJ is trying to assert that Hispanic voters' "preferred candidates of choice" means "Democrats," when more than 25% of Hispanic voters in Texas support Republicans, then DOJ has converted the Voting Rights Act into a Democratic candidate protection program.

DOJ's specific complaints about the state house map fare no better. House District 41 was drawn to protect Aaron Peña, a Hispanic Republican who was elected as a Democrat but switched parties. DOJ makes the astonishing claim that this effort to enhance the re-election prospects of a *Hispanic* incumbent in a predominantly Hispanic district is unconstitutional racial discrimination. But the goal of incumbent protection is constitutional, and a decision to move Democratic voters out of Representative Peña's district to enhance his re-election prospects will inevitably affect some minority Democratic voters. Had the legislature *not* acted to protect

28

Representative Peña, then DOJ might very well have cited that omission as evidence of racial bias because the 2011 plans took steps to protect other Republican incumbents throughout the state.   DOJ also claims that Representative Peña is *not* a "candidate of choice" of minority voters, even though Representative Peña is Hispanic and received substantial support from Hispanic voters.   Apparently Represenative Peña was a minority "candidate of choice" only up until the moment that he switched parties.

In Nueces County, population changes and the Texas Constitution's county-line rule required the Legislature to reduce the number of state house seats in that county from three to two.   *See, e.g.*, Opinion (Doc. 690) at 6–8. Because Nueces County's total SSVR was 49.5%, the Legislature did not believe it was possible to draw two majority-Hispanic districts that would qualify as ability-to-elect districts under section 5.[12]   Faced with this situation, the Legislature could either ensure that one district would qualify as a section 5 ability district, leaving the second as a Republican-leaning district, or risk allegations of cracking or retrogression.   It chose the first option.   All three Nueces County incumbents were Republicans; two were white and one was Hispanic.   Todd Hunter, one of the white Republican incumbents, who had far more seniority than the other two, was placed in the

---

[12] *See* Trial Tr. at 1449:19-23, 1452:10–14, 1498:14–18.

29

Republican-leaning district.  Representatives Connie Scott and Raul Torres, both freshmen, were paired in the second Nueces County district, which was expected to favor Democratic candidates (as it did in 2012, electing Democrat Abel Herrero).  It is absurd for DOJ to argue that Texas acted with racial animus by following its county-line rule.

Finally, in Harris County, the state house lines were drawn to protect Republican incumbents from Democratic voters, and the minority legislators who were "excluded" from the redistricting process were excluded because they were Democrats.  Hispanic Republicans (such as Representative Peña) were very much included in the redistricting process, and had any of the "excluded" legislators decided to switch parties as Representative Peña did they would doubtless have found the legislature far more solicitous of their concerns.

All that the plaintiffs and DOJ have shown is that the 2011 plans boosted the electoral prospects and voting power of white and minority Republicans and diminished the electoral prospects and voting power of white and minority Democrats.  That is not evidence of purposeful racial discrimination.  The plaintiffs and DOJ bear the burden of proof, and they have produced absolutely nothing to show that the 2011 redistricting process

targeted minority Democrats on account of their race rather than their political party.

The rancorous partisanship that characterizes the redistricting process may be offensive to neutral observers, including many judges who might prefer to see redistricting handled in a more dignified, non-partisan manner. But the Supreme Court could not be more clear: Politics defines the redistricting process, and that is perfectly constitutional.  Absent evidence of racial—not political—animus, it is not for judges to second-guess the legislative redistricting process.  *See, e.g.*, *Miller*, 515 U.S. at 915–16 ("The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus."); *White v. Weiser*, 412 U.S. 783, 795–96 (1973) ("[R]eapportionment is a complicated process. Districting inevitably has sharp political impact and inevitably political decisions must be made by those charged with the task."); *cf. Perry v. Perez*, 132 S. Ct. 934, 941 (2012) (per curiam) ("[E]xperience has shown the difficulty of defining neutral legal principles in this area, for redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment.").

