UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SHANNON PEREZ; HAROLD DUTTON, JR.; GREGORY TAMEZ; SERGIO SALINAS; CARMEN RODRIGUEZ; RUDOLFO ORTIZ; NANCY HALL and DOROTHY DEBOSE | ) ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs | ) | **11-CA-360-OLG-JES-XR** |
| | ) | CONSOLIDATED ACTION |
| | ) | [Lead case] |
| v. | ) | |
| | ) | |
| STATE OF TEXAS; RICK PERRY, in his official capacity as Governor of the State of Texas; DAVID DEWHURST, in his official capacity as Lieutenant Governor of the State of Texas; JOE STRAUS, in his official capacity as Speaker of the Texas House of Representatives; JOHN STEEN, in his official capacity as Secretary of State of the State of Texas | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | | |

**O R D E R**

After careful deliberation, the Court grants the parties' request to amend their

pleadings and denies Defendants' motion to dismiss the 2011 claims as moot. All legal

challenges and requests for injunctive, declaratory and equitable relief relating to the

2011 and 2013 enacted plans will remain in this Court. The Court has also concluded,

however, that a full, fair and final review of all issues before this Court cannot be

completed prior to the upcoming deadlines for the 2014 elections. Thus, for reasons

explained herein, the Court ORDERS that the 2013 enacted plans for the United

States House of Representatives (Plan C235) and the Texas House of Representatives

(Plan H358) be used as interim plans for the 2014 elections.[1]  These plans are being used on an interim basis only, and nothing in this order should be construed as a ruling on the merits of any claims, causes of actions, or requests for relief that have been asserted in this consolidated action.

## I. Procedural history

In June 2011, the 82nd Legislature for the State of Texas, in its first called special session, enacted House Bill 150 (Plan H283) to establish new districts for the Texas House of Representatives.  House Bill 150 was signed into law on or about June 17, 2011.  The Legislature also enacted Senate Bill 4 (Plan C185) to establish new congressional districts for the State of Texas.  Senate Bill 4 was signed into law on or about July 18, 2011.  On July 19, 2011, the Attorney General for the State of Texas petitioned the U.S. District for the District of Columbia ("the D.C. Court") for preclearance under § 5 of the Voting Rights Act.

In response, Plaintiffs filed several lawsuits asserting challenges to the 2011 plans under § 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.  They sought declaratory and injunctive relief, and asked the Court to enjoin the implementation of both plans pending preclearance. The lawsuits were transferred and consolidated into one action, a three-judge panel was convened, and this consolidated lawsuit proceeded accordingly.

In September 2011, with the 2012 primary elections on the horizon, this Court enjoined the implementation of the unprecleared 2011 plans and held a bench trial to

---

[1] No challenges are raised with regard to the Senate map enacted by the Texas Legislature in the 2013 session.

hear evidence on the § 2 and constitutional challenges to the plans.  But the law precluded this Court from issuing a decision on the merits until a final decision on preclearance was rendered.  By October 2011, it was clear that a final decision on preclearance would not be forthcoming in time for the 2012 elections.  This Court began its work on interim court-ordered plans and extended the election deadlines.[2]

In November 2011, the Court adopted interim plans H302 and C220.  The State of Texas appealed, and sought to stay the interim plans pending appeal.  The U.S. Supreme Court granted the stay and noted probable jurisdiction.  In January 2012, the Supreme Court issued its decision, clarifying the governing legal standards and remanding to this Court for further proceedings.  *See Perry v. Perez*, 565 U.S. __, 132 S. Ct. 934 (2012)(per curiam).

Under severe time restraints, this Court undertook the task of crafting a second set of interim plans, applying the legal standards imposed by the Supreme Court.  On February 28, 2012, because there still had been no ruling on preclearance from the D.C. Court, this Court adopted Plans H309 and C235 as interim plans to be used for the 2012 elections.  Docket nos. 681, 682.  No appeal was taken.  The Court expressly noted that the interim maps were based on preliminary determinations under the *Perry v. Perez* standard and did not constitute rulings on the merits of the claims.  A majority of Plaintiffs argued that the interim maps did not resolve all of their claims and concerns, and asserted that further relief would be required in a final remedial plan rendered after a decision on preclearance.

---

[2] The pre-census plans could not be used because the tremendous population growth rendered them inconsistent with one-person, one-vote requirements.

Faced with yet another set of redistricting maps, election officials advised the Court that they could not possibly meet the deadlines for the upcoming election. In March 2012, the Court extended the deadlines once again and the 2012 elections proceeded under Plans H309 and C235.

