IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SHANNON PEREZ, *et al.*, <br><br>     Plaintiffs, <br><br> and <br><br> UNITED STATES of AMERICA, <br><br>     Plaintiff-Intervenor, <br><br>     v. <br><br> STATE OF TEXAS, *et al.*, <br><br>     Defendants. | Civil Action No. 5:11-cv-360 <br> (OLG-JES-XR) <br> Three-Judge Court <br> [Lead Case] |
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES (MALC), <br><br>     Plaintiff, <br><br>     v. <br><br> STATE OF TEXAS, et al., <br><br>     Defendants. | Civil Action No. 5:11-cv-361 <br> (OLG-JES-XR) <br> Three-Judge Court <br> [Consolidated Case] |
| TEXAS LATINO REDISTRICTING TASK FORCE, *et al.*, <br><br>     Plaintiffs, <br><br>     v. <br><br> RICK PERRY, <br><br>     Defendant. | Civil Action No. 5:11-cv-490 <br> (OLG-JES-XR) <br> Three-Judge Court <br> [Consolidated Case] |

| | |
|---|---|
| MARGARITA V. QUESADA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RICK PERRY, *et al.*, <br><br> Defendants. | Civil Action No. 5:11-cv-592 <br> (OLG-JES-XR) <br> Three-Judge Court <br> [Consolidated Case] |
| JOHN T. MORRIS, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF TEXAS, *et al.*, <br><br> Defendants. | Civil Action No. 5:11-cv-615 <br> (OLG-JES-XR) <br> Three-Judge Court <br> [Consolidated Case] |
| EDDIE RODRIGUEZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RICK PERRY, *et al.*, <br><br> Defendants. | Civil Action No. 5:11-cv-635 <br> (OLG-JES-XR) <br> Three-Judge Court <br> [Consolidated Case] |

## **COMPLAINT IN INTERVENTION**

The United States of America, plaintiff-intervenor herein, alleges:

1.The Attorney General files this complaint under Sections 2 and 12(d) of the Voting Rights Act, 42 U.S.C. §§ 1973 and 1973j(d), to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction of this action under 42 U.S.C. § 1973j(f) and 28 U.S.C. §§ 1331, 1345, and 2201(a).

3.     A three-judge district court is required under 28 U.S.C. § 2284(a).

4.     Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

5.     The Attorney General is authorized to file this action in the name of the United States.  42 U.S.C. § 1973j(d).

6.     The State of Texas is a state of the United States and is obligated to comply with Section 2 of the Voting Rights Act.  From 1975 until the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), Texas was subject to the preclearance requirements of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, through the coverage formula in Section 4(b) of the Voting Rights Act, 42 U.S.C. § 1973b.

7.     John Steen is the Secretary of State and chief election officer of the State of Texas.  He is sued in his official capacity.

## ALLEGATIONS

**Background**

8.     Between 2000 and 2010, the total population of Texas increased by 4,293,741 persons, and 89.2 percent of that growth was attributable to the State's minority population. Specifically, the State's Hispanic population growth comprised 65 percent of the increase, the African American population growth comprised 13.4 percent of the increase, and Asian population growth comprised 10.1 percent of the increase.

9. Following the release of 2010 Census data, the Texas legislature was required to draw new boundaries for its Congressional and state legislative districts to account for the State's population growth and the apportionment of four additional seats to its Congressional delegation.

10. The Texas legislature passed a new redistricting plan for the State House of Representatives on May 23, 2011, and Governor Rick Perry signed it into law on June 17, 2011. That plan is known as H283.

11. Plan H283 became effective under Texas law on August 29, 2011, but it was unenforceable because the State had not obtained preclearance under Section 5 of the Voting Rights Act.

12. The Texas legislature passed a new Congressional redistricting plan on June 24, 2011, and Governor Rick Perry signed it into law on July 18, 2011. That plan is known as C185.

13. Plan C185 became effective under Texas law on September 28, 2011, but it was unenforceable because the State had not obtained preclearance under Section 5 of the Voting Rights Act.

**Background on Redistricting Litigation**

14. Texas sought preclearance under Section 5 of the Voting Rights Act for the 2011 Congressional and House plans by filing a declaratory judgment action in the United States District Court for the District of Columbia. *See Texas v. United States*, No. 1:11-cv-1303 (D.D.C. filed July 19, 2011).

