# In the United States District Court
## for the
## Western District of Texas

SHANNON PEREZ, ET AL.          §
                               §
v.                             §          SA-11-CV-360
                               §
RICK PERRY, ET AL.             §

## ORDER

On this date, the Court considered Defendants' Motion to Dismiss (docket no. 995). Defendants raise two arguments in their motion: (1) the claims relating to the 2011 plans are moot and the Court should reconsider its prior rulings to the contrary; and (2) the political gerrymandering claims relating to the 2013 plans should be dismissed as nonjusticiable and for failure to state a claim. After careful consideration, the Court will deny the motion to dismiss the 2011 plan claims as moot and grant the motion to dismiss the political gerrymandering claims for failure to state a claim.

### Background

In 2011, numerous Plaintiffs and Intervenors ("Plaintiffs") filed suits asserting constitutional and statutory challenges against the State's 2011 enacted maps, Plan H283 (Texas House of Representatives) and Plan C185 (United States House of Representatives). At the time, Texas was subject to the preclearance requirements of Section 5 of the Voting Rights Act ("VRA"), and preclearance litigation was pending in the United States District Court for the District of Columbia ("the D.C. Court"). Because the preclearance proceedings were incomplete at the time new maps

1

were required for the 2012 elections, this Court adopted interim maps to be used for the 2012 elections. These maps were proposed compromise maps submitted by some of the parties.

The Court adopted the interim maps after reviewing them under the standard set forth by the Supreme Court in *Perry v. Perez*, 132 S. Ct. 934 (2012). Under this standard, the Court determined whether Plaintiffs presented "not insubstantial" claims under § 5 or demonstrated a substantial likelihood of success on the § 2 and Fourteenth Amendment claims with regard to the enacted plans. The Court emphasized that it made no determinations on the merits of any claims because it was acting under severe time pressures that prevented the Court from fully examining the record. Docket no. 690 at 3 ("[W]e emphasize the preliminary nature of this order and that, except for the fact that PLAN H309 sets the districts for the 2012 elections, nothing in this opinion reflects this Court's final determination of any legal or factual matters in this case or the case pending in the D.C. Court."); Docket no. 691 at 1 (noting that "this interim map is a result of preliminary determinations" and "is not a final ruling on the merits or any claims"). Some Plaintiffs complained that the compromise maps did not fully redress their complaints, but no appeal was taken. The Court's interim maps were therefore used for the 2012 elections.

In August 2012, the D.C. Court issued a decision denying preclearance of the Legislature's 2011 enacted plans. *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012). Texas appealed the D.C. Court's decision.

By the end of May 2013, the Legislature's regular session ended with no redistricting action. But the Governor called the Legislature back for the first called special session to consider "legislation which ratifies and adopts the interim redistricting plans ordered by the federal district court as the permanent plans for districts used to elect members of the Texas House of

Representatives, Texas Senate and United States House of Representatives." The Legislature reconvened and undertook this redistricting task.

By June 23, 2013, the Legislature had passed Senate Bill 3 (Plan H358) and Senate Bill 4 (Plan C235) to enrollment. *See* S.B. 3 and S.B. 4, 83rd Legislature, 1st Called Session. Senate Bill 4 "ratified and adopted" this Court's interim congressional map, Plan C235, without change, and repealed Senate Bill 4 from the 2011 first special session, which had adopted Plan C185. Senate Bill 3 adopted Plan H358 as the plan for the Texas House of Representatives and repealed House Bill 150 from the 2011 regular session, which had adopted Plan H283.[1] Plan H358 is substantially similar to the Court's interim plan, but contains some changes, primarily to HD90. The plans were sent to Governor Perry for approval on June 24, 2013.

