IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SHANNON PEREZ, *et al.*, | |
| Plaintiffs, | |
| and | Civil Action No. 5:11-cv-360 (OLG-JES-XR) Three-Judge Court [Lead Case] |
| UNITED STATES of AMERICA, | |
| Plaintiff-Intervenor, | |
| v. | |
| STATE OF TEXAS, *et al.*, | |
| Defendants. | |
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES (MALC), | Civil Action No. 5:11-cv-361 (OLG-JES-XR) Three-Judge Court [Consolidated Case] |
| Plaintiff, | |
| v. | |
| STATE OF TEXAS, *et al.*, | |
| Defendants. | |
| TEXAS LATINO REDISTRICTING TASK FORCE, *et al.*, | Civil Action No. 5:11-cv-490 (OLG-JES-XR) Three-Judge Court [Consolidated Case] |
| Plaintiffs, | |
| v. | |
| RICK PERRY, | |
| Defendant. | |

MARGARITA V. QUESADA, *et al.*,

                    Plaintiffs,

        v.

RICK PERRY, *et al.*,

                    Defendants.

Civil Action No. 5:11-cv-592
(OLG-JES-XR)
Three-Judge Court
[Consolidated Case]

JOHN T. MORRIS,

                    Plaintiff,

        v.

STATE OF TEXAS, *et al.*,

                    Defendants.

Civil Action No. 5:11-cv-615
(OLG-JES-XR)
Three-Judge Court
[Consolidated Case]

EDDIE RODRIGUEZ, *et al.*,

                    Plaintiffs,

        v.

RICK PERRY, *et al.*,

                    Defendants.

Civil Action No. 5:11-cv-635
(OLG-JES-XR)
Three-Judge Court
[Consolidated Case]

## UNITED STATES' POST-TRIAL BRIEF

### Table of Contents

I.     Introduction ................................................................................................. 1

II.    Factual Background ...................................................................................... 3

   A.   Population Growth ................................................................................... 3

   B.   2010 Election Results ............................................................................. 4

III.   Historical Background ................................................................................. 5

IV.    Legal Standard ............................................................................................ 8

   A.   Intentional Vote Dilution ........................................................................ 8

   B.   Proving Discriminatory Purpose ............................................................ 9

V.     Direct Evidence of Intentional Discrimination ......................................... 11

   A.   "Nudge Factor" ....................................................................................... 11

   B.   Racially Focused Statements .................................................................. 13

   C.   Precinct Splits ......................................................................................... 14

VI.    The 2011 Congressional Redistricting Plan Was Enacted with a Discriminatory
       Purpose ....................................................................................................... 15

   A.   The 2011 Congressional Redistricting Plan Created No Additional Minority
        Opportunity Districts Despite Massive Minority Population Growth .......... 16

   B.   The Construction of CD 23 Provides Evidence of Discriminatory Intent ..... 19

   C.   The 2011 Plan Eliminated Minority Electoral Opportunity in CD 27 .......... 26

   D.   The Construction of the Congressional Districts in DFW Provides Evidence of
        Discriminatory Intent .............................................................................. 28

   E.   The Discriminatory Treatment of Minority Members of Congress Provides Further
        Evidence of Texas's Intent During the 2011 Redistricting Process .............. 31

   F.   The Legislative Process in Enacting the 2011 Congressional Plan Was a Departure
        From Past Practice ................................................................................... 32

VII.   The State House Redistricting Plan Was Enacted with a Discriminatory Purpose .......... 35

   A.   The 2011 House Plan Refused to Recognize Minority Growth Through New
        Opportunity Districts ............................................................................... 37

B.   Texas Intentionally Eliminated Hispanic Opportunity in HD 117 ............................... 41

C.   Texas Intentionally Eliminated Hispanic Opportunity in HD 35 .................................. 44

D.   Texas Intentionally Eliminated Hispanic Opportunity in HD 41 .................................. 45

E.   Texas Intentionally Eliminated a Hispanic Opportunity District in Nueces County..... 48

F.   Texas Intentionally Prevented the Emergence of a Hispanic Opportunity District in Dallas County............................................................................................................... 51

G.   Texas Intentionally Eliminated a Minority Opportunity District in Harris County and Excluded Minority Representatives from the Process .................................................... 55

H.   The Legislative Process Excluded Minority-Preferred Legislators and Deviated from Established Procedures ................................................................................................... 59

VIII.   The Totatlity of the Circumstances Supports a Finding of Discriminatory Purpose ..... 63

A.   Texas Has a Long and Persistent History of Voting-Related Discrimination ............... 63

B.   Voting in Texas Is Racially Polarized. .......................................................................... 64

C.   Texas Has Used Voting Practices or Procedures that Enhanced Minority Vote Dilution ......................................................................................................................... 65

D.   Socioeconomic Disparities Hinder the Ability of African-Americans and Hispanics in Texas to Participate Effectively in the Political Process ................................................ 66

E.   African-Americans and Hispanics in Texas Are Underrepresented in Public Office ... 67

IX.   The State's Asserted Defenses Are Meritless .................................................................... 68

A.   Partisanship Is Not a Defense to Intentional Vote Dilution........................................... 68

B.   Opportunity to Elect a Preferred Candidate Is Defined by Electoral Outcomes, Not Demographic Concentrations......................................................................................... 73

C.   The Voting Rights Act Protects Minority Voters Who Live Outside of Single-Minority Majority Districts ........................................................................................................... 76

X.   Conclusion ......................................................................................................................... 80

## I.     <u>INTRODUCTION</u>

Between 2000 and 2010, Texas experienced tremendous minority population growth and a striking decline in the Anglo share of the State's population.  In the redistricting that followed the 2010 Census, Texas faced a choice:  whether or not to draw new Congressional and House districts that would fairly represent its growing minority communities.  Rather than reflect the demographic realities of a changing state, Texas officials consciously and deliberately chose to minimize minority representation in its 2011 Congressional and House redistricting plans.  The 2011 Congressional Plan further diluted minority voting strength in Texas's Congressional delegation by maintaining ten minority opportunity districts despite the increase in total districts from 32 to 36.  Even more brazenly, the 2011 House Plan reduced the number of minority opportunity districts from 50 to either 45 or 46.

The evidence presented at trial established that these plans were the product of an intent to dilute minority voting strength.  Using novel tools to implement outmoded ideas in the face of massive growth in the minority population, the 2011 plans are the latest chapter in Texas's long history of racial discrimination in districting.  Clothing these stark facts in the race-neutral terms of incumbency protection and partisanship cannot justify the state's "troubling blend of politics and race."  *LULAC v. Perry*, 548 U.S. 399, 442 (2006).

The 2010 election provides critical context for Texas's conscious decision to dilute minority voting strength across the state.  In 2010, for reasons unique to that election cycle, candidates who were not the candidates of choice of minority voters prevailed in a number of Congressional and House minority opportunity districts.  For the next election cycle, Texas could either leave the new incumbents to seek the votes of minority voters in these minority opportunity districts or redraw districts to eliminate minority voters' opportunity to elect their preferred candidates of choice.  In both the 2011 Congressional and House plans, state officials

1

chose to redraw districts in order to protect incumbents from minority voters who had not favored them in the past.

State officials minimized minority voters' opportunity to elect their preferred candidates using a variety of deliberate techniques. In Congressional District ("CD") 23 (West Texas) and House District ("HD") 117 (Bexar County), state officials applied a "nudge factor" that focused on replacing high-turnout Hispanic voters with low-turnout Hispanic voters, preserving the appearance of Hispanic majorities while maximizing Anglo control. In the Dallas-Fort Worth ("DFW") Metroplex, Texas packed minority citizens into CD 30, which had already provided minority voters an opportunity to elect their preferred candidate in the district that existed prior to the 2011 redistricting (hereinafter "2006 Plan"), and cracked the remaining minority community between CDs 6, 12, 26, and 33, each a majority Anglo district anchored in neighboring suburban and rural counties. Texas also split precincts by race and divided communities in ways that could not be explained by merely partisan aims. In HD 41 (Hidalgo County), Texas divided precincts by race and pulled in Anglo voters while excluding Hispanic voters. Similarly, in and around HD 105 (Dallas County), Texas divided precincts by race and overpopulated minority opportunity districts to forestall the natural emergence of a new minority opportunity district. Finally, Texas simply dismantled and moved two functional minority opportunity districts—HD 33 (Nueces County) and HD 149 (Harris County)—to Anglo regions without making any attempt to replace these districts with new districts in which minority voters would have the opportunity to elect their preferred candidates of choice.

While the Texas Legislative Council (TLC) and others expressed concerns that the Congressional and House maps would violate the Voting Rights Act and warned that state law concerns must yield to the Voting Rights Act, state officials ignored these warnings. Texas

enacted the 2011 Congressional and 2011 House plans knowing—indeed, specifically intending—that the result would be to dilute the opportunity of minority voters to elect their candidates of choice.

Texas's 2011 Congressional Plan and 2011 House Plan were adopted with the purpose of diluting minority voting strength in violation of Section 2 of the Voting Rights Act, which enforces the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution.  The direct and circumstantial evidence presented in this case and the inferences that flow from this evidence compel this conclusion.  Therefore, this Court should enter a declaratory judgment and set this matter for a remedial hearing to determine whether Texas's long and continuing history of racial discrimination in voting merits further relief under Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c).

## II.     FACTUAL BACKGROUND

### A.     Population Growth

According to the 2010 Census, Texas's population increased by nearly 4.3 million people between 2000 and 2010.  US PFOF ¶ 34.  Explosive growth among the state's minority populations accounted for approximately 90 percent of the increase, US PFOF ¶ 34, driving the state's total minority population up from approximately 48 percent in 2000 to 55 percent in 2010, US PFOF ¶ 36, and decreasing the state's total Anglo population from 52 percent to 45 percent during that same period of time, US PFOF ¶ 36.  Specifically, the state's Hispanic population growth comprised 65 percent of the total population increase, the African-American population growth comprised 13.4 percent, and the Asian population growth comprised 10.1 percent.  US PFOF ¶ 35.  As a result of this growth, Texas was apportioned four additional seats in the House of Representatives, increasing the number of representatives from 32 to 36.  US PFOF ¶ 44.

Even using other metrics, the overwhelming majority of growth is attributable to the state's minority groups.  Between 2000 and 2010, the voting age population (VAP) of Texas grew by approximately 3.3 million people, with more than 78 percent of the increase attributed to the state's minority population.  US PFOF ¶¶ 37-38.  The citizen voting age population (CVAP) also expanded by almost 2 million people, with minority citizens comprising more than 70 percent of the state's CVAP growth between 2000 and 2010.  US PFOF ¶¶ 39-43.

### B.    2010 Election Results

The 2010 election helps explain why Texas intentionally diluted minority voting strength in both the Congressional and House plans just months later in 2011.  After the 2010 elections, Texas officials stated that the goal of redistricting would be to protect incumbents, including several representatives who were not Hispanic-preferred candidates, but nonetheless had recently been elected from Hispanic opportunity districts.  US PFOF ¶¶ 47, 49, 51, 54, 57.

While the 2010 election featured reduced voter turnout among Hispanic and African-American voters, as often occurs in a midterm election, Anglo voters turned out at high levels, nearing participation rates typically associated with a presidential election.  US PFOF ¶ 46.  These turnout rates enabled Anglo-preferred candidates of choice to prevail over Hispanic-preferred candidates of choice in two Hispanic opportunity districts in Congress—CD 23 and CD 27, US PFOF ¶¶ 49, 51—and in four Hispanic opportunity districts in the State House—HD 33, HD 34, HD 35, and HD 117, US PFOF ¶¶ 53-54.

Although CD 23 elected a Hispanic-preferred candidate in 2006 and 2008, U.S. Representative Francisco Canseco defeated the Hispanic-preferred candidate in the 2010 election.  US PFOF ¶ 49.  Similarly, while CD 27 consistently elected U.S. Representative Solomon Ortiz, the Hispanic-preferred candidate, in each election from 1982 through 2008, U.S.

Representative Blake Farenthold, an Anglo-preferred candidate, defeated Representative Ortiz in 2010.  US PFOF ¶ 50-51.

For three election cycles prior to 2010, HDs 33, 34, 35, and 117 consistently elected Hispanic-preferred candidates, but in racially polarized contests in 2010, each district elected a candidate preferred by Anglo voters.  US PFOF ¶¶ 53, 55.  In HD 33, Representative Raul Torres bested Representative Solomon Ortiz, and in HD 34, Representative Connie Scott defeated Representative Abel Herrero.  Likewise, while Hispanic voters in HD 35 elected their preferred candidates of choice between 2002 and 2008, Representative Jose Aliseda, the Anglo-preferred candidate, was elected in 2010.  US PFOF ¶ 54.  Further, HD 117 elected a Hispanic-preferred candidate in 2004, 2006, and 2008, but Representative John Garza defeated the Hispanic-preferred candidate in the 2010 election.  US PFOF ¶ 54.  Prior to the 2011 redistricting cycle, even if they did not do so in every election, Hispanic voters were able to elect their preferred candidates of choice in all four of these House districts.  US PFOF ¶¶ 53, 55.

 Texas officials knew that these new incumbents would face difficulty in winning reelection in 2012, when minority turnout would be higher, so they announced that a redistricting goal would be incumbency protection.  Consistent with that goal, those charged with redistricting then diluted minority voting strength in those districts in order to protect the new incumbents.

## III.   <u>HISTORICAL BACKGROUND</u>

In the context of Texas's history of voting discrimination, the 2011 Congressional and House plans were some of the latest efforts in a persistent pattern of unconstitutional intentional discrimination.  As the demographic and political strength of minority citizens has grown, Texas has repeatedly sought to limit the minority vote through discriminatory redistricting and restrictive voting laws.  *See LULAC v. Perry*, 548 U.S. at 439-40; US PFOF ¶¶ 587-602.

Texas's history of official voting discrimination is recent.  The same session of the Texas Legislature that enacted the 2011 Congressional and House plans also enacted a "draconian" photographic voter identification requirement with the intent to disenfranchise minority voters. *Veasey v. Perry*, ___ F. Supp. 2d ____, 2014 WL 5090258, at *25, *55-56 (S.D. Tex. Oct. 9, 2014), *appeal pending*, No. 14-41127 (5th Cir. filed Oct. 10, 2014).  A federal court has found that Texas's voter identification law also "creates an unconstitutional burden on the right to vote, has an impermissible discriminatory effect against Hispanics and African-Americans," and "constitutes an unconstitutional poll tax." *Id.* at *1.[1]

The imposition of impermissible barriers to voting is nothing new in Texas.  Historically, Texas established poll taxes, authorized White-only primaries, and instituted other forms of discrimination that directly affected the rights of minorities to register, vote, and otherwise participate in the political process.  *E.g.*, *White v. Regester*, 412 U.S. 755, 768 (1973); *Veasey*, 2014 WL 5090258, at *1-4; US PFOF ¶¶ 588-601.

The pattern of discrimination has also been persistent in redistricting.  In every redistricting cycle since 1970, courts have found that one or more of Texas's statewide redistricting plans violated the U.S. Constitution or the Voting Rights Act.  *See Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013); *LULAC v. Perry*, 548 U.S. 399 (2006); *Balderas v. Texas*, No. 6:01-cv-158, 2001 WL 36403750 (E.D. Tex. Nov. 14, 2001) (three-judge court) (per curiam); *Bush v. Vera*, 517 U.S. 952 (1996); *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1992) (three-judge court), *aff'd sub nom. Richards v. Terrazas*, 505 U.S. 1214 (1992); *Upham v. Seamon*, 456 U.S. 37

---

[1] The 2011 Texas legislative process also had significant racial tension.  US PFOF ¶¶ 117, 292; *Veasey*, 2014 WL 5090258, at *17-18.  In addition to voter identification, legislation concerning immigration and sanctuary cities created a hostile atmosphere toward minority legislators.  US PFOF ¶ 117; *Veasey*, 2014 WL 5090258, at *17-18.

(1982); *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982) (three-judge court) (per curiam); *McDaniel v. Sanchez*, 452 U.S. 130 (1981); *White v. Regester*, 412 U.S. 755 (1973); *White v. Weiser*, 412 U.S. 783 (1973).  *See generally Veasey*, 2014 WL 5090258, at *3.

With regard to Congress, the redistricting plan that Texas enacted in 2003 violated the Voting Rights Act.  In 2006, the Supreme Court invalidated portions of Texas's 2003 Congressional redistricting plan because it diluted the vote "of a group that was beginning to achieve § 2's goal of overcoming prior electoral discrimination."  *LULAC v. Perry*, 548 U.S. at 442 (referring to the state's growing Hispanic population).

Likewise, for every House redistricting plan enacted by Texas from 1975 to June 25, 2013—the entire period that Texas was required to comply with Section 5 of the Voting Rights Act, 52 U.S.C. § 10303—either the United States Attorney General or a federal district court has concluded that Texas failed to establish the absence of a discriminatory purpose or effect in that plan.  PFOF ¶¶ 595, 597.  Most recently in 2001, the Attorney General objected to the 2001 House redistricting plan based on Texas's failure to establish the absence of a discriminatory purpose or effect.  US PFOF ¶ 597.

As discussed in the next section, the persistent pattern of voting discrimination in Texas is a significant factor under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), in assessing whether purposeful discrimination infected the 2011 redistricting plans.  *See Rogers v. Lodge*, 458 U.S. 613, 625 (1982) (stating that "[e]vidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where . . . discriminatory practices were commonly utilized," were not abandoned until federal intervention, and were replaced by practices "which, though neutral on their face, serve to maintain the status quo").

IV.     **LEGAL STANDARD**

Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301, prohibits practices and procedures that were adopted or maintained for the purpose of denying or abridging the right to vote on the basis of race, color, or membership in a language minority group.  Under Section 2, vote dilution exists if, based on the totality of circumstances, it is shown that citizens of a particular racial or language minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  52 U.S.C. § 10301(b).  Section 2 also forbids the adoption of a voting law or practice with a racially discriminatory purpose.  *United States v. Brown,* 561 F.3d 420, 433 (5th Cir. 2009); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990); S. Rep. 97-417, at 27 (1982).  The Fourteenth and Fifteenth Amendments to the Constitution similarly prohibit the implementation of voting practices enacted with a racially discriminatory purpose.  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997) ("*Bossier Parish I*").

   A.     **Intentional Vote Dilution**

A deliberate decision not to create an opportunity district required by Section 2 or a conscious decision to eliminate such a district constitutes intentional vote dilution, in violation of both Section 2 and the Equal Protection Clause of the Fourteenth Amendment.  *See LULAC v. Perry*, 548 U.S. at 440; *Brown*, 561 F.3d at 424 (holding that defendants "violated § 2 by intentionally diluting the voting power of white Democrats"); *Garza*, 918 F.2d at 766 ("To the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the [F]ourteenth [A]mendment.").  In order for this Court to find intentional vote dilution, "racial discrimination need only be one purpose, and not even a primary purpose" underlying the challenged redistricting plan.  *Brown*, 561 F.3d at 433 (internal quotation marks omitted); *see also Arlington Heights*, 429 U.S. at 265-

8

66; *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984); *Nevett v. Sides*, 571 F.2d

209, 218-19 (5th Cir. 1978); *Garza*, 918 F.2d at 771 (holding that the deliberate choice to

fragment Hispanic population for the purpose of perpetuating incumbencies constitutes

intentional discrimination).

