# In the United States District Court
## for the
## Western District of Texas

SHANNON PEREZ, ET AL.          §
                               §
v.                             §          SA-11-CV-360
                               §
GREG ABBOTT, ET AL.            §


## ORDER

Before Circuit Judge SMITH, Chief District Judge GARCIA, and District Judge RODRIGUEZ


Circuit Judge Smith, dissenting


XAVIER RODRIGUEZ, District Judge and ORLANDO L. GARCIA, District Judge:

This Order addresses Plaintiffs' claims against the plan for the United States House of Representatives ("congressional plan" or "Plan C185") enacted by the Texas Legislature in 2011, following a full trial on the claims.[1]  Plaintiffs mount both statewide claims[2] and regional claims, specifically in the South/West Texas area, Dallas-Fort Worth area, and Houston area, under § 2 of

---

[1] This Order is designed to be read in conjunction with the Court's fact findings, which are issued separately.

[2] Plaintiffs assert statewide claims under § 2, which the Court considers in terms of whether Plaintiffs have shown that more minority opportunity districts were required than were included in Plan C185 and whether minorities have proportional representation.  However, because the analysis necessarily focuses on whether additional districts could have been drawn in specific areas, the Court finds that conducting the analysis in terms of specific geographic areas is necessary.

1

the Voting Rights Act ("VRA") and the Fourteenth Amendment to the United States Constitution.[3]

Before turning to the merits, the Court will again explain why the 2011 plan claims are not moot and a determination on the merits of those claims is required. This Court thoroughly explained its reasoning in its September 6, 2013 Order (docket no. 886). Specifically, in rejecting Defendants' argument that the 2011 plans posed no threat and any order on those plans could provide no effectual relief, the Court reasoned: (1) it was Defendants' burden to prove mootness; (2) Defendants failed to meet their burden of demonstrating that the conduct alleged to violate § 2 and the Constitution with regard to the 2011 plans could not reasonably be expected to recur; (3) the fact that a challenged law is amended does not alone moot the underlying claim unless the law has been sufficiently altered so as to present a substantially different controversy; (4) the 2013 plans are heavily derived from the 2011 plans, and Plaintiffs contend that many of the alleged violations of the VRA and the Constitution initially enacted in 2011 persist in the 2013 plans, though some perhaps to a lesser degree; (5) although the new plans may disadvantage Plaintiffs to a lesser degree, they disadvantage them in the same fundamental way such that Plaintiffs are still suffering injury from the 2011 plans, even if they are technically repealed; (6) there is no indication that the Legislature would not engage in the same conduct that Plaintiffs assert violated their rights in upcoming redistricting cycles; (7) because Texas refused to concede the illegality of any conduct, a dispute remains over the legality of the challenged practices and there is no assurance that the conduct will not recur, and Plaintiffs

---

[3] Plaintiffs' Fifteenth Amendment and partisan gerrymandering claims were disposed of prior to trial. Docket no. 275, 285. This Court granted summary judgment on the Fifteenth Amendment claims, holding that the law does not recognize a claim under the Fifteenth Amendment for vote dilution. Docket no. 275 at 17. On the political gerrymandering claims, the Court found that the claims were justiciable, but because Plaintiffs had not identified a reliable standard by which to measure the redistricting plan's alleged burden on their representational rights, the Court was required to grant judgment on the pleadings pursuant to Supreme Court precedent. Docket no. 285 at 19-22. *But see Whitford v. Gill*, 15-cv-421-bbc, 2016 WL 6837229 (W.D. Wis. Nov. 21, 2016) (finding for plaintiffs on political gerrymandering claim).

maintain a personal stake in the controversy; and (8) there remains the possibility of declaratory and equitable relief under § 3(c) for some claims.  All three members of this Court agreed with this reasoning.

However, after the Fifth Circuit issued its decision in *Davis v. Abbott*, 781 F.3d 207 (5th Cir. 2015), in which the Court stated that the 2011 Senate Plan lawsuit had become moot, Defendants again argued that the 2011 House and congressional plan claims were moot.  Docket no. 1310. Defendants argued that the Fifth Circuit's mootness conclusion was necessary to its decision that Texas waived its opportunity to seek vacatur of this Court's interim-relief orders in light of *Shelby County v. Holder*, and that the Fifth Circuit's holding "bears directly on this Court's jurisdiction over claims against the Texas Legislature's 2011 House and congressional redistricting plans."  Docket no. 1310 at 23-24.  "At the very least," Defendants argued, "*Davis* implies that the Plaintiffs' claims are moot if they challenge districts that were, like Senate District 10, modified by the Court and later adopted in modified form by the Legislature."  *Id.* at 25.  However, *Davis v. Abbott* does not change the Court's conclusion that most of the 2011 plan claims are not moot.

*Davis v. Abbott* was not a decision about mootness; it concerned whether the plaintiffs in the 2011 Senate Plan case were prevailing parties entitled to fees and costs.  It did not announce a new rule of law or change the legal landscape concerning mootness.  Thus, the only basis upon which it could change this Court's prior conclusions and bind this Court on mootness is if it is factually indistinguishable from this case.  But it is not.

As a preliminary matter, the Court notes that the case against the 2011 Senate Plan was not consolidated with the House and congressional plans, and it remained a separate case (5:11-CV-00788).  It also involved a very limited set of claims, unlike the House and congressional plan cases.

At the interim remedy stage, the proposed compromise plan[4] approved by this Court under the applicable standard set forth in *Perez v. Perry* resolved all of the plaintiffs' claims. *See* docket no. 190 (final judgment noting that Plan S172 "restored [Senate] district 10 to near benchmark configuration and remedied the constitutional infirmities being asserted"). Plaintiffs *agreed* that the interim Plan S172 did not violate the VRA or the Constitution. Thus, when the Legislature adopted that plan in 2013, no plaintiff was complaining that infirmities remained in the plan or alleged that they were still suffering injury from the repealed 2011 plan, and no plaintiff sought to amend their pleadings to pursue § 3(c) relief. When the Fifth Circuit decided that the 2011 plan claims were moot, it was therefore operating under substantially different facts, and it was *not* addressing the House or congressional plan claims when it referred to "the lawsuit" becoming moot.

In this case, in contrast, numerous alleged infirmities from the 2011 plans remained in the interim plans that Plaintiffs contended were continuing to injure them. Unlike in the Senate plan, many asserted VRA and constitutional infirmities were *not* remedied in the interim plans, and thus the injuries were alleged to persist in the 2013 plans. Thus, there was not only a possibility that Defendants would continue to engage in conduct that Plaintiffs claimed violated the VRA or the Constitution, Defendants were continuing to engage in exactly such conduct when they adopted the interim plans in 2013. The fact that this Court finds that mapdrawers acted with an impermissible intent to dilute minority voting strength or otherwise violated the Fourteenth Amendment and that Plaintiffs are still being harmed by the lines drawn as the direct product of these violations demonstrates that many of Plaintiffs' claims against the 2011 plans are not moot. Specifically,

---

[4] The plan was submitted by the plaintiffs, and the defendants indicated in open court that they had no objection to entry of an order directing that Plan S172 be used on an interim basis. Docket no. 147 at 2.

Plaintiffs contended, and this Court finds, that Plaintiffs continue to be harmed by violations of the VRA and Fourteenth Amendment in CD23, CD27, and CD35.

While Defendants undoubtedly would prefer that we address those infirmities only in the context of the 2013 legislative session and the plans adopted therein, doing so would potentially deprive Plaintiffs of a remedy tied to that 2011 injury—the § 3(c) remedy.  Confining the analysis to the 2013 plan claims would significantly impact the intent analysis for Plaintiffs' intentional vote dilution claims given the involvement of a different Legislature and Defendants' assertion that they could have no such discriminatory intent by simply adopting the Court's interim plans.  Plaintiffs should not have to jump through additional hoops to prove that the 2011 mapdrawers' intent carried forward to the 2013 Legislature when Plaintiffs' fundamental claims are that the 2011 mapdrawers acted with discriminatory intent, Plaintiffs are still being harmed by the districts drawn with that intent, and Plaintiffs have potential relief available under § 3(c) for that harm.  Nothing in *Davis v. Abbott* requires a contrary conclusion.

While it is possible that *Davis* implies "at the very least," that the remedied claims are moot, the Court still finds *Davis* distinguishable based on the possibility of § 3(c) relief for certain claims.[5] Because Plaintiffs are still seeking relief under § 3(c) for certain claims, the Court holds they are not moot even where the districts were altered.  As discussed below, however, the Court does agree that the remedied § 2 *results* claims are moot.

---

[5] The Court does not imply that such relief is or is not available or will be granted; those issues remain to be determined.  However, Plaintiffs are seeking such relief and, as this Court previously concluded, "Plaintiffs' claim for § 3(c) relief is certainly not so implausible that it is insufficient to preserve jurisdiction."  Docket no. 886 at 15.

### I. South/West Texas claims

Plaintiffs contend that § 2 requires that there be seven (and some Plaintiffs argue eight) Latino opportunity districts in the combined areas referred to as South/West Texas.  Plaintiffs also contend that Nueces County Hispanics have a § 2 right and should be included in one of those minority opportunity districts, and most Plaintiffs contend that Travis County should not be included. Plaintiffs (other than the Task Force Plaintiffs) contend that CD35, the new HCVAP-majority district that connects portions of Austin and San Antonio, is not a valid § 2 district because it is not compact and because it includes Austin/Travis County, where the *Gingles* preconditions are not satisfied because there is no racially polarized voting.  And Plaintiffs contend that CD23 is no longer a Latino opportunity district despite its HCVAP-majority status.

Defendants contend that Plan C185 has the number of HCVAP-majority districts in South/West Texas that could be required by § 2 (seven districts), and that the State has discretion in deciding their location based on political and other factors, and thus there is no § 2 violation. Although Plaintiffs acknowledge that Plan C185 contains seven HCVAP-majority districts in South/West Texas, they assert that it does not contain seven Latino opportunity districts, and they assert that Plan C185 does not sufficiently remedy the § 2 violation.

A. Whether there should be eight Latino opportunity districts in South/West Texas?

Some Plaintiffs offered demonstration maps with eight HCVAP-majority districts in South/West Texas.  The Supreme Court has recognized that a redistricting scheme may violate § 2 by impermissibly diluting the minority's potential to elect, and has established three threshold requirements for such a vote dilution claim (in the absence of intentional discrimination).  The first factor requires that the relevant minority is "sufficiently large and geographically compact to

constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).

As this Court noted in its March 2012 order, Plans C188 and C211 include a proposed district that stretches from south Hidalgo County all the way to north Travis County, and the Supreme Court ruled that a nearly identical district in the same location was "noncompact for § 2 purposes." *LULAC v. Perry*, 548 U.S. 399, 435 (2006). In *LULAC*, the Supreme Court emphasized that it was the combination of the "enormous geographical distance" between the Austin/Travis County and Mexican-border communities in McAllen/Hidalgo County, coupled with "the disparate needs and interests of these populations," that rendered the district non-compact for § 2 purposes. *Id.* The Court noted that 77% of the population of the district resided in Hidalgo and Travis Counties, on either end of the district. *Id.* at 424. Although this number is reduced to 69% in CD10 in Plan C188 and to 73% in CD33 in Plan C211, the basic problem with the proposed districts remains the same. Thus, these plans are foreclosed by *LULAC v. Perry* and fail to demonstrate that an additional compact opportunity district could be drawn in South/West Texas.

LULAC demonstration plan C262 proposes a district (CD28) that connects rural southwest Texas counties (Webb, Dimmit, and Maverick Counties) with parts of Bexar County and northeastern Travis County. Plan C261 includes a similar district (also CD28) that extends farther south and connects parts of Starr County with parts of Bexar and Travis Counties. Although these districts are unlike the district found noncompact in *LULAC v. Perry* insofar as the population is more evenly dispersed among the various counties in the districts,[6] the districts still span a very large

---

[6] In Plan C261, approximately 2% of the CD28 population is in Starr County on one end, 17% is in Travis County on the other end, 36% is in Webb County, and 10% is in Bexar County. In Plan C262, 36% of the CD28 population is in Webb County and 8% in Maverick County at one end, 17% in Travis County on the other end, and 8% in Bexar County.

distance and connect Hispanic populations in Travis/Hays and Bexar Counties with border communities that seem to have little in common with those populations.  Although the Court could perhaps find them to be compact if sufficient evidence were presented, Plaintiffs have not proffered any basis for joining these various populations aside from race to show that this is a compact minority population, taking into account traditional districting principles and communities of interest.[7]

In addition, Plans C261 and C262 create a long, thin district CD27 that spans from Hidalgo County to Wharton County near Houston, and another long district CD15 running alongside CD27 that joins part of Hidalgo County with Jackson County.  Although the Court is aware that sparser population in some south and southwest Texas counties results in larger districts spanning longer distances, Plaintiffs have offered no justification for the creation of such long and narrow districts joining these various populations, other than race.  Further, Plan C262 (Korbel's preferred map) creates a CD16 joining El Paso with ten other West Texas counties in a significant deviation from its prior compact configuration in El Paso County, and again there is no evidence in the record demonstrating that joinder of these communities has any basis besides achieving a 50% HCVAP population.[8]  Without any additional information, the Court is unable to determine whether the

---

[7] LULAC also presented partial plans C256 and C259 during the 2014 trial on the congressional plan.  These plans include a proposed South Texas Latino opportunity district (CD28) that spans from Hidalgo County to Hays County (there are only slight variations in Hidalgo, Wilson, and Hays Counties in these two maps) and a Travis County-based, Anglo-CVAP-majority CD25 (proposed as a tri-ethnic coalition district), as well as eight HCVAP-majority districts.  LULAC's counsel referred to Plans C256 and C259 in his closing argument, TrA1970, but he proffered no evidence concerning these plans at trial other than the plan maps and data.  LULAC's expert George Korbel (who drew these plans) testified that they "fixed" CD23 and created an additional district out of Corpus Christi that would be very similar to the Corpus Christi district (CD27) under the benchmark plan, but he otherwise did not testify about these plans or discuss the proposed district.  TrA1211.  *See Rodriguez v. Harris Cty., Tex.*, 964 F. Supp. 2d 686, 738 (S.D. Tex. 2013) (noting that it is plaintiffs' burden to put on some evidence of geographical compactness for § 2 purposes).

[8] The Rodriguez Plaintiffs objected to a similar El Paso district proposed by MALC in Plan C211.  Docket no. 465 at 17.

minority populations contained in such districts are compact for § 2 purposes. The fact that the Legislature's enacted map contains three such "fajita strip" districts does not relieve Plaintiffs of their obligation to produce evidence showing that *their* proposed *Gingles* demonstration districts are compact for § 2 purposes.[9] Thus, these plans fail to demonstrate that an additional compact Latino opportunity district could be drawn in South/West Texas.

B. Plaintiffs' claims and proposed maps with seven HCVAP-majority districts in South/West Texas

   Given the Court's conclusion that Plaintiffs have failed to demonstrate that § 2 requires more than seven HCVAP-majority districts in South/West Texas, the Court must initially determine whether Plaintiffs may bring a § 2 claim against a map such as Plan C185 that has seven HCVAP-majority districts in South/West Texas. If so, the Court must relatedly determine whether CD23 and CD35 in Plan C185 are Latino opportunity districts required or permitted by § 2 and whether Nueces County Hispanics have established a § 2 claim.

   Defendants contend that Plaintiffs must show that more HCVAP-majority districts could have been drawn than were included in Plan C185, and because they fail to do so, they cannot bring a § 2 claim. Defendants point to *Johnson v. De Grandy*, 512 U.S. 997 (1994), in which the Supreme Court stated that, "[w]hen applied to a claim that single-member districts dilute minority votes, the

---

[9] In his 2014 closing argument, Mr. Garza stated that plaintiffs "presented testimony both through Dr. Kousser and Mr. Korbel that measured the compactness of [the proposed HCVAP-majority districts in Plan C262] based on the measures contained in the RedAppl utility. Mr. Korbel testified that those districts in 262 were comparable to the compactness of districts – in 185." TrA2129. The Court has not located any testimony from Mr. Korbel about the compactness of the South/West Texas districts in Plan C262. The plan data submitted with Plan C262 includes the compactness analysis using area rubber band and perimeter-to-area measurements from RedAppl, but these measurements were not discussed at trial. Korbel did state that using compactness measurements "is a way to compare the different plans" and "one of the things that I think is important is, are the plaintiffs' plans within – within the range of compactness that the State plan is." TrA1215. However, he never actually compared Plan C262 with Plan C185 in terms of compactness scores. In addition, the State's enacted plan contains many non-compact districts due to its high degree of gerrymandering, and thus the compactness of districts in Plan C185 is not, standing alone, an adequate basis for assessing the compactness of Plaintiffs' proposed districts for § 2 purposes.

first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Id.* at 1008. However, the dispute in *De Grandy* centered on "whether Hispanics are sufficiently numerous and geographically compact to be a majority in additional single-member districts" and "whether, even with all three *Gingles* conditions satisfied, the circumstances in totality support a finding of vote dilution when Hispanics can be expected to elect their chosen representatives in substantial proportion to their percentage of the area's population." *Id.* at 1007-08.

This case does involve claims that Plaintiffs are entitled to an additional HCVAP-majority district in South/West Texas, as discussed above in relation to certain Plaintiffs' claim that there should be eight HCVAP-majority districts in South/West Texas. But Plaintiffs *also* claim that § 2 requires seven Latino opportunity districts in South/West Texas, and Plaintiffs challenge whether the HCVAP-majority districts in Plan C185 are appropriate Latino opportunity districts and whether they sufficiently comply with § 2. The Supreme Court has repeatedly emphasized that "the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim." *Id.* at 1007 (citing *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993)). The Supreme Court has never held that a State's creation of a certain number of HCVAP-majority districts forecloses all relief, and nothing in the Supreme Court's precedents indicates that Plaintiffs may not still challenge whether the enacted districts comply with § 2 and are Latino opportunity districts, whether they appropriately and adequately address Plaintiffs' § 2 rights, and/or whether they comply with the Equal Protection Clause. In fact, *Shaw v. Hunt*, 517 U.S. 899, 916 n.8 (1996), indicates that Plaintiffs may challenge whether the minority districts drawn in the State's plan were lawfully drawn, and that the rule of *Johnson v. De Grandy* applies only when the State's districts are lawfully drawn (or presumed to

10

be).[10]  Thus, while Plaintiffs may not have submitted sufficient proof that they are entitled to eight

HCVAP-majority districts in South/West Texas, they have shown that they are entitled to seven such

districts, and they may assert claims under *Shaw* and § 2 against the districts in Plan C185.  The

Court thus turns to those claims.

### 1. CD23 § 2 claims

Plaintiffs claim that CD23 in Plan C185 is not a Latino opportunity district.  Defendants

assert that it is, noting that both Spanish Surname Voter Registration ("SSVR") and HCVAP

increased from the benchmark and both are over 50% (54.1%/54.8% and 58.5% respectively).  Thus,

Defendants argue, the district provides an opportunity for a politically cohesive Hispanic voting

population to overcome any equally cohesive Anglo voting bloc.  Docket no. 1250-1 at 14.

Defendants also take the position that a 50.1% majority-HCVAP district is by definition an

opportunity district regardless of its projected election performance or other factors because, if

minority voters will "pull, haul, and trade," they can control the district.  Therefore, Defendants

reason, because CD23 is majority HCVAP, it is an opportunity district.

Plaintiffs and their experts contend that election performance and other factors (as opposed

to mere population statistics) determine whether a district is an opportunity district, and most of the

experts contend that a district is not a Latino opportunity district unless Latinos can win 50% of the

---

[10] The Court wrote, "Justice STEVENS in dissent argues that it does not matter that District 12 could not possibly remedy a § 2 violation because he believes the State's plan would avoid § 2 liability.  As support, Justice STEVENS relies on our decision in *Johnson v. De Grandy*, 512 U.S. 997, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994), which he reads to say that 'a plaintiff cannot make out a prima facie case of vote dilution under § 2 unless he can demonstrate that his proposed plan contains *more* majority-minority districts than the State's.'  The dissent's reading is flawed by its omission.  In *De Grandy*, we presumed that the minority districts drawn in the State's plan were lawfully drawn and, indeed, we expressly stated that a vote dilution claim under § 2 'requires the possibility of creating more *than the existing number of reasonably compact districts* with a sufficiently large minority population to elect candidates of its choice.'" (emphasis in original) (some citations omitted).

time or more on an exogenous statewide election index.  As discussed below, the Court does not agree with either side's position, but finds that proposed CD23 in Plan C185 was not intended to be and is in fact not a Latino opportunity district despite its majority-HCVAP status.

First, the Court rejects Defendants' bright-line rule that any HCVAP-majority district is by definition a Latino opportunity district.  Although some courts have applied such a rule and held that § 2 challenges may not be raised to a majority-minority district,[11] that appears to be a minority view. In fact, Justice Kennedy recognized that a majority-HCVAP district may still lack "real electoral opportunity."  *LULAC*, 548 U.S. at 428 (Kennedy, J.); *see also Bartlett v. Strickland*, 556 U.S. 1, 39-40 (2009) (Souter, J., dissenting) ("[E]ven when the 50% threshold is satisfied, a court will still have to engage in factually messy enquiries about the 'potential' such a district may afford, the degree of minority cohesion and majority-bloc voting, and the existence of vote-dilution under a totality of the circumstances.").

Although no Supreme Court decision explains when a majority-HCVAP district lacks "real electoral opportunity," some lower courts have considered this issue and, consistent with Justice Kennedy's observation, have recognized that the majority-minority status of a district does not preclude a § 2 claim.  For example, in considering a plan in which all five districts were majority-African American (though in terms of registered voters "blacks would have exceedingly slim majorities in some of these districts and minorities in others"), the Fifth Circuit noted that "[t]he mere existence of a black population majority does not preclude a finding of dilution."  *Moore v.*

---

[11] For example, in *Jeffers v. Beebe*, 895 F. Supp. 2d 920 (E.D. Ark. 2012), the court relied upon the bright-line 50% threshold for plaintiffs to prove the first *Gingles* condition and Supreme Court cases stating that § 2 does not require maximization or electoral advantage to hold that a plaintiff may not establish a claim for § 2 vote dilution when the challenged district is already majority-minority under *Bartlett*'s definition.

*Leflore Cty. Bd. of Election Comm'rs*, 502 F.2d 621, 624 (5th Cir. 1974) (citing *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc) (rejecting claim that "an at-large scheme cannot work a dilution of black voting strength where blacks, though constituting a minority of registered voters, comprise a majority of the total population of the parish" because although population is the proper measure of equality in apportionment, access to the political process and not population is the barometer of dilution of minority voting strength)).  The Court recognized that the history of fear and civil rights repression resulted in minimal political activity for African Americans such that drawing a district that retained "the barest of black population majorities . . . enhanced the possibility of continued black political impotence." *Id.*  The Fifth Circuit therefore affirmed the district court's rejection of such a plan in favor of a plan with four districts with greater black majorities such that "[b]lack voters [were] therefore far more likely to be able to exercise their franchise in a full and meaningful way." *Id.* at 625.

Later, in *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1547 (5th Cir. 1992), the Fifth Circuit held that even when a protected group is the registered voter majority, it may seek relief in a vote dilution case; the question would be one of proof.  The Court recognized that "access to the political process, aside from population statistics, is the criteria by which a court determines illegal or unconstitutional vote dilution." *Id*. at 1549.  Thus, whether dilution exists is determined as part of the totality of circumstances, peculiarly dependent on the facts of each case. *Id.* at 1551.

As Dr. Lichtman noted, demographics alone do not demonstrate opportunity; the degree of racially polarized voting and turnout will affect whether an HCVAP-majority district provides opportunity, such that a searching, practical inquiry is required.  Tr1226-27, Tr1258.  *Gingles*

13

established that the majority-HCVAP requirement is the minimum threshold a § 2 plaintiff must demonstrate because otherwise that plaintiff cannot show potential to elect as a matter of law,[12] but the existence of a majority HCVAP in a district does not, standing alone, establish that the district provides Latinos an opportunity to elect, nor does it prove non-dilution.  In other words, it is a necessary but not always sufficient requirement for opportunity under *Gingles*.

As part of the "totality of circumstances" analysis, courts consider two factors that focus on the effect of past discrimination on minority groups' ability to participate in the political process: (1) the history of voting-related discrimination in the State or political subdivision; and (2) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. *Clark v. Calhoun Cty., Miss.*, 88 F.3d 1393, 1399 (5th Cir. 1996) (citing *Gingles*, 478 U.S. at 44-45). In *Salas*, the Fifth Circuit also directed courts to consider whether voting is polarized along racial lines and whether the inability of the protected class to elect was caused primarily by racial bloc voting or instead by other circumstances that the VRA does not redress.  *Salas*, 964 F.2d at 1554-55. Looking to the totality of circumstances, it held that a protected group may attempt to prove that its registered voter majority is "illusory" because of errors or shortcomings with the registered voter data, because of practical impediments to voting, or because low turnout at elections was the result of prior official discrimination.  *Id.* at 1555.  However, a protected class is not entitled to § 2 relief merely because it turns out to vote in a lower percentage than non-protected voters.  *Id.* at 1556.

---

[12] The Supreme Court has held in the context of claims involving the failure to create opportunity districts that if minority voters cannot demonstrate at least a potential to elect, then voters challenging a structure as diluting their ability to elect cannot claim that the challenged structure or practice is responsible for their inability to elect.  *Gingles*, 478 U.S. at 50.  For § 2 results claims, *Gingles* and *Bartlett* define potential to elect as having majority-minority CVAP population in a district.

The Second Circuit considered this issue in *Pope v. Albany County*, 687 F.3d 565 (2d Cir. 2012). The court recognized that a majority-minority CVAP population means that, by definition, if the majority voters are cohesive, they have the opportunity to control the outcomes of elections. *Id*. at 575-76. However, low voter registration and turnout rates may mean that this opportunity cannot be realized, and "low voter registration and turnout rates raise questions that go beyond the merely statistical because, as the Supreme Court has recognized, such circumstances may sometimes be 'traceable, at least in part, to [a] historical pattern of . . . official discrimination.'" *Id.* at 575 n.8. As a result, "the law allows plaintiffs to challenge legislatively created bare majority-minority districts on the ground that they do not present the 'real electoral opportunity' protected by Section 2." *Id.*[13]

The Seventh Circuit embraced this same principle in *Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir. 1984), a case that predates *Gingles*. In *Ketchum,* the district court had determined that in fashioning a remedial district, a bare majority constituted an effective majority for minority groups because "there is no statistical or objective evidence in the record that a minority is entitled to or should have more than a majority of the voting age population in order to have a reasonably fair opportunity to vote for candidates of their choice or even to elect candidates of their choice." *Id.* at 1411 (citing the trial record of the lower court). But the court of appeals disagreed, explaining that the district court failed to consider "voter registration and turn-out patterns in the Hispanic and black

---

[13] The Second Circuit held that a plaintiff may satisfy the first *Gingles* factor simply by meeting the 50.1% CVAP requirement, and that the size of the minority population in the district "may well be among the totality of circumstances that can inform the ultimate determination of vote dilution and the appropriate remedy." *Pope*, 687 F.3d at 574. Thus, the majority-CVAP requirement still serves a useful gate-keeping role by identifying, in broad terms, when a minority group has at least "the potential to elect representatives in the absence of the challenged structure or practice" and "serves at the outset to screen out cases in which there is no point in undertaking a full Section 2 analysis." *Id.* at 575 & n.10. "Toward that end, it asks a preliminary question; it does not attempt to answer the ultimate one." *Id.*

16

communities" in determining whether there was a reasonable opportunity to elect. *Id.* at 1413.

Thus, while an HCVAP-majority always provides a *theoretical* opportunity, courts and experts in the field have phrased the § 2 requirement (for both liability and remedy in many instances) as providing "realistic opportunity," "reasonable opportunity," "practical opportunity," "effective opportunity," and like terms. *E.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1023 (8th Cir. 2006) ("[A]ll that is required is that the remedy afford Native-Americans a realistic opportunity to elect representatives of their choice."); *Kirksey v. Bd. of Superiors of Hinds Cty., Miss.*, 554 F.2d 139, 150 (5th Cir. 1977) ("These figures, adjusted upward to a skin-of-the-teeth 'maybe so' 50% of voting age population, were coupled with inconsistencies in predicting bloc voting patterns to support the inference of 'realistic opportunity.'"); *see also Bartlett*, 556 U.S. at 29 n.2 (Souter, J., dissenting) ("§ 2 simply provides that, subject to qualifications based on a totality of circumstances, minority voters are entitled to *a practical chance* to compete in a roughly proportionate number of districts.") (emphasis added).[14]

A "real opportunity" is not a guarantee of success, as the Court is mindful that § 2 does not guarantee electoral success for minority-preferred candidates. *LULAC*, 548 U.S. at 428 ("We have said that the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.") (citation omitted).[15] Along those lines, the Court

---

[14] Although in past practice some courts have imposed a 60 or 65% minority population rule to ensure an effective opportunity, this Court does not adopt such a rule and instead supports a particularized inquiry into the facts of each case to determine whether a particular district provides a reasonable opportunity. *See, e.g.*, *Cottier v. City of Martin*, 604 F.3d 553, 571 (8th Cir. 2010) (Smith, J., dissenting).

[15] *Uno v. City of Holyoke*, 72 F.3d 973, 979 (1st Cir. 1995) ("the statutory scheme does not provide an assurance of success at the polls for minority candidates"); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 449 (S.D.N.Y. 2010) ("This does not mean that Port Chester is obligated to guarantee electoral success for Hispanics, but rather the plan must provide a genuine opportunity 'to exercise an electoral power that is commensurate with its population.'") (citing *LULAC*, 548 U.S. at 428); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 763 (N.D. Ohio 2009) ("[T]here is no right under the Voting Rights Act to win; there is, rather, a right to meaningfully compete.").

rejects Plaintiffs' position that a district provides opportunity only if the district would allow minority voters to elect their candidate of choice more than 50% of the time in an exogenous election index. Section 2 does not require that minority-preferred candidates would win some number of exogenous statewide elections in a proposed district. Such a requirement is not compatible with the Supreme Court's directives that § 2 requires a searching, practical inquiry specific to the facts of each case.[16]

Performance of 50% or lower on a statewide exogenous election index does not automatically rule out minority opportunity. Based on the evidence, we know that CD23 may still perform relatively well for minority-preferred candidates even when its performance on statewide indices is equal to or less than 50%.[17] The OAG 10 indicated that benchmark CD23 performed for minority candidates in only 3 of 10 statewide elections, and Dr. Handley's 2011 and 2014 analyses indicated a 40% and 50% minority success rate. TrA617 (Handley). The Task Force indices revealed a 7/14 (50%) and a 3/7 (43%) success rate.[18] Nevertheless, despite the 50% or less success rate in those exogenous election indices, preferred-minority candidate success in the actual endogenous elections of the district demonstrates that benchmark CD23 did in fact provide "real electoral opportunity." *See* TrA592-93, TrA617-18 (Handley) (the endogenous election is most important to consider because it shows whether a district is actually performing for minorities, and she would not rely on

---

[16] *Gingles*, 478 U.S. at 79 (explaining that the proper assessment of vote dilution claims is "peculiarly dependent upon the facts of each case").

[17] In fact, this knowledge forms part of the basis for Dr. Alford's opinion that proposed CD23 would still perform in endogenous elections despite its poor performance on the exogenous election indices. Dr. Alford's opinion is discussed below.

[18] As these numbers demonstrate, a standard that relies on a certain percentage of wins in an exogenous election index is further undesirable because different indices reflect different success rates depending on the set of elections selected.

the exogenous election index in an existing district); *see also* Engstrom Corr. Rebuttal Report (docket no. 307-1) at 26-27; Tr512-15 (Engstrom) (to determine whether a district is an opportunity district, he would look to endogenous elections if there were any, and benchmark CD23's endogenous performance demonstrates that it was a Latino opportunity district despite its lack of performance in 2010). Of course a proposed district such as CD23 in Plan C185 will not have endogenous election indices to guide the determination, and performance on an exogenous election index (or various indices, preferably) will be important evidence in determining whether a district provides real opportunity to elect. The Court simply declines to adopt any bright-line rule that sets a specific success percentage on such indices for defining opportunity.

With these principles in mind, the Court turns to an examination of whether proposed CD23 provides "real electoral opportunity." The Court begins with the Supreme Court's decision in *LULAC v. Perry*, 548 U.S. 399 (2006), which concerned CD23 after the 2003 redistricting. In 2003, the Legislature, trying to protect Republican incumbent Henry Bonilla, reduced the HCVAP of CD23 from 57.5% to 46% and "the projected results in new District 23 show[ed] that the Anglo citizen voting-age majority [would] often, if not always, prevent Latinos from electing the candidate of their choice in the district." *Id.* at 427. Although the benchmark district "had not been an effective opportunity district," the district court found it was "moving in that direction," and the Latino candidate of choice won 13 of 15 statewide elections in the district in 2002. *Id.* at 428. The fact that Latinos had not yet won elections in CD23 itself did not resolve the issue of vote dilution, because the Latino majority was becoming more active and was increasingly voting against Bonilla, such that CD23's "Latino voters were poised to elect their candidate of choice." *Id.* at 438. Thus, the Court found that Latino voters had a real opportunity to elect that was taken from them by the redistricting.

18

*Id.* at 428-29.

On remand, the U.S. District Court for the Eastern District of Texas redrew CD23 to be an "effective Latino opportunity district" based on its HCVAP numbers (57.4%) and its election performance. *LULAC v. Perry*, 457 F. Supp. 2d 716, 721 (E.D. Tex. 2006) ("In addition to the HCVAP numbers, the underlying data from the statewide elections supports the conclusion that new District 23 will perform as an effective Latino opportunity district."). Even when drawn to be "effective" and with a 57.4% HCVAP, however, CD23 did not consistently perform for minority candidates of choice, and the elections were close. CD23 elected the minority-preferred candidate in the first two of three endogenous elections, with the loss in which Canseco was elected occurring during the Republican/Tea Party sweep in 2010. According to Dr. Engstrom, the 2010 election was highly racially polarized, and Latino turnout was low. Engstrom Corr. Rebuttal Report (docket no. 307-1) at 25-26; Tr509 (Latino support for Rodriguez was 84.7% while non-Latino support was only 18.1%) (Latinos were 40.77% of actual voters turning out); Tr514 (turnout was low compared to registration percentages); *see also* Tr1865 (Alford) (agreeing with Engstrom's turnout data).

In 2011, Republican leaders in the House and Senate were concerned that Canseco would lose the 2012 election unless the district was changed to protect him. TrA224-25 (Seliger) (agreeing that he thought it was possible that Canseco would lose in 2012 if the district were not reconfigured). Mapdrawer Ryan Downton knew that Canseco was not the Latino candidate of choice. Tr966 (Downton) ("I was told that he was not."); Downton 8-12-11 depo. (Joint Ex. J-62) at 90 ("I don't believe he was."). As it did in 2003, the Legislature therefore reconfigured the district to protect a Republican candidate who was not the Latino candidate of choice from the Latino voting majority in the district. And as it did in 2003, the Legislature intentionally split a largely Hispanic county

19

(Maverick County, which is 95.7% Hispanic) and city (Eagle Pass) to exclude from CD23 politically active Hispanics who would not support Canseco, while adding in all or parts of more Anglo counties.  TrA1666 (Downton) (admitting that some Maverick County Hispanics were excluded from CD23 because they would not support Canseco); Downton 8-12-11 depo. (Joint Ex. J-62) at 87 (portions of Maverick County were excluded because "Maverick County does not have a particularly good record of voting in high numbers for Republicans").  However, this time Downton and the Republican leadership took care to maintain SSVR and HCVAP levels above 50% (and in fact above benchmark), thus maintaining theoretical opportunity, while simultaneously manipulating the population of the district to decrease its potential effectiveness for Latinos.  This was not an easy task, given that the Senate-side mapdrawers had been unable to maintain CD23 as an opportunity district and still protect Canseco, TrA222-24 (Seliger), and it did not happen by accident. TrA524 (Flores) (the changes are systematic and precise, not accidental).

In addition to the Maverick County split to exclude politically active Hispanics who would not support Canseco, mapdrawers (specifically Downton) took steps to increase the turnout gap between Latinos and Anglos and to decrease Latino cohesion in the district.  Although Downton did not propose the "nudge factor" idea, Downton understood that manipulating Latino cohesion and turnout would affect a district's performance for minority voters.  Downton 8-31-11 depo. (Joint Ex. J-62) at 26-27.   Downton admitted to increasing the district's SSVR while simultaneously intentionally manipulating (decreasing) Hispanic voter cohesion in the district by including Republican Hispanics and excluding non-Republican (Democrat) Hispanics.  He stated that he did this by looking for precincts with high SSVR and including those with high voting percentages for

Republicans and excluding those with lower voting percentages for Republicans.[19]  The intentional use of race to maintain or increase the HCVAP and SSVR levels was not done to provide or protect Latino voter opportunity but rather "to create the facade of a Latino district."  *See LULAC*, 548 U.S. at 441 (noting that the use of race to create the facade of a Latino district weighed in favor of a § 2 claim); TrA525 (Flores).

Although Downton denied intentionally manipulating turnout, the Court does not find this denial to be credible.  More than 600,000 individuals were moved around to achieve the final configuration of CD23, and 39 voter tabulation districts ("VTDs") were split.  PL-1633.  Downton split two precincts in Maverick County, nineteen precincts in Bexar County, nine precincts in El Paso County, one precinct in La Salle County, and eight precincts in Atascosa County, and he did not provide any convincing explanations for the splits, indicating that race was being used as the basis for allocating population into and out of CD23.[20]  He moved in lower-turnout Hispanics and moved out higher-turnout Hispanics in some areas.  In other areas, he moved in Hispanics but simultaneously moved in Anglos with comparatively higher turnout rates.  The net effect across the district was to widen the participation gap by 4.1% (decreasing SSVR turnout and increasing non-SSVR turnout).  TrA519-20, TrA523-24 (Flores) (noting that non-Latinos in the district turn out at

---

[19] Of course, as Downton acknowledged, precincts with both high SSVR and high voting percentages for Republicans would not necessarily include only precincts with higher numbers of Hispanic Republican voters.  They could also reflect precincts with low Hispanic turnout and high Anglo Republican turnout or higher Anglo bloc voting levels.  Further, although Downton claimed this manipulation to allegedly include Hispanic Republicans was to help Republican Hispanic incumbent Canseco, he did not consult with Canseco about whether the changes would benefit him in the Republican primary, and Downton made changes that did not favor Canseco in this regard.  The Court finds that Downton's changes were not made to aid Canseco as a Hispanic Republican, but to make the district less effective for Hispanics, whom Downton viewed as synonymous with Democrats.

[20] *See Bush v. Vera*, 517 U.S. 952, 970-71 (1996) (given that RedAppl provides only racial data at the block level, the fact that a district splits VTDs and individual streets in many places suggests that racial criteria predominated over other criteria in determining the district boundaries).

almost a two-to-one rate compared to Latinos).[21]

Plaintiffs established by a preponderance of the evidence that turnout was manipulated in addition to cohesion, and the increases in SSVR and HCVAP were not intended to and did not maintain or improve Latino voting strength.  TrA518-19 (Flores).[22]  Instead, Downton used race to increase the SSVR and HCVAP of CD23 to create the facade of a Latino opportunity district, while he intentionally manipulated Hispanic voter cohesion and turnout to reduce the performance of the district for Hispanic candidates of choice.  Downton knew and intended that the changes would decrease performance for Latino-preferred candidates in the district, and he knew from the OAG 10 that he had achieved this intended goal.

Further, Solomons' statements on the House floor (which were likely prepared by Downton) actively misled other legislators about why changes were made and about the district's performance. He stated that mapdrawers maintained the performing nature of all the Hispanic-majority districts

___

[21] Defendants argue that changes in Bexar County were made to create new CD35 and maintain HCVAP levels in CD20, but Downton's explanations of why certain areas in Bexar County were included and excluded were not credible and were not supported by the evidence.  Further, Dr. Alford's conclusions regarding Bexar County are consistent with Plaintiffs' experts and do not undermine Dr. Flores's conclusions that the *overall* effect of areas moved in and out of CD23 was to decrease SSVR turnout, increase non-SSVR turnout, and widen the turnout gap.  In addition, the fact that the turnout analysis was based on 2010 turnout (a non-presidential year) and there may be lower minority turnout in such years than in presidential years (such as 2008) does not undermine the conclusion that the turnout gap was intentionally widened.  Flores compared turnout rates in the benchmark district and the proposed district *in the same election year* (2010), and found the turnout gap was significantly increased between the benchmark and the enacted plan. We can only speculate about what the turnout results may have shown in a different year; such speculation does not undermine Dr. Flores's results.

[22] The fact that the specific datasets originally requested by Opiela were not available in RedAppl does not undermine the conclusion that turnout was manipulated.  The evidence, including the testimony of Clare Dyer and the expert testimony, establishes that turnout could be manipulated based on data available in RedAppl.  In addition, the evidence indicates that the OAG produced reports showing estimated turnout by race for VTDs in the various districts, including CD23 (*see* US-600, Quesada-271); TrA1740 (Downton) (discussing the fact that US-601, a racially polarized voting analysis produced by the OAG, included estimated turnout percentage for Hispanic voters in CD23 in various elections).  Further, as Downton made changes to the district he could and did evaluate their impact on the district's performance for Latino candidates of choice.  Thus, any argument that Defendants lacked the necessary data to manipulate turnout is refuted by the evidence.

and that increases to SSVR in CD23 were necessary to "maintain the performing nature" of CD23 in particular.  D-603.2 at S367.  The evidence indicates that mapdrawers did not maintain the performing nature of the district, that it in fact performed worse, and that mapdrawers were not only aware of this fact but intended it.  Yet they claimed their use of race was to help Latino performance in order to maintain the facade of a Latino opportunity district.

Thus, to protect an incumbent who was not the choice of the Latino majority in the district and who they knew would likely be ousted in the next election by those Latino voters, mapdrawers intended to decrease and successfully decreased the performance of CD23 for minority-preferred candidates.  There was both discriminatory motive and improper use of race to achieve the desired goal.[23]  While § 2 does not require relief merely due to lower Latino voter turnout, intentionally targeting Hispanic voter turnout and cohesion while advantaging Anglo cohesion and turnout is qualitatively different.[24]  And when done to minimize Hispanic electoral opportunity, it bears the mark of intentional discrimination.

The Court also finds that the reconfiguration of CD23 had the intended effect insofar as it decreased minority performance.  This decrease in performance is undisputed, but the parties do dispute whether CD23 still provided an opportunity for minority voters to elect.  As noted above,

_____

[23] While incumbency protection may be a legitimate goal standing alone in certain circumstances, "winning an election does not empower anyone in any party to engage in purposeful racial discrimination." *N. Ca. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 226 (4th Cir. 2016).  As Judge Costa recently noted, discriminatory purpose can be the product of "elected officials engag[ing] in the single-minded pursuit of incumbency." *Veasey v. Abbott*, 830 F.3d 216, 335-36 (5th Cir. 2016) (Costa, J., dissenting in part) (citing *Garza v. Cty. of L.A.*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring); *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) ("[M]any devices employed to preserve incumbencies are necessarily racially discriminatory."); *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291, 313 (D. Mass. 2004) (noting that incumbency protection in its traditional form is often thought to be a legitimate consideration in redistricting; "[t]he issue becomes more complex, however, when race is used as a tool to achieve incumbency protection").

[24] This is even more true given the well-documented history of discrimination against Hispanics in Texas and its lingering effects on their electoral participation, which is discussed later.

although a district may provide theoretical opportunity given its majority-HCVAP status, whether a proposed district provides "real electoral opportunity" must be determined through an examination of the totality of the circumstances, including its performance on exogenous election indices.

All of the Plaintiffs' experts opined that CD23 in Plan C185 does not provide electoral opportunity. Dr. Flores concluded that proposed CD23 was not an opportunity district and that a Hispanic candidate would find it very difficult to get elected. Tr454-55. Dr. Arrington also testified that the exogenous election index indicates that CD23 offers no opportunity for Hispanics to elect a candidate of their choice. TrA405. Dr. Engstrom concluded that CD23 was not a Latino opportunity district. Tr515-16. Dr. Lichtman stated that CD23 does not provide a reasonable opportunity to elect minority candidates of choice. Tr1235-36 (also noting that the candidate of choice of Latino voters lost five general elections in 2008 and 2010, and in some cases by wide margins); Joint Expert Ex. E-3 at 15-17, Table 8. Dr. Handley performed a functional election-based analysis of CD23, using its demographics as a starting point, and then considering election performance, racial bloc voting analyses, crossover, cohesion, and participation rates, and concluded that CD23 in Plan C185 would not have given minority voters an opportunity to elect candidates of choice. TrA590-92 (Handley). Her 2014 exogenous election index using six statewide, top-of-the-ticket elections from 2002 to 2012 that included a minority-preferred minority candidate showed 0/6 wins for the minority-preferred candidates. TrA596 (Handley).

Even Dr. Alford stated that he would not count CD23 as "effective" or "performing" for Latinos (though of course that is not the measure of opportunity). Tr1839, Tr1878; Alford depo. (Joint Ex. J-43) at 139; D-430 (also finding 0/6 wins for Democrats in his reconstituted exogenous election analysis). In his 2014 testimony, however, Dr. Alford opined that CD23 is capable of

electing a Democrat (which he equates with Latino candidate of choice) even though it "tilts Republican" in the exogenous election index, and he performed a "reconstituted mosaic" analysis to determine whether this might be true in Plan C185.  He concluded that in Plan C100 and Plan C235, there is the potential for the CD23 endogenous election to be more favorable to minority candidates than the exogenous pattern would suggest, and his analysis suggested that it was at least possible that the same would be true for the Plan C185 configuration.  TrA1857 (Alford).  However, the Court finds that Alford's unique methodology and conclusions are too speculative to be afforded much weight, and his conclusions are outweighed by the numerous expert opinions offered by Plaintiffs that CD23 as configured in Plan C185 does not provide real electoral opportunity.

In addition to the expert analyses and exogenous election indices indicating that CD23 as enacted in Plan C185 does not provide real electoral opportunity, all of the experts agreed that there is racially polarized voting in Texas, and the State conceded this point with regard to all areas included in CD23.  As noted, Dr. Engstrom found significant racially polarized voting in the 2010 general election for CD23.  Engstrom Corr. Rebuttal Report (docket no. 307-1) at 25; Tr509 (incumbent Rodriguez received an estimated 84.7% of the votes cast by Latinos and just 18.1% of those cast by non-Latinos).

The Court further considers the mapdrawers' fracturing of Maverick County and politically active communities in South San Antonio.  Disruption of politically active and cohesive Latino voting areas has the foreseeable effect of depressing Latino turnout, magnifying the increase in the turnout gap identified by Dr. Flores.  *See LULAC*, 548 U.S. at 440 (noting that the State acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo).

25

Plaintiffs also provided evidence concerning the lingering effects of past discrimination on Latino voter turnout and electoral opportunity.  Several courts have recognized the "long history of discrimination against Latinos" in Texas and its role in the electoral process.  *LULAC*, 548 U.S. at 439-40 (citing cases); *LULAC v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993) ("Texas' long history of discrimination against its black and Hispanic citizens in all areas of public life is not the subject of dispute among the parties. Nor has anyone questioned plaintiffs' assertion that disparities between white and minority residents in several socioeconomic categories are the tragic legacies of the State's discriminatory practices.").  The Supreme Court has further recognized that "the 'political, social, and economic legacy of past discrimination' for Latinos in Texas may well 'hinder their ability to participate effectively in the political process.'"  *LULAC*, 548 U.S. at 440 (citations omitted).

Dr. Andres Tijerina's expert report was admitted without objection. Joint Expert Ex. E-10. He opined on the history of the violation of civil rights of Latinos in Texas and the use of devices related to voting to limit the Mexican-American vote.  *Id.*; Tr592-96 (discussing use of the white man's primary, the poll tax, the literacy clause, intimidation, corralling, slating).   He testified that those devices "left a legacy that hinders and has prevented Mexican-Americans from feeling comfortable and feeling any trust in the electoral system." Tr595.  He states that "[t]he legacy of 150 years of multi-faceted government-condoned discrimination against Mexican Americans in Texas is a state educational system that maintains a high drop out rate and is still characterized by widespread segregation." Joint Expert Ex. E-10 at 30.  He further concludes that, "[a]s a result of the historical discrimination against Mexican Americans in Texas, they still bear the effects of this discrimination which hinders their ability to participate effectively in the political process" and "[i]t is clear that the lower rates of voter registration, voting, and running for elective office are directly

related to this discrimination." *Id.* at 32; Tr596 (Tijerina) (legacies of past discrimination affect voter registration, voter turnout, campaign organization, running for office, and voting itself).

Dr. Susan Gonzalez-Baker's report was admitted without objection. Joint Expert Ex. E-9. She concluded that it is clear "that Latino educational achievement lags far behind that of Non-Latino Whites in the same age bracket." *Id.* at 7. Further, "absolute median incomes are substantially lower for both [Latino] men and women than they are for Non-Latino Whites." *Id.* at 9. Dr. Baker noted that the ACS data "speak to a continuing pattern of disadvantage with respect to social and economic well-being, one that is likely to persist for some time into the future." *Id.* "[O]n indicators spanning a range of topics from educational attainment to childhood poverty, to female-household-headship poverty, to income, to unemployment, Latinos display a continuing legacy of disadvantage relative to their Non-Latino counterparts." *Id.* at 10.

Dr. Jorge Chapa's report was admitted without objection. Joint Expert Ex. E-1. Dr. Chapa surveyed certain counties with large Hispanic populations and established that Texas Hispanics have lower levels of both education and income and higher poverty rates when compared to non-Hispanics, and these disparities have persisted throughout the 20th Century. *Id.* at 4-5. Dr. Chapa noted that the lingering effects of past discrimination such as lower economic and educational attainment are strongly associated with lower rates of registration, voting, and participation in the political system. *Id.* at 5 ("[D]iscrimination still has a strong present day impact on the education, income and earning of Hispanic Texans."); *id.* at 16 (noting effect on voter registration and turnout); Tr179-80, Tr203 (lower economic and educational attainment are strongly associated with lower rates of registration, voting, and participation in the political system); Tr189 (there are lower levels of income, education, and earnings that continue to the present day and they have the lingering effect

of lowering the Latino participation rates in vote and registration and politics in general); Tr200 (there are a plethora of studies that show that people with lower levels of education and lower incomes participate less in our electoral system); Tr201 (there are lower registration rates and lower participation rates among registered voters).

Dr. Lichtman analyzed turnout rates (as a percentage of voting age population) for Hispanics, African-Americans, and Anglos in five elections (2008 President, 2008 US Senate, 2008 Supreme Court Chief Justice, 2010 Governor, and 2010 Lt. Governor) and found a statewide mean turnout rate of 14%, 39%, and 52%, respectively.  Joint Expert Ex. E-3 at 10, Table 3. The Fifth Circuit also recently noted in the voter ID case that "the record contains evidence that minority voters generally turn out in lower numbers than non-minority voters and that State-sponsored discrimination created socioeconomic disparities, which hinder minority voters' general participation in the political process." *Veasey v. Abbott*, 830 F.3d 216, 261 (5th Cir. 2016).  It is undisputed that Latino voter turnout in CD23 in 2010 was low.  Tr509, Tr514 (Engstrom); Engstrom Corr. Rebuttal Report (docket no. 307-1) at 25-26; Tr1865 (Alford).

Considering all the evidence, including the mapdrawers' intent to protect an incumbent who was not the Latino candidate of choice and to lower the Latino performance of CD23, the expert testimony, the high level of racial polarization, the low Latino voter turnout, the manipulation of voter turnout and cohesion, the increase in the turnout gap, the splitting of cohesive, politically active areas (Maverick County, San Antonio), and the lingering effects of past discrimination on turnout and electoral participation, the Court finds that CD23 does not provide real electoral opportunity.

In sum, the VRA does not require that minority opportunity districts be drawn to give minorities a sure chance or even the best chance at electing their candidates of choice.  Minorities

are not immune from the obligation to "pull, haul, and trade to find common political ground." *De Grandy*, 512 U.S. at 1020. Section 2 does not require those who draw election districts to draw majority-minority districts with the most potential or to maximize minority voting strength, nor does it always require mapdrawers to account for low voter turnout. However, it does require equality of opportunity, and that equality is lacking where the mapdrawers take steps to intentionally disadvantage Hispanic voters in the district, even if done to further political goals. Including lower-turnout Hispanics and excluding higher-turnout Hispanics (and fracturing politically cohesive and active Hispanic communities), while simultaneously including higher-turnout Anglos in the district ensures that Hispanics have less practical opportunity to elect. Although the State contends that it has no obligation to account for low Hispanic voter turnout, it certainly has an obligation to avoid treating Hispanic voters less favorably than Anglo voters in determining the population of the district. Similarly, mapdrawers cannot intentionally target Hispanics by including less cohesive Hispanic precincts and those with higher Anglo cohesion in an attempt to depress Hispanic opportunity to elect. Because mapdrawers had the intent to provide Hispanic voters less opportunity to participate in the political process and elect their candidates of choice, and they effectuated that intent in CD23, CD23 violates § 2 in both intent and in effect.

### 2. CD23 Shaw-*type racial gerrymandering claims*

The Task Force Plaintiffs also mount a *Shaw*-type racial gerrymandering claim against CD23. *See* docket no. 416 at 36; docket no. 1313; docket no. 1308; Fourth Am. Complaint (docket no. 891) ¶ 56. Defendants do not contest standing on this claim. *See* docket no. 1310. Plaintiffs Gilberto Torres and Socorro Ramos live and vote in CD23 in Plan C185, and thus they have standing to assert this claim. Docket no. 277 at 17 (stipulated); *Shaw v. Hunt*, 517 U.S. 899 (1996); *Bush v. Vera*, 517

U.S. 952 (1996).[25]

The Supreme Court recently reaffirmed that a *Shaw*-type racial gerrymandering claim is "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015). The plaintiff's evidentiary burden is "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motiving the legislature's decision to place a significant number of voters within or without a particular district." *Id.* at 1267. In *Alabama Legislative Black Caucus* ("*Alabama LBC*"), the Court recognized such a claim in plaintiffs' evidence "that the legislature had deliberately moved black voters into [certain] majority-minority districts . . . in order to prevent the percentage of minority voters in each district from declining." *Id.* at 1266-67.[26]

In this case, there is clear evidence that Downton moved certain populations of Hispanics into CD23 to increase its SSVR and HCVAP numbers. In doing so, traditional redistricting principles such as respecting city and county boundaries were subordinated to this racial goal when Downton

---

[25] MALC also asserts that it has mounted *Shaw*-type claims against CD23. *See* docket no. 1309 at 7. MALC member Pete Gallego resides in proposed CD23 in Plan C185, which would provide standing to assert such a claim. Docket no. 258-3. However, Defendants contend that MALC has not in fact raised a *Shaw*-type claim, but instead has raised only an intentional discrimination claim under the Equal Protection Clause. Defendants argue that although MALC uses the term "racial gerrymandering," it has done so only in the context of vote-dilution claims and has not pleaded or pursued an independent claim of racial gerrymandering under *Shaw*. The Quesada Plaintiffs also provided briefing concerning how the evidence establishes a *Shaw* claim in CD23. *See* docket no. 1305. The Court need not decide at this time whether these or other Plaintiffs have asserted such a claim.

[26] Even more recently, the Supreme Court reaffirmed the principles it set forth in *Alabama LBC*, the *Shaw* line of cases, and *Miller v. Johnson*. *Bethune-Hill v. Va. State Bd. of Elections*, __ S. Ct. __, __ (2017) ("The Court reaffirms the basic racial predominance analysis explained in *Miller* and *Shaw II*, and the basic narrow tailoring analysis explained in *Alabama*."). *Bethune-Hill* additionally made clear, however, that "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering" and that courts should evaluate the predominant motive for the design of the district as a whole. *Bethune-Hill*, __ S. Ct. at __.

placed half of Maverick County into CD23 solely to maintain Hispanic numbers, splitting both Maverick County and the City of Eagle Pass. Downton 8-12-11 depo. (Joint Ex. J-62) at 35 (stating that half of Maverick County was placed into CD23 to make sure they were not reducing Hispanic population percentages); *id.* at 86 ("And so 23 in order to stay at benchmark level needed to be more Hispanic in other areas. I think that's why Maverick County is included."); *id*. at 88 (Maverick County population was included solely to maintain Hispanic numbers "to comply with the Voting Rights Act" and not for political reasons); TrA1642 ("we had to maintain the existing majority Hispanic status" of CD23); TrA1754-56 (Downton) (he was not paying attention to the City of Eagle Pass boundaries when adding in Hispanic portions of Maverick County even though the City is a community of interest). Downton and Interiano stated that maintaining or increasing Hispanic percentages needed to be done to comply with the VRA. Downton 8-12-11 depo. (Joint Ex. J-62) at 88, 73-74 (stating that they tried to comply with the VRA "to make sure that [CD23] wasn't subject to court challenge" by maintaining or increasing all Hispanic population percentages, including total population, HVAP, SSVR, and HCVAP). Downton also stated that he deliberately looked for and included certain precincts with high SSVR. The Court finds that race was the predominant motive in the decision to include significant numbers of Latino voters into CD23, triggering strict scrutiny.

To survive strict scrutiny, the challenged districting plan must be narrowly tailored to serve a compelling governmental interest. *Bush*, 517 U.S. at 976. Downton indicated that he was trying to increase HCVAP enough to be safe from a VRA challenge even though the district's minority

electoral performance remained low.[27]  US-630 (May 28 email).  Downton testified that he was the one who "made the call" regarding inclusion of part of Maverick County.  TrA1668.  However, increasing Hispanic numbers simply to avoid a VRA challenge and without attempting to ensure or maintain opportunity to elect (to comply with § 2) or ability to elect (to comply with § 5) (and in fact working to decrease such opportunity and/or ability) cannot survive strict scrutiny because such use of race was not to comply with the VRA.  *See Alabama LBC*, 135 S. Ct. at 1274-75 (use of race to preserve minority percentages without preserving minority ability to elect would not be narrowly tailored to comply with § 5); *Bush v. Vera*, 517 U.S. 952, 959, 976 (1996) (explaining that to survive strict scrutiny, the district must be narrowly tailored to further a compelling governmental interest).

The Court thus finds that Plaintiffs have established a *Shaw*-type equal protection violation in the drawing of CD23 because the use of race predominated in the decision to include substantial population within and without the district, subordinating traditional redistricting principles, and the use of race was not narrowly tailored to comply with a compelling state interest.[28]

---

[27] Doug Davis, the Director of the Senate Redistricting Committee, also testified that he believed CD23 complied with the VRA because they increased the relevant population metrics (Hispanic population, HVAP, HCVAP, and SSVR), though he did not know whether these changes increased Latino ability to elect. Davis depo. (Joint Ex. J-58) at 52-53.  He also indicated that VRA compliance was measured primarily by meeting or exceeding benchmark population numbers, and that election performance in terms of ability of elect was an issue left to counsel. *Id.* at 23-25.

[28] *Alabama LBC* indicates that *Easley v. Cromartie*, 532 U.S. 234, 258 (2001) sets forth the plaintiff's burden in cases in which the plaintiff asserts a *Shaw*-type claim against a majority-minority district where racial identification correlates highly with political affiliation and the State argues that politics, not race, was its predominant motive. *Alabama LBC*, 135 S. Ct. at 1267.  In that case, the issue was whether individuals were included in a district because they were African American or because they were Democrats—in other words, "whether the legislature drew District 12's boundaries because of race *rather than* because of political behavior (coupled with traditional, nonracial districting considerations)." *Easley*, 532 U.S. at 257 (emphasis in original).  That is not the question presented here with regard to CD23.  Rather, Defendants admit (and the evidence demonstrates) that a portion of the population of CD23 (half of Maverick County) was included because they were Hispanic and for no other reason.  In addition, according to Downton, certain precincts were included because they were Hispanic *and* Republican.  The fact that, among those Hispanics being considered for inclusion, Downton purportedly tried to choose more Republicans than Democrats, as Downton stated that he did (or, as the Court has concluded, lower turnout Hispanics) does not negate the fact that individuals were first selected for inclusion because of their race.  Race, not politics, was the predominant inclusion criterion.  And, as discussed, the use of race was not to comply with the VRA and thus did not further a compelling state interest.

### 3. CD35 Shaw-*type racial gerrymandering claim*

Although Defendants contend that the Rodriguez Plaintiffs have not asserted any *Shaw*-type claims, *see* docket no. 1310 at 4-5, these Plaintiffs have plainly asserted such a claim related to CD35 throughout this litigation as part of their Fourteenth Amendment equal protection claim.[29]  The Court recognized this in its March 19, 2012 order, in which it noted that "[c]ertain Plaintiffs, but primarily the Rodriguez Plaintiffs, contend that CD 35 is an impermissible racial gerrymander."  Docket no. 691 at 41-42.  The Court concluded that, "[w]hether CD 35 crosses the line from a permissible § 2 district to an impermissible racial gerrymander is a close call" and then analyzed the district under the *Shaw* line of cases.  *Id.* at 42-49.

The Rodriguez Plaintiffs contend that the new CD35 was drawn predominantly on the basis of race but is not a reasonably compact district and does not comply with § 2.  *See* docket no. 424 at 26; docket no. 1277 at 40-41.  In support, they note that Defendants' expert Todd Giberson ranked

---

[29] *See, e.g.*, docket no. 229 at 10 ("Plaintiffs prevail if they 'show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)); docket no. 603 at 7 ("CD 35 is also inconsistent with the equal protection requirements in cases such as *Shaw v. Reno* and, more recently, *Bartlett v. Strickland.*"); docket no. 623 at 68-69 ("For related reasons, C185's CD 35 is constitutionally flawed under the *Shaw v. Reno* line of cases, barring race-based redistricting based on convoluted lines and bizarre shapes.  CD 35, in fact, strongly resembles the prototypical North Carolina district, CD 12, that gave birth to the *Shaw v. Reno* doctrine."); docket no. 896 (Second Am. Compl.) at 11 (noting that Plan C185 uses race as a tool to divide Travis County and Austin and "[i]n so carving up the residents of Travis County and Austin, the legislature disregarded traditional and neutral redistricting principles").  Their live Complaint asserts that Plan C185 violates the Equal Protection Clause by purposefully fragmenting Hispanics and African-Americans in all regions of the state, dispersing them among numerous districts without regard to traditional and neutral redistricting principles; that the Legislature carved up the residents of Travis County and Austin by using race and disregarded traditional and neutral redistricting principles; and that Plan C185 uses race as a tool for no compelling reason to destroy CD25 in Travis County.  Docket no. 896 at ¶ 18.  The fact that Plaintiffs specify an improper purpose does not mean that they are not asserting a *Shaw*-type claim.  While an intentional vote dilution and a *Shaw* claim are analytically distinct, meaning the Court must analyze them under different rubrics, they are not mutually exclusive, and the allegations are sufficient to support both types of claims.

it as the least compact district in Plan C185 by each of the three technical compactness measures,[30] that Dr. Alford also stated it was not a compact district, and that Downton stated it was "borderline" and that he had his doubts that the district was required by § 2.  Docket no. 1277 at 40-41; Joint Expert Ex. E-18 (Giberson report); Alford depo (Joint Ex. J-43) at 42-44 (noting that CD35 caught his eye and was "definitely not a compact district"); Tr987-88 (Downton).  The Rodriguez Plaintiffs further argue that CD35 is "tenuous . . . in terms of the way it links different communities of interest, as well as the way it disregards traditional districting criteria."  Docket no. 424 at 28; docket no. 1277 at 42.  They note that in Travis County, mapdrawers "went to extreme lengths to gather in Hispanic population" and that minority communities in San Antonio and Austin were linked in a questionable manner into the non-compact new CD35.  Docket no. 424 at 28-29; docket no. 1277 at 43.  Their claim therefore addresses the elements of a *Shaw*-type racial gerrymandering claim—that race was improperly used in the drawing of the district boundaries, that race was the predominant factor motivating the decision to place a significant number of voters within the district (such that traditional districting criteria were disregarded or subordinated to racial criteria), and that such use of race was impermissible (would not survive strict scrutiny) because the district is not compelled by or drawn in compliance with the requirements of § 2 of the VRA.

Although the Rodriguez Plaintiffs assert an interrelated claim under *Bartlett v. Strickland* that Defendants intentionally destroyed a viable crossover district in Travis County (benchmark CD25) and an intentional vote dilution claim, that does not mean they are only asserting an intentional discrimination claim.  As they noted in their Advisory in response to the Court's request for briefing

---

[30] Giberson also found that CD35 was not "compelling from a Section 2 standpoint."  Giberson depo. (Joint Ex. J-42) at 100-01.

after the *Alabama LBC* decision, "Crossover CD25's dismantlement contains elements of both intentional minority vote dilution and a racial gerrymander.  The intentional vote dilution suffices to invalidate it, but the predominance of race in the way it was accomplished also would invalidate it, in light of *Alabama LBC*, as a racial gerrymander."  Docket no. 1302 at 3 n.1.  Thus, the Rodriguez Plaintiffs have stated a *Shaw*-type claim against CD35, and Plaintiffs Eddie Rodriguez and Betty Lopez have standing to assert this claim because they live in CD35 in Plan C185.  Docket no. 277 at 17 (stipulated).[31]

In its interim map order concerning the CD35 *Shaw*-type claim, this Court concluded that this was a "mixed motive" case as described by a plurality of the Court in *Bush v. Vera*, 517 U.S. 952, 959 (1996), and noted that in such cases "determining when traditional districting criteria have become subordinated to race is highly fact specific and difficult."  Docket no. 691 at 44.  The Court did not find Plaintiffs likely to prevail on this claim because Plaintiffs had "not convinced the Court at [that] stage that district lines in CD 35 were manipulated to such an extreme degree" that race predominated.  Docket no. 691 at 46.  The Court now finds that its preliminary finding—made without the benefit of a full examination of the evidence—was in error.  A careful review of the evidence shows that CD35 was drawn in such a manner that race predominated.  Further, the Court finds that CD35 does not survive strict scrutiny.

The Court's fact findings based on the entire record provide ample support for the conclusion that race was the predominant factor motivating the decision to place a significant number of voters

---

[31] Although Defendants have argued that Plaintiff Eddie Rodriguez was not harmed because he remained in a Latino opportunity district, *see, e.g.*, TrA851-52 and docket no. 1272 at 126, that argument misunderstands the harm that confers standing to assert a *Shaw*-type racial gerrymandering claim.  The harm flows from being "personally . . . subjected to [a] racial classification," not from vote dilution or intentional discrimination.  *Alabama LBC*, 135 S. Ct. at 1265.

within or without CD35.  It is undisputed that the Legislature, and its mapdrawer Ryan Downton, intended to create CD35 as a new Latino opportunity district, meaning it had to have over 50% HCVAP.  Tr915-16 (Downton) (stating that he was "directed to" create "a new citizen voting age population majority district for Hispanics in Texas"); Tr918 (Downton) ("When we drew the map originally, we were focused on getting District 35 above 50 percent of HCVAP."); TrA1642 (Downton) ("When we were creating District 35, we were creating a Section 2 majority Hispanic CVAP district, so it had to be over 50 percent.").  That criteria (a majority HCVAP) was the number one criteria for drawing the district, and could not be compromised for any other purpose or traditional districting criteria.  Downton 8-12-11 depo. (Joint Ex. J-62) at 86 ("We had to keep or we wanted to keep 35 above 50 percent.").

Defendants admit that Downton set out to draw a majority-HCVAP district when he drew CD35 and that he considered racial data to reach the 50% threshold.  Docket 1272 at 126.  However, Defendants argue that non-racial factors, including placing the district where the population growth occurred and partisan politics (including targeting Congressman Lloyd Doggett), as well as other considerations such as requests from Texas House Representatives to keep Guadalupe County whole or to weight the district more heavily toward Bexar County played a role in shaping the district.  The Court finds that while other factors did play some role in shaping the district, racial criteria had a qualitatively greater influence on the drawing of district lines and selection of district population, such that race predominated over other districting criteria and those other criteria were subordinated to race.[32]

---

[32] The Court notes that the only traditional redistricting principles that Downton could say he complied with in Travis County were "[r]edistricting for partisan purpose[s], protecting incumbents, [and] compliance with the Voting Rights Act with respect to 35."  TrA1781 (Downton).  The Court further notes that CD35 was not drawn to protect

Previously, the Court found significant that although Downton admitted to trying to include Hispanics in the Travis County portion of CD35, Downton had not maximized the Hispanic population in CD35 because some Travis County Hispanics were left outside CD35. *See* docket no. 691 at 46-47. Because of this, the Court noted that "Plaintiffs' assertion that the Legislature 'went to extreme lengths to gather in Hispanic population' [was] not fully supported by the evidence." Docket no. 691 at 47. Upon a full review of the record, the evidence has shown that Downton was trying to weight the district more toward Bexar County at the request of certain Representatives, and thus he did not maximize the number of Hispanics in the Travis County portion of CD35. It is clear, however, that whatever population Downton chose to include in the Travis County portion of CD35, he included because that population was Hispanic and not for other reasons. *See, e.g.*, TrA1673-1674 (Downton stating that he included "the Hispanic areas of Travis County" in CD35), Tr989 (with regard to an area in north central Austin included in CD35, he said, "If that is a Hispanic area, and I think it is likely that it is, then, yes, it would have been included in District 35 as we were trying to create a Hispanic majority district.").

Downton admitted to drawing the Travis County portion of the district using racial shading in order to find concentrated Hispanic populations to include in CD35. TrA1674-75 ("At some point in trying to get District 35 over the 50 percent threshold, I also turned on racial shading for Travis County to find the concentrated Hispanic populations to draw them in to get over the 50 percent benchmark."). This led to some precinct splits, including the Precinct 433 split to divide St. Edward's University to place the dorms (with large Hispanic student population) into CD35, while

---

incumbent Lloyd Doggett, whose district CD25 was primarily affected by CD35. TrA1781 (Downton) (stating that he protected Congressmen Flores, McCaul, and Smith).

placing the administration building in CD21, and the Precinct 440 split to include an arrowhead

shape containing the Riverside apartments (a more Hispanic population) within CD35.  Tr1198-99

(Butts); TrA1631 (Downton) (stating that sometimes splitting precincts was required by the VRA).[33]

Downton admitted that the "squiggle" at the northern part of CD35 was included to increase

Hispanic population, and racial shading confirmed that this area was 90-100% Hispanic.  Tr989

(Downton).  He also noted that he split the African-American community in East Austin because he

had to include some of that population in CD35 "to create a conduit to pick up the rest of the

Hispanic population in the northwest part of 35."  TrA1779 (Downton).[34]  When asked why he

wanted "to go up to the northwest part of 35 to join Hispanic population to south San Antonio," he

responded, "Because we were trying to create a Hispanic opportunity district that was over 50

percent HCVAP."  *Id.*  Downton admitted that he paid no attention to the City of Austin boundaries.

TrA1782  (stating he did not pay attention to City of Austin boundaries when drawing CD35).  The

CD35 district lines in Travis County do not match up with any city boundaries, with House districts,

or with any recognizable communities of interest other than race.  TrA1780-81 (Downton) (agreeing

---

[33] *See Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 670 (5th Cir. 2009) (noting that "it is obviously questionable whether splitting members of geographically contiguous communities in interest, *i.e.*, the colleges, into separate constituencies would have been legally satisfactory" and "[a]ny plan that split USM into multiple wards, furthermore, would be highly suspect on its face").

[34] Although Downton testified that he made efforts in the DFW area to "keep the black population together" in a district, he knowingly split the African-American population in Austin because, as he said, including "that block [an African-American block] was necessary to create a conduit to pick up the rest of the Hispanic population in the northwest part of 35." TrA1779 (Downton).  Thus, whereas Downton felt that "keeping the black population together" in DFW was part of the traditional redistricting principle of keeping communities of interest together, he was willing to split up this Austin African-American population to reach an HCVAP-majority in CD35.  Further, Downton was aware that African-American voters in Travis County are strongly cohesive Democrats, and if he had simply been including Democrats in CD35, he would not have felt that including this African-American population "was necessary" to achieve his goal of including Hispanics, further evidencing that his goal was simply to include Hispanics.  (The Court also notes that Defendants have not seriously contended that certain populations were included in CD35 because they were Democrats (as opposed to Hispanics), but they have instead asserted that creation of CD35 furthered the political goal of attempting to unseat Doggett.  As discussed herein, that racial criteria are used to further a political goal does not negate or excuse the use of racial criteria.)

that the various House districts were divided among several congressional districts); TrA1776 (Downton) ("I think I kept the Hispanic community of interest in east Austin together in District 35.").[35]

In the Bexar County portion of CD35, Downton included areas with high percentages of Hispanic residents and voters and excluded less Hispanic areas.  Downton 8-12-11 depo. (Joint Ex. J-62) at 116 (noting that they tried to raise Hispanic percentages in CD35 by including Hispanics from Bexar County); *id.* at 120 (noting that the fact that CD35 is narrow in northern Bexar County is a "Voting Rights Act issue" because "[t]hat northeastern part of Bexar County has a very low concentration of Hispanics, so if we had widened that out up there, it would cause a problem in keeping another majority Hispanic district"); TrA1642-43 ("So in creating District 35, originally, we took a lot of Hispanics out of District 20 to put them into District 35"; and after moving some Hispanic population to increase Hispanic numbers in CD20, "we had to get additional Hispanic population into District 35 to replace what we were giving back to 20, and then we took that from 23"); TrA1752-53 (stating that he did not know about or attempt to consider actual communities of interest in San Antonio, and that he was trying to create districts under the VRA and was "required to consider race to create those"); Davis depo. (Agreed Ex. J-58) at 99-100 (noting that the downtown San Antonio area moved from its historic location in CD20 to the new CD35 was a

---

[35] Defendants also state that CD35 reflects the significant Hispanic growth in this area.  However, Travis County was not an area of significant Hispanic growth compared to other areas of the State, and in fact Anglo growth kept pace with Hispanic growth.  *See, e.g.*, TrA936 (Ansolabahere) (noting that Travis County was the one area where Anglo growth roughly kept pace with minority growth); D-222 (Gonzalez-Baker Table 2) (showing an increase in HCVAP in Travis County between 2000 and 2010 from 102,342 to 126,810 (approximately 24,000), compared to an increase of almost 50,000 in Dallas County, 42,000 in Tarrant County, and 120,000 in Harris County).  In terms of percentage increases, Exhibits D-230 (2000 census) and D-231 (2008-2012 ACS) show that the percentage HCVAP of Travis County increased from 18.86% to 21.05%, while Nueces County increased from 50.97% to 55.87%, Tarrant County from 11.37% to 15.44%, Dallas County from 14.11% to 20.39%, and Harris County from 19.04% to 25.36%.

"Latino community that . . . the policymakers chose to use as a base for the new 35th district").

Further, as discussed more fully in the fact findings, although Rep. Kuempel wanted Guadalupe

County kept whole in CD15 and mapdrawers wanted to keep small cities whole, these goals were

compromised to keep the HCVAP of CD35 above 50%.  TrA1655, TrA1663 (Downton).

The evidence is clear that racial considerations predominated in the determination of what

population to include in CD35.[36]  That Downton and the Legislature also had the purpose of using

CD35 to try to unseat Lloyd Doggett (who lives in Austin/Travis County) does not negate the finding

that they used race to do so.  *See Shaw*, 517 U.S. at 907 (noting that the fact that the legislature

addressed other interests, including creating one rural and one urban district and partisan politicking,

"does not in any way refute the fact that race was the legislature's predominant consideration");

*Bush*, 517 U.S. at 959, 962 (finding that race was the predominant factor even when the redistricting

process was not "purely race-based"); *Clark v. Putnam Cty.*, 293 F.3d 1261, 1270 (11th Cir. 2002)

("[The] fact that other considerations may have played a role in . . . redistricting does not mean that

race did not predominate."); *Harris v. McCrory*, 159 F. Supp. 3d 600, 615 (M.D.N.C. 2016) (even

in a "mixed-motive suit"—in which a state's conceded goal of "produc[ing] majority-minority

districts" is accompanied by "other goals, particularly incumbency protection"—race can be the

predominant factor in the drawing of a district without the districting revisions being "purely

race-based"), *probable jurisdiction noted*, 136 S. Ct. 2512 (2016) (No. 15-1262).

The Legislature could have simply divided Travis County and Austin Democrats among five

---

[36] In accordance with the Supreme Court's recent pronouncement in *Bethune-Hill v. Virginia State Board of Elections*, __ U.S. __ (2017), the Court makes clear that although it has analyzed certain portions of CD35 in isolation for evidence that race predominated and that traditional redistricting principles were subordinated to race, its finding that race predominated in the drawing of the district applies to the district as a whole.

Republican districts to unseat Doggett.  They did not do so, as the evidence demonstrates (including the supplemental report of Dr. Ansolabahere, showing that the district lines correspond more strongly with race than with party affiliation).  Downton chose which population to include in CD35 on the basis of race, not political affiliation.[37]  He created a Hispanic-majority district so that he could use the creation of exactly such a district (which appeared to be friendly to Hispanic voters and in compliance with the VRA) to fulfill a political motive of unseating Doggett in part by putting Doggett's Hispanic constituents in a Bexar-County weighted district.[38]  And placement of a new VRA district in part in Travis County allowed the Republican-dominated Legislature to create a new majority-minority district while simultaneously destroying an existing Democrat district, in accord with the objective to create a "3-1 map" that increased the number of Republican seats by three and Democrat seats by only one.  The fact that creation of an HCVAP-majority district also fulfilled a political goal does not mean that the district was not created with race as the predominant consideration.  The Court thus finds that race predominated in the drawing of CD35 and that strict scrutiny applies.[39]

---

[37] Again the Court finds this case to be distinguishable from *Easley v. Cromartie*, 532 U.S. 234 (2001).  This is not an issue of whether population was included in CD35 because they were Hispanic or because they were Democrat. Rather, mapdrawers relied on race to create a majority-HCVAP district and advanced political motives (dividing Travis County/Austin Democrats among numerous districts, unseating Doggett, limiting the number of Democrat districts) by doing so.

[38] Downton and the Republican-dominated Legislature used the intentional creation of a Hispanic-majority district that extended in large part into Travis County to justify its destruction of Travis County-based CD25, which it knew had a substantial minority population that was successfully electing its candidate of choice, a Democrat.  Because the Court finds below that CD35 is an invalid district under *Shaw*, it does not reach the Rodriguez Plaintiffs' alternative argument that CD25 was a protected crossover district and that its destruction also violated the Equal Protection Clause.

[39] Judge Smith contends that because mapdrawers had a political motive, race did not predominate in the drawing of CD35.  While this Court agrees with Judge Smith that, ultimately, many issues in this case boil down to "whether the congressional lines in the challenged districts were drawn for racial or partisan purposes," the Court still must conclude from the evidence that the congressional lines in CD35 were drawn for racial reasons, even if the ultimate location of CD35 was based in part on the partisan goal of unseating Doggett.  In fact, the Court agrees that mapdrawers viewed the central Texas configuration as a "threefer" in terms of fragmenting Travis County, unseating Lloyd Doggett,

As noted, to survive strict scrutiny, the challenged districting plan must be narrowly tailored to serve a compelling governmental interest. *Bush*, 517 U.S. at 976. Compliance with § 2 of the VRA constitutes a compelling governmental interest. *Id.* at 994 (O'Connor, J., concurring); *Clark v. Calhoun Cty.*, 88 F.3d at 1405. However, Defendants must do more than simply assert that they were attempting to comply with the VRA to survive strict scrutiny. "[T]he State must have a strong basis in evidence for concluding that the three *Gingles* preconditions exist in order to claim that its redistricting plan is reasonably necessary to comply with § 2." *Clark v. Calhoun Cty.*, 88 F.3d at 1405-06; *see also Shaw*, 517 U.S. at 915; *Bush*, 517 U.S. at 978 ("The State must have a 'strong basis in evidence' for finding that the threshold conditions for § 2 liability [*i.e.*, the *Gingles* preconditions] are present.").

Here, the Task Force Plaintiffs (who proposed a new Travis County/Bexar County Latino opportunity district during the legislative session) contend that CD35 is an appropriate § 2 district

and creating a Latino opportunity district along the Austin/San Antonio I-35 corridor. That the first two goals were furthered by placing the new Latino opportunity district in part in Austin does not undermine the conclusion that race predominated in the drawing of CD35.

It is undisputed that mapdrawers intended CD35 to be a Latino opportunity district, meaning it had to have over 50% HCVAP, and that this was the overriding criterion that could not be compromised in drawing the district. Downton admitted repeatedly to this being the ultimate criterion and to including population within and without the district for purely racial reasons, and traditional redistricting criteria were subordinated to race throughout the district. In that regard *Easley v. Cromartie* is easily distinguished and actually bolsters the Court's conclusion. In that case, the mapdrawers argued that they placed population into the district because they were Democrats, who also happened to be African-American, and that therefore politics, not race, shaped the district. The task was distinguishing a legislative effort to create a majority-African-American district from a legislative effort to create a safely Democratic district. *Easley*, 532 U.S. at 239. Here, in contrast, it is admitted that Downton placed population in the district because they were Hispanic, not because of their political characteristics. There was no argument or evidence that any population was included or excluded from the district based on partisan criteria (as distinguished from the political motive of using the race-based district to unseat Doggett). The fact that mapdrawers had the purpose of using CD35 to try to unseat Doggett and limit the number of Democrat districts statewide does not negate the fact that they used race as their tool and intentionally drew CD35 based predominantly on race. The political motive does not excuse or negate that use of race; rather, the use of race is ultimately problematic for precisely that reason—because of their political motive, they intentionally drew a district based on race in a location where such use of race was not justified by a compelling state interest.

42

because it satisfies all *Gingles* criteria.  *See* docket no. 460 at 16-18; docket no. 638 at 36.[40]  The Task Force Plaintiffs offered some evidence in support of their position that the Hispanic populations of Travis and Bexar Counties are a community of interest that form a compact minority community for purposes of § 2.  Defendants also argue that Southeast Austin and the Southside and Westside of San Antonio "are major urban areas sharing common interests" and "[i]t is not unusual for Austin and San Antonio to be combined in the same congressional district."[41]  Docket no. 1272 at 125. Other Plaintiffs refute these assertions and contend that CD35 is not compact.  The Rodriguez Plaintiffs further argue that CD35 is not properly drawn in Travis County because voting there is not racially polarized.

Although the Court is inclined to find that CD35 is not compact for § 2 purposes, it need not decide this issue because CD35 is invalid for another reason—there is no racially polarized voting in Travis County, such that the third *Gingles* precondition is not present in a significant portion of the district.  *See Bush*, 517 U.S. at 979 (finding that challenged districts could not be considered narrowly tailored to avoid § 2 liability when one *Gingles* precondition was not fulfilled, even if the Court assumed the other two preconditions were met).  Evidence from county-level elections shows substantial Anglo crossover voting and shows that the Anglo majority does not usually defeat the minority-preferred candidate.  More importantly, as the history of benchmark CD25 demonstrates,

---

[40] In 2011, Defendants actually asserted that CD35 is not required by § 2; instead, they argued (as discussed) that racial considerations did not predominate in the drawing of the district.  Docket no. 411 at 57 (ECF page 69).  It is not clear whether Defendants maintained this position post 2014-trial.

[41] The Court notes, however, that Austin has also been joined with parts of Houston in a congressional district (in both the benchmark and the enacted plan), but obviously that fact alone does not mean that the minority community within the district is a compact minority community for § 2 purposes.  The fact that the State chooses to combine certain communities in a non-racially (but politically) gerrymandered district does not mean that a different district that also combines parts of those communities is not racially gerrymandered or complies with § 2, or that the minority communities in a similar district are compact for § 2 purposes.

43

Travis County Hispanic (and African-American) voters could be included in a non-racially gerrymandered district with an Anglo majority and still elect minority-preferred candidates because the Anglo majority did not vote to defeat the minority-preferred candidate. Therefore, there was no strong basis in evidence to include Travis County Hispanic voters in a racially gerrymandered district because they had no § 2 right to remedy; inclusion of Travis County Hispanic voters based on their race was not narrowly tailored to serve a compelling state interest.[42]

Mapdrawers and the Legislature may have had a strong basis in evidence for believing that § 2 required seven Latino opportunity districts in South/West Texas, but they had no basis in evidence to believe that the *Gingles* preconditions were satisfied in Travis County such that a race-based majority-Hispanic district should be drawn there.[43] There is no § 2 violation in Travis County, and where there is no § 2 wrong there cannot be a § 2 remedy. *Shaw*, 517 U.S. at 916 (quoting *Growe v. Emison*, 507 U.S. 25, 40-41 (1993)). Just as a state may be in violation of § 2 if it draws a noncompact majority-minority district and the plaintiffs' proposed alternative districts would be compact, *see LULAC*, 548 U.S. at 429-31, a state may be in violation of § 2 if it draws a district that does not substantially address the § 2 violations or is otherwise not narrowly tailored to the State's professed interest in avoiding § 2 liability when compliant districts could be drawn. *Shaw*, 517 U.S.

---

[42] *See also Moon v. Meadows*, 952 F. Supp. 1141, 1150 (E.D. Va.), *aff'd sub nom. Harris v. Moon*, 521 U.S. 1113 (1997) (finding that racially gerrymandered minority district failed to survive strict scrutiny because defendant failed to show that Anglo bloc voting usually defeated the minority-preferred candidate and district's compactness was doubtful); *Harris*, 159 F. Supp. 3d at 623 (noting that a failure to establish any of the three *Gingles* preconditions is fatal to defendant's assertion that a racially gerrymandered district is narrowly tailored to serve the compelling state interest of complying with the VRA).

[43] Rather, the Legislature heard testimony (from Rep. Dawnna Dukes, Rep. Elliot Naishtat, and Sen. Kirk Watson from Austin/Travis County) that Anglos, Hispanics, and African-Americans worked in coalition (*i.e.*, voting was not racially polarized) and that, despite their Anglo-majority status, Austin and Travis County regularly elected minority candidates of choice. Defendants' expert Dr. Alford testified that there was "no question" that there was not racially polarized voting in Travis County. Alford depo. (Joint Ex. J-43) at 255.

at 911, 915.  *Cf. Miller v. Johnson*, 515 U.S. 900, 921 (1995) (compliance with the VRA cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws).

To be a compelling interest, the state must show that the alleged objective was the Legislature's actual purpose for the discriminatory classification and the Legislature must have a strong basis in evidence to support that justification before it implements the classification.  If avoidance of § 2 liability is asserted to be the State's compelling state interest, "the racial classification would have to realize that goal; the legislative action must, at a minimum, remedy the anticipated violation or achieve compliance to be narrowly tailored."  *Shaw*, 517 U.S. at 916.  In other words, the legislative action should substantially address, if not achieve, the avowed purpose.  *Id.* at 915.[44]

If a § 2 violation is proved for a particular area, it flows from the fact that individuals in that area have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  *Shaw*, 517 U.S. at 917.  There is no indication that mapdrawers or the Legislature drew CD35 in Travis County because they felt that Hispanic voters there had a § 2 right that needed a remedy.  Rather, they drew CD35 as an HCVAP-majority district that extended into Travis County for the purpose of eliminating the existing district in which minorities and Anglos together elected a Democratic candidate (and to unseat that candidate).  In this way, they were able to create the facade of complying with § 2 while actually minimizing the number

---

[44] Additionally, the challenged district "must not subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability."  *Bush*, 517 U.S. at 979.  Of course, the State is not prohibited from drawing majority-minority districts *per se*, *Voinovich*, 507 U.S. at 155, nor does § 2 prohibit the creation of a non-compact majority-minority district, *LULAC*, 548 U.S. at 430, but if the State allows race to predominate the drawing of a majority-minority district such that strict scrutiny is triggered, its race-based districting must be narrowly tailored to serve a compelling state interest.

of districts in which minorities could elect their candidates of choice despite the massive minority population growth that had occurred throughout the state.[45]  Plaintiffs have shown, and mapdrawers were aware, that seven Latino opportunity districts could be drawn in South/West Texas without including Travis County.  The Legislature's objective in drawing CD35 in Travis County was not to remedy a § 2 violation but to eliminate a Democratic district to offset the required creation of a new § 2 district, and the use of race for political advantage rather than compliance with the VRA cannot survive strict scrutiny.  CD35 therefore violates the Equal Protection Clause and, as will be discussed, Plan C185 does not "substantially address" the § 2 violation in South/West Texas.

---

[45] Downton testified that he did not think CD35 was necessary for § 5 compliance, and he was not sure if it was required by § 2, but he thought a court might find it was required by § 2.  Tr987-88; Downton 8-12-11 depo. (Ex. J-62) at 113-14 (stating that CD35 was not required by § 5 and he was not sure if it was required by § 2 because it was "just minimally a majority Hispanic district" and he felt that drawing it was maximizing Hispanic opportunity districts); TrA1636-38, TrA1696-97 (stating his position that enacted CD23 was the same as in the benchmark, a not-performing Latino opportunity district, such that there was no retrogression, but "even if it turned out that it was a Section 5 district and became not a Section 5 district, we had a replacement district, so there wasn't additional Section 5 analysis").  He testified that he was the one who "made the call" on these issues, including whether CD23 counted as a § 5 district. TrA1639-40.  He also testified that he had been instructed to draw a new § 2 district in the plan, and when he saw MALDEF's proposal that included the district extending into Travis County, he decided to use that district.  There is no indication that he had any evidence, much less a strong basis in evidence, to support the inclusion of Travis County in the new § 2 district when he decided to place the district there.  Rather, he chose that location to fulfill the goal of drawing a new § 2 district while drawing a "3-1 map" that had only one new Democrat district.  TrA1769 (Downton) (noting that CD35 would be a Latino opportunity district and it replaced a "different Democratic district" (CD25)); TrA1782 ("With respect to having the Democrat elected to Congress, there was not likely to be one elected from 25. There would be one elected from 35."); TrA1809 ("It was the issue of Democratic district.  We created two new minority districts, but took away one non-minority Democratic district.").

Further, there is no evidence that any member of the Legislature, including Chairmen Solomons and Seliger, had any basis in evidence for believing that CD35 was required by § 2 other than its HCVAP-majority status.  Solomons repeatedly stated that he relied on his staff, primarily Downton, to make legal determinations for him, and Downton repeatedly testified that his sole criteria for a § 2 district was whether it was above 50% HCVAP.  Both Downton and Solomons indicated that CD35 was created because it could meet the majority-HCVAP threshold (and fulfill the 3-1 map goal), not because all of the *Gingles* factors were satisfied.  Solomons depo. (Ex. J-60) at 134-36 (noting that the proposed DFW district was rejected because it did not meet the 50% threshold and the MALDEF proposal was selected because it could meet the threshold); *id.* at 143 ("it just seemed to me that that central part, that part of Texas made a good place for a district, if the numbers worked").  Solomons apparently believed that Seliger's staff was more knowledgeable about the Congressional plan than his own staff because the plan was initially released by the Senate, even though his own counsel Ryan Downton was the primary architect of the Congressional plan.  *Id.* at 151-52.

46

#### 4. CD27/Nueces County § 2 claims

The Legislature's decision to place CD35 in Travis County ties into Plaintiffs' other claims that there is an unremedied § 2 violation for Hispanic voters in Nueces County, which was placed into Anglo-majority CD27.  In *LULAC v. Perry*, the Supreme Court reemphasized[46] that creation of a district not required by § 2 (because it was not compact for § 2 purposes) could not remedy a § 2 violation elsewhere in the state.  Though a § 2 plaintiff does not always have a right to be placed into a minority opportunity district as a remedy, and the State retains broad discretion in drawing districts to comply with the mandate of § 2, these principles have limits.  *LULAC*, 548 U.S. at 429.  The State may "use one majority-minority district to compensate for the absence of another only when the racial group in each area had a § 2 right and both could not be accommodated."  *Id.*  "Simply put, the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right."  *Id.* at 430.

In this case, the State intentionally created a § 2 majority-Latino district that included substantial population (215,626 persons in Travis County, 21% of the district's population) that did not have a § 2 right because the third *Gingles* precondition (Anglo bloc voting) does not exist in Travis County.  Travis County minority voters could be included in an Anglo-majority district (such as benchmark CD25) and still elect their preferred candidate.  At the same time, Plaintiffs demonstrated that approximately 200,000 Hispanic voters in Nueces County (a majority-HCVAP county) had a § 2 right that could be remedied but was not.

Numerous maps showed that seven compact Latino opportunity districts could be drawn in

---

[46] The Supreme Court previously held in *Shaw* that even if a state legislature has a strong basis in evidence for determining that a § 2 violation exists in one part of the state, it cannot remedy that violation by drawing a majority-minority district in a different part of the state.  *Shaw*, 517 U.S. at 916.

South/West Texas and that Nueces County Hispanics could be included in one of those districts for § 2 purposes.[47]   Instead, they were placed in an Anglo-majority district where they have no opportunity to elect their preferred candidates.   Thus, by including Hispanic voters in Travis County (who did not have a § 2 right) in CD35 but excluding Nueces County Hispanics (who did have a § 2 right) from a Latino opportunity district, Plan C185 does not "substantially address" the § 2 liability in South/West Texas.   *Shaw*, 517 U.S. at 915 ("the legislative action must, at a minimum, remedy the anticipated violation or achieve compliance to be narrowly tailored"); *Dillard v. City of Greensboro*, 946 F. Supp. 946, 956 (M.D. Ala. 1996) ("Because the State has a compelling interest only in remedying the § 2 violation, a plan would be narrowly tailored and thus survive strict scrutiny only if it substantially addresses the [§ 2] liability . . . .") (internal quotation marks omitted); *see also Wilson v. Jones*, 130 F. Supp. 2d 1315, 1322 (S.D. Ala. 2000), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000) (discussing *Shaw*'s requirement that the district restore rights to the specific persons affected by the potential violation).

Defendants argue that the reconfiguration of CD27 and the creation of CD34 preserves the core of former CD27 and makes it more likely to perform.   Docket no. 411 at 32.   However, that argument ignores the § 2 rights of Nueces County Hispanic voters and Supreme Court precedent. Defendants' expert Dr. Alford noted that what happened to the Hispanic voters in Nueces County was similar to what happened to Hispanic voters in CD23 during the 2006 redistricting—a majority-Hispanic district that would likely have elected the Hispanic-preferred candidate was flipped into an Anglo-majority district to protect a candidate that was not preferred by the Hispanic voters.

---

[47] Plans were submitted during the legislative session and during this litigation that showed that seven compact districts could be drawn that included all or most Nueces County Hispanic voters but not Travis County voters (*see, e.g.*, Plans C123, C163, C164, C201, C208, and C220).

Tr1829, Tr1832, Tr1837 (Alford).  The Supreme Court found that to be a violation of § 2 for the Hispanic voters who no longer had an opportunity to elect because they were no longer part of a Hispanic voting majority.  Increasing electoral ability or performance for some voters in former CD27 cannot offset the loss of opportunity suffered by Nueces County Hispanic voters when *all* the voters' § 2 rights can be accommodated.

Although Defendants contend that there is no racially polarized voting in Nueces County, that claim is disproved by the evidence.  Assuming that looking at Nueces County in isolation (as opposed to in a congressional district[48]) is the proper focus, all of the expert testimony on the issue showed the existence of racially polarized voting in Nueces County.  Dr. Ansolabahere found very high Anglo voter cohesion in Nueces County, and Anglo support for minority-preferred candidates is very low; only about 10 to 15% of Anglo voters support minority-preferred candidates.  TrA943 (Ansolabahere).  Dr. Engstrom testified that the bivariate analysis of statewide elections from 2006 to 2010 revealed racially polarized voting in both general and primary elections in Nueces County.  Tr503 (Engstrom); Engstrom Rebuttal Report (docket no. 307-1) at 7 & Table 2.  In his original report (Joint Expert Ex. E-7), Dr. Engstrom found that Latinos are highly cohesive in support of Latino candidates with the Democratic party nomination in general elections—all five got strong support (all point estimates were >90% on the bivariate analysis).  The only Latino Republican, Guzman, was not supported.  Further, all Latino candidates in Democratic primaries received strong Latino support (78.4% (Noriega), 90.5% (Cruz), 95% (Yanez), 83.9% (Chavez-Thompson), and 91.5% (Uribe)).  Latinos voting in Republican primaries did support the Latino candidate running

---

[48] *See Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (elections involving the particular office at issue are more relevant than elections involving other offices such that limited minority success in municipal elections did not demonstrate equal opportunity in county-wide elections).

for Railroad Commissioner (Carrillo, 84.2%), but not for Governor (Medina, 28.2%). *Id.* at 12-13.

Non-Latino voters provided little support to any of the five Latino candidates favored by Latino voters in general elections, according to the bivariate analysis (support ranged between 11.2% and 17.6%). They did support the only Republican candidate that was a Latino (Guzman) with an estimated 78%. They did not provide majority support to any of the Latinos seeking nominations in the Democratic primaries and did not favor either Latino candidate in the Republican primaries (10.3% for Medina and 21.8% for Carrillo). Dr. Engstrom concluded that Latinos in Nueces County are very cohesive in their candidate preferences for Latino candidates, in both general elections and Democratic primaries, but their preferences were not shared by non-Latino voters in any elections analyzed. *Id.* at 13.

Engstrom's rebuttal report has similar findings: Latino voters in Nueces County "have been strongly cohesive in their support of Latino candidates with the Democratic Party nomination in general elections." Docket no. 307-1 at 5. All seven such Latino candidates received "strong support" from Latino voters—each candidate received over 90% of the Latino vote, with the range being from 90.1% to 97.8%. *Id.* at 6. In none of the elections analyzed did non-Latino voters share that preference, and their support ranged from 7.5% to 17.6%. *Id.* All of the Latino candidates in the Democratic primaries "also received strong support from the Latino voters in Nueces County." *Id.* Their estimated support range was 78.4% to 96%, with four of the six exceeding 90%. *Id.* Non-Latinos did not provide majority support in any of these primaries, with their support estimates ranging from 29.7% to 46.6%. *Id.* In the 2010 Republican primary for Railroad Commissioner, Latinos supported the Latino incumbent with 84.3% support, while non-Latinos did not support him

(21.8%).  *Id.*[49]

To the extent Defendants have argued that racially polarized voting is not legally significant when Latino cohesion falls below 80% or Anglo crossover voting is significant, *see, e.g.*, docket no. 411 at 49-50; docket no. 1276 at 92 (proposed FF 860: "Plaintiffs have failed to demonstrate that racially polarized voting in any Texas county is legally significant."), the level of racial bloc voting in Nueces County is legally significant even under Defendants' standards.[50]  In addition, to the extent Defendants assert that the cause of polarized voting is partisanship and not race, Plaintiffs have sufficiently rebutted that evidence by showing that voting is sufficiently racially polarized in the primaries, where partisanship plays no role.  Specifically, Latinos were highly cohesive (84.3%) in support of the Latino candidate Victor Carrillo (the incumbent) in the 2010 Republican Primary for Railroad Commissioner, while non-Latinos provided only 21.8% support, and Carrillo was defeated.[51]  In addition, although voting is not as racially polarized in the Democratic primaries,

---

[49] In the 52-county area he defined as South Texas, Dr. Engstrom also found racially polarized voting.  Tr503. He found Latino cohesion for the Latino candidate with the Democratic Party nomination exceeding 80% (the range was 80.5% to 88.5%) while non-Latinos ranged in support between 13.1% and 19.1%.  Docket no. 307-1 at 7.  In addition, Latino candidates in the Democratic primaries also received "strong support" estimated to be greater than 80% (ranging from 76.8% to 93.5), with non-Latinos providing between 26.1% and 39.11% support.  In the 2010 Republican primary for Railroad Commissioner, Latinos provided 69.73% support and non-Latinos provided only 25.5% support.  *Id.* at 8.

[50] Defendants have not challenged Dr. Engstrom's qualifications, methodologies, or results.  Dr. Alford stated that Dr. Engstrom's EI methodology was good and that his report was credible.  Tr1765, Tr1859; Alford depo. (Joint Ex. J-43) at 111-12.  Dr. Engstrom's data, in addition to the other expert data, demonstrate the existence of legally significant polarization sufficient to satisfy *Gingles*.  Dr. Alford acknowledged that there was significant variation in Hispanic voter cohesion across the state.  Tr1785, Tr1848.  Dr. Engstrom's analysis shows that Latino voters in Nueces County were consistently cohesive in the 90% range, while non-Latino voters were highly cohesive in voting for the non-Latino-preferred candidate and provided weak support to the Latino-preferred Latino candidate (between 7.5 and 17.6%) in the 2006, 2008, and 2010 general elections he studied.  Engstrom Corr. Rebuttal Report (docket no. 307-1) at 32 (Table 2).  Dr. Alford stated that such levels of bloc voting were legally significant.  Tr1846.

[51] In his 2014 supplemental report, Dr. Engstrom found that in the Republican primary runoff election for Texas Supreme Court Place 4, 68.6% of Latino voters support Medina, while 34.4% of non-Latino voters did.  TrA481 (noting that he found polarized voting in some counties but not others in this election); PL-967.  He did not find racially polarized voting in the Cruz Republican primary election, but he also noted that Latinos did not support Cruz in the general election either, and there are such low participation rates by Latinos that it did not provide effective analysis.  TrA482.  He also noted that none of the results of his 2012 analysis altered his prior conclusions regarding racially

51

Latino cohesion remains high (ranging from 78.4% to 95% in regular primaries and reaching 96% in the 2006 runoff for Lt. Governor) and although non-Latino/Anglo crossover voting is higher (ranging from 29.7 to 46.6%), non-Latinos did not provide majority support to the Latino-preferred Latino candidate in any of the primaries Engstrom evaluated.

Dr. Engstrom also found high Latino cohesion in the HD33 election in 2010, with Solomon Ortiz, Jr. receiving an estimated 92.3% of the Latino vote, while non-Latinos provided only 11% support. Docket no. 307-1 at 25; Tr510 (Engstrom). Dr. Kousser also found that contests in HD33 between 2002 and 2010 were "starkly racially polarized," with Latino voters overwhelmingly supporting the Democratic candidates. Joint Expert Ex. E-2 (Kousser report) at 87 n.55, Tables 12-14.[52]

Dr. Brischetto similarly found racially polarized voting in the 2012 HD34 election in Nueces County[53] as well "a high degree of racially polarized voting between Latinos and non-Latinos" in the other elections analyzed. TrJ937-38 (Brischetto). Dr. Brischetto analyzed ten general elections in Nueces County in 2012 and characterized the racially polarized voting between Latinos and non-Latinos as "extreme." TrJ992; Brischetto Report (MALC-161) at ¶ 48. Dr. Brischetto found that Latinos had a high level of cohesiveness, with their support for the minority/Latino candidate above 90% in nine of ten general elections. TrJ969 (Brischetto); Brischetto Report Table 4. He also found

polarized voting since that analysis was more extensive in terms of the number of elections analyzed.

[52] Table 14 shows Kousser's results using ecological inference. In 2002, Latinos supported Luna with 97.3% of their vote, while non-Latinos provided majority support (63.5%) to Cuellar. In 2008, Latinos supported Ortiz with 93.2% of their vote, while non-Latinos provided majority support (66.6%) to Torres. In 2010, Latinos supported Ortiz with 86.3% of their vote while non-Latinos provided strong support (89.6%) to Torres. Tables 12 and 13 (reflecting the results of other methodologies) display similar results.

[53] Latino support for Herrero, the Latino candidate, was 95.55% while non-Latino support was 11.09%. Non-Latino support for Scott, the Anglo, was 88.91%, while Latino support for Scott was 4.45%. TrJ937 (Brischetto); Brischetto Report (MALC-164) Table 4.

that Anglo bloc voting was sufficient to usually defeat the Latino-preferred candidate. *Id.*; MALC-164.

Although Dr. Brischetto did not find extreme differences and did not think voting was racially polarized in the Democratic primary for CD27, he did find racially polarized voting in the race for Democratic Party Chair, where Latinos supported the Latino candidate with 90% of their votes and non-Latinos supported the non-Latino candidate with 60% of their votes. TrJ944; Brischetto Report ¶ 50, Table 4. He also found racially polarized voting in three of five Republican primary elections. TrJ942-43; Report ¶ 49, Table 4. Those three elections involved head-to-head contests between a Latino and non-Latino candidate, while the other two involved three or more candidates. TrJ943 (Brischetto); Brischetto Report Table 4.[54]

Defendants fail to cast doubt on any of these findings and conclusions. Instead, Defendants contend that there is no racially polarized voting because minority-preferred candidates have won a number of elections in Nueces County. Accordingly, Defendants contend that the third *Gingles* factor—that the Anglo majority votes sufficiently as a bloc to enable it usually to defeat the minority-preferred candidate—is absent. However, in those elections, minorities had a sufficiently large majority to overcome the Anglo bloc voting. Dr. Brischetto explained that the minority candidate does win when the district is over 66% minority. TrJ996 (Brischetto). In districts that were less than 50% minority, however, Anglo bloc voting defeated the minority-preferred candidate all but one time. *Id.*. The fact that minority candidates can win when they have a super-majority does not

---

[54] In the Senate primary, Latinos split their vote primarily between Cruz, the Latino candidate (41.77%), and Dewhurst (42.35%) and there was a fairly large error range. TrJ939 (Brischetto). In the Supreme Court Place 4 race, Latinos supported Medina with 69.5% of their votes but Anglos supported Medina with 36.21% of their vote and Devine with 43.19% of their vote, leading Dr. Brischetto to say that although voting was racially polarized, he would not call it highly racially polarized. TrJ941.

disprove the existence of racially polarized voting.

Moreover, looking instead at a district level[55] (as opposed to the county in isolation), placement of Nueces County Hispanics in an Anglo-majority district ensures that the Anglo majority usually will defeat the minority-preferred candidate, given the racially polarized voting in the area, and thus those Hispanic voters lack opportunity.  CD27 in Plan C185 is a district in which Latino voters have no opportunity to elect their preferred candidates.  In contrast, past performance of benchmark CD27 (as well Plaintiffs' proposed plans) demonstrates that Nueces County can be placed in a majority-HCVAP district that provides Latino opportunity.

Plaintiffs have thus shown that a district could be drawn in which Hispanics, including Nueces County Hispanics, are sufficiently numerous and geographically compact to constitute a majority HCVAP.  They have also shown that racially polarized voting exists such that an Anglo-majority would usually defeat their preferred candidate.  They satisfy the *Gingles* preconditions, and a consideration of the totality of circumstances leads the Court to conclude that they have a § 2 right.  A searching practical evaluation of "past and present reality" and a functional view of the political processes indicates that the political processes are not equally open to Hispanics.  Texas's history

---

[55] Dr. Engstrom found racially polarized voting in the 2010 general election for CD27.  Tr510 (Engstrom); Engstrom Corr. Rebuttal Report (docket no. 307-1) at 25.  The incumbent Ortiz received an estimated 86.6% of the votes cast by Latinos and only 15.9% of those cast by non-Latinos.  *Id.*; Tr509-10 (Engstrom).  Dr. Kousser also found racially polarized voting in the 2010 general election for CD27 using various methodologies. Tr226 (Kousser) (noting that, using ordinary least squares method, Latinos voted 85% for Ortiz and only 13.4% for Farenthold) (Joint Expert Ex. E-2 at 42-44, Table 12) (non-Latino support for Ortiz was 8%); Joint Expert Ex. E-2 at 45-47, Table 13 (using least squares weighted by votes, Ortiz received 81.9% of Latino support and 9.3% of non-Latino support); Joint Expert Ex. E-2 at 48-50, Table 14 (using ecological inference method, Ortiz received 80.6% of Latino vote and 10.7% of non-Latino vote, and Latinos provided only 12.4% support for Farenthold).  Using homogeneous precinct analysis, Dr. Ansolabahere also found racially polarized voting in the 2010 general election for CD27, and found that it was greater in that race, which involved an Anglo Republican and a Hispanic Democrat, than the 2010 gubernatorial race between two Anglo candidates, indicating that race played a role in addition to partisanship.  Joint Expert Ex. E-15 at 36.  Benchmark CD27 was a Latino opportunity district, and the § 2 rights of those Hispanic voters in Nueces County were intentionally taken away to protect the Republican incumbent.  *See* Tr514 (Engstrom) (noting CD27's past performance).

of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the democratic process is well documented and has been discussed above.  Similarly, as discussed, the evidence indicates that Latinos bear the effects of past discrimination in areas such as education and employment/income, which hinder their ability to participate effectively in the political process.[56]

The challenged district CD27 has the effect of diluting Nueces County Hispanic voters' electoral opportunity—that is in fact why the State chose to put those voters in an Anglo-majority district, to protect an incumbent who was not the candidate of choice of those Latino voters.  Although Defendants assert that some people wanted Nueces County to anchor its own district, see docket no. 1272 at 127, the Court finds that the primary and dominant motive was to place the incumbent Farenthold, who lived in Nueces County and would likely be ousted by the existing Latino majority, into an Anglo-majority district (and thus to take away the opportunity to elect that Nueces County Latinos had enjoyed).  *See, e.g.*, Downton 8-31-11 depo. (Joint Ex. J-62) at 49 ("Q. What was the purpose of including Nueces County in Congressional District 27 in the enacted plan? A. Congressman Farenthold lives in Nueces County. We were trying to draw him into a Republican district."); Seliger depo. (Joint Ex. J-59) at 25-26 (noting that joining Nueces County with counties to the north was to try to help Farenthold hold the district).  As discussed previously, incumbency protection does not permit the dominant party to ignore § 2 or to dilute Latino voting power because

---

[56]In Nueces County, the mean family income and the mean household income for Anglos is almost twice that of African Americans and Hispanics.  MALC-149.  Hispanics and African Americans are several times more likely to rely on food stamps. *Id*. The per capita income for Anglos is more than three times that of Hispanics and almost three times that of African Americans. *Id*. More than 86% of the Nueces County functionally illiterate persons over 25 are Hispanic.  MALC-150.  16.3% of Hispanics over the age of 25 are functionally illiterate, compared to 2.6% of Anglos. *Id*. Almost one third of Hispanics over the age of 25 are not high school graduates, compared to 8.3% of Anglos.  *Id*. 11.4% of Anglos over 25 have graduate or professional degrees, compared to 4% of Hispanics. *Id*.

the Latino voters would not favor the incumbent candidate.

Even if incumbency protection must be considered or weighted equally with § 2 obligations to avoid Equal Protection Clause issues (which the Court does not decide), Defendants failed to show that both considerations could not be accommodated in the plan. They never explored this option; they made the decision to place all of Nueces County in an Anglo district going to the north from the beginning of the process. TrA1772-73 (Downton) (directive to put Nueces County in a northern-oriented district was given "[f]rom the beginning of the process"). Several plans (*e.g.*, Plans C126, C164, C187, C225) demonstrate that the political goal of protecting Farenthold could be accommodated along with the § 2 rights of most Nueces County Hispanics, and the neighboring district(s) would not extend so far north. Numerous maps also demonstrated that accommodating the § 2 rights of all or most Nueces County Hispanic voters would not compromise the § 2 rights of any other voters, and in fact including it substantially accommodates the § 2 rights of Hispanic voters in South/West Texas.

Where the rights of voters who have demonstrated § 2 violations can be accommodated through the use of compact districts that do not subordinate traditional redistricting principles more than necessary to address the § 2 liability, those voters' § 2 rights must be accommodated. This is not a case in which Plaintiffs are asserting that their districts are simply preferable, that the State did not get things "just right," or in which Nueces County Hispanics' § 2 rights could not be accommodated along with other voters with § 2 rights. *See Bush v. Vera*, 517 U.S. 952, 977-78 (1996) (noting that a § 2 district that is reasonably compact and regular, taking into account traditional districting principles, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless "beauty contests"); *LULAC*, 548 U.S. at 429 (the

56

state may use one majority-minority district to compensate for the absence of another only when the racial group in each district has a § 2 right but they could not both be accommodated; if the inclusion of the plaintiffs would necessitate the exclusion of others, then the State cannot be faulted for its choice).

To the extent the desire for Nueces County to anchor a district did play a small role, that desire must yield to the requirements of the VRA, especially where, as here, Hispanic voters compose more than 50% of the County's CVAP (and that percentage is increasing) and the decision to remove Nueces County from its existing configuration led to other questionable race-based decisions, such as CD34 stretching from Cameron County all the way to Gonzales County and CD15 stretching from Hidalgo County to Guadalupe County in an effort to "pick up Anglo voters."[57] Accordingly, Plaintiffs have amply demonstrated that Nueces County Hispanics have a § 2 right that has not been remedied in Plan C185, but could be remedied without the loss of a § 2 remedy for others (and without the Equal Protection Clause violation that exists in CD35 and potentially the South Texas districts in Plan C185).[58]

*5. Summary*

In sum, Plaintiffs have established a § 2 violation, both in terms of intent and effect, in

---

[57] *See* US-76 (Opiela email to Interiano noting that there was a "ripple effect" from putting Nueces County in a northern Anglo-majority district that would cause mapdrawers to create a South Texas district stretching far north to "pick up Anglo voters" to avoid a packing claim); TrA345 (Interiano) ("I believe that what we had discussed was that if Nueces County went north and you took that population to a district going north . . . the concern was that any district south of that, there was a risk of it being considered packing.").

[58] The Court notes that, although its finding that CD35 violates the Equal Protection clause under a *Shaw*-type analysis is related to and supports Plaintiffs' § 2 claim in Nueces County, the claims are independent. The Task Force Plaintiffs support CD35 but still assert § 2 claims on behalf of Nueces County Hispanic voters. Therefore, even if the Rodriguez Plaintiffs are no longer pursuing a *Shaw*-type claim concerning CD35, the Court still concludes that Plaintiffs have demonstrated that the Nueces County Hispanics have established a § 2 violation insofar as they have shown that their § 2 rights could have been accommodated but were not.

South/West Texas.  Plaintiffs have shown that seven compact majority-HCVAP districts could and should be drawn there that would substantially address the § 2 rights of Hispanic voters in South/West Texas, including Nueces County.  Defendants' decision to place Nueces County Hispanic voters in an Anglo district had the effect and was intended to dilute their opportunity to elect their candidate of choice.  Meanwhile, race predominated in the drawing of CD35, and Defendants' decision to place majority-HCVAP CD35 in Travis County was not to comply with the VRA but to minimize the number of Democrat districts in the plan overall.  Plaintiffs have established an equal protection violation with regard to CD35.  Defendants' manipulation of Latino voter turnout and cohesion in CD23 denied Latino voters equal opportunity and had the intent and effect of diluting Latino voter opportunity.  Nueces County Hispanics and Hispanic voters in CD23 have proved their § 2 results and intentional vote dilution claims.  The configurations of CD23, CD27, and CD35 in Plan C185 are therefore invalid.

## II. Dallas-Fort Worth area

In the DFW area, Plaintiffs assert § 2 intentional vote dilution and results claims, Fourteenth Amendment racial discrimination claims, and Fourteenth Amendment *Shaw*-type racial gerrymandering claims.  In support of their claims, Plaintiffs contend that the one existing African-American opportunity district (CD30) was unnecessarily and intentionally packed with minority voters and that the rest of the minority populations in Dallas and Tarrant Counties were intentionally fragmented ("cracked").  Plaintiffs assert that, had the Legislature not intentionally fragmented the minority population to avoid creating what it viewed as a district that would elect Democrats, there would "naturally" be additional minority opportunity districts in the area.  Thus, a primary complaint is the Legislature's failure to create one or two new minority opportunity districts (either single-

minority or coalition) in DFW, and its intentional avoidance of such districts. The Task Force plaintiffs also contend that, regardless of intent to help or hurt minorities, race predominated in the decision to include populations in districts throughout DFW, but primarily in CD26 in Tarrant County and in CD6 in Dallas County, in violation of the *Shaw* line of cases on racial gerrymandering.

Defendants contend that politics, not race, was the metric used to draw lines in DFW, and although they concede that race was used to some degree in districts CD12 and CD26, Defendants contend that this use of race was not discriminatory and did not violate the Equal Protection Clause under a *Shaw*-type inquiry. With regard to the § 2 results claim, Defendants argue that the Hispanic population in DFW is not sufficiently geographically compact to create a § 2 Latino opportunity district because the HCVAP population is too small and too dispersed, and that it was not required to draw a coalition or other minority district, which would elect a Democrat.[59] And because no majority-minority district was required, Defendants contend, mapdrawers were free to engage in political gerrymandering that had the unsurprising and foreseeable (but not intended) effect of dividing minority communities.

The Court will begin its analysis with Plaintiffs' traditional § 2 results claims under *Gingles*. Because the Court finds that Plaintiffs' results claims regarding the failure to draw one additional minority coalition district are moot and that Plaintiffs have failed to provide sufficient evidence to support their other § 2 results claims at this time, it must consider the constitutional claims.[60]

---

[59] *See* TrA205-06 (opening arguments); proposed fact finding 644 (docket no. 1276) ("The Legislature viewed the creation of coalition districts as Democratic districts and they did not have the goal of creating additional Democratic congressional districts unless it was required to do so under the Voting Rights Act.").

[60] Even if the Court did find for Plaintiffs on the results claims, consideration of the intentional vote dilution claims would likely still be necessary given the request for bail-in relief.

A. Whether Plaintiffs can satisfy *Gingles* for an additional Latino opportunity district?

    To satisfy the *Gingles* preconditions for a new Latino opportunity district in a traditional

vote dilution results case, Plaintiffs must show that Latinos are "sufficiently large and geographically

compact to constitute a majority in a single-member district," and all parties agree that a majority

is greater than 50% HCVAP for a Latino opportunity district. *Bartlett v. Strickland*, 556 U.S. 1, 11

(2009) (plurality); *Thornburg v. Gingles*; 478 U.S. 30, 50 (1986); *Valdespino v. Alamo Heights

Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999). Numerous maps were submitted to Downton

and the Legislature for consideration during the session and as demonstration maps at trial, but

Plaintiffs have failed to demonstrate that any contained a compact district that was majority-HCVAP.

    *1. Task Force Plan C190*

    The Latino Task Force has submitted Plan C190 (Joint Map Ex. J-11), which includes CD6,

the only proposed HCVAP-majority district using 2005-2009 ACS data. Using that data, CD6 is

50.4% HCVAP (and 66.8% HVAP and 41.6% total SSVR). It joins Latino neighborhoods in the

Fort Worth area with "several heavily Latino neighborhoods in the Dallas area, such as Oak Cliff and

Grand Prairie, and the Latino populated areas of Irving and Farmers Branch." Docket no. 482 at 55

(Task Force proposed fact finding 304); *see also* docket no. 1274 at 152 (Task Force proposed fact

finding 1003: "Congressional District 6 in plan C190 unites Latino communities in Dallas and

Tarrant Counties."). The Task Force asserts that this district takes in "similar neighborhoods" and

would elect the Latino-preferred candidate in seven of seven racially contested general elections.

Docket no. 1282 at 10.

    The Task Force proffered some exhibits that show that CD6 encompasses many areas with

10% or higher population age 18 years and over who speak Spanish and speak English "not well"

60

or "not at all" (PL-360), high percentages of population age 25 and over with less than a high school diploma (PL-361), and mostly areas with low (below $38,000) median household income (PL-362). Task Force exhibit PL-363 also shows that the contours of the district closely track areas with high Hispanic population, including virtually all areas in Tarrant County with 80% or higher Hispanic population and most such areas in Dallas County.  Thus, the Task Force Plaintiffs assert, CD6 unites Latino communities, communities with low educational attainment, and low-income communities in Dallas and Tarrant Counties.  Docket no. 482 at 54 (proposed FF 300-302).

Alex Jimenez, a Task Force individual plaintiff from Tarrant County, testified that proposed CD6 joins people, businesses, and consumer bases in Fort Worth and Dallas that are fairly similar. Tr574-75.  He testified that people in Fort Worth and Jefferson/Oak Cliff in Dallas are very similar. Tr575.  He thinks voters in the district communities would support the same candidate based on what the candidate represents, not on whether the candidate is Republican or Democrat. Tr576.

The Task Force also offers the Declaration of Hector Flores, a Dallas County resident, who notes that CD6 "reflects several predominantly Latino neighborhoods in the Fort Worth area," "several heavily Latino neighborhoods in the Dallas areas, such as Oak Cliff and Grand Prairie," and "Latino populated areas of Irving and Farmers Branch."  PL-415 at ¶ 20.  He stated that the schools in those areas are largely Latino and have large ESL populations, that the streets and transportation infrastructure are uniformly poor, the housing is typically low-to-middle-class-income housing with substantial multifamily housing, the Latinos in the areas largely work in construction or run small businesses, and the Latinos who reside in the areas reflected in this proposed district have much in common culturally, linguistically, and economically.  PL-415 at ¶¶ 21-24.

Defendants argue that the district is not reasonably compact as required by *Gingles* because

of its low compactness scores, its convoluted shape, and its many fingers and extensions.  Tr56; Docket no. 411 at 28; Docket no. 457 at 22.  Defendants' compactness expert Todd Giberson noted that CD6 had the worst compactness scores of all proposed demonstration districts he analyzed. Joint Expert Ex. E-18 at 6.  It has an area rubber band score of .303 and a perimeter-to-area score of .018, both of which reflect very low compactness.[61]  Joint Map Ex. J-11.  It is the only proposed district that is less compact using the area rubber band measurement than CD35 in the enacted plan, which is the least compact district in Plan C185.  Giberson 2011 depo. (Joint Ex. J-42) at 40-41. However, using the area-to-smallest-circle measurement, CD6 is more compact than CD35 in Plan C185.  *Id.*

To satisfy the first *Gingles* precondition, Plaintiffs must prove that their demonstration district contains a majority HCVAP and that the minority population in the district is "geographically compact."  *Gingles*, 478 U.S. at 50.  The § 2 compactness inquiry considers the compactness of the minority population, not the compactness of the contested district or necessarily the precise shape of its boundaries, though as discussed below the shape of the district is relevant.  *LULAC v. Perry*, 548 U.S. 399, 433 (2006).  In other words, the Court should focus on the size and concentration of the minority population.  *Houston v. Lafayette Cty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995).

If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district, and a district

---

[61] As explained by the court in *Rodriguez v. Harris County, Texas*, 964 F. Supp. 2d 686, 740 (S.D. Tex. 2013), the area rubber band score measures the ratio of the area of the district to the area of the smallest convex polygon enclosing the district and symbolizes "how tightly packed or spread out the geography of a district is."  "A long, narrow district, or one with 'fingers' or other extensions, is less compact because it takes a large circle to enclose the entire district, yet much of that circle is empty."  *Id.*  Perimeter-to-area compares the relative length of the perimeter of a district to its area.  *Id.*; *see also LULAC v. Perry*, 548 U.S. 399, 455 n.2 (2006).  "Jagged district borders substantially lengthen the boundary without enclosing more area and hence score low."  *Rodriguez*, 964 F. Supp. 2d at 741.

that reaches out to grab small and apparently isolated minority communities is not reasonably compact. *Bush*, 517 U.S. at 979; *LULAC*, 548 U.S. at 432. However, members of a racial group in different areas could share similar interests and therefore form a compact district "if the areas are in reasonably close proximity." *LULAC*, 548 U.S. at 435. "A district would not be sufficiently compact if it was so convoluted that there was no sense of community, that is, if its members and its representative could not easily tell who actually lived in the district." *Rodriguez v. Harris Cty., Tex.*, 964 F. Supp. 2d 686, 737-38 (S.D. Tex. 2013) (citing *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 96 (5th Cir.1994) (noting that "[a] number of courts have concluded that the first *Gingles* precondition is not satisfied if the proposed district does not retain a natural sense of community such that it can be effectively represented")).

Further, the § 2 compactness inquiry must take into account traditional districting principles such as maintaining communities of interest and traditional boundaries. *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (citing *Bush v. Vera*, 517 U.S. 952, 977 (1996)); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1391-92 (E.D. Wa. 2014) ("The compactness inquiry under § 2 . . . focuses more generally on whether the proposed minority district reasonably comports with 'traditional districting principles' such as contiguousness, population equality, maintaining communities of interest, respecting traditional boundaries, and providing protection to incumbents."). "The recognition of nonracial communities of interest reflects the principle that a State may not 'assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *LULAC*, 548 U.S. at 433. Thus, to evaluate geographical compactness, the Court considers the dispersion of the relevant minority population, the shape of the proposed district (as measured by a visual evaluation and by statistical measures of compactness), and the

district's compliance with traditional redistricting principles (such as respect for communities of interest and traditional boundaries).  *See Rodriguez*, 964 F. Supp. 2d at 737-54; *see also Vera v. Richards*, 861 F. Supp. 1304, 1341 (S.D. Tex. 1994) (noting that a district's compactness must be a relative measure based on location and population density and that "[i]n a major urban county, compactness makes little sense if considered in terms of geographic sprawl alone, but it seems far more probative when viewed in terms of a city's or county's neighborhoods, geopolitical subdivisions, and business location"), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996).

The Court agrees with Defendants that the proposed district indicates that the HCVAP population is not sufficiently geographically compact to satisfy the first *Gingles* precondition.  The evidence shows that, although the Hispanic population in Dallas and Tarrant Counties has grown, neither county was above 25% HCVAP at the time of redistricting, and neither county contained sufficient HCVAP population to form the majority of a district solely within that county.  *See, e.g.*, TrA1237-38 (Korbel); D-231.  As a result, the proposed CD6 joins, by a long narrow strip, a significant portion of Fort Worth to various areas of Dallas and Dallas County. Although the western portion of the district is mostly populated by Fort Worth residents, it includes small portions of Haltom City, Sansom Park, Lake Worth, and River Oaks, and has several large tentacles rather than a compact shape.  One who drove in a circle within Fort Worth could exit and enter the district ten or more times. This portion of the district does not appear to have a natural sense of community.

As noted, CD6 then connects this Fort Worth-area population to other Latino population in Dallas County via a long, narrow strip no wider than a block or a highway at points.  Once within Dallas County it takes only select portions of Grand Prairie, reaches north and juts into portions of Irving via highly irregular lines that do not appear to respect any traditional boundaries, then narrows

and again employs bizarre shapes to take additional Irving population, Dallas population, as well as parts of Farmers Branch and Carrollton.  Elsewhere, it narrows through central Dallas and then extends a long, jagged protrusion east throughout parts of Dallas and picks up part of Balch Springs. The district has very little integrity in terms of traditional boundaries or districting principles within Dallas County and does not appear to retain a natural sense of community.

Overall, the district shows no regard for traditional districting principles such as compactness or respecting county lines, towns, cities, or voting precincts.  *See* docket no. 461-1 at 2 (Engstrom report) (noting that CD6 was drawn without regard to precinct boundaries).  The Task Force asserts that the shape of CD6 "is not dictated solely by race at the expense of all other redistricting factors" and that DFW districts "are notoriously challenging to draw because of the existing African American opportunity district, CD30, and because of the demands of incumbents to protect their homes and district office locations."  Docket no. 460 at 15.  The Task Force argues that, for this reason, the State's plan "has very poor compactness scores in the Dallas-Fort Worth area" and "in light of the State's tolerance for less compact districts in this region, and the lack of any evidence that Plaintiffs' CD6 follows boundaries other than communities of interest," the State cannot successfully challenge CD6 as noncompact.  *Id.*  However, it is Plaintiffs' burden to demonstrate compactness, especially in light of the district's visual non-compactness.[62]  *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009) ("plaintiffs bear the burden of proof in a VRA case, and any lack of record evidence on VRA violations is attributed to them").  Plaintiffs fail to demonstrate

---

[62] *See Chen v. City of Houston*, 206 F.3d 502, 512 (5th Cir. 2000) ("[T]he district challenged in *Shaw* could be safely assumed not to have been driven by communities of interest, since it 'winds in snakelike fashion through tobacco country, financial centers, and manufacturing areas' in an attempt to gather up 'enclaves of black neighborhoods' and 'even towns are divided.'") (quoting *Shaw v. Reno*, 509 U.S. 630, 635-36 (1993)).

specifically how the cited factors play a role in the demonstration district's strange shape or that the district in general respects communities of interest and traditional boundaries.[63]  The fact that the districts in Plan C185 may be noncompact due to various gerrymandering and incumbency factors does not demonstrate that CD6 is compact.

To be sure, the first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the population be sufficiently compact to constitute a majority in a single-member district.  *Houston v. Lafayette Cty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) (quoting *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994)).  But despite this directive and although Supreme Court precedent indicates that courts are to focus on the compactness of the minority community and not necessarily district borders when determining § 2 compactness, Justice O'Connor's plurality opinion in *Bush v. Vera* makes clear that "[d]istrict shape is not irrelevant." 517 U.S. 952, 980 (1996).  Although her inquiry was whether the district at issue satisfied strict scrutiny, Justice O'Connor's plurality relied primarily on bizarre shape and noncompactness of district lines to conclude that the district was not compact and therefore not required by § 2.[64]

---

[63] David Hanna testified that he was unable to draw a majority-HCVAP district that was more compact than a proposed district with "a lot of arms and tentacles" that may have been CD6, indicating that it is the dispersion of the HCVAP population and not other factors that cause its strange shape.  TrA1576-77.

[64] The Court is mindful that the compactness inquiry under § 2 and the purpose inquiry under a *Shaw*-type equal protection claim are distinct.  *Clark v. Calhoun Cty., Miss.*, 88 F.3d 1393, 1406-07 (5th Cir. 1996).  As the Fifth Circuit noted, Plaintiffs typically attempt to show that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district by drawing hypothetical majority-minority districts; this is necessary to show that it is "the current districting scheme and not, for example, geographic dispersal that is the source of their disproportionately weak political strength." *Id.* at 1406.  Thus, the *Shaw*-type claim's emphasis on purpose (specifically, whether race predominated and subordinated traditional redistricting principles) does not apply to the first *Gingles* precondition because "the first *Gingles* factor is an inquiry into causation that necessarily classifies voters by their race." *Id.* at 1406-07 (also noting that the Court has not suggested that a district drawn for predominantly racial reasons would necessarily fail the *Gingles* test).  Accordingly, the Court does not accept Defendants' argument that CD6 must be rejected simply because it "would have likely raised a *Shaw* challenge" (proposed fact finding 647, docket no. 1276 at 70).  In addition, the Court rejects the Task Force's argument that Defendants must show that the proposed district would violate *Shaw*.  *See* docket no. 460 at 15 ("Although the State contests the compactness of Plaintiffs' demonstration CD 6 in Plan C190, it fails to explain how the shape of CD 6 would be an unconstitutional racial gerrymander.").

66

Justice O'Connor agreed with the district court's finding that the district had "no integrity in terms of traditional, neutral redistricting criteria." *Id.* at 960. She described the Dallas district at issue as having 50% of its population in a compact, albeit irregularly shaped, core in south Dallas, but "the remainder of the district consists of narrow and bizarrely shaped tentacles." *Id.* at 965 She wrote, "Over 98% of the district's population is within Dallas County, . . . but it crosses two county lines at its western and northern extremities. Its western excursion into Tarrant County grabs a small community that is 61.9% African-American; its northern excursion into Collin County occupies a hook-like shape mapping exactly on the only area in the southern half of that county with a combined African-American and Hispanic percentage population in excess of 50%." *Id.* The district court wrote,

> The district sprawls throughout Dallas County, deliberately excludes the wealthy white neighborhoods of Highland Park and University Park and extends fingers into Collin County, which include the outermost suburbs of Dallas. In Collin County, the district picks up a small African-American neighborhood. The district extends into Tarrant County only to pick up a small border area with a high African-American concentration. It also reaches out to claim Hamilton Park, an affluent African-American neighborhood surrounded by whites. Part of the district runs along Trinity River bottom, using it to connect dispersed minority population. Numerous [voter tabulation districts] were split in order to achieve the population mix required for the district. . . . It is at least 25 miles wide and 30 miles long.

*Id.* at 965-66 Although she used these facts to determine that race predominated over traditional districting principles in drawing CD30, Justice O'Connor also relied on them to determine that the district was noncompact. It is difficult to distinguish the Task Force's proposed CD6 from CD30 in the *Bush* case, which Justice O'Connor's plurality concluded was not compact and not required

---

Nevertheless, *Clark* re-iterates that *Gingles* "insists upon a compact district" to establish § 2 liability. *Clark*, 88 F.3d at 1407. Further, *Shaw*-type cases that discuss whether a district that has been drawn by a legislature satisfies strict scrutiny in terms of complying with § 2 of the VRA—specifically, whether the state had a strong basis in evidence for believing that the *Gingles* preconditions were satisfied—are relevant.

by § 2.



Although the Task Force proffered some evidence showing that the population included in the proposed district shares a community of interest other than race, some such evidence was also introduced in *Bush* (citing evidence that the district "has a consistently urban character and has common media sources throughout, and that its tentacles include several major transportation lines

into the city of Dallas"), but that evidence was insufficient.  *Id.* at 967.[65]  While the population included in CD6 may have interests and characteristics in common other than race and one could generally say that urban Hispanics in Fort Worth and Dallas share similarities, that does not make them geographically compact, and Plaintiffs offer no explanation of why certain bizarrely shaped appendages are included, while nearby areas that could presumably form communities of interest are carefully excised.  There is no evidence that specific lines, such as where the district reaches out and grabs a strangely shaped portion of the City of Irving and extends upward to take portions of Farmers Branch and Carrollton yet excises portions of Dallas, respect specific communities of interest such as neighborhoods (they certainly do not respect cities).  Similarly, within Tarrant County and Fort Worth, there is no evidence to explain specifically what communities of interest are contained within the various appendages, other than that they are poor, relatively uneducated, and Latino.  Nor is there evidence that the areas included in CD6 from various parts of Dallas County have more of a "community of interest" with those areas of Tarrant County to which they are joined than the areas immediately surrounding them but excluded from the district.

Thus, because of a lack of such evidence, the shape of the proposed district, and the other factors discussed above, the inescapable inference remains that the Hispanic citizen voting age population is not sufficiently compact and it is necessary to draw bizarre and convoluted lines to obtain enough population to reach the majority threshold.  *See Fairley*, 584 F.3d at 669 ("Without sufficiently detailed evidence, a court is flatly unable to evaluate whether a possible redistricting

---

[65] In addition, although CD12 in *Shaw v. Hunt ("Shaw II")*, 517 U.S. 899 (1996) was drawn to share communities of interest (the state wanted to place predominantly rural voters in one district and predominantly urban voters in another and ensure that incumbents would remain residents of their districts), the Court declared that "[n]o one looking at District 12 could reasonably suggest that the district contains a 'geographically compact' population of any race." *Id.* at 916.

scheme would establish legally adequate districts consistent with traditional districting principles such as compactness, contiguity, maintaining communities of interest, and respect for incumbency."); *see also Vera*, 861 F. Supp. at 1341 (rejecting argument that districts were sufficiently compact for *Shaw* purposes because they "include residents of similar socioeconomic background and lie fully within [one] county" because the districts were formed "in utter disregard for traditional redistricting criteria" and were "ultimately unexplainable on grounds other than the racial quotas established for those districts").

Further, CD6 is similar to the district rejected as noncompact in *Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004). There, the district court rejected the plaintiffs' proposed 50.1% and 50.5% African-American voting age population districts because they failed to satisfy the geographical compactness requirement. Plaintiffs appealed, complaining that the court focused too much on district shape and "should have inquired more generally into whether the reconfigured district had 'take[n] into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 596.

The Fifth Circuit noted, "As the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question, it is clear that shape is a significant factor that courts can and must consider in a *Gingles* compactness inquiry." *Id.* In other words, the compactness inquiry "should not *hinge* on the shape of a district," but "the shape of a district certainly cannot be disregarded in a compactness inquiry." *Id.* (emphasis in original). The *Sensley* district was "an irregularly-drawn District 6 whose extended and distorted shape—resulting specifically from excluding non-blacks while simultaneously adding 'excess' blacks from other communities—constitutes strong evidence that the black minority

populations contained therein are not 'reasonably compact.'" *Id.* at 597.  Further, in order to connect

African-American populations in two towns from two distinct communities ("which are separated

by considerable distance (approximately 18 miles) and share few community interests"), the

plaintiffs were required to ignore traditional districting principles such as maintaining communities

of interest and traditional boundaries insofar as they split a town in half and disrupted existing

electoral districts.  For these reasons, the Fifth Circuit found that the district court's conclusion that

plaintiffs failed to prove that the African-American population of Union Parish was sufficiently

compact was not clearly erroneous.  *Id.* at 598.[66]

Precedent thus indicates that if a proposed district is simply too bizarrely shaped *because* the

minority population is dispersed in such a way that traditional districting criteria are barely

considered, if at all, in drawing the district, it will be found to be non-compact for § 2 purposes.

Like the districts in *Bush v. Vera* and *Sensley*, Plaintiffs' proposed CD6 has many tentacles and

appendages.  It shows no regard for traditional districting principles such as respecting counties,

towns, cities, or voting precincts.  It spans 60 miles and connects Hispanic populations in Dallas and

Fort Worth by a long narrow corridor along the highway.  Although there is evidence that the persons

included do share some commonalities, it appears that the Latino citizen age voters are simply too

dispersed to form the majority in a compact district, and Plaintiffs have failed to satisfy the first

*Gingles* precondition for the creation of a new Latino opportunity district in the DFW area through

---

[66] *See also Gonzalez v. Harris Cty., Tex.*, 601 F. App'x 255, 258 (5th Cir. Feb. 9, 2015) (noting that *Gingles* compactness requires accounting for traditional districting principles such as maintaining communities of interest and traditional boundaries, and affirming district court's rejection of geographically compact hypothetical HCVAP-majority district because it did not respect traditional districting principles).

proposed CD6.[67]

### 2. Use of 2008-2012 ACS data for certain proposed districts

Certain Plaintiffs contend that, given the lagging nature of the ACS data and the fact that it underestimated the Hispanic and African-American CVAP in Dallas and Tarrant Counties,[68] some proposed districts in DFW that were below 50% HCVAP using 2005-2009 ACS data actually exceeded the 50% threshold at the time of redistricting. Although the Court finds that the 2008-2012 ACS data, which the experts generally agree more accurately reflects the population in 2010 than the 2005-2009 ACS data used by the Legislature, is relevant to Plaintiffs' results claims against Plan C185,[69] Plaintiffs have failed to demonstrate with that data that any of those proposed districts would have exceeded 50% HCVAP in 2010 or 2011.

For example, CD34 in Veasey's Fair Texas Plan C121 was 45.6% HCVAP using 2005-2009 ACS data, but increased to only 47.4% using 2008-2012 ACS data. Joint Map Ex. J-2; D-545.6. CD35 in MALDEF's Plan C122 was 45% HCVAP using 2005-2009 ACS data, but increased to only 45.9% using 2008-2012 ACS data. Joint Map Ex. J-3; D-546.6. CD35 in Plan C166 was 45.6%

---

[67] The Court notes that this ruling does not preclude Plaintiffs from introducing additional hypothetical districts in the 2013 plan trial phase.

[68] As discussed in the fact findings, the Court agrees that the 2005-2009 ACS data was lagging insofar as it more accurately represented the population in 2007 than 2010 and that it underestimated the minority CVAP.

[69] Even counsel for Defendants acknowledged that, for § 2 results claims, "there's an argument that [the 2008-2012 ACS data] is a much more accurate picture of what the facts on the ground were in 2010." TrA2123. The court in *Rodriguez v. Harris County, Tex.*, 964 F. Supp. 2d 686, 732-33 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris County, Tex.*, 601 F. App'x 255 (5th Cir. Feb. 9, 2015), allowed the plaintiffs to support their § 2 claims with 2006-2010 ACS figures even though the 2005-2009 ACS data was the only publicly available data at the time the plan at issue was adopted in August 2011. The Court agrees with that court's conclusion that more recent ACS 5-year surveys can be considered in evaluating the HCVAP of proposed *Gingles* districts in § 2 results claims. In fact, the Court finds that the 2008-2012 ACS data would best reflect the CVAP data corresponding to 2010, and would be the preferable data for evaluating § 2 results claims concerning the 2011 redistricting maps. Even though this data was not available to the Legislature at the time of redistricting, a § 2 results claim determines only whether the district lines result in minority vote dilution, and is not dependent on what the Legislature knew or intended at the time of redistricting.

HCVAP using 2005-2009 ACS data, but increased to only 47.4% using 2008-2012 ACS data.[70] Joint Map Ex. J-7; D-565.5.  CD35 in Plan C193 was 44.6% using 2005-2009 ACS data, and increased to only 45.8% using 2008-2012 ACS data.[71]  Joint Map Ex. J-14; D-571.6.  Although the Court finds that the 2005-2009 ACS data did underestimate the HCVAP population in 2010/2011, it does not appear to have done so as drastically as Plaintiffs anticipated.  Thus, even using the 2008-2012 ACS data to analyze the districts, Plaintiffs do not reach the 50% HCVAP threshold.

### 3. NAACP Plan C193 and use of post-enactment population projections

The NAACP asserts that this Court should rely on post-enactment population data to determine whether the *Gingles* numerosity condition is satisfied.  As noted, the NAACP submitted Plan C193, which included CD35 that was not HCVAP-majority based on 2005-2009 ACS data (it was 44.6%) or 2008-2012 ACS data (it was 45.8 (+/- .9)%), but that Dr. Fairfax testified became HCVAP-majority sometime between 2012 and 2013.  TrA805-06 (Fairfax) (testifying that the projected HCVAP was 50.48% in 2013 and 51.92% in 2014).

NAACP Plaintiffs rely on two Fifth Circuit cases to support their use of post-enactment population data.  In *Westwego Citizens for Better Government v. City of Westwego*, 906 F.2d 1042 (5th Cir. 1990), the plaintiffs filed suit in 1985, challenging the at-large election of city aldermen and

---

[70] In their 2011 post-trial briefing, the Rodriguez Plaintiffs urged the Court to credit Dr. Ansolabahere's testimony and rebuttal report, which sought to compensate for the 2005-2009 ACS data lag.  Docket no. 424 at 9-10.  Dr. Ansolabahere testified that he believed CD35 in Plan C166 exceeded 50% HCVAP at the time of redistricting.  The 2008-2012 ACS data have not borne that out, however, and Plaintiffs have not offered a convincing argument for relying on Dr. Ansolabahere's testimony over the 2008-2012 ACS data.

[71] LULAC submitted Plan C195 with CD33 that expert witness George Korbel "designed" to be majority-HCVAP.  Joint Map Ex. J-16.  As he notes, it is a very "stressed" district and reaches only 47.5% HCVAP using 2005-2009 ACS data.  Tr691.  Korbel opined that the district likely exceeded 50% HCVAP using more current data, but LULAC did not provide the 2008-2012 ACS data to show whether this was true.  Given that the HCVAP in other plans did not increase by more than 2%, the Court finds that CD33 in Plan C195 was likely not majority-HCVAP at the time of redistricting.

proposed two plans, both of which would create one district in which black residents would be a majority. Trial was initially postponed pending the Supreme Court's decision in *Gingles*, and then after a bench trial the court dismissed the case based on oral rulings. The Fifth Circuit remanded after the first appeal, directing the district court to make specific findings of fact and conclusions of law. *Westwego Citizens for Better Government v. City of Westwego*, 872 F.2d 1201 (5th Cir. 1989) ("*Westwego I*"). In a footnote, the Court noted that the record was "unclear" whether there would in fact be a black majority of voting age population in a single district under the plaintiffs' proposed plan, and the district court was directed to make this determination on remand. *Id.* at 1205 n.4.

On remand, the district court issued supplemental findings, including that "there was no evidence in the record to support the conclusion that blacks would constitute a majority of the voting age population in any proposed single-member district." *Westwego II*, 906 F.2d at 1043. The district court also rejected a finding of racially polarized voting and entered judgment. The plaintiffs then filed a motion asking the district court to amend its findings to take into account developments in the two years since the case was originally tried, specifically a March 1989 election that, for the first time, involved a black candidate. *Id.* The plaintiffs also included "black voter registration data and data from the 1989 election." *Id.*

On the second appeal, the Fifth Circuit held that "given the long term nature and extreme costs necessarily associated with voting rights cases, it is appropriate to take into account elections occurring subsequent to trial" to determine the presence of racially polarized voting. *Id.* at 1045 (footnote omitted). This was especially true in that case, given that no elections prior to trial involved an African-American candidate, such that the post-trial election was "highly relevant." *Id.*

Regarding the population, the Fifth Circuit faulted the district court for failing to take new

74

evidence that the BVAP was sufficient in size, instead determining based on the old record that there was no evidence "that blacks would constitute a majority of the voting age population." *Id.* at 1046. The Court noted that the proffer "would have allegedly proved that blacks constituted a majority of the voting age population in certain hypothetical districts," and included evidence as to the number of registered black voters in the hypothetical districts, evidence that the black candidate in the March 1989 election received 52% of the vote in those districts, and an affidavit that an agency could provide BVAP data for the districts. Id. The Fifth Circuit noted that minority voting age population data, minority voter registration data, and evidence of success by minority-preferred candidates is relevant to the first *Gingles* factor, specifically to establish potential to elect. *Id.* The Court stated, "[b]ecause of frequent difficulties of proof and in light of the fact that vote dilution cases often become 'prohibitively expensive,' the [Supreme] Court espoused a 'flexible, fact intensive test.'" *Id.* The Court cited *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 502 (5th Cir. 1987) for the proposition that *"Gingles* 'suggests flexibility in the face of sparse data.'" The Fifth Circuit remanded a second time, stating that plaintiffs would "have the opportunity to adduce the evidence referred to in their motion." *Westwego*, 906 F.2d at 1047.

On remand, plaintiffs proposed one of their original plans but used 1990 census data to show it would be majority BVAP, and also proposed a variation on that plan "drawn to account for population changes between 1980 and 1990." *Westwego Citizens for Better Gov't v. City of Westwego ("Westwego III")*, 946 F.2d 1109, 1113 (5th Cir. 1991). The district court found that the original plan was "acceptable." *Id.* On the third appeal, the plaintiffs prevailed.

Plaintiffs also cite *Valdespino v. Alamo Heights ISD*, 168 F.3d 848 (5th Cir. 1999), in which the issue was whether the defendant could present 1997 non-census data to override the plaintiffs'

75

1990 census data, such that the plaintiffs' hypothetical HCVAP-majority district was no longer HCVAP-majority at trial.  The Court noted that *Westwego* "opened the door to the use of non-census data when census data are not sufficiently probative of the voting-age proportion of a population" and that its decision in *Perez v. Pasadena Independent School District*, 165 F.3d 368 (5th Cir. 1999) affirmed a district court's decision that the plaintiffs' population projections were too unreliable to overcome 1990 census data.  *Id.* at 854.  The Fifth Circuit held that the district court properly placed the burden on the Plaintiffs to prove a majority of Hispanics among voting-age citizens in their demonstration district at trial, and the defendant presented sufficient evidence to prove demographic changes since the census that showed there was no majority.  *Id.* at 856.  Citing other cases, the district court had noted that the court was not confined to census data, and that census data could be overcome by thoroughly documented and accurate proof of changed figures.

These cases support NAACP's position that, when appropriate, parties may use non-census data, if shown reliable, to prove that the CVAP is sufficiently changed from prior census data or data used at redistricting to either prove or disprove § 2 liability.  By analogy, plaintiffs could potentially use data such as projections, if shown reliable, to prove that the CVAP is sufficiently changed from the ACS data used at redistricting to prove § 2 liability.  However, the Court finds it inappropriate to consider Fairfax's projections in the 2011 plan case given the facts of this case.

In *Westwego*, the post-enactment evidence was considered to clarify an ambiguity, whereas here there is no such ambiguity—the ACS data show that the district was not majority HCVAP in 2010, and Fairfax agrees it was not HCVAP-majority at the time of redistricting.  In *Valdespino*, the lawsuit was not filed until 1995 and trial was held in 1997, many years after the 1990 census data that plaintiffs were relying on for their case, such that it was appropriate for the court to consider

76

whether liability was established using more current demographic data.[72] Here, in contrast, Plan C185 was enacted in 2011, but a new plan was enacted in 2013. There is no ambiguity or significant lapse of time that would warrant consideration of 2012 or later projections to evaluate the 2011 plan. Reliable demographic data concerning the population in 2012/2013 may be relevant to Plaintiffs' § 2 claims against the plan enacted in 2013, Plan C235, but not Plaintiffs' claims against the 2011 plan. Accordingly, the Court finds that the NAACP Plaintiffs failed to establish that their proposed district satisfied the numerosity requirement in 2011, though they are not precluded from raising this same argument and plan in the 2013 plan trial phase with regard to Plan C235.

B. Whether Plaintiffs can satisfy *Gingles* for a coalition district in DFW?

A number of maps were submitted to the Legislature during redistricting that would have created coalition districts in the DFW area, but the mapdrawers refused to draw such districts because they did not feel they were required by the VRA. In fact, mapdrawers were hostile to the creation or existence of minority coalition districts because they viewed them as Democrat districts. *See, e.g.*, TrA277; TrA287 (Seliger) (minority districts were "without question" thought of as Democrat districts and Republican leaders thought maps with proposed districts "were just designed simply for Democratic seats"); TrA1600 (Downton) (stating that the map had to be 3-1 and that the Legislature would not vote for a district unless it was a Republican district).[73] As discussed in the

---

[72] The situation in *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335 (11th Cir. 2000), another case cited by the NAACP Plaintiffs, was similar. The court found it proper to consider non-census data to determine whether the 1990 census data accurately described the county population at trial in 1998.

[73] At the June 2 HRC hearing when Solomons laid out Plan C125, he characterized CD6 as a "coalition district" (D-601 at 10), but there is no indication that any of the mapdrawers actually believed this to be true. Rather, as with Solomons' statements about CD23, this statement was made to create an appearance that mapdrawers were drawing new minority districts or were recognizing minority growth, when in fact they were not, and they knew they were not. The Red-100 Report shows that CD6 was 11.4% BVAP and 39% HVAP, and 50.1% B+HVAP. Thus, it had a bare majority of minority VAP, but it also had an Anglo CVAP of 59.5%. D-548. Therefore, it was not a majority-minority CVAP district. It was inconsistent for Solomons to assert that CD6 was a coalition district based on VAP when he and the

Conclusions of Law, however, this Court finds that coalition districts may be required by § 2, so long as Plaintiffs satisfy *Gingles* with regard to the coalition.  The Court thus turns to that inquiry.

As noted, to satisfy the first *Gingles* precondition, plaintiffs generally must proffer a demonstration district with a geographically compact minority population that exceeds 50% of the CVAP of the district. Plaintiffs have proffered a number of plans with coalition districts that exceed 50% minority CVAP when Hispanic and African-American CVAP are combined.   Some demonstration plans include one additional minority coalition district compared to Plan C185, but most include two additional minority coalition districts (in addition to benchmark CD30).   In addition to arguing that coalition districts are never required, Defendants attack these plans as creating non-compact districts and for lacking the required minority cohesion.

The Court finds that Plaintiffs' § 2 results claims concerning the failure to draw one additional coalition district are moot, given that Plan C235 contains such a district and no additional bail-in relief could be granted even if Plaintiffs were to prevail on this claim.  With regard to the results claims based on the failure to draw two additional districts, the Court finds that Plaintiffs fail to offer sufficient evidence to satisfy the first *Gingles* requirement of compactness.

### *1. Plan C121*

Veasey's Fair Texas Plan C121[74] includes two coalition districts spanning Dallas and Tarrant

---

mapdrawers had insisted on using CVAP to determine whether a district was a required VRA district.  In addition, mapdrawers knew this district would not perform for minorities, and given their adherence to a 3-1 map policy, admittedly would not have drawn it to perform for minorities because they felt that would have made it a Democrat district.

[74] Plan C121 was offered during the 2011 legislative session and, according to then-Representative Marc Veasey, was drawn to more accurately reflect partisan balance in the state between Republicans and Democrats, in line with the partisan fairness arguments that Republicans used to justify the mid-decade redistricting in 2003.  Veasey depo. (Joint Ex. J-55) at 70-72.

Counties, in addition to maintaining CD30 entirely within Dallas County (with a 2005-2009 ACS combined BCVAP of 45.6% and B+HCVAP over 50%). Joint Map Ex. J-2. The Quesada Plaintiffs offer this plan, asserting that CD34 would be a new Hispanic district (with 45.6% HCVAP and 16.5% Black alone CVAP using 2005-2009 ACS data) and CD35 would be a new African-American opportunity district (with 35.6% Black alone CVAP and 15.2% HCVAP using 2005-2009 ACS data).[75]

The Quesada Plaintiffs state that CD34 "would be based in the traditional and growing Hispanic neighborhoods in the North Oak Cliff, East Dallas, Pleasant Grove and Grand Prairie neighborhoods in Dallas County and extend west to include growing Hispanic neighborhoods in east Arlington as well as Fort Worth's north side and south side Hispanic neighborhoods." Docket no. 409 at 15. Veasey testified that CD34 "keeps communities of interest together" and was more "coherent" compared to CD26 in Plan C185. Veasey depo. (Ex. J-55) at 67.

The Quesada Plaintiffs state that CD35 "would be based in the large and growing African-American neighborhoods in southeast, southwest, and east Fort Worth" and "would extend east through growing minority neighborhoods in Arlington and into Dallas County to include African-American neighborhoods in the southwest Dallas County cities of Cedar Hill and DeSoto." Docket no. 409 at 15-16. Meanwhile, they say, existing African-American opportunity district CD30 would "retain its core South Oak Cliff and South Dallas neighborhoods but would extend north to include the growing African-American neighborhoods along the east and north Interstate Highway 635

---

[75] Using 2008-2012 ACS data, these districts remained majority B+HCVAP and although both Black alone and HCVAP increased in both districts, neither district exceeded 50% for a single minority group. D-545.6. The Quesada Plaintiffs also offer Plan C192, which would "retain District 30 as a Dallas-based African-American opportunity district" and create CD34 (a new Hispanic opportunity district) and CD35 (a new African-American opportunity district). Docket no. 409 at 17. These districts are identical to those in Plan C121 and thus are not separately analyzed. The Quesada Plaintiffs also offer Plan C202, which is discussed below.

corridors." Docket no. 409 at 15.

Veasey testified that Plan C121 was drawn to comply with the VRA in terms of using race and so that African-American and Latino voters would have additional opportunities to elect. Veasey depo. (Joint Ex. J-55) at 80-81. When asked if race was considered in drawing the DFW districts, Veasey stated that he followed the Constitution and the VRA with regard to race and further stated, "I would say that the communities of interest, and those communities of interest happen to be communities that were mainly Hispanic, were taken into consideration when drawing this map." *Id.* at 80-81, 83. When asked what the other considerations were, he stated "that would be the biggest one" but also whether they would be able to work together and whether people in the district would have their voices heard. *Id.* at 83-84.

Ed Martin, one of the primary mapdrawers of Plan C121, testified that Congresswoman Johnson approved her district (CD30) in Plan C121 and thought it would be effective, that CD34 would be an effective Latino district, and that CD35 would be an effective African-American district similar to CD9 in Houston. Martin depo. (Joint Ex. J-48) at 120-21. He testified that CD34 was "drawn to provide electoral opportunity for 1.4 million Latino voters in the region." *Id.* at 122.

Dr. Lichtman analyzed Plan C121, and he testified that CD34 and CD35 in DFW would provide effective opportunity for the minorities in those districts (the minority-preferred candidate prevailed in all five reconstituted statewide elections studied, and usually by a wide margin). Tr1240-41; Joint Expert Ex. E-3 at 20-22, Table 12. He concluded that CD34 would be an effective voting age single race Latino district (66.2% HVAP) and CD35 an effective voting age majority-minority district (59.5% B+HVAP). Joint Expert Ex. E-3 at 20, Table 11. Dr. Lichtman testified that he believed these districts were required by the VRA. Tr1259.

From a visual perspective, all three districts look somewhat bizarre, especially CD34. Although the Quesada Plaintiffs assert that proposed CD34 and CD35 are "reasonably compact," they fail to support this assertion. Docket no. 409 at 17. Defendants' compactness expert Todd Giberson noted that CD34 was similar to CD6 in Plan C190 and that it was not very compact. Joint Expert Ex. E-18 at 5-6. CD34 has an area rubber band score of .331 and a perimeter-to-area score of .043, both of which reflect low compactness. Joint Map Ex. J-2. Giberson did acknowledge that Texans view Dallas and Fort Worth as a unit—the "metroplex." Giberson depo. (Joint Ex. J-42) at 69. Although he testified that a district could connect two separate and distinct minority populations and still be compact (such as a referenced "earmuff" district in Illinois), he thought that CD34 (like CD6 in Plan C190) went to greater lengths to connect small pockets in both Dallas and Fort Worth and that the boundary was more convoluted than other districts he believed to be compact. *Id.* at 68-70.

Plaintiffs have not sufficiently proven that the proposed districts are compact for § 2 purposes insofar as they have not shown that the districts (and the minority populations therein) are compact taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries. *See Rodriguez v. Harris Cty., Tex.*, 964 F. Supp. 2d 686, 738 (S.D. Tex. 2013) (noting that plaintiffs' demonstration maps satisfied the numerosity requirement but failed to present evidence explaining or permitting the court to understand to what extent the maps comported with traditional districting principles such that plaintiffs failed to establish the first *Gingles* precondition), *aff'd sub nom Gonzalez v. Harris Cty., Tex.*, 601 F. App'x 255 (5th Cir. Feb. 9,

81

2015).[76]  Even if CD35 could be considered compact, CD34 suffers from the same problems and lack

of evidence as the Task Force's proposed CD6 in Plan C190.  Conclusory assertions that the districts

join "communities of interest" are insufficient, especially when the district is convoluted in shape

and does not appear to respect traditional boundaries and communities of interest such as cities and

voting precincts.  Thus, Quesada Plaintiffs' proposal C121 fails to demonstrate that two additional

compact minority districts could be drawn in DFW taking into account traditional redistricting

principles and communities of interest.

### 2. Plan C163 & Plan C164

MALC offered demonstration plans C163 and C164 as creating two additional opportunity

districts in DFW.  Tr93-94 (Martinez-Fischer).  Dr. Arrington found that Plan C163 overall "satisfied

traditional redistricting principles" at least as well as the enacted plan.  TrA410-11.  However, this

plan still split 447 precincts (Plan C185 split 518).  US-352 at 54.  He found that the overall

compactness score (as measured by the mean Polsby-Popper score) was roughly similar to the

enacted plan.  TrA433; US-352 at 54.  He opined that Plan C163 did "a better job . . . in respecting

---

[76] In *Gonzalez*, the Fifth Circuit indicated that the Supreme Court's directive in *Easley v. Cromartie* that "the party attacking the . . . boundaries [drawn by the political subdivision] must show at the least that [it] could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles" would be part of the plaintiff's burden under the *Gingles* first precondition in a § 2 results case.  *Gonzalez*, 601 F. App'x at 259 (citing *Easley v. Cromartie*, 532 U.S. 234, 258 (2001)).  However, *Easley v. Cromartie* is not a § 2 case—in that case, the plaintiffs asserted a *Shaw*-type racial gerrymandering claim against North Carolina's CD12, with plaintiffs arguing that the district was drawn predominantly on the basis of race and defendants arguing that the district was drawn on the basis of politics.  The Supreme Court held that, in trying to prove that the district was drawn on the basis of race rather than the basis of politics, when the voting population is one in which race and political affiliation are highly correlated, plaintiffs must show that the legislature could have achieved its legitimate political goals in alternative ways comparably consistent with traditional redistricting principles and that would have brought about significantly greater racial balance.  *See Alabama LBC v. Alabama*, 135 S. Ct. 1257, 1267 (2015) (noting that *Easley v. Cromartie* explains the plaintiff's burden in racial gerrymandering cases in which the State argues that politics, not race, was its predominant motive).  This Court fails to see how this requirement would apply to the plaintiffs' burden under § 2 to demonstrate that the minority population is sufficiently geographically compact to constitute the majority in a district, taking into account traditional redistricting principles.  In a § 2 results claim, there is no question of discerning political from racial motive in the drawing of a demonstration district—as the Fifth Circuit recognized in *Clark v. Calhoun County* (and as discussed *supra* n.59), demonstration districts are necessarily drawn using racial criteria.

the integrity of Dallas and Tarrant County."  US-352 (Arrington Decl.) at 54.

CD5 in Plan C163 and Plan C164 is a convoluted butterfly shape that is almost entirely within Dallas County except for a small protrusion into Tarrant County that picks up 148 persons who are 86.5% Hispanic and African-American.  Joint Map Ex. J-5 & J-6.   It splits Grand Prairie, Irving, Farmers Branch, Carrollton, Mesquite, and Balch Springs.   Giberson noted that "the convoluted boundaries stand out, as does the wispy, narrowly connected protrusion to the east." Joint Expert Ex. E-18 at 6.  At his deposition, Giberson stated that CD5 was "borderline" to him. Giberson depo. (Joint Ex. J-42) at 77.  He felt that the "wispiness" and "the connectivity of some of the area through such a narrow point" (specifically one large mass and two smaller masses "connected via some very small point") were problems.  *Id.* at 78; *see also id.* at 79 ("I didn't like it on compactness because of the appendages that were there.").   Again, this district does not appear to respect traditional boundaries and communities of interest, and Plaintiffs have failed to offer sufficient evidence to show that the population is sufficiently geographically compact taking into account such principles.  The evidence concerning proposed CD12 in Plan 164 (which is almost identical to CD35 in Plan C163), which spans Dallas and Tarrant Counties, and CD30, which includes parts of Dallas and splits Duncanville, Balch Springs, Mesquite, and Garland, is similarly deficient.

### *3. Plan C193*

The NAACP and the African-American Congressperson Plaintiffs offer Plan C193,[77] which the NAACP contends maintains "the effectiveness and integrity" of CD30 (as an African-American

---

[77] The three DFW districts in Plan C193 are the same as in Plan C201 (also known as the "SCSJ July 5 Plan"). Plan C193 is a 7-district plan, and Plan C201 is a 14-district plan.  They also resemble the districts in Plan C121, proposed by the Quesada Plaintiffs.

district) while adding a proposed new coalition African-American opportunity district (CD34) and

a new coalition Latino opportunity district (CD35).  Tr2077-78 (Ms. Riggs); *see also* docket no. 406

at 20-29; Joint Map Ex. J-14.  CD30 has 49.6% BCVAP and 14.1% HCVAP using 2005-2009 ACS

data.  CD30 is 51.9% BCVAP using 2008-2012 ACS data.  D-571.6.  Proposed CD34 is majority-

minority CVAP, but the B+HCVAP (32.4% + 15.8%) is less than 50% using 2005-2009 ACS data.[78]

The H+BCVAP of CD34 is 52.9% using 2008-2012 ACS data.  D-571.6.  Proposed CD35 is over

50% B+HCVAP using either 2005-2009 or 2008-2012 ACS data.

Dr. Murray opined that Plan C193 "corrects the glaring failures in 2003 and 2011 to

recognize the tremendous minority population growth in the area" and would create three effective

minority opportunity districts there.  Joint Expert Ex. E-4 at 36-37; Tr1035 (noting that CD34 and

CD35 would be effective districts for minority voters).  He stated that C193 creates a "more

compact" CD30, does not undermine its long-term viability as an African-American district, and

restores economic engines and communities of interest.  Joint Expert Ex. E-4 at 37.  He fails to

explain how the NAACP's CD30 is more compact than the CD30 in Plan C185.  Murray also opined

that "[t]he heavily black and Hispanic neighborhoods in the Dallas/Fort Worth area were fairly close

together in 2000.  Since then, the combination of out-migration of Anglos and the rapid growth of

mixed neighborhoods . . . has consolidated a broad swath of territory in over half of Dallas County

and a third of Tarrant County that provides ample population for three compact minority opportunity

districts" such that it is now "easier . . . to draw three minority opportunity districts in Dallas and

Tarrant Counties in 2011 than was the case in [Houston] in 2003 when three such districts were

---

[78] In 2011, this district was proposed as an African-American, Latino, and Asian-American coalition district that would perform as an African-American opportunity district.  Docket no. 406 at 27-28.

produced."  Murray report (Joint Expert Ex. E-4) at 32-33.  However, Murray fails to offer any support for his assertions that these districts are compact, and visually, they are bizarrely shaped and non-compact.

The NAACP's expert Anthony Fairfax prepared a 2011 report (docket no. 267[79]) evaluating these districts (in the SCSJ July 5 Plan).  Fairfax concluded that "the districts included in the Congressional SCSJ July 5 plan [including districts 30, 34, and 35] met traditional redistricting criteria and could be adopted in whole or in part by the state legislature."  Docket no. 267-2 at 10; Docket no. 267-1 at 7; Tr834, Tr838-39, TrA793.  The traditional redistricting criteria he evaluated were demographic information (this appears limited to the district's VAP status), equal population, contiguity, county splits, and compactness.

Fairfax found that all districts in the plan were within the minimum and maximum compactness measurements (using Reock compactness measurements) of the enacted Plan C185. TrA794.  Using the Schwartzberg and Polsby-Popper measurements, all districts were within the range except for proposed CD35.  Fairfax depo. (Joint Ex. J-45) at 25-26; docket no. 267-1 at 4. Fairfax noted that it was not outside the compactness range of C185 by much, and he felt that CD35 was still within the acceptable range and would not raise *Shaw* problems in terms of compactness. Fairfax depo. (Joint Ex. J-45) at 38, 37; Tr795.  Fairfax stated that CD35 was more compact than the district invalidated in *Shaw v. Reno* and was "not that much different" from other districts he had seen "around the country."  *Id.* at 29.  However, Fairfax did not know why the district was drawn in its particular configuration.  *Id.* at 29-30.  And he also noted that there may be other factors that

---

[79] Fairfax's report was submitted at trial as Joint Expert Ex. E-13.  However, a corrected report and a supplemental report were filed on August 30, 2011 at docket no. 267.

determine whether a district violates *Shaw v. Reno* besides compactness scores.  *Id.* at 37-38.

Nevertheless, Fairfax provided his expert opinion at the August trial that CD34 and CD35 in Plan

C193 are "compact enough to avoid *Shaw* problems."  TrA795.

Congresswoman Johnson testified that CD34 and CD35would be effective districts in terms

of the voters therein voting cohesively and electing a candidate of choice.  Tr1291-92.  When asked

about C193 in terms of "the handling of the African American and Latino growth in the Dallas and

Tarrant County areas," Congresswoman Johnson stated, "they get representation because they're

placed together.  They have common desires, common economics.  And the important issues to them

are the same.  And a map like this, they get representation so they can elect a person of their choice."

TrA691.  She testified that a "major purpose" behind drawing the three districts (CD30, CD34, and

CD35) was "to give an opportunity for those concentrated minorities to elect a candidate of their

choice."  Tr1304.  She stated that there are communities of interest beyond race that were part of the

creation of CD34 and CD35 (though she stated it was primarily race).  Tr1311.  On follow up, she

agreed that the districts contained communities of interest that have concerns about education and

employment, criminal justice and "issues of that nature."  Tr1312.  She also testified that there were

non-racial components to the district such as public television, public radio areas, and there was a

major community coalition there with people with "very like desires."  *Id.*

Franklin Moss, a resident of Tarrant County, testified that proposed CD34 "pulls together

most of the . . . black areas on the Fort Worth Side of it" and "also takes under consideration, we call

kind of the I-20 corridor of cities that are – that are right now majority African American. And that's

Cedar Hill, Duncanville, DeSoto, Lancaster.  So it pulls those areas together."  TrA1185.  He stated

that those areas share "a lot of commonalities," but the only explanation of that statement was that

"it sits on . . . that I-20 corridor, which even runs into Fort Worth.  So it gives us an opportunity to pretty much be assured that we would elect a black candidate from that particular area."  *Id.*  He testified that African-American and Latino voters in Tarrant County share common concerns and interests, and that they shared interests concerning economic development, housing (specifically rebuilding communities), health, and employment issues.  TrA1180.  Congresswoman Johnson testified that new CD34 took a large concentration of African-American population from CD30 but because of the growth in certain areas of proposed CD30, CD30 would be maintained as an African-American coalition district.  Tr1293-94.  She acknowledged the CD34 was minority Anglo in terms of voting age population, and stated that was significant because the African Americans and Latinos have mutual issues and live in a concentrated area together.  Tr1294.  She also felt the Asian voters would act in coalition with African-American and Latino voters.  *Id.*  The NAACP asserts that CD34 "is [a] naturally-occurring minority opportunity district that captures high growth communities of interest in the DFW region" and that "CD34 encompasses a community of interest—the growing African American population along the I-20 corridor."  Docket no. 1280 at 39; docket no. 1281 at 35 (proposed FF 190); docket no. 1232 at 13; TrA1980 (Riggs closing argument) ("We heard testimony from Franklin Moss about the community of interest that exists along the I-20 corridor in the southern parts of Tarrant County and Dallas County, and this is where that district [CD34] is drawn to encompass that naturally occurring population growth.").  The NAACP also asserts that "CD34 is a compact district, well within the norms of the compactness of the enacted districts."  Docket no. 1281 at 34 (proposed FF 189).  It has an area rubber band score of .600 and a perimeter to area score of .089.  Joint Map Ex. J-14.

The NAACP states that "CD35 is a reasonably compact district that encompasses a compact

minority population.  It is only in two counties, and all within one urban region."  Docket no. 1232 at 14; docket no. 1280 at 42; docket no. 1281 at 35 (proposed FF 192).  Congresswoman Johnson testified that it would be appropriate to consider African-Americans and Latinos as a group for the creation of CD35 and it would be a good coalition "because we all vote together now."  Tr1293. Defendants' expert Giberson stated that CD35 has one of the worst compactness scores of all DFW districts in the Plaintiffs' proposed interim plans. Giberson Decl. docket no. 468 at ¶ 11.  Its area rubber band score is .331 and its perimeter to area score is .037, again very low.  Joint Map Ex. J-14.

The NAACP asserts that African-American and Latino voters in Dallas and Tarrant Counties face many of the same hurdles in day-to-day life, including lack of access to health care, lack of fair educational opportunities, and persistent economic disparities.  Docket no. 1280 at 41 (citing TrJ1134-35 (Magdaleno)).  The NAACP also asserts that schools in Dallas County are still highly segregated and that Anglo officials are not responsive to minority needs.  *Id.* (citing TrJ572 (Wallace) and TrA1184-86 (Moss)).  Dr. Murray also opined that CD34 would be an effective district for African-American voters and CD35 would be an effective opportunity district for Latino voters.  Tr1035-36.

Based on the districts' CVAP and the testimony of its experts, the NAACP asserts that it has demonstrated that proposed CD34 and CD35 comply with the first prong of *Gingles* and are legal and fair districts.  Docket no. 406 at 21-29.  However, the Court disagrees.  Once again, Plaintiffs demonstrate that these districts meet the CVAP threshold and could elect minority candidates of choice, and even offer some evidence that the communities included within the districts contain some similarities, but they have failed to proffer sufficient evidence to establish that the minority populations contained therein are compact.  Dr. Fairfax's analysis is superficial and fails to

adequately account for the fact that the districts do not appear to respect traditional boundaries. Although he looked at counties and noted the districts each only include one or two counties, he did not address cities, voting precincts, neighborhoods, or other geographical boundaries.

CD34 and CD35 both span Dallas and Tarrant Counties.  CD35 extends a long tentacle into CD30, and CD30 reaches around with a long arm and hook at the top to grab minority population. CD35, which is the most visually bizarre, splits numerous small cities and appears to have little integrity in terms of traditional redistricting principles.  The NAACP's proof suffers from the same deficiencies as CD6 in the Task Force Plan C190.  Accordingly, the Court finds again that Plaintiffs have failed to demonstrate that two additional compact minority districts could have been drawn in DFW.

### 4. Plan C196

The LULAC Plaintiffs offer Plan C196, which they assert remedies the fracturing of minority communities in Dallas and Tarrant Counties and maintains CD30.  Joint Map Ex. J-17.  The LULAC Plaintiffs state that the minority areas that are placed in CD12, CD26, and CD33 in Plan C185 are adjacent to each other and together have sufficient population to create a congressional district, which is proposed CD34 in Tarrant County (which has a minority population of 73.8%).  Docket no. 417 at 11.  CD34 is 22.1% HCVAP and 29.4% Black alone CVAP.  In Dallas County, the LULAC Plaintiffs propose that combining the adjoining minority populations of CD5, CD6, CD24[80], and CD32 from Plan C185 with "a slight modification of adjoining District 30 . . . results in a new minority district that is similar to that in plan C196" and is over 80% minority population, while

---

[80] The brief states CD26, but that does not extend into Dallas County, so the Court presumes Plaintiffs meant CD24.

maintaining CD30 over 80% minority population.  *Id.* at 12.  CD30 (renamed CD32) is 49.7% Black

alone CVAP (and 50.1% combined BCVAP) and CD33 is 39.5% HCVAP and 20.1% Black alone

CVAP.

The districts in Plan C196 are not at ideal population.  Further, while these districts are

contained entirely within their respective counties, they again are not obviously compact, and no

evidence has been presented showing that they respect communities of interest or otherwise take into

account traditional redistricting principles.   Thus, this map fails to demonstrate that two additional

compact minority districts could have been drawn in DFW.

### *5. Plan C202*

The Quesada Plaintiffs also offer demonstration Plan C202, which they assert draws CD34

and CD35 "more compactly" than the proposed districts in Plan C121/C192, "while maintaining

them as minority opportunity districts, effective for Hispanic and African-American voters,

respectively." Docket no. 409 at 17; Quesada-70.  Quesada Plaintiffs state that CD34 "is an effective

Hispanic opportunity district in the Dallas Fort Worth region" and is more compact than districts 2,

5, 9, 12, 15, 18, 20, 22, 28, 29, 32, 33, and 35 in the enacted plan.  *Id.* at 17-18.  They further assert

that CD35 "is an effective African-American opportunity district" and is more compact than districts

2, 5, 9, 12, 15, 18, 22, 28, 29, 32, 33, and 35 in Plan C185.  *Id.*

Quesada Plaintiffs contend that these districts are "very compact."  Docket no. 409 at 17.

They are certainly an improvement visually over some of Plaintiffs' proposed districts, but they are

still not obviously compact. And again, there is a lack of evidence in the record demonstrating how

these districts comply with traditional redistricting principles or respect communities of interest.

Thus, this map fails to demonstrate that two additional compact minority districts could have been

drawn in DFW.

### 6. Plan C206 & Plan C214

Plan C206 is LULAC's DFW three-district proposal. The districts are similar to those in LULAC's Plan C196 and statewide Plan C214. In both maps, the districts are not at exactly equal population. More importantly, again there is a lack of record evidence concerning anything other than population statistics.

### 7. Plan C261 & Plan C262

LULAC's demonstration Plans C261 and C262 contain CD33, a coalition district located entirely within Tarrant County and CD6, a non-compact looking district in Dallas, Denton, and Tarrant Counties, in addition to CD30.[81] The compactness scores for CD33 are .600 area rubber band and .125 perimeter to area. Red-315 Report. CD33 in Plan C262 is 28.7% combined BCVAP and 20% HCVAP, resulting in a combined 48.7% B+HCVAP using 2005-2009 ACS data. Using 2008-2012 ACS data, however, it is 51.7% B+HCVAP (22.1% HCVAP, 29.6% Black-alone CVAP). MALC-173 (docket no. 1259). Korbel noted that Plan C185 splits up the minority population in Tarrant County, but if the minority population that had been in the Plan C100 CD26 southern extension and the minority population included in the Plan C185 CD26 "lightning bolt" was connected with areas in eastern Tarrant County, which is heavily minority, "you have almost a perfect district, and a district that's overwhelmingly black and Hispanic, primarily black." TrA1223. He described this is a "logical district." *Id.*

Plan C262 also contains a proposed coalition district (CD6) mostly within Dallas County

---

[81] Proposed CD33 in Plan C262 is somewhat similar to proposed CD35 in Plan C154 introduced during the session by Representatives Turner and Y. Davis and proposed CD34 in LULAC's Plan C196. Korbel testified that Plan C262 is similar to Plan C196. TrA1211 (Korbel); Joint Map Ex. J-17 (Plan C196).

(though also extending into Tarrant County and partly into Denton County) that is 57.5% B+HCVAP using 2005-2009 ACS data. Korbel further testified that if he were starting over drawing districts in DFW, he "would take 30, shift it over, pick up five here and draw the second district right next to it" but instead the State had divided Dallas County into five districts, packing CD30, and cracking minorities in CD5 and CD6. Tr1224. Korbel also testified that the DFW districts in Plan C262 "the minority-preferred candidate appears to win virtually all the time." Tr1244

Once again, despite reaching the numerical threshold, the record fails to demonstrate how these districts respect traditional redistricting principles or communities of interest, and thus Plaintiffs fail to satisfy the first *Gingles* precondition for these districts.

### *8. Summary*

Plaintiffs fail to proffer a demonstration plan accompanied by sufficient evidence to demonstrate that additional compact minority districts could be drawn taking into account traditional redistricting principles and communities of interest. Any plan not specifically discussed herein suffers from this same lack of evidence. However, Plaintiffs are not precluded from raising § 2 results claims with regard to Plan C235 during the trial on that plan.

## C. Whether Plaintiffs have established a *Shaw*-type racial gerrymandering claim?

The Task Force asserts a *Shaw*-type Equal Protection racial gerrymandering claim with regard to specific districts in DFW. *See* docket no. 891 ¶ 53 (Task Force Fourth Amended Complaint) (Plan 185 uses race as a predominant factor to allocate Latino voters into and out of districts across DFW); docket no. 1308 at 2 (brief regarding *Alabama LBC*). Specifically, the Task Force asserts a *Shaw*-type racial gerrymandering claim against CD26 in Tarrant County and CD6 in Dallas County. Docket no. 1282 at 67 ("The State also assigned Latino voters in the Dallas Ft.

Worth area into and out of CDs 6 and 26 on the basis of their race."); Docket no. 1274 at 278 (proposed FF 43) ("C185 also assigns Latino voters to districts on the basis of race in CD23, CD26 and CD6 in violation of the rule against race-based redistricting in *Shaw v. Reno*, 509 U.S. 630 (1993)."); TrA1963-64 (closing argument).  Defendants contend that the Task Force has failed to demonstrate standing as to CD26, though they previously conceded standing as to CD6 because individual Plaintiff Renato de los Santos resided in CD6.  Certain other Plaintiffs also contend that they are bringing *Shaw*-type claims in DFW, but Defendants argue that those Plaintiffs have not alleged such claims.

### *1. Standing*

It is well settled that a plaintiff must reside in the specific district subject to a *Shaw*-type racial gerrymandering claim in order to have standing.  *Baker v. Carr*, 369 U.S. 186 (1962); *United States v. Hays*, 515 U.S. 737 (1995); *Shaw v. Hunt*, 517 U.S. 899 (1996); *Bush v. Vera*, 517 U.S. 952 (1996).  Early in this litigation, Defendants moved for dismissal of the Task Force's claims based on lack of standing, arguing that the Task Force individual Plaintiffs had failed to show they lived in congressional districts other than 6, 12, 23, and 27 and that its "organizational members cannot suffer vote dilution or racial discrimination."  Docket no. 209 at 14.  The Task Force responded that it included "Latino organizations committed to securing fair redistricting plans for Texas," including Hispanics Organized for Political Education (HOPE), the Mexican American Bar Association of Texas (MABA), the National Organization for Mexican American Rights (NOMAR), Southwest Voter Registration Education Project, the William C. Velasquez Institute, and Southwest Workers' Union.  Docket no. 234 at 3.  The Task Force argued that it had "standing to bring claims, in a representative capacity, on behalf of the individual members of its constituent organizations," that

these individual members have standing to sue in their own right, and that the members of these organizations live throughout the State. *Id.* at 5, 7 (also citing responses to interrogatories stating that Texas HOPE has more than 7,000 individual members living throughout Texas).

This Court denied Defendants' motion. It stated the general test for associational standing, including that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Docket no. 285 at 18-19. We held that "[t]he State asks for more factual specificity than is required at this stage of the litigation," though we recognized that more specificity might be required at the summary-judgment stage. *Id.* at 19; *see Ass'n of Comm. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) ("When the defendant moves for summary judgment because of lack of standing, . . . the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue.").[82]  Although the State has filed motions since that time, including a motion to dismiss based on mootness (docket no. 995) and a motion for summary judgment (docket

---

[82] This Court's order did not expressly address Defendants' argument that the Task Force's member organizations did not suffer any harm sufficient to confer standing and that the Task Force could not base its standing on the standing of individual members of those member organizations. The Court holds that the Task Force has associational standing based on the standing of the individual members of its constituent organizations such as HOPE and NOMAR. *See Action Alliance for Senior Citizens of Greater Philadelphia v. Shapp*, 400 F. Supp. 1208, 1214 (E.D. Pa. 1975) (rejecting defendants' argument that Action Alliance lacked standing because its members were organizations rather than people since "defendants do not seriously dispute that there exists at the grass roots membership tier a substantial number of people" with standing); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 693 (E.D. Va.), *modified on other grounds sub nom. Campaign Clean Water, Inc. v. Train*, 489 F.2d 492 (4th Cir. 1973), *vacated on other grounds*, 420 U.S. 136 (1975) ("The fact that the groups representing the individuals injured rather than the individuals themselves are the actual members of Campaign Clean Water is unimportant, since it is the interests of the individual persons that plaintiff ultimately represents."); *see also Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 326 (D. Mass. 2013) (finding standing for umbrella organization of coalition of Ugandan organizations whose individual members had suffered harm).

no. 996), it did not raise the issue of standing in those motions.  And although this Court also has an independent obligation to confirm its jurisdiction, this Court also did not raise the issue again or require Plaintiffs to put forth more particularized proof.

After the 2014 trial in this case, the Supreme Court issued its decision in *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015).  Therein, the Court re-iterated that *Shaw*-type claims are asserted with regard to specific districts and that an association has standing to bring suit on behalf of its members when its members would have standing to sue in their own right. The Court found that the evidence in the record supported the inference that the organization at issue had members in all of the State's majority-minority districts because "it seems highly likely that a 'statewide' organization with members in 'almost every county,' the purpose of which is to help 'blacks and other minorities and poor people,' will have members in each majority-minority district." *Id*. at 1269.  The Court further found that nothing in the record would lead the Conference to reasonably believe that it needed to provide additional information such as a specific membership list, and there was no reason to believe it could not do so.  *Id.* at 1269-70.  Thus, as part of the remand, the district court was instructed to "reconsider the Conference's standing by permitting the Conference to file its list of members and permitting the State to respond, as appropriate."  *Id.* at 1270.  In light of the Supreme Court's decision, the Court directed the parties "to file briefs specifically identifying the districts for which they are asserting *Shaw*/racial gerrymandering claims and discuss how the Supreme Court's recent opinion . . . affects those claims," including whether additional factual development was required.  Docket no. 1301.

In response, the LULAC, NAACP, and Rodriguez Plaintiffs disavowed bringing any *Shaw*-

type claims in DFW.[83]  Docket no. 1302.  DOJ also disavowed any *Shaw*-type claims.  Docket no.

1304.  However, other Plaintiffs assert that they are bringing "racial gerrymandering" claims, though

the State disputes that any party other than the Task Force has specifically pleaded *Shaw*-type racial

gerrymandering claims.  Instead, the State contends, other parties have asserted only intentional

discrimination (vote dilution) racial gerrymandering claims.  Docket no. 1310; *see Miller*, 515 U.S.

at 910 (noting that a *Shaw*-type claim is "analytically distinct" from a vote dilution claim because

a vote dilution claim "alleges that the State has enacted a particular voting scheme as a purposeful

device 'to minimize or cancel out the voting potential of racial or ethnic minorities,' an action

disadvantaging voters of a particular race, while the essence of the equal protection claim recognized

in *Shaw* is that the State has used race as a basis for separating voters into districts" regardless of

motive).

Quesada Plaintiffs state that the "evidence developed in this case (at the 2011 and 2014 trials)

show[s] that the following districts are unconstitutional racial gerrymanders: Districts 6, 12, 23, 26,

---

[83] The Rodriguez Plaintiffs did plead Equal Protection Claims in their live Complaint (docket no. 896) that could be read to state a claim under both an intentional vote dilution and a *Shaw*-type theory.  In paragraph 18, they allege that Plan C185 "fails to satisfy the requirements of the equal protection component of Section 1 of the Fourteenth Amendment" in at least the following particulars: (1) "Plan C185 purposefully fragments Hispanic and African-Americans in all regions of the state, dispersing them among numerous districts without regard to traditional and neutral redistricting principles, to reduce and lessen their electoral opportunities in congressional elections significantly below the level of opportunities that would be available to Hispanics were traditional and neutral redistricting principles followed. . . . (b) "Plan C185 purposefully fragments a politically cohesive coalition of African-American and Hispanic voters in the Dallas-Fort Worth Metroplex, in disregard of traditional and neutral redistricting principles, to reduce and lessen the electoral opportunities of minority voters in the area in congressional election[s] and to give undue advantage to Anglo voters."  Rodriguez Plaintiffs Josie Martinez and Nina Joe Baker are Hispanic registered voters who reside in CD26 in Plan C185. Pretrial Stip. 38, 39; Second Am. Compl. ¶ 2.  However, their Advisory indicates that they are asserting only vote dilution claims in DFW, though their claim involving the dismantling of CD25 also contained elements of a racial gerrymander because "the predominance of race in the way it was accomplished also would invalidate it . . . as a racial gerrymander."  Docket no. 1302 at 3 & n.1. The Court has addressed this claim above in relation to CD35.

27, 30, and 33." Docket no. 1305 at 3.[84]  [T]heir live Complaint (docket no. 899) asserts that they

reside in proposed districts 6, 9, 12, 18, 20, 24, 29, 30, 33, and thus, it appears that they could have

standing to assert their *Shaw* claims with regard to districts 6, 12, 30, and 33 in DFW.

The Quesada Plaintiffs previously asserted a packing claim related to CD30, and they phrased

this claim in terms of both intentional vote dilution and a *Shaw* claim.  Docket no. 409 at 9, 29

("These actions by State officials were undertaken with an intent to pack minority voters and to

allow racial or language minority group membership to be the predominant factor in the drawing of

the Districts.").[85]  Although Quesada Plaintiffs clearly asserted *Shaw*-type claims during the 2011

phase of litigation, Defendants contend that they no longer assert such claims because the racial

gerrymandering language was omitted from their live complaint (docket no. 899), their (Joint) Post-

Trial Brief (docket no. 1277) does not cite *Shaw* or *Miller* or specifically argue a racial

gerrymandering claim, and their (Joint) Post-Trial Reply Brief (docket no. 1292) appears to

"disavow" any *Shaw*-type claims.  Docket no. 1310 at 4-5.

In their brief concerning *Alabama LBC*, Quesada Plaintiffs correctly assert that a substantial

amount of the evidence relevant to the intentional discrimination claims "also supports a finding of

---

[84] In 2011, Quesada Plaintiffs argued in their post-trial brief that "Plan C185 violates *Shaw v. Reno* and Its Progeny" and stated that "[e]xamples of congressional districts where race played the predominant role in creating the district include District 6, 9, 12, 18, 20, 25, 29, 30, and 33, among others."  Docket no. 409 at 44, 29; *see also id.* at 45 (referencing districts 6, 12, and 26 in DFW as examples).  They asserted that bizarre shape, in conjunction with certain racial and population-density data, may be "persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines."  Docket no. 409 at 45 (quoting *Miller v. Johnson*, 515 U.S. 900, 913 (1995)).  They also asserted that if one overlays the district boundaries onto a map shaded for Hispanic and African-American population concentrations, "it is clear that race drove the process in creating these districts and that racial considerations subordinated traditional redistricting principles such as compactness, protecting communities of interest, and respecting political subdivision lines."  Docket no. 409 at 46 (noting the CD26 lightning bolt picking up Hispanic communities).

[85] Quesada Plaintiffs Jane Hamilton and Kathleen Maria Shaw are African-American voters who would reside in CD30 in Plan C185.  Docket no. 302.

unconstitutional racial gerrymandering because it demonstrates that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" Docket no. 1305 at 6 (quoting *Miller*, 515 U.S. at 916). Quesada Plaintiff's live Complaint, however, does not assert an obvious *Shaw*-type claim. The Fourteenth Amendment claims are couched only in terms of intentional discrimination and vote dilution. Therefore, the Court finds that Quesada Plaintiffs' live Complaint does not sufficiently state a *Shaw*-type racial gerrymandering claim.

MALC's Advisory asserts that it maintains *Shaw*-type racially gerrymandering claims against "the districts in Tarrant and Dallas Counties (primarily CDs 12 and 26)." Docket no. 1309 at 7 (citing MALC's Third Amended Complaint (docket no. 897) ¶¶ 56-65). MALC then contends that this Court "has already decided that MALC has standing," citing this Court's prior order at docket no. 285. Docket no. 1309 at 8. MALC notes that it previously disclosed its membership list (*see* docket no. 258). This list demonstrates that it has members who reside in CD26 (Lon Burnam) and CD30 (Rafael Anchia and Roberto Alonzo), but not other DFW-area districts. MALC has provided no other information demonstrating that any of its members reside in CD12, and does not ask to supplement the record. As to a *Shaw*-type claim involving CD26 and CD30, MALC's live complaint does not clearly and distinctly allege such a claim. It alleges, "Latino and African American voters in Dallas and Tarrant Counties have been splintered and fragmented in both 2011 and 2013 to diminish their ability to effectively participate in the political process," but these allegations appear to support only their intentional vote dilution claim. Docket no. 897 at ¶ 73. The Court thus finds that MALC did not sufficiently state a *Shaw*-type racial gerrymandering claim to put Defendants on notice of such a claim.

The African-American Congresspersons state that they are asserting a racial gerrymandering claim regarding CD30 based on packing, since CD30 had its minority population increased even though it was already a safe functioning minority opportunity district.  Docket no. 1307.  However, this claim is phrased in terms of intentional vote dilution and racial discrimination.  In addition, the record is clear that Congresswoman Johnson does not in fact reside in CD30 in Plan C185, nor do the other African-American Congresspersons.  Thus, they lack standing to assert a *Shaw*-type claim as to CD30.

Thus, the only party that has clearly pleaded a *Shaw*-type racial gerrymandering claim with regard to the DFW districts in their live Complaint is the Latino Redistricting Task Force.  As noted, Defendants previously conceded that the Task Force Plaintiffs have standing to assert this claim for CD6, given that individual Plaintiff Renato De Los Santos lived in CD6 in Plan C185.  However, Defendants argue that the Task Force Plaintiffs lack standing as to the other DFW districts (specifically CD26) because they have not put forth evidence that an individual with standing resides in one of the challenged districts.

The Task Force was formed during the 2011 legislative session and includes both organizational and individual members. The Task Force states that it has associational standing because it is composed of organizations with members who reside throughout Texas.  It notes that the Supreme Court recognized that this fact makes it highly likely that it will have members in each district being challenged, and nothing in the record undermines the conclusion that the Task Force has standing through its members.  The Task Force now seeks leave to file exhibits under seal that include addresses of named plaintiffs as well as members of the various organizations that are part of the Task Force.  Docket no. 1314.  The Task Force also notes that Renato De Los Santos no

longer resides in CD6.

Defendants oppose the motion, arguing that the Task Force does not explain why it could not have introduced evidence of standing before or during trial, and that allowing the Task Force to supplement the record by filing out-of-court declarations from undisclosed witnesses would prejudice the State severely. Docket no. 1315. Defendants argue that the Task Force has had "every opportunity, and every reason, to prove standing." Docket no. 1310 at 8. Defendants contend that during discovery, the Task Force objected to an interrogatory asking it to identify each individual member of the association or its member associations with standing to assert the claims, asserting a First Amendment privilege. *Id.* at 9.

In response, the Task Force notes that Defendants did request the names of members in 2011 and deposed representatives of the Task Force and two of its constituent statewide organizations,[86] but chose not to ask them to identify individual members who were affected and, following this Court's denial of Defendants' motion to dismiss for lack of standing in September 2011, did not raise the issue again. Docket no. 1313 at 5 n.2. The Task Force asserts that the current membership of HOPE and NOMAR includes Latino individuals who reside and are registered to vote in CD6 and CD26 in Plan C185. *Id.* at 6.

The Task Force's motion for leave to file its membership list under seal (docket no. 1314) is granted, and the Court finds that the Task Force has standing to pursue its *Shaw*-type claims with regard to CD6 and CD26 based on the individual standing of members of its constituent

---

[86] The Task Force notes that HOPE, MABA, and Southest Worker's Union are statewide membership organizations, and that NOMAR has members who reside in Tarrant and Dallas Counties. Docket no. 1313 at 3. Defendants deposed Celeste Villareal, the legislative director for MABA, as a 30(b)(6) witness for the Task Force. Joint Ex. J-56.

organizations who reside there.  The Court initially found that the Task Force had satisfied the pleading standard for associational standing, and neither the Court nor Defendants again raised the issue.  Given the undisputed existence of standing with regard to CD6 and the strong likelihood that an individual member of the Task Force's member organizations would have standing to challenge CD26, the Task Force was not dilatory in seeking to admit evidence, especially given that the *Shaw* claims have not been a primary focus of the litigation, the issue had not been pressed by Defendants or the Court, and the Task Force had First Amendment and privacy concerns about releasing member information.  Defendants are not surprised by this claim and were not so concerned about the issue to have raised it again via motion for summary judgment or otherwise.  *See Mullaney v. Anderson*, 342 U.S. 415, 417 (1952) (allowing joinder of parties on appeal to address lack of standing and noting that "[t]o . . . require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration").

### 2. CD26 analysis

The evidence demonstrates (and Defendants do not deny) that Downton used race to assign Latino population into CD26 in Tarrant County (and relatedly, African-American population out of CD26 and into CD12).  CD26 is the Denton County-based district that has the so-called "lightning bolt" extension into Tarrant County, and that lightning bolt is completely surrounded by CD12.  It is undisputed that early in his mapdrawing process (around May 28, shortly before the first plan C125 was released), Downton used racial shading to make changes "to keep the Black population together" in CD12.  TrA1618-21 (Downton); PL-1659.  He stated that he made this change (putting "the areas of more concentrated black population" into CD12) in response to concerns raised by Interiano that he had divided the Fort Worth black communities, and he wanted to unite them as part

of the principle of keeping communities of interest together, but not for specific compliance with the VRA. TrA1618, TrA1621-22. He used racial shading because he did not "know Fort Worth at all" and the only way for him to identify the community of interest of "the Fort Worth black population" was racial shading. TrA1619-20 (Downton). Thus race played a predominant role in the original configuration of CD12 and CD26.

Downton also admitted to using race to assign Latino voters into CD26 and African-American voters into CD12 in Tarrant County later in the process. Downton 8-12-11 depo. (Ex. J-62) at 128 (noting that the CD26 lightning bolt contains "most, if not all, the concentrated Hispanic population of neighborhoods in Tarrant County"); TrA1625. But he claimed that this was to remedy a split of north and south Hispanic communities of interest. TrA1768 (he turned on racial shading to keep minority "communities of interest" together). At his 2011 deposition, Downton testified that the original map Plan C125 did not include the lower section of the lightning bolt, which is a largely Hispanic area, but there were "complaints" that he had split the Fort Worth Hispanic population. He stated that there was testimony at the hearing and "there [were] some public posts about it," but he could not remember where he had seen them. Downton 8-12-11 depo. (Ex. J-62) at 129. In the August 2014 trial, Downton stated for the first time that he had seen it on a blog and later identified the blog as gregsopinion.com. TrA1628, TrA1710, TrA1783-84, TrA1803.[87]

Downton stated that mapdrawers "recognized their concern about splitting the Hispanic community" and put them together in one district "to help the Hispanic community" to give them

---

[87] He testified that the blog had pictures with racial shading showing the two Hispanic areas in different districts. TrA1628. He testified that the blog pointed out that what he thought of as two distinct populations were considered one community. TrA1624. The blog entry entered into evidence by Defendants, D-715, complains only generally that Plan C125 fractures the minority community throughout the DFW area and connects minority populations to heavily-Anglo populations in surrounding counties. There is a map of DFW shaded by CVAP population, but it does not discuss the Hispanic population in Fort Worth specifically.

"a solid voting block" that a candidate would need to consider.  Downton 8-12-11 depo. (Ex. J-62) at 131-32.  Downton also placed the primarily African-American community of Como into CD26 with the newly united Fort Worth Hispanic communities based on his recollection that Rep. Veasey had wanted Como with the Hispanic populations in HD90 in the House map.[88]  As a result, he stated, he put "almost all of the concentrated part" of the Hispanic population in Tarrant County into CD26, except parts excluded to accommodate Congresswoman Granger and the Trinity River Project, and these changes were reflected in Plan C144, Solomons' statewide substitute plan.  *Id.* at 132.

The criteria for these assignments was race, and Downton used racial shading to select population.  TrA1619 (Downton) (stating that he looked at racial shading at the VTD level and "saw two Hispanic populations, a northern population and a southern population"); TrA1621-22 (Downton) ("I also looked at the Hispanic population and I saw two distinct Hispanic communities. . . . [A]nd so I kept each of those communities together."); TrA1624 (Downton) ("I think this is the map where I tried to put the two Hispanic communities back together.  And to do that, I would have pulled up racial shading."); TrA1789 (stating that the characteristics the areas had in common were

---

[88] At the 2011 deposition, Downton testified that Como, a primarily African-American community, had been placed originally in CD12 but Rep. Marc Veasey, an African-American member, believed it should be placed into CD26 with the Hispanic community because it would fit better there, though he was not sure if he recalled that correctly (he did not). Downton 8-12-11 depo. (Ex. J-62) at 129-30. In fact, as Downton correctly recalled in 2014, Downton modified the original plan to place the African-American community of Como into CD26 along with the newly united Hispanic population because he recalled that Rep. Veasey had wanted Como in "the Democrat Hispanic opportunity district" HD90 in the House map.  TrA1625 (Downton), TrA1713-14 (Downton). Rep. Veasey and Rep. Burnam had objected to changes in the House map that removed the Lake Como area from HD90, Rep. Burnam's district, and Rep. Burnam had offered an amendment to return it that was defeated.  Based on this recollection, Downton placed the African-American Como community with the Hispanic communities in CD26 when he was uniting the two Hispanic communities. TrA1625.  However, Downton stated that Veasey "had different thoughts" about Como in the congressional plan, and that as a result "I moved it later."  TrA1625; see also TrA1714 ("Mr. Veasey said that with respect to the congressional map, it was more appropriate to have Como with the black population that was in the other district, so he took it back out.").

that they were both Latino and they were both in Fort Worth).[89]  Although Downton knew that the Hispanic populations were included in HD90 in the House plan, he did not overlay the contours of HD90 when assigning population into CD26.  TrA1711-12 (Downton).  Downton admitted that he did not "have any personal knowledge of the community characteristics for the residents who live inside the lightning bolt of Congressional 26."  TrA1710.  He "used racial shading to identify the community of interest that [he was] seeking to place together in [CD]26."  *Id.*[90]  The Como area was later removed from CD26 and placed back into CD12 as part of an amendment (Plan C169) introduced by Anglo Republican Charlie Geren, which Geren said on the floor was "a swap between Congressional Districts 12 and 26" to make downtown Fort Worth whole, put the entire city of Westlake in the same district, and "unite the black communities in Fort Worth."  D-23 at S3.  The amendment was adopted.  D-23 at S3; TrA1629 (Downton).  Thus, it is undisputed that race was an important criteria for the assignment of population into and out of CD26.

Downton testified that he felt it was "damned if you do, damned if you don't" with regard to using race to keep minority communities together in DFW, because if he did not, he would be accused of dividing the minority community, but if he did, he would be accused of improper racial gerrymandering.[91]  He testified that he felt it was in error to split the Hispanic population and

---

[89] Racial shading shows that Latino population is captured in CD26 and African-American population is largely excluded and placed in CD12.  *E.g.*, PL-1145; PL-1146.

[90] Dr. Arrington noted that CD26 in Tarrant County has 38 precinct splits, and further stated that the precinct splits in the so-called "lightning bolt" "split off the Hispanic population" and put it into CD26.  TrA410.  He found that it was "incomprehensible that it was done on any basis other than race."  TrA472.  (The Court notes that, while there are 38 precinct splits in CD26 in Tarrant County, 36 are in the lightning bolt, while two are in the short eastern protrusion.)

[91] Judge Smith specifically asked the parties in closing argument to discuss "when if ever is it legitimate to use racial shading whether it's through RedAppl or any other means?  Can it be used, for example, to join together minority communities of interest?"  TrA1967.  In addition, the State of Texas has argued in this case that it did not know how to comply with both the VRA and the Equal Protection Clause.  It has also argued recently in an amicus brief before the Supreme Court that redistricting is a "minefield" requiring states to get the use of race "just right."  However, the

although he knew CD12 and CD26 were not protected districts, he felt he was following the "traditional redistricting principle . . . to keep communities of interest together" and "people want to do that and thought we needed to for Voting Rights Act in that district." TrA1745. However, he also stated that he did not personally think that. *Id.* It was not his view that they needed to be kept together, but "people raised the issue" and "a possible legal challenge, so [he] changed it to address that concern and prevent a legal challenge on the basis that it would split up minority groups." TrA1746.

David Hanna of the TLC testified that, with respect to assignment of minority neighborhoods in DFW, his advice was just that minority neighborhoods, either Black or Hispanic, be kept whole, even though he knew they would not be creating a minority opportunity district. TrA1546-47, 1574-76. He did not want there to be a consistent pattern of dividing minority neighborhoods. TrA1574. He examined whether whole neighborhoods were being split up in DFW by looking at racial shading at the VTD/precinct level. TrA1547-48, 1568-69. He recalled giving that advice after being asked by Doug Davis or Interiano, but he did not remember to whom he mentioned it. TrA1548, 1569. Thus, he said that he thought that it was better not to divide a black neighborhood or a Hispanic neighborhood and assign those different districts, but he did not express an opinion as to whether Blacks and Hispanics should have been divided from each other or not. TrA1546.

Given the apparent and admitted use of race in assigning population into CD26 in Tarrant County, Plaintiffs contend that strict scrutiny applies and that, because the districts were not

---

requirements for using race are not that treacherous. Nina Perales identified acceptable uses of racial shading, and noted that "what Mr. Downton did in Tarrant County is probably the example of what you should not do, which is turn on racial shading and simply select people for different congressional districts based on that and that alone, without a knowledge of the community, without a knowledge of socioeconomic status, or cultural, or community patterns. There [has] to be more to it, especially if you're just gathering people together without a remedial purpose." TrA1968.

majority-minority, no compelling state interest justifies the use of race. Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. *Bush*, 517 U.S. at 958 (O'Connor, J.). Nor does it apply simply because members of racial groups are concentrated in specific districts, as that may be the result of legitimate redistricting principles that have nothing to do with race. *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

However, in this case we have admissions from the mapdrawer that he used race as the sole criteria for assigning a significant portion of voters into and out of CD26, and that his sole basis for regarding them as a community of interest was their race, given that he had no familiarity with the area. "When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller v. Johnson*, 515 U.S. 900, 911-12 (1995). Justice O'Connor recognized that it is evidentially significant that this is what has occurred if the mapdrawer used racial data but made no apparent attempt to compile or refer to equivalent data regarding communities of interest. *Bush*, 517 U.S. at 967 (O'Connor, J.).[92]

Laws that classify citizens on the basis of race are constitutionally suspect, regardless of whether the reason for the classification is benign or the purpose remedial. *Shaw*, 517 U.S. at 904-

---

[92] Similarly, Justice Kennedy explained in *Miller*, 515 U.S. at 919, that a State's districting legislation cannot be rescued "by mere recitation of purported communities of interest":

> A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests. "[W]hen members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." But where the State assumes from a group of voters' race that they "think alike, share the same political interests, and will prefer the same candidates at the polls," it engages in racial stereotyping at odds with equal protection mandates.

*Id.* at 920 (citations omitted).

05.   The essence of a *Shaw* equal protection claim is that the State has used race as a basis for separating voters into districts.  *Miller*, 515 U.S. at 911.  That is precisely what occurred here, and thus strict scrutiny applies.

A racial classification may be justified if it is narrowly tailored to serve a compelling state interest, such as compliance with the VRA.  The narrow tailoring analysis requires that "the legislature have a 'strong basis in evidence' in support of the (race-based) choice that it has made." *Alabama LBC*, 135 S. Ct. at 1274.  This standard "does not demand that a State's actions actually be necessary to achieve a compelling state interest in order to be constitutionally valid," and legislators "may have a strong basis in evidence to use racial classifications in order to comply with a statute when they have good reasons to believe such use is required, even if a court does not find that the actions were necessary for statutory compliance." *Id.* (emphasis omitted).[93]  The Legislature here did not have a strong basis in evidence for the race-based choice of uniting the north and south Fort Worth Hispanic communities in CD26.  Downton, the person who made the decision to place both communities together in CD26, admitted that he did so solely on the basis of race, that he used racial shading to do so, and that he was not himself familiar with the communities he was joining other than that they lived in Fort Worth and were Hispanic.  Though he stated that he learned from a blog that he had split what was considered one Hispanic community, that testimony was not credible, and even if it were believed, does not provide a "strong basis in evidence" that these communities should be considered a community of interest apart from their shared race.  Moreover, Downton admitted that he personally felt that placing these Latino communities together in a district

---

[93] These principles were recently affirmed in *Bethune-Hill v. Virginia State Board of Elections*, __ U.S. ___ (2017).

would not be necessary to comply with either § 2 or § 5 of the VRA, given that they still remained a significant minority without ability to elect in CD26, yet he made the decision to do so. The fact that some decisionmakers and advisors might have been concerned that they would be accused of splitting minority populations if they did not unite these communities in CD26 (and exclude African-Americans to "unite" them in CD12) is insufficient to establish a strong basis in evidence that these race-based actions were necessary to comply with the VRA. *See Shaw*, 517 U.S. at 908 n.4.[94] Accordingly, the Court finds that the use of race in CD26 violates the Equal Protection Clause.

### 3. CD6 analysis

The Task Force further asserts a *Shaw*-type claim with regard to CD6. CD6 includes all of Ellis and Navarro Counties and joins them to Tarrant and Dallas Counties with divergent finger-like extensions. Approximately half (358,632 persons) of CD6's population comes from Dallas County, while 142,511 persons from Tarrant County are included, and the remainder are the population of Ellis County (149,610) and Navarro County (47,735). Ellis County is 32.7% combined African-American and Hispanic population. Navarro County is 37.9% combined African-American and Hispanic population. The portion of Tarrant County included is 39.2% combined African-American and Hispanic population. However, the portion of Dallas County included is 75.8% combined African-American and Hispanic population. With these areas combined, the population of CD6 is 56.5% combined African-American and Hispanic population and 39.5% Anglo population, but it is only 51.5% combined African-American and Hispanic voting age population, and is majority Anglo (57.7%) CVAP.

---

[94] While complying with the VRA is a compelling state interest, obtaining preclearance and avoiding potential litigation for their own sakes and without a strong basis in evidence that race-based actions are required for VRA compliance are not compelling state interests.

To demonstrate that race-based criteria predominated in the drawing of portions of CD6, the Task Force relies in part on evidence that Downton split numerous precincts and that certain precinct splits (specifically 1105, 1127, 4614, 4610, 4433) place portions with more Hispanic population inside CD6 and areas with less Hispanic population outside of CD6.  Docket no. 1308 at 12; docket no. 1274 at 217 (proposed FF 1389-1391) (citing TrA1721-24 (Downton); PL-1155; PL-1156; PL-1157).  The Task Force also states that "the bizarre boundaries" of CD6 indicate that race was the predominant factor in its creation.  Docket no. 1308 at 12 n.5.

Downton testified that in CD6, he would not have been "drawing to pull in Hispanics" because it was not a Hispanic opportunity district.  TrA1720.  Downton testified that he thought these splits were "zeroing out," but agreed that some were placing more Hispanic population inside CD6 and less Hispanic population outside CD6.  TrA1720-24.  However, he also stated that, as he did in CD26, he "would have attempted to keep communities of interest together in 6 as well."  TrA1720-21.  Although there is some evidence indicating that race was used to allocate some population into CD6, the Court finds that Plaintiffs have failed to demonstrate that race predominated and that other redistricting principles were subordinated to race, such that their *Shaw*-type claim related to CD6 must fail.

## D. Intentional vote dilution claims

Some Plaintiffs allege that Defendants violated the Fourteenth Amendment through intentional vote dilution; other Plaintiffs bring intentional vote dilution claims under § 2 of the VRA; and some Plaintiffs assert both types of intentional vote dilution claims.[95]  As noted, an intentional

---

[95] The NAACP brings intentional vote dilution claims under the Fourteenth Amendment, but does not appear to bring them under § 2 (instead asserting only results claims).  DOJ brings intentional vote dilution claims only under § 2.  The Task Force Plaintiffs bring claims under both § 2 and the Fourteenth Amendment.

vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). "In the context of single-member districts, the usual device for diluting minority voting power is the manipulation of district lines," either by dividing the minority group among various districts (fragmenting or "cracking") or concentrating minority voters within a district ("packing"). *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993). In other words, the "'[d]ilution of racial minority group voting strength may be caused' either 'by the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters or from the concentration of [minorities] into districts where they constitute an excessive majority.'" *Id.* at 154 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)); *see also Shaw v. Hunt*, 517 U.S. 899, 914 (1996) ("a Plaintiff may allege a § 2 violation in a single-member district if the manipulation of districting lines fragments politically cohesive minority voters among several districts or packs them into one district or a small number of districts, and thereby dilutes the voting strength of members of the minority population").[96]

Plaintiffs here allege that the Legislature intentionally packed minority voters into CD30 and otherwise cracked minority populations throughout DFW to dilute their voting strength. *E.g.*, docket no. 1277 (Joint Post-Trial Brief) at 11, 57-66. Plaintiffs allege that the one existing minority opportunity district, CD30, was packed "far in excess of what is needed to create an ability to elect

---

[96] "When a redistricting plan employs [cracking] in a racially polarized environment, the result is predictable: Like a multimember plan, [a single-member district plan which fractures a geographically concentrated minority voting population] . . . tends to dilute the voting strength of the minority." *Major v. Treen*, 574 F. Supp. 325, 353 (E.D. La. 1983). "The most crucial and precise instrument of the . . . denial of the . . . minority's equal access to political participation, . . . remains the gerrymander of precinct lines so as to fragment what could otherwise be a cohesive minority voting community. . . . This dismemberment of the [minority] voting community . . . [may have] the . . . effect of debilitating the organization and decreasing the participation of [minority] voters." *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 149 (5th Cir. 1977).

district" and that the State deliberately created a packed district to waste minority votes and diminish the possibility of placing minority voters into an additional ability-to-elect district. Docket no. 603 (Joint Advisory) at 13; *see also* docket no. 1279 (United States Post-Trial Brief) at 2..

Plaintiffs further allege that the minority neighborhoods in DFW are cracked into different congressional districts, CD5, CD6, CD12, CD26, and CD33, which will all be dominated by Anglo voters, and in which minority voters cannot elect candidates of choice. *E.g.*, docket no. 603 at 11-13; docket no. 1279 (United States Post-Trial Brief) at 2; docket no. 409 (Quesada Post-Trial Brief) at 9-10. They assert that the district lines are "bizarre in shape because they have been configured to avoid the creation of a majority-minority district or districts in the North Texas area." Docket no. 603 at 11.

Expert witness Richard Murray testified that minority populations were packed into CD30 and otherwise cracked, and despite the fact that population changes (out-migration of inner-city Anglos and increase in minority populations) are making it easier to draw districts to benefit minority voters, the map intentionally avoids creating any such districts. Tr1044; TrA1397-98. He noted that districts around Dallas and Tarrant Counties "link[] up a lot of these inner-city neighborhoods with folks way out, mostly Anglo folks with a history of polarized voting against minorities and high turnout that are going to overwhelm the minority voters in these inner-city neighborhoods." Tr1044. He noted that many districts outside urban cores were regularly shaped, while in the inner city, "where all this minority growth is occurring," there are convoluted districts and "there's gerrymandering going on here." TrA1395.

Dr. Arrington testified that it was possible to create additional minority opportunity districts (not necessarily Hispanic majority but effective) in DFW, but Plan C185 employed cracking by

breaking up large, heavily-populated minority populations into a number of different districts so that they are unable to elect a candidate.  TrA407, TrA456, TrA474-75.  He stated that mapdrawers "took Anglo-dominated suburban districts and they took fingers from those districts and brought them into the Dallas/Fort Worth area to pick up some of the Hispanic population so that that population becomes cracked."  TrA407.  Arrington noted that there are four essentially suburban districts that move into Dallas County to pick up approximately 624,000 Hispanics.  TrA408; US-758_17 (Arrington testimony powerpoint).  And the same pattern exists in Tarrant County—one bizarrely shaped district (CD12) is entirely within Tarrant County, while four suburban districts move into Tarrant County to extract minority population.  TrA408-09.  He felt this was evidence of discriminatory purpose, as was the bizarre shapes of the districts.  TrA407-08.  He also testified that, rather than moving in the direction of unifying the growing Hispanic community in DFW, "we've cracked it that much greater than was done in [the benchmark]."  TrA475.

### 1. Applicable standards

In *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980), the Supreme Court held that an intentional vote dilution claim under the Fourteenth Amendment requires proof that the disputed plan was conceived or operated as a purposeful device to further racial discrimination by minimizing, cancelling out, or diluting the voting strength of racial elements in the voting population.  The Court noted that the requirement that there be purposeful discrimination for a violation of the Equal Protection Clause set forth in *Washington v. Davis*, 426 U.S. 229 (1976), *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), applied to claims of racial discrimination affecting voting "just as it does to other claims of racial discrimination."  446 U.S.

112

at 66-67.

In *Arlington Heights*, 429 U.S. at 266, the Court noted that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking."). In *Shaw v. Reno*, 509 U.S. 630 (1993), the Supreme Court recognized "the difficulty of determining from the face of a single-member districting plan that it purposefully distinguishes between voters on the basis of race," especially because the "legislature always is *aware* of race when it draws district lines," just as it is aware of a variety of demographic factors.  *Id.* at 646 (emphasis in original).  However, *Arlington Heights* set forth certain types of circumstantial evidence that may be considered to determine intent, including: the impact of the official action, including whether "it bears more heavily on one race than another"; the historical background of the jurisdiction's decision, particularly if it reveals a series of official actions taken for invidious purposes; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; substantive departures, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached; and the legislative history, especially any contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.  429 U.S. at 267-68; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488-89 (1997).

To prove intentional vote dilution under the Fourteenth Amendment, plaintiffs must show both discriminatory purpose and discriminatory effect.  *York v. City of St. Gabriel*, 89 F. Supp. 3d 843, 850, 864 (M.D. La. 2015); *Backus v. S. Carolina*, 857 F. Supp. 2d 553, 567 (D.S.C.), *summ.*

113

*aff'd*, 133 S. Ct. 156 (2012).[97]  The role that § 2 and *Gingles* play in intentional vote dilution claims as opposed to results-only claims is somewhat unsettled.  Congress amended § 2 of the VRA to allow results-only vote dilution claims in response to the Supreme Court's imposition of an intent requirement, and the Supreme Court established the standard for such results claims in *Gingles* and its progeny.   Although Congress noted the difficulty and expense involved in proving intentional discrimination and that charges of purposeful discrimination can have a divisive impact, it expressly stated that voters could seek to prove a violation of § 2 through *either* a results-only claim or a discriminatory purpose claim.  *United States v. Brown*, 561 F.3d 420, 432-33 (5th Cir. 2009); *McMillan v. Escambia Cty., Fla.*, 748 F.2d 1037, 1046 (5th Cir. 1984) ("Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2.") (emphasis in original); S. Rep. No. 97-417 at 27 ("The Amendment to the language of section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.") (footnote omitted).[98]

Because intent is not an element of results-only claims and results-only claims are usually easier to prove, few voters have asserted intentional vote dilution claims since § 2 of the VRA was

---

[97] To the extent Defendants argue that Plaintiffs' intentional discrimination claims fail because there was no discriminatory effect from the 2011 plans because they were never used, that is more properly viewed as a mootness argument, which the Court has already rejected.  The Court will evaluate the discriminatory effect of Plan C185 in terms of its effect on voters had it been used.

[98] The Senate Report further states that if a § 2 plaintiff chooses to prove discriminatory intent, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions" would be relevant evidence of intent.  *McMillan*, 748 F.2d at 1047 (quoting S. Rep. No. 07-417, at 27 n.108).

amended,[99] and thus the Supreme Court has not had occasion to establish a specific analytical framework for intentional vote dilution claims post-amendment and post-*Gingles*.[100]  Thus, while there is Supreme Court guidance regarding what plaintiffs must show to prove dilutive effects under the § 2 results test (*e.g.*, *Gingles* and its progeny) and there is precedent concerning the proof required to show discriminatory intent in intentional vote dilution cases under the Fourteenth Amendment, the level of proof of dilutive effects required in a § 2 intentional vote dilution claim is less clear.

> As one court has stated,
>
> [T]he effects standard for an intentional vote dilution claim is uncertain, largely because of a dearth of precedent. The cases provide little direct authority as to the requisite degree of dilutive effect for an intentional discrimination claim under either the constitution or the statute. This is so in part because direct evidence of discriminatory intent is relatively rare, and thus plaintiffs generally prefer to bring traditional § 2 vote dilution cases where intent need not be shown, rather than constitutional or statutory intentional vote dilution claims. In fact, since the 1982 amendments to the Voting Rights Act, which eliminated the intent requirement for statutory vote dilution claims, there has been a virtual absence of intentional vote dilution litigation.

*Cano v. Davis*, 211 F. Supp. 2d 1208, 1248-49 (C.D. Cal. 2002) (citations omitted), *summ aff'd*, 537 U.S. 1100 (2003).  The *Cano* court agreed with the plaintiffs in that case that "where invidious intent exists in a vote dilution case, it may be appropriate to relax the first or even second of the *Gingles*

---

[99] *See Veasey v. Abbott*, 830 F.3d 216, 335 n.15 (5th Cir. 2016) (Costa, J., dissenting in part) (noting that "[t]he impact that making the typically easier-to-prove effects test an equally powerful avenue of relief has on purpose claims can be seen from the drop in the number of discriminatory purpose claims brought in voting cases after the 1982 amendments to the Voting Rights Act made effects a basis for section 2 liability").

[100] As the Fifth Circuit has noted, prior to *Bolden*, "there was relatively little judicial interpretation of section 2" and "most courts chose to deal exclusively with the constitutional standards, probably under the assumption that the standard under section 2 was equivalent." *McMillan*, 748 F.3d at 1042 n.9.  The Fifth Circuit further noted that, in *Bolden*, the Supreme Court explicitly held that "the language of § 2 no more than elaborates upon that of the Fifteenth Amendment and the sparse legislative  history of § 2 makes it clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself."  *Id.* (quoting *Bolden*, 446 U.S. at 60-61).

pre-conditions, as well as to consider intent in connection with the 'totality of the circumstances' inquiry." *Id.* at 1249. Nevertheless, it held that "plaintiffs in vote dilution cases must still show a practical effect on the minority group's ability to elect representatives of choice, whether or not intent is shown." *Id.* at 1249-50. The court concluded that the "irreducible minimum" showing would be that a minority group's preferences are regularly defeated by a non-minority bloc of voters. *Id.* at 1250.

After the *Cano* case, the Supreme Court expressly stated in *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009), that it did not consider "whether intentional discrimination affects the *Gingles* analysis" and that its holding (setting forth the majority-minority requirement to satisfy the first *Gingles* factor for a § 2 results claim) "does not apply to cases in which there is intentional discrimination against a racial minority."[101] The Court has not had occasion to further clarify the standard.

A 2011 case, *Committee for a Fair and Balanced Map v. Illinois Board of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *3 (N.D. Ill. Nov. 1, 2011), noted that "[t]he circuit courts that have addressed this issue have taken varying approaches," with the Ninth Circuit in *Garza* holding that both intent and injury must be shown, but that *Gingles*' majority-showing requirement did not apply when there was proof of intentional vote dilution, and the Eleventh Circuit in *Johnson v. DeSoto County Board of Commissioners*, 72 F.3d 1556, 1561-63 (11th Cir. 1996), holding that intent

---

[101] The Supreme Court cited the Unites States' amicus brief arguing that evidence of discriminatory intent "tends to suggest that the jurisdiction is not providing an equal opportunity to minority voters to elect the representative of their choice, and it is therefore unnecessary to consider the majority-minority requirement before proceeding to the ultimate totality-of-the-circumstances analysis." *Bartlett*, 556 U.S. at 20. In distinguishing intentional vote dilution cases, *Bartlett* also cited *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990), in which the Ninth Circuit rejected the County's argument that plaintiffs had to show they could have constituted a majority when they alleged intentional discrimination. The Ninth Circuit held that "to the extent that *Gingles* does require a majority showing [for a vote dilution claim under § 2], it does so only in a case where there has been no proof of intentional dilution of minority voting strength." *Garza*, 918 F.2d at 769.

would be considered as circumstantial evidence of discriminatory results in assessing the totality of the circumstances.  The Illinois court held that "[a] showing that the drafters of the plan intended to discriminate very well may lead to the conclusion that the plan had its intended effect, but the other factors in the totality of circumstances test are still relevant in resolving the issue." *Committee*, 2011 WL 5185567, at *4. Thus, it concluded, "the first *Gingles* factor is appropriately relaxed when intentional discrimination is shown, but [plaintiffs] will nevertheless have to show that the plan lessened [minority] opportunity to elect a candidate of [their] choice" by satisfying the second and third *Gingles* preconditions.  *Id.*

In a later opinion, the Illinois court again re-affirmed and expanded on this framework, concluding that, where a plaintiff shows intentional discrimination, the first *Gingles* precondition is relaxed, though discriminatory intent alone "will not carry the day." *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 581 (N.D. Ill. 2011).  Thus, "[f]ailing proof of the first *Gingles* factor, [plaintiffs] may show discriminatory effect through circumstantial evidence of discriminatory intent," and including, but not limited to, evidence of bloc voting along racial lines; low minority voter registration; exclusion from the political process; unresponsiveness of elected officials to needs of minorities; depressed socio-economic status attributable to inferior education and employment and housing discrimination; minority retrogression; manipulation of district boundaries to adjust the relative size of minority groups, including the "packing" of minority votes; proportionality; and the *Arlington Heights* factors.  *Id.* at 581-82.

This Court agrees that, when discriminatory purpose (intentional vote dilution) is shown, a plaintiff need not satisfy the first *Gingles* precondition to show discriminatory effects.  The Court thus rejects Defendants' argument that Plaintiffs can show intentional vote dilution through packing

and cracking only if they show that it prevented the creation of an additional CVAP-majority district.

If plaintiffs had to satisfy the *Gingles* test, there would be little point in allowing them to

alternatively pursue intentional discrimination claims, as Congress stated its intent to do in the

Senate Report.  However, plaintiffs still must show some discriminatory effect, and in making that

determination, the Court will consider the other § 2 *Gingles* and totality-of-the-circumstances

factors.[102]

### 2. Racial motive

The Court thus turns to whether Plaintiffs have demonstrated a racially discriminatory motive

in the drawing of district lines (specifically, by packing and cracking) in the DFW area.  A primary

difficulty in this case lies in the fact that race and political party affiliation are strongly correlated

in Texas, and Defendants contend that they were merely engaged in partisan gerrymandering, which

had a foreseeable negative effect on minority voting strength (because cracking Democrats

necessarily means cracking minority populations).  Defendants argue that they did not engage in

intentional vote dilution of minority voting strength, but only of Democrat voting strength.

It is undisputed that Defendants engaged in extreme partisan gerrymandering in drawing the

---

[102] *See United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1574 (5th Cir. 1984) (noting that the "same evidence is relevant to both theories" of intent and results).  In *Rogers v. Lodge*, 458 U.S. 613, 623-24 (1982), the Supreme Court stated that evidence of racial bloc voting and lack of success of African-American candidates despite their substantial population bore "heavily on the issue of purposeful discrimination."  However, such evidence alone would not be sufficient to prove purposeful discrimination "absent other evidence such as proof that blacks have less opportunity to participate in the political processes and to elect candidates of their choice."  *Id.* at 624.  To that end, the Court discussed the district court's analysis of the "impact of past discrimination on the ability of blacks to participate effectively in the political process" (such as by contributing to low voter registration), "evidence of exclusion from the political process" (exclusion from the Democratic Party County Executive Committee, property ownership requirements, and discrimination in the selection of grand jurors, hiring of county employees, and appointments to boards and committees that oversee county government), evidence that elected officials of the County had been unresponsive and insensitive to the needs of the African-American community, which increases the likelihood that the political process was not equally open to African Americans, evidence of the depressed socio-economic status of African Americans in the County, and other factors that the Court had "indicated enhance the tendency of multimember districts to minimize the voting strength of racial minorities."  *Id.* at 624-27.

map, ignoring many if not most traditional redistricting principles in their attempt to protect Republican incumbents, unseat Democrat Lloyd Doggett, gain additional Republican seats, and otherwise gain partisan advantage. Defendants do not really dispute the fact that minority populations are divided or "cracked" in the plan, but they assert that the cracking was only an effect of partisan gerrymandering, not of discriminatory purpose.

Defendants say all lines were drawn on partisan or other legitimate, non-racial criteria, without racial motive or racial decisionmaking, except where they believed the use of race was necessary to comply with the VRA. Defendants contend that the VRA did not compel the Legislature to draw an influence district or even a performing district for minorities under the circumstances, and also did not protect minorities from the foreseeable effects of political gerrymandering. Because their reason for not drawing minority districts was political, Defendants contend, it was not racially discriminatory. Plaintiffs acknowledge Defendants' partisan intent, but contend that the mapdrawers had both partisan and racial intent and that they used racially discriminatory linedrawing to advance their partisan interests. And they argue that so long as they demonstrate that racial discrimination was a motivating factor, they have made out a prima facie case of discrimination.

Plaintiffs correctly note their burden is not to prove that race was the sole decisionmaking factor or motivation, and that discriminatory purpose need only be "a motivating factor." *Arlington Heights*, 429 U.S. at 265-66; *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016).[103] "Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive." *Veasey*, 830 F.3d at

---

[103] *E.g.*, docket no. 1065 (joint response to MSJ) at 7; docket no. 1080 (Task Force response to MSJ) at 5-6; docket no. 1291 (United States post-trial reply brief) at 8-9.

241 n.30.  Upon such a showing that race was a motivating factor, the burden shifts to the

Defendants to demonstrate by a preponderance of the evidence that the action would have been taken

anyway.  *Hunter*, 471 U.S. at 228 ("Once racial discrimination is shown to have been a 'substantial'

or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to

demonstrate that the law would have been enacted without this factor."); *Arlington Heights*, 429 U.S.

at 270 n.21; *Veasey*, 830 F.3d at 231.

It is undisputed in this case that voting in Texas is strongly racially polarized,[104] and this

polarization was reflected in the fact that 93 of the 101 Republican members of the House in 2011

were Anglo, while only 8 of the 49 Democrat members were Anglo.  As the Fourth Circuit recently

acknowledged, the presence of racially polarized voting provides a strong incentive for intentional

discrimination, commonly through vote dilution, because "[i]t is the political cohesiveness of the

minority groups that provides the political payoff for legislators who seek to dilute or limit the

minority vote" and "racially polarized voting may motivate politicians to entrench themselves

through discriminatory elections laws" by targeting groups unlikely to vote for them.  *N.C. State*

*Conf. of NAACP v. McCrory*, 831 F.3d 204, 214, 222 (4th Cir. 2016).

The Supreme Court noted in *LULAC v. Perry* that the Legislature's actions that diluted

Latino voting strength in order to protect a Republican incumbent bore "the mark of intentional

discrimination." *LULAC*, 548 U.S. at 440.  The Supreme Court also recognized that the existence

of racially polarized voting resulting in a lack of minority success despite their majority status was

---

[104] Defendants dispute the cause of racially polarized voting, the legal sufficiency of racially polarized voting, and the existence of racially polarized voting in Nueces and Kleberg Counties.  However, they do not dispute that people of different races vote differently from one another, and that minorities tend to vote Democrat while Anglos (Austin/Travis County excepted) generally tend to vote Republican.

highly relevant to the issue of purposeful discrimination in *Rogers v. Lodge,* 458 U.S. 613, 623 (1982).  It noted, "Voting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race" such that the "fact that none have ever been elected is important evidence of purposeful exclusion."  *Id.* at 623-24.

The Ninth Circuit in *Garza* similarly recognized that partisan motive (specifically incumbency protection) may go hand-in-hand with racially discriminatory purpose. *Garza*, 918 F.2d at 771 (finding that racially discriminatory intent was coupled with the intent to preserve incumbencies and stating that "discrimination need not be the sole goal in order to be unlawful"). The Seventh Circuit in *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) noted that "[s]ince it is frequently impossible to preserve white incumbencies amid a high black-percentage population without gerrymandering to limit black representation, it seems to follow that many devices employed to preserve incumbencies are necessarily racially discriminatory."

Thus, while Defendants assert that the strong correlation between party and race supports their position that what looks like racial discrimination is in fact only partisan discrimination, it is also highly relevant to Plaintiffs' intentional vote dilution claims.  As the United States correctly argues, in an intentional vote dilution claim, "partisanship and intentional vote dilution are not an either/or proposition; the two goals can co-exist, one serving the other."  Docket no. 1279 at 72.

However, to some degree, the parties in this case mischaracterize their opponents' positions regarding the impact of the strong overlap between race and politics in Texas.  For example, the NAACP claims that the State relies on *Easley v. Cromartie*, 532 U.S. 234 (2001), "for the proposition that the Supreme Court had endorsed discrimination along racial lines so long as race

was highly correlated with partisanship." Docket no. 1280 (NAACP Post-Trial Brief) at 9. But that is not Defendants' position. Rather, they argue that the State may draw lines and even intentionally discriminate on the basis of partisanship (politically gerrymander) despite knowing that there is a strong correlation between race and partisanship and despite knowing that such political gerrymandering will foreseeably negatively affect and dilute the vote of minorities. They argue that taking action *despite* its predictable effect on race is not the same as taking action *because of* its effect on race, and so long as its actions are merely the former, there is no intentional race discrimination. In partial support of their position, Defendants rely on certain language from *Shaw*-type racial gerrymandering cases that did not involve claims of intentional discrimination,[105] but they do not argue that these cases stand for the proposition that racial discrimination is valid so long as race and politics are highly correlated.

In that vein, the Court agrees with Defendants that statements made about determining motive in the *Shaw*-type cases can have application to intentional vote dilution cases, even though *Shaw*-type cases involve a different motive than intentional vote dilution cases. All parties agree that an intentional vote dilution and a *Shaw*-type racial gerrymandering case are analytically distinct. Nevertheless, Defendants correctly point out that both are based on the Equal Protection Clause and both are fundamentally based on the use of race in districting decisionmaking. In a *Shaw*-type claim, we are not concerned with discriminatory versus benevolent motive, only whether race was the predominant motive in the decisionmaking, while in an intentional vote dilution case, we look to see whether intentional racial discrimination was a motivating factor in the districting decision. Whether

---

[105] *E.g.*, *Bush*, 517 U.S. at 968 (O'Connor, J.) (stating that, if the State's goal is otherwise constitutional political gerrymandering, it is free to use various kinds of specific political data to achieve that goal "regardless of its awareness of its racial implications").

partisanship provides an explanation for the specific lines that were chosen is relevant to both motive inquiries. Thus, the Court disagrees with statements such as the NAACP's proposed conclusion of law 223 (docket no. 1281) that "correlation between party and race, such as that discussed in *Cromartie v. Easley*, 532 U.S. 234 (2001) and *Bush v. Vera*, 517 U.S. 952 (1996) is irrelevant in cases where vote dilution is alleged." *See LULAC v. Perry*, 548 U.S. 399, 515 (2006) (Scalia, J., dissenting) (citing *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999), a *Shaw*-type racial gerrymandering case, in the context of an intentional vote dilution claim analysis, for the proposition that "a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact") (emphasis in original).

Defendants, however, also mischaracterize Plaintiffs' argument as being that because most minority voters prefer Democratic candidates, intentionally protecting Republicans amounts to intentionally disfavoring minority voters. Docket no. 1272 at 18. Defendants also incorrectly argue that "Plaintiffs refuse to acknowledge any distinction between partisan and racial motivation." *Id.* at 20. Plaintiffs do not argue that partisan motivation favoring Republicans is automatically racially discriminatory motivation against minorities, who generally vote Democratic. Rather, they argue that Defendants intentionally discriminated on the basis of race to gain partisan advantage and protect incumbents, and that this constitutes racially discriminatory purpose.[106] *See, e.g.*, docket no.

---

[106] Defendants refer to the United States' argument that the Legislature's intentional decision not to create a minority opportunity district was intentional vote dilution to support their position that Plaintiffs are arguing that any decision not to create a Democratic district is intentional vote dilution. Docket no. 1272 at 22-23. However, the United States' position is that intentionally refusing to draw a minority district required by the VRA because it would be a Democratic district is intentional vote dilution in violation of § 2. The United States also argues that the mapdrawers went to great lengths to prevent the creation of minority districts by cracking and gerrymandering. TrA2151 (Mr. Mellett) ("you can't prevent a district from coming to be by cracking, packing, going to extraordinary lengths to make sure it does not occur, and that is what we are arguing is done here").

1279 (United States Post-Trial Brief) at 14 ("The use of precinct splits is critical evidence that state officials used race as a proxy for partisanship and that map drawers intentionally reduced minority political opportunity for a partisan political purpose in the 2011 Congressional and House plans.").

In addition, the Court agrees with Plaintiffs that they need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will towards minorities because of their race. *See McCrory*, 831 F.3d at 222-23, 233 (intentionally targeting a particular race's access to the franchise because its members predictably vote for a particular party is discriminatory purpose even absent any evidence of race-based hatred and despite the obvious political dynamics, and a finding of intentional discrimination does not mean that any member of the legislature harbored racial hatred or animosity toward any minority group); *Veasey*, 830 F.3d at 335-37 (Costa, J., dissenting in part) (a finding of discriminatory purpose is not tantamount to a finding of racist motivation). If the Republican-dominated Legislature targeted voters who, based on race, were unlikely to vote for Republicans, that constitutes racial discrimination even if done for partisan ends. *McCrory*, 831 F.3d at 233; *Veasey*, 830 F.3d at 336 (Costa, J., dissenting in part) ("That most basic of human instincts—self-preservation—can thus provide an explanation for enacting a law at least in part because it will have a disparate impact on protected groups that favor the out-of-power party.").

As Judge Kozinski explained in *Garza v. County of Los Angeles*, a finding of intentional discrimination is not a finding that legislators harbored any ethnic or racial animus, in terms of dislike, mistrust, hatred, or bigotry, toward minority communities. He illustrated the point as follows:

The lay reader might wonder if there can be intentional discrimination without an

124

> invidious motive. Indeed there can. A simple example may help illustrate the point. Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

918 F.2d at 778 n.1 (Kozinski, J., concurring and dissenting in part). Thus, if the "desire for partisan advantage . . . leads a legislature to select 'a course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group,' that is enough." *Veasey*, 830 F.3d at 336 (Costa, J., dissenting in part) (citing *Garza*, 918 F.2d at 778 (Kozinski, J.)).

With these principles in mind, the Court turns to the issue of whether Plaintiffs have demonstrated that mapdrawers chose certain district lines *because of* race and with a racially discriminatory purpose. While there is certainly an overlap between cracking and packing Democrats and cracking and packing minorities, the Court finds that Plaintiffs have satisfied their burden of showing that intentional minority vote dilution was a motivating factor in the drawing of district lines in DFW and that mapdrawers intentionally diluted minority voting strength in order to gain partisan advantage.

The Court has already found that the Republican-dominated Legislature viewed minority districts as Democrat districts and was generally unwilling to create any districts in which minority voters could elect their representatives of choice unless they felt compelled to do so by the VRA. The Court has further found that mapdrawers were willing to disadvantage minorities to gain partisan advantage, as was done in CD23, and that they were willing to use race to gain partisan advantage,

as was done in drawing race-based CD35 in Travis County to destroy the Democrat district CD25 and limit the number of Democrat districts overall. Further, because the Republican-dominated Legislature and the mapdrawers felt that the VRA created and protected Democratic districts, they consistently took the most restrictive positions on the VRA.[107] Thus, the record indicates not just a hostility toward Democrat districts, but a hostility to minority districts, and a willingness to use race for partisan advantage.

In addition, the evidence shows that mapdrawers were more than just "aware of" race; they often referred to race in discussing the drawing of districts, they paid close attention to the racial makeup of all districts, and they engaged in discussions about how to gain political advantage by disadvantaging Hispanic voters through use of the "nudge factor." *E.g.*, Tr912 (Downton) (mapdrawers "were always conscious of the [race] numbers, and so we would look at them throughout the process before moving forward with the map"); D-122 (Hanna memos on House proposals, which focused on percentages of racial minority populations within minority districts); US-75 (Opiela "nudge factor" email to Interiano and Lisa Kaufman proposing to manipulate districts

---

[107] Mapdrawers and decisionmakers testified that a district that could potentially perform for minority voters in DFW, both Hispanic and African American, was viewed by mapdrawers and legislative decisionmakers as a "Democrat district." TrA351 (Interiano) (Congressman Smith's proposed district "would have simply been an additional Democratic district), TrA381 (Interiano) (unless required by the VRA, "we should not be giving a Democrat district"); TrA1604 (Downton) (according to conversations with Solomons, there were not votes to pass any plan that did not have three Republican districts out of four, but Smith's plan was a 2-2 Republican/Democrat district); TrA277 (Seliger) (minority districts were "without question" thought of as Democrat districts), TrA287 (stating that maps proposed by minority members that created a minority district in DFW were just designed simply for Democratic seats). Downton and other decisionmakers in the Republican-dominated legislature took the position that only a single majority-minority CVAP district would be required by § 2 despite the fact that Supreme Court precedent regarding coalition districts was unsettled, the Fifth Circuit had held that they could be required by § 2, and they had been advised by TLC lawyers that they could be required. D-590 at 85. In drawing the House plan, they had taken the position that the Texas County Line Rule would trump § 2 unless told otherwise by the courts to avoid drawing new minority districts, again against the advice of TLC lawyers. TrJ1208-09; D-590 at 38-39. In addition, there is no indication that mapdrawers or Republican leadership asked David Hanna for a VRA analysis of the proposed congressional plan even though they had for the House plan (and Seliger had stated at a hearing that maps would be scrutinized by Hanna), and they ignored concerns that were raised about VRA compliance (such as in CD23) that interfered with their partisan goals.

to increase Hispanic population metrics while keeping SSVR and Hispanic turnout low); US-76 (Opiela email to Lamar Smith and Interiano, later forwarded to Denise Davis,  (Speaker Straus's Chief of Staff) referring to having to "pick up Anglo voters" "to avoid packing claims on Hispanic districts").[108] Although Opiela, who originally proposed the "nudge factor," may not have had as significant a role in the ultimate specific lines in the plan as Plaintiffs contend, he was undoubtedly an insider to the process—he was friends with mapdrawers; he was frequently in the office, even referred to as "frequent flier" by the committee clerk Bonnie Bruce; he made requests and gave input; and he engaged in numerous discussions with mapdrawers Downton and Interiano.

More importantly, Downton admitted that once the decision was made not to create a minority coalition district in DFW, it became more difficult to draw "strong" Republican districts,[109] and Downton and the other decisionmakers knew it would also be more difficult to maintain these districts as Republican across the decade as minority population continued to grow (and outpace Anglo growth).  One way to solve this problem was to pack and crack minority voters.

Packing would be achieved by increasing the number of minority voters in the existing

---

[108] One Judge in *Veasey* found it notable that, despite being "granted wide-ranging and invasive discovery into potentially privileged internal correspondence of the Legislature," including email, plaintiffs in that case "uncovered not a single slip of the tongue or errant statement indicative of a racially discriminatory motive." *Veasey*, 830 F.3d at 287-88 (Jones, J., concurring in part and dissenting in part). The Court notes that, in this case, there are very few emails among Interiano, Downton, Solomons, Seliger, and Doug Davis concerning redistricting. The Court finds that these key players generally discussed redistricting in person and not by email, which explains the lack of email evidence. Downton repeatedly referred to discussions he had with Solomons and others, but few to none of these occurred by email. Solomons and others repeatedly referred to the fact that they were highly aware that the maps would end up in court, and the Court finds that they took intentional steps to avoid creating an email record of their discussions. *See* PL-311 (docket no. 324-3 at 55) (email expressing dissatisfaction with the fact that Dub Maines was criticizing the proposed plan in an email when it would likely end up in court, forwarded by Lamar Smith to Opiela and Interiano).

[109] TrA1606 (Downton) ("One of the reasons the Republican congressional delegation proposed that [minority] district was because it protected all the incumbent congressmen by taking Democratic votes and concentrating them in a new district.  It allowed the percentage of Republicans in the old districts to increase by nine.  Drawing [Anglo-majority, Republican CD33 in Plan C185 instead], it became much harder to balance all of the existing districts with the new district, to where the congressmen felt that they still had strong Republican districts.").

African-American opportunity district CD30 and moving Anglo voters out of CD30 and into the Republican districts, and the evidence demonstrates that this was in fact done.  In Plan C185, all CD30 Hispanic and African-American population metrics increased from the benchmark: total African-American population increased from 42.4% to 45.6%, BVAP increased from 42.5% to 46.5%, and BCVAP increased from 49.8% to 53.1%; total Hispanic population increased from 39.7% to 40.3%, HVAP increased from 34.7% to 35.6%, and HCVAP increased from 19.8% to 20.6%.  Anglo population metrics correspondingly decreased.  Defendants contend that there is no evidence "that African-Americans were packed in District 30 in Plan C185 because the voting age population and citizen voting age population are largely the same as under Plan C100."  Docket no. 1276 at 83 (proposed FF 772).  Although it is true that minority population metrics are not drastically increased, they are increased.

Benchmark CD30 was slightly overpopulated (by approximately 8,000 persons), was at the 50% BCVAP threshold that Downton and mapdrawers had set for opportunity districts (it was 49.8% Black alone CVAP using 2005-2009 ACS data and 50.3% combined BCVAP), and was performing effectively and reliably for African-American voters.  Therefore, no additional African-American population would have been needed to be added to CD30 to comply with the VRA.[110]  Yet the district was changed significantly, without any input from Congresswoman Johnson or respect for

---

[110] *See Bush v. Vera*, 517 U.S. 952, 983 (1996) (an increase from 35.1% to 50.9% African-American population was not narrowly tailored to comply with the VRA because there was no showing that it was necessary to ensure nonretrogression); *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 WL 3604029, at *17 (E.D. Va. June 5, 2015) (an increase in BVAP from 53.1% to 56.3% was not narrowly tailored where the district had been a safe majority-minority district for two decades).  Downton and mapdrawers took the position that as long as a district was above 50% CVAP of a single minority, nothing else was required for § 2, and that § 5 compliance meant only that the relevant population metrics and election performance remained the same as in the benchmark plan.  Thus, under their interpretation of the VRA, no increases in minority population would be necessary to comply with the VRA.

the integrity of the district other than its racial composition.[111]

A plan overlap analysis shows that 80.7% of the old CD30 population is included in the new district, and the new population taken from surrounding districts CD5, CD24, and CD32 is overwhelmingly minority. Of the approximately 6,000 persons taken from CD5, only 27.4% are Anglo.[112] Of the approximately 75,000 persons taken from CD24, only 25.7% are Anglo. And of the approximately 54,000 persons taken from CD32, only 16.5% are Anglo.[113] The population changes resulted in a decrease of 26,214 Anglos (25,677 of voting age), and a corresponding increase of 19,290 African-Americans (12,127 of voting age) in CD30.[114] Moreover, the contours of CD30 coincide with maximizing minority population; except for a few places in the north central portion of the district and the southeastern portion of the district, the boundaries consistently exclude heavily Anglo areas and include heavily minority areas.

CD30 has 31 split precincts along its borders (three precincts are split twice, resulting in 34 total splits),[115] and the causes of these splits were generally unexplained by Downton or any defense witnesses. As noted, while accurate racial data is available below the precinct level, accurate

---

[111] Congresswoman Johnson testified in detail about the negative changes to her district, including the removal of her home, her office, and what she considered to be "economic engines." She and Dr. Murray also expressed concerns about population changes to the district that could undermine its long-term status as an African-American district.

[112] Of the 31,000 persons moved into CD5 from CD30, 36.2% are Anglo.

[113] In contrast, of the approximately 68,000 persons moved from CD30 to CD32, 61.1% are Anglo. No population was moved from CD6 to CD30, but a large amount of Hispanic population (approximately 43,000 who were 82.5% Hispanic) was moved from CD30 to CD6. As discussed below, this is because CD6 was not in Dallas County in the benchmark, but in Plan C185 it reaches into Dallas County to take minority population.

[114] Although Hispanic total population increased by 1,157, HVAP actually declined by 1,810. However, as these voters became voting age, the HVAP of CD30 would increase over the decade. Further, the total Hispanic + African-American population increased by 20,147 and the combined voting age population by 10,219.

[115] To compare, the border of the lightning bolt in CD12 and CD26, where Downton admitted to using race, has 36 split precincts.

political data is not, and any testimony that mapdrawers were not aware of this fact is not credible,[116] suggesting that many precinct splits have a racial basis.  *See Bush*, 517 U.S. at 961-62 (O'Connor, J.) (noting that the availability of block-level racial data "enabled districters to make more intricate refinements on the basis of race than on the basis of other demographic information").   Dr. Arrington's split precinct analysis indicates that although split precincts included more voting-age Anglos in CD30 than were excluded, this was *more true* for Hispanics and African-Americans.[117]

Defendants contend that the allegations concerning split precincts "rest on speculation and factual misstatements."  Docket no. 1272 at 35.  Defendants concede that accurate political data was not available at the precinct level, but note that RedAppl statistics nevertheless reflected changes in political data when precincts were split.  Defendants also state that precincts may be split, and were split, for non-racial reasons, such as following city boundaries, including financial supporters, following roads, incorporating airports and government buildings, including a member's home, and complying with the Texas Election Code.  *Id.* at 36.  They assert that, to the extent any precincts

---

[116] The Court notes that Downton claimed to have studied redistricting law, and he surely would have studied *Bush v. Vera*, 517 U.S. 952 (1996), one of the more recent Supreme Court cases involving Texas redistricting.In that case, Justice O'Connor expressly noted that RedAppl "contained racial data at the block-by-block level, whereas other data, such as party registration and past voting statistics, were only available at the level of voter tabulation districts (which approximate election precincts)."  *Id.* at 961.  Further, the TLC's publication *Data for Redistricting* noted this limitation, and emails from TLC providing information noted this limitation in the data.  PL-728 (Data for Redistricting publication) at 11-12;  US-185 (email from Davenport of TLC to Interiano noting allocation issues).  Thus, it is simply not credible that Downton or other mapdrawers were unaware of this fact.

In addition, Downton's testimony that he did not worry about splitting precincts because there was no policy against it is also unconvincing.  If split precincts were not an issue, then Solomons would not have used split precincts to argue against minority members' proposed changes, and members would not have been told to avoid splitting precincts when drawing the House map. Rep. Pickett of the El Paso delegation testified that they were told not to split precincts. Downton claimed this was so that the members' pieces could be fit together more easily in the House map, but this explanation makes no sense with regard to counties such as El Paso, which were going to be "dropped in" to the House map.  Downton knew that splitting precincts was disfavored and that accurate political data was not available, yet split precincts anyway, indicating the use of racial data to do so.

[117] In CD30, 4,250 BVAP individuals were excluded in split precincts, while 17,192 were included. US-352 (Arrington Decl.) at 56, Table 21.  17,358 HVAP individuals were excluded, while 25,502 were included.  *Id.*  11,947 Anglo VAP were excluded, while 17,535 were included.  *Id.*

were split on the basis of race, it was only to comply with the VRA.  *Id.*

However, neither Downton (nor anyone else) ever explained why the population metrics of CD30 were changed in the way that they were or why these 31 precincts were split.[118]  He testified that each time he made changes in an area, he split precincts to equalize population, so that there might be a lot of split precincts in an area that he worked on more regularly (such as Tarrant County).  TrA1718.  But there were not so many changes in this portion of the map as it progressed that the numerous splits could be explained simply by repeated population equalization, nor have Defendants shown that the splits were in fact caused by neutral reasons, other than providing generalities and speculation.[119]  Thus, the evidence indicates that the splits were likely race-based, and Defendants fail to proffer a non-racial basis for the numerous precinct splits in CD30.

Further, Downton's testimony is consistent with a racial packing motive— he testified that he was trying to maintain all the existing Republican Dallas districts at a certain Republican percentage, and packing minorities into CD30 while removing Anglo (and thus presumably Republican) voters and placing them into adjacent districts is consistent with that stated goal.  Plaintiffs have shown that minorities were moved into CD30 and Anglos were removed, and Defendants have not pointed to any evidence showing that Democrats (who happened to be minorities) were packed into CD30 while Republicans (who happened to be Anglos) were removed.  Thus, CD30 demonstrates a classic racial gerrymandering technique of packing minority voters into

---

[118] Downton testified that mapdrawers "tried to make sure we were maintaining levels of HCVAP in the Hispanic districts and black voting age population in the black districts," Tr914 (Downton), and never indicated that there would have been a need to increase the minority population in CD30.

[119] CD30 did not change much between the time of the initial Solomons Plan C125 and the enacted plan. Therefore, any splits due to "zeroing out" caused by changes to the districts would have had to exist in Plan C125.  The Court is not aware of any split precinct reports in the record that would show the progression of split precincts in the map as it was developed before Plan C125 was released that might support Downton's explanation.

CD30 to waste their votes, while moving Anglos into neighboring districts to increase their Republican performance. The Court finds that race was used as a proxy for political affiliation, and that this was done intentionally to dilute minority voting strength.

To support their claim that minority populations in DFW were otherwise intentionally cracked, Plaintiffs point to the bizarre shapes of the districts and the numerous split precincts in the various DFW districts.[120] The Court agrees that the bizarre shapes and the numerous split precincts, which indicate the use of racial data, support an inference that the mapdrawers intentionally used racial criteria to split the minority population.[121]

More importantly, however, expert George Korbel noted that the map looked as though mapdrawers started out with the district they wanted to avoid, and then carved it up into pieces, Tr669, and the progression of the maps in Downton's RedAppl account bears this out. Plan hrc1C109 from late April contains the same proposed minority coalition district from a map provided by Opiela on behalf of the delegation (hrc1C104). Plan hrc1C116 ("labeled Congressional 5/3") still contains a possible minority coalition district (CD33), though modified somewhat from Opiela's district (Downton stated that he modified the delegation's district to try to get it above 50%

---

[120] MALC asserts that overlays of districts 12, 26, 6, and 33 with minority population concentrations show "that the jagged and extremely odd shapes were used to gather minority populations and place them into Anglo-dominated congressional districts." Docket no. 1275 at 36 (proposed FF 188). The Task Force argues that the lines more closely track race than partisanship. TrA2134-35 (Ms. Perales). As discussed above, mapdrawers admit that the lines of CD12 and CD26 are partly based on race.

[121] The Court acknowledges that while bizarre shapes are evidence of gerrymandering, they may be evidence of political gerrymandering and not necessarily racial gerrymandering. However, considering all the evidence, including the precinct splits and the map progression (discussed *infra*), the Court finds that the bizarre shapes are at least in part due to racial gerrymandering. Further, although there are some precinct splits with obvious non-racial explanations, such as tracking the boundaries of cities (this appears to be the case with respect to the cities of Southlake, Grapevine, Lewisville, and Coppell along the southern portion of Denton County, as well as the boundaries of CD12 along North Richland Hills), most of the district lines in Dallas County do not appear to particularly follow city boundaries or have obvious non-racial bases.

HCVAP), and then hrc1C119 returns to the delegation's proposed district (or a district substantially similar to it). By hrc1C124, however, DFW begins to take its final shape, and the minority coalition district is removed, now divided up (cracked) primarily among CD6, CD12, CD26, and CD33.[122]

The CD26 extension from Denton County is extended and now includes a significant portion of what had been in the minority district, including what Downton referred to as the northern Fort Worth Hispanic community. CD12 and CD33 then take the other portions of what had been in the minority district in Tarrant County, including what Downton referred to as the southern Fort Worth Hispanic community, and CD6 shifts east into Dallas County to take a large portion of the former proposed minority district within that county. CD24 remains largely the same, as do portions of the border between CD30 and CD32, indicating that this was not a new map drawn from scratch, but a modification of the prior map that essentially dismantled the minority district.[123] The fact that the minority district was drawn and then cracked is demonstrated by overlapping the maps as follows:



---

[122] The Court notes that Defendants had offered an exhibit (D-509) of maps and reports for each of the congressional plans in the hrc1 account, but later withdrew this exhibit. United States exhibit 731 contains shapefiles of the plans discussed here, and the Task Force has submitted exhibits showing some of the shapefiles as well.

[123] This configuration remains in hrc1C130 ("Congressional Ryan Merge 5/20") (PL-1134), and then further modifications are made to include the Trinity River Project and North Richland Hills in CD12 in hrc1C131 ("Congressional Ryan Merge 5/23") (PL-1135). Thus, while the Trinity River Project and inclusion of North Richland Hills in CD12 did help shape the final district configurations in Tarrant County, Downton initially cracked the proposed minority district before making these adjustments.

This contradicts Defendants' assertion that once Downton determined that he could not draw a 50%-HCVAP district, he simply drew districts based on partisan criteria. The progression of his maps demonstrates that he included a minority district in the map, then cracked it into Anglo-majority districts. This is consistent with a motive to disadvantage minorities, not Democrats. Moreover, it is consistent with a motive to crack and limit *minority* population within the Republican districts to curb the effect of continued minority growth (in contrast to Anglo decline or stagnant growth) throughout the decade—to keep the districts "safe" Republican districts as long as possible. Downton cracked minority populations, not just Democrat populations, and dispersed them within Anglo-dominated districts to account for future growth, to ensure that the minority populations would not grow sufficiently to control the district for as long as possible. Thus, the mapdrawing process itself demonstrates cracking of minority populations to disadvantage minority voters.

The Court finds that this evidence persuasively demonstrates that mapdrawers intentionally packed and cracked on the basis of race (using race as a proxy for voting behavior) with the intent to dilute minority voting strength. The Court also finds that the *Arlington Heights* factors further buttress a conclusion of intentional discrimination.

Defendants argue that none of the *Arlington Heights* factors are established or point to a finding of intentional racial discrimination, and contend that Plaintiffs improperly view the factors as boxes to be checked to prove their claim or as establishing a *prima facie* case. However, the *Arlington Heights* factors are permissible areas of inquiry, that when viewed in totality with other evidence in the record, may provide an inference of racial discrimination, given that government actors will rarely provide direct evidence of discrimination. *See Hunt v. Cromartie*, 526 U.S. t541, 553 (1999) (noting that outright admissions of impermissible racial motivation are infrequent and

134

plaintiffs often must rely upon other evidence); *Veasey*, 830 F.3d at 230 n.12 ("[W]e have noted that discriminatory intent . . . may be shown through circumstantial evidence, as discriminatory motives are often 'cleverly cloaked in the guise of propriety.'").[124]

The Supreme Court has stated that *Arlington Heights* provides guidance for assessing a jurisdiction's motive in enacting voting changes and "set[s] forth a framework for analyzing 'whether invidious discriminatory purpose was a motivating factor' in a government body's decisionmaking." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997).[125]  Consideration of the *Arlington Heights* factors, when viewed in totality with the entire record evidence, may support a finding of intentional racial discrimination, even where the individual factors considered alone are not compelling.  *McCrory*, 831 F.3d at 233 (district court erred by considering each piece of evidence in a vacuum rather than engaging in the totality of the circumstances analysis because "[a]ny individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context").  Thus, the Court rejects Defendants' attempt to limit the analysis to each individual factor in isolation.

Concerning the impact of the plan, Plaintiffs rely heavily on the fact that, despite the overwhelming and concentrated minority population growth and the decline in Anglo population in

---

[124] As the Fourth Circuit recently recognized, such a holistic inquiry is particularly important today, where discrimination is achieved more subtly and through more sophisticated devices.  *McCrory*, 831 F.3d at 221; *see also Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994) (noting the "demonstrated ingenuity of state and local governments in hobbling minority voting power" as "jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices").

[125] In *Reno*, the Supreme Court referred to *Arlington Heights* as establishing both a "framework" and a "test" for evaluating purpose.  *Reno*, 520 U.S. at 488-89, 490.

the DFW area, no new minority opportunity districts were drawn.[126]  Further, minority voters' share of statewide proportional representation actually decreased.  Plaintiffs argue that "[t]he only way the minority community would lose their proportion of seats is if a purposeful series of decisions were made to the detriment of the minority community" and "that is exactly what happened."  Docket no. 1228 (MALC closing argument summary) at 4.  Dr. Ansolabahere noted that Plan C185 "falls short of what might reasonably have been expected for Hispanic and black representation following the 2010 Census and reapportionment."  Joint Expert Ex. E-15 at 5.[127]

All of the population growth in Dallas County was attributable to minorities, since Anglo population actually declined by about 200,000, yet this is not reflected in Plan C185.  Under Plan C100, CD24, 30, and 32 had a majority of their population in Dallas County, and CD5 had a plurality.  Anglos controlled all of the districts except CD30 (3 of 4).  Under Plan C185, Dallas residents are the majority of the population in CD6, 30, and 32, and are a plurality in CD5 and 24 (Ansolabahere considers these the five Dallas districts).  Joint Expert Ex. E-15 (Ansolabahere report) at 22. Anglos are majority or plurality in all of the districts except CD30 (4 of 5) even though they are now only about 33% of Dallas County's population.  *Id.* at 22-23.  Thus, the minority group has a majority of seats.  *Id.*  African-Americans were and remain the plurality in CD30.  *Id.*  Hispanics, who are a plurality of the county's population (38%), are the plurality or majority in no districts.

---

[126] Plaintiffs note that the combined total population of Dallas and Tarrant Counties roughly equals Harris County's total population and the combined African-American and Latino population of Dallas and Tarrant Counties is nearly the same as in Harris County, yet Harris County has three minority opportunity districts while the DFW area only has one.  *See, e.g.*, docket no. 1277 at 58.  Because the Harris County African-American districts (CD9 and CD18) already existed, mapdrawers felt they had to maintain them to avoid retrogression under § 5 even though they were not BCVAP-majority districts using available CVAP data.

[127] Dr. Ansolabahere found that, statewide, Plan C185 *reduced* the number of African Americans and Hispanics in minority ability-to-elect districts by 781,408 persons.  Rod-914 (January 2012 Report) at 31.

Ansolabahere report (Joint Expert Ex. E-15) at 22, Table 7 (depo. at 84).  90% of Anglos in Dallas County live in districts in which their race is the majority, compared to 58% of African Americans and 0% of Hispanics.  *Id.* at 23.

In Tarrant County, Anglos are approximately 52% of the County population but are the majority in both districts that are based in Tarrant County, as well as the four districts that take some part of Tarrant County.  *Id.* at 24.  None of the 270,000 African Americans (who are 14% of the population) or the 480,000 Hispanics (who are 27% of the population) are in a district in which they are a plurality or majority.  *Id.*

Although Defendants contend that Plaintiffs are asserting a proportionality argument and that § 2 expressly provides that it does not create a right to proportional representation, Defendants again mischaracterize Plaintiffs' argument.   Plaintiffs are not asserting a right to proportional representation, but are instead arguing that the failure to increase (and in fact creating a plan that results in a *decrease* in) proportional representation despite the minority population growth and the decline in Anglo growth, is evidence of intentional discrimination and purposeful dilution.  *E.g.*, docket no. 1282 (Task Force Post-Trial Brief) at 68 ("In the face of shifting demographics, and the increase in the number of Latino eligible voters in Texas from 2000 to 2010, the State's refusal to create additional Latino opportunity congressional districts is circumstantial evidence of an intent to limit Latino electoral strength in the new redistricting plans."); docket no. 1279 (United States Post-Trial Brief)  at 15-16 (the most relevant circumstantial evidence of discriminatory purpose is the fact that despite massive minority population growth responsible for Texas gaining four seats, Texas did not create any new minority opportunity though it easily could have done so).  On that issue, the law is clear that "the impact of the official action is often probative of why the action was

taken in the first place since people usually intend the natural consequences of their actions." *Reno,*, 520 U.S. at 488. "[A] jurisdiction that enacts a plan having a dilutive impact is more likely to have acted with a discriminatory intent to dilute minority voting strength than a jurisdiction whose plan has no such impact." *Id.*; *see also Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994) ("One may suspect vote dilution from political famine . . . .").

Besides the fact that proportionality is always a relevant consideration in a § 2 vote dilution analysis and lack of proportionality is probative evidence of vote dilution, *De Grandy*, 512 U.S. at 1025 (O'Connor, J., concurring), the effect on proportional representation is also relevant to determining whether the plan bears more heavily on minorities than Anglos. *See Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291, 315 (D. Mass. 2004) (noting that "[i]n the face of a burgeoning minority population, this sort of [proportional] retrogression counts in the plaintiffs' favor"). The United States contends that Plan C185 is more dilutive than the benchmark plan because it widened the representation gap. Docket no. 1279 at 16-17. The United States argues that Hispanic and African-American citizens make up about 38.2% of the State's CVAP (using 2006-2010 ACS data), such that proportionality would be 12/32 districts in Plan C100 and 14/36 districts in Plan C185. *Id.* at 17. Because there were ten opportunity districts in the benchmark plan and there remain ten opportunity districts in Plan C185, the United States argues that the representation gap increased from two to four, thereby further diluting minority voting strength. *Id.* The District Court for the District of Columbia agreed with the concept of this argument in the § 5 preclearance litigation when it found the plan to have a retrogressive effect and denied preclearance.[128] *Texas v.*

---

[128] The majority in *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) noted that the "same Legislature that passed SB 14 also passed two laws found to be passed with discriminatory purpose," citing the D.C. District Court's decision on § 5 preclearance of these maps in *Texas v. United States*, 887 F. Supp. 2d 133, 159-66 (D.D.C. 2012), even

*United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated and remanded on other grounds*, 133 S.

Ct. 2885 (2013).  It found:

> [T]he representation gap in Texas has increased. The Black and Hispanic communities currently make up 39.3% of Texas's CVAP. Joint Stipulations of Fact ¶ 38. Thus, if districts were allocated proportionally, there would be 13 minority districts out of the 32 in the benchmark (39.3% of 32 is 12.6). Yet minorities have only 10 seats in the benchmark, so the representation gap is three districts. In the enacted plan, proportional representation would yield 14 ability districts (39.3% of 36 is 14.1), but there are still only 10 ability districts.  Thus, the representation gap in the enacted plan is four districts.  Because this gap increases by one district, we cannot preclear the enacted plan.

*Id.* at 158 (footnotes omitted).  This Court also agrees.

Further, although Hispanic populations are sufficiently concentrated that most are placed in Hispanic-majority districts in South and West Texas in Plan C185, minorities and Anglos are treated quite differently in Plan C185 overall, with many Hispanics stranded in Anglo-majority districts. In Plan C185, White non-Hispanics of voting age are overwhelmingly placed in districts in which the majority are White non-Hispanics: 83% of White non-Hispanics reside in districts where a majority of the population is White non-Hispanic of voting age, and 88% live in districts in which a majority or plurality are White non-Hispanics.  Ansolabahere Report (Joint Expert Ex. E-15) at 14-15.

In comparison, minority voters are treated quite differently.  *Id.* at 15.  Although there are three million African-Americans (12% of the State's population), there are no majority-Black districts in terms of voting age population, and only 21% of the Black voting age population is in a

---

though this opinion was vacated pursuant to *Shelby County*.  In response to the dissent's attempt to "discredit" the case because it was vacated, the Fifth Circuit majority noted that "the opinion was not vacated on the merits and remains factually relevant as a contemporary example of State-sponsored discrimination based on the finding of a three-judge federal court."  *Id.* at 257 n.54.  Thus, the Court finds that the D.C. Court's conclusions under its § 5 analysis may be considered in this case.

Black-plurality VAP district. *Id.* at 15-16. Forty-four percent of Hispanics live in districts that are majority-Hispanic, while 47% live in districts with a White-majority VAP. *Id.* at 16  Thus, White non-Hispanics, who are 45% of the total population, hold clear majorities in 70% of districts and have opportunities to win 70% of seats, while African-Americans and Hispanics, who are 48% of the State's population, are pluralities or majorities in just 30% of districts. *Id.* at 16-17. This presents a differential opportunity to elect, and it is not explained by having to put more Hispanics into districts to create majority-HCVAP districts. *Id.* at 17. Hispanics of voting age are dispersed into Anglo districts more than Anglos of voting age are dispersed into non-Anglo districts such that nearly three times as many Hispanics are stranded in districts in which they are the minority. *Id.* at 18-19. As a result, proportionality of representation is lacking statewide. *De Grandy*, 512 U.S. at 1025 (O'Connor, J., concurring) (lack of proportionality is probative evidence of vote dilution and is always relevant).

Regarding the historical background of the plan, Plaintiffs offered expert and lay witness testimony concerning Texas's long history of discrimination with regard to voting and in general. *See also Bush v. Vera*, 517 U.S. 952, 981 (1996) (noting parties' reliance on "Texas' long history of discrimination against minorities in electoral processes, stretching from the Reconstruction to modern times, including violations of the Constitution and of the VRA"). The parties take divergent views of the importance of this factor. Citing *Arlington Heights*, the Fifth Circuit recently noted that "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," but unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. *Veasey*, 830 F.3d at 232. Defendants seek to cast most of Texas's history of racial discrimination as ancient history.

The Court finds it unnecessary to rely on evidence of long-past State-sponsored discrimination to find discrimination here. But the Court agrees with the Fourth Circuit in *McCrory* and the Fifth Circuit in *Veasey* that the state's history of race discrimination and violations of the VRA, coupled with other evidence, is relevant to providing context. *Veasey*, 830 F.3d at 232 n.14 ("history (even 'long-ago history') provides context to modern-day events"); *McCrory*, 831 F.3d at 223-24. In this regard, the Court notes the Fifth Circuit recognized that restrictive and discriminatory voting laws have typically been enacted (by *both* political parties) in response to a perception of increased voting power by emerging demographic groups. *See Veasey*, 830 F.3d at 331 & n.10 (Costa, J., dissenting in part); *see also Veasey*, 830 F.3d at 241 n.30 (noting the testimony of Dr. Burton that every time African-Americans had been perceived to be increasing their ability to vote and participate, there has been State legislation to deny them the vote, dilute the vote, or make it more difficult for them to participate on an equal basis as White voters); TrA532 (Flores) (noting that both Republicans and Democrats have discriminated against minorities because they are unsure of how they will vote and therefore try to control it); TrJ1228 (Thompson) (both Democrats and Republicans have engaged in voting rights violations that had to be remedied in court).

With regard to more recent instances of voting discrimination, the Fifth Circuit stated in *Veasey* that *LULAC v. Perry* does not lend support for a finding of "relatively recent" discrimination because the Court relied on the history of discrimination as a context for the disenfranchisement of voters who had grown disaffected by the Republican incumbent, but "did not base its decision on a conclusion that the legislature intentionally discriminated based upon ethnicity." 830 F.3d at 233. However, this seems to overlook the fact that the Supreme Court noted that Texas's actions "bore the mark of intentional discrimination" even though that was not ultimately its holding. *See*

LULAC, 548 U.S. at 440.  The actions that "bore the mark of intentional discrimination" in *LULAC v. Perry* were carried out in 2003 by the Republican-dominated Legislature, and are similar to the actions Plaintiffs complain were taken in 2011 with regard to CD23 and CD27.

Regarding the sequence of events leading up to the challenged decision, the Texas Legislature enacted its 2011 redistricting plans in the context of strong racial tension and heated debate about Latinos, Spanish-speaking people, undocumented immigration and sanctuary cities, and the contentious voter ID law.  Tr810-12 (Turner) (it was a tough session with a lot of tension around voter ID and the early voting absentee bill and their impact on minority voters); TrA262 (Seliger) (the 2011 session involved voter ID, redistricting, and sanctuary cities, which are all "racially charged"); Tr436 (Flores), Joint Expert Ex. E-8 at 6 (the 2011 session was the most racially acrimonious he had seen and it seemed Hispanics and Spanish speakers were targeted); Tr437-38 (Flores) (stating that he observed a video of an individual trying to give testimony in Spanish through an interpreter to the Transportation Committee and one of the Senators interrupted him and said it was insult that he was speaking in Spanish rather than English).

Plaintiffs contend that the process of enacting the map was exclusionary/secretive and was unnecessarily rushed, with little opportunity for public input or meaningful amendments, and that this is further circumstantial evidence of improper motive.  Although David Hanna testified that he did not feel the process was particularly or unusually rushed, TrA1557, and Defendants contend that Plaintiffs have not identified an objective standard to determine whether this process was "rushed" (docket no. 1272 at 39-40), the timeline speaks for itself.

Although the interim field hearings may have succeeded in notifying the public about upcoming redistricting, they were of limited usefulness in terms of obtaining meaningful public input

for legislators, and there is little indication that the 82nd Legislature or the mapdrawers paid much attention to the public testimony received at these hearings. No congressional maps were proposed during the regular session. Once Plan C125 was made public, the map essentially passed in sixteen days.

The initial proposal was drawn largely in secret by Downton in consultation with Solomons, Seliger, Doug Davis, Interiano, and Republican congressional and Texas House insiders. Even Senate redistricting committee lawyers were not shown the plan before it was released. D-602 at ECF 126, 140-41. Senator Seliger admitted that no minority member of the Senate was involved in drawing the plan. TrA256-57. Minority members of the house and senate redistricting *committees* were generally shut out of the mapdrawing process. Although mapdrawers obtained and relied on data such as the RPVAs and OAG 10 analyses from the OAG, this data was not shared with minority members of the Legislature or even the redistricting committee.[129]

When Plan C125 was released on May 31, hearings were set on June 2 and June 3, and a new Plan C130 was released before the June 3 hearing. This was a very short preparation time for hearings, which made it difficult for minority groups to organize to review the maps and prepare comments and proposed alternatives. There was no meaningful debate over minority-proposed plans, and few minority-proposed changes were given meaningful consideration or adopted, only

---

[129] Defendants assert that it should come as no surprise that Democrat members did not have influence on the process, given that they were outnumbered two-to-one in the House. Docket no. 1272 at 48. Defendants also argue that Democrats were kept out of the process because they constantly threatened litigation and refused to support the final plan for fear of weakening their litigation position. *Id*. at 45, 48-49. However, if mapdrawers were truly concerned with complying with the VRA and avoiding litigation, an open process would seem more conducive to that end.

those that did not enhance minority ability or increase the number of minority opportunity districts.[130]

"This hurried pace, of course, strongly suggests an attempt to avoid in-depth scrutiny." *McCrory*, 831 F.3d at 228. Although Defendants note that there was no point of order raised and they were operating within the time limits of the special session, "a legislature need not break its own rules to engage in unusual procedures." *Id.* Further, Defendants assert that Plaintiffs cannot gain traction on this factor because they point to no "normal" procedure from which the Legislature departed in passing this bill, *see* docket no. 1272 at 39, to which Plaintiffs respond that there has been no "normal" benchmark procedure to point to that did not involve violations of the VRA.

Defendants contend that the fact that the process was secretive is not evidence of discriminatory intent "because Plaintiffs have not established that the 2011 redistricting process was any more secretive than previous redistricting legislation, or any legislation for that matter." Docket no. 1272 at 46. However, we examine the process to glean insight into whether there was discriminatory purpose, and the inquiry is not limited solely to comparing this process to prior processes for deviations. In this case, the rushed and secretive process suggests that Defendants did want to avoid scrutiny of whether their efforts in fact complied with the VRA or were intended to do so, or whether they were only creating a facade of compliance.[131] Solomons made misleading comments from the floor, such as that he had not seen a congressional map proposal from Congressman Lamar Smith, that CD6 in DFW was a minority coalition district, and that changes

---

[130] For example, Defendants argue and the record supports a finding that the Hispanic population of CD20 was increased to bolster its performance at the request of minority legislators, but this was in response to retrogression concerns under § 5 and did not affect the partisan balance of the map.

[131] Defendants' argument that "the supposedly inadequate time for public input cannot support a claim of racial discrimination because it affected all members of the public equally" (docket no. 1272 at 41) misunderstands this factor. Plaintiffs are not arguing that the rushed process itself was a discriminatory act; they argue that it is circumstantial evidence of improper motive.

were made to CD23 to maintain its performance.[132]  A rushed process provided less time for minorities to evaluate the plans or to learn that Smith and other Republican leaders were proposing a minority district in DFW.

Legislators' comments that the short-time frame necessitated such a rushed process, while facially valid, were also pretextual in some regards.  Unlike with the House map, there was no impending LRB deadline.  The Governor could have called a second or third special session if the map was not passed during the first special session.  Though Defendants imply that would have caused extra delay, they chose to go to the D.C. Court for preclearance, which they knew to be slower, indicating that delay was not their true concern.  Extending the process even a few extra days would not have derailed the plan, but might have afforded minorities a more meaningful opportunity to examine proposed maps and engage in actual debate, rather than having all their proposed maps tabled without any meaningful debate.

Although these factors are not dispositive on their own, they provide additional pieces of support concerning motivation.  The exclusion of minority member and public input despite the minority population growth, the misleading information, the secrecy and closed process, and the rushed process, all support an inference that steps were taken to undermine minority voting strength to obtain partisan advantage.  Combined with the other evidence in this case, the Court finds that Plaintiffs have established that Defendants acted at least in part with a racially discriminatory motive in enacting Plan C185, and with regard to the districts in DFW in particular.  Defendants have failed to show that the same lines would have been drawn in DFW or that minorities would not have been

---

[132] In addition, although Defendants now state that they rejected maps that included a DFW district because it would have been a Democrat district, this was not the reason given for rejecting and moving to table maps during debates.

packed and cracked without this racial motive.

With regard to effects, packing and cracking is an effective dilution technique that had the intended effect in DFW. Minority votes are wasted in CD30, and elsewhere minorities are kept at levels in which they cannot elect representatives of their choice. The Court has already found that Plaintiffs do not need to satisfy the 50% CVAP requirement, and the Court finds that there is racially polarized voting in Dallas and Tarrant Counties.[133] Except for the existing African-American district CD30, minorities have been consistently unable to elect candidates of their choice to the United States House in the DFW districts. The Court also heard evidence that Anglo Representatives elected in those districts have been unresponsive to their needs. The record sufficiently demonstrates dilutive effect. Accordingly, the Court finds that the districts in DFW are invalid because they violate § 2 and the Fourteenth Amendment.

### III. Houston area claims

Plaintiffs bring § 2 intent and results claims in the Houston area, as well as intentional vote dilution claims under the Fourteenth Amendment. Plaintiffs complain that, despite the minority growth in the area, Plan C185 maintains the same number of minority opportunity districts (three) as the benchmark plan, when an additional minority district could have been drawn. Plaintiffs further argue that the failure to create more minority opportunity was the result of intentional vote dilution in violation of § 2 and the Fourteenth Amendment.

A. Section 2 Results Claims

The benchmark plan C100 had three minority districts in Harris County, one Hispanic and

---

[133] Defendants conceded the existence of racially polarized voting in DFW. Dr. Engstrom found racially polarized voting in Dallas and Tarrant Counties. Docket no. 307-1 (Engstrom Corr. Rebuttal Report) at 12-15, 18-21, Tables 5 & 7.

two African-American.  CD29 (wholly within Harris County) was a Latino opportunity district (56%

HCVAP using 2005-2009 ACS data), and was represented by Gene Green (Anglo, Democrat).  CD9

(in Harris and Fort Bend Counties) and CD18 (wholly within Harris County) were considered to be

African-American districts that consistently elected minority candidates of choice.  CD9 was 38.9%

HVAP, 36.3% BVAP, 12.6% Anglo VAP, 48.2% Black alone CVAP, and 48.4% combined

BCVAP, and was represented by Al Green (African American, Democrat).  CD18 was 39% HVAP,

37.9% BVAP, and 19.3% Anglo VAP, 46.4% Black alone CVAP, and 46.7% combined BCVAP,

and has been represented by Sheila Jackson Lee (African American, Democrat) since 1994.

Although the African-American districts were not quite at the 50% BCVAP threshold set by

mapdrawers for § 2-required opportunity districts, mapdrawers felt these were ability-to-elect

districts that had to be maintained under § 5.

All the population growth in the Houston area was attributable to minorities.  At the Houston

field hearing, many witnesses testified about the minority growth and asked for an additional Latino

district to be drawn there.  Expert witness Richard Murray noted that the minority growth tended to

be in the same areas (eastern half of Fort Bend County and southwest Harris County), and opined

that it would be easy to create a second district (in addition to CD29) that would give Latino voters

an opportunity to elect while maintaining African-American opportunity districts CD9 and CD18.

Joint Expert Ex. E-4 at 27.

Despite the Latino population growth in the Houston area, no new Latino or coalition

opportunity district was created there.  Defendants contend that a new Latino opportunity district

could not be drawn in Harris County without retrogressing the existing Latino district CD29 below

50% HCVAP, and thus no new Latino district was required (and Defendants continue to assert that

minority coalition districts are never required by § 2). *See* docket no. 1276 at 81 (proposed FF 741); TrA1593 (Downton); Downton 8-12-11 depo. (Joint Ex. J-62) at 73 (Downton testified that he tried to draw an additional Latino opportunity district in Harris County (using a 50% HCVAP standard), but could not without retrogressing CD29 (reducing its HCVAP below 50% HCVAP)).

Plan C185 retained the two African-American (CD9, CD18) districts and one Latino opportunity district (CD29) from Plan C100, though certain Plaintiffs contend that changes were made to the African-American districts that weaken them in terms of removing economic engines and creating "tension" between Latino and African-American voters in the districts.  In Plan C185, CD29 is 56.3% HCVAP (and 16.3% BCVAP) using 2005-2009 ACS data.  CD9 is 47.7% combined BCVAP (and 18.3% HCVAP), and CD18 is 48.9% combined BCVAP (and 17.4% HCVAP).  A new district, CD36, was added in the area, but it and all the other Houston-area districts are majority-Anglo CVAP and do not provide minority opportunity to elect.  TrA1498, TrA1505 (Murray) (new CD36 is an Anglo-dominated, Republican district).

Plaintiffs point to various plans that were submitted during the legislative session and as demonstration maps in this litigation to support their argument that an additional minority district should have been drawn in the Houston/Harris County area, and that the failure to do so resulted in vote dilution.  *E.g.*, docket no. 1279 (United States Post-Trial Brief) at 19 n.10 ("Alternative plans created an additional minority opportunity district in Harris County.")[134]; Tr93-94 (Martinez Fischer) (MALC contends that demonstration plans C163, C164, C187, and C188 all created one additional

---

[134] The Court notes that the United States' proposed fact finding 241 states that it was possible to create an additional Hispanic opportunity district in Harris County and cites MALC Proposed Plan C211. Docket no. 1278 at 51. But Plan C211 largely retains the Harris County configuration from Plan C185.  That same proposed fact finding also cites David Hanna's testimony from the July 2014 House trial (though the cited page number is incorrect), but the Court notes that Hanna testified that it was possible to create another minority district in Harris County in the Texas House plan, not the Congressional plan.  TrJ1206-07.

opportunity district in Houston). Although certain Plaintiffs have issues with the districts as drawn, which are discussed in the context of the claims brought by the African-American Congresspersons, they do not challenge any of the Houston-area minority districts as not being opportunity districts. Rather, their claim is that four minority opportunity districts were required by § 2. Thus, the Court concludes that the rule of *De Grandy* applies, and that Plaintiffs must demonstrate that four compact majority-CVAP districts were required by § 2. *See De Grandy*, 512 U.S. at 1008 ("When applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice.").

Given this Court's conclusion that Plaintiffs may satisfy *Gingles* through the use of minority coalition districts with a combined minority CVAP over 50%, the Court must reject Defendants' argument that reducing the HCVAP of CD29 below 50% (when its combined CVAP remains above 50%, converting it from a Latino-majority opportunity district to a coalition district) would be retrogressive and violate § 5 (or would create problems under § 2 in terms of the number of minority-majority-CVAP districts). Creating four opportunity districts instead of three would not be retrogressive, and this is yet another example where Defendants took the most restrictive position on the VRA to avoid creating any new opportunity districts. Further, Defendants improperly focused only on maintaining existing population percentages as the measure of retrogression, and pretextually used their professed compliance with the VRA to avoid creating new minority opportunity districts. Defendants do not seriously assert that they would have been denied preclearance or sued under the

VRA for creating *more* minority opportunity districts.[135]   Nevertheless, the Court concludes that Plaintiffs have failed to proffer sufficient evidence demonstrating that four compact majority-minority coalition districts were required by § 2.

### *1. Plan C122 & Plan C123*

MALDEF proposed Plan C122 and Plan C123 with a new coalition district in Harris County during the session. D-602 at 77; Joint Map Exs. J-3 & J-4.  The four-district configuration in Harris County in these two plans is identical.  What had been the southeastern part of CD29 (the Latino district) is replaced with the new CD36, a Latino opportunity district (50.1% HCVAP using 2005-2009 ACS data), and CD29 is shifted westward (keeping one of the two main Hispanic population centers from former CD29) and changed into a coalition district (35.7% HCVAP + 21.4% BCVAP). Using 2005-2009 ACS data, CD9 was 40.7% BCVAP (and 17.3% HCVAP) and CD18 was 42.7% BCVAP (and 14% HCVAP).  Downton rejected this plan because it did not propose two HCVAP-majority districts (he acknowledged that CD36 is HCVAP-majority but asserted that CD29 was retrogressed because its HCVAP dropped from above 50% to 35.7%).  TrA1593.  As noted, the Court finds that was a pretextual basis for rejecting the plan, given that it provided more minority opportunity.

However, the Court finds that Plaintiffs have failed to offer sufficient evidence that four compact minority-majority districts could have been drawn in the Houston area.  These proposed districts are bizarrely shaped and little information is given concerning how the districts were drawn

---

[135] To the extent Defendants would assert that they could not intentionally draw a fourth minority opportunity district without being subject to a possible *Shaw*-type challenge, the Court does not hold today that Defendants were required to draw four minority opportunity districts in Houston.  Nor does the Court hold that Defendants had to try to draw four minority opportunity districts.  The Court holds only that the VRA did not prevent Defendants from allowing there to be more minority opportunity districts, as Defendants apparently assert by arguing that CD29 HCVAP "retrogression" prevented them from drawing a fourth district.

and what traditional redistricting principles were applied.  While CD18 and CD29 remain wholly within Harris County, they are changed significantly from the benchmark configuration.  CD9 is also modified and adds a long appendage into Fort Bend County that splits the cities of Richmond, Rosenberg, and Sugar Land.  New CD36 is not particularly compact, its borders do not respect cities, and it contains a small appendage that juts into Brazoria County to pick up 940 individuals, splitting the city of Brookside Village.  Plaintiffs fail to offer sufficient evidence that the minority populations in these four districts are compact, taking into account traditional redistricting principles.

### 2. Plan C163, Plan C164, and Plan C188

Representative Martinez Fischer proposed Plans C163 and C164 during the session, and the four proposed districts in these maps and MALC demonstration Plan C188 (districts 9, 18, 29, and 36) are almost identical.  These plans maintain the general shape and location of existing districts CD18 and CD29.  Joint Expert Ex. E-18 (Giberson Report) at 7 (noting that the existing Hispanic-majority district CD29 is essentially maintained in its current form, with both large Hispanic population cores remaining in the district).  Although these districts are bizarrely shaped, their configuration is arguably explained by the traditional districting principles of maintaining benchmark configurations and member-constituent relationships.  New CD36 is placed to the west, and Giberson noted that it encloses some additional areas of Hispanic population in the western part of Harris County.  *Id.*  Although Giberson gives compactness scores for CD36 in the plans (10.5/2.1/3.8 for C163 and 10.4/2.1/3.8 for C164), he did not comment on the compactness of the districts other than his general observation that none of the districts he evaluated "are compelling by shape alone."  *Id.* at 7-8.

Dr. Arrington found generally that Plan C163 "satisfied traditional redistricting principles"

without specifically analyzing the proposed Harris County districts. TrA410-11. He stated generally that Plan C163 overall "did at least as good a job as the 2011 plan in satisfying traditional districting principles." TrA411. The borders of CD36 appear to respect the boundaries of small cities (by excising them from the district), but the boundaries of CD9 cut Stafford, Missouri City, and Arcola. Further, CD36 is not particularly visually compact and extends a fishtail-shaped protrusion into CD9. While this configuration of districts is an improvement over many other plans, the Court nevertheless must conclude that Plaintiffs have not provided sufficient evidence to satisfy the first *Gingles* precondition at this time. As previously noted, Plaintiffs must provide the Court with evidence to find that, taking into account traditional districting principles such as respecting communities of interest (aside from race), these districts include compact minority populations. Unless and until such evidence is presented, the Court cannot find that Defendants violated § 2 by failing to draw a fourth minority district in the Houston area.

### 3. Plan C166

Plan C166 is offered by the Rodriguez Plaintiffs as creating an additional Hispanic opportunity district in Harris County. Joint Map. Ex. J-7. CD9 is 40.5% BCVAP and 18.5% HCVAP; CD18 is 44.3% BCVAP and 14.8% HCVAP; CD29 is 38% HCVAP and 21.2% BCVAP, and new CD36 is 45.1% HCVAP and 14.2% BCVAP.[136] This plan was offered by Representative Dawnna Dukes during the session, but she was not pleased with its Harris County configuration,

---

[136] Ansolabahere testified that CD36 was 45.1% HCVAP using 2005-2009 ACS but that he believed it would be slightly over 50% using updated data. Tr1159. In fact, it is 49.1 (+/- .9)% using 2008-2012 ACS data. D-565.5. In any event, its combined B+HCVAP would be well over 50%.

which was a result of having to create the map in a short time.  TrA916 (Dukes).[137]

Dr. Arrington testified that he studied Plan C166 and believed it was possible to create a new minority opportunity district in the Houston area.  TrA406-07.  Arrington found generally that Plan C166 "satisfied traditional redistricting principles" without specifically analyzing the proposed Harris County districts.  TrA410-11.  Dr. Ansolabehere testified that Plan C166 created an additional Hispanic opportunity district by moving existing CD29 and adding new CD36 in southeastern Harris County. Tr1157-61.  The concept of this map is similar to MALDEF's Plan C122.

This plan does not demonstrate that four minority coalition districts were required by § 2 because Plaintiffs again failed to proffer sufficient evidence that the minority communities contained therein are compact.  Even if new CD36 could be viewed as reasonably compact based on shape, the other three districts are bizarrely shaped. CD9 contains a long tentacle that reaches far into Fort Bend County and splits small towns.  Plaintiffs fail to demonstrate that these districts are compact, taking into account traditional redistricting principles.

### 4. Plan C168

Plan C168 was offered during the session by Rep. Alvarado (Hispanic, Democrat) to add a second Latino opportunity district in Harris County while maintaining the three existing districts. Rep. Alvarado said both districts CD29 and CD36 are completely in Harris County and have a

---

[137] The Harris County districts are almost identical to those proposed during the session by Sen. Gallegos in four-district Plan C127.  The NAACP and African-American Congresspersons objected to Plan C166 because, they contend, it "seriously undermines the continuing effectiveness of the Harris County African-American opportunity districts"  Docket no. 466 at 5. Gallegos noted that 100% of the growth in Harris County was due to minorities, yet no new minority district was created.  D-602 at 175.  He stated that his proposed map did not retrogress and that there are a number of ways to draw four effective minority districts in Houston "if there is a will."  *Id.*  He also proposed Plan C129, but no party seems to be offering that plan (and in any event CD1 is far from compact).  Gallegos stated that his proposals included two compact Latino districts with HVAP over 60%, one representing "East Side" communities of interest and one representing "North Side" communities of interest.  *Id.* at 176-78.  He stated that both districts would provide Latino ability to elect even though their SSVR was below 50%.  *Id.*

HVAP over 50%, and though the SSVR was slightly under 50%, "both have proven to elect Latino voters' preferred candidate." D-23 at S7.[138]   She stated that CD29 remained anchored in north Houston and "picks up the growing Latino communities of west and southwest Houston, Harris County." *Id*.

The four proposed minority districts in this plan are similar to the ones in Plan C122 and C166.  And again, other than the fact that they might reach the numerosity threshold by picking up minority areas and will perform for minorities, Plaintiffs failed to offer sufficient evidence that the minority populations are compact for § 2 purposes.

### *5. Plan C187*

MALC contended that this plan created an additional minority opportunity district in Houston.  Joint Map Ex. J-9.  However, proposed new minority-coalition CD36 is an absurdly long, visually non-compact district, and Plaintiffs failed to proffer sufficient evidence showing that four compact minority-majority districts were required by § 2.

### *6. Plan C190*

The Task Force alleges that there should be a Latino opportunity district and a coalition district in the Houston area, in addition to the existing two African-American districts, as shown in its demonstration plan C190.  Docket no. 416 at 4-7; Joint Map Ex. J-11; PL-345 (map).  This map suggests a similar configuration to Plan C122, with proposed new CD36 being HCVAP-majority (50.1% HCVAP using 2005-2009 ACS data) and CD29 taking the northern Hispanic population

---

[138] Solomons opposed the amendment, stating that the map retrogressed CD29 because it dropped the SSVR to 35.5% and its HCVAP to only 38.6%, and the new district was only 42.5% SSVR and 41.1% HCVAP, and that it in effect had one less Latino opportunity district. D-23 at S9-S10.  Alvarado responded that they were coalition districts, and Rep. Veasey stated that Solomons was using arbitrary numbers that "are not the gold standard," and that there are other factors that need to be taken into consideration, including that the proposed district would elect the candidate of choice. D-23 at S10.

center from former CD29 and moving westward to become a coalition district (35.7% HCVAP, 57.1% H+BCVAP).[139]   The African-American districts are 40.7% BCVAP (CD9) and 42.2% BCVAP (CD18).  The district locations are also similar to those proposed in Plan C166.

The Task Force says CD29 would be a Latino and African-American coalition district with HCVAP of 35.7%, and that the district provides reasonable opportunity for Latino voters.  Docket no. 482 at 73-74 (proposed FF 408-412); docket no. 1274 at 160 (proposed FF 1061).  It is wholly contained within Harris County. The Task Force says the district "unites communities with low educational attainment" and "low-income communities" in Harris County.  Docket no. 482 at 74-75 (proposed FF 413, 416); docket no. 1274 at 161 (proposed FF 1062, 1065).  Further, citing the declaration of Mary Ramos from Houston, the Task Force asserts that CD29 "would combine a largely African American community with a predominantly Latino community into one district" and that the communities joined in CD29 "are largely working class and low income," "share many similarities in terms of the public safety, economic, and educational issues that they face," and "are unified in terms of many of the key issues that voters often look at when choosing who to vote for as an elected official."  Docket no. 1274 at 164 (proposed FF 1088); PL-417.

Task Force exhibit PL-364 shows that CD29 joins areas with significant amounts of population 18 years or older who speak Spanish or speak English "not well" or "not at all."  The same is true for CD36, though it also includes a large area to the east that includes less than 10% such population.  Both districts encompass significant amounts of populations with high percentages

---

[139] As with other plans, Defendants contend that the new Latino district retrogresses CD29 by bringing it from 56% HCVAP and 52.6% SSVR to 35.7% HCVAP and 31% SSVR.  Docket no. 411 at 17. The Task Force correctly responds that, by reconfiguring the existing districts to create one Latino opportunity district (the same number as in the benchmark) as well as an additional coalition district, Plaintiffs increase electoral opportunity and do not diminish it. Docket no. 460 at 15.

of adults age 25 and over without a high school diploma.  PL-365.  Both districts include a mix of median household incomes, though both include predominantly lower income households.  PL-366.

Defendant's expert Todd Giberson noted that historically, CD29 has connected two distinct but proximate centers of Hispanic population, one north of downtown Houston and another to the southeast.  Joint Expert Ex. E-18 at 6.  He states that in Plan C190 these two centers of Hispanic population are severed to form the core of two separate districts.  *Id.*  Although he provides compactness scores for CD29 (16.0/2.1/4.0) and CD36 (11.5/1.7/2.6), he makes no comments about compactness.  *Id.*  At his deposition, Giberson stated that CD36 was "probably not an issue" in terms of compactness, and that his concern was about the splitting of CD29.  Giberson depo. (Joint Ex. J-42) at 16.  However, he acknowledged that the shape of CD29 could be explained by its working around adjacent African-American opportunity district CD18.  *Id.* at 16, 21.

The Task Force also states, "In light of the fact that traditional redistricting criteria support the location of new congressional districts in areas of greatest growth, and racial minorities comprised more than 100% of the increase in Harris County from 2000, it is easily understandable why a new congressional district in this area would be majority-minority, regardless of whether § 2 requires such a district.  The State presents no evidence to suggest that a new majority-minority district in Harris County would be an unconstitutional racial gerrymander, as opposed to the natural result of locating a new congressional district in an area of high population growth."  Docket no. 460 at 16.  Once again, Plaintiffs appear to shift the burden to Defendants to prove that their proposed districts would violate *Shaw*, when the proper burden is for Plaintiffs to demonstrate that four compact majority-minority CVAP districts could be drawn in the Houston area.  While it is true that growth in the Houston area was attributable to minorities and Defendants may have been able to

156

draw an additional non-racially-gerrymandered district there that could have performed for minorities, Plaintiffs fail to demonstrate that their plan includes four compact districts required by § 2. Plaintiffs proffer evidence that the districts meet minority population CVAP thresholds and would perform, and that the populations do have some commonalities other than race, but as with CD6 in Plan C190, they fail to proffer evidence showing that, taking into account traditional districting principles, these four districts represent compact minority populations of sufficient number.

### 7. Plan C193 & Plan C194

The NAACP and African-American Congresspersons offer plan C193, which contains only the two African-American districts CD9 and CD18, and Plan C194, which adds CD29 and CD36. Their expert Murray opined that a new effective Latino district could be added in Harris County without changing the African-American districts (in fact restoring them from changes made in Plan C185), as shown in Plan C193. Tr1047-49, TrA1431-32; TrA1494; Joint Expert Ex. E-4 at 37; Murray depo. (Joint Ex. J-49) at 98-99.

Fairfax testified that Plan C193 met traditional redistricting criteria and could be adopted by the state. Tr834. He stated that CD9 and CD18 were centered in Harris County. Tr836. They retain their benchmark configuration in general. Fairfax stated that CD9 was a majority-minority district with 49.4% BCVAP and 18% HCVAP, and that it complied with the traditional redistricting criteria he analyzed (equal population, contiguity, compactness, and county splits). Tr836. He testified that CD18 was 49.3% BCVAP and 18.6% HCVAP. Tr837. However, these Plaintiffs fail to proffer sufficient evidence showing that districts 29 or 36 contain compact minority populations—CD36 stretches all the way to the coast, and CD29 expands into Montgomery County. Accordingly, they

have failed to demonstrate that four compact minority-majority districts were required.

### 8. Plan C199

LULAC offers its demonstration Plan C199 (LULAC 12-1-C), a four district plan.[140]  Tr742 (Korbel).  Korbel stated that the purpose of this plan was to see if a Hispanic opportunity district could be added without affecting the numbers of the current Latino opportunity district CD29.  He stated that the proposed new district puts the minority population in Jefferson and Galveston Counties in with the primarily Hispanic minority population in Harris County.  He acknowledged that "may seem like a stretch" but that it had been traditionally done in Texas, with those areas instead attached to Anglo-dominated districts. Tr694-95 (Korbel).  Korbel stated that Plan C185 ties the minority community in Jefferson County to the minority community in Galveston County and connects them with a sand dune and then joins them to quite a number of Anglos to make an odd-shaped district (CD14) when one could join the minority community of Jefferson County with the minority community in Harris County to create a new minority district.  Korbel depo. (Joint Ex. J-46) at 77-78.  However, as discussed previously, the fact that populations or areas may have been joined in other districts for unknown reasons or as part of political gerrymandering does not satisfy Plaintiffs' burden of demonstrating that the minority population contained in their proposed district is compact.  Further, these districts are not at ideal population.  This map fails to show that four compact districts were required by § 2.

### 9. Summary of § 2 results claims

In sum, Plaintiffs have failed to proffer a demonstration plan accompanied by sufficient

---

[140] The districts are similar to those proposed in LULAC demonstration Plan C197 for Harris County.

evidence to demonstrate that four minority opportunity districts were required by § 2.[141]  However, they are not precluded from raising § 2 results claims with regard to Plan C235 during the trial on that plan.

B. Intentional Vote Dilution

Expert witness Murray noted that Harris and Fort Bend Counties added about 920,000 people between 2000 and 2010, and all the growth was minorities, as the two-county Anglo population declined by about 42,000.  Joint Expert Ex. E-4 at 27.  As noted, he opined that this minority growth and its location (generally southwestern Harris County and the eastern half of Fort Bend County) should make it easy to provide additional minority opportunity in Houston.  *Id.*

The Task Force Plaintiffs note that, in 2010, persons of Hispanic origin were 40.8% of the population of Harris County. PL-301 (docket no. 322-5) at ECF 1008.  Nearly 80% of the intercensal growth was attributable to persons of Hispanic origin. Joint Expert Ex. E-9 at 5. Non-Hispanic Whites were 33% of the population, and African-Americans were 18.9% of the population of Harris County.  PL-301 (docket no. 322-5) at ECF 1008.  Despite the fact that minorities were responsible for the growth in the area, and a new district (CD36) was placed partly in Harris County, no new minority district was drawn in the Houston area.

Plaintiffs allege that mapdrawers utilized racial gerrymandering (cracking) to avoid creating a new minority district and to intentionally dilute minority voting strength in the Houston area.  *See* docket 1282 (Task Force post-trial brief) at 68 ("In Harris County, where Latinos constituted 79.75% of the growth and the total Latino population exceeds 1.5 million, Texas redistricters created boundaries that prevented the emergence of a new combined opportunity district."); docket no. 1278

---

[141] Any other plan not specifically discussed herein suffers from the same lack of proof.

at 51 (United States proposed FF 242) ("The 2011 Plan intentionally cracked the Hispanic population of Harris County, dividing 672,362 Hispanics among six Anglo-controlled districts—CD 2, CD 7, CD 8, CD 10, CD 22, and CD 36.").[142]  They allege that the configuration of districts and the failure to create a new minority opportunity district despite the minority population growth is circumstantial evidence of dilutive intent.  Docket no. 1282 at 78; docket no. 1278 at 52 (proposed FF 244).

The United States relies on Dr. Arrington's expert opinion that mapdrawers used cracking to prevent the creation of an additional Hispanic district.  TrA412; US-352 at 48; US-356 at 11; Rod-906.[143]  He notes that there are 672,362 Hispanics divided in six Anglo majority districts, four of which "swoop in" from outside Harris county to grab Hispanic population.  TrA412-13 ("There are a number of Anglo-dominated suburban districts which have fingers reaching into Harris County and picking off Hispanic population and, therefore, cracking that population, making it impossible to create an additional district in Harris County."); US-356 at 11.  Given that Hispanic majority district CD29 had 525,996 Hispanics in Plan C185, Arrington reasons that 672,362 Hispanics is more than enough to create a second Hispanic district.  US-352 at 49.  Arrington also notes the bizarre shapes

---

[142]  It is not clear whether any Plaintiffs assert packing claims against districts in Houston. In 2011, Quesada Plaintiffs alleged that CD18 was packed.  Docket no. 409 (Quesada Post-Trial Brief) at 46.  Kousser testified in 2011 regarding his report (Table 24), which asserted that minority districts were packed, and he stated that BHVAP was increased in all ten districts with BHVAP majorities except CD18. Joint Expert Ex. E-2 at 114-116; Tr296-98. Although the Task Force cites Kousser's Report for his opinion that there was packing and cracking statewide (docket no. 1274 at 414, ¶ 541), no party asserts packing as to a particular district in Houston in their post-2014 trial briefs.  The Court notes that the BHVAP numbers for Plan C100 in Kousser's report appear to be incorrect, and when correct numbers are used the BHVAP in CD9 decreased from 74.3% to 72.4 and the BHVAP in CD18 decreased from 76.2% to 71.7%, while the BHVAP in CD29 increased only 1% from 82.5% to 83.5%.  Further, CD9 actually contains fewer Hispanics (C100 had 310,931 and C185 has 271,030) and African Americans (C100 had 269,443 and C185 has 267,466) and more Anglos (C100 had 76,112 and C185 has 77,211).  This is inconsistent with an intent to pack the district.  CD18 has fewer Hispanics, more African Americans, and more Anglos.  Only CD29 has more Hispanics and African-Americans and fewer Anglos.  To the extent any Plaintiffs are asserting packing claims regarding the Houston minority districts, they have failed to support them.

[143]  To the extent Defendants have objected to Dr. Arrington's reports on hearsay grounds, the Court notes that it cites these reports only as support for Dr. Arrington's live testimony at trial.

of the districts as evidence of gerrymandering.[144]  *Id.*

The NAACP argues that the fracturing of historic and politically active African-American communities was rampant in Harris County, with communities like the Third Ward/MacGregor neighborhood being fractured.   Docket no. 1280 at 22; TrA1451-52 (Murray) (Third Ward/MacGregor had been in CD18 and was now split between CD9 and CD18)); Tr1407-09 (Dixon).  The NAACP contends, "Across the board, this fracturing was so precise, and so destructive that it can be explained only by an intent to undermine the emerging political power of minority voters."  Docket no. 1280 at 22.

The Court finds that some of the evidence that supported a finding of intentional vote dilution in the DFW area applies to the Houston area.  Despite the fact that minorities were responsible for the growth, mapdrawers were hostile to the creation of any district in the Houston area that would contain sufficient minority population to allow them to elect candidates of their choice (because mapdrawers assumed those candidates would be Democrats).  Mapdrawers decided that the new map would add only one Democrat seat and three Republican seats, which meant that they would permit only one new minority district.  And mapdrawers wanted to limit minority population in the districts at the time of redistricting and for the foreseeable future to minimize their future ability to elect candidates of their choice, which Defendants thought would be Democrats.

Further, the *Arlington Heights* factors, discussed previously, are relevant circumstantial evidence of dilutive intent.   Concerning the impact of the plan in Houston specifically, Dr. Ansolabahere noted that Harris County is an example of where Hispanics are disproportionately

---

[144] As before, the Court notes that while bizarre shapes are often evidence of gerrymandering, it may be partisan gerrymandering and not necessarily racial gerrymandering.

stranded in Anglo-majority districts. In Plan C185, ten districts take part of Harris County, and seven of those districts draw a majority or plurality of their population from Harris County. Ansolabahere Report (Joint Expert Ex. E-15) at 20. Ansolabahere noted that Harris County is plurality Hispanic (41%) (and there enough Hispanics in Harris County (1.7 million) to populate two and half districts), but only one district based in Harris County is majority-Hispanic (CD29) and none is plurality-Hispanic (two are Black plurality even though Blacks are 19% of the population). Even though Anglos are only 33% of Harris County's population, four of the seven districts (57%) are White-majority. *Id.* at 21, Table 7; Ansolabahere depo. (Joint Ex. J-44) at 83-84. Thus, while Hispanics have the largest population in Harris County, they are distributed in such a way that they have the least representation of all the groups (31% of Hispanics are in plurality or majority-Hispanic districts, while 67% of the Black population is in the two Black districts, and over 80% of Whites are in majority-White districts). Ansolabahere Report at 21-22.[145] The district lines magnify Anglo representation and shrink Hispanic representation. *Id.*

The Court further notes that the existence of racially polarized voting in the Houston area[146] the lack of minority candidates of choice being elected outside of protected VRA districts, the lingering effects of discrimination that affect voting, and whether the policy underlying the state's

---

[145] In Harris County, African Americans have two districts, which is proportionally more than their share of the population (though one district would be less than their proportional share). Ansolabahere depo. (Joint Ex. J-44) at 122-24. But statewide they have less.

[146] The Court again notes that Defendants conceded the existence of racially polarized voting statewide except for Nueces and Kleberg Counties. In addition, there was ample expert and lay witness testimony concerning the existence of racially polarized voting in the Houston area, including but not limited to: Joint Expert Ex. E-15 (Ansolabahere Report) at 33, Table 5; Tr887 (Murray); Joint Expert Ex. E-2 (Murray report) at 26; Tr1333-51 (Al Green); Tr1080-81 (Lawson); Tr1390-91 (Jefferson); Tr1400 (Gonzalez); Tr1412-14 (Dixon); Tr1521-23 (Jackson Lee).

action is tenuous[147] are also relevant evidence of intentional vote dilution.

Nevertheless, the Court must find that Plaintiffs have failed to sufficiently distinguish the role of race and politics in the drawing of district lines in Harris County. There is no dispute that minority communities are cracked; the question is whether such cracking was intentionally race-based and racially discriminatory (as opposed to being the result of partisan gerrymandering), and Plaintiffs have failed to offer sufficient proof that it was. Unlike in DFW, Plaintiffs fail to show race-based packing in minority districts or the intentional splitting of a minority district, and Plaintiffs did not provide evidence of precinct splits that were likely race-based as they did in DFW. Further, although minority neighborhoods like Third Ward/MacGregor were split, the Court does not find sufficient evidence that these splits were intended to dilute minority voters or to harm them—minority communities were simply foreseeable casualties of Downton and other decisionmakers pursuing their partisan ends without consideration for or input from the affected minority communities. And existing Supreme Court precedent on partisan gerrymandering precludes any relief for the harmful effects on minority voters in this case. Accordingly, the Court finds that Plaintiffs have failed to prove entitlement to relief under § 2 or the Fourteenth Amendment for intentional vote dilution in the Houston area.

## IV. African-American Congresspersons' claims

Congresspersons Eddie Bernice Johnson, Sheila Jackson Lee, and Al Green allege Equal Protection Clause claims based on the claim that the African-American districts were drawn in a way

---

[147] As noted, Republican leadership continually took the position that in proposed plans creating an additional minority district, CD29 would be "retrogressed" and this would violate the VRA to justify their refusal to consider those plans, when the creation of more minority opportunity districts would not be retrogressive and they could not reasonably believe that they would be denied preclearance or sued under the VRA for creating more minority opportunity. This pretextual assertion furthered Defendants' goal of appearing to diligently comply with the VRA while deliberately minimizing its effectiveness and deliberately limiting minority opportunity.

the undermines the ability of African-Americans to effectively participate in the political process in those areas. Specifically, they complain that mapdrawers unnecessarily split communities of interest, removed important areas from existing districts, and undermined the effective and long-term voter coalition (by creating tension between African-American and Latino voters) in these areas. However, the Court finds that Plaintiffs failed to establish an intent to discriminate based on race in the drawing of the African-American Congresspersons' districts. Rather, the changes to the district were the effects of partisan gerrymandering and the lack of input from Democrat members.

The evidence indicates that Congresswoman Johnson's home was mistakenly drawn out of her district, and mapdrawers were not aware of the error until after the plan was enacted. To the extent specific "economic engines" or district offices were removed, Plaintiffs failed to prove that these areas were knowingly or intentionally removed from the specific districts with an intent to harm or discriminate, and the evidence shows that Anglo members also lost economic engines and district offices. With regard to the potential for tension among racial groups within the districts, the Court finds that Plaintiffs failed to prove that this tension was purposefully created or intentionally discriminatory. Rather, the evidence shows that mapdrawers were concerned with racial population percentages and district performance of these districts for § 5 retrogression purposes, but gave little to no thought about how the different minority populations might interact within the district long-term.

## SUMMARY

Plaintiffs have established a § 2 violation, both in terms of intent and effect, in South/West Texas. Plaintiffs have shown that seven compact majority-HCVAP districts could and should be drawn there that would substantially address the § 2 rights of Hispanic voters in South/West Texas,

including Nueces County. Defendants' decision to place Nueces County Hispanic voters in an Anglo district had the effect and was intended to dilute their opportunity to elect their candidate of choice. Meanwhile, race predominated in the drawing of CD35, and Defendants' decision to place majority-HCVAP CD35 in Travis County was not to comply with the VRA but to minimize the number of Democrat districts in the plan overall. Plaintiffs have established a *Shaw*-type equal protection violation with regard to CD35. Plaintiffs also establish a *Shaw*-type equal protection violation with regard to CD23. In addition, Defendants' manipulation of Latino voter turnout and cohesion in CD23 denied Latino voters equal opportunity and had the intent and effect of diluting Latino voter opportunity. Nueces County Hispanics and Hispanic voters in CD23 have proved their § 2 results and intentional vote dilution claims. The configurations of CD23, CD27, and CD35 in Plan C185 are therefore invalid.

Plaintiffs fail to proffer a demonstration plan accompanied by sufficient evidence to demonstrate that additional compact minority districts could be drawn in DFW or Houston, taking into account traditional redistricting principles and communities of interest. However, they are not precluded from raising § 2 results claims with regard to Plan C235 during the trial on that plan.

Plaintiffs have proved intentional vote dilution through packing and cracking in DFW and also establish a *Shaw*-type racial gerrymandering claim with regard to CD26, but not CD6. However, they fail to prove intentional vote dilution in the Houston area, and fail to prove that mapdrawers acted with racially discriminatory purpose when drawing the districts represented by the African-American Congresspersons.

SIGNED on this 10th day of March, 2017.


_____/s/_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE


_____/s/_____

ORLANDO L. GARCIA
CHIEF UNITED STATES DISTRICT JUDGE


JERRY E. SMITH, Circuit Judge, dissenting:

I respectfully dissent.

First, we no longer have Article III jurisdiction, because, under recent, binding Fifth Circuit caselaw, the case is moot, so we have a constitutional duty to dismiss. Second, although this court should not be issuing an advisory opinion on a matter that is moot, I dissent on the merits, assuming arguendo that the matter is not moot, insofar as the majority finds violations, with the exception of the majority's treatment of DFW, as to which I agree with the result and largely with the reasoning. The majority's findings of violations in other districts are insufficiently supported in the record under applicable law.

The majority's massive product, including its opinion and its findings and conclusions, is commendable, to say the least. I trust that the attorneys and litigants appreciate the efforts of my two colleagues and their staffs. Though I disagree with a good number of their ultimate conclusions, no one can reasonably question the integrity and dedication that underlie each statement and every decision. The majority's detailed recitation of the record is remarkable in its detail. It is

166

evenhanded, thorough, and fair.  It will permit the Supreme Court, on direct appeal, the opportunity to know every nuance of the case in the unlikely event that that Court concludes that the matter is not moot.

There is good news and bad news from the fact that the majority has tackled this colossal task with such proficiency.  The good news is that, as I have already said, the reviewing court—as well as the public and, perhaps ultimately the legislature—has the advantage of a full record and a complete explication of the majority's conclusions.  The bad news is that that project has taken about 2½ years to complete, measured from the end of trial in August 2014.

No one can reasonably criticize the delay.  Some of the parties have made repeated but polite inquiries and have filed motions reminding the court of the need for expeditious resolution in light of the statutory schedule for the 2018 elections.  I can appreciate the litigants' and attorneys' frustration that these proceedings have pended for almost six years.  But assuming that this panel needed to wade through the huge record and caselaw to announce a result (beyond a declaration of mootness), the time it spent was absolutely necessary.  We explained that in a carefully detailed order entered January 5, 2017, denying the January 2 "Amended Non U.S. Plaintiffs' Joint Motion for Entry of Judgment":

> This case involves a voluminous record.  As movants acknowledge within this motion, "The litigants in this cause have had two trials totaling hundreds of hours of testimony and thousands of pages of exhibits and evidence.  All pending issues have been briefed extensively."  In terms of the record alone, this case includes: over 1300 docket entries, including pleadings, lengthy post-trial briefs, reply briefs, supplemental briefs, proposed fact findings, proposed conclusions of law, argument summaries, and Powerpoint presentations from each of the parties in this case (the post-trial briefs and proposed fact findings and conclusions of law from just two of the many parties—Plaintiff Latino Redistricting Task Force and Intervenor United States—total over 1,000 pages); over 10,000 pages of transcripts (including 6,850 pages of transcripts from the trials in this case, not including the interim plan

167

proceedings or any other hearings, thirteen agreed lay witness depositions entered into evidence totaling almost 1,800 pages, and twelve agreed expert witness depositions entered into evidence totaling almost 1,400 pages); approximately 3,000 exhibits, many of which are hundreds of pages long and include numerous lengthy reports, supplemental reports, and rebuttal reports from the twenty-one expert witnesses in this case; as well as numerous disputed proposed deposition excerpts and offers of proof.  The relevant case law contains too many pages to count.  The Court continues to diligently work through this voluminous record and the complex legal questions presented in this case and will issue an opinion as soon as possible.

Back to the bad news:  Although the delay in respect to an examination of the complex merits issues is understandable, the delay in rendering a dispositive, final, and appealable judgment is not.  Once *Davis v. Abbott*, 781 F.3d 207 (5th Cir. 2015), was announced two years ago, reversing the decision of this panel, and more certainly after the Supreme Court denied certiorari in November 2015, mootness was obvious.  And no one disputes that a federal district court has the constitutional duty to examine possible want of jurisdiction, including mootness, *sua sponte* if necessary.[1]

But no *sua sponte* examination was even needed:  In early May 2015, the state alerted this court to *Davis* with unmistakable precision:

> [In *Davis* the Fifth Circuit] made clear that "after Texas repealed the 2011 plan, . . . the case became moot and eliminated the district's jurisdiction over the remaining issues in the lawsuit."  [*Davis*, 781 F.3d] at 220.  In light of this new, binding authority on mootness from the Fifth Circuit, the State Defendants respectfully submit that the Plaintiffs' claims in this case were also mooted by the repeal of the challenged 2011 redistricting plans.  (Because the United States did not file its complaint until after the challenged plans were repealed, it did not present a live case or controversy to begin with.)  It follows from *Davis v. Abbott* that the plaintiffs' claims became moot before final judgment; they should therefore be dismissed for lack of subject-matter jurisdiction.  At the very least, *Davis* implies that the Plaintiffs' claims are moot if they challenge districts that were, like Senate District 10, modified by the Court and later adopted in modified form by the Legislature.

---

[1] The majority's assertion that "it was Defendants' burden to prove mootness" is misleading.  Every federal court has the undeniable duty to assure itself, on a continuing basis, that it has jurisdiction.  So any preliminary pronouncements that this panel may have made concerning mootness must be corrected if we no longer have jurisdiction.

(Ellipses in original, citations omitted.)  The United States, as intervenor, filed a three-page response in mid-May 2015.[2]

In the interest of expediency, and as directed by the Fifth Circuit in a related case that is in all relevant respects identical, the panel should have agreed to issue a judgment of dismissal for mootness no later than late 2015, after certiorari had been denied.  That would have provided ample time for a direct appeal to the Supreme Court, which long ago would have rendered a judgment on mootness.

Although misguided, the majority's decision is somewhat understandable if not downright commendable in showing dedication to the task at hand.  A bare dismissal for mootness would have incensed the parties aggrieved by it, and if the dismissal had ultimately stood, all the efforts that culminated in the August 2014 trial on the 2011 Congressional plan would have been seen as wasted.  The panel would have been maligned for "punting" on a significant segment of the Texas decennial redistricting litigation.  Moreover—and speaking charitably—my distinguished colleagues may have been reasonably influenced by the "sunk cost fallacy," defined as "continu[ing] a[n] endeavor as a result of previously invested resources (time, money or effort)."[3]

But we are where we are.  I will examine, in detail why this matter is moot.  Then, with great respect, I will show why significant parts of the majority's legal analysis are infected with clear error.

---

[2] Other plaintiffs separately indicated that they joined in that response.

[3] "Sunk cost fallacy," https://www.behavioraleconomics.com/mini-encyclopedia-of-be/sunk-cost-fallacy/. The concept results from "bias resulting from an ongoing commitment . . . . [A] person may have a $20 ticket to a concert and then drive for hours through a blizzard, just because [he or she] feels that [he or she] has to attend due to having made the initial investment.  If the costs outweigh the benefits, the extra costs incurred (inconvenience, time or even money) are held in a different mental account than the one associated with the ticket transaction."  (Citing H.R. Arkes and C. Blumer, "The Psychology of Sunk Costs," *Organizational Behavior and Human Decision Processes* 35, 124-40 (1985); R.H. Thaler, "Mental Accounting Matters," *J. of Behavioral Decision Making* 12, 183-206 (1999).

I. Mootness deprives this court of jurisdiction

A.

The state correctly contended, long ago, that this matter is moot as mandated by *Davis*, a Fifth Circuit decision by which we are bound. Because we are without jurisdiction in the absence of an Article III case or controversy, the only thing we are empowered to do is to dismiss with prejudice.[4]

It is worthwhile to review the proceedings. The plans at issue (the "2011 plans") were adopted in 2011—six years ago. This three-judge panel of the district court enjoined the implementation of those plans, also in 2011, also six years ago. We twice drew interim maps to be used for 2012, two election cycles ago. While the case was ongoing, Texas also sought preclearance under Section 5 of the Voting Rights Act ("VRA") for these same plans in the U.S. District Court for the District of Columbia. In August 2012, 4½ years ago, a three-judge panel of that court denied preclearance. *See Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated*, 133 S. Ct. 2885 (2013).

The next events happened quickly and were ably and concisely summarized in *Davis*:

First, while Texas's appeal of the preclearance denial was still pending in the Supreme Court, the Texas Legislature repealed the 2011 plan and adopted the district court's interim plan (Plan S172) without change. This prompted Plaintiffs to ask the Supreme Court to dismiss as moot Texas's appeal of the D.C. court's preclearance denial on June 24, 2013. The next day, on June 25, 2013, the Supreme Court decided *Shelby County, Alabama v. Holder*, – U.S. – , 133 S. Ct. 2612 (2013), finding unconstitutional Section 4(b) of the Voting Rights Act—the section containing the coverage formula that automatically required Texas to seek Section 5 preclearance. Although the Court reaffirmed the validity of Section 2 and "issue[d] no holding on

---

[4] Lest the reader think that this would terminate the Texas redistricting litigation stemming from the 2010 decennial census, a dismissal for mootness would apply only to the 2011 plans, leaving (as the majority acknowledges) the task of litigating the 2013 plans to a conclusion.

[Section] 5 itself," the Court held that Section 4(b)'s coverage formula could "no longer be used" because it was based on outdated data. *Id.* at 2619, 2630-31. The day after *Shelby County* came down, on June 26, 2013, then-Governor Rick Perry signed the bill repealing the 2011 plan, adopting the new Senate plan (that is, the district court's interim plan), and making the plan immediately effective. Finally, on June 27, 2013, the Supreme Court vacated the D.C. district court's judgment denying preclearance of Texas's 2011 plan and remanded the case for further consideration in light of Shelby County and possible mootness. *See Texas*, 133 S. Ct. 2885.

*Davis*, 781 F.3d at 211-12.

In June 2013, nearly four years ago, Texas repealed the 2011 plans and adopted the second set of interim maps that we had, by then, drawn. Those are the plans that remain in effect today and were used for the 2014 and 2016 election cycles; we have yet to hold a trial on their merit.

In other words, this case concerns maps originally adopted six years ago, and which have not even threatened to be in effect in the past four years. They were never used in an election. Indeed, three elections cycles—2012, 2014, and 2016—have occurred since the putative adoption of the 2011 plans, and in none were the 2011 plans utilized. In these circumstances, it is no surprise that the specter of mootness loomed large.

Nevertheless, when confronted with mootness, we rejected the state's position that claims involving the 2011 plans should be dismissed. *See Perez v. Texas*, 970 F. Supp. 2d 593, 601-03 (W.D. Tex. 2013). We concluded that this fell into the "voluntary cessation" exception to general mootness law, *id.*, and thus that plaintiffs' claims under the never-used, since-superseded plans should survive.

Circumstances dispositively changed when the Fifth Circuit unanimously reversed this panel's decision. Specifically, in *Davis*, the Fifth Circuit ruled, in essence, that claims involving the 2011 Texas Senate plan were moot. We cannot ignore a decision from this circuit that is so

171

unequivocally directed at the enactments that resulted from the 2011 legislative redistricting.  Any controversy regarding those enactments is moot, depriving us of jurisdiction.

B.

A precedential decision by a circuit court binds all district courts in the circuit.  That command is absolute.  Even if this panel would have applied the law differently if it had seen the issue *de novo*—indeed, even if we had previously decided precisely the same issue in precisely the opposite way—we still must follow the dictates of the circuit once it issues a new decision.[5]

Every district court has the task to determine under what circumstances it is, or is not, bound by circuit precedent.  The key distinction is between holdings and dicta.  In this circuit, courts "are bound by not only the result but also those portions of the opinion necessary to the result."[6]  "A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law."[7]  These rules apply to both circuit panels and district courts within the circuit.[8]  By contrast, "[a] statement is dictum if it 'could have been deleted without seriously impairing the analytical foundations of the holding' and 'being peripheral, may not have received the full and careful consideration of the court that uttered it.'"[9]  So, the test is straightforward:  The result of the case, as well as all the reasoning necessary to it, is holding and cannot be disregarded by this district court or by subsequent circuit court panels.

---

[5]  *See, e.g.*, *United States v. Hernandez*, 580 F.2d 188, 189-91 (5th Cir. 1978); *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 720 F. Supp. 2d 800, 805 (W.D. Tex. 2010); *Jett Racing & Sales, Inc. v. Transamerica Commercial Fin. Corp.*, 892 F. Supp. 161, 163 (S.D. Tex. 1995).

[6]  *Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000) (internal quotation marks omitted).

[7]  *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004).

[8]  *See, e.g.*, *Hill v. Hom/Ade Foods, Inc.*, 136 F. Supp. 2d 605, 609 (W.D. La. 2000) (citing cases).

[9]  *Int'l Truck*, 372 F.3d at 721 (quoting *Gochicoa*, 238 F.3d at 286 n.11).

172

Now to apply these principles to *Davis*. Recall that *Davis* dealt with a challenge specifically to the 2011 State Senate redistricting plans, *see Davis*, 781 F.3d at 209, while the case before us concerns the State House and Congressional plans. After the legislature's decision to repeal and replace all of the 2011 plans, both the plaintiffs and the defendants in *Davis* agreed that the 2011 claims had, by then, been rendered moot,[10] *id*. at 212, and this three-judge panel entered an order dismissing them, as explained in *Davis*, *id*. at 212-13. As the majority accurately says, *Davis* was not a dispute about mootness, since both sides were in agreement on that; instead, the question was whether the plaintiffs who were challenging the 2011 Senate plan were prevailing parties within the meaning of 42 U.S.C. § 1973l(e), thus entitling them to attorneys' fees. That depended on whether they had received any judicially sanctioned relief on the merits of their claims. *Id*. at 213-14.

The plaintiffs in *Davis* brought Section 2, Section 5, and malapportionment claims. With regard to Section 5 and malapportionment, Texas argued that the plaintiffs could not have been prevailing parties because the decision in *Shelby County* rendered the initial decision to enjoin the 2011 Senate plans unconstitutional. *Id*. at 215. The *Davis* panel, consisting of Chief Judge Carl Stewart and Judges Edith Jones and Steven Higginson, unanimously disagreed. They stated flatly that "Texas had *already mooted the entire lawsuit*" by adopting the 2013 interim plan, and thus that the state had waived its opportunity to raise that claim. *Id*. (emphasis added). "In other words, when Texas raised this argument, the district court no longer had jurisdiction to entertain it." *Id.*[11]

So, *Davis* held that Texas could not raise its argument based on *Shelby County* because it had

---

[10] Subject to certain exceptions not relevant here.

[11] For support, the panel cited *National Rifle Ass'n of America, Inc. v. McCraw*, 719 F.3d 338, 344 (5th Cir. 2013), which specifically noted that "[i]f a claim is moot . . . a court has no constitutional jurisdiction to resolve the issues it presents."

been waived, and the waiver was conditioned on the declaration that the case had been mooted.[12]
This easily satisfies *Gochicoa*'s requirement, 238 F.3d at 286 n.11, that courts be bound "not only
[by] the result but also those portions of the opinion necessary to the result." *Sans* the mootness
determination, the claims would not have been waived, and *sans* waiver, the *Davis* panel would have
had to examine Texas's claims regarding *Shelby County*.

With regard to Section 2, *Davis* held that the mootness of the claims prevented the plaintiffs
from becoming prevailing parties. The plaintiffs maintained, to the contrary, that this district court's
interim order enjoining the implementation of the 2011 Senate plan sufficed to render them
prevailing parties. *Davis*, 781 F.3d at 218. The Davis panel rejected plaintiffs' argument; it noted
that Texas did indeed adopt the relief mandated by this district court's orders when the legislature
enacted the interim plan but that this was not judicially sanctioned relief. *Id*. at 218-19. To the
contrary, the fact that Texas adopted the plans of its own accord mooted the plaintiffs' claims,
rendering them unable to secure judicially sanctioned relief. *Id*. Without the mootness, the plaintiffs
would have been able to claim that the relief was judicially sanctioned. But because Texas's
adoption of the interim plans rendered judicial sanction of them superfluous, the plaintiffs could not
prevail.

Finally, Texas itself requested vacatur of our three-judge district court's two interim orders.
*Id*. at 220. The *Davis* panel rejected that as well, and again based its decision on mootness. Texas
"believe[d] that *Shelby County* compelled the district court to vacate both of [those] orders." *Id*. But
it did not ask the court for that vacatur; instead, it "repealed the 2011 plan and adopted the district

---

[12] *See Davis*, 781 F.3d at 215 (noting that "once a district court no longer has jurisdiction to resolve the plantiffs'
claims on the merits, the defendant cannot continue to collaterally litigate against those claims").

court's interim plan in its place, thus *mooting* Plaintiffs' lawsuit." *Id*. (emphasis added).  "[I]t was only later, after Texas repealed the 2011 plan, that the case became moot and eliminated the district court's jurisdiction over the remaining issues in the lawsuit." *Id*.  Texas could have sought vacatur at the district court level but did not, instead repealing the 2011 plan and mooting the case.  By doing so, it could not seek vacatur on appeal.  Again, mootness comprised a "portion[] of the opinion necessary to the result." *Gochicoa*, 238 F.3d at 286 n.11.  The majority makes no effort to dispute that, nor can it.

To summarize:  In *Davis*, mootness comprised a vital—indeed irreplaceable—portion of the reasoning of the decision on the plaintiffs' Section 2, Section 5, and malapportionment claims and the defendant's request for vacatur.  None of those statements regarding mootness "could have been deleted without seriously impairing the analytical foundations of the holding." *Int'l Truck*, 372 F.3d at 721 (internal quotation marks omitted).  They are thus part of the holding, not *dicta*, and must be followed in all legally indistinguishable cases.  *See Hernandez*, 580 F.2d at 189-90.

And this case is nothing if not legally indistinguishable from *Davis*; the only differences are that *Davis* dealt with the State Senate, while we address the State House and Congress, and that the plaintiffs here have refused—by their silence—to accede to the commonsense proposition that their claims are moot.  Under *Davis*, we are bound to dismiss.

## C.

The United States urges, essentially, that *Davis* changes nothing and that the governing Fifth Circuit decisions on mootness, which based lack of mootness on voluntary cessation and the continued availability of other remedies, remain correct.  These are wan justifications, and though the panel majority accepts them, its logic is faulty, to say the least.

175

The obvious flaw with the voluntary-cessation argument is that that theory was equally available in *Davis*, yet the *Davis* panel declared the matter moot.  *Davis* involved the same claims and nearly the same parties,[13]  was in the same procedural posture, and examined the same potentially mooting measures taken by the state.  If the case had not been moot—that is, if the voluntary-cessation exception had applied—the Davis panel's various mootness-related holdings would have been invalid.  Put another way, *Davis*'s implicit rejection of voluntary cessation as grounds for rejecting mootness was "necessary to the result."  *Int'l Truck*, 372 F.3d at 721.

Certainly the *Davis* panel was on firm ground in concluding that.  "[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case," but "[t]he case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated."[14]  The Fifth Circuit has repeatedly held that "[s]uits regarding the constitutionality of statutes become moot once the statute is repealed."[15]  In *Save Our Aquifer v. City of San Antonio*, 108 F. App'x 863 (5th Cir. 2004), the court found that Section 2 and Section 5 claims against a voting ordinance were moot once the ordinance had been repealed.

There is no reason to suspect that the legislature would even entertain the notion of reenacting 2011 plans if we were to find this case moot—nothing beyond raw conjecture, which is not enough.[16]  Indeed, Texas has already conducted three elections under the 2013 plans, and it is

---

[13]  There is significant overlap between the plaintiffs in Davis and the plaintiffs here, and the defendant state officials are the same.

[14]  *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953) (internal quotation marks omitted).

[15]  *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004).

[16]*See id.* at 849 n.3; *see also, e.g.*, *Cnty. of Morris v. Nationalist Movement*, 273 F.3d 527, 534 n.4 (3d Cir. 2001); *AT&T Commc'ns of Sw., Inc. v. City of Austin*, 235 F.3d 241, 243 (5th Cir. 2000); *Robinson v. Kimbrough*, 520 F.2d 1264, 1265 (5th Cir. 1976) (per curiam); *Parrish v, Board of Com'rs of Ala. State Bar*, 533 F.2d 942, 946 (5th Cir.

unrealistic to think that the state would choose to scrap all that and throw its electoral system into uncertainty immediately upon a finding of mootness by this court. The mere possibility of such a legislative do-over is emphatically not the "virtual certainty" that circuit courts have demanded.[17] Even if *Davis* had not already removed voluntary cessation from the equation, it would not be a viable theory on which to base the notion that there is still an Article III case or controversy.

The second distinction that the United States proffers between this case and *Davis* (and the prime factor relied on by the majority) is that the plaintiffs in *Davis*, contra the plaintiffs here, never pursued Section 3(c). To begin, Section 3(c) remedies are premised on "violations of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(c). So, the potential availability of Section 3(c) remedies cannot keep the other remedies here—which are all statutory, not constitutional, claims—on life support. Helpfully, the majority at least admits that "the remedied § 2 results claims are moot."

Even beyond that, the Fifth Circuit in *McCorvey*, 385 F.3d at 849, made absolute that "[s]uits regarding the constitutionality of statutes become moot when the statue is repealed." Any Section 3(c) claims question the constitutionality of the plans, given that they are premised on putative violations of the Fourteenth and Fifteenth Amendments, and by the Fifth Circuit's precedent they

---

1976); *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 644-45 (6th Cir. 1997); *Wisc. Right to Life v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004); *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994); *Jones v. Tremmer*, 57 F.3d 921, 923 (10th Cir. 1995); *Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1283 n.4 (11th Cir. 2004); *Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997); 13C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3533.6 ("Repeal—even repeal by implication—likewise moots attacks on a statute." (footnote omitted)).

[17] *Log Cabin Republicans v. United States*, 658 F.3d 1162, 1165-67 (9th Cir. 2011). The majority's insinuation that "there is no indication that the Legislature would not engage in the same conduct . . . in upcoming redistricting cycles" finds no support in the majority's exhaustive review of the record and, moreover, requires the State to prove a negative. Even more importantly, the majority does not even attempt to show—because it cannot—"virtual certainty."

are moot based on the statute's repeal.  Once the 2011 plan was repealed, the case was dead.  Any assertion now of Section 3(c) relief cannot retroactively resurrect it.

As a final point, permitting the Section 3(c) claims to proceed here would ultimately be fruitless; plaintiffs have no hope of winning.  Their principal claim is based on intentional voter dilution, which is a Fourteenth Amendment violation.  Under Fifth Circuit precedent, plaintiffs must prove that "the purpose [of the challenged law] and the operative effect of such purpose . . . is to dilute the voting strength of [the protected class]."[18]   A vote-dilution claim has two elements: "both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group."[19]

Plaintiffs cannot show both.  No 2011 district that was reconfigured in 2013 ever had, or ever could have, any effect on any voter, so plaintiffs cannot establish intentional vote dilution under the Fourteenth Amendment.  The 2011 plans were never used for any election; they never had any effect on anyone beyond precipitating this lawsuit.   It is a logical impossibility for a plan that never went into effect for any election, and never will be used for any purpose, to be a "violation," in the words of Section 3(c), or to have had an "actual discriminatory effect."  *Bandemer*, 478 U.S. at 127.[20]  The 2011 plans were never implemented and will never be used; in circumstances such as these, no

---

[18] *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980).

[19] *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality opinion); *see also, e.g.*, *Lucas v. Townsend*, 967 F.2d 549, 551 (11th Cir. 1992) (per curiam); *Backus v. South Carolina*, 857 F. Supp. 2d 553, 567 (D.S.C.), *aff'd mem.*, 133 S. Ct. 156 (2012); *White v. Alabama*, 867 F. Supp. 1571, 1574 (M.D. Ala. 1994); *NAACP v. Austin*, 857 F. Supp. 560, 572 (E.D. Mich. 1994) (three-judge panel).

[20] This is not a controversial proposition; there are myriad cases reciting the maxim that a plaintiff cannot show injury for a law that has never been, and can never be, applied to him.  *See, e.g.*, *Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174, 1183-84 (10th Cir. 2000) (holding that claims against a repealed law were mooted because future enforcement was impossible and prosecutions for past violations were hypothetical); *Lux v. White*, 99 F. App'x 490, 491-92 (4th Cir. 1994) (per curiam) (same).

plaintiff can show actual injury.

The majority ignores these facts. Instead, it posits that if we dismiss this suit, the resulting confinement of discussion of intent to the 2013 plans "would significantly impact the intent analysis for Plaintiffs' intentional vote dilution claims given the involvement of a different legislature and Defendants' assertion that they could have not such discriminatory intent by simply adopting the Court's interim plans." The majority opines that "[p]laintiffs should not have to jump through additional hoops to prove that the 2011 mapdrawers' intent carried forward to the 2013 legislature." In other words, even without jurisdiction, this court should charge ahead to "decide" the 2011 claims by issuing what would necessarily be an advisory opinion.

That notion is profoundly flawed. Article III contains no exception (nor has any court ever found one) that allows us to resurrect dead claims in order to make it easier for plaintiffs to pursue live ones. If the Constitution requires plaintiffs to jump through hoops to prove their claims in this important litigation, then they will just have to do that.

But even if (by some theory) making things easier for the plaintiffs were an acceptable reason to evade Article III, the endeavor would, in the end, be pointless. As I have shown, plaintiffs must prove both discriminatory intent and discriminatory effect, *Bandemer*, 478 U.S. at 127, and these plaintiffs can never prove any effect from the 2011 plans. Allowing plaintiffs to proceed further down the garden path of a successful Section 3(c) claim before slamming the door shut on them only confers false hope, requires the State to expend more time and effort for no reason, and delays a final resolution. Giving someone a shovel and telling him to dig a hole to China is just as pointless as telling him to do it with his bare hands.

To sum up: Six years later, we are still enveloped in litigation over plans that have never

been used and will never be implemented.  That second fact—that these plans will not trouble any voter—has been pellucidly clear for at least four years.  In addition, we confront a Fifth Circuit case —undeniably binding on this panel—that concludes, as a necessary part of its reasoning, that a case identical in all relevant respects to this one was moot.

The majority insists we press on with granting relief to plaintiffs who have never been, and cannot be, injured by the 2011 plans.  This busy panel majority's dedication to exploring the voluminous legal and factual issues is commendable, but we are prohibited from issuing advisory opinions and from ruling where there is no Article III case or controversy.  Instead, we should move on to review the 2013 plans and, as to the 2011 maps, accept the Fifth Circuit's mandate—in a decision that reversed this very panel in this very redistricting controversy—instead of trying to keep the case on life support.

## II.  Summary of the merits

I have commended the majority for its detailed examination of the merits.  For two reasons, I will not try to duplicate that detail.  First, it would further delay these proceedings, and on balance, that would be unwise in the interest of justice.  Second, even assuming that lengthy dissents are read, there are aspects of the majority opinion that miss the forest for the trees.  There are some general themes that decide this case as to the respective geographical areas in dispute.  I will explore those in due course.

In summary, the majority holds that the plaintiffs have established a Section 2 violation, in intent and effect, for what we are calling "South/West Texas," primarily dealing with CD23, CD27, and CD35.  That is clear error.  The majority declares that race predominated in the drawing of CD35 and that there is a *Shaw*-type equal-protection violation regarding CD23 and CD35.  That likewise

180

is clearly erroneous.  The plaintiffs are entitled to no remedy with respect to those three congressional districts.

The majority holds that the plaintiffs have failed to proffer a sufficient demonstration plan for additional compact minority districts in the Dallas/Fort Worth area ("DFW").  That is true.

The majority declares that the plaintiffs have proven intentional vote dilution through packing and cracking in DFW (including, largely, CD30) and have established a *Shaw*-type racial gerrymandering claim for CD 26 but not CD6.  I concur in each of those sound recitations.

The majority rules that there is a failure of proof of intentional vote dilution or a racially discriminatory purpose for districts in the Houston area in respect to the districts represented by the African-American Congresspersons.  That is a correct finding.

### III. What this case is really about

This case is really about only whether the congressional lines in the challenged districts were drawn for racial or partisan purposes.  That is complicated, and the two considerations often overlap.  With the exception of DFW, I agree with the State's assertion that the plaintiffs and the United States have utterly failed "to prove that the 2011 Texas Legislature enacted [the challenged plans] for the purpose of diluting minority voting strength rather than protecting incumbents and preserving Republican political strength won in the 2010 elections."

As mentioned above, I disagree with the panel majority's conclusions that race, instead of partisan advantage, drove the decisions made in CD23, in Nueces County and throughout CD27, and in the Austin/San Antonio IH35 corridor affecting primarily CD25 and CD35.  As to all those areas, a careful examination of the record in light of the applicable law reveals that, as the State maintains, the goal was to achieve the maximum number of Republican seats in the 36-member Congressional

181

delegation by allotting three of the new seats to Republicans and one to a Democrat. The heavily Republican legislature (in both houses) was determined to protect the Hispanic Republican incumbent in the most closely contested race (CD23), to redraw a safe Republican district (new CD27) in order to reinforce the surprise win by an Anglo Republican incumbent, and to do whatever it took, within the law, to defeat its perceived *bête noir*, the outspoken and successful Anglo Democrat, Lloyd Doggett, including creating a new district predictably able to elect an Hispanic Democrat.

For understandable reasons, the majority relegates to a short footnote the brand new and highly significant decision in *Bethune-Hill v. Virginia State Board of Elections*, No. 15-680, 2017 U.S. LEXIS 1568 (U.S. Mar. 1, 2017). I had hoped that the respective parties would be asked to furnish supplemental briefs on this new case, but that would have delayed this matter to some extent. One might easily dismiss *Bethune-Hill* as case- and fact-specific, especially given that the Court summarized by saying that its "holding . . . is controlled by precedent" and that "[t]he Court reaffirms the basic racial predominance analysis explained in *Miller* and *Shaw II*, and the basic narrow tailoring analysis explained in *Alabama*."[21] But even if *Bethune-Hill* is read as announcing no new law, it sets forth a necessary overview (which the majority fails to mention) of the current Supreme Court's take on redistricting.

The Court reminds us that race is not invisible and that "the legislature always is aware of race when it draws district lines." *Id.* at *16. The key question (as the majority properly acknowledges) is whether "race was the predominant factor" in placing voters into or out of a

---

[21] *See Miller v. Johnson*, 515 U.S. 900 (1995); *Shaw v. Hunt*, 517 U.S. 899 (1996); *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015).

district." *Id*. (citing *Johnson*, 515 U.S. at 916). But what does the Court mean by "predominant factor"? The Court explains that the reason for drawing the district must be "race for its own sake." *Id*. at *18 (quoting *Johnson*, 515 U.S. at 515); *id*. at *20.

Probing further, what does the Court mean by "race for its own sake"? To answer that, the Court returns to *Shaw II*: The test for race as the "predominant factor," and thus for "race for its own sake," is whether "[r]ace was the criterion that, in the State's view, could not be compromised." *Id*. at *19 (quoting *Shaw II*, 517 U.S. at 907). That can only mean that to satisfy the test, a plaintiff must show that the state acted, in regard to a given voter or group of voters, on the ground that the voter's race was significant in and of itself and not for some other, non-invidious reason.

And importantly: In *Bethune-Hill* the Court goes out of its way to emphasize that examination of legislative lines is at the macro, not micro, level. "[T]he basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." *Id*. at *23. This means that "[a] holistic approach is necessary." *Id*. at *24. A court's ultimate inquiry must be into "the legislature's predominant motive for the design of the district as a whole . . .; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context." *Id.*

Also as relevant to the case at hand, *Bethune-Hill* addresses the dilemma that legislators face when trying to achieve legitimate goals in redistricting while still complying with the VRA and especially now-inapplicable Section 5. The test is not whether using race was eventually shown to be "actually necessary" but, instead, only whether the legislature had "good reasons to believe" that it must use race. *Id*. at *26 (quoting *Alabama*, 135 S. Ct. at 1274). Under the facts of *Bethune-Hill*, the Court concluded that state officials, "charged with the sensitive duty of reapportioning legislative

183

districts," "had a strong basis in evidence to believe a 55% BVAP floor was required to avoid retrogression" under Section 5.  *Id*. at *28.

In addition to *Bethune-Hill*, the other Supreme Court decision that needs more deference than the majority affords it is *Easley v. Cromartie*, 532 U.S. 234 (2001), to which the majority gives scant attention and dismissively declares, in a footnote, to be "distinguishable."  In *Cromartie*, the Court reminds us that the "ultimate" decision is whether "the legislature's motive was predominantly racial, not political."  *Id*. at 241.  "Caution is especially appropriate . . . where the State has articulated a legitimate political explanation . . ., and the voting population is one in which race and political affiliation are highly correlated."  *Id*. at 242.  "A legislature may, by placing reliable Democratic precincts within a district without regard to race, end up with a district containing more heavily African-American precincts, but the reasons would be *political rather than racial*."  *Id.* at 245 (emphasis added).

Also importantly, the Court in *Cromartie* rejected a contention that using a precinct split and "placing the more heavily African-American segment" into a district was impermissible.  *Id*. at 248.  The Court found no infirmity in the fact that "the legislature drew boundaries that, in general, placed more-reliably Democratic voters inside the district, while placing less-reliable Democratic voters outside the district."  *Id*. at 252.  That statement can logically be applied to voters who are more "reliable" because of a higher history of turnout.

In *Cromartie*, the Court reversed, as clearly erroneous, the three-judge district court's finding that racial considerations predominated.  As the Supreme Court explained, it reversed "because race in this case correlates closely with political behavior.  The basic question is whether the legislature drew [the] boundaries because of race rather than because of political behavior (coupled with

184

traditional, nonracial districting considerations)." *Id*. at 257. Racial considerations were not "dominant and controlling." *Id.*

## IV. Applying the law to the facts

Texas redistricting in 2011 was essentially about politics, not race. All sides concede that —whether it is a good thing or not—Texas has a strong correlation between race and party. As the majority states, "93 of the 101 Republican members of the House in 2011 were Anglo, while only 8 of the 49 Democrat members were Anglo." It naturally follows that actions taken to disadvantage Democrats will disproportionately affect non-Anglo voters, regardless of the intent. It falls to the courts to decide whether those decisions were directed at "race for its own sake."

The record amply demonstrates that the Congressional redistricting (as well as that for the State House) was designed for the sole purpose of maximizing the number of Republicans to increase political power. That primarily meant protecting Republican incumbents irrespective of their race or the race of their constituents.

That is true, for example, in the perennially litigated CD23. The State drew CD23 for purely permissible partisan political reasons and to comply with the VRA: to make it a district with a reliable HCVAP majority (increased from 58.4% to 58.5%, which the State saw as an Hispanic opportunity district) and to give the best chance of reelection to newly elected incumbent, Hispanic Republican Quico Canseco, who had been the surprise winner in 2010.

The majority makes no effort to show—because it cannot, under this record—that "[r]ace was the criterion that . . . could not be compromised" or that the district was a "race-based decision."[22] The testimony of expert Theodore Arrington showed that the precincts moved into CD23 had higher

---

[22] *Bethune-Hill*, 2017 U.S. LEXIS 1568, at *19.

levels of Republican performance than those that were removed.[23]  Protection of incumbents is one of the most often recognized traditional redistricting principles.  The majority's findings, including that "race was the predominant motive" and that "[t]here was both discriminatory motive and improper use of race," are clearly erroneous.

The same is eminently true of CD27.  Blake Farenthold, an Anglo Republican, was another surprise winner in the 2010 Republican sweep.  The Republican legislature set out to protect him. In addition, the legislature pursued the racially neutral goal of placing the Port of Corpus Christi in a separate district from the competing Port of Brownsville so that each of those districts would have a major city/port as its anchor.  In its interim order, this court found no violation as to CD27, and nothing has changed that should alter that sound decision.  The majority's change of heart, now finding "intentional vote dilution," is clearly erroneous.

The situation for Travis County, affecting mainly CD25 and CD35, is, to put it mildly, unique.  No one will dispute that the Republican majority in the legislature viewed Travis County as the most liberal of the sizeable counties in Texas, also wielding disproportionate influence as the seat of state government and the University of Texas.  As the State boldly acknowledges, "The Legislature reconfigured CD 25 to ensure that Democrats in Travis County, including Anglo Democrats, did not maintain their ability to elect a member of Congress."

Purely as a political matter, the Republicans saw opportunity for a "twofer": fragmenting Travis County into relatively harmless parts, rather than a unified political force, and, by the same

---

[23] The winners in CD23 undermine the stereotype that Republicans are Anglo and Democrats are not.  As the majority points out, in recent terms the seat has been filled by Conseco (elected in 2010) and by African-American Republican Will Hurd (elected in 2014 and 2016).  Curiously, the majority labels Hurd only as "a non-Latino," thus masking the fact that he is in the rare category of African-American Republican.

fragmentation, defeating Congressman Doggett, an Anglo Democrat, by placing his house in heavily Republican CD25.[24] Or maybe even a "threefer": creating a Latino opportunity district in Travis County and the San Antonio/Austin I-35 corridor. It is fanciful to contend that that decision— whether or not wise in terms of public policy or fairness—was one as to which race was "the legislature's predominant motive for the design of the district as a whole." *Bethune-Hill*, 2017 U.S. LEXIS 1568, at *24. The question is "whether the legislature drew District [35's] boundaries because of race rather than because of political behavior (coupled with traditional, nonracial districting principles)." *Cromartie*, 532 U.S. at 257.

An attempt to dislodge an incumbent political adversary should logically be viewed as a permissible redistricting principle, as is true for the traditional principle of protecting an incumbent. It only stands to reason that if a partisan political majority can exercise its legislative weight to protect its friends, it can do that to punish its enemies for political, non-racial reasons.[25] The main point still is that by no stretch of the imagination can what happened to Travis County and Congressman Doggett be chalked up to racial motive.[26] In its interim order, this panel found no likelihood of success for the *Shaw*-type claims for CD35. The majority now finds, to the contrary, that "race pre-dominated in the drawing of CD35." Nothing has changed, and the same result should

[24] "He is one of the most liberal white Democrats from a Southern district, and one of the most liberal congressmen ever to represent Texas in Congress. He has been described as a strong voice for his party on taxes and environmental policies and as a 'muscular progressive.'" Wikipedia, Lloyd Doggett, https://en.wikipedia.org/wiki/Lloyd_Doggett (quoting "Sober Look at the Depth Chart Intensifies for House Democrats," *Roll Call* (Feb. 2, 2014).

[25] In *LULAC v. Perry*, 548 U.S. 399 (2006), the Court rejected a challenge to the dismantling of CD24 that was effected to defeat incumbent Anglo Democrat Martin Frost.

[26] As it turned out, Doggett, the incumbent in CD25, won re-election running in the newly-created CD35, promising to move if elected. (The Constitution requires a Member of Congress to live in the state but not in his or her district.)

187

obtain now as then.  The majority's revised finding is clearly erroneous.

In stark contrast to Travis County and CD35 is the DFW (Dallas/Fort Worth/Arlington) Metroplex.  Relatively little about the 2011 Congressional redistricting passes the smell test as to DFW, the largest metropolitan area in Texas with 6.4 million residents in 2010 but where the apparent choice of minority voters in 2010 was reflected only in CD30 (veteran African-American Democrat Congresswoman Eddie Bernice Johnson).  Naturally, the law requires that we conduct much more than a smell test, and the majority goes well beyond that to show, in detail, vote dilution by "packing and cracking" and a *Shaw*-type violation with regard to CD12 and CD26 and to find no violation for CD6.

In terms of what redistricting law requires, the differences between DFW and Travis County/CD35 are dramatic, and, with all due respect, I hope the majority will revisit the latter.  The goal and the methods for Travis County/CD35 were so overwhelmingly and purely partisan and political that, even if the peculiarities of Travis County are viewed as *sui generis*, in no respect can it reasonably be said that the breakup of the county and the creation of CD35 were for "race for its own sake."[27]

Then look at DFW:  Minority voters moved into CD30 without substantial explanation.  And disparate Latino communities in Fort Worth joined together without demonstrated reason, and unusual appendages added to CD26 from an adjoining, but demographically dissimilar, neighboring county.  As the majority properly says, "we have admissions from the mapdrawer that he used race as the sole criteria for assigning a significant portion of voters into and out of CD26, and that his sole basis for regarding them as a community of interest was their race, given that he had no familiarity

---

[27] *Bethune-Hill*, 2017 U.S. LEXIS 156, at *18.

188

with the area" (citing *Johnson*, 515 U.S. at 911-12). That looks more like race for the sake of race. By way of stark contrast, the districts drawn in Travis County and the I-35 corridor do not.

And last, there is the Houston area. I agree with the panel majority that the plaintiffs did not offer sufficient proof of the first *Gingles* factor, so the Section 2 claims premised on coalition districts fail. And the claims of the African-American Congresspersons—two in the Houston area and one in Dallas—are properly seen as unsuccessful.

Regarding Houston-area districts, the plaintiffs desperately tried to find examples of racial slights, but those presentations were especially unimpressive. They quibbled about loss of, or swaps concerning, "economic engines," which are generally recognized as prestigious for any Member of Congress and often provide a good source for fundraising. One expert went so far as to contend that the Astrodome/NRG Stadium complex (home of the Houston Texans NFL team and the Houston Livestock Show and Rodeo and, *inter alia*, the site of the 2017 Super Bowl and the 2016 NCAA Men's Basketball Final Four competition) was not a meaningful economic engine for purposes of redistricting. The plaintiffs complained of Congress Members' loss of district headquarters, though the proof showed that statewide, as well as in the Houston area, many more Republican than Democrat members lost their headquarters. And the plaintiffs bemoaned the swap of some important economic engines between and among the Democrat Congress Members representing the Houston area, though in every case, any loss of significant economic engines was replaced with approximate equal value. One African-American member complained of the incursion of Latinos into his district and was concerned that, in a large undeveloped tract added to his district, housing might be built that would be populated mainly by higher-income persons (presumably meaning Anglos).

189

## V. The United States as intervenor

I have saved the worst for last, ending unfortunately on a sour note (as many dissents do). I make a needed observation on the behavior of the United States and compare it with the performance of the other plaintiffs and the State. In short, the United States should not have been permitted to intervene in the first place.[28] That was wholly unnecessary, and its presence has negatively infected these proceedings.

The various plaintiffs and plaintiffs' groups were, and are, magnificently represented by talented counsel, most of whom have appeared in Texas redistricting litigation through the decades, usually with notable success. They are candid and fair with the court and opposing counsel. As officers of the court, they strike the proper balance between zealous advocacy and professionalism. They generally refrain from taking completely meritless positions, and their briefs and courtroom presentations reflect an advocate's colorable reading of the law, so they have credibility. They take setbacks and frustrations in stride. Their experts—usually also veterans of Texas redistricting cases past and present—are well versed in the facts of Texas geography and demographics. They meet the court's often rigid scheduling and briefing demands with alacrity and cooperation. In short, they represent their clients well but, at the same time, assist the court in deciding the issues.

The same has been, and is, true of the State defendants, ably represented by attorneys from the Office of the Attorney General. Though badly outnumbered, they likewise have aided this court with their skillful advocacy and honest but spirited presentations. They have cooperated with opposing counsel by, for example, refraining from weak objections to evidence and testimony and

---

[28]  I dissented from the majority's decision to grant the motion to intervene. I will not repeat those reasons, which were *ex ante*. The majority judges on this panel bear no responsibility for the behavior of the United States, which I review *ex post*.

have conceded points, where appropriate, as officers of the court. Though for the most part they are relatively new to Texas redistricting (at least as compared to plaintiffs' counsel), they exude a thorough knowledge of the law and facts. The State is as blessed to be represented by their attorneys as the plaintiffs are by theirs.

And then there is the United States, appearing through attorneys from the Department of Justice. I have no criticism of their knowledge of the law, and their zeal is, to say the least, more than adequate. But they entered these proceedings with arrogance and condescension. One of the Department's lawyers even exhibited her contempt for Texas and its representatives and her disdain for these proceedings by regularly rolling her eyes at State witnesses' answers that she did not like, and she amused herself by chewing gum while court was in session.

It was obvious, from the start, that the DoJ attorneys viewed state officials and the legislative majority and their staffs as a bunch of backwoods hayseed bigots who bemoan the abolition of the poll tax and pine for the days of literacy tests and lynchings. And the DoJ lawyers saw themselves as an expeditionary landing party arriving here, just in time, to rescue the state from oppression, obviously presuming that plaintiffs' counsel were not up to the task. The Department of Justice moreover views Texas redistricting litigation as the potential grand prize and lusts for the day when it can reimpose preclearance via Section 3(c).

Of course, these are just personal impressions based on demeanor and attitude. More objectively verifiable are the witch hunts and fishing expeditions that the DoJ conducted in pursuit of its goals. I give two examples.

First is the DoJ's vicious attack on Clare Dyer, a dedicated career employee of the Texas Legislative Council who has served both Democratic and Republican legislatures. She was a key

191

witness on several aspects of the redistricting process. The DoJ accused Ms. Dyer and the mapdrawers of intentionally removing the house of Congresswoman Johnson from her district, CD30. That was an attempt to show blatant and intentional racial discrimination by targeting the only minority member of the DFW Congressional delegation and one of only three African-American Texas Congress Members.

It was nothing short of bizarre for the DoJ to think that Ms. Dyer, the redistricting staff, and the Republican legislative leaders would—at one and the same time—both pack African-American voters into Congresswoman Johnson's district and remove her from it. Members of Congress are not required to live in their respective districts, and the line that was accidentally drawn placed Congresswoman Johnson barely outside the district. No one can doubt that, especially given the packing into CD30, she would have easily won reelection anyway. So it defies common sense that legislative leaders and staff would have taken an action that would be seen as openly discriminatory on the basis of race, with no possible political gain.

But the DoJ was desperate to find some evidence of overt racism to lay the foundation for a Section 3(c) remedy. It wasted substantial time at trial looking for the smoking gun by its mean-spirited questioning of Ms. Dyer and other witnesses, certain that they were guilty of rampant bias.

As it turns out, the error was purely accidental and resulted not from any intent or mistake by Ms. Dyer, but only from the fact that Congresswoman Johnson's house had inadvertently been shown using a 2009 census block instead of a 2010 census block. The majority appropriately finds that "[t]here is no evidence that mapdrawers became aware during the redistricting process that they had not included Johnson's home in her district or that anyone asked them to remedy the problem

before the map was adopted."

Another example of a Department of Justice witch hunt, in its frustrated attempt to find evidence of intentional discrimination to support an ultimate claim for Section 3(c) opt-in relief,[29] was its unsuccessful fishing expedition to uncover a smoking gun regarding what occurred on Monday and early Tuesday, June 13 and 14, 2011.  As the majority opinion aptly shows in detailing the minute-by-minute communications from very early morning to late at night, those were critical days for finalizing maps for the 2011 redistricting.

The DoJ was determined to uncover racially-tinged communications (perhaps shopping for firehoses on the Internet?) to prove that the ultimate maps were based on "race for its own sake." Because it was inadequately prepared, the DoJ called witness after witness, and presented document after document, to try to confect a paper trail from which the court could infer bigotry.  The State accurately recounts the record as follows:

> After three years and multiple opportunities for discovery, DOJ can offer nothing more than a string of question-begging assertions to connect Eric Opiela's 'nudge factor' e-mail to the Legislature's redistricting plans.  There is still no evidence that Eric Opiela developed the "useful metric" he proposed in November 2010, no evidence that any person used his metric to draw districts in 2011, and no evidence that any person who worked on the 2011 plans considered turnout data or used any other race-based method to achieve partisan goals.

The DoJ wholly failed, but not for lack of trying.  There was, and is, no smoking gun in this record, nor has the United States shown that the State hid or failed to disclose one.  The DoJ's scheme to build a record on which to urge opt-in relief via Section 3(c) has initially failed.  Of course, if this court is deemed to have jurisdiction, the judges will consider any remaining claims

---

[29] I acknowledge that the DoJ is not the only party mentioning Section 3(c) relief and attempting to develop proof to support it.  My focus, however, is on the DoJ's obvious main purpose for intervention and its behavior in presenting its theories.

pressed by any party, including Section 3(c) claims, as appropriate.

The Department of Justice has overplayed its hand and, in the process, has lost credibility. The wound is self-inflicted. The grand theory on which its intervention was mainly based—that invidious racial motives infect and predominate in the drawing of the 2011 district lines—has crashed and burned.

I respectfully dissent from the refusal to dismiss for want of jurisdiction.

_____/s/_____
JERRY E. SMITH
UNITED STATES CIRCUIT JUDGE