# In the United States District Court
## for the
## Western District of Texas

SHANNON PEREZ, ET AL.  §
§
v.                     §    SA-11-CV-360
§
GREG ABBOTT, ET AL.    §


## FACT FINDINGS  – PLAN H283

Before Circuit Judge SMITH, Chief District Judge GARCIA, and District Judge RODRIGUEZ


Circuit Judge Smith, dissenting


XAVIER RODRIGUEZ, District Judge and ORLANDO L. GARCIA, District Judge:


### General Fact Findings

1.  The Texas House of Representatives has 150 members, each elected in a single-member district. Based on the 2010 U.S. Census, the ideal population size for each House district is 167,637.

2.  Key players in charge of drawing and putting together the House map were Burt Solomons, Gerardo Interiano, and Ryan Downton, and to a lesser extent Bonnie Bruce, none of whom had any prior experience with redistricting. Tr995 (Downton).  The House mapdrawers were drawing under the supervision of House Redistricting Committee ("HRC") Chairman Solomons. *Id.*  Speaker Joe Straus and Chairman Solomons were the ultimate decisionmakers on the number of districts in a county and on pairings.  TrJ1575 (Interiano).

3.  A regular session starts in January and lasts 140 days, and the only bills that can be passed the first 60 days are emergency items designated by the Governor. Tr1558 (Solomons); TrA1085-86 (Hunter).  Committee assignments are often not made until February.  Tr1558.  Hunter testified that there were emergency items that needed attention. TrA1086.   He also testified that the budget was hotly contested and there were fifteen sunset bills.  *Id.*

4.  Immediately after the census data came out, Interiano and others, including Texas Legislative

1

Council ("TLC") lawyers, Straus's chief of staff Denise Davis, and his legislative director Lisa Kaufman, began looking at county populations to determine drop-in counties and how to abide by the Texas County Line Rule. TrA59-61 (Interiano). Looking at population growth, they determined where new districts would likely go and how many districts would be in drop-in counties. *Id*. Population growth in suburban counties, such as Fort Bend, Williamson, Collin, and Denton Counties, required adding districts in those areas. TrA62, TrJ1535 (Interiano). Dallas County lost two seats, and Tarrant County gained a seat. Bexar County and El Paso maintained the same number of seats. It was not initially decided whether Harris County would maintain 25 districts or would lose a district and have 24. Interiano met with the County delegation leaders to inform them of the likely number of districts they would have. TrA60-61 (Interiano).

5. Interiano started drawing House districts right after the census data came out in February 2011. Interiano 8-2-11 depo. (Joint Ex. J-61) at 157.

6. In drawing the House map, Interiano and Downton relied primarily on non-suspense SSVR with regard to Hispanic districts because (1) non-suspense SSVR data was shown in RedAppl; (2) CVAP data was not available when they started drawing the House map; and (3) they believed, based in part on advice from Hanna (who relied on the 2011 DOJ objection letter), that use of SSVR was appropriate. Tr925, TrJ2070, TrJ2146 (Downton); TrA35, TrJ1534 (Interiano) (SSVR "was the main statistic that we used throughout the entire process"). Downton believed SSVR was a good proxy for HCVAP because a registered voter is presumably a citizen, and he believed that they correlated fairly closely. However, Downton knew that HCVAP was always going to be slightly higher than SSVR. Tr925 (Downton). CVAP data was available no later than April 21, before the map went to the House floor.

7. At the beginning of redistricting, Solomons announced to the members that the House plan would be a member-driven process, by which Solomons allegedly meant that the members would have as much input as possible and the process would be "wide open for that purpose." Tr1560-61, TrJ1069-74 (Solomons). Solomons asked the members to send him three versions of their districts—their ideal/"Christmas list" map, the "realistic map," and one "you can live with but wouldn't necessarily want." Tr922 (Downton); TrJ1934 (Bruce); Tr1563 (Solomons).

8. A main goal for drawers of the House plan was to have a member-driven process that paired the fewest members. Tr1499 (Interiano); Interiano 8-2-11 depo. (Joint Ex. J-61) at 256. By its nature, a member-driven process will protect incumbents. TrJ1382 (Vo); Tr1631-33 (Solomons); TrJ780-81 (Pickett) (redistricting is an exercise in self-preservation). Incumbent protection and re-electing as many Republican members as possible were priorities. Tr1499-1500 (Interiano); Tr997 (Downton); TrJ1729 (Aycock). Solomons wanted to give every incumbent legislator an opportunity to be re-elected. Tr922, Tr939 (Downton); Tr1426-27 (Interiano); Tr1560-62, TrJ1069-70 (Solomons). To Solomons, this meant that only members of the same party would be paired when pairing was required. Tr1427 (Interiano). In Plan H283, twelve Republicans and two Democrats are paired. *Id.* Democrats Vo and Hochberg were paired in Harris County. Other pairings in the map paired Anglo Republicans. TrJ1331-32 (Coleman). The mapdrawers felt they were required to pair Republicans

where they did so because the Democrat districts were protected districts under the VRA. Plan H283 achieved the goals of incumbent protection and maximizing Republican seats as much as possible.

9. The process used to draw Plan H283 was not conducive to creating new minority opportunity districts under § 2 of the VRA. Downton testified that they looked at where new districts could be drawn, but balanced that with the Texas Constitution's County Line Rule and the political reality of getting a map passed. Downton 8-12-11 depo. (Joint Ex. J-62) at 20-21; TrJ2036-37 (Downton). It was clear to Solomons that it would take Republican votes to pass a map. Tr1556, Tr1613-14 (Solomons). However, Republicans were very resistant to creating any new minority opportunity districts because they felt they would be Democratic districts. Thus, Republican members would not vote for a map that created more minority districts or enhanced minority voting strength unless they felt it was legally required. Even Democrats and minority members could be reluctant to create new districts where it would disrupt their districts. TrJ1806 (Lozano). Further, members were often shown only their own districts and approved only their own districts until the first public plan was revealed. Although drop-in county delegation members worked together on the county map, member participation was constricted because all the member can do in that situation is protect his own district. TrJ152 (Arrington). A member cannot create additional minority districts because there is mutual accommodation. *Id.*

10. Solomons assumed that VRA compliance was being looked at by the drop-in county delegations because there were members in protected minority districts in the counties. Tr1603 (Solomons). Interiano testified that delegation maps were dropped into the map "and that was it." TrJ1444. He agreed that, in most cases, they dropped in county delegation maps; if a new Latino opportunity district was created by the delegation, it was left in there, but if there was not a new district, it was not put in. TrJ1445; Interiano 8-2-11 depo. (Joint Ex. J-61) at 47-48 ("[B]eing that this was a – a member-driven process . . . we dropped in a county onto the map, and if it was a [minority opportunity] district that was included in there, it was left in there and if there wasn't, that was it. I mean, I think you'd have to ask the members where – where those drop-in districts occurred, whether that was done [assessing whether additional Latino or minority opportunity districts were justified] or not."). Interiano did not spend time looking to see what was possible (such as in Harris County and El Paso County) when he knew the delegation was working on a map. Interiano 8-2-11 depo. (Joint Ex. J-61) at 145, 169. Interiano testified that questions about whether the VRA might require something different in a county than what members had agreed upon or might require an additional minority opportunity district were raised to members, and "those were issues that they needed to look at within the delegation." *Id.* at 147-49. Interiano was ultimately responsible for determining whether § 2 required additional districts, but he had to work with the members, and he testified that he "was not in a position to be providing instructions to members." *Id*. at 149, 167-69. His job would include telling Speaker Straus if he thought the law required a particular district. *Id.* at 167.

11. Early in the process, Interiano made an effort to identify the number of Latino opportunity districts in the benchmark so they could meet or surpass that number in the final plan. Tr1443 (Interiano). He testified that whether a district is an opportunity district depends on the HCVAP,

SSVR, HVAP, as well as any election analysis that might have been done. Interiano 8-2-11 depo. (Joint Ex. J-61) at 143. However he also testified that he did not know whether HD90 or HD148 were electing Latino candidates of choice. Tr1454. Interiano also testified that he tried to determine how many overall Latino opportunity districts could be drawn. Interiano 8-2-11 depo. (Joint Ex. J-61) at 131, 138. He tried mapping a Hidalgo+Cameron Latino opportunity district but not others. *Id.* at 140.

12. Interiano also testified that he relied on his conversations with Baker Botts, the OAG, and TLC to determine whether any additional Latino opportunity districts were required, and that he did not think any additional opportunity districts were required, but he did not independently try to draw new opportunity districts. TrJ1531; Interiano 8-2-11 depo. (Joint Ex. J-61) at 48, 169.

13. Solomons relied on staff to tell him which districts were Latino opportunity districts. Tr1584 (Solomons). He did not make those assessments himself. *Id.* Solomons relied on staff, working with TLC, to ensure that the map met legal requirements. Tr1584, Tr1615 (Solomons). Solomons said that if there was an issue raised by staff, who were far more knowledgeable than he was, his role, as facilitator, was to go back and tell the delegations they would have to make some adjustments, and to "get with staff and see what adjustments work out," so they could get a consensus. Tr1606-07.

14. Solomons never told a county delegation or members that they needed to add new Latino opportunity districts. Tr1587 (Solomons). Solomons did not decide whether to draw a new opportunity district in Cameron or Hidalgo. Tr1589 (Solomons). Solomons did not make a decision whether El Paso County needed an additional Latino opportunity district. Tr1601 (Solomons). Solomons agreed it might be possible that the El Paso delegation might agree on the map as satisfactory to them, but that it might not comply with the VRA. Tr1602 (Solomons). He relied on staff to say whether it met the VRA. *Id.* Solomons also relied on the TLC and OAG to advise him whether there were problems with the map. Tr1640-41 (Solomons).

15. The process also was not conducive to protecting ability to elect under § 5 in existing opportunity districts that were represented by Republicans. Republicans who represented minority opportunity districts but were not the Hispanic candidates of choice, such as John Garza in HD117 and Jose Aliseda in HD35 preferred district configurations that were less likely to perform for Hispanics. Protecting these Republican incumbents required the reduction of Hispanic voters' ability to elect their preferred candidates of choice in future elections. In HD117, this was done by removing areas with higher Hispanic voter turnout and including Hispanic areas with lower turnout, while maintaining the district at exactly 50.1% SSVR. In HD35, all Hispanic population metrics were reduced from the benchmark. Similarly, to protect newly Republican Aaron Peña, mapdrawers created a disproportionately Anglo district, split several precincts on the basis of race, and deliberately underpopulated the district to limit Hispanic ability to elect as much as possible in this majority-Hispanic area.

16. Solomons told members that Interiano and Downton were available as resources for drawing

maps. Downton 8-12-11 depo. (Joint Ex. J-62) at 12; Interiano 8-2-11 depo. (Joint Ex. J-61) at 40. Downton had a big-screen TV in his office so members could sit down with him and they could pull up the map and discuss different ideas. Downton 8-12-11 depo. (Joint Ex. J-62) at 12. Interiano also helped answer questions from Solomons, Straus, and others (Harless, Aycock, Geren) during floor debates. Interiano 8-2-11 depo. (Joint Ex. J-61) at 41-42; Tr1442 (Interiano). However, Solomons preferred that the HRC and staff not be the resource for legal issues; instead he directed members to the TLC for that. TrJ1929 (Bruce). He also refused to allow Interiano and Downton to be legal resources for members of the HRC or the House. D-601 at 131, 146-47; Tr1609 (Solomons).

17. As they started the House map, Interiano and Bruce worked on areas other than the eight drop-in counties, leaving holes where those would go. TrJ1935 (Bruce). Interiano was the primary mapdrawer for the House plan, but Downton also drew parts of the plan. Tr1418, TrJ1575 (Interiano); TrJ1152 (Hanna); TrJ1989 (Downton). Interiano's role in the House map included: rural districts, Bexar County, the initial draft of Pena's district in Plan H113 (drawn with Reps. Peña and Guillen), and helping with amendments in Harris County and the 24/25 district issue. TrJ1575-77 (Interiano). Intern Elizabeth Coburn worked on HD35 with Interiano. For the most part, Interiano had little involvement in drop-in counties other than helping draw the lines in Bexar County and the Harris County amendments made during debate. TrJ1575.

18. Interiano worked on the map as a whole in terms of putting the pieces together, and different members and different delegations worked together on their individual pieces. Interiano 8-2-11 depo. (Joint Ex. J-61) at 159. Interiano made sure to not cut county lines after everybody gave their preferences. *Id.* at 159. The bigger challenge was putting all the pieces together because of all the rural districts. TrJ1573 (Interiano). Rural members could work together with their neighbor, or where there were conflicts they could go to Interiano, and he would work with them. If there were conflicts, he took them to Solomons or Straus, but if the members agreed, there was no need to elevate the issue to Solomons or Straus unless there was a legal issue raised by legal counsel. TrJ1574 (Interiano). Interiano estimated that he worked with two-thirds of members while drawing the House map. *Id.*

19. Interiano worked with Reps. Peña and Guillen on the initial configuration of Hidalgo County and HD31, and then Downton and Peña made further changes to "maximize" Peña's district. Control of the Hidalgo County map was taken from the other three members, and they voiced strong objections to the map.

20. The incumbents in Fort Bend County worked with Interiano to draw their districts and the new district in that area.

21. The evidence does not indicate who drew the lines in McLennan County (Waco), but Interiano was ultimately responsible for the configuration of the map outside of the drop-in counties.

22. Rep. Jimmie Don Aycock, working with Rep. Sheffield and with assistance from Downton,

drew the lines for HD54 and HD55 in Bell and Lampasas Counties.  TrJ1755 (Aycock).

23.  Drop-in county delegations were instructed to work together on a county delegation plan.  The eight drop-in counties were Travis, Denton, Nueces, Tarrant, Dallas, Bexar, El Paso, and Harris Counties.  Some county delegations were able to reach an agreement and some were not.  If a county delegation could not agree, Solomons and Speaker Straus would make the final decision.  Tr1442 (Interiano).

24.  Travis County members were able to reach an agreement, and their delegation map was put into the statewide map unchanged.  TrJ2088 (Downton).  Rep. Dawnna Dukes only approved of her own district.  D-229.

25.  Solomons worked on the Denton County drop-in map with other members of that delegation, and Bruce was responsible for providing the delegation map to Downton to put into the entire map.  TrJ1924, TrJ1948 (Bruce).

26.  Nueces County was drawn by the delegation, primarily by Rep. Todd Hunter, with the agreement of Connie Scott and Raul Torres.

27.  The Bexar County delegation worked with Interiano on an agreed map.  Rep. Villarreal, the vice-chair of the HRC, was working on draft Bexar County maps and submitting them to Interiano, but Interiano worked separately with Garza and his staff and Larson's staff on the version of HD117 that was ultimately incorporated into the map.  Interiano worked on HD117 without input or approval from Rep. Farias, whose district HD118 was also affected.  The Bexar County delegation map that went into Plan H113 was not approved by all members of the county delegation.  Further, all county delegation members but Garza and Straus voted against the motion to table Farias's floor amendment.

28.  The Dallas County delegation could not agree on a map due to the loss of two districts, so Downton drew the map, working with some but not all members of the Dallas County delegation.  Tr924-26 (Downton).  Rep. Davis testified that she was shut out of the process.  Y. Davis depo. at 198.  Other members were also left out of the process or complained that their input was not considered, including Driver (Anglo, Republican), Mallory Caraway (African American, Democrat), and Giddings (African American, Democrat).

29.  The El Paso delegation submitted two maps through Rep. Pickett, and Downton moved forward with the map that favored the Republican incumbent Margo even though this was not the map that Pickett preferred.  Further, Downton then changed the border between HD77 and HD78 to increase the SSVR of HD78 without consulting any delegation members about the specific changes.  Rep. Margo was unhappy with the changes, which he felt did not favor him politically.

30.  The Tarrant County delegation submitted a map in which the members approved of their own districts, and that county map was put into Plan H113.  Tr929 (Downton); TrJ14 (Veasey).

However, Downton made changes to HD90 (Burnam) and HD95 (Veasey) to increase the SSVR of HD90 without consulting the affected representatives. TrJ14 (Veasey). Veasey was not asked for input, even though he was on the HRC. *Id.* Reps. Veasey and Burnam opposed the changes.

31. The Harris County delegation did not submit an agreed map. The thirteen Republican members submitted a map for the whole county that they had worked on without any input from the twelve Democrat members. Downton made some changes "to attempt to comply with the Voting Rights Act" by looking at the SSVR and BVAP numbers and trying to keep the numbers "relatively the same" as the benchmark plan, and placed that into Plan H113. Tr932 (Downton). After that, Downton made further changes to increase the SSVR of HD148 without approval from Rep. Farrar, who represented the district. *Id.* Additional changes were made during second reading after debate on an amendment proposed by Republican Woolley, and Democrats were allowed to make changes to their districts without affecting the Republican districts or decreasing the SSVR of HD148. Rep. Thompson was able to obtain further negotiated changes with some Democrats and Republicans after that. Tr933 (Downton).

32. Downton was responsible for some of the lines in the House map in Harris County (he made changes to the Republican delegation's map before putting it into the initial public plan and likely increased the SSVR of HD148 after the initial public plan), Dallas County (he was the primary mapdrawer for Dallas County), Hidalgo County (he worked with Peña to make "tweaks" to the district after the first public plan by splitting precincts), Tarrant County (he helped develop the delegation map and then made changes to HD90 and HD95), and El Paso County (he made "tweaks" to the border of HD77 and HD78 by splitting precincts). TrJ1989 (Downton); Downton 8-31-11 depo. (Joint ex. J-62) at 73; TrJ1576 (Interiano). Downton stated that he was "the person who's probably most responsible for all of the tweaks to the districts after the initial draft." Downton 8-31-11 depo.(Joint Ex. J-62) at 73.

33. As they were drafting the House plan, Downton, Interiano, and Bruce did not show legislators full maps, but took maps of individual districts to legislators for them to sign if the district was acceptable to them. TrJ1539 (Interiano); D-229. Once they got the full map together, they went around with paper copies and asked members (but not all members) to sign off on their districts that they had already talked to them about. TrJ1997 (Downton). Members were asked to sign a map of their district with the statement that the member would vote for passage of H.B. 150 as long as their district was in the form shown in the map. Tr1942 (Bruce); D-229.

34. Although Solomons stated that the process would be member-driven, members had input primarily only on their own districts or counties, and there were numerous instances where the member-driven process was not followed and where member input was not sought or was ignored.

35. At trial, Downton admitted using block-level racial shading in Dallas County, but denied using it in any other part of the House map. TrJ2144-45 (Downton); *see also* Downton 8-31-11 depo. (Joint Ex. J-62) at 113-14 (admitting using block-level racial shading when drawing all six minority districts in Dallas County). However, his denial regarding other portions of the House map is not

credible. Downton admitted using block-level racial shading to split precincts along the border between HD77 and HD78 in El Paso County to increase the SSVR of HD78. TrJ2118 (Downton). When discussing racial shading and SSVR in RedAppl in general terms, Downton stated that he "was moving blocks in and out based on the Hispanic shading, if a district needed Hispanic population, [he] would take part of the precinct that was more Hispanic and put it in, and the Anglo part of the precinct in the other district." TrJ2093-94 (Downton). Downton also made changes to HD90 to increase its SSVR, and the Court finds that he would have used block-level racial shading to do so. HD90 has 27 split precincts, which indicates the use of block-level racial shading. Red-381 Report. The Court finds that Downton would have also used racial shading in the Harris County map to "tweak" the initial map to maintain benchmark minority numbers and to later increase the SSVR of HD148. HD148 has 30 split precincts, which indicates the use of block-level racial shading. Red-381 Report.

36. As he was putting the map together, Interiano continued to work with Hanna, outside counsel, and "the different stakeholders involved." TrJ1612 (Interiano). Interiano, Downton, and Bruce asked Hanna to provide § 5 retrogression analyses on three plans in progress, and Interiano had frequent conversations with Hanna on the phone and in emails. TrJ1612; TrJ1940-41 (Bruce). Hanna's memos were not shared with minority legislators. TrJ1957 (Bruce). Hanna did not provide election analysis; he directed them to the OAG for that. TrJ1613 (Interiano); TrJ2137 (Downton); TrA1513 (Hanna). Interiano sought legal advice from TLC, OAG, and Baker Botts. TrJ1576 (Interiano). Downton sought legal advice from TLC and the Texas OAG, and he also looked at memos from and had conversations with Hanna. TrJ2032-33 (Downton). Downton recognized Jeff Archer of the TLC as an expert on redistricting and respected his opinion, but did not always follow his advice. Tr1007 (Downton).

37. Solomons, Straus, and others wanted to avoid going to the LRB, so there was a lot of pressure to pass the map during the regular session. TrJ1926 (Bruce). Bonnie Bruce, the HRC Committee Clerk, was the principal driver of the schedule and ensuring that it complied with House rules. TrJ1924 (Bruce).

38. The HRC held a public hearing on redistricting for the Texas House on March 24, 2011, before a map was released, but this hearing did not allow for meaningful pubic input because no public plan was available at that hearing. TrJ16 (Veasey).

39. Once the first public plan was released on April 13, the process moved very quickly, and all changes were completed on April 28, when the House concluded third reading. The Senate Redistricting Committee did not adopt any amendments to the House map, nor did the full Senate. It is customary for the Senate to not interfere with the House map, and the Senate did not make any changes. Therefore, all meaningful consideration of the House plan occurred between April 13 and April 28. Solomons acknowledged that the session did not end until May 30, but stated that they decided they needed to take the map to the floor and pass the map by the end of April because there were a number of other items that also needed to go to the floor during the session. Tr1628-29.

40. Before the first public plan H113 was released on April 13, the overall plan was largely drawn in secret. No one saw a statewide plan until the first committee plan was released. TrJ1942 (Bruce). Several minority members complained about the secrecy and exclusion from the mapdrawing process. TrJ18, TrJ43 (Veasey); TrJ1298-1305 (Coleman); TrA899 (Dukes).

41. The first public map, Plan H113, was released late in the afternoon on April 13, and the five-day posting rule was suspended to allow the HRC to hold two public hearings—one on April 15 (fewer than 48 hours later) and one on April 17, which was Palm Sunday (and Solomons was absent). Hanna expressed concern that a Friday hearing did not allow sufficient opportunity for public and member input. After Solomons informed the members from the House floor that he had filed the bill and notified them of the hearings, many members, including Rep. Turner, voiced objections that the time-line was too quick. Tr795-96 (Turner). Fourteen witnesses testified at the April 15 hearing, and all of them opposed Solomons' proposed map. D-116 at 99.

42. Twenty-three witnesses testified at the April 17 hearing, most in opposition to Solomons' proposed map. D-116 at 103. Several witnesses complained about the short notice and the inadequate time to evaluate the map. (*E.g.*, Jacquie Chaumette from Fort Bend County, Donna Klaegez of Burnet County, Chuck Bailey of Dallas County, Gabriel Soliz from Victoria). Witness Rogene Calvert of the Texas American Asian Redistricting Initiative ("TAARI") felt there was insufficient notice for the hearings. Calvert depo. at 69. In addition, Reps. Veasey and Turner testified that there was insufficient time for meaningful public input given the short notice and the hearing being on Palm Sunday. TrJ17 (Veasey); Tr798 (Turner).

43. The HRC formal meeting to consider amendments (with no public testimony allowed) was set for 11 a.m. April 19 in the Agriculture Museum, without cameras or a method to allow recording. Alvarado decl. (docket no. 331) at 6. The latest version of Solomons' statewide plan (Plan H134) was made public the day before on April 18. The HRC voted out the plan on the 19th with few changes. Tr799 (Turner). Solomons went back to the floor again that week and indicated that for all other members who were not on the HRC, they would be given until that following Friday to file amendments on the bill that was voted out the 19th. Tr799 (Turner). After concerns were raised, the deadline for filing amendments was changed to Monday, and the bill would go to the floor on the 27th. Tr800-01 (Turner); TrJ1259 (Thompson). Turner again said the time-line was not adequate and complained to Solomons about the lack of input from the black caucus. Tr801.

44. Although members were given more time to file amendments, that did not translate into more minority input into the map. Minorities presented options that would have expanded the number of minority opportunity districts, and they were routinely defeated in committee and then later on the floor. TrJ155-56 (Arrington).

45. Minority legislators testified that there was inadequate time for people to respond to the proposed plan. Y. Davis depo. at 203; TrJ1259 (Thompson). When Turner questioned the schedule, he was told they were operating on an expedited schedule, even though there were still five or six weeks left in the session. Tr798 (Turner). This was Turner's third redistricting process and he said

that "this was a much more expedited timeline" compared to the previous two, and "it didn't provide us with enough opportunity to get the word out, to have people come up to testify on maps, on a substantive map, that was just introduced on April the 13th." Tr796. He stated that in the past they would have had a week and a half at least. Tr796.

46. Minority groups testified and said that the VRA required changes to the proposed map, but those changes were not adopted. TrJ18 (Veasey). Minority members also offered amendments and alternative plans, but they were not adopted by the HRC. *Id*. Minority House members were very upset about the secrecy and lack of inclusion in the process. *Id*. Veasey does not believe the process was fair and inclusive of minority-elected officials because of the secrecy, last-minute changes, and lack of input. TrJ19.

47. Rep. Alvarado, a member of the HRC, testified that the committee met with little notice to the public and had accelerated timetables for consideration of committee amendments and committee substitutes. Alvarado decl. (docket no. 331) at 6. There were only four days between initial consideration of committee substitute Plan H113 by the HRC on April 15 to passage from the HRC on April 19. The accelerated time-line made it difficult for the public and members to meaningfully amend the bill or give full comment. Alvarado decl. (docket no. 331) at 6.

48. Hanna did not feel this redistricting cycle was under more time pressure than the past two cycles. TrJ1177 (Hanna). Hunter testified that the redistricting procedures this time were not substantially different from others he has experienced. TrA1088.

49. There were few improvements that would benefit minorities between Plan H113 and H283. Joint Expert Ex. E-2 (Kousser Report) at 71; Tr806 (Turner). Although the non-suspense SSVR was increased above 50% in HD90 and HD148, the representatives of these districts and minority legislators opposed these changes as unnecessary given that these were already performing minority districts. These increases in SSVR were not made to enhance minority voting opportunity or ability, but to "offset" the loss of HD33 as a majority-Hispanic district and increase the number of SSVR-majority districts in the map. Tr238 (Kousser). In the second and third reading, although some minority members' minor amendments passed, no amendments passed that would have repaired minority districts or increased minority voting strength statewide. TrJ46 (Veasey); Tr806 (Turner).

50. Rep. Turner testified this redistricting cycle was less transparent than the previous two and had much more of an adverse effect on minorities. Tr805. He felt that the House map was predetermined and public input did not cause any changes. Tr806.

51. Rep. Farrar testified that it was not an open process and it seemed that many things were already decided by leadership early in the process. Farrar depo. at 90-91.

52. Rep. Y. Davis did not think the process was fair. Y. Davis depo. at 30. She did not believe it was an open process because they did not see the map until it was put on the floor. *Id*. She was not shown her district before the first public plan was released. *Id*. at 202.

53. Not all minority members were displeased with the process, however. Rep. Anchia did not have any complaints or criticisms of the 2011 redistricting process other than that his district was overpopulated. Anchia depo. at 165. Anchia testified that Downton's door was generally open. *Id*. at 174. Rep. Lozano (at the time a Democrat, now a Republican) felt that House leadership was there for him during redistricting. TrJ1791 (Lozano).

54. Mapdrawers applied the County Line Rule to the census data to determine how many districts would be placed within each county and whether the County Line Rule would have to be broken to comply with one-person, one-vote. Hanna had advised the HRC that the County Line Rule would have to yield to the VRA. D-590 at 38-39; D-124. Solomons took the position that they would not break the County Line Rule unless it was necessary to comply with one-person, one-vote, and he relied on staff to determine when that was necessary. Solomons refused to break the County Line Rule to comply with the VRA, stating he would need a federal court to tell him that the VRA trumped the County Line Rule. Solomons flatly rejected all plans that broke the County Line Rule in order to create or maintain minority opportunity districts.

55. Mapdrawers also took the position that any excess population in a county (what they termed "spillover") had to be placed in only one other district, and could not be divided and placed in two districts. TrJ2043-44 (Downton). Hanna had provided testimony before the committee that there was no clear answer on that issue, D-590 at 51-57, and numerous past maps had placed spillover into more than one district.

56. Interiano testified that Plan H283 has one county cut in violation of the County Line Rule in Henderson County; part of its population is joined with Ellis County to create HD10. Tr1423 (Interiano). He testified that all other county cuts are spillovers, which were not considered to be county cuts in violation of the County Line Rule. Tr1426 (Interiano). Arrington also testified that Plan H283 had one County Line Rule violation. TrJ181.

57. For § 5 compliance, mapdrawers compared the number of Hispanic-majority districts (using SSVR) and African-American districts (using BVAP) in the plan with the benchmark. They felt that as long as the they had the same number of minority districts statewide as in the benchmark, they were not retrogressing. Downton 8-12-11 depo. (Joint Ex. J-62) at 19. Benchmark HD33 would have been included in the count of benchmark majority Hispanic districts. *Id.* at 20.

58. Downton testified that if a district was majority-minority CVAP, then by definition the majority group had the opportunity to elect their candidate of choice, and any failure to do so was a function of turnout and not of whether they had the opportunity. Downton 8-12-11 depo. (Joint Ex. J-62) at 24-25. He felt it was an opportunity district even if the district was never electing the minority candidate of choice. *Id.* at 25. He stated that, if a district performed consistently for minorities but was not majority-minority, it was not considered to be a protected district, but that fact would be considered from a political perspective. *Id.*

59. Downton testified that, for the House map, they also looked at total Hispanic population, HVAP,

and Black total population to make sure they did not retrogress districts. Downton 8-12-11 depo. (Joint Ex. J-62) at 22. He said that they looked at the OAG retrogression analysis for minority-majority districts to ensure they had a legal map by maintaining benchmark levels. *Id*. at 22-23. He stated that if a district was a majority-minority district, they would look at the election analysis under the benchmark plan and under the new plan to see if they matched up, and they would try to maintain the election performance under the OAG 10 as close to benchmark as possible. *Id.* at 23-26. Interiano also testified that they tried to keep population metrics and minority performance in majority-minority districts near benchmark levels. TrA35. However, they did not try to maintain minority performance levels in HD35, HD41, or HD117, minority opportunity districts with Republican incumbents, because doing so would make it harder for the Republican incumbents to win re-election.

60. Interiano had discussed with Hanna how to measure retrogression, and had talked about the DOJ letter from 2001, which said that an election analysis should be conducted as part of the retrogression analysis. TrJ1538 (Interiano). Interiano testified that he did not look at election performance of benchmark districts until close to end of the process, around the time that Plan H153 was voted out of committee. TrA10. Although he knew from the OAG analysis that performance in HD35, HD41, and HD117 had decreased, no changes were made to any of those districts in response. TrA11 (Interiano). Interiano felt that any decreases in performance could be offset by increases in performance elsewhere in the map. TrA34, TrA37, TrA77 (Interiano). Interiano used the OAG analysis for § 5 compliance and felt that if one minority district went from 3/10 to 5/10 wins and another from 5/10 to 3/10 wins, then it was a wash. TrA34 (Interiano). Interiano testified that they did not remedy all of Hanna's concerns because they had worked with members and the rest of the legal team (Baker Botts and the OAG) and had been assured the plan was legal, and they thought there were offsets throughout the map. TrJ1529-20, TrJ1538 (Interiano).

61. Interiano and Opiela were friends and had frequent personal and email contact throughout the House redistricting process. TrJ1478 (Interiano). Downton and Opiela were also friends. TrJ2085 (Downton). Although mapdrawers denied that Opiela had any input into the House map, this testimony is not credible. Interiano emailed Opiela on March 3 asking for help on something he was working on, and this was a time Interiano testified he was not working on a congressional plan. US-104. Interiano also emailed Opiela information about House plans, and they discussed proposed House plans. US-514; US-515; US-493; TrJ2086 (Downton). Even if Opiela did not directly play a role in drawing district lines in the House map, he shared his ideas with Interiano and Downton, and there is evidence that the mapdrawers utilized a variation of Opiela's nudge factor and manipulated Hispanic voter turnout in drawing districts.

62. Interiano denied using Hispanic turnout data to draw districts and denied getting turnout data from Opiela or another source. However, this testimony is not credible. Interiano admitted that members wanted to look at turnout. In addition, reports from the Texas OAG that Interiano received and relied upon included estimated turnout by race in specific districts. *See* US-3; D-182; D-183. Downton also knew that whether a majority-minority district performs is partly a question of turnout. Downton 8-12-11 depo. (Joint Ex. J-62) at 24-25; TrJ133 (Arrington). Interiano and Downton were

aware that the effectiveness of a minority district depended in large part on voter turnout and that manipulating Hispanic voter turnout would help protect Republican incumbents in minority districts.

63.  Interiano testified that he did not know how to do racial shading at the block level while he was mapping.  TrA72-73.  This testimony is not credible, given the fact that he claimed 1000 hours of experience with RedAppl, that Downton knew how to use block-level racial shading, and that "block" is clearly visible as an option on the drop-down menu when a RedAppl user selects shading level.  Bruce testified that she would be surprised to hear that Interiano was unaware that RedAppl has the capability to shade census blocks by race.  TrJ1967.

64.  The benchmark plan H100 had 29 SSVR-majority districts (using non-suspense SSVR), including: 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 74, 75, 76, 77, 79, 80, 104, 116, 117, 118, 119, 123, 124, 125, 140, 143, and 145.

65.  Plan H113, the first publicly released plan, had 28 SSVR-majority districts (using non-suspense SSVR): these were the same districts that were in Plan H100 except for HD33. (HD104, which had been majority SSVR using either non-suspense or total SSVR, was now 50.1% non-suspense SSVR and 48.1% total SSVR).

66.  Downton noted that there was testimony at the HRC hearings that they reduced the number of Hispanic-majority districts by one, and that there were three districts in which they could increase the SSVR over 50% to raise the number.  TrJ2099 (Downton).  The mapdrawers chose to increase the SSVR in HD90 and HD148 because those districts were performing minority districts with Democrat incumbents.  They chose not to increase the SSVR of HD78 because it had a Republican incumbent, increasing the SSVR might endanger his re-election, and they felt they did not need to increase the SSVR of all three districts above 50%.  Solomons was aware that people were saying that the increase in SSVR in HD90 and HD148 was not necessary to comply with the VRA because they were already performing Latino districts. Tr1600 (Solomons).  Interiano testified that they did not look at any election analysis to determine whether HD90 or HD148 were opportunity districts in the benchmark plan.  Interiano 8-2-11 depo. (Joint Ex. J-61) at 152-53.  They counted them as new Latino opportunity districts in the enacted plan simply because they were majority-SSVR in the enacted plan but not in the benchmark.  *Id*. at 152-53.

67.  Plan H153, the plan passed out of the HRC on April 19, had 30 SSVR-majority districts (using non-suspense).  They were the same districts as in H113 but HD90 and HD148 were added, with HD90 brought to 50.1% non-suspense SSVR (but only 47.9% total) and HD148 brought to 50.2% non-suspense SSVR (but only 49% total).  The total deviation of Plan H153 was 9.9%, with the smallest district being HD90 (-4.9%) and the largest being HD103 (+5%).

68.  Plan H283 has the same 30 majority-SSVR districts (using non-suspense SSVR).  The smallest district is HD90 (-4.9%) and the largest district is HD61 (+5.02%), for a total deviation of 9.92%.

69.  Plan H100 had 30 HCVAP-majority districts based on 2005-2009 ACS data: 31, 33, 34, 35, 36,

37, 38, 39, 40, 41, 42, 43, 74, 75, 76, 77, 78, 79, 80, 104, 116, 117, 118, 119, 123, 124, 125, 140, 143, 145. HD51 was 45.8%; HD90 was 47.9%; HD103 was 46.5%; HD148 was 42.1%.

70. Plan H113 had 29 HCVAP-majority districts, the same ones as in H100 except for HD33 in Nueces County. HD32 was 42%; HD51 was 44.1%; HD90 was 43.2%; HD103 was 44.5%; HD148 was 42.4%.

71. Plan H153 had 30 HCVAP-majority districts, adding HD148. HD32 was 43.6%; HD51 was 44.1%; HD90 was 49.7% (50% is within the margin of error of +/- 2%); HD103 was 44.6%.

72. Plan H283 has 30 HCVAP-majority districts (31, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 74, 75, 76, 77, 78, 79, 80, 104, 116, 117, 118, 119, 123, 124, 125, 140, 143, 145, and 148) using 2005-2009 ACS data. HD32 is 44.2%; HD51 is 44%; HD90 is 49.7(+/-2)%; HD103 is 44.6%.

73. Dr. Chapa estimated that Plan H283 has 31 HCVAP-majority districts (the same 30 as determined by using 2005-2009 ACS data, plus HD90 with estimated 52% HCVAP), 10 BCVAP-majority districts, and 9 B+HCVAP-majority districts, for a total of 50 minority-majority-CVAP districts. Joint Expert Ex. E-1 (Chapa Report) at Table 11.

74. The House plan splits 412 precincts, and some precincts are split more than once. TrJ138 (Arrington); US-387 (Red-381 report). In the House map, precincts are split most often in the minority districts. TrJ139 (Arrington). Looking at the whole state, Dr. Arrington found that there was at least one precinct split in 85% of minority districts compared to 56% of Anglo districts, and about three times as many splits per precinct in the minority districts than in Anglo districts. TrJ139 (Arrington). Looking only at urban counties, he found that 87% of the Anglo districts have at least one split while 84% of the minority districts have at least one split, but there are twice as many splits per district in the minority districts than in Anglo districts, and the difference is statistically significant at the .002 level. TrJ140, TrJ218 (Arrington); US-519 (the mean number of splits in minority districts is 10.57 and in Anglo districts is 5.32). He concluded that the disruption from splitting precincts would be primarily in minority districts. TrJ140 (Arrington). Kousser found that 252 (61%) of the split precincts had BHVAP populations above 50% while only 3154 (37.5%) of the state's precincts had such concentrations of Latinos and African Americans. Joint Expert Ex. E-2 (Kousser Report) at 84.

75. Dr. Arrington acknowledged that there can be race-neutral reasons for splitting precincts (such as equalizing population), but he did not distinguish between race-conscious and race-neutral reasons for precinct splits in his analysis. TrJ141. However, he felt it was inconceivable that all of these other, race-neutral reasons would center on the minority districts to that extent and not in Anglo districts. TrJ1410, TrJ218 (Arrington). Arrington testified that race was being used improperly to split precincts to increase Anglo population percentages in HD41 to make it more Republican and to reduce the ability of Hispanics to elect a candidate of their choice. TrJ141-44. He also noted that precincts were split based on race in HDs 103, 104, and 105 in Dallas County. US-519.

76. Downton stated that he split precincts based on member requests, or in making changes to comply with the VRA, alter SSVR levels, "that type of thing." TrJ2023.

77. Solomons opposed Farias's proposed amendment to Bexar County in the House map in part because it increased the number of split precincts. TrJ333-35 (Farias). Given the number of split precincts in the plan, this basis for opposition was pretextual.

78. Minority members and groups thought Plan H283 would have a negative impact on the minority community because it did not account for the minority growth. Y. Davis depo. at 203. The Legislature was told that this map would not be good for minorities. *Id.* at 204.

79. Dr. Arrington opined that there is discriminatory effect (retrogression) because the benchmark plan had 50 effective minority districts, and H283 has only 45 or 46. TrJ118 (Arrington). He noted that HD33 in Nueces County was eliminated/moved and HD149 in Harris County was eliminated/moved; he concluded that HD117 in Bexar County was no longer effective and HD35 was no longer effective; and he was not sure about HD41's performance due to the many split precincts (and therefore unreliable election data); and no new minority opportunity districts were created. TrJ119-20 (Arrington). Dr. Arrington looked at demographics and election results (endogenous and exogenous). TrJ121. For endogenous elections, he relied on data from the State regarding elections and Hispanic candidate of choice. TrJ122-23. For exogenous elections, he and Dr. Handley looked at one election in each of the five elections in the previous decade, and looked at the highest office for which there was a Hispanic candidate who was preferred by Hispanic voters. TrJ123.

80. Dr. Engstrom concluded that Plan H283 provided Latinos with a reasonable opportunity in 30 districts: 31, 34, 36, 37, 38, 39, 40, 41, 42, 43, 51, 74, 75, 76, 77, 79, 80, 90, 103, 104, 116, 118, 119, 123, 124, 125, 140, 143, 145, and 148. Joint Expert Ex. E-7 (Engstrom Corr. Rebuttal Report docket 307-1) at 28. Dr. Engstrom considered Latinos to have a reasonable opportunity in a district when their preferred candidates win a majority of the votes cast in the district in a select set of general and primary elections more often than not. *Id.*; Tr511-12 (Engstrom). Dr. Engstrom concluded that the Latino Task Force Plan, H292, provided Latinos with 34 such opportunities: 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 51, 74, 75, 76, 77, 78, 79, 90, 103, 104, 116, 117, 118, 119, 123, 124, 125, 140, 143, 145, and 148. Joint Expert Ex. E-7 (Engstrom Corr. Rebuttal Report) at 28-29.

81. Dr. Chapa testified that there is sufficient concentrated minority population to form more majority-minority districts (with combined Latino and African-American CVAP population) than were created in Plan H283. Tr189.

82. Dr. Kousser opined that every other plan he looked at that was considered during the session (H111, H115, H130, H195/H269, H201, and H205) offered more opportunities for minorities to elect their candidates of choice in terms of the numbers of HVAP, HCVAP, B+HVAP, and B+HCVAP-majority districts created than Plan H283 did. Joint Expert Ex. E-2 (Kousser Report) at 80, Table 19. He concluded that the failure to create more opportunity districts was not justified by the number

of deviations, county breaks, split VTDs, and compactness scores of other plans. *Id*. at 81-86; Tr240-45. Plan H283 has a larger average deviation than several other plans, is less compact than almost all the other plans, and it splits more VTDs. Tr244 (Kousser). To address criticisms that the proposed districts in minority proposed plans are not compact, Kousser looked at compactness of districts in Plan H283 and concluded that the minority districts in Plan H283 are not more compact. Tr244-45. Mapdrawers rejected these plans as violating the County Line Rule or failing to create more HCVAP or SSVR-majority districts than their plan.

83. Kousser and expert Anthony Fairfax opined that Plan H283 provided less opportunity than the benchmark plan because it reduced the number of B+HVAP districts, despite the minority population growth. Joint Expert Ex. E-2 (Kousser Report) at 80; Tr844 (Fairfax).

84. Plan H201 (MALC's Whole County Plan submitted during the session) has 32 SSVR-majority districts, 31 HCVAP-majority districts, 37 HVAP-majority districts, 50 B+HCVAP-majority districts, and 59 BHVAP-majority districts. Joint Expert Ex. E-2 (Kousser Report) Table 19; Tr91. According to Dr. Chapa's 2010 population estimates (Report Table 9), Plan H201 has 32 HCVAP-majority districts, 11 BCVAP-majority districts, and 55 H+BCVAP-majority districts. Tr186, 188 (Chapa). Interiano testified that H201 has three county cuts. TrJ1434-35.

85. Plan H205 submitted during the session has 34 HCVAP-majority districts, 42-HVAP majority districts, 53 H+BCVAP-majority districts, and 62 BHVAP-majority districts. Joint Expert Ex. E-2 (Kousser Report) Table 19. According to Dr. Chapa's 2010 population estimates (Report Table 10), Plan H205 has 34 HCVAP-majority districts, 9 BCVAP-majority districts, and 58 H+BCVAP-majority districts. Tr188 (Chapa). Interiano testified that this map has numerous county cuts. Tr1436-37 (Interiano).

86. Professor Lichtman opined that Plan H232 (submitted during the session) created eight additional effective minority opportunity districts (three in Dallas County, three in Harris County, one in Tarrant County, and one in Fort Bend County) compared to the enacted House plan. Tr1229-30, Tr1239-34 (Lichtman); Joint Expert Ex. E-3 (Lichtman Report) at 9-14. Two of the districts are majority-HVAP and the others are majority-minority-VAP. In Dallas County there are two net additional majority-minority districts: HD101 with 54.2% combined minority and HD102 with 75.5% combined minority. There is also HD105 with 60% HVAP and 72.3% combined minority VAP. Tr1230 (Lichtman). In Harris County, there are HD132 (67.3% combined minority VAP), HD149 (84% combined), and a majority-HVAP district HD138 (57.3% HVAP and 71.2% combined VAP). In Tarrant County, there is HD96 (51% combined) and in Fort Bend County HD28 (70.6% combined VAP). *Id.* Each of the proposed new districts performs for minorities in the five 2008 and 2010 general elections Lichtman studied. Plan H232 has only one County Line Rule violation, the same number as Plan H283. Tr1437 (Interiano). It has two fewer HCVAP-majority districts (28) than Plan H283. Tr1439-40 (Interiano).

87. Expert Anthony Fairfax opined that, using 2010 Census data, Plan H202 (the Legislative Black Caucus map submitted during the session, which had 24 seats in Harris County) had 65 majority-

minority-VAP districts. Joint Expert Ex. E-13 (Fairfax Report (docket 267-2)) at 8. There are 12 districts that are predominantly African American, 45 that are predominantly Hispanic, and 93 that are predominantly White. The relative overall deviation range was 9.93% and the relative mean deviation was 2.97%. The plan has 151 split VTDs. *Id*. at 9. In Fairfax's supplemental report (docket 267-1), which used TLC CVAP data from RedAppl, he found that Plan H202 has 56 majority-minority-CVAP districts (in which non-Hispanic White CVAP was less than 50%), 53 of which were majority Hispanic plus Black (H+BCVAP>50%), 14 were predominantly Black, and 33 were predominantly Hispanic (31 were majority-HCVAP). The remaining 103 districts were predominantly White. Supp. Report at 4. Fairfax states that Plan H202 displayed overall mean compactness values that are closer to the ideal value of 1 for all three compactness measurements used (Reock, Schwartzberg, Polsby-Popper) than Plan H283. Supp. Report at 5. The least compact district was more compact than the least compact district in H283 using Schwartzberg and Polsby-Popper, while the compactness measurements for the least compact district was the same using Reock. According to Fairfax (Supp. Report at 6), this plan increased the number of H+BCVAP majority districts from 57 (benchmark) to 58. Interiano testified that Plan H202 maintained the Henderson County split, and also split San Patricio, Nueces, Victoria, Goliad, Bee, and Austin Counties. Tr1435-36.

88. Fairfax also opined that Plan H214 had 63 majority-minority VAP districts. Joint Expert Ex. E-13 (Fairfax Report (docket 267-2)) at 9. Twelve districts were predominantly African American, 42 were predominantly Hispanic, and 96 were predominantly White. Twenty-nine are majority-HCVAP. Using CVAP data from RedAppl, this plan had 54 majority-minority districts (in which non-Hispanic White CVAP was less than 50%); 51 of these were majority Hispanic plus Black (H+BCVAP>50%), 14 were predominantly Black, and 31 were predominantly Hispanic. The remaining 105 districts were predominantly White. Fairfax states that Plan H214 displayed overall mean compactness values that are closer to the ideal value of 1 for all three compactness measurements used (Reock, Schwartzberg, Polsby-Popper). Supp. Report (docket no. 267-1) at 5. The least compact district was more compact than the least compact district in Plan H283 under all three compactness measurements.

89. The Task Force's Plan H292 has 31 HCVAP-majority districts: 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 74, 75, 76, 77, 78, 79, 80, 90, 103, 104, 116, 117, 118, 119, 123, 124, 125, 140, 143, 145, and 148. The Task Force contends that HD51 (HCVAP 43.7%, SSVR 36.9%), HD90 (49.7% HCVAP, SSVR 50.1%), and HD103 (HCVAP 44.6%, SSVR 38.1%) are also Latino opportunity districts. The Task Force does not count HD80 as a Latino opportunity district despite its HCVAP-majority status because minority-preferred candidates do not win more often than not in the general election (3/7 or 6/13). The Task Force therefore asserts that H292 has 34 Latino opportunity districts. Interiano testified that it has six county cuts—Nueces, San Patricio, Victoria, Brazos, Henderson, and Smith Counties and would violate the Texas Constitution. Tr1440.

90. The mapdrawers, the HRC, and the Legislature were aware of one person, one vote requirements for the House map, and were also aware of the decision in *Larios v. Cox*, 300 F. Supp. 2d 1320 (2004). Interiano 8-26-11 depo. (Joint Ex. J-61) at 11-12. At the March 1, 2011 HRC hearing,

Hanna stated that for the Texas House districts the law "allows for a ten percent deviation without justification . . . ." D-590 at 40.  But he noted that the case of *Larios v. Cox* might mean that "the old ten percent rule, which was a safe harbor, may not be any more." *Id.*  Hanna warned that "[i]f all [of a] certain kind of district are drawing small, then we start to run into the sort of issues that they [had] in [*Larios v.*] *Cox*. Or if all the districts are drawing big, we start to run into that question. That's not fully developed jurisprudence yet but that starts to get me a little bit concerned." D-590 at 45.  Hanna advised that, to avoid *Larios* problems, the Legislature should "[e]nsure that all deviations are justified by a legitimate, consistently applied policy such as the preservation of county lines" and should "[m]ake sure that deviations in a plan with a total deviation of less than 10 percent do not consistently advantage or disadvantage one or more regions, racial or ethnic groups, or political parties." Perez-132 at 1.  At the April 15 HRC meeting, Rep. Madden and Luis Figueroa of MALDEF discussed *Larios*, and Rep. Madden noted that the case "indicated that you had to pay attention to deviations from the standard so that you didn't have one group as under and other groups as over." D-595 at 57.

91.  The TLC's publication, *State and Federal Law Governing Redistricting in Texas* (March 2011 version), stated, "[I]t is reasonably clear that, so long as the total deviation range of a state legislative plan remains under 10 percent, the state is not required to strive for a more exacting level of population equality.  Within this range, the state is relatively free to use population deviation for any rational purpose.  However, as discussed in Section D below, a discriminatory scheme of population deviation may be invalid for other reasons, even if the range of deviation is less than 10 percent." US-357 at 36.  Section D stated, "Even if a legislative plan has an overall range of population deviation less than 10 percent, a pattern of population deviation within that range to further invidious intentional discrimination or that inadvertently resulted in systematic underrepresentation of a racial or ethnic group may be held invalid on other grounds." *Id.* at 37.  It also warned that, "To minimize the chance of a successful challenge under the somewhat amorphous *Larios* standard, mapdrawers may want to consider, in a legislative redistricting plan with an overall deviation of less than 10 percent, avoiding deviations that consistently advantage or disadvantage a particular political, racial, or ethnic group or region of the state." *Id.* at 39.

92.  Plan H283 has a total deviation (the difference in population between the smallest and largest districts) of 9.92%.  The smallest district is HD90 in Tarrant County (-8,209, -4.9%) and the largest is HD61 (8,417, 5.02%).  Red-100 Report.

93.  Mapdrawers assumed they could have a 10% top-to-bottom deviation range and put the map together with that assumption. Tr994 (Downton); Tr1473-74 (Interiano).  There was no effort to minimize deviation beyond complying with the 10% top-to-bottom deviation. Downton 8-12-11 depo. (Joint Ex. J-62) at 15; Tr1474.[1]  For drop-in counties, ensuring population equality was left

_____

[1] Downton testified at his deposition that they "made an effort to have a narrower range within the counties than the overall 10 percent range." Downton 8-31-11 depo. (Joint Ex. J-62) at 96. However, there was no effort to achieve minimal deviation, and the drop-in counties have significant population deviations.  As noted, deviation issues beyond staying within 10% were left to the county delegations.  At most, there is evidence that Downton attempted to decrease

to the delegation members. Tr1474. Interiano advised the members to attempt to comply with one person, one vote, but there was no effort to get population equality beyond ensuring a 10% deviation. Tr1474; Interiano 8-2-11 depo. (Joint Ex. J-61) at 53-54. Interiano calculated deviation only statewide; he did not look at individual counties except to the degree it had to fit within statewide deviation. Interiano 8-26-11 depo. (Joint Ex. J-61) at 10-11. Solomons was not aware of any legal justification for the population deviations within counties, but assumed the staff would know why there were population deviations. Tr1596-98 (Solomons).

94. Given the adherence to the County Line Rule, the House map would necessarily have a top-to-bottom deviation close to 10%. However, districts within drop-in counties could have been drawn with little to no deviation from a county ideal.

95. Martin testified that there are fourteen counties with two or more whole districts contained within them, and they account for 93 of the 150 districts. Tr379-80. He testified that these 93 districts could have been drawn with zero or minimal population deviations. Tr380. Further, eight of the fourteen counties (accounting for 75 districts) have a deviation over 3.5%. Tr380. Martin would give an "F" on good faith effort to minimize deviation. Tr381.

96. A large number of Texas House districts in Plan H283 deviate substantially from the ideal population, and there is more population disparity in Plan H283 than in the benchmark. Tr233 (Kousser). Professor Kousser opined that, if the Legislature had been trying to minimize deviations, a histogram of population deviations would have resembled a normal curve, with the largest number of districts clustered around zero deviations. Tr233; Joint Expert Ex. E-2 (Kousser Report) at 61. Instead, he noted, it is more U-shaped, with the largest number of districts between four and five percent underpopulated (23 districts) and four and five percent overpopulated (20 districts). Tr233; Joint Expert Ex. E-2 at 61, 63.[2] Looking only at Anglo-majority and Latino-majority districts, in general the Anglo districts are more underpopulated than overpopulated and the Latino districts are primarily overpopulated: 34/80 Anglo districts are overpopulated and 46/80 are underpopulated while 22/37 Latino districts are overpopulated and 15/37 are underpopulated.[3] Tr234 (Kousser); Joint Expert Ex. E-2 at 64-65. Dr. Arrington opined that usually the population deviations in a districting plan would be unimodal, with most of the population deviations clustering near the ideal population. US-355 at 7.

97. Kousser opined that Plan H283 was "not very compliant" with one person, one vote and that

deviations by a small amount in Dallas County (to 8.88%) and in Hidalgo County.

[2] This is an increase from Plan H100, in which 37 districts had deviations over 4%. Joint Expert Ex. E-2 at 62, 63.

[3] Five of the underpopulated Latino districts are in El Paso County, where the population deficit combined with the County Line Rule required that all five districts be underpopulated compared to the state district ideal. Excluding those districts, more than twice as many Latino-majority districts are overpopulated than underpopulated. Tr235 (Kousser); Joint Expert Ex. E-2 (Kousser Report) at 64.

"the population disparities are clearly correlated with partisanship and ethnicity." Tr248-49. Kousser found that the population deviations were not justified and more heavily burdened Latinos. Tr249, Tr313. He did not consider whether incumbency protection played a role in the population deviations. Tr272-73.

98. Kousser also noted that districts in urban counties were generally overpopulated, including Republican districts (19 over and 15 under, with an average deviation of .47), but Democrat districts were more overpopulated (22 over and 17 under, with an average deviation of .94), and Latino Democrat districts were even more overpopulated (13 over and 6 under, with an average deviation of 1.17). Tr236 (Kousser); Joint Expert Ex. E-2 at 66. Kousser found "no particular pattern" for districts represented by Republicans in urban counties. Tr236. But he found a bias in Democrat districts, finding that they tended to be overpopulated. *Id.* And he found that districts represented by Latino Democrats were almost all overpopulated, such that Democrats were disadvantaged, but Latinos were even more disadvantaged. Tr235-37. Kousser noted that this difference cannot be explained simply by partisanship or by the County Line Rule. Tr237. He opined that this demonstrated that the Legislature acted with a partisan and racially discriminatory intent. Joint Expert Ex. E-2 at 67.

99. Dr. Alford testified that there is not a strong tendency toward a unimodal distribution around zero when redistricters start with existing districts and modify them based on new population data, as opposed to starting from scratch. TrJ1887-88. Alford testified that this was because mapdrawers were redistributing population while trying to preserve constituency representational relations and follow county lines, and they would stop when satisfied that they were within the top-to-bottom deviation. TrJ1888-89 (Alford). He also noted that both minority and Anglo districts in Plan H283 have a bimodal pattern. TrJ1890 (Alford). Alford concluded that the distribution indicates that population equality was balanced against other redistricting interests, the way that 10% leeway presumes it will be. *Id.* He also opined that the fact that the population deviations were not clustered around zero did not indicate a systematic or planned pattern of under or over population. *Id.*

100. Dr. Alford analyzed population deviations in his 2014 supplemental report. TrJ1867 (Alford). He divided the House districts in Plan H283 into minority and non-minority by CVAP and then compared how they were treated. TrJ1868 (Alford). Roughly 100 districts are non-minority and 50 or 52 are minority, depending on how one counts. *Id.* His count used minority CVAP (using the 2008-2012 ACS average) to capture HCVAP, BCVAP, and H+BCVAP minority districts, and the actual deviation numbers came from the 2010 Census. TrJ1868-69. He also used 2012 SSVR data. TrJ1869. He found that the average minority district is overpopulated by 232 people, and the average Anglo district undersized by 124 people. TrJ1870. In addition, SSVR majority/Hispanic majority districts are undersized by 242 and Anglo majority districts (SSVR <50%) are oversized by 63. *Id.* Alford testified that an ideal district is around 168,000, so these are very small deviations from ideal. TrJ1871.

101. Dr. Alford also looked at adjusted average population deviation, taking into account drop-in counties and looking at deviation from county ideal for those. TrJ1872. For districts outside drop-in

counties, he took all of the state population outside the drop-in counties and divided by the number of districts to get a new ideal for those districts. TrJ1873. He testified that this would take out the possibility that data are being obscured by drop-in county districts. *Id.* Using the adjusted average population deviations, minority-majority-CVAP districts are 172 underpopulated, majority-Anglo districts are 91 overpopulated, SSVR-majority districts are 80 overpopulated, and districts with SSVR below 50% are 21 underpopulated. TrJ1874 (Alford); D-168 (Alford March 14, 2014 Report Table 7 & Graphs D & E). He testified that these numbers show that the districts are close to ideal. TrJ1874.

102. Dr. Alford also analyzed all the drop-in counties as a whole (Bexar, Dallas, Denton, El Paso, Harris, Nueces, Tarrant, and Travis), using an adjusted countywide ideal, to see if on average the districts are being treated differently. This examines drop-in counties without the risk that the rest of state will obscure the results. TrJ1875 (Alford). In this analysis, minority-majority-CVAP districts are underpopulated by 149 persons; Anglo-CVAP-majority districts are on average 141 persons overpopulated; SSVR-majority districts are on average 626 persons underpopulated; and districts with less than 50% SSVR are on average 209 persons above the county ideal. TrJ1874-77 (Alford); D-168 (Alford March 14, 2014 Report Table 8).

103. Dr. Alford testified that, based on statewide ideal population, there is not a discernible pattern of overpopulation of minority-CVAP or SSVR-majority districts or of underpopulation of Anglo-CVAP-majority districts. TrJ1880-82; D-172; D-173; D-174. He also testified that, based on county ideal population, there is no discernible pattern of systematically overpopulating minority-majority-CVAP districts or majority-SSVR districts in drop-in counties. TrJ1884-86; D-175; D-176.

104. Dr. Alford did not analyze population deviations within any one county such as Dallas, Harris, or Nueces County. TrJ1900 (Alford). Nor did he look for patterns by only considering the specific counties in which Plaintiffs allege that population deviations were used to disadvantage minorities. Dr. Alford agreed that population variations can be a tool to discriminate. TrJ1901.

105. Dr. Arrington admitted that statewide there is no systematic overpopulation of minority districts when the County Line Rule is taken into account. TrJ182. However, he noted that Peña's district was intentionally underpopulated and surrounding districts were overpopulated to allow Peña to win as a Republican in the face of the known opposition of Hispanic voters to Republican candidates. US-355 at 10-11. He also opined that deviations combined with bizarre district shapes suggest a possible racial bias in Dallas and Harris Counties, and his conclusion based on the evidence was that any racially discriminatory effects must have been intentional. US-355 at 11-13.

106. The total deviation of Dallas County is 8.88%. Tr329 (Martin). Martin testified that there appeared to be no effort to draw a minimal deviation map. *Id.* He testified that a map could be drawn without deviation, and noted that the deviation of demonstration Plan H288 was only 1.74%, and that was easily achieved. Tr333-34. By minimizing deviation and not splitting minority population in northeast Dallas, that plan increased minority ability to elect. Tr335 (Martin).

107. In Dallas County, in Plan H283, the two Latino districts are overpopulated. Based on deviation from the statewide ideal district size, HD103 is overpopulated by 8,379 people (5%) (the most in the County) and HD104 is overpopulated by 5,147 people (3.07%). Of the four African-American districts, one is overpopulated (HD109 by 3.9%) and three are underpopulated (HD100 by 3.87%, HD110 by .05%, and HD111 by .39%). Thus, among the six minority districts in Dallas in Plan H283, three were overpopulated (HD103, HD104, and HD109) and three were underpopulated (HD100, HD110, and HD111). D-109; TrJ183 (Arrington). Of the eight Anglo-majority districts, four are underpopulated and four are overpopulated. HD102 is underpopulated by 3.88%; HD108 is underpopulated by 2.63%; HD112 is underpopulated by .35%; and HD115 is underpopulated by .54%. HD105 is overpopulated by 4.83%; HD107 is overpopulated by 2.53%; HD113 is overpopulated by 2.25%; and HD114 is overpopulated by 2.8%.[4] Kousser opined that HD103 and HD104 were overpopulated to put as much Latino population as possible into those districts (packing), making it much more difficult to draw additional opportunity districts for the minority population growth. Dr. Arrington similarly noted that the Hispanic districts are overpopulated, and that makes it more difficult to create another minority district. TrJ222 (Arrington). Martin further noted that Anglo-district HD105 is overpopulated by 8,091 people, and because the additional population is Anglo population from the south, it makes it more difficult to draw an additional minority opportunity district in western Dallas County. Tr325 (Martin). Without those additional Anglos, the district is more likely to elect Latino candidates of choice. Tr326 (Martin).

108. Downton testified that he did not recall an effort to have a 1% deviation range within Dallas and explained the population deviations as resulting from an effort to maintain benchmark minority population levels. Downton 8-31-11 depo. (Joint Ex. J-62) at 97-98. He testified that because benchmark HD103 and HD104 were underpopulated (HD103 was 30% underpopulated, the most in the state), he did not think they could have gotten the districts to ideal population and also maintained their benchmark levels of minority population (SSVR). *Id.* However, in his October 20, 2011 deposition, Downton testified that HD103 in Plan H283 was 8,379 above ideal population because he worked with Rep. Anchia to include that population. TrJ2148 (Downton). He further testified that it was not necessary to have a 5% deviation in HD103 to maintain the Hispanic population, and that there were others ways to have done it, "but that was a policy decision." TrJ2149.

109. The population deviation of Harris County in Plan H283 is 9.74%. Tr356 (Martin). Martin testified that it was easy to draw a plan with a deviation of only 1.81%. Tr357. Because the Legislature chose to go with 24 districts, there was enough population to have all districts be at ideal population or above. However, some districts were overpopulated and some were underpopulated. Three of the four Latino-majority districts (HD140, 145, and 148) were overpopulated, and four of the six African-American districts (HD131, HD139, HD146, and HD147) were overpopulated.

---

[4] Dr. Arrington's rebuttal report, US-355 Table 1, analyzes the districts in Dallas County. He noted at trial that both Anglo and minority districts in Dallas County were roughly half under and half over-populated. TrJ183 (Arrington). However, his Table 1 only has 13 districts, leaving out HD100, a significantly underpopulated minority district. He agreed that including HD100 would completely change the results of the analysis. TrJ184-85.

HD137 is also overpopulated. Rep. Alvarado contended that this uses up minority population unnecessarily and limits the ability to draw new districts. Alvarado Decl. (docket no. 331) at 5; Hochberg Decl. (docket no. 331) at 3. Ten of the thirteen Anglo Republican districts were overpopulated, and the average overpopulation of these ten districts was 4,337, compared to 6,337 for the eight overpopulated minority/Democrat districts.

110. Interiano stated that, given the choice to have 24 districts in Harris County, the ideal population size for a district in the County was 170,519, slightly higher than the ideal state district size (167,637). Interiano Decl. (docket no. 370-2) at ¶ 2. He stated, for example, that HD140 and HD145 are populated at 170,732 and 170,821, respectively, which is almost the ideal county size but several thousand above ideal state size. Interiano stated, "This overpopulation is due to the fact that Harris County was awarded twenty-four districts, not in order to avoid drawing an additional minority opportunity district. With that said, there were several instances where it was necessary to increase the population of a particular district either because a member specifically requested to have certain precincts and was unwilling to give up other populations or because the population was needed in order to maintain certain benchmarks, like the 50% Spanish Surname Voter Registration (SSVR) for Latinos or the existing levels of African-American voting age population." *Id.*

111. Rep. Walle raised the issue of minority district overpopulation in Harris County during second reading on April 27. D-13 at S235. No justification was given at the time for the population deviations.

112. Mapdrawers removed population (including the African-American community of Como, which has historically been part of the district) from HD90 in Tarrant County to raise its SSVR, leaving it underpopulated by 8,209 (-4.9%) and the smallest district in the state. D-190 at 685-89.

### El Paso

113. In Plan H100, El Paso County had five districts wholly contained within it, and all five districts were majority-HCVAP using 2005-2009 ACS data. HD75 was 83.1% HCVAP; HD76 was 89.4% HCVAP; HD77 was 78.6% HCVAP; HD78 was 56.2% HCVAP; and HD79 was 70% HCVAP. TrJ709 (Rodriguez); D-100 at 34.

114. In Plan H100, four districts were majority total SSVR and HD78 was not. HD75 was 75.6% total SSVR (75.9% non-suspense), HD76 was 84.1% total SSVR (84.4% non-suspense); HD77 was 72.6% total SSVR (73.1% non-suspense); HD78 was 47.1% total SSVR (47.5% non-suspense); HD79 was 64.6% total SSVR (65.2% non-suspense). TrJ1046 (Solomons); TrJ709 (Rodriguez); D-100.

115. In 2008, HD78 was an open seat (before that, the seat had long been represented by Republican Pat Haggerty), and Hispanic Democrat Joe Moody defeated Anglo Republican Dee Margo by a margin of 51.53% to 45.11% to represent HD78. Tr406 (Martin); TrJ880-81 (Moody).

116.  In 2010, Margo defeated Moody by a margin of 52.41% to 47.59%.  TrJ881 (Moody).  Dr. Engstrom determined that the voting was racially polarized.  He estimated that Latino support for the Latino incumbent Moody was 79.6% and non-Latino support was 28.4%.  Tr510 (Engstrom). SSVR turnout was 34.88%. Tr510 (Engstrom).  Margo was not the candidate of choice of Hispanic voters.  Joint Expert Ex. E-2 (Kousser Report) at 46; US-351 (Handley Report) at 34.

117.  At the time of redistricting, El Paso County was 82% Hispanic in terms of total population and was 74.74% estimated HCVAP based on 2005-2009 ACS data.  TrJ716 (Rodriguez); D-218; Chapa Table 1; Gonzalez-Baker Report Table 3; PL-297.

118.  In 2011, the incumbents were four Democrats and one Anglo Republican: Chente Quintanilla (Hispanic, Democrat) (HD75); Naomi Gonzalez (Hispanic, Democrat) (HD76), Marisa Marquez (Hispanic, Democrat) (HD77), Dee Margo (Anglo, Republican) (HD78), and Joe Pickett (Anglo, Democrat) (HD79).  TrJ730 (Pickett).

119.  As in Plan H100, all five El Paso districts in Plan H283 are majority-HCVAP districts using 2005-2009 ACS data.  HD75 is 89% HCVAP; HD76 is 83.5% HCVAP; HD77 is 73.4% HCVAP; HD78 is 55.2% HCVAP; HD 79 is 76.7 HCVAP.  D-109 at 44.  HD78 HCVAP% decreased from 56.2% to 55.2% between Plan H100 and H283.

120.  In Plan H283, as in Plan H100, four districts are majority total SSVR and HD78 is not.  HD75 is 81% total SSVR (81.2% non-suspense); HD76 is 80.7% total SSVR (81.3% non-suspense), HD77 is 66% total SSVR (66.4% non-suspense); HD78 is 46.8% total SSVR (47.1% non-suspense); and HD79 is 69% total SSVR (69.3% non-suspense).  Total and non-suspense SSVR are lower in HD78 than in the benchmark plan.

121.  El Paso was a drop-in county with five districts (the number did not change from the benchmark).  Tr923 (Downton); TrJ731 (Pickett).  Solomons and Downton told the El Paso delegation to draw their five districts, staying within El Paso County.  Tr923 (Downton).  Around March 1, Solomons told Pickett that, since he was on the HRC, he should take the lead for El Paso and come up with a map for Solomons' staff to review. TrJ732, TrJ783 (Pickett).  Pickett was "the dean" of the El Paso delegation.  Tr923 (Downton); TrJ1045 (Solomons).

122.  In the benchmark plan, HD77 had a northeast extension and a middle "horn," and there were also extensions towards the east coming out of the southern portion into HD76.  TrJ738 (Pickett).

123.  Changes were necessary to the El Paso districts to equalize the population.  HD75 was 51,771 overpopulated; HD76 was 34,922 underpopulated; HD77 was 35,070 underpopulated; HD78 was 1,148 overpopulated; and HD79 was 20,465 underpopulated.  D-100 at 17; TrJ720 (Rodriguez); TrJ734, TrJ786 (Pickett) (goals included equalizing population and that was going to be the biggest challenge); Marquez depo. at 18.

124. Geographic factors play a role in drawing districts in El Paso County.  The Davis Mountains,

state and international boundary lines, and federal installations all influence the map. D-267; TrJ717-18 (Rodriguez) ("There's no question the mountain range is a factor, and certainly the international boundary, the federal installation Fort Bliss, and Biggs Army airfield are also factors. Those are all considerations."); TrJ736 (Pickett) (the mountains, Ft. Bliss, and New Mexico and Mexico lines are factors in drawing lines).

125. Pickett asked the delegation members to participate and bring him comments or maps. TrJ732, TrJ783 (Pickett); Marquez depo. at 24:7-13. Pickett also prepared maps. TrJ733 (Pickett). The Pickett RedAppl plan log shows that Pickett and/or his staff were drafting some possibilities in early March. PL-703.

126. Marquez and Gonzales sat down on RedAppl and drew a proposed plan, which they shared with Pickett. On March 14, a plan from Marquez's RedAppl account was shared with Pickett's account. PL-703 (pick plan log); D-307 (map of pickH111). Pickett was very upset by how his district was drawn, and he rejected it. Marquez depo. at 24:14-24; 28:8-10; TrJ757-59 (Pickett).

127. On March 15, Pickett sent Solomons a proposed El Paso House plan. PL-613 (solo plan list); D-271(solo plan list); TrJ1046-54 (Solomons). The plan appears in Solomons' RedAppl account plan list as soloH108 and was created on March 15, 2011. PL-613; D-271. The comments said, "From Pickett; El Paso House plan." PL-613; D-271. This map (PL-501) is the same as pickH113 (PL-495) in Pickett's RedAppl account. This map (1) has what was referred to at trial as the "chef's hat" configuration at the top of the northeast antler/extension in HD78; (2) has no long northwest antler/extension; (3) has no split precincts along the HD77/HD78 boundary; (4) has an HD77 protrusion into HD76; and (5) has a total SSVR of 47.4% (compared to benchmark 47.1%) in HD78. PL-501 (map packet); D-300 (map); PL-733 (TLC report); TrJ1049 (Solomons). Bruce asked Pickett if he had approval from other delegation members for this map. He said no, so she told him to let her know when everybody signed off. TrJ1951 (Bruce).

128. Around March 16, Pickett presented his preferred map (which was similar to pickH113 except HD77 no longer protruded into HD76) to the delegation members and asked them to review it on RedAppl and sign the map so he could provide a delegation map to the HRC. TrJ755 (Pickett); Marquez depo. at 33:19-22; 39:19-22; 40:10-13. Marquez had some concerns about her district (HD77), including the loss of geography to HD76 (Gonzalez's district). Marquez was concerned about the loss of Latino areas and gain of Anglo areas, and a decline in SSVR. Marquez depo. at 35-38, 42-45. When she talked to Gonzalez about it, Gonzalez replied that she did not draw the map. Marquez depo. at 43:8-9. When Marquez expressed her concerns to Pickett, he said, "You'll be fine." Marquez depo. at 44:5-9.

129. Marquez continued to express concerns and asked to make additional changes. TrJ785 (Pickett). Pickett's initial reaction was that it was too late and that she could not make changes. TrJ774 (Pickett). She persisted. TrJ785 (Pickett). Pickett eventually told Marquez that she could change her district and Margo's district (HD78) by mutual agreement, but could not change the other three districts. Marquez depo. at 49:1-5; TrJ765, TrJ785-86, 790. Marquez then approached Margo

with her proposed changes, and Margo agreed. Marquez depo. at 50:4-6; TrJ809 (Margo). Marquez had been concerned that her district's SSVR percentage was lower; she moved the district line between HD77 and HD78 in RedAppl and determined which precinct changes would increase her SSVR numbers; if she liked it, she asked Margo for the particular precincts. Marquez depo. at 50:19-22. Marquez asked Margo if she could take some precincts with high Hispanic numbers, and he agreed. *Id*. at 50:10-12. It is not clear whether Marquez told Margo that she wanted high Hispanic precincts or simply told him which areas of the map she wanted in her district. *Id*. at 52:1-4. She was also concerned about whether potential opponents were in her district. TrJ821 (Margo). The map with their agreed changes was submitted to Pickett's RedAppl account on March 21. This map had two antlers in HD77 and also a middle horn. D-303; PL-503. Compared to Pickett's preferred map, the total SSVR of HD77 (Marquez's district) is higher and the SSVR of HD78 (Margo's district) is lower. Plan pickH120 is the agreed map between Marquez and Margo. TrJ790 (Pickett).

130. On March 21, Pickett's staff (on Pickett's behalf) sent Solomons two proposed El Paso House plans. PL-613 (solo plan list); D-271 (solo plan list); TrJ762-63 (Pickett). The maps were the agreed-upon delegation map that Pickett preferred (pickH118) ("the Pickett map") and the map with changes along the boundary between HD77 and HD78 that were agreed between Margo and Marquez (pickH120) ("the Marquez map"). These appeared in Solomons' RedAppl account plan list on March 21, 2011 as soloH109 and soloH110.

131. Plan soloH109 (PL-504) is the Pickett map (it is the same as pickH118 in Pickett's RedAppl plan account (PL-500)). The soloH109 plan has the same chef's hat configuration in the northeast extension as the March 15 plan, has no long northwest extension, and the SSVR for HD78 is 47.4%. PL-504 (map); D-301 (map). Pickett and/or his staff played the primary role in developing this map, without a lot of input from the delegation members other than Quintanilla and his staff. TrJ756-57 (Pickett); TrJ784-85 (Pickett).

132. Plan soloH110 (PL-505) is the Marquez map (it is the same as pickH120 in Pickett's RedAppl plan log (PL-503)). This is the map in which Marquez and Margo changed the boundary between their districts without changing the other three districts, which are the same as in Pickett's preferred map. In this map, the configuration of HD77 has a longer, thinner extension to the northeast than the prior "chef's hat" extension, and it has a long extension to the northwest not present in the benchmark or Pickett's map. In addition to the antlers in HD77, there is also a tall middle horn. PL-505; D-302. The total SSVR for HD78 is 45.8% (below benchmark).

133. Neither the Pickett map nor the Marquez map had split precincts along the border of HD77 and HD78.

134. Pickett testified that he told Solomons that he had an agreed-upon map by the delegation members, and that one of them kept coming back with concerns. He told Solomons, "It is up to you how you want to handle it." TrJ765(Pickett). Pickett's map, soloH109, with the chef's hat and no long northwestern extension was not the proposal that moved forward and was adopted. The version

that Downton put in the plan was Marquez's map, soloH110, which included the two antlers and a middle horn configuration and had an SSVR of 45.8%. TrJ2104-05 (Downton).

135. Downton testified that Pickett told him the "el paso #2 version" (the Marquez map) was the consensus version to put into the map. TrJ2104 (Downton). This testimony is not credible and conflicts with Pickett's testimony.

136. Neither Interiano nor Downton had any role in creating the initial configuration of El Paso. Tr1445 (Interiano); TrJ2101 (Downton).

137. On March 23, the Marquez plan ("el paso #2 version") appeared in Downton's RedAppl account plan list as hrc1H169 created and last modified 3/23/2011 1:18 PM. PL-615 (hrc1account plan list). This plan was sent to Downton's account from Solomons' account by Bruce. D-244; PL-506; TrJ1992-93 (Downton). Downton says he changed the description to "received from Pickett" because if a plan was forwarded from another account like Solomons' account, he would change it to indicate the person who actually drafted the map. TrJ1992. Downton is not sure when he received it; it could have been before March 23, since RedAppl only indicates when a plan is first saved. TrJ1993. Downton incorporated the configuration into his draft statewide map hrc1H215. TrJ1996-98 (Downton); PL-1615.

138. Sometime around April 5, Margo signed his approval on a map of his district. D-209; D-229 at 75. This map came from plan hrc1H215 dated April 1, 2011. D-209. The configuration of HD77 and HD78 in this map is the same as the Marquez map. TrJ1996 (Downton); TrJ790-92 (Pickett); D-279 at 2.

139. On April 7, Hanna wrote his first retrogression memo. TrJ1155-56 (Hanna); D-122. For El Paso, the memo notes that proposed HD78 has 45.8% total SSVR (benchmark was 47.1%), the other El Paso districts have SSVR between 67.2 and 81%, and "the slight decrease in SSVR in District 78 does present some level of risk of retrogression that likely could easily be remedied by swapping some precincts with an adjoining district. Section 5 analysis frequently focuses on the differences in minority voting strength in adjacent districts." Hanna recommended swapping precincts; he did not recommend splitting precincts. TrJ1083 (Solomons); TrJ1158 (Hanna); TrJ2001 (Downton).

140. Downton testified that he made changes along the boundary between HD77 and HD78 with the goal of complying with § 5 of the VRA by raising the SSVR level of HD78. TrJ2002, TrJ2102. In making his changes, Downton reviewed the other two plans that had been received in the solo account from Pickett on March 15 ("El Paso House Plan") and March 21 (Pickett's map). TrJ2012. These show up in Downton's hrc1 account on April 11 as hrc1H260 and hrc1H261. TrJ2009, TrJ2012. Downton created hrc1H258, "full state 7" on April 11 at 12:26 and then at 12:27 opened the two Pickett maps. When he opened "Pickett 2" on April 11 at 12:27, he had already started working on hrcH258 (created at 12:26). TrJ2012. Downton did not use Pickett's preferred map, which had a higher SSVR, but instead continued working on the Marquez map. Downton's changes to the El Paso configuration were incorporated into the full state map on April 11. TrJ2129

(Downton); PL-615. By April 11, 2011 at 2:25 p.m., Downton had completed the final El Paso configuration.

141. Downton "tweaked" the El Paso map by altering the boundary between HD77 and HD78. Tr1003-04 (Downton). Downton's "tweaks" were made based on race and to raise the SSVR of HD78. Tr1004, TrJ2103 (Downton). The changes included removing Precinct 23 from HD78 and making changes to the northeast antler that resulted in the so-called "anteater" configuration. Downton did not try to incorporate any input from Margo or Marquez about precincts or neighborhoods that they wanted in their districts. TrJ2103 (Downton). Downton looked at block level data for Hispanic population while making these changes. TrJ2117 (Hispanic). He split precincts and moved blocks across the boundaries between HD77 and HD78 based on that Hispanic population. TrJ2117 (Downton); TrJ1004 (Downton) ("I did look at the Hispanic population to try to raise that back up and did raise it back up."). Downton split fourteen precincts. It was not necessary to split precincts to raise the SSVR of HD78 above benchmark. TrJ1603-04 (Downton); TrJ2109-13 (Downton); TrJ2116 (Downton); PL-1007; TrJ2151-52; PL-733; PL-712; PL-713.

142. Moody testified that he could see no reason based on income, housing, or ethnic makeup of certain precincts to divide the precincts in the way Downton did. TrJ840-43 (Precinct 10), TrJ852-53 (Precinct 17); TrJ853-54 (Precinct 24, and noting that it split a cohesive neighborhood); TrJ854-55 (Precinct 25); TrJ863-64 (Precinct 43); TrJ864-65 (Precinct 45); TrJ867 (Precinct 49, and noting that it split a cohesive neighborhood); TrJ867-69 (Precinct 47); TrJ869-70 (Precinct 55).

143. As noted, Downton admitting splitting precincts on the basis of race, using block level Hispanic shading. TrJ2118 (Downton) (saying he put the "heavily Hispanic concentrated portion in 78 and the non-Hispanic portion in 77"); PL-1012. But Downton was selective in choosing which Hispanic areas to include in HD78. TrJ2118-19 (Downton).

144. Although Downton denied watching political results while splitting precincts to raise the SSVR to achieve the lowest possible percentage of votes for Latino-preferred candidates, TrJ2119, that testimony is not credible. Downton admitted that while mapping, he had election data showing (likely the McCain/Obama 2008 contest) and kept an eye on changes in election results. TrJ2119-20. Downton did not exchange whole precincts to raise the SSVR, even though that was suggested by Hanna and he could have easily done so. Rather, he chose specific areas of precincts to include and exclude from HD78, and often did not include Hispanic population nearby in HD78. This suggests that Downton had a purpose other than simply raising the SSVR. Therefore, Downton was using race-based data to increase the SSVR of the district, while simultaneously watching the election results to ensure they remained favorable to the Anglo Republican incumbent and therefore less favorable to the Latino-preferred candidate. In addition to the method used by Downton, this fact is shown by the ultimate result he achieved. Although Downton increased the SSVR in HD78 from 45.8 to 46.8%, he kept the political performance close to where it had been in the Marquez map. In the 2006 general election for Lieutenant Governor, Dewhurst went from 59.9% to 59.6% and Alvarado went from 40.1% to 40.4%. PL-503 at 56; D-109 at 1989. Keller went from 53.9% to 53.5% and Molina went from 46.1% to 46.5% in the CCA Presiding Judge race. PL-503 at 56; D-

109 at 1990. At the same time, the SSVR% in the election went from 43.9% in Marquez's map pickH120 to 44.9% in H283. PL-503 at 56; D-109 at 1990. Thus, although he increased the total SSVR by 1%, election performance for the Latino-preferred candidate only increased .3 or .4%.

145. Downton's changes did not change the population deviation percentages, which are identical to the deviations in Marquez's map (though the actual population numbers changed slightly). D-109 at 141; D-279 at 77.

146. In the hrc1 plan account, plan hrc1H265 created April 12 is described as "Full State 9," which was Downton's "notation for the ninth iteration of [his] full state map." TrJ2002 (Downton); D-270. This plan was last modified April 13 at 2:45 p.m. TrJ2002; D-270. This map reflects the changes that he made in El Paso. TrJ2003 (Downton); D-351 (map). The total SSVR for HD78 in this map is 46.8%, which is higher than the hrc1H215 SSVR and the one that Margo signed. TrJ2003 (Downton).

147. Hanna's second retrogression memo was done around April 12 on non-public Plan H110 (the source for this plan was hrc1H265). D-327. Plan H110 contained Downton's changes. D-368. Hanna noted that the total SSVR of HD78 was now 46.8%, and said, "The minor decreases in the SSVR in Districts 77 and 78 will not likely present retrogression issues." D-327. No further changes were made to the El Paso configuration after this. TrJ2006 (Downton). The third retrogression memo notes that HD78 in Plan H153 still has 46.8% total SSVR. TrJ2007 (Downton); D-123.

148. Margo was not happy with the changes made by Downton, since he felt he lost some areas that had performed favorably for him and he felt his Republican performance decreased. TrJ808-16 (Margo). Margo lost Precinct 23 and an area named "Festival," which went into HD77. TrJ811, TrJ823-24 (Margo). Festival had been a strong area for him in 2010; it included Coronado Country Club, his district office, the residence of his mother-in-law, and most of his financial supporters. TrJ812 (Margo). Margo also lost a portion of North Hills, where he had spent a lot of time campaigning and that had been a good area for him in 2010. He did not want to lose that area. TrJ814-15 (Margo). Margo also lost an area in the Upper Valley, where his support included a substantial number of Hispanic Republicans. TrJ813 (Margo). Margo testified that the changes meant he was giving up Republican precincts to HD77. TrJ815-16.

149. Plan H113 was released April 13. On April 13 at 4:46 p.m., the Downton-revised plan for El Paso County was sent from the hrc1 account to Pickett's RedAppl account, and it appears in Pickett's plan list as pickH121. PL-515.

150. On April 22, Stacy Napier from the OAG sent an RPVA summary for Plan H153 to Bruce and Downton that included an election analysis for HD78. US-190/190A. Bruce shared it with Solomons and Interiano. TrJ1957-58 (Bruce). The analysis showed that in Plan H153 the Latino-preferred candidate was elected in 2 out of 10 races, which was the same as the benchmark Plan H100, but the margin of victory for the two prevailing Latino candidates had been reduced compared

to the benchmark, and the margin of victory for the prevailing non-Latino-preferred candidates had been increased. US-190/190A. Interiano reviewed the RPVA before the House plan was adopted. TrA5, TrA10 (Interiano).

151.  On April 27 at the floor debate, Rep. Coleman introduced Plan H232.  He noted that in Solomons' proposed plan, four of the districts ranged between 73% and 92% HVAP, while HD78, which only elected the Hispanic candidate of choice once in the last decade, was only 62.8% HVAP. His substitute would have increased SSVR and HVAP in HD78 to make it more likely to perform effectively.  D-13 at S248-49.  It was tabled.

152.  The configuration of El Paso did not change between Plan H113, released April 13, and Plan H283, the enacted plan. Plan H283 contains the fourteen precinct splits along the boundary of HD77 and HD78 incorporated by Downton.  TrJ1045 (Solomons); TrJ2117 (Downton); PL-733 (split precincts report).  The SSVR of HD78 remained below benchmark at 46.8%.  Thus, as noted, all five El Paso districts were majority-HCVAP but only four were majority-SSVR.

153.  Senator Jose Rodriguez testified that both partisanship and racial considerations are evident in the El Paso map.  TrJ695 (Rodriguez); D-158 (showing lines of HD77 track Democrat shading in many respects).

154.  In Plan H283, the distribution of the Latino population and SSVR is uneven across the five House districts, with HD78 being disproportionately low.  TrJ697 (Rodriguez), D-109 at 44; Joint Expert Ex. E-8 (Flores Report) at 9.

155.  It would have been possible to draw five more compact districts and to increase the SSVR of HD78 above 50%.  Tr378-79 (Martin) (citing Plan H232); Tr1052 (Murray); TrJ462 (Flores) (citing Plan H292).  Hanna testified that it was possible to create an additional minority opportunity district in El Paso County and that a number of plans were submitted to the Legislature that created an additional opportunity district. TrJ1174, TrJ1206 (Hanna).  The Legislature chose not to increase the SSVR of HD78 above 50% because it would not benefit the Anglo Republican incumbent.  Joint Expert Ex. E-4 (Murray Report) at 34.

156.  Downton testified that it was "a political decision as to how to draw the districts" and that "an effort was made to give the Republican representative a chance to be reelected."  Tr1006. Mapdrawers could have created another majority [SSVR] Hispanic district in El Paso, but made a "policy choice" not to.  TrJ2043 (Downton).

157.  Interiano did not consider HD78 to be a Latino opportunity district in the benchmark or in Plan H283. Tr1444 (Interiano); Interiano 8-2-11 depo (Joint Ex. J-61) at 143-44.  Interiano testified that he discussed with outside counsel whether § 2 required five Latino opportunity districts (measured by a 50% SSVR threshold) in El Paso, but that he did not undertake his own separate inquiry. Interiano 8-2-11 depo. (Joint Ex. J-61) at 166. Solomons did not make an independent determination of whether El Paso needed an additional Latino opportunity district (measured by a 50% SSVR

threshold). Tr1601-02 (Solomons).

158. Interiano testified that he never tried to draw an additional Latino opportunity district in El Paso because Pickett and the El Paso delegation were working on a drop-in map. Tr1444-46, TrJ1563 (Interiano). However, this testimony is not credible. On April 13 someone in his account received or created a "VRA" version of El Paso County, in which the SSVR of HD78 was increased to 52.6%, and sent it to David Hanna. At 8:58 p.m. on April 13, 2011, plan strjH244 was created in the strj Red Appl plan account. Its description says "CURRENT DISTRICTS - El Paso Changes0 [sic]" and the comments say, "Copy of PLANH113." PL-517. It was last modified at 9:00 p.m. April 13, 2011. In this plan, HD78 is compact and has no antlers, and the total SSVR for HD78 is 52.6%, which was higher than the benchmark. TrJ1565 (Interiano); PL-517. Right after strjH244 was saved, strjH245 was saved with the description "El Paso - VRA" and its comments say "Copy of STRJH244." PL-518. The SSVR for HD78 is also 52.6%. These two maps appear to be identical. PL-517; PL-518. Thus, someone in the account started with Plan H113 and then modified El Paso County, increasing the SSVR in HD78. Later in the evening of April 13, the same El Paso County configuration appears in Hanna's Red Appl account, as drh1H115. PL-512. Interiano sent this plan to Hanna at 9:04 p.m. on April 13, 2011. TrJ1569 (Interiano). The evidence indicates that Interiano drew this map. TrJ1567 (Interiano) (admitting that it was possible that he drew the map).

159. Dr. Engstrom concluded that HD78 was a Latino opportunity district in Plan H100. Engstrom Corr. Rebuttal Report (docket no. 307-1) at 25. Engstrom concluded that HD78 was not a Latino opportunity district in Plan H283. *Id.* at 28. Engstrom considers Latinos to have a reasonable opportunity in a district when their preferred candidates win a majority of the votes cast more often than not in the seven general elections and six Democratic primaries that he studied. *Id.*

160. Martin thought benchmark HD78 (at 47.5% SSVR) was an effective Latino opportunity district because it elected a Latino candidate of choice in 2008 (Joe Moody, a Hispanic Democrat) and had been preferring other candidates of choice in statewide elections as well. Tr406 (Martin).

161. Dr. Handley found that benchmark HD78 had an endogenous minority effectiveness index of 20% and an exogenous minority effectiveness index of 20%. US-351 (Handley Report) at 4-5. She concluded that benchmark HD78 did not offer Hispanic voters an ability to elect candidates of choice when election performance is considered. *Id.* at 5-6. Handley also opined that HD78 in Plan H283 was not likely to provide Hispanic voters with an ability to elect their preferred candidates because the exogenous index score was 20%. *Id.* at 9.

162. Dr. Flores opined that HD78 is not a Latino opportunity district in Plan H283. Tr462.

163. The Task Force offers Plan H292, which has five SSVR-majority Latino opportunity districts. Joint Map Ex. J-37; PL-340 (map); D-111; Tr462 (Flores). HD78 in H292 reflects the growing Latino population in downtown, the Westside, and the town of Canutillo. PL-414 (Sergio Coronado Decl.) ¶ 13. HD78 encompasses the growing Latino population. PL-414 ¶ 15; PL-418 (Carmen Rodriguez Decl.) ¶ 23.

164. There are Hispanic Republicans in El Paso County and in HD78. TrJ694, TrJ722 (Rodriguez).

165. Dr. Engstrom (Joint Expert Ex. E-7) found that Latino voters are highly cohesive in support of Latino candidates with the Democratic Primary nomination in general elections. The only Latino Republican nominee, Guzman, was not supported by Latino voters in the general election. He found that all Latino candidates in Democratic primaries also received strong support from Latinos. Latinos voting in the Republican primary did support the Latino candidate for Railroad Commissioner, but not for Governor. Non-Latino voters provided weak support for all five of the Latino candidates favored by Latino voters in the general election, according to bivariate analysis. They also supported the only Republican candidate that was a Latino with an estimated 73.8% of their votes. They also provided majority support for only one of the Latinos seeking nominations in the Democratic primaries, and did not favor either Latino candidate in Republican primaries. He concluded that Latinos in El Paso County are very cohesive in their candidate preferences for Latino candidates, in both general elections and Democratic primaries. This preference was shared only once by the non-Latino voters in the county.

166. In his corrected rebuttal report (docket no. 307-1), Dr. Engstrom concluded that voting in the general election for HD78 in 2010 was racially polarized. Latino support for the incumbent was estimated to be 79.6% in a bivariate analysis, with non-Latino/Anglo support estimated to be 28.4%. SSVR turnout percent was estimated at 34.88%, and incumbent Moody received 47.59% of the overall vote.

167. Because El Paso's population was not enough for five ideal districts, all five districts in El Paso are underpopulated compared to the ideal district population. Red-202 Report; Joint Expert Ex. E-5 (Martin Report) (noting that population deviation is not an issue in El Paso).

168. 34.1% of Hispanics in El Paso County lack a high school education. Joint Expert Ex. E-1 (Chapa Report) Table 4. The per capita income for Hispanics was $13,582, compared to $32,570 for non-Hispanic Anglos. *Id*. Table 5.

169. Carmen Rodriguez filed a declaration stating that she has lived in El Paso for the past thirty years. She remembers her father discussing the poll tax and his struggles to pay it. PL-418 ¶ 5. She states that there is a constant struggle to encourage voter participation in the Latino neighborhoods of El Paso, but the population has begun to see more Latino elected officials and government employees. PL-418 ¶ 6. She notes that Lubbock, which is much smaller, has a major medical university and a law school, while El Paso does not have a law school and relies on a Texas Tech satellite campus for the only medical school in the County. PL-418 ¶ 7. Rodriguez noted that El Paso had *de jure* segregation through the 1970s in its public schools until the *Alvarado v. El Paso ISD* case desegregated the schools. PL-418 ¶ 10.

170. The delegation members were primarily responsible for the initial configuration of the El Paso districts. El Paso is an example of the member-driven process ensuring that maps will be drawn to benefit the members and not necessarily to ensure compliance with the VRA.

171.   Rep. Marquez drew lines based on race to add Hispanics and increase SSVR in her district while placing Anglos in Margo's district HD78.  These race-based lines were put into the final map (with some further race-based modifications by Downton).  There is no evidence that Marquez's use of race was to disadvantage Hispanics (*i.e*, there is no evidence of discriminatory intent); rather, it was to increase her own electoral prospects.  Nevertheless, this use of race was improper.

172.   Downton admitted to using block-level racial shading to split precincts along the border of HD78 and HD77 based on race in order to increase the SSVR of HD78 to ameliorate § 5 retrogression concerns.  At the same time, however, he chose specific Hispanic areas that would increase the SSVR while simultaneously remaining as favorable to the Anglo incumbent as possible.  He accomplished this goal and raised the SSVR by 1% while improving the performance of Latino-preferred candidates in the district by only .3 or .4 %.

173.   All five El Paso districts were HCVAP-majority in the benchmark and remained so in Plan H283.

174.   Four of the five districts were SSVR-majority in the benchmark (all but HD78) and it remained that way in Plan H283, though the SSVR of HD78 was decreased slightly.

## Bexar County

175.   In the 2001 redistricting cycle, DOJ noted that when Bexar County went from eleven to ten districts, the State unnecessarily eliminated a Latino opportunity district, and DOJ rejected the State's argument that there were sufficient new Latino opportunity districts to offset the loss.  The court's plan remedied the DOJ's retrogression concerns about the loss of a Latino district in Bexar County.  *Balderas v. Texas*, No. 6:01-CV-158, 2001 WL 34104833 (E.D. Tex. Nov. 28, 2001), *summarily aff'd*, 536 U.S. 919 (2002).  The court reconstituted a seventh majority-Latino district in Bexar County and equalized the SSVR (of at least 55%) across all seven Latino districts.

176.   In Plan H100, Bexar County had ten districts, seven of which (HD116, 117, 118, 119, 123, 124, and 125) were majority HCVAP using 2005-2009 ACS data.  All seven districts also were SSVR majority, though the total SSVR of HD117 had dropped to 50.3% (50.8% non-suspense) while the other six districts remained in the 55-56% total SSVR range.

177.   In the 2011 redistricting cycle, Bexar County maintained ten districts without excess population, and Bexar County was therefore a drop-in county.  TrJ196 (Arrington); TrJ1074 (Solomons); TrJ1517 (Interiano).

178.   In 2011, the Bexar County delegation was seven Democrats and three Republicans.  TrJ338 (Farias); TrJ196 (Arrington). The seven Democrats included six Hispanic Democrats and one African-American Democrat, and included Rep. Mike Villarreal, vice-chair of the HRC, and Rep. Jose "Joe" Farias.  The Republicans included Speaker Joe Straus (Anglo), Rep. John Garza (Hispanic), and Rep. Lyle Larson (Anglo).

179. John Garza represented HD117 in the 82nd Legislature. TrJ356 (Garza). He is a Hispanic Republican. TrJ358, TrJ413. He first ran in 2008 and lost. He ran again and won in 2010 by a margin of 1,070 votes. TrJ358, TrJ362 (Garza). Garza was not the Hispanic candidate of choice. TrJ125 (Arrington); Joint Expert Ex. E-2 (Kousser Report) at 46; US-351 (Handley Report) at 35. He was a member of MALC in 2011. TrJ415.

180. Benchmark HD117 had a total SSVR of 50.3% and non-suspense SSVR was 50.8%. TrJ360. It had 58.8% HCVAP using 2005-2009 ACS data and 57.7% using 2008-2012 ACS data. It was considered to be a protected Latino opportunity district, and Garza knew it was a protected district under the VRA. TrJ363, TrJ416 (Garza). Benchmark HD117 was overpopulated by 52,723 persons. TrJ416 (Garza); D-100.

181. Dr. Arrington concluded that HD117 voters had the ability to elect in the benchmark but did not in Plan H283. TrJ119, TrJ124. Benchmark HD117 elected the Hispanic-preferred candidate in 2004, 2006, and 2008, but not 2002 or 2010. TrJ125 (Arrington). The Hispanic-preferred candidate won 3/5 elections (60%) in both the endogenous and exogenous effectiveness indices for benchmark HD117. TrJ125 (Arrington); US-351 (Handley Report) at 5; US-363 (Red-225 report). In benchmark HD117, Molina (Hispanic, Democrat) got 51.2% of the vote in the race for Court of Criminal Appeals presiding judge in the 2006 general election. TrJ395 (Garza).

182. In the enacted Plan H283, HD117 HCVAP (using 2005-2009 ACS data) increased to 63.8% from 58.8% in the benchmark, while total SSVR was reduced from 50.3% to 50.1% and non-suspense SSVR was reduced from 50.8% to 50.1%. HD117 in Plan H283 had an exogenous election index of 20% (1/5 elections), compared to 60% in the benchmark. TrJ126 (Arrington); US-351 (Handley Report) at 5, 11. Dr. Arrington testified that, because it went from 60% to 20% effectiveness, HD117 ceased to be a reasonable opportunity for the Hispanic-preferred candidate to win. TrJ126. Although total SSVR dropped only .2% from the benchmark, Molina's reconstituted performance in the 2006 general election dropped from 51.2% to 48.8%. TrJ395 (Garza).

183. The State's expert, Dr. Alford, testified that Democrats win in benchmark HD117 60% of the time (29 of 48 contested statewide elections), while in Plan H283 that is reduced to 33% (16 of 48). US-350 (Alford Oct. 2011 report) at 10-11.

184. HD117 in Plan H283 was drawn by Interiano, Rep. Garza, and Garza's and Rep. Larson's staffers. TrA53 (Interiano). It was designed to give Garza, who was not the Hispanic-preferred candidate, the best chance at being re-elected, while keeping the HCVAP and SSVR statistics consistent with a Latino opportunity district (*i.e.*, keeping SSVR above 50%).

185. Jose "Joe" Farias represented HD118 in the 82nd Legislature. TrJ312 (Farias). He was first elected in 2006. TrJ313 (Farias). Although he was a member of MALC, he was not very involved with MALC in the redistricting process. TrJ315 (Farias). HD118 was adjacent to Garza's district HD117.

186. Benchmark HD118 included the City of Somerset and the neighborhood of Whispering Winds. US-290. Somerset was a small, poor, rural, mostly Hispanic city. US-66 (total population 1,631; 76.9% Hispanic). Whispering Winds was also very poor and predominantly Hispanic. TrJ322-23 (Farias). These areas had been neglected and had been having trouble with water service provided by Bexar Met, a water district that served rural parts of Bexar County. TrJ317 (Farias). Farias had worked to abolish Bexar Met and bring the areas within the City water system, but that had failed, and problems continued with Bexar Met. TrJ318 (Farias). Farias testified that the Bexar Met issue was "very big" to these areas and he voted to abolish Bexar Met, while Garza voted the opposite. TrJ324-25. Farias had spent a lot of time in Somerset and Whispering Winds campaigning and engaging in community support. TrJ321 (Farias). Both these areas had low Hispanic voter turnout. TrJ323-24 (Farias). Farias had lost some precincts to Republican challengers in those areas, which he attributed to low Hispanic voter turnout. TrJ336-37 (Farias).

187. Although Interiano played a large role in the Bexar County map, Downton did not draw or otherwise participate in the Bexar County map. TrJ2057 (Downton).

188. The Bexar County delegation began working on their county map around February 24. On February 24, 2011, Villarreal sent an email to the members of the Bexar County delegation, asking members to "[p]lease draw your ideal district taking into account your surrounding neighbors and three recommended parameters," including: "1) there should be 10 House districts in Bexar County; 2) try to keep all districts within a +/- 5% deviation; and 3) do not eliminate any minority-majority voting age districts." D-265. He asked them to get their maps to him before their meeting the next week. He also stated, "To judge the political balance of your districts, I recommend using a mid-term election, supreme court or court of criminal appeals race where there is a Democratic and Republican candidate and where neither candidate has a Hispanic Surname. I would avoid using 2010. 2010 is a worst case scenario for Democrats, while 2008 is a best case scenario. The only race that fits these conditions is the 2006 Supreme Court [Place] 2 race [Don Willett v. Bill Moody]. I recommend we all use this race or another one the group agrees to so we can judge each others [*sic*] maps using the same political rule. The Dean of our delegation, Ruth Jones McClendon will be convening us next week to discuss redistricting. I will bring to the meeting maps that illustrate how Bexar County has been changing politically and demographically. I am asking Gerardo [Interiano], the Speakers [*sic*] attorney[,] to join us to answer any legal questions. I would also like to include MALC's attorney if that is alright with the group." D-265.

189. Members of the Bexar County delegation met numerous times during the process. TrJ315 (Farias). Ruth Jones McClendon (African American, Democrat) was the dean of the delegation. TrJ315-16. Villarreal oversaw laying the map out on RedAppl and presenting it to the delegation. TrJ316.

190. Villarreal began working on a plan for the delegation and sending draft plans to Interiano. He sent his first draft to Interiano on February 24. D-313. Villarreal continued sending draft delegation plans to Interiano throughout February and March.

191. Interiano met with the delegation and was also meeting with some representatives individually to work on their districts. Interiano worked individually with the Republican members of the delegation, Garza, Straus, and Larson. TrA53-54 (Interiano)

192. In early March, Interiano worked with Garza and Garza's staff to help design HD117. They would work in Interiano's office in Interiano's RedAppl account (strj), and he would send the plan to Garza's account. TrJ1548 (Interiano). Garza's personal participation was limited. TrJ1518 (Interiano). He instructed his staff to follow Villarreal's guidelines and create a district that would give him the highest possibility of being reelected. TrJ374 (Garza). Garza believed that 2012 would be a tougher election for him than 2010 had been. TrJ379. Garza and his staff looked at election and turnout data, and precinct returns for his 2010 race. TrJ362 (Garza). Garza and his staff were aware of which precincts gave him strong support and which had weak support. TrJ363 (Garza). Garza and his staff knew that he had performed better in the northern part of his district than the southern part in 2010, and had performed better outside Loop 410 than inside. TrJ377-78 (Garza). They also looked at precinct returns for other races, including the Governor's race, the Attorney General's race, and some other statewide races going back to 2006. TrJ363, TrJ375 (Garza). Garza and his staff did an analysis of turnout district-wide. TrJ373 (Garza). He admitted that one of the metrics they looked at was "the turnout between Anglos and Hispanics and turnout generally." TrJ373 (Garza). In his deposition, Garza stated that rural Hispanic turnout tended to be low but tried to explain this statement at trial as being due to the fact that population numbers were lower in rural areas. TrJ374 (Garza).

193. In the benchmark, HD117 was in western Bexar County and did not extend all the way to the north of the County or very far south into the County. It included portions of northwest San Antonio and southwest San Antonio. Garza admitted at his deposition that he wanted to spin the district farther north because the area was more Anglo and more conservative, and they would tend to vote Republican. TrJ367-69 (Garza); PL-454 (Garza 10-19-11 depo. at 30, admitted during interim plan proceedings 11-3-11 Tr704).

194. Garza testified that because his district was overpopulated (by 52,723), he was going to have to give up population. TrJ378. He said that most of the Bexar County delegation was Democrats who wanted to remain in the City and were looking to pick up those areas, and he was defending some of the stronger areas within the City or within 1604. TrJ378, TrJ372 ("[M]ost of them were looking to gain population from me, so it was more of what I would be able to maintain in the district within the city.").

195. The initial draft that Garza's staff and Interiano came up with (garzH100) was less than 50% SSVR (total was 46.3%, non-suspense SSVR was 47.3%). PL-523; TrJ1547-49 (Interiano). The proposed district extended to the north outside the City of San Antonio, but still included parts of northwest San Antonio, and extended farther south than it had previously, with an appendage jutting into southwest San Antonio. The top northeast corner of the district was I-10 and Loop 1604, which includes suburban development in the City. TrJ1549 (Interiano). This proposed district was given to Villarreal to put in the delegation map as Garza's ideal district. TrJ381 (Garza). Therefore,

Garza's ideal district was not completely rural, but contained portions of the City of San Antonio.

196. Around March 10, Villarreal put all the districts together in a map that showed areas of overlap and unclaimed areas. Then the delegation members went into a room and starting discussing who would get which areas. TrJ1519 (Interiano). Both Garza and Farias wanted an area in southwestern Bexar County that included the city of Somerset. PL-527 (plan strjH136). Garza's proposed district at that time did not include Whispering Winds; it remained in Farias's district HD118.

197. Farias's main concern was to keep the Harlandale School District in his district, HD118. He served on the Harlandale school board and lives in that district, and his children and grandchildren went to school there. TrJ316-17 (Farias). He also wanted to keep Somerset and Whispering Winds in South Bexar County because they were poor, neglected areas, and he wanted to continue to help them with their water issues. Farias did not need these communities to get re-elected, but he was very engaged with those communities and was trying to provide support for them. TrJ317, TrJ325 (Farias).

198. Villarreal continued to work on delegation maps, and his maps included versions of HD117 with SSVR above 50%. Villarreal urged the delegation to be careful about VRA compliance, and was checking proposed districts for compliance. TrJ364-66 (Garza). Villarreal had concerns about the performance of HD117 and voiced them to Interiano. Interiano talked to the attorneys, and then informed Garza that his proposed district would not work. TrJ1521 (Interiano). Interiano explained to Garza that his district's SSVR had to stay above 50%. TrJ1521. Garza told Interiano to work with his staff to make changes.

199. Interiano and Garza's staff knew that Garza did not tend to win SSVR-majority precincts. On March 25, Adelina Bryant sent Interiano an email with an attachment called HD117 VTD Analysis. PL-1664. This was a racially polarized voting analysis of HD117 that focused on Garza's election. PL-1664; Quesada-240. A notation says, "Of the 27 VTD's won by Garza, 4 had a majority of SSRV. Of the 23 VTDs which are majority SSRV, Garza won 4."

200. Between March 23 and March 29, Interiano worked with Garza's staff, primarily his Chief of Staff Art Martinez, and with Lynlie Wallace, Rep. Larson's Chief of Staff, on HD117. TrJ388-89 (Garza); TrA53-54 (Interiano). Larson's district adjoined HD117 to the north. They ended up moving Garza's district farther south, farther into Farias's preferred areas, including Whispering Winds. TrJ1522, TrJ1554 (Interiano). This new southern portion of the district included areas that Garza had not spent much time in. TrJ396 (Garza). Several precincts in heavily Hispanic and politically active South San Antonio ISD that had strongly preferred Garza's opponent in 2010 (Precincts 1025, 1040, 1044, and 1045) were moved out of HD117 and into HD118. TrJ399-403 (Garza); PL-1361.[5] The goal was to get the district to 50.1% SSVR, while also keeping the district

---

[5] In the Task Force's Fifth Supplemental Exhibit List filed July 14 (docket no. 1154), exhibit PL-954 was listed but the description was blank. During trial on July 15, Nina Perales discussed this exhibit, calling it PL-954, with Rep. Garza. TrJ401-03. Defendants did not object. On the Amended Exhibit List filed July 19, PL-954 is listed as the Bexar

as strong as possible for Garza's re-election. TrJ399 (Garza); TrJ1523 (Interiano).

201. Interiano acknowledged that they could have gone into inner city San Antonio and taken areas from other members to get the SSVR up above 50%, but he said they were trying to balance getting the SSVR up with keeping political numbers up, as well as the desire to stay outside the City of San Antonio and Loop 1604, so instead they went south into Farias's district. TrJ1524 (Interiano). Interiano said that Garza wanted to stay outside the City of San Antonio proper due to water issues, referring to issues surrounding the Bexar Met water district. TrJ1518, TrJ1526 (Interiano). Interiano's testimony that Garza wanted to stay outside the City and was concerned with water issues is not credible. Garza testified that he felt that the political issues surrounding Bexar Met were independent from redistricting, and he did not have any goals in redistricting relating to taking more or less of Bexar Met territory. TrJ405-07 (Garza). Garza did not know specifically which areas of HD117 included people who were taxpayers for Bexar Met. TrJ405, TrJ408 (Garza). Interiano's testimony that Garza wanted to stay outside City of San Antonio conflicts with Garza's testimony that he was defending some of the stronger areas within the City from other members of the delegation who wanted to take them from his district, and also conflicts with the fact that Garza's proposed ideal district included parts of the City. TrJ378 (Garza). Further, Interiano acknowledged that certain areas outside 1604 and west of I-10 that were included in Garza's "ideal" HD117 included quite a bit of suburban development and were not necessarily rural. TrJ1550-51 (Interiano); PL-991; PL-992.

202. Interiano said that, when he was working with Garza's staff drawing the district, he never had on racial shading or demographic shading at the block level, and there was no racial discussion. TrJ1599, TrA55 (Interiano). Interiano stated that SSVR is considered an election statistic, and they had it turned on, but not HVAP, BVAP, or census data. TrJ1599. Interiano testified that, in addition to SSVR, he monitored election performance. TrJ1551. He stated that he used SSVR instead of other metrics because all of the guidance (from DOJ, TLC) had been to use SSVR. TrJ1600. There could be a wide gap between HVAP and SSVR; members wanted to look at SSVR because of the gap and to see who actually turned out in an election. *Id.* Interiano denied using turnout percentages when selecting areas for HD117 or using turnout data at all to draw districts. *Id.* Interiano described the process as: looking at political shading and SSVR in statistics, and adding and removing portions, looking to stay outside 1604 and the City of San Antonio; a lot of testing, going back and forth and seeing what happened to the numbers to keep above benchmark SSVR and as high Republican as they could. TrA54.

203. Between March 23 and March 29, the versions of HD117 that Interiano and Garza's staff worked on showed incremental increases in SSVR from 48% to 50%, while the electoral performance of Hispanic-preferred candidate Molina remained below 50%. Plans garzH106 and

<hr />

County precinct returns. The State filed its objections to the Task Force exhibits on August 1 (docket no. 1194) but listed no objection for PL-954, noting that there was no exhibit description (based on the July 14 exhibit list). On October 2, the Task Force Plaintiffs moved to admit this same exhibit with the corrected exhibit number of PL-1361 (docket no. 1256) and the motion was granted by text order that same day. The exhibit was filed at docket no. 1257.

garzH107 have total and non-suspense SSVR of 48.6%, while Molina receives 47.3% of the vote. PL-533; PL-534. Plan garzH109 had total and non-suspense SSVR of 50.0%, and Molina received 48.7% of the vote. PL-535.

204. To increase SSVR but keep Republican numbers up (and therefore Hispanic-preferred candidate performance lower) as the map progressed, some higher turnout precincts in north San Antonio were taken out and more-Hispanic but lower turnout precincts in southern and southeastern Bexar County were added in. TrJ125 (Arrington); PL-523 (garzH100, Garza's ideal proposed district); PL-538 (hrc1H190, final version); PL-1361 (precinct turnout for Bexar County); PL-739; PL-740.

205. On March 29, Interiano saved a draft map from Villarreal that had an SSVR of 50.3% and Molina won with 50.3% of the vote. PL-536 (strjH205). Thus, although the difference between Villarreal's plan and garzH109 is only .3% SSVR, the difference in performance for candidate Molina is 1.6%. The 2006 Molina race for Court of Criminal Appeals was one of the races included in the OAG 10 analysis provided to redistricters. TrA56 (Interiano).

206. On March 29, both Garza's account and Interiano's account included a draft HD117 with 50.0% SSVR (garzH109) (strjH206). In both of these plans, HD117 had 172,717 people and Molina gets 48.7% of the vote.

207. At some point, additional changes were made that reduced the total population of HD117 to 171,249 and raised the SSVR to 50.1%. After these changes, the election analysis shows that Molina gets 48.8% of the vote in the 2006 Court of Criminal Appeals race. The mapdrawer for HD117 would have been able to see that the SSVR for the district was 50.1% and election statistics, including that the vote for Chavez-Thompson was 40.6%. TrJ243 (Dyer). Later on March 29, Villarreal incorporated this new 50.1% SSVR version of HD117 into the delegation map and gave it to the HRC. PL-538 (hrc1H90).

208. In the Bexar County delegation, nine members voted for the delegation map submitted to the HRC, and Farias voted against it. Farias's objection was based on the removal of Somerset and Whispering Winds from his district. TrJ326 (Farias). The delegation plan was delivered to Solomons despite Farias's objection. TrJ316 (Farias); Tr1432 (Interiano).

209. Both Farias and Garza wanted the City of Somerset and Whispering Winds. Farias felt strongly about keeping those areas and helping them resolve water and other issues. TrJ317-21 (Farias). Farias visited with Villarreal and Interiano about it. TrJ326. Farias asked for a meeting with the Speaker, and Interiano was there. After that meeting, the Speaker gave Interiano the direction to keep Garza's district in that area. TrJ1558, TrJ1595, TrJ1598 (Interiano). Thus, Speaker Straus resolved the dispute between Garza and Farias over who would get the Somerset and Whispering Winds areas. TrJ1558 (Interiano). Interiano said that Garza needed that rural population to keep Garza's district outside of 1604 and outside the City of San Antonio. TrJ1559 (Interiano) ("So we believe that in order to keep him outside of 1604 and outside of the city of San Antonio, we needed

that rural population. It was, again, the balancing of the different priorities that were political performance, SSVR, as well as the geographic."). Again, for the reasons discussed previously, this explanation is not credible.

210. Garza believed that rural Hispanic turnout would be low. TrJ373-74 (Garza). He also thought Somerset Hispanic turnout would be low. TrJ403-04 (Garza). In addition, to the extent mapdrawers were looking at estimated turnout reports from the OAG, those reports showed both Anglo and Hispanic estimated turnout going down, but Hispanic turnout went down by more. US-3.

211. In Plan H283, HD117 has a very large gap between HCVAP and SSVR of 13.7 points, which is well beyond any gap in any other House district (it appears the next largest gap is in HD41, which has a 9.1 gap).

212. Farias testified that, toward the end of the process, Rep. McClendon called him and Garza to the back of the room to negotiate about Somerset and Whispering Winds. Farias testified that Garza said, "Joe, all I want is more Mexicans in my district." TrJ335, TrJ347 (Farias). Farias did not know what Garza meant by that, but it upset him. TrJ335 (Farias). Garza denied making any comment about wanting or not wanting any kind of Mexican, but refused at trial to give an unqualified answer when asked if he made the statement. TrJ425-27 (Garza).

213. Farias attempted to work with Garza and his staff to find a solution where he could keep Whispering Winds and Somerset and both could be happy with the lines. TrJ326-27 (Farias). Garza would not move from 50.1% SSVR. The instruction Farias was given was that HD117 had to be 50% or more SSVR, and Garza wanted no more than 50.1%. TrJ329 (Farias). Garza rejected maps that had 50.3% and 50.4%. TrJ329. Farias offered to keep his areas of Whispering Winds and Somerset and let Garza keep his areas in South San Antonio ISD area, which is a politically active, high turnout, predominantly Hispanic area mostly inside Loop 410. TrJ330-31 (Farias). Garza did not want the South San Antonio ISD area back. TrJ332 (Farias). Farias testified that, if Garza had wanted more Hispanics, then South San Antonio ISD area would be good to have in his district, but everyone in politics in Bexar County knows that this area is very politically active and high turnout. TrJ352 (Farias). Eventually Farias gave up on Somerset and focused only on keeping Whispering Winds because of the Bexar Met issue. Garza still would not agree, and Farias would eventually propose a floor amendment to try to make the change. TrJ327 (Farias).

214. All three of Hanna's retrogression memos raised the same points about Bexar County:

Bexar County's seven Hispanic districts may constitute one of the most challenging balances of population in order to avoid retrogression. In 2001, the state proposed eliminating one of these districts because of the loss of a district in the county but preclearance was denied for this proposal by DOJ. In its fix, the court chose to draw seven Hispanic districts each with an SSVR of 55%. In the decade since the court drew its plan, six of the districts have remained at the level of SSVR at which they were drawn, and one (District 117) has diminished to just above 50% SSVR. Bexar

County as a whole has remained relatively constant in SSVR over the decade going from 42.4% to 43.1%. Despite this near constant level of SSVR, it is possible that Hispanic voters have become more dispersed across the county making Hispanic districts more difficult to draw. Five of the seven districts are short people necessitating a move of districts to the north and west. The proposed plan raises retrogression questions as to the significant declines in Districts 116 and 119. These declines seem inexplicable in light of the raises in the SSVR levels in adjacent Districts 118 and 125. The declines in SSVR in Districts 123 and 124 seem to be only of minor concern. The most prudent approach would be to eliminate the increases in SSVR in Districts 118 and 125, and restore as much of the declines as possible starting with Districts 116 and 119.

215. Plan H113 was released on April 13, and no changes were made to HD117 after Plan H113.

216. Interiano knew from the OAG RPVA that performance for the Hispanic candidate of choice decreased in HD117 in Plan H153. TrA9-10 (Interiano). He acknowledged that there could have been drafts with 50.1% SSVR with higher performance for Hispanic candidates of choice. TrJ1631 (Interiano).

217. On April 27, during debate on the House floor, Rep. Menendez (Hispanic, Democrat) offered Amendment 1 (Plan H160), which changed some lines between his district and Rep. Castro's district (HD124 and HD125 in Bexar County) that involved no people and was agreed between them and was acceptable to the author. It was adopted. D-190 at 88-89, S729; D-13 at S130.

218. Rep. Farias put forth Amendment 2 (Plan H182) regarding his district and Rep. Garza's district in Bexar County (HD117 and HD118). D-13 at S130; D-190 at 90-91. His amendment would put parts of four precincts that were moved into Garza's district (Whispering Winds) back into Farias's district. D-13 at S130-31. Farias stated that these were poor, rural areas that had been his constituents that he would like back, and that the amendment would keep Garza's district at 50.1% minority, which was a "big concern" for Garza. Farias stated that Garza had stated to him that he would not oppose the amendment, but would live with the will of the House. *Id.* at S132-33. Rep. Aliseda asked how it would affect Republican performance, and Farias stated, "We didn't look at republican numbers because the last conversation we had was that his big concern was that he did have a minority district, and he wanted to keep it without changing the numbers. So we kept it at 50.1 percent that he had. He said he would be happy with that." *Id.* at S132. Farias further stated that the areas in question (that Farias wanted) likely would not support Garza because Garza is a Republican and they were Democrat areas, but Garza was getting military precincts that have "some republican votes." *Id.* Farias was a third-term member, while Garza was a freshman, and having represented the area, Farias did not think those areas would vote for Garza. The amendment put Lackland Air Force Base back into HD117, and it is predominantly Anglo. TrJ346. The amendment split precincts 1033, 1035, 1037, and 1040. TrJ346-47 (Farias). The splits were made solely on the basis of race, to meet the 50.1% SSVR requirement. TrJ347 (Farias). Farias did not know if the changes would reflect an increase in Republican strength for HD117. TrJ347. Farias's amendment stayed within

the required deviations. TrJ349 (Farias).

219. Solomons stated, "The proposed District 117 was drawn to bring together rural and suburban communities and interests in south and west Bexar County. The amendment as proposed creates a jagged and awkward line that divides these communities and creates an island along I-37 that connects to the west of the district by only a tiny strip of land. And a proposed map cleanly follows the proposed map as it exists today, follows the Medina River, a natural barrier that divides the rural and urban counties–communities in south Bexar County. The amendment reduces the compactness of both 117 and 118. It increases number of split precincts in District 117 from one to seven and in District 118 from nine to fifteen, and increases the number of split VTD's in District 111 from one to seven and in District 118 from 10 to 15. It does have a negative impact on District 117, republican numbers. It is a district that--it goes from--let's see--pretty much--that's pretty much it. I guess the will of the House--I'm going to make a motion to table but it really will become a matter for the will of the house, I suppose, but I'm going to oppose it because of the reasons stated." D-13 at S133-34. Solomons testified that leaving it to the will of the House means you are trying to communicate to the House floor and other members that it is really up to them. TrJ1040. Solomons' comments on the amendment were given to him by staff to try to inform members about the specific effects of an amendment because redistricting bills cannot just be read. TrJ1042-44. In this case the comments were likely prepared by Interiano. TrJ1098 (Solomons); TrJ1599 (Interiano).

220. Farias tried to convince Garza to say he was okay with the amendment so they could move on without it coming to a vote on the House floor. TrJ328 (Farias). Garza had said he would leave it to the will of the House, which meant that he was releasing anybody that he has ties with to go ahead and vote how they want. TrJ332-33 (Farias). Farias told that to Solomons, but Garza never got up to say that; he stayed in his chair, and the amendment failed. TrJ333 (Farias). Farias testified that there was concern about split precincts but that was the only way to get to 50.1% SSVR. *Id.* They had tried to keep all the precincts together because Farias realized how hard it is for representatives and for constituents to figure out where they vote when precincts are split. TrJ334 (Farias).

221. Solomons voted against the amendment and moved to table it. TrJ1040. Amendment No. 2 was tabled. The motion to table prevailed by (Record 568): 94 Yeas, 49 Nays, 5 Present, not voting. D-190 at 2294-95. Farias testified that Garza and Larson voted against his amendment, but the record vote indicates that only Garza voted to table the amendment, and all the other members of the San Antonio delegation (except Straus, who abstained) voted against the motion to table. TrJ350-51 (Garza).

222. Although Solomons objected to the Farias amendment because it split six precincts along the boundary of HD117 and HD118, Solomons did not have a problem with the 14 split precincts along the border of HD77 and HD78 in El Paso or those in HD41.

223. In H283, HCVAP for HD117 is 63.8% and SSVR is 50.1%. Garza testified that he viewed the increase in HCVAP from 58.8% to 63.8% as "an extreme positive." TrJ423 (Garza). With regard to the slight decrease in SSVR from the benchmark, Garza testified that he did not understand at the

time that a decrease in SSVR indicated a decrease in the effectiveness of the Hispanic vote, and he still viewed the increase in HCVAP as a positive because they could go out and register those voters and have them be more active. TrJ432 (Garza). However, they did not do voter registration in 2012. *Id.*

224. Dr. Engstrom concluded that HD117 was not a Latino opportunity district in Plan H283. Engstrom Corr. Rebuttal Report (docket no. 307-1) at 28. He considers Latinos to have a reasonable opportunity in a district when their preferred candidates win a majority of the votes cast in 7 general elections and 6 Democratic primary elections in the district more often than not, both in the general and primary elections. *Id.*

225. Dr. Engstrom found a high level of racial polarization in voting in Bexar County. Tr504. Engstrom (Joint Ex. 7) concluded that Latino voters in Bexar County are highly cohesive in support of Latino candidates with the Democratic Party nomination in general elections. Latino Republican Guzman (Supreme Court) was not supported by Latino voters, who provided her an estimated 16.3% of their votes based on bivariate analysis and 23.8% based on multivariate analysis. All Latino candidates in Democratic primaries also received strong support from Latino voters (85 to 93.2% bivariate and 83.7-89.2% multivariate). Latinos voting in the Republican primaries did support the Latino candidate running for re-election to the Railroad Commission in both analyses (80.7% bivariate and 63.3% in multivariate), but they did not support the Latino seeking the Republican nomination for Governor. Non-Latino voters were generally not supportive of Latino candidates. In general elections they did not share the candidate preferences of Latino voters (estimates of support range from 24 - 31.1% in the bivariate analysis). Multivariate analysis reveals that African Americans did support these Latino candidates, with support ranging from 70 to 81.4%. Other voters (mostly Anglos), however, supported these candidates at rates estimated to range from 8.2% to 21.9%. The only Latino Republican candidate received an estimated 70.3% support from non-Latino voters in bivariate analysis, but again there was deep division between African-American and other/Anglo voters–estimated African-American support for her in a multivariate analysis is 14.2% while other voters is 84.9%. Non-Latinos provided a majority of their votes to two of the five Latino candidates that were preferred by Latino voters in the Democratic primaries. This was true of African Americans in only one of the Democratic primaries in the multivariate analysis, while other voters cast majorities of 54 to 60.2% in three. In the Republican primaries, non-Latino voters, both African-American and others, did not support either of the Latino candidates.

226. Engstrom concluded that, based on these results, the ultimately decisive general elections in Bexar County reveal Latinos to be very cohesive in their candidate preference for Latino candidates, and that preference is shared by African-American but not other voters. The analysis of the Democratic primary elections reveals that Latinos are likewise very cohesive in their preference for Latino candidates in these elections, but these preferences are not consistently shared by the rest of primary voters.

227. In Engstrom's corrected rebuttal report, he again concluded that Latino voters are highly cohesive in support of Latino candidates with the Democratic party nomination in the general

election. Docket no. 307-1 at 9. Estimates of their support ranged from 96% to 91.8% in the bivariate analysis. None of these Latino candidates received a majority of support from non-Latino voters, with their estimated support ranging from 23.9% to 33.1%. *Id.* at 10. Multivariate analysis showed African-American support to range from 51.2% to 81.4%, while other voters only supported them between 8.2% to 21.9%. All Latino candidates also received strong Latino support in the Democratic primaries (85.3% to 93.2% in the bivariate analysis). He concluded that the general elections revealed a high level of racially polarized voting, and that Latinos shared a strong preference for Latino Democratic candidates that was shared by African-Americans, but not other voters, whose support was never more than 22%. Latinos are also very cohesive in their support of Latino candidates in the Democratic primary, but these preferences were not shared by African-American voters or Anglo voters.

228. In Bexar County, 29.5% of Hispanics lack a high school education. Joint Expert Ex. E-1 (Chapa Report) Table 4. The per capita income for Hispanics was $15,526, compared to $34,401 for non-Hispanic Anglos. *Id*. Table 5.

229. Benchmark HD117 was a Latino opportunity district that elected John Garza, a Hispanic Republican, in 2010. Garza was not the Hispanic candidate of choice.

230. In Plan H283, Garza's district was not drawn by the Bexar County delegation but by Interiano and staffers from Garza's office and Anglo Republican Larson's office. Mapdrawers knew they had to keep HD117 above 50% SSVR based on the metrics they were using, so they kept HD117 at 50.1% SSVR and refused to go any higher. Garza and his staff knew that Garza did not perform well in SSVR-majority districts and wanted more Anglos in HD117 because they believed them to be conservatives who would vote Republican. To achieve the goal of 50.1% SSVR while at the same time protecting Garza, they removed higher turnout, urban precincts and added rural precincts with low Hispanic turnout that had been in HD118. They created a district with the largest gap between HCVAP and SSVR by far (13.7 points). Interiano's explanations of drawing the district because Garza wanted a rural district and was concerned about Bexar Met issues are not credible. Garza had stated that he was defending some urban areas and his ideal district included urban areas, and he did not view Bexar Met as relevant to redistricting. Further, Garza admitted that they looked at turnout between Anglos and Hispanics and Garza knew that rural Hispanic turnout tended to be low. Even though Farias had represented the rural communities of Whispering Winds and Somerset, which had low Hispanic voter turnout, Garza refused Farias's attempts to return these areas to his district because Interiano and Garza knew that including other Hispanic urban areas instead would hurt Garza's election chances by including Hispanic areas with higher turnout.

### Nueces County

231. In 2000, Nueces County was apportioned 2.2562 districts. D-212. Based on 2000 Census data, it had an HCVAP of 50.97%. D-180; D-230. In the benchmark, three districts—HD32, HD33, and HD34—were wholly or partly in Nueces County.

232.  Benchmark HD32 consisted of the whole counties of San Patricio, Aransas, and Calhoun Counties, and 14% of Nueces County.  The 14% of Nueces County (approximately 47,712 persons) was 59.1% Anglo, and HD32 was majority Anglo in terms of total population (52%) and VAP (56.8%). TrJ633 (Herrero); Red-100 Report.  Benchmark HD32 was represented by Gene Seaman (Republican), then Juan Garcia (Hispanic Democrat) (2006), then Todd Hunter (Anglo Republican). TrJ633 (Herrero).  Hunter defeated Garcia in 2008 with 50.13% of the vote, and was re-elected in 2010 without an opponent in the general election.  HD32 was 35.3% HCVAP using 2005-2009 ACS data and 36% HCVAP using 2008-2012 ACS data.  Tr1497 (Interiano); PL-324; D-100 (Red-106 using 2005-2009 ACS); MALC-106.

233.  HD33 and HD34 were entirely within Nueces County and were majority-Hispanic, majority-HCVAP, and majority-SSVR districts.  Tr461 (Flores); D-100.

234.  Benchmark HD33 was 60.4% HCVAP using 2005-2009 ACS data and 62.2% HCVAP using 2008-2012 ACS data.  MALC-106; D-100.  HD33 was completely within Corpus Christi and was 54.3% total SSVR/55.3% non-suspense SSVR.  From 2004 to 2010, HD33 was represented by Hispanic Democrats and was a Latino opportunity district.  Solomon Ortiz, Jr. defeated Republican challenger Raul Torres in 2008.  In November 2010, however, Torres defeated Ortiz to represent HD33 by a vote of 52.51% (12,499 votes) to 47.49% (11,306 votes).  Dr. Engstrom estimated that Ortiz received 92.3% of the Latino vote and 11% of the non-Latino vote.  Tr510 (Engstrom).  The turnout in HD33 was 45.08% Latino.  Tr510 (Engstrom).  Although he was Hispanic, Torres was not the Latino candidate of choice.  Joint Expert Ex. E-2 (Kousser Report) at 45.

235.  Benchmark HD34 was 58.2% HCVAP using 2005-2009 ACS data and 59.4% HCVAP using 2008-2012 ACS data. MALC-106; D-100.  HD34 was 53.3% total SSVR/53.8% non-suspense SSVR.  From 2004 to 2010, HD34 was represented by Abel Herrero, a Hispanic Democrat.  Herrero defeated Anglo Republican challenger Connie Scott in 2008.  In 2010, however, Scott defeated Herrero to represent HD34 by a vote of 53.96% (13,892 votes) to 46.04% (11,855 votes).  TrJ660 (Herrero).  Scott was the not the Latino candidate of choice.  Herrero attributes his loss to reduced Latino voter turnout.  TrJ630 (Herrero).

236.  Benchmark HD33 and HD34 were Latino opportunity districts.  However, in 2010, they did not elect the Latino candidate of choice.  All three Nueces County House districts were represented by Republicans in the 82nd Legislature. Tr1497 (Interiano).

237.  In both 2000 and 2010, Nueces County was majority Hispanic population and majority HCVAP.  D-230 (estimated 50.97% in 2000); D-231 (estimated 55.87% in 2010).  Between 2000 and 2010, the growth in Nueces County was attributable to Hispanics, as both African-American and Anglo population declined.  MALC-148.

238.  Nueces County growth did not keep pace with statewide growth. TrJ658 (Herrero); Tr1498 (Interiano).  Based on 2010 census figures, Nueces County was apportioned 2.0295 districts. D-214. Accordingly, two districts could be contained wholly within Nueces County without exceeding 5%

deviation.

239. In 2010, Rep. Herrero had discussions with Speaker Straus about Nueces County. Straus had mentioned to Herrero and Solomon Ortiz, Jr. that one of them was going to have to run for Congress because one of their seats was not going to be there for the next session. TrJ645 (Herrero). He did not say the representative of HD32 might have to run for Congress. *Id.* MALC contends that it was therefore predetermined that they would lose a minority district.

240. According to 2005-2009 ACS data available to the Legislature, Nueces County was 54.61% HCVAP. D-51. According to 2008-2012 ACS data, Nueces County was 55.87% HCVAP. D-181.

241. On February 17, Hanna emailed Denise Davis with the subject "redist issues." D-192; US-102; Quesada-242. He wrote, "Corpus - Two seats only; three R's. And worse one of the seats will probably have to be more Hispanic than the other and probably elect a D. Not sure on this but preclearance likely an issue here."

242. On February 18, 2011 Denise Davis forwarded Hanna's email to Interiano. D-132. Interiano responded to Davis stating, "[Hanna] and I went through all of this yesterday afternoon and through some of the first things that we need to look at as soon as RedAppl is up and running. . . . The big issue with Corpus is that two of the current seats are 65% Hispanic (Scott, Torres), but the county as a whole is only 60%. Meaning that all of the Anglos live in Hunters [*sic*] district, so it really is going to be a tricky issue. This might be one of the things to mention to Nina Perales when we meet next week and see if she has any thoughts on whether there should be two 60% seats or one 65% and one 55%." D-132.

243. On March 21, the mapdrawers were still deciding what to do about Nueces County. *See* D-228 (Bruce email regarding issues to discuss and for which litigation team advice was needed).

244. On March 22, 2011, Rep. Hunter, Interiano, and Hanna met to discuss Nueces County issues. Afterwards, Hanna sent an email to Interiano (copying Archer) with the subject "Nueces County." D-136; US-110; US-156; Quesada-275. He wrote, "According to the 2010 census and the TLC database, Nueces County as a whole is 56.8 % HVAP and 49.6% Spanish surname for the 2010 general election. It is 60.6% total Hispanic pop. Accordingly you cannot have two wholly contained house districts in the county with 60% HVAP or 50% Spanish surname. It may be that the 60% total number got interpreted as HVAP but it wasn't. I am also not finding the election data to support the theory that Nueces County as a whole 'performs' for Hispanics. Thus I think it highly unlikely that you can ever get two performing districts for Hispanics no matter how you draw them, but I am not volunteering to test that theory." Archer responded, "Hispanic D's narrowly won most countywide elections (statewide, regional, and county offices) in 2008 general (like 51-49 size margins) and got trounced by larger margins in 2010 general (like 56-40, 55-41, 55-45)." US-156; Quesada-163. Archer then sent Interiano and Hanna election results from the 2006 general election for Court of Criminal Appeals (Keller (R) 50.59%, J.R. Molina (D) 49.41%), County Judge (Lloyd Neal (R) 54.55%, Larry Olivarez (D) 45.45%), and three district judge races (in two the Democrat Hispanic

wins and in one the Democrat Hispanic loses). D-205; US-110; Quesada-252. Interiano responded, "Perfect. Thanks for all of this stuff. I think I explained to [Hanna] my new strategy at the end." D-205; Quesada-402.

245. By April 1, the mapdrawers were working on a full state plan that had only two districts in Nueces County. Solomons made the decision to have only two districts, on advice of counsel. TrJ1560 (Interiano). Interiano talked about it with Hanna, and felt that any § 5 concerns caused by the loss of HD33 in Nueces County could be offset elsewhere in the plan without breaking the County Line Rule. *Id.* Interiano does not remember any specific § 2 discussions regarding Nueces County. *Id.*

246. On April 7, David Hanna wrote the first retrogression memo on the draft House plan. In this plan, there were two districts in Nueces County, one that was strongly Hispanic and one that was not. In his memo, Hanna wrote, "Nueces County may be the single most difficult retrogression issue to predict. While there are two 50% SSVR plus districts within the county currently that may constitute performing Hispanic districts, they are both significantly underpopulated and the remaining people in Nueces County are predominantly Anglo. The county line rule likely requires two districts to be wholly contained within Nueces County with no surplus coming out; however this would have to yield to the federal Voting Rights Act if it can be shown retrogression could be avoided by splitting the county. The approach taken in the proposed plan is to draw one clearly performing district and one that is not. Another approach is to split the Hispanic population exactly in half, resulting in two districts that are slightly at or under 50% SSVR, though neither will likely reliably perform as Hispanic districts of choice. A final approach is to see if by splitting county lines in the area, the second Hispanic district could be preserved. This approach should be further investigated though it runs the risk of violating state law and requiring other county lines to be split, and should be pursued only if it would clearly contribute to total Hispanic voting strength statewide." Thus, Hanna suggested three options for Nueces County: (1) draw one performing Hispanic district and one not (as had been done in the draft map); (2) draw two equally Hispanic districts just below 50% SSVR, which may not perform reliably; or (3) determine whether the VRA required them to break the County Line Rule.

247. On April 12, David Hanna wrote his second retrogression memo concerning Plan H110, a non-public plan. US-339; D-327. Since no changes had been made to Nueces County, this memo raised the same concerns and gave the same three suggestions.

248. On April 13, Solomons issued a press release stating that the proposed House map (Plan H113) would be released that day. PL-205; D-9; D-206. The press release included the following "key points" for the map: (1) under "compliance with the Voting Rights Act," "In Nueces County, which has a 49% Spanish Surname Voter Registration and an apportionment of two districts, one new performing majority Hispanic district is created with a 63.7% [non-suspense] Spanish Surname Voter Registration, and (2) due to lack of growth in Nueces County, the County went from having 2+ districts to 2 districts, which led to the pairing of Republicans Torres/Scott." The "new performing majority Hispanic district" referred to HD34, which had been a majority-Hispanic

opportunity district in the benchmark but did not elect the Hispanic candidate of choice in 2010.

249.  In Plan H113, Nueces County contained only two districts, HD32 and HD34.  Total SSVR for HD32 was 34.9% and for HD34 was 62.9%.  In addition, both districts were overpopulated, HD32 by 1.61% and HD34 by 1.34%.

250.  At the April 15 HRC meeting, Luis Figueroa of MALDEF asserted that the loss of the Latino opportunity district HD33 in Nueces County raised retrogression concerns and concerns under § 2.

251.  Hanna and Interiano felt that the loss of Latino opportunity district HD33 in Nueces County could be offset for § 5 compliance by creating a new Hispanic opportunity district in a different part of the State.  TrJ1190-91, TrJ1210 (Hanna); TrJ1560 (Interiano).  Downton also believed they could resolve any retrogression by finding a district elsewhere in the state that was below 50% SSVR and taking it above 50%.  TrJ2096-97 (Downton).  As a result, mapdrawers increased the SSVR of HD90 in Tarrant County and HD148 in Harris County above 50% in part to "offset" the loss of the Nueces County district.  Both HD90 and HD148 were below 50% SSVR in the benchmark but were already performing for Latinos.

252.  On April 17, Downton received a revised Nueces County map from Rep. Hunter.  PL-538 (hrc1H288, hrc1H289).  Downton did not work on the Nueces map at all.  TrJ2014 (Downton).  Hunter's version of Nueces County included an odd-shaped border between HD32 and HD34 in and around Corpus Christi.

253.  On April 18, Rep. Torres sent an email to fellow members Hunter and Scott.  D-142.  He wrote, "I have made my decision regarding [Hunter's] request last Friday which was to leave his proposed map stand without challenge. I have decided that the good of the many outweigh the needs of just the one. Therefore, despite the fact that both I and HRT [Hispanic Republicans of Texas] have great concerns over the layout of the proposed redistricting map for Nueces County because of the perceived lower percentage of available Republican voters in the proposed district, I believe that it is my duty to do my part to keep us all on the same page of understanding. In addition, there are many other reasons such as: 1. All three of us made a commitment to each other at the beginning of session to work together. This is important.  2. Maintaining a positive working relationship between us three to ensure our success as a delegation. 3. Promoting party unity and long term political gains for Nueces County. 4. Maintaining a high degree of trust between us. I have informed HRT of my decision and have asked them to respect it. They are very disappointed with me right now. Todd, I am placing my trust in your word that you gave me last week to allow you time to see this process through and that you would find a way to fix the proposed district map to resolve my concerns." *Id.* Todd Hunter forwarded this email to Interiano. *Id.*

254.  At the April 19 HRC meeting, Solomons offered statewide substitute Plan H134, and it was adopted.  He then offered an amendment (Plan H135) to Plan H134, affecting Webb and Nueces Counties, and it was adopted (Nay: Veasey, all else present voting Aye).  D-12.  These amendments incorporated the plan received from Hunter with the odd-shaped border and became the Nueces

County configuration in Plan H153. In Plan H153, HD32 was .06% overpopulated and HD34 was 2.89% overpopulated (compared to Plan H113, where HD32 was 1.61% overpopulated and HD34 was 1.34% overpopulated). In Plan H153, HD34 was 61.1% total SSVR/61.7% non-suspense SSVR compared to 62.9%/63.7% SSVR in Plan H113. Therefore, the population of HD34 increased but its SSVR (and its HVAP) declined slightly.

255. Sometime around April 20, David Hanna wrote his third retrogression memo analyzing Plan H153. US-338; TrJ1161 (Hanna). Despite the changes to the map, this memo raised the same retrogression issue and made the same three suggestions regarding Nueces County. Hanna's concerns regarding Nueces County did not change across his three retrogression memos. TrJ1195 (Hanna).

256. On April 27, Plan H153 was brought to the House floor for debate/second reading. TrJ1947 (Bruce). With regard to Nueces County, Solomons said that the County Line Rule required two districts in Nueces County because it was at 2.03% of ideal district size, and the overall population in Nueces was 49% SSVR such that "it is impossible to draw two Hispanic majority seats within Nueces." D-13 at S120-21. He said that they decided to draw only one strongly Hispanic district (HD34) to allow the Hispanic community in Nueces County to elect a representative of their choice, and all three members of the Nueces County delegation (Hunter, Torres, and Scott) had agreed to that. *Id.* at S121. Rep. Martinez Fischer (Hispanic, Democrat) stated that, had they cut a county line, they could have had two minority opportunity districts in Nueces County, and that Plan H153 had 17 cuts, such that one could have been in Nueces County. *Id.* Solomons responded that there was only one county cut in Plan H153 and that everything else was spillovers. *Id.* Solomons made clear throughout the debate that he would not break the County Line Rule to comply with the VRA.

257. Later in the debate, Martinez Fischer proposed Amendment 31 (Plan H198) regarding the Coastal Bend. D-13 at S219. Plan H198 had one district (HD34) wholly within Nueces County and four districts (HD 32, 33, 35, and 43) partly within Nueces County; it violated the County Line Rule. HD32 was an Anglo-majority CVAP district, and HD33 (58% HCVAP) and HD34 (63.8% HCVAP) were HCVAP-majority districts. D-104. Rep. Raymond complained that in Plan H153 minority voters in Nueces County were diluted and that the Nueces County configuration violated § 5. He stated that African-American neighborhoods had been placed into HD32, diluting their strength, and that Hispanic precincts were split into different districts, being diluted. D-13 at S219. He also noted that HD33, a Hispanic opportunity district, had been eliminated. Raymond advocated for Plan H198. Solomons stated, "This is a continuation of the dialogue on the Texas Constitution county line rule, and I'll move to table." The amendment was tabled. D-13 at S220.

258. Hunter laid out Amendment No. 14 (Plan H178) that he said moved a precinct and was approved by the committee. It was adopted. This amendment added the "toe" to the "boot" extension in Corpus Christi in HD34 by adding a precinct, and removed some population from the precinct below to keep a pathway to the HD32 extension into Los Encinos. Los Encinos is a low-turnout minority area. TrJ647 (Herrero). The amendment also moved Precincts 57 and 68 (near the coast) from HD34 to HD32. This amendment created the final configuration of Nueces County that

appeared in the enacted Plan H283.

259. Interiano testified that the Nueces County configuration in H283 was given to him by the Nueces County delegation (Hunter, Scott, and Torres). Tr1429-30 (Interiano). Hunter was the longest serving member of the Nueces County delegation in 2011, so he was the dean of the delegation. TrJ659 (Herrero). Hunter was the architect of the Nueces County map. Hunter depo. (docket no. 1092-3) at 53-54.

260. On April 27, Nina Perales of MALDEF wrote a letter to Solomons to provide information on Plan H153. PL-227; D-15. She wrote that Plan H153 was retrogressive and raised serious concerns under the VRA, including that Plan H153 eliminated HD33, a Latino opportunity district. She wrote, "Adding Latino voters to Districts 90 and 148 does raise the SSVR but does not create new Latino opportunity districts that can offset the loss of District 33." MALDEF and other minority members took the position that HD90 and HD148 could not offset the loss of an opportunity district because they were already performing Latino districts in the benchmark, such that increasing their SSVR above 50% did not create a new Latino opportunity district.

261. In Plan H283, Nueces County is divided into HD32 to the east and HD34 to the west, and HD33, which was a Latino opportunity district, is eliminated. TrJ646 (Herrero). HD33 was relocated to Rockwall County, and it is undisputed that it is not a Latino opportunity district in Plan H283. Hunter, an Anglo Republican, was left as incumbent of HD32. Connie Scott and Raul Torres (the two junior members) were paired in Hispanic-majority district HD34. TrJ661 (Herrero).

262. HD32 (Hunter's district) is 563 persons (-.34%) underpopulated and is 45.9% HVAP and 46% Anglo VAP. Red-100 Report. HD32 is 44.2% HCVAP using 2005-5009 ACS data (and 46.3% under 2008-2012 ACS) and 36.6% total SSVR/37.3% non-suspense SSVR. D-109. HD32 is not a Latino opportunity district.

263. HD34 is 5,512 persons (+3.29%) overpopulated and is 67.7% HVAP and 27.4% Anglo VAP. Red-100 Report. HD34 is 64.6% HCVAP using 2005-2009 ACS data (and 65.9% using 2008-2012 ACS data) and 60.1% total SSVR/60.8% non-suspense SSVR. MALC-105; D-109.

264. Although benchmark HD34 was underpopulated by 24,055, D-46, it is overpopulated in the enacted plan by 5,512, while HD32 is underpopulated by 563. Between Plan H113 and H153, HD34 went from 1.34% overpopulated to 2.89% overpopulated, and between Plan H153 and H283, HD34 went from 2.89% overpopulated to 3.29% overpopulated, while HD32 got less populated. The difference in population between HD32 and HD34 in Plan H283 is 6,075 persons. As a whole, Nueces County is overpopulated, and thus neither district was required to be underpopulated. No explanation is given for the population deviation.

265. HD34's total SSVR went from 53.3% in the benchmark to 60.1%. Benchmark HD34 was already majority-Hispanic and was made more Hispanic. TrJ650 (Herrero). Herrero did not recall anyone at the field hearings suggesting that HD34 needed more Hispanic voters. *Id.*

266. Herrero describes the jagged boundary line between HD32 and HD34 as "unique," "just odd," and appearing "strategic." TrJ646. There are ten split precincts along the border of HD32 and HD34. US-387; US-375. The boot removed two potential Hispanic rivals (Torres and Ortiz) with legislative experience who might challenge the Anglo Hunter in HD32. TrJ647-49 (Herrero). The map also placed the minority community of Los Encinos into HD32, but it is a low-performing area with low turnout. TrJ647 (Herrero). In addition, the northern extension of HD32 is Hillcrest (Precincts 30 and 38), which is majority-African American surrounded by port areas, and is also low-performing. TrJ648 (Herrero). Herrero opined that Hispanic voters were packed into HD34 unnecessarily and those left in HD32 were marginalized. TrJ650.

267. The Plan H283 districts for Nueces County are currently in effect in Plan H358. TrJ646 (Herrero). Herrero beat Scott in 2012 in the new HD34. TrJ661 (Herrero). Therefore it appears that HD34 as drawn is a performing Hispanic opportunity district.

268. Nueces County was over 50% HCVAP in 2000 and was over 50% HCVAP based on the 2005-2009 ACS data available to the Legislature. Interiano knew that Nueces County was majority HCVAP. Tr1463 (Interiano). However, Interiano used a standard of 50% SSVR (rather than 50% HCVAP) to determine whether § 2 required a Latino district, stating that it was based on guidance he had been given. TrA64-65, TrA354 (Interiano). Interiano would have been aware that 50% HCVAP was the standard that had been set forth by many courts, including the Fifth Circuit. Archer and Hanna had also testified before the HRC on February 16 and March 1 and provided guidance that HCVAP was the relevant metric for § 2. Interiano testified that the intent behind the chosen configuration was to ensure that one of the two districts was an HCVAP-majority district, Tr1498 (Interiano), but this explanation is not credible given his statement that they were focusing on SSVR, and if they had been focusing on HCVAP, both districts could have been drawn as HCVAP-majority districts since the HCVAP of the county was over 50%. In addition, Interiano testified that they never looked at whether they could draw two HCVAP-majority districts in Nueces County. TrA65. There is no evidence that they could not do so. Nor did they ever do an exogenous election analysis on a draft two-district plan with HCVAP majority districts. *Id.*

269. Of the three options noted by Hanna for Nueces County (draw one clearly performing Hispanic district and one not performing district, split the Hispanic population exactly in half to create two districts slightly under 50% SSVR, or consider breaking the County Line Rule to preserve the second Latino opportunity district), the Legislature chose the first option and drew two districts in Nueces County, one more Hispanic and one less Hispanic. To support their choice, mapdrawers cited the fact that because Nueces County as a whole had SSVR below 50%, if they tried to draw two districts at 49.5% SSVR, they would be dropping two below a majority of SSVR and they were worried they would not perform for Latinos. TrA50 (Interiano). However, they were more focused on the number of 50% SSVR and whether they were "performing" for § 5 purposes than whether the districts would actually provide an opportunity for Latinos to elect or whether they were required by § 2. TrA64 (Interiano). Two districts slightly below 50% SSVR would likely have been above 50% HCVAP. There is no indication that they ever tried to draw two districts that were equally Hispanic or measured their election performance. Further, although they were concerned about dropping below

50% SSVR for retrogression purposes, they did not look at whether they could draw two 50% HCVAP districts, which could have been required by § 2. Interiano did not recall talking to Hanna about whether § 2 would require keeping two Latino opportunity districts in Nueces County. TrA1560 (Interiano). They also refused the third option mentioned by Hanna, which was to determine whether the County Line Rule should yield to the VRA because Solomons had foreclosed that option. By choosing to draw only one strong Hispanic district, they protected Anglo Republican Todd Hunter, whereas drawing two HCVAP-majority districts or two more equal SSVR districts slightly below 50% SSVR would create two districts that might not perform for Republicans.

270. Even following their 50% SSVR requirement, mapdrawers could have drawn two SSVR-majority Latino opportunity districts if they disregarded the County Line Rule. TrA50 (Interiano). There were proposals that preserved the existing two Latino opportunity districts wholly within Nueces County and then spilled additional population out of the County. TrJ1560 (Interiano). These were not considered because Solomons refused to violate the County Line Rule to comply with the VRA. *Id*. Interiano testified that no proposed plan created two Nueces County districts that could elect without violating the County Line Rule. Tr1449. The Court has not located any proposed plan in the record with two equal SSVR districts or two HCVAP-majority districts in Nueces County that does not break the County Line Rule (Plan H130, Plan H212, Plan H214, Plan H226, and Plan H232 each have one district around 70% HVAP and one around 43% HVAP).

271. The Latino Task Force offers demonstration Plan H292 with two Hispanic, HCVAP-majority districts in Nueces County. Tr461 (Flores); PL-326; Joint Map Ex. J-37; D-111. HD30 is 23.6% HCVAP, HD33 is 57.4% HCVAP, and HD34 is 57.1% HCVAP. PL-326. HD33 and HD34 are wholly within Nueces County, and a portion of HD30 is in Nueces County. This plan breaks the County Line Rule. PL-326 (docket no. 325-4 at 4); PL-341 (map).

272. MALC offers Plan H201, which preserves the existing two majority-HCVAP districts (HD33 and HD34) in Nueces County and spills over additional population to a third district (HD32). In H201, 6% of Nueces County (mostly Anglo) is put into HD32. This plan breaks the County Line Rule.

273. MALC also offers Plan H205, which has one HCVAP-majority (63.8%) district (HD34) wholly contained within Nueces County and the rest of Nueces County attached to four additional districts (HD32, 33, 35, and 43), all of which are HCVAP-majority districts except HD32. Joint Map Ex. J-26; D-108. This plan breaks the County Line Rule.

274. MALC's lower-deviation Plan H295 has one HCVAP-majority district (HD33) wholly contained within Nueces County and the additional population is joined with two different districts (HD32 and HD34), one of which is a Hispanic-majority district. It also breaks the County Line Rule.

275. MALC has offered demonstration Plan H329 and Plan H373, which have the same Nueces County configuration. MALC-107, MALC-110. In both plans, HD34 is wholly within Nueces County, while part of Nueces County is joined with Kleberg County in HD32, and part of Nueces

County is joined with counties to the north in HD30. MALC-108. HD32 and HD34 are HCVAP-majority districts. MALC-109. H329 and H373 split only Nueces County, but split it two ways. H373 is an eight-district plan that could be plugged into H309 or H358.

276. Dr. Engstrom testified that the bivariate analysis of statewide elections from 2006 to 2010 revealed racially polarized voting in both general and primary elections in Nueces County. Tr503; Engstrom Rebuttal Report (docket no. 307-1) at 7/Table 2.

277. In his original report (Joint Expert Ex. E-7), Dr. Engstrom found that Latinos are highly cohesive in support of Latino candidates with the Democratic party nomination in general elections—all five got strong support (all >90% bivariate). The only Latino Republican, Guzman, was not supported. Further, all Latino candidates in Democratic primaries received strong Latino support (78.4% -95% bivariate). Latinos voting in Republican primaries did support the Latino running for Railroad Commissioner, but not for Governor. Non-Latino voters provided little support to any of the five Latino candidates favored by Latino voters in general elections, according to the bivariate analysis (11.2% - 17.6% support). They did support the only Republican candidate that was a Latino with an estimated 78%. They did not support any of the Latinos seeking nominations in the Democratic primaries and did not favor either Latino candidate in the Republican primaries. Engstrom concluded that Latinos in Nueces County are very cohesive in their candidate preferences for Latino candidates, in both general elections and Democratic primaries, but their preferences were not shared by non-Latino voters in any elections analyzed.

278. In his corrected rebuttal report (docket no. 307-1), Dr. Engstrom found racially polarized voting in the HD33 2010 general election. Latino support for incumbent Solomon Ortiz, Jr. was estimated to be 92.3%, while non-Latinos gave him only 11% support. SSVR turnout was estimated to be 45.08%, and Ortiz received 47.49% of the vote.

279. Dr. Brischetto's EI supplemental analysis of 2012 elections showed that 88.9% of non-Latino voters supported Scott and 4.45% of Latino voters supported Scott. TrJ938 (Brischetto). About 11.09% of non-Latino voters supported Herrero and about 95.55% of Latinos supported Herrero. This showed a high degree of racially polarized voting between Latinos and non-Latinos. TrJ938 (Brischetto). Brischetto found this pattern of polarization in all ten general elections that he analyzed in Nueces County. He characterized it as extreme. TrJ992. Brischetto found it difficult to measure racially polarized voting in the Republican primaries because there were so few Latinos participating. TrJ939. Nevertheless, in three of five races he could "say with some confidence that there is racial bloc voting." TrJ940, TrJ942. He also found good evidence of racially polarized voting in the Democratic primary. TrJ944. Partisanship is not a factor in the primary elections. TrJ943.

280. Dr. Brischetto found that Latinos had a high level of cohesion. TrJ969 (Brischetto). He also found that Anglo bloc voting was sufficient to usually defeat the Latino-preferred candidate. *Id.*

281. Dr. Kousser also found that contests in HD33 between 2002 and 2010 were "starkly racially polarized," with Latino voters overwhelmingly supporting the Democratic candidates. Joint Expert

Ex. E-2 (Kousser Report) at 87, Tables 12-14.

282. Dr. Robert Bezdek stated in his declaration that he worked as a political consultant for a Latino candidate for mayor who faced an Anglo opponent in the runoff election, and through his work on this campaign he saw firsthand the political cohesion of the Latino community in Nueces County. PL-412. He stated that much of the support for Latino candidates comes from the predominantly Latino West Side, and much of the support for Anglo candidates comes from predominantly Anglo neighborhoods. PL-412.

283. Defendants dispute the existence of racially polarized voting in Nueces County, specifically the requirement that "the White majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate" because minority-preferred candidates have won elections in Nueces County. At Defendants' request, the Court has taken judicial notice of the election results in docket no. 1169, set forth in the table below. TrJ2161.

TABLE 1: 2012 General Election Results in Nueces County

| Year | County | Election | Results in County |
|---|---|---|---|
| 2012 | Nueces | General Election, US President (Brischetto, Feb. 2014 at 21). Exhibit A at 1. | Romney/Ryan (R) |
| 2012 | Nueces | General Election, US Senator (Brischetto, Feb. 2014 at 21-22). Exhibit A at 1. | Cruz (R) |
| 2012 | Nueces | General Election, US Representative, Dist. 27 (Brischetto, Feb. 2014 at 22). Exhibit A at 1-2. | Farenthold (R) |
| 2012 | Nueces | General Election, State Representative Dist. 34 (Brischetto, Feb. 2014 at 22). Exhibit A at 4. | Herrero (D) |
| 2012 | Nueces | General Election, SBOE Dist. 2 (Brischetto, Feb. 2014 at 22). Exhibit A at 3. | Cortez, Jr. (D) |
| 2012 | Nueces | General Election, Justice, 13th Ct. Appeals, Place 2 (Brischetto, Feb. 2014 at 22). Exhibit A at 4. | Longoria (D) |
| 2012 | Nueces | General Election, Justice, 13th Ct. Appeals, Place 4 (Brischetto, Feb. 2014 at 22). Exhibit A at 4. | Rodriguez (D) |
| 2012 | Nueces | General Election, Justice, 13th Ct. Appeals, Place 5 (Brischetto, Feb. 2014 at 22). Exhibit A at 4. | Benavides (D) |
| 2012 | Nueces | General Election, District Judge, 214th Jud. Dist. (Brischetto, Feb. 2014 at 23). Exhibit A at 5. | Longoria (D) |

| 2012 | Nueces | General Election, District Judge, 347th Jud. Dist. (Brischetto, Feb. 2014 at 23). Exhibit A at 5. | Medary (R) |

284. Defendants note that in the nine elections for Texas House Representative in Nueces County (districts 32, 33, and 34) studied by Dr. Brischetto in his supplemental report, the minority-preferred candidate won the election six out of nine times. TrJ993-94 (Brischetto); MALC-166 Table 1. Dr. Brischetto explained that the minority candidate does win when the district is over 66% minority. TrJ996. In districts that were less than 50% minority, Anglo bloc voting defeated the minority-preferred candidate all but one time. *Id.*

285. There have been a significant number of Latinos in elected office in Nueces County. TrJ665 (Herrero). Three of eight Corpus Christi council members are Hispanic, as are the county attorney, Nueces County district clerk, and three of eight district court judges. *Id.*

286. In Nueces County, the mean family income and the mean household income for Anglos is almost twice that of African Americans and Hispanics. MALC-149. Hispanics and African Americans are several times more likely to rely on food stamps than Anglos. *Id.* The per capita income for Anglos far exceeds that of Hispanics and African Americans. *Id.*; Joint Expert Ex. E-1 (Chapa Report) Table 5. More than 86% of the Nueces County functionally illiterate persons over 25 are Hispanic. MALC-150. 16.3% of Hispanics over the age of 25 are functionally illiterate, compared to 2.6% of Anglos. MALC-150. Hispanics lag behind Anglos in high school graduation rates. *Id.* (stating that almost one third of Hispanics over the age of 25 are not high school graduates, compared to 8.3% of Anglos); *see also* Joint Expert Ex. E-1 (Chapa Report) Table 4 (noting that 21.3% of Hispanics in Nueces County have less than a high school education). More Anglos have graduate or professional degrees than do Hispanics. MALC-150; Joint Expert Ex. E-1 (Chapa Report) Table 4.

287. Rep. Lozano was elected to HD43, which included Kleberg County directly to the south of Nueces County, in 2010 as a Hispanic Democrat (he ran again in 2012 as a Republican). TrJ1781-82 (Lozano). Lozano testified that nobody in his region wanted Kleberg County to be paired in a district with Nueces County and that the prior representative had fought against such a pairing in the 2000 redistricting cycle. TrJ1792. Lozano did not feel that MALC was there for him, because he felt some of their proposed maps paired Kleberg and Nueces against his wishes or butchered the region without consulting the members. TrJ1791-1811 (Lozano).

288. Although Nueces County was less than 50% SSVR in 2010, it was majority HCVAP and had been since at least 2000. Mapdrawers were aware that it was majority HCVAP. Because mapdrawers only focused on a threshold of 50% SSVR, they failed to look at whether two majority-HCVAP districts could have been drawn wholly within Nueces County with no additional districts coming into Nueces County. However, no Plaintiffs have presented such a map. Plaintiffs did present maps that maintained two HCVAP-majority districts in Nueces County, but they had more than two districts in Nueces County and thus broke the County Line Rule.

289. Of the two districts in Nueces County, HD34 (the minority district) is overpopulated in the enacted plan by 5,512 persons, while HD32 is underpopulated by 563 persons. The difference in population between HD32 and HD34 in Plan H283 is 6,075 persons. As a whole, Nueces County is overpopulated and thus neither district was required to be underpopulated. No justification is given for the population deviation.

290. Plan H283 eliminates Latino opportunity district HD33, and mapdrawers refused to break the County Line Rule to maintain a second Latino opportunity district in Nueces County. Although mapdrawers assert that they chose to draw one strong performing Hispanic district and one non-Hispanic district in order to comply with the VRA, there is no indication that they needed to make HD34 as Hispanic as they did, and by doing so they protected Anglo Republican incumbent Hunter. Mapdrawers also did not thoroughly explore whether two districts slightly under 50% SSVR or two HCVAP-majority districts could or should have been drawn.

## HD35

291. In 2001, the DOJ objected to the LRB's House plan in part based on its configuration of HD35. D-326; D-327; PL-225. The DOJ noted that the new district was created from existing HD31 and HD44 and paired an Anglo and a Hispanic incumbent. The Hispanic incumbent represented a district with 55.6% SSVR, and the new HD35 dropped the SSVR to 50.2%; HVAP also dropped from 57.8% to 52.1%. In addition, over half of the configuration of the new HD35 came from the Anglo incumbent's former district. The DOJ therefore concluded that Hispanic voters would lose their opportunity to elect their candidate of choice in HD35 and that the district "as drawn [would] preclude Hispanic voters from electing their candidates of choice." D-326; PL-225. This district was remedied in 2001, when the court reconfigured it and drew it with 51.5% SSVR. *Balderas v. Texas*, No. 6:01-CV-158, 2001 WL 34104833 (E.D. Tex. Nov. 28, 2001), *summarily aff'd*, 536 U.S. 919 (2002).

292. In 2002, Democrat Gabi Canales won the district. In 2004, Democrat Yvonne Gonzalez Toureilles defeated Republican candidate Eric Opiela, and she won again in 2006. She was re-elected without an opponent in the general election in 2008. In 2010, she was defeated by Republican Jose Aliseda 52.81% to 47.19%. Aliseda was not the Hispanic candidate of choice. Joint Expert Ex. E-5 (Martin Report) at 13; Martin depo. (Joint Ex. J-48) at 94; Joint Expert Ex. E-2 (Kousser Report) at 46; US-351 (Handley Report) at 5, 34.

293. In the benchmark Plan H100, HD35 was located in South Texas and was made up of Atascosa, McMullen, Live Oak, Jim Wells, Karnes, Goliad, and Bee Counties.

294. Benchmark HD35 was 15,755 people underpopulated. Red-202 Report. Hispanics were 60.6% of the total population; Anglos were 34.8% of the total population. HVAP was 56.4% and Anglo VAP was 38.2%. Total SSVR was 55.4%; non-suspense SSVR was 55.3%. HCVAP was 54.6%. Red-106 Report.

295. Benchmark HD35 was a Latino opportunity district. TrJ119, TrJ134 (Arrington). Benchmark HD35 had an exogenous effectiveness index of 40% (2/5) and an endogenous effectiveness index of 80% (as noted, it elected the Hispanic preferred candidate in 2002, 2004, 2006, and 2008, but not in 2010, when Aliseda was elected). TrJ34 (Arrington); Joint Expert Ex. E-5 (Martin Report) at 13; US-351 (Handley report) at 5; PL-290 (Red-225 Report); US-363 at 170 (Red-225 Report).

296. Interiano asked intern Elizabeth Coburn to work on HD35. TrA48-49 (Interiano); TrJ1924 (Bruce); D-370 (April 11, 2011 email from Coburn to Interiano saying she has "done the Aliseda district numbers"). Therefore, Interiano was responsible for the configuration of HD35. Downton did not work on HD35. TrJ2046 (Downton).

297. Aliseda signed off on a version of his district that was created by Coburn and Interiano on April 4. D-229 at 4.

298. In Plan H113 (Solomons' first public plan) released on April 13, HD35 included La Salle, Atascosa, McMullen, Duval, Live Oak, Bee, and San Patricio Counties. Thus, it maintained Atascosa, McMullen, Live Oak, and Bee Counties, lost Jim Wells, Karnes, and Goliad Counties, and added La Salle, Duval and San Patricio Counties. The configuration of HD35 did not change between Plan H113 and Plan H283.

299. Hanna's three retrogression memos written between April 7 and April 20 all said the same thing about HD35. He noted that as drawn in 2001 the district had 51.5% SSVR, that benchmark HD35 had 55.4% SSVR, and that the proposed district had 52.7% SSVR. D-122; D-327; D-338. He wrote, "This district drew an objection from DOJ for having its SSVR lowered from 55.6% to 50.2% and pairing an Anglo and Hispanic rep. in a district DOJ concluded favored the Anglo. The court remedy only increased the SSVR to 51.5 but drew the district as an open district that a Hispanic candidate could win. The proposed plan lowers the SSVR 2.5 points but has it higher than the court plan 10 years ago. Further election analysis should be performed on the district to measure the performance of the existing and proposed districts."

300. Interiano knew from the OAG RPVA that performance for the Hispanic candidate of choice decreased in HD35. TrA9-10 (Interiano). No changes were made to the map.

301. At the April 15 HRC meeting, Luis Figueroa offered Plan H115, which attempted to maintain HD35 as a Latino opportunity district. D-595 at 64-65. In Plan H115, the total SSVR of HD35 was 58.2% (non-suspense SSVR was 58.3%). HD35 shifted east and broke the County Line Rule.

302. At the April 27 floor debate, Rep. T. King (Anglo, Democrat) proposed Amendment No. 16 (Plan H161 as amended by Plan H242) that affected La Salle County and Jim Hogg County. D-13 at S179. The amendment would have moved La Salle County out of Aliseda's district, HD35, and into King's district, HD80 (where it had been in the benchmark), and moved Jim Hogg County into HD35 from HD80—basically a county swap. King said it would look better and make his district easier to travel, with negligible effects on electoral numbers. *Id*. at S180. King said it was only a

.3% decrease in the 2008 Obama election (though later he said it might be .5% and Rep. Aliseda argued it had a more significant effect down ballot). Aliseda stated that he was not happy with the amendment because he was a freshman who would likely draw an opponent and it would reduce his Republican numbers. *Id.* Aliseda said he wanted to keep La Salle County to respect the community of interest of the Eagle Ford Shale, and King responded that the Eagle Ford Shale was also in his HD80. *Id.* at S181. When Rep. Villarreal asked how the amendment would change his district, Aliseda said it reduced his HVAP but increased his SSVR "a little bit more." *Id.* at S183. Rep. Villarreal responded that SSVR is the relevant population (not HVAP) to look at if you want to get a sense of ability to elect. *Id.* Aliseda said he was not fighting the amendment because it increased the SSVR in the district. *Id.* Villarreal argued that SSVR in HD35 had dropped, and the amendment would bring it up, and that the amendment decreased the Republican numbers because of the increase in SSVR. *Id.* When Villarreal said that Aliseda seemed to be opposed to King's attempt to restore some of the decrease in SSVR, Aliseda said he did not oppose the increase in SSVR but was opposed to "the fact that it changes my district into a more democrat district." *Id.* at S184. Aliseda also said the increase in SSVR from the amendment was less than .02%. *Id.* Aliseda said the district as drawn was better for him than the district proposed by King's amendment. *Id.* at S185. Aliseda moved to table. King asserted that the amendment kept constituents that wanted to stay in his district, respected communities of interest, looked cleaner, and had a minimal effect on HVAP. *Id.* King argued that it should not be a Republican or Democrat issue but what was best for that area of Texas. Solomons left it to the will of the House, and it was tabled. *Id.* at S186.

303. Also on April 27, Rep. Coleman offered Plan H232, a statewide amendment to Plan H153. He stated that Plan H232 strengthened existing Latino opportunity district HD35, in contrast to the way Plan H153 treated it. D-13 at S247. His written comments, which were placed in the record, stated that benchmark HD35 was only 56.4% HVAP and had not consistently elected the Hispanic candidate of choice. They stated that Plan H153 diluted HD35's HVAP by 1.5%, but Plan H232 would increase its HVAP to 63.9% while preserving all other Latino districts in the region (there are 12 HCVAP-majority districts in South Texas). *Id.* at S248. The comments stated that HD35 was weak because it had failed to elect a Latino candidate of choice in the recent election or would experience retrogression under Plan H153, and Plan H232 would make it more likely that it would perform. *Id.* at S249. This amendment was tabled.

304. From Plan H100 to Plan H283, HD35 lost Karnes, Goliad, and Jim Wells Counties, and gained La Salle, Duval, and San Patricio Counties. San Patricio County, which was added, was a large county of about 68,000 that was only 48.5% HCVAP using 2005-2009 ACS data, and Jim Wells County, which was removed and had about 40,000 people, was 74.22% HCVAP. D-51.

305. In Plan H283, Hispanics are 58.9% of the total population of HD35 (a decrease from 60.6%). HVAP is 54.9% (a decrease from 56.4%) and Anglo VAP is 40.6% (an increase from 38.2%). Total SSVR is 52.7% (a decrease from 55.4%) and non-suspense SSVR is 53.4% (a decrease from 55.3%). HCVAP is 52.5% (a decrease from 54.6%). Therefore, all Hispanic population metrics were decreased from the benchmark.

306.  HD35 in Plan H283 is less effective for minority voters.  The exogenous effectiveness index shows a reduction from 40% to 20%.  TrJ134-35 (Arrington); *see also* US-351 (Handley Report) at 5, 11.  Dr. Arrington testified that although HD35 had been an effective district in the benchmark, the new district, at 20%, was no longer effective. TrJ135 (Arrington).

307.  Dr. Engstrom found that HD35 did not provide a reasonable opportunity for Latinos, and he considered Latinos "to have a reasonable opportunity in a district when their preferred candidates win a majority of the votes cast in [7 general and 6 Democrat primary elections with Latino candidates] in the districts more often than not." Engstrom Corr. Rebuttal Report (docket no. 307-1) at 28.

308.  In his report, Dr. Alford acknowledges that the Hispanic metrics have been reduced, but notes that Hispanics remain the majority in both HCVAP and SSVR.  In his election analysis (Table 2), he notes that in benchmark HD35, Democrats win 28 of 48 statewide elections (58%) while in Plan H283 they win 23 of 48% (48%).  US-350 at 5 & Table 2.

309.  Martin opined that mapdrawers retrogressed HD35 via a reduction in HVAP from 56.4% to 54.9%, packed neighboring HD43 (the HVAP of HD43 in Plan H283 is 76.5%), and added San Patricio County to HD35 to improve the electoral chances of Republican incumbent Aliseda.  Martin further opined that this retrogression of Hispanic population in HD35 was not necessary to meet any other redistricting principles.  He noted that alternative Plan H232 created HD35 with an HVAP of 63.9%, while preserving the other Latino districts in the region and complying with the County Line Rule.  Joint Expert Ex. E-5 (Martin Report) at 13-14.

310.  In proposed Fact Finding 405, DOJ asserts that "[a]lthough there is an increase in overall turnout among both Anglo and Hispanic voters in HD35, the Anglo voter turnout is significantly greater than the Hispanic voter turnout, reducing the effective share of Hispanic voters in the electorate," citing US-3 (the OAG RPVA) at 103, 105, 127, 129.  However, a comparison of estimated Anglo and Hispanic turnout and of estimated distribution of votes of Anglos and Hispanics in various election contests in this exhibit actually shows that the "estimated turnout % for Anglo" decreased from Plan H100 to Plan H283, while "estimated turnout % for Hispanic" increased.  In addition, the "percent Anglo estimated distribution of votes" decreased from Plan H100 to Plan H283, while the "percent Hispanic estimated distribution of votes" increased.  Thus, this exhibit does not support DOJ's assertion, and in fact supports the opposite conclusion; if anything, mapdrawers looking at the OAG RPVA reports would have believed that Hispanic turnout was increased in comparison to Anglo turnout.  Further, the Court notes that mapdrawers were limited in their ability to manipulate turnout in drawing HD35 because the district is composed of whole counties.

311. Benchmark HD35 was a performing Latino opportunity district but elected Republican Aliseda in 2010, who was not the Latino-preferred candidate.

312.  In Plan H283, all the Hispanic population metrics were decreased slightly from the benchmark, but HCVAP and SSVR remained above 50%.

313.  Benchmark HD35 scored an 80% on the endogenous election index and a 40% on the exogenous election index.  The exogenous election index shows performance of HD35 in Plan H283 to be 20%.  However, HD35 performance increased from 2/5 to 3/4 in the general elections under Dr. Engstrom's election index.

314.  There is no evidence that mapdrawers manipulated Hispanic turnout in drawing the district.

### Rio Grande Valley and HD41

315.  In Plan H100, there were four districts wholly contained in Hidalgo County and no surplus population.  All four districts were Latino opportunity districts.  HD36 (Muñoz) was 83.8% HCVAP; HD39 (Martinez) was 79.1% HCVAP; HD40 (Peña) was 90.2% HCVAP; HD41 (V. Gonzales) was 77.5% HCVAP.

316.  In Plan H100, HD40 had an HVAP of 93.5%, Anglo VAP of 5.1%, and total SSVR of 86.5%.  The incumbent was Aaron Peña.

317.  In Plan H100, HD41 had an HVAP of 81.8%, Anglo VAP of 14.8%, and total SSVR of 68.7%.  Red-202 Report.  This district had the highest Anglo VAP of the four Hidalgo County districts.  Red-202 Report (showing HD36 had 9.8% Anglo VAP; HD39 had 11.2% Anglo VAP; HD40 had 5.1% Anglo VAP).  The incumbent was Veronica Gonzales.

318.  Hidalgo county grew more than the statewide growth rate, and all the Hidalgo County districts were overpopulated.  D-43, D-46.

319.  In 2010, all four representatives of Hidalgo County districts were elected as Democrats, but shortly after the 2010 election, Aaron Peña switched parties and became a Republican.  TrA114 (Peña).  Therefore, at the time of redistricting, there were three Hispanic Democrat incumbents and one Hispanic Republican incumbent in Hidalgo County.

320.  Between Plan H100 and Plan H283, HD40 and HD41 were switched, so that Peña would be the incumbent in HD41, and Gonzales would be the incumbent in HD40.

321.  In Plan H283, there are four districts wholly contained in Hidalgo County, and the surplus is joined into HD31 (represented by Rep. Guillen, a Hispanic Democrat), which includes Starr and Zapata Counties to the west.  HD31 was a Latino opportunity district in the benchmark and remains one in Plan H283.  In the benchmark, Rep. Guillen did not represent any part of Hidalgo County.  TrJ525 (Longoria).

322.  In Plan H283, HD36 (Muñoz) is 88.7% HCVAP; HD39 (Martinez) is 82.4% HCVAP; HD40 (Gonzales) is 89% HCVAP, and HD41 (Peña) is 72.1% HCVAP.

323.  In Plan H283, HD41 (Peña's new district) has an HVAP of 76.2% (a drop of 5.6%), an Anglo

VAP of 19.7% (an increase of 4.9%), and total SSVR of 63% (a drop of 5.7%). Red-202 Report. It has an HCVAP of 72.1% (a drop of 5.4%). Red-109 Report (2005-2009 ACS).

324. In Plan H283, the total SSVR of HD41 is 63% compared to 85.8% in HD40, 82.2% in HD39, 85.1% in HD36, and 90.8% in HD31. Red-202; Red-109.

325. In both Plan H100 and Plan H283, Cameron County has two districts wholly contained within it (HD37 and HD38) and surplus population is joined to the north in HD43. HD43 was a Latino opportunity district in the benchmark, and remains one in Plan H283.

326. Hidalgo County was not a drop-in county because it had surplus population. However, members in the area made some attempts to work together on a plan. Peña attended one meeting with the other three members of the county delegation, but believed they were hostile to having a Republican in the Valley. TrA125 (Peña). After that, he did not attend meetings or work with the other Hidalgo County representatives. TrJ73 (Fischer); V. Gonzales Decl. at 4. Interiano also did not work with other members of the Hidalgo County delegation because there was disagreement on whether to draw a district that would help Peña be re-elected. TrJ1579 (Interiano). Rep. Lozano (HD43) testified that there were "precincts that Sergio Muñoz wanted to keep but were being taken away really by surprise in some versions of the maps that were just coming out all of the sudden." TrJ1788. Muñoz, V. Gonzales, and Martinez were not happy with the Hidalgo County map in Plan H283. Solomons' direction that the House map should be a member-driven plan was not applied to Hidalgo County.

327. Interiano drew the initial configuration of what became HD41 in the final map. He wanted to draw a district that would give Peña the best chance at re-election. Tr1426-27 (Interiano). He wanted to increase the Republican performance of the district, and he looked for Republican-performing precincts to include. Tr1428 (Interiano). Reps. Peña (Hispanic, Republican) and Guillen (Hispanic, Democrat) assisted Interiano in drawing the initial district.

328. The initial configuration of the district—then HD40—closely tracked VTDs with higher Republican performance as measured by votes for Greg Abbott in the 2010 general election shaded in RedAppl. D-334; TrA38 (Interiano). Including Republican-performing VTDs and approaching ideal population were the only criteria for the initial configuration of Peña's district, and all other traditional redistricting criteria were subordinated to political goals. TrJ1580-81, 1590 (Interiano). The configuration of the district does not follow city lines and splits the cities of Palmhurst, Mission, McAllen, Pharr, and Edinburg. D-670, US-489. No city is entirely within HD41, and the map does not respect the cohesiveness of cities and communities. TrJ509 (Longoria).

329. Sometime around April 5, Peña signed off on a proposed district. TrA110 (Peña); TrJ2061 (Downton); D-229 at 91. This district came from plan hrc1H202 dated March 31, 2011. Guillen's plan log has a map (plan guilH119) called "new 40" in his RedAppl account dated March 29, 2011 that matches it. TrJ135; D-384. As noted, Guillen worked on the initial district configuration with Interiano and Peña.

330.  In his first retrogression memo written on April 7, Hanna said the Hidalgo County districts in the plan were "problematic."  D-122.  He noted that HD40 took "a significant dive in SSVR from its current level" and "[t]he significant reworking of the district lines in Hidalgo County means that new District 40 is likely more comparable to old District 41, but even here the SSVR drops by almost 6 points."  He also wrote, "With all adjoining districts having substantially higher SSVR there is a significant risk that DOJ will conclude that the change in District 40 is retrogressive with regard to Hispanic voters through packing of Hispanics in the other districts. The safer approach would be to restore Dist. 40's SSVR to the previous low SSVR for a district in Hidalgo County which was 68.7%."  D-122.

331.  Hanna's second retrogression memo written on April 12, which reviewed proposed Plan H110 (a non-public plan), raised the same concerns. D-327.  No changes were made in response to Hanna's concerns.

332.  In the first public House plan, Plan H113, made public on April 13, Hidalgo County had four districts wholly contained within it, and the surplus Hidalgo County population was joined with HD31 (represented by Guillen).  Except for a small change in Precinct 62, the configuration of Peña's district was identical to the one he had signed off on previously.  Peña's district (still HD40) had 19.8% Anglo VAP and 76.2% HVAP.  Red-202 Report.  It had four precinct splits in Precincts 14, 28, 62, and 124.

333.  Precinct 14 was cut to include Peña's home in his district but not other areas of Precinct 14, which is not strongly Republican.  TrJ1507, TrJ1583 (Interiano); US-311(political shading shows Precinct 14 to be 0-42.9% Republican based on a composite index of all 2010 statewide elections); D-335 (political shading shows Precinct 14 to be 43-47.9% in favor of Greg Abbott in the 2010 Attorney General general election).

334.  Precinct 28 was cut to remove Precinct 9, which was less Republican; cutting Precinct 28 was necessary to create a removal path.  TrJ1507 (Interiano); US-311 (political shading shows Precinct 9 to be 0-42.9% Republican based on a composite index of all 2010 statewide elections); D-335 (political shading shows Precinct 9 to be 48-49.9% in favor of Greg Abbott in the 2010 Attorney General general election).

335.  Precincts 62 and 124 were split to remove Rep. Gonzales's home from then-HD40 (Peña's district) and place it into then-HD41 (Gonzales's district) and to create a removal path.  TrJ1507 (Interiano).

336.  These splits and the overall initial configuration of the district were the result of collaboration among Interiano, Guillen, and Peña.  TrJ1501-03, TrJ1584 (Interiano); TrA39-40 (Interiano). Guillen and Peña indicated to Interiano which precincts and areas they would like to have in their districts.  Tr1479 (Interiano).

337. In Plan H113, HD40 (then Peña's district) was 8,256 persons (-4.92%) below ideal population.

HD31 (Guillen's district) was 999 persons (.6%) overpopulated. HD41 (then Gonzales's district) was 4,737 persons (2.83%) overpopulated. HD39 was 7,746 persons (4.62%) overpopulated, and HD36 was 6,344 persons (3.78%) overpopulated. Red-202 Report (PL-994). Thus, Peña's district was underpopulated and all other Hidalgo County districts were overpopulated.

338. At the April 15 HRC hearing on Solomons' Plan H113, Reps. V. Gonzales, Martinez, and Muñoz testified against Solomons' plan, but Guillen supported it. Gonzales noted that Peña's district would contain a large majority of her current district and would be one of the smallest districts in the state at negative 4.92%. D-595 at 130. She noted that the map drastically reduced the (non-suspense) SSVR of the district from 88.3% to 64.6%, which she asserted was retrogressive. *Id.* at 131. Solomons stated that the proper SSVR comparison was between the old HD41 and the new HD40, and that it went from 69.2% to 64.6%. *Id.* at 136. Gonzales asserted that her district was packed because the SSVR increased from 69% to 86.7%. She stated that it would require developing new member-constituent relations because the districts were so changed and did not reflect the minority citizens' preferred candidate of choice based on previous elections. *Id.* at 134. Gonzales submitted a proposed amendment that would keep the core of the current districts while increasing Republican precincts in Peña's district, and was approved by Muñoz, Martinez, and Gonzales. *Id.* at 135. Muñoz complained that he was losing the city of Pharr and that it was being split among three districts. *Id.* at 146.

339. Guillen, whose district HD31 was combined with the Hidalgo County surplus population, testified that he was disappointed to lose Webb and Duval Counties, but that he was fine with gaining part of Hidalgo County. D-595 at 172. Guillen said he played with the maps quite a bit after the census came out, and that MALDEF's map (Plan H115) required a county line break in Victoria County. *Id.* at 173. Peña asked Guillen if he was happy with the Hidalgo County proposed map, and he said he would be happy with it. *Id.* at 179-80. He also said that even though his district was very high in Hispanic population it was not packed because those counties have very high percentages of Hispanics. *Id.* at 181.

340. Luis Figueroa of MALDEF criticized Plan H113 in part for its failure to create a Latino opportunity district in the Rio Grande Valley and advocated for Plan H115, which created a new Latino opportunity district (HD32) in the Valley by combining portions of Cameron County and Hidalgo County. D-595 at 12. This map had four districts wholly within Hidalgo County, two districts wholly within Cameron County, the new HD32 (combining portions of Cameron County with portions of Hidalgo County and all of Willacy County), and additional excess population from Hidalgo County was joined with HD43. Figueroa emphasized that the map created an additional Latino opportunity district in South Texas compared to the committee plan H113. *Id.* at 124.

341. At the April 17 HRC hearing, George Korbel, a redistricting expert, testified that there were unnecessary county cuts in the map, including in Hidalgo and Cameron County because there was a county cut in Cameron and a cut in Hidalgo, but if the spillover of the two districts were joined, there would only be one county cut. There was a discussion about whether these were county cuts or spillovers. One of the HRC members asked if doing what Korbel suggested would push

population up and end up diluting the Hispanic population in HD35. Korbel said he had a plug-in fix that would show how it would work. He also testified that the map "shorted" the Hispanic population in the Valley by one district.

342. On the afternoon of April 17, Downton made further changes to Peña's district. Downton made changes with input from Peña, and there were areas that Peña wanted in his district even though they were traditionally Democratic because he thought they would support him. Downton 8-31-11 depo. (Joint Ex. J-62) at 79-80. These changes appear in plan hrc1H287, which was last modified on April 17, 2011, and in Plan H134 (Solomons' statewide substitute), which was made public April 18. D-317; PL-1615; US-434; US-427. In Plan H134, HD40 was renamed HD41, and HD41 was renamed HD40. The district numbers were switched because the retrogression analysis comparing statistics using the same district numbers was showing dramatic changes in the districts. TrJ2034 (Downton). These changes were adopted into the map in Plan H153 (the plan passed out of the HRC on April 19) and remained in the final Plan H283.

343. Peña testified at trial that Guillen was directing the changes that Downton made to HD41 on April 17, but this testimony is not credible. Downton never mentioned that Guillen was involved in the changes; he stated only that it was Peña. In addition, the evidence does not support a finding that Guillen directed the changes. There are only three maps in Guillen's RedAppl plan log during the relevant time period. Although plan guilH127 (created April 14, last modified April 21) (D-372, D-399, D-375) has some of the same precinct changes that appeared in Plan H134, this plan was last modified on April 21 and thus it cannot be determined if the changes predated the release of Plan H134 or came after. Similarly, plan guilH128 (created April 14, last modified April 15) (D-372, D-387) shows Peña's district the same as in Plan H113. Plan guilH129 (created and last modified on April 17) contains a very different configuration of HD41. Nor is there any evidence that Guillen was familiar with Hidalgo County to the level necessary to make the precinct splits or, as a Democrat, had any motive to maximize a Republican district. The Court finds that Peña and Downton were responsible for the changes.

344. Downton's changes consisted primarily of splitting additional precincts to add or remove areas from Peña's district, HD41. Interiano testified that most of the splits were made to "follow roads," but Interiano denies being involved in these splits, and his explanations are based on hearsay. The Court does not find it credible that Downton would have split numerous precincts simply to follow roads.

345. Downton testified that the changes were partly made in an effort to increase the population of HD41 so there was a narrower deviation between it and the surrounding Hidalgo County districts. Downton 8-31-11 depo (Joint Ex. J-62) at 80-81. In Plan H113, Peña's district was 4.92% below ideal, a fact that Rep. Gonzales had pointed out at the hearing. In Plan H153, Peña's district was 4.41% below ideal. Thus, the total population of Peña's district was increased (from 159,381 to 160,238). However, because the splits both added and removed population from Peña's district, increasing district population cannot explain all of the splits.

346. Although he denied being directly involved in the changes, Peña testified that the changes were made to "maximize" the district for Republican performance. TrA98. Peña said it was maximized by including "persuadables" that were conservatives but not necessarily Republicans. TrA104. He testified that people who pay heavy property taxes or income taxes were more likely to be conservative and "persuadable." TrA139, TrA155.

347. By objective measures available through RedAppl, the Downton/Peña changes actually slightly decreased the Republican performance of Peña's district, HD41. TrA17-19 (Interiano); US-518 (summary table showing that Republican performance decreased in the 2002 Governor's race, the 2004 CCA Place 6 race, the 2006 Lt. Governor's race, the 2008 U.S. Senate race, and the 2010 Lt. Governor's race); US-365, US-367, US-369, US-371, US-372, US-517 (all election analysis reports). The changes were not made based on Republican shading or Republican performance measures in Red Appl. Therefore, the changes were made on some other basis.

348. Because RedAppl allocates election results homogeneously across the precinct, changes in election results are not accurately reflected when precincts are split. Someone who knows an area could split precincts in a way that they believed would increase Republican performance even though RedAppl shows a decline in performance. TrA20 (Interiano). Because RedAppl does have accurate information on race below the VTD level, a mapdrawer with racial shading turned on could split precincts by using race as a proxy to try to increase Republican performance even though RedAppl might show a decline in performance. TrA21 (Interiano). With Hispanic shading turned on or with knowledge of the racial makeup of an area, a mapdrawer could identify areas that are more Hispanic within a precinct even though they show up as being Republican based on the characteristics of the precinct as a whole. A mapdrawer could also identify areas using racial shading that had a higher Anglo VAP than the current district to find blocks to add to the district that would increase the Anglo VAP of the district. TrA27 (Interiano). Similarly, using racial shading, a mapdrawer could identify blocks within a district that had a higher Hispanic VAP than the district being drawn and remove them to lower the HVAP of the district. TrA28-29 (Interiano).

349. Downton did not change the existing splits in Precincts 62 and 124 (to exclude Gonzales's home and create a pathway).

350. The existing split in Precinct 14 to include Peña's home was changed to take less of the area surrounding his home. Downton said the change was made because Peña said he did not need the whole area, just his house. TrJ2062-63. This precinct is shaded as 43-47.9% in favor of Greg Abbot in 2010 (D-335) and 0-42.9% Republican strength on a 2010 election index (US-311). Areas excluded are generally less than 50% Anglo according to RedAppl shading. D-296. The Court lacks information to determine the specific number of Anglo and Hispanic voting age population that was moved in this change. The portion of Precinct 14 that is included in Peña's district has a lower HVAP (85.4%) than the portion of Precinct 14 excluded (86.2%).

351. A new split was made in nearby Precinct 107 to take in a small portion of that precinct. Downton said Peña wanted to include areas where he felt people were likely to vote for him based

on personal relationships. TrJ2029. Peña said the splits in Precincts 14 and 107 include his home and high school. TrA146. The Precinct 107 split takes in 44 AVAP and 312 HVAP in an area that is shaded as 0-42.9% support for Abbott in 2010 (D-335) and 0-42.9% Republican strength on a 2010 election index (US-311). RedAppl shading shows the area being taken in as largely Hispanic. D-296. The portion of Precinct 107 included in Peña's district has a lower HVAP (86.9%) than the portion of Precinct 107 excluded (90.6%).

352. Precinct 52 is shown on RedAppl reports as being split in this area, but it appears to be a technical split, since no split is visible on a map and no population is split out of HD41.

353. Previously, Precinct 28 was split to remove Precinct 9, a less than 50% Republican precinct. Rep. Muñoz (HD36) wanted to keep his district office in his district, and it was located in Precinct 103, which had been put into Peña's district. TrA152 (Peña). To accommodate Muñoz, the Precinct 28 split was removed[6] and a new split was made in Precinct 103 to place Muñoz's office back into his district and maintain a path to remove Precinct 9 from Peña's district. The Precinct 28 split that was removed put back some population into HD41 that shows as 52-56.9% in favor of Abbott in 2010 (D-335) and 43-47.9% Republican strength under a 2010 election index (US-311). RedAppl shading shows the population put back into HD41 to be heavily (>90%) Hispanic. D-296. The Court lacks information to determine what voting age population was returned to HD41. The Precinct 103 split removed an area that showed 57-100% support for Abbott (D-335) and 52-56.9% Republican support under the 2010 election index (US-311). Thus, with the changes to Precincts 28 and 103, a less Republican area was put into HD41 and a more Republican area was taken out. At trial, a RedAppl demonstration showed that areas taken out included areas that were more than 76% HVAP, which would decrease the HVAP % of the district. TrA29 (Interiano). This is confirmed by reports showing that the Precinct 103 split took out 115 AVAP and 822 HVAP, which would decrease the HVAP% by removing an area that was 86.5% HVAP. RedAppl shading shows the population taken out to be only 10-19.9% Anglo. D-296. The Red-110 Report indicates that the area taken out was 9.3% Anglo total population and 12.1% Anglo VAP. Longoria testified that the excluded part of the precinct includes more working-class Hispanics, and includes a higher percentage of Hispanics. TrJ519 (Longoria). This change is not consistent with Republican maximization but is consistent with Anglo maximization. It is partly explained by the need to return Muñoz's office to his district, though more of the precinct was moved into HD36 than necessary to do so.

354. In addition to keeping the splits in Precincts 62 and 124 to get to Gonzales's home, and the changes to the other existing splits, new splits were made in ten more precincts, including Precincts 105, 35, 25, 6, 8, 47, 48, 95, 63, and 88.

355. Precinct 105: This split added population to Peña's district. Downton said HD105 was split to include an area with Peña's childhood home and friends into his district. TrJ2028-29. Peña testified that the area put in includes the Vineyards, which is fairly affluent and "there are aspects

---

[6] Visually, the existing split in Precinct 28 was removed, though the Red-370 report still shows a split existing there. PL-733. This supposed split involves no voting age population. US-382.

of that area that are favorable to me." TrA95. However, at his deposition, Peña said he had no reason to believe that any portion of the precinct was more favorable politically for him. TrA95 (Peña). Longoria testified that the part of Precinct 105 included in HD41 is a very exclusive neighborhood of private homes and a gated community, with very high income and Anglo population. TrJ1517. This split brought in an area shaded as 0-42.9% in favor of Abbott in 2010 (D-335) and 0-42.9% in favor of Republicans under a 2010 election index (US-311). This split is not consistent with Republican maximization. RedAppl shading shows the area brought in to be a mix of areas between 0-39.9% Anglo. D-296. A trial demonstration showed that some of the areas included were shaded as greater than 20% Anglo VAP in RedAppl, which when added would increase the Anglo VAP of the district. TrA27-28 (Interiano). However, this split brought in 61 AVAP (14.6% AVAP) and 357 HVAP (84.6% HVAP) in total, which would decrease Anglo VAP and increase HVAP. The portion of Precinct 105 included in Peña's district has a lower HVAP (84.6%) than the portion excluded (91.4%). The Court finds that this split was made to increase the population of the district, to include areas that Peña thought might support him based on his personal relationships, and to include affluent voters.

356. Precinct 35: This split brings in a tiny area of Precinct 35 that includes no VAP. It appears to follow a road, as Downton asserted. TrJ2029 (Downton); TrA148 (Peña). Peña does not recall asking for this split. TrA107 (Peña). The Court finds that this split was made to follow Jackson Road.

357. Precincts 6, 8, and 25: These splits all removed population from Peña's district. Downton did not recall why these splits were made but thought they were to follow roads. TrJ2029 (Downton). Peña did not recall asking Downton to split Precincts 6, 8, or 25. TrA106-08 (Peña). However, Peña said the splits in Precinct 6 and 25 separate areas with a socioeconomic difference—above the split (included in his district and where his daughter lives) is affluent, and there is a flood zone that divides the area. TrA149. Similarly, he said the split in Precinct 8 separates people with "socioeconomic differences" and follows Jackson Road. TrA150. Longoria testified that the parts of Precinct 25 included in HD41 include densely populated, fairly well-to-do areas with a higher concentration of Anglos. TrJ513. He testified that the parts of Precinct 25 excluded have higher concentrations of Hispanics and lower income population. TrJ514. Longoria testified that the parts of Precinct 8 included in HD41 are around Plaza Mall, the McAllen Country Club, a very exclusive part of McAllen with higher income people and a higher concentration of Anglos, and an area around 2nd Street that is affluent with a higher concentration of Anglos. TrJ516. He testified that the excluded portion is not highly populated.

358. These splits remove portions of precincts that appear as greater than 50% in support of Abbott in 2010 (D-335) and greater than 50% Republican support under the 2010 election index (US-311). Thus they remove areas that appear Republican and are not consistent with Republican maximization. The area of Precinct 8 removed is shaded as 0% Anglo in RedAppl and removes 0 AVAP and 6 HVAP. Thus it removes an area that is 100% HVAP and decreases the HVAP of the district. The area of Precinct 6 removed is shaded as 10-39.9% Anglo and removes 18 AVAP and 37 HVAP. It removes an area that is only 64.9% HVAP, which increases the HVAP of the district.

The area of Precinct 25 removed is mixed racial shading and removes 10 AVAP and 410 HVAP. This split removes an area that is 97.2% HVAP and thus decreases the HVAP of the district. Thus, two of the splits increase the district's Anglo VAP and one split decreases the Anglo VAP. At trial, a RedAppl demonstration showed that areas removed were greater than 76% HVAP, and thus excluding them would decrease the HVAP % of the district. TrA29 (Interiano). In total, these three splits remove only 28 AVAP while removing 453 HVAP, and they decreased the HVAP of the district. Considered together, these splits are not consistent with Republican maximization but are consistent with Anglo maximization. The Court finds that these splits were made to increase the Anglo VAP and decrease the HVAP of the district.

359. Precincts 47, 48, & 95: These three splits all added population to Peña's district. Downton explained these splits as "almost certainly roads." TrJ2029 (Downton). The roads overlay in RedAppl shows that the district lines for Precinct 95 already followed a road, and there is no road where these precincts are split. TrA31-33 (Interiano). However, the splits do continue a straight line from Bentsen Road above, and the splits create a straighter line. TrA45 (Interiano). Peña testified that the portions of Precincts 47 and 48 brought into his district include an affluent area called Sharyland with lots of affluent Mexican-Americans and Mexican nationals. TrA150-51. Longoria testified that the portion of Precinct 47 that is excluded is working-class Hispanics. TrJ520. He also testified that the portion of Precinct 48 that is excluded includes Colonia McAllen[7] (before it was annexed), which has a very high concentration of Hispanics, and another colonia with a high concentration of Hispanics. TrJ521-22. Longoria testified that the portion of Precinct 95 that was excluded includes a former colonia with a higher concentration of low-to-moderate income Hispanics, emphasis on low. TrJ522.

360. These splits bring into Peña's district areas shaded as 0-42.9% in favor of Abbott in 2010 (D-335) and 0-42.9% in Republican voting strength under the 2010 election index (US-311). These changes are not consistent with Republican maximization. The splits in Precincts 48 and 95 bring in areas shaded as 0-19.9% Anglo, and the split in Precinct 47 brings in mixed population. The splits bring in 439 AVAP (198 from Precinct 47 (31.7% AVAP), 65 from Precinct 48 (11.1% AVAP), and 176 from Precinct 95 (12% AVAP)) and 2035 HVAP (394 from Precinct 47 (63.1% HVAP), 466 from Precinct 48 (79.3% HVAP), and 1175 from Precinct 95 (80.2% HVAP)). Thus, the Precinct 47 split increases the Anglo VAP of the district, while the Precinct 48 and 95 splits decrease the Anglo VAP slightly. However, someone like Peña who is familiar with the area would know that areas with many Mexican nationals would reflect higher numbers of HVAP but lower numbers of HCVAP who could actually vote. The Court finds that these changes were made to increase the total population of the district (*i.e.*, to minimize deviation) but were also made on the basis of race to increase the Anglo VAP.

361. Precinct 63: This split removed population from Peña's district. Downton explained it as a road. TrJ2029 (Downton). At trial, Peña made general statements about socioeconomic differences

---

[7] A colonia is a community similar to a shanty-town, with sub-standard housing and a lack of roads, utilities, and basic infrastructure. PL-419 (Seifert Decl.) ¶ 8; TrJ542-542 (Seifert).

and assumed changes were made to include "persuadables." TrA151-52. Longoria testified that the excluded areas include La Cuchilla, which is poor and has a very high concentration of Hispanics. He testified it includes an area around Leal Elementary School that has a high concentration of Hispanics with low-to-moderate income, but it also includes a little part of a country club with a mixed population. TrJ515.

362. The Precinct 63 split removes an area that is shaded as 57-100% support for Abbott in 2010 (D-335) and 57-100% Republican voting strength under a 2010 general election index (US-311). Therefore it is not consistent with Republican maximization. It is shaded as largely 0% Anglo with some areas 10-19.9% Anglo in RedAppl. D-296. At trial, a RedAppl demonstration showed that removing this area would remove areas that were more than 76% HVAP, which would decrease the HVAP % of the district. TrA29 (Interiano). This is confirmed by the reports, which show that the split removes 165 AVAP and 701 HVAP, an area that is 79.7% HVAP, which would decrease the district's HVAP. This split is not consistent with Republican maximization but is consistent with Anglo maximization. The Court finds that this split was made on the basis of race to increase Anglo VAP% in the district.

363. Precinct 88: This split added population to Peña's district. Downton said that Peña requested it and that "he said it was a significant road, and he thought it made a more appropriate dividing line." TrJ2062. Downton later said that he recalled Peña's having him put up the city overlay, and the line conforms to the City of Alton line. At trial, Peña testified that the line tracks the edge of the City of Alton, which is a colonia, and that communities on the other side of the split (split into his district) are "dramatically different" and affluent. TrA100, TrA155. However, at his deposition, Peña said he had no reason to believe that the political performance of one part or the other would be superior. TrA99 (Peña). Longoria testified that the portions of Precinct 88 included are a higher concentration of Anglos and higher-income population, and also a sparsely populated mobile home park and mixed population but generally more Anglos. TrJ522-23.

364. The precinct split tracks Shary Road and the edge of the City of Alton. The area that is brought into HD41 is shaded as 0-42.9% support for Abbott (D-335) and 0-42.9% Republican voting strength under a 2010 election index (US-311). Therefore it is not consistent with Republican maximization. RedAppl shades the area as mixed between 0-39.9% Anglo. D-265. At trial, a RedAppl demonstration showed that areas of greater than 20% Anglo VAP were included, which would increase the Anglo VAP% of the district. TrA28 (Interiano). This is confirmed by the reports, which show that the change brings in 65 AVAP and 211 HVAP (and population that is 23.4% Anglo VAP), which would increase the Anglo VAP of the district. This split is not consistent with Republican maximization but is consistent with Anglo maximization. The Court finds that this split was made on the basis of race to increase the Anglo VAP% of the district.

365. HD41 contains all or part of 42 precincts. Red-110 Report (US-382). RedAppl reports indicate that 17 precincts are split, although three (35, 52, and 28) do not involve any population. With 17 precinct splits, 40% of the precincts in the district are split. With 14 precincts, 33% of the precincts are split.

366. Approximately 46% of all the Anglo voters in Hidalgo County are placed in HD41. Tr369 (Martin); V. Gonzales Decl. (docket no. 331) at 5 (noting that half of the Anglos residing in Hidalgo County are in the new HD41).

367. In Precincts 105, 107, 14, 25, 8, 47, 48, 95, 63, 103, and 88, the portions of split precincts excluded from Peña's district are all significantly higher in HVAP than the portions included in Peña's district. Only in Precinct 6 is the HVAP% higher in the included portion than the excluded portion.

368. Dr. Arrington examined all 17 split precincts as a whole and found that the portions of split precincts excluded from HD41 are more heavily Hispanic than areas included. TrJ141-43 (Arrington). He concluded that the map drawer was shaping this district to make it more Anglo than it was before, and more Anglo than any district in Hidalgo County was before. TrJ143. Making the district more Anglo reduces the ability of Hispanics to elect a candidate of their choice. TrJ144 (Arrington). Considering all 17 split precincts in HD41, 7,239 AVAP and 26,019 HVAP are included, and 3,171 AVAP and 38,643 HVAP are excluded. US-516[8]. This is a net gain of 4,068 AVAP and a net loss of 12,624 HVAP. US-516. Arrington also found that the average HVAP of blocks split out is 92.1% and of blocks split in is 77.6% TrA23 (Interiano). Similarly, AVAP of blocks excluded from Peña's district is 7.6% while AVAP of blocks included is 21.6%. TrA24 (Interiano). Arrington's testimony supports the conclusion that, with regard to split precincts overall, areas with higher Anglo VAP were retained and areas with higher Hispanic VAP were excluded from Peña's district. This supports the conclusion that HD41 was drawn to maximize Anglo VAP.

369. DOJ contends that the precinct splits made by Downton between Plan H113 and Plan H134/H153/H283 were race-based. The Court finds that some, but not all, of the splits were race-based. The Court is unable to determine the exact effect on HVAP and AVAP for the changes to Precincts 14 and 28 because it lacks the Red-110 Report for Plan H113. However, Precincts 25, 8, 63, and 103 were all split to remove areas that appeared to be Republican yet decreased the HVAP% of the district. In addition, the Precinct 88 split and the Precinct 47 split bring in areas that do not appear favorable to Republicans, yet increase the Anglo VAP%. Looking just at these metrics, these precinct splits are consistent with an improper use of race and intentional vote dilution. Although the Precinct 48 split decreases the Anglo VAP slightly, the HVAP in that area includes many Mexican nationals, and thus someone like Peña would know that the Anglo CVAP was actually higher and thus this split would increase the number of Anglo voters.

370. However, the other splits in Precincts 105, 107, 6, and 95 do not support a finding of an improper use of race. Although the Precinct 105, 107, and 95 splits all brought in areas that appeared to be 0-42.9% in favor of Abbott (D-335) (so that they would not make the district more

---

[8] The Court has confirmed that the totals in this exhibit are correct, but a number of entries in the individual columns are wrong. In addition, Arrington's analysis includes "split" precincts 28, 35, and 52, which did not actually split any VAP. However, the same trend is seen when those precincts are not included in the total. Not including the precinct splits that do not split any voting age population (i.e., not considering Precincts 28, 35, and 52), the precinct splits resulted in a net gain of 3,420 AVAP and a net loss of 13,696 HVAP.

Republican in RedAppl), they were racially shaded as primarily Hispanic, and each brought in populations that would increase the HVAP of the district. And the Precinct 6 split removed an area that appeared Republican but also removed population that was 31.6% Anglo VAP.

371. Between Plan H113 and Plan H134/H153/H283, the total population of Peña's district went from 159,381 persons with 111,239 VAP to 160,238 persons with 111,689 VAP. Therefore, despite all the precinct splits, the net change was only 857 persons and only 450 persons of voting age. Red-202 Reports.

372. Between Plan H113 and Plan H134/H153/H283, Peña's district went from 16.3% Anglo population and 19.8% Anglo VAP to 16.2% Anglo population and 19.7% Anglo VAP. Thus, Anglo VAP decreased by .1%. Pena's district went from 79.9% Hispanic population and 76.2% HVAP to 79.8% Hispanic population and 76.2% HVAP. Thus, Hispanic VAP remained the same. HCVAP went from 72% to 72.1%. Total SSVR increased from 71,487 (62.9%) to 71,813 (63%). Red-202 Report. Non-suspense SSVR went from 60,631 (64.6%) to 60,984 (64.6%).

373. No changes were made to the district after Plan H134. Plan H134, Plan H153, and Plan H283 have the same SSVR and the same 17 precinct splits. D-335; US-311; PL-733 (Red-370 Report); TrJ2029 (Downton).

374. On April 19 at the HRC formal meeting, Rep. Veasey offered an amendment (Plan H119) to Plan H134 that would amend only the Hidalgo County districts HD31, 36, 39, 40, and 41, but it failed (Ayes were Villarreal, Alonzo, Alvarado, Veasey).

375. On April 20, David Hanna wrote his retrogression memo concerning Plan H153. D-338. There were some changes between the second and third memos regarding the Hidalgo County area. TrJ1196 (Hanna). The district numbers for HD40 and HD41 were swapped, but the retrogression analysis did not change. TrJ1196 (Hanna). Hanna noted that HD41's SSVR dropped by almost 6 points, while the surrounding districts all had substantially higher SSVR, creating a risk that DOJ would conclude that HD41 was retrogressive through packing of voters in the surrounding districts. Hanna recommended restoring HD41's SSVR to its previous level of 68.7%. US-338. These concerns were never resolved. TrJ1164 (Hanna). Hanna did not perform an offset analysis to see if any retrogression could be made up elsewhere, nor did he perform any election analysis regarding HD40 and HD41. TrJ1196 (Hanna).

376. On April 22, Stacy Napier from the OAG sent Bruce and Downton an RPVA for Plan H153. It showed the performance of HD41 decreasing from 7 out of 10 elections in the benchmark plan to 5 out of 10 elections in Plan H153. US-190/190A. Interiano, Bruce, and Downton discussed the RPVA (thought not specifically as to HD41) via email, and Solomons was copied. US-169; US-176. Based on the RPVA, Interiano and Downton were aware that the performance for Hispanics was decreased in HD41. TrA9 (Interiano).

377. During the April 27 debate on Plan H153, Rep. Martinez noted that although Solomons had

said it would be a member-driven map, a lot of amendments from members, especially from the Valley, were not taken into account or adopted. D-13 at S100. Martinez asked who Gerardo Interiano was, and Solomons responded that he was working out of Speaker Straus's office, but at Solomons' direction. *Id*. at S100-01. Martinez noted that he, Rep. Gonzales, and Rep. Muñoz had testified against the Valley configuration at the HRC hearing and also raised a point of order on the basis that the legislators were not included in the minutes. *Id*. at S102.

378. During the floor debate, Rep. V. Gonzales offered amendments to the Valley. Gonzales, Martinez, and Muñoz presented Amendment No. 18 (Plan H187) relating to Hidalgo County. D-190 at 123-124; D-13 at S186. Gonzales discussed the major changes that had been made to Hidalgo County districts, including that her district and Peña's district had essentially been swapped and they both had 1.5% or less of their prior districts. D-13 at S186. She stated that she would have to start all over with member-constituent relationships. *Id*. at S190. She noted that Martinez's district was also changed (he stated that he had only 72% of his district) and Muñoz had only 57.2% of his prior district. She also noted that the HD40 and HD41 district numbers had been swapped and that they tried to make Peña's district a Republican district. She noted that 14 VTDs are split, despite Solomons' having objected to Farias's proposed Bexar County amendment based on an increase in split VTDs. She complained that the committee map did not create a new district in the Rio Grande Valley despite the population growth, and that Peña's district would be one of the smallest in the state. *Id*. at S186-87. Gonzales stated that her proposed amendment would put "us basically back to where we were" by adjusting the population and preserving communities of interest, without splitting any VTDs. *Id*. at S188. She also stated that she believed there was retrogression and the committee plan would not be pre-cleared. *Id*. at S189. Rep. Aliseda (Hispanic, Republican) noted that MALDEF's representative Figueroa had previously testified that the Hidalgo County map would not violate the VRA, and Gonzales responded that Figueroa had been concerned with § 2, not § 5 and Figueroa was not aware of the issues. *Id*. at S190. Aliseda asked if the proposed amendment would affect Rep. Peña's Republican numbers. Rep. Oliveira stated that if you combine Cameron and Hidalgo County, you could create seven districts in the Valley and create a brand new Latino opportunity district while keeping the other districts. *Id*. at S191-92. Oliveira also criticized the over-reliance on the County Line Rule, and he and Rep. Burnam asserted that the Legislature was being inconsistent on its use of the rule and its insistence on 50% SSVR. *Id*. at S192-93. Rep. Guillen noted that Gonzales's amendment did not create a seventh Valley district, and Oliveira responded that those maps were laid out in other plans. *Id*. at S193. Oliveira stated that Guillen was protected by being given Hidalgo County population that he did not need in order to keep his minority opportunity district, but "that population was sacrificed for your benefit and perhaps for Representative Peña." Guillen stated that he was not sure "about the logic behind" the assertion that it was drawn for his benefit. *Id*. at S193-94. Rep. Martinez asked who drew the lines for the Hidalgo County map, and neither Solomons nor Villarreal knew. *Id*. at S194-95. Martinez noted that someone other than the delegation had to have given input because the map was not drawn the way he, Muñoz, and Gonzales had asked, even though it was supposed to be member-driven. *Id*. at S195. Villarreal noted that he opposed the map and voted against it coming out of committee because it failed to create a district that combined Cameron and Hidalgo population. *Id*. at S195. Peña stated, "I did not draw this map. But there are certain things I do know and certain things I did

ask for. I said one, please don't pair any of my colleagues. . . . The other thing I said was if there's going to be spillover I would rather have an experienced member come into the valley than a freshman. And so Representative Guillen, who you know, is somebody who is respected, senior member, so that was my suggestion. Those are the two suggestions I made." *Id*. at S195-96. Peña argued that he should be in a conservative district and Gonzales in a democratic district, and that the map was fair. *Id*. at S196. He stated he would love another Valley district but that the County Line Rule would be followed unless a court said it could be ignored. *Id*. Martinez asked Peña if he had input on the lines drawn in Hidalgo County. Peña stated that he had "some input," including that members not be paired, that the conservative member get a conservative district, that other members represent the areas they have, and that a senior member like Representative Guillen come in if there was spillover." *Id.* at S197. When asked if he had input on his own district, Peña said, "No. When I met with the members what I said to you was, look I expect that the Republicans are going to maximize the conservative seats. That's what I told you, you can recall that. And I said I will not draw this map because one, I did not want to be involved. And two, that I didn't want to be involved in pairing or being involved in affecting my neighbor's districts." *Id*. at S198. Martinez asked him "So, the drawing of your lines in your district you didn't have any input in?" and Peña said "No, I never even bothered to learn the RedAppl." *Id*. Peña agreed that the Valley needs a new district, but only if the court would give permission to break the County Line Rule. *Id*. at S199. Rep. Castro pointed out that the objection to Rep. Farias's amendment in Bexar County was that it created a jagged line, yet HD41 was full of jagged lines. Peña stated that "the entire map has that sort of thing" and that he did not draw it, and then he moved to table. *Id.* The amendment was tabled. D-13 at S203.

379. Gonzales offered another Hidalgo County plan, Amendment No. 19 (H162) that tried to keep the core of the districts the same but attempted to create a more Republican district for Peña, as more of a compromise than the previous amendment. D-13 at S203; D-190 at 125-26. Solomons told members to "vote their consciences." D-13 at S203. It was tabled. *Id.*

380. Rep. Martinez Fischer laid out a statewide amendment (Amendment No. 29) (H196). Rep. V. Gonzales emphasized the Latino growth and the need for a seventh Valley seat (HD72) by combining Cameron and Hidalgo Counties. D-13 at S217-18. This map had seven districts wholly in Hidalgo and Cameron Counties, and part of HD43 also came into Cameron County. This map had been debated with regard to other areas. Citing the County Line Rule and prior debate, Solomons moved to table, and the amendment was tabled. D-13 at S218.

381. Martinez Fischer also offered Plan H201, which created a seventh Latino opportunity seat in the Valley by combining the spillover from Hidalgo and Cameron Counties to create a new HD144. Martinez Fischer/Gonzales depo. at 19. This map had seven districts wholly contained within Cameron and Hidalgo Counties. It also had a County Line Rule violation in Nueces County to keep HD33 as a Latino opportunity district. With only 33.2% HCVAP, HD35 was no longer a Latino opportunity district. Despite the loss of HD35, this map did result in a net gain of one HCVAP-majority district in South Texas over the committee plan with the addition of HD144 and retention of HD33. Martinez Fischer/Gonzales depo. at 19. It has a total of 13 HCVAP-majority districts in

South Texas (31, 33, 34, 36, 37, 38, 39, 40, 41, 42, 43, 80, & 144). However, it had a County Line Rule violation in Nueces County, and without that violation to include Nueces County population in HD32, HD32 would be outside the permissible population deviation.[9] Rep. Lozano (Hispanic, Republican) testified at trial that he would have preferred H201 over H283 because it created a new Rio Grande Valley district. TrJ1821 (Lozano). The amendment was tabled.

382. In Plan H283, approximately 1.5% of Peña's constituents are the same as in Plan H100. Tr366 (Martin). Most of the areas represented by Peña in H283 are areas he had not represented before. TrJ509 (Longoria). Peña's district HD41 is underpopulated by 7,399 persons, while the other districts in Hidalgo County are overpopulated—HD31 by 999; HD36 by 4,368; HD39 by 7,746, and HD40 by 5,856 persons. Tr1478, Tr1000 (Downton); Tr369 (Martin); Red-202 Report. Peña's district is one of the smallest in Plan H283. The under- and overpopulation of districts in Hidalgo County was intentional to make the district as Republican as possible and to give Peña the best opportunity to be re-elected. Tr1478 (Interiano); Downton 8-31-11 depo. (Joint Ex. J-62) at 81. Downton admitted that adding population into HD41 to minimize the deviation would make the district more Democratic. Tr1001. HD41 was intentionally underpopulated to avoid putting in additional voters because they would be largely Latino and would vote Democratic. Tr372 (Martin). Kousser testified that HD41 splits more precincts than the entire Texas Senate plan, and the pattern of population shows that "it captures just about all of the heavily Anglo areas that it possibly could" in a county that is heavily Latino. Tr247 (Kousser); Joint Expert Ex. E-2 (Kousser report) at 92-97 & n.64.

383. Dr. Arrington testified that, because of the numerous precinct splits in HD41, reconstituted exogenous election analyses do not provide an accurate picture of electoral opportunity in HD41. TrJ120, TrJ141-42 (Arrington); *see also* US-351 (Handley report) at 9-10.

384. Dr. Engstrom concluded that HD41 in Plan H283 was a Latino opportunity district. Joint Expert Ex. E-8 (Engstrom Corr. Rebuttal Report docket no. 307) at 28.

385. Dr. Alford notes that Democrats win benchmark HD41 in 32 of 48 (67%) of contested statewide races, this number drops to 23 of 48 (48%) in Plan H283. US-350 (Alford Report) at 8.

386. Plaintiffs offer demonstration Plan H291 that equalizes the population of the four Hidalgo County districts and raises the SSVR of H41 to 75.3% total/75.1% non-suspense. Tr373 (Martin). It has a deviation of .4%. *Id.*

387. The Rio Grande Valley is a community of interest that includes Hidalgo County, Cameron County, Starr County, and Willacy County. TrJ540 (Seifert); PL-456 Decl. of Hidalgo County Judge Ramon Garcia. The Valley is a community of interest with shared issues and similar socio-economic characteristics, geography, and challenges. PL-456 (Garcia declaration); Tr630-31 (Garcia); PL-419

---

[9] HD32 was -3,277 (-1.95%) underpopulated, and it included 20,381 persons from Nueces County. Therefore, without Nueces County population, it would be -23,658, well outside the permissible deviation from the ideal of 167,637.

(Seifert Decl.) ¶ 7. Cameron and Hidalgo Counties share issues with border security, colonias, and flooding. PL-419 (Seifert Decl.) ¶¶ 15, 8-10, and 12. Hidalgo and Cameron County residents are more aligned with each other than with residents of the largely rural Starr and Zapata Counties, yet Plan H283 joins the excess population of Hidalgo County to Starr and Zapata Counties with a representative who does not live in Hidalgo County. V. Gonzales Decl. (docket no. 331) at 4-5. Instead of joining Hidalgo and Cameron Counties, both counties are joined with multiple other counties, preventing an increase in representation for the people of the Lower Valley. *Id*.

388. Hidalgo County and Cameron County grew faster than the State of Texas as a whole between 2000 and 2010. Hidalgo County grew at a rate of 36.1% compared to the State average of 20.6%. PL-298. Cameron County grew at a rate of 21.2%. PL-296.

389. In 2010, Hidalgo County had enough population for about 4.62 ideal-sized districts. Tr363 (Martin); Tr1447 (Interiano); D-200. Cameron County had enough population for about 2.42 ideal-sized districts. Tr1446 (Interiano); D-200. Plaintiff groups and certain legislators, including Democrat Trey Martinez Fischer and Republican Jose Manuel Lozano (HD43) advocated for a new Latino opportunity district in the Rio Grande Valley. TrJ1812 (Lozano). Rep. Oliveira argued on the floor on April 27, 2011 for the creation of a seventh Latino opportunity district by combining the Hidalgo and Cameron surplus. US-198 at 95-96.

390. The surplus population from Cameron and Hidalgo could have been joined to form a new Latino majority opportunity district without violating the County Line Rule and without forcing a county line break elsewhere in the map. TrJ1542-45 (Interiano); TrJ1044-45 (Downton); Tr462-63 (Flores); Plan H309; Plan H358. Joining Cameron and Hidalgo Counties would unite a community of interest and increase representation for the Rio Grande Valley. PL-456 (Garcia declaration); Tr630-31 (Garcia). However, while this does create a new Latino opportunity district in the Lower Rio Grande Valley, it does not necessarily result in the creation of an additional Latino opportunity district in the overall South Texas area. In Plan H309 and Plan H358, there are twelve HCVAP-majority districts in South Texas (HD31, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, and 80), the same as in Plan H283.

391. The Legislature failed to create a new Latino opportunity district in the Valley. Downton testified that he tried to draw a Cameron+Hidalgo district but does not remember the result. TrJ2140. Interiano testified that no one gave him a proposal that created the district without also including a split around Nueces County. Tr1429. He believed that drawing the district would create a split somewhere else in the map. Tr1448. He said he could not draw the district in a way that did not create a split further up in the map. TrA58. However, he could not identify the split allegedly caused by such a district at trial. TrJ1543 (Interiano). Interiano stated that he did not draw a new Cameron+Hidalgo district because he did not believe the Legislature needed to maximize the number of minority districts. Tr1499. Downton concluded that the district was not legally required, and testified that it was a policy decision not to draw it. TrJ2095 (Downton).

392. The Task Force Plaintiffs offer Plan H292 that creates a new district (HD32) in the lower

Valley with an 85.6% HCVAP using 2005-2009 ACS. Joint Map Ex. J-37; D-111; PL-342 (docket no. 325-4 at 21); Tr463 (Flores). In the Valley, four districts are located within Hidalgo County and the excess population of Hidalgo County is joined with Cameron County. Cameron County has two districts wholly within in it, and some of its excess population is joined with HD43. This Plan splits the surplus population of Cameron County into two different districts, HD32 and HD43. This plan maintains CD35 as a majority-HCVAP district. It also has a County Line Rule violation in Nueces County to create two HCVAP-majority districts (HD33 and HD34) in Nueces County. It has 14 HCVAP-majority districts in South Texas (31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, & 80).

393. LULAC proposes Plan H294, an eleven-district plan for South Texas that includes a district created by combining the excess population in Cameron and Hidalgo Counties. Joint Map Ex. J-39. This would plug into Plan H283. However, this plan does not create any new HCVAP-majority districts, because it would replace eleven districts that are all HCVAP majority (31, 35, 36, 37, 38, 39, 40, 41, 42, 43, and 80) in Plan H283 (though HD35 is challenged by the Plaintiffs as not being an opportunity district in Plan H283).

394. MALC also proposes a seventh district combining the Hidalgo and Cameron surplus (new HD35) in Plan H295. Plan H295 had seven districts wholly contained within Cameron and Hidalgo Counties, moving South Texas HD35 (an existing HCVAP-majority district) into the Lower Valley. This plan violates the County Line Rule in Nueces County.

395. The Rio Grande Valley has been one of the fastest growing areas from 1990 to 2010 and is an integrated economic, cultural, social, and political region. The small towns in the area represent a community of interest. Joint Expert Ex. E-8 (Flores report) at 10.

396. Latinos make up the majority of the population in the Rio Grande Valley. The shared cultural affinities and social conditions of these Latino communities have led to a high level of political cohesiveness of Latinos in the area. PL-419 (Seifert Decl.) ¶ 6. 98% of the population of Brownsville is Mexican American. TrJ542 (Seifert). About 300,000 of the 1.2 million people in the Valley reside in colonias. TrJ550 (Seifert). Some colonias, such as Cameron Park, still have unpaved roads, and the per capita income in Cameron Park is $4,100. TrJ550 (Seifert). Cameron Park and other Valley communities share socioeconomic issues, poverty, lack of good jobs, and lack of access to health services and public hospitals. TrJ550-51 (Seifert). Cameron Park has been able to get improvements through political organizing and voting. *Id*. A district that combines portions of Cameron and Hidalgo Counties reflects a community of interest. PL-419 (Seifert Decl.) ¶ 7.

397. All districts in Cameron County and Hidalgo County in Plan H283 are majority-HCVAP districts. Defendants attempted to elicit testimony from lay witness Michael Seifert that all of the districts in Plan H283 would be Latino opportunity districts, but he did not know what that term meant. TrJ559 (Seifert). Upon further questioning, Seifert did agree that "all of those districts [in Cameron and Hidalgo County in Plan H283] currently elect members to the legislature who are Hispanic" and "so that would mean that every voter who lives in Hidalgo and Cameron County would live in a district that would elect a Hispanic." TrJ559. However, this testimony is

meaningless. None of the districts in Hidalgo County and Cameron County in Plan H283 were "currently electing" any members because all of those districts were changed in the interim map. Further, as a lay witness, Seifert could only speculate about whether the districts could elect a Hispanic, especially regarding HD41.

398. Dr. Engstrom found racially polarized voting in the 52-county area he classified as South Texas, which included the Rio Grande Valley. Tr503 (Engstrom); Joint Expert Ex. E-7. He found weak support for Latino candidates among non-Latinos in these counties. The highest level of support by them for any Latino Democratic candidate in the general election was 19.1%. And none of the five Latino candidates in the Democratic primaries received as much as 40% of their votes. In his corrected rebuttal report, Joint Expert Ex. E-7 (Docket no. 307-1), Dr. Engstrom found racially polarized voting in general and primary elections in the 52-county area he classified as South Texas. He found that Latinos are cohesive in support of Latino candidates in general and Democratic primary elections. This preference was shared by non-Latinos in only one general election and no primaries. In other words, Latinos and non-Latinos shared a preference for the Latino candidate in only 1 of 17 elections studied.

399. In Hidalgo County, 39.3% of Hispanics lack a high school education. Joint Expert Ex. E-1 (Chapa Report) Table 4. In Cameron County, 43.3% of Hispanics lack a high school education. *Id.*

400. In Hidalgo County, the per capita income for Hispanics is $11,617, compared to $27,198 for non-Hispanic Anglos. Joint Expert Ex. E-1 (Chapa Report) Table 5. In Cameron County, the per capita income for Hispanics is $11,568, compared to $29,394 for non-Hispanic Anglos. *Id*.

401. In Hidalgo County, 38.1% of Hispanics live in poverty. Joint Expert Ex. E-1 (Chapa Report) Table 6. 48.65% of Latino children live in poverty, compared to 23.09% of non-Latino Anglos. Joint Expert Ex. E-9 (Gonzalez-Baker Report) Table 8. In Cameron County, 37.2% of Hispanics live in poverty. Joint Expert Ex. E-1 (Chapa Report) Table 6. 27.27% of Latino children live in poverty, compared to 3.19% of non-Latino Anglos. Joint Expert Ex. E-9 (Gonzalez-Baker Report) Table 8.

402. Using 2005-2009 ACS data, Cameron County's estimated HCVAP is approximately 78.7% and Hidalgo County's estimated HCVAP is approximately 82.6%. D-218.

403. In 2010, all Valley districts elected Latino-preferred candidates. After his re-election as a Democrat, Rep. Peña switched parties. The configuration of Hidalgo County was not member-driven. Instead, Peña and Downton worked together to draw a district that would give him the best chance at re-election as a Republican. To do this, they created the most Anglo, Republican district possible, which meant creating an almost completely new district for Peña (only 1.5% of his constituents are the same) and basically switching his district with incumbent Gonzales's district. The district was also intentionally underpopulated because any additional population would have been less likely to vote for Peña. The mapdrawers ignored Hanna's suggestion to raise the SSVR of Peña's district because it was low in comparison to the surrounding districts.

404. Downton's precinct splits included less Hispanic portions of precincts in Peña's district and excluded more Hispanic portions of the precincts. Many of the precinct splits make the district less Republican by objective measures, and thus these splits were not based on making the district more Republican by objective measures. Several of the precinct splits are consistent with an improper use of race.

405. Despite support from both Republican and Democrat legislators from South Texas, the Legislature did not create a new Latino opportunity district in the lower Valley by combining the excess population of Hidalgo County with the excess population of Cameron County. However, no plan was presented to the mapdrawers that created this district as an additional Latino-majority district that did not also have a County Line Rule violation.

### Harris County

406. In 2000, Harris County had 24.4625 districts based on ideal population. D-212.

407. The Texas House passed a plan in 2001 that had 24 seats in Harris County by a vote of 76 to 71. D-49 (House J. Supp. May 7, 2001) at 11; D-127. Democrat members, including Reps. Coleman, Farrar, Hochberg, Martinez Fischer, Thompson, and Turner, generally voted for the map with 24 Harris County seats. TrJ1327-28 (Coleman); TrJ1665 (Hochberg); D-49 at 11.

408. However, because the Legislature failed to pass a map in 2001, the LRB drew the map that was eventually put into place. The LRB rounded up, and placed 25 districts in Harris County. TrJ1667 (Hochberg); TrJ1278 (Thompson). Rep. Hochberg questioned it at the time, but he was told by an attorney that there was no court precedent on which direction it had to go, so it was not challengeable. TrJ1666-67 (Hochberg). Rep. Coleman testified that he supported the LRB's change to 25. TrJ1328 (Coleman).

409. Hochberg had been elected in HD132, but in the 2001 LRB map he was placed in HD134, so he moved to HD137. TrJ1644-45 (Hochberg). Hochberg felt the 2001 redistricting targeted leading/active Democrats. TrJ1647 (Hochberg). Hispanics in the district that became the new HD137, especially those living in apartments, had not had good turnout, but their turnout improved with voter outreach efforts. TrJ1646-47 (Hochberg).

410. At the Houston field hearing on November 20, 2010, Rogene Calvert of the Texas Asian American Redistricting Initiative ("TAARI") testified about the Asian population in Houston/Harris County and Fort Bend County, which borders Harris County to the southwest. D-117; US-461 at 3. Calvert asked that the Asian community be kept together. US-461 at 3. In Harris County, the Asian population is located primarily in the southwest, including Alief and Sharpstown. Tr419 (Calvert); US-322A; Tr1363-64 (Vo). In the benchmark plan, the Alief area was in four districts—HD149, HD133, HD131, and HD137. TrJ1377-78 (Vo). The most concentrated Asian census blocks were together in HD149, though there were also some concentrated Asian populations, Vietnamese and Chinese, in HD137. TrJ1364-65 (Vo); US-322A. Calvert testified at trial that,

although they are too small in total numbers to control elections, the Asian community has been able to form coalitions with other minorities in the area such that the Asian population can elect candidates of their choice. Tr420. Calvert wanted the Legislature to consider that the Asian-American community in that area was very concentrated and had demonstrated its political strength through the election of candidates of their choice, and they did not want to be divided or diluted in redistricting. Tr421 (Calvert).

411. In Harris County, the minority population (including Hispanic, African-American, and Asian) grew between 2000 and 2010, while the Anglo population declined. TrJ1437 (Korbel); Joint-Expert Ex. E-5 (Martin Report) at 5. The Harris County Hispanic population increased by almost 552,000. The African-American population increased by over 134,000, and the Asian population increased by 76,827. Joint Expert Ex. E-5 (Martin Report) at 5; Joint Expert Ex. E-2 (Kousser Report) at 89. The Anglo population decreased by 82,000 or more. Tr338 (Martin). All of the growth in Harris County was due to the increase in minority population. *Id.* The HCVAP in 2000 was 19.04%. D-230. According to the 2005-2009 ACS data, it was 22.53%, and according to the 2008-2012 ACS data, it was 25.36%. D-218; D-231.

412. In 2010, the Anglo population share of Harris County was 33%. Tr338 (Martin). Harris County was 40.8% Latino, 18.9% African-American, and had a fairly significant Asian population. *Id.*

413. At the start of 2011 redistricting, there were 25 districts in Harris County; 13 were Republican and 12 were Democrat. TrJ1265 (Thompson).

414. One of the first decisions that had to be made for Harris County was how many seats to apportion to it. Tr1567 (Solomons). It was undecided at the beginning of the process whether to have 24 or 25 districts. Tr930 (Downton); Downton 8-31-11 depo. (Joint Ex. J-62) at 108. Based on ideal population size and census data, Harris County had 24.4126 districts. D-214; D-221; D-124_13; PL-226. With either 24 or 25 districts, Harris County districts would be within the permissible deviation range from the ideal population size. D-214; TrJ1326 (Coleman). Staff and leadership had various conversations about the issue. Downton 8-31-11 depo. (Joint Ex. J-62) at 108. Downton's opinion from the beginning was that it should have 24. Downton and TLC made that recommendation, and Downton believes there were other attorneys who made it as well. Tr931 (Downton). But Downton tried to draw it both ways, and he asked the delegation to draw it both ways. Downton 8-31-11 depo. (Joint Ex. J-62) at 108.

415. Plaintiffs claim that past practice supported rounding up to 25. *E.g.*, TrJ1326 (Coleman). LULAC-13 shows historically the number of House seats assigned to Harris County and ideal population. It shows that in 1980, 25.40 was rounded up to 26 (it does not specify who made the decision; it only states "3 changes 2 by legislature and 1 by Federal Court"). LULAC-13; Alvarado Decl. (docket no. 331) at 4. It appears that the plan was enacted by the three-judge court in *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982), based on an LRB plan modified to remedy DOJ objections. It was then adopted by the 68th Legislature in 1983.

416. LULAC-13 also shows that after the 1990 census, 24.89 was rounded up to 25 (again it does not specify who made the decision; it only states "changes by Court and Legislature"). LULAC-13; Alvarado Decl. (docket no. 331) at 4. This plan was enacted by the Legislature and then modified by the three-judge court in *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1991).

417. As noted, in 2001, 24.46 was rounded down to 24 by the House, but the LRB rounded up to 25 in its plan.

418. Korbel testified that, from 1980 to 2000, Harris County has been "redistricted in one way or another" fifteen times, and in eight of those fifteen times, the excess population above a whole number of districts was less than .5, but it was always rounded up. Tr702. Korbel said that the policies utilized by the State up until 2011 would have resulted in 25 seats. Joint Expert Ex-11 at 2. He stated that, contrary to the State's assertion, there is no rule regarding rounding. Tr756.

419. Dr. Murray testified that it made sense, as in previous redistricting cycles, to round up partly to compensate for the acknowledged undercount and the imprecision of the census count. Tr892. This is especially true given the large population of Hispanics and Asians in Harris County, which are most likely to be undercounted. Tr892; V. Gonzales depo. at 33-34, 40. He noted that Harris County grew at almost the exact same rate of growth (20.4% ) as the State (20.6%). Joint Expert Ex. E-4 (Murray Report) at 26.

420. The benchmark plan had six African-American districts. Tr352 (Martin). These included HD131 (47.7% BVAP) (Allen); HD139 (47.2% BVAP) (Turner); HD141 (42.8% BVAP) (Thompson); HD142 (42.7% BVAP) (Dutton); HD146 (47.1% BVAP) (Miles); and HD147 (39.2% BVAP) (Coleman). All of these districts were represented by African-American Democrats. All of these districts were majority-BCVAP districts using 2005-2009 ACS data. HD131 was 58.7% BCVAP; HD139 was 61% BCVAP; HD141 was 54.1% BCVAP; HD142 was 54.5% BCVAP; HD146 was 53.9% BCVAP; and HD147 was 50.8% BCVAP.

421. The benchmark plan had three performing HCVAP (using 2005-2009 ACS data) and SSVR-majority districts: HD140 (66.1% HCVAP; 57.9% total SSVR) (Walle); HD143 (64.7% HCVAP; 64.8% total SSVR) (Hernandez-Luna); and HD145 (68.9% HCVAP; 65.2% SSVR) (Alvarado). These districts were represented by Hispanic Democrats.

422. In addition, HD148 was less than 50% HCVAP/SSVR (42.1% HCVAP using 2005-2009 ACS data; 39.4% total SSVR) but performed for Latinos. Tr80 (Martinez Fischer); Tr1039-40 (Murray); Joint Expert Ex-5 (Martin Report) at 6. HD148 had elected Jessica Farrar, a Hispanic Democrat, every election since 1994, and thus the Latino candidate of choice was successfully elected in both primary and general elections in the district. Farrar Decl. (docket no. 331) at 3. HD148 was an effective Latino district based in the traditional North Side and Heights neighborhoods. Joint Expert Ex-5 (Martin Report) at 6; Farrar depo. at 37. Mapdrawers and Hanna were aware that HD148 was a performing Hispanic district even though it was not a majority-HCVAP/SSVR district. TrJ2049 (Downton); TrJ1215-16 (Hanna); D-122 at 5; Farrar depo. at 40-41.

423. Similarly, benchmark HD137 was not a majority-HCVAP district but it performed for Latinos and minorities. Tr352 (Martin). It had a high Hispanic population—63.8% Hispanic population and 59.8% HVAP. TrJ1642 (Hochberg). It was a diverse district, with 35.5% Anglo CVAP, 26.4% BCVAP, 25.6% HCVAP, and 11.6% Asian CVAP based on 2005-2009 ACS data. D-100 at 32; TrJ1354 (Vo); TrJ1642 (Hochberg). The combined minority CVAP in HD137 was 64.5%. TrJ1643 (Hochberg). Despite the high Hispanic population, it had only 22% total SSVR.

424. HD137 had elected Scott Hochberg, an Anglo Democrat, since 2002. TrJ1641 (Hochberg). Hochberg testified that minority voters controlled the outcome of elections in the district. TrJ1642. Hochberg analyzed election results, and they consistently showed that he would not have won without the support of minority voters. *Id.* Sarah Winkler also provided lay testimony that the minority coalition in Alief is able to elect candidates of choice to the Texas House in HD137. Tr426. The State described HD137 as a fifth Latino opportunity district in its 2001 preclearance submission. Joint Expert Ex-5 (Martin Report) at 6; Tr352 (Martin); TrJ1643 (Hochberg) (Texas had indicated that HD137 provided Latino opportunity when justifying the district for preclearance after the 2001 redistricting cycle).

425. The benchmark plan also had a second effective minority coalition district, HD149. Tr352 (Martin); TrJ135-36 (Arrington); Tr827 (Turner). Benchmark HD149 was very diverse, with 37.6% Anglo CVAP, 26.1% BCVAP, 19% HCVAP, and 16.2% Asian/Other CVAP. D-100 at 32; TrJ1342-43, TrJ1346 (Vo); Tr350 (Martin). HD149 had a strong influence from Asian Americans. TrJ1648 (Hochberg); TrJ1342-46 (Vo). No particular ethnic group controlled the district; it was a multi-ethnic coalition. TrJ1648 (Hochberg); Tr350 (Martin). In the benchmark plan, HD149 was located in southwestern Harris County and included the Alief community, which has a large Asian population. Tr1342-43 (Vo). As noted, the largest concentrated area of predominantly Asian census blocks were together in HD149. TrJ1364-65 (Vo); US-322A; D-201; D-264; D-332.

426. The multi-ethnic coalition of minority voters (Asian, African-American, and Latino) in HD149 supported Hubert Vo, the first Vietnamese American in the Texas House, and successfully elected him in 2004, 2006, 2008, and 2010. Tr349-50 (Martin); TrJ1647-48 (Hochberg); Tr891 (Murray); Tr426 (Winkler). Sarah Winkler provided lay testimony that the minority coalition in Alief is able to elect candidates of choice to the Texas House in HD149. Tr426. Vo defeated incumbent Anglo Republican Talmadge Heflin in 2004 by only 32 votes. US-366 at 91 (Red-225 report); TrJ1343 (Vo). In 2006, Vo again defeated Heflin, but by almost 2000 votes. US-368 at 184 (Red-225 report). Vo again defeated Republican and Tea Party challengers in 2008 (by approximately 5,700 votes) and 2010 (by approximately 1,300 votes). Tr891 (Murray).

427. The coalition has supported and elected other local candidates (council members and school board members) as well. TrJ1348-49 (Vo); Joint Expert Ex-5 (Martin report). The minority communities work together to elect the candidate of choice. TrJ1346, TrJ1348 (Vo). The group votes for the issues of the district and the candidates who support their issues, and they collectively vote for the candidate of their choice. TrJ1348. Winkler testified that electing candidates of choice is not really based on political affiliation but more on common interests and because of Vo himself.

Tr429. Vo was very involved with his constituent community and was supported by the Alief Super Neighborhood. TrJ1342-43 (Vo). Most Asians have voted for Vo over the years. TrJ1349.

428. On February 17, 2011, Hanna emailed Denise Davis with the subject "redist issues." D-192; US-102; Quesada-242. Regarding Harris County, he wrote, "Houston- Like last time Houston comes out to 24.41 seats. Many will want to round up again as LRB did but this caused legal issues w. county line rule. Politically popular w. Harris County but legally more risky. Should do 24 but this will mean the loss of another R seat since all D seats are minority. (Hochberg has Hispanic seat)." At trial, Hanna said he made an initial, cursory review and that he made a mistake on the Hochberg seat (HD137) being a minority seat because it had an HVAP in the 60s (59.8% HVAP; 63.8% total Hispanic population). He testified that later he determined that the SSVR was in the 20s (22%), and he was not aware of a theory where that would be a protected seat, so his assessment changed. TrJ1185.

429. On February 18, Denise Davis forwarded Hanna's email to Interiano. D-132. Interiano responded to Davis stating, "Dave [Hanna] and I went through all of this yesterday afternoon and through some of the first things that we need to look at as soon as RedAppl is up and running. I also visited with Wayne Smith and Solomons and mentioned the issue about Houston and immediately both of them leaned towards keeping Harris County at 25 seats." *Id.*

430. Rep. Wayne Smith and/or his staff started working on Harris County plans in RedAppl around February 22. US-441. Smith's RedAppl plan log contains both 24-district and 25-district plans. *Id.*

431. On February 24, Solomons made a statement from the House front microphone that there would be 25 districts in Harris County. TrJ1295, TrJ1324 (Coleman); TrJ1652 (Hochberg); TrJ1931 (Bruce). Bruce said this caused the staff "a small panic attack" because that issue had not yet been decided, so they alerted Solomons to this fact when he came off the floor, and he told them to clarify it. TrJ1931. Solomons' office sent out a memo to members that same day clarifying that the decision about how many districts would be in the drop-in counties had not necessarily been decided. *Id.*; D-72. The memo stated, "The numbers I provided on the House floor relating to the number of districts that will be wholly contained within the larger urban counties represent a preliminary calculation of the number of ideal districts each county could receive. Only after the committee takes testimony will we be able to consider the actual number of districts that each county receives. The members will have to determine this number based on legal standards governing one-person, one-vote and the Voting Rights Act, the requirements of the Texas Constitution, as well as the policy choices of the members. If you need any guidance on the criteria that a district must meet under state and federal law, as well as preclearance I would encourage you to ask either the redistricting staff or if you need to ask confidential questions please contact the redistricting attorneys in the Texas Legislative Council." D-72.

432. On March 7, Interiano emailed Hanna with the subject "Harris County." D-135; US-157. He asked if Hanna could meet with the Harris County GOP delegation on March 9, but he wanted to talk beforehand "to make sure that we are on the same page." D-135. Regarding the number of districts

that Harris County would get in the House plan, Hanna wrote, "Arguments for 25: We've rounded up before. It fits within the 10% overall deviation. Harris County has a lot [of] votes in the legislature. You have to bring this claim in state court. Arguments for 24: 'As nearly as may be' means something, and one number only – not a range of numbers. Very safe from state lawsuit – putting the wrong number in Harris County is a catastrophic error if you guess wrong and requires all of Harris County and most of the rural parts of your map to be redrawn." *Id.* At trial, Hanna explained that the risks were "fairly small on the substance," but if you were required to redraw from 25 to 24, it would require redrawing in Harris County and elsewhere in the state where the other new seat was awarded. TrJ1202.

433. Because Harris County was a drop-in county, members of the Harris County delegation were told to work together on a delegation plan. Alvarado decl. ¶ 6. Early in the process, Rep. Senfronia Thompson (African American, Democrat) and Rep. Wayne Smith (Anglo, Republican) worked together and with the delegation members to try to draw a 25-district plan. TrJ1266 (Thompson); TrJ1351 (Vo). Smith took the lead on working with Republican members and Thompson took the lead on working with Democrat members, and they tried to reach a consensus. TrJ1295 (Coleman); TrJ1241 (Thompson). Thompson testified that they started in mid-March to the beginning of April.[10] TrJ1266. She reached out to Democrats to see if they could get a consensus and avoid the LRB and legal challenges. TrJ1266-67 (Thompson). Vo worked with surrounding members Murphy (HD133), Allen (HD131), Hochberg (HD137), and Miles (HD146). TrJ1350 (Vo); TrJ1652-53 (Hochberg).

434. Some Republicans (Jim Murphy and Dwayne Bohac) approached Rep. Woolley and asked if she knew that Smith was drawing maps. Woolley went to Speaker Straus, who confirmed that Smith had said he was drawing county maps, but that Straus had not put him in charge. Woolley hired Mike Hull (an attorney who worked for Associated Republicans and Texans for Lawsuit Reform) and Scott Sims to help draw a map. Woolley depo. at 12-13, 17. She thought all Republicans should be working together, and that the Republicans knew more about the west side than Smith did. Woolley depo. at 13-14. Led by Rep. Woolley, the Harris County Republican delegation independently worked with Mike Hull to draw their proposed map. TrJ1490, TrJ1577 (Interiano).

435. Around March 30, Smith sent Interiano a 25-member map of Harris County. D-313 (strjH212). The delegation did not reach consensus on Smith's map, although it was informally approved by a majority of the delegation. TrJ1268 (Thompson); Alvarado decl. (docket no. 331) at ¶ 7. The Smith/Thompson map was not introduced in the session. TrJ1268 (Thompson).

_____

[10] In Rep. Wayne Smith's RedAppl plan log, there is a plan dated 3/3/2011 with comments "started on 3/2/2011" and "Plan #17 with adjustments to 134 and 136 to make Woolley's district more Anglo." It also says 149/137 (24 members) SKK. US-441 at 5. Only an authorized user in Smith's account or the person who sent the plan to that account could have put that in the comments. This same comment is in the smlw plan account for plan H121 called "Redistricting Plan Bohac". US-441 at 6. There is also a plan with comments "Plan #18 with adjustments to keep vo/hochburg more hispanic" dated 3/4/2011. US-441 at 6. Given Rep. Thompson's testimony, it appears that Rep. Smith was not yet working with her on a delegation map at this time. In addition, Smith's map did not get adopted, and the evidence indicates that Smith's maps were not incorporated into the adopted plan. However, this is evidence that Harris County mapdrawers were focusing on race in drafting plans.

436. The thirteen Republican members of the Harris County delegation all signed off on a 24-district map, woolH111. D-234. This plan was dated March 31 and was provided to Downton/the HRC, and Solomons on March 31. D-234; PL-538; PL-1613. The Woolley map was drawn only by the Republican members of the delegation. Downton incorporated the Woolley 24-district plan into his full state map on April 1. PL-538; Downton 8-31-11 depo. at 108; Tr931 (Downton).[11]

437. The Houston Republican delegation made the decision to pair Hochberg and Vo and eliminate HD149. Tr1482 (Interiano). The Republican delegation plan eliminated HD149, the multiethnic district in southwest Harris County, which was the part of the County that had experienced a lot of growth, but kept all four Anglo/Republican districts in East Harris County (HD127, HD128, HD129, HD144), which had experienced slower growth, despite the fact that all the growth in Harris County was attributable to minorities. Tr347-50 (Martin); Tr428 (Winkler); Tr809-10 (Turner); Tr892 (Murray). This pushed the other districts farther west in Harris County, with adverse impact on Latinos, African-Americans, and Asians, and eliminated HD149. Tr809-10; Tr892-93.

438. Solomons made the decision to go with 24 districts. TrJ1012, Tr1567 (Solomons). He based this decision on the County Line Rule and the "as nearly as may be" language in the Texas Constitution. TrJ1012, Tr1567-68. (Solomons). Solomons felt that giving Harris County 25 seats would be giving them an extra representative, and the rest of the State would not be properly represented. TrJ1568 (Solomons). Bruce said they discussed it with each other and with TLC and did some research and looked at legislative history. The Speaker's office also discussed it with their litigation team. Then Solomons made the decision to go with 24 districts. TrJ1933 (Bruce). But Solomons had no role in deciding who would be paired; he left that and the map in general to the delegation. Tr1576, Tr1615-16 (Solomons).

439. Several representatives felt that the decision to go with 24 or 25 was not mandated by the Texas Constitution, but was a political question given past practice. Farrar depo. at 75; Smith depo. at 24-25. Hochberg did not think there was a need to go to 24 because the population of Harris County relative to that of the state changed very slightly. TrJ1653 (Hochberg). Martin also felt it was a policy choice to create only 24 districts. Joint Expert Ex-5 (Martin Report) at 5. Murray testified that the decision to go to 24 districts was "fishy" given what happened in 2001. Tr892. He opined that a 25-district map would have almost certainly resulted in a district in which Hispanic and Black voters would have had an opportunity to elect a candidate of their choice in the 2012 election. Joint Expert Ex. E-4 (Murray Report) at 27. Korbel also felt the decision was not justified by past practice and made it more difficult to draw an additional minority opportunity district in Harris County. Tr756-57.

440. Sometime around April 5 or 6, Coleman and others learned about the 24-district Woolley map drawn only by Republicans. TrJ1296-97, TrJ1299 (Coleman); TrJ1653 (Hochberg); TrJ1983-84

---

[11] It appears from the plan logs that Woolley and the Republican delegation continued working on a 25-district plan as well. *E.g.*, US-432; US-441; PL-706.

(Bruce).

441. Coleman testified that Woolley "inserted herself" and "took over" without discussion with the other members, and there was no formal designation for her to take responsibility. TrJ1298 (Coleman). Those working on the Woolley map did not discuss it with Coleman or other minority members of the delegation. TrJ1298-99 (Coleman). Coleman was angry because the process was supposed to include all members in a particular delegation, and there was a discussion about it being an incumbent protection plan, but the Woolley map was not an incumbent protection map, nor did any of the minority members or any other members that were not Republicans have any comment on that map before it was given to Solomons. TrJ1299 (Coleman). Coleman had concerns about the proposal because it went to 24 districts and paired Hochberg and Vo. TrJ1299 (Coleman). Coleman felt that Vo and Hochberg represented districts that allowed minority voters an opportunity to elect their candidates of choice, and elimination of either district would reduce the number of districts of color protected under the VRA by one district. TrJ1300 (Coleman). On April 7, Coleman sent a memo to Woolley, Smith, Thompson, and copied Solomons and the other members of the Harris County delegation about the Harris County map expressing his concerns. US-266. No one responded directly to this letter. TrJ1302 (Coleman).

442. Hanna's first retrogression memo, written April 7, had concerns about Harris County. Hanna wrote,

> (11) While most of the performing Black districts in Harris County do not appear to have retrogression issues, the decline in District 147 in the proposed plan may be a problem. While three of the other Black districts (139, 141, 142) see increases in their Black populations over their current levels, the Black district with the lowest percentage of Black population (147) sees a decrease. This would appear to be a potential retrogression issue. The solution would be to increase the Black percentage in District 147 so that it does not decline from current levels.

> (12) Of the four performing Hispanic districts in Harris County, three appear to be in pretty good shape in the proposed plan. Only District 148 is dropping in its level of SSVR [from 39.4% to 34.2%]. Unfortunately this district is the lowest in SSVR already so there is a possible retrogression issue with District 148. Given that there is a sizable cushion in adjacent District 145 over 50% SSVR, it should be possible to restore District 148 to its current level of SSVR.

> (13) This multiethnic district in Harris County [HD149] is eliminated. The "other" population is primarily Asian but represents different ethnic groups. If it can be determined that the district was a true minority coalition district, there could be a retrogression issue in its elimination but this would be a novel retrogression theory to apply where no single racial or ethnic group has more than a quarter of the VAP of the district.

Hanna testified at trial that he did not think HD149 was a protected district. TrJ1158. Interiano

thought it was legal to pair Vo and Hochberg because it was simply a Democrat pairing and the districts were not protected. Tr1482. Because no single minority group was over 50% of the population or over 25% of the voting age population in HD149, mapdrawers felt it was legal to dismantle HD149 even though it was electing a minority member. Tr1009, TrJ2015, TrJ2142-43 (Downton); TrJ1194 (Hanna). Hanna never performed election analyses to determine cohesiveness of the ethnic groups in that area. TrJ1194.

443. The Republican delegation had not paid very much attention to the Democratic districts, as far as VRA compliance. Tr931-32 (Downton). Downton made some "tweaks" to the Republican delegation map; he modified it to try to match benchmark numbers for the minority opportunity districts. He did not recall tweaking it to try to enhance Republican numbers. Downton 8-31-11 depo. (Joint Ex. J-62) at 99-100. Downton looked at the numbers, essentially the SSVR and the BVAP, and compared them to the baseline plan, and tried to keep the numbers about the same. Tr932 (Downton). The goal was to make sure the numbers did not decrease. *Id.*

444. In Hanna's second retrogression memo, Hanna no longer had concerns about HD147 and felt the performing African-American districts did not appear to have retrogression concerns, though he said that election analysis should be performed on HD131 and HD146 to ensure the slight BVAP declines did not affect ability to elect. He further noted that, of the four performing Hispanic districts, only HD148 was dropping in SSVR (total SSVR dropped from 39.4% to 38.6%, which was higher than in the plan Hanna previously reviewed) and there was "a minor possible retrogression issue with District 148." He again stated, "Given that there is a sizable cushion in adjacent District 145 over 50%, it should be possible to restore District 148 to its current level of SSVR." He added, "Consideration should also be given as to whether a fifth majority Hispanic district could be drawn in Harris County and whether such a district would be required by Section 2 of the Voting Rights Act." D-327. With regard to HD137, he noted that one might assume that it was an effective Hispanic district given its total Hispanic population of 63.8% and HVAP of 59.8%, but explained that the high number of non-citizens in the district gave it an SSVR in the low 20s and "as such this is not currently a performing Hispanic district." D-327. He further wrote, "In any event the SSVR increases so there is little possibility of retrogression with this district." D-327. Hanna did not find potential retrogression issues regarding HD137 because the proposed district had a higher SSVR than the benchmark. TrJ1193 (Hanna). With regard to HD149, he again noted that "there could be a retrogression issue in its elimination but this would be a novel retrogression theory to apply where no single racial or ethnic group has more than a quarter of the VAP of the district." D-327.

445. Woolley's plan with Downton's changes was the first version of Harris County in Plan H113, released April 13. Tr931-32 (Downton); Tr1430, Tr1474, TrJ1609 (Interiano); TrJ1303 (Coleman). Other than the 25-district plan from Smith, Interiano does not remember getting a proposed map from the whole Harris County delegation, the Harris County democrats, or any member. TrJ1609, TrJ1611 (Interiano). In Plan H113, HD148 had a total SSVR of 38.6% and non-suspense SSVR of 39.4% and thus was not further increased in response to Hanna's second memo. HD149 was eliminated and moved to the Austin area. TrJ1352 (Vo).

446.  The initial configuration of southwest Harris County in Plan H113 remained substantially unchanged in Plan H283.  Before redistricting, Hochberg's district HD137 did not go west of the Beltway.  TrJ1658 (Hochberg).  HD137 is elongated and extended westward into the current HD149, and incumbents Vo and Hochberg are paired.  The concentrated Asian area that was formerly in HD149 is split, with most of it being placed in HD133 (an Anglo-controlled district) and the rest in HD137; the remaining minority population of benchmark HD149 is placed in HD131, represented by Allen (African American, Democrat).  D-333; Tr351 (Martin).  Adding the population from HD149 to HD137 makes HD137 less Hispanic (Hispanic VAP decreased by 4.4% from 59.8% to 55.5%).  Tr352 (Martin).  A substantial Asian-American community was removed from HD137 and placed in a predominantly African-American district, HD146.  TrJ1658 (Hochberg).

447.  Hochberg was more senior than Vo and was significantly more active and vocal in the opposition party than Vo, and Hochberg believed that past partisan practice was to target more senior members of the opposition party.  TrJ1659, TrJ1661, TrJ1667 (Hochberg); TrJ1352-53 (Vo). However, rather than targeting Hochberg, the perception among members was that the redistricting favored Hochberg, who was Anglo, over Vo because minority population was reduced in the new HD137. TrJ1302 (Coleman); TrJ1660 (Hochberg); Hochberg Decl. (docket no. 331) at 3; Alvarado Decl. (docket no. 331) at 5. Hochberg was assured by his Anglo Republican colleagues that HD137 was drawn to give him a district in which he could win re-election and that he would be back. Hochberg Decl. (docket no. 331) at 4; TrJ1660 (Hochberg).  This included Wayne Smith, Dan Huberty, and Ron Eissler. TrJ1675 (Hochberg).  A large portion of the new district was area that Hochberg had represented for ten years, and substantial Asian-American population that would have at least been perceived as friendly to Vo was removed. TrJ1660.  Hochberg testified that the configuration of HD137 could not be justified on partisan grounds unless they were trying to create a solidly Democratic district. TrJ1661.

448.  In Plan H283, the Alief community would have a tougher time supporting Vo and would not be able to elect its candidate of choice.  TrJ1370 (Vo).  Similarly, Vo would have a harder time being successfully re-elected because most of the district was new for him.  TrJ1354-55 (Vo).  Although both benchmark HD137 and HD149 were diverse and included Asian population, HD149 had more Asians (mostly Vietnamese) than HD137.  TrJ1354 (Vo).  When HD137 and HD149 were paired and HD149 eliminated, the new HD137 more closely resembled HD137 than HD149. TrJ1354. Vo believes he was targeted because what is left of HD149 is just a little section and he lost a lot of Asian population to other districts. TrJ1362 (Vo).

449.  The Legislature did not pair Rep. Button (Republican), another Asian incumbent, in Dallas. TrJ1680 (Hochberg).

450.  After seeing the map, Vo went to Solomons to ask why the map was drawn the way it was drawn.  TrJ1355 (Vo).  Solomons said to give his concerns to the committee staff.  TrJ1356 (Vo). Vo submitted some changes to the new HD137 but did not hear back.  Vo talked to Solomons and Straus, noting the inconsistency of rounding down to 24 districts.  He talked to Harris County members of the HRC to try to get them to understand that the new HD137 would be hard for him

to run in. TrJ1356 (Vo). Vo stated that there was little time to organize and prepare for the hearings on Plan H113, though some members of the Asian community were able to testify. TrJ1357.

451. At the April 15 HRC hearing, Rogene Calvert testified against Plan H113 and the pairing of HD137 and HD149 in Harris County. D-595 at 181. She said Alief ISD was split among five districts and the Asian vote was diluted. *Id*. at 182. She testified that there was voter cohesion among the different minority groups in HD149. *Id.* at 185. David Nguyen also testified against the potential loss of Vo and to cohesion among all the minority groups. *Id*. at 190-92. Lilly Truong also testified against the proposed plan as it related to HD149, saying that it was important to the Asian community to continue to be able to elect Vo. *Id*. at 195-96. John Truong testified similarly, adding that the Asian vote would be divided up. *Id*. at 196. Barbara Quatro of Alief testified that they had hoped Alief would be represented by one district but instead it was now divided among four. *Id*. at 198. Lupe Martinez from Alief testified against dividing Alief. *Id*. at 199. Toi Phon also testified against the splitting of Alief. *Id*. at 200. Fred Bandera testified that they were bringing many minority groups together in HD149, and Vo had been helpful. He asked that Alief be kept together. *Id*. at 202. Nicole Trals also testified on behalf of Vo and keeping Alief and HD149 intact. *Id*. at 211-12.

452. In testifying against Plan H113 and in favor of the MALDEF Plan H115, Luis Figueroa of MALDEF complained about the loss of Latino opportunity district HD33 in Nueces County and stated, "we can draw Section 2 compliant districts in West Texas, in the Valley, and increase populations in Houston [in] Representative Farrar's district [HD148] and in Lon Burnam's district [HD90 in Tarrant County] to create a clear Latino CVAP majority district." D-595 at 34. Figueroa stated, "[I]n HD148, which is currently represented by Representative Farrar, [SSVR] is also reduced whereas we are able to even out the population to increase Representative Farrar to make it a Latino majority district." D-595. In Plan H115, HD148 had 51.6% total SSVR, 52.6% non-suspense SSVR, and 55.4% HCVAP using 2005-2009 ACS data. Rep. Farrar, who represented HD148, disagreed with Figueroa's suggestion to increase the SSVR in her district because it already performed for Latinos. Farrar depo. at 40-41, 98.

453. At the April 17 HRC hearing, Hochberg testified in opposition to Plan H113. He disagreed with the decision to round Harris County down to 24 districts, noting that it was almost the same as in the previous census, when it was rounded up. He also stated that it had been rounded up for 40 years, which kept it closer to one-person, one-vote requirements throughout the decade due to its fast growth. He noted that the LRB in 2000 said it could be either 24 or 25, and it chose 25. He asserted that if there were in fact a rule to round down, then it had been violated in the past. He noted that the LRB also described HD137 as a minority district in its DOJ preclearance submission, when its HVAP was 50.6%.[12] He said it was inconsistent to claim it as a minority district in 2000 for

_____

[12] The DOJ objection letter to the LRB's House plan stated that the State initially asserted in its preclearance submission that HD137 was a minority district that could offset the loss of a district, but also noted that "in the supplemental materials" provided by the State, "the State notified us that if any district should be considered as the replacement, District 80 in South Texas - not District 137 - should be the one which offsets the loss of a majority

preclearance but deny it minority status in 2011, when its HVAP had increased to 59.8%. He also noted that the map split the Sharpstown community of interest, and he submitted letters in opposition. Hochberg testified before the committee about specific precincts that should be moved, but he did not offer any amendments because there was a limited amount of time. TrJ1668 (Hochberg). The only amendment he could have offered that would have fixed Harris County would bring a district back or substantially change Harris County, and he knew that would not be successful. TrJ1669 (Hochberg).

454. In Plan H113, HD148 was 38.6% total SSVR and 39.4% non-suspense SSVR, which was down slightly from the benchmark of 39.4% total and 40% non-suspense SSVR. Mapdrawers Downton and Interiano testified that they increased the SSVR in HD148 in Plan H153 to 49% total SSVR/50.2% non-suspense SSVR[13] (and 51.6% HCVAP) in order to respond to claims that the map reduced the number of SSVR-majority districts from benchmark and to offset the loss of SSVR-majority district HD33 in Nueces County. Tr932-33, TrJ2049, TrJ2141 (Downton); Tr1431 (Interiano).

455. Between Plan H113 and Plan H153, mapdrawers manipulated the population of numerous Harris County minority districts (HD148, HD139, HD141, HD142, HD143, and HD145) to increase the SSVR in HD148, but they did not alter the Anglo districts. They elongated HD148 to the southeast and shed its most northwest population into HD139 for the purpose of increasing its SSVR. Latino population was taken from HD143. HD145 (Alvarado), which was also a Latino district, was elongated to the northwest to take population from HD143 and HD148. Downton did not know if population included in the southern part now joined into HD148 shared community interests with the population included in the northern part of the district. Downton 8-31-11 depo. (Joint Ex. J-62) at 103. Similarly, all he knew about the community joined at the ends of HD145 was that they were all in Harris County and they were all "along the highway" (although they are not all, in fact, along the highway). *Id*. at 102. The Heights neighborhood was no longer completely in HD148, and the district was disjointed. Farrar depo. at 63-64. In addition, the mapdrawers were not concerned with whether the increase in SSVR actually improved Hispanic effectiveness in HD148. Downton agreed that the increase in SSVR did not enhance the ability of minority voters in the district to elect their candidate of choice. TrJ2050 (Downton). However, Downton testified that new Hispanic voters added into HD148 now had an opportunity to elect (though voters being moved from an existing Latino-opportunity district already had that). TrJ2150 (Downton). In addition, election returns do not indicate that increasing the SSVR actually made HD148 more effective for Latinos. Joint Expert Ex-5 (Martin Report) at 6.

456. On April 19, Plan H153 was voted out of the HRC. When the HRC adopted its committee substitute and voted to send it to the full House, it did not make changes in response to the concerns

---

Hispanic district in Bexar County." D-326; PL-225.

[13] Although total SSVR was available to mapdrawers through reports, RedAppl displayed only non-suspense SSVR such that mapdrawers only increased the non-suspense SSVR above 50%.

raised by Coleman and the other minority members of the delegation. TrJ1305 (Coleman).

457. Sometime between April 19 and April 26, there had been a discussion among members about whether the process had been fair, and some of the Harris County delegation had a meeting about how the map came about. TrJ1303-04 (Coleman). Coleman asked for the meeting. TrJ1304. Reps. Woolley, Callegari, Bohac, Alvarado, and Farrar also attended the meeting. *Id.* It was contentious. Coleman asked Woolley why she had done a separate Republican map, saying it was a violation of the process and was not in good faith in terms of the process they were supposed to follow. During the discussion, in the context of the issue of whether to have 25 or 24 districts, Woolley responded that "you all's districts are protected. Ours aren't." *Id.* Coleman testified that Woolley stated that 24 districts made their districts "stretch further in terms of the limited number of Anglo votes that there were." TrJ1304-05. Coleman felt it was very clear that she was talking about ethnicity and the VRA and how that applied to the districts in Harris County. TrJ1305. Coleman felt she was talking about racial minorities because only they would be protected under the VRA. TrJ1330. He stated to others at the meeting that the Hochberg/Vo pairing violated the VRA. TrJ1305.

458. In an April 22 email, Stacy Napier of the OAG sent racially polarized voting summaries for some of the proposed districts, including HD137, to Bruce. US-190/190A; PL-1616. The attachment contained a spreadsheet consisting of ten elections for various districts. US-190/190A; TrJ1019 (Solomons). The spreadsheet contained a column identifying the minority preferred candidate. US-190A; TrJ1020 (Solomons). It provided an analysis of Plan H153 (committee substitute bill). US-190A; TrJ1022 (Solomons). Napier wrote, "Given the low turnout and Hispanic citizenship in districts 137 and 144, we didn't feel comfortable identifying a candidate of choice from the regressions, but 137 seems to have been strengthened for minority candidates whereas 144 appears to have been weakened." Bruce forwarded the email with the attachments to Downton, Interiano, and Solomons that same day. Interiano responded to Bruce and Downton saying, "Am I missing something ... both of the districts that Stacey mentions in her email are strengthened in that report that she sent when comparing plan 100 and 153." US-169 . Downton then responded and copied Solomons saying, "I believe 144 is Legler. The prevailing candidate in the district (the Republican) was strengthened. But I'm not sure the Republican was the choice of the Hispanic community – I don't think that district has ever been performing. US-176. Bruce responded to Napier saying, "Gerardo [Interiano] is saying SSVR was enhanced in district 144 from PLAN 150 so not sure how it regressed." US-131. Bruce then wrote Interiano, "Checking. We didn't talk about Legler's district [HD144]. Talked about Alvarado's district, Sly's district, Thompson's district and Vo and Hochberg's districts at the meeting. I asked her to send me a summary of the regression analysis of all of the minority districts whether performing or not." US-169. At 9:51 Bruce wrote Interiano, "I THINK she's saying it was not performing because they couldn't identify a candidate of choice, but that it may have been weakened because of turnout (not registration). US-170. Interiano responded, "See I don't think that Leglers was ever a performing district specifically bc it's [sic] SSVR is so low... If they are arguing that it is then we improved it, at least based on what they sent." US-170. On April 25, Napier responded to Bruce, saying, "On District 144, my data shows that SSVR went from 31.54 in H100 to 28.80 in H153, which is what our analysis compares, so it does make some sense to me that there was less performance by the Hispanic population. However,

that district is a solid R district which looks like it elected the Republican candidate in every general election we analyzed. I don't think 144 is a performing district for Hispanics." US-131. Bruce forwarded Napier's email to Interiano. US-131, US-177.

459. On April 22, Interiano emailed Hanna, "Also when you get a minute, will you look at the Woolley amendment that's been filed? This is to help S. Davis and they dropped Miles's district to 40.5% BVAP. I know they drop it but it doesn't bother me too much. Let me know what you think." US-172. Hanna replied, "It is a 7 point drop from benchmark. probably performs (as do 141 and 142 which are currently at this level) but this is a different part of town and I guess there is a chance that voters behave differently in that part of town. couldn't Miles shed some non-Black pop to boost numbers a bit? Coleman looks good in this version." *Id.* Interiano responded, "Well that's exactly the issue..." Hanna wrote, "Is there a way to accomplish what they want without dropping Miles so much?" *Id.*

460. On April 26, Calvert, Nina Perales of MALDEF, Dr. D.Z. Colfield of the NAACP Houston, and Mustaafa Tameez of TAARI wrote a letter to Solomons about HD149. US-267; TrJ1359 (Vo). They wrote, "The map voted out of committee, Plan H153 eliminates HD149, one of the most diverse and multi-ethnic areas in Harris County, if not the State of Texas. It has the largest concentration of Asian Americans in Harris County, as well as large percentages of Hispanic and African American populations. Plan H153 creates a new HD137 which includes some of the current 149 but breaks up the majority of it into 4 other districts. It in fact breaks up Alief, a neighborhood community of interest as well as home to a large number of Asian Americans. There is also the Alief Independent School District, International Management District and Alief Superneighborhood that will be split into 5 state districts. We would like to see HD149 reinstated and not be eliminated. This would allow Harris County to have 25 districts as currently exists and provide better representation of people with smaller districts. Southwest Harris County is one of the most populous areas. The plan as presented will be harmful to the diverse communities of interest coexisting in this area. We implore you to amend the plan to ensure the preservation of communities of interest." US-267. The HRC did not take any action to address these concerns. TrJ1359 (Vo).

461. At the April 27 floor debate, when Solomons laid out Plan H153, he said they had increased the SSVR in HD90 in Tarrant County and HD148 in Harris County (from Plan H113) at the request of MALDEF. D-13 at S100. In Plan H153, the SSVR of HD148 was 49% total/50.2% non-suspense. Rep. Farrar asked why the map did not increase the number of effective minority opportunity districts given that 89% of the growth was minority. *Id.* at S111. Solomons said they increased the number of minority districts from 29 to 30 and "beefed up" a couple of districts, including Farrar's, for SSVR. *Id.* Solomons stated that a primary index they used was SSVR. *Id.*

462. Farrar pointed out that they did not need to increase the SSVR in her district HD148 because it was already electing Hispanic representatives. D-13 at S112.

463. Rep. Walle (Hispanic, Democrat) noted that Harris County had grown at the same rate as the state but was losing one seat, going from 25 to 24. D-13 at S124. He also noted that Anglo

population declined in Harris County (by 82,000) (-5.7%) while minority population increased (Hispanic by 551,789; African-American by 134,564; Asian by 76,827), yet no new minority opportunity districts were created, an effective coalition district, HD149, was eliminated, and the HVAP in HD137 (Hochberg) was reduced by 4.4%. *Id.* Solomons stated that the Texas Constitution required them to round down and pointed out that in 2011 the House passed a map with 24 districts in Harris County, and it was the LRB that issued a map with 25 seats. Solomons stated that Reps. Coleman, Dutton, Farrar, Hochberg, Thompson, and Turner all voted for a 24-district map. *Id.* Solomons asserted that the 25-district aspect of the LRB plan was never challenged in court, so they did not know if it would have survived judicial scrutiny, but they did not want to take the legal risk. *Id.* at S125. Solomons stated that their legal team did not think HD137 or HD149 were protected districts, though he recognized that there was disagreement on that. *Id.* Hochberg noted that he had previously testified before the HRC on April 17 (when Solomons was absent) that 2001 was not the first time the County had been rounded up and previously no one had said they could not. *Id.* at S126. Hochberg said, "We were even further from 25 in an earlier approved redistricting plan that passed muster with the courts. So I don't understand where you get the requirement that it has to go down." Solomons responded that there had not been a court challenge to resolve the issue, and the safer course was to round down. *Id.*

464. The Harris County Democrats said they were not happy with the way the Democratic districts within Harris County had been drawn. Tr933 (Downton). They felt shut out of the process. TrJ1258 (Thompson). Rep. Thompson had specific conversations with Interiano about what she wanted her district to look like before the first map was shown, and although he appeared to listen, her concerns did not seem to be considered in the map. TrJ1251, TrJ1275, TrJ1236-37 (Thompson). Turner testified that agreements that had been reached, such as an agreement he had with Rep. Harless (Anglo, Republican), were disregarded. Tr808 (Turner). Both African-American and Hispanic members in Harris County felt their districts were problematic, while the Anglo seats were in good shape. TrJ1239, TrJ1243, TrJ1254 (Thompson).

465. In addition, Coleman objected to Amendment 23 (Plan H191), Woolley's pre-filed amendment that made changes to the Harris County map Woolley originally proposed. TrJ1309, TrJ1334 (Coleman). Woolley's amendment was filed after the contentious meeting with Coleman. TrJ1310 (Coleman). Coleman felt that Woolley's amendment targeted him in retaliation for his earlier complaints. Coleman thought the amendment gutted parts of his district, and it removed his district office and mother's house from his district. TrJ1306-07, TrJ1312 (Coleman). The Speaker's team, leadership, his Chief of Staff (Denise Davis), and Interiano went to Coleman's office and asked what changes he wanted to the amendment. Rep. Charlie Geren (Anglo Republican) and Rep. Branch (Anglo Republican) also spoke with the Speaker and said Woolley's amendment was inappropriate. TrJ1314 (Coleman). Rep. Miles said there were people working in Denise Davis's office to fix the map. Coleman, Turner, and others went to the Speaker's office.

466. At that point, they stopped the floor debate for about three hours for people to meet with the Harris County Democrats and try to get their input on changes to the map. Tr933 (Downton); Tr1430-31 (Interiano). Downton testified that the Democrat members were told to leave the

Republican districts alone, to not drop the SSVR or BVAP of the respective districts, and to keep HD148 above 50% SSVR, but within those guidelines, they could draw their districts however they wanted. Tr933, Tr934 (Downton); Downton 8-31-11 depo.(Joint Ex. J-62) at 104-05. Rep. Farrar also stated that Republicans said, "once our districts are drawn, you can have whatever is left and you can draw them amongst yourselves." Farrar depo. at 30-31. She stated that the Democrats "were confined to only certain areas." *Id.* at 49-50. Rep. Turner testified that they were able to make some minor adjustments, but no real substantive changes that would add to or restore minority districts or change the pairing of 137 and 149. Tr802-03. Alvarado stated that members were told they could not alter HD148 "nor could [they] alter the Anglo portions of the map." Alvarado Decl. (docket no. 331) at 7. To rebut this testimony, Interiano stated that members of the delegation "were never advised by House Redistricting staff that they could not alter any of the Republican and/or Anglo districts in the plan," and notes that the agreed amendments did alter some Republican districts. Interiano Decl. (docket no 370-2) at ¶ 5. The Court finds that the Democrat members were told they could not alter Republican districts, and one amendment to a Republican district was made with the consent of that member, as discussed below.

467. Turner's district HD139 would be taking in a lot of new area. Tr817 (Turner). Turner did not want the area that crosses 290 and the area toward and north of 45 and Beltway 8, and he also lost area in the southwest corner of 140. Tr938-39 (Downton). He shared his concerns with Interiano and Denise Davis. Tr817-18. His concerns involved how the district would grow/look in the future. Tr819. Turner thought he could still win his district but it would be harder for an African American coming after him. Tr820. Downton said they were concerned with retrogression if they reduced his BVAP, and could not accommodate him while getting HD148 above 50% and keeping HD140 where it was. Tr939.

468. The delegation reached an agreement (Plan H271) that was set out as Amendment 24 to Woolley's amendment. TrJ1315, TrJ1334 (Coleman). Everyone from the Harris County delegation supported the changes. TrJ1316. Woolley laid out Amendment No. 23 to Harris County (H191), and Coleman Amendment No. 24 (H271) to that amendment, reflecting the changes made through negotiations among Harris County members. D-13 at S206; D-190 at 134-37. Woolley noted on the floor that "we all worked together in the back room." D-13 at S207. At Woolley's request, Coleman assured Woolley that his district, HD147, which went from 39.2% to 38.2% BVAP, was still an African-American opportunity district and was not retrogressed. *Id.* Woolley moved for adoption of Plan 191 as amended by Coleman's amendment Plan H271, and it was adopted, as amended. D-13 at S208. The amendment was acceptable to the author and not subject to a vote, but the whole House approved it. TrJ1336 (Coleman); Tr934 (Downton). The amendment did not remedy Coleman's prior concerns about 24 seats and pairing Vo and Hochberg, and that remained in the final map. TrJ1316 (Coleman).

469. Plan H271 (Amendments 23 and 24) made changes mostly to Democrat/minority districts, including HD131, HD137, HD139, HD140, HD141, HD143, HD145, HD146, HD147, and HD148, but also changed two Republican districts, HD134 (S. Davis) and HD136 (Woolley). However, the changes to Woolley's district were entirely due to Woolley's pre-filed amendment Plan H271, and

thus were not the result of any compromise with Democrat members. Some changes to S. Davis's district are from Woolley's amendment, but further changes were made in Plan H271 that appear to be the result of compromise. HD137 lost some population to HD134, possibly at Hochberg's request. TrJ1359-61 (Vo). Changes were made to HD148 that did not lower its SSVR. Rep. Farrar testified that she had to ask her colleagues for precincts that would "drop the white number and increase the Hispanic number," which she thought was a disservice to both groups of voters. Farrar 2014 depo. at 37. Changes to HD145 included narrowing a part of the district that created a bridge between the northwest and southeastern parts of the district, which Downton testified was done at the request of Democrats. Tr935 (Downton).

470. Later, Rep. Martinez Fischer laid forth Amendment No. 33 (H200) focusing on Harris County. Rep. Walle asserted that Plan H153 violated the VRA and Texas Constitution in Harris County, and the MALC plan remedied the issues. Walle stated that reducing the number of districts to 24 diluted minority representation in Harris County, and that Plan H153 packed existing Latino opportunity districts and failed to create any new Latino opportunity districts. D-13 at S230. Walle and Hochberg asserted that HD137 was a protected district. *Id.* at S231. Hochberg noted that the LRB had stated his district HD137 was a fifth majority HVAP district when submitting it for preclearance, but that it had not been treated as a protected district. *Id.* at S232. Hochberg pointed out that there was a VTD split that actually split an apartment complex and that the map cut the Sharpstown community of interest (this was fixed). *Id.* Walle complained about the loss of Vo's district and dilution of the Asian vote. *Id.* at S234. Vo and Walle discussed that HD149 was a majority-minority district, with about 20% Asians, 20% Hispanics, and 20% African Americans. Vo noted that witnesses had come to testify to support HD149, and hundreds of emails had been sent to the members of the HRC. *Id.* at S233. Solomons stated that he believed the map was legal, that HD137 and HD149 were not protected districts, and moved to table. *Id.* at S234. Walle stated that "we were not informed that a 24 map was going to be submitted. Okay. That map was submitted to you without any of the other democratic members from Harris County being informed of such map. And that's the issue that many of us from Harris County have is that we were not informed that those maps had been submitted, signed off on, a 24 map. When we were trying to negotiate to get a 25 map. And for us, we take that very personally because one, you are eliminating Representative Hubert Vo and pairing him with Representative Hochberg. And at the same time packing the other Latino - other majority minority districts. So for us, the process wasn't clean for us." *Id.* at S235. Walle also asked why nearly every minority-majority district in Harris County was overpopulated, which Solomons did not answer. The amendment was tabled. D-13 at S236.

471. Alvarado set forth Amendment No. 37 (Plan H226), a statewide map that had 25 Harris County districts and "maximizes minority majority opportunity districts." D-13 at S245. She stated that it has 57 total districts where minority voters can elect a candidate of choice and created five new coalition districts. Alvarado pointed out that Harris County had been rounded up for "the last couple of decades." *Id.* She also stated that a good portion of the Harris County delegation did not have input into the first map that was drawn at 24, and that it was not member-driven. *Id.* Solomons moved to table, stating that the committee map was legal and increased the number of minority-majority districts to 30, that there were 2 BVAP over 50% districts, and that other maps broke county

lines. *Id*. at S246. He also stated that the proposed map created 25 districts in violation of the Texas Constitution. The amendment was tabled. D-13 at S247.

472. Coleman offered Amendment 38 (Plan H232), his statewide plan. He said that minority population was responsible for over 100% of Harris County population growth because Anglo population decreased by over 82,000. He stated that Plan H232 would create an additional Latino opportunity district (HD138), an additional minority coalition district (HD132 that is 67.3% non-Anglo VAP), and preserve HD149 as an 80% non-Anglo district. The map would provide minority opportunity in 58% of the districts in a county that was 67% non-Anglo, compared to 46% in Plan H153. D-13 at S248; *see also* Joint Expert Ex. E-3 (Lichtman Report) at 9-14; Tr1230 (Lichtman).

473. Some time after Plan H271 was adopted, Rep. Thompson (African American, Democrat) wanted changes. Tr936 (Downton); Tr1475 (Interiano). Speaker Straus asked Interiano to go to back and work with her and every member that would be impacted. Tr1475. Both Republican and Democrat members were involved. Tr1430-31 (Interiano). Other members who were affected by the changes were included in her meeting with the Speaker's staff, including Harold Dutton (African American, Democrat) and Dan Huberty (Anglo, Republican), and they both agreed to changes that affected their districts. TrJ1276 (Thompson). There were also some precinct swaps with other members, including Walle. TrJ1277 (Thompson). Republican districts around Thompson's HD141 changed to accommodate her requests, including HD126 (Harless), HD127 (Huberty), HD128 (Smith), and HD150 (Riddle). Interiano Decl. (docket no. 370) ¶ 6; Tr936 (Downton); TrJ1258, TrJ1276 (Thompson). HD141 ended up above 50% BVAP, which made it the third such district in the state. Tr936. Thompson was "85% happy" with her district. TrJ1275 (Thompson). The agreed changes were proposed by Smith as Amendment 4 during third reading. Tr936.

474. On April 28, the House debated third reading. TrJ1947; D-190 at S846. Solomons noted that there were a few agreed-to amendments "that help make the bill better, and they'll be acceptable to the author, I believe." D-190 at S846. Smith (Anglo, Republican) proposed the amendment to several districts in Harris County (Plan H281, affecting 126, 127, 128, 139, 141, 142, 143, and 150, as agreed to by members working with Thompson), and it was adopted. D-190 at S846; D-53(4) (map). Just before final passage, Rep. Allen (African-American, Democrat) realized that her district office was left out of her district, so they drew a line with as little population as possible to connect her district (HD131) to her district office, and that caused the little island of HD131 in the middle of HD146. Tr937 (Downton). Allen offered the amendment (H282), and it was acceptable to the author. It was adopted. D-190 at S848; D-53(5) (map); TrJ1610 (Interiano).

475. While some improvements were made to minority districts during the process, minority members still were not happy with their districts, and they felt that the Anglo members were 100% satisfied with their districts while minorities were not. TrJ1253, TrJ1281 (Thompson). African-American legislators were not very successful in getting changes made to their districts in a way they wanted. TrJ1257 (Thompson). Plan H283 did not address concerns about the pairing of Vo and Hochberg and elimination of HD149 or the fragmentation of the Asian community. TrJ1361 (Vo). Coleman, Vo, and other minority members of the Harris County delegation did not support Plan

H283. TrJ1317 (Coleman); TrJ1362 (Vo).

476. Sarah Winkler, a lay witness from Alief, testified that the new configuration essentially destroyed the coalition and that minority voters' voices would be lost. Tr427-28. She also thought there would be voter confusion. Tr427. Calvert testified that Plan H283 paired two districts that were very representative of the minority coalition, eliminating one, and that it also fractured the concentration of minorities in that area. Tr422.

477. Instead of reflecting the minority population growth, Plan H283 eliminates a minority coalition district, HD149, and does not create any new districts where minority voters can elect candidates of their choice. Tr339 (Martin); TrJ1438 (Korbel). Kousser opined that the only change that might be thought to have increased Latino representation between Plan H113 and Plan H283 was the increase in HCVAP/SSVR in HD148, but that "merely further packed a district in which Latino voters had been able to elect their candidates of choice for at least a generation." Joint Expert Ex. E-2 at 71. Martin opined that the benchmark had six African-American districts, five Hispanic districts, and HD149 that were electing minority candidates of choice; Plan H283 eliminated HD149, thus reducing the number of effective minority districts from twelve to eleven. Tr352 (Martin). Martin opined that the reduction in minority opportunity in Harris County was the result of cracking and packing. Joint Expert Ex. E-5 (Martin Report) at 5-7.

478. Murray noted that it would seem logical to delete a district from the east side of the County, where the growth rate was only about 10%, but that did not happen. Joint Expert Ex. E-4 (Murray Report) at 27. Instead, he noted that the map moves some of the eastern Harris County Republican districts slightly west to pick up minority population. Specifically, HD127 shed some of its Anglo/Republican population to the south into HD128 (to shore it up) and extended westward into Spring, taking in high performing minority areas and diluting their vote among the Anglo majority. *Id.* at 28. He stated that HD129 also moved northwest to add racially mixed, heavily populated precincts, where they would be diluted by the Anglo majority. *Id*. at 27-28.

479. Martinez Fischer, Martin, and Murray also asserted that there was an effort to maintain Anglo voting strength at the expense of minorities in HD144 in eastern Harris County. Tr339 (Martin). Benchmark HD144, which was drawn in 2001 as a majority-Anglo district and was represented by Anglo Republican Legler, had an Anglo VAP of 36.3% and a Hispanic VAP of 50.3% (but only 31.5% total SSVR and 34.8% HCVAP using 2005-2009 ACS data). In 2008, Legler defeated Democrat Redmond by only 902 votes (51.15% to 48.85%), though he won with 59.45% of the vote in the 2010 Republican-tide year. Murray opined that, to prevent HD144 from becoming an opportunity district and to shore up the Anglo Republican incumbent, three predominantly Anglo precincts with a vote history of opposing minority-supported candidates were added to HD144 from HD129, seven mixed-race majority precincts and one majority black precinct were removed from HD144, and the district was extended to the east north of the ship channel to pick up sizeable Hispanic areas, but not in sufficient voter numbers to threaten the Anglo incumbent. Joint Expert Ex-4 (Murray report) at 28.

480. In Plan H283, HD144 is underpopulated by 5,759 people (-3.44%), and its Anglo VAP is increased to 42.8% and Hispanic VAP decreased to 48.5%. Martin testified that HD144 picked up Anglo population and shed Latino population into HD145 and HD147, which were overpopulated, but retained enough Latino population that that population was not available to create additional minority districts. Tr340-42. Martin testified that Latino voting strength could be increased by putting the Latinos that were removed back in and not underpopulating the district. Tr341. Martin asserted that the map retrogressed HD144 by reducing the Hispanic VAP from 50.3% to 48.5% and reducing the BVAP by 2.6% (from 7.8% to 5.2%).

481. Martin further noted that, in Plan H283, both HD145 and HD148 are elongated for miles, with HD145 extending north and west of downtown Houston for the first time since the district was created to take core Heights precincts from HD148 and beyond that, all the way to the 610/290 interchange. HD145 stretches roughly 25 miles across the city. Tr342-43; Joint Expert Ex-5 (Martin Report) at 6. Martin further opined that putting the HD144 population into HD145 and overpopulating it, shoving it north and taking population that had been in HD148, as well as artificially packing HD148, had the effect of preventing the creation of another minority opportunity district. Tr345 (Martin). HD148 has one of the lowest perimeter-to-area compactness scores (.099) in Plan H283. HD145 is the least compact using the area-to-smallest circle compactness measure. Giberson depo. at 47.

482. Martin opined that high-growth minority areas in west Harris County were cracked. Benchmark HD132 (Callegari (R)) was only 43.8% Anglo VAP and HD135 was only 38.8% Anglo VAP, reflecting an area of rapid minority growth in West Harris County along and west of State Highway 6, north of I-10 and south of 290. Martin asserted that neither district was yet effective for minority voters, but plans H232 and H287 (24-district plans) show that an effective majority-minority district can be drawn in the area, while instead the State split this minority growth area among three Anglo-controlled districts 132, 135, and 138. Joint Expert Ex. E-5 (Martin Report) at 7. Murray noted that HD133 elected Kristi Thibaut, a Democrat, in 2008, but she was defeated in 2010 during the "Tea Party tsunami." Joint Expert Ex. E-4 at 31. To shore up the Anglo Republican incumbent, minority precincts were moved from HD133 to HD137, and high turnout Anglo precincts were added. *Id*.

483. Murray opined that mapdrawers used the artificial 50% SSVR threshold to unnecessarily pack large Hispanic majorities into just four districts (HD140, HD143, HD145, and HD148), without a showing that a 50% SSVR majority was needed for the districts to be effective. Joint Expert Ex. E-4 (Murray report) at 29. He asserted that Hispanics are otherwise packed into African-American districts or diluted in Anglo-dominated districts. Thus, although Hispanics are 41% of the Harris County population, they can elect their candidates of choice in only five districts of twenty-four districts (the four Latino SSVR majority districts and HD137, where they can be an effective part of a coalition district). *Id*. He also opined that African-American voters are packed into the existing African-American districts (131, 138, 141, 142, 146, & 147). *Id*.

484. Despite Hanna's second retrogression memo stating that "consideration should also be given

as to whether a fifth majority Hispanic district could be drawn in Harris County" and whether it would be required by § 2 of the VRA, D-327, mapdrawers Downton and Interiano did not try to determine if an additional Hispanic opportunity district could be drawn in Harris County. Downton testified that "it may have been possible" to draw a new Hispanic opportunity district in Harris County. TrJ2051-52. He stated that they "definitely could have created another district with a sizable Hispanic population" but he was not sure if they could have created another Hispanic majority district, and it was not something he worked on. TrJ2052. He was not sure if anyone worked on one. TrJ2053. Interiano also did not work to see what else was possible because the delegation was working on it. Tr1450 (Interiano). Hanna was able to draw an additional minority opportunity district within Harris County, though doing so likely would not have been popular with the Harris County incumbents (Republicans would not like it because they would lose a Republican district and Democrats would not like it because their districts would be rearranged). TrJ1207, TrJ1217-18 (Hanna). However, he did not run any election analysis on such a district. TrJ1218.

485. Anglos make up only 33% of Harris County population, but would control 54% (13 of 24) of the House Districts in Plan H283. Joint Expert Ex. E-5 (Martin Report) at 5; TrJ1245 (Thompson).

486. It is possible to preserve HD148, HD137, and HD149 with only 24 districts and create an additional Latino opportunity district, as was done in the Court's interim plan H309. TrJ138. Plan H309 eliminated Woolley's district HD136 because she retired. Plan H309 creates an additional HCVAP-majority district HD144 in eastern Harris County. PL-689.

487. The Legislative Black Caucus introduced two House plans—H202 and H214. Tr803 (Turner). Plan H214 had 25 districts in Harris County and Plan H202 had 24. When Solomons' map came out, Harris County had 24 districts, so they proceeded with H202 and did not introduce Plan H214 as an amendment. Tr804 (Turner). Plan H202 was a 24-district map that eliminated HD144 (represented by Anglo Republican Legler). It maintained the three benchmark HCVAP majority districts HD140, HD143, and HD145. It also maintained the six African-American districts (though two districts are below 50% BCVAP—HD146 is 48.7% (+/- 1.7%) and HD147 is 48% (+/- 1.5%)). It also maintained HD148 as 44.1% HCVAP, HD137 as a minority-majority coalition CVAP district, and HD149 as a majority-minority coalition CVAP district. Therefore, H202 maintained the same number of minority districts in Harris County as the benchmark based on demographics.

488. Plan H232 is a 24-district plan introduced by Coleman during second reading. It eliminates HD126, an Anglo/Republican district. This plan maintains the three benchmark HCVAP majority districts (HD131, HD143, and HD145) and the six benchmark African-American districts (though BCVAP in HD147 is 49.3% (+/- 1.3%)). It maintains HD148 as a 42.3% HCVAP district and maintains HD137 and HD149 as multi-ethnic minority-majority CVAP districts. Both HD132 and HD135 are majority-minority VAP (HD132 is 32.7% Anglo VAP, and HD135 is 46.6% Anglo VAP), but neither district is a majority VAP for a single minority. Further, both districts are majority Anglo CVAP using 2005-2009 ACS data: HD132 is 50.1% Anglo CVAP (and thus would probably not be majority Anglo CVAP using 2008-2012 ACS data), and HD135 is 59.2% Anglo CVAP. *See also* Joint Expert Ex. E-3 (Lichtman Report) at 9-14.

489. Plan H286 is LULAC's proposed *Gingles* 24-district Harris County map. LULAC-12-2A. It has four HCVAP-majority districts (HD1, 2, 3, & 4), and two of those are SSVR-majority districts (HD1 & 3). It has four districts that appear to be African-American districts, with BVAP of 39.4% (HD7), 48% (HD10), 56% (HD12), and 40.2% (HD13). Two of those (HD10 & 12) are BCVAP-majority districts. HD5 is 31.9% BVAP but 45.2% BCVAP (so it would be either an African-American district or a minority-coalition district (it is 33.1% HCVAP and only 17.9% Anglo CVAP). Four additional districts are majority-minority CVAP coalition districts (HD6, with 47.4% Anglo CVAP; HD9, with 36% Anglo CVAP; HD14, with 47.6% Anglo CVAP; and HD16, with 28.2% Anglo CVAP).

490. The Perez Plaintiffs offered Plan H287 (24 districts) for Harris County with 1.81% deviation that remedied the pairing of Hochberg and Vo, preserved all existing minority districts, and added two additional minority coalition districts. Joint Expert Ex-5 (Martin report) at 7; Tr357-61 (Martin); Perez-113. HD126, an Anglo/Republican district, is eliminated and HD149 is retained. Martin testified that by taking out the overpopulation of districts in the Alief area, HD149 could be re-created, and by fixing deviations and cracking, two more minority opportunity districts—HD132 and HD138—could be created. Tr360-61. Plan H287 maintains the three HCVAP-majority districts from the benchmark—HD140, HD143, and HD145. It also maintains the six BVAP districts (one of the districts, HD147, drops slightly below 50% BCVAP at 49.5%, but the margin of error is 1.3%, and in any event the mapdrawers were only looking at BVAP for African-American districts). HD148 (Farrar) is a majority-minority CVAP district (Anglo CVAP is 43%), but not a majority-HCVAP district (HCVAP is 43.5%). HD137 and HD149 are maintained as majority-minority CVAP coalition districts. And HD132 and HD138 are added as majority-minority CVAP coalition districts. HD132 is 31.6% Anglo VAP and 49.8% Anglo CVAP using 2005-2009 ACS data. No single minority group is over 50% CVAP, so this would be a coalition district. Similarly, HD138 is 47% Anglo CVAP using 2005-2009 ACS data, while HCVAP is 35.9% and BCVAP is 12.5%. Martin testified this map was much more reflective of the demographics of the County and recognized the substantial minority population growth. Tr362.

491. Demonstration plan H205 (Martinez Fischer statewide substitute) would create 25 districts in Harris County. V. Gonzales depo. at 33-34, 40. With 25 districts, sufficient Latino population remained in HD144 to make it a new HCVAP-majority district. Alvarado Decl. (docket no. 331) at 5; Hochberg Decl. (docket no. 331) at 3. It has four HCVAP-majority districts using 2005-2009 ACS data: HD140 (55.7%); HD143 (52.6%); HD144 (53%); and HD145 (53.8%). These districts also have non-suspense SSVR over 50%. HD144 in Plan H205 is a compact majority-HCVAP district. HD148 is 35.7% non-suspense SSVR, 41.1% HCVAP using 2005-2009 ACS data, and 54.6% HVAP. H205 has two BCVAP-majority districts (HD139, 59.8% and HD147, 58%) and four additional districts with BCVAP in the 40s (HD131, 47.5%; HD141, 49.2%; HD142, 44.8%; and HD146, 44%). H205 has five districts with BVAP over 40%: HD131 (41.4%; HD139 (49.1%); HD141 (43.2%); HD142 (40.3%); and HD147 (50.8%)) and one district with BVAP of 36.4% (HD146). HD137 and HD149 are maintained as majority-minority CVAP coalition districts (HD137 is 33.1% Anglo CVAP, and HD149 is 28.2% Anglo CVAP) and B+CVAP in these districts is greater than 50%. Three additional districts (HD133, HD136, and HD138) are majority-minority

CVAP, but H+BCVAP is less than 50%.

492. Plan H214 was a Legislative Black Caucus statewide substitute plan with 25 districts in Harris County. It maintained the three HCVAP/SSVR majority districts, 140, 143, and 145. It maintained the six African-American districts, though HD146 and HD147 fell slightly below 50% BCVAP. It maintained HD137 as a majority-minority CVAP district (Anglo CVAP 34.4%) and maintained HD149 as a majority-minority coalition district (Anglo CVAP 23.4%). It did not create any new minority opportunity districts.

493. MALC offered Plan H295, which created HD144 in Harris County with 51.4% SSVR.

494. The population deviation of Harris County in Plan H283 is 9.74%. Tr356 (Martin). Martin testified that it was easy to draw a plan with a deviation of only 1.81%. Tr357.

495. Alvarado noted that three of four Latino-majority districts (HD140 (1.85%), HD145 (1.9%), and HD148 (4.59%)) were overpopulated, and four of six African-American districts (HD131, HD139 (4.83%), HD146 (4.09%), and HD147 (4.91%)) were overpopulated. Alvarado decl. (docket no. 331) at ¶ 11a. She opined that this uses up minority population unnecessarily and limits the ability to draw new districts. Alvarado Decl. (docket no. 331) at 5; Hochberg Decl. (docket no. 331) at 3.

496. One would expect Harris County districts to be overpopulated compared to the statewide ideal because there was enough population for 24.41 districts. Because the Legislature chose to go with 24 districts, there was enough population to have all districts be at ideal population or above. However, six districts (three Anglo Republican and three Democrat) were underpopulated. All other districts were overpopulated. HD147, an African-American district, is the most overpopulated district in Harris County (4.91%). And HD142, also an African-American district, is the most underpopulated district in Harris County (-4.83%). Dr. Arrington noted that minority districts in Harris County were drawn with larger populations than the Anglo Republican districts. US-356 (Arrington report) at 28. The overpopulated Anglo Republican districts are populated as follows compared to the statewide ideal: .97, .55, 2.45, 4.71, 3.18, 3.22, 4.05, 2.85, 3.23, .65. The overpopulated minority districts are populated as follows compared to the statewide ideal: 4.53, 3.56, 4.83, 1.85, 1.9, 4.09, 4.91, 4.59.

497. Interiano stated that, given the choice to have 24 districts in Harris County, the ideal population size for a district in the County was 170,519, slightly higher than the ideal state district size (167,637). Interiano Decl. (docket no. 370-2) at ¶ 2. He stated, for example, that HD140 and HD145 are populated at 170,732 and 170,821, respectively, which is almost the ideal county size, but several thousand above ideal state size. Interiano stated, "This overpopulation is due to the fact that Harris County was awarded twenty-four districts, not in order to avoid drawing an additional minority opportunity district. With that said, there were several instances where it was necessary to increase the population of a particular district either because a member specifically requested to have certain precincts and was unwilling to give up other populations or because the population was

needed in order to maintain certain benchmarks, like the 50% Spanish Surname Voter Registration (SSVR) for Latinos or the existing levels of African-American voting age population." Interiano Decl. (docket no. 370-2).

498. In Harris County, Bill White got 50.23% and Obama got 50.44% of the vote. Tr337(Martin).

499. Arrington testified that coalition districts are effective districts in the sense that one or more of the racial groups in coalition have an ability to elect their first choice candidate in the district, even if they oppose each other in the primary, though he found no evidence of that in HD149. TrJ135-36 (Arrington).

500. Dr. Engstrom (Joint Expert Ex. E-7) found that Latino voters are highly cohesive in support of Latino candidates with Democratic primary nominations in the general election. All five of such candidates received strong support (75-83%). The only Republican Latino in the general election, Eva Guzman, did not. All Latino candidates in Democratic primaries also received Latino support (78.1% bivariate and 59-87.8% multivariate). Latinos voting in Republican primaries also supported the Latino running for Railroad Commissioner but not for Governor. While non-Latino voters overall did not provide majority support for the two Latino candidates endorsed by the Democratic party in the 2008 election, they did provide all three such candidates with slight majorities in 2010, though it appears to be a function of very high African-American support for these candidates (98% of their vote, whereas other voters ranged from 15 to 24.7%) The only Latino Republican received a slight majority of support from non-Latino voters overall, but multivariate showed African-American support was less than 2% while others was 81.1%. Non-Latino voters in Harris County provided a slight majority of their votes to just one of the Latino candidates seeking the nomination in the Democratic primary. In the multivariate analysis, African Americans provided a majority of their votes to two of the Latino candidates favored by Latinos, while the other voters provided majorities of their votes to only one. In Republican primaries, African Americans and Latinos supported the incumbent candidate for Railroad Commissioner, while others did not, and neither favored the Latino candidate for Governor. The analysis reveals that Latinos are very cohesive in their candidate preference for Democratic Latino candidates in general elections and that is shared by African Americans in these elections, but not other voters. The analyses of the Democratic primary elections show Latinos to be likewise cohesive in their preferences for Latinos, but this preference was not generally shared by the rest of the primary voters.

501. In his corrected rebuttal report (docket no. 307-1), Dr. Engstrom found racially polarized voting in Harris County. In general elections, Latinos were very cohesive in their support for Latino candidates with the Democratic party nomination, and that preference was shared by African Americans but not by other voters, whose support did not exceed 30%. Latinos are also very cohesive in their support for Latino candidates in the Democratic primaries, but these preferences are not usually shared by non-Latinos, and African Americans were least likely to share the preference.

502. Data from 2008 and 2010 in Harris County show "almost zero black voting in the Republican

Primaries, and very, very little Hispanic participation." Joint Expert Ex. E-4 (Murray Report) at 19.

503. Plaintiffs provided lay testimony of tri-ethnic cohesion. Sarah Winkler provided lay testimony that the minority coalition in Alief is able to elect candidates of choice to the Texas House in HD137 and HD149. Tr426. Rep. Turner testified that Asians, Latinos, and African Americans have worked together to pick someone of their choice in HD137 and HD149. Tr827. Rep. Thompson testified that, in Harris County, African Americans, Latinos, and Asians work in cooperation together politically. TrJ1256. Thompson, who is African American, is supported by the Latino community and has supported many in the Latino community. *Id.*

504. 48.1% of Hispanics in Harris County lack a high school education, compared to 22.6% of the total population of Harris County. Joint Expert Ex. E-1 (Chapa Report) Table 4. The median household income for Hispanics is $37,520, compared to $50,567 for the total population of the County. *Id.* Table 5. Per capita income for Hispanics was $14,103, while for non-Hispanic Anglos it was $43,902. *Id.* 31.42% of Hispanic children live in poverty, compared to 7.08% of non-Hispanic Anglo children. Joint Expert Ex. E-9 (Gonzalez-Baker Report) Table 8.

505. Murray noted that the King Street Patriots, a Tea Party affiliate, used "ballot security" programs in Houston aimed at suppressing African-American and Hispanic voting in October and November 2010. Joint Expert Ex. E-4 (Murray Report) at 17. They monitored early and in-person voting at Harris County polling places in minority neighborhoods, and there were a number of confrontations with voters and election officials at minority polling places. *Id.*[14] Murray also noted that the Harris County Tax Assessor-Collector and Registrar of Voters Paul Bettencourt used his position in 2008 to slow the rise in voter registrations that year among younger, mostly minority applicants by rejecting thousands of applications for minor errors and creating a backlog of unprocessed voter registration cards. These actions resulted in a lawsuit alleging violations of the VRA. *Id.*

506. The Harris County map was drawn primarily by the Anglo Republican members of the delegation (and their mapdrawer) without any input from minorities or Democrats. Downton made some changes to their map to try to match benchmark numbers for the minority districts, and he used race to do so. During second reading, Democrats were able to make some changes to the map within limitations placed upon them, including that they could not alter the Republican districts. Rep. Thompson was able to get further negotiated changes to the map that were agreed upon by some Republican members.

507. Because Harris County went from 25 to 24, one district was eliminated, and the Harris County Republican delegation chose to pair Hochberg and Vo and eliminate Vo's district HD149. HD149 was a multi-ethnic district that had been electing Vo, the first Vietnamese-American representative, since 2004. The pairing was viewed as favoring Hochberg, an Anglo, over Vo. Because no single minority group was over 50% HCVAP or VAP, mapdrawers took the position that the district was

---

[14] Congresswoman Sheila Jackson Lee also testified about the King Street Patriots engaging in voter intimidation in minority areas. Tr1533, Tr1536 (Jackson Lee).

not protected.

508. Plan H283 eliminated HD149 and did not create any new minority ability districts despite the fact that all the growth in Harris County was due to minorities. Mapdrawers increased the SSVR of HD148, a district that was already strongly performing for Latinos, above 50% in order to offset the loss of an SSVR-majority district in Nueces County, and claimed it was a new Latino opportunity district. Mapdrawers did not look at and were not concerned with whether this increase improved Latino electoral ability in HD148; they increased the Hispanic population solely to bring the district above 50% SSVR.

509. HD144, which had become 50.3% HVAP, was reconfigured to protect the Anglo Republican incumbent, resulting in a district that was underpopulated and was 48.5% HVAP.

510. Representatives from the Asian community in southwest Harris County testified repeatedly that they wanted to be kept together in a district, but the Asian community was split among several districts in Plan H283.

## Fort Bend County

511. In Plan H100, HD26 and HD27 are wholly contained within Fort Bend County, with the remainder of Fort Bend County being connected in HD28 with Waller County and Wharton County.

512. HD26 was 39.4% Anglo in terms of total population, 41.9% Anglo VAP, and 53.5% Anglo CVAP using 2005-2009 ACS data (but only 48.2% Anglo CVAP using 2008-2012 ACS data). HD26 was represented by Rep. Howard, an Anglo Republican.

513. HD27 was 25.1% Anglo in terms of total population, 27.5% Anglo VAP, and 34.5% Anglo CVAP (using 2005-2009 ACS data). Its BCVAP was 36.4% and its HCVAP was 23.2%. Red-106 Report. HD27 was represented by Rep. Reynolds, an African-American Democrat.

514. HD28 was 46.6% Anglo in terms of total population, 41.9% Anglo VAP, and 59% Anglo CVAP using 2005-2009 ACS data. HD28 was represented by Rep. Zerwas, an Anglo Republican.

515. In 2010, Fort Bend County was 36.2% Anglo (and 38.7% Anglo VAP). D-58. Fort Bend County has a substantial Asian-American population. TrJ1454 (Korbel).

516. Fort Bend County was one of the suburban areas with high population growth, warranting a new district in the area. TrJ1535 (Interiano). Fort Bend County was not a drop-in county because there was spillover. TrJ1603 (Interiano). Due to the growth in Fort Bend County, it went from two districts with spillover population to three districts with spillover population, and the Legislature placed new HD85 there.

517. Interiano worked with the three incumbent delegation members because it was not a drop-in

county. The delegation members had to work together to create their districts within the confines of the county, and Interiano had to provide constant feedback on how many counties and which ones they would be pulling in to join with the spillover population. TrJ1603 (Interiano). The mapdrawers could have combined the spillover with two, three, or four counties, and that would have an impact across the rest of the map. The location of the incumbents' homes was a constraint on drawing the districts. Rep. Reynolds lives in the southern part of HD27 but wanted population located to the north. TrJ1604 (Interiano). Reynolds also lives in a very Republican part of the city and he wanted to make sure that the community that he lived in stayed entirely together. TrJ1605 (Interiano). Putting Reynolds in the new HD85 would not have given him a chance to be re-elected. TrJ1606 (Interiano). They also tried to keep the districts similar in size; they were on the low end because they "ultimately ended up pairing the spillover from Fort Bend County with only 2 counties," so they needed the spillover population from Fort Bend County to be higher. All members of the Fort Bend County delegation agreed to the configuration. TrJ1608 (Interiano); D-229 at 51, 98, 120.

518. The delegation-agreed map was put into Plan H113, the first public map. The configuration of the Fort Bend County districts did not change, and thus were the same in the enacted Plan H283. In Plan H113 and Plan H283, HD26, HD27, and HD28 are wholly within Fort Bend County, and the remainder of Fort Bend County is joined in HD85 with Wharton and Jackson Counties.

519. At the April 15 HRC hearing, Rogene Calvert of the Texas Asian American Redistricting Initiative complained about the proposed configuration of HD26 in Fort Bend County, which had one of the largest Asian-American populations, stating that they had hoped for two more compact districts to protect their strength. D-595 at 184. She had also testified at the Houston field hearing on November 20, 2010 about the Asian population in Harris County and Fort Bend County, and had asked that the Asian community be kept together. D-117; US-461 at 3.

520. During the April 27 floor debate, Rep. Walle (Hispanic Democrat from Harris County) proposed an amendment (Plan H172) that would have created an Asian, Latino, and African-American coalition district based in Sugar Land. D-13 at S174, S176. This plan left HD27 the same as in the committee plan but changed the configuration of HD26, HD28, and HD85. Walle said that the proposed amendment would put over 30% "other" population (Asian Americans) into HD26, and it would be a coalition district with an opportunity for Asians to reflect the Asian population growth in Fort Bend County. Walle contended that the growing Asian population in Fort Bend County needed representation. D-13 at S177-78. He stated the committee map was convoluted and violated the city boundaries; it split precincts, fractured the City of Sugar Land, and diluted Asian voting power in Fort Bend County. *Id.* at S174. Rep. Howard (Anglo Republican), who represented HD26, noted that the members of the area had agreed on the plan, that much of the Asian community was concentrated in his district, and that he felt he had adequately represented them and that they had "overwhelmingly voted" for him. *Id.* at S177. Walle argued that Asians needed representation and that it was also wrong to eliminate Vo's district HD149 in Harris County. *Id.* at S176. The amendment was tabled. *Id.* at S178.

521. Rep. Turner (African American, Democrat) proposed Plan H202 during the April 27 floor

debate. It placed HD26, HD27, and H28 wholly inside Fort Bend County, and joined the surplus with Waller County and Washington County in HD13. HD26 (Fort Bend County) in H202 is 12.9% HCVAP, 14.5% BCVAP, 23.8% Asian CVAP, and is majority-minority CVAP using 2005-2009 ACS. Tr841-42 (Fairfax); Joint Map Ex. J-25. This would be a tri-ethnic coalition district.

522. Rep. Coleman (African American, Democrat) proposed Plan H232. He said that Fort Bend County was 62% non-Anglo and his substitute created a 70% non-Anglo coalition district HD28 in addition to African-American HD27 (with 43.9% BCVAP). D-13 at S248. This map kept HD26, HD27, and HD28 wholly within Fort Bend County, and joined the excess Fort Bend population with Waller County and Wharton County in HD126. HD28 was 40.4% Anglo CVAP, and majority-minority HCVAP (25% HCVAP, 19.9% BCVAP, and 13.7% Asian CVAP). This would be a tri-ethnic coalition district. *See also* Joint Expert Ex. E-3 (Lichtman Report) at 9-14; Tr1230 (Lichtman).

523. As noted, no amendments were adopted or changes made to the Fort Bend County districts. In Plan H283, HD26 is 57.3% Anglo CVAP; HD27 is 30.8% Anglo CVAP; HD28 is 58.9% Anglo CVAP, and HD85 is 52.5% Anglo CVAP using 2005-2009 ACS data.

524. Using 2008-2010 ACS data, HD27 had a combined B+HCVAP of 62% and Anglo CVAP of 26.8%. TrJ1420 (Korbel); D-109. BCVAP alone is 46.4%. HD85 is 42.9% H+BCVAP and 49.4% Anglo CVAP (+/- 1.2%). HD26 is 51.8% Anglo CVAP and HD28 is 55.2% HCVAP. D-109. Korbel testified that HD27 is a minority opportunity district but the other districts are not. TrJ1417.

525. Martin noted that Fort Bend County is only 38% Anglo in terms of voting age population, but in Plan H283, Anglo voters would control 71% of the 3.5 districts in Fort Bend County. Joint Expert Ex. E-5 (Martin Report) at 12. Relying on racial shading maps by VTD, he opined that this partisan gerrymander was achieved by splitting the minority community outside the African-American opportunity district HD27 among Districts 26, 28, and 85 (which extends into neighboring rural counties). *Id*. Korbel testified that HD27 is packed with minorities and the remaining minority population is cracked among the other districts that will not provide minority opportunity. TrJ1417. The Legislature spread the minority population of Fort Bend County into four districts. TrJ1416 (Korbel).

526. Korbel testified that HD26 is an odd-shaped district that does not appear to follow traditional redistricting principles of compactness and respecting communities of interest. TrJ1413-14. However, his report did not provide information about factors such as rivers, city boundaries, roads, or political data that might account for district boundaries. TrJ1455 (Korbel). Interiano testified that the HD26 lines partly track precinct lines and natural boundaries, and also reflect the goal of trying to keep a balance of Republican strength between HD26 and 28. TrJ1607.

527. The population growth in Fort Bend, Wharton, and Jackson Counties was 80% minority. TrJ1411 (Korbel). Asian, Hispanic, and African-American growth all exceeded Anglo growth, and there was sufficient total minority population growth in Fort Bend County to populate a new district.

MALC-154; Joint Expert Ex. E-5 (Martin Report) at 12; Joint Expert Ex. E-4 (Murray Report) at 29. The growth meant the Legislature created a new district there, and although there were roughly 140,000 more minorities added to the area than Anglos, no minority opportunity district was created. TrJ1411-12 (Korbel); Joint Ex-5 (Martin Report) at 12; Joint Expert Ex. E-4 (Murray Report) at 29. Martin opined that the Legislature failed to draw an additional coalition district in Fort Bend County even though one could have been drawn. Tr404 (Martin). Interiano testified that the mapdrawers looked at whether to put a new minority opportunity district in Fort Bend but decided not to because it would have been a coalition district, and they did not feel that § 2 required it. TrJ1571, TrA66 (Interiano). The mapdrawers also did not believe they had an obligation to provide an opportunity for minority growth; instead they chose to draw the districts to keep them Republican throughout the decade. TrA67 (Interiano).

528. The Perez Plaintiff's *Gingles* demonstration plan H290 is a three-district plan. Joint Map Ex. J-35. It contains an African-American district (HD27) (44.3% BCVAP) and a proposed tri-ethnic minority coalition district (HD28) with an Anglo VAP of 25.5% and a B+HVAP of 52.7%, and "other" (Asian) VAP of 21.7%. HD28 would have an Anglo CVAP of only 36.2% and 26.3% HCVAP, 21.8% BCVAP, and 14.7% Asian CVAP, and would be a tri-ethnic coalition. Joint Expert Ex. E-5 (Martin Report) at 12.

529. MALC offers *Gingles* plan H329 that would create two minority districts. MALC-126. Using 2008-2012 ACS data, HD27 is 30.3% Anglo CVAP (45.6% BCVAP, 15.9% HCVAP, and 7.3% Asian CVAP), and HD26 is 37.8% Anglo CVAP (16.5% BCVAP, 13.6% HCVAP, and 30.8% Asian CVAP). MALC-128. HD28 and HD85 are majority-Anglo CVAP.

530. MALC also offers *Gingles* demonstration map H361 (H366 is the same), a plug-in map that MALC contends creates two minority opportunity districts, HD27 and HD85 (a tri-ethnic coalition district). TrJ1418, TrJ1421 (Korbel); MALC-131. HD27 is similar to that in H283; HD26 encompasses Sugar Land and areas to the south; HD85 encompasses Rosenberg and Richmond and extends southwest, and HD28 includes the rest of Fort Bend and Wharton County and all of Jackson County. TrJ1418. In this map, HD27 is 65% B+H in total population and HD85 is 59.9% B+H in total population, and both are over 12% in "other" (Asian) population. TrJ1419-20 (Korbel). Using 2008-2012 ACS data, HD27 has 25.4% Anglo CVAP and 64.2% B+HCVAP, and HD85 has 34.1% Anglo CVAP and 54.3% B+HCVAP. TrJ1421 (Korbel). With Asian 10.8% CVAP included, it is over 64% minority CVAP. TrJ1421. Korbel testified that this area has a tri-ethnic coalition and that there are no significant compactness differences between H283 and H361. TrJ1421-22 (Korbel). This would be a minority coalition district. TrJ1455 (Korbel).

531. LULAC offers Plan H285, a four-district plug-in *Gingles* demonstration map for Fort Bend County with 1.94% deviation. LULAC 12-2-B; Joint Map Ex. J-30; Tr699 (Korbel). HD27 is the same as in Plans H361 and H366, and the remaining districts are similar but not identical. Thus, HD27 is 47.4% BCVAP, and HD85 is a coalition district (28.8% HCVAP, 23% BCVAP, and 8.8% Asian CVAP). HD26 and HD28 remain Anglo-majority CVAP.

532.  Rep. Senfronia Thompson (African American, Democrat) is familiar with Fort Bend County politically and personally. TrJ1246 (Thompson).  She has observed cooperation between African Americans, Latinos, and Asians in Fort Bend County, and she thinks there should be an Asian coalition district there.  *Id*. She testified that African Americans and Latinos vote with Asians in that area.  *Id*.

533.  Dr. Brischetto found a high degree of racially polarized voting in Fort Bend County. TrJ969.  Dr. Brischetto found racial bloc voting in general elections in Fort Bend County. TrJ947, TrJ969; MALC-161.  He found that Latinos had a very high cohesiveness. TrJ969.  He also found that Anglo bloc voting was sufficient to usually defeat the Latino-preferred candidate.  *Id*.  Brischetto found that African Americans, Asians, and Latinos were very cohesive in Fort Bend County in the general elections.  TrJ970.  He did not conduct a multivariate analysis for the primary elections in Fort Bend County. TrJ978-79; TrJ1866 (Alford).

534.  Based on his analysis of the expert reports in this case, Dr. Alford did not find any evidence of cohesion among Asian-American, Black, and Hispanic voters in primary elections in Fort Bend County.  TrJ1866 (Alford).  He testified that no expert has done a multivariate analysis for Anglo, Asian, Black, and Hispanic voters in primary elections in Bell or Fort Bend Counties. TrJ1866. He stated that there was no evidence of cohesion among Asian Americans, Black, and Hispanic voters in primary elections in Bell or Fort Bend County, and unless their behavior is remarkably different from what is seen everywhere else in the state, they would not vote cohesively. TrJ1866-67.  He thinks there is neither political cohesion nor electoral voter cohesion. TrJ1867.  His conclusion about lack of evidence of cohesion in Bell and Fort Bend does not take into account lay witness testimony about minority cohesion in those areas. TrJ1895 (Alford).  His conclusion is based only on the statistical evidence. *Id*.

535.  In Fort Bend County, 31.7% of Hispanics have less than a high school education, compared to 11.3% for the entire County population.  Joint Expert Ex. E-1 (Chapa Report) Table 4.  The per-capita income for Hispanics was $18,086, compared to $43,208 for non-Hispanic Anglos.  *Id.* Table 5.

536. The Fort Bend County map was drawn by the incumbents, two Anglo Republicans and an African-American Democrat, working with Interiano.

537. Fort Bend County had enough growth for a new district to be added there. The mapdrawers did not put a new minority district in Fort Bend County, despite substantial minority population growth there.

538.  Plans were proposed during the session to create tri-ethnic coalition districts, but mapdrawers did not feel a coalition district was required.  They chose to draw the map so that three districts would remain Republican throughout the decade.

539.  Dr. Brischetto found that Latinos, African Americans, and Asians were very cohesive in

general elections in Fort Bend County. Dr. Brischetto did not conduct a multivariate analysis of the primary elections. Dr. Alford found no expert evidence of cohesion among Latinos, African Americans, and Asians in the primary elections. Plaintiffs provided lay testimony of cohesion.

### Dallas County

540. In the benchmark plan H100, Dallas County had 16 districts (100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, and 115).

541. Four districts were African-American opportunity districts and were represented by African-American Democrats: HD100 (Rep. Johnson) (40.3% BVAP, 50.9% BCVAP), HD109 (Rep. Giddings) (63.9% BVAP, 62.2% BCVAP), HD110 (Rep. Mallory Caraway) (42.2% BVAP, 53% BCVAP), and HD111 (Rep. Y. Davis) (49.1% BVAP, 54% BCVAP). TrJ145 (Arrington). These districts were in the southern part of the County.

542. Two districts were considered to be Hispanic districts (only one was majority HCVAP) and were represented by Hispanic Democrats: HD103 (Rep. Anchia) (69.3% HVAP, 46.5% HCVAP and 14% BCVAP using 2005-2009 ACS data, and 38% total SSVR/39.3% non-suspense SSVR) and HD104 (Rep. Alonzo) (77.2% HVAP, 60.8% HCVAP using 2005-2009 ACS data, and 56.7% total SSVR/58.3% non-suspense SSVR). TrJ145 (Arrington); Anchia depo. at 46. These districts were in the central west part of the County.

543. The ten other districts were Anglo CVAP majority districts using 2005-2009 ACS data.

544. HD105 and HD106, in the western part of the County, were majority-minority VAP. Using 2008-2012 ACS data, benchmark HD105 was 50.8% Anglo CVAP with a margin of error of +/-1.2% and HD106 was only 47% Anglo CVAP. D-100.

545. HD105 was a compact district that included much of the City of Irving. The incumbent was Linda Harper-Brown, an Anglo Republican. HD105 had an HVAP of 31.2%, BVAP of 14.7%, and Anglo VAP of 36.1%. It had 19.6% HCVAP, 15.3% BCVAP, and 56% Anglo CVAP using 2005-2009 ACS data (50.8% +/- 1.2% Anglo CVAP using 2008-2012 ACS data). Hispanic voters did not have the opportunity to elect their candidates of choice in benchmark HD105. US-351 (Handley 2011 report) at 3-8. However, in 2008, Democrat Bob Romano lost to incumbent Harper-Brown by only 19 votes. And in 2008, 7 of 9 Hispanic-preferred candidates prevailed in statewide elections in HD105 (President, U.S. Senate, Railroad Commissioner, Supreme Court Chief, Supreme Court Places 7 and 8, and Court of Criminal Appeals Places 3, 4, and 9). US-370 at 99-100.

546. HD106 in the benchmark plan was also in the western part of the County, just below HD105, and included portions of Irving, Grand Prairie, and a small part of Dallas. The incumbent was Anglo Republican Rodney Anderson. HD106 had an HVAP of 44.3%, BVAP of 13.7%, and Anglo VAP of 35.9%. It had HCVAP of 29%, BCVAP of 12.8%, and Anglo CVAP of 52% using 2005-2009 ACS data, though, as noted, using 2008-2012 ACS data it was only 47% Anglo CVAP. The total

SSVR was 23.4%. Minority voters elected their candidate of choice in HD106 in 2006 and 2008, but not in 2002, 2004, or 2010. US-351 (Handley report) at n.10. In 2010, Anderson narrowly defeated the Democratic incumbent Kirk England by 204 votes.

547. Three districts in the eastern/northeastern part of Dallas County, HD101, HD102, and HD113, had also become majority-minority VAP but remained majority Anglo CVAP. HD113 (60.1% Anglo CVAP) was located in the northeastern corner of Dallas County and had been represented by Anglo Republican Joe Driver since his election in 1992. Some Plaintiffs' experts opined that HD101 (61.3% Anglo CVAP) and HD102 (61% Anglo CVAP) had experienced minority population growth and had become effective minority coalition districts. TrJ1425 (Korbel); Joint Expert Ex. E-5 (Martin Report) at 9-10. Those districts elected Republicans in 2002, 2004, 2006, and 2010, but elected Democrats in 2008. In 2010, Anglo Republican Cindy Burkett was elected to represent HD101, and African-American Republican Stefani Carter was elected to HD102.

548. Dallas County lost population relative to the state as a whole, so Dallas County was only apportioned 14 seats in the 2011 redistricting cycle, meaning a loss of two seats. TrJ145 (Arrington). The mapdrawers knew that the two lost seats would have to be Republican seats because all of the Democrat districts were protected minority opportunity districts. D-192; D-132; TrJ925, TrJ2073, TrJ2015 (Downton). HD106 was one of the two districts that was eliminated from Dallas County (Anderson and Harper-Brown were paired in HD105); it was moved to Denton County, which gained a district. HD101 was eliminated (Burkett and Driver were paired in HD113) and moved to Tarrant County, which also gained a district.

549. The 2010 population of Dallas County was 2,368,139, meaning it was apportioned 14.1266 districts. All districts within Dallas County could therefore be slightly overpopulated from the ideal district size. The Anglo population of Dallas County decreased by over 198,000, a negative 20.2% growth rate. Tr327-28 (Martin); TrJ1423 (Korbel). The minority population of Dallas County grew by almost 350,000 and accounted for 100% of the growth in Dallas County. Tr328 (Martin); TrJ1423 (Korbel). In 2010, Dallas County was 33.1% Anglo, 38.3% Latino, and 22.3% African American. Tr327 (Martin). Despite this growth pattern, the Legislature did not put any new minority opportunity districts in Dallas County. TrJ1423 (Korbel); TrJ146 (Arrington); Joint Expert Ex. E-5 (Martin report) at 8. In addition, their enacted map gave Anglo control (majority-Anglo CVAP) to 8 of 14 districts (57% of districts) in Dallas County. Tr1053 (Murray).

550. On February 17, Hanna emailed Denise Davis with the subject "redist issues." D-192; US-102; Quesada-242. He wrote, "1. Dallas Lose two seats. Both will have to be R's b/c all D seats are minority. It may get worse. If it is possible to draw third Hispanic seat, you'll need to do that too. That would be a 3rd seat. Four Black seats (as now) looks doable." Downton testified that it was not possible to draw a third Hispanic seat. TrJ2053. He said that they could not get two majority-SSVR districts, let alone three, and he did not think it could be done while keeping Alonzo's Latino opportunity district (HD104) at 50% SSVR. TrJ2054-56.

551. On February 18, 2011, Denise Davis forwarded Hanna's email to Interiano. D-132. Interiano

responded to Davis stating, "[Hanna] and I went through all of this yesterday afternoon and through some of the first things that we need to look at as soon as RedAppl is up and running. . . . As far as Dallas goes, the ones that are going to be at risk are Sheets, R. Anderson, and Burkett,[15] but Hartnett may also have issues because Branch has to pick up population as well and he told me last night that he would like to pick it up from Hartnett and give up some other portions to some of the minority seats." D-132.

552.   Dallas was a drop-in county, but the delegation could not agree on a map due to the loss of two seats and no members wanting to be paired.  Tr924, TrJ2014-15 (Downton); Y. Davis depo. at 199. Rep. Branch (Anglo, Republican), a member of the HRC, served as the delegation lead and tried unsuccessfully to get an agreed delegation map.  Downton was then tasked by Branch with trying to draw a map. Tr924, TrJ2015-16 (Downton).

553.   Downton was the principal mapdrawer for Dallas County.  Downton 8-31-11 depo. (Joint Ex. J-62) at 72-73; Tr924-29, 930-39 (Downton). Downton drew some of the districts with Rep. Branch, particularly his district (HD108).   TrJ2015-17, 2073-74 (Downton).   As to the other districts, Downtown came up with ideas and met with some members to get their input.  TrJ2016 (Downton). Downton met with Democrat members Anchia (HD103) and Johnson (HD100). Tr2017 (Downton). Several of the members came to talk with him, including Burkett and Harper-Brown, who also gave him a Dallas County proposal.  TrJ2016-17.   Downton got district proposals from all members except Alonzo.  Tr924 (Downton). Downton testified that he got a proposal from Y. Davis but said she did not have approval of the other Democrat members for those districts (there is a plan in the hrc1 account that says it was "received from davy," though Rep. Y. Davis said that she did not submit a map). Tr924, TrJ2077 (Downton); PL-1615 (plan log). Downton stated that he "essentially looked at various ideas from different people" and "drew a map."  Downton 8-31-11 depo. (Joint Ex. J-62) at 100.

554.   Dallas County was not a "member-driven" process.  Y. Davis depo. at 32, 198.  Although some members participated, Rep. Davis said she was "shut out of the process." Davis depo. at 198.  Davis was not shown her district before the first plan was publicly released. *Id*. at 202.  Davis testified that Solomons and his staff did not work with her or her office. *Id.* at 35-36, 41, 44, 207.  She testified that when she talked to Solomons, he said to have her staff contact his staff, but when her staff reached out to the designated redistricting person, he did not respond.  *Id*. at 41-42.  He was nonresponsive to their inquiries about how to submit plan ideas or to see the map in progress. *Id.* at 208-09.   Davis did not feel that Solomons' door was open to her and felt that the Republicans already had a plan and "we were not part of that factor."  *Id*. at 43, 45.  She testified that "we were not successful in getting involved with his office with the maps." *Id*. at 199. Davis testified that she was told that Solomons was drafting his own map.  *Id*. at 208.  She also testified that one of the other members had told her that Solomons had directed her to talk to Rep. Branch about the map, but she did not provide a map to him because he was not on the HRC, and Branch later told her that he was

_____

[15] There is no evidence as to why these three representatives were "at risk," but they had all been recently elected in the 2010 election, defeating Democrat incumbents.

not putting together the Dallas County map. *Id.* at 209-11.

555. Mapdrawers knew early in the process that they would likely pair Reps. Harper-Brown and Anderson, and Downton was drawing some maps pairing them as early as March 10 in hrc1H135. TrJ2073 (Downton). For the other pairing, there were different ways it could have been done. *Id.*

556. The first map sent to Hanna for a retrogression analysis (either hrc1H215 or hrc1H220) contained a Dallas County map that was very different from what ended up in Plan H283. It does not appear to pair Harper-Brown and Anderson. Hanna's first retrogression memo, written around April 7 (D-122), raised some concerns about Dallas County. Hanna noted that the proposed HD103 went from 38.0% total SSVR to 33.8% total SSVR and HD104 went from 56.7% SSVR to 45.6% SSVR, and wrote that both districts "present retrogression issues." He continued, "While both are significantly short people (more than 86,000 combined), no new Hispanic districts are being added in Dallas County, and the overall percentage increase in the Hispanic population in Dallas County makes the declines in SSVR especially difficult to justify. While it can be argued that District 104 will likely perform at 45.6 SSVR since this is similar to the performing level it was drawn at in 2001, no similar argument exists for the reduction in District 103. Accordingly, at a minimum, the decline in SSVR in District 103 should be remedied. Consideration should also be given to keeping District 104 over the 50% SSVR threshold if this can be done." D-122; TrJ2143-44 (Downton). With regard to the African-American opportunity districts, Hanna wrote, "The Black population in Dallas County is moving to the south and West and out of the inner city. This is reflected in the disparities in the Black populations in the current districts between the two more northerly ones (100 and 110) and the two southern ones (109 and 111). This effect is enhanced by the proposed plan and presents clear retrogression issues. With the Black percentage in District 109 sitting at 62.1% in the proposed plan, it is likely that the levels of Black populations in District 100 and 110 can be restored significantly closer to their current levels without endangering the viability of District 109 or District 111 as performing Black districts. Additional leveling out of the Black populations could occur, but likely would not be required for preclearance under Section 5."

557. Downton stated that, in response to Hanna's suggestion to remedy the SSVR decline in HD103 and keep HD104 above 50% SSVR, they increased SSVR in both of those districts. TrJ2143-44. To do this, Downton used HVAP racial shading at the block level (SSVR is only available at the precinct level and he could not recall whether he could shade for SSVR). TrJ2144 (Downton). Downton was able to increase the SSVR in HD104 to 48.1% total SSVR and 50.1% non-suspense SSVR. TrJ201 (Arrington).

558. Downton admitted using block level racial shading when drawing all six minority districts in Dallas County—HD100, 103, 104, 109, 110, 111. Downton 8-31-11 depo. (Joint Ex. J-62) at 113-14.

559. Downton testified that he began with Anchia's district HD103 and with HD104, because those were the two Hispanic opportunity districts. TrJ2017, TrJ2069. He testified that he drew HD103 and then drew other districts around it. Tr999. Downton also testified that he worked with Rep.

Anchia to determine what population to include. Tr999, TrJ2017. It is not clear from the testimony whether Downton was referring to the time before or after Hanna's first retrogression memo, but it appears to be after. Anchia confirmed that he was involved in the configuration of his district. Anchia depo. at 15. They generally discussed the "metes and bounds" of the district, and Anchia made specific requests about areas he wanted included in his district, but did not recall those requests other than including a portion of Farmers Branch and Carrollton. *Id*. at 15:25-16:10. He does not recall making any requests about the overall demographics or kind of voting profile of his district. *Id*. at 16:11-14. HD103 was at the bottom end of the population range and needed more population. Downton testified that they tried unsuccessfully to get the SSVR of HD103 above 50% but could not have it and HD104 both above 50%, so mapdrawers decided to maintain the SSVR of HD103 at benchmark levels. Tr925-26, TrJ2069. Downton testified that because mapdrawers also wanted to maintain the SSVR in HD104 over 50%, they could not take concentrated Hispanic population out of 104 to put into 103 because it would have dropped the SSVR in HD104. He stated that although the Hispanic VAP in the area was high, there were a lot of noncitizens. Tr926 (Downton). Benchmark SSVR in HD103 was 38% total/39.3% non-suspense, and in Plan H283 it was reduced slightly to 36.9% total/38.1% non-suspense. Although SSVR decreased, Anchia did not think it affected the ability of Hispanic voters to elect their candidate of choice, and Downton agreed with him. TrJ2071 (Downton). Anchia was displeased that his district was so overpopulated (5%), and it seemed like there was an effort to put a lot of population in unnecessarily, but otherwise he was happy with his district. Anchia depo. at 19, 165. However, he voted against Plan H283. Tr160 (Martinez Fischer).

560. In Plan H283, an HD103 arm reaches to the west into HD105 (represented by Anglo Republican Harper-Brown), picking up the most heavily concentrated Latino population in Irving and splitting ten precincts. Tr323-24 (Martin); TrJ148 (Arrington). These splits made HD103 at lot less Anglo and more Hispanic, and made HD105 more Anglo. TrJ151 (Arrington). Downton admitted using racial shading in drawing HD103, including the incursions of HD103 into HD105, because he wanted to keep the SSVR of HD103 at benchmark. TrJ2080-81 (Downton). This is confirmed by racial shading exhibit PL-106, which shows that the HD103 west arm is picking up primarily population that is 70-100% Black + Hispanic population.

561. HD105 has a long arm that reaches from Irving in west Dallas County down through Grand Prairie, with HD104 wrapping around it. Downton had been instructed to pair Rep. Anderson with Rep. Harper-Brown in a district either could win (*i.e*, a Republican district). Anderson lived in southern Grand Prairie, so Downton had to draw the long extension down from HD105 to pick up Anderson's home and pair him with Harper-Brown, who lived at the north end of the district. Downton 8-31-11 depo. (Joint Ex. J-62) at 113; TrJ2018 (Downton). Downton stated that he also drew the arm to contain Republican-leaning precincts, which fit more with the composition of HD105, which is a Republican-leaning district, than HD104, which is a Democratic-leaning district. He testified that he did that by looking at political shading, and the area below the highway was the most Republican area, and so he pulled it up into HD105. Tr927. Additionally, he testified that the 105/104 configuration was a combination of trying to pick up Anderson's house for HD105, trying to keep HD104 compliant with the VRA, and trying to cut Grand Prairie into as few pieces as he

could, given other considerations. Tr928. Downton stated that the fact that the HD105 southern arm into HD104 matched with picking up Anglos was explained by trying to maintain the Hispanic numbers of 104 by putting Anglos in HD105 and not in HD104. Downton 8-31-11 depo. (Joint Ex. J-62) at 114-15. Downton admits using racial shading at the block level when drawing HD105 and HD104, but says it was to keep HD104 above 50% SSVR and loop it around the southern portion of HD105 that picked up Anderson's home. Tr928-29, TrJ2080. Interiano testified that they drew the HD105 arm down to pick up Anderson, and then drew HD104 around it. Interiano 8-9-11 depo. (Joint Ex. J-61) at 36 . He also testified, "As much as possible, we tried to keep the minority community in Dallas County together." *Id*. at 37

562. Downton split a number of precincts between HD104 and HD105. Downton stated that he split precincts because there was no policy against it and he needed to create the pathway to Anderson's house while maintaining HD104's total and Hispanic population. TrJ2020-21. He stated that he split Precinct 4504 because it was too large to include all of it in HD105 and he needed to maintain a pathway to keep the population of Precincts 4510, 4514, and 4516 in HD104. TrJ2021. He said he split Precinct 4508 to create a pathway to Anderson's home without taking too much population; he split Precinct 4515 to comply with the VRA for HD104, and he did not recall why he split Precinct 4517. TrJ2022-24. Downton testified that he did not know of any other ways to pair Anderson and Harper-Brown, keep HD104 above 50% SSVR, and maintain HD103 at or as close as possible to its benchmark SSVR level. TrJ2081.

563. The boundary of HD105 divides the cities of Grand Prairie and Irving, splits 22 precincts, and breaks up numerous communities of interest. Tr321-23 (Martin); US-387 at (Red-381 Report); US-299. The benchmark configuration of HD105 is compact, encompassing most of Irving north of the Rock Island railroad and west of Loop 12. TrJ1107 (McPhail). HD105 in H283 has jagged, bizarrely shaped lines, that extend much farther outward than they used to. TrJ1108 (McPhail). Downton split precincts in the HD105 arm extending into HD104 on the basis of race to include Anglos in HD105 and place Hispanics in HD104. TrJ148 (Arrington); Tr322 (Martin). HD103 reaches an arm into HD105 to take Hispanic portions of Irving by splitting precincts. TrJ146-48 (Arrington); TrJ599 (Lopez); TrJ1117-18, TrJ1121 (McPhail); Tr321 (Martin); US-299D. The population excluded from HD105 by splitting precincts was disproportionately Hispanic and low income. TrJ599-01, 602-05, 606-09 (Lopez); TrJ1124-25 (McPhail); US-299D. The population included in HD105 in split precincts is disproportionately Anglo and relatively affluent. TrJ151 (Arrington); TrJ595-96, TrJ601-02, TrJ606 (Lopez); TrJ1109-26 (McPhail); US-356 ¶¶ 52-53 & Table 1 (Feb. 2014 Arrington report). Downton deliberately split precincts by race to put Hispanic voters into HD103 and HD104 but not in HD105. TrJ2069 (Downton); TrJ147-51 (Arrington).

564. Hanna's first memo (around April 7) had pointed out that HD109 had 62.1% BVAP and districts 110 and 100 had gone down but could be restored. In Plan H113, the BVAP of HD109 is 57.4%. BVAP in HD100 is 40.8% and in HD110 is 42.5%. Downton spoke with Rep. Caraway and she gave him some suggestions about her district HD110. Tr1018 (Downton). He did not recall Caraway complaining to him that the Hispanic numbers in her district were dramatically increased. *Id*. Again, it is not clear whether Downton worked with these members initially or in making

changes after Hanna's initial retrogression memo.

565.   Hanna's second retrogression memo, written around April 12, still noted the decreases in SSVR for HD103 and HD104 as potential retrogression issues and suggested remedying the reduced SSVR (36.8% total, down from 38%) in HD103.   With regard to the African-American districts, Hanna no longer felt that there were retrogression issues. D-327.

566.   Plan H113, the first public plan, was released April 13.   As noted, Rep. Linda Harper-Brown (Anglo, Republican) and Rep. Rodney Anderson (Anglo, Republican) were paired in HD105, and Rep. Cindy Burkett (Anglo, Republican) with Rep. Joe Driver (Anglo, Republican) in HD113, and HD101 and HD106 were eliminated. The Plan H113 configuration of Dallas County remained mostly unchanged in Plan H283.   The only change was through Branch's amendment at the April 19 committee meeting, which shifted 690 people from HD108 into HD103.

567.   At the April 15 hearing before the HRC, Sandra Crenshaw from Dallas testified against Plan H113, asserting that it improperly split cities. D-595 at 206.   She also noted that splitting precincts causes costly problems for elections and confuses voters. *Id.* at 208.

568.   At the April 17 hearing before the HRC, Rep. Driver (Anglo, Republican), who had been paired with Burkett in Dallas County, asked how the map was created and what criteria had been used.   He wanted to know how they had decided to pair a senior and junior member, and why the map was changed from what he had been shown before.

569.   Rep. Mallory Caraway (African-American, Democrat, HD110) opposed Plan H113.   She complained that she was not included in the delegation meeting and she did not know that Rep. Branch was in charge of drawing districts.   She said the plan destroyed the community of interest in the southwestern portion of HD110.   She said that certain precincts (3506, 3514, 3515, 3517, 3526, 3351, and 3353) should not be moved into HD100 (because they do not share interests with the rest of HD100) but should stay in HD110 (her district) and that the plan was gerrymandered to include them in HD100.   She proposed a map to move them back into HD110 and to put other precincts that were more "geographically compatible" into HD100.   She complained that the precinct she lives in (Precinct 3515) was split.   She stated that she proposed a district, but the map did not look like her proposal.   She noted that HD109 (Giddings) was the only district that gained population, so it was more logical for HD110 to absorb that excess, and she proposed that in her map to Solomons.   Although HD109 did absorb some of that population, she also lost some of her most valuable precincts.   She said she understood that changes were necessary given the loss of a district but did not see why drastic measures were taken to disconnect her core stable precincts.   She also stated that Plan H113 eliminated a majority African-American district by diluting the African-American voting strength in HD100 and giving it to HD110.   Rep. Johnson (HD100) testified in opposition to Caraway's proposed changes that would swap areas between HD100 and HD110.   He stated the changes would reduce the BVAP of HD100 from 40.8% (H113) to 36.5% (benchmark was 40.3%).   Johnson stated it would impermissibly retrogress HD100.   No changes were made.

570. Sandra Crenshaw (Precinct 3549 Chair) from Dallas testified against Plan H113. She stated that Oak Cliff was split among districts and the African-American community in HD110 should be kept together. She objected to suburban districts coming in and "cherry picking" population and asserted that Oak Cliff should stay together. She also stated that HD100 could get African-American population from Mesquite. She noted that Dallas County representatives had testified about lack of transparency and encouraged the mapdrawers to respect communities of interest.

571. At the April 19 HRC formal meeting, Rep. Branch offered an amendment (Plan H126) to the committee substitute (Plan H134) affecting HD100, 103, and 108 in Dallas County, and an amendment (Plan H148) to the amendment (Plan H126). D-12. The amendment (Plan H126) and the amendment to it (Plan H148) were adopted. This moved some population between HD108 and HD103.

572. The third Hanna memo, which considered Plan H153 voted out of committee, raised the same concerns about HD103 and HD104 and suggested remedying the drop in SSVR in HD103 but did not raise any other concerns about Dallas County. US-338.

573. On April 22 and 23, Interiano was working on the Dallas County map as a possible amendment, and emailed Hanna to run a retrogression analysis on it. US-171; US-161; PL-1669; D-133. Archer responded to Interiano's email and noted that benchmark HD103 was not a Hispanic opportunity district and he had not seen a plan that made it into one. D-134.

574. On April 27, during second reading, Rep. Veasey pointed out that Anglo population had decreased by 198,000 in Dallas County and all the growth was minority, that although Anglos were only about 33% of Dallas County they still controlled most of districts, and that the numbers did not seem to be adding up. D-13 at S116. Solomons replied that the committee did not see the need to create new districts, and that primarily the growth "was in a lot of existing protected districts." *Id*. He said it "didn't grow in the relevant areas." *Id.*

575. Rep. Anderson (Anglo Republican) laid out Amendments No. 3 (H220) and 4 (H247) relating to Dallas County that would pair Rep. Sheets and Hartnett and Driver and Button instead of Anderson and Harper-Brown. D-190 at 92-95, S733; D-13 at S134-35. Anderson stated that he believed the district as currently drawn was fair and legal but he "believe[]d there's another way to keep the core districts and communities of interest together. It keeps Mesquite, Garland, Richardson, Carrollton, Addison, Irving, and Grand Prairie predominantly intact. It also reflects the diverse neighborhoods that are located within the city of Dallas." D-13 at S134. Rep. Martinez Fischer stated that the proposed map might be retrogressive because it dropped HD104's SSVR from 58.3% to 45.5% and it did not create any new opportunity districts. *Id*. at S138, S141. Republicans Hartnett, Jackson, Branch, and Harper-Brown did not support the amendment. Solomons moved to table, and it was tabled. *Id*. at S142-43.

576. Rep. Driver (Anglo, Republican) took issue with Solomons' statement that it was a member-driven map in Dallas County and complained that he was not consulted on his district or on Dallas

County, that it was not inclusive, and that his community of interest was "cut up." D-13 at S137, S141, S157. Rep. Anderson complained that the proposed map "dramatically chang[ed] representation throughout all of Dallas County." *Id.* at S142.

577. Rep. Harper-Brown proposed Amendments 5 and 6 (Plan H219) relating to Dallas County. Harper-Brown asserted that the amendment would keep more of Irving in HD105 and allow HD115 to encompass Carrollton and Farmers Branch and protect the community of interest of these cities and improve compactness. Rep. Giddings (African American, Democrat) complained that it destroyed the core of HD109, a minority opportunity district. D-13 at S144. Anderson complained that it divided Grand Prairie, "the 15th largest city in Texas," into five pieces in Dallas County. *Id.* at S145. Rep. Y. Davis asserted that it changed HD111 from a majority African-American district to majority Hispanic and opposed the amendment. *Id.* at S146. Anchia complained that it reduced the SSVR of his district, and he opposed the amendment. *Id.* at S148. Solomons stated, "It breaks up Grand Prairie far more than what the original map does. It redraws the west side of Dallas County. It reduces Representative Anchia's SSVR numbers problematically simply but not enough for Leg Council to have an over-concern ...." *Id.* Rep. Turner opposed the amendment on behalf of the Legislative Black Caucus "because we view it as outright regression" (to change it from an African-American district to a Latino district). *Id.* at S155. It was tabled. D-13 at S158; D-190 at 96-97.

578. Rep. Martinez Fischer then set forth Amendment No. 32 (H199) focusing on Dallas and Tarrant Counties to increase the number of opportunity districts. This plan included three districts that spanned Dallas and Tarrant Counties. Martinez Fischer stated that Plan H153 violated § 2 of the VRA by limiting the creation of minority opportunity districts. Rep. Alonzo noted it was the same plan Martinez Fischer had presented for other areas, but he was just focusing on DFW. D-13 at S223. A statement of legal issues regarding the DFW metroplex and the April 27, 2011 letter from MALDEF stating that Plan H153 was retrogressive were made a part of the record. *Id.* at S224. The statement of legal issues noted that H153 substantially overpopulated Latino majority districts HD103 and HD104 in Dallas and across the state. It concluded that the overpopulation of Latino majority districts in Dallas County served to limit Latino influence in Dallas County House districts. *Id.* at S221-22. It argued that use of the County Line Rule fenced apart minority voters in Dallas County and Tarrant County, and that Plan H153 packed minority districts and failed to create additional minority opportunity districts, while alternative plans created up to two by unpacking districts and avoiding the County Line Rule. *Id.* at S222. The amendment was tabled. D-13 at S230.

579. Martinez Fischer also proposed Amendment No. 34, Plan H201. Joint Map Ex. J-24. Like the enacted plan, this plan eliminates HD101 and HD106. Using 2005-2009 ACS, HD109, 110, and 111 remain majority BCVAP, but HD100 is 46.6% BCVAP.[16] HD103 is 42.2% HCVAP (34.4%/35.3% SSVR) and HD104 is 56.9% HCVAP (51.7%/53.4% SSVR). HD102 is 49.7% Anglo CVAP (though B+HCVAP is less than 50%). The Anglo VAP of HD102 is only 31.2% and the Anglo VAP

---

[16] Chapa estimated that HD100 was 49% BCVAP. Joint Expert Ex. E-2 Table 9. Using 2008-2012 ACS data, HD100 is 47.3% (+/- 1.6) BCVAP.

of HD105 is 40.1%. Seven of the districts are majority Anglo CVAP.

580. Arrington opined that Plan H201 creates eight minority districts – four African-American, three Hispanic, and one in which the situation in the primary is "unclear." US-352 at 18. The plan pairs Republican incumbents in three districts and leaves HD106 an open seat. *Id.*

581. Rep. Turner laid out Amendment No. 35, Plan H202, on behalf of the Legislative Black Caucus. This plan eliminates HD114 and HD115. Plan H202 maintains the four African-American districts, though the BCVAP of HD100 falls below 50% to 47.2% Black Alone CVAP (47.6% combined). It maintains HD104 above 50% HCVAP and includes an HD103 with a lower HCVAP than benchmark (38.8% compared to 46.5% HCVAP in the benchmark) and lower SSVR. It also creates an additional proposed minority coalition district (HD107) in northeastern Dallas County. Using 2005-2009 ACS data, HD107 had a BCVAP of 26.5% and HCVAP of 23.9%, for a combined B+HCVAP of 50.4%. Joint Map Ex. J-25; TrJ581 (Wallace); TrJ913, TrJ921 (Fairfax); Y. Davis depo. at 67. The Anglo CVAP was 42.8%. Y. Davis depo. at 67. Rep. Davis testified that HD107 was drawn to recognize the Hispanic and African-American communities that had grown in the area. Y. Davis depo. at 67. Lay witness Juanita Wallace is familiar with the area of proposed HD107 and states that Hispanics and African Americans live in the proposed HD107, and they would benefit from additional representation of their choice. TrJ578 (Wallace).

582. Rep. Coleman set forth Amendment No. 38, a statewide amendment (Plan H232), that would create a number of opportunity and coalition districts (59 in total). He said that minority population was responsible for 100% of Dallas County growth because Anglo population declined by over 198,000. This plan eliminates HD106 and HD107. Coleman's written comments for Plan H232 were put into the record, and they assert that this plan: creates a new Latino district HD105 (60% HVAP, though only 34.1% HCVAP using 2005-2009 ACS data) while preserving the two existing Latino districts HD103 and HD104; creates a new HD102 that is 80% non-Anglo in terms of total population and 67.5% B+HVAP (50.8% B+HCVAP); and preserves coalition HD101 (this is 49.3% B+HVAP but remains 60.9% Anglo CVAP). He asserted it would provide minority opportunity in 64% of the districts (9 of 14) in a county that is 67% non-Anglo, compared to 42% in H153. D-13 at S248. The amendment was tabled. D-13 at S250. H232 keeps HD100, 109, and 110 above 50% BCVAP using 2005-2009 ACS, but HD111 drops to 48.9% (+/- 1.5). The SSVR of HD103 is reduced to 38.3/40.4% (45.2% HCVAP using 2005-2009 ACS) and the SSVR of HD104 is reduced to 43.5/45.2% (49.2% (+/-1.9) HCVAP using 2005-2009 ACS). HD101 is 60.9% Anglo CVAP and HD105 is 52.5% Anglo CVAP using 2005-2009 ACS data. HD102 is a coalition district with 24.3% HCVAP and 26.5% BCVAP. *See also* Joint Map Ex. J-28; Joint Expert Ex. E-3 (Lichtman Report) at 9-14; Tr1230 (Lichtman).

583. Rep. Giddings (African-American, Democrat) noted that he and other Dallas County members had submitted maps and they were not accepted. He stated that the proposed committee map was problematic because it did not create influence districts and there was racial disparity in terms of African Americans having less representation than could have been achieved, and the communities of interest were not preserved in minority districts. D-13 at S253.

117

584. Even Anglo Republican members of the House felt that the Dallas County map unnecessarily divided physical communities and did not maintain core districts and communities of interest.

585. In Plan H283, based on deviation from the statewide ideal district size, HD103 is overpopulated by 8,379 persons (5%) (the most in the County) and HD104 is overpopulated by 5,147 persons (3.07%). Of the four African-American districts, one is overpopulated (HD109 by 3.9%) and three are underpopulated (HD100 by 3.87%, HD110 by .05%, and HD111 by .39%). Of the eight Anglo districts, four are underpopulated and four are overpopulated. HD102 is underpopulated by 3.88%; HD108 is underpopulated by 2.63%; HD112 is underpopulated by .35%; and HD115 is underpopulated by .54%. HD105 is overpopulated by 4.83%; HD107 is overpopulated by 2.53%; HD113 is overpopulated by 2.25%; and HD114 is overpopulated by 2.8%.

586. Dr. Arrington and Martin testified that HD103, HD104, and HD105 are also overpopulated using the County ideal, and population deviations play a role in not creating a new minority district. TrJ222 (Arrington); Tr330-32 (Martin). Martin and Arrington opined that the two Latino districts HD103 and HD104 are overpopulated and packed with excess Latino population, preventing that population from being used to create another minority district, and that HD105 is overpopulated with Anglos, preventing it from providing minority opportunity. Tr326, Tr330 (Martin); TrJ149, TrJ148-51, TrJ222 (Arrington).

587. The HD103 western arm and the HD105 southern arm are not in the benchmark configuration of Dallas County. PL-103; Tr328 (Martin). As noted, the HD103 western arm reaches into Irving in HD105 and takes out the Latino population, splitting approximately ten precincts. Tr322-23 (Martin). The HD105 southern arm then reaches down to the "most Anglo part of the City of Grand Prairie" to pick up that population, following the "least Hispanic channel that could have been drawn" and splitting seven precincts to split out the Latino community of Grand Prairie into HD104. Tr321-22 (Martin). The net effect of the new configuration of taking Latino Irving population out of HD105 and picking up Anglos with the southern arm is to increase Anglo VAP by about 5% over benchmark in HD105. Tr325(Martin). HD105 is also overpopulated by 8,091 persons. *Id.* Because the additional population is Anglo population from the south, it makes it more difficult to draw an additional minority opportunity district in West Dallas County. *Id.* Without those additional Anglos in the southern arm, the district is more likely to elect Latino candidates of choice. Tr326 (Martin).

588. Arrington testified that other plans created more minority opportunity, such as Plan H201 and Plan H288. TrJ150; US-352 ¶¶ 52-59 & Tables 5-6 (Oct. 2011 Arrington report). These were not incumbent-protection plans. Arrington asserts that the failure to recognize the Hispanic population growth by increasing representation, when it could have been done consistent with traditional districting principles, is evidence of intentional discrimination. US-352 at 17-18. He further asserts that Plan H288 and Plan H201 are examples of "what can be done if the line drawer makes an effort to recognize the demographic changes that are rapidly altering the racial landscape of Dallas County." *Id.* at 18. He opined that those who drew Plan H283 "did not make any effort to increase representation for minority citizens to match these drastic changes." *Id.*

589.  The total deviation of Dallas County is 8.88%.  Tr329 (Martin).  Downton testified that he did not recall an effort to limit the deviation range to 1%.  Downton 8-31-11 depo. (Joint Ex. J-62) at 96.  Downton said that he could not draw the districts at zero deviation.  His explanation (Downton 8-31-11 depo. (Joint Ex. J-62) at 97-98) was:

> In Dallas County there was -- there were multiple districts that are minority opportunity districts.  You've got one district there that it's arguable as to whether it is or not, depending on your definition.  Representative Anchia's district [HD103].  Based on the definition I've been using, the 50 percent threshold, Representative Anchia's district did not have 50 percent SSVR.  And you could not get it 50 percent SSVR.  But what we did to try to stave off any possible legal challenge with Dallas County, we wanted to maintain as close as possible to the benchmark levels for minority populations as possible in Hispanic districts and the district.  Representative Anchia's district was the most underpopulated district in the entire state.[17]  I think Representative Alonzo's neighboring district [HD104] was slightly underpopulated or right around the line.[18]  So I don't think we could have brought Representative Anchia's district up to the ideal population and Representative Alonzo to the ideal population and also maintain their benchmark levels of minority population.

590.  In his October 20, 2011 deposition, Downton testified that HD103 is 8,379 above ideal population (about 5%) and that he drew it with that deviation because he worked with Rep. Anchia to include that population.  TrJ2148.  Anchia, however, was not happy that his district was overpopulated.  Downton further testified that it was not necessary to have a 5% deviation in HD103 to maintain the Hispanic population, and that there were others ways to have done it, "but that was a policy decision."  TrJ2149.

591.  In Plan H283, HD103 is 67.7% HVAP, 44.6% HCVAP using 2005-2009 ACS, and 36.6% total SSVR/37.6% non-suspense SSVR.  HD103 has one of the lowest perimeter-to-area compactness scores (.081) in Plan H283.

592.  HD104 is 69.2% HVAP, 51.7% HCVAP using 2005-2009 ACS data, and 48.1% total SSVR/50.1% non-suspense SSVR.  HD104 has the lowest perimeter-to-area compactness score (.076) in Plan H283.  Giberson depo. (Joint Ex. J-42) at 46.

593.  HD105 is 39.2% HVAP, 24.1% HCVAP using 2005-2009 ACS data, and 18.1% total SSVR/18.3% non-suspense SSVR.  The Anglo VAP went from 36.1% in H100 to 41% in H283.  The HVAP went from 31.2% to 39.2%.

---

[17] At the start of redistricting, HD103 was 30% underpopulated and was in fact the most underpopulated district in the state.

[18] HD104 was in fact 21.32% underpopulated.  Of course, due to Dallas County's comparative slow population growth, all but HD109 were underpopulated.  But the two Latino districts HD103 and HD104 were among the most underpopulated.

594.  In his report, Martin asserted that HD101, HD102, HD106 were effective districts that were less than 50% Anglo VAP, and that HD107 was also less than 50% Anglo VAP and had elected the minority voters' candidate of choice during the prior decade, and that all these districts were eliminated in plan H283.  Joint Expert Ex. E-5 at 4.  He asserted that even though minority population growth was responsible for over 100% of the Dallas County population growth, Plan H283 creates no new minority opportunity districts and eliminates effective majority-minority coalition districts.  *Id.* at 8.

595.  Martin opined that Plan H283 uses a bizarre configuration in west Dallas County to dilute a trending minority district HD105 and prevent creation of an additional Latino district, eliminates two effective majority minority coalition districts—101 and 102—by splitting areas of rapid minority growth in eastern and northeastern Dallas County into five Anglo-controlled districts, eliminates majority-minority HD106 (Grand Prairie) and its population is not used to create an additional minority district in west Dallas County, and contains an unnecessary 8.8% population deviation with Dallas County.  Joint Expert Ex. E-5 (Martin report).

596.  Martin opined that the gerrymander of HD105 preserved Republican advantage and prevented an additional Latino district.  Joint Expert Ex. E-5 at 8.  He asserted that benchmark Irving-based HD105 had only 36.1% Anglo VAP and experienced rapid Latino population growth, and benchmark HD106 had only 35.9% Anglo VAP, so between them there was sufficient Latino population to create an additional effective district.  But instead of creating that district, he contends, Plan H283 extends HD105 south through a series of narrow channels that split seven predominantly Latino precincts, dividing the Grand Prairie Hispanic population while reaching far to the south for the Anglo population.  *Id.*  Latino HD104 was packed, and then looped around this bizarre southern extension of HD105 to run back north up the western border of the county.  *Id.*  To the north, a long narrow arm of Latino HD103 is extended through HD105 in Irving, splitting ten precincts to remove Hispanic population from HD105.  As a result of this bizarre configuration, the Anglo VAP of HD105 is increased from 36.1% to 41% and no additional Latino district is created.  *Id.*

597.  Martin opined that deviation and other factors have prevented the creation of a minority opportunity district in northeast Dallas County.  Tr331.  Where HD107, 112, 102, 114, and 100 come together, there is a significant area of minority population growth in northeast Dallas, south Richardson, and that population is split among five districts in H283 instead of together where it might be able to elect a candidate of choice.  Tr331-35 (Martin).  He also opined that two effective eastern/ northeastern Dallas County majority-minority districts (HD101 (Anglo VAP 46.7%, district eliminated) and HD102 (Anglo VAP 43% increased to 51.2%) were eliminated by splitting minority population into five Anglo districts.

598.  Plaintiffs' expert Korbel opined that the minority population of HD101 was split among HD113, which is a long district that stretches almost all the way along the county's edge, and HD107 and HD110.  TrJ1425.  Some of the black population was moved into an already packed district HD110, and the minority population placed in HD113 is diluted with Anglo population from the north. TrJ1427 (Korbel).  HD106 was already a very heavily minority district and it was close to

ideal population, but the Legislature moved it to Denton County. TrJ1425 (Korbel). HD104 and HD105 are moved into where HD106 had been. TrJ1427 (Korbel). HD104 is the most noncompact district in Plan H283. TrJ1427 (Korbel). These are strange-shaped districts that do not appear to follow traditional redistricting principles. TrJ1427-28 (Korbel). HD105 extends down into HD104 and picks up minority population and ties it into heavily Anglo population to the north, cracking the minority population and making it difficult for them to elect their candidate of choice. TrJ1429 (Korbel). There are numerous places within Dallas County where the minority population is cracked. *Id*. The minorities that were in HD101 are split into HD113, HD110, and HD107. *Id.* Minority population in the northeast corner is split between HD112 and H113. *Id.* Minority population is split between HD100 and HD107. TrJ1430 (Korbel). Minority population in central Dallas County is split between HD100 and HD108, which contains Highland Park. *Id*. In the northwest area, minority population is split between HD103, HD105, and HD115. *Id*. In west Dallas County, HD104 and HD105 split the minority community. TrJ1431 (Korbel). HD100 is also one of the five least compact districts in the map. TrJ1432 (Korbel). Korbel agrees that there is enough spread-out minority population that it cannot all be put in one district and any map will split some minority population. TrJ1458. Korbel did not look at the role of incumbents and how it might have affected the lines. TrJ1460. He did not consider the role of Rep. Johnson (African American, Democrat) in drawing HD100 (Downton testified that he worked with Johnson on the district, however it is not clear whether this was before he made significant changes to the map). *Id.*

599. Murray opined that minorities in Dallas County are worse off than they were in the benchmark plan. Joint Expert Ex. E-4 (Murray Report) at 33. He noted that, over the decade, there was rapid Anglo population share decline in HD101, 102, 105, 106, and 107, such that these non-competitive districts represented by Anglo Republicans gradually came into play. In 2008, Anglo Republicans lost four of the five districts, and prevailed in the fifth by only 20 votes, though the four lost seats were recaptured in 2010. He felt these areas presented minority opportunities, but Plan H283 "takes that opportunity off the table" by eliminating two of the mixed districts (HD101 and HD106), assigning as many minority residents as possible to the six protected minority districts, and moving the rest of the minority voters into districts with high-turnout Anglos and a recent history of polarized voting. Joint Expert Ex. E-4 (Murray report) at 32-33.

600. In Dallas County, Perry got 42.5% of the vote and Bill White got 55.2%. Tr327 (Martin). Obama got 57.27% of the vote and McCain got 41.97%. Tr327 (Martin).

601. Perez Plaintiffs propose Plan H288 for Dallas County to show that up to nine minority opportunity districts could be drawn in Dallas County (as opposed to six in Plan H283). Perez-107; PL-207; D-110; Tr333 (Martin); Joint Expert Ex. E-5 (Martin Report) at 9. It has a 1.72% deviation, which was not difficult to achieve. Tr334 (Martin). The basic configuration of districts in this map is similar to that in Plan H232, offered by Rep. Coleman during the session. According to Martin, Plan H288 creates HD102 in northeast Dallas County to recognize minority growth in that area. HD102 is two-thirds Black plus Hispanic VAP and majority H+BCVAP, is less than 20% Anglo population, and is very compact. Tr334-35 (Martin); Joint Map Ex. J-33. HD101 is preserved as

a majority-minority district with 46.4% Anglo VAP. Joint Expert Ex. E-5 (Martin Report) at 10.[19] In west Dallas County, HD103 and 104 are retained as performing Latino districts, and HD105 is "fixed" so that it is 66.3% Hispanic population, and 60.4% HVAP (35.6% HCVAP using 2005-2009 ACS; 37.4% using 2008-2012 ACS data). Tr335 (Martin); D-110. The net effect is an additional Latino district and two additional coalition districts where minority voters can elect their candidate of choice while more closely achieving one-person, one-vote principles. Tr335 (Martin); Joint Expert Ex. E-5 (Martin Report) at 10. Martin admits that HD103 does not have a great shape (though it is no worse than HD104 in H283), but Martin says that is caused by HD100 coming in to keep together the traditional African-American community in West Dallas that has always been in HD100. Tr336 (Martin). The upper arm of HD103 is picking up and keeping together a Latino community in east Dallas. Tr337.

602. Arrington used Plan H288 as an example of a plan that showed it was possible to create more minority opportunity in Dallas County to recognize the minority population growth. US-352 at 18. He opined that Plan H288 created four African-American districts (HD100, 109, 110, 111) and four Hispanic districts (HD102, 103, 104, 105), though "the %SSVR is low in two of the Hispanic districts, so they might be considered multi-race districts in which Hispanics and Blacks would compete in the Democratic primary and vote together in the general election." *Id.* He further notes that it leaves two open seats—the two weak Hispanic districts HD102 and HD105—and pairs numerous incumbents (both Republican with Republican and Republican with Democrat, but he felt the pairings were difficult to avoid given the population changes. *Id.*

603. Comparing Plan H288 with Plan H283 using 2005-2009 ACS data, Plan H283 has one HCVAP-majority district (HD104), while Plan H288 has none, and Plan H283 has three BCVAP-majority districts (HD109, 110, and 111), while Plan H288 has two (HD109 and 110), though HD111 is right at 50% using combined BCVAP. However, both plans have four districts that are over 40% BVAP (HD100, 109, 110, 111), which is the criteria legislators were using for defining African-American opportunity districts. In terms of 50% SSVR, Plan H283 has one (HD104) and Plan H288 has none. Plan H288 creates five strongly Anglo districts in terms of Anglo CVAP using 2005-2009 ACS data, with HD108 being 78.5% Anglo CVAP, HD112 being 73.2% Anglo CVAP, HD113 being 64.1% Anglo CVAP, HD114 being 76% Anglo CVAP, and HD115 being 65.8% Anglo CVAP. As noted HD101 remains 61.1% Anglo CVAP, similar to its benchmark numbers and configuration.

604. Plan H205 (proposed by MALC) has 25 districts in Dallas and Tarrant Counties (three districts span both counties, and thus it breaks the County Line Rule). In Dallas County, it would maintain the African-American districts (HD100 46.9% BCVAP; HD109, HD110, and HD111 all above 50% BCVAP) and the Latino districts (HD103 (43.8% HCVAP) and HD104 (56.4% HCVAP)). It would create minority-majority CVAP HD102 in northeastern Dallas County, with 48.8% Anglo CVAP (and 25.8% HCVAP, 18.9% BCVAP, and 4.1% Asian CVAP). HD107 is majority-Anglo (52.7%)

[19] Because HD101 remains 61.1% Anglo CVAP, it must be considered a crossover district (or a combination minority coalition + Anglo crossover district) rather than a true minority coalition district.

122

CVAP using 2005-2009 ACS data, but is majority-minority CVAP (46.8% Anglo CVAP) using 2008-2012 ACS data. D-109. H205 violates the County Line Rule by joining districts between Dallas and Tarrant Counties and also joining some population of Dallas County with Kaufman County.

605. Dr. Engstrom (Joint Expert Ex. E-7) concluded that Latino voters have been highly cohesive in their support of Latino candidates with the Democratic Party nomination in the general elections. All five candidates received their strong support (83.8% -90.3% bivariate and 81.1% -88.1% multivariate). The only Latino candidate that was the Republican nominee in a general election was Guzman and she was not supported by Latino voters (17.4% bivariate and 18.6% multivariate). All Latino candidates in Democratic primaries also received strong Latino support (71.5%-84.7% bivariate and 64.7-87.8% multivariate). Latinos voting in the Republican primary did support the Latino candidate for Railroad Commissioner, but gave only a bare majority of support for the Latino candidate seeking the Republican nomination for Governor (50.5% bivariate, but multivariate shows only 32.6%). Non-Latino voters overall provided majority support for four of the five Latino candidates favored by Latino voters in the general elections, according to bivariate analysis, but this appears to be a function of the strong African-American support for these candidates. All five are estimated to have received over 99% of African-American votes in the multivariate analysis. The estimated support from other voters ranges from 22.1% to 29.4%. The only Latino Republican candidate received less than a majority of the support of the non-Latino voters overall, but in the multivariate analysis, her African-American support was less than 1% while that of other voters was 72.1%. Non-Latino voters did not provide majority support for any Latinos seeking nominations in the Democratic primaries. In the multivariate analysis, African-Americans provided a majority of their support for only one of the Latino candidates favored by Latinos, and other voters provided majorities of their votes to only two of them. In the Republican primaries, non-Latino voters, both African-American and others, did not support either Latino candidate.

606. Engstrom's analyses reveal that Latinos in Dallas County are very cohesive in their candidate preferences for Latino candidates, and that preference is shared by African Americans but not other voters. The analysis of Democratic primaries shows Latinos are very cohesive in their preference for Latino candidates, but these preferences are not generally shared by the rest of primary voters.

607. In Engstrom's corrected rebuttal report (docket no. 307-1), he found racially polarized voting in Dallas County. In the general elections, Latinos were very cohesive in their support for Latino candidates with the Democratic party nomination, and that preference was shared by African Americans, but not by other/Anglo voters, who did not cast as much as 30% of their votes in favor of the candidates. Latinos are also very cohesive in their support for the Latino candidate in the Democratic primaries, but these preferences were not shared by non-Latinos, with African-Americans being least likely to share the preference.

608. Rep. Anchia has seen examples of Latinos and African-Americans being cohesive in Dallas. Anchia depo. at 116-117. He believes they are cohesive more often than not. Anchia depo. at 117, 163.

609.  Juanita Wallace, a long-time resident of Dallas, offered lay testimony that Black and Latino voters work together to elect candidates, including county commissioner Elba Garcia, who got significant support from black voters. TrJ568-69 (Wallace). Wallace testified that there are similar issues and challenges facing Black and Latino voters in Dallas—transportation, the criminal justice system, and education. TrJ569-72.  Wallace has not reviewed election data showing the breakdown of voting for particular candidates by minority groups. Tr582 (Wallace).

610.  Raul Magdaleno, a resident of Dallas, testified to the coalition in Dallas between Latinos and African Americans. TrJ1134.  He works closely with the community and sees that they have a lot of issues in common, the three primary issues being education, health care, and economic disparities. *Id.*  He agrees that the populace in Dallas votes by issue rather than by racial coalition. TrJ1140.  When Marc Veasey ran against Domingo Garcia, the African Americans supported Garcia, a Hispanic. TrJ1141.  When Jason Villalba ran in HD114, the Latino Republicans—just a very few—supported him. *Id.*

611.  Wallace testified that there is official discrimination against Hispanics and African Americans in Dallas County, which she knows because part of her job was to listen to complaints of discrimination, and they would investigate. TrJ573.  She testified that minority voters are still under-represented in Dallas. TrJ574.  She has encountered people who lack photo ID that would be affected by voter ID.  TrJ575.  She is aware of Abbott's campaigning with Ted Nugent, and feels he did not denounce the comment Nugent made. *Id.*  The Dallas branch of the NAACP started a petition over this and sent it to Abbott and DOJ. TrJ577.

612.  Magdaleno testified that he has not gotten favorable help from elected officials in Dallas when seeking help for the Latino and African-American communities in Dallas.  TrJ1135.  When people have not gotten help from their congressperson, such as Pete Sessions, he has gone through Congresswoman Johnson's office, and they have been very supportive. TrJ1136.  When Magdaleno was getting an award from the Park Cities Republican Women's Organization, Pete Sessions responded to a question about immigration, stating that "the solution to it was to round them up like dogs and send them back." TrJ1138.  This was seven years ago, but Sessions is still in office.  Congresswoman Johnson helped him get his citizenship (he was her constituent then). TrJ1139.  Magdaleno says he has not really experienced racial discrimination, but more economic discrimination.  He says discrimination is against poor people regardless of their ethnicity. TrJ1142.  The concerns he listed for the coalition of blacks and Hispanics also apply to the poor Anglo population of Dallas. *Id.*  But in Dallas it tends to be more prevalent in the African-American and Latino communities, which are poverty-stricken communities. TrJ1143. So they are affected more deeply than the Anglo communities in Dallas. *Id.*

613.  Rep. Anchia has heard complaints from constituents (fewer than 10) in Dallas County about Spanish-language materials not being available at polling locations.  Anchia depo. at 75.

614.  54.8% of Hispanics in Dallas County lack a high school education (compared to 25.1% of the total population of Dallas County).  Joint Expert Ex. E-1 (Chapa Report) Table 4.  The per capita

income for Hispanics was $12,727, compared to $43,103 for non-Hispanic Anglos. *Id.* Table 5. 33.24% of Hispanic children live in poverty, compared to 7.01% of non-Latino Anglo children. Joint Expert Ex. E-9 (Gonzalez-Baker Report) Table 8.

615.  The HCVAP of Dallas County in 2010 was estimated to be 19.17% (using 2005-2009 ACS data), yet Latinos have only 2/14 districts (14%) in Plan H283.  Latino representation is not proportional.

616.  Dallas County lost two districts and four Republicans were paired because all Democrats represented minority districts and thus mapdrawers felt they could not be paired.

617.  Despite the decline in Anglo growth and increase in minority growth, Plan H283 maintains only the six existing districts represented by minority Democrats and eliminates emerging minority districts.

618.  Downton used racial shading to draw all of the minority districts in Dallas County.  Downton drew lines and split precincts based on race to put Anglos in HD105 (which had an Anglo Republican incumbent) and put Latinos in HD103 and HD104.  He was told to pair Anderson and Harper-Brown, and thus HD105 extends south into HD104 to get to Anderson's house, but this caused Downton to have to use race and split precincts to keep HD104 at 50% SSVR. This configuration also eliminated emerging minority coalition district HD106.

### Tarrant County

619.  In Plan H100, Tarrant County had ten districts (HD90, HD91, HD92, HD93, HD94, HD95, HD96, HD97, HD98, and HD99).  It had one African-American opportunity district, HD95 (BCVAP 54.2%), which was represented by Marc Veasey (African American, Democrat).  And it had one Latino district, HD90, which was represented by Lon Burnam (Anglo, Democrat).  HD90 was 47.9% HCVAP using 2005-2009 ACS data and 49.5% (+/- 2) HCVAP using 2008-2012 ACS data.  Except for HD90, HD93, and HD95, all benchmark districts were majority Anglo VAP.

620.  Benchmark HD93 (represented by Anglo Republican Nash) was 53% Black + Hispanic VAP (and only 37.9% Anglo VAP).  HD93 was 50.5% (+/1 1.3) Anglo CVAP using 2005-2009 ACS data but only 46.9 Anglo CVAP using 2008-2012 ACS data.  Using 2005-2009 ACS data, B+HCVAP was 41.7% and using 2008-2012 ACS data, B+HCVAP was 43.4%.  HD93 elected Democrat Paula Pierson in 2006 and 2008.  However, Republican Nash defeated Pierson in 2010 by 431 votes.

621.  Benchmark HD96 was minority-majority in terms of total population (Anglo population was 49%), but was majority-Anglo VAP (53.6%) and CVAP (61.4% using 2005-2009 ACS data).  In HD96, Democrat Chris Turner defeated Republican incumbent Bill Zedler in 2008, but Zedler then defeated Turner in 2010.

622.  Thus, at the time of redistricting, two minority districts HD90 and HD95 were represented by

Democrats, and the other eight districts were represented by Anglo Republicans.

623. In the last decade, Tarrant County grew by 362,815 residents, but only 41,882 of them were Anglo, meaning minority population growth accounted for almost 89% of Tarrant County's population growth. Joint Expert Ex. E-5 (Martin Report) at 10; TrJ1432 (Korbel). The Hispanic population increased by 197,687; African-American population increased by 79,809; and Asian population increased by 31,321. Joint Expert Ex. E-5 (Martin Report) at 10. Tarrant County gained one seat, so HD101 from Dallas County was moved to Tarrant County. But no new minority opportunities were created, and Plaintiffs' expert Korbel testified that two districts where minorities might have had a chance to elect their representatives of choice were eliminated. TrJ1433. Martin opined that the enacted map merely maintained the status quo, preserving the two effective minority districts (HD90 and HD95) (though unnecessarily packing them) and replacing HD93 with HD101 as a majority-minority coalition district. Joint Expert Ex. E-5 (Martin Report) at 10-11.

624. At the start of redistricting, Solomons asked Rep. Charlie Geren, a member of the HRC, to take the lead on the Tarrant County delegation map, so Geren led the Tarrant County delegation. TrJ2097 (Downton), TrJ29 (Veasey); Interiano 8-2-11 depo. (Joint Ex. J-61) at 27-28; TrJ1561 (Interiano). The members of the Tarrant County delegation met once or twice and were able to agree on the lines. TrJ13 (Veasey). Downton helped to get a consensus map. TrJ2097 (Downton); TrJ1576 (Interiano). Veasey initialed a map of his district HD95 to show his approval. TrJ13 (Veasey). Everyone in the Tarrant County delegation agreed on their districts and signed off on a delegation map (hrc1H195) in late March. TrJ14 (Veasey); D-233; US-498 (no obj); Quesada-341. This was incorporated into Plan H113, and therefore the configuration of Tarrant County in Plan H113 came from the delegation. Tr929, TrJ2099 (Downton).[20]

625. In the benchmark Plan H100, HD90 had a total SSVR of 45% (and 47.2% non-suspense SSVR). TrJ1561 (Interiano). Lon Burnam (Anglo, Democrat) was the incumbent in HD90. TrJ1562 (Interiano). In Plan H113, total SSVR dropped to 40% (41.9% non-suspense). TrJ2099 (Downton); TrJ1562 (Interiano).

626. Hanna's first retrogression memo (written around April 7) noted, "While current District 90 is short people and that likely accounts for most of the drop in SSVR, further consideration should be given to see whether the level of SSVR in the proposed plan can be raised to come closer to the level in the current plan." D-122. Hanna's second retrogression memo, written around April 12, raises the same point. D-327; TrJ2145-46 (Downton).

627. At the April 15 HRC hearing, Luis Figueroa of MALDEF testified in opposition to Plan H113 and in support of MALDEF's Plan H115. He stated, "[W]e can draw Section 2 compliant districts in West Texas, in the Valley, and increase populations in Houston [in] Representative Farrar's

---

[20] Veasey testified that when the first House plan (Plan H113) was publicly released, Veasey's district HD95 was different than the one he signed off on. TrJ14 (Veasey). However, Veasey was more likely referring to changes made later in Plan H153 because his district in Plan H113 is the same as the district he approved (D-233).

district [HD148] and in Lon Burnam's district [HD90] to create a clear Latino CVAP majority district." D-595 at 34. In Plan H115, HD90 had 46.8% total SSVR, 48.9% non-suspense SSVR, and 51.7% HCVAP using 2005-2009 ACS data. Joint Map Ex. J-23. In response to questioning, Figueroa also pointed out that in HD90 in Tarrant County, Solomons' proposal reduced the (non-suspense) SSVR from 47.2% to 41.9% while MALDEF was able to increase it by almost ten points over Solomons' map. D-595 at 32. Figueroa said MALDEF wanted to "ensure that that district becomes a Latino citizen voting age population" majority district. D-595 at 66.

628. At the April 17 HRC hearing, Jose Chavez testified on behalf of himself that Plan H113 did not reflect the population changes. He noted that Tarrant County had seen tremendous minority population growth. He stated that HD90, 93, 95, and 96 were performing minority districts, and although there was a new seat added to Tarrant County, there were only three performing districts—HD90, 95, and H101—in Tarrant County in Plan H113. He said HD90 and HD95 were packed by taking voters from HD96 (which had a combined minority population over 50%). He said they packed three districts and cracked two to end up with only the three performing districts. A member of the HRC noted that HD90 had 40% SSVR, which was down from the benchmark, but it only concerned him somewhat because the district would probably perform given its consistent performance. He also noted that it seemed inconsistent with the growth pattern for the SSVR to decrease.

629. In response to Figueroa's testimony, Hanna's concerns, and to offset the loss of SSVR-majority district HD33 in Nueces County, the mapdrawers made changes to HD90 to increase its SSVR. Tr930, TrJ2097-99, TrJ2145-46 (Downton); Tr1431, TrJ1562 (Interiano). Downton made changes to bring HD90 over 50% SSVR; those changes involved including new areas with Hispanic population in the southeast portion of HD90 (areas that had been in Veasey's district HD95) and reducing the non-Hispanic population to the far south (which was put into HD95) and in the western part of the district (which was put into HD99, represented by Anglo Republican Charlie Geren). TrJ2101 (Downton). Some population was also exchanged between HD90 and HD93 in the northeast part of the district. Burnam and Veasey were not consulted about the changes before they were made, and they later opposed the changes. Tr930, TrJ2101 (Downton). These changes (reflected in Plan H134) (along with a minor change moving some population from HD99 to HD97 in Plan H151) were incorporated into the plan (Plan H153) at the April 19 HRC meeting.

630. Veasey testified that there were some key African-American neighborhoods that were taken out of his district HD95 and some areas that were added in, and he was "completely in the dark about it" and "very upset." TrJ14. Veasey said that he did not know why the changes were made because no one came to him and no one reached out to explain the changes to him. TrJ15. Veasey was on the HRC and would have been very accessible. TrJ15-16. He felt that the process was secret and there was no transparency. TrJ15.

631. In Hanna's third retrogression memo (written about April 20) concerning Plan H153, Hanna noted that the total SSVR of HD90 was 47.9% and there were no retrogression issues identified. D-123; TrJ2146 (Downton). Downton testified that he would have been using non-suspense SSVR on

RedAppl, which was 50.1%, to measure the SSVR of the district.   TrJ2146.

632.  On April 27 at the floor debate, when Solomons laid out Plan H153, he said, "Specifically we increased the SSR-SSVR- in District 90 in Tarrant County and District 148 in Harris County. Both of these changes were made at the request of MALDEF." D-13 at S100; D-190 at 632; TrJ32 (Veasey). Rep. Veasey noted that HD101 was a new coalition district but questioned why HD93 in Tarrant County was retrogressed.  Solomons stated it was an agreed, drop-in map from the delegation. D-13 at S116.  Veasey later stated that the members had not approved of the entire County map, only their districts.  *Id*. at S163.  He further noted that his and Burnam's districts had been changed without their approval, but with the approval of people in Anglo districts. *Id*. at S117. Rep. Geren responded that HD93 was a minority district that became HD101, and that the new HD93 did not resemble the old HD93 at all, and that MALDEF asked them to increase the HVAP of HD90. *Id.* Veasey responded that legally that meant nothing because HD90 was already an opportunity district that had been performing, and HD90 now came far into his district HD95. *Id.* Geren responded that "it has more Hispanic opportunity now than what it was." *Id*. at S118. Solomons said the SSVR numbers of HD90 and HD148 "were increased slightly . . . because we were advised basically we needed to do that just for additional protection to make sure that they were where they needed to be."  *Id*.  Solomons said the only reason they increased the SSVR of HD90 was because MALDEF requested it and its SSVR was only at 45% before. D-13 at S119-20.

633.  Rep. Veasey proposed Amendment No. 10 (H120) for Tarrant County that would have created a new minority opportunity district (HD96) in Tarrant County. D-13 at S160; D-190 at 106-07.  He said his map more accurately reflected the growth there.  Veasey said that there were four majority Black and Hispanic districts in the benchmark, and that H153 dropped a minority opportunity district from the benchmark Tarrant County (from 4 to 3) and packed his district and Burnam's unnecessarily, despite the large minority growth.  Veasey further noted that Tarrant County had agreed on a map but his (HD95) and Rep. Burnam's district (HD90), the two most minority districts, had been changed. D-13 at S161.  Rep. Truitt (Anglo, Republican) complained that Veasey's map split communities of interest in northeast Tarrant County.  *Id*. at S162.  Veasey stated, "There's a big line going through the middle of my district.  Representative Geren picked up the Como community, and I think everybody over there knows Charlie [Geren] and I think they are more comfortable being represented by Lon [Burnam].  But if you look at the major changes that took place from after the point in which we signed off, the big change that has happened in the districts were represented by the minorities, and we didn't approve them."  *Id*. at S163.  Burnam and Veasey stated that they did not approve of the whole Tarrant County map, only their districts, which were then changed. *Id.* Burnam stated that his district has essentially been the same since it was first created by the federal court in 1978.  *Id*.  He also stated that, "Since the creation of this district, neighborhoods that are incredibly important and protected by virtue of their minority status in District 90 include the Lake Como community."  *Id.*  Como had been moved into HD99, represented by Anglo Republican Geren.)  Burnam also complained that his neighborhood was split.  *Id*.  Veasey further asserted that HD96, represented by Zedler (Anglo Republican), was "one of the fastest growing minority areas in the entire county" and they had "a shot to decide who gets elected in that district," but "[u]nder the plan that was voted out, they do not have that opportunity anymore" and "[t]hey've become

completely irrelevant under what was voted out [of the HRC]."  Geren moved to table the amendment, stating that it split communities of interest and dropped the HVAP of HD90 below 50%, and that there were only three minority districts in the benchmark.  *Id*. at S164-65.  Burnam stated that he was elected in a district that was 47.2% SSVR, and although the committee map raised it over 50%, it was done by making his district 8,200 plus people below the ideal population and by taking the Lake Como community out, which is an overwhelming minority-majority community, and put into Geren's district.  *Id*. at S165.  Burnam and Veasey argued that the map was retrogressive, that HD90 was already effective, and that the map did not represent Tarrant county.  They also asserted that HD96 was an effective coalition district when there was good turnout, and it had been cracked to assure reelection of a white representative.  *Id*. at S167.  Geren pointed out that changes were also made to districts represented by Nash, Patrick, and Shelton, but Veasey said they were only "slight changes."  *Id*.  The amendment was tabled.

634.  Burnam laid out Amendment No. 11(H203) and a perfecting Amendment No. 12 (H236) for Tarrant County.  D-13 at S168; D-190 at 108-11.  He said he thought they had an agreed-to plan acceptable for HD90, which was established by a federal judge in 1978.  D-13 at S168.  He said his plan was ugly, but it fixed HD90 and put Lake Como back.  It was only 49.1% SSVR, but he said that the 50% number was arbitrary, and the DOJ had rejected using a fixed demographic percentage in favor of a functional analysis.  *Id*.  Burnam stated that the predominantly African-American district in Tarrant County was packed, that his district represents "the artificial nuance of just two or three percentage points in the registered Hispanic voters, when, in fact, the proposed map takes out over 10 percent of the voting population in this district, which includes the minority constituency in the Lake Como community.  It rips it out and puts it in a district in far northwest Tarrant County in Azle.  And while the people in Azle are wonderful folks they just don't have very much in common with my inner-city Fort Worth constituency, the Lake Como community.  I'm extremely concerned that in a district that is largely a no growth district that you would put me at such a low number. It undermines the one person, one vote."  *Id.* at S169.  Solomons stated that there were problems with the amendment because it reduced the SSVR of HD90 below 50% (to 49.1%) and that MALDEF had testified that it needed to be above 50%.  Burnam asked him if he had heard Veasey talking about the letter from representatives of the Latino community stating that the 50% criteria was not particularly important in this instance, and Solomons stated that the letter did not repudiate and take back the MALDEF testimony on the record.  Solomons stated that they were trying to be consistent and conservative about legal risk.  *Id*. at S171.  Burnam also asked him about the DOJ guidelines and stated that "it looks a little hypocritical to people that are looking at it closely because if you were really following the MALDEF recommendation you would create five new Hispanic districts not just call Representative Farrar's district and my district new Hispanic districts. Those two communities in Harris County and Tarrant County already vote for who they want to vote for, and those minority communities don't want to have their districts ripped up."  *Id*. at S172.  Solomons moved to table.  Veasey and Burnam reiterated that Plan H153 was "all a contrivance to look like we're not in retrogression" and that there would be a lawsuit if the map was not changed.  The proposed amendment was tabled.  *Id*. at S173.

635.  Rep. Martinez Fischer then set forth Amendment No. 32 (H199) focusing on Dallas and

Tarrant Counties to increase the number of opportunity districts from three to five. This plan created three districts that spanned Dallas and Tarrant Counties and thus broke the County Line Rule. He stated that Plan H153 violated § 2 of the VRA by limiting the creation of minority opportunity districts. Rep. Alonzo stated it was the same plan Martinez Fischer had presented for other areas, but he was just focusing on DFW. *Id.* at S223. A statement of legal issues regarding the DFW metroplex and the April 27, 2011 letter from MALDEF stating that Plan H153 was retrogressive was made a part of the record. *Id.* at S224. The statement argued that use of the County Line Rule fenced apart minority voters in Dallas County and Tarrant County, and that Plan H153 packed minority districts and failed to create additional minority opportunity districts, while alternative plans created up to two by unpacking districts and avoiding the County Line Rule. *Id.* at S222. The amendment was tabled. *Id.* at S230.

636. Rep. Coleman offered Plan H232. He said that almost 89% of the growth was non-Anglo in Tarrant County, and his map would maintain communities of interest and the core of effective minority opportunity districts 90 and 95, while also creating two new coalition districts, HD106 and HD96. Plan H232 moves HD106 from Dallas County into Tarrant County and turns it into a minority coalition district with 19.6% HCVAP and 26.9% BCVAP. HD90 is 44.3% HCVAP using 2005-2009 ACS data and 40.4/42.1% SSVR. HD95 is 52.9% BCVAP using 2005-2009 ACS data. HD93 and HD96 are both Anglo-CVAP majority districts, though HD96 is only 49% Anglo VAP. *See also* Joint Expert Ex. E-3 (Lichtman Report) at 12-14; Tr1230 (Lichtman).

637. Plan H283 has eleven districts in Tarrant County. Eight of the eleven districts are majority Anglo VAP. HD90 is 49.7%(+/- 2%) HCVAP using 2005-2009 ACS data and 51.6% HCVAP using 2008-2010 ACS data. It is 47.9% total/50.1% non-suspense SSVR. HD95 is 49.8% (+/-1.5) BCVAP using 2005-2009 ACS data and 49.1% BCVAP using 2008-2012 ACS data. HD93 is 66.5% Anglo CVAP using 2005-2009 ACS data and 57.8% Anglo VAP. HD96 is 62% Anglo VAP and 68.4% Anglo CVAP using 2005-2009 ACS data. Thus, both HD93 and HD96 are solid Anglo districts. The new HD101 is 29.5% Anglo VAP and 42.9% Anglo CVAP, 28% Black CVAP, 19.7% Hispanic CVAP, and 7.8% Asian CVAP using 2005-2009 ACS data. The new HD101 elected Chris Turner, who is the Latino candidate of choice. TrJ612 (Lopez).

638. Dr. Murray opined that Plan H283 creates minimal opportunities for minority voters. Tr1052. He opined that Tarrant County gained a seat and has had very substantial minority growth, and had as many as four districts (HD90, 93, 95, and 96) where minorities in combination with coalitions have been able to elect candidates. Tr1053 (Murray); Joint Expert Ex. E-4 (Murray Report) at 34. Murray opined that Plan H283 locks in a 2/9 delegation with just two districts where Black and Hispanic voters will have an opportunity to elect, despite the fact that they are the fastest growing segment of the county population. Tr1052-53.

639. Martin opined that Plan H283 packs minority opportunity districts HD90 and HD95 to prevent creation of a majority-minority district HD96, which had a rapidly growing minority population in the benchmark plan and had elected the minority candidate of choice in 2008. He stated that HD90 was already an effective Latino district, but H283 extended it into existing HD95 and HD96 to meet

an arbitrary and unnecessary 50% SSVR, and that HD95 was already an effective African-American district, but it was extended west of I-35 to take in areas of African-American growth to protect the Republican incumbent of HD96. Martin opined that new coalition district HD101 simply replaces existing HD93. He noted that benchmark HD93 was 55% B+HVAP and 37.9% Anglo VAP and new HD101 has only a 29.5% Anglo VAP and contains the bulk of HD93's Arlington and Grand Prairie population, but is shifted south to take in minority precincts from existing HD96 to prevent its creation as a majority-minority district. Joint Expert Ex. E-5 (Martin Report) at 10-11.

640. Plaintiffs' expert Korbel testified that HD93 became a very odd-shaped district cutting across the county from its eastern border, through Fort Worth, and up to the northern border of the County. TrJ1434. He opined that the minority population in eastern Tarrant County used to be part of HD93 and now it is joined with north Tarrant County near Denton, which is Anglo, and that dilutes the minority vote. TrJ1434-36 (Korbel). HD93 is also one of the least compact districts in the plan. TrJ1437 (Korbel). Korbel testified that HD96 in the southern portion of the County was developing into a minority district, but some of its heavily minority population in the east is placed into HD101 and that stops its growth. TrJ1435 (Korbel). Korbel did not consider the role of incumbents or city boundaries as reasons for the lines. TrJ1460-61 (Korbel).

641. Rep. Burnam testified that HD93 is the leftover district made out of nothing else that meanders across Tarrant County, includes many municipalities, and prevents a third majority-minority district inside the loop. Burnam depo. at 242-43.

642. Dr. Kousser testified that the shape of HD90 (Burnam's district) is suspect, and was drawn to capture as many Latinos as possible while avoiding non-Latinos. Tr248; Joint Expert Ex. E-2 (Kousser Report) at 99. He noted that HD90 was performing for Latinos, and had a 64.9% VAP, 47.9% HCVAP, and 47.2% non-suspense SSVR, but Plan H283 raised its HVAP to 71%, its HCVAP to 49.7%, and its SSVR to 50.1%. Joint Expert Ex. E-2 (Kousser Report) at 98. This was accomplished by subtracting non-Latino population, making this district the smallest in the State and giving it the second-to-lowest perimeter-to-area compactness score (.079) in the State. Joint Expert Ex. E-2 (Kousser Report) at 99-102.

643. HD90 is underpopulated by 4.9% and is the smallest district in Plan H283. HD95 is also underpopulated by 3.58%. Potential coalition district HD101 is underpopulated by 1.77%. Six of the Anglo districts are underpopulated and two are overpopulated.

644. In his report (Joint Expert Ex. E-7), Dr. Engstrom found that Latinos are highly cohesive in support of Latino candidates with Democratic party nominations in general elections—all five had strong support (all >90% bivariate and 86.1-98.3 multivariate). The Latino Republican, Guzman, was not supported. All Latino candidates in Democratic primaries also received solid support from Latino voters (74.9% - 99 % bivariate; 64.3% -85% multi). Non-Latinos were generally not supportive of the Latino candidates. In general elections they did not share the candidate preferences of Latino voters (35.4% to 40.1% bivariate). The multivariate analysis showed that African Americans did support these candidates (>99%), but other voters/Anglos did not (17.6% to 25.7%).

The only Republican candidate that was a Latino did receive an estimated 60% support from non-Latino voters in bivariate analysis, but the multivariate analysis showed a deep divide between African Americans (less than 1% support) and other voters (76.9%). Non-Latinos did not provide a majority of their votes to any of the five Latino candidates preferred by Latino voters in the Democratic primaries. African-American voters provided a majority of their votes to one of the five according to multivariate analysis, as did the other voters. In the Republican primaries, non-Latino voters, both African-Americans and others, did not support either of the Latino candidates. The analyses reveal that Latino voters in Tarrant County have been very cohesive in their candidate preferences for Latino candidates, and that preference is shared by African-Americans in the general elections studied, but not by other voters. Analysis of the Democratic primary elections shows Latinos are very cohesive in their preference for Latino candidates, but these preferences are not generally shared by the rest of primary voters.

645. In his corrected rebuttal report (docket no. 307-1), Dr. Engstrom found racially polarized voting in Tarrant County. He found that in the general elections Latinos were very cohesive in support of Latino candidates with the Democratic party nomination, and that preference was not shared by non-Latino voters in any of the elections. While African-American voters were strongly supportive of these Latino candidates, the other voters preferred the opponent in every instance. Latinos are also strongly cohesive in support of Latino candidates in the Democratic primary elections, but that preference was not shared by non-Latino voters, with African-American and other voters supporting the Latino candidate in only one of six primaries.

646. Plan H201 has the same Tarrant County configuration as the enacted plan. MALC's Plan H205 has 25 districts in Dallas and Tarrant Counties, with three districts spanning both counties (and thus violating the County Line Rule). Joint Map Ex. J-26. It maintained HD90 (45.5% HCVAP using 2005-2009 ACS data) and HD95 (51% BCVAP using 2005-2009 ACS data). HD107, which spans Dallas and Tarrant Counties, has an Anglo CVAP of 52.7% using 2005-2009 ACS data and 46.8% using 2008-2012 ACS data. D-108.

647. Perez Plaintiffs offer Tarrant County Plan H289, an eleven-district Tarrant County Low Deviation (1.08% total deviation) Plan. Joint Map Ex. J-34. Martin stated that this plan preserved HD95 as an African-American district (it is 52.2% BCVAP using 2005-2009 ACS data), preserves HD90 as an effective Latino opportunity district, replaces existing HD93 with HD106 as an effective majority-minority coalition district, and creates HD96 as a proposed additional minority district. Joint Expert Ex. E-5 at 11. This plan is very similar to H232 in Tarrant County. HD90 is the same as in H232 (44.3% HCVAP using 2005-2009 ACS data and 40.4/42.1% SSVR). HD95 is similar, with 52.2% BCVAP. Proposed HD106 is 43.7% Anglo CVAP, 19.6% HCVAP, and 26.9% Black Alone CVAP (27.4% combined). HD93 and HD96 are both Anglo-CVAP majority districts, though HD96 is only 48.8% Anglo VAP.

648. Task Force Plan H292 moves HD115 into Tarrant County, and it is 42.9% Anglo CVAP using 2005-2009 ACS data (47.7% B+HCVAP) and 37.3% Anglo CVAP using 2008-2012 ACS data (50.7% B+HCVAP). Joint Map Ex. J-37. HD90 is 49.7% (+/- 2) HCVAP using 2005-2009 ACS

data and 51.6% HCVAP using 2008-2012 ACS data. HD95 is 49.8% (+/- 1.5) BCVAP using 2005-2009 ACS data and 49.1% BCVAP using 2008-2012 ACS data. Joint Map Ex. J-37; D-111. All other districts are majority-Anglo VAP.

649. Terrysa Guerra, a campaign staffer and consultant who worked for Chris Turner in Tarrant County in 2008 and 2010, testified about "black/brown coalitions" in Tarrant County. Tr1146. Turner won election in HD96 in 2008, but lost in 2010. Guerra testified that these groups existed in 2008 and were working on different neighborhood issues and other issues not related to a specific candidate. Tr1146. She testified this coalition was successful in 2008 and also elected Senator Wendy Davis in that area. Tr1147. She stated that they were not successful in 2010, and the tone of the 2010 election was "venomous." Tr1148. She testified that Turner's skin was darkened and he was given a gap in his teeth in Zedler's 2010 opposition campaign materials, and they tried to link him to President Obama. Tr1148-51. In one mail piece Turner is wearing a Mexican flag button. Tr1152 (Guerra); NAACP-609. She said these mail pieces only went to Anglo households. Tr1150-51. Guerra testified that Zedler was a member of the Tea Party, which she had seen making race an issue in elections. Tr1149.

650. In Tarrant County, 47% of Hispanics lack a high school education. Joint Expert Ex. E-1 (Chapa report) Table 4. The per capita income for Hispanics was $14,489, compared to $35,179 for non-Hispanic Anglos. *Id*. Table 5. 28.93% of Hispanic children live in poverty, compared to 13.71% of non-Hispanic Anglo children. Joint Expert Ex. E-9 (Gonzalez-Baker Report) Table 8.

651. Tarrant County went from 11.37% HCVAP in 2000 to 13.99% under the 2005-2009 ACS Special Tabulation (D-51).

652. Due to minority population growth, Tarrant County gained a district, but the Legislature maintained the status quo, keeping a Latino district, an African-American district, and a potential coalition district.

653. Mapdrawers increased the SSVR of HD90 above 50% (non-suspense) to offset the loss of HD33 in Nueces County (and perhaps also in response to concerns raised by MALDEF and Hanna about potential retrogression). Downton made these changes based on race. Mapdrawers applied the 50% SSVR threshold without regard to whether the district was already performing for minorities.

### McLennan County/Waco/HD57

654. The McLennan County/Waco district (at the time HD35) was the subject of litigation over at-large districts in *Graves v. Barnes II*, 378 F. Supp. 640 (W.D. Tex. 1974). TrJ1441 (Korbel). In that opinion, the court stated, "All of these factors—past history of discrimination resulting in continuing lack of minority political participation, demographic and geographic factors, the failure of the few bids of minority candidates, and the present representatives' lack of commitment to the particularized needs of minorities—present a persuasive pattern of cancellation and minimization of minority

133

voting strength." The court held that the use of multi-member districts in McLennan County was unconstitutional.

655. What is now HD57 was drawn so that minorities could elect representatives of their choice. TrJ1442 (Korbel). That district has performed for minorities. TrJ1443 (Korbel). Plaintiffs provided lay testimony from NAACP-member and County Commissioner Lester Leon Gibson. He testified that the minority community (African-American, Hispanic, and others) vote for the candidate that will represent their interests, regardless of their color. They are very supportive of minorities in that area. TrJ1828 (Gibson). The minority community supported Rep. Jim Dunnam (Democrat), who represented HD57 from 1998 to 2010, and those who won prior to him, who were responsive to the concerns of the minority community in Waco. TrJ1828. Dunnam lost the election in 2010 to Anglo Republican Marva Beck.

656. In Plan H100, HD56 was located wholly within McLennan County. HD57 joined the remainder of McLennan County with Falls, Robertson, Leon, and Madison Counties. The City of Waco was divided between districts 56 and 57. HD14 was wholly within Brazos County and included most of Bryan/College Station, and the remainder of Brazos County was joined with HD17 to the southwest. Brazos County was not connected to McLennan County in a district.

657. In 2010, HD57 was majority minority in terms of total population (45.5% Anglo population). Red-202 Report. However, it was majority Anglo VAP (50.7%) and majority Anglo CVAP (57.3% using 2005-2009 ACS data and 55.8% using 2008-2012 ACS data). D-100 (Red-106 Report; Red-116 Report).

658. HD56 was 12,339 people underpopulated. HD57 was 23,076 people underpopulated. HD14 was 14,441 people overpopulated. Red-202 Report.

659. In Plan H283, HD56 remains wholly within McLennan County and includes large portions of Waco. HD14 remains in Brazos County and includes much, but not all of Bryan/College Station. Although it has a somewhat odd shape, many of the lines track city boundaries and a river. HD12 (which takes the place of HD57) moves west and now joins the remainder of McLennan County to the remainder of Brazos County, spanning Limestone County, Falls County, and Robertson County in between. MALC-132 (map). All three districts are majority Anglo in terms of total population, VAP, and CVAP. HD12 is 55.2% Anglo in terms of total population.

660. Instead of underpopulated HD56 simply gaining population from HD57, mapdrawers shifted population between the two districts along their boundary in McLennan County in Plan H283. The mapdrawers removed largely minority areas of Waco (about 23,000 people who were 70% minority) from HD57 (renumbered HD12) and replaced them with more Anglo areas (about 20,000 people who were 80% Anglo). TrJ1444 (Korbel). A significant portion of minority population is moved out, including minority Precincts 12 and 14. TrJ1444; TrJ1841 (Gibson). This split minority communities of interest and cracked minority voting strength. TrJ1444 (Korbel); TrJ1837 (Gibson). Gibson testified that if HD57 were restored it could again elect minority candidates of choice.

TrJ1838.

661. MALC has provided *Gingles* demonstration map Plan H363 that is a three-district plug-in plan. MALC-135 (H363 map) (Plan H367 is the same). This map joins minority population in Bryan/College Station in Brazos County with minority population in Waco in McLennan County in HD57. TrJ1445 (Korbel); MALC-136. Thus, by leaving benchmark HD57 essentially intact and changing the border with HD14 in Brazos County, HD57 is 58.7% B+HVAP. TrJ1445 (Korbel); Red-100 Report. Using 2008-2012 ACS data, HD57 is majority B+HCVAP (HCVAP is 23.7% and BCVAP is 29.1%). MALC-137.

662. Martin noted that benchmark HD57, a 53.2% Black + Hispanic district in terms of total population that had elected the minority candidate of choice until the 2010 election, was eliminated and effectively replaced by a 59.2% Anglo VAP HD12. Joint Expert Ex. E-5 at 14. He notes that in statewide Plan H232, which was offered by Rep. Coleman during the session, HD57 is drawn as a Waco-based district that is only 49.5% Anglo in terms of total population. *Id*. at 14. In Plan H232, HD57 is wholly within McLennan County, and it is 55.3% Anglo VAP and 63.3% Anglo CVAP using 2005-2009 ACS data. Joint Map Ex. J-28; Red-106 Report.

663. Gibson testified that there is a "black and brown" coalition in McLennan County. TrJ1829-30 (Gibson). They have been able to come up with a common candidate for their support. TrJ1830. They have had success—Gibson, when he ran for school board, had the support of the coalition, and also as county commissioner. *Id*. He testified that the African-American community has supported Latino candidates with success. *Id*. Other examples are school board members, like Sunny Lozano, a Justice of the Peace, and a constable. *Id*.

664. HD57, a majority-minority district in terms of total population (but not HVAP or HCVAP) had been electing minority candidates of choice until the 2010 election, when it elected an Anglo Republican. In Plan H283, population was shifted and minority population was split in Waco, and HD57 was replaced with an Anglo-majority district (55.2% Anglo in terms of total population and 59.9% Anglo VAP).

665. Plaintiffs offer demonstration Plan H363 to show that a majority-minority coalition district (B+HCVAP majority) could be drawn affecting only three districts in Plan H283.

666. Plaintiffs presented lay testimony of a black and brown coalition. There is no expert testimony concerning racially polarized voting in McLennan County specifically. There is evidence of racially polarized voting and African-American and Latino cohesion in general elections statewide (*e.g.*, Joint Expert Ex. E-2 (Kousser Report)) and in Bell County, which is directly adjacent to McLennan County and Falls County.

### Bell and Lampasas Counties

667. In Plan H100, two districts, HD54 and HD55, were wholly contained within Bell, Burnet, and

Lampasas Counties.

668. HD54 included all of Lampasas and Burnet Counties and almost all of the City of Killeen in Bell County. TrJ1726 (Aycock); D-340. Jimmie Don Aycock (Anglo, Republican), who lives in Killeen, represented HD54. TrJ1725 (Aycock). HD 54 was 48.5% Anglo (*i.e.*, majority minority) in terms of total population and was 53.4% Anglo (*i.e.*, majority Anglo) in terms of VAP. Using 2005-2009 ACS data, benchmark HD54 was Anglo-majority CVAP (it was 14.8% HCVAP, 20.5% Black alone CVAP, 2.1% Asian alone CVAP, and 59.4% Anglo CVAP). Red-106 Report. It was 55.3% Anglo CVAP using 2008-2012 ACS data. D-100.

669. HD55 included the rest of Bell County, including the cities of Temple and Belton. D-340. HD55 was 62.1% Anglo in terms of total population and 66.4% Anglo VAP. Red-202 Report. The HD55 incumbent was Ralph Sheffield (Anglo, Republican).

670. HD54 was overpopulated by 28,815 persons, and HD55 was overpopulated by 8,573. Minority population growth accounted for more than 70% of the growth in Bell and Lampasas Counties between 2000 and 2010. MALC-151. Due to population growth in Bell and Burnet Counties, the two counties could not be joined in a house district, so Burnet County was removed from HD54. TrJ1727 (Aycock).

671. Aycock requested to be on the HRC because he wanted input into how HD54 was drawn. He was senior to Sheffield, the HD55 incumbent, so he took the lead in drawing the lines between HD54 and HD55. TrJ1729 (Aycock). Aycock worked with Sheffield. TrJ1730 (Aycock). They worked well together and reached a compromise map for their districts. *Id.* Because Aycock lost Burnet County, which was a heavily Republican portion of his district, he was anxious to gain Republican strength and looked for places that could be done, like Salado, which Sheffield did not want to give up. TrJ1731 (Aycock). Sheffield gave Aycock Salado as part of their compromise. Incumbency/ Republican protection was a high priority, and Aycock "was looking for Republican voters who would vote for [him] primarily." TrJ1741-44 (Aycock).

672. Aycock was responsible for the lines of districts HD54 and HD55 in Plan H283. TrJ1770 (Aycock). He went to Downton when he needed assistance moving the lines; he would direct Downton where to move lines. TrJ1755 (Aycock) ("I knew where the voters were and knew where I wanted to draw those lines"). Aycock denied drawing the lines on the basis of race. *Id.*

673. Aycock is not a lawyer and has no VRA expertise. He relied on staff to tell him if the districts complied with the VRA and other legal requirements. TrJ1741 (Aycock). Aycock stated that he looked at whether he had to create a coalition district but "the combined minority populations do not exceed 50%." TrJ1766. He did not think a coalition district was required by the VRA. TrJ1769. He also stated in his deposition that a coalition district "would have probably got me unelected because I couldn't put that many Republicans together in one place." *Id.* He testified that he "sort of looked at" whether he could configure HD54 in such a way that it would create a coalition district and came to the conclusion that it could not be done. TrJ1766-67 (Aycock). He did not look at

election returns in deciding not to draw a coalition district. TrJ1767.

674. On February 16, 2011, the Senate Select Committee held a hearing on redistricting to solicit public testimony and hear invited testimony. D-117 at 33; D-589 (transcript). Claudia Brown of Killeen testified about an African-American community in Bell County that she would like to see together for voting. D-589 at 37.

675. The initial configuration of districts HD54 and HD55 in Plan H113 came from Rep. Aycock. This was the configuration that remained throughout the session and is in Plan H283. In Plan H283, HD54 includes all of Lampasas County and the western part of Bell County, including the City of Harker Heights and much of the City of Killeen. Burnet County is no longer part of HD54. HD55 includes the eastern portion of Bell County, including Temple and Belton, and the rest of Killeen and most of Fort Hood within Bell County. D-341. HD54 is 99 (.06%) above the ideal district population and HD55 is 5,461 (-3.26%) below. Red-100 Report.

676. In Plan H283, HD54 is 47.6% Anglo in terms of total population, 52.1% Anglo VAP, 15.8% HCVAP, 22.2% Black alone CVAP, 2.6% Asian alone CVAP, and 56.1% Anglo CVAP using 2005-2009 ACS data (and 52.4% Anglo using 2008-2012 ACS data). D-109; MALC-114. There were increases in all three minority populations from the benchmark. TrJ1731 (Aycock). This was due to minority growth and because HD54 no longer included Burnet County, which is more Anglo.

677. In Plan H283, HD55 is 56.9% Anglo in terms of total population, 61.3% Anglo VAP, and 64.9% Anglo CVAP (under both the 2005-2009 and 2008-2012 ACS). D-109; MALC-114.

678. During the floor debate on April 27, the Texas Legislative Black Caucus introduced Plan H202 (and the NAACP relied on this plan during trial). Plan H202 created HD54 encompassing most of the City of Killeen and the City of Harker Heights in Bell County, and HD55 includes the remainder of Bell County and all of Lampasas County. HD54 in Plan H202 is 17.7% HCVAP, 28.7% BCVAP, 3.2% Asian CVAP, .8% American Indian CVAP (and thus a combined minority CVAP of 50.4% using 2005-2009 ACS data) and 46.4% Anglo CVAP. Red-106 Report; Tr842 (Fairfax). It is a proposed majority-minority coalition district. Tr842 (Fairfax).[21]

679. Aycock opposed Plan H202 because it connected Lampasas County to Temple/Belton in the eastern part of Bell County, instead of putting Lampasas County with the western part of Bell County/Killeen. Aycock testified that he felt that Lampasas County was more aligned with western Bell County than with Temple/Belton, so it was beneficial for them to remain in a district with Killeen. TrJ1732, TrJ1741. Aycock testified that Killeen is the largest population center accessible easily to Lampasas County, and people in Lampasas County have commonality with Killeen. TrJ1734, TrJ1741. He also noted that H202 still has a split of Killeen. TrJ1735. However, he acknowledged that the vast majority of Killeen population is in HD54. TrJ1759.

---

[21] According to Dr. Fairfax, HD54 in 2014 would have a B+HCVAP of 53.29%. TrJ912 (Farifax). Fairfax estimated the combined B+HCVAP of HD54 in 2010 was 47.9%. NAACP-673.

680. During the session, Rep. Martinez Fischer proposed Plan H201 and other plans that created a district combining parts of Killeen with parts of Temple and Belton in Bell County and had an Anglo CVAP of 43.7%. Aycock opposed this configuration because it included a "land bridge" joining the population of Killeen with Temple and Belton. TrJ1770 (Aycock). However, he admits that Plan H283, which he voted for, also includes land bridges in other areas. *Id.*

681. During the April 27 floor debate, Rep. Coleman introduced Plan H232 as a statewide substitute to Plan H153, which maintained HD54 and HD55 wholly within Lampasas and Bell Counties. It created HD54, a proposed minority coalition district. Tr409 (Martin); Joint Map Ex. J-28. HD54 joined Lampasas County with Fort Hood and most of Killeen. Using 2005-2009 ACS data, it showed Anglo CVAP of 49.7% (+/- 1.4). Red-106 Report. BVAP is 28.4%, HVAP is 19.4%, SSVR is 13.1%, and HCVAP 17.5%. Anglo VAP is 46.6%, less than a majority. Tr410 (Martin); Red-100 Report. HD54 is drawn as a majority-minority district that reunites the Killeen and Ft. Hood community that was split by Plan H283, and when Martin drew this district for Coleman, he assumed minority voter cohesion. Tr411(Martin); Joint Expert Ex. E-5 (Martin Report) at 14. Rep. Davis testified that it made sense not to split this community up and that HD54 would be a coalition district with the possibility that the minority groups would be politically cohesive based on anecdotal experience and her analysis of election data. Y. Davis depo. at 63-65.

682. In Plan H283, the minority population of Bell County is divided between the two districts. MALC-113 (racial shading exhibit). Plan H283 fails to create a majority-minority district in Bell and Lampasas Counties. Tr408 (Martin). Minorities in Bell County do not have an opportunity to elect their candidate of choice in Plan H283. *Id.*

683. Aycock testified that he primarily wanted to maintain communities of interest and that maintaining communities of interest is important. TrJ1739-41, TrJ1762. He agreed that the City of Killeen is a community of interest. TrJ1746. The City of Killeen has elected an African-American mayor (Hancock) and a Latino mayor (Villaronga). TrJ1747 (Aycock). There was a small split of Killeen in the benchmark, but the split was enlarged in H283 (more of Killeen voters were removed from HD54). TrJ1743 (Aycock). Aycock's assertion that it was more important to keep Lampasas County together with the City of Killeen as a community of interest (TrJ1744) than it was to keep the City of Killeen together as a community of interest is not credible. Killeen has been kept virtually whole in one district in previous plans. TrJ1403 (Korbel). The decision to split Killeen, which is more than 50% minority (TrJ1760 (Aycock)) was made to ensure that HD54 and HD55 would remain Republican and would re-elect the Republican incumbents. To accomplish this goal, Killeen was split and more of it was removed from Aycock's district, which Aycock knew meant that he was removing minority voters because Killeen is heavily minority in all areas. TrJ1744 (Aycock). About 32,000 persons (about two-thirds minority) from the northern part of Killeen were removed from HD54. TrJ1404 (Korbel). 47,000 persons from southwest Bell County, including Salado, an area that historically votes heavily Republican, and which is more Anglo than Killeen, were placed into HD54. TrJ1405 (Korbel); TrJ1745 (Aycock). Thus, areas that were largely minority voters were removed from HD54 and replaced with areas that were largely Anglo voters; the effect was to make it more difficult for minority voters in HD54 to elect their candidate of

choice. TrJ1405.

684. Plaintiffs' demonstration maps propose minority coalition districts; none are 50.1% of a single minority group. TrJ1454 (Korbel).

685. LULAC has provided Plan H293 with a proposed *Gingles* demonstration district in Bell County that joins portions of Killeen and Harker Heights with portions of Temple and Belton. LULAC-12-2C; Joint Map Ex. J-38; Tr700-01 (Korbel). Using 2005-2009 ACS, this district has 19% HCVAP, 31.2% BCVAP, and 2.8% Asian CVAP. Red-106 Report. B+HCVAP is therefore 50.2% and B+H+Asian CVAP is 53%. Anglo VAP is 39.2% and Anglo CVAP is 43.6%. Red-202 Report; Red-106 Report. This is a proposed minority coalition district. The compactness scores for the district are .310 area rubber band and .025 perimeter-to-area. Red-315 Report. The proposed district is not compact and fails to satisfy the first *Gingles* precondition.

686. MALC has provided Plan H329 as a *Gingles* demonstration map. MALC-115 (demo map). This map creates a compact district, HD54, based around the City of Killeen, while HD55 takes in the remainder of Bell County and all of Lampasas County. HD54 keeps the minority population in and around Killeen together. MALC-116 (demo map with racial shading). HD54 Anglo CVAP is 43%; (B+H+Asian CVAP is 51.6%), and HD55 Anglo CVAP is 73.2%. MALC-117(demographic data using 2008-2012 ACS for H329). These districts could plug-in to the existing map.

687. LULAC, MALC, and the Perez Plaintiffs have provided Plan H364 as a *Gingles* demonstration two-district map. TrJ1406 (Korbel); MALC-118 (demo map) (it consists of two plug-in districts to map H283, H309, or H358) . This map creates HD54, a compact district centered around Killeen. HD54 includes almost the entire city of Killeen (with the exception of finger annexations with virtually no population) and all of nearby Fort Hood that is within Bell County. TrJ1406; MALC-172. HD55 includes the remainder of Bell County and all of Lampasas county. This map keeps the minority community in Killeen together in HD54 and joins it with Fort Hood. MALC-119 (H364 map with racial shading). The B+HVAP of HD54 is 50.5%. TrJ1408 (Korbel); Red-202 Report; MALC-172. Using 2008-2012 ACS data, the B+HCVAP is 50.4% (including Black plus White and Black plus American Indian). TrJ1408; MALC-172 (Red-116 Report). Using 2008-2012 ACS data, HD54 is 42.4% Anglo CVAP (B+H+A CVAP is 52.2%), and HD55 is 73.1% Anglo CVAP. TrJ1408; MALC-120; MALC-172/Perez-135 at 25. Compactness measures are essentially the same between H283 and H364. TrJ1409 (Korbel). District 54 is very compact and is more compact than HD54 in Plan H283, while HD55 is less compact. MALC-172.

688. LULAC, MALC, and the Perez Plaintiffs have provided Plan H369 as a *Gingles* demonstration map. MALC-121 (demo map) (three plug-in districts). This map creates HD54 around minority areas in Killeen and combines them with a portion of Coryell County in order to keep all of Fort Hood together in HD54; it also creates HD55 in the remainder of Bell County and HD59 places Lampasas County together with other rural central Texas counties. MALC-172 ; MALC-122 (demo map with racial shading). Using 2008-2012 ACS data, HD54 is 42.8% Anglo CVAP (B+H+A CVAP is 51.8%) and HD55 is 70.4% Anglo CVAP. MALC-123 (demographic data using 2008-2012

ACS).

689.  Although Aycock has received support from some minority community leaders, including Miok Doranski (Asian), former mayor Raul Villaronga (Hispanic), and former mayor Tim Hancock (African American), TrJ1736-37 (Aycock), Aycock is not the minority candidate of choice. TrJ955 (Brischetto).  In the race between Aycock (R) and Brown (D), almost 9 out of 10 Anglo voters supported Aycock, while 8 out of 10 Latino voters, 9 out of 10 black voters, and 7 out of 10 Asian voters supported Brown. TrJ955.  The voting showed a clear pattern of polarization between minority and non-minority voters.  *Id.*[22]  Other races examined showed the same pattern of polarization, with Anglo voters supporting the Republican candidate and minority voters supporting the Democratic candidate. TrJ956 (Brischetto).  Dr. Brischetto testified that Blacks, Asians, and Latinos vote very cohesively in Bell County in the general elections. TrJ970.

690.  Dr. Brischetto found racial bloc voting in general elections in Bell County. TrJ947, TrJ969; MALC-161.  He found that Latinos had a very high cohesiveness. TrJ969.    He also found that Anglo bloc voting was sufficient to usually defeat the Latino-preferred candidate. *Id.* Brischetto did not analyze any primary elections in Bell County because of the lack of good predictor data of who is voting. TrJ956.  Brischetto did not conduct a multivariate analysis for the primary elections in Bell County. TrJ978-79.  No expert conducted a multivariate racially polarized voting analysis for Anglo, Asian, Black, and Hispanic voters in the primary elections in Bell County; TrJ1866 (Alford).  Dr. Alford testified that there was no expert analysis of cohesion among Asian, Black, and Hispanic voters in primary elections in Bell County.  TrJ1866, TrJ1895.  Based on all the evidence, Alford believed it was safe to assume they would not vote cohesively.  TrJ1866. Alford's conclusions about cohesion do not take into account lay witness testimony about minority cohesion; his conclusion is based only on the statistical evidence. TrJ1895.

691.  Phyllis Louis Jones of Killeen provided lay testimony of minority voter cohesion.  TrJ1689. She has lived in Killeen and Fort Hood and has witnessed Black and Latino voters working together to elect candidates in Killeen.  TrJ1695.  They joined forces behind Timothy Hancock, an African American, for mayor of Killeen and behind Dr. Claudia Brown, an African American, for the Texas House.  TrJ1695, TrJ1697-98.  These African-American candidates were supported by Latinos. TrA1695, TrJ1697-98.  There was also a multi-racial coalition in support of Jonathan Okray, an African American, for city council. TrJ1696.  There was cohesion in support of Juan Rivera for city council, who was supported by African Americans.  TrJ1697.  Based on his observation of school board elections, Aycock did not agree that Black, Latino, and Asian voters vote as a bloc. TrJ1772 (Aycock).

692.  Jones is an election judge and has witnessed voters of color being treated differently than Anglo voters in Bell County elections in recent years.  TrJ1698-99 (Jones).  She stated that Anglo election judges do not get interpreters for Latino voters.  TrJ1699.  She testified that the Fraternal

---

[22] Because of the large percentage of African-American voters in Bell County, Brischetto used the 2010 Census data that identified the racial composition of a precinct to estimate votes for each racial group.  TrJ953-55 (Brischetto).

Order of Police in Temple stood within 50 feet and asked voters how they were going to vote, and this was intimidating. *Id.* She further testified that, in 2014, when Anglos voted they were not asked for as much ID as Hispanic voters (if the voter was Hispanic and only had one form of ID, they had to fill out a residency form). TrJ1702 (Jones).

693. Jones lived in benchmark HD54, represented by Jimmie Don Aycock, and she testified that he does not adequately represent voters of color in Killeen. TrJ1703. Specifically, she did not feel he represented them with regard to education and testing. Tr1703-04. Aycock voted for the voter ID law even though minority groups and legislators opposed it. TrJ1751 (Aycock). He also voted for massive education cuts in 2011, and for drug testing for individuals to get unemployment even though these were opposed by the NAACP. TrJ1751. Latinos, African Americans, and Asians supported Brown, an African American, against Aycock. TrJ1705 (Jones). When Brown ran against Aycock, she won most of the minority precincts in Killeen. TrJ1755 (Aycock). Aycock does not prevail in heavily African-American precincts. TrJ1717 (Jones). Jones testified that Bell County needs more minority representation. TrJ1708-09.

694. Jones supports the configuration of HD54 in Plan H202 because it keeps Killeen and Harker Heights together. TrJ1708 (Jones). It also puts Killeen with the portion of Fort Hood that is in Bell County, and she felt that Killeen and Fort Hood should be together in a district. TrJ1706 (Jones). However, a southern portion of Killeen is split into HD55. In Plan H283, Fort Hood is split and is separated from the northern part of Killeen, which considers itself "one" with Fort Hood. TrJ1709-10 (Jones).

695. In Bell and Lampasas Counties, 13% of Hispanic and 12.1% of African-American households received SNAP or food stamps, compared to only 5% for Anglos. MALC-152. Hispanic and African-American families were twice as likely to be below the poverty level than Anglo families. *Id.*

696. In Bell and Lampasas Counties, 15% of Hispanics over the age of 25 are functionally illiterate, compared to 2.4% of Anglos. MALC-153. 25.5% of Hispanics over the age of 23 have not graduated high school, compared to 8.8% for Anglos. *Id.* Hispanic and African-American students lag behind Anglo students in SAT scores, college readiness, TAKS commended performance, and advanced placement. *Id.*

697. Anglo Republican incumbent Aycock divided the growing minority City of Killeen to protect his incumbency.

698. Plaintiffs' proposed § 2 districts are proposed minority coalition districts. There is expert testimony and lay testimony of cohesion in the general elections.

### West Texas Midland/Ector Counties

699. In Plan H100, HD81 consisted of Andrews, Winkler, and Ector Counties. HD81 was 52.4%

Hispanic in terms of total population and 47.1% HVAP. HD81 was 41.8% Anglo in terms of total population and 47.2% Anglo VAP. HD82 consisted of Dawson, Martin, Midland, Crane, and Upton Counties. HD82 was majority-Anglo in terms of total population and Anglo VAP. Red-202 Report.

700. Benchmark HD81 was 8,611 (-5.1%) below ideal population and HD82 was 4,403 (-2.6%) below ideal population. Red-202 Report.

701. In Plan H283, HD82 stays the same, but Ward County is added to HD81. TrJ1393 (Korbel). Using 2008-2012 ACS data, HD81 has 52.8% Anglo CVAP and HD82 has 60.1% Anglo CVAP. MALC-90; D-109 at 54. Neither district is a Latino opportunity district.

702. The minority population of the nine counties that make up the Midland-Ector mix grew by 46,067, while Anglo population shrank by 8,498. TrJ1392-93 (Korbel); MALC-142. According to 2010 Census data, minorities make up more than 53% of the population of the nine-county area included in HD81 and HD82 in Plan H283. MALC-142. There is a substantial, fast-growing Hispanic population in the Midland-Ector County area. TrJ1393-94 (Korbel). Midland and Odessa have been electing Hispanic county commissioners for some time now. TrJ1394. Despite the minority growth, the Legislature did not create any opportunity districts in the Midland-Ector area. TrJ1393.

703. Plan H111 and Plan H205, two Martinez Fischer statewide proposals submitted during the session, create HD81 in West Texas that joins Hudspeth County next to El Paso County, with Culberson, Reeves, Loving, Ward, Crane, and parts of Winkler, Ector, and Midland Counties. Proposed HD81 is 51.2% HCVAP. This district splits numerous cities, including Kermit in Winkler County, Odessa in Ector County, and Midland in Midland County. It violates the County Line Rule. HD81 has an area-rubber-band score of .741 and a perimeter-to-area score of .235. Red-315 Report. Rep. V. Gonzales testified that proposed HD81 was no more strange looking than HD74, a large west-Texas district, in the enacted map. V. Gonzales depo. at 65. HD74 in Plan H283 has an area-rubber-band score of .692 and a perimeter-to-area score of .189. MALC-138 (Red-315 Report). Defendants' expert Giberson concluded, based on compactness scores and visual observation, that the district is not compellingly compact such that it would be required to be drawn. Joint Expert Ex. E-18 (Giberson report) at 8; Giberson depo. (Joint Ex. J-42) at 12-13. In his deposition, he acknowledged that the compactness scores for HD81 were not remarkable. Giberson depo. (Joint Ex. J-42) at 87. He noted that the scores for this district benefitted from the inclusion of whole counties on the west side, which help offset the non-compactness on the eastern side. Joint Expert Ex. E-18 at 8; Giberson depo. (Joint Ex. J-42) at 87-88.

704. MALDEF advocated for a new Latino opportunity district in West Texas during the session. Plan H115 creates HD81, a long, odd-shaped district that spans along I-20 from Reeves County to Howard County, including parts of five counties and three whole counties, and breaking the County Line Rule numerous times. It splits the cities of Kermit in Winkler County, Odessa in Ector County, and Midland in Midland County. Proposed HD81 is 59.5% HCVAP using 2005-2009 ACS data. Red-109 Report. HD81 has an area-rubber-band score of .479 and a perimeter-to-area score of .128.

Red-315 Report.

705. At the April 15 HRC hearing, Luis Figueroa testified against Plan H113 and offered H115. He asserted that the new CVAP-majority district in West Texas (HD81) united the Latino community of interest. D-595 at 62-63. In response to questioning about the County Line Rule, Figueroa admitted that the map broke the rule to create § 2 districts, but asserted that this was necessary to comply with the VRA, and that the County Line Rule was being applied in a discriminatory manner to prevent the creation of § 2 districts. *Id*. at 12-15, 93. (Plan H115 also has numerous county cuts related to one-person, one-vote that were not necessary for VRA compliance and Figueroa said they could be re-evaluated. D-595 at 96.) Figueroa asserted that proposed HD81 was compact given the lower populations in the area and did not split any precincts. *Id*. at 108-16. He asserted that the district represented "communities within different counties that are contiguous, that they are in a compact geographical region, and the Latinos in the area are over 50 percent of the required population size, and that they -- but not for these county line rules would be able to elect a candidate of choice." *Id*. at 106. He further stated, "And so it encompasses metropolitan areas in Ector and includes parts of Winkler. But you can see that it doesn't extend all the way out in one single stream, nor does it extend into -- you've got to remember this area of the population is very under -- very small population so it's going to be larger than most districts because of the lack of population. So for that area, it is -- it is a compact district." *Id*. at 107. Rep. Phillips (Anglo, Republican) argued that it was not compact and did not respect communities of interest like cities and commissioner precincts, and that it was a racial gerrymander. Figueroa stated that they were willing to do further study to encompass more communities of interest. *Id*. at 111. Plan H115 was not adopted.

706. At the April 27 floor debate, Rep. Alonzo (Hispanic, Democrat) laid out Amendment No. 26 (Plan H164), "the MALDEF amendment." D-190 at 139. This plan included the same proposed HD81 as in Plan H115. He noted that West Texas lost population and had lost two districts, but there was an increase in Hispanic population, so they should create new opportunity districts. D-13 at S208. There was discussion that the plan paired members in Dallas, and Alonzo stated that the main purpose of the proposal was to talk about the opportunities, and that he would withdraw it. *Id*. at S209.

707. Rep. Martinez Fischer laid out Amendment No. 27 (H195) and Amendment 30 (Plan H197) as MALC statewide plans. D-13 at S210; D-190 at 190-244. These maps created the same proposed HD81 as in Plan H111 and Plan H205. Martinez Fischer and Rep. Gallego discussed the lack of Latino districts in West Texas, Odessa, Amarillo, Lubbock, Midland, and the Panhandle. D-13 at S211. Martinez Fischer stated that Latinos represent 40% of the West Texas population and their numbers had maintained growth, while Anglo population had declined, yet no growth was reflected in the proposed plan. *Id*. Gallego and Rep. Alonzo discussed that the MALC plan was trying to address the increase in Hispanic population in West Texas, even though the overall population decline caused a loss of two seats in West Texas. *Id*. at S218-19. Martinez Fischer stated that the map demonstrated that if you want to create minority opportunity districts, you certainly can, but that it was not done. *Id*. at S212. Solomons stated that Martinez Fischer's amendments unnecessarily violated the County Line Rule and they were tabled.

708. County Commissioner Luis Sanchez testified that the majority of Latinos that live in Midland come from a small town in Mexico called Ojinaga. TrJ445. They still read the paper from Mexico. *Id.* There is a similar connection to the Mexican-American population in Odessa. TrJ446 (Sanchez). They are U.S. citizens and residents with a common connection to a small town in Mexico. *Id.* He testified that there is a natural connection between the Latino communities in Odessa and Midland. They all work in the same type of oilfield business, the majority of their families are from that same small town in Mexico, and they have the same media and church diocese. He testified that H283 splits up the Latino vote because the majority of Latinos are concentrated in certain areas in Midland and certain areas of Ector County, and they would be more effective together. TrJ457-58. Sanchez testified that Plan H283 does not give an equal opportunity for Latino voters to elect their candidate of choice because they do not have enough concentrated minority population. TrJ459-60.

709. MALC and the Perez Plaintiffs submitted plans Plan H295, Plan H296, and Plan H297 as interim House plans that also create a new HD81. Proposed HD81 includes all of Ward, Crane, Upton, Reagan, Irion, Crockett, and parts of Tom Green, Midland, and Ector Counties. It is 61.4% HVAP and 50.1% total SSVR (51% non-suspense SSVR). MALC interim plan hearing ex. 9. This district violates the County Line Rule.

710. MALC has submitted *Gingles* demonstration plan H329. MALC-94 (map). In this map, HD81 takes in part of Midland and Ector Counties and large portions of West Texas. HD82 takes in the remainder of Midland and Ector Counties. Minority areas of Midland and Odessa and Midland and Ector Counties are joined with West Texas counties that have mixed population. MALC-95 (H329 HD81 overlay with shading by VTD). This is not a plug-in map. Using 2008 to 2012 ACS data, HD81 is 55.3% HCVAP. MALC-96. HD81 has an area-rubber-band score of .743 and a perimeter-to-area score of .238. *Id.* Sanchez testified that this plan would give the Latino community a better opportunity to elect a candidate of their choice than Plan H283. TrJ463-64. Sanchez testified that the areas encompassed are similar, and although the Latino-preferred candidate lost in an election analysis of a similar district, he thinks someone local, who knows people, could win. TrJ464.

711. MALC submitted demonstration Plan H360 as a plug-in plan to Plan H283. MALC-91 (map). HD81 in this plan includes Ward, Crane, Upton, and minority parts of Ector and Midland Counties. Proposed HD81 is 50.1% HCVAP using 2008-2012 ACS data. TrJ461 (Sanchez); MALC-93. HD82 takes the remainder of Ector County and Midland County and pairs them with Dawson County, Martin County, Andrews County, and Winkler County. These districts can be plugged-in to Plan H283. This plan breaks the County Line Rule.

712. Plaintiffs' expert Korbel testified that the Midland-Odessa minority community is a naturally occurring district, as shown in Plan H360, a two-district plug-in plan. TrJ1397. The minority populations of Midland and Odessa are only about 12 to 15 miles apart. TrJ1396 (Korbel). But they are separated into two districts in Plan H283 (as they were in the benchmark plan H100). Plan H360 has no VTD splits. TrJ1398 (Korbel). The district deviations are similar to those in H283. HD81 in H283 is 46.9% Hispanic VAP, and in Plan H360 it is increased to 56.3%. TrJ1399 (Korbel). B+HVAP is increased from 50.7% to 63%. *Id.* HCVAP is increased from 41.4% to 50.1% in HD81.

TrJ1400. B+HCVAP increases from 45.5% to approximately 58% (57.5%). TrJ1400 (Korbel). It does not pair the incumbents. TrJ1401 (Korbel). The districts are within the range of deviation for compactness and there is very little difference from H283 in terms of compactness. *Id*. Korbel agreed that this map likely captures every 50% plus Hispanic VTD into HD81. TrJ1456. Sanchez testified that Plan H360 would give the Latino community more of an opportunity to elect a minority candidate of choice. TrJ460.

713. Sanchez testified that he won his 2008 primary against an African American because he had African-American support. He testified that he did well in his 2012 general election with Latino voters and African-American voters. TrJ450. He also testified that Anglo voters in Midland County generally do not support candidates that are also supported by the Latino community. TrJ455. Latinos have not been successful in county-wide races in Midland. TrJ453 (Sanchez). The mayor of Midland is Latino. TrJ454 (Sanchez). Sanchez did not know of any Latino officeholders elected in and around Midland County from areas that were majority Anglo. *Id*. Sanchez does believe that Midland Latino citizens have an equal opportunity to participate in the political process. TrJ468. Korbel agrees that minority voters can and do participate in Midland and Ector County school board, city council, and county commissioner elections. TrJ1458.

714. Plaintiffs offered the deposition and Declaration of Rep. Pete Gallego. Rep. Gallego served eleven terms in the House and represented HD74 in West Texas. He is familiar with the location and distribution of Latino communities in West Texas from campaigning and redistricting over four cycles. Docket no. 331 at 2. Many of the Latino communities in West Texas represent a community of interest consisting of individuals and families in certain low-income categories and at certain poverty levels. These communities are characterized by high poverty levels, low income, and significant health issues. *Id*. The Latino community in West Texas has experienced substantial population growth. Instead of creating two new Latino districts, Plan H283 diluted Latino voting strength and HD81 and HD84 are 35.8% HCVAP and 24.9% HCVAP, respectively. *Id*. at 3. In contrast, MALC's plan H205 provides Latino opportunity by including HD81 (in Midland/Ector Counties) and HD84 (in the Panhandle) with 51.8% and 53.9% HCVAP. *Id*. The two districts seek to combine communities that share a similar poverty level, low-income characteristics, and health-related concerns. These communities have been in place many decades and represent a politically cohesive community with similar interests that are expressed in local, state, and national elections. HD81 includes significant portions of the Latino community residing in the southern parts of Ector and Midland Counties, and other counties such as Reeves, Culberson, and Hudspeth Counties, which also contain substantial Latino communities. *Id*. at 4.

715. In Midland County, the mean household income for Anglos is more than twice that of Hispanics and African Americans. MALC-140. Per capita income for Anglos is almost three times that of Hispanics. *Id*. Hispanics and African Americans are four to five times more likely to rely on food stamps than Anglos. *Id*. Sanchez testified that the Latino community is lower to middle class. TrJ465. More than 22% of Hispanics over the age of 25 are functionally illiterate, compared to 1.9% of Anglos. MALC-141. 42.9% of Hispanics and 21.4% of African Americans over the age of 25 are not high school graduates, compared to 7.4% of Anglos. *Id*. 8.3% of Anglos over the age of 25 have

professional degrees, compared to 1.1% of Hispanics and 5% of African Americans. *Id.* Sanchez testified that Hispanics are not doing as well as Anglo counterparts in terms of educational attainment. TrJ465.

716. In Ector County, the Anglo per capita income is almost twice that of Hispanics and African Americans. MALC-143. The median income of Hispanic families is approximately two-thirds of that of Anglos. African-American median family income is less than half that of Anglos. *Id.* More than one quarter of Hispanics over the age of 25 are functionally illiterate compared to 3.5% of Anglos. MALC-144. Anglos make up 71.2% of those with professional or post-graduate degrees even though minorities make up more than 50% of the population. Almost 44% of Hispanics over the age of 25 are not high school graduates, compared to 13.8% of Anglos.

717. Dr. Brischetto found racially polarized voting in general elections in Midland and Ector Counties. TrJ947, TrJ969. He found that Latinos had a high level of cohesiveness. TrJ969. He also found that Anglo bloc voting was sufficient to usually defeat the Latino-preferred candidate. *Id.* Brischetto noted that, according to 2010 Census data, Ector county was 47.3% Latino VAP and 46.4% Anglo VAP. MALC-161 Table 8. Dr. Brischetto found racially polarized voting in Ector County in the general election, and the Republican and Democratic primaries. TrJ947-51. Midland County was 32.9% Latino VAP and 58% Anglo VAP. MALC-161 (Brischetto report) Table 11. Latino voter participation was very low. MALC-161 ¶ 60. In each of the three races involving minority candidates, voting between Latinos and non-Latinos was extremely polarized. MALC-161 ¶ 61. Brischetto was unable to draw a conclusion for the Republican primary due to a lack of good data. MALC-161 ¶ 62-63. Brischetto also did not look at the Democratic primary because there were no races with Latino versus non-Latino candidates. MALC-161 ¶ 63.

718. Plaintiffs presented maps with majority-HCVAP districts during the session (H111/H205 and H115/H164) that were rejected. These required breaking the County Line Rule.

719. Plaintiffs present demonstration maps with majority-HCVAP districts using 2008-2012 ACS data (H329/H360); one is more compact and is a plug-in plan (H360). These require breaking the County Line Rule.

720. Dr. Brischetto found racially polarized voting in general elections and Democratic primaries in Midland and Ector Counties.

### West Texas Lubbock/Panhandle

721. In Plan H100, HD84 was centered around the City of Lubbock in Lubbock County, and HD83 included the rest of Lubbock County and joined it with Hockley, Cochran, Yoakum, and Gaines Counties. Both were Anglo-majority districts in terms of VAP, though HD84 was only 47.7% Anglo in terms of total population. D-100; Red-202 Report.

722. In Plan H113, the first public plan, HD84 remained centered around Lubbock and wholly

within Lubbock County. HD83 joined the remainder of Lubbock County with Hockley County to the west and Hale County to the north.

723. Plan H115 was introduced by MALDEF during the session. At the April 15 HRC hearing, Luis Figueroa testified against Plan H113 and offered H115 with proposed Latino opportunity district HD87 in the Panhandle, in and around Lubbock County. HD84 remains wholly within Lubbock County. HD83 (an Anglo district) takes in part of Lubbock County and connects to eleven other counties (six whole counties and five parts of counties). HD87 is a long, odd-shaped district that includes two whole counties (Floyd and Crosby) and parts of nine other counties, including Lubbock County. HD87 is 51.6% HCVAP using 2005-2009 ACS data and 46.8% total SSVR/48.9% non-suspense SSVR. It has an area-rubber-band score of .395 and a perimeter-to-area score of .062. Defendants' expert Giberson concluded, based on compactness scores and visual observation, that the district is not compellingly compact such that it would be required to be drawn. Joint Expert Ex. E-18 (Giberson Report) at 8; Giberson depo. (Joint Ex. J-42) at 12-13.

724. There was quite a bit of discussion about the proposed district at the hearing. Figueroa noted that there were "huge Latino growths" in the Panhandle region that were not reflected in the proposed map, and that they were a community of interest so that the district could be drawn in compliance with § 2. D-595 at 62. Rep. Hilderbran (Anglo, Republican) noted that HD87 did not look compact, did not look like it cared about communities of interest, and "basically zigzag[ged] around to catch precincts in those rural counties that have the most Hispanics in them." *Id*. at 73. Figueroa disputed the assertion, stating, "We drew a Latino majority district in an area that we felt was compact enough to where a district could be drawn. And so we attempted to see if Latinos were being split because of the county line rule and we thought the Latino communities were being split because of the county line rule fracturing their ability to elect their candidate of choice." *Id*. at 74. Figueroa said the district was drawn with a goal of 50% HCVAP to ensure Latino voter opportunity. *Id*. at 75-76. Rep. Hilderbran asserted that the Latino communities in the different counties might have different interests, and that he thought more compact districts could be drawn that respect communities of interest but still provide Latino opportunity. *Id*. at 77-79. Figueroa pointed out that other districts in Solomons' proposed map were not particularly compact and thus "communities of interest and the prettiness of compactness is sometimes in the eye of the beholder." *Id*. at 87. Figueroa said that HD87 was compact given the lower populations in the area and did not split any precincts. *Id*. at 108-16. He asserted that the district represented "communities within different counties that are contiguous, that they are in a compact geographical region, and the Latinos in the area are over 50 percent of the required population size, and that they -- but not for these county line rules would be able to elect a candidate of choice." *Id*. at 106. Figueroa noted that HD87 did not split any precincts and although it included parts of several counties, "these populations in these counties are very small so it is going to extend a little bit longer than, of course, an urban district, but it is still very much within the traditional size of a house district in those areas." *Id*. at 112. Figueroa noted that the communities of interest they were trying to unite "came from working with the community, reaching out to them, looking at socioeconomic data, looking at some of the industries." *Id*. at 114. Figueroa and Rep. Phillips (Anglo, Republican) discussed whether the district was required by § 2 or whether it was a racial gerrymander, and Phillips asked how HD87

showed respect for political subdivisions. *Id*. at 110-16. Figueroa responded, "In District 87 we maintain all the VTDs. We drew as many counties as we could whole to respect the communities of interest. We drew it in a way so that Latinos who are unified under a community of interest would be able to elect a candidate of choice." *Id*. at 116. However, Figueroa acknowledged that only two of ten counties were wholly within HD87. *Id.* at 117. In response to questioning about the County Line Rule, Figueroa admitted that the map broke the rule to create § 2 districts, but asserted that this was necessary to comply with the VRA. *Id.* at 12-15, 63-64, 94-95. Figueroa said that the other county cuts elsewhere in the map (other than to create Latino opportunity districts) were made to comply with one person, one vote, and they would be happy to re-evaluate those. *Id*. at 96.

725. Plan H111 and Plan H205, two Martinez Fischer statewide proposals presented during the session, create HD84 in the Panhandle, taking in all of Crosby County, and parts of Dawson, Lynn, Terry, Lubbock, Floyd, Hale, Lamb, Swisher, Castro, Deaf Smith, Randall, and Potter Counties. It breaks the County Line Rule. Proposed HD84 has a 53.3% HCVAP using 2005-2009 ACS data. It has an area-rubber-band score of .342 and a perimeter-to-area score of .042. Defendants' expert Giberson concluded based on compactness scores and visual observation (which included observing that many county lines were split) that this district was not compellingly compact and was likely not required by the VRA. Joint Expert Ex. E-18 (Giberson Report) at 8-9; Giberson depo. (Joint Ex. J-42) at 86-87.

726. On second reading on April 27, Rep. Smithee (Anglo, Republican) offered Amendment No. 20 (Plan H154) concerning West Texas. D-13 at S203. This amendment would avoid the pairing of Landtroop and Perry and eliminate part of "that district that has drawn so much attention, that linear district that goes pretty much to the width of Texas, over 350 miles" (HD88 in Solomons' plan, which was a long narrow district in Plan H153 that stretched from north of DFW to almost the New Mexico border). *Id.* He also stated it would preserve communities of interest and make the districts more geographically compact. *Id*. at S204. Rep. Perry (Anglo, Republican) offered Amendment No. 21 (H206) to Amendment No. 20 to "clean up some inter-district stuff." He stated that it would affect HD84 in Lubbock County by removing a "little finger" that was created before and was politically motivated but no longer needed. *Id*. at S206. Rep. Frullo (Anglo, Republican) opposed it. *Id*. at S204. Rep. Martinez Fischer advised that members of MALDEF should "sit this one out" because they should not vote for maps that they may not ultimately agree on in the bigger picture. *Id*. at S205. Amendment No. 21 was tabled. Rep. Gallego offered Amendment No. 22 (H250) to Amendment No. 20 to add Loving County to HD74, and it was acceptable to the author and adopted. *Id*. at S206. Amendment No. 20, as amended, was adopted. *Id.* After the amendment, HD84 remained the same, but HD83 now joined the rest of Lubbock County with Lynn County to the south, Terry County and Gaines County to the southwest, and Borden, Scurry, and Mitchell Counties to the southeast. It also made significant changes to HD68, HD88, and other districts in the Panhandle and West Texas.

727. Rep. Alonzo (Hispanic, Democrat) laid out Amendment No. 26 (Plan H164), "the MALDEF amendment." D-190 at 139. The proposed HD87 in this plan is the same as in Plan H115. Alonzo said it would add opportunity districts, including in Lubbock. D-13 at S208. After a debate about

the County Line Rule, the amendment was withdrawn. *Id*. at S209. Alonzo stated that he did not intend for it to have a legal effect. *Id*. at S210.

728. In Plan H283, HD84 is centered in the City of Lubbock, while HD83 takes in the remainder of Lubbock County and joins it with Lynn, Borden, Scurry, Mitchell, Terry, and Gaines Counties. Using 2008-2012 ACS data, HD83 is 67.6% Anglo CVAP and HD84 is 59.3% Anglo CVAP. MALC-99; D-109.

729. County Commissioner Lorenzo "Bubba" Sedeno lives in Lubbock County. He testified that H283 splits the Latino voters off and divides up the minority community. TrJ482. He testified that Plan H283 does not provide Latinos with an opportunity to elect candidates of their choice.

730. MALC submits *Gingles* demonstration Plan H329. MALC-100 (map). In this map, HD84 is wholly within Lubbock County and the remainder of Lubbock County is joined with two other districts, HD83 and HD88. According to 2008-21012 ACS data, proposed HD88 has a 50.9% HCVAP. MALC-102; TrJ495 (Sedeno). Using 2005-2009 ACS data, the HCVAP for HD88 is 47.2%. TrJ496 (Sedeno). HD88's SSVR is 46.3%. TrJ497 (Sedeno). Three districts (HD83, HD84, HD85) come into Lubbock County, but that is the only split. TrJ485, TrJ493 (Sedeno). The City of Lubbock is also divided among three districts. HD88 includes parts of the City of Lubbock and Lubbock County and joins them with 10 surrounding counties. HD84 takes a portion of Lubbock County. And HD83 takes another portion of Lubbock County and joins it with Lamb, Hockley, and Terry Counties. HD88 has a .623 area-to-rubber band score (compared to less-compact HD83 of .576 in Plan H283) and a .162 perimeter-to-area compactness score. MALC-99; MALC-102. Sedeno testified that this map would help Latinos "tremendously" because it includes more Hispanic population and "would give us a fighting chance." TrJ483-84. This map creates a district that unites counties with significant Hispanic population. TrJ479 (Sedeno). Based on his political experience in the area, Sedeno testified that proposed HD88 would give Latinos an opportunity to elect a candidate of their choice. TrJ485.

731. Past Texas House maps have split excess county population between two districts. *Graves v. Barnes*, 343 F. Supp. 704 (W.D. Tex. 1972) (1972 map, Brazoria County and Smith County); S.B. 590, 63rd Leg. R.S. (1974 map, Brazoria County and Smith County); H.B. 1097, 64th Leg. R.S. (1976-1980, Brazoria County and Smith County); H.B. 1389, 68th Leg. R.S. (1982-1984 Brazoria County, Jefferson County, Collin County); H.B. 753, 69th Leg. R.S. (1986-1990 Brazoria County, Jefferson County, Collin County). MALC Oct. 31, 2011 interim hearing exhibits 29-34.

732. Although Precinct 3, which is 52% Hispanic, has elected Sedeno, no other county commissioners are Hispanic. TrJ472 (Sedeno). There are Latino elected officials in city council and school district positions in the Lubbock area. TrJ488-89 (Sedeno).

733. In Lubbock during the Obama 2012 election, Obama signs were stolen, then cut up and the "N" word written on them. TrJ486 (Sedeno).

734.  Schools and public facilities in Lubbock were segregated.  TrJ487 (Sedeno).  The Latino community has a lower standing in education and income than their Anglo counterparts in Lubbock. *Id.*

735.  Sedeno was not aware of any racial voting discrimination. TrJ490 (Sedeno).  He also could not think of any specific examples of discrimination against Hispanics in employment or health. TrJ490-91.

736.  Plaintiffs offer the declaration and deposition of Rep. Pete Gallego.  Rep. Gallego served eleven terms in the House and represented HD74 in West Texas.  He is familiar with the location and distribution of Latino communities in West Texas from campaigning and redistricting over four cycles. Docket no. 331 at 2.  Many of the Latino communities in West Texas represent a community of interest consisting of individuals and families in certain low income categories and at certain poverty levels.  These communities are characterized by high poverty levels, low income, and significant health issues.  *Id.*  The Latino community in West Texas has experienced substantial population growth.  Instead of creating two new Latino districts, Plan H283 diluted Latino voting strength and HD81 and HD84 are 35.8% HCVAP and 24.9% HCVAP, respectively.  *Id.* at 3.  In contrast, MALC's plan H205 provides Latino opportunity by including HD81 (in Midland/Ector Counties) and HD84 (in the Panhandle) with 51.8% and 53.9% HCVAP.  *Id.*  The two districts seek to combine communities that share a similar poverty level, low-income characteristics, and health-related concerns.  These communities have been in place many decades and represent a politically cohesive community with similar interests that are expressed in local, state, and national elections.  Although HD84 may appear odd-shaped, the contours are no more odd than districts in other parts of H283, such as HD41.  HD84 is odd-shaped to include communities in rural areas and is the best shape to accommodate a community of interest of similarly situated voters united by common industries and shared cultural experiences.  *Id.* at 4.

737.  In Lubbock County, the mean family income for Anglos is twice that of African Americans and Hispanics.  MALC-146.  The per capita income for Anglos is more than twice that of African Americans and Hispanics.  *Id.*; Joint Expert Ex. E-1 (Chapa Report) Table 5.  Hispanics and African Americans are several times more likely to rely on food stamps than Anglos.  MALC-146.

738.  In Lubbock County, almost 20% of Hispanics over age 25 are functionally illiterate, compared to 3.2% of Anglos.  MALC-147.  35.3% of Hispanics and 21.7% of African Americans over the age of 25 are not high school graduates, compared to 8.5% of Anglos.  *Id.*; *see also* Joint Expert Ex. E-1 (Chapa Report) Table 4 (noting that 40.6% of Hispanics have less than a high school education). 18.5% of Anglos over 25 have graduate or professional degrees, compared to 2.5% of Hispanics and 3.8% of Blacks.  MALC-147.  Anglos in Lubbock ISD are more likely to have TAKS commended performance, have SAT scores at or above criterion, take advanced placement or IB courses, and be college ready.  *Id.*  Anglos have higher average SAT scores than Hispanics and African Americans. *Id.*

739.  Dr. Brischetto found racial bloc voting in general elections in Lubbock County. TrJ947,

TrJ969; MALC-161. He also found racial bloc voting in the Republican primary. MALC-161. He found that Latinos had a very high cohesiveness. TrJ969. He also found that Anglo bloc voting was sufficient to usually defeat the Latino-preferred candidate. *Id.* Attorney Jackson said at trial that the State does not contest the existence of racially polarized voting in Lubbock County. TrJ975.

740. Plans (H115, H111/H205) were proposed during the session that would create a new HCVAP-majority (but not SSVR-majority) district in the Panhandle. Although other significant changes were made to the map at the request of an Anglo Republican member, the proposed Latino districts were rejected because they did not look compact and would require a violation of the County Line Rule.

741. MALC's *Gingles* demonstration map H329 creates HD88, an HCVAP-majority district using 2008-2010 ACS data but it would not have been HCVAP-majority using 2005-2009 ACS data.


SIGNED on this 20th day of April, 2017.

_____/s/_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE


_____/s/_____
ORLANDO L. GARCIA
CHIEF UNITED STATES DISTRICT JUDGE