# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **SHANNON PEREZ, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **NO. 11-CA-360-OLG-JES-XR** |
| | § | **[Lead Case]** |
| **STATE OF TEXAS, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## RODRIGUEZ PLAINTIFFS' PRE-TRIAL BRIEF (JOINED BY PEREZ AND LULAC PLAINTIFFS)

This pre-trial brief is submitted pursuant to this Court's Order Re: Pretrial Disclosures, Dkt. No. 1404, ¶ 2.[1]

## I.    INTRODUCTION

Plan C235 is not the product of a judicial cleansing process. Faced with an urgent need to get the 2012 election process underway, this Court did the best it could with an exceedingly difficult situation in an exceedingly complicated case. But at no point did the Court implicitly or explicitly "bless" Plan C235 or purge the plan of its multiple legal infirmities. As will be proven at trial, those legal infirmities render Plan C235 no more lawful than its predecessor plan.

In February 2012, the State, along with some of the other plaintiffs, proffered to the Court a "compromise map." *See* 2/14/2012 Tr. at 146:23 (Judge Rodriguez referring to Plan C226 as a "compromise map" because it is incorrect to call it a "settlement"); *id.* at 149:22-25 (Defendants' counsel referring to "what we call a compromise map"). The State admitted the plan was "far

---

[1] At the end of the pretrial brief, starting at p. 25, is an Addendum on Plan C235 following the format the Court requested on pages 3-5 of its Order Re: Pretrial Disclosures.

from perfect" but asserted it was "adequate for [its] intended purpose: to . . . allow[] elections to move forward without further inconvenience to Texas voters." Defendants' Advisory Regarding Interim Redistricting Plans, Dkt. No. 605 at 4.

The Court accepted Plan C226 as the interim plan for the 2012 election cycle, modifying it "for purely technical reasons." Order of March 19, 2012, Dkt. No. 691 at 2. After working with the Texas Legislative Council to remedy "inadvertent intrusions" of small pieces of Plan C226, consisting of essentially no population, *id*. at 29, the Court adopted Plan C235 as the interim plan. In doing so, it went to great lengths to explain that no one should take Plan C235 as the final word on map legitimacy in the context of this litigation. Plan C235 was interim only and "not a final ruling on the merits of any claims," reflecting only "preliminary determinations" that "may be revised upon full analysis." *Id*. at 1-2.

The following year, in a willful display of legislative tone-deafness, that "compromise map" was formally adopted by the Texas Legislature as Plan C235. Like its predecessor plan, it compromised the voting rights of hundreds of thousands Texas minorities. In several key areas, it incorporated district configurations identical to the configurations in Plan C185. In several others, the State adopted changes that gave the outward appearance of chipping away at the gross racial disparities apparent in Plan C185 while, in reality, falling far short of capturing—or even recognizing—the voting strength of the growing minority population or providing minorities an equal opportunity to elect their preferred candidates in congressional elections. The State continued the same miserly approach to minority voting rights as it had with respect to Plan C185, asserting that the original plan was lawful in all respects and that minorities had no legal right to a more even playing field. As a result, Plan C235 perpetuates the discriminatory voting

districts established in Plan C185 and continues to inflict injury under the Constitution and the Voting Rights Act upon Texas's minority populations.

While it is an understatement to call Plan C235 "far from perfect," the Rodriguez Plaintiffs[2] agree that Texas's congressional plan has a long way to go before it complies with the constitutional and statutory prohibitions against discriminatory redistricting. As an initial matter, the Texas Legislature has consistently stood behind the legality of the core elements of Plan C185 and refused to reverse course, and, as a result, the same discriminatory intent that pervades Plan C185 infects Plan C235. This is especially true with respect to the portions of Plan C235 that remain identical to those portions deemed invalid in Plan C185, namely, CD27 (with respect to Nueces County) and CD35 (with respect to Travis County). In a *deja vu* vein, meanwhile, the State's changes to CD23 once again create the illusion of minority opportunity without actually achieving it. Finally, the State's changes to Dallas-Fort Worth perpetuate the cracking of minority populations throughout the area in order to avoid creating a naturally-occurring coalition district—a district which is afforded protection under Section 2 of the Voting Rights Act.

Plan C235 makes plain that, with respect to the Texas Legislature's approach to congressional redistricting, the more things change the more they stay the same. Like its predecessor plan, Plan C235 squelches growing minority voting strength and, in so doing, runs afoul of the Voting Rights Act and the Constitution. The Rodriguez Plaintiffs respectfully request that the Court invalidate Plan C235, enjoin its use, and ensure that—once and for all this decade—Texas voters cast ballots under a lawful congressional redistricting plan.

---

[2] The text's frequent references to the Rodriguez Plaintiffs impliedly includes the Perez Plaintiffs and the LULAC Plaintiffs. The shorter reference is used for efficiency reasons.

## II.    THE PORTIONS OF PLAN C235 THAT REMAIN IDENTICAL TO PLAN C185 REMAIN UNLAWFUL

It is undisputed that Plan C235 makes no changes whatsoever to CD27, CD35, or Travis County. *See* Stipulation of Facts No. 1, Dkt. 1442 (Stips. 7-9). This was not an oversight. In their 2012 Advisory Regarding Interim Redistricting Plans, Defendants freely admitted that the plan "does not alter CD27 as drawn in [Plan C185]" because they believed it did not pose a legal violation and "makes no change to CD25 [in Travis County] . . . because there is no legal basis on which to do so." Dkt. No. 605 at 15; *see also* 2/14/12 Tr. at 11:3-6 (Mr. Mattax: "[T]he State just can't agree to . . . the dismantling of areas of Texas that we don't think have any legal issues involved with them.").

Defendants were sorely mistaken. Earlier this year, this Court determined that "Defendants' decision to place Nueces County Hispanic voters in an Anglo district [CD27] had the effect and was intended to dilute their opportunity to elect their candidate of choice" in violation of Section 2 of the VRA. Amended Order, Dkt. No. 1390 at 57. It further found that CD35 is a racial gerrymander in violation of the Equal Protection Clause, as "Defendants' decision to place majority-HCVAP CD35 in Travis County" was effectuated through race-based means and not justified by a compelling state interest. *Id.* As a result, "[t]he configurations of . . . CD27[] and CD35 in Plan C185 are . . . invalid." *Id.* at 58. Those configurations remain in place—and remain invalid—in Plan C235.

### A.    The State's Discriminatory Intent From Plan C185 Carries Over to Plan C235

This Court has already determined that, "[w]ith regard to those elements of the 2011 plan[] that remained unchanged and remained challenged in the interim plans, *when the Legislature adopted the Court's interim plans it engaged in the same conduct or incorporated the identical portions of the 2011 plans alleged to be illegal into the 2013 plans.*" Order, Dkt.

No. 1104 at 14 (emphasis added). Indeed, the State experienced no change of heart with regard to minorities in enacting Plan C235. On the contrary, it refused to "concede[] that any of its actions were wrongful" or otherwise indicate that it had "abandoned any intent to engage in the same conduct." *Id.* at 14-15. Thus, the facts and law of the case make clear that whatever intent Texas had in drawing Plan C185 carried over to Plan C235—at the very least with respect to those portions that are identical between the two plans.

