# In the United States District Court for the Western District of Texas

| | |
|---|---|
| SHANNON PEREZ, ET AL. § | |
| § | |
| v. § | SA-11-CV-360 |
| § | |
| GREG ABBOTT, ET AL. § | |

## QUESTIONS FROM THE THREE-JUDGE PANEL TO BE ADDRESSED AT THE CONCLUSION OF TRIAL

### General/Unclassified Questions

1)  In its previous orders, the Court identified certain violations in Plans C185 and H283 in districts that remain unchanged in Plans C235 and H358. With respect to these violations, what open questions are there, if any?

2)  Much of the plaintiffs' presentation looks more like the remedial phase than the trial on the 2013 plans. What decisions and rulings does this panel need to make regarding the 2013 plans? If the Court finds discriminatory intent, what judgment should it enter? If it finds no discriminatory intent, what judgment should it enter? What other issues are joined and ready for decision on this phase?

3)  Defendants appear to be asserting that any time a minority opportunity district's minority population is increased (one example was with regard to CD28 in a *Gingles* demonstration map) that this is unlawful "packing." But is there anything inherently wrong with a district having an increased or high minority population if it reflects the demographics of the area, does not have the effect of dilution, and wasn't intentionally racially gerrymandered?

1

**Questions about Claims and Defenses Asserted**

4) Is the State still contesting standing as to any of the plaintiffs? If so, for which plaintiffs, on which claims, and why do they think the evidence is deficient?

5) For those Texas House districts that the Court found violated either Section 2 or the 14th Amendment, were changed in plan H358, and are not being challenged now (El Paso, the Valley), can the Court assume that no further remedy—at least in terms of map drawing—is necessary?

6) Can the Court assume that any Texas House claims regarding Lubbock, Midland/Ector, and McLennan Counties have been abandoned in terms of the current challenges to H358, or are the parties relying on evidence from the 2014 proceeding?

**Questions about Evidence Presented (or Law as Applied to Specific Evidence Presented)**

7) Several witnesses relied on the rulings of the DC court, which were vacated. To what extent, if at all, can those findings be considered in determining the intent of the 2013 Legislature?

8) What does the law say about whether the Legislature's discriminatory intent can be inferred from its adoption of the Court's interim 2013 plans? Some of the plaintiffs' presentation appears to criticize the Legislature for refusing to consider amendments of the Court's plan, while other parts of the presentation appear to criticize legislators and staff for even considering changes to the Court's plans. Which is the correct analysis under the law?

9) How does the intent or statement or action of a legislator or staff relate to the intent of the Legislature as a whole? Does it depend at all on whether other legislators, and/or the body as a whole, was aware of the individual intent or action?

10)     If the Legislature allowed individual members or staff members to draw districts, why shouldn't any discriminatory intent or effect be attributed to the Legislature as a whole?

11)     How are minority priorities (such as, without limitation, immigration, healthcare, education) to be distinguished from priorities of the Democratic Party for purposes of attributing discriminatory intent to the Legislature, and also for purposes of identifying racial cohesion and shared communities of interest?

12)     For CD23, can discriminatory intent be imputed to the 2013 Legislature for adopting this Court's addition of areas with low turnout?

13)     The Court's opinion adopting the interim maps clearly stated that the Court's work product was not complete and additional analysis was necessary.  Didn't the Legislature have some affirmative duty to ensure that the Plans they voted on complied with the VRA and Constitution?

14)     For the Congressional Plan, can the fact that no amendments were accepted from minority members during the 2013 special session be evidence of discrimination if also no amendments were accepted from non-minority Democrats?

15)     Was there evidence that non-minority members requested substantive amendments?

16)     How, if at all, should the Court consider the skill of candidates and their campaigns in evaluating performance, including the effects on turnout?

17)     To what extent, if at all, is it appropriate for those who draw demonstration maps to use racial shading to make small changes to lines within precincts?

18)	At various points, the State has attacked the validity of data and formulas used by experts, including specifically Engstrom's data and analytical methodology. Is there any evidence that actually supports these attacks? In the 2011 phase, didn't Alford explain that there was nothing wrong with Engstrom's data or analysis?

19)	Is there data in the record (or on the Secretary of State website) reflecting the actual number of voters in specific primary elections? If the number of voters is very small, how does it meaningfully inform our decision on cohesion of the populations in the district as a whole, and why should we consider it in determining minority cohesion?

20)	Dr. Chervenak stated that he thinks looking at racially contested elections (meaning races between candidates of different races) is very important for determining racially polarized voting. But how does this fit with the position taken by some that the race of the candidate is irrelevant to determining the minority candidate of choice and/or the existence of racially polarized voting?

## Questions about Data

21)	When and for what purposes should the Court look only to Census data (and the State's use of it)? When and for what purposes should the Court look at current ACS data (and the State's use of it)? When and for what purposes should the Court look at projections (and the State's use of it)?

22)	What does the law say about using ACS and other data that was not available in 2013, for the purpose of informing the Court's decisions as to the 2013 plans?

23)	Would the parties agree that on the Section 2 effects (not intent) claims, current ACS (2011-2015) data and current population estimates must be used pursuant to *Gingles* because an effects claim asks whether the district, as configured, currently gives minorities the opportunity to elect the candidate of their choice. If, for example, a State undertook redistricting and implemented a plan that didn't dilute a minority

opportunity district at the time but eight years later (with substantial demographic changes) the district was no longer performing as a minority opportunity district, couldn't a Section 2 effects claim be brought several years after the map's implementation? In other words, an effects claim is not tied to intent, or what data the legislature had at the time of redistricting.  And using this logic, if the Court finds that CD23 is not currently performing under C235, doesn't the Court need to look at the Section 2/*Gingles* analysis based on current ACS data and current election data to determine whether it could perform as a minority opportunity district under any of the *Gingles* demonstrative plans?

