UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SHANNON PEREZ, et al. | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 5:11-CV-0360-OLG-JES-XR |
| | § | [Lead Case] |
| STATE OF TEXAS, et al. | § | |
| | § | |
| *Defendants* | § | |

## PEREZ PLAINTIFFS' POST-TRIAL BRIEF

The Perez Plaintiffs hereby submit their Post-Trial Brief as follows:

### Introduction

1. Our argument will be limited to the Texas House Plan and those counties where we have focused, Dallas, Harris, Tarrant and Bell. With respect to Fort Bend County, we adopt the arguments of MALC and NAACP.

### The Findings of Intentional Discrimination in H283.

2. The Court has found "persuasive evidence of intentional vote dilution in Harris County. (Doc. 1365, p. 56).

3. Similarly, the Court has found that "intentional vote dilution in Dallas County violates § 2 and the Fourteenth Amendment. (Doc. 1365, p. 69).

4. In Tarrant County, the Court concluded "mapdrawers acted with racially discriminatory intent to dilute Latino voting strength." (Doc. 1365, p. 71).

5. Finally, in Bell County, the Court found "intentional vote dilution …in violation of § 2 of the VRA and the Fourteenth Amendment. (Doc. 1365, p. 78).

6.      The Court has also concluded "that § 2 can require the creation of coalition districts." (Doc. 1365, pp. 8 and 16).

## **The 2013 Enactment Did Not Sanitize H283.**

7.      The State argues that the Legislature's adoption of the Court's interim plan nullified any unlawful aspects of H283. This argument must fail in face of the Court's opinion of March 19, 2012 (Doc. 690):

> "We emphasize the preliminary and temporary nature of the interim plan…Nothing in this opinion explaining this Court's independently drawn PLAN H309 represents a final judgment on the merits as to any claim or defense in this case." (Slip Op. at 12).

8.      There is no factual basis to support the claim that the 2013 enactment rectified the discrimination that tainted H283. Defendants offered no testimony that countered the findings of discrimination, nor evidence of 2013 efforts to cure.

9.      The evidence most recently establishes there were no meaningful changes in H283 that even purported to address the discriminatory aspects of the plan. There were no changes in Bell County and no changes that altered the discriminatory impact of HD93 in Tarrant, nor any in Dallas. Witness Fischer testified that the changes were essentially cosmetic (Tr. Day 1 at 152). and the product of a most restricted process. (Tr. Day 1 at 159).

10.     This conclusion is best exemplified by the testimony of Representative Anchia who explained the sole change in Dallas County. His neighboring House Member Ratliff wanted his office in his District. The two agreed to swap some population to accomplish their goal. No part of this exchange addressed the intentional discrimination the Court has found with respect to the districts in West Dallas County. (Tr. Day 1 at 142).

## How Should the Court Remedy the Discriminatory Features of the 2013 Plan?

11.  As previously noted, the Court has already ruled that the creation of coalition districts is an appropriate remedy for § 2 violations. This makes perfect sense inasmuch as the minority community, primarily Latinos and African-Americans, certainly shared one thing in common, i.e. victimization by discrimination. H391 produced by witness Korbel demonstrates the feasibility of addressing the discriminatory aspects of the legislative plan.

12.  Elections should not be conducted under unlawfully discriminatory plans. The remedy is to eliminate those features and replace them with remedial plans. H391 prepared by Mr. Korbel could accomplish that goal as he explained in his testimony and in his report. Ex. 133.

13.  In western Harris County, H391 respecting city boundaries and other neutral principles, produces "two naturally occurring" minority concentrations and are incorporated into districts HD132 and HD135. These are coalition districts that remedy the intentional discrimination that existed in HD283, which had been carried forward in the 2013 enactment.

14.  The Korbel Report provides detailed analysis, and explanation of each of his demonstration plans. In Bell County, he reunited the City of Killeen into a single district, with the exception of 221 people, who live in noncontiguous outlying areas. (Tr. Day 1 at 21).

15.  It seems evident that Korbel is faithful to the Court's approved methodology in the drawing of election districts. (Tr. Day 1 at 17).

