UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO
DIVISION

| | | |
|---|---|---|
| SHANNON PEREZ, *et. al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | |
| | § | C.A. SA-11-CA-360-OLG-JES-XR |
| STATE OF TEXAS, et. al., | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

POST TRIAL BRIEF OF PLAINTIFF-INTERVENOR UNITED STATES
CONGRESSMAN HENRY CUELLAR

---

TO THE HONORABLE JUDGES OF SAID COURT:

I. Introduction:

Having decided that C185 was intentionally adopted by the State of Texas to discriminate against Latinos[1] in violation of the Constitution and has the effect of violation the Federal Voting Rights Act (Dkt #1390), the Court must now decide if those violations in C185 continue in C235. This brief will focus on the discriminatory effects and intent that continue to infect C235 in so far as South West

---

[1] The terms "Latino" and "Hispanic" are used interchangeably throughout this document.

Texas and Latinos are concerned.

The relevant additional evidence to be analyzed that was presented at the six (6) day trial just terminated is as follows[2]:

A) the 2014 election results on CD 23 and Nueces County.

B) the 2016 election results on CD 23 and Nueces County.

C) Intentional Discrimination: the disgraceful disrespect Texas demonstrated by ignoring six (6) Federal Judges:

> First, during the 2013 legislative session, the opinion of the three judge court in *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) issued 300 findings of fact establishing intentional and effectual discrimination of C185. Texas made superficial changes to C185 and adopted C235; the findings in *Texas v. United States*[3] were completely ignored even though those findings would have been scrutinized by the Supreme Court under a "clear error" standard, *Cooper v. Harris*, 197 L. Ed. 837, 844 (May 22, 2017)

> Second, on May 2, 2017, during the 2017 Legislative Session, this court issued an extensive 500 page opinion on facts and law (Dkt#1390 and #1340) finding intentional and effectual discrimination in C185

> Third, the Judge Rodriquez order suggesting that Texas consider a redistricting remedy while they were in session, (Dkt #1395).

---

[2] The election results will be considered in light of the demonstrative *Gingles I* plan C299 (JX 109, Dkt # 1507 Cuellar Exhibit List; should this case proceed to remedy, a remedy plan will be proposed by Intervenor Cuellar with less voting precinct splits.(JX 109.14)

[3] The case was later vacated by the Supreme Court on separate grounds and remanded but the findings of fact were undisturbed, *Texas v. United States,* 133 S. Ct. 2885, 186 L. Ed. 2d 930, 2013 U.S. LEXIS 4927 (U.S., 2013)

II.Demonstration *Gingles I* Districts (JX 109):

In 2006 the Supreme Court pointed out that "West Texas's CD 23 has a complicated history under the VRA. It held that CD 23, as then constituted, violated Section 2. See *LULAC v. Perry*, 548 U.S. 399, 425-42, 126 S. Ct. 2594, 165 L. Ed. 2d 609 (2006).   The susceptibility to manipulation of CD 23 was well established back then.

In *Texas v. United States,* 887 F. Supp. 2d 133 (D.D.C. 2012) the three judge Court issued the findings of fact and law Nos. 56 through 60 stating that CD 23 is 67.8% Hispanic, with an HCVAP of 58.5% and an SSVR of 54.8%, *supra* at 210. As far as CD 23, the Court warned that "the ability of Hispanic voters to elect their candidate of choice is lost in enacted CD 23." *Id* at 211. The cosmetic changes made in C235, has CD 23 at 69.3 % Hispanic population (JX 100.2); with an HCVAP of 62.1% ( JX 100.3) and an SSVR of 56.1% (JX100.6).

The cosmetic changes made in C235 resulted in the following: the choice of the Hispanic community, Pete Gallego, loses in the 2014 and 2016 Congressional Elections. Also, in the 2014 election, the choice of the Hispanic Community, Windy Davis for Governor, received 42.1% (JX 100.8); in the 2016 Presidential election the choice of the Hispanic Community (Clinton) is also defeated;  this is hardly an "ability … to elect" a candidate of their choice for

the Hispanic voters.

