**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **SHANNON PEREZ, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **NO. 11-CA-360-OLG-JES-XR** |
| | § | **[Lead Case]** |
| **STATE OF TEXAS, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

# TABLE OF CONTENTS

**Page**

I.    PLAN C235 IS THE LEGISLATURE'S PERMANENT PLAN, NOT THE COURT'S ................................................................................................... 4

II.   THE PORTIONS OF PLAN C235 THAT REMAIN IDENTICAL TO PLAN C185 REMAIN UNLAWFUL ................................................................. 7

    A.    The State's Discriminatory Intent From Plan C185 Carries Over to Plan C235 ................................................................................................... 8

    B.    Even Absent Discriminatory Intent, CD27 and CD35 Remain Unlawful .......... 12

        1.    CD27 Still Violates the § 2 Results Test ................................................. 12

        2.    CD35 Remains a Racial Gerrymander ..................................................... 13

III.  CD23 UNDER PLAN C235 VIOLATES § 2 BOTH IN INTENT AND IN EFFECT ......................................................................................................... 15

    A.    CD23 Is Not an Effective Latino Opportunity District ....................................... 15

    B.    CD23 Was Designed to Perform Poorly for Latino-Preferred Candidates .......... 18

    C.    CD23's "Competitiveness" Only Underscores Plan C235's Disparate Treatment of Minorities ..................................................................................... 19

    D.    Plan C286 Demonstrates How to Transform CD23 Into an Effective Latino Opportunity District ................................................................................. 20

IV.   PLAN C235 INTENTIONALLY DISCRIMINATES AGAINST MINORITIES IN THE DALLAS-FORT WORTH AREA ....................................... 22

    A.    Plan C235 Continues to Crack Minority Population Centers .............................. 22

    B.    Plan C235 Maximizes Anglo Representation While Minimizing Minority Representation in Dallas and Tarrant Counties ................................................... 24

    C.    Plan C286 Shows that Fixing the Cracking of Majority-Minority Cities Yields an Additional Minority Opportunity District ........................................... 26

V.    PLAINTIFFS HAVE ESTABLISHED A § 2 "RESULTS" VIOLATION IN DALLAS-FORT WORTH ................................................................................. 27

    A.    The Minority Population in DFW Is Sufficiently Large and Geographically Compact to Allow for the Creation of at Least One Additional Coalition District (*Gingles* 1) ........................................................ 28

    B.    African Americans and Latinos in DFW Are Politically Cohesive and the DFW Region Is Characterized by Racially Polarized Voting (*Gingles* 2 and 3) ................................................................................................................. 30

        1.    Causation is Irrelevant to the *Gingles* Inquiry ....................................... 31

## TABLE OF CONTENTS
(continued)

**Page**

2.   Courts Routinely Use General Election Data to Determine Political Cohesion for Purposes of the *Gingles* Analysis.......................................35

3.   The Specific Circumstances Here Indicate that General Elections Are a Better Metric of Minority Cohesion in DFW.................................40

C.   Under the Totality of Circumstances, African-American and Latino Residents of DFW Have a Diminished Opportunity to Participate in the Political Process and to Elect Representatives of Their Choice .........................47

VI.   CONCLUSION..............................................................................................................48

### RODRIGUEZ PLAINTIFFS' POST-TRIAL BRIEF (JOINED BY PEREZ AND LULAC PLAINTIFFS)

The Rodriguez Plaintiffs, joined by the Perez and LULAC Plaintiffs,[1] submit this post-trial brief following completion of the trial on the validity of the congressional redistricting plan enacted in 2013 as Plan C235.[2]

In practical effect, much of this phase of the case has already been decided—adversely to the State. The intervening years since the 2014 trial have not yielded a new set of facts favorable to the State. Rather, the facts weigh even more heavily against the State now than they did in 2014.

As the Court well knows, the fact that the current phase of this case is about the constitutional and statutory validity of the 2013 Legislature's Plan C235 hardly renders the Court's ruling on 2011's Plan C185 a dead letter.[3] Plan C235 did not mythically spring full-blown and newly-born from the legislative brow in 2013, and the Court is not presented, as the State would have it, with a whole new constellation of issues. The intricate relationship between the two maps means that the Court's Plan C185 Order bears heavily on the issues now presented for resolution. More than half of Plan C235's districts are identical to the districts in Plan C185.

---

[1] For the sake of brevity and clarity, the text typically refers only to the Rodriguez Plaintiffs, but they impliedly include the Perez and LULAC Plaintiffs. The LULAC Plaintiffs propound Plan C285 as a demonstration map supporting their claims. Mr. Korbel testified as their expert in connection with that plan. Since he was also testifying as MALC's expert, it will be left to MALC to address Mr. Korbel's testimony concerning Plan C285.

[2] The Rodriguez Plaintiffs have no claims against the Texas House of Representatives Plan, and accordingly that plan is not addressed in this brief. This post-trial brief largely addresses the following Questions posed by the Court on July 14, 2017, Dkt. No. 1494: 1-2, 11-12, 19, 28, 33-36, 41-42.

[3] *See* Amended Order of May 5, 2017, Dkt. No 1390 ("Plan C185 Order").

Stipulation of Facts No. 1 (Doc. 1442) ("Stip. 1") ¶¶ 7-9 (19 of the 36 districts unchanged).[4] For other challenged areas in Plan C235, the 2013 changes fail to eliminate legal injury to minority voters that the Court determined was embodied in Plan C185. The Plan C185 Order speaks directly to the invalidity of some parts of Plan C235 and deeply informs the judicial inquiry as to the validity of others.  The Court's Plan C185 Order found constitutional and statutory violations in the same Plan C235 areas and districts still challenged by the Rodriguez Plaintiffs: the South/West Texas "envelope,"[5] and the Dallas-Fort Worth area.

In the South/West Texas envelope, the Court found legal violations in three areas. It found that CD35 was a Fourteenth Amendment equal protection violation under the *Shaw* racial gerrymandering principle, using racial divisions that did not substantially address § 2 violations otherwise present in the envelope. Plan C185 Order, Dkt. No. 1390 at 46.[6] The Court also found that the stranding of more than 200,000 Nueces County Latinos, nearly 150,000 of whom are citizens of voting age, in CD27, dominated by Anglo voters, violated both the intent and results prongs of § 2. Plan C185 Order, Dkt. No. 1390 at 57. Absent the stranding, and without the racial carve-up of Travis County with CD35 as the centerpiece, seven Latino opportunity districts could have been, but were not, created in the South/West Texas envelope. *Id*. The Court further found that CD23 was not designed to function as a Latino opportunity district, in violation of both the intent and results prongs of § 2, *id*. at 29, and that, because the race-based line drawing

---

[4] "Effectively identical" is more precise but only in a technical sense. In 18 districts, the move from Plan C185 to Plan C235 shifted no people at all, only slightly adjusting the boundary lines in 8 of them. The other "unchanged" district shifted just 10 people at the far northern extremity of C185's CD25 into an adjoining district.

[5] "Envelope" is used as a convenient short-hand reference to an area generally bounded by a line drawn from Travis County southwest toward Bexar County, west to El Paso, along the international border to Cameron County, northward up the Gulf Coast to Nueces County, then west and northwest toward Bexar County, veering up to Travis County again. Trial Tr. 1037:23-1038:1 (Dr. Ansolabehere's description).

[6] Because of this ruling, the Court did not reach the Rodriguez Plaintiffs' claim that the intentional destruction of the preexisting crossover CD25 in the benchmark plan, using race as the means to that end, was an equal protection violation. Plan C185 Order, Dkt. No. 1390 at 41 n.38.

of CD23 was not tailored to actual compliance with the State's §2 obligations, it was an unconstitutional racial gerrymander, *id*. at 32.

In the Dallas-Fort Worth area, the Court found that a § 2 results claim had not been established. *Id*. at 92 (leaving open the possibility of such a claim being made against Plan C235). But the Court found intentional vote dilution in the area, through cracking and packing of minority voters, that violated both the intent prong of § 2 and the Fourteenth Amendment. *Id*. at 146.[7]

The Rodriguez Plaintiffs continue to level similarly-based challenges to Plan C235 in the same two areas.

In the South/West Texas area, the Rodriguez Plaintiffs maintain that CD35 and the related carve-up of Travis County along racial lines reflect an unconstitutional racial gerrymander in violation of the Fourteenth Amendment, *see* Rodriguez Pls.' Pretrial Br., Dkt. No. 1457, at 27,[8] and that the configuration of CD27 in Nueces County continues to violate both the intent and results prongs of § 2 claims as well as the Fourteenth Amendment's prohibition against intentional vote dilution, *id*. at 29. These two areas of South/West Texas remain identical to the versions struck down in Plan C185. The Rodriguez Plaintiffs further assert that CD23, as modified in Plan C235, violates the results prong of § 2 and intentionally dilutes minority voting strength in violation of § 2 and the Fourteenth Amendment. *Id.* at 28.[9]

---

[7] The Court also found a *Shaw* violation in Plan C185's CD26. Plan C185 Order, Dkt. No. 1390 at 108.

[8] They also continue to assert a *Bartlett* intentional discrimination claim based on the race-based intentional destruction of a cross-over district. *See* Rodriguez Pls.' Pretrial Br., Dkt. No. 1457, at 27. Just as it did not reach this claim in its Plan C185 Order, the Court need not reach it in this phase either if it hews to the CD35 analysis in its earlier ruling.

[9] The Rodriguez Plaintiffs' pretrial submission inadvertently omitted the intentional discrimination claims from its summary of claims. This omission was called to the Court's attention during closing argument, and the Court directed that this clarification be specifically noted in this post-trial brief. Trial Tr. 1722:20-1723:5.

In the Dallas-Fort Worth area, the Rodriguez Plaintiffs allege intentional vote dilution claims under both § 2 and the Fourteenth Amendment based on the State's continued strategy of cracking minority populations and communities across the region. *Id*. at 26. Secondly, the Rodriguez Plaintiffs also assert § 2 results-based claims in the area, based on a failure to create two minority coalition districts. *Id*.

## I.     PLAN C235 IS THE LEGISLATURE'S PERMANENT PLAN, NOT THE COURT'S

Contrary to the State's assertions, Plan C235 is not the product of a judicial cleansing process. The Court's interim plan order was not a grant of absolution to the State as to either past or future sins in its treatment of minorities in exercising their right to an equal opportunity to elect members of the Texas congressional delegation.

Faced with an urgent need to get the 2012 election process underway, this Court did the best it could with an exceedingly difficult situation in an exceedingly complicated case. But at no point did the Court implicitly or explicitly "bless" Plan C235 or purge the plan of its multiple legal infirmities. As the trial evidence conclusively established, those legal infirmities render Plan C235 no more lawful than its predecessor plan.

In February 2012, the State, along with just two of the plaintiff groups,[10] proffered to the Court a "compromise map." *See* 2/14/2012 Hearing Tr. at 146:23 (Judge Rodriguez referring to Plan C226 as a "compromise map" because it is incorrect to call it a "settlement"); *id.* at 149:22-25 (Defendants' counsel referring to "what we call a compromise map"); Order of June 5, 2014, Dkt. No. 1048 at 2 n.2 (referring to Plan C226 as "the compromise plan on which C235 was

---

[10] A limited subset of plaintiff groups joined the State in proffering this interim map—the Task Force and Congressman Cuellar. *See* Order of June 5, 2014, Dkt. No. 1048 at 2 n.1. Virtually every other plaintiff group opposed it. In particular, the Rodriguez Plaintiffs submitted a report from Dr. Ansolabehere comparing CD23 under the benchmark plan and Plan C226. Rod. P. Ex. 916 ("Analysis of Congressional District 23 Under Plans C100 and C226," Feb. 22, 2012), and concluding that Plan C226 reduces the performance of CD23 compared with the benchmark CD23 "in every election examined," *id*. ¶ 5; *see also id.* ¶ 10 (viewing "the proposed version CD23 under Plan C226 as a reduction in the ability of Hispanics to elect their preferred candidates").

based"). The State admitted the plan was "far from perfect" but asserted it was "adequate for [its] intended purpose: to . . . allow[] elections to move forward without further inconvenience to Texas voters." Defendants' Advisory Regarding Interim Redistricting Plans, Dkt. No. 605 at 4.

