**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| SHANNON PEREZ, ET AL., | § | |
| | § | |
| v. | § | SA-11-CV-360 |
| | § | |
| GREG ABBOTT, ET AL., | § | |

**PLAINTIFF MALC'S POST-TRIAL BRIEF**

**I.**
**PROCEDURAL BACKGROUND**

Plaintiff MALC files this post-trial brief in accordance with this Court's Order and in support of its claims against the State of Texas for violations of statutory and constitutional voting rights protections in its enactment in 2013 of plans for the election of members of the Texas House of Representatives and Texas Congressional delegation.

Plaintiff MALC filed this action on May 9, 2011, alleging that the State's 2011 redistricting plan for the Texas House of Representatives and U.S House of Representatives violated federal statutory and Constitutional voting rights protections. After the State adopted plan H358, Plaintiff MALC amended its complaint and submitted claims for relief asserting that H358 violates Section 2 of the Voting Rights Act in that arbitrary application of rules such as those imposed by Article III, § 26 of the Texas Constitution, were used to avoid the creation of additional majority Latino and majority minority (coalition) opportunity districts in H358. *See* Dkt. 897, MALC's Third Amended

Complaint, ¶¶ 7, 38- 45, 75. More generally, MALC submitted Section 2 results claims that Texas could have enacted a plan with more minority opportunity districts (both single-minority and coalition districts or combined minority districts). *Id*. ¶¶ 2, 74-75.

MALC also alleged violations of Section 2 of the Voting Rights Act in the failure of the State to create additional majority minority opportunity districts in H358 in Harris County, Dallas County, Bell County, Fort Bend County, and Tarrant County. *See* Dkt. 897, MALC's Third Amended Complaint, ¶¶ 8, 49-57, 74-75, and 77.

In addition, MALC alleged that H358 violated Section 2 of the Voting Rights Act and the Fourteenth Amendment because the failure to create a Latino opportunity district in Nueces County and in West Texas (Midland/Odessa), justified by the pretext of complying with the whole county line rule, was done with the intent to discriminate. *Id.* ¶¶ 38, 40-44, and 77.

Finally, MALC alleged that H358 violated Section 2 of the Voting Rights Act and the Fourteenth Amendment because the failure to create additional minority coalition districts in Tarrant, Dallas, Harris, Fort Bend, and Bell counties was done with the intent to discriminate. *Id.* ¶¶ 8, 49-57, and 74-75, and 77.

MALC's complaint also challenged the Texas redistricting plan for Congressional districts, C235, alleging it is a racial gerrymander in violation of Section 2 and the Fourteenth Amendment. *Id.* ¶¶ 8, 60-73, 83.

Specifically, MALC alleged Section 2 and Fourteenth Amendment violations with regard to CD 23, 27, and 25 and the fragmentation and packing of cohesive minority communities to avoid the creation of minority opportunity districts. *Id.* ¶¶ 8, 60-73, and 83.

After an abbreviated discovery period, trial was held in San Antonio from July 10, 2017, through July 15, 2017.

## II.
## ARGUMENT

### A.  Texas House, Plan H358

> 1.  Does Section 2 require additional Latino or minority opportunity districts in the State's plan?

> > a)  Legal Standard

Section 2 of the Voting Rights Act prohibits any practice or procedure that "interact[ing] with social and historical conditions," impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters. *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986). The Court identified, in *Gingles,* three threshold conditions for proving vote dilution under § 2 of the VRA. *See id.* at 50-51. First, a "minority group" must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured legislative district. *Id.* at 50. Second, the minority group must be "politically cohesive." *Id.* at 51. And third, a district's white

majority must "vote [ ] sufficiently as a bloc" to usually "defeat the minority's preferred candidate." *Id*. Those three showings, the Court explained, are needed to establish that "the minority [group] has the potential to elect a representative of its own choice" in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is "submerg[ed] in a larger white voting population." *Growe v. Emison*, 507 U.S. 25, 40 (1993).

(1) *Gingles I*

With regard to *Gingles I*, the Supreme Court has established that only by presenting a majority-minority district could minority plaintiffs satisfy the first *Gingles* precondition. *Bartlett v. Strickland,* 129 S. Ct. 1231, 1244 (2009). ("We find support for the majority-minority requirement in the need for workable standards and sound judicial and legislative administration"). A working majority of the "voting age population" has been determined to mean a district in which the minority group is at least 50% of the citizen voting age population of a single member district. *Valdespino v. Alamo Heights I.S.D.*, 168 F.3d 848 (5th Cir. 1999) *cert. denied*, 528 U.S. 1114 (2000). Moreover, in the 5th Circuit, and the law of this case, *Gingles I*, may be satisfied if one or more cohesive minority groups combine to establish the 50% requirement in combination. See *Campos v. City of Baytown*, 840 F.2d 1240, 1242-45 (5th Cir. 1988); *Perez v. Abbott*, 2017 WL 1450121 (W.D. Tex. 2017) slip op. at *7.

In addition, the district must be reasonably compact. *Gonzalez v. Harris County, Texas*, 601 Fed. Appx. 255, 258 (2015).

> Satisfying the first *Gingles* precondition-compactness-normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans. *E.g., Fairley v. Hattiesburg, Miss.* 584 F. 3d 660, 669 (5th Cir. 2009). In assessing these plans, the issue is not whether plaintiffs' plan is "oddly shaped, but whether the proposal demonstrate[s] that a geographically compact district could be drawn". *Houston v. Lafayette Cnty.*, Miss., 56 F. 3d 606, 611 (5th Cir. 1995).

*Id.* Thus, by compactness, *Gingles* does not mean that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness. An aesthetic norm, by itself, would be not only unrelated to the legal and social issues presented under § 2, it would be an unworkable concept, resulting in arbitrary and capricious results, because it offers no guidance as to when it is met.

Rather, "a district is sufficiently geographically compact if it allows for effective representation. For example, a district would not be sufficiently compact if it was so spread out that there was no sense of community, that is, if its members and its representative could not effectively and efficiently stay in touch with each other; or if it was so convoluted that there was no sense of community, that is, if its members and its representative could not easily tell who actually lived within the district." *Dillard v. Baldwin County, Board of Education*, 686 F. Supp. 1459, 1465-6 (M.D. Ala. 1988).

Finally, *Gingles I* requires that Plaintiff submit a plan that has more reasonably

compact districts "with a sufficiently large minority population to elect candidates of its choice than the challenged plan." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994).

(2) *Gingles II and III*

Whether the minority group demonstrates it is politically cohesive embodies a similarly functional focus. "If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Gingles,* 478 U.S. at 51. Like the first *Gingles'* precondition, however, the Court does not expressly define political cohesiveness.

In *Gomez v. City of Watsonville,* 863 F.2d 1407, 1415 (9th Cir. 1988), *cert. denied,* 489 U.S. 1080 (1989), the Ninth Circuit observed, "the inquiry is essentially whether the minority group has expressed clear political preferences that are distinct from those of the majority." Thus, political cohesiveness is determined by looking at the "voting preferences expressed in actual elections." *Id.* Necessarily, when the evidence of political cohesiveness is examined as to voting preferences, courts review the same statistical evidence plaintiffs must offer to establish vote polarization. Indeed, political cohesiveness is implicit in racially polarized voting.[1]

(3) Racial Bloc Voting

---

[1] *Gingles* stated that one purpose of determining the existence of racially polarized voting is "to ascertain whether minority group members constitute a politically cohesive unit" *478 U.S. at 56*; *see also Sanchez v. State of Colo.*, 97 F.3d 1303, 1312 (10th Cir. 1996).

*Gingles* adopted a straightforward definition of racial bloc voting. Racial polarization or bloc voting "exists where there is a consistent relationship between the race of the voter and the way in which the voter votes . . . or to put it differently, where black voters and white voters vote differently." *Gingles*, 478 U.S. at 53 n.21 (internal quotation marks omitted). The Court's focus was twofold: to determine whether the minority group votes cohesively and "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Id.* at 56. The extent to which this bloc voting impairs the minority's ability to elect candidates of their choice, however, must be "legally significant," a sliding scale that varies with the district and a variety of factual circumstances and may emerge more distinctly over a period of time. *Id.* While the Court offered no "simple doctrinal test for the existence of legally significant racial bloc voting," *Id.* at 58, it urged a flexible approach, noting that the isolated success of a minority candidate in a district that usually exhibits voter polarization will not alone negate plaintiffs' showing.