**B. Even If This Court Concludes That The 2011 Plans Contained Intentional Racial Discrimination, No Constitutional Violations "Have Occurred" Because The Maps Never Went Into Effect.**

Even if this Court could conclude that the 2011 maps contained intentional racial discrimination, it is impossible for any court to find that "violations of the fourteenth or fifteenth amendment . . . *have occurred*" as a result of the 2011 plans. *See* 42 U.S.C. § 1973a(c) (emphasis added). The 2011 plans never took effect because they were never precleared, and they were repealed *before* the Supreme Court's ruling in *Shelby County*. Violations of the Fourteenth or Fifteenth Amendments do not "occur[]" until a State actually "deprive[s]" or "den[ies]" a person of due process or equal protection, or "denie[s]" or "abridge[s]" a citizen's right to vote on account of race. *See* U.S. CONST. amends. XIV, XV. The enactment of a law subject to a preclearance requirement does not result in a "violation" of the Fourteenth or Fifteenth Amendments, and the 2011 plans were repealed before they could "deprive" or "deny" or "abridge[]" the rights of any person or citizen. *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209 (2010) (contrasting the First Amendment, which is violated upon the enactment of a speech-restricting law, with the remaining provisions of the Bill of Rights, which are not violated until the executive acts).

**C. Even If This Court Concludes That The 2011 Plans Were The Product Of Intentional Racial Discrimination, This Case Does Not Present The Threat Of Pervasive, Flagrant, Widespread, and Rampant Constitutional Violations Needed To Justify Preclearance.**

Finally, even if this Court concludes that the 2011 maps were the product of intentional racial discrimination, the remedy of bail-in would not be congruent and proportional under *Shelby County*. Under *Shelby County*, preclearance remedies must be reserved for situations involving "'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination" that cannot be remedied through normal litigation. *See Shelby County*, 133 S. Ct. at 2629–30. The very same constitutional scrutiny applied by the Supreme Court to the legislative reauthorization of the section 4 coverage formula must be applied to any request for judicial bail-in under section 3(c).

*Shelby County* threw out Congress's reauthorization of a preclearance regime because the legislative record failed to show "anything approaching the 'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination that faced Congress in 1965, and that clearly distinguished the covered jurisdictions from the rest of the Nation at that time." *Id.* at 2629. No less of a showing can be required when a court (rather than a legislature) attempts to place a sovereign State into federal receivership. Judicially imposed

preclearance cannot survive constitutional scrutiny absent findings of: (1) pervasive, flagrant, widespread, rampant discrimination that cannot be remedied through traditional litigation; and (2) discrimination that "clearly distinguish[es] the covered jurisdiction[] from the rest of the Nation." *See id.* The plaintiffs and DOJ come nowhere close to making the first showing, and they do not even attempt to make the second.

As for the first required showing, even assuming that the 2011 plans contained constitutional violations, Texas's decision to enact new redistricting plans is nothing like the recalcitrant southern jurisdictions' efforts to "stay one step ahead" of the courts, as DOJ suggests. *See* Statement of U.S. at 11. The Legislature enacted the 2013 maps, based on this Court's interim plans, to address what this Court found were not-insubstantial claims against the 2011 plans. And although the constitutional attacks on the 2011 plans are meritless for the reasons discussed in Part II.A, the State enacted new plans to ensure that the 2014 elections can proceed under plans that will not be bogged down by threatened litigation. The enactment of the 2013 plans represents a good-faith response to the attacks on the 2011 maps, not a sinister plot to perpetuate racial discrimination.

Neither the plaintiffs nor DOJ provide any evidence to the contrary.[13] And in the unlikely event that the 2013 plans are proven to violate the Constitution or the Voting Rights Act, a court will remedy those violations, obviating any need for the sovereignty-infringing burdens of preclearance.