In August 2012, the D.C. Court issued its opinion on § 5 issues, denying preclearance on the 2011 enacted plans. *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012). With regard to the Congressional plan, the D.C. Court found the plan retrogressive, and denied preclearance on that basis. In addition, with regard to the Black ability districts, the D.C. Court found that the changes to the districts were not retrogressive, but "they raise serious concerns about what motivated the Congressional Plan." 887 F. Supp. 2d at 159-60. Specifically, the Court noted that "substantial surgery" was done on the Black ability districts, but not on any Anglo districts. The Court concluded, "Texas did not adequately engage with the evidence raised by the other parties on this point, and under *Arlington Heights* we find sufficient evidence to conclude that the Congressional Plan was motivated, at least in part, by discriminatory intent." *Id.* at 161. With regard to the Texas House plan, the D.C. Court found that the enacted plan had the "effect of abridging minority voting rights in four ability districts – HD's 33, 35, 117 and 149 – and that Texas did not create any new ability districts to offset those losses." *Id.* at 51. Thus, the enacted plan was retrogressive and could not be precleared. *Id.* The D.C. Court also expressed concern about the manner in which the mapdrawers used "deliberate, race-conscious method[s]" to dilute minority voting power, specifically noting the manner in which they switched high-turnout for low-turnout Hispanic voters and cracked VTD's along racial lines. *Id.* at 70-71.

4

Because the plan was retrogressive, the D.C. Court did not need to reach the issue of discriminatory purpose, but concluded that "at a minimum, . . . the retrogressive effect . . . may not have been accidental." *Id.* at 71.  The State appealed to the Supreme Court, and the appeal of the preclearance issues remained pending at the same time the Supreme Court considered the *Shelby County* case.  During the pendency of the Supreme Court proceedings, the Texas Legislature was also in session and further redistricting was a clear possibility.  With so many contingent possibilities that would change the course of these proceedings, this Court had no choice but to wait for the outcome.

By the end of May 2013, the Legislature's regular session ended with no redistricting action.  But the Governor called the Legislature back for the first called special session to consider "legislation which ratifies and adopts the interim redistricting plans ordered by the federal district court as the permanent plans for districts used to elect members of the Texas House of Representatives, Texas Senate and United States House of Representatives."  The Legislature reconvened and undertook this redistricting task while the Supreme Court continued to deliberate the § 5 issues pending before it.

By June 23, 2013, the Legislature had passed S.B. 3 (Plan H358) and S.B. 4 (Plan C235) to enrollment.  *See* S.B. 3 and S.B. 4, 83rd Legislature, 1st Called Session. Senate Bill 4 "ratified and adopted" this Court's interim Congressional map, Plan C235, without change, and repealed Senate Bill 4 from the 2011 first special session, which adopted Plan C185.  Senate Bill 3 adopted Plan H358 as the plan for the Texas House of Representatives and repealed H.B. 150 from the 2011 regular session, which

adopted Plan H283.   Plan H358, the plan for the Texas House of Representatives, had slight changes from the 2012 interim plan.   The plans were sent to Governor Perry for approval on June 24, 2013.

On June 25, 2013, while the appeal of the D.C. Court's decision on preclearance was pending, the Supreme Court decided *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), striking down the coverage formula in § 4(b) of the Voting Rights Act which, in turn, means that Texas is no longer automatically subject to § 5 preclearance requirements.   On June 26, 2013, the Governor signed the redistricting plans into law. The plans for the Texas and U.S. House do not become effective until September 24, 2013.  *See* Tex. Const. Art. III § 39.

On June 27, 2013, the Supreme Court vacated the D.C. Court's judgment denying preclearance of the 2011 plans and remanded the case for further consideration in light of *Shelby County* and the suggestion of mootness of appellees Wendy Davis, et al.  *See Texas v. United States*, 133 S. Ct. 2885 (June 27, 2013).[3]

Despite two years of litigation on the 2011 plans, the course of these proceedings changed dramatically with a significant change in voting rights law and newly enacted redistricting plans.   With the demise of § 4(b), Plaintiffs were forced to take a new look at § 3(c) and the 2013 enacted plans and make decisions on how they wished to proceed.   On June 28, Defendants filed a motion to dismiss for lack of subject matter jurisdiction, arguing that the case had become moot and should be dismissed.  *See* docket no. 768.   Specifically, Defendants argued that passage of the new plans in the

---

[3] On remand, Texas has moved to dismiss the case as moot, and the United States does not oppose the motion.   Some defendants in the D.C. case have, however, sought leave to amend to assert counterclaims for relief under § 3(c) of the VRA.   Those motions remain pending.

2013 special legislative session repealed the 2011 plans, which are the subject of this lawsuit, and that the vacated 2011 plans can never be used to conduct any election and therefore pose no threat of injury to Plaintiffs.   Therefore, Defendants asserted, because the 2011 plans pose no threat and "any order regarding the 2011 plans can provide no effectual relief," the case should be dismissed as moot.

This Court held a status conference on July 1, 2013.  At the hearing, Plaintiffs expressed a desire to amend their complaints to challenge the 2013 plans, and some Plaintiffs stated their intent to amend their existing claims related to the 2011 plans to seek relief under § 3(c) of the Voting Rights Act.  After the status conference, the Court issued an order summarily denying the motion to dismiss for lack of jurisdiction without prejudice (docket no. 771) and issued an order directing Plaintiffs to file motions for leave to amend pleadings by July 12.  The Court also provided a schedule for interim attorneys' fees requests, briefs on § 3(c), and submission of parts of the D.C. record to begin supplementing the record herein.