15. On September 29, 2011, this Court enjoined implementation of the 2011 Congressional and House redistricting plans on the ground that Texas had not yet obtained preclearance for either plan under Section 5 of the Voting Rights Act. *See Perez v. Perry*, No. 5:11-cv-360 (W.D. Tex. Sept. 29, 2011) (ECF No. 380).

16. On August 28, 2012, following a two-week bench trial, a three-judge court of the U.S. District Court for the District of Columbia denied preclearance of the 2011 Congressional and House plans under Section 5. The court concluded that the State had failed to meet its burden under Section 5 to prove that it had not acted with discriminatory intent in adopting the Congressional plan, C185. *See Texas v. United States*, 887 F. Supp. 2d 133, 138, 159-65 (D.D.C. 2012) (three-judge court), *vacated*, 133 S. Ct. 2885 (2013). Indeed, the D.C. Court observed that "[t]he parties have provided more evidence of discriminatory intent [about the Congressional plan] than we have space, or need, to address here." *Id.* at 161 n.32. The court further concluded that the State had failed to meet its burden under Section 5 to establish the absence of discriminatory effect in the State House plan, H283. *See id.* at 138, 166-77. Because the D.C. Court determined that the State had failed to establish that its 2011 House plan would not have a discriminatory effect, it did not analyze whether Texas had established that the plan did not intentionally discriminate against minority voters. Nevertheless, the court noted that the United States and Defendant-Intervenors had presented "record evidence that cause[d] concern" that the House plan may have been adopted with discriminatory purpose. *Id.* at 177-78.

17. After entry of judgment, Texas appealed the denial of preclearance to the U.S. Supreme Court. *See* Notice of Appeal, *Texas v. United States*, No. 1:11-cv-1303 (D.D.C. Aug. 31, 2012) (ECF No. 234).

18. On June 27, 2013, the Supreme Court entered an order vacating the judgment of the D.C. Court in *Texas v. United States* and remanding the case for further consideration in light of *Shelby County* and "the suggestion of mootness" made in a filing concerning the 2011 plans. *Texas v. United States*, 133 S. Ct. 2885 (2013).

**The 2011 Congressional Plan**

19. A combination of direct evidence, discriminatory impact, and other circumstantial evidence—including the sequence of events preceding redistricting, procedural and substantive deviations from redistricting principles, and the historical background of previous discrimination in redistricting—establishes that Texas enacted the 2011 Congressional plan with the intent to discriminate against minority voters.

**Direct Evidence of Discriminatory Intent**

20. Individuals who played key roles in the 2011 redistricting process devised a method—which they discussed by email—to make it more difficult for Hispanics to elect their candidates of choice in certain districts while preserving the appearance of Hispanic population majorities.

21. The plan entailed redrawing districts to increase their Hispanic Citizen Voting Age Population (CVAP) while simultaneously decreasing Hispanic voter turnout in those districts by removing precincts with high-turnout Hispanic voters. These plans are revealed in e-mail exchanges between legislative staff and are evident in the redrawing of districts for the 2011 Congressional plan.

**Race-Based Splitting of Precincts**

22. The 2011 Congressional plan purposefully split precincts on the basis of race and ethnicity to dilute minority voting strength.

23. The Texas Senate and House Redistricting Committees had a policy to minimize the splitting of voting tabulation districts (VTDs), which are equivalent to precincts.

24. Although political data—*i.e.*, election returns, voter registration, and turnout—are compiled at the precinct level in Texas, that information is not available for smaller geographic

5

areas such as census blocks. Data about the race of the inhabitants is, however, available below the precinct level.

25. The 2011 Congressional plan split 518 precincts, significantly more than is necessary to minimize the population deviation among the Congressional districts.

26. The precinct splits in the 2011 Congressional plan primarily were concentrated in minority communities.

27. The 2011 Congressional plan purposefully fragmented minority communities and placed them in separate districts to prevent minority voters from having an opportunity to elect representatives of their choice. The fragmentation cannot be explained by traditional race-neutral redistricting principles. For example, District 26 included a lightning-bolt shaped extension into Tarrant County to append only the Hispanic community there to primarily Anglo Denton County.

**Discriminatory Impact**

28. The 2011 Congressional plan would have a discriminatory impact on minorities, and this impact provides additional evidence that the plan was adopted with a discriminatory purpose.

29. Despite dramatic minority population growth in the last decade, the 2011 Congressional plan for Texas did not create any additional Congressional districts in which minority voters would have the opportunity to elect candidates of choice.