On June 25, while the appeal of the D.C. Court's decision was pending, the Supreme Court decided *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), holding that §4(b), the formula that determines which jurisdictions are subject to § 5 preclearance, is unconstitutional. On June 26, Governor Perry signed Senate Bill 3 and Senate Bill 4 into law. On June 27, 2013, the Supreme Court vacated the D.C. Court's judgment denying preclearance of the 2011 plans and remanded the case for further consideration in light of *Shelby County* and the suggestion of mootness of appellees Wendy Davis, et al. *See Texas v. United States*, 133 S. Ct. 2885 (June 27, 2013).[2]

---

[1] Tex. S.B. 3, art. III, § 3, 83d Leg., 1st C.S. ("Chapter 1271 (H.B. 150), Acts of the 82nd Legislature, Regular Session,2011 (Article 195a-12, Vernon 's Texas Civil Statutes), is repealed."); Tex. S.B. 4 § 3, 83d Leg., 1st C.S. ("Chapter 1 (Senate Bill No. 4), Acts of the 82nd Legislature, 1st Called Session, 2011 (Article 197j, Vernon 's Texas Civil Statutes), is repealed.").

[2] On remand, Texas moved to dismiss the case as moot, and the United States did not oppose the motion. Some defendants in the D.C. case sought leave to amend to assert counterclaims for relief under § 3(c) of the VRA. On December 3, 2013, the D.C. Court granted Texas's motion to dismiss proceedings in that court and denied the motions to amend to assert claims under § 3(c). That

On June 28, Defendants in this case filed a motion to dismiss for lack of subject matter jurisdiction, arguing that the case had become moot and should be dismissed. *See* docket no. 768. Specifically, Defendants argued that passage of the new plans in the 2013 special legislative session repealed the 2011 plans, which are the subject of this lawsuit, and that the vacated 2011 plans can never be used to conduct any election and therefore pose no threat of injury to Plaintiffs. Therefore, Defendants asserted, because the 2011 plans pose no threat and "any order regarding the 2011 plans can provide no effectual relief," the case should be dismissed as moot.

This Court held a status conference on July 1, 2013. At the hearing, Plaintiffs expressed a desire to amend their complaints to challenge the 2013 plans, and some Plaintiffs stated their intent to amend their existing claims related to the 2011 plans to seek relief under § 3(c) of the VRA. Section 3(c), known as the VRA's "bail-in" provision, states, "If in any proceeding instituted by . . . an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period [may impose preclearance requirements]." 42 U.S.C. § 1973a(c). After the status conference, the Court issued an order summarily denying the motion to dismiss for lack of jurisdiction without prejudice (docket no. 771) and issued an order directing Plaintiffs to file motions for leave to amend pleadings.

In accordance with the Court's order, Plaintiffs filed their motions for leave to amend their pleadings. Various Plaintiffs sought leave to amend to assert § 2 and Fourteenth and Fifteenth

---

case is now closed.

4

Amendment claims against Plans C235 and H358, as well as to seek equitable relief under § 3(c) of the VRA. Some Plaintiffs maintained their § 2 and constitutional claims against the 2011 plans and sought leave to amend to request equitable relief under § 3(c) of the VRA with regard to the 2011 plans. And some Plaintiffs sought leave to amend to assert political gerrymandering claims against the 2013 plans. The State filed a response in opposition to the motions for leave to amend, along with a motion to dismiss as moot all claims related to the 2011 plans. Docket no. 786.

On September 6, 2013, this Court issued an order on the pending motions to dismiss and to amend. *See* docket no. 886. The Court permitted Plaintiffs to amend their claims with regard to the 2011 plans to assert requests for equitable relief under § 3(c). With regard to the 2013 plans, the Court held that amendment or supplementation to add § 2 and constitutional claims (including relief under § 3(c)) against the 2013 plans was appropriate. The Court also permitted certain Plaintiffs to amend their complaints to file political gerrymandering claims directed at the 2013 plans. Finally, the Court ordered that the 2013 enacted plans, C235 and H358, would be used for the 2014 elections.[3]

In considering the mootness issue, the Court applied the mootness standard for voluntary cessation set forth by the Supreme Court in *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982); *Ne. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 & n.3 (1993), and *Friends of the Earth, Inc. v. Laidlaw Environmental. Services*, 528 U.S. 167 (2000). In *W.T. Grant*, the Supreme Court considered whether the voluntary resignation of a corporate director from certain boards

---

[3] The 2013 enacted plans for the Texas and U.S. House became law on September 24, 2013. *See* Tex. Const. Art. III § 39.