### B.        Proving Discriminatory Purpose

Discriminatory purpose does not require proof that one or more legislators is a "racist"

or bears racial animus; rather, discriminatory purpose can be established simply by proving an

intent to disadvantage minority voters.  *Garza*, 918 F.2d at 778 & n.1 (Kozinski, J., concurring

and dissenting in part); *see also LULAC v. Perry*, 548 U.S. at 440 (noting that taking away

political opportunity just as a minority group is about to exercise it "bears the mark of intentional

discrimination that could give rise to an equal protection violation").

Such discriminatory purpose may be proved by direct or circumstantial evidence.

*Bossier Parish I*, 520 U.S. at 488; *Rogers*, 458 U.S. at 618.  "Direct evidence is something close

to an explicit admission . . . that a particular decision was motivated by discrimination; this type

of evidence is rare, but it 'uniquely reveals' the . . . intent to discriminate."  *Diaz v. Kraft Foods*

*Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420

F.3d 712, 720 (7th Cir. 2005)).

In *Arlington Heights*, the Supreme Court outlined a framework for courts to assess

circumstantial evidence of a discriminatory purpose.  429 U.S. at 265-66.  In applying this

framework, this Court will need to examine the discriminatory impact of the 2011 Congressional

and House plans, followed by an inquiry into the historical background, sequence of events

leading up to the decision, procedural or substantive deviations from the normal decisionmaking

process, and contemporaneous viewpoints expressed by the decisionmakers.  *Id.* at 266-68; *see*

*also, e.g.*, *Brown*, 561 F.3d at 433; *Overton v. City of Austin*, 871 F.2d 529, 540-41 (5th Cir.

1989).  These categories of evidence "identif[y], without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed."  *Arlington Heights*, 429 U.S. at 268.

The categories of evidence known as the "Senate Factors"—due to their inclusion in the Senate Report that accompanied the 1982 amendments to the Voting Rights Act—are also circumstantial evidence of a discriminatory purpose.  *Brown*, 561 F.3d at 433; *see also Rogers*, 458 U.S. at 620-22 (including similar evidence categorized previously in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), *aff'd sub nom. E. Carroll Parish Sch. Bd. v. Marshall*, 424 U.S. 636 (1976)).  The 1982 Senate Report specifies factors that typically may be relevant to a claim under the Section 2 standard.  *Thornburg v. Gingles*, 478 U.S. 30, 44-45 (1986). These include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

[1.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;]

[2.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 36-37 (quoting S. Rep. No. 97-417 at 28-29). The Senate Report's "list of typical factors is neither comprehensive nor exclusive. . . . Furthermore, . . . 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.'" *Id.* at 45 (quoting S. Rep. 97-417 at 29).

## V.   <u>DIRECT EVIDENCE OF INTENTIONAL DISCRIMINATION</u>

Although direct evidence of intent is not usually available in voting lawsuits, this is an unusual case. The United States and the other plaintiffs produced direct evidence that Texas acted with discriminatory intent in enacting the 2011 Congressional and House plans. Among the direct evidence of intentional discrimination are (1) emails among key redistricting figures explaining how map drawers would attempt to diminish minority voting strength, (2) racially focused statements by key players in the redistricting, and (3) the use of race in splitting precincts when drawing several of the Congressional and House districts.[2]

### A.   **"Nudge Factor"**

Emails between map drawers, legislative staff, and political operatives establish a plan by Texas to draw Congressional districts that would appear to afford Hispanic voters the

---

[2] Split precincts are also discussed in *infra* Sections VI.B.4, VI.D.1, VII.D and VII.F as evidence of the State's departure from traditional redistricting principles.

opportunity to elect their preferred candidates but would—by design—be politically controlled by Anglo voters.  While Eric Opiela and Gerardo Interiano both served on the staff of House Speaker Joe Straus, Opiela suggested that Interiano focus on Hispanic turnout when crafting districts to maintain the superficial appearance of minority population majorities while minimizing actual minority electoral opportunity.  US PFOF ¶ 106.  According to Opiela,

> It also would be good to calculate Spanish Surname Turnout/Total Turnout ratio for the 2006-2010 General Elections for all VTDs (I already have the data for this for 2006-2008 in a spreadsheet, just need to gather it for every VTD for 2010).  These metrics would be useful in identifying a "nudge factor" by which one can analyze which census blocks, when added to a particular district (especially 50+1 minority majority districts) help pull the district's Total Hispanic Pop and Hispanic CVAPs up to majority status, but leave the Spanish Surname RV and TO the lowest. This is especially valuable in shoring up Canseco and Farenthold.

US Ex. 75 (Email, Nov. 19, 2010).[3]  In this and in other emails, Opiela and Interiano discuss maintaining the Hispanic citizen-voting age population ("HCVAP") in certain 2011 Congressional districts at the same level as in the existing 2006 Congressional districts by using voter turnout data to swap blocks or precincts with lower Hispanic turnout for those with higher Hispanic turnout.  US PFOF ¶ 107.  Interiano admitted that "with regard to the nudge factor e-mail, there was never any doubt . . . that Mr. Opiela was trying to draw districts that would appear to be Latino opportunity districts because their demographic benchmarks were above a certain level but would elect a candidate who was not the Hispanic candidate of choice."  Trial Tr. 375:19-25, Aug. 11, 2014 (Interiano); US PFOF ¶ 114.

The map drawers used race as a proxy for partisanship, and they assumed that excluding politically active Hispanic voters was equivalent to excluding politically active Democratic

---

[3] Interiano explained that in this email "CVAP" stands for citizen voting age population, "RV" stands for registered voters, and "TO" stands for turnout.  US PFOF ¶ 108.

voters.  Texas's Redistricting Application software, known as "RedAppl," allowed map drawers to apply racial shading at the census block level. [4]  US PFOF ¶¶ 109-117.  When the map drawers combined the race-based turnout data, which Interiano and Opiela requested and received from the TLC, with racial population figures, they were able to create a block-level estimate of the number of Hispanic and non-Hispanic voters who turned out in a given election from a single census block.  US PFOF ¶ 111.  With this information, they were able to determine the level of Hispanic turnout in each census block and include (low turnout) or exclude (high turnout) Hispanic voters accordingly. [5]  US PFOF ¶¶ 114, 117.

The nudge factor was needed only in those few districts where state officials had to maintain the appearance of complying with the Voting Rights Act, by keeping the demographic numbers roughly equal to those in the 2006 Congressional Plan, while at the same time making it more difficult for Hispanic voters to elect their candidate of choice in those same districts in the 2011 Congressional Plan.  *See infra* Sections VI.B.4 and VI.D.1.  Moreover, evidence before this Court establishes that the map drawers applied these same concepts when eliminating Hispanic opportunity in certain districts in the 2011 House Plan.  *See infra* Sections VII.D and VII.F.

### B.   Racially Focused Statements

The emails provide further direct evidence of intentional discrimination. They show that decisionmakers thought and spoke in terms of race.  One email from Opiela describes his plan to protect the newly elected incumbents in CD 23 and CD 27 by adding "Anglo voters" to those districts and then, in the case of CD 23, adding enough low-turnout Hispanic areas of Bexar

---

[4] RedAppl has shading features that allow a map to be shaded by race or ethnicity.  For example, if a map drawer wants to know all of the census blocks in which black voting age population ("VAP") is greater than 75 percent in Dallas County, he or she could turn on racial shading in RedAppl to obtain that information.  US PFOF ¶ 82.

[5] Clare Dyer of the TLC explained that a map drawer could achieve the same "nudge factor" result with data already built into RedAppl.  US PFOF ¶ 111.

County to ensure its majority-minority population status.  US PFOF ¶ 118.  Opiela refers to "Anglo voters" as the solution to his political problem not just once, but four times in a single paragraph.  *Id.*  Regarding CD 23, Opiela explained that the map drawers did not want to use Anglo voters to bolster Republican performance, because that would "put a neon sign telling the court to redraw [the district]."  US PFOF ¶¶ 150-152.  Likewise, the non-Hispanic-preferred candidate elected to HD 117 in 2010 testified that he wanted to add "more Anglo" voters to his district to secure his reelection chances.  US PFOF ¶ 362.  These emails and statements reveal the extent to which the key redistricting participants conceived of partisan politics in distinctly racial terms.

### C.    Precinct Splits

The use of race in splitting voting tabulation districts (also known as "VTDs" or "precincts") further confirms that Texas acted with discriminatory intent during the 2011 redistricting.  Texas split an extraordinarily large number of precincts during the 2011 redistricting:  518 precincts in the Congressional Plan and 412 precincts in the House Plan.  US PFOF ¶ 119.  In some instances, map drawers admitted that they relied on racial data in deciding whether and how to split precincts.  *See infra* Section VI.D.1.  In many other instances, the frequency of and manner in which the plans split precincts are simply unexplainable on grounds other than race.  US PFOF ¶¶ 121-125; *see infra* Sections VI.B.4, VI.D.1, VII.D, and VII.F.  The use of precinct splits is critical evidence that state officials used race as a proxy for partisanship and that map drawers intentionally reduced minority political opportunity for a partisan political purpose in the 2011 Congressional and House plans.  US PFOF ¶¶ 119-125; US Ex. 356 ¶¶ 31-32, 54-56 (Feb. 2014 Arrington Rep.).

When Texas split precincts, the only accurate statistical data available to guide boundaries were population size and racial composition—not election information.  US PFOF

121.  RedAppl provided population and race data at the census block level, which is typically a much smaller unit than a precinct.  Election data is available only by precinct, and it is not available at the census block level.  Although RedAppl allocates election data to the census block level, that allocation is not accurate, and Texas redistricting officials knew that.  US PFOF ¶ 123.  RedAppl applies election results homogenously throughout a precinct.  In other words, RedAppl assumes that the percentage of the vote received by a candidate in a particular census block within a precinct is identical to the percentage that the candidate received in the precinct as a whole.[6]  *Id.*  Therefore, when Texas split precincts, it had no accurate way to determine the electoral performance of the census blocks within those precincts.  US PFOF ¶ 124.  But Texas did have racial data for those census blocks and it used this racial data as a proxy to predict the partisan leanings of voters in those areas.  US PFOF ¶ 122.  This was intentional race discrimination.

## VI.    THE 2011 CONGRESSIONAL REDISTRICTING PLAN WAS ENACTED WITH A DISCRIMINATORY PURPOSE.

In addition to the direct evidence discussed above, powerful circumstantial evidence establishes that the 2011 Congressional Plan was enacted with discriminatory intent.  Evidence probative under *Arlington Heights* demonstrates that Texas specifically intended to minimize minority representation in the state's congressional delegation.

The most relevant circumstantial evidence is the fact that despite massive growth in the state's minority population—growth almost entirely responsible for Texas's gaining four seats in Congress—Texas did not create a single new minority opportunity district.  Though the state

_____

[6] RedAppl assumes that all voters will vote in the same proportion across a precinct.  For example, assume a precinct provided President Obama with 45 percent of the vote.  Assume further that the precinct is one-third Hispanic, and two-thirds Anglo.  If the precinct's Hispanic population is split out of a district, the assumption under RedAppl is that 45 percent of the remaining Anglo voters voted for President Obama.

easily could have done so, it instead chose to cabin minority voting opportunity to ten districts and thereby diluted the minority vote. In addition, Texas's targeted manipulations in particular districts—splitting precincts by race and swapping low-turnout Hispanic voters for high-turnout ones in CD 23, eliminating minority opportunity in CD 27, and cracking and packing minority voters in the DFW Metroplex—readily give rise to an inference of intentional discrimination. Moreover, the unique impact of the 2011 Plan on the districts of minority representatives, along with troubling deviations in the legislative process, support a finding that Texas acted with discriminatory purpose in sapping voting power from its minority communities.

### A.    The 2011 Congressional Redistricting Plan Created No Additional Minority Opportunity Districts Despite Massive Minority Population Growth

Under *Arlington Heights*, the "important starting point" for an assessment of the circumstantial evidence is the discriminatory impact of the 2011 redistricting plans. 429 U.S. at 266. This is because "people usually intend the natural consequences of their actions." *Bossier Parish I*, 520 U.S. at 487. The 2011 Congressional Plan diluted minority voting strength.

Despite the enormous growth of Texas's minority population, the 2011 Congressional Plan has only ten districts in which minority citizens have the opportunity to elect candidates of their choice. US PFOF ¶¶ 90-91. This is the same number of minority opportunity districts that existed in the 32-district 2006 Congressional Plan. US PFOF ¶¶ 92-93.[7] Therefore, the 2011 Congressional Plan is more dilutive than the 2006 Congressional Plan. *Reno v. Bossier Parish Sch. Bd.* (*Bossier II*), 528 U.S. 320, 335 (2000).

---

[7] Although the 2011 Congressional plan created two new minority opportunity districts (CD 34 and CD 35), it eliminated two others (CD 23 and CD 27). US PFOF ¶ 94. The parties agree that under the 2006 Congressional plan, CD 27 provided minority voters with an opportunity to elect their candidates of choice, but no longer did in the 2011 Congressional plan. US PFOF ¶¶ 195, 198. And, as discussed below, the evidence establishes that minority voters' opportunity to elect their preferred candidate of choice in CD 23 was deliberately eliminated in the 2011 plan. *See infra* Section VI.B.

One gauge of whether a redistricting plan is more dilutive is to assess the gap between the actual number of minority ability districts and the number that would be roughly proportional to the minority share of the citizen voting age population.  *See, e.g., LULAC v. Perry*, 548 U.S. at 438 ("Latinos are, therefore, two districts shy of proportional representation.").

While "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," 52 U.S.C. § 10301(b), the proportionality of "electoral power," as measured by the share of districts that provide minority voters electoral opportunity, is relevant to the Section 2 inquiry.  *See Johnson v. De Grandy*, 512 U.S. 997, 1013-17 & n.11 (1994) (noting that this sort of proportionality is an indication of equal electoral opportunity).  The degree of disparate impact increases if this gap widens.

According to the American Community Survey (ACS) five-year estimate for 2006-2010, Black and Hispanic citizens combined constitute 38.2 percent of the state's citizen voting age population.  US PFOF ¶¶ 40, 632.  Proportionality of electoral power would be 12 minority opportunity districts in the 32-district 2006 Congressional Plan (38.2% x 32 = 12.2) and 14 minority opportunity districts in the 2011 36-district Congressional Plan (38.2% x 36 = 13.75).[8] US PFOF ¶¶ 40, 631.  Consequently, the 2006 Plan left minority voters two seats shy of proportionality, and the 2011 Plan increased the gap to four.  Therefore, the 2011 Congressional Plan further diluted minority voting strength.  US PFOF ¶ 45.

In addition to the 10 minority opportunity districts in the 2011 Congressional Plan, Texas could have created at least two additional minority opportunity districts.  Numerous alternative plans have shown that it is feasible to draw at least twelve Congressional districts in which minority citizens would have an opportunity to elect candidates of their choice.  US PFOF ¶¶ 95-

---

[8] The American Community Survey for 2010 had a one-year ACS estimate of 39.3 percent.  US PFOF ¶¶ 41.

96. Indeed, this Court's interim plan, C220, contained 12 minority opportunity districts. *See* November 26, 2011 Order at 16 n.32 (ECF No. 544).[9]

First, a minority opportunity district could have been created in South and West Texas simply by maintaining CD 23 as an opportunity district. Various proposals presented during the 2011 redistricting process did so, and this Court's interim plans proved that maintaining CD 23 as an opportunity district would not diminish minority opportunities elsewhere as the state has claimed. US PFOF ¶¶ 167-169. Notably, CD 23 could have been maintained as a Hispanic opportunity district with only relatively minor changes to the district as it existed in the 2011 Plan. US PFOF ¶ 167.

Second, Texas also could have created an additional minority opportunity district in the DFW Metroplex and was urged to do so by its Congressional delegation. Between 2000 and 2010, the minority population in the DFW area grew by more than 500,000, while the Anglo population decreased by more than 250,000. US PFOF ¶ 211. At the outset of the redistricting process, U.S. Representative Lamar Smith submitted a Congressional plan on behalf of the Texas Congressional delegation that would have provided minority voters in Tarrant and Dallas counties with an additional opportunity to elect their candidate of choice. US PFOF ¶ 213. Ryan Downton, counsel to the House Redistricting Committee, was aware of Representative Smith's plan and discussed the configuration with Smith during the 82nd Legislature's regular session. US PFOF ¶ 214. Indeed, many of Downton's early drafts included the additional minority opportunity district in DFW, as did many alternative proposals submitted to the Texas Legislature. *Id.* And again, this Court's interim plans proved that creating a new minority

---

[9] Minority political cohesion and racially polarized voting patterns are established by the state's own analyses and are not seriously in dispute. US PFOF ¶¶ 98-104.

opportunity district in DFW would not diminish minority opportunities elsewhere.  US PFOF ¶ 215.[10]

## B.     The Construction of CD 23 Provides Evidence of Discriminatory Intent

CD 23 had been redrawn by a three-judge court following the Supreme Court's decision in *LULAC v. Perry*, 548 U.S. 399 (2006), in order to remedy unlawful vote dilution that occurred when the Texas Legislature attempted to protect a vulnerable incumbent who was not the preferred candidate of a growing Hispanic electorate.  US PFOF ¶ 135.  Just like in *LULAC v. Perry*, state officials in 2011 once again eliminated minority voters' opportunity to elect their candidate of choice in CD 23.  Map drawers used a variety of techniques to achieve their goal of diluting Hispanic voting strength, and these actions further confirm that Texas acted with discriminatory intent.

### 1.     In CD 23, the Opportunity to Elect Has Been Eliminated

The Texas Legislature intentionally configured CD 23 so that it would no longer be an opportunity district for minority voters.  Dr. Lisa Handley testified that under the 2006 Plan, Latino voters in CD 23 elected their preferred candidate in two of the three "endogenous" Congressional elections held in the district.  US PFOF ¶ 135.[11]  In addition, Dr. Handley examined the district's likely performance using recompiled election results from six

---

[10] There are additional minority opportunity districts that could have been created.  Alternative plans created an additional minority opportunity district in Harris County.  US PFOF ¶ 241.  A separate minority opportunity district in South Texas also could have been created in which the Hispanic citizens of Nueces County would have had the opportunity to elect their candidate of choice.  US PFOF ¶¶ 203-205.  Instead, the Hispanic population in Nueces County was captured by a majority Anglo district, CD 27.

[11] An endogenous election refers to an election that is for the district at issue, and in the context of Congressional redistricting, it means an election contest for U.S. Representative.  Courts generally consider such elections more probative than other elections for determining whether minority voters can elect their preferred candidate of choice.  *See, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020-21 (8th Cir. 2006); *Goosby v. Town Bd.*, 180 F.3d 476, 497 (2d Cir. 1999) (*citing Clark v. Calhoun County*, 88 F.3d 1393, 1397 (5th Cir. 1996)); *Johnson v. Hamrick*, 196 F.3d 1216, 1222 (11th Cir. 1999).