Courts have held in various contexts that when a law is found to have been enacted with discriminatory intent, the legislative amendment or reenactment of the law—especially where the amendment or reenacted law is the same or similar to the discriminatory law—does not remove the taint of discriminatory intent. In *United States v. Fordice*, the Supreme Court held that Mississippi's "facially-neutral" education system policy failed to remove the "discriminatory taint" of the state's previous policy mandating a segregated higher education system. 505 U.S. 717, 733-35 (1992). While the new policy was racially neutral on its face, it made no effort to remove—and as a result, maintained—the discriminatory nature of the earlier facially discriminatory policy. *Id.* at 734-35. Because a state "may not leave in place policies rooted in its prior officially segregated system," the Court held that the education system still violated the Equal Protection Clause. *Id.* at 743. Just as in *Fordice*, Texas has made no attempt to remedy the discriminatory intent that plagued multiple portions of Plan C185. In fact, it reenacted the exact same district configuration in CD27 that this Court has held was originally enacted with discriminatory intent, *see* Amended Order, Dkt. No. 1390 at 57, and the same configuration in Travis County (and CD35) that the Rodriguez Plaintiffs alleged (and continue to allege) intentionally discriminates against minority voters, *see id.* at 41 n.38 ("Downton and the Republican-dominated Legislature used the intentional creation of a Hispanic-majority district

that extended in large part into Travis County to justify its destruction of Travis-County-based CD25, which it knew had a substantial minority population that was successfully electing its candidate of choice, a Democrat.").[3]

The taint of discriminatory intent is generally only removed from amended or reenacted legislation where a fact-specific inquiry reveals that the new statute was enacted significantly later than the discriminatory statute, legislators underwent a "deliberative process" prior to amendment or reenactment, and the new statute does not continue the same adverse racially disparate impact as the original discriminatory law. *See Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1224-26 (11th Cir. 2005); *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998). None of those factors is present here. The State enacted Plan C235 on the heels of Plan C185, and it did not undertake any "deliberative process" to remove the discriminatory taint of the law. On the contrary, it resolutely refused to change course on several portions of the map. Finally, minority voters in CD27, CD35, and Travis County—who have lived under a discriminatory redistricting plan since the beginning of the decade—continue to suffer injury under Plan C235 to the same extent as they would under Plan C185.

Because the State did not make *any* changes to these areas—let alone any changes that would have remedied the legal violations this Court found—CD27 and CD35 continue to violate the law and should, once again, be declared unlawful by this Court. The same holds true for the carve-up of Travis County more broadly.

---

[3] The racial carving of Travis County into five congressional districts remains as an unconstitutional blot on C235, and the Rodriguez Plaintiffs continue waging the same challenge they have been waging all along—that the intentional destruction of the preexisting crossover district anchored in the Austin area (Plan C100's CD25) violates the Fourteenth Amendment under the standard addressed in the *Bartlett v. Strickland* plurality decision. The Court did not need to reach the issue in its decision on Plan C185 in light of its finding on CD35. *See* Amended Order, Dkt. No. 1390 at 41 n.38.

### B.      Even Absent Discriminatory Intent, CD27 and CD35 Remain Unlawful

Even were the State's discriminatory intent magically cleansed by the adoption of a different bill number to effectuate identical district lines, CD27 and CD35 are still invalid based on this Court's findings with respect to Plan C185.

### 1.      CD27 remains intentionally dilutive but also violates the Section 2 Results Test

With respect to CD27, "Plaintiffs demonstrated that approximately 200,000 Hispanic voters in Nueces County (a majority-HCVAP county) had a § 2 right that could be remedied but was not." Amended Order, Dkt. No. 1390 at 47. Those Nueces County Hispanics still hold onto a Section 2 right that is not remedied under Plan C235. Thus, the discriminatory impact on Latino voters in Nueces County who have been unlawfully deprived of the equal opportunity to elect their candidates of choice is still present in CD27.

"Where the rights of voters who have demonstrated § 2 violations can be accommodated through the use of compact districts that do not subordinate traditional redistricting principles more than necessary to address the § 2 liability, those voters § 2 rights must be accommodated." *Id.* at 56. The Rodriguez Plaintiffs' Demonstrative Plan C286 shows that Nueces County can be incorporated in a majority-HCVAP district (Demonstration CD34) such that both the Latino-opportunity district and the majority-Anglo Demonstration CD27 become significantly more compact and adhere to traditional districting principles. *See* Ansolabehere 2017 Report ¶ 45, tbl. 14 (P. Exh. 955). The Section 2 remedy for Nueces County Latinos, moreover, facilitates changes throughout South/West Texas and allows for the creation of seven true Latino-opportunity districts in the area, without imposing a racial gerrymander in the process.

**C.    CD35 Remains a Racial Gerrymander**

This Court has already found that race predominated in "the drawing of district lines and selection of district population" in CD35 in Plan C185. Amended Order, Dkt. No. 1390 at 36. Those district lines—including the "squiggle" at the northern part of the district and the division of Travis County and numerous city boundaries, *id.* at 37-38—remain unchanged in Plan C235, and the same district population suffers from the State's unjustified race-based classification. *See id.* at 35 n.31 ("The harm flows from being 'personally . . . subjected to [a] racial classification,' not from vote dilution or intentional discrimination." (quoting *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015)). Indeed, CD35 remains the least compact congressional district in the State of Texas—and one of the least compact districts in the country. *See* Ansolabehere 2017 Report ¶ 48, tbl. 14.

The Court's racial gerrymandering finding, moreover, in no way hinges on the State's discriminatory intent. On the contrary, although the Rodriguez Plaintiffs continue to maintain that the State engaged in intentional discrimination in breaking up an existing crossover district in Travis County to create CD35, *see supra* n.3, intent to dilute the votes of racial minorities is not an element of a racial gerrymandering claim. *See e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 178 (M.D.N.C. 2016) (in finding that legislative redistricting plans constitute racial gerrymanders in violation of the Equal Protection Clause, "we make no finding that the General Assembly acted in bad faith or with discriminatory intent in drawing the challenged districts"), *aff'd*, __ S. Ct. __, No. 16-649, 2017 WL 2407469 (2017).

The Rodriguez Plaintiffs' Demonstrative Plan C286 shows that this configuration of CD35 was not necessary in order to create a majority-HCVAP congressional district in this area. Plan C286 presents a more compact version of CD35 that does not cross the Travis County or

city of Austin borders, remains a majority-HCVAP district, and, based on election results in the area, is a district in which Latinos have the opportunity to elect their preferred candidates.[4]

## III.    CD23 UNDER PLAN C235 VIOLATES SECTION 2 BOTH IN INTENT AND IN EFFECT

This Court found that CD23 under Plan C185 reflected the mapdrawers' "intent to provide Hispanic voters less opportunity to participate in the political process and elect their candidates of choice," and because they "effectuated that intent," the Court determined that the district violated Section 2 "in both intent and in effect." Amended Order, Dkt. No. 1390 at 29. Plan C235 changes the configuration of CD23 somewhat, but as the Rodriguez Plaintiffs will demonstrate at trial, CD23 continues to run afoul of Section 2.