24)     To what extent should the Court weigh the HCVAP as distinguished from the turnout in determining whether it is an opportunity district?

**Questions about Particular Areas—HD90**

25)     We heard testimony from Lon Burnam and Conor Kenney that they went along the border of HD90 and HD99 and moved people solely on the basis of race to get the SSVR of the district back above 50%.  Do we know how many people/voters this affected and is this a "significant number of voters" to show that race predominated in the decision to place a "significant number of voters" within and without the district for purposes of a *Shaw* analysis?

26)     What evidence was before or was considered by the Legislature in 2013 for it to believe that HD90 needed to have over 50% SSVR?

27)     Does the fact that Romero won the racially contested primary and then won the general election in HD90 in 2014 establish that HD90 in Plan H358 is a Latino opportunity district?  If so, what legal basis would there be for making any changes to the district just because Romero is "vulnerable"?

**Questions about Particular Areas—DFW**

28) If CD33 is currently performing as a minority opportunity district, why would the Court make any changes to that district?

29) Assuming the Court finds packing in CD30, how should the Court take account of and respect the Section 2 rights of those who are removed, assuming they are moved into a district in which they cannot elect the candidate of their choice?

**Questions about Particular Areas—Nueces County**

30) Korbel testified that you cannot draw two HCVAP-majority Latino opportunity districts wholly within Nueces County (i.e., without breaking the County Line Rule) in a Texas House plan.  Does anyone dispute this assertion?

31) Assuming the Texas County Line Rule must yield to federal law, can two HCVAP majority Latino opportunity districts be drawn?

32) Regarding Nueces County and elsewhere, does the law allow packing of so-called "stranded" Hispanic voters into an already-performing district?

**Questions about Legal Tests (or Certain Aspects of Legal Tests)**

33) What does cohesion mean under *Gingles* 2?  How is the race of the candidate relevant?  What should the Court be focusing on in terms of determining whether minorities are cohesive?  Does the race of the candidate factor into political cohesion?  What does the fact that black voters vote for black candidates in the Democratic Primary and Hispanic voters vote for Hispanic candidates in the Democratic Primary tell us about minority political cohesion if both groups are voting in the Democratic primary for candidates who generally espouse the same political positions?  Assuming cohesion is politically-based, does that require that coalition districts be drawn?

34)     Doesn't Section 2 case law on the *Gingles* 2 factor talk about "political cohesion," rather than "racial cohesion"? If so, why would the Court look only at primary elections, as Dr. Alford proffers, to determine "political cohesion" or lack thereof among minorities? Section 2 precedent seems to make clear that a minority candidate of choice doesn't need to be of the same race or ethnicity as the voters that elected him or her, yet Dr. Alford suggests that a minority does not get their "candidate of choice" unless the candidate elected is the same race or ethnicity as the voters. Please explain this inconsistency.

35)     In determining the performance of a district such as CD33, should primary elections, or general elections, or both be considered? Can you offer a consistent and legally defensible rule for deciding whether those elections are relevant for deciding racial cohesion? Do they take on increased relevance when examining coalition districts?

36)     In looking at minority political cohesion and RPV, would the parties agree that RPV looks at whether the minority vote is successfully blocked by the Anglo vote and that Anglo bloc voting doesn't come into play until the general election? And, if minorities happen to differ on their preferred candidate at the primary, but then coalesce to elect the same candidate in the general election, haven't they shown that their political cohesion is enough to overcome the Anglo bloc voting—which is the real issue?

37)     What does the law say about adding an area such as Como to a district such as HD90, which is a performing district in the general elections with or without the addition of that area? Can discriminatory intent be inferred from that change, under established law?

38)     How, if at all, do we account for the distribution of populations across the entire state in evaluating proportionality? For that matter, is it even appropriate or required for the Court to consider proportionality for the limited purpose of this trial on the 2013 plans?

39) At what point does the use of race come to "predominate" in the drawing of a district, in light of the command of *Bethune-Hill* that we view the district as a whole?

40) What does the Supreme Court mean by its repeated (including 2017) use of the term "race for its own sake"?

41) Given that retrogression is no longer an issue, and given the Supreme Court's 2017 pronouncements on whether a 50.1% threshold is always required, does it violate Section 2 to move minorities into a crossover district such as the East Travis County district shown on multiple demonstration maps?

42) What caselaw informs whether the 2017 findings on intent for the 2011 plans can be used, in whole or part, to find intent for the 2013 plans?

43) What does the law say about whether a § 2 results test should focus solely on whether opportunity exists when the district is drawn versus some later point in time? Must the Legislature account for later changes in the district due to population changes? In other words, to what extent is a results claim to be determined at the time of redistricting versus at some later time?

44) Under the Senate factors and "totality of circumstances" analysis for a Section 2 "effects" (not intent) claim, because we're examining whether a minority opportunity district is currently performing and, if not, whether a *Gingles* district could perform, shouldn't the evidence on the Senate factors and totality of circumstances (with perhaps the exception of the "history of discrimination" factor) also be as current as possible?

45) The Supreme Court has directed that the first *Gingles* precondition focuses on the compactness of the minority population, taking into account traditional redistricting principles. This makes sense in terms of looking at cities, precincts, neighborhoods, geographical features, etc. While incumbency protection is also a traditional redistricting factor

8

in some respects, how does it have any bearing on whether a minority population is compact?  In other words, how does where the incumbents live (and thus whether they are paired) affect whether a minority population is compact?

SIGNED this 14th day of July, 2017.

                                          XAVIER RODRIGUEZ
                                          UNITED STATES DISTRICT JUDGE
                                          On behalf of the panel