## Population Deviation in HD391 Should Not Be an Issue.

16.  We have dealt with the so-called *Larios* issue in earlier briefing. The case stands for the proposition that legislative redistricting tainted by gerrymanders, racial and partisan, may not enjoy the 10% deviation tolerance typically accorded legitimate legislation. However, once those

discriminatory features are removed, as is accomplished in HD391, then a state plan would enjoy traditional 10% leeway, a result that is faithful to the original legislative scheme.

### The State's Attack on Coalition Districts is Flawed.

17. As we understand it, the State's attack on a remedy of coalition districts takes two lines. There is no meaningful cohesion among minority voters and that is evidenced by analysis of primary elections as opposed to general elections.

18. It seems almost a given that the general election is the appropriate place to measure the level of minority cohesion. Indeed, it was general elections which the Supreme Court looked to in *Cooper v. Harris*, analyzing "five successive general elections." (Slip Op. at 5). As Dr. Brischetto testified, primary elections are not the "key contests." Only a small portion of the electorate participate in primary elections and, as a result, any analysis is skewed. (Tr. Day 1 at 115). The record abounds with expert and lay testimony of minority voter cohesion. Thus, for example, in the original trial, in Harris County, Engstrom found high degree of cohesion in Latino voters, shared by African-Americans (Doc. 1364, ¶499).

19. In Dallas County, Engstrom concluded that Latinos were very cohesive in their support for Latino candidates and this was shared by African-Americans. (Doc. 1364, ¶¶609-10).

20. In Tarrant County, similar findings of cohesion were made by Engstrom. (Doc. 1364, ¶649).

21. In Bell County, there was both expert and lay testimony of cohesion in the general election. (Doc. 1364, ¶141).

22. The state relies upon the Alford testimony to support its claim that the primaries should be the determinant of cohesion. That claim fairly well evaporated on cross examination regarding the Veasey congressional race: "more than three times as many Latinos chose to turn

4

out in support of Marc Veasey in 2016 general election…and they're joining with large numbers of black voters to support Marc Veasey in the general election." (2017 Tr. Vol. 5 at 1460). Primaries in Texas have become modest affairs with principal focus on general elections and that is where to focus in determination of cohesion and coalition politics.

23. We summarize below a portion of the findings and evidence from the earlier trial, that to our mind, require a remedy.

**Dallas County**

24. "Downton shored up HD105 by making it more Anglo…he admitted to splitting precincts to put the Hispanic population into HD104 and HD103 and the Anglo population in HD105." (Doc. 1365, p. 68).

25. Three districts in East Dallas, HDs 101, 102 and 113 "had become majority-minority VAP" (Doc. 1364, p. 109, ¶ 547).

26. In 2010, Dallas County was 33.1% Anglo, yet Anglo controlled 8 of 14 districts. (Murray) (Doc. 1364, p. 109, ¶ 549).

27. Martin opined that "two effective eastern/northeastern Dallas County majority-minority districts…HD101…and HD102…were eliminated by splitting minority population into five Anglo districts." (Doc. 1364, p. 120, ¶ 597).

28. Engstrom concluded that "in the general elections, Latinos were very cohesive in their support for Latino candidates…and that preference was shared by African-Americans. (Doc. 1364, p. 123, ¶ 605).

29. Juanita Wallace testified "that Black and Latino voters work together to elect candidates." (Doc. 1364, p. 124, ¶ 609).

30. H283 eliminates emerging minority districts. (Court Finding) (Doc. 1364, p. 125, ¶ 617).

### **Tarrant County**

31.     Murray testified that Tarrant County had very substantial minority growth, and had as many as four districts where minority coalitions had been able to elect candidates of choice. (Doc. 1364, p. 130, ¶ 638).

32.     Korbel testified that HD93 is one of the least compact districts in the plan. (Doc. 1364, p. 131, ¶ 640).

33.     Burnam testified HD93 meanders and prevents creation of a third minority district. (Doc. 1364, p. 131, ¶ 641).

34.     Engstrom testified Latino candidates received solid support from Latinos; in general elections African-American voters supported Latino candidates. (Doc. 1364, p. 131, ¶ 644).