The changes made by demonstration map C299 creates a CD 23 with 77.5 % Hispanic population (JX 109.2), HCVAP of 70.3% ( JX 109.3) and SSVR of 64.3% (JX109.6).  The difference in performance is significant and restores the Hispanic Community "ability" to elect a candidate of their choice; moreover, this *Gingles[4]* I District is easily accomplished by simply unpacking CD16[5].  See TABLE A and map (JX 109.1) below.

| | CD 23 in C 185 (declared illegal) (%) | CD 23 in C 235 (existing and declared illegal) (%) | CD23 in C 299 (Gingles I District) (%) | % Increase between C235 and C299 |
|---|---|---|---|---|
| TABLE A: CD 23 in Congressional Plans C185 (declared illegal) and C235 (existing and declared illegal) compared to  C299 | | | | |
| Hisp pop | 67.8 | 69.3 | 77.5 | +8.2 |
| HCVAP | 58.5 | 62.1 | 70.3 | +8.2 |
| 2016 SSVR | 54.8 | 56.1 | 64.3 | +8.2 |
| 2016 Clinton | 46.6 | 49.4 | 54.8 | +5.4 |

(Source: JX 100.2, 100.3, 100.4, 100.6  and JX 109.3, 109.4 and 109.6)

---

[4]  *Thornburg v. Gingles*, 478 U.S. 30, at 50.
[5] The unpacking of CD 16 is also demonstrated in Korbel Demonstration Plan C283, (JX 102.1) ; for a recent discussion on "packing" by the Supreme Court see *Cooper v. Harris*, 197 L. Ed. 2d 837, *837; 2017 U.S. LEXIS 3214.



(Demonstration of JX 109.1)

Insofar as CD 20 is concerned, the DC three judge court found that:

98. Hispanic Congressman Charlie Gonzalez represents CD 20. In the Congressional Plan, his district office is removed from CD 20. The enacted plan also removes key economic and cultural landmarks from Congressman Gonzalez's district, including the Alamo and the Convention Center named after Congressman Gonzalez's father. Devaney Decl., Ex. 16 (Decl. of Congressman Charles Gonzales, ¶¶ 3-9, 11). *Texas v. United States, supra* at 218.

C299 addresses this matter by simply placing the "economic engine" of downtown San Antonio back into CD 20 where it was before Texas' inane attempt to defeat incumbent Congressman Doggett placed the downtown area in CD 35.

Proposed C299 can also be the basis of a potential remedy plan[6] as it preserves much of the State Policy reflected in C235 while proposing a viable remedy. Pursuant to Supreme Court directive to this court: **"drawing district lines by judicial order...as a general rule, should be guided by the legislative policies underlying" a state plan--even one that was itself unenforceable--"to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act**." *Perry v. Perez,* 565 U.S. 388, 393 (2012), see also *Abrams v. Johnson*, 521 U.S. 74, 79, 117 S. Ct. 1925, 138 L. Ed. 2d 285 (1997).

C299 does what the Supreme Court directs us to do by maintaining the following state policies: it maintains the connecting of El Paso and San Antonio in CD23; it keeps five congressional districts in Bexar County (CD 23, 20, 28, 35 and 20); it maintains the state policy of connecting Bexar County along the IH 35 corridor up to Travis to create a new Hispanic District.

---

[6] At the time C299 was prepared it was unclear if there would be an opportunity to propose a remedy plan; therefore this plan does have input from the elected Latino Congressmen. Should there be an opportunity to propose remedies, Intervenor Cuellar will be proposing a plan with less voting precinct splits while continuing to maintain as much of the state policy as possible as directed by the Supreme Court, *Perry v. Perez,* 565 U.S. 388, 393 (2012).