Notably, the plan, C226, was not a product of this Court's mapdrawing efforts, and thus is not a "court-drawn plan." Plan C226 derived from a plan (C216) submitted by two Congressmen (Canseco and Cuellar), drawn by an aide to the former. *See* Order of June 5, 2014, Dkt. No. 1048 at 10. The Court's discovery order, however, largely closed the curtain on how the plan was developed and the State's involvement in it. The State had urged that the curtain be kept closed, but was careful not to represent that its officials, be it legislative or executive, played no role in developing the map. It said only that "if" the compromise efforts "could shed light on the Legislature's purpose in 2013," the Court nonetheless should not allow any of that light to escape. Defendants' Response to Quesada Plaintiffs' Motion to Compel Discovery, Dkt. No. 1025, at 2-3; *see also id*. at 10 ("*[t]o the extent* any legislators were involved in the discussion of a compromise plan . . .") (emphasis added).

The Court accepted Plan C226 as the interim plan for the 2012 election cycle, modifying it "for purely technical reasons." Order of March 19, 2012, Dkt. No. 691 at 2; *see also* Order of June 5, 2014, Dkt. No. 1048 at 2 (Plan C235 made only "minor non-substantive modifications" to Plan C226). After working with the Texas Legislative Council to remedy "inadvertent intrusions" of small pieces of Plan C226, consisting of essentially no population, Order of March 19, 2012, Dkt. No. 691 at 29, the Court adopted Plan C235 as the interim plan. In doing so, it went to great lengths to explain that no one should take Plan C235 as the final word on map legitimacy in the context of this litigation. Plan C235 was interim only and "not a final ruling on

the merits of any claims," reflecting only "preliminary determinations" that "may be revised upon full analysis." *Id*. at 1-2.

The following year, in what was at best a willful display of legislative tone-deafness and at worst open disregard of judicial rulings, that "compromise map" was formally adopted by the Texas Legislature as Plan C235.[11] Once again, the State has attempted to pull the curtain over details of the legislative deliberations leading to its adoption of Plan C235.

Like its predecessor plan, Plan C235 compromised the voting rights of hundreds of thousands Texas minorities. In several key areas, it incorporated district configurations identical to the configurations in Plan C185. In several others, the State adopted changes that gave the outward appearance of chipping away at the gross racial disparities apparent in Plan C185 while, in reality, falling far short of capturing—or even recognizing—the voting strength of the growing minority population or providing minorities an equal opportunity to elect their preferred candidates in congressional elections. The State continued the same miserly approach to minority voting rights as it had with respect to Plan C185, asserting that the original plan was lawful in all respects and that minorities had no legal right to a more even playing field. As a result, Plan C235 perpetuates the discriminatory voting districts established in Plan C185 and continues to inflict injury t upon Texas's minority populations in disregard of the Constitution and Voting Rights Ac.

While it is an understatement to call Plan C235 "far from perfect," the Rodriguez Plaintiffs agree that Texas's congressional plan has a long way to go before it complies with the constitutional and statutory prohibitions against discriminatory redistricting. As an initial matter,

---

[11] Plan C235 was signed into law on June 26, 2013. Stip. 1 ¶ 10. This was ten months after a three-judge panel of the U.S. District Court for the District of Columbia, in a then-in-effect ruling applying the *Arlington Heights* standard for discerning intent, had been "persuaded . . . that [Plan C185] was enacted with discriminatory intent." *Texas v. United States*, Order of Aug. 28, 2012, Dkt. No. 230 at 42.

the Texas Legislature has consistently stood behind the legality of the core elements of Plan

C185 and refused to reverse course, and, as a result, the same discriminatory intent that pervades

Plan C185 infects Plan C235. This is especially true with respect to the portions of Plan C235

that remain identical to those portions deemed invalid in Plan C185, namely, CD27 (with respect

to Nueces County) and CD35 (with respect to Travis County). In a *deja vu* vein, meanwhile, the

State's changes to CD23 once again create the illusion of minority opportunity without actually

achieving it. Finally, the State's changes to Dallas-Fort Worth perpetuate the cracking of

minority populations throughout the area, constituting intentional vote dilution in violation of the

equal protection rights of minorities. Absent the cracking, the use of traditional districting

criteria such as honoring political subdivision boundaries would have naturally yielded two

districts in the area that unite the otherwise cracked minority populations and, in addition,

happen to meet the criteria of coalition districts which, in addition to proving a Fourteenth

Amendment violation, would be afforded protection under § 2 of the Voting Rights Act.[12]

Plan C235 makes plain that, with respect to the Texas Legislature's approach to

congressional redistricting, the more things change the more they stay the same. Like its

predecessor plan, Plan C235 squelches growing minority voting strength and, in so doing, runs

afoul of the Constitution and the Voting Rights Act. The Rodriguez Plaintiffs respectfully

request that the Court invalidate Plan C235, enjoin its use, and ensure that—once and for all this

decade—Texas voters cast ballots under a lawful congressional redistricting plan.

## II.   THE PORTIONS OF PLAN C235 THAT REMAIN IDENTICAL TO PLAN C185 REMAIN UNLAWFUL

It is undisputed that Plan C235 makes no changes whatsoever to CD27 and Nueces

County or CD35 and Travis County. *See* Stip.. 1, ¶¶ 7-9; *see also* Trial Tr. 1055:12-24; 1056:17-

---

[12] It is not necessary to reach the § 2 issue since a proper remedy to the unconstitutional cracking would suffice to capture minority population growth and voting strength in DFW.

18 (Dr. Ansolabehere testifying that there are no changes in CD27 and Nueces County); *id.* 1057:18-1058:4 (same, with respect to CD 35 and Travis County). This was not mere legislative oversight. In their 2012 Advisory Regarding Interim Redistricting Plans, Defendants freely admitted that the plan "does not alter CD27 as drawn in [Plan C185]" because they believed it did not pose a legal violation and "makes no change to CD25 [in Travis County] . . . because there is no legal basis on which to do so." Dkt. No. 605 at 15; *see also* 2/14/12 Hearing Tr. at 11:3-6 (Mr. Mattax: "[T]he State just can't agree to . . . the dismantling of areas of Texas that we don't think have any legal issues involved with them.").

Defendants were sorely mistaken. Earlier this year, this Court determined that "Defendants' decision to place Nueces County Hispanic voters in an Anglo district [CD27] had the effect and was intended to dilute their opportunity to elect their candidate of choice" in violation of § 2 of the VRA. Plan C185 Order, Dkt. No. 1390 at 57. It further found that CD35 is a racial gerrymander in violation of the Equal Protection Clause, as "Defendants' decision to place majority-HCVAP CD35 in Travis County" was effectuated through race-based means and not justified by a compelling state interest. *Id.* As a result, "[t]he configurations of . . . CD27[] and CD35 in Plan C185 are . . . invalid." *Id.* at 58. Those configurations remain in place—and remain invalid—in Plan C235.

A.    **The State's Discriminatory Intent From Plan C185 Carries Over to Plan C235**

This Court has already determined that, "[w]ith regard to those elements of the 2011 plan[] that remained unchanged and remained challenged in the interim plans, *when the Legislature adopted the Court's interim plans it engaged in the same conduct or incorporated the identical portions of the 2011 plans alleged to be illegal into the 2013 plans.*" Order of June 17, 2014, Dkt. No. 1104 at 14 (emphasis added). Indeed, the State experienced no change of

heart with regard to minorities in enacting Plan C235. On the contrary, it refused to "concede[] that any of its actions were wrongful" or otherwise indicate that it had "abandoned any intent to engage in the same conduct." *Id.* at 14-15. Thus, the facts and law of the case make clear that whatever intent Texas had in drawing Plan C185 carried over to Plan C235—at the very least with respect to those portions that are identical between the two plans.

Courts have held in various contexts that when a law is found to have been enacted with discriminatory intent, the legislative amendment or reenactment of the law—especially where the amendment or reenacted law is the same or similar to the discriminatory law—does not remove the taint of discriminatory intent. In *United States v. Fordice*, the Supreme Court held that Mississippi's "facially-neutral" education policy failed to remove the "discriminatory taint" of the state's previous policy mandating a segregated higher education system. 505 U.S. 717, 733-35 (1992). While the new policy was racially neutral on its face, it made no effort to remove— and as a result, maintained—the discriminatory nature of the earlier facially discriminatory policy. *Id*. at 734-35. Because a state "may not leave in place policies rooted in its prior officially segregated system," the Court held that the education system still violated the Equal Protection Clause. *Id.* at 743. Just as in *Fordice*, Texas has made no attempt to remedy the discriminatory intent that plagued multiple portions of Plan C185. In fact, it reenacted the exact same district configuration in CD27 that this Court has held was originally enacted with discriminatory intent, *see* Plan C185 Order, Dkt. No. 1390 at 57, and the same configuration in Travis County (and CD35) that the Rodriguez Plaintiffs alleged (and continue to allege) intentionally discriminates against minority voters, *see id.* at 41 n.38 ("Downton and the Republican-dominated Legislature used the intentional creation of a Hispanic-majority district that extended in large part into Travis

County to justify its destruction of Travis-County-based CD25, which it knew had a substantial minority population that was successfully electing its candidate of choice, a Democrat.").[13]

The taint of discriminatory intent is generally only removed from amended or reenacted legislation where a fact-specific inquiry reveals that the new statute was enacted significantly later than the discriminatory statute, legislators underwent a "deliberative process" prior to amendment or reenactment, and the new statute does not continue the same adverse racially disparate impact as the original discriminatory law. *See Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1224-26 (11th Cir. 2005); *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998). None of those factors is present here. The State enacted Plan C235 on the heels of Plan C185, and it did not undertake any "deliberative process" to remove the discriminatory taint of the law. On the contrary, despite the knowledge that Plan C185 had been struck down as intentionally discriminatory against minority voters by the D.C. Court, it resolutely refused to change course on several portions of the map. Finally, minority voters in CD27, CD35, and Travis County— who have lived under a discriminatory redistricting plan since the beginning of the decade— continue to suffer the same injury under Plan C235 as they would under Plan C185.

Because the State did not make *any* changes to these areas—let alone any changes that would have remedied the legal violations this Court found—CD27 and CD35 remain intentionally discriminatory and continue to violate the law and should, once again, be declared unlawful by this Court. The same holds true for the carve-up of Travis County more broadly.

---

[13] The racial carving of Travis County into five congressional districts remains as an unconstitutional blot on C235, and the Rodriguez Plaintiffs continue waging the same challenge they have been waging all along—that the intentional destruction of the preexisting crossover district anchored in the Austin area (Plan C100's CD25) violates the Fourteenth Amendment under the standard addressed in the *Bartlett v. Strickland* plurality decision. The Court did not need to reach the issue in its decision on Plan C185 in light of its finding on CD35. *See* Plan C185 Order, Dkt. No. 1390 at 41 n.38.

No facts have come to the fore since the 2014 trial to suggest that things have changed in these two areas—at least, not in any way that aids the State. If anything, the opposite is true.

Dr. Ansolabehere analyzed racial voting patterns in the intervening years, focusing on general elections in 2014 and 2016. He concluded that, aside from Travis County, racially polarized voting remained significant in Nueces County, as well as the other parts of the South/West Texas envelope. Trial Tr. 1049:22-23 (Nueces County); *id.* 1048:1-2; 1051:2-24; *see also* Rod. P. Ex. 955 (2017) (Ansolabehere 2017 Report), tbls. 6-8, ¶42. Dr. Ansolabehere's updated analysis led him to conclude yet again that in Travis County there is essentially no racially polarized voting. Trial Tr. 1050:10-13; Rod. P. Ex. 955 (Ansolabehere 2017 Report), tbl. 10, ¶50. In short, his updated analysis led him to reach the same conclusions as to these areas that he had reached, and testified to, in the 2014 trial. Trial Tr. 1055:25-1056:7. The Court's Plan C185 Order is consistent with Dr. Ansolabehere's earlier testimony, and there is no reason its ruling in this round should be any different.

It is further telling that, after three more years have passed, the State has yet to provide any rebuttal whatsoever to Dr. Ansolabehere's 2014 analysis showing that race better explains Plan C235's divisions of Travis County than party. *See, e.g.*, Rod. P. Ex. 912 (Ansolabehere 2014 Report) ¶ 14. Indeed, while the State has long insisted that targeting Congressman Doggett was a prime explanation for the Travis County carve-up, *see* Defendants' Post-Trial Br., Dkt. No. 1272 at 125 (citing 2014 Trial Tr. 1785:4-14), Plan C235 maintained the carve-up and CD35 intact even though Congressman Doggett had won more than 60% of the vote in each of the elections since CD35's creation. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶ 49. This further belies the State's justification for what it did to Travis County.