In *Gingles*, the district court had relied on expert testimony offered by Dr. Bernard Grofman, who used two methods of analysis of voting patterns, "bivariate ecological regression analysis" and "homogeneous precinct analysis," also called "extreme case analysis." Bivariate ecological regression analysis determines the degree of relationship between two variables - the relationship between the racial composition in each political

unit (the independent variable) and the support provided a particular candidate within that political unit (the dependent variable). *Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.*, 4 F.3d 1103, 1119 n.10 (3d Cir. 1993), *cert. denied*, 114 S. Ct. 2779 (1994). In an ecological regression analysis, the correlation coefficient shows which data points fall on the straight line. The linear relationship created by the two variables ideally then will pack closely together on a line. The inferences that arise from the analysis are often graphically demonstrated by the statistical method. MALC's 2011 Exhibit 19, pp. 11-16 (Kousser report).

In this case, an additional question arises about the probative value of measuring voter cohesion and polarization through general or primary elections.

General election analysis consistently shows that Latino voters are politically cohesive, that African American voters are politically cohesive, that Latino and African American voters vote together and are politically cohesive and that Anglo voters consistently vote together, are politically cohesive, and vote differently from Latino and African American voters. *See* TT, Vol. 1 pp. 79, 81 - 82, 85-86, (Brischetto); TT, Vol. 2, p. 416 (Chervenak).

Dr. Robert Brischetto relied only on general elections to evaluate voter cohesion and polarized voting, testifying that primary election data was less reliable than general election data. TT, Vol. 1, pp. 114-115. Dr. Brischetto explained:

> when we're analyzing primary elections, we're not getting a cross-

> section of the electorate.   And so we're getting a very, what we say
> in statistics, is a skewed -- a very skewed sample of the population,
> a very skewed and distorted view of the question of whether or not
> there is racially polarized voting in the electorate overall.

TT, Vol. 1, p. 115. (Brischetto testimony). Similarly, Dr. Edward Chervenak testified that

the lower number of voters participating in primary elections compared to general

elections made primary elections less probative on the issue of polarized voting. TT, Vol.

2, p. 410.

Plaintiff Latino Redistricting Task Force's expert on polarized voting on whose

analysis the State's expert relies said the following on this issue:

> It must be noted that *the more important estimates for assessing
> polarized voting in these counties and in the South Texas area are
> those for voting in general elections* because much larger numbers of
> Latinos voted in these election than in the Republican nomination
> contests. The differences are stark. Whereas 10,067 Latinos
> received ballots for the 2014 Republican primary in Bexar County,
> 105,945 received ballots for the general election that year. These
> respective figures for Dallas County are 3,579 and 37,279, for El
> Paso County 3,414 and 50,766, for Harris County 8,146 and 87,461,
> for Nueces County 1,754 and 22,639, for Tarrant County 4,108 and
> 29,587, and for Travis County 1,988 and 31,003. The figures for the
> South Texas area are respectively, 12,846 and 196,923.
>
> The corresponding figures for 2016, a year in which the Republican
> primary contained a presidential preference contest and the
> general election contained a presidential election, are as follows;
> Bexar County 29,108 and 240,489, Dallas County 12,333 and
> 116,358, El Paso County 12,590 and 148,925, Harris County 33,179
> and 258,048, Nueces County 5,958 and 47,614, Tarrant County
> 13,391 and 78,795, Travis County 6,263 and 67,459, and the South

Texas area, 40,585 and 438,995.

2017 Task Force Exh. 19, p. 6 (Engstrom Report) (emphasis added).

In *Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615, (4th Cir. 1996), the Fourth Circuit examined the question of the relevance of looking to general elections for determining racially polarized voting and evaluating whether minorities could elect candidates of their choice. That court noted that the statute itself is concerned not just with equal access to nomination but also election. *See* 52 U.S.C.A. § 10301(b) ("A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to *nomination or election* . . . are not equally open to participation . . . in that its members have less opportunity than other members of the electorate to *participate in the political process and to elect* representatives of their choice." (emphasis added)).

Finally, the State's blanket criticism of general elections as a measure of cohesion and polarized voting is deficient on two grounds. First, under the Defendants' theory, the district court would be required, contrary to *Gingles,* to assess the **cause** of the minority community's support of the candidate. In *Gingles,* defendants argued that the plaintiffs were required to use multiple regression analysis, rather than bivariate regression analysis, to ensure that only those defeats of black-preferred candidates that were actually caused by race, and not some other reason such as party affiliation, were

considered defeats of black-preferred candidates for purposes of a vote dilution claim. The *Gingles* plurality explicitly rejected such a requirement in the context of assessing the second and third *Gingles* preconditions. *Gingles*, 478 U.S. at 62. Second, even if it were proper to evaluate the cause of voting patterns, an assumption that partisanship has carried the day over race and ethnic political considerations, cannot overrule Plaintiffs' evidence without some statistical showing of partisanship and not race or ethnicity dominating voting patterns. *See LULAC v. Northeast I.S.D.* 903 F. Supp. 1071, 1083 (W.D. Tex. 1995) ("Dr. Rives disregarded the results of the analysis he performed on the general elections because he assumed that party affiliation, rather than race, accounted for the results . . . However, Dr. Rives performed no multi-variate analysis that would have proved or disproved this assumption. More importantly, Dr. Rives admitted that his analysis of the general elections showed, *inter alia,* both that Hispanics and Blacks generally vote together and that they vote differently than Anglo voters in NEISD.")

Here, the general election analysis is consistent across experts, including Texas' expert, that Latinos vote together and are cohesive, that African Americans vote together and are cohesive, that Latinos and African Americans vote together and are cohesive and that Anglos vote as a bloc to defeat the minority preferred candidates of choice.

(4) Totality of Circumstances

While these three pre-conditions are necessary to establish a vote dilution claim, they are not alone sufficient. *De Grandy,* 114 S. Ct. 2647 at 2657.

The Court in *De Grandy*, determined that a court's examination of relevant circumstances is not complete "once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution." *Id*. This is so "because the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Id*. Failure to prove the totality of circumstances establishes the minority is not harmed by the challenged practice and rebuts the inference of discrimination arising from proof of the three preconditions. *Uno v. City of Holyoke,* 72 F.3d 973, 980 (1st Cir. 1995).

In a review of the totality of circumstances the court should be guided by the factors identified by Congress commonly referred to as the Senate factors. The Senate Report accompanying the 1982 amendments elaborates on the proof for a § 2 analysis, specifying a "variety of relevant factors, depending upon the kind of rule, practice, or procedure called into question." S. Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07. The Senate Report added that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 207. Moreover, "while the enumerated factors will

often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles,* 478 U.S. at 45 (citation omitted) (footnote omitted). Most importantly, "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process." *Id.* (quoting S. Rep. No. 417, 1982 U.S.C.C.A.N. 177, 208). The lack of electoral *opportunity* is the key. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47. The Senate Report lists the following factors to be considered in the analysis of the totality of circumstances:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

Sen. Report *supra.*

   b)  Section 2 (Effects) Factual Record

      (1) *Gingles I*

The factual record presented in this case is compelling. MALC and other plaintiffs have presented evidence on the *Gingles* preconditions as well as the totality of circumstances that have gone virtually unchallenged. As detailed above, a plaintiff's burden begins with the development and submission of a demonstration redistricting plan that creates additional districts with a sufficiently large minority population to elect candidates of its choice. *DeGrandy*, *supra.*

Plaintiffs submitted plan H391, a plug in map that fits into H358 and alters only the 41 districts shown on the map. TT, Vol. 1, p. 16, line 22 (Korbel testimony); Jt. Exh. 107 (H391 maps and data). Mr. Korbel testified that in developing the demonstration

*Gingles* districts in H391 he adhered to the suggestions of the courts (Supreme Court, 5th Circuit and this Court) with regards to redistricting and paying close attention to city and county lines, voting precincts, equalizing population, and to communities of interest. TT, Vol. 1, p. 16, line 23 – p. 21, line 20. As was shown in MALC exhibits 10 and 11, in the urban areas shown, H391 respects municipal boundaries as well or better than the state's H358. MALC 2017 Exhibits 10 and 11; TT, Vol. 1, pp. 19-21.