The plaintiffs and DOJ do not even attempt to make the other constitutionally required showing: that current conditions in Texas "clearly distinguish [it] from the rest of the Nation at [this] time." And they could not have made this showing had they tried. The congressional record in 2006 showed that blacks registered and voted at higher rates than whites in Texas in every federal election from 1996 to 2004, and Hispanic citizens in Texas

---

[13] The 2013 congressional plan addresses DOJ's claim of intentional discrimination in CD 9, CD 18, and CD 30 by reincorporating economic engines and offices moved to other districts in the 2011 plan, *cf.* Statement of Interest at 13; it restores the electoral performance in CD 23 to the level that existed in the benchmark plan (C100) and reunites Maverick County and the City of Eagle Pass, *cf. id.*; it maintains CD 33, now represented by Democratic Congressman Marc Veasey, which eliminates irregular district boundaries that drew objections in the 2011 plan, *cf. id.* at 14; and it reduces the percentage of minority population in CD 30 to address allegations of packing in the 2011 plan, *cf. id.* The 2013 Texas House redistricting plan reconfigures HD 117 to address claims of vote dilution, *cf. id.* at 15; it redraws the boundaries of HD 41 to address complaints about irregular district lines, *cf. id.* at 16; it maintains HD 35 as a new Hispanic opportunity district in Hidalgo and Cameron Counties, *cf. id.* at 15–16; and it restores HD 149 and maintains HD 144 as a new Hispanic opportunity-to-elect district, which offsets the alleged loss of a Hispanic opportunity district in Nueces County. *Cf. id.* at 17. The State denies DOJ's allegation that the Legislature eliminated a district from Nueces County for a racially discriminatory purpose. *See* Statement of Interest at 16. The Legislature apportioned two districts to Nueces County to comply with the Texas Constitution's whole-county requirement. *See* TEX. CONST. art. III, § 26 ("The members of the House of Representatives shall be apportioned among the several counties, according to the number of population in each, as nearly as may be, on a ratio obtained by dividing the number of population of the State, as ascertained by the most recent United States census, by the number of members of which the House is composed . . . ."). Nueces County is currently represented by Republican Todd Hunter and Democrat Abel Herrero.

registered to vote at higher rates than Hispanics in non-covered jurisdictions in every federal election from 1980 to 2002. *See* H.R. REP. NO. 109-478, at 14 (2006). These conditions distinguish Texas *favorably* from the rest of the nation, and they cannot be overlooked by courts that are asked to impose bail-in remedies in a post-*Shelby County* world.

### D. The Remaining Allegations Of Race Discrimination Are Not Constitutional Violations And Cannot Be Used To Support Bail-In.

The Task Force plaintiffs claim to have uncovered a "pattern of enacting unconstitutional redistricting maps" because "[t]welve of fifteen maps enacted by the Legislature since 1971 have not been implemented because they were racially discriminatory." Task Force Brief at 11. But of the fifteen plans identified by the Task Force as "unconstitutional," only two—not twelve—were actually found to violate the Constitution, one based on malapportionment under Article I § 2, *see White v. Weiser*, 412 U.S. at 790–93, the other based on unconstitutional vote dilution under the Fourteenth Amendment, *see White v. Regester*, 412 U.S. 755, 765–70 (1973).[14]

---

[14] In one case, the Texas Supreme Court held that the 1971 Texas House reapportionment plan violated the county-line rule contained in Article III, section 26, of the Texas Constitution. *See Smith v. Craddick*, 471 S.W.2d 375 (Tex. 1971). The court did not find that the redistricting plan violated the United States Constitution. Because the Texas Supreme Court invalidated the Legislature's 1971 House redistricting plan on state-law grounds, the Legislative Redistricting Board created a replacement plan, which was

None of the remaining thirteen plans was ever determined to be unconstitutional,[15] and the State has worked to reconcile its electoral maps with court orders, adopting court-ordered plans, in whole or in part, in all but one decennial redistricting cycle since 1970.[16]

The Joint Plaintiffs also seem to think that the appointment of federal observers under section 3(a) provides evidence of constitutional violations. *See* Joint Plaintiffs' Brief at 25 ("Section 3(a) shares with Section 3(c) the requirement of a finding of a constitutional violation.").  But not one of the cases they cite found intentional race-based discrimination in violation of the

---

challenged successfully in *Graves v. Barnes*, 343 F. Supp. 704 (W.D. Tex. 1972), *aff'd in part sub nom. White v. Regester*, 412 U.S. 755 (1973).