In accordance with the Court's order, Plaintiffs filed their motions for leave to amend their pleadings on July 12, 2013.  Various Plaintiffs seek leave to amend to assert § 2 and Fourteenth and Fifteenth Amendment claims against Plans C235 and H358, as well as equitable relief under § 3(c) of the Voting Rights Act.  Some Plaintiffs maintain their § 2 and constitutional claims against the 2011 plans and seek leave to amend to request equitable relief under § 3(c) of the Voting Rights Act with regard to the 2011 plans.   And some Plaintiffs seek leave to amend to assert political gerrymandering claims against the 2013 Congressional and Texas House plans.

7

On July 19, 2013, the State filed a response in opposition to the motions for leave to amend, along with a motion to dismiss as moot all claims related to the 2011 plans. Docket no. 786. Plaintiffs filed a response to Defendants' motion to dismiss and their various replies on August 5, 2013.

On July 22, 2013, Plaintiffs filed their motion for leave to re-open and supplement the record with approximately 400 documentary exhibits from the D.C. record. The State filed a response and objections on August 5, 2013. The Latino Task Force also file a motion to supplement the record with testimonial evidence from the D.C. case. On August 9, 2013, Defendants filed a response in opposition thereto. All parties simultaneously filed briefs on § 3(c), and the U.S. Department of Justice filed a Statement of Interest on or about July 25, 2013. Responses to the § 3(c) briefs were filed on August 5, 2013.

On August 9 and 19, 2013, Plaintiffs filed motions for interim attorneys' fees, and Defendants have filed responses in opposition. On August 22, 2013, the United States filed an opposed motion to intervene.

## II. Motions for Leave to Amend and Mootness of 2011 Claims

This section addresses the following motions: (1) motions for leave to amend pleadings filed by Congressman Cuellar (docket no. 774); the NAACP, African-American Congresspersons, LULAC, Rodriguez Plaintiffs, and Quesada Plaintiffs (docket no. 776); the Perez Plaintiffs (docket no. 777); the Mexican American Legislative Caucus (docket no. 779); and John Morris (docket no. 784); (2) the motion for leave to supplement pleadings by the Texas Latino Redistricting Task Force (docket no. 780); (3) the motion for leave to file amended cross-claim by the Texas Democratic

Party (docket no. 778); and (4) Texas's motion to dismiss Plaintiffs' claims against the 2011 Plans as moot (docket no. 786).

Congressman Cuellar seeks leave to amend to assert § 2 and Fourteenth and Fifteenth Amendment claims against Plan C235 "on the same grounds as the original pleadings" directed at Plan C185.  Docket no. 774.[4]   The NAACP Plaintiffs, the African-American Congressional Plaintiffs, LULAC, the Quesada Plaintiffs, and the Rodriguez Plaintiffs seek leave to amend to assert § 2 and Fourteenth and Fifteenth Amendment claims against Plan C235.  Docket no. 776.  Some of these Plaintiffs also seek leave to amend to request relief under § 3(c) of the Voting Rights Act.[5]   The Perez Plaintiffs seek leave to amend to assert claims under § 2 and the Constitution against the 2013 plans, but do not request relief under § 3(c).  Docket no. 777.  Plaintiff Texas Latino Redistricting Task Force's proposed amended complaint maintains its challenges to the 2011 Texas House and Congressional plans, and seeks to add these same claims under § 2 and Fourteenth and Fifteenth Amendment against Plan H358. The Task Force also raises specific challenges to changes made in HD 90 from the Court's interim plan.  The Task Force does not assert any claims against C235 and

---

[4] It is unclear whether Congressman Cuellar seeks to maintain his claims against Plan C185 or intends to assert claims only against Plan C235 in the proposed amended complaint.

[5] It is unclear from the proposed amended complaints submitted by the NAACP Plaintiffs, the African American Congressional Plaintiffs, the LULAC Plaintiffs, and the Rodriguez Plaintiffs whether they are continuing to assert claims (and adding a request for § 3(c) relief) against the 2011 plans, or only wish to pursue claims against the 2013 plans.  The Quesada Plaintiffs' proposed amended complaint asserts claims only against the 2013 plans, and does not seek relief under § 3(c).  Defendants assert that the NAACP Plaintiffs, African American Congressional Plaintiffs, LULAC Plaintiffs, Rodriguez Plaintiffs, and the Quesada Plaintiffs "drop[ped] all moot claims against the 2011 maps."  Docket no. 786 at 1.  However, in their joint Reply brief, docket no. 839, these Plaintiffs argue that challenges to the 2011 plans are not moot, suggesting that at least some of these Plaintiffs are intending to maintain claims against the 2011 plans.

does not seek relief under § 3(c).[6] Plaintiff MALC's proposed amended complaint maintains its § 2 and constitutional claims against the 2011 plans, adds these same claims against the 2013 plans, and adds a request for relief under § 3(c) with regard to the claims against both the 2011 and 2013 plans.  Docket no. 779.[7]