30. The configurations of the districts in the 2011 Congressional plan for Texas provide additional evidence of purposeful discrimination. For example, District 6 extended a finger-like appendage into majority-minority areas of Dallas and Tarrant counties and appends those communities to primarily Anglo Ellis and Navarro counties and another portion of Tarrant

6

County.  This has the effect of submerging these majority-minority areas into a majority-Anglo district.

33. The 2011 Congressional plan for Texas purposefully packed minorities into certain districts to dilute overall minority voting strength.  For example, to prevent the emergence of a new district in the Dallas-Fort Worth Metroplex in which minority voters would have the opportunity to elect representatives of their choice, the 2011 plan increased the combined African-American and Hispanic population of District 30 from 81.3% to 85.2%.

32. The 2011 Congressional plan for Texas made substantial changes to three Congressional districts in which African-American voters have the ability to elect their preferred candidates, even though 2010 Census data showed that those districts were already close to the correct size.

33. The 2011 Congressional plan for Texas removed key economic engines and cultural facilities—such as medical and convention centers, sports arenas, and universities—from several majority-minority Congressional districts but not from majority-Anglo districts.

34. The 2011 Congressional plan for Texas removed already-established Congressional district offices from several majority-minority Congressional districts but not from majority-Anglo districts.

35. The 2011 Congressional plan for Texas drew the home of one African American member of Congress out of her district but did not draw the homes of any Anglo members out of their districts.

### Procedural Departures from Texas's Usual Redistricting Practices

36. The redistricting process leading to the enactment of the 2011 Congressional plan for Texas departed from normal procedures followed by the Texas legislature in previous redistricting cycles.

37. Unlike past redistricting cycles, plans and election data relevant to the 2011 Congressional plan for Texas were not available for a sufficient period to allow for substantive public input.

38. The Texas House and the Senate each provided for only one hearing on the Congressional redistricting plan and provided less than 48 hours' notice before the hearings.

## The 2011 State House Plan

39. A combination of direct evidence, discriminatory impact, and other circumstantial evidence—including the sequence of events preceding redistricting, procedural and substantive deviations from redistricting principles, and the historical background of previous discrimination in redistricting—establishes that Texas enacted the 2011 House plan with the intent to discriminate against minority voters.

### Direct Evidence of Discriminatory Intent

40. As alleged above, individuals who played key roles in the 2011 redistricting process devised a method—which they discussed by email—to make it more difficult for Hispanics to elect their candidates of choice in certain districts.

41. Texas implemented this race-based strategy in adopting the 2011 House plan, especially in redrawing House District 117. In changing the boundaries of that district, Texas increased its Hispanic CVAP while simultaneously removing precincts where Hispanic voters turned out to vote at a high level and replacing them with precincts whose Hispanic residents

8

turned out at much lower rates. By doing so, Texas created the illusion of Hispanic electoral control in District 117 even though—in reality—the change eliminated the opportunity and ability of Hispanic voters to elect their candidates of choice.

42. State decision makers made public statements during the 2011 House redistricting process that indicate a racially discriminatory motive. For example, Texas state legislators—including State Representatives John Garza and Beverly Woolley—made comments indicating that their decisions during the 2011 House redistricting process were based, at least in part, on race and ethnicity.

**Race-Based Splitting of Precincts**

43. The 2011 House plan purposefully split precincts on the basis of race and ethnicity to dilute minority voting strength. This is particularly evident in House District 41, where six split precincts fenced out census blocks with significantly greater Hispanic population than those blocks that were included in the district.

44. As alleged above, the Texas House Redistricting Committee had a policy to minimize the splitting of precincts.

45. The Chair of that Committee rejected an amendment sponsored by a minority-preferred Hispanic legislator on the ground that it violated this policy by splitting precincts.

46. Despite the Committee's policy of minimizing precinct splits, the 2011 Texas House plan split 412 precincts. This occurred even though there was no requirement—as there is with Congressional plans—that House districts have minimal population deviation. Deviations in district population biased the proposed House plan against minority voters by overpopulating districts in which minority voters have the opportunity to elect candidates of their choice, thereby limiting the number of such districts.

47. The precinct splits in the 2011 House plan primarily were concentrated in minority communities.

48. In the Section 5 preclearance action, the D.C. Court found that the lead map-drawer for the House plan provided "incredible testimony" that "reinforces evidence suggesting mapmakers cracked [precincts] along racial lines to dilute minority voting power" and "suggests that Texas had something to hide in the way it used racial data to draw district lines." *Texas*, 887 F. Supp. 2d at 178.