5

mooted the plaintiffs' claims that the defendant corporations were violating the Clayton Act's prohibition against interlocking corporate directorates. The Supreme Court noted "that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot," and that "[a] controversy may remain to be settled in such circumstances, *e.g.*, a dispute over the legality of the challenged practices." 345 U.S. at 632. The fact that the defendant "is free to return to his old ways," "together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." *Id.* The Court noted, however, that "[t]he case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" *Id*. at 632-33. The Court stated, "The burden is a heavy one." *Id.* at 633.

In *Aladdin's Castle*, the plaintiff sought an injunction against enforcement of a city ordinance. The district court held that certain language in the ordinance was unconstitutionally vague and upheld the ordinance's age restriction. The court of appeals affirmed the former holding and reversed the latter. During the appeal, the city eliminated the vague language and retained the age restriction. The Supreme Court noted that "[a] question of mootness is raised by the revision of the ordinance that became effective while the case was pending in the Court of Appeals." 455 U.S. at 288. The Court continued, "When that court decided that the term 'connections with criminal elements' was unconstitutionally vague, that language was no longer a part of the ordinance. Arguably, if the court had been fully advised, it would have regarded the vagueness issue as moot. It is clear to us, however, that it was under no duty to do so." *Id.* The Court then stated, "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.* at 289. The Court reasoned,

6

Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power. In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated. The city followed that course with respect to the age restriction, which was first reduced for Aladdin from 17 to 7 and then, in obvious response to the state court's judgment, the exemption was eliminated. There is no certainty that a similar course would not be pursued if its most recent amendment were effective to defeat federal jurisdiction.

*Id.* (footnotes omitted).  In a footnote, the Court stated,

"The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.' *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 [73 S.Ct. 894, 897, 97 L.Ed. 1303] (1953); *see, e.g., United States v. Trans-Missouri Freight Assn.*, 166 U.S. 290 [17 S.Ct. 540, 41 L.Ed. 1007] (1897). A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.... Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. [345 U.S.] at 633–636, [73 S.Ct., at 897–899]. This is a matter for the trial judge.  But this case is not technically moot, an appeal has been properly taken, and we have no choice but to decide it." *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203–204, 89 S.Ct. 361, 364, 21 L.Ed.2d 344.

*Id.* at 289 n.10.  The Court also noted in another footnote that the city had announced an intention to reenact precisely the same provision if the district court's judgment were vacated.  *Id.* at 289 n.11. The Court therefore considered the merits of the vagueness holding, despite the repeal of the language.

In *Associated General Contractors*, the Court again considered a challenge to a city ordinance, and said, "the mootness question is controlled by *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), where we applied the 'well settled' rule that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the

legality of the practice." 508 U.S. at 661-62.  The Court noted that, although the challenged statutory language at issue in *Aladdin's Castle* had been eliminated while the case was pending, it held that the case was not moot because the repeal would not preclude it from reenacting precisely the same provision if the district court's judgment were vacated.  The dissent argued that the case was controlled by *Diffenderfer v. Central Baptist Church of Miami, Inc.*, 404 U.S. 412 (1972),[4] but the Court stated that the "short answer" to that assertion was that in *Diffenderfer* the statute was "changed substantially, and . . . there was therefore no basis for concluding that the challenged conduct was being repeated."  508 U.S. at 662 n.3.