"exogenous" contests[12] involving minority candidates[13] in statewide elections. In the six exogenous elections Dr. Handley examined, the minority-preferred candidate prevailed in the 2006 Plan version of CD 23 in three of the six elections, giving the district a score of 50 percent on her Exogenous Index. US PFOF ¶ 136.[14]   In contrast, under the 2011 Plan, the minority-preferred candidate lost in CD 23 in all six of the exogenous election contests that Dr. Handley analyzed. US PFOF ¶ 136, 138.

Texas's expert, Dr. John Alford, has admitted that CD 23 in the 2011 Plan would not provide minority voters an effective opportunity to elect. US PFOF ¶ 138.   Dr. Alford testified, with respect to the changes in CD 23 from the 2006 Plan to the 2011 Plan, that the problems that existed in CD 23 in *LULAC v. Perry* were also present in the 2011 Plan:  "There are some obvious parallels between what happened previously [in 2003] and what happened this time." US PFOF ¶ 139.  As Dr. Alford put it when discussing the changes to CD23, "we feel like we are all having déjà vu[.]"  *Id.*  He conceded in his testimony that "[i]f I [were] advising the legislature on drawing the 23rd, I would not have done what was done to the 23rd." *Id.*

---

[12] Exogenous election contests refer to any elections that are not for the district at issue. Recompiled election analysis is simply the practice of aggregating votes from past elections to predict how voters in a proposed district will perform in the future.  More specifically, recompilation analysis looks at the votes actually cast in a voting precinct and then recompiles a vote count for those precincts that would comprise the proposed district.  Because the proposed district often includes voting precincts that were not a part of the benchmark district, recompilation analysis can only be performed by looking at elections that span the entire jurisdiction, in this case, statewide elections.  Recompilation analysis thus depends strictly on exogenous elections and does not work with endogenous elections that are specific to any particular district.  The purpose of recompiled election analysis is to determine whether a minority-preferred candidate would prevail if the districts were drawn as proposed.

[13] When assessing ability to elect, the Fifth Circuit has found that elections involving minority candidates are more probative than Anglo-only election contests.  *See LULAC v. Clements*, 999 F.2d 831, 864 (5th Cir.1993) (en banc) ("This court has consistently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates, generally on grounds that such elections do not provide minority voters with the choice of a minority candidate.").

[14] Dr. Engstrom also found that the minority candidate of choice prevailed in 7 of 14 racially contested exogenous elections in CD 23, which would again demonstrate that the minority candidate of choice would prevail in 50 percent of the elections in the old CD 23.

In his rebuttal report, Dr. Alford presented a reconstituted election analysis of 2012 Congressional elections in the 2011 Plan, and he argued that Representative Pete Gallego, the Hispanic candidate of choice, would have won the 2012 election in the 2011 version of CD 23. US PFOF ¶ 140. Dr. Alford did not conduct a standard reconstituted elections analysis. He took the election results in CD 11, CD 16, CD 20, CD 21, CD 23, and CD 28, parts of which would have comprised CD 23 in the 2011 Plan, and when he added up the results, he found that the Democratic candidates in the relevant precincts in those six districts would have received more than the Republican candidates. Dr. Alford admits that no other expert or the TLC uses reconstituted election analysis in this manner. US PFOF ¶¶ 141, 143. A key flaw in this type of analysis is that it fails to consider the ethnicity of the candidate in each of the Congressional contests, or the likelihood that these candidates may not have take similar stances on issues. US PFOF ¶¶ 142, 143. Dr. Alford's flawed analysis does not rebut the well-supported conclusions of Dr. Handley and other experts in this matter that CD 23 in the 2011 Plan did not provide Hispanic voters with the opportunity to elect their candidates of choice.

### 2. The "Nudge Factor" Applied to CD 23

Legislators wanted to help Representative Canseco get re-elected, even though he was not the candidate of choice of Hispanic voters in CD 23. US PFOF ¶ 145. Texas's past experience in the *LULAC v. Perry* case indicated that Texas would likely be found to violate Section 2 if it simply decreased the number of Hispanic voters and increased the number of Anglo voters in CD 23. As Opiela said in one of his emails, if the state used Anglo voters to boost Canseco's performance, that would "put a neon sign telling the court to redraw [the district]." US PFOF ¶ 151.

Those officials responsible for the 2011 Congressional Plan had to resort to more

sophisticated, less obvious means.  They intentionally drew CD 23 to make it appear to be a Hispanic opportunity district but in reality fail to provide Hispanic voters the opportunity to elect their candidate of choice.  US PFOF ¶ 146.  Officials intentionally removed highly mobilized Hispanic voters from the district and replaced them with low-turnout Hispanic voters, thus maintaining the same HCVAP level as in the 2006 Plan but eliminating CD 23 as a minority opportunity district. US PFOF ¶¶ 147-149.

Analysis of turnout data shows that Texas succeeded in decreasing Hispanic turnout, even though the district appeared to have the same demographics.  Dr. Handley concluded that turnout was higher in areas removed from CD 23 than in areas added to the district.  US PFOF ¶ 154.  Dr. Henry Flores found that in the precincts swapped by the map drawers, Hispanic turnout was two percentage points lower in CD 23 in the 2011 Plan as compared to the 2006 Plan, and Anglo turnout was two percentage points higher in the same comparison. US PFOF ¶ 155.  Furthermore, reconstituted election analyses by Texas's Office of the Attorney General ("OAG") show that Hispanic voters turned out at a lower rate in CD 23 in the 2011 Plan than in the 2006 Plan.  US PFOF ¶ 156.

### 3.  State Officials Ignored Warnings that CD 23 Did Not Comply with the Voting Rights Act

The dilution of the Hispanic vote in CD 23 was the direct result of deliberate choices.  As the map drawers were creating CD23, they received a recompiled election analysis for their draft maps, which included an index of 10 elections compiled by the Texas OAG.  US PFOF ¶ 152.  The OAG used 10 statewide elections ("the OAG 10") to determine whether the Hispanic candidate of choice would prevail in an election in CD 23 in the 2006 Plan, as well as in the configuration of CD 23 for which map drawers requested election analysis.  US PFOF ¶ 152.  For example, this index showed that Hispanic voters would be able to elect their candidate of choice

in CD 23 in 3 out of 10 elections in the 2006 Plan.  US PFOF ¶ 600.  In the Solomons-Seliger Plan

(C125), Hispanic voters could elect their candidate of choice in CD 23 in only 1 in 10 elections.

US PFOF ¶¶ 160-163.  In Plan C130, the Senate Committee substitute, again the candidate of

choice of Hispanic voters was able to prevail in only 1 of 10 elections.  *Id.*  TLC Counsel Jeffrey

Archer and David Hanna warned that the committee map being offered for consideration

impermissibly decreased election performance for Hispanic voters in CD 23.  *Id.*  Senate

Committee staffer Doug Davis also expressed concerns that the proposed CD 23 would elect

Hispanic-preferred candidates in only 1 of 10 elections.  *Id.*  Not only did the legislators and map

drawers not heed any of the warnings, they adopted Plan C185, which, compared to Plan C125,

decreased the percentage of the vote for Hispanic candidates of choice in most elections.  US

PFOF ¶¶ 164-166.

### 4. Splitting Counties and Precincts at the End of the map Drawing Process

In the 2011 Plan, CD 23 contained 39 precinct splits, 37 of which were inserted into the

plan on the last day of map drawing, which occurred on June 13, 2011.  Some of these changes

originated in a map that Opiela sent to Interiano.  Other changes, such as the addition of 30 split

precincts, occurred because Downton added them to the map.

Opiela sent a map to Interiano on the morning of June 13, 2011, which is in evidence as

Map STRJC 116.  US PFOF ¶ 149.  Interiano provided that map to Downton, one minute after he

downloaded it into his RedAppl account.  *Id.*  Opiela's map had two different features that ended

up being adopted in the final 2011 map, Plan C185—the split of predominantly Hispanic

Maverick County and Eagle Pass,[15] and the addition of seven split precincts in Atascosa and

Bexar counties.  US PFOF ¶¶ 172-174.  Downton admitted that the splitting of Maverick County

---

[15] Eagle Pass, the largest city in Maverick County, has a population of 26,248 and both Eagle Pass and
Maverick County are more than 90 percent Hispanic.  US PFOF ¶ 181.

and the City of Eagle Pass was taken from Opiela's proposal and implemented in the final map. US PFOF ¶ 182.  Downton split the boundaries of Maverick County differently than had Opiela, and Downton included one additional precinct split in the City of Eagle Pass that Opiela had not proposed in his map.  *Id*.  Neither Maverick County nor Eagle Pass had been split during any prior Congressional redistricting.  US PFOF ¶ 183.

State defendants have invoked the goal of raising CD 23's Spanish Surname Registered Voter ("SSVR") level to defend Downton's splitting of Maverick County.  Chairperson Solomons admits, however, that the SSVR percentage could have been increased without dividing Maverick County, and by incorporating less of Atacosa, La Salle, or Dimmit Counties in the final plan. US PFOF ¶ 186.  Moreover, Hanna admitted that doing so would have alleviated his concerns about the low level of Hispanic performance in CD 23.  US PFOF ¶ 169.

Downton agreed that he did not need to split Maverick County, and he could have put all of it into CD 23, but that option would have made it difficult for Representative Canseco to get re-elected.  US PFOF ¶ 187.  Redrawing the district's lines to increase slightly the number of Hispanic citizens should have significantly increased Hispanic voters' ability to elect their candidates of choice in CD 23—an increase that would have seriously jeopardized Representative Canseco's reelection.  US PFOF ¶ 188.

Splitting counties and cities is not the only way in which Downton attempted to diminish Hispanic voting strength.  He also split precincts.  Downton's actions reveal that he adopted Opiela's "concept" of making the district appear Hispanic but driving down the ability of

Hispanic voters to elect their candidates of choice.  He just did it in a different way than Opiela suggested.[16]

Downton found another way to decrease the opportunity of Hispanic voters to elect their candidates of choice in CD 23 without having it show up in the recompiled election results of the OAG 10.[17]  Downton split 30 additional precincts on the final day of map drawing.  US PFOF ¶ 175.  Downton split heavily Hispanic precincts that have high voter turnout.  Precincts on the Southside of San Antonio were split, and they have heavily Hispanic precincts that turn out to vote in elections.  US PFOF ¶ 176.  Downton split the community of Harlandale, which had previously been part of only CD 23, among CD 20, CD 23, and CD 35.  US PFOF ¶ 177. Historically, this area has been home to a highly effective and politically active Hispanic community that wielded considerable influence within a single congressional district.  US PFOF ¶¶ 176-78.

Dr. Arrington explained the burdens associated with split precincts.  Hispanic voters in the Southside of Antonio have mobilized effectively to support Hispanic candidates.  US PFOF ¶¶ 118-120.  When a community is split among three Congressional districts, however, there is not the same opportunity to get out the vote through mobilization efforts.  *Id.*  Dr. Arrington pointed out that even knowing where to vote is confusing when the area is carved up among different districts.  *Id.* By splitting the precincts in the manner that he did and assigning them to three separate congressional districts, Downton was betting that the actual turnout in the fractured Hispanic community would not be as high in future CD 23 elections.

---

[16] In Map STRJC 116, Opiela changed the boundaries in such a manner that no Hispanic preferred candidates would receive 50 percent of the vote in any of those elections.  US PFOF ¶ 164.  Downton rejected Opiela's boundary changes.  US PFOF ¶ 158.

[17] As explained above, election results are available only by precinct, and there is not an accurate way to determine the election results for subunits of a precinct once it has been split.

There was no question that CD 23 could have been changed to allow Hispanic voters a greater opportunity to elect their candidates of choice.  US PFOF ¶¶ 167-169.  The evidence shows that this did not happen because Texas officials wanted to make CD 23 safer for an incumbent who was not preferred by Hispanic voters.  US PFOF ¶¶ 129, 145.

5.       **Statements in the Legislative Process Support an Inference of Discriminatory Purpose**

A contemporaneous statement by Chairperson Solomons, which misled fellow members in supporting a plan that diminished the ability of Hispanic citizens to elect their candidate of choice in CD 23, further supports an inference of discriminatory intent.  Chairperson Solomons introduced an amendment, Plan C170, to the Congressional redistricting plan on June 14, 2011.  The amendment concerned changes to the boundaries of CD 23 and CD 20.  US PFOF ¶ 287.  Chairperson Solomons assured representatives on the House Floor that Plan C170 made changes necessary to maintain the ability of Hispanic voters to elect their candidates of choice in CD 23. *Id.* Based on that representation, Representative Mike Villareal, a member of the Redistricting Committee, voted for the amendment.  US PFOF ¶¶ 288.  Contrary to Chairperson Solomons' assurances, Plan C170 in fact decreased the performance of Hispanic-preferred candidates in statewide elections in CD 23.  US PFOF ¶ 287.  Chairperson Solomons and his staff had received OAG election analyses prior to his introduction of Plan C170. *Id.*

Moreover, Representative Tracy King on the House floor alerted the legislators to the fracturing of Maverick County and the City of Eagle Pass at this time.  US PFOF ¶ 184. Even after becoming aware of the splitting of these Hispanic communities, neither Downton nor anyone else involved in the process attempted to rectify the problem. *Id.*

C.       **The 2011 Plan Eliminated Minority Electoral Opportunity in CD 27**

The 2011 Plan eliminated the opportunity for Hispanic voters to elect the candidates of their choice in CD 27.  All of the experts in this case agree that in CD 27, as it existed under the 2006 Plan, minority voters could elect their candidates of choice.  US PFOF ¶ 195.  The 2006 version of CD 27 was located in southeastern Texas; it included the cities of Corpus Christi and Brownsville and the counties of Kenedy, Kleberg, Willacy, and Nueces, as well as portions of Cameron and San Patricio counties.  US PFOF ¶ 191.  Representative Farenthold has represented CD 27 since 2010, when he defeated 27-year incumbent Solomon Ortiz, Jr.  Representative Farenthold was not the Hispanic candidate of choice in 2010.  US PFOF ¶ 193.

The 2011 redistricting plan removed the southern counties of Kenedy, Kleberg, Willacy, and Cameron from CD 27, and instead, it included Nueces County with predominantly Anglo counties north and west of Nueces County.  US PFOF ¶ 197.  All experts again agree that Hispanic voters in Nueces County and the new CD 27 no longer had the ability to elect their preferred candidates.  US PFOF ¶ 198.

Because CD 27 in the 2006 Plan was overpopulated by only approximately 43,000 individuals, the map drawers could have removed only a few precincts to bring the district into compliance with one-person, one-vote requirements.  US PFOF ¶ 202.  Downton testified that CD 27 was redrawn to give Representative Farenthold a better chance of re-election.  *Id.*  This could have been accomplished in the congressional plan by carving out the small portion of Nueces County containing the incumbent's home and moving that portion into a northern district, leaving the bulk of Nueces County in a South Texas district.  *Id.*  If that had occurred, the sizable Hispanic population in Nueces County would still be able to elect its candidates of choice.

Contrary to Texas's assertion, the 2010 interim field hearings on redistricting do not justify the choice to join the Hispanic population of Nueces County with counties to the

27

northwest in a new CD 27.  Representative Todd Hunter stated that witnesses testified at one of those hearings that they wanted a congressional district in the Coastal Bend area.  US PFOF ¶ 205.  He conceded that no one attending the hearings requested that Nueces be grouped with Bastrop, Caldwell, Gonzales, and Lavaca Counties.  US PFOF ¶ 206.  Moreover, numerous individuals at the interim hearings testified about the importance of continuing to allow Hispanic voters in Nueces County the opportunity to elect candidates of choice.  *Id.*  Some individuals at the hearings—including, for example, Congressperson Blake Farenthold—suggested that it might be possible to create both a Coastal Bend district and maintain a majority-Hispanic district, but these suggestions were not adopted.  US PFOF ¶ 205-206.

### D.   The Construction of the Congressional Districts in DFW Provides Evidence of Discriminatory Intent

#### 1.   Map Drawers Diluted Minority Voting Strength by Splitting Precincts and Cracking Minority Communities

Map drawers diluted minority voting strength in DFW by violating traditional redistricting principles—cracking minority communities and splitting precincts.[18]  Instead of allowing an additional minority opportunity district to occur naturally within the compact minority communities in the DFW Metroplex, the map drawers intentionally divided much of the minority population among four Anglo-controlled Congressional districts—CD 6, CD 12, CD 26, and CD 33.  US PFOF ¶¶ 217-219.

CD 6 is anchored in majority Anglo Ellis and Navarro Counties.  Anglos make up 69.7 percent of the VAP in Ellis County and 65.1 percent of the VAP in Navarro County.  US PFOF ¶¶ 220.  In the 2011 plan, a "finger" reaches up from majority Anglo Ellis and Navarro Counties

---

[18] Cracking occurs when a cohesive minority community is divided into several districts, preventing the group from voting together to elect a candidate of their choice.  US PFOF ¶ 217.  Splitting precincts tends to reduce turnout because of voter confusion.  US PFOF ¶ 120; *see also supra* Part V.C.  Concentrating precinct splits in minority communities weighs more heavily on minority voters and drives down minority voter turnout.  US PFOF ¶ 120.

to take in large concentrations of African-American and Hispanic population from Dallas and Tarrant Counties.  US PFOF ¶ 222.  The boundaries of the district split 39 precincts.  *Id.*  These splits disproportionately affect majority minority precincts—28 of the 39 split precincts are majority minority.  US PFOF ¶ 222.

CD 12 is located entirely within Tarrant County.  US PFOF ¶ 223.  The boundaries of CD 12 split 53 precincts to combine a majority of northern Tarrant County's Anglo, rural population with southeast Fort Worth, which is made up of several inner-city, low-income communities that are predominantly African-American.  US PFOF ¶¶ 224-227.  Placing the minority population of southeast Fort Worth into a district that is anchored by the Anglo communities in northern Tarrant County nullifies the voting strength of the minority population.

CD 26 is anchored in rural, majority Anglo Denton County.  Anglos make up 67.5 percent of the VAP in Denton County.  US PFOF ¶ 228.  The district strikes downward from Denton County in a "lightning bolt" and removes two significant minority communities of interest in Tarrant County—Near North Side and South Fort Worth.  US PFOF ¶ 229.  The boundaries of CD 26 divide 49 precincts, and 38 of those splits are located in the "lightning bolt" in Tarrant County.  US PFOF ¶ 230.  The entire divided area is overwhelmingly Democratic, and therefore the division could not have been driven by political data.  US PFOF ¶¶ 231-233.  Downton confirmed that he drew the boundaries of the lightning bolt in CD 26 using racial data, but he stated that he did so in an effort to comply with another traditional redistricting criterion— preserving minority communities of interest.  US PFOF ¶ 232.  This testimony is not persuasive.  Mr. Downton admitted that he had no personal knowledge of the actual minority communities in DFW, belying his claim that he tried to preserve a cohesive community of interest.  *Id*.  Instead, he used racial shading in RedAppl to group some Hispanic communities together into CD 26

while severing other cohesive Hispanic and African-American communities in Fort Worth and placing them in other Congressional districts.  US PFOF ¶¶ 231-232.  Including the Near North side and South Fort Worth communities from southern Tarrant County in CD 26 only serves to dilute the minority vote in these communities, as the overwhelming majority of CD 26's voting strength comes from Anglo-dominant Denton County.