The key question under Section 2's results test is "whether . . . CD23 provides 'real electoral opportunity'" for Latino-preferred candidates. *Id.* at 18. CD23 under Plan C235 does not perform nearly as well for minority-preferred candidates as CD23 under the benchmark Plan C100. According to the analysis of CD23 by Texas's expert Dr. John Alford, under Plan C235, minority-preferred candidates carried only one out of three (33%) endogenous elections and three out of 25 (12%) reconstituted statewide elections. Alford 2017 Report at 16-17, 20. While it is true that "[p]erformance of 50% or lower on a statewide exogenous election index does not automatically rule out minority opportunity," Amended Order, Dkt. No. 1390 at 17, an abysmal 12% success rate is far below any of the indices this Court cited in its discussion of benchmark CD23, *see id.* (statewide indices ranging from 30% to 50% success for minority-preferred candidates in CD23 under Plan C100). And unlike that benchmark CD23, in which "despite the

---

[4] The LULAC Plaintiffs are proponents of Demonstrative Plan C285, and, together with the Perez Plaintiffs, are of the view that, similarly to the Rodriguez Plaintiffs' Demonstrative Plan C286, it addresses the claims as to CD35 and the Central Texas congressional district configurations. Mr. Korbel, their expert, will testify to many of the same matters to be addressed by Dr. Ansolabehere. Again, the text's references to Dr. Ansolabehere, without extensive discussion of or reference to Mr. Korbel, are for efficiency reasons. Mr. Korbel will be a key witness on the claims advanced by the Perez and LULAC Plaintiffs.

50% or less success rate in those exogenous election indices, preferred-minority candidate success in the actual endogenous elections of the district [66%] demonstrates that benchmark CD23 did in fact provide 'real electoral opportunity,'" *id.*, current CD23's remarkably low success rate in the State's preferred exogenous election index is mirrored in the remarkably low success rate (33%) in endogenous elections.

Dr. Ansolabehere will testify as to why the slightly higher HCVAP in CD23 (from 58.5% under Plan C185 to 61.3% under Plan C235) has not actually translated into a "real electoral opportunity" for Latino-preferred candidates. In particular, he will demonstrate that the areas kept in the district from its predecessor version vote so overwhelmingly for Republican candidates (who are not preferred by Latino voters) that the addition of Latino voters (who predominantly vote for Democratic candidates) is insufficient to overcome the deficit those candidates faced in the areas that comprise the district's core. Thus, the influx of Latino voters is unable to transform the district into one in which Latinos have the opportunity to elect their preferred candidates.

Dr. Ansolabehere's analysis will further shed light on the motivation of the mapdrawers in drawing CD23.[5] At the time CD23 was drawn, the only election data available was from 2010. Both the 2010 congressional election and the 2010 gubernatorial election reflect the same pattern: while mapdrawers brought into CD23 VTDs in which Latino-preferred candidates won by over 5,000 votes, they kept in the district VTDs in which Latino-preferred candidates lost by nearly 13,000 votes (in the congressional election) and nearly 16,000 (in the gubernatorial election). *See* Ansolabehere 2017 Report tbl. 4. Thus the areas brought in were not sufficiently supportive of Latino-preferred candidates to overcome the deficit the candidates faced in the

---

[5] The precise identity of Plan C235's mapdrawers has not been disclosed, but it is clear that the State had a heavy hand in it.

areas kept in the district. Any gains for Latino candidates of choice over the predecessor (legally invalid) version of CD23 are thus marginal at best and illusory at worst. The election data available to the mapdrawers made clear that, even with the addition of eligible Latino voters, Latino-preferred candidates would not fare well in CD23.

The Rodriguez Plaintiffs' Demonstrative Plan C286 shows how undoing the separation of Nueces County from the rest of the South/West Texas region allows CD23 to be configured as a true Latino-opportunity district. According to Dr. Alford's analysis, under Demonstrative Plan C286, Latino-preferred candidates prevail in 15 out of 25 (60%) statewide elections in CD23, *see* Alford 2017 Report at 20,[6] far from "a guarantee of success," Amended Order, Dkt. No. 1390 at 16, but indisputably providing a "real electoral opportunity" for Latino-preferred candidates, *id.* at 18.

In sum, like its predecessor district in Plan C185, CD23 under Plan C235 is not a district in which Latinos have a reasonable opportunity to elect their candidates of choice, and thus, like its predecessor district, CD23 violates the Section 2 results test.[7] As a result, under Plan C235, South/West Texas still contains only six Latino-opportunity districts. *See* Amended Order, Dkt. No. 1390 at 45-46 ("Plaintiffs have shown, and mapdrawers were aware, that seven Latino opportunity districts could be drawn in South/West Texas without including Travis County."). The evidence available to mapdrawers, moreover, indicates that CD23's failure to provide a

---

[6] According to Dr. Ansolabehere's analysis, the average performance of Latino-preferred candidates in CD23 in statewide elections from 2010 to 2016 is 54%. *See* Ansolabehere 2017 Report tbl. 16.

[7] This Court has already found that "there is racially polarized voting in Texas" and that "the State conceded this point with regard to all areas included in CD23 [under Plan C185]." Amended Order, Dkt. No. 1390 at 25. Dr. Ansolabehere's analysis confirms as much for the areas included in CD23 under Plan C235. *See* Ansolabehere 2017 Report ¶¶ 36-38. Moreover, this Court's findings regarding "the lingering effects of past discrimination on Latino voter turnout and electoral opportunity," *see* Amended Order, Dkt. No. 1390 at 25-28, remain in effect for purposes of the Court's Section 2 evaluation of Plan C235.

meaningful opportunity to Latino voters was not an oversight, but instead a deliberate, well-calibrated decision.

## IV.    PLAN C235 INTENTIONALLY DISCRIMINATES AGAINST MINORITIES AND VIOLATES THE SECTION 2 RESULTS TEST IN THE DALLAS-FORT WORTH AREA

Earlier this year, the Court found that, in Plan C185, the State of Texas "intentionally diluted minority voting strength" in the Dallas-Fort Worth area ("DFW") "in order to gain partisan advantage."  Amended Order, Dkt. No. 1390 at 125.  The Rodriguez Plaintiffs will demonstrate that Plan C235 perpetuates the cracking of DFW minority population centers—and the intentional avoidance of an additional minority-opportunity district—bearing many of the same hallmarks of intentional discrimination as its predecessor plan.  Plaintiffs will further demonstrate that the additional coalition district Texas so deftly avoided creating in Plan C235 satisfies the first *Gingles* precondition and, together with a cohesive minority population and an undisputed track record of racially polarized voting, establishes a violation of the Section 2 "results" test in DFW.

### A.    Plan C235 Continues to Crack Minority Population Centers

Plan C235 introduces a newly configured CD33, which has a combined African-American and Latino citizen voting age population of 66.4% and has consistently elected the minority-preferred candidate. *See* Ansolabehere 2017 Report ¶ 113.  But the advent of CD33 hardly cures—and in fact exacerbates—the fragmenting of minority populations in the region. Dr. Ansolabehere will testify that CD33 straddles Dallas and Tarrant Counties, and along with other district lines in the region, divides multiple majority-minority cities and neighborhoods along the way.