35.     Engstrom found African Americans strongly supportive of Latino candidates in general. (Doc. 1364, p. 132, ¶ 645).

### **Bell County**

36.     HD54 was overpopulated by 28,815 persons; minorities accounted for more than 70% of growth in Bell and Lampasas Counties. (Doc. 1364, p. 136, ¶ 670).

37.     Minority population of Bell County was divided between two districts. (Doc. 1364, p. 138, ¶ 682).

38.     There is expert testimony and lay testimony of cohesion in the general election. (Doc. 1364, p. 141, ¶ 698).

### **Harris County**

39.     Calvert testified that Asians have coalesced. (Doc. 1364, p. 79, ¶ 410).

40.     Multi-ethnic coalition elected Vo. (Doc. 1364, p. 81, ¶ 426).

41. Republicans decided to preserve four Anglo/Republican districts in East Harris County – HDs 127, 128, 129, 144 – pushed population westward adversely affecting minorities. (Doc. 1364, p. 84, ¶ 437).

42. Democrats told to leave Republican districts alone; Democrats told they could not alter Anglo portion of map. (Doc. 1364, p. 92-93, ¶ 66).

43. Murray asserted to prevent HD 144 from becoming minority opportunity district and shore up Republicans, three Anglo precincts were added and eight precincts (minority population) were removed (Doc. 1364, p. 96, ¶ 479).

44. Murray opined mapdrawers used unnecessarily packing of Hispanics into HDs 140, 143, 145 and 148. (Doc. 1364, p. 97, ¶ 483).

45. It is possible to preserve HD148, HD137 and HD149… and create an additional Latino opportunity district, as was done in the Court's interim plan…HD144 in eastern Harris County." (Doc. 1364, p. 98, ¶ 486).

46. "Perez Plan H287 remedied the pairing of VO and Hochberg, preserved all minority districts and added two additional minority coalition districts." Joint Expert Ex-5 (Martin report) (Doc. 1364, p. 99, ¶ 490).

47. Arrington testified "coalition districts are effective." (Doc. 1364, p. 101, ¶ 499).

48. Engstrom found "Latinos are very cohesive in their candidate preference for Democratic Latino candidates in general elections and that is shared by African Americans in these elections." (Doc. 1364, p. 101, ¶ 500).

49. Engstrom found racially polarized voting in Harris County. (Doc. 1364, p. 101, ¶ 501).

50. Harris County map was drawn primarily by Anglo Republicans…without any input from minorities. (Doc. 1364, p. 102, ¶ 506).

7

51. "Given the existence of racially polarized voting, the lingering effects of past discrimination, and the totality of circumstances, the Court finds that the Harris County configuration is the result of intentional vote dilution in violation of §2 and the Fourteenth Amendment." (Doc. 1365, p. 57)

52. HD144…was reconfigured to protect the Anglo Republican. (Doc. 1364, p. 103, ¶ 509).

53. The Court has found that intentional discrimination infected H283. The Court's interim plan addressed a portion of those districts. Other issues remain to be cured. Those issues are the cracking of minority concentrations in other areas of Harris County.

54. The Korbel demonstration map and his testimony describe the cracking and the potential for a cure.

## Conclusion

55. The discriminatory features of the 2011 Redistricting Plan require a judicial remedy. Elections should not be conducted under schemes that violate the 14th Amendment and the Voting Rights Act. The Supreme Court in *White v. Regester*, 412 US 755 (1973) unanimously affirmed a Texas trial court's implementation of a Redistricting Plan that remedied the 14th Amendment violations in the 1971 Texas House Redistricting and that is the appropriate remedy in this matter.

Respectfully submitted,

*/s/ David Richards*

―――――――――――――――――――――――――――

DAVID RICHARDS
State Bar No. 16846000
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Tel (512) 476-0005
Fax (512) 476-1513

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

This is to certify that on July 31, 2017, a true and correct copy of the above and foregoing document was filed via the Court's ECF/CM system, which will serve a copy on all counsel of record.

*/s/ David Richards*

―――――――――――――――――――――

**DAVID RICHARDS**