III.Demonstration map C299 and  Nueces County:

In reference to Nueces County, in *Texas v. United States*, 887 F. Supp.
2d 133 at 215, the three judge court found that:

> 78. In the Congressional Plan, CD 27 has a total Hispanic
> population of 49.5%, an HVAP of 45.1%, an HCVAP of 41.1%, and
> an SSVR of 36.8%. Defs.' Ex. 859, at 2; Defs.' Ex. 881, at 1. When
> compared to the Benchmark Plan, the HVAP decreases by 24.4%,
> SSVR decreases by 22.6%, and the HCVAP decreases by 22.7% in
> enacted CD 27.

> 79. While enacted CD 27 no longer includes counties in South
> Texas, Nueces County remains in the district. Nueces County is
> thus no longer included in the South and West Texas configuration
> of Hispanic ability districts. Trial Tr. 103, Jan. 18, 2012 AM
> (Downton). Mr. Downton testified that, Nueces County effectively is
> in a different district in the Congressional Plan than in the
> Benchmark Plan. Defs.' Ex. 778B (Downton Dep. 49, Aug. 31,
> 2011).

> 80. Nueces County has a population of 340,223 and an HCVAP of
> 54.6%. Pl.'s Ex. 11; Defs.' Exs. 883, 746B, 391. In the Benchmark
> Plan, Nueces County voters constitute over 50% of the total
> registered voters of CD 27, while in the Congressional Plan, they do
> not. Trial Tr. 119-20, Jan. 18, 2012 AM (Downton); Defs.' Ex. 778B
> (Downton Dep. 54-55, Aug. 31, 2011).

Also, this Court found that "Plaintiffs demonstrated that approximately 200,000 Hispanic voters in Nueces County (a majority-HCVAP county) had a § 2 right that could be remedied but was not." (Dkt. # 1390 at p.47).

The changes made by C299 places most of the Nueces County Hispanic population in the two South Texas Congressional districts, CD 15 and CD 34 as follows:

| TABLE B: | |
|---|---|
| Nueces County Hispanic Community in C299 distributed in CD 15 and 34 as follows | |
| CD 15 | 57,489 |
| CD 34 | 81,405 |

(Source: JX 109.2) See also map at page 5.

In these two districts, the choice of the Hispanic Community (Clinton and Davis) gets elected in 2014 and 2016; Clinton by over 60%; see JX 109.7 and JX 109.8. Both of the congressmen elected from CD 15 and CD 34 are Hispanic – Congressmen Gonzales and Vela.

Notwithstanding the three Judge Courts findings in the DC Court in 2012, Texas made no accommodation for the Hispanic Community of Nueces County in adopting CD 235 in 2013. Notwithstanding this Courts finding in May of this year, Texas made no accommodation for the Hispanic Community of Nueces County during the 2017 Legislative Session. In short, the Hispanic Community of Nueces County is treated

the same in C235 as it was in C185 – no changes were made and the discrimination continues in C235 and must be addressed by this Court.

As this court stated, even if incumbency protection must be considered or weighted equally with § 2 obligations to avoid Equal Protection Clause issues, Defendants' decision to place Nueces County Hispanic voters in an Anglo district had the effect and was intended to dilute their opportunity to elect their candidate of choice, Dkt# 1390 at 55. These simple changes demonstrated in C299 could been made during the 2013 Legislative Session and allowed the Hispanic Community to elect candidates of their choice during the 2014 and 2016 general elections. Instead, Texas chose to ignore the federal courts and continue the violations.

A.Intentional Discrimination:

The 2006 amendments to the Voting Rights Act clarified that "intent" must be read "broadly" and includes "any discriminatory purpose." 42 U.S.C. § 1973c(c); *see also* H.R. REP. NO. 109-478, at 93 (stating that Congress "rejects the Supreme Court's holding in *Reno v. Bossier Parish*"). Moreover, the Court must follow the well-worn path and base their inquiry upon the five *Arlington Heights* factors: (1) discriminatory impact, (2) historical background, (3) sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision making process, and (5) contemporaneous viewpoints expressed by the decision makers. *Arlington Heights*, 429 U.S. at 266-68.