### B.    Even Absent Discriminatory Intent, CD27 and CD35 Remain Unlawful

Even were the State's discriminatory intent magically cleansed by the adoption of a different bill number to effectuate identical district lines, CD27 and CD35 are still invalid based on this Court's findings with respect to Plan C185.

#### 1.    CD27 Still Violates the § 2 Results Test

With respect to CD27, "Plaintiffs demonstrated that approximately 200,000 Hispanic voters in Nueces County (a majority-HCVAP county) had a § 2 right that could be remedied but was not." Plan C185 Order, Dkt. No. 1390 at 47. (Dr. Ansolabehere's 2017 report found 225,900 Nueces County Latinos stranded in CD27. Rod. P. Ex. 955 ¶ 44). Those Nueces County Hispanics still hold onto a § 2 right that is not remedied under Plan C235. Thus, the discriminatory impact on Latino voters in Nueces County who have been unlawfully deprived of the equal opportunity to elect their candidates of choice is still present in CD27.

"Where the rights of voters who have demonstrated § 2 violations can be accommodated through the use of compact districts that do not subordinate traditional redistricting principles more than necessary to address the § 2 liability, those voters § 2 rights must be accommodated." *Id.* at 56. The Rodriguez Plaintiffs' Demonstrative Plan C286, Joint Ex. 105.1, shows that Nueces County can be incorporated in a majority-HCVAP district (Demonstration CD34) such that both the Latino-opportunity district and the majority-Anglo Demonstration CD27 become significantly more compact and adhere to traditional districting principles. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶ 45, tbl. 14Ex. . The § 2 remedy for Nueces County Latinos, moreover, facilitates changes throughout South/West Texas and allows for the creation of seven true Latino-opportunity districts in the area, without imposing a racial gerrymander in the process.

In Plan C286, Dr. Ansolabehere moved most of Nueces County into a Demonstrative CD34, which is oriented south. At the same time, he carved away a northern portion of Nueces County where Congressman Farenthold resides, leaving his residence in a north- and northwestern-oriented district. Trial Tr. 1084:9-21. The move of most Nueces County Hispanics into a southern orientation had the effect of relieving pressure on southern Bexar County, which had been divided to provide population to several districts. *Id*. 1085:2-5. Thus, nearly 150,000 Latino citizens of voting age would be put back into the South/West Texas envelope. *Id*. 1085:12-15; Rod. P. Ex. 955 ¶ 41.

This reorientation of the stranded Nueces County Latino population had the ripple effect of allowing Dr. Ansolabehere to undo the racial gerrymander in CD35 (see discussion below) while creating in Plan C286 seven Latino opportunity districts (including CD23) in the South/West Texas envelope, all except one of which are more compact than under Plan C235. Trial Tr. 1092:2-15; Rod. P. Ex. 955 ¶¶ 120-123, tbl. 14.

### 2.    CD35 Remains a Racial Gerrymander

This Court has already found that race predominated in "the drawing of district lines and selection of district population" under CD35 in Plan C185. Plan C185 Order, Dkt. No. 1390 at 36. Those district lines—including the "squiggle" at the northern part of the district and the division of Travis County and numerous city boundaries, *id.* at 37-38—remain unchanged in Plan C235, and the same district population suffers from the State's unjustified race-based classification. *See id.* at 35 n.31 ("The harm flows from being 'personally . . . subjected to [a] racial classification,' not from vote dilution or intentional discrimination." (quoting *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015)). Indeed, CD35 remains the least compact congressional district in the State of Texas—and one of the least compact districts in the country. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶ 48, tbl. 14.

The Court's racial gerrymandering finding, moreover, in no way hinges on the State's discriminatory intent. On the contrary, although the Rodriguez Plaintiffs continue to maintain that the State engaged in intentional discrimination in breaking up an existing crossover district in Travis County to create CD35, *see supra* n.13, intent to dilute the votes of racial minorities is not an element of a racial gerrymandering claim. *See e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 178 (M.D.N.C. 2016) (in finding that legislative redistricting plans constitute racial gerrymanders in violation of the Equal Protection Clause, "we make no finding that the General Assembly acted in bad faith or with discriminatory intent in drawing the challenged districts"), *aff'd*, 137 S. Ct. 2211 (2017). Here, the Court's conclusion that race predominated in the drawing of CD35 did not rest on direct evidence about the subjective intent of legislators. Instead, it relied on evidence about what the mapdrawer (Mr. Downton) actually did in his line-drawing and on Dr. Ansolabehere's analysis of what better explained that line-drawing in Travis County. *See* Plan C185 Order, Dkt. No. 1390 at 35-41. Since the lines went untouched in 2013 when Plan C235 was enacted, the pertinent evidence is largely the same.

The Rodriguez Plaintiffs' Demonstrative Plan C286 shows that this configuration of CD35 was not necessary in order to create a majority-HCVAP congressional district in this area. Plan C286 presents a more compact version of CD35 that does not cross the Travis County or City of Austin borders but is pulled entirely out of Travis County, made thicker as it moves south to Bexar County, then finally pulled more into southern Bexar County to pick up the population it needs after dropping out of Travis County. Trial Tr. 1085:20-25. It remains a majority-HCVAP district, and, based on election results in the area, is a district in which Latinos would have the opportunity to elect their preferred candidates. *See* Rod. P. Ex. 955, tbl. 16. Dr. Ansolabehere testified that Plan C286's CD35 is, in his opinion, a Latino opportunity district, Trial Tr. 1086:8-

11, and Defendants do not contend otherwise, *see id.* 1439:25-1440:5 (Dr. Alford testifying that Plan C286's configuration of CD23 does not "render[] any of the other Latino-majority districts nonperforming").

Plan C286 thus "uncracks" the Travis County minority populations. Trial Tr. 1086:3-7; Rod. P. Ex. 955 ¶ 124. Under Plan C286, three districts (CDs 10, 21, and 25) would be situated in Travis County, with CD25 entirely within the county. Trial Tr. 1086:14-16.[14] The CD25 created by Plan C286 "incorporates the core" of the benchmark crossover district. *Id.*[15]

## III.    CD23 UNDER PLAN C235 VIOLATES § 2 BOTH IN INTENT AND IN EFFECT

This Court found that CD23 under Plan C185 reflected the mapdrawers' "intent to provide Hispanic voters less opportunity to participate in the political process and elect their candidates of choice," and because they "effectuated that intent," the Court determined that the district violated § 2 "in both intent and in effect." Plan C185 Order, Dkt. No. 1390 at 29. Plan C235 changes the configuration of CD23 somewhat, but as Plaintiffs demonstrated at trial, CD23 continues to run afoul of § 2.

### A.    CD23 Is Not an Effective Latino Opportunity District

The key question under § 2's results test is "whether . . . CD23 provides 'real electoral opportunity'" for Latino-preferred candidates. *Id.* at 18. CD23 under Plan C235 does not perform nearly as well for minority-preferred candidates as CD23 under the benchmark Plan C100. According to the analysis of CD23 by Texas's expert Dr. John Alford, under Plan C235,

---

[14] Contrary to the suggestion of the Rodriguez Plaintiffs' counsel at trial in his examination of Dr. Ansolabehere, Plan C286's CD25 does keep the residence of the incumbent congressman, Mr. Williams, in the district. *See* Rod. P. Ex. 955 (Map F, showing congressional residences in Travis County).

[15] Question 41 of the Court's questions (Doc. 1494) seems to ask whether a configuration such as Plan C286's CD25 somehow constitutes a § 2 violation. It does not. Even aside from the problem of creating a race-conscious district in a location lacking racially polarized voting, there has been no suggestion or evidence that the first *Gingles* factor could be satisfied in Travis County while also avoiding the cracking of minority populations. Plan C286's CD25 demonstrates a way of undoing the cracking in the county, while also maintaining the basic integrity of the two preexisting districts (CDs 10 and 21) and adhering to traditional districting principles.

minority-preferred candidates carried only one out of three (33%) endogenous elections and three out of 25 (12%) reconstituted statewide elections. DX 878 (Alford 2017 Report) at 16-17, 20; *see also* Tr. 1431:15-25. While it is true that "[p]erformance of 50% or lower on a statewide exogenous election index does not automatically rule out minority opportunity," Plan C185 Order, Dkt. No. 1390 at 17, an abysmal 12% success rate is far below any of the indices this Court cited in its discussion of benchmark CD23, *see id.* (statewide indices ranging from 30% to 50% success for minority-preferred candidates in CD23 under Plan C100). And unlike that benchmark CD23, in which "despite the 50% or less success rate in those exogenous election indices, preferred-minority candidate success in the actual endogenous elections of the district [66%] demonstrates that benchmark CD23 did in fact provide 'real electoral opportunity,'" *id.*, current CD23's remarkably low success rate in the State's preferred exogenous election index is mirrored in the remarkably low success rate (33%) in endogenous elections.

Dr. Ansolabehere testified as to why the slightly higher HCVAP in CD23 (from 58.5% under Plan C185 to 61.3% under Plan C235) has not actually translated into a "real electoral opportunity" for Latino-preferred candidates. He noted, first, that despite the increase in HCVAP, the number of Spanish surname voter registrations in CD23 stayed rather flat. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶ 27 (noting net increase of only 243 SSVRs in CD23). Dr. Ansolabehere further demonstrated that the areas kept in the district from its predecessor version vote so overwhelmingly for Republican candidates (who are not preferred by Latino voters) that the addition of Latino voters (who predominantly vote for Democratic candidates) is insufficient to overcome the deficit those candidates faced in the areas that comprise the district's core. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶¶ 28-38 & tbl.4; Trial Tr. 1065:10-12 ("[T]he Democratic-preferred candidate started off with an 8,000 vote . . . hill to climb compared

to the Republican candidate."). In other words, the influx of Latino voters is unable to transform the district into one in which Latinos have the opportunity to elect their preferred candidates. Thus, the configuration and composition of CD23 stacked the deck against Latino-preferred candidates before a single ballot was cast.

The bottom line: based on its performance in both endogenous and exogenous elections, Dr. Ansolabehere "would not classify [CD23] as a Latino opportunity district." Tr. 1067:19-25. And he is not alone. *See* Trial Tr. 726:11-14 (Mr. Korbel concluding CD23 in C235 not a performing district for Hispanic voters); *id.* 850:14-25 (Dr. Flores, same); *see also* Plan C185 Order, Dkt. No. 1390 at 25 (Dr. Alford's "conclusions are outweighed by the numerous expert opinions offered by Plaintiffs that CD23 as configured in Plan C185 does not provide real electoral opportunity").

Indeed, Defendants do not—and cannot—disagree with the numbers. Defendants' expert confirms that CD23 is a district that (a) is designed to tilt in favor of Anglo-preferred candidates, *see* Trial Tr. 1389:12-13, 1402:13-14, 14:30:12-14; (b) will more often than not elect the Anglo-preferred candidate in endogenous elections, *id.* 1430:15-18; (c) favors the Anglo-preferred candidate in 88% of exogenous elections, DX 878 (Alford 2017 Report) at 20; *see also* Trial Tr. 1431:22-25; and (d) could have been drawn to perform more reliably for Latino-preferred candidates without compromising performance of any other Latino-majority districts, Trial Tr. 1430:19-1431:5. Defendants merely disagree on the legal inference to draw from these undisputed facts, asserting that *any* opportunity to elect, albeit remote or statistically unlikely, is good enough to satisfy the State's VRA obligation.

Defendants are mistaken. CD23 is decidedly stacked against Latino-preferred candidates, and neither the modest increase in HCVAP nor the lone victory for Latinos in 2012[16] transforms the district into one that provides "real electoral opportunity" for Latinos.

### B.    CD23 Was Designed to Perform Poorly for Latino-Preferred Candidates

Dr. Ansolabehere's analysis further shed light on the motivation of the mapdrawers in drawing CD23. Mapdrawers knew that the increase in HCVAP was unaccompanied by a similar increase in SSVRs, "and that was an indication that maybe the areas being moved in . . . were not going to perform to the level that they needed to in terms of participation levels" to establish a real electoral opportunity for Latino-preferred candidates. Trial Tr. 1061:20-23; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997) ("[T]he impact of the official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions.").