In Bell County, the MALC plan equalized population between the districts, while H358 maintained the population variances found by this Court to violate the one person, one vote constitutional requirement. TT, Vol. 1, p. 22, line 23 – p. 23, line 3; Jt. Exh. 107.2; Jt. Exh. 106.2; See *Perez v. Abbott,* 2017 WL 1450121, (W.D. Tex. 2017) slip op. at *48. ("Aside from the intentional vote dilution caused by the population shifts among HDs 54 and 55, these same shifts also caused population deviations in contravention of the one person, one vote principle."). HD 54 and HD 55 are thus 1.56% and 1.62% below the ideal in H391, just as this Court indicated could have occurred to comply with one person one vote. *Perez*, at p. 63 ("A comparison of the prior and current maps reveals that it would have been relatively easy to draw HD54's extension into Bell County in a way that left both HDs 54 and 55 equally underpopulated, but this was not done.")

With regard to Nueces County, Mr. Korbel first made an effort to create two HCVAP districts wholly contained within Nueces County and to measure their

performance. TT, Vol. 1, pp. 26-28; MALC Exhibits 12 and 13. Satisfying himself that it was not feasible to create two performing districts wholly within Nueces County, he then developed a plan that created two performing, reasonably compact districts, that did not unnecessarily intrude on traditional redistricting principles and opened up only the Nueces County boundary. TT, Vol. I pp. 29-30; Jt. Exh. 107 (Plan H391); MALC Exhibit 24.

In Dallas County and as described above, Mr. Korbel began with an attempt to adhere to the suggestions of the courts, respecting municipal and county boundaries, avoiding the splitting of voting precincts but also trying to respect communities of interest. TT, Vol. 1, pp. 16-21. The resulting map developed three new minority majority CVAP districts in Dallas County that were compact and performing. TT, Vol. 1, p. 31, Jt. Exh. 107; MALC Exhibit 24. Similarly, in Harris County, Mr. Korbel, applying the criteria he described, developed two new minority majority CVAP districts that were compact and performing. TT, Vol. 1, p. 32; MALC Exhibit 24. And in Fort Bend County, a new majority minority district that performs in the most recent elections in 2016. TT, Vol. 1, p. 30; MALC Exhibit 24.

In Midland/Odessa, Plaintiffs submitted Plan H321, an amendment offered in committee during the 2013 special session by Rep. Trey Martinez Fischer. TT, Vol. 1, p. 175; MALC Exh. 28. H321 contains HD 81 combining a vibrant community of interest of

Page 16 of 50

cohesive Latino neighborhoods in Midland and Odessa. *See Perez v. Perry,* 2017 WL 1406379, (W.D. Tex. 2017) slip op. at *114, FOF ¶708. Combining those neighborhoods with seven other whole counties (Upton, Crane, Ward, Reeves, Loving, Winkler, and Andrews) and dividing no other county line except for Midland and Ector Counties, results in a district with 63% Hispanic population, 58.6 Hispanic voting age population, and 52% SSVR. MALC Exh. 28, p. 457, 466. In addition, HD 81 in H321 is 51.7% HCVAP. Jt. Exh. 15.3, p. 108, lns. 7-12.

Thus MALC presented and satisfied *Gingles I* with five new majority Latino or minority CVAP performing districts that were reasonably compact in Mr. Korbel's H391 and an additional Latino CVAP majority district in plan H321.

Mr. Korbel adhered to traditional redistricting principles that were comparably consistent principles—not necessarily principles identical, or subjugated, to the State's exact prioritization, but simply those within the confines of a "well-developed, legally-adequate plan that can be adjusted" at the remedial stage. *See Fairley v. Hattiesburg, Miss.,* 584 F3d 660, 671 n.14, (5th Cir. 2009). The county line rule was subordinated only in three counties (Nueces, Midland, and Ector counties) to form two new Latino opportunity districts that could not have been created otherwise.

(2) *Gingles II and III*

The Plaintiffs' evidence and statistical analysis and lay witness testimony established the Latinos are politically cohesive, that African Americans are politically cohesive and that in Dallas, Harris, and Bell County Latinos and African Americans vote together and are cohesive politically. Dr. Robert Brischetto's statistical analysis and testimony showed that in the 2014 and 2016 General Elections Latinos in South Texas, Nueces County, in the 23rd Congressional District, in Bexar County, Harris County, Dallas County are politically cohesive. TT, Vol. 1 pp. 79, 81-82, 85-86; MALC Exhibit 22. Moreover, he had previously testified that in the 2014 elections he also found the same cohesion and racially polarized voting. TT, Vol. 1, p 80; MALC Exhibit 22, at p. 320. In addition, Dr. Brischetto found that in general elections, Latinos and African Americans voted together and were politically cohesive in Dallas and Harris Counties. *Id.*

In Bell County, Plaintiff Texas NAACP's expert Dr. Edward E. Chervenak testified and submitted a statistical analysis that showed that African Americans are politically cohesive, that Latinos are politically cohesive and that together Latinos and African Americans are politically cohesive. TT, Vol. 2, pp. 414-416; NAACP Exh. 002. In Fort Bend County, Dr. Chervenak testified and submitted statistical evidence that demonstrated that African Americans are politically cohesive, Latinos are politically cohesive, and that Asian Americans are politically cohesive and that all are politically

cohesive together. TT, Vol. 2, pp. 420-422; NAACP Exh. 002. Dr. Brischetto made similar findings in his testimony in 2014.

In addition, Dr. Brischetto and Dr. Chervenak found that the Anglo vote did not support the minority preferred candidates and voted sufficiently as a bloc to defeat the minority preferred candidates. TT, Vol.1 pp. 111-114 (Brischetto); TT, Vol. 2, pp. 414-416, 420-422 (Chervenak). Moreover, Dr. Chervenak also determined that general elections were more probative than primary elections for similar reasons as Dr. Brischetto. TT, Vol. 2, p. 410.

### (3) Totality of Circumstances

With regard to the factors that should be examined to evaluate the totality of circumstances, Plaintiffs have submitted evidence, both statewide and regionally that supports the Section 2 results claims asserted here.

On a statewide basis, the history of discrimination has been well documented in this and other cases. *See LULAC v. Perry*, 548 U.S. 399, 439-440 (2006) ("The District Court recognized 'the long history of discrimination against Latinos and Blacks in Texas,' and other courts have elaborated on this history with respect to electoral processes.") (internal citation omitted). In addition, Dr. Burton and Dr. Lichtman summarized that history during their testimony. TT, Vol. 3, pp. 938-940 (Lichtman); TT, Vol. 3, pp. 873-882 (Burton).

Regionally, this Court has examined the continuing effects of that discrimination and various other factors to be considered in the totality of circumstances in a number of the regions relevant to MALC's claims. *See Perez v. Perry,* 2017 WL 1406379, (W.D. Tex. 2017) slip op. (on socio-economic factors for Bexar County, at 28, FOF ¶228; for Nueces County, at 36, FOF ¶286; for Harris County, at 66, FOF ¶504; for Dallas County, at 80, FOF ¶614; for Tarrant County, at 86, FOF ¶650; and for Midland and Odessa, at 94, ¶FOF 715-716).

With regard to proportionality, Mr. Korbel testified that Anglos in Texas in 2017 comprise just over 50% of the citizen voting age population of the state. TT, Vol. I, pp. 13-14; MALC Exhibits 2-3. Thus, in order for minorities, to approach proportionality in any fashion, would require about 75 districts to be minority opportunity districts. Under any count, majority minority of CVAP, majority minority of VAP, or performing minority opportunity districts, no plan offers proportionality. Minorities in Texas continue to be underrepresented in the Texas House of Representatives.