[15]  Nine of the plans drew DOJ objections under section 5, and one was modified based on section 2.  In at least one case, the court expressly disavowed any finding of intentional discrimination.  *See Seamon v. Upham*, 536 F. Supp. 931, 944 n.17 (E.D. Tex. 1982) ("This Court in no way intends to indicate that it has determined the State of Texas acted with a malevolent purpose in passing S.B. 1."), *vacated on other grounds*, 456 U.S. 37 (1982) (per curiam).

[16]  *See, e.g.*, Act of May 31, 1975, 64th Leg., Ch. 537, 1975 Tex. Gen. Laws 1390 (adopting a court-ordered congressional redistricting plan with a modification to the boundary between two districts); Act of May 10, 1983, 68th Leg., R.S., Ch. 185, 1983 Tex. Gen. Laws 756 (adopting modifications to the LRB's 1981 House redistricting plan ordered in *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982)); Act of May 28, 1983, 68th Leg., R.S., Ch. 531, 1983 Tex. Gen. Laws 3086 (enacting court-ordered congressional plan from *Seamon v. Upham* with changes to seven districts); Act of May 8, 1997, 75th Leg., R.S., 1997 Tex. Gen. Laws 258 (enacting a Texas House settlement plan entered in *Thomas v. Bush*, No. 1:95-CV-186-SS (W.D. Tex. Sept. 15, 1995), with minor changes to Collin, Jefferson, and Williamson Counties).  These redistricting bills are available, together with every redistricting bill introduced in the Texas Legislature between 1881 and 2013, from the Legislative Reference Library of Texas at http://www.lrl.state.tx.us/legis/redistricting/redistrictingBills.cfm (last visited August 1, 2013).

Fourteenth or Fifteenth Amendment.  In each case, the court immediately entered a consent decree addressing election-administration provisions of the Voting Rights Act.[17]  A State's decision to settle a case that does not allege violations of the Constitution does not establish that constitutional violations occurred.

### III.   BAIL-IN WILL IMPOSE ENORMOUS BURDENS ON THE STATE OF TEXAS AND THIS COURT.

The implications of section 3(c) bail-in are far-reaching for both this Court and the State.  DOJ urges this Court to

> impose Section 3(c) coverage on the State of Texas as to all voting changes for a ten-year period following the entry of a coverage order, and [to] consider extending the bail-in period beyond 10 years in the event of further discriminatory acts. This preclearance requirement would apply to any voting qualification or voting-related standard, practice, or procedure that the State enacts or seeks to administer that differs from that in force or effect . . . on May 9, 2011.

---

[17] *See United States v. Fort Bend County*, No. 4:09-cv-1058 (S.D. Tex. April 9, 2009), ECF Nos. 2, 4 (agreed proposed order adopting consent decree filed on same day as complaint, consent decree entered four days later); *United States v. Galveston County*, No. 3:07-cv-00377 (S.D. Tex. July 16, 2007), ECF Nos. 2, 5 (agreed motion for entry of consent decree filed on same day as complaint, consent decree entered four days later); *United States v. Brazos County*, No. 4:06-cv-2165 (S.D. Tex. June 29, 2006), ECF Nos. 4, 5 (joint stipulation requesting entry of proposed consent decree filed on same day as complaint, consent decree entered on the next day); *United States v. Hale County*, No. 5:06-cv-0043 (N.D. Tex. Feb. 27, 2006), ECF Nos. 1, 11 (consent decree entered two months after complaint filed); *United States v. Ector County*, No. 7:05-cv-131 (W.D. Tex. Aug. 23, 2005), ECF Nos. 3, 4 (joint stipulation requesting entry of proposed consent decree filed on same day as complaint, agreed judgment entered three days later).

38

Statement of Interest at 7–8 (internal citation and quotation marks omitted). While "the State" might be read to extend preclearance only to statewide voting changes, DOJ's request for bail-in relies on objections to "a broad spectrum of voting changes proposed by the State and its political subdivisions." Statement of Interest at 18; *see also id.* at 18–19.