The Texas Democratic Party, Gilberto Hinojosa, and Plaintiff John Morris seek leave to amend their pleadings to assert political gerrymandering claims against the 2013 plans.  Docket nos. 778 & 784.[8]

Defendants oppose Plaintiffs' motions to amend, asserting that the 2011 plan claims are moot and that amendment with regard to the 2013 plans is precluded by the jurisdictional limits of 28 U.S.C. § 2284.  Defendants argue that the 2011 plan claims are moot because those plans have been effectively repealed and even though the new plans will not go into effect until September 24, 2013, the 2011 plans will not be used for any future election.  Thus, Defendants argue, Plaintiffs cannot be injured by the 2011 plans, and the 2011 plan claims must be dismissed now, or, in the alternative, on September 24, 2013.  Defendants contend that leave to amend to assert claims against the 2013 plans cannot be granted because the 2013 plans are new apportionments, which require the convening of a new three-judge court.

---

[6] The Task Force's proposed amended complaint retains all its claims against the 2011 plans, including Count 4, which alleges that Plans C185 and H283 (the 2011 plans) have not received required preclearance under § 5.  It appears that Count 4 was included as an oversight.

[7] MALC's proposed Third Amended Complaint includes a prayer for "[a]n order requiring all Defendants to comply with Section 2 and comply with the Section 5 preclearance requirements of the Voting Rights Act as provided by Section 3(a) of the Act."  Docket no. 779-1 (Third Amended Complaint at 18, Prayer ¶ C).  However, based on the parties' briefing and MALC's statement in open court that it intended to assert a claim under § 3(c), the Court presumes that this is a typographical error.

[8] The Court previously dismissed the political gerrymandering claims against the 2011 plans.

The Court must therefore decide the following issues: (1) whether Plaintiffs' claims against the 2011 plans are moot and whether Plaintiffs may amend to request § 3(c) relief with regard to their 2011 plan claims; (2) whether Plaintiffs should be permitted to amend their complaints to assert § 2 and constitutional claims (and a request for relief under § 3(c)) against the 2013 plans and whether such amendment is precluded by § 2284; and (3) whether the Texas Democratic Party, Gilberto Hinojosa, and John Morris should be permitted to amend to assert political gerrymandering claims against the 2013 plans.

A.     The 2011 Plan Claims

Defendants contend that Plaintiffs' claims against the 2011 plans must be dismissed as moot.  Defendants cite numerous decisions setting forth the standard for Article III standing to support their argument.  However, the Supreme Court has made clear that the standards for standing and mootness are not identical.  To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).  In other words, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the "threatened injury [is] certainly impending." *Id.* at 190.

In contrast, the standard for determining whether a case seeking prospective relief has been mooted by the defendant's voluntary conduct is whether "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189.  The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness. *Id.*; *see also Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) (in determining whether a request for declaratory judgment has become moot, the question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment").[9]

Thus, although it may affect the scope of the remedy, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.*; *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (defendant's declaration of intent not to revive challenged practice "does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts").  "Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *W.T. Grant*, 345 U.S. at 633.  "But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent

---

[9] Because of the different standards for initial standing and subsequent mootness, a defendant's voluntary action after suit is filed may not necessarily moot a claim, even though the plaintiff would have lacked initial standing had she filed her complaint after the defendant's voluntary action took place. *Id.* at 191.

violation, something more than the mere possibility which serves to keep the case alive." *Id.* "To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id.*

Defendants fail to meet their burden of demonstrating that the conduct alleged to violate § 2 and the Constitution with regard to the 2011 plans could not reasonably be expected to recur.  Although the 2011 plans have been repealed, the Supreme Court has held that repeal of a challenged law does not render a case moot if there is a reasonable possibility that the government would reenact the law if the proceedings were dismissed.  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982). Similarly, the fact that a challenged law is amended does not alone moot the underlying claim unless the law has been sufficiently altered so as to present a substantially different controversy.  *Ne. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville,*, 508 U.S. 656, 662 & n.3 (1993).

The 2013 plans are heavily derived from the 2011 plans, given the deferential standard required by the application of *Perry v. Perez.*  Plaintiffs contend that many of the alleged violations of the Voting Rights Act and the Constitution in the 2011 plans persist in the 2013 plans, though some perhaps to a lesser degree.  Most Plaintiffs  contend that the interim plans did not go far enough in curing the alleged intentional racial discrimination, and argue that the Legislature ignored these concerns when adopting the interim plans in 2013.  Like the amended ordinance in *Associated General Contractors*, the new plans may disadvantage Plaintiffs to a lesser degree, but they disadvantage them in the same fundamental way.  Therefore,

Plaintiffs allege that they are still suffering injury from the 2011 plans, even if they are repealed.