**Discriminatory Impact**

49. The 2011 House plan would have a discriminatory impact on minorities, and this impact provides additional evidence that the plan was adopted with a discriminatory purpose.

50. Despite dramatic minority population growth in the last decade, the discriminatory intent is shown by the fact that the 2011 House plan for Texas reduced by five the number of districts that would provide minority voters with the ability to elect their candidates of choice. Under the plan in effect prior to 2011, minority voters had the ability to elect their candidates of choice in 50 House districts. In the 2011 plan, that number was reduced to 45 districts, even though minority communities accounted for the overwhelming majority of Texas's population growth in the past decade.

51. The 2011 House plan for Texas purposefully packed minority population into certain districts to avoid creating—or to try to justify eliminating—districts in which minority voters would have the opportunity to elect candidates of choice. In Nueces County, for example, the State eliminated House District 33—a district represented by a Hispanic Republican in which minority voters had the ability to elect representatives of their choice—and protected the Anglo

incumbent in District 32 by crafting a hook-shaped extension to pack Hispanic voters and potential Hispanic challengers (Republican and Democrat) into District 34.

52. The configurations of the 2011 House districts for Texas provide additional evidence of purposeful discrimination. One of the most vivid illustrations is the configuration of House District 41, an oddly shaped district designed to minimize the number of Hispanic voters in a district located in overwhelmingly Hispanic Hidalgo County. The district was under-populated, and its borders split 17 precincts (more than 40% of the precincts in the district). The partial precincts in District 41 included census blocks with higher Anglo population and excluded homogenous Hispanic census blocks.

**Procedural Departures from Texas's Usual Redistricting Practices**

53. Unlike past redistricting cycles, plans and election data relevant to the 2011 State House plans for Texas were not available for a sufficient period to allow for substantive public input.

54. The chair of the Texas House Redistricting Committee released his statewide 2011 House plan proposal only two days before the first public hearing and required waiver of Texas's five-day posting rule, which is uncommon for a major bill such as redistricting.

55. Two public hearings concerning the 2011 House redistricting were conducted on a Friday and on Palm Sunday, limiting public participation.

56. The "County Line Rule" in Article III, Section 26 of the Texas Constitution states that if population will allow a district to be created without crossing county lines, then such a district should be created. The Texas Legislative Council Guidelines state that the County Line Rule should yield to the need for population equality or adherence to the Voting Rights Act.

57. Deviations from the County Line Rule in the 2011 House plan in Texas were permitted in Henderson County in order to comply with the federal one-person-one-vote requirement, but calls for deviation from the County Line Rule in order to comply with the Voting Rights Act in Nueces County—to protect a district in which minority voters previously had the ability to elect their candidates of choice—were rejected.

58. The County Line Rule in the 2011 House plan in Texas was applied inconsistently from past practice in Harris County, providing legislators an excuse to eliminate House District 149, a district in which minority voters had the ability to elect their candidate of choice.

**Intent Factors Common to Both Plans**

### The History of Discrimination in Texas

59. Under Supreme Court precedent, *see, e.g.*, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977), the examination of past discrimination is relevant to determining whether more recent government actions are intentionally discriminatory. Texas's history of official voting discrimination against its African-American and Hispanic citizens is longstanding and well-documented. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006). This history of persistent racial discrimination provides circumstantial evidence of intentional discrimination in the 2011 Congressional and House plans.

### The Sequence of Events

60. The sequence of events leading to the enactment of the 2011 Congressional and House plans for Texas reveals a pattern of excluding African-American and Hispanic representatives from the redistricting process while soliciting and implementing the preferences of Anglo representatives.

61. The sequence of events leading to the enactment of the 2011 Congressional and House plans for Texas also reveals a pattern of limiting the opportunity of African-American and Hispanic citizens to analyze and comment on the redistricting plans.

### Substantive Departures from Texas's Usual Redistricting Practices

62. The redistricting process leading to the enactment of the 2011 Congressional and House plans for Texas departed from normal procedures followed by the Texas legislature in previous redistricting cycles.

### Other Relevant Factors

63. Texas elections are marked by a pattern of racially polarized voting at virtually every level.

64. Many Hispanic and African-American citizens in Texas continue to suffer the effects of official discrimination, including a history of discrimination in voting-related activities.

65. The effects of discrimination on Hispanic and African-American citizens in Texas, including their markedly lower socioeconomic conditions relative to Anglos, continue to hinder their ability to participate effectively in the political process in Texas.