In *Friends of the Earth*, the Supreme Court considered the voluntary cessation of allegedly illegal conduct by a private defendant, and, citing *W.T. Grant* and *Aladdin's Castle*, stated that it is "well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  528 U.S. at 189.

Although two of the four cases upon which this Court relied involved city ordinances, the Supreme Court did not differentiate between public and private defendants, nor did it indicate that a different standard or burden of proof would apply to public entity defendants.  Applying the

---

[4]In *Diffenderfer*, the plaintiff brought an as-applied challenge to a state statute insofar as it authorized a tax exemption for church property used as a commercial parking lot.  The district court affirmed the validity of the statute as applied, and the plaintiffs appealed to the Supreme Court. While the appeal was pending, the Florida Legislature repealed the statute and enacted new legislation that provided that church property was exempt from taxation only if the property was used predominantly for religious purposes.  The Court found that the requested relief – declaratory judgment that the now-repealed statute was unconstitutional as applied to a church parking lot used for commercial purposes and an injunction against its application to said lot – was "inappropriate now that the statute has been repealed."  404 U.S. at 414-15.  Because the lot in question was no longer fully exempt from taxation, the Court concluded that there was no longer a present, live controversy.  The *Diffenderfer* Court did not consider whether there was a possibility that the statute would be re-enacted.

standard set forth in those cases, this Court held that Defendants had a heavy burden of persuading the court that the challenged conduct could not reasonably be expected to recur. Docket no. 886 at 12. The Court then held that Defendants failed to meet their burden of demonstrating that the conduct alleged to violate § 2 and the Constitution with regard to the 2011 plans could not reasonably be expected to recur. The Court noted that the 2013 plans are heavily derived from the 2011 plans, given the deferential standard required by the application of *Perry v. Perez*, and that most Plaintiffs contend that many of the alleged violations of the VRA and the Constitution in the 2011 plans persist in the 2013 plans, though some perhaps to a lesser degree. Therefore, some of the conduct alleged to be wrongful in 2011 was repeated in exactly the same manner in 2013, and the plan was not sufficiently altered so as to present a substantially different controversy; rather, Plaintiffs allege the same fundamental harms are continuing and Plaintiffs are still suffering injury from the 2011 plans in the 2013 plans. Further, the Court noted that Defendants had never conceded the illegality of any of the conduct and had steadfastly maintained that the 2011 plans contained no legal deficiencies. Nor was there any indication or assurance that the Texas Legislature would not engage in the same conduct during any future legislative session. The Court found that a dispute remained over the legality of the challenged practices (even those that were remedied in the 2013 plans), that there was no assurance that the conduct would not recur, and that Plaintiffs maintained a personal stake in the controversy. Given these circumstances, the Court found that there exists some cognizable danger of recurrent violation such that Plaintiffs' claims for declaratory and injunctive relief with regard to the 2011 plans are not moot.

The Court further held that Plaintiffs could amend their pleadings to assert claims under § 3(c) with regard to the 2011 plans and that the possibility of § 3(c) relief also precluded Plaintiffs'

2011 plan claims from being moot.  *See Knox v. Serv. Emps. Int'l Union, Local 1000*, ___ U.S. ___, ___, 132 S. Ct. 2277, 2287 (2012) ("A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing 'party.'"); *Blackmoon v. Charles Mix County*, 505 F. Supp. 2d 585, 592-93 (D.S.D. 2007) (holding that the plaintiffs' claims against districts no longer in place were not moot because of the possibility of relief under § 3(a)).

In the instant motion, Defendants again move to dismiss the claims relating to the 2011 plans as moot and move to dismiss the political gerrymandering claims relating to the 2013 Plans.

## A. Whether the 2011 plan claims are moot?

Defendants assert that the Court's prior conclusion that the 2011 plan claims are not moot is "inconsistent with binding Supreme Court and Fifth Circuit precedent, and the State Defendants file this motion to dismiss respectfully urging the Court to reconsider that decision."  Motion at 2. Although some parties urge the Court not to entertain the motion because the Court has already decided this issue and no facts have changed, the Court will consider the motion because Defendants are asserting new legal arguments and the mootness issue is an important one.