CD 33, one of the state's newly apportioned congressional districts, encompasses all of Parker County and parts of Wise County.  US PFOF ¶ 234.  Anglos make up 87.2 percent of the VAP in Parker County and 82.9 percent of the VAP in Wise County.  *Id.*  That district wends eastward splitting 10 precincts and fracturing minority communities of interest in the City of Arlington, which has one of the fastest growing minority populations in Tarrant County, and subordinates their voting strength to that of the majority-Anglo electorate in Parker and Wise counties.  US PFOF ¶ 235.  The configuration of the congressional districts in the DFW Metroplex, which intentionally cracks the minority population, is evidence of discriminatory intent.  US PFOF ¶ 237.

### 2.       Map Drawers Further Diluted Minority Voting Strength by Packing CD 30

The 2011 Plan also packed a large concentration of Dallas County's minority population into CD 30, a majority-minority district that already provides minority voters the opportunity to elect candidates of their choice.  US PFOF ¶ 238.  Packing occurs when a minority community can elect their candidates of choice in a district, and yet, substantial minority population is added to the already performing district.  *Id.*  Prior to the 2011 redistricting, CD30 had a total Black and Hispanic VAP of 82.1 percent, with a combined Black and Hispanic citizen voting age population (BHCVAP) of 62.3 percent.  US PFOF ¶ 239.  In the 2011 Congressional Plan, the total Black and Hispanic VAP in CD 30 was increased to 85.9 percent, and the BHCVAP to 66

percent.  *Id*.  This high concentration of African-American and Hispanic population is much greater than necessary for minorities to elect their candidate of choice in CD 30.  US PFOF ¶ 241.  This excessive concentration of African-American and Hispanic population is not necessary for minorities to elect their candidate of choice in CD 30 and thus serves only to further suppress minority voting strength in the DFW Metroplex.  *Id*.

E.     **The Discriminatory Treatment of Minority Members of Congress Provides Further Evidence of Texas's Intent During the 2011 Redistricting Process**

The treatment of minority members of Congress during the 2011 redistricting process further illuminates the discriminatory nature of the process.  The evidence at trial establishes that the map drawers removed key economic features from the districts of Representatives Eddie Bernice Johnson, Sheila Jackson Lee, and Alexander Green, all of whom are African-American and represented minority opportunity districts.  US PFOF ¶¶ 255-257.  The map drawers drew those members' district offices out of their districts and drew Representative Johnson's district to exclude her home.  US PFOF ¶ 246.  This occurred despite those members' repeated efforts to address and remedy these issues.  US PFOF ¶¶ 246-265.

Limiting the economic ability of a congressional district similarly hinders members in representing their constituents effectively.  For members serving minority opportunity districts, access to economic engines add to the quality of life of constituents by boosting the economy, revitalizing struggling communities, and providing jobs for citizens.  US PFOF ¶ 259.  By placing these economic engines in Anglo opportunity districts that are not anchored in these struggling, minority communities, the non minority-preferred Representative has no incentive to use the economic engines to benefit the minority community.  *Id*.  Changing the main district offices makes it more difficult for members to meet the needs of their constituents.  That is

particularly true in minority-controlled districts, where the demand for constituent services is often high.  *Id.*

There was no comparable treatment of Anglo members of Congress in the 2011 redistricting process.  To the contrary, the map drawers accommodated the Anglo members' requests to have certain schools, country clubs, and other special projects drawn into their districts.  US PFOF ¶¶ 255-56.  When asked to explain this disparate treatment, Interiano notably did not chalk it up to politics.  Rather, he claimed that it was all merely a "coincidence."  US PFOF ¶ 265.  This "coincidence" affected only minority representatives and is further evidence of purposeful discrimination.

### F. The Legislative Process in Enacting the 2011 Congressional Plan Was a Departure From Past Practice

The process leading up to the adoption of the 2011 Congressional Plan illustrates deviations from typical redistricting procedural standards designed to solicit substantive public input and to permit meaningful debate.  As a result, the 2011 Plan was a product of an exclusive process that prevented meaningful participation by minority citizens and their elected officials in both the State Senate and House.  US PFOF ¶¶ 265, 292.

Prior to the start of the 82nd Legislative session, the Senate and House committees held redistricting hearings across the state, but they did not provide a meaningful opportunity for citizens to comment.  US PFOF ¶¶ 59-65, 265. [19]  The hearings were held prior to the release of the 2010 Census data for the state and as a result no draft maps were available for public comment.  US PFOF ¶¶ 61-62.  The hearings were also held during the day in locations that were not accessible by transportation or that required participants to pay for parking.  US PFOF ¶¶ 64-

---

[19] Between June 21, 2010 and November 20, 2010, the Texas House Committee on Redistricting, the Texas House Judiciary Committee, and the Texas Senate Select Committee on Redistricting held a total of 18 field hearings around the State regarding the redistricting process.   US PFOF ¶ 59.

65.  Because the hearings did not allow for any substantive public comment, it is clear that they were organized at least in part to provide superficial support for Texas's request for preclearance of its redistricting plans under Section 5.

On May 30, 2011, the 82nd Legislature's Regular session adjourned and no legislation reapportioning the congressional districts was passed or had even been considered.  US PFOF ¶ 268.  The first detailed proposal for the 2011 Congressional plan (C125) was released that evening.  US PFOF ¶ 269.  The following day, the Governor called a special session.  US PFOF ¶ 163.  From there, the Texas Legislature flew through the enactment process.  The entire process—from the Senate committee hearing and debate through reconsideration by the Senate after the House committee hearing and debate—lasted only two-thirds of the time that was allotted, US PFOF ¶ 289; there was time to conduct further debate and additional hearings, but neither occurred.  US PFOF ¶ 289-90.  Even more significantly, the legislative debate failed to address the substance of most alternative proposals and amendments offered by minority groups or minority-preferred legislators.  US PFOF ¶ 250, 254, 256-58, 272, 275, 277-78.

### 1.    Senate Process

Plan C125 was jointly released to the public by Senator Kel Seliger, Chairperson of the Senate Select Committee on Redistricting in 2011, and House Redistricting Committee Chairperson Solomons.  US PFOF ¶ 269.  Minority senators did not have an opportunity to see Plan C125 before its public release, US PFOF ¶ 269, and the Senate Redistricting Committee then held its only public hearing at the State Capitol less than 72 hours later, on June 3, 2011.  US PFOF ¶ 271.  However, at that hearing, the Committee took up an entirely different plan— Plan C130—that was only released for public comment the prior evening, on June 2.  US PFOF ¶

271.  Both actions—holding only one hearing and switching the plan prior to the hearing—were deviations from the traditional redistricting process.  US PFOF ¶¶ 273-74.

At the June 3, 2011 public hearing, minority members of the Committee complained about their exclusion from the Congressional redistricting process.  Chairperson Seliger also admitted on the floor of the Senate that unlike in previous years, no minority members were involved in the development of the 2011 Congressional Plan.  US PFOF ¶ 267.

At the same public hearing, outside counsel for the State Senate expressed concern to the Committee that the plan had been rushed without sufficient time for public scrutiny.  US PFOF ¶ 273.  The Senate Committee's counsel described the redistricting process as "quite different from what we've seen in the past" based on the failure to release a proposal during the regular session, the limited time for review of the proposal, and failure to provide counsel with the necessary election data to evaluate Voting Rights Act compliance.  US PFOF ¶ 273.  The plan that was ultimately passed, C185, differed substantially from Plan C130 that was available at the June 3 hearing, especially with regard to CD 23 and the DFW Metroplex.  US PFOF ¶ 276.

## 2.  House Process

Minority members of the Texas House of Representatives also were excluded from the redistricting process until plans were unveiled to the public, just days before the public hearing held by the House Redistricting Committee.  US PFOF ¶ 278.  On May 31, 2011, one day after the release of Plan C125, Chairperson Solomons announced that the House Committee would hold its sole public hearing on June 2.  Minority legislators and members of the public were given less than 48 hours' notice for this hearing.  US PFOF ¶ 279.  This was a fraction of the time that was allotted for comment on other significant legislative proposals during the 2011 Legislature.  US PFOF ¶¶ 272-273, 282.  Scheduling the hearing so soon after the release of the

public proposal also provided insufficient time for minority-preferred legislators and their constituents to offer amendments to the proposal, which was a particular burden on the minority community whose voting strength was diminished in the plan.  US PFOF ¶ 291.

Minority-preferred legislators' input was also limited on the House floor.  Representative Dawnna Dukes proposed an alternative plan, Plan C166, which received wide support from House members who represented minority opportunity districts.  US PFOF ¶ 283.  However, the amendment was tabled after only 30 minutes of debate, preventing the proposal from ever being brought up again.  US PFOF ¶ 283.  The rejection of Plan C166 mirrored the treatment of virtually every amendment offered by minority-preferred representatives: perfunctory debate and a move to table.  US PFOF ¶ 285.

* * * * *

In sum, the 2011 Congressional Plan purposefully diluted minority voting strength. Texas experienced significant population growth in the last decade, largely attributable to growth in minority population.  Numerous alternative plans before the Legislature reflected that growth by creating additional minority opportunity districts.  The legislature refused to adopt or even allow for any meaningful debate on any of these alternative plans.  Instead, the 2011 Plan further diluted minority voting strength with regard to Texas's Congressional delegation by maintaining ten minority opportunity districts despite the increase in total districts from 32 to 36.  Texas deliberately prevented new minority opportunity districts by swapping low-turnout Hispanic voters for high-turnout voters in CD 23,  by cracking and packing minority voters in the DFW Metroplex, and by fracturing communities through the use of split precincts in both areas.  The direct and circumstantial evidence regarding the 2011 Congressional Plan demonstrates discriminatory intent under Section 2. *See, e.g.*, *Brown*, 561 F.3d at 433.

## VII.  THE STATE HOUSE REDISTRICTING PLAN WAS ENACTED WITH A DISCRIMINATORY PURPOSE

The record establishes that Texas enacted the 2011 House Redistricting Plan with a discriminatory purpose: the aim to minimize minority representation in the Texas House. Dramatic growth in the state's minority communities over the preceding ten years should have led the legislature to create new minority opportunity districts.  Instead, the 2011 House Plan *reduced* the number of minority opportunity districts from 50 to either 45 or 46.  *See* US PFOF ¶¶ 34-45, 297-299.  Minority voters no longer had an opportunity to elect their preferred candidates in HD 33 (Nueces County), HD 35 (South Texas), HD 117 (Bexar County), HD 149 (Harris County), and possibly HD 41 (Hidalgo County).  US PFOF ¶ 298.  In each case, the 2011 House Plan either moved a minority opportunity district to another region or reshaped a district in an attempt to protect an incumbent who had not been the candidate of choice of minority voters or who had changed parties after the 2010 election.  US PFOF ¶ 299, 356, 401, 424-425. Moreover, where minority population growth made the creation of new opportunity districts a simple matter of setting natural district boundaries, the state refused to do so.  US PFOF ¶ 300, 409-412, 495-504.  Prior to the 2011 redistricting, the number of minority opportunity districts in the Texas House was disproportionately low, and the 2011 House Plan further diluted minority voter strength.  US PFOF ¶ 295, 632-633.

Both direct evidence and circumstantial evidence under the *Arlington Heights* framework establish that this dilutive effect was precisely what the Texas Legislature intended.  The Legislature's failure to create any additional minority opportunity districts, when it knew such districts could be created without violating any traditional redistricting principles, is evidence of intent to dilute the minority vote.  Additional evidence of discriminatory intent is found in state officials' use of the "nudge factor" in HD 117 to swap areas of high Hispanic turnout for areas of

low Hispanic turnout to minimize Hispanic voting strength in the district while creating the illusion that it was still a minority opportunity district.  Furthermore, evidence regarding how state officials split precincts base on race, and fractured minority communities in HD 41, Nueces County, and Dallas County provides further confirmation of Texas's discriminatory intent. Texas's inconsistent use of the Texas County Line Rule in Nueces and Harris counties to eliminate minority opportunity districts demonstrates additional circumstantial evidence of intent.[20]  The destruction of HD 149, which state officials knew to be a minority coalition district, also shows discriminatory purpose.  This discriminatory intent also can be inferred from how the legislative process protected Anglo-preferred incumbents in minority opportunity districts, excluded minority legislators, and deviated from standard redistricting practices.  Under the *Arlington Heights* framework, this Court should conclude that the 2011 House Plan constitutes intentional vote dilution.

### A.     The 2011 House Plan Refused to Recognize Minority Growth Through New Opportunity Districts

The tremendous growth in Texas's minority community preceding the 2011 redistricting made it clear to the Texas Legislature that it could draw new minority opportunity districts in the House, but officials declined to do so.  This Court has recognized that the failure to create any such districts likely violated the results standard of Section 2 of the Voting Rights Act.  *See*

---

[20] The Texas County Line rule requires that "whenever a single county has sufficient population to be entitled to a Representative, such county shall be formed into a separate Representative District, and when two or more counties are required to make up the ratio of representation, such counties shall be contiguous to each other; and when any one county has more than sufficient population to be entitled to one or more Representatives, such Representative or Representatives shall be apportioned to such county, and for any surplus of population it may be joined in a Representative District with any other contiguous county or counties." Tex. Const. art. III, § 26. The Texas Supreme Court has interpreted this provision to bar "the wholesale cutting of county lines" unless "required or justified to comply with the one-[person], one vote decisions."  *Smith v. Craddick*, 471 S.W.2d 375, 378 (Tex. 1971); *see also Clement v. Valles*, 620 S.W.2d 112, 114-15 (Tex. 1981) (striking down a redistricting plan that divided several counties unnecessarily).

Opinion at 8-9 (ECF No. 690).  The evidence has now made clear that this conduct was

intentionally discriminatory.  The map-drawers themselves have deemed their decision to limit

minority electoral opportunity a "policy choice."  *See* US PFOF ¶ 504.  In both the Rio Grande

Valley and El Paso County, new Hispanic opportunity districts could have been drawn without

disturbing existing opportunity districts.  As discussed in more detail below, the Legislature also

could have created additional minority opportunity districts in Dallas and Harris counties.

Rather than doing so, the State of Texas intentionally diluted the Hispanic vote.

      **1.**    **Rio Grande Valley**

      Hidalgo County and Cameron County, the two overwhelmingly Hispanic counties that

make up the core of the Rio Grande Valley, had six Hispanic opportunity districts wholly within

their borders prior to the 2011 redistricting.  US PFOF ¶ 410.  Similar to many other minority

communities, the population of the Rio Grande Valley grew faster than the state as a whole

between 2000 and the 2010.  US PFOF ¶ 409; *see also* US PFOF ¶¶ 34-45.  Following the 2010

Census, Hidalgo County had a population equal to 4.62 ideal-sized state house districts, and

Cameron County had a population equal to 2.42 ideal-sized state house districts, making it

possible to create an additional minority opportunity district with the surplus population from

each county.  US PFOF ¶ 411.  In addition, the Hispanic population in this region is sufficiently

large and geographically compact to create seven districts in the Rio Grande Valley that all

provide Hispanic voters with an opportunity to elect their preferred candidates.  US PFOF ¶ 410,

412.  In fact, this Court drew seven minority opportunity districts in the Rio Grande Valley in its

second remedial House map.  *See* Opinion at 3-5 (ECF No. 690).

      While the state was aware during the 2011 House redistricting that a seventh district

could be drawn wholly within the Rio Grande Valley, it instead split the Valley and attached the

surplus population in each county to a House district with an incumbent who resided elsewhere. *See* US PFOF ¶ 413, 417-419.  Downton admitted that a seventh Rio Grande Valley district could have been drawn but claimed that the Redistricting Committee made a "policy decision" not to create it.  US PFOF ¶ 419.  Gerardo Interiano claimed that he had been unable to create such a district without violating the Texas County Line Rule elsewhere in the state, but this Court's remedial map established that it was indeed possible.  US PFOF ¶ 413.  In fact, by refusing to combine the surplus population of the Valley into a single district, the 2011 Plan increased the number of county line breaks, a substantive departure from the Texas County Line Rule.  *Cf. Clements v. Valles*, 620 S.W.2d 112, 114 (Tex. 1981) (finding a violation of the County Lines Rule where counties had been "cut so that their surplus populations [were] joined to two, rather than one adjoining district").  Minority legislators warned of this problem, but House leadership refused to apply the same unyielding interpretation of the County Line Rule in the Rio Grande Valley that it applied elsewhere in the map.  US PFOF ¶ 418; *see also infra* Section VII.E (Nueces County).  The key decisionmakers simply would not accept another Hispanic opportunity district in the 2011 Plan.  For all of these reasons, the State of Texas's deliberate decision not to recognize explosive Hispanic growth in the Rio Grande Valley through the creation of an additional Hispanic opportunity district constitutes intentional vote dilution.

### 2.    El Paso County

Likewise in El Paso County, the Hispanic share of population grew dramatically over the decade preceding the 2011 redistricting, but Texas knowingly and intentionally refused to create an additional Hispanic opportunity district in that region as well.  US PFOF ¶ 495-504. Specifically, 2010 Census data revealed that Hispanics made up more than 80 percent of the population of El Paso County and that the Anglo portion of the voting-age population in HD

78—the sole El Paso district that had not previously afforded Hispanic voters an opportunity to elect their preferred candidate—had decreased from 39.2 percent to 29.4 percent over the course of a decade.  US PFOF ¶ 498.  While the SSVR of the old HD 78 remained at 47.1percent, notwithstanding the low Anglo VAP remaining in the district, these shifting demographics made it clear to the legislature's leadership that the 2011 redistricting could create an additional Hispanic opportunity district in El Paso County.  US PFOF ¶ 498-499.

Minority preferred legislators presented redistricting plans that created five Hispanic opportunity districts in El Paso County, but legislative leadership rejected these proposals based on a "policy choice" to protect an Anglo-preferred incumbent.  US PFOF ¶ 502, 504.  Instead, the 2011 House Plan reduced the SSVR of HD 78, albeit only marginally, and Downton analyzed election data to ensure that Hispanic-preferred candidates were unlikely to be elected.  US PFOF ¶ 509, 511.  Hanna had advised that SSVR levels in HD 78 should be maintained at pre-redistricting levels in order to avoid Voting Rights Act concerns and noted that any problems "could easily be remedied by swapping some precincts with an adjoining district."  US PFOF ¶ 507.  Rather than follow Hanna's guidance, Downton surgically split precincts and moved individual census blocks between HD 78 and HD 77, all the while monitoring election data (the McCain/Obama contest) to ensure that he did not create a Hispanic opportunity district.  US PFOF ¶ 508-509.  The state's failure to create a new minority opportunity district was intentional, even if it ultimately was motivated by a desire to protect the Anglo-preferred incumbent, and therefore violates Section 2.  See LULAC v. Perry, 548 U.S. at 440-41.[21]

---

[21] The fact that creating a new Hispanic opportunity district in El Paso County would have left Anglos underrepresented in the El Paso delegation in proportion to their percentage of the County's population is legally irrelevant.  Proportionality must be measured on a statewide basis.  See LULAC v. Perry, 548 U.S. at 436.  "[G]iven the presence of racially polarized voting—and the possible submergence of minority votes—throughout Texas, it makes sense to use the entire State in assessing proportionality."  Id at 437-38.