Dr. Ansolabehere will describe how CD33 splits the majority-minority city of Irving in half, stranding more than half of the city's minority voters in majority-Anglo CD24 in which

African-American and Latino voters decidedly do not have the opportunity to elect their candidates of choice. Ansolabehere 2017 Report ¶¶ 71-76. Similarly, the majority-minority city of Grand Prairie is divided among three districts, leaving 21% of its minority population in a majority-Anglo district. *Id.* ¶¶ 77-83. Dividing these two Dallas County cities, which together have enough population to comprise half of one congressional district, splits a high concentration of African Americans and Latinos and ensures that 35% of the cities' combined minority population is carved into districts in which minorities will have no opportunity to elect their preferred candidates. *Id.* ¶ 84.

The fragmentation of minority populations in Tarrant County is even more glaring. Dr. Ansolabehere will testify that, although 42% of the County's population is African-American or Latino,[8] the vast majority of the minority population is drawn into majority-Anglo districts. *Id.* ¶ 85. By contrast, only 5% of Tarrant County Anglos are placed in the new minority opportunity district, leaving 95% of Anglos in districts in which they can continue to elect their preferred candidates. *Id.*

This feat of cartography was accomplished through (1) the careful dissection of the city of Arlington, a city in which African Americans and Latinos together form a plurality, such that three times as many African-American residents end up in a majority-Anglo congressional district as end up in majority-minority CD33, *id.* ¶¶ 86-92; (2) the carving up of the majority-minority city of Fort Worth among five congressional districts, only one of which provides minority voters an opportunity to elect their preferred candidates, *id.* ¶¶ 93-96; and (3) the exclusion from CD33 of predominantly minority neighborhoods in Fort Worth to ensure that these high concentrations of minority voters are placed in majority-Anglo districts, *id.* ¶¶ 97-105.

---

[8] This number is drawn from the 2010 Census data. Based on the 2011-2015 American Community Survey ("ACS") data, the minority population of Tarrant County is 50.1%, and thus Tarrant County is now a majority-minority county.

The shape of CD33 makes plain just how assiduously the State had to work to avoid providing an additional minority opportunity district in the region. Dr. Ansolabehere will demonstrate that CD33 is highly non-compact, due in part to the awkward cut to exclude the majority-minority neighborhood of Meadowbrook and the tentacle extending into the eastern part of Arlington. *Id.* ¶ 112. Thus, CD33 in this "compromise" map draws in just enough minorities from across Dallas and Tarrant Counties to create a new opportunity district, but carefully (and awkwardly) avoids creating "too much" electoral opportunity for minorities in the region. Consistent with Texas's approach from the beginning, there is a ceiling on how much minority opportunity Texas will tolerate. *See, e.g.*, Amended Order, Dkt. No. 1390 at 77 ("[M]apdrawers were hostile to the creation or existence of minority coalition districts because they viewed them as Democrat districts.").

In short, the creation of a new minority opportunity district in CD33 hardly cures the fragmentation of minority populations in DFW and required careful manipulation of district lines to ensure that a substantial portion of the region's minority population remains stranded in majority-Anglo districts.

## B.    Plan C235 Maximizes Anglo Representation While Minimizing Minority Representation in Dallas and Tarrant Counties

The Rodriguez Plaintiffs will demonstrate that the cracking of minority populations throughout Dallas and Tarrant Counties perpetuates the disparate impact on minorities that this Court found indicative of discriminatory intent in Plan C185. *See* Amended Order, Dkt. No. 1390 at 135-37.

Fifty-four percent of the population of Dallas and Tarrant Counties, together, are African American or Latino. Yet out of the seven districts that draw population from these counties, only two (CDs 30 and 33) are contained entirely within the counties and provide minorities an

opportunity to elect their preferred candidates.  The other five districts take population from these counties and join them with outlying counties to maroon Dallas and Tarrant County minorities in majority-Anglo districts.  Ansolabehere 2017 Report ¶ 116.  Thus, although Anglos comprise only 46% of these counties' population, they are a majority in 71% of the congressional districts in the region.  *See* Amended Order, Dkt. No. 1390 at 136 ("Thus, the minority group has a majority of seats.").

Dr. Ansolabehere will testify that the effect of the division of Dallas and Tarrant Counties is to concentrate Anglo voters in majority-Anglo districts and split African-American and Latino voters between majority-Anglo and majority-minority districts.  As a result, 93% of Anglos in Dallas and Tarrant Counties live in districts in which their race is a majority, compared to 59% of African Americans and Hispanics.  Ansolabehere 2017 Report ¶ 117.

Indeed, the extent to which minority voters are treated differently than Anglo voters statewide remains stark in Plan C235.  In Plan C235, 87% of Anglos reside in majority-Anglo districts, compared to only 53% of African Americans and Latinos.  *See* Red-100, Plan C235; *compare* Amended Order, Dkt. No. 1390 at 139.[9]  Thus, even if CD23 were considered a Latino-opportunity district, "White non-Hispanics, who are 45% of the total population, have opportunities to win [66%] of seats, while African-Americans and Hispanics, who are 48% of the State's population," have opportunities to win 33% of seats. *Id.* When accounting for the fact that CD23 is *not* a Latino opportunity district, *see, supra* Section III, the numbers are even bleaker: Anglos have opportunities to win 69% of seats and African Americans and Latinos have opportunities to win only 31% of seats. *See* Red-100, Plan C235.

---

[9] These percentages are based solely on population measures, and thus CD23 is included among the districts in which African Americans or Latinos comprise a majority of the citizen voting age population even though Plaintiffs contend that CD23 is not a Latino opportunity district, *see supra* Section III.

Thus, the impact of Plan C235 in the Dallas-Fort Worth area undeniably "bears more heavily" on minority voters than on Anglos. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).[10]

C.    **Demonstrative Plan C286 Will Show that Fixing the Cracking of Majority-Minority Cities Yields an Additional Minority Opportunity District**

The Rodriguez Plaintiffs' Demonstrative Plan C286 demonstrates that eliminating the divisions of significant minority populations by adhering to municipal boundaries and compactness principles naturally creates an additional opportunity district for African Americans and Latinos to elect their preferred candidates.[11]  Dr. Ansolabehere will testify to his process in creating Demonstrative Plan C286 and explain that, by making the cities of Irving and Grand Prairie whole in Dallas County, and moving CD33 into Tarrant County, a new congressional district (Demonstration CD24) emerges without compromising the existing minority opportunity districts in the area.  Ansolabehere 2017 Report ¶¶ 126-37.  By simply adhering to traditional districting principles, Demonstrative Plan C286 lays bare the contortions Plan C235 had to undertake to avoid creating an additional opportunity district in the area.