1.Three Judge Court in District of Columbia:

In *Texas v. United States*, 887 F. Supp. 2d 133, the three judge Court started the "intent" analysis by pointing out that:

> In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost. See, e.g*., LULAC*, 548 U.S. 399; *Vera,* 517 U.S. 952, 116 S. Ct. 1941, 135 L. Ed. 2d 248; *Upham v. Seamon*, 456 U.S. 37, 102 S. Ct. 1518, 71 L. Ed. 2d 725 (1982); *White v. Weiser,* 412 U.S. 783, 93 S. Ct. 2348, 37 L. Ed. 2d 335 (1973); *White v. Regester*, 412 U.S. 755, 93 S. Ct. 2332, 37 L. Ed. 2d 314 (1973); *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1992), aff'd sub nom., *Richards v. Terrazas*, 505 U.S. 1214, 112 S. Ct. 3019, 120 L. Ed. 2d 891 (mem.). While a losing streak alone does not control our decision, Texas's history of failures to comply with the VRA is one of the circumstantial factors that *Arlington Heights* instructs us to consider. *Id* at 160.

Given this track record, the Court then proceeded to track the sequence of events leading to the passage of C185; the Court reviewed the testimony of the minority members of congress and the departures from the normal decision making process that led to the passage of C185.  The Court concluded that C185 was "motivated, at least in part," by discriminatory intent and added:

> "The parties have provided more evidence of discriminatory intent than we have space, or need, to address here. Our silence on other arguments the parties raised, such as potential discriminatory intent in the selective drawing of CD 23 and failure to include a Hispanic ability district in the Dallas-Fort

Worth metroplex, reflects only this, and not our views on the merits of these additional claims" *Id* at 161 note 32.

Therefore, in 2013 the Texas Legislature had before it the specific findings of intentional discrimination pursuant to *Arlington Heights*. Given these findings entered by three federal judges in 2012 the 2013 Texas Legislature proceeded to basically ignore the three judges: Texas proceeded to make minor changes in CD 23, <u>no changes</u> in the treatment of the Hispanic community in Nueces County, and adopted C235[7].

2. Three Judge Court in San Antonio:

In May 2, 2017 while the Texas Legislature was in session, this Court issued a 500 plus page opinion establishing that "proposed CD23 in Plan C185 violated § 2 in both "intent and in effect."    (May 2, 2017 Order, Dkt# 1390 at 29)    Moreover, the Court held that in C185 "approximately 200,000 Hispanic voters in Nueces County (a majority-HCVAP county) had a § 2 right that could be remedied but was not."  Also, on May 22, 2017 Judge Rodriquez suggested to the Defendants "whether the State wishes to voluntarily undertake redistricting in a special session" (Dkt #1395).

The historical background and sequence of events are astonishing: in 2012 three federal judges find intentional discrimination in C185; in the 2013 Legislative Session, Texas ignores the three judge findings.

---

[7] During the 2010 redistricting cycle, Texas was the only state in the union to not have their statewide congressional redistricting plan approved under Section 5 of the Federal Voting Rights Act; every other covered state had their plans approved.

Then on May 2, 2017, this three judge court finds intentional discrimination with C185 and suggested six (6) times that the infirmities of C185 may continue in C235 (Dkt #1390, p5, p72n67, p77, p92, p152, p165).

Again, during the 2017 Legislative Session, Texas ignores the three judge court again makes no corrections. Finally, Texas again ignores the suggestion of Judge Rodriquez that the Legislature consider correcting C235 (Dkt. # 1395).