Moreover, at the time CD23 was drawn, the only election data available was from 2010. Both the 2010 congressional election and the 2010 gubernatorial election reflect the same pattern: while mapdrawers brought into CD23 VTDs in which Latino-preferred candidates won by over 5,000 votes, they kept in the district VTDs in which Latino-preferred candidates lost by nearly 13,000 votes (in the congressional election) and nearly 16,000 (in the gubernatorial election). *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report), tbl. 4. Thus the areas brought in were not sufficiently supportive of Latino-preferred candidates to overcome the deficit the candidates faced in the areas kept in the district. Any gains for Latino candidates of choice over the predecessor (legally invalid) version of CD23 are thus marginal at best and illusory at worst.

---

[16] While Dr. Alford places great emphasis on primaries in coalition districts, he notably overlooked entirely the primaries in CD23 which reveal that the only time a Latino-preferred candidate won a CD23 general election was when he was preferred by Anglos—and *not* preferred by Latinos—in the primary. *See* NAACP Ex. 27; Trial Tr. 1437:12-22.

The election data available to the mapdrawers made clear that, even with the addition of eligible Latino voters, Latino-preferred candidates would not fare well in CD23.

Dr. Alford conceded at trial that CD23 could have been drawn to perform more reliably for Latino-preferred candidates, but was not. *See* Trial Tr. 1430:19-1431:5. This begs the question: *Why not?* The mapdrawers' grudging addition of eligible Latino voters to CD23 was by no account a full-throated effort to transform a non-performing district into a performing district. Instead, it reflects the State's consistent effort to limit Latino opportunity in CD23 to the bare minimum by strategically shuffling in and out Latino voters to ensure the net effect would be a district that Anglo-preferred candidates will capture more often than not. The mapdrawers had the means and information to effectuate real change in CD23 under Plan C235, and their failure to do so speaks volumes.

### C.    CD23's "Competitiveness" Only Underscores Plan C235's Disparate Treatment of Minorities

Defendants' expert extols CD23 as a "highly competitive district," DX 878 (Alford 2017 Report) at 16, "that can elect either a Democrat or a Republican," Trial Tr. 1402:19-20, and that, consequently, has "produced some pretty terrific members of Congress," *id.* 1402:23-24. But Defendants' endorsement of CD23 as "competitive" rings hollow where only Latinos are selected to bear the alleged benefits—and obvious burdens—of a competitive district.

To be clear, there is no dispute that in referring to CD23 as "competitive," Dr. Alford means that this purported "Latino opportunity district" has (once) elected a Latino-preferred candidate and (twice) elected the Anglo-preferred candidate. *See* Trial Tr. 1427:16-25.[17] And while Dr. Alford appears to believe that such "competitiveness" is a virtue, *see id.* 1402:24-1403:1 ("We might be better off if we tried to create a few more districts like that."), the State of

---

[17] The Rodriguez Plaintiffs do not concede that CD23 is "competitive" in a more general sense. Indeed, it is hard to imagine anyone would consider a match-up "competitive' where one team has an 88% chance of winning.

Texas does not seem to share this view. *See* Trial Tr. 1428:12-15 ("Dr. Alford has "seen no evidence that the state of Texas has some policy preference favoring such highly competitive congressional districts"). On the contrary, CD23 is "the only competitive district . . . in Texas." *Id.* 1402:16-18; *see also id.* 1428:16-23 (Dr. Alford is not aware of "a single other congressional district in Plan C235 that has elected both a Democrat and a Republican in endogenous elections.").[18]

As a result, while one of eight Latino-majority districts (12.5%) has elected the Anglo-preferred candidate in two out of three endogenous elections, each and every one of the state's 24 Anglo-majority districts "has consistently and uniformly elected the Anglo-preferred candidate under Plan C235." Trial Tr. 1429:2-12. Thus, while Anglo-majority seats are safe for Anglo voters across the state, Latinos in CD23 are not afforded the same luxury. *See* Plan C185 Order, Dkt. No. 1390 at 139-40 ("minority voters are treated quite differently. . ., present[ing] a differential opportunity to elect"). Until Texas extends the same "privilege" of competitive elections to its Anglo voters, the creation of CD23 as a "highly competitive" district only exemplifies the extent to which Texas is willing to marginalize Latino electoral opportunity.

### D.    Plan C286 Demonstrates How to Transform CD23 Into an Effective Latino Opportunity District

The Rodriguez Plaintiffs' Demonstrative Plan C286, as explained earlier, shows how undoing the separation of Nueces County from the rest of the South/West Texas region allows CD23 to be configured as a true Latino-opportunity district. According to Dr. Alford's analysis, under Demonstrative Plan C286, Latino-preferred candidates prevail in 15 out of 25 (60%) statewide elections in CD23, *see* Alford 2017 Report at 20, far from "a guarantee of success,"

---

[18] The official election results on the Secretary of State's website confirm there is no other such district in Plan C235. *See* http://elections.sos.state.tx.us/elchist164_state.htm (2012); http://elections.sos.state.tx.us/elchist175_state.htm (2014); and http://elections.sos.state.tx.us/elchist319_state.htm (2016).

Plan C185 Order, Dkt. No. 1390 at 16, but indisputably providing a "real electoral opportunity" for Latino-preferred candidates, *id.* at 18.

For CD23, the specific impact of the ripple effect of including most of Nueces County in a southern orientation occurs in southern Bexar County. The primary mechanism used by Dr. Ansolabehere was to undo some of the splits in the area and also to shift the district into higher Latino voter turnout areas in the western part of the county. Trial Tr. 1090:24-1091:5. With the additional population from Bexar County, CD23 "can be reconfigured to increase the turnout and Hispanic CVAP of the district" and, thus, improve the opportunity of Latinos to elect their preferred candidate. Rod. P. Ex. 955 ¶¶ 123, 124. Plan C286's CD23 has an HCVAP of 65.5%, *id.* tbl. 15, and, using a statewide average for elections in the 2010-2016 period, performs at 54% for Latino voters, *id.* tbl. 16. Dr. Ansolabehere considers it to be a Latino opportunity district, Trial Tr. 1090:14-17, and Dr. Alford agrees, *id.* 1439:25-1440:2.

*        *        *

In sum, like its predecessor district in Plan C185, CD23 under Plan C235 is not a district in which Latinos have a reasonable opportunity to elect their candidates of choice, and thus, like its predecessor district, CD23 violates the § 2 results test.[19] As a result, under Plan C235, South/West Texas still contains only six Latino-opportunity districts. *See* Plan C185 Order, Dkt. No. 1390 at 45-46 ("Plaintiffs have shown, and mapdrawers were aware, that seven Latino opportunity districts could be drawn in South/West Texas without including Travis County."). The evidence available to mapdrawers, moreover, indicates that CD23's failure to provide a

---

[19] This Court has already found that "there is racially polarized voting in Texas" and that "the State conceded this point with regard to all areas included in CD23 [under Plan C185]." Plan C185 Order, Dkt. No. 1390 at 25. Dr. Ansolabehere's analysis confirms as much for the areas included in CD23 under Plan C235. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶¶ 36-38. Moreover, this Court's findings regarding "the lingering effects of past discrimination on Latino voter turnout and electoral opportunity," *see* Plan C185 Order, Dkt. No. 1390 at 25-28, remain in effect for purposes of the Court's § 2 evaluation of Plan C235.

meaningful opportunity to Latino voters was not an oversight, but instead a deliberate, well-calibrated decision.

## IV.    PLAN C235 INTENTIONALLY DISCRIMINATES AGAINST MINORITIES IN THE DALLAS-FORT WORTH AREA

Earlier this year, the Court found that, in Plan C185, the State of Texas "intentionally diluted minority voting strength" in the Dallas-Fort Worth area ("DFW") "in order to gain partisan advantage."  Plan C185 Order, Dkt. No. 1390 at 125.  At trial, Plaintiffs demonstrated that Plan C235 perpetuates the cracking of DFW minority population centers—and the intentional avoidance of an additional minority-opportunity district—bearing many of the same hallmarks of intentional discrimination as its predecessor plan.  Plaintiffs further demonstrated that the additional coalition district Texas so deftly avoided creating in Plan C235 satisfies the first *Gingles* precondition and, together with a cohesive minority population and an undisputed track record of racially polarized voting, establishes a violation of the § 2 "results" test in DFW.

### A.    Plan C235 Continues to Crack Minority Population Centers

Plan C235 introduces a newly configured CD33, which has a combined African-American and Latino citizen voting age population of 66.4% and has consistently elected the minority-preferred candidate. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶ 113.  But the advent of CD33 hardly cures—and in fact exacerbates—the fragmenting of minority populations in the region.  As Dr. Ansolabehere testified, CD33 straddles Dallas and Tarrant Counties, and along with other district lines in the region, divides multiple majority-minority cities and neighborhoods along the way.

Dr. Ansolabehere described how CD33 splits the majority-minority city of Irving in half, stranding more than half of the city's minority voters in majority-Anglo CD24 in which African-American and Latino voters decidedly do not have the opportunity to elect their candidates of

choice. *See* Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶¶ 71-76. Similarly, the majority-

minority city of Grand Prairie is divided among three districts, leaving 21% of its minority

population in a majority-Anglo district. *Id.* ¶¶ 77-83. Dividing these two Dallas County cities,

which together have enough population to comprise half of one congressional district, splits a

high concentration of African Americans and Latinos and ensures that 35% of the cities'

combined minority population is carved into districts in which minorities will have no

opportunity to elect their preferred candidates. *Id.* ¶ 84.

      The fragmentation of minority populations in Tarrant County is even more glaring.

Dr. Ansolabehere testified that, although 42% of the County's population is African-American or

Latino,[20] the vast majority of the minority population is drawn into majority-Anglo districts. *Id.*

¶ 85. By contrast, only 5% of Tarrant County Anglos are placed in the new minority opportunity

district, leaving 95% of Anglos in districts in which they can continue to elect their preferred

candidates. *Id.*

      This feat of cartography was accomplished through (1) the careful dissection of the city

of Arlington, a city in which African Americans and Latinos together form a plurality, such that

three times as many African-American residents end up in a majority-Anglo congressional

district as end up in majority-minority CD33, *id.* ¶¶ 86-92; (2) the carving up of the majority-

minority city of Fort Worth among five congressional districts, only one of which provides

minority voters an opportunity to elect their preferred candidates, *id.* ¶¶ 93-96; and (3) the

exclusion from CD33 of predominantly minority neighborhoods in Fort Worth to ensure that

these high concentrations of minority voters are placed in majority-Anglo districts, *id.* ¶¶ 97-105.

---

[20] This number is drawn from the 2010 Census data. Based on the 2011-2015 American Community Survey ("ACS") data, the minority population of Tarrant County is 50.1%, and thus Tarrant County is now a majority-minority county.

The shape of CD33 makes plain just how assiduously the State had to work to avoid providing an additional minority opportunity district in the region. Dr. Ansolabehere demonstrated that CD33 is highly non-compact, due in part to the awkward cut to exclude the majority-minority neighborhood of Meadowbrook and the tentacle extending into the eastern part of Arlington. *Id.* ¶ 112. Thus, CD33 in this "compromise" map draws in just enough minorities from across Dallas and Tarrant Counties to create a new opportunity district, but carefully (and awkwardly) avoids creating "too much" electoral opportunity for minorities in the region. Consistent with Texas's approach from the beginning, there is a ceiling on how much minority opportunity Texas will tolerate. *See, e.g.*, Plan C185 Order, Dkt. No. 1390 at 77 ("[M]apdrawers were hostile to the creation or existence of minority coalition districts because they viewed them as Democrat districts.").

In short, the creation of a new minority opportunity district in CD33 hardly cures the fragmentation of minority populations in DFW and required careful manipulation of district lines to ensure that a substantial portion of the region's minority population remains stranded in majority-Anglo districts.[21]

## B.    Plan C235 Maximizes Anglo Representation While Minimizing Minority Representation in Dallas and Tarrant Counties

Dr. Ansolabehere demonstrated that the cracking of minority populations throughout Dallas and Tarrant Counties perpetuates the disparate impact on minorities that this Court found indicative of discriminatory intent in Plan C185. *See* Plan C185 Order, Dkt. No. 1390 at 135-37.

---

[21] To be clear, the Rodriguez Plaintiffs are not challenging CD33 as a stand-alone violation of the Constitution or the Voting Rights Act. Rather, the configuration of CD33 demonstrates the tortured lines the State had to draw in order to avoid creating an additional opportunity district for minorities in Texas, an opportunity district that would have naturally emerged from minority population growth and traditional districting principles. CD33 is not a fix for the cracking and packing this Court found in DFW under Plan C185, nor does it effectively mask the hallmarks of intentional discrimination that persist in DFW under Plan C235. On the contrary, CD33 only highlights and perpetuates the State's consistent approach of cracking minority populations in DFW to avoid what would otherwise be inevitable: increased electoral opportunities for minority voters.