On balance, evaluation of the totality of circumstances supports and weighs in favor of finding a Section 2 violation in this case. When taken together with the evidence on *Gingles I, II and III,* MALC has established a violation under Section 2.

2. <u>Was Plan H358 adopted with the intent to discriminate in violation of Section 2 and the Fourteenth Amendment?</u>

The State has violated the law in enacting its chosen interim remedy for both the Texas House of Representatives and Texas' delegation to the United States House of Representatives. This failure to uphold the law is two-fold. First, the State failed to analyze, investigate, or meaningfully attempt to cure any of the unconstitutional and illegal defects present in the interim map. This failure to take this Court's mandate to seek a full remedy is strong evidence of intentional discrimination. Second, even if the State's reliance on this Court's interim map was not intentionally discriminatory, the State has failed to meet its burden to prove that its adopted interim remedy cures all of the defects present in the current maps for Congress and the State House of Representatives.

a) Legal Standard

The Fourteenth and Fifteenth Amendments protect against purposeful vote dilution generally and minority vote dilution in particular. *Reynolds v. Sims,* 377 U.S. 533 (1964); *White v. Regester,* 412 U.S. 755 (1973); *Rogers v. Lodge,* 458 U.S. 613, 617 (1982). The Defendants assert that no evidence exists of intentional discrimination. Defendants simply ignore the evidence offered by the Plaintiffs.

The standard of proof required for determining intent or discriminatory purpose is the same as that used in resolving cases under the Fourteenth Amendment's Equal Protection Clause. *Rogers v. Lodge,* 458 U.S. 613, 617 (1982); *Arlington Heights v.*

*Metropolitan Housing Corp.,* 429 U.S. 252, 265 (1977). Discriminatory purpose may be inferred from the totality of the relevant facts, including the fact that the law bears more heavily on one race than another. *Washington v. Davis,* 426 U.S. 229, 240, (1976). Factors that may be probative of a discriminatory purpose include: (1) impact of the official action; (2) historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes"; (3) specific sequence of events leading up to the challenged decision; (4) departures from normal procedural sequences; (5) substantive departures "particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 266-67.

In *Rybicki v. State Board of Elections,* 574 F. Supp. 1082, 1109 (N.D. Ill. 1982), the court found that it is indicative of an intent to discriminate where the requirements of incumbency "were so closely intertwined with the need for racial dilution that an intent to maintain a safe, primarily white, ... is virtually coterminous with a purpose to practice racial discrimination." *See Garza v. County of Los Angeles*, 918 F. 2d 763, 771-72 (9th Cir. 1990), *cert. denied* 111 S. Ct. 681 (1991).

In a redistricting context, cracking or packing minority populations and minority neighborhoods is the usual device used for diluting minority voting strength. *Perez v. Abbott*, 2017 WL 1787454, (W. D. Tex. 2017) slip op. p. 47. ("In other words, the

'[d]ilution of racial minority group voting strength may be caused' either 'by the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters or from the concentration of [minorities] into districts where they constitute an excessive majority.'") (citations omitted).

b) Intent Factual Record

In some areas of the State, H358 made no changes from the plan, H283, this Court has already made legal determinations regarding intent. For example this Court has determined that:

> With regard to the intentional vote dilution claims under § 2 and the Fourteenth Amendment, the Court finds that Plaintiffs proved their claims in El Paso County (HD78), Bexar County (HD117), Nueces County (the elimination of HD33 and the configuration of HD32 and HD34), HD41 in the Valley, Harris County, western Dallas County (HD103, HD104, and HD105), Tarrant County (HD90, HD93), Bell County (HD54), and with regard to Plan H283 as a whole.

*Perez v. Abbott,* 2017 WL 1450121, (W.D. Tex. 2017) slip op. p. 65. Among these districts are those that remained unchanged by the adoption of H358: Nueces County, with the elimination of HD 33, and the configuration of HD32 and HD34; and Bell County (HD 54). Moreover, the modifications in Dallas County were not substantive and did nothing to address the determination of this Court that "mapdrawers improperly used race with an intent to dilute Latino voting strength by wasting Latino votes in HD103 and HD104 and

creating a more Anglo HD105 to protect the Anglo Republican incumbent in the general election. This intentional vote dilution in Dallas County violates § 2 and the Fourteenth Amendment." *Id.* at 33; *See* TT, Vol. 1, pp. 131-133, 141-142. (Anchia). Thus, in Bell County, Nueces County, and Dallas County, the evidence presented in this case and the findings of this Court carry forward and infect H358 with the motives uncovered by this Court in its prior orders.

The plaintiffs' case does not rest solely on the record established in prior evidentiary hearings and trials before this Court. The record of the proceedings in 2013 legislative sessions also instruct and establish intent.

As with the 2011 session, the Texas House established rules in 2013 that specifically targeted new Latino and minority opportunity districts for exclusion from any amendment or enactment, in contradiction of legal counsel from the person designated by the redistricting committee chair and sponsor of the redistricting bill, Jeff Archer of the Texas Legislative Council. TT, Vol. 1, pp. 152-153; TT, Vol. 5, p. 1531 5-*19; 2017 MALC Exh. 14, p. 179 ("you've heard some of the concerns we have to go back to say coalitions are not protected by Section 2, House District 54 becomes a coalition district . . . . Also, the county line rule is violated in order to create this district. County line violation in Nueces County because it contains three districts."). Thus, without examining proposals, any new minority opportunity district that required the break of a

county line was summarily rejected just like in 2011. 2017 MALC Exh. 14, p. 132 ("not

doing anything on county line, not doing anything that is a larger issue that we will have

to look at.") This affected potential districts in Nueces County and Midland/Odessa. 2017

MALC Exh. 27, 28. Moreover, the blanket rule that no coalition minority opportunity

districts would be considered at all is as close to direct evidence of intentional

discrimination as one can secure. MALC 2017 Exh. 14, 179 ("we have go back to say

coalitions are not protected by Section 2".) This is especially true in light of the fact that

Chairman Darby in his private notes acknowledged that in the jurisdiction of the Fifth

Circuit, coalition districts are specifically recognized as potential Section 2 districts.

Quesada Exhibit 91; TT, Vol. 5, pp. 1576-7.

### c) Texas' failure to adopt a complete remedy is evidence of intentional discrimination

On February 28, 2012, this Court adopted interim plans for the Texas House of

Representatives and the U.S. Congress. Dkt. 681, 682. This Court stated its adoption of

interim plans was not a final ruling on any legal or factual matters in the case, but a

"preliminary determination[]" of the merits of the asserted claims. Dkt. 690 at 3; Dkt.

681 at 2; Dkt. 682 at 1-2. As to the state House interim plan, the Court emphasized the

"preliminary and temporary nature of the interim plan, ordered in adherence to the

standards set forth by the Supreme Court in this very case." Dkt. 690 at 12. As to the

congressional interim plan, the Court similarly emphasized "that it has been able to

make only preliminary conclusions that may be revised upon full analysis." Dkt. 691 at

2.[2] As "[this] Court is keenly aware . . . its preliminary injunction analysis was 'expedited

and curtailed' due to the circumstances at the time." *Perez v. Texas*, 970 F. Supp. 2d 593,

602 (W.D. Tex. 2013); Dkt. 691 at 2. In sum, the interim maps were never intended to be

a final remedy. They were formulated in haste to ensure the timely administration of an

election and created without all of the evidence presented at trial.[3] All of this was made

clear in this Court's multiple opinions adopting these plans. Nevertheless, Texas

persisted in its ceaseless pursuit of a remedy that promised to be incomplete.