Department of Justice regulations illustrate the breadth of the preclearance regime that DOJ and the plaintiffs ask this Court to impose and administer.  DOJ provides the following non-exhaustive list of covered voting changes:

> Changes affecting voting include, but are not limited to, the following examples:
>
> (a) Any change in qualifications or eligibility for voting.
>
> (b) Any change concerning registration, balloting, and the counting of votes and any change concerning publicity for or assistance in registration or voting.
>
> (c) Any change with respect to the use of a language other than English in any aspect of the electoral process.
>
> (d) Any change in the boundaries of voting precincts or in the location of polling places.
>
> (e) Any change in the constituency of an official or the boundaries of a voting unit (e.g., through redistricting, annexation, deannexation, incorporation, dissolution, merger, reapportionment, changing to at-large elections from district elections, or changing to district elections from at-large elections).
>
> (f) Any change in the method of determining the outcome of an election (e.g., by requiring a majority vote for election or the use of a designated post or place system).

39

(g) Any change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, or to become or remain holders of elective offices.

(h) Any change in the eligibility and qualification procedures for independent candidates.

(i) Any change in the term of an elective office or an elected official, or any change in the offices that are elective (e.g., by shortening or extending the term of an office; changing from election to appointment; transferring authority from an elected to an appointed official that, in law or in fact, eliminates the elected official's office; or staggering the terms of offices).

(j) Any change affecting the necessity of or methods for offering issues and propositions for approval by referendum.

(k) Any change affecting the right or ability of persons to participate in pre-election activities, such as political campaigns.

(l) Any change that transfers or alters the authority of any official or governmental entity regarding who may enact or seek to implement a voting qualification, prerequisite to voting, or standard, practice, or procedure with respect to voting.

28 C.F.R. § 51.13.  Even if preclearance were limited to State- and county-level voting changes, section 3(c) bail-in would make this Court responsible for monitoring every one of the above-listed voting changes in 255 jurisdictions.

DOJ's suggestion that administrative preclearance will reduce this burden is uncertain at best.  The choice between administrative and judicial preclearance lies entirely with the covered jurisdiction.  And unlike section 5,

40

which required covered jurisdictions to submit changes to the U.S. Attorney General or "institute an action in the United States District Court for the District of Columbia for a declaratory judgment," 42 U.S.C. § 1973c(a), section 3(c) requires judicial preclearance to take place in a local district court.  It is reasonable to expect that a jurisdiction faced with the choice of seeking administrative preclearance or filing a federal lawsuit in Washington, D.C., might proceed differently from a jurisdiction with the option of presenting a voting change to a Texas federal court already vested with continuing jurisdiction under section 3(c).

## CONCLUSION

The Court should deny the plaintiffs' request for relief under section 3(c).

41

Dated: August 5, 2013               Respectfully submitted.

                                    GREG ABBOTT
                                    Attorney General of Texas

                                    DANIEL T. HODGE
                                    First Assistant Attorney General

                                    JAMES D. BLACKLOCK
                                    Deputy Attorney General for Legal
                                    Counsel

                                    J. REED CLAY, JR.
                                    Special Assistant and Senior Counsel
                                    to the Attorney General

                                    /s/ Jonathan F. Mitchell
                                    JONATHAN F. MITCHELL
                                    Solicitor General

                                    PATRICK K. SWEETEN
                                    Division Chief
                                    Special Litigation Division

                                    MATTHEW H. FREDERICK
                                    Assistant Solicitor General

                                    ANGELA V. COLMENERO
                                    Assistant Attorney General

                                    P.O. Box 12548, Capitol Station
                                    Austin, TX 78711-2548
                                    (512) 463-0150
                                    (512) 936-0545 (fax)

                                    **ATTORNEYS FOR THE STATE OF
                                    TEXAS, RICK PERRY, AND JOHN
                                    STEEN**

42

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this filing was sent on August 5, 2013, via the Court's electronic notification system and/or email to the following counsel of record:

DAVID RICHARDS
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
512-476-0005
davidr@rrsfirm.com

RICHARD E. GRAY, III
Gray & Becker, P.C.
900 West Avenue, Suite 300
Austin, TX 78701
512-482-0061/512-482-0924 (facsimile)
Rick.gray@graybecker.com

**ATTORNEYS FOR PLAINTIFFS PEREZ, DUTTON, TAMEZ, HALL, ORTIZ, SALINAS, DEBOSE, and RODRIGUEZ**

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
210-392-2856
garzpalm@aol.com