Moreover, there is no indication or assurance that, in the next redistricting cycle, the Texas Legislature will not engage in the same alleged conduct that Plaintiffs assert violated their rights, including removing economic engines from minority districts, dismantling coalitions, manipulating voter turnout among Hispanics, or engaging in other conduct that Plaintiffs allege violated their rights in connection with the 2011 plans. While Texas may have voluntarily ceased or diminished the allegedly illegal conduct, it has not conceded the illegality of the conduct and has steadfastly maintained that its actions did not violate Plaintiffs' rights. The fact that the Legislature has adopted the Court's interim plans in an attempt to curb this particular litigation is no assurance that it will not engage in the same conduct in the next legislative session or any session thereafter. Thus, a dispute remains over the legality of the challenged practices, there is no assurance that the conduct will not recur, and Plaintiffs maintain a personal stake in the controversy. Given these circumstances, the Court finds that there exists some cognizable danger of recurrent violation such that Plaintiffs' claims for declaratory and injunctive relief with regard to the 2011 plans are not moot.

Further, some Plaintiffs seek leave to amend to request equitable relief under § 3(c) premised on their claims of intentional racial discrimination in the 2011 plans. Therefore, even if the Court ultimately declines to award injunctive relief, it may find that declaratory relief and equitable relief under § 3(c) are appropriate. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, ___ U.S. ___, ___, 132 S. Ct. 2277, 2287 (2012) ("A

case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing 'party.'"); *Blackmoon v. Charles Mix County*, 505 F. Supp. 2d 585, 592-93 (D.S.D. 2007) (holding that the plaintiffs' claims against districts no longer in place were not moot because of the possibility of relief under § 3(a)). Although the State vigorously opposes the availability of § 3(c) relief, Plaintiffs' claim for § 3(c) relief is certainly not so implausible that it is insufficient to preserve jurisdiction. *See Chafin v. Chafin*, ___ U.S. ___, ___, 133 S. Ct. 1017, 1026-27 (2013) (holding that uncertainty as to relief does not render a case moot and even availability of a partial remedy is sufficient to prevent a case from being moot).

Accordingly, Plaintiffs' claims for declaratory and injunctive relief with regard to the 2011 plans are not moot now, nor will they become moot on September 24, 2013, and Plaintiffs may maintain them and may assert claims for relief under § 3(c) with regard to the 2011 plans. We emphasize that, in holding that Plaintiffs' 2011 plan claims are not moot, we express no opinion on the merits of those claims or on the request for relief under § 3(c). We simply hold that the claims are not moot.

B.    The 2013 Plan Claims

Defendants concede that, in the ordinary case, Plaintiffs would be permitted to amend their pleadings to add claims against the 2013 plans. *See* docket no. 786 at 8-9 (citing *Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990); *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 415 (1972)). The Court agrees that amendment or supplementation to add § 2 and constitutional claims (including relief under § 3(c)) against the newly enacted plans is appropriate.

15

However, Defendants assert that, because this is a three-judge court empaneled pursuant to 28 U.S.C. § 2284, Plaintiffs must file a new lawsuit and request a new three-judge court to proceed with their claims against the new plans.  Section 2284(a) states, "A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."  28 U.S.C. § 2284(a).  Defendants argue that this case presents an issue of first impression regarding whether Plaintiffs may amend their pleadings and continue their lawsuit in the present case, before the same three-judge court, or whether they must dismiss this action and file a new one.  Defendants state that this potential jurisdictional defect can be avoided "[f]or the price of a filing fee."  Docket no. 786 at 10.

As Plaintiffs note, however, the plain language of § 2284 does not require appointing a three-judge court every time an apportionment is challenged.  If that were the case, presumably this action would have required appointment of two three-judge courts, one for the Texas House challenge and one for the Congressional plan challenge.  Rather, the plain language requires that the three-judge court be convened "when an action is filed" challenging apportionment.  That was done in this case. Because the original 2011 plan claims are not moot and amendment to assert claims against the 2013 plans is appropriate, the Court concludes that § 2284 presents no jurisdictional bar.

C.     Political Gerrymandering Claims

Defendants contend that the Texas Democratic Party and Hinojosa seek "to include a (now moot) illegal-gerrymandering 'claim' against the 2011 plans," and argue that "the Court should refuse permission to introduce moot claims into this lawsuit." These Plaintiffs originally challenged the 2011 plans on two bases: (1) § 5 preclearance; and (2) illegal political gerrymandering.  They seek to amend to "drop the Section 5 claim" but preserve the political gerrymandering claim.  The proposed amended complaint therefore maintains the political gerrymandering claim against the 2011 plan and adds a political gerrymandering claim against the 2013 plans.  However, the proposed amended complaint, if filed, would not "introduce" a moot claim into this case. The political gerrymandering claims against the 2011 plans are the same claims that were originally filed; they have already been and will remain dismissed, and will not be revived simply by the filing of the amended complaint.  Accordingly, the Court will permit the Texas Democratic Party and Gilberto Hinojosa, as well as John Morris, to file amended complaints that add political gerrymandering claims against the 2013 plans.