### The Need for Section 3(c) Relief

66. As alleged above, the State of Texas has a history of intentional racial discrimination in redistricting. In each decennial redistricting cycle since 1975, the Attorney General has interposed an objection under Section 5 or the D.C. District Court has denied preclearance to at least one of the State's statewide redistricting plans.

67. Outside the redistricting context, the State of Texas has employed a variety of devices to restrict minority voters' access to the franchise.

13

68. In the absence of relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), there is a danger that Texas will continue to violate the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendments in the future.

## CAUSES OF ACTION

69. The United States re-alleges and incorporates by reference the allegations set forth above.

70. The State of Texas's 2011 Congressional delegation redistricting plan, Plan C185, was adopted with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution.

71. The State of Texas's 2011 State House redistricting plan, Plan H283, was adopted with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court enter an order:

(1) Declaring that the 2011 Congressional and House plans for Texas were adopted with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution;

(2)  Retaining jurisdiction of this action under Section 3(c) of the Voting Rights Act for a period of ten years and ordering that during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced (May 9, 2011) shall be implemented by the State of Texas unless and until it receives preclearance for the voting change from the Attorney General or this Court;  and

(3)  Granting such additional relief as the interests of justice may require.

Date: September 25, 2013

                                                Respectfully submitted,

ROBERT L. PITMAN                     JOCELYN SAMUELS
United States Attorney                    Acting Assistant Attorney General
Western District of Texas                 Civil Rights Division

                                                */s/ Timothy F. Mellett*
                                                T. CHRISTIAN HERREN, JR.
                                                TIMOTHY F. MELLETT
                                                BRYAN L. SELLS
                                                JAYE ALLISON SITTON
                                                DANIEL J. FREEMAN
                                                MICHELLE A. MCLEOD
                                                Attorneys
                                                Voting Section, Civil Rights Division
                                                U.S. Department of Justice
                                                Room 7254 NWB
                                                950 Pennsylvania Avenue, N.W.
                                                Washington, D.C. 20530
                                                (202) 305-4355

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2013, I served a true and correct copy of the foregoing via the Court's ECF system on the following counsel of record:

David R. Richards
Richards Rodriguez & Skeith, LLP
davidr@rrsfirm.com

Richard E. Grey III
Gray & Becker, P.C.
rick.gray@graybecker.com

*Counsel for Perez Plaintiffs
and Plaintiff-Intervenors Pete Gallego and
Filemon Vela Jr.*

Luis Roberto Vera, Jr.
Law Offices of Luis Roberto Vera, Jr. &
    Associates
lrvlaw@sbcglobal.net
George Joseph Korbel
Texas Rio Grande Legal Aid, Inc.
gkorbel@trla.org

*Counsel for Plaintiff League of United Latin
American Citizens*

John T. Morris
johnmorris1939@hotmail.com

*Pro Se Plaintiff*

Nina Perales
Marisa Bono
Nicolas Espiritu
Karolina J. Lyznik
Mexican American Legal Defense
    and Education Fund
nperales@maldef.org
mbono@maldef.org
klyznik@maldef.org
nespiritu@maldef.org

Mark Anthony Sanchez
Robert W. Wilson
Gale, Wilson & Sanchez, PLLC
masanchez@gws-law.com
rwwilson@gws-law.com

*Counsel for Plaintiff Latino Redistricting
Task Force*

Jose Garza
Law Office of Jose Garza
garzpalm@aol.com

Mark W. Kiehne
Ricardo G. Cedillo
Davis, Cedillo & Mendoza
mkiehne@lawdcm.com
rcedillo@lawdcm.com

Joaquin G. Avila
Seattle University School of Law
avilaj@seattleu.edu

Cynthia B. Jones
Jones Legal Group, LLC
jones.cynthiab@gmail.com

*Counsel for Plaintiff Mexican American
Legislative Caucus*

Karen M. Kennard
City of Austin Law Department
karen.kennard@ci.austin.tx.us

Max Renea Hicks
Law Office of Max Renea Hicks
rhicks@renea-hicks.com

Manuel Escobar, Jr.
Manuel G. Escobar Law Office
escobarm1@aol.com

Marc Erik Elias
Abha Khanna
Perkins Coie LLP
akhanna@perkinscoie.com
melias@perkinscoie.com