In their prior motion to dismiss, Defendants cited numerous decisions setting forth the standard for Article III standing to support their mootness argument.  However, this Court noted that the standards for standing and mootness are not identical and applied the standard for mootness set forth in the Supreme Court precedents as described *supra*.

In this motion, Defendants argue that finding that the 2011 plan claims are not moot (1) treats the State Defendants as if they were private actors, (2) misconstrues the Supreme Court's two narrow exceptions to the "near categorical" rule that legislative repeal moots claims against the repealed statute, and (3) "disregard[s] the Supreme Court's settled view that States, not federal courts, bear

the primary responsibility for reapportionment to the point of suggesting that the Legislature's adoption of plans in 2013 amounts to an interference with the reapportionment process." Docket no. 995 at 2.

Defendants' primary assertion is that this Court's prior order applied the wrong standard and burden of proof. Relying on a number of decisions from the various Courts of Appeals, Defendants contend that the "heavy burden" on defendants applied by the Supreme Court in voluntary cessation cases does not apply to government defendants in statutory repeal and amendment cases. Rather, Defendants assert that there is a "near categorical" rule that statutory repeal moots a case, and the burden is upon Plaintiffs to present evidence to satisfy one of the Supreme Court's two narrow exceptions to that rule – (1) when there is evidence that the legislature will reenact "precisely the same provision" once litigation ends (citing *Aladdin's Castle*), and (2) when there is evidence that replacement legislation has not "changed substantially" or "significantly revised" the challenged provisions of the repealed provisions, thereby disadvantaging the plaintiffs in the same "fundamental way" (citing *Northeastern Florida*).

As noted above, the Supreme Court has applied the voluntary cessation "heavy burden" in cases involving both private and government actors. Nevertheless, Defendants urge us to follow the approach of the Courts of Appeals, which have differentiated between private parties and government officials.

In *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924 (7th Cir. 2003), the Seventh Circuit considered whether the city's repeal of a challenged ordinance rendered the case moot. The court recognized that the voluntary cessation doctrine is "the appropriate standard for cases between private parties," but noted, "this is not the view we have

11

taken toward acts of voluntary cessation by government officials." *Id.* at 929.  The court stated that, "[r]ather than presuming bad faith, we have repeatedly held that the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar." *Id.* at 930.  The court found its approach consistent with Supreme Court precedent, noting that, "[i]n a string of cases, the Court has upheld the general rule that repeal, expiration, or significant amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's request for injunctive relief." *Id.*  The court stated, "Only in cases where there is evidence that the repeal was not genuine has the Court refused to hold the case moot." *Id.*

The court noted that in *Aladdin's Castle*, the city had announced its intention to reenact the challenged provision if the case was dismissed and in *Northeastern Florida*, the City had already replaced the repealed ordinance with one that was substantially similar.  The court further concluded that language in the *Aladdin's Castle* majority opinion that "perhaps suggests that mere repeal of a challenged statute does *not* moot a case" was "dicta and therefore not controlling" in light of "both previous and subsequent cases" and Justice White's concurrence. *Id.* at 930 n.5.  The court therefore held that *Aladdin's Castle* and *Northeastern Florida* "represent only an exception to the general rule" and that what separated them from *Diffenderfer* and similar cases was that "in the prior cases there was 'no basis for concluding that the challenged conduct was being repeated,' whereas in *Northeastern Florida* the City had already reenacted a similar statute." *Id.* at 930 n.6.