### B.      Texas Intentionally Eliminated Hispanic Opportunity in HD 117

The 2011 House Plan eliminated Hispanic voters' opportunity to elect their preferred candidate of choice in HD 117.  US PFOF ¶¶ 359-360, 377.  The evidence before this Court established that state officials applied the same redistricting strategy underlying the "nudge factor" emails to protect Representative John Garza, who was elected to HD 117 in 2010 over the opposition of most Hispanic voters.  US PFOF ¶¶ 368-369.  The 2011 district replaced middle-class, high-turnout Hispanic precincts with poor, low-turnout Hispanic precincts.  US PFOF ¶ 368.  The intended and achieved result was a district that increased Hispanic population levels but decreased SSVR and substantially decreased Hispanic turnout and electoral performance.  US PFOF ¶¶ 376, 378.

#### 1.      Legislative Goals Regarding HD 117

At the outset of the 2011 redistricting process, members of the Bexar County delegation were instructed to draw their ideal districts.  Representative Garza testified that his ideal district extended north to I-10 and south to the Medina River and it remained outside of the I-410 Loop, which removed all of the City of San Antonio.  US PFOF ¶ 361.  According to Representative Garza, these areas outside of San Antonio tended to be "more Anglo and more conservative," and election returns confirmed that he performed best in these Anglo areas.  US PFOF ¶ 362.  However, his ideal configuration reduced SSVR to 46.3 percent, and it was rejected by the leadership of the Bexar County delegation because it impermissibly reduced Hispanic voting strength.  US PFOF ¶ 366.  Representative Villarreal in the Bexar County delegation told Representative Garza that his district was a Hispanic opportunity district and that SSVR in HD 117 needed to be at least 50 percent.  *Id*.

#### 2.      "Nudge Factor" Applied to HD 117

Representative Garza refused to allow the SSVR in HD 117 to exceed 50.1 percent.  US PFOF ¶ 390.  He and his staff worked with Interiano to build a district that would both maintain superficial majority-SSVR status while improving his reelection chances, notwithstanding that he had not been the Hispanic-preferred candidate in 2010.  US PFOF ¶ 367.  To maintain the necessary Hispanic demographics, Representative Garza and Interiano added large portions of southern Bexar County to HD 117, while removing the concentrated Hispanic population in the core of the City of San Antonio.  US PFOF ¶ 368.  In particular, Representative Garza and Interiano drew HD 117 into southern Bexar County, including the City of Somerset and the community of Whispering Winds, two areas that previously were in HD 118.  US PFOF ¶¶ 371-379.  Somerset and Whispering Winds are two impoverished communities with relatively high Hispanic population but low rates of Hispanic turnout.  US PFOF ¶ 373.  By contrast, Representative Garza and Interiano removed the politically mobilized, high Hispanic turnout area of South San Antonio Independent School District (ISD) from HD 117.  US PFOF ¶¶ 374-375.

The result is a district that deliberately maintains a 50.1 percent SSVR but decreases Hispanic turnout and performance.  HD 117 in the 2011 Plan increased HVAP by 4.8 points, increased HCVAP by 5.0 points, but decreased SSVR by 0.7 points.  US PFOF ¶ 376.  The 2011 district increased the degree of racially polarized voting and decreases Hispanic turnout.  *Id.*  The experts for the United States and Texas both agree: no opportunity to elect existed for Hispanic citizens in HD 117 in the 2011 Plan.  According to Dr. Lisa Handley's exogenous index, HD 117 scores only 20, compared to a score of 60 under the 2001 Plan.  US PFOF ¶ 377.  Dr. John Alford similarly concluded that, despite improvements in Hispanic demographics, Hispanic voters are only able to elect their candidate of choice 33 percent of the time, a decrease from 60

percent in HD 117 in the 2011 Plan.  US PFOF ¶ 377.  The fact that Representative Garza and Interiano worked to increase the HVAP and HCVAP substantially while simultaneously decreasing the proportion of Spanish surnamed voters and Hispanic electoral opportunity indicates that they intentionally and impermissibly focused on race when drawing the district.  US PFOF ¶¶ 378-380; *see also* ECF 690 at 6 (3/9/12 Opinion).

### 3.    Disparate Treatment of a Minority-Preferred Legislator in HD 118

Representative Joe Farias is the Hispanic-preferred candidate in HD 118, which is adjacent to HD 117 in the 2011 Plan.  US PFOF ¶¶ 381, 384.  Prior to the 2011 redistricting, HD 118 encompassed a majority of southern Bexar County, including the City of Somerset and the community of Whispering Winds.  US PFOF ¶ 382.  Since being elected in 2007, Representative Farias has worked with Somerset and Whispering Winds to improve the general infrastructure in these areas, including introducing and supporting bills to improve funding for education, housing, and water and sewer systems.  US PFOF ¶¶ 385, 387.  After draft plans placed much of southern Bexar County—including Somerset and Whispering Winds—in HD 117, Representative Farias met with Representative Garza to attempt to negotiate returning those two communities to HD 118.  US PFOF ¶ 386.

During these negotiations, Representative Garza said that he needed "more Mexicans" in his district, and he refused any alterations to HD 117 that would raise the SSVR above 50.1 percent.  US PFOF ¶ 388.  Representative Farias offered to return the South San Antonio ISD area back to Representative Garza.  The heavily Hispanic and politically active community had been in HD 117 prior to 2011, but Representative Garza refused.  US PFOF ¶ 389. Representative Farias drew a number of alternative plans that returned Somerset and Whispering Winds to HD 118, but they were all soundly rejected by Representative Garza because they

increased the SSVR share in HD 117.  US PFOF ¶ 391.  Representative Farias testified that none

of those alternative plans increased the SSVR in HD 117 to more than 52 percent.  *Id.*

In a final effort to negotiate, Representative Farias drafted an amendment that left the

City of Somerset in HD 117 but added the community of Whispering Winds back to HD 118.

US PFOF ¶ 392.  Representative Farias testified that his proposed amendment necessarily split

precincts because he only had 0.1 percent SSVR share to work with due to Representative

Garza's precise 50.1 percent limitation.  US PFOF ¶ 394.  When Representative Farias presented

this amendment to Representative Garza, Representative Garza said that he would leave the

amendment to the "will of the House."  US PFOF ¶ 392.  When this amendment was presented

on the House floor, Representative Garza refused to inform the House that he did not oppose the

Amendment.  US PFOF ¶ 393.  Moreover, Chairperson Solomons spoke against the amendment

because it split precincts, despite the fact he supported the 2011 Plan, which split 412 precincts.

*Id.*  Representative Farias's treatment during the 2011 redistricting process further establishes

that minority-preferred representatives had no ability to influence the process when their desires

interfered with the goal of eliminating minority voters' opportunity to elect their preferred

candidates of choice in districts that were represented by Anglo-preferred candidates following

the 2010 wave election.  US PFOF ¶¶ 396-397.

## C.  Texas Intentionally Eliminated Hispanic Opportunity in HD 35

Although HD 35 provided Hispanic citizens the opportunity to elect their candidates of

choice prior to the 2011 redistricting, the 2011 House Plan redrew HD 35 so that it was no longer

a Hispanic opportunity district. US PFOF ¶¶ 406-407.  HD 35 was assigned as a "special

project" to an employee of the Office of Speaker Straus, indicating that the effects of changes

made to the district were intended by House leadership.  US PFOF ¶ 402.  The 2011 House Plan

reduces SSVR in HD 35 by 1.9 percentage points to 53.4 percent.  US PFOF ¶ 404.  Although

there is an increase in overall turnout among both Anglo and Hispanic voters, the Anglo voter turnout is significantly greater than the Hispanic voter turnout, reducing the effective share of Hispanic voters in the electorate.  US PFOF ¶ 405.

### D.     Texas Intentionally Eliminated Hispanic Opportunity in HD 41

In HD 41, the 2011 House Plan deliberately minimized Hispanic electoral opportunity in a district that had formerly provided Hispanic voters with the opportunity to elect their preferred candidates of choice.  Texas divided precincts along racial lines.  Although Texas claims that the boundaries of HD 41 were drawn for purely partisan reasons, the evidence shows otherwise.  In redrawing HD 41, Texas split precincts to exclude portions of Republican-leaning precincts and include portions of Democratic-leaning precincts—actions that, according to electoral data provided by RedAppl, would be expected to harm the prospects of a Republican candidate.  US PFOF ¶ 459.  Therefore, the boundaries of HD 41 establish the state's intent to dilute the Hispanic vote.

Hispanic citizens had the opportunity to elect their preferred candidates of choice to the Texas House of Representatives in HD 41 prior to the 2011 redistricting, and they had successfully done so for the prior decade.  US PFOF ¶ 422.  An election analysis of HD 41 in the 2011 House Plan establishes that the district is marginal, but reconstituted election analysis cannot determine which side of the margin the district falls on, due to data limitations.  US PFOF ¶ 442.  Electoral data are gathered at the precinct level, and reconstituted election analysis assumes that voters across a precinct provide identical levels of support to each candidate.  US PFOF ¶ 442.  However, HD 41 split 17 precincts along its boundaries, and many of those precincts were divided along racial lines.  US PFOF ¶¶ 433, 437-439.  Given the presence of racial bloc voting, it is likely that different portions of those precincts exhibit different voting patterns.  US PFOF ¶ 442.  Therefore, while it is certain that the 2011 House Plan diminished

Hispanic electoral strength in HD 41, the manner in which Texas drew HD 41 makes it impossible to know whether the state successfully eliminated Hispanic electoral opportunity.  US PFOF ¶¶ 422, 442.

On the other hand, the state's reason for attempting to eliminate Hispanic electoral opportunity in HD 41 is clear.  Representative Aaron Peña of HD 40 had changed parties and joined the Republican Caucus after being reelected as a Democrat in 2010.  US PFOF ¶¶ 423-424.  While Representative Peña's district was overwhelmingly Hispanic, neighboring HD 41 had the highest Anglo concentration in Hidalgo County.  US PFOF ¶¶ 420, 423.  In an effort to preserve Representative Peña's incumbency, the 2011 House Plan added his home to HD 41 and surgically excised incumbent Representative Veronica Gonzales, who had represented HD 41 until the 2011 redistricting, by drawing her home out of HD 41.  US PFOF ¶ 425.  This constituted a substantive deviation from the incumbent-driven principles that governed the rest of the map.  US PFOF ¶ 471.  Moreover, in contrast to the "member-driven" plan in other areas of the map, three of the four members of the Hidalgo County delegation—all but Representative Peña—were not allowed to give input on the Hidalgo County map and were not even told who had drawn their districts.  US PFOF ¶ 469.

Not content with merely placing Representative Peña in the most Anglo district in Hidalgo County, the map drawers further manipulated district lines to minimize Hispanic electoral opportunity.  This occurred in two phases.  Initially, Gerardo Interiano used partisan data to draw the most Republican district possible in the region.  US PFOF ¶ 446.  Interiano's map split only four precincts, however, and Representative Peña signed off on the plan.  US PFOF ¶¶ 447-448.  Even after Representative Peña gave his approval, Ryan Downton went beyond what could be achieved using partisan data alone and split several additional precincts

46

along the boundary of HD 41.  US PFOF ¶ 449.  Many of these precinct splits followed a plain racial division, with census blocks with greater Anglo concentrations included in HD 41 and homogeneous Hispanic neighborhoods excluded from the district.  US PFOF ¶¶ 437-438.  HD 41 divided precincts to include country clubs, gated communities, and other disproportionately Anglo neighborhoods and to exclude densely populated Hispanic neighborhoods and colonias.  US PFOF ¶ 440.  The final district drawn by Downton was also highly under-populated, by 4.41 percent of an ideal-sized district, while other Hidalgo County districts (with greater Hispanic population concentrations) were overpopulated by up to 4.62 percent of an ideal-sized district.  US PFOF ¶¶ 430-432 & tbl.2.  This strongly suggests that Texas drew HD 41 to include as many Anglo voters as could be found in Hidalgo County and then—once there were no concentrations of Anglo voters left to be added—ceased adding additional population that would dilute the Anglo concentration of the district.  US PFOF ¶ 432.

This Court should accept the simplest explanation for the remarkable racial pattern in split precincts along the boundary of House HD 41:  The precincts were divided along racial lines using racial data.  US PFOF ¶ 464.  In the 2011 Plan, Downton excluded some heavily Hispanic portions of precincts that favored Republicans.  US PFOF ¶ 460.  Downton also included Anglo portions of precincts that favored Democrats.  US PFOF ¶ 461.  As the evidence shows, Downton's actions would—according to electoral data on RedAppl alone—harm the prospects of Republican candidates.  US PFOF ¶ 458.  In a marginal district subject to extensive attention and analysis, it is dubious that line drawers would have reduced projected Republican performance.  US PFOF ¶ 463.  In fact, it appears that Downton was using race as a proxy to determine how the persons included and excluded would vote.  US PFOF ¶ 462.

The state's witnesses contradicted each other and offered implausible testimony in an effort to provide a race-neutral explanation for the racial precinct splits.  At trial, Downton claimed that Representative Peña had directed him to split the additional precincts, principally to follow roads.  US PFOF ¶ 451.  However, Representative Peña testified that he did not request any further precinct splits after he signed off on an earlier version of the district, and the boundary of HD 41 did not consistently follow roads.  US PFOF ¶¶ 453-455.  Rather, at trial Representative Peña claimed to have worked with Representative Ryan Guillen to target more affluent voters using property tax records.  US PFOF ¶ 456.  This implausible claim contradicted both Representative Peña's sworn deposition testimony and Downton's testimony at trial and should not be accepted by this Court.  US PFOF ¶¶ 456, 682-686.

In sum, HD 41 cannot be explained by any race-neutral redistricting principle.  Rather, HD 41 is designed to maximize the likelihood that Hispanic voters will lack an opportunity to elect their preferred candidates.  *See Bush v. Vera*, 517 U.S. at 963 (recognizing that "incumbent protection boundaries" may "sabotage[] traditional redistricting principles" by drawing districts to "shed hostile groups").  Regardless of whether Texas intended to rely upon racial bloc voting to achieve an ultimate partisan end, "a clear pattern, unexplainable on grounds other than race, emerges from the effect" of the District's boundaries, and this evidence alone is sufficient to establish intentional discrimination as a concomitant purpose.  *Arlington Heights*, 429 U.S. at 266.  Therefore, this Court should conclude that this striking racial gerrymander constitutes intentional vote dilution.

### E.  Texas Intentionally Eliminated a Hispanic Opportunity District in Nueces County.

The 2011 Plan intentionally eliminated the ability of Hispanic voters to elect their preferred candidate of choice in HD 33 in Nueces County and made no attempt to replace HD 33

with a new Hispanic opportunity district elsewhere in the state.  This alone constitutes intentional vote dilution.  In the two remaining House districts in Nueces County, the Texas House drew the boundaries to ensure Anglo control over one district, HD 32, instead of providing Hispanic voters with the possible opportunity to elect in both districts.

Prior to the 2011 redistricting, Nueces County included two house districts in which Hispanic voters had the opportunity to elect their preferred candidates, HD 33 and HD 34, as well as a portion of a third district (HD 32) in which Anglo voters were a majority.  US PFOF ¶ 472.  In 2010, however, Hispanic voters did not successfully elect their preferred candidates in any Nueces County district.  US PFOF ¶¶ 54, 472.  Moreover, Nueces County did not grow as quickly as the rest of the state between 2000 and 2010, and its total population was only slightly more than the population of two ideal-sized House Districts going in to the 2011 redistricting.  US PFOF ¶ 478.

The 2011 Plan acted on the slow growth rate by drawing two House districts (HD 32 and HD 34) entirely within Nueces County—only one of which (HD 34) would provide Hispanic voters with a electoral opportunity—and moving HD 33 to another region of the state where Hispanic voters would not have the opportunity to elect their preferred candidate of choice.  US PFOF ¶¶ 473-478.  Moreover, as described above, Texas refused to create any new Hispanic opportunity districts that would have replaced the loss of Hispanic electoral opportunity in HD 33.  *See supra* Section VII.A.  These decisions were intentional, ignored Voting Rights Act guidance offered by the TLC, and diluted statewide minority voting strength.

Although Texas has asserted that maintaining a third district that included Nueces County would violate the Texas County Line rule, the state ignored the guidance of TLC Attorney David Hanna that this state-law provision would be required to yield to the Voting Rights Act.  It was

possible to include the entire population of Nueces County in two districts without either district being more than five percent larger than an ideal-sized district. US PFOF ¶ 478. The Texas County Line Rule requires the state, where possible, to draw House districts without attaching a portion of a county's population to a district that extends to other counties. *See Clement v. Valles*, 620 S.W.2d 112, 114 (Tex. 1981). However, the Texas Supreme Court had acknowledged, in the context of one-person, one-vote requirements, that federal law could preempt this requirement. *See id.*; *see also Bartlett v. Strickland*, 556 U.S. 1, 7 (2009) (holding that "state election-law requirements like [a] Whole County Provision may be superseded by federal law"). Hanna even warned that in Nueces County, the County Line Rule would "have to yield to the federal Voting Rights Act if it can be shown [a violation of the Act] could be avoided by splitting the county." US PFOF ¶¶ 479-480. But while the County Line Rule routinely yielded to one-person-one vote requirements, the 2011 House Plan deviated from general preemption principles by ignoring the Voting Rights Act implications of removing HD 33 from Nueces County. *Cf. Arlington Heights*, 429 U.S. at 267 (establishing that when determining discriminatory intent, "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached").

Even within the two remaining Nueces County districts (HD 32 and 34), the 2011 House Plan divided the county along a convoluted line that ensures Anglo control over HD 32. HD 34 was packed with a greater share of Spanish surnamed registered voters than any Nueces County district prior to the 2011 redistricting, leaving HD 32 with a substantial majority of the Anglo voters in Nueces County. US PFOF ¶ 484. Moreover, HD 34, the predominantly Hispanic district, had a population that is 6,075 greater than HD 32. US PFOF ¶ 485. Most notably,

50

however, the boundary dividing the two Nueces County districts created a protuberance from HD

34 that ensured that no potential Hispanic candidate with recent legislative experience—

including the Republican incumbent of HD 33, the former representative of HD 33, and the

former representative of HD 34—would reside in the new HD 32 to challenge the Anglo

incumbent.  US PFOF ¶ 488.  Again, the State's witnesses provided no plausible alternative

explanation for the convoluted district boundary.  US PFOF ¶¶ 491-492.  By deliberately

packing District 34 and eliminating potential Hispanic challengers in HD 32, the State

intentionally minimized the possibility that HD 32 might make up for the loss of HD 33.  These

actions provide further proof that the State of Texas engaged in intentional vote dilution in

redistricting Nueces County.

### F. Texas Intentionally Prevented the Emergence of a Hispanic Opportunity District in Dallas County

State officials used race to prevent the natural emergence of a minority opportunity

district in Dallas County.  HD 106 elected the Hispanic-preferred candidate of choice in 2006

and 2008.  HD 105 came within 20 votes of electing the minority-preferred candidate in 2008.

With the additional minority population growth in the area, state officials realized that the

minority population had a very real possibility of electing its candidate of choice in 2012, and

those officials impermissibly used race to make HD 105 in the 2011 Plan more Anglo.