D.    **Plaintiffs Will Establish a Section 2 "Results" Violation in Dallas-Fort Worth**

Demonstrative Plan C286 shows that eliminating the cracking of minority populations in DFW yields an additional minority opportunity district (Demonstration CD24) that naturally

---

[10] While the Rodriguez Plaintiffs' analysis and expert will focus primarily on the impact of Plan C235 on Texas's minority population, the evidence at trial presented by multiple Plaintiffs' groups will demonstrate that Plan C235 bears several of the other hallmarks of intentional discrimination identified in *Arlington Heights*. Indeed, this Court has already recognized Texas's "long history of discrimination with regard to voting and in general," Amended Order, Dkt. No. 1390 at 140, as well as the State's "most restrictive positions on the VRA" despite the weight of Fifth Circuit authority and the advice of TLC lawyers, *id.* at 125 & n.107, and its intentional refusal to recognize naturally-occurring minority coalition districts in DFW, *id.* at 77, 127 ("One way to solve this problem was to pack and crack minority voters.").  Moreover, "the 'same Legislature that passed [Plan C235] also passed two laws found to be passed with discriminatory purpose,'" Amended Order, Dkt. No. 1390 at 138 n.128 (quoting *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016)), *cert. denied*, 137 S. Ct. 612 (2017), namely Plan C185 and Texas's voter identification law, *see Veasey v. Abbott*, __ F. Supp. 3d __, No. 2:13-CV-193, 2017 WL 1315593 (S.D. Tex. Apr. 10, 2017).

[11] Demonstrative Plan C285, advanced by the Perez and LULAC Plaintiffs, contains a similar demonstration.

captures minority population growth in the area.  But even if the Court were to find no intentional discrimination against minority voters in DFW, Section 2 of the VRA mandates the creation of an additional coalition district in the region.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives."  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  In *Gingles*, the Supreme Court established the well-known framework governing Section 2 claims.  To establish a Section 2 claim, a plaintiff must satisfy three "necessary preconditions": (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  478 U.S. at 50-51.  A plaintiff who establishes these preconditions has very likely established a violation of Section 2.  "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2."  *NAACP v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1019 n.21 (2d Cir. 1995).

> **1.    The Minority Population in DFW Is Sufficiently Large and Geographically Compact to Allow for the Creation of at Least One Additional Coalition District (*Gingles* 1)**

This Court has made clear that "§ 2 can require the creation of minority coalition districts."  Order on Plan H283, Dkt. No. 1365 at 8; *see also* Amended Order, Dkt. No. 1390 at 78.  Thus, to establish the first *Gingles* precondition, Plaintiffs must show that together the African-American and Latino population of the DFW area is "sufficiently large and geographically compact to constitute a[n additional] majority in a single-member district." *Gingles*, 478 U.S. at 50.

It cannot be disputed that both Demonstration CD24 and Demonstration CD33 in Plan C286 satisfy the numerosity requirement of *Gingles* 1. The stipulated data make plain that the combined African-American and Latino CVAP of Demonstration CD24 is 54.8%, while the combined African-American and Latino CVAP of Demonstration CD33 is 54.6%. *See* Red-116, Plan C286; *see also* Ansolabehere 2017 Report tbl. 15.

Dr. Ansolabehere will explain how he created these districts primarily to adhere to county, city, and neighborhood boundaries. Demonstration CD24 unifies the cities of Irving and Grand Prairie and connects them with the west side of the city of Dallas to create a coalition district based almost entirely within Dallas County.[12] Demonstration CD33 is moved entirely into Tarrant County, eliminating the county boundary crossing. It closely follows the municipal border of Fort Worth on the eastern side of the city, reducing the number of times that the city border is crossed by the district boundary. This configuration eliminates the splitting of Fort Worth in the predominantly-minority neighborhoods extending from Meadowbrook to far east Fort Worth, eliminates the splitting of the Fort Worth city border on the eastern side of Tarrant County, and incorporates the historically African-American neighborhood of Como in Demonstration CD33.

As a result of these changes, both of the DFW coalition districts in Demonstrative Plan C286 are more compact than the current CD33. Under Plan C235, CD33 has a Reock score of .23 and a Polsby-Popper score of .05. *See* Ansolabehere 2017 Report tbl. 14. Demonstration CD33, by contrast, is at least 50% more compact, with a Reock score of .35 and a Polsby-Popper score of .11. *Id.* Demonstration CD24, meanwhile, has a Reock score of .34 and a Polsby-

---

[12] The City of Grand Prairie itself crosses the Dallas-Tarrant County boundary, and two Grand Prairie VTDs are included in Demonstration CD33 for purposes of equalizing population.

Popper score of .18. Based on the Reock measure, both of these coalition districts are as or more compact than 17 of the congressional districts under Plan C235. *See id.*

Plan C286 also minimizes the number of VTD splits. While Plan C235 split no fewer than 488 VTDs (based on the 2010 VTD configuration available at the time of its creation), Demonstrative Plan C286 splits a total of 17 VTDs (based on the 2016 VTD configuration). Demonstration CD24 splits only three VTDs (compared to 39 VTD splits under Plan C235) and Demonstration CD33 splits only two VTDs (compared to 113 VTD splits in Plan C235).

Demonstrative Plan C286's adherence to traditional districting principles thus not only exemplifies the lengths to which the State had to go to avoid drawing an additional coalition district in DFW, it also establishes the first prong of *Gingles*.

<blockquote>

**2.     African Americans and Latinos in DFW Are Politically Cohesive and the DFW Region Is Characterized by Racially Polarized Voting (*Gingles* 2 and 3)**

</blockquote>

Dr. Ansolabehere will testify to what is beyond dispute: African Americans and Latinos in DFW prefer the same candidates in general elections. *See* Ansolabehere 2017 Report tbl. 9. Dr. Ansolabehere will further confirm that the vast majority of Anglo voters in DFW vote against minority-preferred candidates in DFW. *Id.*; *see also* Amended Order, Dkt. No. 1390 at 120 ("It is undisputed in this case that voting in Texas is strongly racially polarized."); *id.* at 145 n.133 ("Defendants conceded the existence of racially polarized voting in DFW.").

The State's only response has been—and will be again—that Plaintiffs cannot establish *Gingles* 2 cohesiveness unless they can show that African Americans and Latinos vote cohesively in Democratic primaries. Just as that baseless argument was rejected by the D.C. District Court in its Section 5 evaluation of Plan C185, *see Texas v. United States*, 8867 F. Supp.2d 133, 174 (D.D.C. 2012), *vacated on separate grounds and remanded*, 133 S. Ct. 2885 (2013) ("[T]here is little support for Texas's focus on primary elections."), it should be rejected

here.  Indeed, Texas's position is manifestly incorrect.  The Voting Rights Act explicitly addresses equal opportunity for minority voting blocs in both primary and general elections. And a wealth of federal case law supports the use of data from general elections to determine the presence of cohesive minority voting blocs.

The language of the Voting Rights Act plainly contradicts Texas's position and supports the conclusion that data from general elections are not only probative of cohesive voting blocs but are necessary to such determinations.  A violation of the Voting Rights Act "is established if . . . it is shown that the political processes leading to *nomination or election* in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) . . . ."  52 U.S.C. § 10301 (emphasis added).  Thus, the Voting Rights Act, on its face, is concerned with whether minority voters have an equal opportunity to elect the candidate of their choice in both primary nominations and general elections.  "It is well established that, when the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).  Because the plain language of the Voting Rights Act clearly comprehends protection of minority voting rights in both primary and general elections, this Court is required to consider general election data as highly probative of cohesion between voters of different races.