"Intent" is defined by Black's Law Dictionary as "purpose to use particular means to affect certain result". Here Texas clearly decided to ignore six federal judges to obtain "certain results" – minimize the effect of the Latino vote.

IV Selective Questions (Dkt# 1494)  and Responses:

    1)    In its previous orders, the Court identified certain violations in Plans C185 and H283 in districts that remain unchanged in Plans C235 and H358. With respect to these violations, what open questions are there, if any?

**RESPONSE:**  As far as C235 is concerned, the Court must address the problems with CD 23 and the Nueces County Latino Community.  CD 23 is not a viable Latino District and the Nueces County Latino community could easily be placed in CD 15 and CD 34 where they will be able to elect

a candidate of their choice.

2)      Much of the plaintiffs' presentation looks more like the remedial phase than the trial on the 2013 plans. What decisions and rulings does this panel need to make regarding the 2013 plans? If the Court finds discriminatory intent, what judgment should it enter? If it finds no discriminatory intent, what judgment should it enter? What other issues are joined and ready for decision on this phase?

**RESPONSE:**  In evaluating the 2013 plans should be considered in light of what the Texas Legislature had in front of them during the 2017 Legislative session: besides the three judge court decision in DC, they also had this Court's May decision and decided to take no action to correct the six potential infirmities, one of them specifically mentioning CD 23, highlighted by this Court's May 2017 order, (Dkt #1390, p5, p72n67, p77, p92, p152, p165).

3)      Defendants appear to be asserting that any time a minority opportunity district's minority population is increased (one example was with regard to CD28 in a *Gingles* demonstration map) that this is unlawful "packing." But is there anything inherently wrong with a district having an increased or high minority population if it reflects the demographics of the area, does not have the effect of dilution, and wasn't intentionally racially gerrymandered?

**RESPONSE:** There is nothing inherently wrong with a district having an increase or high minority population so long as it does not have the effect of dilution or wasn't intentionally racially gerrymandered. In this case for example, CD 16 has extremely high Hispanic concentration; unpacking

13

this district to make CD 23 an effective district is permitted, see *Cooper v. Harris*, 197 L. Ed. 2d 837, *837; 2017 U.S. LEXIS 3214. Moreover, the unpacking will not affect the overall impact the Hispanic Community of South West Texas will have on the statewide plan.

## Questions about Evidence Presented (or Law as Applied to Specific Evidence Presented)

7.) Several witnesses relied on the rulings of the DC court, which were vacated. To what extent, if at all, can those findings be considered in determining the intent of the 2013 Legislature?

**RESPONSE:** Texas has always used the deliberative process that is part of the federal court system to its advantage. It appeals adverse rulings to delay a remedy as elections move forward without any remedy being imposed. This case is a clear example of that. We have had three elections, 2012, 2014, and 2016, using illegal and unconstitutional redistricting plans.

Now Texas is using the Supreme Courts "vacating" the three judge court decision in, *Texas v. United States*, 887 F. Supp. 2d 133, as an excuse to ignore the finding of fact and law even though they were undisturbed by the Supreme Court. The findings of the three federal judges in the DC Court should, at the very least, be considered as placing Texas on "notice" that there were minority voting rights issue with C 185 that were not addressed in C 235 -- specifically CD 23 and the Nueces County Latinos. As previously mentioned those findings of fact were never

disturbed by the Supreme Court and would have been scrutinized by the Supreme Court under a "clear error" standard, *Cooper v. Harris*, 197 L. Ed. 837, 844 (May 22, 2017).

12) For CD23, can discriminatory intent be imputed to the 2013 Legislature for adopting this Court's addition of areas with low turnout?

**RESPONSE:** On November 26, 2011 this Court made it clear that the Court Ordered interim plan was "not a ruling on the merits of any claims asserted by the Plaintiffs in this case" and reminded the State that "Plaintiffs further complain that the State intentionally weakened district 23, a minority opportunity district, to protect a Republican incumbent" (Dkt#544 p1-3).