Fifty-four percent of the population of Dallas and Tarrant Counties, together, are African American or Latino. Yet out of the seven districts that draw population from these counties, only two (CDs 30 and 33) are contained entirely within the counties and provide minorities an opportunity to elect their preferred candidates. The other five districts take population from these counties and join them with outlying counties to maroon Dallas and Tarrant County minorities in majority-Anglo districts. Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶ 116. Thus, although Anglos comprise only 46% of these counties' population, they are a majority in 71% of the congressional districts in the region. *See* Plan C185 Order, Dkt. No. 1390 at 136 ("Thus, the minority group has a majority of seats.").

Dr. Ansolabehere testified that the effect of the division of Dallas and Tarrant Counties is to concentrate Anglo voters in majority-Anglo districts and split African-American and Latino voters between majority-Anglo and majority-minority districts. As a result, 93% of Anglos in Dallas and Tarrant Counties live in districts in which their race is a majority, compared to 59% of African Americans and Hispanics. Rod. P. Ex. 955 (Ansolabehere 2017 Report) ¶ 117.

Indeed, the extent to which minority voters are treated differently than Anglo voters statewide remains stark in Plan C235. In Plan C235, 87% of Anglos reside in majority-Anglo districts, compared to only 53% of African Americans and Latinos. *See* Joint Ex. 100.2 (Red-100, Plan C235); *compare* Plan C185 Order, Dkt. No. 1390 at 139.[22] Thus, even if CD23 were considered a Latino-opportunity district, "White non-Hispanics, who are 45% of the total population, have opportunities to win [66%] of seats, while African-Americans and Hispanics, who are 48% of the State's population," have opportunities to win 33% of seats. *Id.* When accounting for the fact that CD23 is *not* a Latino opportunity district, *see, supra* Section III, the

---

[22] These percentages are based solely on population measures, and thus CD23 is included among the districts in which African Americans or Latinos comprise a majority of the citizen voting age population even though Plaintiffs contend that CD23 is not a Latino opportunity district, *see supra* Section III.

numbers are even bleaker: Anglos have opportunities to win 69% of seats and African

Americans and Latinos have opportunities to win only 31% of seats. *See* Joint Ex. 100.2 (Red-

100, Plan C235).

Thus, the impact of Plan C235 in the Dallas-Fort Worth area undeniably "bears more

heavily" on minority voters than on Anglos. *Vill. of Arlington Heights v. Metro. Hous. Dev.*

*Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).[23]

### C.    Plan C286 Shows that Fixing the Cracking of Majority-Minority Cities Yields an Additional Minority Opportunity District

The Rodriguez Plaintiffs' Demonstrative Plan C286 demonstrates that eliminating the

divisions of significant minority populations by adhering to municipal boundaries and

compactness principles naturally creates an additional opportunity district for African Americans

and Latinos to elect their preferred candidates.[24]  Dr. Ansolabehere testified to his process in

creating Demonstrative Plan C286 and explained that, by making the cities of Irving and Grand

Prairie whole in Dallas County, and moving CD33 into Tarrant County, a new congressional

district (Demonstration CD24) emerges without compromising the existing minority opportunity

districts in the area.  Rod. P. Ex. 955 ¶¶ 126-37.  By simply adhering to traditional districting

---

[23] While the Rodriguez Plaintiffs' analysis and expert focus primarily on the impact of Plan C235 on Texas's minority population, the evidence at trial presented by other Plaintiffs' groups demonstrated that Plan C235 bears several of the other hallmarks of intentional discrimination identified in *Arlington Heights*. *See, e.g.,* Trial Tr. 924:5-19, 937:5-938:8 (Dr. Lichtman, addressing factors indicating intentional discrimination, particularly in DFW area; *id.* 735:2-25; 736:6-9 (Mr. Korbel, addressing demonstration map that undoes cracking and packing in DFW area. Indeed, this Court has already recognized Texas's "long history of discrimination with regard to voting and in general," Plan C185 Order, Dkt. No. 1390 at 140, as well as the State's "most restrictive positions on the VRA" despite the weight of Fifth Circuit authority and the advice of TLC lawyers, *id.* at 125 & n.107, and its intentional refusal to recognize naturally-occurring minority coalition districts in DFW, *id.*at 77, 127 ("One way to solve this problem was to pack and crack minority voters.").  Moreover, "the 'same Legislature that passed [Plan C235] also passed two laws found to be passed with discriminatory purpose,'" Plan C185, Dkt. No. 1390 at 138 n.128 (quoting *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016)), *cert. denied*, 137 S. Ct. 612 (2017), namely Plan C185 and Texas's voter identification law, *see Veasey v. Abbott*, __ F. Supp. 3d __, No. 2:13-CV-193, 2017 WL 1315593 (S.D. Tex. Apr. 10, 2017).

[24] Demonstrative Plan C285, advanced by the LULAC Plaintiffs, contains a similar demonstration.

principles, Demonstrative Plan C286 lays bare the contortions Plan C235 had to undertake to
avoid creating an additional opportunity district in the area.[25]

## V.    PLAINTIFFS HAVE ESTABLISHED A § 2 "RESULTS" VIOLATION IN DALLAS-FORT WORTH

Demonstrative Plan C286 shows that eliminating the cracking of minority populations in
DFW yields an additional minority opportunity district (Demonstration CD24) that naturally
captures minority population growth in the area.  Thus the Court need not reach the § 2 analysis
in DFW if it finds that the State intentionally avoided creating an additional majority-minority
district by cracking minority populations in violation of traditional districting criteria.

But even if the Court were to find no intentional discrimination against minority voters in
DFW, § 2 of the VRA mandates the creation of an additional coalition district in the region.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts
with social and historical conditions to cause an inequality in the opportunities enjoyed by
[minority] and white voters to elect their preferred representatives."  *Thornburg v. Gingles*, 478
U.S. 30, 47 (1986).  In *Gingles*, the Supreme Court established the well-known framework
governing § 2 claims.  To establish a § 2 claim, a plaintiff must satisfy three "necessary
preconditions": (1) the minority group must be "sufficiently large and geographically compact to
constitute a majority in a single-member district," (2) the minority group must be "politically
cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat
the minority's preferred candidate."  478 U.S. at 50-51.  A plaintiff who establishes these
preconditions has very likely established a violation of § 2.  "[I]t will be only the very unusual
case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have

---

[25] Notably, Defendants have offered no expert analysis to rebut Dr. Ansolabehere on the issues of cracking and
failure to adhere to traditional districting principles in DFW. *See, e.g.*, Trial Tr. 1442:19-1443:1 (Dr. Alford offers
no "analysis of the issues of cracking or intentional discrimination" in DFW).

failed to establish a violation of § 2." *NAACP v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1019 n.21 (2d Cir. 1995).

A.    **The Minority Population in DFW Is Sufficiently Large and Geographically Compact to Allow for the Creation of at Least One Additional Coalition District (*Gingles* 1)**

This Court has made clear that "§ 2 can require the creation of minority coalition districts." Order on Plan H283, Dkt. No. 1365 at 8; *see also* Plan C185 Order, Dkt. No. 1390 at 78. Thus, to establish the first *Gingles* precondition, Plaintiffs must show that together the African-American and Latino population of the DFW area is "sufficiently large and geographically compact to constitute a[n additional] majority in a single-member district." *Gingles*, 478 U.S. at 50.

It cannot be disputed that both Demonstration CD24 and Demonstration CD33 in Plan C286 satisfy the numerosity requirement of *Gingles* 1. The stipulated data make plain that the combined African-American and Latino CVAP of Demonstration CD24 is 54.8%, while the combined African-American and Latino CVAP of Demonstration CD33 is 54.6%. *See* Joint Ex. 105.3 (Red-116, Plan C286); *see also* Rod. P. Ex. 955 (Ansolabehere 2017 Report), tbl. 15.

Dr. Ansolabehere explained how he created these districts primarily to adhere to county, city, and neighborhood boundaries. Demonstration CD24 unifies the cities of Irving and Grand Prairie and connects them with the west side of the city of Dallas to create a coalition district based almost entirely within Dallas County.[26] *See, e.g.*, Trial Tr. 1101:22-1102:6. Demonstration CD33 is moved entirely into Tarrant County, eliminating the county boundary crossing. Trial Tr. 1103:13-25. It closely follows the municipal border of Fort Worth on the eastern side of the city, reducing the number of times that the city border is crossed by the

---

[26] The City of Grand Prairie itself crosses the Dallas-Tarrant County boundary, and two Grand Prairie VTDs are included in Demonstration CD33 for purposes of equalizing population.

district boundary. *Id.* This configuration eliminates the splitting of Fort Worth in the predominantly-minority neighborhoods extending from Meadowbrook to far east Fort Worth, eliminates the splitting of the Fort Worth city border on the eastern side of Tarrant County, and incorporates the historically African-American neighborhood of Como in Demonstration CD33. Trial Tr. 1104:18-1105:17.

Dr. Ansolabehere was careful to point out that his demonstration map in the DFW area was not originally constructed as part of a *Gingles* analysis. Trial Tr. 1106:1-11. Rather, it was an effort to undo the pattern of cracking of minority communities across counties, cities, and neighborhoods, and to demonstrate what a map honoring traditional districting principles such as respect for city and county boundaries, as well as significant minority communities, would look like. Trial Tr. 1106:18-25, 1107:10-13.

As a result of these changes, both of the DFW coalition districts in Demonstrative Plan C286 are more compact than the current CD33. Under Plan C235, CD33 has a Reock score of .23 and a Polsby-Popper score of .05. *See* Rod. P. Ex. 955, tbl. 14. Demonstration CD33, by contrast, is at least 50% more compact, with a Reock score of .35 and a Polsby-Popper score of .11. *Id.* Demonstration CD24, meanwhile, has a Reock score of .34 and a Polsby-Popper score of .18. Based on the Reock measure, both of these coalition districts are as, or more, compact than 17 of the congressional districts under Plan C235. *See id.*[27]

---

[27] In finding that Plaintiffs had failed to establish the first *Gingles* precondition in DFW with respect to Plan C185, the Court specifically pointed to the "low compactness" of the coalition district proposed in Plan C121. *See* Plan C185 Order, Dkt. No. 1390 at 81 ("CD34 has an area rubber band score of .331 and a perimeter-to-area score of .043, both of which reflect low compactness."). By contrast, the proposed coalition districts in Plan C286 are remarkably more compact. Demonstrative CD24 under Plan C286 has a rubber band score of .586 and a perimeter-to-area score of .113, and thus is 77% higher than the C121 district on the rubber band metric and 163% higher on the perimeter-to-area metric. Demonstrative CD33 under Plan C286 has a rubber band score of .728 and a perimeter-to-area score of .175, and thus is 120% higher than the C121 district on the rubber band metric and 307% higher on the perimeter-to-area metric. *See* Joint Ex. 105.10 (Red-315, Plan C286).

Avoiding an abundance of precinct, or VTD, splits is also a traditional districting principle. As Dr. Ansolabehere explained in his testimony, comparing VTD splits between one map and another is a somewhat complicated, apples-to-oranges task. Trial Tr. 1121:14-1122:17. Nonetheless, his assessment was that his Plan C286 splits far fewer VTDs than Plan C235 did. *Id*. (estimating 68 in Plan C286, compared to about 500 in Plan C235).

Demonstrative Plan C286's adherence to traditional districting principles thus not only exemplifies the lengths to which the State had to go to avoid drawing an additional coalition district in DFW, it also establishes the first prong of *Gingles*.

### B.    African Americans and Latinos in DFW Are Politically Cohesive and the DFW Region Is Characterized by Racially Polarized Voting (*Gingles* 2 and 3)

There is no dispute that "a significant number" of African Americans and Latinos in DFW prefer the same candidates in general elections. *Gingles*, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2."); *see* Rod. P. Ex. 955 (Ansolabehere 2017 Report), tbl. 9; *see also* Trial Tr. 1448: 21-24 (Dr. Alford agrees that "blacks and Latinos in CD33 have voted cohesively for the same candidates in all the general elections held under Plan C235"). It is further undisputed that the vast majority of Anglo voters in DFW vote against minority-preferred candidates in DFW. *See, e.g.*, Rod. P. Ex. 955 (Ansolabehere 2017 Report), tbl. 9; *see also* Plan C185 Order, Dkt. No. 1390 at 120 ("It is undisputed in this case that voting in Texas is strongly racially polarized."); *id.* at 145 n.133 ("Defendants conceded the existence of racially polarized voting in DFW.").