On March 8, 2013, the Attorney General of Texas, Greg Abbott, sent a letter to the

Speaker of the Texas House advising that "the best way to avoid further intervention

from judges in the Texas redistricting plans . . . is to enact the interim maps during the

regular session." Defs. Exh. 858. The Attorney General further advised "[e]nacting the

interim plans into law would confirm the legislature's intent for a redistricting plan that

fully comports with the law, and will insulate the State's redistricting plans from further

---

[2] Indeed, the interim maps contain many of the discriminatory features that this Court has now ruled were intentionally discriminatory. Specifically, the State House districts in Nueces County, Bell County, and western Dallas County have been found to violate the 14th Amendment and Section 2 of the VRA. These districts are unchanged in Plan H358, the State's adopted interim remedy. This is also true in the congressional map.

[3] For instance, this Court did not have the full analysis of the precinct cuts made in HD 105 that painstakingly made clear that the map drawers cut precincts along racial lines in order to form its interim maps. Likewise, it did not have the benefit of the opinion of the D.C. District Court on pre-clearance.

legal challenge." *Id.* After no action was taken during the regular session, Governor Perry called a special session to enact the interim redistricting plans pursuant to this legal advice given by the Attorney General. The State of Texas adopted these interim maps with a few modifications to the State House map and none to address vote dilution claims.

The intent stated in this letter is clearly pretextual and belies a sub-rational and discriminatory purpose. Despite the warnings of this Court and the clear language of its opinion regarding the adoption of the interim maps, Texas enacted a remedy it knew was incomplete and could not possible achieve its stated goal.

Texas was warned by interest groups, every litigant in this case, committee witnesses, and this Court that anything less than a full remedy would not end this case. Nevertheless, Texas persisted. While Texas could be forgiven for its deaf ears to its litigative rivals, it also ignored the advice of its own counsel. Jeff Archer advised the Texas House's Select Committee on Redistricting concerning whether or not adopting the interim maps would end the litigation in June of 2013. Representative Jason Villalba asked Jeff Archer, a high-ranking lawyer for the Legislature, whether the Legislature's adoption of the Court's interim plans would "insulate or innoculate" those plans from constitutional challenges. TT, Vol. 5 at 1570:11-19; Jt. Exh. 15.3 Redistricting Committee Hearing July 12, 2013 Tr. 18:8-16. Archer's answer was far from ambiguous. He said

adoption would not inoculate the plans from constitutional challenges. Jt. Exh. 15.3 Tr. 18:17-18. "The parties to the case will continue to press issues that the Court took a [s]tab at perhaps but didn't fix." Jt. Exh. 15.3 Tr. 19:15-17. Adoption of the interim plans would merely give the Court a new baseline from which to work. Jt. Exh. 15.3 Tr. 18:18-24.

In total, Texas was warned by this Court, its litigants, members of the Legislature, well-intentioned interest groups, experienced legislators, and, finally, its own lawyers that this strategy was misguided, incomplete, and could not possibly achieve its stated goal. That is the risk that the State of Texas took when it began its ill-advised strategy to try to end this litigation. Yet, instead of heeding these words, the State of Texas pressed on.

Today, Texas is asking this Court to validate its bizarre choice to ignore the plain words of its opinion. It is asking this Court to ratify its failure to consider or even evaluate any proposal that might have cured the defects in the interim map. Willful avoidance of the law and unfriendly facts cannot protect the State of Texas from a finding of intentional discrimination. In fact, it is strong evidence that the State's reliance on the legality of the interim maps was a pretext for seeking an incomplete remedy.

d) Adoption of the interim maps does not inoculate Texas

The legislature does not mindlessly adopt laws. To conclude that the Legislature took this approach when considering the Court's interim maps would ignore reality, as recognized by the Supreme Court, because "redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment." *Perry v. Perez*, 565 U.S. 388, 393 (2012). The Court must assume the Legislature critically evaluated the interim maps before deciding whether to adopt or amend them. This fact can be seen at work with the changes to the House maps. Thus, the Legislature engaged in a new, independent determination of the districts changed by the Court's interim plans. However, as to the districts that remained untouched from the Legislature's 2011 plans, the Legislature's determination as to those districts must stick and follow those districts to whatever future plan they manifest themselves. *See Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010) ("We do not take lightly the possibility that a legislative body might seek to insulate from challenge a law known to have been originally enacted with a discriminatory purpose by (quietly) reenacting it without significant change."); *Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1246 (Barkett, J., dissenting) (expressing concern that "legislatures could continue to utilize statutes that were originally motivated by racial animus, and that continue to produce discriminatory effects, so long as they re-promulgate the statutes 'deliberately' and without explicit evidence of an illicit motivation").

The Supreme Court in *Perry v. Perez* instructed this Court to "take guidance from the State's recently enacted plan in drafting an interim plan. That plan reflects the State's policy judgments on where to place new districts and how to shift existing ones in response to massive population growth." 565 U.S. at 393. To the extent a Court takes guidance from such a plan, the discriminatory policy judgments employed in drafting those plans would be reflected in the Court's interim plan. The discrimination remains.[4] On the contrary, had the Supreme Court upheld the Court's first set of interim plans and the Legislature adopted those, there would be some merit to the State's claim of inoculation. After all, the State argued to the Supreme Court that the Court's first set of interim plans were unnecessarily inconsistent with the 2011 enacted plans. *Perez*, 565 U.S. at 392.[5]

When this Court redrew some districts in the interim plans, it did not approach them as final remedial plans. They were a remedy as part of a preliminary injunction and were not intended to cleanse the 2011 maps of discrimination. To be clear, MALC is in no way accusing the Court of discrimination in drawing its interim plans. When a district

---

[4] This is abundantly clear today as HDs 54 and 105 remain unchanged in the interim map and, yet, this Court found intentional discrimination in the creation of those districts. The interim map does not solve those defects. Texas has never offered any remedy to those defects despite ample opportunity to do so.

[5] In adopting the first set of interim plans, the Court itself said it was required to draw an "independent map" informed by "neutral principles that advance the interest of the collective public good." *Perez v. Perry*, 835 F. Supp. 2d 209, 212 (W.D. Tex. 2011), *vacated and remanded by*, 565 U.S. 388 (2012); Dkt. 528 at 4; Dkt. 544 at 16.

court is using a State's plan to adopt interim maps, it must "take care not to incorporate into the interim plan any legal defects in the state plan." *Perez*, 565 U.S. at 394. The degree of care a court can exercise depends on the evidence so far presented to the court. Evidence presented at a preliminary injunction hearing is typically not fully developed and the defendant usually does not disclose to the court where it acted discriminatorily. When drawing the interim plans, the evidence before this Court was vast, but not as detailed and targeted as in the 2014 trial on the merits.

In 2013, the Legislature seized an opportunity to adopt a substitute measure to address the preliminary findings as to its 2011 plans. By this undertaking, the Legislature had a duty to meet constitutional requirements. To meet constitutional requirements, the Legislature had to determine whether any constitutional defects existed in the 2011 maps, including districts drawn with intent to discriminate. It's not like these defects were difficult to uncover. The Legislature is in possession of, and has the power to uncover, all the evidence from 2011. To the extent the Legislature breached this duty to fully investigate and evaluate the defects in the remedial plans, it could not have cured any districts drawn with intent to discriminate. *See, e.g., N. C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016). ("[T]he remedy for an unconstitutional law must completely cure the harm wrought by the prior law . . . . But, even if the State were able to demonstrate that the amendment lessens the discriminatory effect of the photo

ID requirement, it would not relieve us of our obligation to grant a complete remedy in this case. That remedy must reflect our finding that the challenged provisions were motivated by an impermissible discriminatory intent and must ensure that those provisions do not impose any lingering burden on African American voters.")

A law that was enacted with discriminatory intent, that was subsequently modified by court decision, and that continues to have a discriminatory effect violates equal protection. *See Hunter v. Underwood*, 471 U.S. 222, 232-33 (1985). In *Hunter*, the Supreme Court was faced with an equal protection challenge to a law disenfranchising individuals convicted of crimes involving moral turpitude. *Id.* at 223-24. The State suggested that intervening events, including court orders voiding other provision of the same law, cured it of its original discriminatory purpose. *Id.* at 232-33. The court left open the question of whether the law would be valid if presently enacted without discriminatory intent. *Id.* at 233. But concluded that the law's "original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*." *Hunter*, 471 U.S. at 233.