MARK W. KIEHNE
mkiehne@lawdcm.com
RICARDO G. CEDILLO
rcedillo@lawdcm.com
Davis, Cedillo & Mendoza
McCombs Plaza
755 Mulberry Ave., Ste. 500

GERALD H. GOLDSTEIN
ggandh@aol.com
DONALD H. FLANARY, III
donflanary@hotmail.com
Goldstein, Goldstein and Hilley
310 S. St. Mary's Street
San Antonio, TX 78205-4605
210-226-1463/210-226-8367 (facsimile)

PAUL M. SMITH, MICHAEL B. DESANCTIS, JESSICA RING AMUNSON
Jenner & Block LLP
1099 New York Ave., NW
Washington, D.C. 20001
202-639-6000

J. GERALD HEBERT
191 Somervelle Street, # 405
Alexandria, VA 22304
703-628-4673
hebert@voterlaw.com

JESSE GAINES
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

**ATTORNEYS FOR PLAINTIFFS QUESADA, MUNOZ, VEASEY, HAMILTON, KING and JENKINS**

43

San Antonio, TX 78212
210-822-6666/210-822-1151 (facsimile)

**ATTORNEYS FOR MEXICAN
AMERICAN LEGISLATIVE CAUCUS**

NINA PERALES
nperales@maldef.org
MARISA BONO
mbono@maldef.org
Mexican American Legal Defense
and Education Fund
110 Broadway, Suite 300
San Antonio, TX 78205
210-224-5476/210-224-5382 (facsimile)
MARK ANTHONY SANCHEZ
masanchez@gws-law.com
ROBERT W. WILSON
rwwilson@gws-law.com
Gale, Wilson & Sanchez, PLLC
115 East Travis Street, Ste. 1900
San Antonio, TX  78205
210-222-8899/210-222-9526 (facsimile)

**ATTORNEYS FOR TEXAS LATINO
REDISTRICTING TASK FORCE,
CARDENAS, JIMENEZ, MENENDEZ,
TOMACITA AND JOSE OLIVARES,
ALEJANDRO AND REBECCA ORTIZ**

JOHN T. MORRIS
5703 Caldicote St.
Humble, TX 77346
281-852-6388

**JOHN T. MORRIS, PRO SE**

LUIS ROBERTO VERA, JR.
Law Offices of Luis Roberto Vera, Jr. &
Associates
1325 Riverview Towers
San Antonio, Texas 78205-2260
210-225-3300
irvlaw@sbcglobal.net
GEORGE JOSEPH KORBEL
Texas Rio Grande Legal Aid, Inc.
1111 North Main
San Antonio, TX  78213
210-212-3600
korbellaw@hotmail.com

**ATTORNEYS FOR INTERVENOR-
PLAINTIFF LEAGUE OF UNITED
LATIN AMERICAN CITIZENS**

ROLANDO L. RIOS
Law Offices of Rolando L. Rios
115 E Travis Street, Suite 1645
San Antonio, TX 78205
210-222-2102
rrios@rolandorioslaw.com

**ATTORNEY FOR INTERVENOR-
PLAINTIFF HENRY CUELLAR**

GARY L. BLEDSOE
Law Office of Gary L. Bledsoe
316 W. 12th Street, Ste. 307
Austin, TX  78701
512-322-9992/512-322-0840 (facsimile)
garybledsoe@sbcglobal.net

**ATTORNEY FOR INTERVENOR-
PLAINTIFFS TEXAS STATE
CONFERENCE OF NAACP
BRANCHES, TEXAS LEGISLATIVE**

44

MAX RENEA HICKS
Law Office of Max Renea Hicks
101 West Sixth Street Suite 504
Austin, TX 78701
512-480-8231/512/480-9105 (facsimile)

**ATTORNEY FOR PLAINTIFFS CITY
OF AUSTIN, TRAVIS COUNTY, ALEX
SERNA, BEATRICE SALOMA, BETTY
F. LOPEZ, CONSTABLE BRUCE
ELFANT, DAVID GONZALEZ, EDDIE
RODRIGUEZ, MILTON GERARD
WASHINGTON, and SANDRA SERNA**