D.     Conclusion

The Court therefore makes the following rulings:

Plaintiffs' 2011 plan claims are not moot and Plaintiffs may amend their complaints to add requests for relief under § 3(c) of the Voting Rights Act.  Defendants' motion to dismiss the 2011 plan claims as moot (docket no. 786) is DENIED.

After the Supreme Court's decision in *Shelby County*, the Task Force Plaintiffs filed an emergency motion to amend the injunction preventing use of the 2011 plans

because they had not been precleared.  Since Texas has repealed the 2011 plans and does not intend to implement them, and they remain enjoined in any event unless and until the Court lifts the injunction, the motion (docket no. 761) is DENIED.

Plaintiffs may amend or supplement their complaints to add claims under § 2 and the Constitution, as well as requests for relief under § 3(c) of the Voting Rights Act, with regard to the 2013 plans (Plan C235 and Plan H358).  The motions for leave to amend or supplement filed by Congressman Cuellar (docket no. 774); the NAACP, African-American Congresspersons, LULAC, Rodriguez Plaintiffs, and Quesada Plaintiffs (docket no. 776); the Perez Plaintiffs (docket no. 777); the Mexican American Legislative Caucus (docket no. 779); and the Texas Latino Redistricting Task Force (docket no. 780) are GRANTED.   The Perez Plaintiffs' original motion to amend (docket no. 775) is DISMISSED AS MOOT because an amended motion was filed.  As noted, it is unclear whether some Plaintiffs are intending to maintain their 2011 plan claims or request § 3(c) relief with regard to the 2011 plan claims.  Plaintiffs' amended complaints should clearly specify whether such claims are being maintained, and Plaintiffs are granted further leave to amend their proposed complaints to clarify their claims or to correct errors identified herein.

The Texas Democratic Party and Gilberto Hinojosa, as well as John Morris, are granted leave to amend their complaints to assert political gerrymandering claims against the 2013 plans.  The motion for leave to file amended cross-claim by the Texas Democratic Party and Gilberto Hinojosa (docket no. 778 ) and John Morris's motion for leave to amend (docket no. 784) are GRANTED.  Morris's motion for extension of time to file (docket no. 782) is GRANTED.  Morris's original motion to amend (docket no.

783) is DISMISSED AS MOOT because an amended motion was filed. Because the Court is allowing the Texas Democratic Party, Hinojosa, and Morris to assert political gerrymandering claims against the 2013 plans, their motions to reconsider the Court's dismissal of their political gerrymandering claims against the 2011 plans (docket nos. 384, 386) are DENIED.[10]

The Court emphasizes that, in allowing amendment to assert new claims, including requests for relief under § 3(c), the Court makes no determination of the merits of those claims, but simply permits the Plaintiffs to place such claims before the Court.

### III. Proceeding with further litigation

With the enactment of the 2013 plans, the amendment of the claims in the pleadings, and the potential impact of § 3(c) issues, there is much to be accomplished. Defendants have already filed two motions to dismiss since the enactment of the new plans, and more dispositive motions may be forthcoming. Another round of fact and expert discovery may be necessary to adequately prepare the case for a second trial. Experts will need to supplement or amend their prior opinions and present same to the Court. There may be additional fact witnesses that will need to testify in person, if possible, or by video deposition if they are unable to testify in person. There will be additional documentary evidence, including approximately 400 exhibits that were previously used in the D.C. preclearance proceedings. Evidentiary challenges will need to be resolved. Oral arguments will be presented. A second trial or series of

---

[10]The motions to reconsider were filed to stay appellate deadlines.

evidentiary hearings will need to be held.  The Court will then begin its review of all the evidence from the first trial in this case, the second trial in this case, and any additional evidence (from the D.C. case or otherwise) that may be presented by submission. After the Court's review and deliberations, it will need to prepare opinions on all remaining claims and causes of action and, if necessary, issue new remedial redistricting maps.  If equitable relief under § 3(c) is warranted, the Court's duties will not end with the issuance of new maps.  Several years of preclearance proceedings may lie ahead.  And of course, the prospect of multiple appeals must be considered.

The Court has strived to keep this case moving at a brisk pace.  The litigation would have been unduly delayed if the parties had not been granted permission to amend their pleadings and continue the proceedings in this Court.  But all litigation, and especially redistricting litigation, requires a tremendous amount of time and expense and recurring election schedules are a constant concern.   The Court understands the importance of the issues in this case and the need to reach final resolution.   But the Court also understands the need to proceed with elections as scheduled.  While it was necessary to delay the 2012 elections, the redistricting maps also changed – not once, but twice.  Shifting district and precinct lines can leave candidates wondering, voters confused, and election officials with a tremendous burden to implement maps in a timely manner with very limited resources.  Thus, the Court must balance the need to protect voting rights that may be affected by the redistricting maps with the need to avoid the adverse effect on voting rights that comes with delay and confusion during election time.  This litigation will continue for as long as it takes to reach a legally correct decision on very important issues, but elections must go on.