S. Abraham Kuczaj, III
Stephen E. McConnico
Sam Johnson
Scott Douglass & McConnico, LLP
akuczaj@scottdoug.com
smcconnico@scottdoug.com
sjohnson@scottdoug.com

David Escamilla
Travis County Ass't Attorney
david.escamilla@co.travis.tx.us

*Counsel for Rodriguez Plaintiffs*

Gerald Harris Goldstein
Donald H. Flanary, III
Goldstein, Goldstein and Hilley
ggandh@aol.com
donflanary@hotmail.com

Paul M. Smith
Michael B. DeSanctis
Jessica Ring Amunson
Jenner & Block LLP
psmith@jenner.Com
mdesanctis@jenner.Com
jamunson@jenner.Com

J. Gerald Hebert
Law Office of Joseph Gerald Hebert
hebert@voterlaw.com

Jesse Gaines
Law Office of Jesse Gaines
gainesjesse@ymail.com

*Counsel for Quesada Plaintiff-Intervenors*

Rolando L. Rios
Law Offices of Rolando L. Rios
rrios@rolandorioslaw.com

*Counsel for Plaintiff-Intervenor Henry Cuellar*

Gary L. Bledsoe
Law Office of Gary L. Bledsoe
garybledsoe@sbcglobal.net

Victor L. Goode
NAACP
vgoode@naacpnet.org

Robert Notzon
Law Office of Robert Notzon
robert@notzonlaw.com

Anita Sue Earls
Allison Jean Riggs
Southern Coalition for Social Justice
allison@southerncoalition.org
anita@southerncoalition.org

*Counsel for Plaintiff-Intervenor Texas State Conference of NAACP Braches*

Chad W. Dunn
K. Scott Brazil
Brazil & Dunn
chad@brazilanddunn.com
scott@brazilanddunn.com

*Counsel for Plaintiff-Intervenor Texas Democratic Party*

John K. Tanner
John Tanner Law Office
3743 Military Rd. NW
Washington, DC 20015

*Counsel for Plaintiff-Intervenor Texas Legislative Black Caucus*

Hector De Leon
Benjamin S. De Leon
De Leon & Washburn, P.C.
hdeleon@dwlawtx.com
bdeleon@dwlawtx.com

Eric Christopher Opiela
Eric Opiela PLLC
eopiela@ericopiela.com

Christopher K. Gober
Michael Hilgers
Gober Hilgers PLLC
cgober@goberhilgers.com
mhilgers@goberhilgers.com

James Edwin Trainor, III
Beirne, Maynard & Parsons, LLP
ttrainor@bmpllp.com

Joseph M. Nixon
Beirne Maynard & Parsons LLP
jnixon@bmpllp.com

*Counsel for Plaintiff-Intervenors Joe Barton et al.*

David Mattax
Patrick K. Sweeten
Angela V. Colmenero
Matthew Frederick
Ana M. Jordan
Jennifer Settle Jackson
Office of the Texas Attorney General
david.mattax@oag.state.tx.us
patrick.sweeten@texasattorneygeneral.gov
angela.colmenero@
texasattorneygeneral.gov
matthew.frederick@
texasattorneygeneral.gov
ana.jordan@oag.state.tx.us
Jennifer.jackson@texasattorneygeneral.gov

*Counsel for Defendants State of Texas and Rick Perry and Defendant-Intervenors David Dewhurst, Joe Strauss, and John Steen*

Donna Garcia Davidson
Donna G. Daviddson Law Firm
donna@dgdlawfirm.com

Frank M. Reilly
Potts & Reilly, LLP
reilly@pottsreilly.com

*Counsel for Defendant-Intervenors Steve Munisteri*

Kent M. Adams
Lewis, Brisbois, Bisgaard, & Smith LLP
kadams@lbbslaw.com

*Counsel to Defendant-Intervenor Sarah M. Davis*

Clarkson F. Brown
Bexar County District Attorney's Office,
101 W Nueva, Suite 5049
San Antonio, TX 78205
(210) 335-2150
clarkb@bexar.org

*Counsel for Amicus Curiae Bexar County*

Ned Bennet Sandlin
Texas Municipal League
bennett@tml.org

*Counsel for Amicus Curiae Texas Municipal League*

Manuel A. Pelaez-Prada
Pelaez Prada, PLLC
mpp@lonestaradr.com

*Counsel for Amicus Curiae San Antonio Hispanic Chamber of Commerce*

*/s/Daniel J. Freeman*
DANIEL J. FREEMAN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7123 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
daniel.freeman@usdoj.gov