Thus, the Seventh Circuit, "along with all the circuits to address this issue, have interpreted Supreme Court precedent to support the rule that repeal of a contested ordinance moots a plaintiff's injunction request, absent evidence that the City plans to or already has reenacted the challenged law

or one substantially similar." *Id.* The Seventh Circuit concluded that the issue was "whether there is any evidence that the City of Chicago's repeal was disingenuous; that is, evidence that the City will reenact the challenged ordinance or one substantially similar." *Id.* at 931.

In *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004), the Fifth Circuit stated, "Suits regarding the constitutionality of statutes become moot once the statute is repealed," but recognized that "an exception to this mootness rule exists where there is evidence, or a legitimate reason to believe, that the state will reenact the statute or one that is substantially similar." *Id.* at 849 & n.3. Further, in *Sossaman v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), the court noted that "courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity – a practice that is reconcilable with *Laidlaw*." Thus, "[a]lthough *Laidlaw* establishes that a defendant has a heavy burden to prove that the challenged conduct will not recur once the suit is dismissed as moot, government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties. Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing." *Id.* The court therefore imposed a "lighter burden to make 'absolutely clear' that the [alleged wrongful conduct] cannot 'reasonably be expected to recur.'" *Id.*

The Court concludes that its prior reasoning and ruling regarding mootness are consistent with Supreme Court precedent. Further, to the extent that the Courts of Appeals have imposed a lighter burden or a presumption of good faith, the Court concludes that application of such a lighter burden or presumption of good faith does not alter the Court's decision. Under any approach, the

ultimate question is essentially whether the Court finds that there is a reasonable possibility that the challenged conduct will recur. *See* Erwin Chemerinsky, Federal Jurisdiction § 2.5, at 139 (3d ed. 1999) ("The difficulty is determining why in some situations a legislative repeal is deemed to make a case moot, yet in other cases it does not . . . . The key appears to be that cases will not be dismissed as moot if the Court believes that there is a likelihood of reenactment of a substantially similar law if the lawsuit is dismissed."). The evidence before the Court, discussed in its prior order on mootness, led the Court to conclude that there is in fact such a likelihood, and the Court reaches the same result today.

With regard to those elements of the 2011 plans that remained unchanged and remained challenged in the interim plans, when the Legislature adopted the Court's interim plans it engaged in the same conduct or incorporated the  identical portions of the 2011 plans alleged to be illegal into the 2013 plans. In addition, the Task Force Plaintiffs complain that the Legislature engaged in similar vote dilution conduct with regard to HD 90 in the 2013 session. Thus, there is evidence that the Legislature has already engaged in both identical and substantially similar conduct, making this case more like *Aladdin's Castle* and *Associated General Contractors*. The fact that the State asserts that it believed the interim maps to be free from legal defect when it enacted them in 2013 goes to the merits of the controversy, not to whether a controversy remains to be decided. And, as noted, the State has steadfastly maintained the legality of *all* of the challenged conduct and has not announced any policy change that would preclude the Legislature from engaging in the same alleged wrongful conduct. Evidence submitted by Plaintiffs and the United States indicates that the Legislature adopted the 2013 plans at least in part in an attempt to end this particular litigation, not because it conceded the any of its actions were wrongful or because it had abandoned any intent to

engage in the same conduct.  Last, even though the 2011 plans would not be enjoined *in toto* given that they have been repealed, the ongoing controversy concerning the legality of certain portions of the plan and the presence of Plaintiffs' requests for § 3(c) relief prevent the 2011 plan claims from becoming moot.  For these reasons, the Court again denies Defendants' motion to dismiss the 2011 plan claims as moot.

**B. Whether the 2013 plan political gerrymandering claims should be dismissed?**

This Court previously permitted the Texas Democratic Party and Gilberto Hinojosa ("TDP") and John Morris to file amended complaints adding political gerrymandering claims against the 2013 plans.  Docket no. 886.[5]  The TDP alleges that the 2013 plans kept intact much of the 2011 plans, and thus are "equal partisan gerrymanders."  Docket no. 902 at 3.  The TDP alleges that the maps were designed with strict partisan purpose and include a number of congressional and house districts that far exceed Republicans' share of the State's electorate.  *Id.*  The TDP asserts political gerrymandering claims under the Equal Protection Clause of the Fourteenth Amendment, Article I, Sections 2 and 4, and the First Amendment of the United States Constitution.  *Id.* at 7-8.