### 1. Population Change and Election Results

Between 2000 and 2010, the minority population in Dallas County grew by 28 percent,

while the County's Anglo population decreased by 20 percent during the same period.  US PFOF

¶ 515.  Much of this minority growth and Anglo population decline occurred in western Dallas

County, including in HD 105 and HD 106.  The Anglo share of the voting-age population (VAP)

in HD 105 fell over the course of the decade from 53.1 percent to 36.1 percent,[22] but the minority growth in HD105 offset the loss of Anglo population.  US PFOF ¶ 519.  The Anglo share of the VAP in HD 106 similarly fell to 35.9 percent.  US PFOF ¶ 520. In that same area of Dallas County, the Anglo share of the VAP fell to 19.5 percent in HD 104, and was 12.8 percent in HD 104.  US PFOF ¶ 518.

Minority voters had elected their candidate of choice in 2006 and 2008 in HD 106 in the 2001 map.  US PFOF ¶ 522.  They had not yet elected their preferred candidate of choice in HD 105 prior to the 2011 redistricting, but the Hispanic-preferred candidate lost the 2008 election contest by only 20 votes.  US PFOF ¶ 521.  Moreover, the endogenous elections in HD 105 and HD 106 show a strong trend toward electing the Hispanic candidate of choice, particularly in Presidential election years.  US PFOF ¶¶ 521-522.  In 2008, the Hispanic-preferred candidate was elected in 7 of 9 statewide election contests in HD 105, and 8 of 9 elections in HD 106.  *Id.*  In HD 103 and HD 104 in the 2001 Plan, the Hispanic-preferred candidate won 100 percent of the time in both the exogenous and endogenous election contests.  US PFOF ¶ 516.

The 2011 House Plan reversed the demographic shift in HD 105 and HD 106 by increasing Anglo VAP in HD 105 by five percentage points by stretching the district almost the entire length of Dallas.  US PFOF ¶ 532.  This had a corresponding effect in the election analyses, in which the Hispanic-preferred candidate in HD 105 won zero of 9 statewide election contests in the recompiled election results for 2008 in the 2011 Plan.  *Id.* HD 106 in the 2011 Plan was in Denton County.  US PFOF ¶ 533.  Similar to what the legislature did in CD 23 in 2003, when Hispanic voters looked like they might have a chance to elect their candidate of choice in 2012, the Legislature took that opportunity away.  *See LULAC v. Perry*, 548 U.S. at

---

[22] CVAP data based on the 2010 Census were not available at the time the House plan was considered. US PFOF ¶ 519.

440 (noting that although Hispanic voters had not elected candidate of choice yet, Hispanic voters were about to do so).

### 2.      Legislative Goals Regarding Dallas County

Dallas County had 16 seats in 2000, but because population in Dallas County had not grown like other areas of the state, Dallas County had to lose two seats.  US PFOF ¶ 523. Legislators and map drawers initially agreed that two Republican seats would need to be eliminated because the other six seats were minority opportunity districts under the Voting Rights Act.  *Id.* It was unlikely that the Dallas County delegation would be able to agree upon a map given the loss of two seats, and therefore Downton said that he needed to draw the map.  *Id.* Downton worked with Representative Dan Branch on the shape of the Republican districts.  US PFOF ¶ 525.

Downton said that he started with the two Hispanic opportunity districts, District 103 and District 104, to make sure to preserve Hispanic electoral opportunity in those districts.  US PFOF ¶ 524.  However, he did not base those districts on what the Hispanic incumbents believed was necessary to ensure that Hispanic voters would continue to enjoy an opportunity to elect their preferred candidates of choice.  At Downton's request, Representative Anchia of HD 103 provided a map of his ideal district, and while Downton received that proposal, it is not the district he adopted.  *Id.*  Although Representative Alonzo of HD 104 was a member of the House Redistricting Committee, Downton never met with him or requested information regarding Representative Alonzo's ideal configuration for his district.  *Id.*

The TLC also advised that, if possible, a new minority opportunity district should be drawn in Dallas County because of the minority population growth.  US PFOF ¶ 526.  Some legislators proposed alternative plans, of which Downton was aware, that would have created an

additional minority opportunity district in the County.  US PFOF ¶ 527.  The legislature, however, rejected these plans.  Similarly, the United States's illustrative map in US Exhibit 513 also illustrates that it is possible to create a new minority opportunity district in Dallas.

### 3.      Preventing Another District in Dallas County from Providing Minority Voters with Electoral Opportunity

The map drawers had to go to great lengths to prevent the emergence of another district in Dallas County in which minority voters would have had an opportunity to elect a candidate of choice.  The shapes of the districts in western Dallas County are bizarre.  US PFOF ¶ 530.  A narrow land bridge in HD 105 maintains the district's Anglo population by splitting precincts to move Anglo voters into the district and to remove Hispanic voters to neighboring districts.  US PFOF ¶ 532.  HD 104 wraps around the bottom of HD 105 to take in population on the western edge of Dallas County.  US PFOF ¶ 530.   HD 103 reaches an arm into HD 105 to specifically remove Hispanic population.  US PFOF ¶ 538.  The boundary of HD 105 splits 22 precincts and numerous communities of interest, and the district includes narrow slivers of population that exclude Hispanic population on either side.  US PFOF ¶ 536.

Downton admits that he used race to draw HD 103, HD 104, and HD 105.  US PFOF ¶ 539.  He excluded Hispanic population from HD 105, and he added it to HD 103 and HD 104.  *Id.*  Downton also admits that he used race and split 22 precincts in order to maximize Anglo population in HD 105 and maximize Hispanic population HD 103 and HD 104.  *Id.*

Both HD 103 and HD 104 were safe Hispanic opportunity seats.  US PFOF ¶ 516.  Election results, which the map drawers received, would show that Hispanic voters could elect their candidate of choice in HD 104, even without 50 percent SSVR.  The Anglo population in HD 104 in the 2011 Plan was at 15.2 percent.  US PFOF ¶ 534. There was no possibility that the Anglo population in HD 104 would be able to defeat the Hispanic candidate of choice.

Consequently, Downton's actions were not necessary for Voting Rights Act compliance.

In Dallas County, the populations of HDs 103, 104, and 105 approach the maximum permitted deviation from the ideal, with HD 103 at precisely 5.0 percent over the ideal district size.  US PFOF ¶ 540.  The overpopulation of HDs 103 and 104 allow the districts to be packed with extra Hispanic voters.  *Id.*  Although HD 105 also has a deviation of 4.8 percent above the ideal, there is nowhere for additional minority population to go.  US PFOF ¶ 541.  As exhibit 299a shows, HD 103 and HD 104 surround most of HD 105, and they are already overpopulated. *Id.* The only other district touching HD 105 is HD 115, which borders HD 105 to the north. Although HD 115 is not overpopulated, there is little minority population in the northern part of HD 105.  *Id.*  If HD 115 took population from HD 105, it would be overwhelmingly Anglo, and that would make HD 105 less safe for an Anglo-preferred incumbent.  The use of population deviations in this manner is also a departure from traditional redistricting principles, providing additional circumstantial evidence of an intent violation under *Arlington Heights*.

### G.   Texas Intentionally Eliminated a Minority Opportunity District in Harris County and Excluded Minority Representatives from the Process

In Harris County, the 2011 House Plan eliminated a minority opportunity district in which a cohesive coalition of Hispanic, African-American, and Asian voters had successfully elected the first Vietnamese American to serve in the Texas Legislature.  Texas purposefully diluted the minority vote in Harris County through a combination of deviation from past practice under the County Line Rule, refusal to accept TLC advice regarding minority coalition districts, and overpopulation of majority-minority districts.  The configuration of the district in which two Democratic incumbents were paired to favor the Anglo incumbent, along with deviations from established procedures and hostile statements in the larger Harris County redistricting process,

establishes that the purpose of the Harris County map was not solely partisan.  Rather, the 2011 House Plan for Harris County had a racially discriminatory intent.

### 1.  Diluting the Minority Vote by Removing HD 149 from Harris County

House District 149, in southwest Harris County, had been crafted in 2001 for Talmadge Helfin, an Anglo Republican and the chairperson of the House Appropriations Committee.  US PFOF ¶ 566.  However, in 2004, the growing minority community that made up the majority of the district worked together and managed to unseat Heflin and to elect Hubert Vo, the first Vietnamese American in the Texas House.  US PFOF ¶ 567.  Heflin tried and failed to regain his seat in 2006, and Vo successfully defeated other Anglo challengers in 2008 and 2010.  US PFOF ¶¶ 569-572.  Through the decade, a diverse coalition of African-American, Hispanic, and Asian American voters developed in southwest Harris County that successfully elected not only Representative Vo, but also members of the Houston city council and the Alief Independent School District school board.  US PFOF ¶¶ 575-576.  Therefore, HD 149 provided a cohesive coalition of minority voters with a demonstrated opportunity to elect their preferred candidate of choice.  US PFOF ¶ 567, 574-577.

With Anglo voters having lost electoral control over HD 149, the 2011 House Plan simply eliminated the district from Harris County and moved it to Williamson County, a predominantly Anglo area where minority voters would not have the opportunity to elect their preferred candidate.  US PFOF ¶ 578.  In order to remove HD 149 from Harris County, the 2011 House Plan deviated from past practice under the Texas County Line Rule.  In the past, the number of districts in Harris County—the largest county in the state and one of the most diverse—had been determined by dividing its total population by the population of an ideal-sized district and rounding up, even when the remaining fraction was less than half of a district.  US

PFOF ¶ 547-550.  In fact, Chairperson Solomons announced on the House floor that this procedure would be followed again in 2011 by apportioning 25 districts to Harris County.  US PFOF ¶ 545.  However, the statewide plan proposed by Chairperson Solomons and the final 2011 House Plan allotted only 24 districts to Harris County, leaving an additional district to be apportioned among slower-growing, predominantly Anglo areas of the state.  US PFOF ¶ 552.

David Hanna of the TLC warned House leadership that a functioning minority coalition district such as HD 149 was protected by the Voting Rights Act and could not be eliminated, but House leadership did not heed his advice.  US PFOF ¶¶ 321, 580; *see also LULAC v. Clements*, 999 F.2d at 864; *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988).  Faced with redistributing the majority-minority population of HD 149, the Harris County map systematically overpopulated minority opportunity districts, leaving the Anglo community in control of a disproportionate number of districts.  US PFOF ¶ 562.  This ensured that the intentional reduction in the number of minority opportunity districts in Harris County would be successful, minimizing the chance that another district designed for Anglo control would eventually provide minority voters with an opportunity to elect their preferred candidates.  US PFOF ¶¶ 553-554, 562.  In sum, these actions constitute prohibited intentional discrimination.  *See Bartlett*, 556 U.S. at 24 (barring intentional elimination of minority voting opportunities even when a single minority group is not a population majority).

The 2011 House Plan paired Representative Vo with Representative Scott Hochberg, a senior Anglo Democrat, in Representative Hochberg's HD 137.  US PFOF ¶ 579.  This district appeared to have been drawn to favor Representative Hochberg by incorporating a far greater portion of his former district and by dividing or excluding Representative Vo's core Asian American constituency.  US PFOF ¶ 581.  Moreover, Anglo Republicans who had greater

control over the redistricting process suggested to Representative Hochberg that he would be reelected from HD 137 in the 2011 House Plan.  US PFOF ¶ 582.  This deviated strongly from the partisan tactics applied in prior redistricting plans, in which senior Democrats had been specifically targeted, even if the Democrats were Anglo.  US PFOF ¶¶ 583-584.  Thus, it cannot be said that the contours of the 2011 House Plan in Harris County followed only a partisan purpose.

### 2. The Redistricting Process in Harris County Reinforces the Role of Race

In Harris County, the redistricting process deviated from statewide procedures, excluded minority legislators from meaningful decisions, and emphasized the role of race in protecting Anglo control from growing minority voting strength.  Although both Anglo and minority legislators initially worked together to develop a 25-district consensus plan under the "member-driven" framework, Representative Beverly Woolley—an Anglo Republican and Speaker Pro Tem—began working on a 24-district plan without informing minority legislators that she was doing so, let alone seeking their input.  US PFPF ¶¶ 544, 553, 555, 561.  Representative Woolley's focus on race and the preservation of Anglo voting strength is made clear by a RedAppl plan log that notes changes to make her district more Anglo.  US PFOF ¶ 554.  When the Woolley plan was unveiled as the final plan for Harris County, Representative Woolley justified the exclusion of minority legislators—not merely Democrats—from the process by saying, "Y'all are protected by the Voting Rights Act and we are not."  US PFOF ¶¶ 555, 557.  Rather than recognize the concerns of minority legislators who had been excluded from the process, she set out to punish Representative Coleman for challenging her authority and filed an amendment to her own map that gutted Representative Coleman's district, removing his district office and many prominent features.  US PFOF ¶ 558.  Representative Woolley's RedAppl plan

log makes the spiteful nature of the amendment clear by labeling the amendment as "The new final amendment changes … LOL."  US PFOF ¶ 559.

While minority representatives in Harris County were eventually permitted to limit the manipulation of their districts by the Anglo members of the Harris County delegation, they were given strict limitations.  Specifically, they were not permitted to make any change that affected a district in which the incumbent was an Anglo Republican.  US PFOF ¶ 560.  Although this allowed minority members of the Harris County delegation to undo changes to their districts made only for malice, it also ensured the principal aim of the Harris County portion of the 2011 House Plan would remain in place: to dilute minority voting strength in the largest county in Texas.  US PFOF ¶¶ 556-557, 560, 563, 579-580.

## H.   The Legislative Process Excluded Minority-Preferred Legislators and Deviated from Established Procedures

The legislative process leading to the enactment of the 2011 House Plan excluded minority-preferred legislators from key components of the legislative process, deviated from established procedures to limit meaningful input from minority legislators, and ultimately passed with negligible minority support.  Development of the 2011 Plan began with the superficial 2010 field hearings, described above.  *See supra* Section VI.F.  Following organization of the 2011 House Redistricting Committee, Chairperson Solomons declared that the House redistricting would be a "member-driven" process.  US PFOF ¶ 331.  As the district-based analysis above demonstrates, however, this principle yielded to the desires of Anglo-preferred incumbents whenever conflict occurred.  *See supra* Sections VII.B, VII.D, VII.G; *see also* US PFOF ¶ 333.  Even in Tarrant County, where the county delegation reached a consensus, House leadership redrew the boundaries of the county's sole African-American opportunity district to divide minority communities.  US PFOF ¶¶ 317-318.  Moreover, throughout the redistricting process,

Anglo legislators had access to substantial resources unavailable to their minority counterparts, including Voting Rights Act analyses by the OAG and state-funded outside counsel, allowing Anglo leadership ¶ drive the process effectively and exclusively.  US PFOF ¶ 328.

Through the development of a complete statewide proposal, House Redistricting Chairperson Burt Solomons and his staff intentionally ignored the requirements of the Voting Rights Act, either disregarding advice provided by the TLC or seeking outside counsel to overrule the State's in-house specialists.  The House Redistricting Committee never announced how it would determine whether a district was a minority opportunity district under the Voting Rights Act, and it never even compiled a list of existing minority opportunity districts for internal use.  US PFOF ¶ 320.  The TLC advised House leadership that the Voting Rights Act required analysis based on election results—rather than simple demographics—in order to determine minority electoral opportunity and that the Voting Rights Act must preempt redistricting requirements imposed by state law.  US PFOF ¶¶ 321, 479.

Instead, the House Redistricting Committee decided that a demographic analysis gave it a "green light" to go forward with a statewide map that eliminated minority electoral opportunity districts, and Chairperson Solomons declared on the House floor that he would not allow the Voting Rights Act to trump the Texas County Line Rule unless the U.S. Supreme Court took up the issue.  US PFOF ¶ 649.  While House leadership addressed some Voting Rights Act issues raised in a series of memoranda by Hanna, it left other issues flagged by Hanna unresolved and specifically sought outside counsel for advice to overrule Hanna in areas such as the legal implications of minority coalition districts.  US PFOF ¶¶ 324-325.  On the House floor, Chairperson Solomons would eventually announce a bright-line threshold of 50.1 percent SSVR to determine the presence or absence of Hispanic electoral opportunity under the Voting Rights

Act, a standard that Hanna acknowledged was "phony."  US PFOF ¶ 326.[23]  However, the first

statewide redistricting plan developed and released by Chairperson Solomons violated even this

purported SSVR standard.  US PFOF ¶ 326.

House leadership also did not share with minority legislators any of the critical Voting

Rights Act analysis that it received while developing the Chairman's initial statewide proposal.

None of the Hanna memos were ever released to minority legislators, even though they pointed

to legal problems that persisted in the map that Chairman Solomons released to the House

Redistricting Committee.  US PFOF ¶¶ 325, 332.  Moreover, minority legislators were not made

aware that the OAG had developed complex quantitative analysis of racially polarized voting.

US PFOF ¶¶ 322, 328-329.  Critically, minority legislators did not receive assessments of the

success of Hispanic-preferred candidates that the OAG had prepared for purposes of gauging

whether the redistricting plans complied with the Voting Rights Act.  Notably, the OAG

assessments confirmed that the State's proposed maps decreased Hispanic electoral

opportunities.  US PFOF ¶ 323.

Once Chairperson Solomons had developed a statewide redistricting plan, he limited

minority legislators' ability to modify that plan prior to passage.  Minority legislators did not

have a chance to review a statewide map until after Chairperson Solomons released his proposal

to the public, which led to surprises for several minority representatives whose districts had been

altered substantially or eliminated.  US PFOF ¶ 338.  On the date that he released his statewide

proposal, Chairperson Solomons announced that the first public hearing would occur two days

later and that the second and final public hearing would occur only four days later.  This required

waiver of Texas's five-day posting rule for every hearing regarding the House redistricting,

---

[23] In commenting on Texas's draft of its Section 5 submission to the Department of Justice, Hanna noted that the demographic 50.1 percent cutoff was not the standard, and he labeled it "phony."

which is a rarity for a major bill.  US PFOF ¶¶ 338-339.  These hearings occurred on a Friday
and on Palm Sunday, when the Texas legislature does not ordinarily conduct public hearings.
US PFOF ¶¶ 340-344.  Moreover, some minority legislators, who had no role in the crafting of
their districts, were allowed only to make limited cosmetic changes to their boundaries as long as
it did not affect Anglo-controlled districts.  US PFOF ¶¶ 348-349.

   While no two redistricting processes are precisely the same, the 2011 House redistricting
process intentionally ignored standards under the Voting Rights Act and deviated below the
minimal opportunities for minority input afforded in past Texas redistricting efforts (even though
those processes had also yielded discriminatory plans).  *See supra* Part III.  Hanna warned House
leadership that the process designed by Chairperson Solomons and his staff did not afford
sufficient opportunities for minority input, but those concerns—like so many others—were
ignored.  US PFOF ¶¶ 335-337.