Indeed, the Fourth Circuit Court of Appeals has extolled the virtues of using general election data to determine minority voter cohesion.  In *Lewis v. Alamance Cty., N.C.*, 99 F.3d 600, 614–16 (4th Cir. 1996), *cert. denied*, 520 U.S. 1229 (1997), the court rejected out of hand the local government's argument that Democrats who received nearly all of the African-American vote in general elections should not be deemed minority-preferred candidates:  "We reject the proposition that success of a minority-preferred candidate in a general election is

entitled to less weight when a candidate with far greater minority support was defeated in the

primary." *Id.* at 615 (internal quotation marks and citation omitted). The Fourth Circuit held not

only that exclusion of general election data was contrary to the plain language of the Voting

Rights Act but also that "[s]uch a view is grounded in the belief that minority voters essentially

take their marbles and go home whenever the candidate whom they prefer most in the primary

does not prevail, a belief about minority voters that we do not share." *Id.* The court concluded

that exclusion of general election data

> ignores altogether the possibility that primary election winners will
> become the minority's preferred candidate during the general
> election campaign, or that where, as here, the overwhelming
> majority of blacks vote in the Democratic primary, that a
> Republican could in fact become the black-preferred candidate in
> the general election by addressing himself to issues of interest to
> the minority community in a way that appeals to them as
> participants in the political process.

*Id.*; *see also id.* ("[C]andidates who receive 99+% of the black vote in general elections are the

black-preferred candidate *in that election*, regardless of their level of support in the primary.").

The Fifth Circuit has consistently relied upon general election data to determine

cohesiveness among different minority groups. *See* Order on Plan H283, Dkt. No. 1365 at 15

("As the Fifth Circuit has stated, 'We are a strict *stare decisis* court.'") (quoting *Ballew v. Cont'l

Airlines, Inc.*, 668 F.3d 777, 782 (5th Cir. 2012)). For instance, in *LULAC, Council No. 4434 v.

Clements*, the Fifth Circuit held that African-American and Latino voters were cohesive in

Tarrant County where "[t]he undisputed facts . . . are that a majority of Hispanic voters always

supported the same candidate favored by black voters in every general election." 999 F.2d 831,

886 (5th Cir. 1993) (*en banc*), *cert. denied*, 510 U.S. 1071 (1994); *see also Campos v. City of

Baytown, Tex.*, 840 F.2d 1240, 1245–46 (5th Cir. 1988) (using general election data to review

cohesion in a coalition district and holding that "if the statistical evidence is that Blacks and

Hispanics together vote for the Black or Hispanic candidate, then cohesion is shown") (footnote omitted); *LULAC v. N.E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1082 (W.D. Tex. 1995) ("Dr. Rives admitted that his analysis of the general elections showed, *inter alia*, both that Hispanics and Blacks generally vote together and that they vote differently than Anglo voters in [the North East Independent School District].").

In fact, federal courts routinely consider statistics from general elections to determine existence of cohesive voting blocs among different minority groups. *See, e.g.*, *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 278 (2d Cir.) (affirming district court's use of general election data to determine cohesive coalition district), *vacated and remanded on other grounds*, 512 U.S. 1283 (1994); *France v. Pataki*, 71 F. Supp. 2d 317, 329 & n.13 (S.D.N.Y. 1999) (reviewing, among other things, "53 general-election contests" to conclude that there was no "coalition building process that involves white, as well as black and Hispanic voters").[13]

And federal courts have repeatedly used general election data to determine the existence of voter cohesion within a single minority group. *See, e.g.*, *Gingles*, 478 U.S. at 58 ("The District Court's findings concerning black support for black candidates in the five multimember districts at issue here clearly establish the political cohesiveness of black voters . . . . [I]n the general elections, black support for black Democratic candidates ranged between 87% and 96%."); *Old Person v. Cooney*, 230 F.3d 1113, 1121 (9th Cir. 2000) ("The State's expert . . . presented evidence that showed American Indians were politically cohesive in more than 70% of

---

[13] Federal courts, including the U.S. Supreme Court, have also analyzed general election data to determine the existence of crossover districts between Anglo and minority voters. *See, e.g.*, *Abrams v. Johnson*, 521 U.S. 74, 93 (1997) ("The results of the 1996 general elections tend to support the District Court's earlier finding of a general willingness of white voters to vote for black candidates. All three black incumbents won elections under the court plan, two in majority-white districts running against white candidates." (internal quotation marks and citation omitted)); *Large v. Fremont Cty., Wyo.*, 709 F. Supp. 2d 1176, 1211–12 (D. Wyo. 2010) (examining general election data to determine if Anglo crossover voting eliminated the possibility of defeating the minority-preferred candidate through white bloc voting).

the general elections, retention elections and ballot issue elections that he examined in the eight House Districts."); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 997 (D.S.D. 2004) ("Dr. Cole analyzed five interracial elections for the state senate: the 1998 general election for Districts 26 and 27, the 1994 general election for District 27, and the 1988 and 1990 general elections for District 28. He found the average estimate of Indian political cohesion in these races to be 83 percent, which is 'highly politically cohesive.'") (citation omitted).

In 2012, a three-judge panel for in the D.C. District Court noted that "[m]ost courts to address this issue have expressed no preference about the election level at which voting cohesion must be shown" and "agree[d] with the majority view." *Texas*, 887 F. Supp. 2d at 174.

> [R]equiring cohesion in the primary election distorts the role of the primary. Although minority groups sometimes coalesce around a candidate at that point in time, minority voters, like any other voters, use the primary to help develop their preferences. We refuse to penalize minority voters for acting like other groups in a political party who do not coalesce around a candidate until the race is on for the general election. . . . "Pull, haul, and trade" describes the task of minority and majority voters alike, and candidates may be minority "candidates of choice" even if they do not "represent perfection to every minority voter."

*Id.* at 175 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)). Like the D.C. Court, this Court should avoid holding minority voters to a different standard. The State of Texas has effectively diluted the voting strength of (and intentionally targeted) both of these minority groups, and both have joined together to vote for the same candidates in the determinative elections.

Thus the weight of authority makes clear that general election data are highly probative of minority voter cohesion—in single, coalition, and crossover districts. Accordingly, this Court should reject Texas's invitation to limit its review to primary election data and should instead consider statistics from general elections to determine cohesive voting among different minority

groups for purposes of Section 2.  As Dr. Ansolabehere will testify, such an analysis yields one

unmistakable conclusion: a "significant number" of African-American and Latino voters in DFW

"usually vote for the same candidates" in satisfaction of *Gingles* 2, *Gingles*, 478 U.S. at 56, and

together these two minority groups have expressed clear political preferences that are distinct

from—and consistently outweighed by—those of Anglo voters.