The following year, on August 28, 2012, *Texas v. United States*, 887 F. Supp. 2d 133 was issued by three federal judges and the following was declared concerning CD 23:

> "Enacted CD 23's exogenous election results are significantly worse than those in benchmark CD 23. In the OAG 10, the number of victories decreases from three of ten to one. In Dr. Handley's sample the number decreases from [**59] two of five to none. Alford Rep. 23 tbl.4b; Handley Cong. Rep. 7; see also Ansolabehere Rep. 37 (concluding that the enacted plan "lowers the electoral performance of minoritypreferred candidates in the District to the point that it is likely no longer a minority opportunity seat"). Minority voter turnout in enacted CD 23 declines. While Hispanic voters accounted for an average of 39% of total votes cast in

benchmark CD 23 over the past decade, they made up only 36.5% in enacted CD 23.21 Defs.' Ex. 365, at 5-12; see also, e.g., Defs.' Ex. 575, Trial Tr. 450:19-454:11, Sept. 7, 2011, Perez, No. 11-cv-360 (testimony of Dr. Henry Flores, noting that Hispanic voter turnout was higher in areas moved out of the district than in areas that were moved in; turnout in some excluded areas was consistently over 30%, while turnout in areas that replaced them was only 25-30%). The changes were enough to "nudge" a district that was an ability district, but barely so, to a nonperforming district. See Ansolabehere Rep. 37 (noting that "in a competitive district such as this one," seemingly small changes "made a huge difference"). Even Texas's expert testified that CD 23 "is probably less likely to  [**60] perform than it was, and so I certainly wouldn't count and don't [and] haven't counted the 23rd as an effective minority district in the newly adopted plan." Defs.' Ex. 581, Trial Tr. 1839:2-7, Sept. 14, 2011, Perez, No. 11-cv-360. Thus, CD 23 is an ability district in the benchmark, but would be no longer in the enacted plan.

Texas claims that the enacted district has remained functionally identical to the benchmark, but these claims are undermined by the mapdrawers' own admissions that they tried to make the district more Republican — and consequently, less dependable for minority-preferred candidates — without changing the district's Hispanic population levels. The mapdrawers consciously replaced many of the district's active Hispanic voters with low-turnout Hispanic voters in an effort to strengthen the voting power of CD 23's Anglo citizens. In other words, they sought to reduce Hispanic voters' ability to elect without making it look like anything in CD 23 had changed. See, e.g., Defs.' Ex. 304 (email from Eric Opiela, counsel to Texas House Speaker Joe Strauss, to  [**61] mapdrawer

Gerardo Interiano in November 2010 urging Interiano to find a metric to "help pull the   [*156]   district's Total Hispanic Pop[ulation] and Hispanic CVAPs up to majority status, but leave the Spanish Surname [Registered Voter] and [turnout numbers] the lowest," which would be "especially valuable in shoring up [CD 23 incumbent] Canseco"); id. (email from Interiano responding that he would "gladly help with this"); Defs.' Ex. 739, at 40 (email indicating that Opiela provided sample maps to Interiano as late as June 11, 2011, that would "improve CD 23's [H]ispanic performance while maintaining it as a Republican district"). We also received an abundance of evidence that Texas, in fact, followed this course by using various techniques to maintain the semblance of Hispanic voting power in the district while decreasing its effectiveness. See, e.g., Defs.' Ex. 436 (evidence showing that over 600,000 persons were moved into and out of the district to redress overpopulation of only 149,000); Defs.' Ex. 903, at 1 (email noting that a draft map of CD 23 was "over 59% HCVAP, but still at 1/10 [exogenous election performance]," and commenting that there must be an HCVAP level high enough that   [**62] low election results would not raise trouble under section 5); Defs.' Ex. 978 (email commenting that a draft map of CD 23 "looks nice politically," but still raises "concern[s] about the Voting Rights Act"); Trial Tr. 106:18-108:3, Jan. 18, 2012 AM (testimony of Ryan Downton that he drew the district's lines precinct-by-precinct based on election results to keep Hispanic population numbers high while maximizing Republican performance); Id. at 12:2-16, Jan. 24, 2012 AM (testimony of Kel Seliger that CD 23 was drawn by considering "voting patterns and ethnicity" to see what could be done "to change the district"). Texas's protestations that the district has