The State's only response is that Plaintiffs cannot establish *Gingles* 2 cohesiveness unless they can show that African Americans and Latinos vote cohesively in Democratic primaries.

According to Defendant's expert, minority cohesion in Democratic primaries is an implied threshold requirement to establishing the second *Gingles* precondition because it helps determine whether voting preferences are driven by partisanship instead of race. *See* Trial Tr. 1357:7-18, 1444:6-12. Just as that baseless argument was rejected by the D.C. District Court in its § 5 evaluation of Plan C185, *see Texas v. United States*, 8867 F. Supp.2d 133, 174 (D.D.C. 2012), *vacated on separate grounds and remanded*, 133 S. Ct. 2885 (2013) ("[T]here is little support for Texas's focus on primary elections."), it should be rejected here.

### 1.    Causation is Irrelevant to the *Gingles* Inquiry

The second *Gingles* precondition asks simply whether minority voters are "politically cohesive," *see Gingles*, 478 U.S. at 56 (purpose of second *Gingles* precondition is "to ascertain whether minority group members constitute a politically cohesive unit"), and is established by a showing that "a significant number of minority group members usually vote for the same candidates," *id.* Thus, on its face, the second *Gingles* precondition is satisfied when minorities turn out in "significant number[s]" to form political alliances with one another, as undisputedly occurs between African Americans and Latinos in DFW.

Notably, *Gingles* adds no requirement for § 2 plaintiffs to demonstrate that minority groups are "racially cohesive," or that the basis of their political cohesion is race. On the contrary, *Gingles* specifically rejected the contention that § 2 plaintiffs must establish that "the term 'racially polarized voting' must, as a matter of law, refer to voting patterns for which the *principal cause* is race" or that "race was the primary determinant of voters' choices." *Id.* at 61. Indeed, an entire subsection of the plurality opinion is entitled (in bold and italics) "***Causation Irrelevant to Section 2 Inquiry.***" *Id.* at 63. The *Gingles* inquiry is thus purposefully narrow and quantitative:

> For purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates.

*Id.* at 62. Actual voting patterns, not hypothetical explanations, are what matters to the *Gingles* inquiry.[28]

Defendants' expert apparently disagrees with the Supreme Court in this regard. *See* Trial Tr. 1444:6-12 (Dr. Alford believes it is important to analyze primaries in the *Gingles* 2 analysis "so you can tell whether minorities are voting for racial reasons or for partisan reasons"); *id.* 1463:7-8 (Dr. Alford: "I believe they're coming back together [in general elections] because of partisanship."). But both the plurality opinion in *Gingles* and Dr. Alford's trial testimony demonstrate why this effort to ascertain the motivation behind racial voting patterns is unhelpful and antithetical to the goals of the Voting Rights Act.

First, the Supreme Court "reject[ed] . . . the argument that racially polarized voting refers to voting patterns that are in some way *caused by race*, rather than to voting patterns that are merely *correlated with the race of the voter*" because "the reasons [minority] and white voters vote differently have no relevance to the central inquiry of § 2." *Gingles*, 478 U.S. at 63 (emphasis in original).

> Both § 2 itself and the Senate Report make clear that the critical question in a § 2 claim is whether the use of a contested electoral practice or structure results in members of a protected group

---

[28] Four justices signed onto this Section of the *Gingles* plurality opinion, but Justice O'Connor's concurring opinion (joined by three other justices) is largely in agreement. Justice O'Connor's concurring opinion specifically concludes: "Insofar as statistical evidence of divergent racial patterns is admitted solely to establish that the minority group is politically cohesive and to assess its prospects for electoral success, I agree that defendants cannot rebut this showing by offering evidence that the divergent racial voting patterns [or, by extension, the concurrent racial voting patterns between different racial groups] may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters [or, by extension, an underlying convergence of interests of African-American and Latino voters]." *Id.* at 100 (O'Connor, J., concurring). Justice O'Connor simply left open the possibility that a state may prove that "another [minority-preferred] candidate, equally preferred by the minority group, might be able to attract greater white support in future elections" for purposes of assessing the third *Gingles* precondition. *Id.*

> having less opportunity than other members of the electorate to
> participate in the political process and to elect representatives of
> their choice. . . . It is the *difference* between the choices made by
> [minorities] and whites—not the reasons for that difference—that
> results in [minorities] having less opportunity than whites to elect
> their preferred representatives. Consequently, we conclude that
> under the "results test" of § 2, only the correlation between race of
> voter and selection of certain candidates, not the causes of the
> correlation, matters.

*Id.* (emphasis in original). By the same token, contrary to Dr. Alford's position, the reasons why

African Americans and Latinos vote together to "elect" their preferred candidates (and the

candidates *not* preferred by Anglos)—whether they include partisan affiliation, race, or some

other characteristic—are irrelevant to the *Gingles* inquiry.

       Second, as Dr. Alford acknowledged, the allegedly "non-racial" reasons why African

Americans and Latinos vote cohesively in general elections may themselves be caused by race.

Dr. Alford agreed that "a person's decision to choose a certain political affiliation" could "be

motivated by his or race," and that, in fact, a person may "choose a political party that he

believes to endorse policies more favorable to members of his racial group." Trial Tr. 1444:22-

1445:5; *see also Gingles*, 478 U.S. at 64 ("Appellants' definition of racially polarized voting is

even more pernicious where shared characteristics are causally related to race or ethnicity.").

Thus, Defendants' notion that cohesion between African Americans and Latinos in general

elections does not "count" because it's based on party affiliation ignores the fact that African

Americans and Latinos in Texas are not *born* Democrats (just as Anglos in Texas are not born

Republicans). Rather, minority voters in Texas likely choose the political party that they perceive

to endorse policies more favorable to minorities (including, for instance, policies regarding

immigration, equal opportunity, and education). *See Rodriguez v. Harris Cty., Tex.*, 964 F. Supp.

2d 686, 754 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cty., Tex.*, 601 Fed. App'x 255

(5th Cir. 2015). By dismissing and discounting the clear preferences of minority voters as

-33-

"partisan," the State sweeps under the rug the fact that the selection of which primary to vote in is itself indicative that African Americans and Latinos in DFW are politically cohesive. *See* Trial Tr. 1737:1-9 (Mr. Hicks: noting that "it is undisputed" that African Americans and Latinos in Texas "overwhelmingly . . . vote in the Democratic primary" and that "Whites overwhelmingly vote in the Republican primary": "That is the key piece of cohesion that has anything to do with primaries.").[29]

Third, requiring § 2 plaintiffs to establish, as an implicit precondition, that minorities vote cohesively *because of race* (or, similarly, that Anglos vote against minority-preferred candidate because of race), would smuggle racial intent back into the § 2 analysis—precisely what both Congress and the Supreme rejected. *See Gingles*, 478 U.S. at 71 ("To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of *Mobile v. Bolden*, 446 U.S. 555 (1980), and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim."). Forcing § 2 plaintiffs to "prove that a *specific factor*"—racial cohesion or racial animosity—determined the voting preference for the different racial groups would necessarily require them "to demonstrate that other potentially relevant *causal factors*," such as socioeconomic characteristics or partisan affiliation, do not correlate better with voting preferences. *Id.* at 72. Both Congress and the Supreme Court refused to foist this "'inordinately difficult burden' on § 2 plaintiffs." *Id.* (quoting S. Rep. No. 97-417, at 36 (1982), *as reprinted in*

---

[29] Dr. Alford's decision to exclude general elections from his analysis "political cohesion," moreover, assumes that African American and Latino cohesion in general elections is "partisan," even though he admitted at trial that African Americans and Latinos may choose to vote for the same candidates in general elections because of the candidates' proximity to minority neighborhoods or their shared socioeconomic background, *see* Trial Tr. 1450:22-1451:4, characteristics that are also "often influenced by the presence or absence of racial or ethnic discrimination," *Gingles*, 478 U.S. at 64. Dr. Alford provided no data or analysis to substantively support his views about partisanship supposedly trumping race. His opinion is bare-bones, resting on little more than surmise.

1982 U.S.C.C.A.N. 177, 214). In short, "[a]ll that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations." *Id.* at 73.

Ultimately, even Dr. Alford admitted at trial that "one way for minorities to show that they are politically cohesive is to coalesce around a major political party." Trial Tr. at 1443:6-12. He could hardly contend otherwise in light of the plain meaning of "political cohesion" and the Supreme Court's guidance. Indeed, Dr. Alford's professed preference for primaries attempts to strip "politics" from the analysis of "political cohesion." Accepting it as part of plaintiffs' *Gingles* burden in challenges to election systems for partisan office would effectively empty § 2 of meaning and force. In the end, Dr. Alford testified, "*I don't think we have any disagreement about the fact that the two groups vote cohesively*. We have a disagreement about the cause, but we don't disagree about the facts." *Id.* at 1487:22-25 (emphasis added). This statement is telling. It concedes cohesion between African Americans and Latinos in DFW, and quibbles (without supportive data) about the cause of that cohesion. The cause of minority voting preferences, however, is simply not relevant to the *Gingles* analysis.

### 2. Courts Routinely Use General Election Data to Determine Political Cohesion for Purposes of the *Gingles* Analysis

Dr. Alford concludes, without any analysis of general elections whatsoever, that African Americans and Latinos are not cohesive in the DFW area, and consequently that CD33 is not a "coalition district." Trial Tr. 1448: 10-24. Thus, according to Defendants, minority cohesion in the Democratic primary is an implicit threshold requirement to establishing the second *Gingles* precondition. But courts across the country, including in the Fifth Circuit, have consistently relied upon general election data in evaluating political cohesion among minorities.[30]

---

[30] Even though Dr. Alford draws his conclusions in DFW based solely on primaries, he agreed "that general election data can be useful" to the *Gingles* 2 analysis and that "it makes sense to evaluate general elections as well." Trial Tr. 1446:3-13.

Indeed, the Fourth Circuit has extolled the virtues of using general election data to determine minority voter cohesion. In *Lewis v. Alamance Cty., N.C.*, 99 F.3d 600, 614–16 (4th Cir. 1996), *cert. denied*, 520 U.S. 1229 (1997), the court rejected out of hand the local government's argument that Democrats who received nearly all of the African-American vote in general elections should not be deemed minority-preferred candidates: "We reject the proposition that success of a minority-preferred candidate in a general election is entitled to less weight when a candidate with far greater minority support was defeated in the primary." *Id.* at 615 (internal quotation marks and citation omitted). The Fourth Circuit held not only that exclusion of general election data was contrary to the plain language of the Voting Rights Act, but also that "[s]uch a view is grounded in the belief that minority voters essentially take their marbles and go home whenever the candidate whom they prefer most in the primary does not prevail, a belief about minority voters that we do not share." *Id.* The court concluded that exclusion of general election data

> ignores altogether the possibility that primary election winners will become the minority's preferred candidate during the general election campaign, or that where, as here, the overwhelming majority of blacks vote in the Democratic primary, that a Republican could in fact become the black-preferred candidate in the general election by addressing himself to issues of interest to the minority community in a way that appeals to them as participants in the political process.

*Id.*; *see also id.* ("[C]andidates who receive 99+% of the black vote in general elections are the black-preferred candidate *in that election*, regardless of their level of support in the primary.").

The Fifth Circuit has consistently relied upon general election data to determine cohesiveness among different minority groups for purposes of the *Gingles* analysis. *See* Order on Plan H283, Dkt. No. 1365 at 15 ("As the Fifth Circuit has stated, 'We are a strict *stare decisis* court.'") (quoting *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 782 (5th Cir. 2012)). For

instance, in *LULAC, Council No. 4434 v. Clements*, the Fifth Circuit held that African-American and Latino voters were cohesive in Tarrant County where "[t]he undisputed facts . . . are that a majority of Hispanic voters always supported the same candidate favored by black voters in every general election."  999 F.2d 831, 886 (5th Cir. 1993) (*en banc*), *cert denied*, 510 U.S. 1071 (1994); *see also Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1245–46 (5th Cir. 1988) (using general election data to review cohesion in a coalition district and holding that "if the statistical evidence is that Blacks and Hispanics together vote for the Black or Hispanic candidate, then cohesion is shown") (footnote omitted); *LULAC v. N.E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1082 (W.D. Tex. 1995) ("Dr. Rives admitted that his analysis of the general elections showed, *inter alia*, both that Hispanics and Blacks generally vote together and that they vote differently than Anglo voters in [the North East Independent School District].").