On the other hand, in *Cotton v. Fordice*, a prisoner challenged a Mississippi law disenfranchising any person convicted of theft. 157 F.3d 388, 389-90 (5th Cir. 1998). The court of appeals noted the law appeared to have been enacted to discriminate against

Page 32 of 50

black felons. *Id.* at 390. However, the law was subsequently curtailed and later broadened through the legislative process and a popular vote. *Id.* at 391. The court concluded each amendment "superseded the previous provision and removed the discriminatory taint associated with the original version." *Id.* The Court distinguished the provision in *Hunter* as "fundamentally different" because the Mississippi legislature and voters "willingly" broadened the law through a deliberative process while the Alabama law was involuntarily amended by the courts. *Id.* at 391 n.8.

The facts of this case align closer to *Hunter* than *Cotton*. The House map was judicially created and opposed by the State. The congressional interim plan was a compromise between some plaintiff groups and intervenors, and the State.[6] None of the maps were willingly created by the State through a legitimate deliberative process and approved by Texas voters. Instead, the maps were more like involuntary amendments by the Court, which the State shrugged its shoulders in adopting, hoping they could use them as a weapon to dispense with this case and get this federal court off its back (or in the artful words of the state "avoid further intervention from judges," Defs. Exh. 858).

---

[6] Although the congressional interim plan was supported by a few plaintiff groups and not opposed by the State, most plaintiff groups had some objections to it. Dkt. 691 at 27-28. And it appears the havoc wrought to the primary schedule and massive uncertainty were as much, if not paramount, reasons for adopting the plan as was fixing some challenged districts. Dkt. 691 at 27-29.

Even if the plaintiffs lose on every single one of the pending claims as to the 2013 maps, the maps still contain intentionally discriminatory features that are a remnant of unchanged aspects of the originally adopted plans. It is uncontested that HD 54, HD 105, and the Nueces County plan for the State House are unchanged in Plan H358. The Legislature failed to investigate these obvious defects. They were warned by the litigants that these were live claims and that these districts were defective and violated federal law. The implication of their counsel's advice was that they had to investigate and evaluate these claims. They were also told by this Court that its remedy in 2012 was an interim remedy and did not make a final determination on any of the pending claims of the litigants. Nevertheless, Texas continued with its choice to re-ratify its decision-making as to HDs 54, 105, and the state house plan for Nueces County and Midland/Odessa. This choice clearly re-institutes the intentional discrimination already found by this Court and must be enjoined and remedied.

Moreover, Texas knew, when this Court issued its opinion as to the State House map in April 2017, that its proposed remedy in 2013 was insufficient. They have failed to remedy those defects. More importantly, they have also failed to prove that those districts are no longer discriminatory. Texas posited no evidence that HD 105 was no longer a racial gerrymander. Texas presented the self-serving testimony of Reps. Hunter and Cosper concerning Nueces and Bell Counties. None of that testimony countered this

Court's finding that those districts were intentionally discriminatory. Rep. Hunter testified that Plan H391 was a poor map because it cut the county line and paired one inland county with several coastal counties. TT, Vol. 5, pp. 1605-07. There is no defense to the current house districts in Nueces County or an explanation that the current districts are no longer discriminatory.

Likewise, Rep. Cosper testified that the justification for the current configuration of HD 54 was warranted because it connected parts of Killeen with Lampasas County and kept Killeen Independent School District more intact because of the inclusion of the cities of Harker Heights and Nolanville. TT, Vol. 2, pp. 608-09. Even taking this testimony at face value, it does not and cannot defeat this Court's previous finding of intentional discrimination. Indeed, the discriminatory features of HD 54 still exist (i.e. the splitting of Killeen, a minority-majority city, and its use of unexplained population deviation). There was no testimony offered that this district as enacted is no longer discriminatory or that its discriminatory features are no longer extant. At best, Rep. Cosper's testimony explicates his governing coalition and the importance of Ft. Hood to Killeen. No doubt, Killeen and Ft. Hood are inextricably tied together. Curiously, the current formulation of HD 54 in Plan H358 only incorporates a small portion of the Ft. Hood Census Designated Place (CDP). MALC 2017 Exh. 10 (Plan H358 for Bell County).

Every legislative enactment should be assumed to have been enacted purposefully. The State was warned that there were significantly troubling features in these districts. They were warned by the counsel, Jeff Archer, that the whole county line rule might have to give way for the creation of section 2 districts in Nueces County. They were warned by the litigants that HD 105's bizarre shape and precinct cuts were strong evidence of racial motivation in the creation of that district. And, they were on notice that the HD 54 configuration was deeply contested. Yet, Texas whistled past the graveyard and ran the risk of adopting a map with discriminatory features. It was a gamble that they lost.

> e) Failure to consider the subordination of the whole county line in Midland/Odessa is intentionally discriminatory

False reliance on the whole county line rule is a "bad faith" effort "intended on limiting Latino opportunity." Dkt. 1365, p. 38. In considering the adoption of the interim remedy, Chairman Darby foreclosed the consideration of any amendment which violated the whole county line rule. MALC 2017 Exh. 14, p. 130 (Darby would consider any amendment which did not "violate[] the Texas Constitution regarding contiguous districts or the county line rule.") In fact, Chairman Darby and other leaders of the Legislature would not even broach the subordination of the whole county line rule to comply with federal law:

"KEFFER: Now, the three amendments that you have accepted on the floor today——the Anchia-Ratliff amendment——and that was just switching precincts that was agreed by those two members, and switching precincts?

DARBY: Correct.

KEFFER: Not doing anything on county line, not doing anything that is a larger issue that we will have to look at." MALC2017 Exh. 14, p. 132.

MALC offered two amendments that sought to change the boundaries to the 2013 State House Map through its Chairman, State Representative Trey Martinez Fischer, Plans H321 and 329. 2017 MALC Exh. 15. Plan H321 was offered during committee consideration of the State House map. Plan H329 was offered during the floor activity. Plan H321 was rejected because it violated the whole county line rule. Jt. Exh. 15.3, pp. 120-127. In addition, Plan H329 was rejected because it violated the whole county line rule. TT, Vol. 5, pp. 1531:5-19.

In both of these plans, the West Texas district situated in Midland and Odessa exceeded 50% Latino majority CVAP. In Plan H321, which was rejected in committee, HD 81 had 51.7% HCVAP using the ACS data at the time. Jt. Exh. 15.3, p. 108:7-10. In Plan H329, which was rejected by the entire House, HD 81 had a 53.7% SSVR. MALC 2017 Exh. 14, p. S47. The compactness of these districts was never contested. The numbers proving that Latinos constituted a majority of the citizen voting age of those districts is also uncontested. The Legislature knew that elections are racially polarized in Texas. Elections are also racially polarized in Midland and Ector Counties. *Perez v. Abbott,* 2017

WL 1406379, at *116 (W.D. Tex. Apr. 20, 2017), FOF ¶717. The sole basis for the rejection of these two amendment as to West Texas is that they violated the whole county line rule.

However, as this Court has noted and the Texas Legislative Counsel has stated the whole county line rule must give way to federal law. The State made no inquiry into whether or not the West Texas districts might be required under federal law. They did not even consider the merits of any of these districts, because of their fundamental, intransigent belief in the whole county line provision of the Texas Constitution. This is practice that this Court has rejected as impermissible.

Just as in Nueces County, the "mapdrawers and redistricting leadership steadfastly refused to consider whether the County Line Rule might have to yield" to create a Latino opportunity districts in the area despite TLC's advice to the contrary. Dkt. 1365, p. 37-38. Just as in Nueces County, their refusal to consider the proper requirements of § 2 and to attempt to comply with it was in bad faith and intended to limit Latino opportunity.