STEPHEN E. MCCONNICO
smcconnico@scottdoug.com
SAM JOHNSON
sjohnson@scottdoug.com
S. ABRAHAM KUCZAJ, III
akuczaj@scottdoug.com
Scott, Douglass & McConnico
One American Center
600 Congress Ave., 15th Floor
Austin, TX 78701
512-495-6300/512-474-0731 (facsimile)

**ATTORNEYS FOR PLAINTIFFS CITY
OF AUSTIN, TRAVIS COUNTY, ALEX
SERNA, BALAKUMAR PANDIAN,
BEATRICE SALOMA, BETTY F.
LOPEZ, CONSTABLE BRUCE
ELFANT, DAVID GONZALEZ, EDDIE
RODRIGUEZ, ELIZA ALVARADO,
JOSEY MARTINEZ, JUANITA
VALDEZ-COX, LIONOR SOROLA-
POHLMAN, MILTON GERARD
WASHINGTON, NINA JO BAKER, and
SANDRA SERNA**

**BLACK CAUCUS, EDDIE BERNICE
JOHNSON, SHEILA JACKSON-
LEE, ALEXANDER GREEN,
HOWARD JEFFERSON, BILL
LAWSON, and JUANITA WALLACE**

VICTOR L. GOODE
Asst. Gen. Counsel, NAACP
4805 Mt. Hope Drive
Baltimore, MD  21215-5120
410-580-5120/410-358-9359 (facsimile)
vgoode@naacpnet.org

**ATTORNEY FOR TEXAS STATE
CONFERENCE OF NAACP
BRANCHES**

ROBERT NOTZON
Law Office of Robert S. Notzon
1507 Nueces Street
Austin, TX  78701
512-474-7563/512-474-9489 (facsimile)
robert@notzonlaw.com
ALLISON JEAN RIGGS
ANITA SUE EARLS
Southern Coalition for Social Justice
1415 West Highway 54, Ste. 101
Durham, NC  27707
919-323-3380/919-323-3942 (facsimile)
anita@southerncoalition.org

**ATTORNEYS FOR TEXAS STATE
CONFERENCE OF NAACP
BRANCHES, EARLS, LAWSON,
WALLACE, and JEFFERSON**

45

CHAD W. DUNN
chad@brazilanddunn.com
K. SCOTT BRAZIL
scott@brazilanddunn.com
Brazil & Dunn
4201 FM 1960 West, Suite 530
Houston, TX  77068
281-580-6310/281-580-6362 (facsimile)

**ATTORNEYS FOR INTERVENOR-
DEFENDANTS TEXAS DEMOCRATIC
PARTY and BOYD RICHIE**

*Via Email*
JOAQUIN G. AVILA
P.O. Box 33687
Seattle, WA  98133
206-724-3731/206-398-4261
jgavotingrights@gmail.com

**ATTORNEYS FOR MEXICAN
AMERICAN LEGISLATIVE CAUCUS**

KAREN M. KENNARD
2803 Clearview Drive
Austin, TX 78703
(512) 974-2177/512-974-2894
karen.kennard@ci.austin.tx.us

**ATTORNEY FOR PLAINTIFF
CITY OF AUSTIN**

DONNA GARCIA DAVIDSON
PO Box 12131
Austin, TX 78711
512-775-7625/877-200-6001 (facsimile)
donna@dgdlawfirm.com
FRANK M. REILLY
Potts & Reilly, L.L.P.
P.O. Box 4037
Horseshoe Bay, TX 78657
512-469-7474/512-469-7480 (facsimile)
reilly@pottsreilly.com
**ATTORNEYS FOR DEFENDANT
STEVE MUNISTERI**

DAVID ESCAMILLA
Travis County Asst. Attorney
P.O. Box 1748
Austin, TX 78767
(512) 854-9416
david.escamilla@co.travis.tx.us

**ATTORNEY FOR PLAINTIFF
TRAVIS COUNTY**

/s/  Jonathan F. Mitchell
JONATHAN F. MITCHELL
Solicitor General

46