## IV. The 2014 elections

The 2014 primary election is fast approaching.  Some of the key dates, governed by the Texas Election Code, are as follows:

September 10, 2013:     Opening of the Filing Period for Office of Precinct Chair

November 9, 2013:      Opening of Filing Period for All Other Offices

December 9, 2013:      Deadline for Candidates to File Applications for General Primary Election

December 13, 2013:     Certification of Candidate by Party Chairs deadline

January 18, 2014:      Deadline to Mail Military Ballots

March 4, 2014:         General Primary Election

With the election deadlines beginning on September 10, 2013, this Court is once again faced with circumstances that call for temporary measures that the Court would not otherwise consider.

## V. Which maps to use

The election cannot proceed as scheduled unless redistricting maps are in place, and the options are limited.  The parties agree that the districts used for the 2010 elections are malapportioned and violate the one-person one-vote requirement under the Fourteenth Amendment to the U.S. Constitution.  The 2011 enacted plans have been repealed by the Texas Legislature.  The Court could order that the 2012 interim plans be used for another election cycle, but the Supreme Court has instructed that the Court defer to legislative judgments reflected in the enacted plans to the extent those policies do not lead to violations of the Constitution or Voting Rights Act.  *Perry v. Perez*, 132 S. Ct. at 941.  Thus, the Court turns to the 2013 enacted plans for purposes

of implementing an interim plan for the 2014 elections.

A.     The Congressional plan (C235)

Plan C235 was adopted by the Court as the interim plan for the districts used to elect representatives in 2012 to the United States House of Representatives. Docket no. 681. The Court adopted the plan after making the requisite preliminary findings as required by the Supreme Court's decision in *Perry v. Perez*. Docket no. 691. When the Texas Legislature met during special session, it adopted Plan C235 in its entirety without any changes. Thus, to the extent that *Perry v. Perez* requires the Court to conduct a preliminary injunction analysis (*i.e.,* likelihood of success on the merits), it has already done so. And to the extent that *Perry v. Perez* requires the Court to defer to the policy judgments of the Texas Legislature, it has done so. The Court is keenly aware that its preliminary injunction analysis was "expedited and curtailed" due to the circumstances at the time. Docket no. 691 at 2. But the Court is facing similar circumstances at this juncture and conducting yet another preliminary review of the same maps under current time restraints would cause unnecessary delay. The Court will review all of the evidence and reach a final decision on the merits of all claims under the Voting Rights Act and the U.S. Constitution, but it is impossible to reach that decision prior to the various deadlines for the 2014 elections.

B.     The Texas House plan (Plan H358)

Plan H309 was adopted by the Court as the interim plan for the districts used to elect representatives to the Texas House of Representatives in 2012. Docket no. 682. The Court adopted Plan H309 after making the requisite preliminary findings as required by the Supreme Court's decision in *Perry v. Perez*. Docket no. 690. When the

Texas Legislature met during special session, it made slight changes to Plan H309, and newly enacted Plan H358 incorporates those changes. The changes to the Texas House plan affect very small portions of Tarrant, Dallas, Harris and Webb counties. Of the 150 districts in the Texas House map, the lines of only 14 districts shifted slightly.[11] Of those 14 districts, the loss or gain of registered voters is minimal.[12] Because the changes to the Texas House plan were so minimal, only one new legal challenge arose. That challenge, brought by the Latino Task Force, is a claim that the Hispanic voting strength in HD 90 has been diluted.[13]

Again, to the extent that *Perry v. Perez* requires the Court to defer to the policy judgments of the Texas Legislature, it has done so. And the Court has already conducted a preliminary injunction analysis of Plaintiffs' legal challenges, with the exception of the new challenge to HD 90. As with the Congressional plan, the Court's

---

[11]The district lines resulted in slightly different configurations for districts 42, 80, 90, 97, 99, 103, 109, 110, 111, 113, 115, 133, 137, and 149.

[12]Based on 2010 Census data, the Texas Legislative Council prepared a Plan Overlap Population Analysis (Red 340) comparing Plan H358 with Plan H309. The analysis shows that District 42 retained 95.9% of its total population and pulled 4.1% from district 80, which includes 3,302 registered voters. District 90 retained 97.1% of its total population; pulled 2.9% of its total population from district 99, which includes 2,439 registered voters; and gained approximately 32 registered voters from district 97. District 99 retained 97.4% of its total population and pulled 2.6% from district 90, which includes 1,850 registered voters. District 103 retained 95.9% of its total population and pulled 4.1% from district 115, which includes 3,178 registered voters. District 109 retained 99.6% of its total population; pulled 0.3% from district 110, which includes 481 registered voters; and gained approximately 17 registered voters from district 111. District 110 retained 99.7% of its total population and pulled 0.3% from district 109, which includes 477 voters. District 111 retained 100% of its total population and gained only 4 registered voters from district 109. District 113 retained 100% of its total population and gained only 3 registered voters from district 109. District 115 retained 93% of its total population and pulled 7.0% from district 103, which includes 2,932 registered voters. District 133 retained 95.7% of its total population and pulled 4.3% from district 149, which includes 3,344 registered voters. District 137 retained 93.1% of its total population; pulled 3.8% from district 133, which includes 2,432 registered voters; and also pulled 3.1% from district 149, which includes 2,478 registered voters. District 149 retained 93.3% of its total population and pulled 6.7% from district 137, which includes 4,548 registered voters.