In the first round of litigation challenging the 2011 plans, the Court dismissed the political gerrymandering claims for failure to state a claim.  Docket no. 285.  Following the Supreme Court's decisions in *Vieth v. Jubelirer*, 541 U.S. 267 (2004) and *LULAC v. Perry*, 548 U.S. 399 (2006), the Court concluded that political gerrymandering claims are justiciable, but require the plaintiffs to set

---

[5] Defendants assert that "[t]he TDP is the only party asserting partisan-gerrymandering claims against the 2013 redistricting plans."  Docket no. 995 at 32.  However, John Morris is also asserting partisan gerrymandering claims against the 2013 congressional plan.  *See* docket no. 784-1.  Defendants have not moved for summary judgment on Morris's claims, but the Court will construe Defendants' motion as encompassing Morris's claims.  Morris has filed a response in opposition to the motion.  Docket no. 1079.  Morris seeks permission to file a brief concerning his First Amendment political gerrymandering claim.  That request is denied.

forth a clear, manageable, and politically neutral standard by which to measure the burden imposed on their representational rights. Because plaintiffs failed to do so, the Court dismissed the claims on the pleadings under Federal Rule of Civil Procedure 12(c). In the present motion, Defendants again assert that the partisan gerrymandering claims against the 2013 plans are nonjusticiable, and that TDP fails to state a claim upon which relief can be granted.

In *Davis v. Bandemer*, 478 U.S. 109 (1986), the Supreme Court held that political gerrymandering claims are justiciable, but could not agree upon a standard to adjudicate them. Eighteen years later, a workable standard still had not emerged, and a plurality of the Court in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), concluded that *Davis* should be overruled and political gerrymandering claims be considered nonjusticiable. The plurality noted that in eighteen years, only one case had provided relief under the standard set forth in *Bandemer*'s four-Justice plurality opinion, and the plurality "would be at a loss to explain why the *Bandemer* line should have been drawn just there, and should not have embraced several districting plans that were upheld despite allegations of extreme partisan discrimination, bizarrely shaped districts, and disproportionate results." *Id.* at 279-80 (Scalia, J.). Because no judicially discernible and manageable standards for adjudicating political gerrymandering claims had emerged, the plurality concluded that *Bandemer* was wrongly decided and such claims should be held nonjusticiable.

Justice Kennedy concurred in the result, but would not "foreclose all possibility of judicial relief if some limited and precise rationale were found to" decide political gerrymandering claims in the future. *Id.* at 306 (Kennedy, J.).[6] In *LULAC v. Perry*, the Court declined to revisit the

---

[6] This Court previously followed the Ninth Circuit in concluding that Justice Kennedy's opinion is controlling. Docket no. 285 at 21 (citing *Alperin v. Vatican Bank*, 410 F.3d 532, 552 n.13 (9th Cir. 2005)); *see also Radogno*, 2011 WL 5868225, at *2 (noting that "political gerrymandering

justiciability holding.  548 U.S. at 414.  Justice Kennedy made clear that "a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must . . . show a burden, as measured by a reliable standard, on the complainants' representational rights." *LULAC*, 548 U.S. at 418 (Kennedy, J.).  Thus, this Court previously required Plaintiffs to proffer a reliable (*i.e.*, clear, manageable, and politically neutral) standard for evaluating these claims.