* * * * *

   In sum, the 2011 House Plan purposefully eliminated minority electoral opportunity in
four districts, Districts 33, 35, 117, and 149, and deliberately minimized minority opportunity in
District 41, possibly eliminating it entirely.  Moreover, the 2011 House Plan intentionally denied
growing minority communities in the Rio Grande Valley and El Paso County additional electoral
opportunities that would reflect their increased population.  Finally, the 2011 House Plan took
away a potential electoral opportunity from a growing minority community in western Dallas
County because minority voters "were about to exercise it."  *LULAC v. Perry*, 548 U.S. at 440.
Direct and circumstantial evidence establishes that this minority vote dilution was intentional.
House leadership ignored Voting Rights Act guidance provided by the TLC and the Office of the
Texas Attorney General and gave lesser priority to the rights of minority voters than to the

protection of incumbents.  Map drawers divided precincts along racial lines, in the absence of

partisan data, in order to exclude minority voters from the districts of Anglo-preferred

incumbents.  Finally, the Texas House voted as a body to enact the 2011 House Plan over nearly

united opposition by minority-preferred legislators and gave little credence to the concerns

expressed by representatives of minority communities.  Notwithstanding the presence of partisan

motives, the evidence has established that at least one of the purposes of the 2011 House Plan

was to dilute the voting strength of minority communities.  This discriminatory intent violates

Section 2 of the Voting Rights Act.  *See, e.g.*, *Brown*, 561 F.3d at 433.

## VIII.   THE TOTATLITY OF THE CIRCUMSTANCES SUPPORTS A FINDING OF DISCRIMINATORY PURPOSE

The evidentiary factors ordinarily used to assess the totality of circumstances in a

discriminatory effect claim under Section 2 of the Voting Rights Act—the "Senate Factors"

described above in Part III.B—are also probative of a discriminatory purpose.  *Rogers*, 458 U.S.

at 620-22; *Brown*, 561 F.3d 433.  Here, the most relevant evidence pertains to Senate Factors 1

(history of official discrimination), 2 (extent of racially polarized voting), 3 (voting practices that

enhance the opportunity for discrimination), 5 (effect of socioeconomic disparities), and 7

(election of minorities to public office).  An assessment of these factors supports a finding that

Texas's 2011 Congressional and House plans were adopted with a discriminatory purpose.

### A.   Texas Has a Long and Persistent History of Voting-Related Discrimination

To satisfy the first Senate factor, Plaintiffs need to show a history of official

discrimination that "touched" a minority group's voting rights or otherwise affected its members'

ability to participate in the democratic process.  *Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No.

97-417 at 28-29).  Texas has a long history of voting-related discrimination that stretches back to

Reconstruction and persists today.  US PFOF ¶ 588.  Texas has used a variety of tactics to

exclude minority voters newly enfranchised by the Fifteenth Amendment from exercising their rights, including all-white primaries, poll taxes, secret ballots, and re-registration requirements. US PFOF ¶¶ 589, 591-594.  Federal intervention ended each of these discriminatory tactics, but Texas persisted.  US PFOF ¶ 590.

Even after Texas became covered under Section 5 of the Voting Rights Act, the intentional discrimination against minority voters continued.  In every redistricting cycle since the 1970s, the Attorney General has objected to all or part of the state's Congressional or House redistricting plans.  *See supra* Part III; US PFOF ¶¶ 595, 598-560.  Texas has also been subject to a series of judicial decisions invalidating all or part of its proposed Congressional and House redistricting plans.  US PFOF ¶ 595.  Still, Texas persists.  Its more recent discriminatory acts have been more subtle but no less intentional.  *See Veasey*, 2014 WL 5090258, at *20, *52-55, n.504, n.529; *LULAC v. Perry*, 548 at 440.  Texas's repeated attempts to prevent minority citizens from participating effectively in the political process have enduring effects that in part account for the disparate turnout rates of Anglo and minority voters today. US PFOF ¶¶ 595-603. The 2011 Congressional and House redistricting plans must be considered in the context of this robust history of voting discrimination against racial minorities.  *See Rogers*, 458 U.S. at 624-25 (holding that evidence of past discrimination is relevant to drawing an inference of purposeful discrimination); *City of Rome v. United States*, 446 U.S. 156, 177 (1980) ("[E]lectoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination.").

**B.     Voting in Texas Is Racially Polarized.**

Senate factor two addresses whether voting is racially polarized.  *Gingles*, 478 U.S. at 37 (quoting S. Rep. No. 97-417 at 28-29).  Racially polarized voting is a practical inquiry into whether racial voting patterns impede the election of minority-preferred candidates.  Voting

patterns need not be extreme to be racially polarized. *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (citing 71.6 percent cohesive voting by Black voters); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1119 (5th Cir. 1991) (reversing district court's finding of no polarized voting and pointing to election in which 89 percent of the city's black voters cast ballots for the black candidate and 84 percent of the city's white voters did not).

Many courts, including the United States Supreme Court, have repeatedly and consistently found that, in Texas, voting is polarized between African-Americans and Anglos and between Hispanics and Anglos. US PFOF ¶ 606. Indeed, analyses conducted in 2011 by the State through the Office of the Attorney General documented racially polarized voting patterns in statewide elections from 2002 to 2010, *see* US PFOF ¶ 607, and State Defendants have conceded that, as a general matter, racially polarized voting persists in the state. Trial Tr. 114:18-115:17, July 29, 2014. Moreover, statistical evidence presented by expert witnesses and anecdotal evidence provided by lay witnesses establish that there is persistent racially polarized voting in Texas. US PFOF ¶ 608. It is against this backdrop of racially polarized voting that this Court must consider Texas's actions to dilute minority voting strength in 2011.

### C.   Texas Has Used Voting Practices or Procedures that Enhanced Minority Vote Dilution

The third Senate factor requires a showing that Texas has used voting practices or procedures that enhance the opportunity for discrimination against a minority group. *Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417 at 28-29). "Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process." *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996). The

State's prior use of discriminatory voting practices or procedures, including in the redistricting

context, is fully outlined in *supra* Part III.  *See also* US PFOF ¶ 597-603.  The prior use of such

practices (and the court rulings against them) support a finding that the novel techniques used in

2011, such as the nudge factor, are also intentionally discriminatory.

### D.  Socioeconomic Disparities Hinder the Ability of African-Americans and Hispanics in Texas to Participate Effectively in the Political Process

Senate factor five assesses the extent to which minority group members bear the effects

of discrimination in such areas as education, employment, and health, which hinder their ability

to participate effectively in the political process. *Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No.

97-417 at 28-29).  "[C]ourts have recognized that disproportionate educational, employment,

income level and living conditions arising from past discrimination tend to depress minority

political participation . . . [Therefore,] plaintiffs need not prove any further causal nexus between

their disparate socio-economic status and the depressed level of political participation."  S. Rep.

at 29 n. 114 (citing *White v. Regester*, 412 U.S. 755, 768 (1973)); *see also Teague v. Attala Cnty.*

92 F.3d 283, 294 (5th Cir. 1996) (stating that once proven, evidence of socioeconomic disparities

argues against the assertion that minority voter apathy is the reason for generally lower minority

political participation).

According to 2010-2012 American Community Survey (ACS) data, Blacks and

Hispanics in Texas experience poverty at roughly three times the rates of Anglos, and Anglo

median per capita income is approximately double Black and Hispanic median income levels.

US PFOF ¶ 613; *see also,* ECF No. 1085 at 5-6 (Mot. for Judicial Notice).  Blacks and Hispanics

in Texas are also far more likely than Anglos to be unemployed and to lack a high school

diploma.  US PFOF ¶¶ 617-621.  Likewise, Blacks and Hispanics are roughly three times more

likely to receive Supplemental Nutrition Assistance Program (SNAP) benefits than Anglos.  US

PFOF ¶ 615.  Overall, minority groups in Texas continue to suffer from wide disparities in education, employment, income, and a number of other areas, which have been the natural result of long and systemic racial discrimination.  *See Veasey*, 2014 WL 5090258, at *4 (stating that "the racial disparities in education, employment, housing, and transportation are the natural result of long and systematic racial discrimination" in Texas).  Each of these disparaties has been shown to decrease the ability of these groups to participate in the political process.  US PFOF ¶¶ 624-625.

### E.   African-Americans and Hispanics in Texas Are Underrepresented in Public Office

The seventh Senate factor examines the extent to which members of minority groups have been elected to public office.  As outlined above, with very few exceptions, Texas has created new minority opportunity districts  only after involvement by the United States Attorney General or a federal court.  US PFOF ¶ 594-598.  As a result, significant disparities persist in Texas between minority population and representation in Congress and in the State House.  While Hispanics make up approximately 30.3 percent of the citizen population of Texas and African-Americans make up 13.3 percent, at the start of the 2013 legislative session, Hispanics held 21.1 percent of Texas House and Senate seats and African-Americans held 11.1 percent of those seats.  US PFOF ¶ 629.  Indeed, African-American and Hispanic underrepresentation exists across federal, state, and local offices.  A 2000 analysis of these offices found that only 1.7 percent of Texas elected officials were African-American.  *Id.*  A similar analysis of Hispanics in 2003 found that they comprise approximately 7.1 percent of Texas elected officials.  *Id.*

* * * * *

The totality of the circumstances supports a finding that Texas's 2011 Congressional and House plans were enacted with a discriminatory purpose.  Texas has a long history of discrimination against minority citizens in voting, consistently adopting practices that undermine African American and Hispanic electoral strength.  The State's targeted efforts at vote dilution have been all the more effective due to stark disparities between minorities and Anglos in income, education, housing, and transportation—disparities that are themselves partly the product of official discrimination.  The result has been low minority turnout, which, when combined with racially polarized voting, has left the state's minorities underrepresented in its legislature and in Congress.  This background illuminates the motivation behind Texas's latest post-Census redistrictings.  The Senate Factors evidence, along with the other direct and circumstantial evidence presented in this case, indicates that Texas again attempted to weaken minority electoral ability with the 2011 plans.

## IX.   THE STATE'S ASSERTED DEFENSES ARE MERITLESS

The State of Texas has asserted three primary defenses to the United States' claims.  *First*, Texas contends that intentional vote dilution cannot be found where the State's principal purpose is partisanship.  *Second*, the State argues that no vote dilution occurs so long as the districts at issue remained majority minority.  *Third*, Texas claims that the Voting Rights Act affords no protection to minority voters who do not reside in districts in which a single minority group makes up a majority of eligible voters.  For the reasons that follow, the State's asserted defenses are meritless.

### A.   Partisanship Is Not a Defense to Intentional Vote Dilution

Texas cannot defend the 2011 Congressional Plan and 2011 House Plan as driven by partisanship.  Partisanship is not a legal defense to intentional race-based vote dilution, as legislators may not purposefully dismantle minority opportunity districts merely to fulfill

partisan objectives.  Intentional racial discrimination is intentional racial discrimination, regardless of its ultimate objective.  Moreover, because of analytical distinctions between an intentional vote dilution claim and an Equal Protection claim under *Shaw v. Reno*, 509 U.S. 630 (1993), the partisanship defense available to a *Shaw* claim does not apply here.  Therefore, the State's assertions regarding partisanship do not insulate it from a finding of intentional discrimination.

### 1.     Incumbency Protection May Give Rise to Intentional Vote Dilution

The use of intentional race discrimination to achieve a majority for a particular political party will "give rise to an equal protection violation."  *LULAC v. Perry*, 548 U.S. at 440.  This is because "'[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act'" to violate Section 2.  *Brown*, 561 F.3d at 433 (quoting *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984)); *see also Arlington Heights*, 429 U.S. at 265-66 (requiring only a showing that "discriminatory purpose has been *a* motivating factor in the decision" (emphasis added)).  Thus, numerous courts have held that "[i]f . . . in order to protect incumbents of whatever race [a] redistricting authority deliberately adopted devices for limiting [minority] representation . . . , they would be engaged in deliberate racial discrimination."  *Barnett v. Daley*, 32 F.3d 1196, 1199 (7th Cir. 1994); *see also Garza*, 918 F.2d at 771 (upholding a finding of discriminatory intent where incumbents "chose fragmentation of the Hispanic voting population as the avenue by which to achieve . . . self-preservation"); *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (upholding a finding of discriminatory intent where "racial discrimination was the necessary accompaniment of the action taken to protect incumbencies").[24]

---

[24] *See also Rybicki v. State Bd. of Elections*, 574 F. Supp. 1082, 1109 (N.D. Ill. 1982) (three-judge panel) (holding that the evidence showed that "the requirements of incumbency [were] so closely intertwined with the need for racial dilution that an intent to maintain a safe, primarily white, district . . . [was] virtually coterminous with a purpose to practice racial discrimination"); *Armour v. Ohio*, 775 F. Supp.

The Supreme Court already warned Texas in *LULAC v. Perry* against using racial vote dilution to partisan ends, explaining that incumbency protection cannot justify "act[ing] against those Latinos who were becoming most politically active."  548 U.S. at 440.  In 2003, Texas redrew Congressional District 23 in response to growing Latino voter participation that threatened a Republican congressman's incumbency.  *See id.* at 438-39.  Legislators "divided the cohesive Latino community" by moving some Latinos into what was already a Latino opportunity district and leaving those that remained with "little hope of electing a candidate of their choice."  *Id.* at 439.  As the Court noted, "the State took away the Latinos' opportunity because Latinos were about to exercise it."  *Id.* at 440.  Thus, even if the State's primary purpose is political, its use of race "bears the mark of intentional discrimination that could give rise to an equal protection violation."  *Id.*

As Judge Kozinski of the Ninth Circuit has explained by way of analogy in another case alleging intentional vote dilution, such purposeful discrimination may occur even in the absence of animus:

> Assume you are an [A]nglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination?  Of course you have.  Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

---

1044, 1061 (N.D. Ohio 1991) (three-judge panel) (noting that, "[a]lthough courts are reluctant to provide relief on claims that a district has been gerrymandered to protect an incumbent's seat, this rule does not hold when the manipulations were conducted on a race-conscious basis," and finding a discriminatory intent where redistricting "was intended to split the black community in order to dilute the potential effectiveness of the black vote, to the obvious benefit of the incumbents") (citations omitted).

*Garza*, 918 F.2d at 778 n.1 (Kozinski, J., concurring in relevant part).  Thus, even if the underlying motive for Texas's intentional discrimination was driven by partisanship rather than racial animus, that intentional discrimination nonetheless violated the Voting Rights Act.

### 2.     *Shaw* Claims Are Analytically Distinct from Intentional Vote Dilution

Texas has incorrectly argued that *Hunt v. Cromartie*, 526 U.S. 541 (1999) ("*Cromartie I*"), a decision from the line of cases beginning with *Shaw v. Reno*, 509 U.S. 630 (1993), establishes a partisanship defense to a claim of intentional vote dilution.  The State's reliance on *Cromartie I* is misplaced.  A *Shaw* claim and an intentional vote dilution claim are "analytically distinct."  *Shaw*, 509 U.S. at 652.  In a *Shaw* claim, consideration of race is not unlawful if other race-neutral principles (such as partisanship) predominate in the drawing of a district.  But that standard does not apply to intentional vote dilution claims because race need only be "a motivating factor" to establish purposeful discrimination.  *Arlington Heights*, 429 U.S. at 265-66.

Intentional vote dilution—the United States' claim in this case—occurs when "the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities,' an action disadvantaging voters of a particular race."  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980)).  The manipulation of district lines to dilute minority voting strength is no less intentional or harmful to minority voters simply because it benefits a party and its incumbents.  *Cf. Garza*, 918 F.2d at 778 & n.1 (Kozinski, J., concurring in relevant part).  If a growing minority population has a tendency to vote in opposition to the party controlling the redistricting process, the controlling party may logically conclude that diminishing the voting strength of minority voters will benefit its partisan interests and protect its incumbents.  That is precisely what happened when Texas drew Congressional District 23 in 2003 *and* what occurred yet again

71

during the 2011 redistricting.  In holding that the 2003 version of CD 23 violated Section 2, the Supreme Court in *LULAC v. Perry* emphasized that the State's intent to dilute Hispanics' voting strength in order to achieve an overarching partisan goal "bears the mark of intentional discrimination that could give rise to an equal protection violation."  548 U.S. at 440.  The same conclusion applies here.

By contrast, "*Shaw* recognized a claim 'analytically distinct' from a vote dilution claim." *Miller*, 515 U.S. at 911.  "[T]he essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts," *id.*, without a compelling justification, *Cromartie I*, 526 U.S. at 543.  In contrast to a vote dilution case, a *Shaw* case does not require allegations that officials tried to diminish the voting strength of any racial or ethnic group.  Rather, the alleged injury in a *Shaw* claim is the racial segregation itself, which according to the Supreme Court, "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole."  *Shaw*, 509 U.S. at 650, 657; *accord Miller*, 515 U.S. at 911-912, 914, 928.

The appropriate legal standard therefore differs significantly depending on whether a plaintiff is alleging intentional vote dilution (as the United States is here) or basing its claim on a *Shaw* theory.  As previously noted, in claims of intentional vote dilution, "[r]acial discrimination need only be one purpose, and not even a primary purpose" of the State's decisionmaking. *Brown*, 561 F.3d at 433; *see also Arlington Heights*, 429 U.S. at 265-66.  Thus, partisanship and intentional vote dilution are not an either/or proposition; the two goals can co-exist, one serving the other.  *Shaw* claims, by contrast, require proof that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a

particular district." *Miller*, 515 U.S. at 916.  In other words, unlike a case challenging vote dilution, it is not sufficient in a *Shaw* claim to prove that race was simply "*a* motivation for the drawing" of a challenged district.  *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (*Cromartie II*) (quoting *Bush v. Vera*, 517 U.S. 952, 959 (1996) (plurality op.)).  Rather, to prevail on a *Shaw* claim, "a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916.  For purposes of *Shaw* claims, one such race-neutral factor is partisanship.  *See Cromartie I*, 526 U.S. at 551-53; *Cromartie II*, 532 U.S. at 241-43, 257-58.

The key point here, which is fatal to the State's argument, is that the United States is *not* basing its claim on a *Shaw* theory.  To prevail on its intentional vote dilution claim, the United States need only show that race was a factor in the State's redistricting, not that it was the sole or even primary purpose.  As long as the United States makes this showing—and it has—the possible existence of other motives, including partisanship, does not immunize the State from liability for intentional vote dilution.

## B. Opportunity to Elect a Preferred Candidate Is Defined by Electoral Outcomes, Not Demographic Concentrations

Throughout the redistricting process and in this litigation, the State has incorrectly claimed that minority voters have the opportunity to elect their preferred candidate of choice in any district where minority citizens make up a majority of eligible voters.  However, the opportunity to elect is defined by actual opportunity, rather than a simple demographic majority. *See, e.g.*, *LULAC v. Perry*, 548 U.S. at 428.  Although several districts in the 2011 Congressional and House plans had marginal majorities of voters with Spanish surnames, Hispanic voters in some of these districts lacked a practical opportunity to elect their candidates of choice. *See*

*supra* Sections VI.B, VII.B, VII.C, VII.D.  Indeed, this was by design.  Therefore, the

preservation of population majorities also does not provide a defense to claims of intentional

vote dilution.

Population majorities may be used merely "to create the facade of a Latino district" that

was actually designed "to protect [an incumbent] from a constituency that was increasingly

voting against him."  *LULAC v. Perry*, 548 U.S. at 440-41.  Aware of this potential, the Fifth

Circuit has "consistently recognized that 'access to the political process and not population is the

barometer of dilution of voting strength.'"  *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 150 (5th

Cir. 1977) (en banc) (quoting *Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109, 1112 (5th

Cir. 1975)), other aspect superseded by statute as recognized in *LULAC v. Clements*, 999 F.2d

831, 866-67 (5th Cir. 1993) (en banc).  That is because "it may be possible for a citizen voting-

age majority to lack real electoral opportunity."  *LULAC v. Perry*, 548 U.S. at 428; *see also*

*Voinovich v. Quilter*, 407 U.S. 146, 158 (1993) (noting that the *Gingles* requirements "cannot be

applied mechanically and without regard to the nature of the claim"); *Major v. Treen*, 574 F.

Supp. 325, 339 (E.D. La. 1983) (three-judge court) (recognizing that under certain circumstances

"a 50/50 ratio of black to white population gives rise to a safe white district").  Minority voters

may participate in elections at lower rates than Anglo voters due to depressed socioeconomic

status and other lingering effects of discrimination, and a determination of minority opportunity

must take this into account.  *See Teague v. Attala Cnty.*, 92 F.3d 283, 294-95 (5th Cir. 1996);

*Kirksey*, 554 F.2d at 145; *see also United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1563

(11th Cir. 1984) (Wisdom, J.) (holding attribution of the lack of black electoral success to

"failure of the blacks to turn out" to be "based on a misconception of law" and "clearly

erroneous").

The absence of real electoral opportunity for Hispanic voters in Congressional District 23, House Districts 35 and 117, and possibly House District 41 in the 2011 Congressional and 2011 House plans establishes precisely why population statistics standing alone cannot be used to assess vote dilution claims. House District 117 was drawn with precisely 50.1 percent SSVR in the 2011 House Plan, and reconstituted election analysis establishes that it would not have provided Hispanic voters with the opportunity to elect their preferred candidates of choice. *See supra* Section VII.B. Similarly, Congressional District 23 and House District 35 were drawn with marginal SSVR majorities of 54.5 percent and 53.4 percent respectively, but neither provided an electoral opportunity for Hispanic voters. *See supra* Sections VI.B & VII.C. Finally, House District 41 had an SSVR majority of 62.1 percent, and it cannot be determined whether Hispanic voters would have had an opportunity to elect their preferred candidates there, due to the large number of precincts split along racial lines on the boundary of the district. *See supra* Section VII.D.

Texas's own actions belie its claim that a bare 50.1 percent majority of minority voters is sufficient to establish electoral opportunity. In both the 2011 Congressional plan and the 2011 House plan, the State publicly presented population statistics while privately scrutinizing analysis of the likely electoral success of Hispanic-preferred candidates. *See supra* Sections V.A, VI.B, VII.H. Not only did the State create districts with only the superficial appearance of Hispanic electoral opportunity, it also took deliberate steps to ensure that those very districts were *not* opportunity districts. In fact, by applying electoral analysis to reduce the electoral prospects of Hispanic-preferred candidates in majority-Hispanic districts, Texas set out to place as many Hispanic voters as possible in districts that would not provide them with an electoral opportunity, sapping Hispanic voting strength across the State. *See Moore v. Leflore Cnty. Bd. of*

*Educ.*, 502 F.2d 621, 624 (5th Cir. 1974) (holding that slim population and registered voter majorities "enhanced the possibility of continued black political impotence"); *see also Busbee v. Smith*, 549 F. Supp. 495, 498-99 (D.D.C. 1982) (three-judge court), *aff'd*, 103 S. Ct. 809 (1983) (finding intentional discrimination in the creation of a district that, although it had both a majority black population and a majority black voting-age population, would not afford black voters with the opportunity to elect their preferred candidate). And again, the evidence shows that the State knew exactly what it was doing: it advanced a superficial demographic measurement of Hispanic opportunity, disregarding Hanna's legal advice and further evincing that the resulting vote dilution was deliberate. *See supra* Section VII.H.

### C.   The Voting Rights Act Protects Minority Voters Who Live Outside of Single-Minority Majority Districts

The State of Texas has claimed that minority citizens who reside in communities in which no single minority group makes up a majority of eligible voters receive no protection under the Voting Rights Act. Contrary to the State's position, deliberate elimination of minority electoral opportunity achieved by a cohesive coalition of minority voters violates the prohibition on intentional discrimination under Section 2 of the Voting Rights Act. *Cf. Bartlett*, 556 U.S. at 24. Nor may a jurisdiction intentionally minimize electoral opportunities for minority voters, regardless of whether those voters reside in an opportunity district or could be drawn into a single-minority majority district. *See, e.g.*, *Garza*, 918 F.2d at 771.

#### 1.   Section 2 Protects Coalition Districts from Intentional Vote Dilution

Texas has claimed that the Voting Rights Act did not bar the State from dismantling House District 149, in which no single minority group made up a majority of eligible voters. Under certain circumstances, Section 2 of the Voting Rights Act requires the drawing of "coalition districts" in which two or more racial-minority groups together form a numerical

majority.  *See LULAC v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc); *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988).[25]  In *LULAC v. Clements*, the Fifth Circuit sitting en banc made clear that "if blacks and Hispanics vote cohesively, they are legally a single minority group, and elections with a candidate from this single minority group are elections with a viable minority candidate."  999 F.2d at 864; *see also Campos*, 840 F.2d at 1244 (holding that a claim brought by a cohesive coalition of minority voters is analytically indistinct from a claim brought by single minority group).  Thus, after a factual finding that a coalition of minority voters is politically cohesive, "nothing in the law . . . prevents the plaintiffs from identifying the protected aggrieved minority to include" minority voters of multiple races.  *Campos*, 840 F.2d at 1244; *cf. Large v. Fremont Cnty.*, 709 F. Supp. 2d 1176, 1195-1202 (D. Wyo. 2010), *remedy aff'd*, 670 F.3d 1133 (10th Cir. 2012) (finding Native American voters to be cohesive notwithstanding division into two tribes).

In turn, *Bartlett v. Strickland*, 556 U.S. 1 (2009), guarantees that voters in any type of district—including a minority coalition district—are protected from intentional discrimination. In *Bartlett*, the Supreme Court stated that if "there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."  556 U.S. at 24 (*citing Bossier Parish I*, 520 U.S. at 481-82).  If the Reconstruction Amendments bar intentionally discriminatory elimination of crossover districts—districts in which minority voters have the opportunity to "elect the candidate of [their] choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate," *id.* at 13—then

---

[25] "[T]he judgments of the Court of Appeals for the Fifth Circuit are binding on the three-judge district court."  *Ala. NAACP State Conf. of Branches v. Wallace*, 269 F. Supp. 346, 350 (M.D. Ala. 1967); *see also Finch v. Miss. State Med. Ass'n*, 585 F.2d 765, 773 (5th Cir. 1978) (recognizing that "a district court within [a] Circuit . . . was bound to follow the law of the circuit").

those Amendments also must bar intentionally discriminatory elimination of coalition districts "in which two minority groups form a coalition to elect the candidate of the coalition's choice," *id.*; *see also id.* at 13-14 (placing coalitions districts on a spectrum closer to single-minority majority districts than either crossover districts or influence districts).  Moreover, because a minority coalition is legally identical a single racial minority group if the coalition is cohesive, *see LULAC v. Clements*, 999 F.2d at 863, this protection must extend to a coalition of three minority groups that have been proven to be cohesive.

Because Section 2 enforces the constitutional bar on intentional discrimination in voting, *see, e.g.*, *Brown*, 561 F.3d at 433, the statute forbids jurisdictions from intentionally eliminating the opportunity of a group of minority voters to elect their candidate of choice, alone or in combination with other racial groups, by dismantling an effective multi-minority coalition district.  Thus, the intentional fragmentation of a cohesive coalition of African-American, Hispanic, and Asian American voters that had demonstrated their opportunity to elect their preferred candidate of choice in House District 149 violated the Voting Rights Act.  *See supra* Section VII.G.

### 2.     *Perry v. Perez* Did Not Address the Legal Viability of Coalition Claims

Texas has argued that the Supreme Court's decision in *Perry v. Perez*, 132 S. Ct. 934 (2012) (per curiam), establishes that Section 2 cannot require the drawing of coalition districts. *See* Defs.' Mot. Partial Summ. J. 20-21 (ECF No. 996).  For the reasons explained in greater detail in the United States' response to Texas's summary judgment motion, the contention is meritless.  *See* U.S. Mem. 11-13 (ECF No. 1071).  When considered in the context of this litigation's procedural history, the Supreme Court's decision in *Perez* establishes only that Section 2 requires a specified factual basis, principally findings of minority cohesion, prior to

recognizing a claim of vote dilution based on the failure to create minority coalition districts. *See* 132 S. Ct. at 944. This Court can and should make an express finding of electoral cohesion among voters in House District 149, *see supra* Section VII.G, which would clarify the nature of the State's intentional vote dilution against those voters.

### 3. The Voting Rights Act Protects Minority Voters Who Do Not Reside in Areas in Which a Minority-Majority District Can Be Drawn

Texas has also claimed that it was not possible to create a second reasonably compact minority opportunity district in the Dallas-Fort Worth Metroplex in which a single minority group made up a majority of eligible voters and that, as a result, the State had carte blanche to pack and crack the minority population of the region. However, regardless of the potential to craft a single-minority majority district, a jurisdiction may not deliberatively split minority communities to create a situation in which minority voters have less opportunity than other citizens to participate in the political process and to elect legislators of their choice. *See Garza*, 917 F.2d at 771.

In *Garza*, the Ninth Circuit heard and rejected a similar argument. Los Angeles County had asserted that there could be no violation of the Voting Rights Act where "there could be no single-member district with a majority of minority voters." 918 F.2d at 769. The court declined to accept this defense and held that "to the extent that *Gingles* does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength." *Garza*, 918 F.2d at 769. Thus, even while accepting that a majority-minority district could not have been drawn at the time that the County had last redistricted, the court held that intentional fragmentation of the Hispanic population to protect incumbents was an act of intentional discrimination that violated the Voting Rights Act. *See id.* at 771. The Supreme Court pointed to *Garza* when it declined to "consider whether intentional discrimination affects

79

the *Gingles* analysis."  *Bartlett*, 556 U.S. at 20 (citing *Garza*, 918 F.2d at 771); *see also id.* (clarifying that the Court's larger holding imposing a majority-minority population requirement for a Section 2 results claim "does not apply to cases in which there is intentional discrimination against a racial minority").

      "To the extent that a redistricting plan deliberatively minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the [F]ourteenth [A]mendment."  *Garza*, 918 F.2d at 765; *see also LULAC v. Perry*, 548 U.S. at 440; *United States v. Brown,* 561 F.3d at 424.  In the 2011 Congressional plan, Texas intentionally segregated Hispanic voters in CD 26, segregated African American voters in CD 12, and packed minority voters in CD 30.  *See supra* Section VI.D.  The Congressional districts in the Dallas-Fort Worth Metroplex are inexplicable on any basis other than race, and the 2011 Congressional plan resulted in the diminution—and likely the elimination—of the opportunity for minority voters to participate in the political process and to elect legislators of their choice outside of CD 30.  *See supra* Section VI.D.  Thus, the cracking of minority communities in the DFW region in the 2011 Congressional Plan violated the Voting Rights Act.

## X.    <u>CONCLUSION</u>

      Texas's 2011 Congressional and House redistricting plans were enacted with a racially discriminatory purpose.  The evidence shows that the state reduced minority voting opportunities in the 2011 Congressional and House plans, when it could easily have expanded such opportunities.  This reduction in minority voting opportunities and overall dilution of the minority voting strength took place in the face of substantial growth in the minority population around the state over the prior decade, the presence of geographically compact areas of minority population that could maintain the cores of existing districts and form the cores of new districts, and in continued presence of racially polarized voting in the state.  The evidence shows that this

was done intentionally.  The United States asks that this Court find that the State Defendants

engaged in intentional racial discrimination in violation of Section 2 of the Voting Rights Act

and the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States

Constitution in adopting the 2011 Congressional and House redistricting plans.

Date:  October 30, 2014

                                                Respectfully submitted,

ROBERT L. PITMAN                                VANITA GUPTA
United States Attorney                          Acting Assistant Attorney General
Western District of Texas                       Civil Rights Division

                                                */s/ Timothy F. Mellett*
                                                T. CHRISTIAN HERREN, JR.
                                                TIMOTHY F. MELLETT
                                                JAYE ALLISON SITTON
                                                DANIEL J. FREEMAN
                                                MICHELLE A. MCLEOD
                                                ERIN VELANDY
                                                Attorneys
                                                Voting Section, Civil Rights Division
                                                U.S. Department of Justice
                                                Room 7123 NWB
                                                950 Pennsylvania Avenue, N.W.
                                                Washington, D.C. 20530
                                                (202) 305-4355

## CERTIFICATE OF SERVICE

   I hereby certify that on October 30, 2014, I served a true and correct copy of the foregoing via the Court's ECF system on the following counsel of record:

David R. Richards
Richards Rodriguez & Skeith, LLP
davidr@rrsfirm.com

Richard E. Grey III
Gray & Becker, P.C.
rick.gray@graybecker.com

*Counsel for Perez Plaintiffs
and Plaintiff-Intervenors Pete Gallego and
Filemon Vela Jr.*

Luis Roberto Vera, Jr.
Law Offices of Luis Roberto Vera, Jr.  &
 Associates
lrvlaw@sbcglobal.net
George Joseph Korbel
Texas Rio Grande Legal Aid, Inc.
gkorbel@trla.org

*Counsel for Plaintiff League of United Latin
American Citizens*

John T. Morris
johnmorris1939@hotmail.com

*Pro Se Plaintiff*

Nina Perales
Marisa Bono
Nicolas Espiritu
Mexican American Legal Defense
 and Education Fund
nperales@maldef.org
mbono@maldef.org
nespiritu@maldef.org

Mark Anthony Sanchez
Robert W. Wilson
Gale, Wilson & Sanchez, PLLC
masanchez@gws-law.com
rwwilson@gws-law.com

*Counsel for Plaintiff Latino Redistricting
Task Force*

Jose Garza
Law Office of Jose Garza
garzpalm@aol.com

Mark W. Kiehne
Ricardo G. Cedillo
Davis, Cedillo & Mendoza
mkiehne@lawdcm.com
rcedillo@lawdcm.com

Joaquin G. Avila
Seattle University School of Law
avilaj@seattleu.edu

Cynthia B. Jones
Jones Legal Group, LLC
jones.cynthiab@gmail.com

*Counsel for Plaintiff Mexican American
Legislative Caucus*

Karen M. Kennard
City of Austin Law Department
karen.kennard@ci.austin.tx.us

Max Renea Hicks
Law Office of Max Renea Hicks
rhicks@renea-hicks.com

Manuel Escobar, Jr.
Manuel G. Escobar Law Office
escobarm1@aol.com

Marc Erik Elias
Abha Khanna
Perkins Coie LLP
akhanna@perkinscoie.com
melias@perkinscoie.com

S. Abraham Kuczaj, III
Stephen E. McConnico
Sam Johnson
Scott Douglass & McConnico, LLP
akuczaj@scottdoug.com
smcconnico@scottdoug.com
sjohnson@scottdoug.com

David Escamilla
Travis County Ass't Attorney
david.escamilla@co.travis.tx.us

*Counsel for Rodriguez Plaintiffs*

Gerald Harris Goldstein
Donald H. Flanary, III
Goldstein, Goldstein and Hilley
ggandh@aol.com
donflanary@hotmail.com

Paul M. Smith
Michael B. DeSanctis
Jessica Ring Amunson
Jenner & Block LLP
psmith@jenner.Com
mdesanctis@jenner.Com
jamunson@jenner.Com

J. Gerald Hebert
Law Office of Joseph Gerald Hebert
hebert@voterlaw.com

Jesse Gaines
Law Office of Jesse Gaines
gainesjesse@ymail.com

*Counsel for Quesada Plaintiff-Intervenors*

Rolando L. Rios
Law Offices of Rolando L. Rios
rrios@rolandorioslaw.com

*Counsel for Plaintiff-Intervenor Henry
Cuellar*

Gary L. Bledsoe
Law Office of Gary L. Bledsoe
garybledsoe@sbcglobal.net

Victor L. Goode
NAACP
vgoode@naacpnet.org

Robert Notzon
Law Office of Robert Notzon
robert@notzonlaw.com

Anita Sue Earls
Allison Jean Riggs
Southern Coalition for Social Justice
allison@southerncoalition.org
anita@southerncoalition.org

*Counsel for Plaintiff-Intervenor Texas State
Conference of NAACP Braches*

Chad W. Dunn
K. Scott Brazil
Brazil & Dunn
chad@brazilanddunn.com
scott@brazilanddunn.com

*Counsel for Plaintiff-Intervenor Texas
Democratic Party*

John K. Tanner
John Tanner Law Office
3743 Military Rd. NW
Washington, DC 20015

*Counsel for Plaintiff-Intervenor Texas
Legislative Black Caucus*

Hector De Leon
Benjamin S. De Leon
De Leon & Washburn, P.C.
hdeleon@dwlawtx.com
bdeleon@dwlawtx.com

Eric Christopher Opiela
Eric Opiela PLLC
eopiela@ericopiela.com

Christopher K. Gober
Michael Hilgers
Gober Hilgers PLLC
cgober@goberhilgers.com
mhilgers@goberhilgers.com

James Edwin Trainor, III
Beirne, Maynard & Parsons, LLP
ttrainor@bmpllp.com

Joseph M. Nixon
Beirne Maynard & Parsons LLP
jnixon@bmpllp.com

*Counsel for Plaintiff-Intervenors Joe Barton
et al.*

David Mattax
Patrick K. Sweeten
Angela V. Colmenero
Matthew Frederick
Ana M. Jordan
Jennifer Settle Jackson
Adam Bitter
William T. Deane
Summer R. Lee
Michael B. Neill
Office of the Texas Attorney General
david.mattax@oag.state.tx.us
patrick.sweeten@texasattorneygeneral.gov
angela.colmenero@
texasattorneygeneral.gov
matthew.frederick@
texasattorneygeneral.gov
ana.jordan@oag.state.tx.us
jennifer.jackson@texasattorneygeneral.gov
adam.bitter@texasattorneygeneral.gov
bill.deane@texasattorneygeneral.gov
summer.lee@texasattorneygeneral.gov
michael.neill@texasttorneygeneral.gov

*Counsel for Defendants State of Texas and
Rick Perry and Defendant-Intervenors
David Dewhurst, Joe Strauss, and John
Steen*

Donna Garcia Davidson
Donna G. Daviddson Law Firm
donna@dgdlawfirm.com

Frank M. Reilly
Potts & Reilly, LLP
reilly@pottsreilly.com

*Counsel for Defendant-Intervenors Steve
Munisteri*

Kent M. Adams
Lewis, Brisbois, Bisgaard, & Smith LLP
kadams@lbbslaw.com

*Counsel to Defendant-Intervenor Sarah M.
Davis*

Clarkson F. Brown
Bexar County District Attorney's Office,
101 W Nueva, Suite 5049
San Antonio, TX 78205
(210) 335-2150
clarkb@bexar.org

*Counsel for Amicus Curiae Bexar County*

Ned Bennet Sandlin
Texas Municipal League
bennett@tml.org

*Counsel for Amicus Curiae Texas Municipal
League*

Manuel A. Pelaez-Prada
Pelaez Prada, PLLC
mpp@lonestaradr.com

*Counsel for Amicus Curiae San Antonio
Hispanic Chamber of Commerce*

*/s/ Daniel J. Freeman*
DANIEL J. FREEMAN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7123 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
daniel.freeman@usdoj.gov