> **3.     Under the Totality of Circumstances, African-American and Latino Residents of DFW Have a Diminished Opportunity to Participate in the Political Process and to Elect Representatives of Their Choice**

This Court has already heard extensive testimony on the totality of circumstances that

address many of the Senate Report factors bearing on Section 2 challenges. *See generally*

*Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1146 (5th Cir. 1993) (discussing role of Senate

factors in Section 2 "results test" framework). Indeed, as recently as 2006, the Supreme Court

took note of the long history of discrimination in Texas against African Americans and Latinos

and the adverse impact that history had, and still has, on the ability of minorities to participate

equally in the electoral and political process. *LULAC v. Perry*, 548 U.S. 399, 439-40 (2006)

(citing a list of such findings by federal courts in Texas in redistricting cases). Witnesses

testifying or providing evidence to the Court on these factors include Dr. Tijerina, who testified

at length in 2011 on the history of discrimination against Latinos in this state and the adverse

impact it has had on their electoral participation, *see* Tr. 9/7/11 at 578-96 (A. Tijerina), and Dr.

Burton, who reported on the state's discrimination against African Americans and the adverse

impact on their participation in the political process, *see* Exh. J-65 (Orville Burton Depo.). In the

2014 trial, former Senator Barrientos added facts further fleshing out the history of

discrimination to which Dr. Tijerina had testified. Tr. 8/15/14 at 1142-52 (G. Barrientos). Mr.

Korbel also provided an extensive examination of the *Zimmer* factors as they applied to Texas

minorities. Joint Exhibit 11 (Korbel Rep. at 16-29).

In this round, testimony to the same kind of historical discrimination against Texas minorities is expected from, among others, Mr. Korbel Dr. Burton, both of whom have provided expert reports in anticipation of the July 10, 2017 trial. In short, the evidence at trial will demonstrate that things remain no less troublesome for Texas minorities than they have proven to be in the past.

This evidence establishes that, under the totality of the circumstances, Texas minorities continue to be denied an equal opportunity to participate in the political process. CONCLUSION

For all of the foregoing reasons, and based on the evidence and testimony to be presented at trial, the Rodriguez Plaintiffs, joined by the Perez and LULAC Plaintiffs, respectfully request that the Court invalidate Plan C235.

* * * * * * * * * * * *

## ADDENDUM—Challenges to Plan C235

# I.    AS A WHOLE

## A.    Claims

Intentional vote dilution under the Fourteenth Amendment's Equal Protection Clause
•        Rodriguez Second Amended Complaint (Dkt. 896) ¶ 19.a
•        Perez Sixth Amended Complaint (Dkt. 960) ¶ 27, Relief ¶ B
•        LULAC Third Amended Complaint (Dkt. 894) ¶ 16.a

## B.    Standing[14]

LULAC, a Latino civil rights organization, has members who are registered to vote in most Texas counties, including in each congressional district involved in this case. Individual LULAC plaintiffs are registered voters in various districts in Plan C235, including CDs 15, 16, 20, 24, 25, and 27.

---

[14] All of the basic standing facts for the Rodriguez and Perez Plaintiffs are stipulated to. *See* Joint Pretrial Order (Dkt. 277) Part E, Stips. 1-8 (Perez) & 27-41 (Rodriguez); Stipulation Between and Among State Defendants and the Rodriguez Plaintiffs (Dkt. 958)at 3-4; Stipulation of Facts No. 1 (Dkt. 1442) Stip. 14. The basic standings facts for the LULAC Plaintiffs are in the Declaration of Elia Mendoza, Texas LULAC State Director (Dkt. 1302-1), ¶¶ 3-7, which the Court admitted into the record in its Order on Plan H283 (Dkt. 1365) at 118-121. The standing assertions in the text above are drawn directly from these sources.

Rodriguez plaintiffs, other than Austin and Travis County themselves, are minorities who are registered to vote in various Plan C235 districts, including CDs 10, 15, 16, 20, 25, 33, 34, and 35.

Perez plaintiffs are minorities registered to vote in the following counties: Bexar; Dallas; El Paso; Hidalgo; Nueces; and Tarrant.

## C.     Witnesses (expert only)

***Dr. Stephen Ansolabehere***. Dr. Ansolabehere's testimony on the other specific regions of the state, discussed in Addendum Parts II-V, below, will show that, taken as a whole rather than piecemeal, Plan C235 constitutes an intentional plan to purposely dilute minority voting power statewide. The Court need not separately analyze the map as a unified whole to reach this conclusion.

***George Korbel***. Mr. Korbel's testimony about the other specific regions of the state, discussed in Addendum Parts II-V, below, will show that, taken as a whole rather than piecemeal, Plan C235 constitutes an intentional plan to purposely dilute minority voting power statewide.


## D.     Key exhibits

"Report on the Representation of Minority Voters under the 2013 Texas Congressional District Map (Plan C235)," by Stephen Ansolabehere (May 26, 2017) (as corrected on June 29, 2017)—Rod. P. Exh. 955

Rod. P. Exhs. 912, 913, 914, and 916 (all reports by Dr. Ansolabehere already in evidence)

Joint Exhibits (various Red- Reports for Plans C235, C285, and C286)

George Korbel Expert Reports (May 26, 2017, and February 28, 2014)

# II.    DFW/CD30/CD33

## A.     Claims (as to DFW region)

Intentional vote dilution under the Fourteenth Amendment's Equal Protection Clause
•       Rodriguez Second Amended Complaint ¶ 19.b
•       Perez Sixth Amended Complaint ¶ 27, Relief ¶ B
•       LULAC Third Amended Complaint ¶ 16.b

Intentional vote dilution and effects-test vote dilution under Section 2 of the Voting Rights Act
•       Rodriguez Second Amended Complaint ¶¶ 19.b, 21.c
•       Perez Sixth Amended Complaint ¶ 27, Relief ¶ B
•       LULAC Third Amended Complaint ¶¶ 16.b, 17.c

**B.        Standing**

See first sentence of Addendum Part I.B's first paragraph. Also, one of the individual LULAC plaintiffs resides in C235's CD 24.

Individual Rodriguez plaintiffs reside in C235's CD 33.

Perez plaintiffs reside in Dallas and Tarrant Counties.

**C.        Witnesses (expert only)**

***Dr. Stephen Ansolabehere***. Dr. Ansolabehere's testimony on this region is summarized, above, in Part IV of this pre-trial brief, at pages 12-19.

***George Korbel***. Mr. Korbel's testimony about the DFW area of Plan C235 will address the cracking of minority communities and the related failure to follow traditional districting criteria. He also will testify about the operation of minority coalitions in the area.

**D.        Key exhibits**

These will be the same as identified in Addendum Part I.D, above, except Rod. P. Exh. 916 will not be pertinent.

## III.    AUSTIN AREA/CD35

**A.        Claims**

Racial gerrymander under the Fourteenth Amendment's Equal Protection Clause
•        Rodriguez Second Amended Complaint ¶ 19.d
•        Perez Sixth Amended Complaint ¶ 27, Relief ¶ B
•        LULAC Third Amended Complaint ¶ 16.d

Intentional destruction of a crossover district (*Bartlett*) under the Fourteenth Amendment's Equal Protection Clause
•        Rodriguez Second Amended Complaint ¶ 19.d
•        Perez Sixth Amended Complaint ¶ 27, Relief ¶ B
•        LULAC Third Amended Complaint ¶ 16.d

**B.        Standing**

See first sentence of Addendum Part I.B's first paragraph. Also, one of the individual LULAC plaintiffs resides in C235's CD 25.

Individual Rodriguez plaintiffs, including Anglos registered to vote, reside in C235's CDs 10, 25, and 35 in Travis County and in CD35 in Bexar County.

An individual Perez plaintiff resides in Bexar County.

**C.    Witnesses (expert only)**

*Dr. Stephen Ansolabehere*. Dr. Ansolabehere's testimony about CD 35, crossover CD 25, and the Travis County area is summarized, above, in Part II.C of this pre-trial brief, at pages 8-9.

*George Korbel*. Mr. Korbel's testimony will address the racial gerrymandering involved in CD 35 and its relation to the division of communities of interest, most especially in the South San Antonio area.

**D.    Key exhibits**

These will be the same as identified in Addendum Part I.D, above (except Rod. P. Exh. 916 will not be pertinent), and Rod. P. Exh. 917.

# IV.    CD23

**A.    Claims**

Effects-test vote dilution under Section 2 of the Voting Rights Act
- Rodriguez Second Amended Complaint ¶ 21.b
- Perez Sixth Amended Complaint ¶ 27, Relief ¶ B
- LULAC Third Amended Complaint ¶ 17.b

**B.    Standing**

See first sentence of Addendum Part I.B's first paragraph. Also, one of the individual LULAC plaintiffs resides in C235's CD 20.

Individual Rodriguez plaintiffs reside in C235's CDs 20 and 35 in Bexar County and CD 16 in El Paso County.

Individual Perez plaintiffs reside in Bexar and El Paso Counties.

**C.    Witnesses (expert only)**

*Dr. Stephen Ansolabehere*. Dr. Ansolabehere's testimony on CD 23 is summarized, above, in Part III of this pre-trial brief, at pages 9-11.

*George Korbel*. Mr. Korbel's testimony will address the ability to create a CD 23 that affords Latino voters a reasonable opportunity to elect candidates of their choice and the reasons that Plan C235's CD 23 fails to do that.

**D.**    **Key exhibits**

These will be the same as identified in Addendum Part I.D, above (except Rod. P. Exh. 917 will not be pertinent).

# V.    CD27/NUECES COUNTY

**A.**    **Claims**

Intentional vote dilution under the Fourteenth Amendment's Equal Protection Clause
•        Rodriguez Second Amended Complaint ¶ 19.c
•        Perez Sixth Amended Complaint ¶ 27, Relief ¶ B
•        LULAC Third Amended Complaint ¶ 16.c

Intentional vote dilution and effects-test vote dilution under Section 2 of the Voting Rights Act
•        Rodriguez Second Amended Complaint ¶ 19.c, 21.a (*including the adverse consequence of the CD27/Nueces County violation for creating an additional Latino opportunity district in the South/West Texas region under the effects-test rubric*)
•        Perez Sixth Amended Complaint ¶ 27, Relief ¶ B
•        LULAC Third Amended Complaint ¶¶ 16.c, 17.a

**B.**    **Standing**

See first sentence of Addendum Part I.B's first paragraph. Also, individual LULAC plaintiffs resides in C235's CDs 15 and 27.

Individual Rodriguez plaintiffs reside in C235's CDs 15 and 34.

Individual Perez plaintiffs reside in Nueces and Hidalgo Counties.

**C.**    **Witnesses (expert only)**

***Dr. Stephen Ansolabehere***. Dr. Ansolabehere's testimony about Nueces County and the stranding of voters is summarized in part, above, in Part II.B.1 of this pre-trial brief, at page 7. He also will testify, as he has before, about the purposeful stranding of large numbers of Latino voters in Nueces County in a district where they have no meaningful role to play in voting on, and electing, a candidate of their choice in a congressional district, as well as the relation of re-orienting Nueces County southward in congressional districting to the ability to create an additional Latino opportunity district in the South/West Texas region.

***George Korbel***. Mr. Korbel's testimony will address the purposeful stranding of large numbers of Latino voters in Nueces County in a district where they have no meaningful role to play in voting on, and electing, a candidate of their choice in a congressional district. He also will testify about the historic geographic orientation of this groups of voters in congressional districts, the reasons for that, and the relation of re-orienting Nueces County southward in congressional

districting to the ability to create an additional Latino opportunity district in the South/West Texas region.

**D.    Key exhibits**

These will be the same as identified in Addendum Part I.D, above (except Rod. P. Exhs. 916 and 917 will not be pertinent).

* * * * * * * * * * * *

Dated:  July 3, 2017                              Respectfully submitted,

                                                  _/s/ Renea Hicks_
                                                  Attorney at Law
                                                  State Bar No. 09580400
                                                  Law Office of Max Renea Hicks
                                                  P.O. Box 303187
                                                  Austin, Texas 78703-0504
                                                  (512) 480-8231 - Telephone
                                                  rhicks@renea-hicks.com

                                                  ATTORNEY FOR PLAINTIFFS EDDIE
                                                  RODRIGUEZ, _ET AL._, TRAVIS COUNTY,
                                                  AND CITY OF AUSTIN


                                                  PERKINS COIE LLP

                                                  Marc Erik Elias*
                                                  Bruce V. Spiva*
                                                  Aria C. Branch*
                                                  *Admitted _Pro Hac Vice_
                                                  700 Thirteenth Street N.W., Suite 600
                                                  Washington, DC 20005-3960
                                                  (202) 434-1609
                                                  (202) 654-9126 FAX
                                                  MElias@perkinscoie.com

                                                  Abha Khanna*
                                                  *Admitted _Pro Hac Vice_
                                                  1201 Third Avenue, Suite 4800
                                                  Seattle, WA 98101-3099
                                                  (206) 359-8312
                                                  (206) 359-9312 FAX
                                                  AKhanna@perkinscoie.com

                                                  ATTORNEYS FOR PLAINTIFFS EDDIE

RODRIGUEZ, *ET AL*.


David Escamilla
Travis County Attorney
State Bar No. 06662300
P.O. Box 1748
Austin, Texas 78767
(512) 854-9416
fax (512) 854-4808

ATTORNEY FOR PLAINTIFF TRAVIS
COUNTY


___/s/ David Richards_____
David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
(512) 476-0005
fax (512) 476-1513
DavidR@rrsfirm.com

Counsel for Perez Plaintiffs




___/s/ Luis R. Vera, Jr._____
LUIS ROBERTO VERA, JR.
LULAC National General Counsel  Law
Offices of Luis Roberto Vera, Jr. & Assoc.
1325 Riverview Towers 111 Soledad
San Antonio, TX78205
(210) 225-3300
lrvlaw@sbcglobal.net

Counsel for LULAC Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of July, 2017, I filed a copy of the foregoing for

service on counsel of record in this proceeding through the Court's CM/ECF system.

*/s/ Renea Hicks*
Max Renea Hicks