remained functionally identical are weakened first by the mapdrawers' admissions that they tried to reduce the effectiveness of the Hispanic vote and then, more powerfully, by evidence that they did. We conclude that CD 23 is a lost ability district." *Supra* at. 155-156.

All of this information with specific findings was before the 2013 Legislative Session; yet, the State chose to ignore what was clearly of concern to the federal courts.  Yes, this clearly goes to "intent" concerning the 2013 Legislature's adoption of C235.

13) The Court's opinion adopting the interim maps clearly stated that the Court's work product was not complete and additional analysis was necessary.  Didn't the Legislature have some affirmative duty to ensure that the Plans they voted on complied with the VRA and Constitution?

**RESPONSE**   Same response as above to #12 above.

32) Regarding Nueces County and elsewhere, does the law allow packing of so-called "stranded" Hispanic voters into an already-performing district?

**RESPONSE:**  The treatment of the Hispanic Community in Nueces County should be considered in light of how Texas attempted to minimize the overall impact of the Latino community in South West Texas in denying the seven (7) districts they were entitled to.  Texas placed the Latinos of Nueces County in CD 27 so that they could maximize the number of non-minority (Republican) districts they control. This, as the Courts clearly found, was an illegal use of racial data.

33) What does cohesion mean under Gingles 2?  How is the race of the candidate relevant?  What should the Court be focusing on in terms of determining whether minorities are cohesive?   Does the race of the candidate factor into political cohesion?  What does the fact that black voters vote for black candidates in the Democratic Primary and Hispanic voters vote for Hispanic candidates in the Democratic Primary tell us about minority political cohesion if both groups are voting in the Democratic primary for candidates who generally espouse the same political positions? Assuming cohesion is politically-based, does that require that coalition districts be drawn?

**Response**:  The focus should be on the actual election and whether or not the elected candidate was the choice of the minority community. Primary elections are part of the process leading up to the election very similar to voter registration drives and political campaign.  As far as vote dilution law is concern, the Court must focus on the election results where all the voters voted, not the nominating process.

V. Prayer:

Because Defendant State of Texas failed to address statutory and constitutional concerns about C185 and C235 that were clearly expressed by six federal judges the court should enter and order finding that C235 continues to violate the Federal Voting Rights Act and the United States Constitution. Because the State of Texas failed to address these concerns during the 2013, 2015 or 2017 Legislative Sessions, the Court should order a remedy hearing and order a legal redistricting plan in time for the 2018 elections.

DATED:  July 31, 2017                              Respectfully Submitted,

                                                   *Rolando L. Rios*
                                                   ROLANDO L. RIOS
                                                   115 E. Travis,
                                                   Suite 1645 San
                                                   Antonio, Texas
                                                   78205 Ph: (210)
                                                   222-2102
                                                   Fax: (210) 222-2898
                                                   E-
                                                   mail:rrios@rolandoriosl
                                                   aw.com By: Rolando L.
                                                   Rios /s/ ROLANDO L.
                                                   RIOS
                                                   SBN: 16935900
                                                   Attorney for Plaintiff-
                                                   Intervenor Cuellar The
                                                   Law Offices of Rolando L.
                                                   Rios The Milam Building

CERTIFICATE OF SERVICE

 I certify that on this a true and correct copy of this Post Trial Brief of US
Congressman Henry Cuellar has been served upon the Defendants using
the electronic filing system.

                                                   *Rolando L. Rios*