In fact, federal courts routinely consider statistics from general elections to determine existence of cohesive voting blocs among different minority groups.  *See, e.g.*, *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 278 (2d Cir.) (affirming district court's use of general election data to determine cohesive coalition district), *vacated and remanded on other grounds*, 512 U.S. 1283 (1994); *France v. Pataki*, 71 F. Supp. 2d 317, 329 & n.13 (S.D.N.Y. 1999) (reviewing, among other things, "53 general-election contests" to conclude that there was no "coalition building process that involves white, as well as black and Hispanic voters").[31]

---

[31] Federal courts, including the U.S. Supreme Court, have also analyzed general election data to determine the existence of crossover districts between Anglo and minority voters. *See, e.g., Abrams v. Johnson*, 521 U.S. 74, 93 (1997) ("The results of the 1996 general elections tend to support the District Court's earlier finding of a general willingness of white voters to vote for black candidates.  All three black incumbents won elections under the court plan, two in majority-white districts running against white candidates." (internal quotation marks and citation omitted)); *Large v. Fremont Cty., Wyo.*, 709 F. Supp. 2d 1176, 1211–12 (D. Wyo. 2010) (examining general election data to determine if Anglo crossover voting eliminated the possibility of defeating the minority-preferred candidate through white bloc voting).

And federal courts have repeatedly used general election data to determine the existence of voter cohesion within a single minority group. *See, e.g.*, *Gingles*, 478 U.S. at 58 ("The District Court's findings concerning black support for black candidates in the five multimember districts at issue here clearly establish the political cohesiveness of black voters . . . . [I]n the general elections, black support for black Democratic candidates ranged between 87% and 96%."); *Old Person v. Cooney*, 230 F.3d 1113, 1121 (9th Cir. 2000) ("The State's expert . . . presented evidence that showed American Indians were politically cohesive in more than 70% of the general elections, retention elections and ballot issue elections that he examined in the eight House Districts."); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 997 (D.S.D. 2004) ("Dr. Cole analyzed five interracial elections for the state senate: the 1998 general election for Districts 26 and 27, the 1994 general election for District 27, and the 1988 and 1990 general elections for District 28. He found the average estimate of Indian political cohesion in these races to be 83 percent, which is 'highly politically cohesive.'") (citation omitted).

In 2012, a three-judge panel in the D.C. District Court noted that "[m]ost courts to address this issue have expressed no preference about the election level at which voting cohesion must be shown" and "agree[d] with the majority view." *Texas*, 887 F. Supp. 2d at 174.

> [R]equiring cohesion in the primary election distorts the role of the primary. Although minority groups sometimes coalesce around a candidate at that point in time, minority voters, like any other voters, use the primary to help develop their preferences. We refuse to penalize minority voters for acting like other groups in a political party who do not coalesce around a candidate until the race is on for the general election. . . . "Pull, haul, and trade" describes the task of minority and majority voters alike, and candidates may be minority "candidates of choice" even if they do not "represent perfection to every minority voter."

*Id.* at 175 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)).[32]  Like the D.C. Court, this Court should avoid holding minority voters to a different standard.  The State of Texas has effectively diluted the voting strength of (and intentionally targeted) both of these minority groups, and both have joined together to vote for the same candidates in the determinative elections.

At closing argument, the state suggested that the Supreme Court's treatment of then-CD24 in *LULAC v. Perry*, 548 U.S. 399 (2006), establishes the role party primaries play in § 2 analysis under *Gingles*. But *LULAC v. Perry*'s discussion of the CD24 issue involved quite a different situation than the one Plan C235 has now pushed to the fore in the DFW area, and is inapposite. There, the plaintiffs were challenging the *elimination* of a district as a violation of § 2, premising their argument on the assertion that the history of Democratic primary elections for the eliminated district showed it to be a protected minority opportunity district. The Supreme Court *rejected* the primary-based argument. It found that the primaries did *not* indicate that the district was a minority opportunity district, especially given the fact that there had never been a contested Democratic primary in the district for the twenty years it had been in existence. 548 U.S. at 444.

Thus, the weight of authority makes clear that general election data are highly probative of minority voter cohesion.  Accordingly, this Court should reject Texas's invitation to limit its review to primary election data and should instead consider statistics from general elections to determine cohesive voting among different minority groups for purposes of § 2.  As set forth

---

[32] *Johnson v. DeGrandy* includes a discussion of the role of building coalitions of "voters from other racial and ethnic groups" that buttresses the commonly understood principle that general elections are dispositive for § 2 purposes. 512 U.S. at 1020; *see also id.* ("Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.").

above, such an analysis yields one unmistakable conclusion: a "significant number" of African-American and Latino voters in DFW "usually vote for the same candidates" in satisfaction of *Gingles* 2, *Gingles*, 478 U.S. at 56, and together these two minority groups have expressed clear political preferences that are distinct from—and consistently outweighed by—those of Anglo voters.

### 3.    The Specific Circumstances Here Indicate that General Elections Are a Better Metric of Minority Cohesion in DFW

To be sure, this Court need not decide, as a matter of law, whether primaries are dispositive of, or even relevant to the issue of political cohesion or racially polarized voting. Regardless of whether primaries are *ever* relevant to the second *Gingles* precondition, the specific facts and circumstances *here* make clear that primaries in DFW are not informative of minority cohesion.

**First, turnout in CD33 primaries is significantly lower than turnout in CD33 general elections.** *See* Trial Tr. 1454:9-24.[33] According to Dr. Alford's EI estimates, while actual turnout in CD33 general elections ranges from 19.2% to 40.3% of the electorate, actual turnout in CD33 primaries and runoffs ranges from 1.1% to 10.8% of the electorate. NAACP Ex. 27 at 3.[34] When viewed in conjunction with the total number of eligible voters, the numbers are stark. CD33 has a total CVAP of 327,150. Joint Ex. 100.3. Based on this figure and Dr.

[33] During trial, Rodriguez Plaintiffs' counsel pointed to the last column on page 3 of NAACP Ex. 27, "Actual Turnout % in Election," and asked Dr. Alford whether that reflects "how many people actually turned out in the various elections under CD33," to which Dr. Alford responded in the affirmative. *See* Trial Tr. at 1454:1-8. Upon closer inspection, however, it appears that "Actual Turnout % in Election" reflects statewide turnout (as made evident by the fact that the column is identical to the "Actual Turnout % in Election" column in the CD23 analysis, NAACP Ex. 27 at 3), while the column entitled "Actual Turnout % in District" reflects the turnout in CD33 elections. The numbers set forth in this brief are drawn from this column.

[34] During trial, Plaintiffs referred to this document—the EI estimates submitted by Defendants alongside Dr. Alford's 2017 report as the basis for his conclusions—as DX 908. Tellingly, by the end of trial, however, Defendants chose not to offer DX 908 into evidence. Plaintiffs accordingly moved the document into evidence as NAACP Ex. 27, *see* Trial Tr. at 1644:4-13, and refer to it as such here.

Alford's turnout estimates, NAACP Ex. 27 at 3, the number of 2012 general election voters (121,700) was six times greater than the number of 2012 Democratic runoff voters (20,611). In CD33 in 2016, the number of general election voters (131,842) was nearly four times greater than the number of Democratic primary voters (35,332).[35]

Thus, based on turnout alone, general election data is more informative than primary data, *see* Trial Tr. 1452:24-1453:8 (Dr. Alford agrees that the more voters in an election, the more reliable the analysis based on that election), as CD33 general elections are where a "significant number" of voters cast their ballots.[36]

**Second, more than *three times* as many Latinos turned out in support of Marc Veasey in the 2016 general election than turned out *at all* in the 2016 primary.** Dr. Alford walked the Court through this analysis at trial. *See* Rod. P. (Demonstrative) Ex. 956; Trial Tr. 1455-60; *see also* Joint Ex. 100.3; NAACP Ex. 27 at 3-4. Based on Dr. Alford's EI estimates, while 12,410 Latinos turned out in the CD33 2016 primary (8,328 of whom voted for Carlos Quintanilla), 38,756 Latinos actually voted for Congressman Veasey in the 2016 general election. Thus, even if one could extrapolate from the small percentage of Latinos who voted in the 2016 primary that Mr. Quintanilla was the candidate of choice of Latinos more broadly, it is hardly the case that Latinos "t[ook] their marbles and [went] home [after] the candidate whom they prefer[red] most in the primary d[id] not prevail." *Lewis*, 99 F.3d at 615; *see also* Trial Tr.

---

[35] The Secretary of State's website data indicates that Dr. Alford's estimates are within 95% of canvass results for the 2016 general election and within 91% of canvass results for the 2016 Democratic primary—and confirms this stark difference between the sheer number of primary and general election voters. *See* http://elections.sos.state.tx.us/elchist319_state.htm (general); http://elections.sos.state.tx.us/elchist233_state.htm (D primary).

[36] Dr. Lichtman testified to the same effect. Trial Tr. 956:5-8 (general elections are most important because they have "vastly higher turnout and thus more fully represent voters than do . . . very relatively low turnout primaries in Texas"). Evidence in the 2014 round made the same point. Dr. Engstrom explained that "the most important estimates for assessing polarized voting . . . are those for the General Election[.]" Task Force Ex. 967 (Engstrom Report at 5). His only reason for even looking at primaries was to see if they filtered out minority preferred candidates over time. 8/12/14 Trial Tr. at 487.

1460:7-10 (Dr. Alford agrees that Latinos are not "walking away from the electoral process after their first-choice candidate loses the primary"). On the contrary, Latinos chose to turn out in far greater numbers, alongside a significant number of African-American voters, to support Congressman Veasey in the general election. *See* Trial Tr. 1460:11-17. [37] Indeed, in each CD33 general election held under Plan C235, African Americans and Latinos vote cohesively for Marc Veasey at rates of 84% and higher. *See* NAACP Ex. 27 at 4.

Thus, Dr. Alford's conclusion that Congressman Veasey is not the Latino-preferred candidate does not hold water. This is particularly true in light of his inconsistent interpretation of primaries and general elections between CD23 and CD33. In CD23, Dr. Alford had no problem concluding that, even though Pete Gallego was not the first choice among Latino primary voters in 2012, he became the Latino-preferred candidate by the 2012 general election, *see* Trial Tr. 1438:12-1439:3, 1465:20:1466:1, receiving 83% of the Latino vote, NAACP Ex. 27 at 2. In CD33, however, Dr. Alford refuses to believe that Congressman Veasey, who was not the first choice among Latino primary voters in 2016, could have become the Latino-preferred candidate by the 2016 general election, *see* Trial Tr. 1466:2-9, even though he received 84% of the Latino vote, NAACP Ex. 27 at 4. Despite Dr. Alford's protestations, the data speaks for itself: a significant number of Latinos coalesced around Congressman Veasey in CD33 general elections, making him the preferred candidate of both African Americans and Latinos.

**Third, in the Democratic Primaries, African-American votes alone were insufficient to give Congressman Veasey the nomination.** Dr. Alford's own estimates make plain that African Americans  required the support of at least some Latino voters in the Democratic primary in order to move forward. Out of the 327,150 eligible voters in CD33, 29.0% (94,874

---

[37] One can imagine a situation where, unlike here, Latinos turn out in large numbers in favor of their first choice candidate in the primaries, and then, discouraged by their loss in the primaries, choose to either sit out the general elections or split their vote among the general election candidates. That is not what we see in DFW.

eligible voters) are Anglo, 23.7% (77,535 eligible voters) are African American, and 43.6%
(142,638 eligible voters) are Latino. Joint Ex. 100.3. Dr. Alford's estimates tell us, first, how
many votes a given candidate needed to win the nomination in each of the three CD33
Democratic primaries in which the Democratic candidate was selected.

| Table 1 | | | | |
|---|---|---|---|---|
| Democratic Nominating Election | Estimated Turnout % in District | Actual Turnout % in District | Total Number of Voters (Actual Turnout % X 327,150) | Number of Votes Needed to Win |
| 2012 Runoff | 6.3% | 6.3% | 20,611 | 10,306 |
| 2014 Primary | 5.7% | 5.7% | 18,648 | 9,322 |
| 2016 Primary | 10.7% | 10.8% | 35,332 | 17,667 |

See NAACP Ex. 27 at 3. Dr. Alford's estimates also tell us how many total votes were cast by
each racial group in these primary/runoff elections.

| Table 2 | | | |
|---|---|---|---|
| Democratic Nominating Election | Estimated Anglo Votes (Estimated Anglo Turnout % X 94,874) | Estimated Black Votes (Estimated Black Turnout % X 77,535) | Estimated Latino Votes (Estimated Hispanic Turnout % X 142,638) |
| 2012 Runoff | 3,321 | 9,537 | 6,704 |
| 2014 Primary | 2,657 | 9,149 | 5,991 |
| 2016 Primary | 7,116 | 13,646 | 12,410 |

See NAACP Ex. 27 at 3, Joint Ex. 100.3. And finally, by multiplying the total number of votes
cast by each racial group, see tbl. 2, by the estimated percentage of votes for Congressman
Veasey for each racial group, see NAACP Ex. 27 at 4, Dr. Alford's estimates tell us the total
number of votes for Congressman Veasey cast by each racial group in these primary/runoff
elections.

| Table 3 | | | | |
|---|---|---|---|---|
| Democratic Nominating Election | Estimated Anglo Vote for Veasey | Estimated Black Vote for Veasey | Estimated Latino Vote for Veasey | Number of Votes Needed to Win |

| | | | |
|---|---|---|---|
| 2012 Runoff | 1,355 | 8,106 | 1,482 | 10,306 |
| 2014 Primary | 1,594 | 8,417 | 2,972 | 9,322 |
| 2016 Primary | 3,871 | 12,336 | 4,083 | 17,667 |

Based on Dr. Alford's own estimates, and focusing only on the Democratic primaries, it stands out that Congressman Veasey could not have won the nomination in any year just from African-American primary votes. And in both the 2012 Democratic Runoff and 2016 Democratic Primary, Congressman only got past the finish line for the nomination with the votes of Latinos.

**Fourth, neither African Americans alone nor Latinos alone could have elected Congressman Veasey in CD33 general elections.** Once again, a calculation of actual numbers undermines Defendants' reliance on Democratic primaries to determine minority cohesion. As set forth above, of the 327,150 eligible voters in CD33, 29.0% (94,874 eligible voters) are Anglo, 23.7% (77,535 eligible voters) are African American, and 43.6% (142,638 eligible voters) are Latino. Joint Ex. 100.3. Dr. Alford's estimates tell us how many votes a given candidate needed to win in each of the three CD33 general elections.

| Table 4 | | | | |
|---|---|---|---|---|
| General Election Year | Estimated Turnout % in District | Actual Turnout % in District | Total Number of Voters (Actual Turnout % X 327,150) | Number of Votes Needed to Win |
| 2012 | 37.0 | 37.2 | 121,700 | 60,851 |
| 2014 | 19.0 | 19.2 | 62,813 | 31,407 |
| 2016 | 39.7 | 40.3 | 131,842 | 65,922 |

*See* NAACP Ex. 27 at 3. Dr. Alford's estimates also tell us how many total votes were cast by each racial group in these general elections.

| Table 5 | | | |
|---|---|---|---|
| General Election Year | Estimated Anglo Votes (Estimated Anglo Turnout % | Estimated Black Votes (Estimated Black Turnout % | Estimated Latino Votes (Estimated Hispanic Turnout % |

| | **X 94,874)** | **X 77,535)** | **X 142,638)** |
|---|---|---|---|
| 2012 | 37,855 | 42,412 | 37,086 |
| 2014 | 18,975 | 23,183 | 17,545 |
| 2016 | 42,883 | 34,891 | 46,358 |

*See* NAACP Ex. 27 at 3, Joint Ex. 100.3. Finally, by multiplying the total number of votes cast by each racial group, *see* tbl. 5, by the estimated percentage of votes for Congressman Veasey for each racial group, *see* NAACP Ex. 27 at 4, Dr. Alford's estimates tell us the total number of votes for Congressman Veasey cast by African Americans and Latinos.

| **Table 6** | | | | |
|---|---|---|---|---|
| **General Election Year** | **Estimated Black Vote for Veasey** | **Estimated Latino Vote for Veasey** | **Estimated Black+Latino Vote for Veasey** | **Number of Votes Needed to Win** |
| 2012 | 39,740 | 31,894 | 71,634 | 60,851 |
| 2014 | 22,256 | 14,931 | 37,187 | 31,407 |
| 2016 | 32,274 | 38,755 | 71,029 | 65,922 |

Notably, as laid bare in Table 6, more Latinos voted for Congressman Veasey in the 2016 general election than did African Americans. *Id.*

The tables above demonstrate that, in each general election, the African-American vote alone was insufficient to elect Congressman Veasey. Rather, *Congressman Veasey needed a majority of Latino voters* (at least 57% of the 37,086 Latino votes cast in 2012, at least 52% of the 17,545 Latino votes cast in 2014, and at least 73% of the 46,358 Latino votes cast in 2016) to vote alongside African-American voters in order to push Congressman Veasey past the finish line. (In fact, he received well over a majority of all Latino votes cast in each general election.) Thus, Dr. Alford's characterization of CD33 as an African-American opportunity district, and not a coalition district, ignores the fact that a coalition of African-American and Latino voters were needed in order to garner a majority of votes for Congressman Veasey, the preferred candidate of both groups.

**Fifth, and in contrast to the African-American and Latino coalition described above, African Americans and Anglos together *do not* constitute a winning coalition for Congressman Veasey.** CD33 is *not* a crossover district. Dr. Alford's estimates tell us the total number of votes cast by African Americans and Anglos.

| General Election Year | Estimated Black Vote for Veasey | Estimated Anglo Vote for Veasey | Estimated Black+Anglo Vote for Veasey | Number of Votes Needed to Win |
|---|---|---|---|---|
| 2012 | 39,740 | 14,271 | 54,011 | 60,851 |
| 2014 | 22,256 | 13,871 | 36,127 | 31,407 |
| 2016 | 32,274 | 21,313 | 53,587 | 65,922 |

*See* NAACP Ex. 27 at 4; *supra* tbl. 5. In 2012 and 2016, African Americans and Anglos together did not comprise a majority of votes needed to elect Congressman Veasey.[38]

In sum, the tables and analyses above, all derived from the undisputed facts and Dr. Alford's estimates, indicate that African Americans and Latinos come together in every CD33 general election to form a majority of votes for Congressman Veasey. Congressman Veasey's election depended on receiving majorities of African American and Latino votes; African Americans could not have elected him alone, and African Americans could not have elected him solely with the support of Anglo voters. In stark contrast to the overwhelming Latino support for Congressman Veasey in CD33 general elections, the relatively small number of Latino voters in CD33 Democratic primaries is simply not indicative of the voting preferences of a "significant number" of Latinos in CD33. In short, CD33 is a coalition district because it actually functions like a coalition district.

---

[38] Note that there was no Republican candidate in the 2014 general election; Congressman Veasey's opponent, Jason Reeves was a Libertarian. *See* NAACP Ex. 27 at 4. This may explain why a higher percentage of Anglos voted for the Democratic candidate.

Ultimately, illuminating as they are, one need not rely on these detailed data and analyses to determine that primaries in Texas are not informative of racially polarized voting. One need only look to Dr. Alford's conclusion that, based solely on Texas primaries, "there is not racially polarized voting in Texas," *see* Trial Tr. 1468:11-1469:9—a conclusion that runs contrary to the findings of this Court, *see, e.g.*, Plan C185 Order, Dkt. No. 1390 at 25, Defendants' concessions in this case, *id.* at 25, 144 n.133, , and the holding of the United States Supreme Court, *see LULAC v. Perry*, 548 U.S. at 438 (observing "presence of racially polarized voting . . . throughout Texas"). If Texas primaries yield such an absurd conclusion, then Texas primaries cannot form the basis of a proper racially polarized voting analysis.

### C.    Under the Totality of Circumstances, African-American and Latino Residents of DFW Have a Diminished Opportunity to Participate in the Political Process and to Elect Representatives of Their Choice

At various points throughout this case, including during the most recent trial, this Court has heard extensive testimony on the totality of circumstances that address many of the Senate Report factors bearing on § 2 challenges. *See generally Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1146 (5th Cir. 1993) (discussing role of Senate factors in § 2 "results test" framework). Indeed, as recently as 2006, the Supreme Court took note of the long history of discrimination in Texas against African Americans and Latinos and the adverse impact that history had, and still has, on the ability of minorities to participate equally in the electoral and political process. *LULAC v. Perry*, 548 U.S. 399, 439-40 (2006) (citing a list of such findings by federal courts in Texas in redistricting cases).

Witnesses testifying or providing evidence to the Court on these factors include Dr. Tijerina, who testified at length in 2011 on the history of discrimination against Latinos in this state and the adverse impact it has had on their electoral participation, *see* Tr. 9/7/11 at 578-96 (A. Tijerina), and Dr. Burton, who reported on the state's discrimination against African

Americans and the adverse impact on their participation in the political process, *see* Ex. J-65

(Orville Burton Depo.). In the 2014 trial, former Senator Barrientos added facts further fleshing

out the history of discrimination to which Dr. Tijerina had testified. Tr. 8/15/14 at 1142-52 (G.

Barrientos). Mr. Korbel also provided an extensive examination of the *Zimmer* factors as they

applied to Texas minorities. Joint Exhibit 11 (Korbel Rep. at 16-29).

In this most recent trial, testimony to the same kind of historical discrimination against

Texas minorities was provided by, among others, Dr. Burton, who has provided a supplemental

2017 expert report. Dr. Burton provided exhaustive testimony on the continuing role of racial

discrimination in lowered education and socioeconomic status for Texas minorities and the

effects of those on electoral participation and equality. Trial Tr. 873:1-6 (and continuing onward)

Further, Dr. Lichtman's testimony provided an updated catalogue of the persistence of historical

discrimination and its ensuing effects into the present day. Trial Tr. 938:18-939:25; 940:13-21;

941:10-17; 941:25-942:25. In short, the evidence at trial demonstrated that things remain no less

burdensome for Texas minorities than they have proven to be in the past.

This evidence establishes that, under the totality of the circumstances, Texas minorities

continue to be denied an equal opportunity to participate in the political process.

## VI.    CONCLUSION

For all of the foregoing reasons, and based on the evidence and testimony presented at the

2011, 2014, and 2017 trials, the Rodriguez Plaintiffs, joined by the Perez and LULAC Plaintiffs,

respectfully request that the Court invalidate Plan C235 and issue an injunction requiring that

future Texas congressional elections be conducted under a redistricting plan that remedies the

constitutional and statutory violations found by the Court.


Dated:  July 31, 2017                              Respectfully submitted,

_/s/ Renea Hicks_
Attorney at Law
State Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231 - Telephone
rhicks@renea-hicks.com

ATTORNEY FOR PLAINTIFFS EDDIE
RODRIGUEZ, _ET AL._, TRAVIS COUNTY,
AND CITY OF AUSTIN

PERKINS COIE LLP

Marc Erik Elias*
Bruce V. Spiva*
Aria C. Branch*
*Admitted _Pro Hac Vice_
700 Thirteenth Street N.W., Suite 600
Washington, DC 20005-3960
(202) 434-1609
(202) 654-9126 FAX
MElias@perkinscoie.com

Abha Khanna*
*Admitted _Pro Hac Vice_
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
(206) 359-8312
(206) 359-9312 FAX
AKhanna@perkinscoie.com

ATTORNEYS FOR PLAINTIFFS EDDIE
RODRIGUEZ, _ET AL_.

David Escamilla
Travis County Attorney
State Bar No. 06662300
P.O. Box 1748
Austin, Texas 78767
(512) 854-9416
fax (512) 854-4808

ATTORNEY FOR PLAINTIFF TRAVIS
COUNTY


__/s/ David Richards_____
David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
(512) 476-0005
fax (512) 476-1513
DavidR@rrsfirm.com

Counsel for Perez Plaintiffs



__/s/ Luis R. Vera, Jr._____
LUIS ROBERTO VERA, JR.
LULAC National General Counsel  Law
Offices of Luis Roberto Vera, Jr. & Assoc.
1325 Riverview Towers 111 Soledad
San Antonio, TX78205
(210) 225-3300
lrvlaw@sbcglobal.net

Counsel for LULAC Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July, 2017, I filed a copy of the foregoing for service on counsel of record in this proceeding through the Court's CM/ECF system.

*/s/ Renea Hicks*
Max Renea Hicks