The State did not engage in any investigation of the plans at the committee level, on the House floor, or in this litigation. The only remaining explanation for their refusal to even consider that the Texas Constitution might need to yield to federal law is the need to further limit minority opportunity in these Counties. That is an impermissible

reason to reject these amendments. It is also more strong evidence that Plan H358 was adopted with a discriminatory intent to dilute the voting strength of the minority community.

      f)   The rejection of coalition districts is evidence of intentional discrimination

The State's stated goal in enacting the interim maps was to adopt maps that fully comport with the law. DX 858. In order to fully comply with "the law", the State would at least have to consider whether or not a coalition district was required under Section 2 in a given geographical area. The State foreclosed the consideration of any amendment that created new coalition districts in any part of the map. 2017 MALC Exh. 14, p. 53. ("DARBY: You've heard some of the concerns we have go back to say coalitions are not protected by Section 2.") In fact, Chairman Darby's testimony is clear:

> Q. During the floor debate you took the position that Texas was not required to create coalition districts?
>
> A. I believe I stated that on the record.
>
> Q. And no amendments with Section 2 coalition districts were accepted by the House, correct?
>
> A. That's correct.

TT, Vol. 5, p. 1576:5-10. However, this is plainly not the case nor was it the advice given to the Legislature. Quesada Exh. 91. Chairman Darby knew that in the 5th Circuit coalition districts may be required by law. This legal requirement was ignored.

Rather than examine the amendments to determine the legitimate concern of the authors, they simply were rejected out of hand. They could have relied on their fact-finding prerogative as a policy-making institution. They did not do so. Instead, they rejected or ignored the law and adopted a fictional barrier to the consideration of amendments that would likely enhance minority voting strength. This, again, is further illustration of the State's intent to limit any enhancement of electoral opportunities for all minorities in Texas.

g)  The State has not met its burden in adopting an interim remedy

When this Court issued the interim maps, it was not a final determination on the merits. Yet, Texas choose to try to remedy the defects that it believed were in the initially adopted map by adopting the interim maps. In essence, when the State of Texas adopted Plan H358 and C235, it was seeking a remedy to cure the defects found by multiple federal courts in the adoption of its 2011 maps. This remedy was taken purposefully with the stated intention of adopting maps that fully comport with the law. When adopting a remedy for a constitutional violation, "[t]he burden rests on the State to prove that its proposed remedy completely cures the harm in this case." *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 240. As of April of this year, Texas was on notice that its interim maps contained intentionally discriminatory defects. In defense of their proposed remedy for these defects, Texas provided no testimony that would

prove that the interim maps cure the constitutional violations found by this Court that remain unchanged in either Plan H358 or C235.

"A remedial decree, this Court has said, must closely fit the constitutional violation; it must be shaped to place persons unconstitutionally denied an opportunity or advantage in 'the position they would have occupied in the absence of [discrimination].' *United States v. Virginia,* 518 U.S. 515, 547 (1996). "A proper remedy for an unconstitutional exclusion, we have explained, aims to 'eliminate [so far as possible] the discriminatory effects of the past' and to 'bar like discrimination in the future.'" *Louisiana v. United States*, 380 U.S. 145, 154 (1965). This is a significant burden that Texas has failed to meet.

"With regard to the intentional vote dilution claims under § 2 and the Fourteenth Amendment, the Court finds that Plaintiffs proved their claims in El Paso County (HD78), Bexar County (HD117), Nueces County (the elimination of HD33 and the configuration of HD32 and HD34), HD41 in the Valley, Harris County, western Dallas County (HD103, HD104, and HD105), Tarrant County (HD90, HD93), Bell County (HD54), and with regard to Plan H283 as a whole." Dkt. 1365, p. 153. The State knew that many of these districts were unchanged from Plan H283 and their discriminatory features continue on until today. The State also knew that districts that had been changed would necessitate proof

that the State's chosen remedy cures the intentional discrimination that was found by this Court. They choose not to defend these districts.

In sum, the State has proffered no evidence that its chosen remedy for any of the proposed districts cures the defects found by this Court. This is their burden. They have failed to meet this burden. As such, the plans containing these defects must be enjoined and their defects must be remedied.

The evidence in this case convincingly establishes that Plan H358 was adopted with the intent to discriminate and violates Section 2 of the Voting Rights Act and the Fourteenth Amendment.

3.    Does Section 2 require additional Latino or minority opportunity districts in the State's Congressional plan?

a.    Legal Standard

The legal standard described above applies equally to MALC's challenge to C235 as it does to H358 and will therefore not be repeated here.

b.    Section 2 (Effects) Factual Record

*Gingles I*

As with State House factual record, the factual record presented on Congressional districts here is compelling. MALC and other plaintiffs presented evidence on the *Gingles* pre-conditions as well as the totality of circumstances as they apply to the challenge to C235. As detailed above a plaintiff's burden begins with the development and submission of a demonstration redistricting

plan that creates additional districts with a sufficiently large minority population to elect candidates of its choice. *DeGrandy supra.*

Plaintiffs submitted plans C283 and C285. Both are state-wide maps that fit into C235 and alters districts only to the degree necessary. TT, Vol. 2, pp. 724. (Korbel testimony); Jt. Exh. 102, and 104 (C283 and C285 repectively, maps and data). Mr. Korbel testified that in developing the demonstration *Gingles* districts in C283 and C285 he adhered to the suggestions of the courts (Supreme Court and 5th Circuit) with regards to redistricting and paying close attention to city and county lines, voting precincts, equalizing population, and to communities of interest. TT, Vol. 2, pp. 724, 729-730. As was shown in MALC exhibits 8 and 9, in the urban areas shown, C285 respects municipal boundaries as well or better than the state's C235. MALC 2017 exhibits 8 and 9; TT, Vol. 2, pp. 733-736. In addition, Mr. Korbel compared C285 and C283 on the question of compactness. TT, Vol. 2, pp. 730-733; MALC 2017 exh. 7. The MALC plan was more compact than C235. *Id.*

Because CD 23 has failed to perform in two of the last three elections and because CD35 was found by this Court to be a racial gerrymander, in assessing the creation of additional Latino or minority opportunity districts two of the current majority HCVAP districts in C235 cannot be characterized as Latino opportunity districts. TT. Vol. 2, pp. 726; *Perez v. Abbott,* ___ F. Supp___, 2017 WL 1787454, (W. D. Tex. 2017) slip op. p. 66 ("In addition, Defendants' manipulation of Latino voter turnout and cohesion in CD23 denied Latino voters equal opportunity and had the intent and effect of diluting Latino voter opportunity. Nueces County Hispanics and Hispanic voters in CD23 have proved their § 2 results and intentional vote dilution claims. The configurations of CD23, CD27, and CD35 in Plan C185 are therefore invalid.")

As with the 2011 congressional plan, the failure of C235 to include seven Latino opportunity districts in South Texas, in light of racially polarized voting, and the totality of circumstances, creates a Section 2 effects violation. Plans C283 and 285 create seven performing, Latino CVAP majority districts in South Texas, including a compact CD35 in plan C283, with no appendages along I35. Jx. 102 and 104.

MALC plans C285 also creates additional performing coalition districts in Dallas and Harris County. Jx. 104.

With regard to Nueces County, Mr. Korbel placed most of the Latino population of Nueces County in a performing Latino opportunity district in both C283 and C285. TT, Vol. 2 pp. 727-728.

Thus MALC presented and satisfied *Gingles I* with 7 performing Latino CVAP majority districts in South Texas and an additional 4 new majority minority CVAP performing districts that were reasonably compact in MALC's C285 and seven performing Latino CVAP majority districts in South Texas in MALC's plan C283. MALC 2017 Exhs. 25; TT, Vol. 2, pp. 740-744.

Mr. Korbel adhered to traditional redistricting principles that were comparably consistent principles—not necessarily principles identical, or subjugated, to the State's exact prioritization, but simply those within the confines of a "well-developed, legally-adequate plan that can be adjusted" at the remedial stage. *See Fairley v. Hattiesburg, Miss.,* 584 F3d 660, 671 n.14, (5th Cir. 2009).

*Gingles II, III and Totality of Circumstances*

As discussed above with regard to the Texas House enactment, racially polarized evidence in this case is clear. Latinos are politically cohesive, African American voters are politically

cohesive and minority voters are cohesive together. Additionally, Anglo voters vote sufficiently as a bloc to defeat minority preferred candidates, absent majority minority districts. In addition the totality of circumstances on balance weigh in favor of the plaintiffs' claims.

On balance, evaluation of the *Gingles* pre-conditions and the totality of circumstances supports and weighs in favor of finding a Section 2 violation in this case.

More generally, the evidence in this case demonstrates that Plan H358 violates Section 2 of the Voting Rights Act.

4. Was Plan C235 adopted with the intent to discriminate in violation of Section 2 and the Fourteenth Amendment?

a. Legal Standard

The legal standard described above on intent applies equally to MALC's challenge to C235 as it does to H358 and will therefore not be repeated here.

b. Factual Record on Intent

The State adopted its Congress map with the intent to discriminate. As with the Texas House plan, the enactment of the congressional plan is equally infected with discriminatory intent. The State of Texas adopted the Court's interim order root and stem. Just as it did with the statehouse map, Plan C235 was an interim court remedy made in haste to comply with an election schedule. The totality of the evidence concerning the congressional map and its discriminatory defects were not before this Court when it made its interim order. It was a plan that was not a final determination of the merits of the claims of the plaintiffs, and was not a final remedy in any regard. Nevertheless, Texas continued as if this was a final remedy to its legislative sins. Texas has violated the law in adopting this map in two ways: 1) it failed to investigate and fully

remedy all of the defects of the interim map and selected a process by which all ameliorative amendments were denied using artificial barriers, and 2) it adopted a map with discriminatory defects and the State of Texas has provided zero evidence that this its proposed remedy has cured the defects found by this Court.

On May 29, 2013, this Court held a status hearing concerning this case. Subsequent to that hearing on May 31, 2017, the House Select Committee on Redistricting met to begin considering a process by which they would enact interim maps pursuant to the Governor's call for a special session. At this hearing, the State of Texas and its legislators were put on notice of the interim nature of these maps. Mr. Martinez Fischer speaking during the committee made clear that "[a]t the May 29th court hearing, and for those of you who have the transcript it is at Page 5, Page 5, Line 17 of the transcript, that makes it clear that the interim map does not address any of the claims brought by the litigants." Moreover, it doesn't address any of the findings by the DC court." JX 10.4, p. 36-37.  The transient nature of these maps was well-known to all of the participants in committee and on the House Floor.

Despite this transient nature of the interim maps, at this same hearing Chairman Darby offered his opinion that the interim maps were "legally sufficient". TT. Vol. 5, pp. 1563-64. At this hearing, Chairman Darby also discussed the necessity to hire counsel to help the committee members understand the redistricting process. TT. Vol. 5, pp. 1564-65. Before June 1, 2013, the Texas Legislative Council hired two attorneys for Chairman Darby, Michael Morrison and David Guinn. TT. Vol. 5, p. 1568 16:24. Initially, Chairman Darby stated that the counsel would be for the committee. TT. Vol. 5, p. 1567, 1:3. Eventually, these attorneys asked to withdraw from their representation of the chairman. TT. Vol. 5, p. 1569, 11:13. After their withdrawal, the chairman

said that if the members of the committee needed legal advice they should seek it from the Texas Legislative Council. TT. Vol. 5, pp. 1569, 17:20.

The committee's attorney, Jeff Archer, stated that the "the Court had not made final determinations, as I said, had not made fact findings on every issue, and had not thoroughly analyzed all the evidence, but they had to make some best-case guesses based on the direction of the U.S. Supreme Court gave them." TT. Vol. 5, pp. 1570-1. Despite this advice, the only legal advice afforded to the members of the committee, they voted to make no changes concerning the congressional map and sent the bill to the whole house for its consideration. No racially polarized analysis was shared with the committee that would disprove the need for section 2 districts. There was no study of racial cohesion to confirm or negate the need for coalition districts. There was no review of any of the totality of circumstances standards. In short, the committee rubber-stamped the congressional maps without investigating the need to make any changes pursuant to federal law. No additional work was done to ensure that the map comported with the law. TT. Vol. 5, p. 1573, 5:12.

On the House Floor, amendments were offered and later withdrawn that would have created more minority opportunity districts. At least one of these amendments was highlighted by Jeff Archer as highlighting some vulnerabilities in the interim maps and it was rejected. TT. Vol. 5, p. 1575, 1:22. Again, during the floor debate, Chairman Darby set out his rules for the acceptance of amendments. Chairman Darby required that only minority opportunity districts that were legally required would be accepted. TT. Vol. 5, p. 1576 11:20.  Also, Chairman Darby wholly foreclosed the consideration of any coalition districts, because in his view they were not legally required. TT. Vol. 5, pp. 1576, 5:10. However, Chairman Darby was aware that the law of the 5th

Circuit included the consideration of coalition districts upon a showing racial cohesion. TT. Vol. 5, pp. 1576-7; Quesada Exh. 91.

In total, the Legislature stated that it was acting to enact maps that it believed would comply with the law. DX -858. Yet, it adopted a process by which no full remedy could be enacted. There was no discussion or consideration of any amendment or any process to evaluate whether or not an amendment might cure the deficiencies present in the interim map. The Legislature knew the interim map was deficient and it would not allow a meaningful process to determine a reasonable remedy to cure those deficiencies. The outright denial of lawful amendments based on the mistaken belief that coalition districts need not be created is direct evidence of the intention to limit minority voting strength. They knew that the interim map was insufficient and they did nothing to make it better. They knew that coalition districts might be required by law and they did nothing to prove or negate the need to seek any of these ameliorative amendments. Finally, the process by which these maps were adopted was a predetermined and closed. The attorney general was actively advising Chairman Darby even though the AG had refused to send a representative to brief the House Select Committee on Redistricting. Further, the AG briefed members of the Republican caucus during the floor debate and no similar briefing was given to any of the minority caucuses.

There is ample evidence that the State sought to adopt these interim maps with the intention to dilute the voting strength of minority voters. But, even if this Court finds this insufficient, the State still adopted a map that contains discriminatory features. As this Court found in its order concerning the congressional map, the failure to place Nueces County in a minority opportunity district is intentionally discriminatory. That failure is replicated in the 2013 maps. The State was

on notice of the claim and did nothing to cure this defect. Willful ignorance is the same thing as intent.

Finally, as with the state house map, districts that this Court has found constitutionally infirm in Nueces County and in CD 35, are carried forward without change. Therefore, the legislative intent in their original creation carries forward.

### c.   The State has failed to meets its burden.

As with any Constitutional violation, the State has the burden to prove that its chosen remedy cures all of the defects found by the Court. The State was on notice of the need to remedy the intentionally discriminatory defects in the Court's recent opinion. The State supplied no evidence that Nueces County is no longer required to be in a minority opportunity district. It provided no evidence that CD 35 is not a racial gerrymander. As to these two issues, the State has failed to meet its burden. These discriminatory features must be enjoined and cured.

The evidence in this case is substantial. The challenged plans for Texas House H358 and Texas Congressional districts C235 violate Section 2 of the Voting Rights Act and the Fourteenth Amendment of the United States Constitution and should be enjoined.

Plaintiff MALC asks this Court to enjoin C235 and H358 and enter judgment for Plaintiffs.

DATED: July 31, 2017                                 Respectfully submitted,


                                                      _/s/Jose Garza_____
                                                     JOSE GARZA
                                                     Texas Bar No. 07731950
                                                     Law Office of Jose Garza
                                                     7414   Robin Rest Dr.
                                                     San Antonio, Texas 78209

(210) 392-2856
garzpalm@aol.com

JOAQUIN G. AVILA
Law Office of Joaquin G. Avila
1160 North 192street, Apt.      No. 3-
214
Shoreline, Washington 98133
Texas State Bar # 01456150
(206) 724-3731
javila1948@outlook.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July, 2017, I electronically filed the foregoing using the CM/ECF system which will send notification of such filing to all counsel of record who have registered with this Court's ECF system.

\_\_/s/ Jose Garza_____
JOSE GARZA