[13]No other Plaintiffs join the Latino Task Force in its claim regarding voter dilution in HD 90.

preliminary injunction analysis was necessarily expedited and curtailed due to circumstances at that time, but current time restraints make the present situation no better. Again, the Court will review all of the evidence and reach a final decision on the merits of all claims under the Voting Rights Act and the U.S. Constitution, but that decision will not be reached prior to the 2014 elections.

To fully comply with the mandate in *Perry v. Perez*, the Court has conducted a preliminary review of the new challenge to HD 90 and is unable to conclude that the Latino Task Force is likely to succeed on the merits of its claim. The Court has reviewed the allegations in the Task Force complaint and analyzed the maps and statistics available to the Court through the Texas Legislative Council. The Task Force alleges that "the Texas Legislature changed HD 90 to reduce the number of Latino registered voters and the strength of the Latino vote in HD 90. The changes to HD 90 also reduce the African American citizen voting age population of HD 90. The changes to HD 90 in H358 reduce the ability of Latino voters to nominate their preferred candidate." Docket no. 780 at 15.

The Task Force correctly notes that HD 90 was a Latino opportunity district before 2011, and it still appears to be a Latino opportunity district. Docket no. 780 at 15. At the Task Force's urging, the Texas Legislature made changes to HD 90 in 2011 to "raise the Latino voting strength" of HD 90, and those changes were maintained in the 2012 interim plans. *Id*. A Latino candidate challenged the Anglo incumbent in the 2012 Democratic primary election. The Anglo incumbent won the primary by 159 votes and went on to win the General election in November 2012. *Id*. Thus, to the extent that the Task Force claims that the Latino candidate was the candidate of choice for

Latinos, their candidate of choice did not win the 2012 election even after the Legislature increased the Latino voting strength.

When the Legislature made changes to HD 90 during the 2013 special session, the changes were minimal. The total combined population of African Americans and Hispanics in HD 90 rose from 84.8% to 86.1%. The total voting age population (VAP) of African Americans and Hispanics combined in HD 90 is 82.3%. The total voting age population (VAP) of Hispanics only is 70.7%. The total citizen voting age population (CVAP) for African Americans and Hispanics combined is 67.4%. The total citizen voting age population (CVAP) for Hispanics only is 49.0%. And the total for Spanish Surname Registered Voters (SSVR) decreased by one percent – from 51.1% to 50.1%.

Although there is still evidence to be presented before the Court reaches a final decision, there is currently insufficient evidence in the record to suggest that the changes to HD 90 were motivated by discriminatory animus. Nor is there sufficient evidence at this juncture to suggest that Hispanic voters have been deprived of the opportunity to elect their candidate of choice. "The ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. DeGrandy*, 512 U.S. 997, 1014 n. 11, 114 S.Ct. 2647 (1994).

C.   Preclearance is not an obstacle to using the 2013 plans on an

interim basis:

In 2012, Texas was a covered jurisdiction under § 5 of the Voting Rights Act and all changes in election procedures were suspended until precleared. 42 U.S.C. § 1973c. The D.C. Court had not reached a final decision on the § 5 issues prior to the 2012 elections and this Court was required to review the § 5 challenges under the "not

insubstantial" standard imposed by *Perry v. Perez* in formulating interim plans. Ultimately, some of this Court's findings under the "not insubstantial" standard differed from the D.C. Court's final rulings on the merits.  But the Texas Legislature has adopted the changes that were based on this Court's previous findings and the D.C. Court's opinion on § 5 issues has been vacated.

In June, the Supreme Court declared the coverage formula in § 4 unconstitutional, meaning that Texas is no longer automatically subject to § 5's preclearance requirement.  Thus, mandatory suspension under § 5 is no longer an obstacle for the State of Texas.  Some Plaintiffs herein have requested equitable relief under § 3(c) of the Voting Rights Act, but coverage under § 3(c) is not triggered unless or until the Court finds that the Fourteenth or Fifteenth Amendment has been violated.  *See* 42 U.S.C. 1973a(c).  At this juncture, this Court has not made such a finding; thus, it is unable to determine whether prospective relief under § 3(c) is necessary and appropriate.  Again, more evidence will be presented, and the Court will give such evidence due consideration.  Until a decision on the merits is reached, however, coverage under § 3(c) is not triggered and any remedial relief thereunder would be premature.

It is so ORDERED this 6th day of September, 2013.


_____/s/_____          _____/s/_____
JERRY E. SMITH                            ORLANDO L. GARCIA
UNITED STATES CIRCUIT JUDGE               UNITED STATES DISTRICT JUDGE

            _____/s/_____
            XAVIER RODRIGUEZ
            UNITED STATES DISTRICT JUDGE