Plaintiffs proffer no new standard in response to Defendants' motion.  Rather, they contend that no standard is necessary in this case because Defendants have admitted to partisan gerrymandering.  And as before, they assert that courts will know an unconstitutional partisan gerrymander whey they see one; the "totality of the circumstances/constellation of facts" demonstrates an unconstitutional partisan gerrymander; lack of proportional representation, and an extreme partisan gerrymander is evident on the face of the plan.  Plaintiffs' standards have all been rejected.  *See Radogno v. Illinois State Bd. of Elections*, No. 1:11-cv-04884, 2011 WL 5868225 (N.D. Ill. Nov. 22, 2011) (listing standards previously rejected by the Supreme Court).

Plaintiffs argue that the Supreme Court's concern over an applicable standard "is not an issue in this case because the state's witnesses admit the motivation for the plan was to target Democrats as a class and therefore undermine the power of their vote."  But a sole-intent test was rejected in *Vieth* and *LULAC v. Perry*.  The *Vieth* plurality considered Justice Powell's standard from *Bandemer* – that the ultimate inquiry ought to focus on whether district boundaries had been drawn solely for partisan ends to the exclusion of all other neutral factors.  *Vieth*, 541 U.S. at 290.  The plurality noted

---

claims remain justiciable in principle but are currently 'unsolvable' based on the absence of any workable standard for addressing them").  If the plurality is controlling, the claims would be dismissed as nonjusticiable.  Regardless of which approach is taken, the result is the same – a denial of relief.

the difficulty inherent in statewide political gerrymandering claims, and concluded that Justice Powell's standard was essentially a totality-of-the-circumstances analysis to determine whether a particular gerrymander had gone too far or was not "fair."  *Id.*  In *LULAC v. Perry*, in which the plaintiffs asserted equal protection and First Amendment claims, Justice Kennedy noted that partisan aims generally would not guide every line in a plan, and the plaintiffs must nevertheless demonstrate a burden, as measured by a reliable standard, on the complainants' representational rights.  548 U.S. at 418  (Kennedy, J.).

With regard to Plaintiffs' other standards, simply saying that a partisan gerrymander is an illegal partisan gerrymander because it is so extreme is not a "clear, manageable, and politically neutral standard" for measuring the burden on representation rights.  It is merely a conclusion.  And as noted, the totality of the circumstances and proportional representation approaches have previously been rejected.

As before, Plaintiffs argue that they should be permitted to go to trial and develop the facts from which a standard will emerge.  They contend, "Nothing in Justice Kennedy's opinion in *Vieth* forecloses the development of the contours of a standard based on the particular facts before the court" and that "a trial would be needed to develop the facts logically follows from the principles suggested in Justice Kennedy's opinion."  Docket no. 1055 at 5.  However, development of a clear, manageable, and politically neutral standard for measuring the burden on representational rights should not depend on development of the factual record.  Rather, the development of facts should alter only the application of the established standard and the ultimate conclusion from such application.  Further, the Court previously rejected this argument, noting that the Court in *Vieth* dismissed the claim under Rule 12(b)(6) based on insufficiency of the complaint when plaintiffs did

not allege a manageable standard and language from Justice Kennedy's opinion in *LULAC* indicating that a standard is necessary to state a claim for relief.  Docket no. 285 at 22.

Accordingly, the Court concludes that Defendants' motion to dismiss the political gerrymandering claims against the 2013 plans should be granted pursuant to Rule 12(c) for failure to state a claim.

### Conclusion

Defendants' motion to dismiss (docket no. 995) is GRANTED IN PART AND DENIED IN PART.  The motion to dismiss the 2011 plan claims as moot is DENIED and the motion to dismiss the political gerrymandering claims against the 2013 plan claims is GRANTED.  Accordingly, all claims asserted by TDP and Morris are DISMISSED.  The Court expresses no view on the ultimate merits or chances of success of the claims that remain for decision.

SIGNED on this 17th day of June, 2014.

_____/s/_____

ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE


_____/s/_____

JERRY E. SMITH
UNITED STATES CIRCUIT JUDGE


_____/s/_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE