# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

SHANNON PEREZ, *et al.*,

      *Plaintiffs,*

v.

STATE OF TEXAS, *et al.*,

      *Defendants.*

CIVIL ACTION NO.
SA-11-CA-360-OLG-JES-XR
[Lead case]

## DEFENDANTS' POST-TRIAL BRIEF

TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................. 3

Argument and Authorities ................................................................................................... 9

I.    The Plaintiffs' Claims of Intentional Racial Discrimination Fail .............. 9

A.    To Prove Intentional Racial Discrimination, Plaintiffs Must
Prove that the 2013 Legislature Acted with the Specific
Intent to Harm Minority Voters Because of their Race or
Ethnicity. ...................................................................................... 10

B.    The 2013 Legislative Redistricting Plans Are Entitled to a
Presumption of Constitutionality ................................................. 16

C.    The Legislative Record Demonstrates that the Legislature
Acted for a Permissible Purpose When It Enacted the 2013
Redistricting Plans ........................................................................ 18

1.    Plan H358 ........................................................................ 19

2.    Plan C235 ........................................................................ 27

D.    The Denial of Preclearance Does Not Undermine the
Legislature's Good-Faith Reliance on this Court's Ruling
Regarding the Interim Plans. ....................................................... 31

1.    Plan H309 addressed every defect identified by the
D.C. district court ........................................................... 31

2.    Plan C235 addressed every defect identified by the
D.C. district court ........................................................... 33

3.    The legislative record disproved opponents' claims
that the Court-drawn plans failed to remedy defects
found by the D.C. district court. .................................... 34

  E. Plaintiffs' Complaints About the Legislative Process Do Not Support their Claims of Intentional Racial Discrimination. ......... 36

II. Discriminatory Effect Under Section 2 of the Voting Rights Act .......... 41

  A. *Gingles* I ................................................................................. 41

  B. *Gingles* II ................................................................................ 44

  C. *Gingles* III .............................................................................. 48

III. Claims Against Plan H358 ................................................................. 52

  A. Bell County ............................................................................. 52

  B. Bexar County .......................................................................... 55

  C. Dallas County ......................................................................... 56

  D. Fort Bend County .................................................................... 63

  E. Harris County ......................................................................... 64

  F. Midland County and Ector County ......................................... 65

  G. Nueces County ....................................................................... 65

  H. Tarrant County ....................................................................... 69

IV. Claims Against Plan C235 ................................................................. 71

  A. Population Growth .................................................................. 71

  B. Congressional District 23 ........................................................ 74

  C. Congressional District 27 ........................................................ 78

  D. Dallas/Fort Worth .................................................................. 80

V. Plaintiffs Failed to Prove that Race Was the Predominant Factor in Any Decision Made by the 2013 Legislature. ............................................ 84

A.    Plaintiffs Cannot Prove Racial Gerrymandering in Plan C235.................................................................................................... 85

B.    The Task Force Plaintiffs Have Failed to Prove Racial Gerrymandering in House District 90............................................. 86

Conclusion........................................................................................................ 90

Certificate of Service .................................................................................... 91

### TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrams v. Johnson,*
    521 U.S. 74 (1997) ........................................................................ 4, 5

*Alabama Legislative Black Caucus v. Alabama,*
    135 S. Ct. 1257 (2015) ...................................................................... 86

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ...............................................................11, 12, 13

*Backus v. South Carolina,*
    857 F. Supp. 2d 553 (D.S.C.), *aff'd,* 568 U.S. 801 (2012)........................ 9, 40

*Baird v. Consol. City of Indianapolis,*
    976 F.2d 357 (7th Cir. 1992) ............................................................ 14

*Bartlett v. Strickland,*
    556 U.S. 1 (2009).............................................................. 13, 41, 42, 43, 79

*Beer v. United States,*
    425 U.S. 130 (1976) .......................................................................... 15

*Bethune-Hill v. Va. State Bd. of Elections,*
    137 S. Ct. 788 (2017)....................................................................... 85, 86

*Branch v. Smith,*
    538 U.S. 254 (2003) ............................................................................ 8

*Bush v. Vera,*
  517 U.S. 952 (1996) ................................................................................. 18, 68

*Castaneda-Gonzalez v. Immigration & Naturalization Serv.,*
  564 F.2d 417 (D.C. Cir. 1977) ....................................................................... 40

*Chapman v. Meier,*
  420 U.S. 1 (1975) ........................................................................................... 16

*Chen v. City of Houston,*
  206 F.3d 502 (5th Cir. 2000) ......................................................................... 85

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ....................................................................................... 13

*Connor v. Finch,*
  431 U.S. 407 (1977) ......................................................................................... 4

*Connor v. Waller,*
  421 U.S. 656 (1975) (per curiam) ................................................................... 8

*Cooper v. Harris,*
  137 S. Ct. 1455 (2017) ................................................................................... 79

*Edwards v. Aguillard,*
  482 U.S. 578 (1987) ....................................................................................... 12

*Everson v. Bd. of Educ. of Ewing Twp.,*
  330 U.S. 1 (1947) ........................................................................................... 17

*Fairley v. City of Hattiesburg,*
  584 F.3d 660 (5th Cir. 2009) ......................................................................... 67

*Fletcher v. Peck,*
  10 U.S. (6 Cranch) 87 (1810) ............................................................. 13, 17, 39

*Florida v. United States,*
  885 F. Supp. 2d 299 (D.D.C. 2012) (per curiam) ......................................... 40

*Growe v. Emison,*
  507 U.S. 25 (1993) ......................................................................................... 79

*Hernandez v. New York,*
  500 U.S. 352 (1991) ....................................................................................... 15

*Hispanic Coal. on Reapportionment v. Legislative Reapportionment Comm'n,*
  536 F. Supp. 578 (E.D. Pa.), *aff'd*, 459 U.S. 801 (1982)................................ 39

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) .................................................................. 15, 85

*Hunt v. Wash. State Apple Adver. Comm'n,*
  432 U.S. 333 (1977) ........................................................................ 74

*Johnson v. De Grandy,*
  512 U.S. 997 (1994) .................................................................. 14, 72

*Karcher v. Daggett,*
  462 U.S. 725 (1983) ........................................................................ 12

*Lewis v. Ascension Parish Sch. Bd.,*
  806 F.3d 344 (5th Cir. 2015) ............................................................. 9

*LULAC v. Clements,*
  999 F.2d 831 (5th Cir. 1993) (en banc) ......................................... 48, 50

*LULAC v. N.E. Indep. Sch. Dist.,*
  903 F. Supp. 1071 (W.D. Tex. 1995)................................................... 9

*LULAC v. Perry,*
  548 U.S. 399 (2006) ........................................... 12, 43, 44, 45, 72

*McCleskey v. Kemp,*
  481 U.S. 279 (1987) ........................................................................ 18

*McDonald v. Bd. of Election Comm'rs of Chi.,*
  394 U.S. 802 (1969) ........................................................................ 18

*Miller v. Johnson,*
  515 U.S. 900 (1995) ........................................... 15, 16, 17, 43, 85

*Nipper v. Smith,*
  39 F.3d 1494 (11th Cir. 1994) (en banc) ........................................ 52

*Palmer v. Thompson,*
  403 U.S. 217 (1971) ........................................................................ 10

*Perry v. Perez,*
  565 U.S. 388 (2012) (per curiam)............................... 1, 3, 4, 5, 6, 41

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ......................................................................... 10, 11

*Rodriguez v. Pataki*,
    308 F. Supp. 2d 346 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004) ....................................... 44

*Rogers v. Lodge*,
    458 U.S. 613 (1982) ...................................................................... 9, 10, 11

*Shaw v. Reno*,
    509 U.S. 630 (1993) ........................................................................ 9, 85

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) ............................................................................ 13

*Terrazas v. Clements*,
    537 F. Supp. 514 (N.D. Tex. 1982) (per curiam) ........................................................ 8

*Texas v. United States*,
    887 F. Supp. 2d 133 (D.D.C. 2012), *vacated*, 133 S. Ct. 2885 (2013) ........7, 31, 32, 33

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ........................................................................ 50, 51

*U.S. Dep't of Labor v. Triplett*,
    494 U.S. 715 (1990) ........................................................................... 16

*U.S.P.S. v. Gregory*,
    534 U.S. 1 (2001) ............................................................................. 16

*United States v. Charleston Cnty.*,
    365 F.3d 341 (4th Cir. 2004) .................................................................. 52

*United States v. O'Brien*,
    391 U.S. 367 (1968) ....................................................................... 10, 39

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995) ................................................................... 52

*Upham v. Seamon*,
    456 U.S. 37 (1982) (per curiam) ............................................................... 4, 5

*Vacco v. Quill*,
    521 U.S. 793 (1997) ........................................................................... 16

*Voinovich v. Quilter,*
  507 U.S. 146 (1993) ................................................................................ 72

*Warth v. Seldin,*
  422 U.S. 490 (1975) ................................................................................ 74

*Washington v. Davis,*
  426 U.S. 229 (1976) ........................................................................... 10, 11

*Whitcomb v. Chavis,*
  403 U.S. 124 (1971) ........................................................................... 48, 49

*White v. Regester,*
  412 U.S. 755 (1973) ............................................................................. 9, 48

*White v. Weiser,*
  412 U.S. 783 (1973) ................................................................................. 5

*Wise v. Lipscomb,*
  437 U.S. 535 (1978) ................................................................................. 4

## Statutes

42 U.S.C. § 1973(b) ..................................................................................... 45

52 U.S.C. § 10302(a) ................................................................................... 48

Act of June 20, 2011, 82d Leg., 1st C.S., ch. 1, 2013 Gen. Laws 5091 ........................... 3

Act of June 21, 2013, 83d Leg., 1st C.S., ch. 3, 2013 Tex. Gen. Laws
  5005 ....................................................................................................... 74

Act of May 21, 2011, 82d Leg., R.S., ch. 1271, 2013 Gen. Laws 3435 ........................... 3

## Other Authorities

Daniel R. Ortiz, *The Myth of Intent in Equal Protection*, 41 STAN. L. REV.
  1105 (1989) ............................................................................................. 11

Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117
  YALE L.J. 174 (2007) ............................................................................... 14

S. Rep. 97-417, *reprinted in* 1982 U.S.C.C.A.N. 177 (1982) ............................... 48, 49, 50

## INTRODUCTION

In 2012, this Court adopted plans C235 and H309 under the Supreme Court's instruction that it "take care not to incorporate . . . any legal defects in the state plan[s]" passed in 2011. *Perry v. Perez*, 565 U.S. 388, 394 (2012) (per curiam). Following that instruction, the Court adopted interim plans that cured every defect the D.C. district court ultimately found when it denied preclearance to the State's congressional and House redistricting plans. The 2013 Legislature relied in good faith on this Court's correct judgment, and it adopted Plan C235 and Plan H358 because it wanted to pass fair and legal redistricting plans.

The legislatively enacted plans are entitled to a strong presumption of constitutionality. Plaintiffs have failed to overcome that presumption with proof that the 2013 Legislature intentionally discriminated on the basis of race. The Court did not intentionally discriminate on the basis of race when it implemented Plan C235, and there is no evidence that the 2013 Legislature intentionally discriminated on the basis of race when it adopted C235 exactly as drawn by the Court. Nor is there evidence that the 2013 Legislature intentionally discriminated on the basis of race when it adopted amendments to Plan H309, or when it enacted the amended plan as Plan H358. The Legislature held hearings across the State and heard input from various individuals and groups, including several of the Plaintiffs in this case. *See, e.g.*, JX-17.3 at S1; JX-20.3; JX-22.3; JX-23.3. The 2013 legislative record reflects the Legislature's correct judgment that "the court-ordered interim maps [are] legally sufficient to meet our legislative duties

1

to enact maps that comply with the constitutions of the United States and Texas under the Voting Rights Act." JX-17.3 at S1.

Plaintiffs have also failed to prove that the 2013 redistricting plans have the effect of denying or abridging any person's right to vote on account of race or membership in a language minority group. Most of Plaintiffs' vote-dilution claims are based on the 2013 Legislature's supposed failure to draw coalition districts in which two or more groups combine to form a majority of a district's citizen voting-age population. Those claims fail because coalition districts are not required by the Voting Rights Act, and even if they could be required in some instances, Plaintiffs have failed to show voting cohesion among the groups that form the proposed coalitions.

Plaintiffs have also failed to prove their claims that the 2013 Legislature drew the boundaries of any district predominantly on the basis of race. In Plan C235, the Legislature did not draw district boundaries or move population between districts; it adopted the district boundaries implemented by this Court. Except for the few districts from Plan H309 that were modified, the same is true of Plan H358. To the extent the Legislature redrew any district boundaries in Plan H358, it did so based on amendments agreed to by the affected members of the House, and subject to the criteria laid out by Chairman Drew Darby. There is no evidence that it relied predominantly on the race of the affected population.

### BACKGROUND

In 2011, the Texas Legislature enacted reapportionment plans for the Texas House of Representatives and the State's congressional districts.[1] Section 5 of the Voting Rights Act prevented those plans from taking legal effect until they were precleared. The 2011 plans were never precleared, and they never took legal effect.

While the State's preclearance lawsuit was pending in the U.S. District Court for the District of Columbia, this Court held a two-week trial beginning on September 6, 2011. Because preclearance was pending and the previous redistricting plans were malapportioned, it fell to this Court to create interim redistricting plans for the 2012 elections. In November 2011, this Court ordered that the 2012 elections would be conducted under court-drawn redistricting plans, C220 and H302.

On January 20, 2012, the Supreme Court issued a unanimous opinion vacating this Court's injunction, holding that the interim plans did not follow the established rules governing court-drawn apportionment plans. Those rules included the basic directive that court-drawn apportionment plans should not deviate from legislative policy unless necessary to remedy or avoid a violation of the Constitution or the Voting Rights Act. *Perry v. Perez*, 565 U.S. at 393. Supreme Court precedent explained that court-drawn apportionment plans are subject to stricter limits than legislative plans

---

[1] Act of May 21, 2011, 82d Leg., R.S., ch. 1271, 2013 Gen. Laws 3435; Act of June 20, 2011, 82d Leg., 1st C.S., ch. 1, 2013 Gen. Laws 5091.

because "a federal court, lacking the political authoritativeness that the legislature can bring to the task, must act circumspectly, and in a manner free from any taint of arbitrariness or discrimination." *Wise v. Lipscomb*, 437 U.S. 535, 541 (1978) (quoting *Connor v. Finch*, 431 U.S. 407, 415 (1977)) (internal quotation marks omitted).

Because the State's preclearance lawsuit was still pending, and because this Court lacked jurisdiction to enter a final judgment on the State's plans unless and until they gained preclearance, the Supreme Court gave specific instructions on creating court-drawn plans for the upcoming elections. It began with the fundamental principle of judicial apportionment:

> "[F]aced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying" a state plan—even one that was itself unenforceable—"to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act."

*Perry v. Perez*, 565 U.S. at 393 (quoting *Abrams v. Johnson*, 521 U.S. 74, 79 (1997)). That standard is not unique to interim court-drawn plans. It applies whenever a court must undertake the legislative function of reapportionment—even when, as in *Abrams v. Johnson*, the court must create a remedial plan. *See* 521 U.S. at 78 ("For the task of drawing a new plan, the court deferred to Georgia's Legislature, but the legislature could not reach agreement. The court then drew its own plan . . . .").

The Supreme Court rejected the Plaintiffs' argument that district courts could "ignore any state plan that has not received § 5 preclearance," noting that "in *Upham* [*v. Seamon*, 456 U.S. 37 (1982) (per curiam)] this Court ordered a District Court to defer to

4

the unobjectionable aspects of a State's plan even though that plan had already been *denied* preclearance." *Perry v. Perez*, 565 U.S. at 395–96. It explained that a state plan that has not been precleared

> serves as a starting point for the district court. It provides important guidance that helps ensure that the district court appropriately confines itself to drawing interim maps that comply with the Constitution and the Voting Rights Act, without displacing legitimate state policy judgments with the court's own preferences.

*Id.* at 394. The Court cautioned, however, that "[a] district court making such use of a State's plan must, of course, take care not to incorporate into the interim plan any legal defects in the state plan." *Id.* (citing *Abrams*, 521 U.S. at 85–86; *White v. Weiser*, 412 U.S. 783, 797 (1973)).

The Supreme Court's instructions in *Perry v. Perez* did not impose a stricter standard on this Court's interim plan than it had applied to court-drawn plans in the past. To account for claims under the Constitution or § 2 of the Voting Rights Act, the Supreme Court instructed that this Court "should still be guided by [the State's] plan, except to the extent those legal challenges are shown to have a likelihood of success on the merits." *Id.*

If anything, *Perry v. Perez* gave this Court greater leeway than previous cases by imposing a less stringent standard for unresolved objections under § 5. Unlike *Upham*, the preclearance objections in this case had not yet been resolved, and this Court lacked jurisdiction to "prejudge the merits of the preclearance proceedings" in creating a court-drawn plan. *Id.* at 395. Accordingly, instead of instructing this Court to determine

whether the § 5 objections were likely to succeed on the merits, the Supreme Court instructed this Court to "tak[e] guidance from [the] State's policy judgments unless they reflect aspects of the state plan that stand a reasonable probability of failing to gain § 5 preclearance"—a "reasonable probability" meaning that "the § 5 challenge is not insubstantial." *Id.* The not-insubstantial standard was meant to "ensure[] that a district court is not deprived of important guidance provided by a state plan due to § 5 challenges that have *no reasonable probability of success.*" *Id.* (emphasis added). Ultimately, this Court's "mission [was] to draw interim maps that do not violate the Constitution or the Voting Rights Act." *Id.* at 396.

Based on those standards, this Court adopted interim plans that followed the Legislature's judgment "except in the discrete areas in which [it] preliminarily found plausible legal defects under the standards of review the Court has announced." Opinion at 11, ECF No. 690. Those plans made substantial changes to the State's plans. In the interim Texas House plan, the Court modified HD 41 to address one-person, one-vote claims; it relocated HD 35 to the Rio Grande Valley as a new Latino opportunity district; it restored HD 149 in Harris County; it reconfigured HD 144 in eastern Harris County to create a new Latino opportunity district; and in El Paso County, it reconfigured HD 77 to make it more compact, with the effect of increasing the HCVAP of HD 78 to 58.3%, ensuring Latino voters' opportunity to elect. *Id.* at 11–12. In summary, the Court noted that 7 House districts were altered minimally, and 21 were altered substantially. *Id.* at 12.

6

In adopting Plan C235 as an interim congressional redistricting plan, this Court concluded "that it sufficiently resolves the 'not insubstantial' § 5 claims and that no § 2 or Fourteenth Amendment claims preclude its acceptance under a preliminary injunction standard." Order at 29 (Mar. 19, 2012), ECF No. 691. The Court restored CD 23 to benchmark levels of performance to address a not-insubstantial claim of retrogression under § 5. *Id.* at 32. It addressed the United States' claim of statewide retrogression by ensuring that the plan included at least 11 minority ability-to-elect districts. *Id.* at 32–33. It addressed not-insubstantial § 5 claims in Dallas and Tarrant County by removing encroachments into minority communities to create CD 33, *id.* at 36–37, and by reducing the minority population of CD 30 to address claims of "packing," *id.* at 37, thereby resolving Plaintiffs' Fourteenth Amendment claims in the Dallas-Fort Worth region, *id.* at 38–39. The Court noted that changes to CD 33 "potentially offset the loss of African American voting strength in CD 25." *Id.* at 49. The Court also modified CD 9, CD 18, and CD 30 to address not-insubstantial claims under § 5 that "map drawers removed economic engines from these districts and had drawn members' offices out of each of their districts." *Id.* at 39. The Court specifically stated that "C235 is not purposefully discriminatory," *id.* at 41, and it concluded that "C235 adequately addresses Plaintiffs' § 2 claims," *id.* at 55.

The United States District Court for the District of Columbia denied preclearance on August 28, 2012. *See Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated*, 133 S. Ct. 2885 (2013). Because preclearance was denied, legal claims

against the 2011 redistricting plans under the Constitution and § 2 of the Voting Rights Act remained unripe, leaving this Court without jurisdiction to make a ruling on the merits. *See, e.g., Connor v. Waller*, 421 U.S. 656, 656 (1975) (per curiam), *cited in Branch v. Smith*, 538 U.S. 254, 283 (2003) (Kennedy, J., concurring) ("Once the District Court found no preclearance, it was premature, given this statutory scheme, for the court to consider the constitutional question. . . . Absent preclearance, a voting change is neither effective nor enforceable as a matter of federal law."); *see also Terrazas v. Clements*, 537 F. Supp. 514, 525 (N.D. Tex. 1982) (per curiam) (collecting cases holding that courts may not decide the constitutionality of unprecleared legislative acts); *cf. Branch*, 538 U.S. at 284 (Kennedy, J., concurring) (noting that the plan in question "was not yet precleared and so could not cause appellees injury through enforcement or implementation").

The State appealed the judgment denying preclearance. The November 2012 elections to the Texas House of Representatives were conducted using this Court's interim plan, H309. The November 2012 elections to Congress were conducted using this Court's interim plan, C235.

While the State's appeal in the preclearance case was pending, the Texas Attorney General urged the Legislature to adopt this Court's interim plans as permanent reapportionment plans for the State. DX-858; DX-941. On May 27, 2013, the Governor of Texas called the Legislature into a special session, to begin that day. The Governor's call included the following item: "To consider legislation which ratifies and adopts the interim redistricting plans ordered by the federal district court as the permanent plans

for districts used to elect members of the Texas House of Representatives, Texas Senate and United States House of Representatives." DX-864. The 2013 Legislature formally repealed the still-unprecleared 2011 redistricting plans and adopted the court-drawn interim plans after making slight modifications to the House plan.

## ARGUMENT AND AUTHORITIES

## I.    THE PLAINTIFFS' CLAIMS OF INTENTIONAL RACIAL DISCRIMINATION FAIL.

The first question before the Court is whether the 2013 Legislature violated the Equal Protection Clause by intentionally diluting the Plaintiffs' right to vote on the basis of race. To prove their claims of unconstitutional vote dilution, Plaintiffs must prove that (1) the Legislature enacted the challenged redistricting plans for a racially discriminatory purpose and (2) the plans had or will have a discriminatory effect. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (explaining that at-large or multimember electoral systems "violate the Fourteenth Amendment when they are adopted with a discriminatory purpose and have the effect of diluting minority voting strength." (citing *Rogers v. Lodge*, 458 U.S. 613, 616–17 (1982); *White v. Regester*, 412 U.S. 755, 765–66 (1973))); *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 358–59 (5th Cir. 2015); *Backus v. South Carolina*, 857 F. Supp. 2d 553, 567 (D.S.C.) ("Viable vote dilution claims require proof that the districting scheme has a discriminatory effect and the legislature acted with a discriminatory purpose."), *aff'd*, 568 U.S. 801 (2012); *LULAC v. N.E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("To prevail on their claim under the Fourteenth Amendment, plaintiffs must show: (1) intentional discrimination; and (2) a

9

resultant discriminatory effect."). Discriminatory purpose alone cannot establish a constitutional violation. *See Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it."); *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (citing the "familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive"). Thus, in addition to proving the 2013 Legislature's specific intent to harm Black or Hispanic voters because of their race or ethnicity, each Plaintiff must prove that the challenged 2013 plan has diluted his or her vote. Plaintiffs have not proven either element in this case.

> **A.    To Prove Intentional Racial Discrimination, Plaintiffs Must Prove that the 2013 Legislature Acted with the Specific Intent to Harm Minority Voters Because of their Race or Ethnicity.**

To prove intentional discrimination, the Plaintiffs must prove that the 2013 Legislature enacted this Court's interim redistricting plans for the specific purpose of injuring Black or Hispanic voters *because of* their race or ethnicity. "[I]n order for the Equal Protection Clause to be violated, 'the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.'" *Rogers*, 458 U.S. at 617 (quoting *Washington v. Davis*, 426 U.S. 229, 240 (1976)); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("[E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose."

(citing *Davis*, 426 U.S 229; *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977))). A law does not violate the Equal Protection Clause "simply because it may affect a greater proportion of one race than another," *Rogers*, 458 U.S. at 618; it must be enacted for the specific purpose of disadvantaging individuals because of their membership in a minority group. The Supreme Court has explained that

> "[d]iscriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Feeney*, 442 U.S. at 279 (citation and footnote omitted) (rejecting a claim of intentional gender-based discrimination under the Equal Protection Clause against a statutory hiring preference for veterans, over 98% of whom were male and only 1.8% of whom were female at the time of the complaint).[2] To establish a Fourteenth Amendment violation under the standard applied in *Feeney* and *Arlington Heights*, Plaintiffs must do more than prove that the 2013 Legislature took a deliberate step that caused a disparate impact (discriminatory purpose "implies more than intent as volition"), or that the 2013 Legislature was aware that its actions would have a disparate impact (discriminatory

---

[2] *See* Daniel R. Ortiz, *The Myth of Intent in Equal Protection*, 41 STAN. L. REV. 1105, 1112 (1989) (explaining that the Supreme Court "refused [in *Feeney*] to import into equal protection the familiar doctrine that a person intends the natural and foreseeable consequences of her voluntary actions"); *see also id.* at 1113 (describing the *Feeney* standard as a "standard of specific intent," and noting that *Washington v. Davis*, *Arlington Heights*, and *Feeney* "require real evidence of motivation to disadvantage a protected group, and all three prevent the government from pursuing discriminatory goals but not from reaching disparate results").

purpose "implies more than . . . intent as awareness of consequences"). They must prove that the 2013 Legislature acted *because of race* and not because of some other factor.

In determining the Legislature's intent in passing the 2013 plans, the Court must look to the evidence that was before the Legislature when it acted. Testimony or information offered after the enactment of the 2013 plans is not probative of the Legislature's intent. *See, e.g., Edwards v. Aguillard*, 482 U.S. 578, 596 n.19 (1987) (finding that "the postenactment elucidation of the meaning of a statute [is] of little relevance in determining the intent of the legislature contemporaneous to the passage of the statute"); *see also Arlington Heights*, 429 U.S. at 266–68 (noting, among other factors to be considered in a discriminatory-purpose analysis, the relevance of "*contemporary* statements by members of the decisionmaking body, minutes of its meetings, or reports" (emphasis added)). This is particularly true in the context of ACS data. The Court cannot look to citizenship data released after the 2013 redistricting process, such as the 2011–2015 five-year survey data, as a basis for finding that the Legislature acted with discriminatory intent in adopting redistricting plans. *See Karcher v. Daggett*, 462 U.S. 725, 728 n.1 (1983) (rejecting consideration of corrected census data in ruling on a challenge to New Jersey's congressional redistricting plan because the data "was not available to the Legislature at the time it enacted the plan at issue"); *LULAC v. Perry*, 548 U.S. 399, 438 (2006) (refusing to consider updated ACS survey data reflecting statewide citizen voting age population figures because the data was "neither available at the time of the redistricting, nor presented to the District Court").

12

Nor can the Court rely on assertions of legislative privilege to infer discriminatory purpose. The Supreme Court has recognized legislative privilege as part of the evidentiary framework for intentional-discrimination claims. In *Arlington Heights*, the Court identified "subjects of proper inquiry," or potential sources of circumstantial evidence, that might be relevant "in determining whether racially discriminatory intent existed." 429 U.S. at 268. It identified legislative or administrative history as one potential source, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* The Court noted that in "extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action," but it recognized that "even then such testimony frequently will be barred by privilege." *Id.* (citing, *inter alia*, *Tenney v. Brandhove*, 341 U.S. 367 (1951)). Moreover, the Court explained that it had "recognized, ever since *Fletcher v. Peck*, [10 U.S. (6 Cranch)] 87, 130–31 (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government. Placing a decisionmaker on the stand is therefore 'usually to be avoided.'" *Id.* at 268 n.18 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

The Legislature's mere decision not to create a potential minority-opportunity district cannot support an inference of discrimination, either. States do not have a duty, under the Constitution or § 2, "to give minority voters the most potential, or the best potential, to elect a candidate." *Bartlett v. Strickland*, 556 U.S. 1, 15 (2009). The Supreme

13

Court has accordingly held that States are not required to maximize minority opportunity districts:

> [R]eading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast. . . . Failure to maximize cannot be the measure of § 2.

*Johnson v. De Grandy*, 512 U.S. 997, 1016–17 (1994). A redistricting plan does not violate the Equal Protection Clause merely because the legislature's political goals happen to have an impact on the party preferred by minority voters.[3] *Cf. Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) ("The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.").

Plaintiffs are therefore wrong to argue that discriminatory purpose must be inferred whenever the Legislature chooses not to create a district that would provide minority voters with the opportunity to elect their candidates of choice. That is not a

---

[3] This argument was anticipated and its consequences discussed, in the context of § 5, shortly after the 2006 amendment and reauthorization of the Voting Rights Act:

> In general elections, racial minorities tend to prefer Democrats. If the VRA requires the construction or preservation of districts where minority-preferred candidates win, then one might plausibly say that the VRA prevents the elimination of Democratic leaning districts in any covered racially heterogeneous community.

Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 YALE L.J. 174, 223 (2007) (noting that under this interpretation, "the Voting Rights Act begins to look like it is a Democratic candidate protection program").

valid theory of intentional discrimination. A legislature's decision not to draw an available minority opportunity district does not support an inference of intentional racial discrimination. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 924 (1995) ("The State's policy of adhering to other districting principles instead of creating as many majority-minority districts as possible does not support an inference that the plan 'so discriminates on the basis of race or color as to violate the Constitution.'" (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976))). Choosing not to draw a Democratic district is not evidence of intentional racial discrimination—even if the Legislature knows that the potential district would be a minority-opportunity district—unless the choice was actually motivated by the specific intent to harm minority voters. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.").[4]

---

[4] It follows from the logic of these decisions that legislative or policy priorities that may be associated with minority voters—whether or not they are also associated with the Democratic party—cannot be conflated with race or ethnicity in the analysis of discriminatory legislative purpose. A decision to disfavor particular legislative or political priorities does not amount to discrimination on the basis of race, even if support for those priorities correlates with race. *See, e.g.*, *Hernandez v. New York*, 500 U.S. 352, 375 (1991) (O'Connor, J., concurring in the judgment) ("No matter how closely tied or significantly correlated to race the explanation for [a governmental action] may be, the [action] does not implicate the Equal Protection Clause unless it is based on race."). A finding of intentional racial discrimination based on that sort of correlation would not fit within the standard announced in *Feeney* and, as a result, could not qualify as a factual finding of intentional race-based discrimination.

**B.    The 2013 Legislative Redistricting Plans Are Entitled to a Presumption of Constitutionality.**

To prove intentional racial discrimination, the Plaintiffs must overcome the strong presumption of constitutionality that attaches to the 2013 Legislature's enactment of this Court's interim redistricting plans. The Supreme Court has consistently held that "a presumption of regularity attaches to the actions of Government agencies." *U.S.P.S. v. Gregory*, 534 U.S. 1, 10 (2001). Facially neutral laws receive a "heavy presumption of constitutionality." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990); *see also Vacco v. Quill*, 521 U.S. 793, 800 (1997) (noting "a strong presumption of validity").

The presumption carries particular weight in the context of redistricting legislation because "reapportionment is primarily the duty and responsibility of the State," *Chapman v. Meier*, 420 U.S. 1, 27 (1975), and "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller*, 515 U.S. at 915. "Although race-based decisionmaking is inherently suspect, . . . until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed." *Id.*

Determining whether a legislature acted "because of," rather than "in spite of," race presents a particular challenge in redistricting cases. Legislatures are presumed to be aware of race, but "[t]he distinction between being aware of racial considerations and being motivated by them may be difficult to make." *Id.* at 916. The difficulty of

distinguishing racial awareness from racial motivation, "together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.*

The Supreme Court's call for extraordinary caution in adjudicating claims of unconstitutional race-based decisionmaking reinforces the presumption of constitutionality. It builds on a constant line of authority holding that federal courts should be reluctant to conclude that a duly enacted law violates the Constitution. In *Fletcher v. Peck*, 10 U.S. at 128, Chief Justice Marshall cautioned that the question whether a law is unconstitutional "is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." *Cf. Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 6 (1947) (explaining that the "far-reaching authority" to strike down state tax statutes based on impermissible purpose "must be exercised with the most extreme caution"). A judgment that the Legislature has violated the Constitution cannot rest on "slight implication and vague conjecture"; rather, "[t]he opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher*, 10 U.S. at 128. The presumption of good faith accorded to legislative enactments means that the burden of untangling permissible and impermissible motivation falls on Plaintiffs, and any doubt must be resolved in favor of the State.

C.    **The Legislative Record Demonstrates that the Legislature Acted for a Permissible Purpose When It Enacted the 2013 Redistricting Plans.**

The presumption of constitutionality applies even when the legislative record is silent: "Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them." *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 809 (1969); *accord, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 298–99 (1987) (explaining, in rejecting an equal-protection claim, that when there are "legitimate reasons" for government action, courts "will not infer a discriminatory purpose"). This is especially so in the context of redistricting. The Constitution does not "require States engaged in redistricting to compile a comprehensive administrative record." *Bush v. Vera*, 517 U.S. 952, 966 (1996) (internal quotation marks omitted); *id.* at 1026 (Stevens, J., dissenting) ("Unless the Court intends to interfere in state political processes even more than it has already expressed an intent to do, I presume that it does not intend to require States to create a comprehensive administrative record in support of their redistricting process.")).

The 2013 legislative record is not silent. It confirms that the 2013 Legislature enacted this Court's interim plans as permanent plans because it wanted to provide certainty to voters with permanent redistricting plans, and it believed in good faith that the Court's interim plans complied with the Voting Rights Act and the Constitution. The legislative record contains no evidence that any individual legislator, let alone the

18

Legislature as a whole, enacted the 2013 redistricting plans with the specific intent to deprive Black or Hispanic citizens of their voting rights. The Plaintiffs therefore cannot overcome the presumption of constitutionality that attaches to the 2013 Legislature's enactment of Plans C235 and H358.

### 1.    Plan H358

At the initial hearing held by the House Select Committee on Redistricting, Chairman Drew Darby articulated his position on the court-drawn interim plans and his intention to consider amendments:

> I believe that the court ordered interim maps are legally sufficient. They are the maps we were all elected under and the maps that our constituents are familiar with, but [I] am not willing to rubber stamp any proposal that has not been evaluated by this committee and appropriate alternatives considered. I believe it is incumbent on this committee to make necessary corrections to the court ordered maps if legally required changes are necessary to comply with the Voting Rights Act or the United States Constitution.

JX-10.4 at 5:9–18. He explained that "the interim maps represent the District Court's best judgment as to . . . fully legal and constitutional redistricting plans." *Id.* at 26:22–25. He made his understanding clear, however, that the Governor's call "necessarily implies that this committee is, through the legislative process, . . . authorized to look at these maps in detail and if there are changes . . . then we will consider those changes to see if they need to be made and then we will act accordingly." JX-11.4 at 22:17–25. Throughout the legislative process, Chairman Darby clearly stated his position that the court-drawn interim plans were legal: "I believe the three maps provided herein comply

with the United States Constitution and the Voting Rights Act to provide the voters with much needed stability going forward. If there's a legal deficiency in these maps, I want this Committee to know about it and I want to correct it." JX-14.4 at 39:8–14.

Other legislators expressed the same belief about the Court-drawn interim plans. Representative Clardy, a member of the House Select Committee, stated, "interim means interim, I understand that, but it's a good, fair map drawn by three hard-working impartial federal judges who are very well acquainted with the law. Don't you think it's reasonable that we use . . . those maps?" JX-13.4 at 151:16–20.[5] At the San Antonio field hearing, Representative Clardy responded specifically to the claim that the interim congressional plan was defective because it was based on a plan motivated in part by intentional discrimination:

> I think we've moved away from that once the San Antonio Court, with the instructions of the Supreme Court, drew the map with none of that intention, that we came up with a map that was void, there was an absence of wrongful intent in the interim maps. . . .
>
> . . .
>
> . . . I keep hearing this testimony or questions asked that these maps were found to have discriminatory intent, and that's not the map that I'm looking at. In fact, that's not a map I'll ever vote for, is one that has any kind of discriminatory taint. . . . But it's confusing, I think, to continue to reference to these maps being discriminatory when the map that I'm looking at, I think the map that we were charged to look at, the map that

---

[5] It is no response to argue—as the witness argued in response to Representative Clardy—that this Court "didn't have the benefit of the full blown trial that came on with the D.C. panel for the Section 5 act." JX-13.4 at 152:10–11. This Court's interim plans remedied every defect identified in the D.C. district court's opinion. *See infra* Part I.D.

20

they drew as our base, is a map drawn by three federal judges in San
Antonio who I believe are good and honorable people.

JX-13.4 at 153:7–154:7.

Chairman Darby noted that members had filed amendments to the bill, and he

articulated the criteria he intended to apply in considering amendments:

> Since I believe the district court drew a map that complied with the
> constitution and the Voting Rights Act, I will be evaluating these
> amendments on a couple of criteria: that it does not create a harm or a
> risk to further litigation by violating the constitution's "one person, one
> vote" principle regarding population deviation; that it does not dilute nor
> dismantle a Section 2 protected district under the Voting Rights Act or
> violate[] the Texas Constitution regarding contiguous districts or the
> county line rule. If those measures can be satisfied, I want to see that it
> addresses a concern, for example, the splitting of a community of interest.
> And finally, I'd like to see an agreement amongst the members affected.

JX-17.3 at S1–S2. Chairman Darby explained that he wanted agreement among the

members "because this is the function of this legislative body is to make decisions that

are in the best interest of the legislature and what they believe is right in the

circumstances." *Id.* at S11. Chairman Darby also recognized the possibility of further

legal review, including preclearance under § 5. *Id.* at S11 ("This map will have to be

precleared by the Department of Justice. So all that we do today and in all the meetings

will be reviewed by the Department of Justice to make sure of constitutional

compliance.").

The House adopted several amendments to Plan H309. Representative Jason

Villalba, a Republican from Dallas County, offered the first amendment at the request

of Representative Rafael Anchia, a Democrat from Dallas County. He explained that

21

the amendment exchanged precincts between the districts represented by Representative Anchia and Representative Bennett Ratliff, uniting portions of Farmers Branch and Carrollton within their respective House districts. JX-17.3 at S4. During the hearing, Chairman Darby noted that the Anchia amendment fixed the population deviations in both districts, as Representative Anchia's district had been overpopulated and Representative Ratliff's district had been underpopulated. *Id.* at S6. He also acknowledged that the Attorney General's office had advised the committee to look at population deviations in Dallas County House districts. *Id.* at S10. Representative Anchia's amendment was accepted without objection. *Id.* at S4.

Representative Gene Wu, a Democrat from Harris County, offered the second amendment, which affected his district and the districts represented by Representatives Vo and Murphy. *Id.* All three affected members agreed to the amendment. *Id.* Representative Wu explained that the amendment reintegrated part of the Harris County Vietnamese-American population into Representative Vo's district to recognize "very strong language and cultural issues" that Representative Vo was better able to represent. *Id.* The amendment was accepted without objection. *Id.*

Representative Richard Raymond, a Democrat from Webb County, offered the next amendment, which affected the districts represented by himself and Representative Tracy King. *Id.* He explained that the court-drawn interim plan had inadvertently taken Texas A&M International University out of his district, and the amendment returned it. The amendment was accepted without objection. *Id.* at S4–S5.

22

Representative Helen Giddings, a Democrat from Dallas County, offered an amendment to move three precincts with minimal population out of her district. *Id.* at S26. She had explained in a previous committee hearing that the precincts put very small parts of Balch Springs, Ferris, and Grand Prairie in her district. JX-15.3 at 137:8–24. She proposed the amendment to put those precincts back with their respective cities. *Id.* The amendment was adopted without objection. JX-17.3 at S29.

Representative Lon Burnam offered an amendment to return the Como neighborhood to HD 90, where it had been since 1978. *Id.* at S29. The agreement affected HD 90 and HD 99, represented by Representative Charlie Geren. *Id.* The affected members agreed to the amendment, and it was accepted without objection. *Id.*

On third reading, Representative Toni Rose, a Democrat from Dallas County, offered an amendment affecting the districts represented by herself and Representative Giddings. JX-18.1 at 11. Representative Rose explained that the amendment was agreed to by the affected members. *Id.* Chairman Darby moved to accept the amendment, and it was adopted without objection. *Id.*

Several proposed amendments were tabled or withdrawn because, at the time they were offered, they were not agreed to by all affected members. *See* JX-17.3 at S29 (tabling amendment offered by Representatives Borris Miles and Sarah Davis of Harris County); *id.* at S39 (amendment by Representative Jose Menendez withdrawn). Other amendments were tabled because they attempted to add statements of future policy, *see*

23

*id.* at S16, S26, or insert disputed or unsupported findings of legislative fact to the bill. *See id.* at S29–31, 39.

Other amendments were rejected or tabled for specific reasons stated on the record. Plan H312, for instance, was offered as a statewide amendment by Representative Yvonne Davis. JX-15.3 at 8:9–20. The Committee ultimately voted against Representative Davis's amendment. *Id.* at 73:13–14. The stated reasons were that, in addition to creating a coalition district in Bell County and potentially weakening the incumbent, the amendment paired two incumbents in Dallas County. *See* JX-15.3 at 13:10–13, 101:17–24. However, Representative Todd Hunter moved to reconsider the vote to allow Representative Davis to withdraw the amendment and potentially introduce it on the floor. *Id.* at 100:10–101:1, 102:1–3. Representative Clardy seconded the motion, which passed without objection, and Representative Davis withdrew the amendment. *Id.* at 102:3–16.

The discussion of Representative Davis's amendment made clear that the legal status of coalition districts was, at best, an open question. Jeff Archer, chief legislative counsel at the Texas Legislative Council, acknowledged that there was much disagreement about "gray area advice," pointing specifically to "the uncertainty of the law regarding multi-ethnic coalitions." *Id.* at 34:22–23, 37:25–38:1. He told the Committee, "I think anybody who claims to know is overstating it based on their zeal, advocacy, point of view, what they want you to do." *Id.* at 34:22–25. He explained that "you get to a situation where I cannot tell you what the Courts will do. It really is an

open question." *Id.* at 39:7–9. Frustrated with this advice, Representative Davis responded that Archer was "absolutely confusing the whole situation. . . . We're making an honest attempt to try to address deficiencies. You've talked for seven minutes about garbage. . . . [T]here's got to be somebody better than you. Because you have not said a thing that's worthwhile." *Id.* at 39:13–22. In an effort to address Representative Davis's concerns, Archer explained that with respect to the coalition district proposed in Bell County, "I don't think that you can say that Section 2 requires that District." *Id.* at 42:1–4.

The Committee also voted against a statewide amendment, Plan H321, offered by Representative Trey Martinez Fischer. *Id.* at 103:13–14, 136:2-4. That amendment made changes to 20 House districts. *Id.* at 107:21–22. It proposed altering HD 81 to split Midland and Ector County in order to create an HCVAP-majority district. *See id.* at 107:24–25; 2017 MALC Ex. 28 at 2. In addition, it proposed the creation of coalition districts in HD 26 in Fort Bend County, HD 54 in Bell County, HD 107 and HD 113 in Dallas County, and HD 138 in Harris County. *See* JX-15.3 at 108:20–110:19. Representative Clardy expressed concern about violating the whole-county rule, adding that the county-line splits in the proposed Plan H321 were exactly what community members had told the Committee that they wanted to avoid. *Id.* at 125:21–126:15. He expressed his intention to vote against the amendment because he wanted to study the proposal more, provided that the vote would not prevent Representative Martinez Fischer from offering the amendment in the future. *Id.* at 129:2–8. Chairman Darby

noted that the amendment would affect several incumbents and create coalition districts. *Id.* at 129:16–131:16. Representative Jim Keffer also expressed concern about the impact of abrogating the whole-county rule on rural counties. *Id.* at 134:4–16. The Committee voted against the amendment. *Id.* at 136:2–4.

Representative Yvonne Davis introduced her statewide amendment again on the House floor. JX-17.3 at S39. She explained that the amendment created coalition districts in HD 26, HD 54, HD 107, and HD 113. *Id.* at S39–40. She explained that the amendment would "maximize opportunity for communities to stay together, as well as elect candidates of their choice." *Id.* at S40. The amendment was opposed on the grounds that it created coalition districts that were not required by the Voting Rights Act. *Id.* at S40–S41. With respect to the proposed HD 54, Chairman Darby noted that the district was redrawn in the initial court-drawn map that was reversed by the Supreme Court, whereas the existing interim plan had not changed the district. *Id.* at S41. The House voted to table the amendment. *Id.* at S44.

The House tabled an amendment to HD 77 and 78 offered by Representatives Marisa Marquez and Joe Moody. *Id.* at S44, S46. Chairman Darby explained that the court-drawn interim plan provided a remedy for El Paso County, and the amendment was rejected because it "trie[d] to unwind that fix, and so that's why it wasn't acceptable." *Id.* at S54.

The House tabled a second statewide amendment offered by Representative Martinez Fischer as Plan H329. *Id.* at S46–S47, S57. The author explained that the

amendment created two "West Texas Hispanic districts"—HD 81, based in Midland and Ector County, and HD 88, based in Lubbock County. *Id.* at S47. The amendment also created a Hispanic opportunity district that crossed the county line between Nueces and Kleberg County; a coalition district in HD 26; a coalition district in HD 54; "an open Latino seat based in Irving and Grand Prairie with a 25.3 percent Spanish surname voter registration; 30 percent Hispanic citizen voting age population," in HD 105; and an open coalition district in HD 126 in Harris County, *id.* at S47. The amendment paired eight Republican incumbents: Hunter and Morrison, King and Springer, Harper-Brown and Ratliff, and Fletcher and Harless. *Id.* at S48. Chairman Darby raised concerns about creating coalition districts, violating the whole-county rule, and making changes that this Court considered but did not address in its interim plan. *Id.* at S53. Representative Aycock pointed out that the configuration of HD 54 separated Lampasas County from the City of Killeen and reflected a change that had been rejected by the Supreme Court. *Id.* at S52. After considering those effects of H329, the House voted to table Representative Martinez Fischer's second proposed amendment. *Id.* at S57.

### 2.    Plan C235

In laying out the bill to enact the Court-drawn interim congressional plan, Chairman Darby explained that Plan C235 addressed all of the legal flaws found by the D.C. district court—specifically, the failure to create an additional minority opportunity district and the removal of offices, residences, and economic interests from CD 9, CD 18, and CD 30. JX-17.3 at S57. Senator Seliger expressed the same view when he laid

27

out the bill before the Senate Select Committee on Redistricting. JX-20.4 at 14. Senator Seliger added that the Court's interim congressional plan would provide certainty to voters as the 2014 election cycle approached. *Id.*

The Legislature considered several amendments but ultimately rejected them for reasons stated on the record. Plan C245 was offered as a statewide amendment that created CD 35 as a crossover district based in Travis County and purported to create a new Hispanic opportunity district stretching from central San Antonio to scattered parts of Corpus Christi. JX-55. Representative Eddie Rodriguez laid out the amendment in the House but withdrew it before a vote could be taken. JX-17.3 at S57–60. Senator Kirk Watson offered the amendment in the Senate. JX-24.4 at 26. He explained that the amendment created CD 35 as a crossover district in Travis County, added CD 34 as a new Hispanic opportunity district, and strengthened CD 20 and CD 23 to maintain the same number of Hispanic opportunity districts in South and Central Texas. *Id.* at 26–27. CD 34, which replaced the existing CD 35, ran from Nueces to Bexar County. *Id.* at 27. Senator Hinojosa noted that the plan divided Nueces County into three different parts, *id.* at 33, and Senator Williams cited testimony by Republican and Democratic elected officials at the Nueces County field hearing that it was important to have a congressional seat anchored in Nueces County, *id.* at 34. Senator Watson withdrew the amendment. *Id.* at 35.[6]

---

[6] The record does not support the claim that only minority legislators had their amendments rejected or tabled. In addition to Senator Watson's withdrawn amendment, Representative Chris Turner

Senator Uresti introduced Plan C246 as a statewide amendment. *Id.* at 36. The amendment created CD 35 as a crossover district based in Travis County and extended CD 34 into parts of Nueces County. *Id.* at 37. It also redrew CD 25 as a new Hispanic opportunity district anchored in Hidalgo County and "co-anchored" CD 28 in Webb and Bexar County. *Id.* In Dallas County, the amendment attempted to create CD 3 as a new Hispanic opportunity district. *Id.* at 37–38. And in Harris County, the amendment created CD 36 as a Hispanic CVAP-plurality district modeled on Plan C243, which had been proposed by Senator Sylvia Garcia. *Id.* at 38. Senator Seliger noted that the amendment reduced the HCVAP in CD 29 from 59.8% to 41%. *Id.* Senator Uresti confirmed that the plan represented a complete redrawing of the statewide map, but he declined to say that it was required by § 2 of the VRA. *Id.* at 39. The amendment failed by a vote of 2 to 12. Senators voting against the amendment included Democratic Senators Hinojosa, Lucio, West, and Zaffirini. *Id.* at 41.

Senator Garcia introduced Plan C243 as an amendment for the Harris County area, which made changes to CD 2, 7, 8, 9, 18, 22, 29, and 36. *Id.* at 42. Senator Garcia stated that districts 9, 18, 29, and 36 would be minority opportunity districts under the plan. *Id.* at 42–43. The proposed CD 36 would be a coalition district. *Id.* at 43. Senator Garcia acknowledged that CD 29 would also become a coalition district, reducing the

---

introduced an amendment to add legislative findings to the congressional redistricting bill. JX-17.3 at S62. Chairman Darby moved to table the amendment on the ground that the proposed legislative findings were not proper within the bill. *Id.* at S63.

HCVAP from 59.8% to 41%. *Id.* at 46. She also acknowledged that the BCVAP levels in CD 9 and CD 18 would be reduced, but that Congresswoman Sheila Jackson Lee and Congressman Al Green had not approved of the changes. *Id.* at 47. The amendment failed by a vote of 2 to 10. Senators voting against the amendment included Democratic Senators Uresti, Hinojosa, West, and Zaffirini. *Id.* at 49.

Senator Garcia also introduced Plan C244 as an amendment that exchanged a small amount of population between CD 18 and CD 29 in Harris County. *Id.* at 49–50. She indicated that she had communicated with Congressman Gene Green, who approved of the amendment, but that she had not spoken to Congresswoman Jackson Lee. *Id.* at 50. The amendment failed by a vote of 5 to 9. Senators voting against the amendment included Democratic Senators Lucio and West. *Id.* at 55.[7]

In the House, Representative Yvonne Davis offered Plan C251, a statewide amendment that would have redrawn CD 3 in Dallas County to be a "Hispanic influence" coalition district with 39.5% HCVAP. JX-17.3 at S61. The amendment would have maintained CD 33 as a coalition district but moved the district to Tarrant County. *Id.*; JX-57. And it would have reconfigured CD 25 as a crossover district in Travis and Hays County. JX-17.3 at S61. The proposed amendment paired

---

[7] Representatives of the NAACP sent a letter to Senator Garcia stating, "The proposed maps by you and Rep. Gene Green, puts the integrity of both the 9th and the 18th [congressional districts] at risk," and asking her to "take it down like the NAACP has taken down maps that the 2012 election indicated could possibly undermine Latino districts." JX-28 at 48.

Congressman Marchant with Congressman Sam Johnson and Congressman McCaul with Congressman Williams. *Id.* at S62. Chairman Darby noted that the amendment added a coalition district but did not create any additional Hispanic opportunity districts. *Id.* The House tabled the amendment. *Id.*

> **D.    The Denial of Preclearance Does Not Undermine the Legislature's Good-Faith Reliance on this Court's Ruling Regarding the Interim Plans.**

The D.C. district court's opinion denying preclearance did not undermine the Legislature's reliance on this Court's interim plans. As Chairman Darby stated in the initial House Committee hearing, "The interim plans remedied all the legal flaws found by the Federal District Court in DC." JX-10.4 at 27; *see generally* Defendants' Advisory on Issues Relating to Interim Redistricting Plans at 5–10 (Dec. 3, 2012), ECF No. 728. That understanding was correct, and it was confirmed by testimony during the 2013 special session.

> **1.    Plan H309 addressed every defect identified by the D.C. district court.**

The D.C. court determined that the 2011 House plan retrogressed in four districts. In Nueces County, it concluded "that HD 33 is a lost ability district." 887 F. Supp. 2d at 167. In Bexar County, it concluded that "HD 117 is a lost ability district." *Id.* at 171–72. Regarding HD 35, the court found "that the evidence Texas offers is not persuasive to meet its burden to show that the changes made to HD 35 will not have a retrogressive effect on minority voters." *Id.* at 168. And in Harris County, it found that

31

"Texas's decision to dismantle [HD 149] without offsetting the loss elsewhere is retrogressive." *Id.* at 175.

In Plan H309, this Court preemptively remedied every finding of retrogression in the House plan. It addressed retrogression in South Texas by "restoring HD 35 to benchmark (or higher) 'performance' levels and shifting the district south to the Rio Grande Valley (as plaintiffs requested)," in response to a not-insubstantial § 5 claim. Opinion at 5, ECF No. 690. It returned HD 117 to benchmark performance levels to address not-insubstantial claims of discrimination under § 5. *Id.* at 6. It addressed any retrogression in HD 33 by creating HD 144 as a new Hispanic opportunity district in Harris County. *Id.* at 7–8. And it reestablished HD 149 in Harris County to address a not-insubstantial claim of retrogression. *Id.* at 10.

The Court's interim plan went beyond the D.C. district court's opinion by making changes to two additional House districts. It modified HD 41 based on a finding that Plaintiffs were likely to succeed on their one-person, one-vote claims. The Court declined to reach any remaining claims because Plan H309 "returns HD 41 to a performing ability district, and because it does not incorporate any portion of the State map that is allegedly tainted by discriminatory purpose." *Id.* at 4. And in El Paso, the interim plan reconfigured HD 77 and HD 78 to address not-insubstantial claims of discriminatory purpose under § 5. *Id.* at 11.

2.    **Plan C235 addressed every defect identified by the D.C. district court.**

Although the D.C. court was divided in its reasoning, it concluded that the 2011 congressional plan was retrogressive because it failed to create an additional ability-to-elect district. 887 F. Supp. 2d at 156–57. The court also concluded, in the alternative, that the plan was motivated, at least in part, by discriminatory purpose based on the removal of "economic engines" and district offices from CD 9, CD 18, and CD30; the sequence of events leading to passage of the bill; the failure to create a new ability-to-elect district in Dallas-Fort Worth, and the percentage of minority voters in CD 30. *Id.* at 160–62, 219, 222.

Plan C235 remedied every defect that led the D.C. district court to deny preclearance. It addressed claims of retrogression and intentional discrimination by restoring CD 23 to benchmark levels of performance, thus ensuring that the plan included at least 11 minority ability-to-elect districts. Order at 32–33, ECF No. 691. It addressed alleged intentional discrimination in Dallas-Fort Worth by creating CD 33, *id.* at 36–38, and by reducing the minority population of CD 30 to address claims of "packing," *id.* at 37. And it addressed claims of discrimination against African-American members of Congress by "redrawing the districts to include member offices and homes, and to restore economic engines." *Id.* at 41.

### 3. The legislative record disproved opponents' claims that the Court-drawn plans failed to remedy defects found by the D.C. district court.

While opponents of the 2013 redistricting bills repeatedly claimed that the court-drawn interim plans failed to remedy the defects found by the D.C. court,[8] the legislative record proved otherwise. Chairman Darby explained how the court-drawn interim plans addressed the legal defects identified by the D.C. district court in the preclearance case. JX-17.3 at S57. With respect to Plan H309, Chairman Darby explained:

> The D.C. court denied preclearance to the state house plan because it concluded that the originally passed plan eliminated four ability districts. The interim plan restores those four ability districts while configuring 122 of the 150 districts in the identical manner as they did in the 82nd Legislature.

JX-17.3 at S1. Representative Villalba raised the question of alleged deficiencies in the interim plans with Jeff Archer at a House Committee hearing: "But what I'm hearing over and over again when I ask people, 'What are those inadequacies and deficiencies?' No one can articulate for me what they are, except to point to previously drawn maps." JX-15.3 at 53:9–13. He asked Archer directly: "What are those and are the amendments we're seeing today, do those address those?" Archer responded: "Well, the Court-ordered plan addresses the ones I'm referring to." *Id.* at 55:3–6.

---

[8] Some of those claims demonstrated a clear misunderstanding of the standards this Court applied in adopting the interim plans. *See, e.g.,* JX-10.4 at 36:3–5 ("And the US Supreme Court said go back and draw a map and do not address a single issue that's in dispute on Section 5 grounds or other grounds."); *id.* at 36:25–37:3 ("[T]he interim map does not address any of the claims brought by the litigants. Moreover, it doesn't address any of the findings by the DC court.").

Materials submitted to the Legislature supported Chairman Darby's accurate description of this Court's interim order and the D.C. district court's opinion. During the 2013 special session, MALDEF provided written testimony to the House Select Committee and the Senate Select Committee explaining exactly how this Court's interim plans addressed every element of the 2011 plans that led the D.C. court to deny preclearance. *See* JX-28 at 11–13; JX-29 at 13–15. With respect to the Texas House plan, MALDEF informed the committees, "The court's interim plan restored enough districts to address the DDC finding of retrogression." JX-28 at 13; JX-29 at 15. With respect to the congressional plan, MALDEF informed the committees that the interim plan addressed the D.C. court's concern about intentional discrimination in CD 23 by restoring the district to benchmark performance levels. JX-28 at 12; JX-29 at 14. In Dallas-Fort Worth, the interim plan remedied claims of intentional discrimination by curing "the fracturing of minority voters in DFW." JX-28 at 12; JX-29 at 14. Plan C235 addressed claims of intentional discrimination in districts represented by African-American and Latino incumbents by ensuring that incumbents' homes and district offices were located in their districts. JX-28 at 12; JX-29 at 14. Finally, MALDEF explained to the committee that the interim plan addressed retrogression by restoring CD 23's performance and creating CD 33, as a result of which "[t]he court's interim plan contains 12 minority ability to elect districts." JX-28 at 12; JX-29 at 14.

Further supporting the legality of Plan C235, members of the Congressional Black Caucus urged the Legislature not to alter their districts. In a letter to the House

Committee, they advised that "African American voters demonstrated the ability to elect their candidate of choice in four districts"—CD 9, CD 18, CD 30, and CD 33. They asserted that "[a]t least four African American districts are necessary to maintain fair proportional representation and to reflect the overall growth of the African American population," and they urged the Legislature to "protect these four districts and refrain from making changes that would harm the ability of African American voters to elect their candidates of choice." JX-28 at 55. And in a letter addressed to Chairman Darby, Congressman Al Green advised the committee: "As the Congressional Representative for the 9th Congressional District, I request that no changes be made to the present judicially-recognized 9th Congressional District for the reasons articulated in the courts that heard the Section 2 and Section 5 cases." JX-28 at 57. The Legislature honored those requests.

### E.    Plaintiffs' Complaints About the Legislative Process Do Not Support their Claims of Intentional Racial Discrimination.

Plaintiffs' complaints about the legislative process are not probative of intentional racial discrimination. They complain, for example, that considering legislation in a special session is unusual and that the Legislature lacked adequate legal advice. Those arguments are not only baseless, they do not support the Plaintiffs' substantive claims. The legislative process does not provide any evidence sufficient for the Plaintiffs to overcome the strong presumption of constitutionality and prove the 2013 Legislature discriminated on the basis of race.

The Legislature's consideration of redistricting bills in a special session cannot support an inference of intentional discrimination. It reflects an effort to solicit input from stakeholders across the State and to pass fair and legal maps under established legislative procedures. While Plaintiffs' lawyers and experts feigned alarm at the Legislature's meeting in special session (as the Legislature was directed to do by the Governor pursuant to the Texas Constitution), legislators who participated in the process showed no concern. Representative Anchia testified that he had no basis to raise complaints about the 2013 redistricting process, 2017 Tr. 131:9–12, and that he did not raise any concerns about the 2013 congressional redistricting plan or the 2013 Texas House redistricting plan. *Id.* at 131:13–18. Likewise, Representative Eric Johnson, a Democrat from Dallas County, testified that the Legislature's adoption of redistricting plans in a special session did not cause him any concern. 2017 Tr. 541:3–9. And former MALC Chairman Trey Martinez Fischer admitted that he could not think of other instances when the Legislature held field hearings during a special session, as it did during the 2013 special session. 2017 Tr. 177:9–178:6.

Nor does the alleged lack of adequate counsel for the House Committee stand up to scrutiny. Chairman Darby announced at the Dallas field hearing on June 6, 2013, that the Texas Legislative Council had retained Baylor law professors Michael Morrison and David Guinn as independent outside counsel to advise him as the chair of the House Committee. 2017 Tr. 178:24–179:7 (Martinez Fischer), 1516:1–13 (Darby). Representatives Martinez Fischer and Yvonne Davis expressed concern that Darby had

hired counsel only to advise the Chair of the Committee. 2017 Tr. 179:11–14 (Martinez Fischer). During the same hearing, Chairman Darby said that he believed it would be proper for Guinn and Morrison to advise individual committee members under his direction. *Id.* at 179:18–180:3. Chairman Darby later offered to amend the contract with Guinn and Morrison to make it clear that they represented the entire committee. *Id.* at 180:4–7. In response to that offer, Representative Martinez Fischer said: "My suggestion is that counsel be asked to leave the proceeding today until you work out this with your members." JX-12.4 at 15:4–7; 2017 Tr. 180:8–14 (Martinez Fischer). Chairman Darby then asked Guinn to leave the hearing. JX-12.4 at 15:16–18. On June 10, Chairman Darby spoke to Representative Davis about the issue of legal representation, but she continued to have objections to the appointment of Guinn and Morrison as counsel. 2017 Tr. 1520:14–25 (Darby). Because of the objections, Guinn and Morrison asked to be let out of their contract. 2017 Tr. 181:5–8 (Martinez Fischer). Chairman Darby advised the members of the committee, however, that the Texas Legislative Council was still available to advise them. 2017 Tr. 1521:1–5 (Darby).

Most importantly, the Plaintiffs have not alleged or proven that any legislator who voted in favor of the 2013 redistricting plans did so with a racially discriminatory purpose. Representative Eric Johnson testified that proponents of the 2013 redistricting plans could have been motivated by politics, but he did not claim to know any legislator's motivation in supporting the plans. 2017 Tr. 544:12–545:12. MALC Chairman Rafael Anchia testified that he has no basis to say that any member of the

Legislature voted for Plan H358 for a racially discriminatory purpose. 2017 Tr. 134:5–8. He testified that Chairman Darby has always been fair with him personally, and he has no basis to believe that Chairman Darby would intentionally discriminate on the basis of race. 2017 Tr. 133:10–15. He testified further that he has no reason to believe that Speaker Joe Straus would engage in racial discrimination against Latinos or African-Americans. 2017 Tr. 134:1–4. Representative Toni Rose could not identify any legislator who voted for the 2013 redistricting plans for a racially discriminatory purpose. 2017 Tr. 1323:10–15. Nor could she say that minority Democrats were treated any differently from non-minority Democrats during the 2013 redistricting process. 2017 Tr. 1324:13–19.

The record contains no evidence that any individual who sponsored or voted for the 2013 redistricting bills intentionally discriminated on the basis of race. Even if any acts or statements on the record called an individual member's purpose into question, an individual's intent cannot be attributed to the body as a whole without some additional evidence to show that the purpose was, in fact, shared or adopted by the Legislature. *Hispanic Coal. on Reapportionment v. Legislative Reapportionment Comm'n*, 536 F. Supp. 578, 585 (E.D. Pa.), *aff'd*, 459 U.S. 801 (1982). As Chief Justice Marshall explained in *Fletcher v. Peck*, "if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned." 10 U.S. at 130; *see also United States v. O'Brien*, 391 U.S. at 384 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it,

and the stakes are sufficiently high for us to eschew guesswork."); *Castaneda-Gonzalez v. Immigration & Naturalization Serv.*, 564 F.2d 417, 424 (D.C. Cir. 1977) ("Statements by individual legislators should generally be given little weight when searching for the intent of the entire legislative body."); *Florida v. United States*, 885 F. Supp. 2d 299, 354 (D.D.C. 2012) (per curiam) ("The purpose of a single legislator is normally too slim a reed upon which to rest a determination regarding the legislature as a whole."); *Backus*, 857 F. Supp. 2d at 565 ("One representative may table an amendment for reasons relating to BVAP, while other representatives may table the same amendment for reasons unrelated to BVAP. Statements by individual legislators are certainly probative, but they do not necessarily reflect the motivations of the body as a whole or even a majority of it.").

Here, there is no need to decide how many individual acts of discrimination might be necessary to impugn an entire legislature's purpose. There is no evidence that any supporter of the 2013 redistricting plans acted for an improper purpose. If no individual legislator intentionally discriminated on the basis of race, there is no basis to conclude that the Legislature as a whole intentionally discriminated on the basis of race. Thus, on this record, there is no basis to find, as a matter of fact, that the 2013 Legislature engaged in intentional racial discrimination.

## II.    DISCRIMINATORY EFFECT UNDER SECTION 2 OF THE VOTING RIGHTS ACT

### A.    *Gingles* I

Most of the Plaintiffs' vote-dilution claims are based on the Legislature's failure to create coalition districts in which two or more minority populations combine to form a majority in a single-member district. Those claims fail because the absence of a coalition district does not dilute any person's right to vote under § 2. While nothing prevents a legislature from creating a coalition district, neither the Constitution nor § 2 of the Voting Rights Act imposes a duty to create coalition districts. The Supreme Court expressly rejected the notion that coalition districts are legally required when it vacated this Court's initial interim plans:

> The [district] court's order suggests that it may have intentionally drawn District 33 as a "minority coalition opportunity district" in which the court expected two different minority groups to band together to form an electoral majority. . . . If the District Court did set out to create a minority coalition district, rather than drawing a district that simply reflected population growth, it had no basis for doing so. Cf. *Bartlett v. Strickland*, 556 U.S. 1, 13–15 (2009) (plurality opinion).

*Perez*, 565 U.S. at 398–99. This reflects the Court's legal determination that coalition districts are not required by the Voting Rights Act. That *Bartlett* involved crossover districts does not change its significance. The case in which the Supreme Court made that statement—this case—raised the issue of coalition districts, and the Supreme Court held that they are not required by § 2.

That conclusion follows from *Bartlett*, in any event. *Bartlett* rejected the proposition that § 2 protects "the opportunity to join other voters—including other

racial minorities, or whites, or both—to reach a majority and elect their preferred candidates." *Bartlett*, 556 U.S. at 14. In *Bartlett*, the State of North Carolina raised § 2 as a defense, arguing that it was required to violate its own whole-county provision to create a district in which African-American voters formed 39% of the voting-age population. The Court explained that these voters might join other groups to form a majority, but they

> cannot . . . elect that candidate based on their own votes and without assistance from others. Recognizing a § 2 claim in this circumstance would grant minority voters a right to preserve their strength for the purposes of forging an advantageous political alliance.

*Id.* at 14–15 (internal quotation marks omitted). The Court refused to recognize a § 2 claim, holding, "Nothing in § 2 grants special protection to a minority group's right to form political coalitions." *Id.* at 15.

*Bartlett* thus rejected the notion that "opportunity" under § 2 includes the opportunity to form a majority with other voters: "There is a difference between a racial minority group's 'own choice' and the choice made by a coalition." *Id.* That logic applies with equal force to coalition districts. The distinction between a group's own choice and the choice of a coalition applies whether the group joins "other racial minorities, or whites, or both." *Id.* at 14. This leaves no more room for a coalition of minority groups than it leaves for a coalition of minority voters and "crossover" Anglo voters.

And coalition districts, no less than crossover districts, undermine "the need for workable standards" and "clear lines for courts and legislatures" embodied in the

majority-minority requirement. *Id.* at 17. In *Bartlett*, the Supreme Court cautioned that a less-exacting standard "would place courts in the untenable position of predicting many political variables and tying them to race-based assumptions," for instance:

> What percentage of white voters supported minority-preferred candidates in the past? How reliable would the crossover votes be in future elections? What types of candidates have white and minority voters supported together in the past and will those trends continue? Were past crossover votes based on incumbency and did that depend on race? What are the historical turnout rates among white and minority voters and will they stay the same?"

*Id. Bartlett* instructs that courts should not answer these questions. *See id.* ("A requirement to draw election districts on answers to these and like inquiries ought not to be inferred from the text or purpose of § 2."). But these are the very questions that must be answered to create coalition districts.

As with crossover districts, interpreting § 2 to require coalition districts "would unnecessarily infuse race into virtually every redistricting," *id.* at 21 (quoting *LULAC v. Perry*, 548 U.S. at 446), and increase "the number of mandatory districts drawn with race as 'the predominant factor motivating the legislature's decision,'" *id.* at 21–22 (quoting *Miller*, 515 U.S. at 916). The Court warned in *Bartlett* that "[t]he statutory mandate petitioners urge us to find in § 2 raises serious constitutional questions." *Id.* at 18. Because a mandate to create coalition districts raises the same constitutional questions, it cannot be inferred from § 2, much less from the Constitution.

43

## B.    *Gingles* II

Even if the Plaintiffs could meet the first *Gingles* prerequisite by combining different groups to form a majority, they cannot establish the second *Gingles* prerequisite because they have failed to prove voting cohesion among minority groups. Primary elections provide the best evidence of cohesion, or the lack thereof, between different racial or ethnic groups. Here, Plaintiffs have failed to provide evidence that Black, Hispanic, or Asian voters are cohesive in Democratic primary elections in contested areas of the State.

The Supreme Court has held that primary elections are necessary to establish cohesion among different minority groups who share the same partisan preference in general elections. In *LULAC v. Perry*, the Court held that, assuming protected coalition districts exist as a matter of law, in "the absence of any contested Democratic primary . . . no obvious benchmark exists for deciding whether [minority voters] could elect their candidate of choice." 548 U.S. 399, 444 (2006); *see also Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004) ("Where, as here, the two minority groups are generally affiliated/registered with the same party (Democratic) and vote for that party's candidates at high rates, primary elections for that party's candidate are by far the most probative evidence of cohesion.").

The question presented in *LULAC v. Perry* was whether a Democratic congressional district in the Dallas-Fort Worth area provided an opportunity for African-American voters to elect their candidates of choice within the meaning of § 2

merely because the Democratic candidate consistently won the general election. Holding that success in the general election was not enough, the Court explained:

> The opportunity [for African-Americans] "to elect representatives of their choice," 42 U.S.C. § 1973(b), requires more than the ability to influence the outcome between some candidates, none of whom is their candidate of choice. There is no doubt African-Americans preferred Martin Frost to the Republicans who opposed him. The fact that African-Americans preferred Frost to some others does not, however, make him their candidate of choice. Accordingly, the ability to aid in Frost's election does not make the old District 24 an African-American opportunity district for purposes of § 2.

548 U.S. at 445–46. The Court explained further that "[i]f § 2 were interpreted to protect this kind of influence, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Id.* at 446. Proof of cohesion in Democratic primary elections is therefore necessary to satisfy the second *Gingles* prerequisite in a § 2 claim predicated on the existence of a coalition of Democratic voters.

The evidence demonstrates that Black and Hispanic voters are not cohesive in their candidate preferences. Dr. Lichtman, for example, testified that African-American voters in CD 33 show a strong preference for the African-American candidate in Democratic primary elections, 2017 Tr. 958:10–22, and he agreed that his analysis showed a lack of cohesion between African-American and Hispanic voters, 2017 Tr. 971:14–973:23. Notwithstanding that Hispanic voters are a clear plurality of eligible voters in CD 33, *see* JX-100.3 (43.6% HCVAP, 23.7% BCVAP), Dr. Lichtman characterized the district as an African-American opportunity district because African-American voters dominate the Democratic primary and can therefore nominate the

African-American candidate of choice. 2017 Tr. 955:12–956:4. In fact, Dr. Lichtman testified that he believes Hispanic voters are currently "shut out" of congressional opportunities in the Dallas-Fort Worth area under C235, despite the presence of two districts that consistently elect the Democratic candidate. *Id.* at 962:23–963:1. Confirming the lack of cohesion between African-American and Hispanic voters (which he said was "no big secret" in Texas), Dr. Lichtman testified that the Quesada Plaintiffs' demonstration Plan C273 would "strengthen" CD 33 as an African-American opportunity district by increasing the proportion of African-American voters. *Id.* at 971:14–22, 980:7–22.

Dr. Brischetto did not analyze cohesion between Black and Hispanic voters in any Democratic primary elections. 2017 Tr. 87:19–88:24. Nor did he attempt to control for the effect of partisanship in any of his analysis. *Id.* at 99:8–100:5. He testified, however, that by analyzing primary elections, it is possible to control for the effect of partisanship. *Id.* at 100:7–19. And he agreed that when partisanship is not a factor, minority voters generally prefer candidates from the same minority group. *Id.* at 108:12–109:25. Dr. Brischetto relied solely on Dr. Engstrom's ecological inference analysis, but he decided to ignore the portion of Dr. Engstrom's analysis that showed a lack of cohesion between Black and Hispanic voters in the Democratic primary election in HD 90. *Id.* at 90:17–91:16; 102:19–103:11. Likewise, Dr. Chervenak did nothing to control for partisanship in any of his analysis, and he agreed that Dr. Engstrom's analysis showed a lack of cohesion. 2017 Tr. 434:5–8.

Tarrant County Commissioner Roy Brooks testified that African-American and Hispanic voters have supported different candidates in Democratic primaries, including primaries in CD 33. 2017 Tr. 1237:3–25. Similarly, Franklin Moss testified that African-American and Latino voters in Tarrant County are less likely to vote cohesively in Democratic primary elections. 2017 Tr. 1307:11–14. And Alex Jimenez testified that in Tarrant County, African-American voters would rather support Anglo candidates than Hispanic candidates. 2017 Tr. 359:18–21.

Far from proving the cohesion necessary to satisfy the second prerequisite of *Gingles*, the testimony from Plaintiffs' witnesses—both expert and lay—shows that minority voting cohesion does not exist in Texas. That is the same conclusion reached by Dr. Alford. 2017 Tr. 1380:1–3 ("[E]xperts are either not demonstrating [cohesion] by avoiding it, or, when people look at it, it's clear that . . . these groups are not cohesive."). And Dr. Alford explains why a coalition district without cohesion must fail under *Gingles*: "In that circumstance, when you go on to create these districts, they will end up being districts that will provide a candidate of choice for one or the other group," even though the population of both was needed to satisfy the first *Gingles* prerequisite. 2017 Tr. 1380:3–6. This is not to say that a candidate must belong to a particular racial or ethnic group to qualify as a minority group's candidate of choice. But when minority groups consistently prefer different candidates, that provides strong evidence that they are not cohesive.

## C.    *Gingles* III

To prove legally significant racially polarized voting under the third *Gingles* prerequisite, Plaintiffs must demonstrate that voting patterns are driven by racial considerations, not just partisan politics. The causation requirement is clear from the text of § 2:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of* race or color . . . .

52 U.S.C. § 10302(a) (emphasis added). To prove a vote-dilution claim under § 2, Plaintiffs must show that voting preferences are caused by racial considerations. *See, e.g.*, *LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc). Plaintiffs cannot make that showing here.

The Senate Report to the 1982 VRA amendments shows that Congress intended to codify the vote-dilution standard announced in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973). *See* S. Rep. 97-417 at 2, *reprinted in* 1982 U.S.C.C.A.N. 177, 179 (1982) ("The amendment also adds a new subsection to section 2 which delineates the legal standard under the results test by codifying the leading pre-*Bolden* vote dilution case, *White v. Regester*."); *see also id.* at 19 (referring to *White v. Regester* and *Whitcomb v. Chavis*); *id.* at 149 (Additional Views of Senator Robert Dole) (recognizing codification of *White v. Regester* and *Whitcomb v. Chavis*). In both *White* and *Whitcomb*, the Supreme Court held that plaintiffs could prove vote dilution with

48

evidence that a challenged voting practice had a discriminatory effect, but only where the discriminatory result was caused by racially motivated voting. In *Whitcomb*, the Supreme Court explained that proof of causation is necessary to distinguish vote dilution from mere "political defeat at the polls," 403 U.S. at 153. Thus under the results test codified in § 2, Plaintiffs must prove that the alleged harm to minority voters results from racially motivated voting by a white majority.

Congress understood that adopting the liability standard in *Whitcomb* and *White* meant that the "results in" standard incorporated an element of causation tied to race. The Senate Report defines "racial bloc voting" as voting on the basis of race:

> [T]here still are some communities in our Nation where racial politics do dominate the electoral process. In the context of such racial bloc voting, and other factors, a particular election method can deny minority voters equal opportunity to participate meaningfully in elections.

S. Rep. 97-417 at 33, *reprinted in* 1982 U.S.C.C.A.N. 177, 211 (1982) (emphasis added). Thus "racial bloc voting" exists where "racial politics . . . dominate the electoral process," *id.*, or "race is the predominant determinant of political preference," *id.* at 28. The Senate Report confirms that plaintiffs must prove that racially motivated voting caused their alleged injuries, and absent such proof of causation, plaintiffs cannot establish liability under the results test:

> The results test makes no assumptions one way or the other about the role of racial political considerations in a particular community. If plaintiffs assert that they are denied fair access to the political process, in part, because of the racial bloc voting context within which the challenged election system works, they would have to prove it.

*Id.* at 34, *reprinted in* 1982 U.S.C.C.A.N. at 177, 212. Without proof of race-based bloc voting, "it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test." *Id.* at 33, *reprinted in* 1982 U.S.C.C.A.N. at 211, *cited in LULAC v. Clements*, 999 F.2d at 855. And the Judiciary Committee expressly denied the charge that the proposed amendments would permit courts to assume or grant a presumption "that race is the predominant determinant of political preference." *Id.* at 28 (quoting Subcommittee Report, 41–44). In short, the results test under § 2 requires Plaintiffs to prove that voting patterns are caused by racial considerations.

The Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30 (1986), did not alter the definition of racial bloc voting. Justice Brennan did not command a majority on the point. His plurality opinion asserted that plaintiffs need not show that race dictated voters' decisions; rather, plaintiffs could satisfy their burden by proving only that white voters preferred different candidates than black voters, even if those voting patterns reflected divergent political views rather than racial discrimination. *See id.* at 74 (Brennan, J.) ("[T]he legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of the voters and the selection of certain candidates."). This reading of § 2 gained only four votes.

A majority of the Supreme Court expressly rejected Justice Brennan's conclusion that the race of the voters is dispositive and "the race of the candidate . . . is irrelevant." *Id.* at 68. Justice White pointed out that such a reading of the statute was inconsistent

50

with congressional intent. He characterized the plurality's position as "interest-group politics rather than a rule hedging against racial discrimination." *Id.* at 83 (White, J., concurring). Justice O'Connor, joined by Justices Burger, Powell, and Rehnquist, agreed with Justice White that the plurality's refusal to consider the race of candidates—or the reasons why voters rejected minority candidates—was inconsistent with Congress's intent when it amended § 2 to incorporate *Whitcomb*'s "results" test. *See id.* at 101 (O'Connor, J., concurring in the judgment) ("I agree with Justice White that Justice Brennan's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with *Whitcomb* and is not necessary to the disposition of this case."). Justice O'Connor went further, stressing that the Court could not determine whether minority voters would be excluded from the political process if it did not know why voters rejected minority candidates. She explained that the basis for the voters' decision "would be probative of the likelihood that candidates elected without decisive minority support would be willing to take the minority's interest into account." *Id.* at 100.

Thus the majority in *Gingles* rejected an interpretation of § 2 that would allow courts to find racially polarized voting based solely on statistical evidence that different groups tend to vote for different candidates. The Fifth Circuit's en banc opinion in *LULAC v. Clements* follows the *Gingles* majority by insisting on proof of causation in vote-dilution claims under § 2. Other courts have similarly concluded that plaintiffs claiming vote dilution must identify race-based voting patterns to satisfy § 2's causation

requirement. *See, e.g.*, *Nipper v. Smith*, 39 F.3d 1494, 1523–24 (11th Cir. 1994) (en banc) ("Unless the tendency among minorities and white voters to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race, voting rights plaintiffs simply cannot make out a case of vote dilution."); *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995) (holding that "plaintiffs cannot prevail on a VRA § 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus"); *see also United States v. Charleston Cnty.*, 365 F.3d 341, 347–48 (4th Cir. 2004) (holding that the cause of racially polarized voting is relevant to the totality-of-circumstances inquiry). Because the evidence does not show that candidates preferred by minority voters are regularly defeated by race-based voting patterns as opposed to partisan preference, Plaintiffs cannot meet the third *Gingles* prerequisite.

## III.    CLAIMS AGAINST PLAN H358

### A.    Bell County

MALC contends that Plan H358 "unnecessarily fragments the minority community of Killeen to minimize its political impact on Texas House elections." Plaintiff MALC's Third Amended Complaint ¶ 54 (Sept. 17, 2013), ECF No. 897. According to MALC, "an additional minority opportunity district that provides a 'real electoral opportunity' can be drawn in the Bell County area." Plaintiff MALC's Advisory at 10 (Apr. 24, 2017), ECF No. 1373. The NAACP Plaintiffs allege a § 2 effects claim involving Bell County and assert that the configuration of HD 54 in Plan

H358 is "intentionally racially discriminatory in violation of Section 2 of the Voting Rights Act and the Fourteenth Amendment." NAACP Plaintiffs' Pre-Trial Brief at 60–61 (July 3, 2017), ECF No. 1454. The configuration of Bell County was changed in this Court's original interim plan (H302), which was subsequently vacated by the Supreme Court; Plan H309 did not alter Bell County from the 2011 enacted map. Opinion at 3 n.4, ECF No. 690. Neither of the claims against Bell County finds support in the record.

As to their § 2 effects claim, Plaintiffs offered no evidence to establish that Plan H358 dilutes any group's voting strength in Bell County. The County's minority population is not large enough to create a House district in which Blacks or Hispanics—on their own—comprise a majority of the district's citizen voting age population. The demonstration plans submitted by the Plaintiffs in 2017 prove this point because neither creates a Bell County district with a majority CVAP of any single minority group. Instead, the demonstration plans draw HD 54 as a coalition district that combines Black and Hispanic citizens to reach a CVAP majority. Under Plan H391, HD 54 contains 30.1% BCVAP and 20.4% HCVAP. JX-107.3. Under Plan H392, HD 54 contains 30.3% BCVAP and 20.9% HCVAP. JX-108.3. These are not legally required districts.

Even if the Plaintiffs could satisfy their burden under the first *Gingles* precondition by proffering coalition districts, they would be unable to satisfy the second *Gingles* precondition. Plaintiffs did not establish that Black and Hispanic voters in Bell County are cohesive. Their experts did not analyze primary elections, and they provided no opinion on whether Blacks and Hispanics in Bell County consistently supported the

same candidates. *See, e.g.*, 2017 Tr. 41:19–42:17 (Korbel). Dr. Brischetto did not analyze any Bell County elections from 2014 or 2016. 2017 Tr. 95:18–20.

Nor does the lay witness testimony provide a basis for finding that Blacks and Hispanics in Bell County vote cohesively. Representative Scott Cosper, the current representative of HD 54, testified that in his experience, these minority groups do not vote as a bloc. 2017 Tr. 597:19–598:7. Representative Cosper further stated that he had enjoyed support from Black and Hispanic voters. *Id.* at 598:8–12. NAACP member Phyllis Jones testified that she has not looked at exit polling data and does not know how anyone voted in any particular election. 2017 Tr. 393:5–7, 393:20–21. She also acknowledged that she did not know the extent to which Blacks and Hispanics supported Representative Cosper. *Id.* at 393:8–11. And Ms. Jones indicated that she did not believe Blacks and Hispanics share the same viewpoint, and vote cohesively, on all issues. *Id.* at 393:12–19.

Plaintiffs' newest Texas House demonstration plans raise other concerns. Plan H392, for example, splits Belton down the middle and divides Harker Heights. 2017 Tr. 603:17–23 (Cosper); JX-108.5 at 4, 19. Plan H392 also disassociates Lampasas County from Killeen even though the two areas have been placed in the same House district for fifty years. 2017 Tr. 602:3–9 (Cosper). MALC's demonstration plan, H391, splits Harker Heights into two districts, separates Lampasas County from Killeen, and moves Nolanville from HD 54 to HD 55. *Id.* at 607:22–608:3, 609:1–4; JX-107.5 at 5. Representative Cosper and Phyllis Jones both testified that Killeen, Harker Heights,

54

and Nolanville are considered one collective community of interest. 2017 Tr. 609:9–12 (Cosper), 388:10–20 (Jones).

The NAACP Plaintiffs' intentional discrimination claims against Bell County also lack merit. The Legislature made no changes to the Bell County districts in Plan H358. Plaintiffs introduced no evidence to show that any legislator acted with a racially discriminatory purpose in voting for the Bell County configuration in Plan H358 (or the plan in general). Indeed, NAACP's witness, Representative Eric Johnson, disclaimed any knowledge as to what motivated legislators to support the 2013 redistricting plans. 2017 Tr. 544:12–545:12.

## B.    Bexar County

Although MALC's live pleading does not state a particular claim against any House district in Bexar County, its 2017 demonstration plan, H391, reconfigures HD 117 and surrounding districts. The demonstration plan was drawn by MALC's expert George Korbel, who acknowledged that this Court reconfigured HD 117 in its 2012 interim plan. 2017 Tr. 46:6–19, 56:13–15. Korbel also acknowledged that in two out of the three endogenous elections held from 2012 to 2016, HD 117 has elected the Hispanic candidate of choice, Democrat Phillip Cortez. 2017 Tr. 56:16–57:6. MALC provided no evidence, through Mr. Korbel or any other witness, that Latino voters lack the opportunity to elect their candidates of choice in HD 117.

As to Bexar County generally, Mr. Korbel confirmed that Latino voters are able to elect their candidates of choice in a greater proportion than their share of the voting-

eligible population. Korbel testified that seven of the ten Bexar County House districts are represented by Latino candidates of choice. 2017 Tr. 57:21–58:3. He also acknowledged that this 70% rate of success is greater than Bexar County's overall HCVAP level of 53.26%. 2017 Tr. 58:16–22; DX-702. To the extent MALC has asserted a claim of vote-dilution against any district in Bexar County, that claim fails.

### C.    Dallas County

In its interim plan, the Court made no changes to the 2011 configuration of the House districts in Dallas County. *See* Opinion at 3 n.4, ECF No. 690. MALC Chairman Rafael Anchia, the representative of Dallas County's HD 103, testified that he and Representative Ratliff agreed to a change in their district boundaries, which was proposed and adopted as an amendment during the 2013 special session on redistricting. 2017 Tr. 131:19–25. Representative Anchia does not believe that the boundaries of HD 103, as drawn in Plan H358, fragmented minority populations. 2017 Tr. 133:3–5. Representative Anchia testified that he did not raise any concerns about the 2013 House redistricting plans. 2017 Tr. 131:16–18.

In spite of its Chairman's statements, MALC asserts a § 2 results claim against Dallas County, arguing that "an additional Latino/minority opportunity district that provides a 'real electoral opportunity' can be drawn in Dallas County and that would increase the net total Latino opportunity districts in the State by, at least, one district."

Plaintiff MALC's Advisory at 10 (Apr. 24, 2017), ECF No. 1373.[9] MALC further alleges unconstitutional racial gerrymandering and intentional discrimination[10] in the 2013 drawing of House districts in Dallas County. MALC's Third Amended Complaint ¶¶ 57, 77, ECF No. 897. The NAACP Plaintiffs allege that the configuration of state House districts "in the DFW region . . . violates the effects test of Section 2 by diluting the voting strength of voters of color in the region and failing to create new electoral opportunities for non-white voters." NAACP Plaintiffs' Pre-Trial Brief at 50–51 (July 3, 2017), ECF No. 1454.

These results claims fail because neither MALC nor the NAACP Plaintiffs presented evidence that Plan H358 dilutes any group's voting strength in Dallas County. Rather, the evidence shows that it is not possible to draw an additional Texas House district in Dallas County with a BCVAP or HCVAP majority. Plaintiffs' 2017 demonstration plans prove this, because they do not create an additional House district in Dallas County in which Blacks or Hispanics—on their own—comprise a majority of the citizen voting age population. Instead, these demonstration plans draw coalition districts that combine Black and Hispanic citizens of voting age to reach a majority.

---

[9] In its live pleading, MALC asserts that it is possible to create "one to *three* new [minority-majority] Texas House Districts in Dallas County." ECF No. 897 at 16 (emphasis added).

[10] MALC also alleges that "[p]lans that reduced the population variance in Latino districts and reduced the fragmentation of minority voters in Dallas County were offered as amendments in . . . 2013 and were rejected." *Id.* at 12. Even if MALC had proved as much, it cannot point to anything in the record that shows any such plan was legally required or that any such plan was rejected with an intent to discriminate on the basis of race.

That is, under the NAACP demonstration plan (H392) and H358, the same districts are majority or near-majority Black CVAP—HD 100 (Johnson), HD 109 (Giddings), HD 110 (Rose), and HD 111 (Davis). Plan H392 creates two districts where HCVAP and BCVAP *together* constitute majority CVAP—HD 102 and HD 110. JX-108.3. But Plan H392 does not create any additional Black- or Hispanic-CVAP-majority House districts in Dallas County. 2017 Tr. 551:4–22 (Johnson).

Similarly, the districts in which the Hispanic candidate of choice has prevailed under Plan H358 retain a similar level of HCVAP in MALC's demonstration plan, H391. Under Plan H358, HD 103 (Anchia) contains 40.6% HCVAP; HD 104 (Alonzo) contains 56.8% HCVAP; and HD 107 (Neave) contains 20.7% HCVAP. JX-106.3. Under Plan H391, HD 103 contains 44.6% HCVAP, HD 104 contains 58.7% HCVAP, and HD 107 contains 22.5% HCVAP. JX-107.3. George Korbel testified that it is not possible to draw additional HCVAP-majority districts in Dallas County based on the currently available data. 2017 Tr. 48:4–10. Plaintiffs have failed to carry their burden under the first *Gingles* prerequisite in Dallas County.

Plaintiffs also fail to satisfy the second *Gingles* precondition because they provided no evidence of cohesion between Black and Hispanic voters in Dallas County. Their experts did not analyze primary elections in Dallas County, and they provided no opinion on whether Blacks and Hispanics in Dallas County consistently support the same candidates. When he drew Plan H391, MALC's expert George Korbel did not consider cohesion in primary elections, and he did not offer any opinion on cohesion.

2017 Tr. 41:19–42:17; *see also* 2017 Tr. 87:19–88:24 (MALC expert Dr. Brischetto has never analyzed cohesion between African American and Hispanic voters beyond looking at general elections).

NAACP expert Dr. Chervenak did not examine primary elections in Dallas County and never attempted to determine whether the preference of African-American voters is the same as any other minority group other than by analyzing minority support for the Democratic candidate in general elections. 2017 Tr. 425:23–426:16, 441:3–20. Similarly, Dr. Chervenak could not make any statements about the characteristics of Latino, African American, or Asian American candidates of choice. 2017 Tr. 444:21–445:10. And NAACP expert Dr. Fairfax only looked at the first *Gingles* factor. 2017 Tr. at 494:14–20.

To the extent the record contains any evidence regarding cohesion, it shows that Black and Hispanic voters are not cohesive. MALC Chairman Rafael Anchia testified, for instance, that when he was a member of the Dallas School Board, he experienced tension between Black and Hispanic representatives during the school-board redistricting process. 2017 Tr. 136:5–8. Neither Representative Eric Johnson nor Representative Toni Rose had any seen any data or analyses on cohesion. 2017 Tr. 531:24–532:5 (Johnson); 2017 Tr. at 1320:2–8 (Rose). Elizabeth Alvarez Bingham testified that Hispanics in Dallas County do not vote cohesively even within political parties. State Defendants' Supplemental Text Designations, Elizabeth Alvarez Bingham, ECF No. 1467-2 at 41–43 (citing Alvarez Bingham Depo 120:23–122:18).

Ms. Alvarez Bingham has also observed, within the Democratic party in Dallas County, instances where members of the Hispanic community do not believe that an African-American can adequately represent their interests, and where members of the African-American community do not believe that a Hispanic can adequately represent their interests. ECF No. 1476-2 at 48–50 (citing Alvarez Bingham Depo at 131:15–17; 131:20–133:11). Ms. Alvarez Bingham identified instances where minority groups within the Democratic party have different candidate preferences, approaches to legislation, and ideologies regarding the best way to achieve progressive ideals. ECF No. 1476-2 at 63–64 (citing Alvarez Bingham Depo at 185:8–10; 186:2–9, 13–24; 187:1–7).

Apart from their failure to satisfy the *Gingles* prerequisites, H391 and H392 also violate traditional districting principles. Plan H391 redraws *every* Dallas County district except HD 109 and HD 111. *Compare, e.g.,* JX-107.1 *with* JX-106.1. Both plans pair various incumbent representatives in Dallas County. JX-107.14; JX-108.14.

Additionally, the evidence shows that under the totality of circumstances, minority voters are not excluded from the political process in Dallas County or denied an equal opportunity to elect candidates of their choice. MALC Chairman Rafael Anchia testified, for instance, that he does not believe Latino voters and candidates are excluded from the electoral process. 2017 Tr. 137:24–138:5. Representative Eric Johnson testified to the success of minority candidates in Anglo-majority districts in Dallas County. 2017 Tr. 532:6–533:2. Representative Johnson could not recall any subtle or overt racial appeals in Dallas County political campaigns, *id.* at 548:14–17, nor could he

think of any examples of minority voters being discriminated against with respect to their right to vote, *id.* at 548:23–549:1. And, in addition to members of the Texas House of Representatives, there are other minority elected officials in Dallas County. *Id.* at 547:2–548:12.

The current makeup of the Dallas County House delegation indicates that candidates of choice of Black and Hispanic voters have been elected in proportion to Black and Hispanic citizen voting-age population. Four members of the fourteen-member Dallas County House delegation are Latino, and three—Representative Anchia, Representative Alonzo, and Representative Neave—are undisputedly the Latino candidates of choice in their respective districts. 2017 Tr. 139:13–140:5 (Anchia). The percentage of Latino candidates of choice elected in Dallas County (21.6%) is proportional to the total HCVAP in the county, 21.87%. *See* DX-702. Similarly, four members of the Dallas County House delegation are African-American, and all are undisputedly the candidates of choice of African-American voters. 2017 Tr. 138:19–139:3 (Anchia). The percentage of African-American candidates of choice elected in Dallas County (28%), is proportional to the African-American CVAP in the county, 26.8%. *See* 2017 MALC-Ex. 5 at 2 (2011–2015 ACS Survey).

To the extent the Plaintiffs have any intentional discrimination claims that are specific to Dallas County, those also fail. The Legislature's only changes to the Dallas County House configuration were not opposed by any legislators. JX-17.3 at S4 (adoption of amendment without record vote). Plaintiffs introduced no evidence to

show that any legislator acted with a racially discriminatory purpose in voting for the Dallas County configuration in Plan H358 (or the plan in general). Indeed, Representative Anchia stated that he had no complaints or criticisms about the House districts used in the 2012 elections, and no basis to determine that the court ordered plan was created for the purpose of discriminating. 2017 Tr. 130:8–11, 21–24. Similarly, Representative Anchia understood that the court ordered plan was the starting point for discussion during the 2013 redistricting process—a process about which he had no complaints. *Id.* at 130:25–131:4; 131:9–12. Representative Anchia had no basis to say whether any member of the Legislature voted for the 2013 House plans for a racially discriminatory purpose. *Id.* at 134:5–8.

Representative Rose could not say whether minority Democrats were treated any differently from nonminority Democrats in the 2013 redistricting process, and couldn't identify any legislator who voted for the 2013 maps with the intent to discriminate on the basis of race. 2017 Tr. 1324:13–19; 1323:10–15. In fact, at Representative Rose's request, she was able to secure a change to her district during the 2013 redistricting process. *Id.* at 1318:14–16. Representative Eric Johnson, similarly, did not recall having any criticisms of the 2013 maps. 2017 Tr. 541:10–543:5; 543:25–544:5. Nor could Representative Johnson say what motivated the members who voted for the 2013 redistricting plans, and he admitted that it could have been politics. *Id.* at 544:12–545:13.

### D.    Fort Bend County

Plaintiffs have not proven that Plan H358 dilutes any group's voting strength in Fort Bend County. The evidence shows that it is not possible to create an additional House district in Fort Bend County in which Asian-American, Black, or Hispanic citizens form a majority of the citizen voting-age population. The demonstration plans offered by the Plaintiffs in 2017 attempt to redraw HD 26 as a coalition district that combines Black, Hispanic, and Asian citizens to achieve a CVAP majority. MALC's expert George Korbel testified that this was necessary to reach 50% CVAP in Fort Bend County. 2017 Tr. 60:14–19. Under Plan H391, HD 26 contains 28.2% Asian CVAP, 17.2% Black CVAP, and 16.4% Hispanic CVAP. JX-107.3. Similarly, under Plan H392, HD 26 contains 30.4% Asian CVAP, 13.1% Hispanic CVAP, and 11.2% Black CVAP. JX-108.3.

Even if the Plaintiffs could satisfy the first *Gingles* precondition with potential coalition districts, they could not satisfy the second *Gingles* precondition because there is no evidence of cohesion among Asian-American, Black, and Hispanic voters in Fort Bend County. The Plaintiffs' experts did not analyze primary elections in Fort Bend County and therefore could not provide an opinion that Black, Hispanic, and Asian voters consistently supported the same candidates. *See, e.g.*, 2017 Tr. 41:19–42:17 (Korbel). Dr. Brischetto did not perform any analysis of 2014 or 2016 elections in Fort Bend County. 2017 Tr. 95:18–96:1. Dr. Richard Murray testified that Asian-American voters in Fort Bend County tended to split their vote almost evenly between Democrats

and Republicans. 2017 Tr. 1274:10–16, 1288:13–25. Testimony from lay witnesses did not establish that the various groups voted cohesively. Jacey Jetton testified that Asian-Americans in Fort Bend County do not vote cohesively among themselves. 2017 Tr. 699:18–25. In the Sugarland area, for example, voters of South Asian descent tend to prefer different candidates than voters of Chinese descent. *Id.* at 700:1–24. Grady Prestage confirmed that the Asian-American community in Fort Bend County is not monolithic. 2017 Tr. 581:25–582:2. Mr. Prestage also testified that in his experience, Asian, Black, and Hispanic voters in Fort Bend County have an equal opportunity to vote and to participate in the political process. *Id.* at 578:8–579:18.

### E.    Harris County

The Plaintiffs have failed to prove their claims of vote-dilution against House districts in Harris County. MALC's expert George Korbel admitted that he does not believe it is possible to draw an additional Texas House district in Harris County that contains a Black or Hispanic CVAP majority. 2017 Tr. 60:1–9. MALC's demonstration plan, H391, reconfigured five House districts in western Harris County, JX-107.1, but none of the proposed districts contains a Black or Hispanic CVAP majority, JX-107.3. Two of the proposed districts are coalition districts. One, HD 135, combines Hispanic, Black, and Asian voters to meet the 50% CVAP threshold. *Id.* The other, HD 132, combines Black and Hispanic voters to reach a CVAP majority. *Id.* Even if the State could be required to create coalition districts, there is no evidence to support the creation of the coalition districts proposed by MALC. Korbel testified that his analysis

was limited to the first *Gingles* prerequisite. 2017 Tr. 45:11–17. He did not consider primary elections, and he did not offer an opinion on political cohesion between African-American and Latino voters in primary elections. *Id.* at 41:19–42:17.

### F.    Midland County and Ector County

Plaintiffs have provided no evidence that the 2013 Legislature intentionally discriminated on the basis of race in adopting House districts in Midland and Ector County, as drawn in Plan H358. Nor have they provided evidence that those districts dilute Hispanic voting strength. The Legislature considered a proposed amendment to Midland and Ector County House districts in 2013, but Representative Clardy testified that the county-line splits in the proposed MALC plan were exactly what community members had told the Committee that they wanted to avoid. JX-15.3 at 126:1–15. Neither of the House demonstration plans offered in 2017 alter the House districts in Midland and Ector County. This Court has already determined that the demonstration districts proposed for Midland and Ector County in earlier phases of this litigation are not sufficiently compact, *see* Order on Plan H283 at 78–79 (Apr. 20, 2017), ECF No. 1365, and the Plaintiffs have offered no evidence to support a different conclusion.

### G.    Nueces County

No party disputes that Nueces County's 2010 Census population entitled it to two—and only two—Texas House districts. Nor does any party dispute that HD 34 is a Latino opportunity district under Plan H358, resulting in representation roughly proportional to the county's total HCVAP of 57.55%, *see* DX-702 at 6 (2011–2015 ACS

Survey). MALC nevertheless argues that the 2013 Legislature violated § 2 of the Voting Rights Act when it failed to abrogate the Texas Constitution's whole-county provision in order to create an additional Hispanic opportunity district located partly in Nueces County. MALC has failed to prove that federal law preempts the whole-county rule as applied to Nueces County, however, because it has failed to prove that the current configuration of House districts dilutes Hispanic voting strength.

MALC's expert George Korbel testified that, based on his experience attempting to draw districts in this case, it is not possible to draw two HCVAP-majority districts contained wholly within Nueces County that consistently elect the Hispanic candidate of choice. 2017 Tr. 66:5–8. But Korbel also testified that the Nueces County population is not sufficient to create two performing HCVAP-majority districts by simply removing part of the county's population and placing it in a separate district—that is, breaking the county line only once. *Id.* at 66:9–18.

In order to create two HCVAP-majority districts using the Nueces County population, Mr. Korbel testified that it was necessary to break the Nueces County line twice. As demonstrated in Plan H391, this required him to remove part of eastern Nueces County's population and put it in a district running north in a district with Victoria County. *Id.* at 66:22–67:10. That district would pair Representative Todd Hunter of Corpus Christi with Representative Geanie Morrison of Victoria. *Id.* at 67:11–14. Plan H391 then takes a second portion of Nueces County and joins it with Kleberg County to the South, creating a district with 61.2% HCVAP and 54.6% non-

66

suspense SSVR. JX-107.1; JX-107.4. MALC's Plan H391 thus demonstrates that the Hispanic population of Nueces County is not sufficient to form a voting majority in two House districts unless the county's population is split three ways—part in a district wholly contained in Nueces County, part in a district with Kleberg County, and part in a district with Victoria County (among others).

If an additional Latino opportunity district cannot be drawn without removing part of the population base and adding population from another county, this would seem to prove that the Hispanic population in Nueces County is not sufficient to form a voting majority in two reasonably compact districts, therefore failing the first *Gingles* prerequisite. *Cf. Fairley v. City of Hattiesburg*, 584 F.3d 660, 671 (5th Cir. 2009) (affirming rejection of § 2 claim where "the only plan the plaintiffs developed in the district court [involved] exclusion of dormitory students, including an unknown number of City residents, from the City's population for redistricting decisions"). That conclusion is reinforced by Mr. Korbel's testimony that it is possible to draw two HCVAP-majority districts wholly within Nueces County, but neither district would provide Hispanic voters with the opportunity to elect their candidates of choice. 2017 Tr. 26:3–15, 28:1–16. And apart from their questionable proof on the *Gingles* prerequisites, MALC has not introduced any evidence to demonstrate that, under the totality of the circumstances, Latino voters are denied an equal opportunity to participate in the political process and elect their candidates of choice in Nueces County.

Even if MALC could show that Plan H358 diluted Hispanic voting strength in Nueces County, any claim that the Legislature's adherence to the whole-county rule reflects intentional racial discrimination is baseless. First, the Legislature had a valid, race-neutral reason not to violate the whole-county rule. As David Hanna testified in an earlier phase of this case, failure to comply with the whole-county rule would have exposed the entire plan to a challenge in state court. 2014 Tr. 1201:15–22. Second, the 2013 Legislature had good reason to believe that maintaining two districts in Nueces County did not violate federal law. In this Court's order implementing Plan H309 as an interim plan, it explained that any retrogression concerns caused by the removal of HD 33 from Nueces County were remedied by the creation of HD 144 as a new Hispanic opportunity district in Harris County. Opinion at 7, ECF No. 690. The Court explained further that it could not "conclude, at this stage of the proceedings, that plaintiffs are likely to succeed on their Section 2 claim," because "the only way to maintain two Latino districts in Nueces County is to cut a county line in violation of the State constitution. Absent a Section 5 retrogression violation, this seems inappropriate in the particular circumstances of this case." *Id.* at 7–8. It concluded that "in the particular circumstances of this case, traditional redistricting principles counsel in favor of maintaining two districts in Nueces County." *Id.* at 8. Given this Court's preliminary ruling, the Legislature lacked a strong basis in evidence to believe that the Voting Rights Act required it to break the whole-county rule solely to create a Latino opportunity district in Nueces County. *Cf. Bush v. Vera*, 517 U.S. at 978 (noting that states "may

avoid strict scrutiny altogether by respecting their own traditional districting principles").

### H.    Tarrant County

The Texas Latino Redistricting Task Force Plaintiffs claim that the 2013 Legislature altered the boundaries of HD 90 for a racially discriminatory purpose, contrary to the Fourteenth Amendment, and that the alterations to HD 90 result in a denial or abridgment of their right to vote on account of their race, color, or ethnicity, in violation of § 2 of the Voting Rights Act. Fourth Amended Complaint ¶¶ 82, 86 (Sept. 9, 2013), ECF No. 889-1. The Task Force Plaintiffs' claim fails on both counts. There is no evidence that the 2013 Legislature adopted HD 90, as configured in Plan H358, for a racially discriminatory purpose, and the evidence proves that it did not deny or abridge the rights of Latino voters in the district.

The Task Force Plaintiffs' claim is based on the 2013 Legislature's adoption of an amendment that returned the Como neighborhood to HD 90. Como is a predominantly African-American neighborhood in Fort Worth. 2017 Tr. 626:7–14 (Kenny). In 2011, the legislatively enacted House redistricting plan moved Como from HD 90 to HD 99. *Id.* at 627:6–9. The Legislature's reconfiguration of HD 90 increased Hispanic voting strength by raising the district's HCVAP from 47.9% to 49.7% and raising the Spanish-surname voter registration (non-suspense) from 47.2% to 50.1%. *Compare* Ex. J-21 *with* Ex. J-29. The Task Force Plaintiffs have acknowledged that HD 90 provided Hispanic voters with the opportunity to elect their candidates of choice in

both the benchmark and 2011 configurations. *See* TLRTF Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 635, 636 (Feb. 10, 2012), ECF No. 634. This Court's interim House plan, Plan H309, made no changes to HD 90. *See* Opinion at 3 n.4, ECF No. 690.

After the 2011 House plan was enacted, residents of Como requested that the neighborhood be returned to HD 90, where it had been since 1978. 2017 Tr. 631:3–632:2 (Kenny); DX-731. In the 2013 special session, Representative Burnam submitted a floor amendment that affected the boundary between HD 90, which he represented, and HD 99, represented by Representative Charlie Geren. When he offered the amendment, Burnam informed the House that the amendment was intended to return Como to HD 90. JX-17.3 at S29. The amendment was agreed to by Representative Geren, adopted by the House without objection, and incorporated into the plan that was eventually enacted as Plan H358. JX-17.1 at 206–12. As configured in Plan H358, the district contains 53.9% HCVAP and 52.7% non-suspense SSVR. *See* JX-106.4 (2011–2015 ACS Survey; 2016 General Election).[11]

There is no evidence that the 2013 Legislature accepted the amendment to HD 90 for any reason other than the reason stated on the record—to return Como to the district, as Como residents had requested. Sal Espino, a witness for the Task Force

---

[11] Based on the data available at the time Plan H358 was enacted, HD 90 contained 50.7% HCVAP and 52.0% non-suspense SSVR. *See* Defendants' Motion for Partial Summary Judgment, Exh. A-5, at 9 (May 14, 2014), ECF No. 996-8 (2007–2011 ACS Survey; 2012 General Election).

Plaintiffs, testified that he was not aware of the requests to put Como back into HD 90, nor was he aware that the Legislature responded to these requests when it accepted the amendment moving Como into HD 90. 2017 Tr. 342:7–17. In any event, HD 90 continued to provide Hispanic voters with the opportunity to elect their candidates of choice. In 2014, voters elected Representative Ramon Romero, Jr. in HD 90, as configured in Plan H358. Representative Romero is the Hispanic candidate of choice. 2017 Tr. 359:22–360:8 (Jimenez). Representative Romero was reelected in 2016. 2017 Tr. 340:24–341:1 (Espino). Because HD 90 provides Hispanic voters with the opportunity to elect their candidate of choice, and because they have taken that opportunity in 2014 and 2016, they have failed to prove vote dilution, intentional or otherwise.

## IV.    CLAIMS AGAINST PLAN C235

### A.    Population Growth

The magnitude of minority population growth, particularly Hispanic population growth, has been a central theme of Plaintiffs' case. Given the Hispanic population growth and the State's gain of four congressional seats, Plaintiffs have argued that the State should have created additional Hispanic-opportunity congressional districts. They claim that the State's failure to do so dilutes Hispanic voting strength and strongly suggests a concerted effort to dilute minority voting strength. But Plaintiffs' most recent demonstration plans indicate that it is not possible to draw more reasonably compact HCVAP-majority congressional districts than the State created in Plan C235.

Districts are drawn on the basis of total population, but the relevant measure of the ability to create districts with a Hispanic voting majority is citizen voting-age population. 2014 Tr. 1819:17–1820:5; 1822:11–13 (Alford). Hispanic CVAP increased by approximately 700,000 from 2000 to 2010, Ex. TLRTF-631. This represents roughly 25% of the total Hispanic population growth of 2.8 million and approximately 44% of the total CVAP growth of 1,596,550. Ex. TLRTF-629, TLRTF-631. Districts drawn to reflect this population growth—that is, districts with a Hispanic population majority, only 25% of which is eligible to vote—would not increase Hispanic voting strength. If anything, they could be cited as evidence of vote dilution, if not intentional racial discrimination. *See, e.g.*, *LULAC*, 548 U.S. at 441 (finding that "evidence suggesting that the State intentionally drew District 23 to have a nominal Latino voting-age majority (without a citizen voting-age majority)" indicated the "use of race to create the facade of a Latino district").

Realistic assessment of the potential to create Hispanic opportunity districts must start with Hispanic citizen voting-age population, just as the assessment of vote-dilution claims must begin with assessment of the potential to create additional reasonably compact districts with an HCVAP majority. "When applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy*, 512 U.S. at 1008; *cf. Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) (illustrating vote-dilution

72

by "packing" with the example of a minority group with "sufficient numbers to constitute a majority in three districts" being apportioned "into two districts in which it constitutes a super-majority").

The demonstration plans offered by Plaintiffs in this litigation prove that it is extremely difficult, if not impossible, to translate Hispanic population growth into additional HCVAP-majority congressional districts. After six years of concerted effort by multiple parties and multiple experts, none of the Plaintiffs have offered a congressional redistricting plan with more than eight geographically compact HCVAP-majority districts—the same number created in the State's 2013 plan, C235.[12] The Rodriguez Plaintiffs' proposed Plan C286, for example contains the same number of HCVAP-majority districts and the same number of districts at or near a BCVAP majority as Plan C235. 2017 Tr. 1179:4–13 (Ansolabehere); JX-100.3; JX-105.3.[13] The Plaintiffs' failure to draw additional compact HCVAP-majority districts confirms Dr. Alford's conclusion: despite the substantial growth in the State's Hispanic population, it is not possible to draw more geographically compact HCVAP-majority districts than the Legislature created in Plan C235. The Legislature's failure to accomplish in 2013

---

[12] In an earlier phase of the litigation, Plaintiffs argued that Plans C188 and C262 created 9 HCVAP-majority districts. This Court correctly held that at least one of the districts in each plan was not reasonably compact. Order at 7–9 (Mar. 10, 2017), ECF No. 1339.

[13] *See also* JX-101.3 (Plan C273); JX-102.3 (Plan C283); JX-104.3 (Plan C285); *cf.* JX-103.3 (demonstrating that Plan C284 creates only 7 HCVAP-majority districts).

what none of the Plaintiffs have been able to accomplish after more than six years of litigation is not evidence of intentional racial discrimination or vote dilution.

## B.    Congressional District 23

The Court modified CD 23 in Plan C235, which was used to conduct elections in 2012. *See* Order at 30–32, ECF No. 691. The 2013 Texas Legislature adopted the Court's configuration of CD 23. *See* Act of June 21, 2013, 83d Leg., 1st C.S., ch. 3, 2013 Tex. Gen. Laws 5005.

Plaintiffs mount several challenges to CD 23, including intentional vote dilution claims under § 2 and the Fourteenth Amendment, as well as § 2 effects claims. *See, e.g.,* MALC's Third Amended Complaint ¶ 64 (Sept. 17, 2013), ECF No. 897; Quesada Plaintiffs' Third Amended Complaint ¶¶ 71–72 (Sept. 18, 2013), ECF No. 899.[14] The Quesada Plaintiffs also now contend that "CD 23 is an unconstitutional racial gerrymander under the *Shaw* line of cases," Quesada Plaintiffs' Advisory at 4 (Apr. 24,

---

[14] The Perez Plaintiffs, MALC, the Quesada Plaintiffs, the Rodriguez Plaintiffs, the LULAC Plaintiffs, and Congressman Cuellar lack standing to bring claims against CD 23. *See* Plaintiffs' Sixth Amended Complaint at 1–2 (Feb. 25, 2014), ECF No. 960 (identifying Perez Plaintiffs but failing to state that any reside in CD 23); Quesada Plaintiffs' Third Amended Complaint at 4 (Sept. 18, 2013), ECF No. 899 (identifying plaintiffs who reside in CDs 6, 9, 18, 20, 24, 29, 30, and 33); Second Amended Complaint at 4–5 (Sept. 17, 2013), ECF No. 896 (identifying Rodriguez Plaintiffs, none of whom reside in CD 23); LULAC Plaintiffs' Motion for Leave to Supplement the Record (Mar. 20, 2017), ECF No. 1342 (failing to identify any individual who resides in CD 23). MALC lacks either associational or organizational standing to bring claims against CD 23 because it has not identified members with standing to sue, and the configuration of congressional districts is not germane to the organization's purpose. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Congressman Cuellar does not reside in CD 23. *See* Plaintiff-Intervenor Congressman Cuellar's Second Amended Complaint in Intervention at 2 (Sept. 12, 2013), ECF No. 893 (stating that Congressman Cuellar resides in Webb County).

2017), ECF No. 1374—although they did not assert this claim in their live pleading. Plaintiffs cannot prevail on their intentional vote dilution claims, as they offered no evidence that the 2013 Legislature acted with the specific intent to harm minority voters because of their race or ethnicity. So too for any racial gerrymandering claims involving CD 23 (even assuming they have been properly asserted), given that the 2013 Legislature did not draw any of the boundaries in Plan C235. *See infra* Part V.

Nor does the evidence support Plaintiffs' § 2 effects claim in CD 23. The Court's changes to CD 23 in the interim plan increased the district's HCVAP and SSVR levels; these changes were maintained in the map adopted by the Legislature in 2013. Using the 2011–2015 American Community Survey data, CD 23's HCVAP increased from 60.0% under Plan C100, to 60.4% under Plan C185, and to 62.1% under Plan 235. 2017 Tr. 1149:16–1150:6 (Ansolabehere); DX-837. At 62.1%, CD 23 has a higher HCVAP than two Hispanic opportunity districts—CD 29 (61.6% HCVAP) and CD 35 (52.1% HCVAP). 2017 Tr. 1151:7–1152:2 (Ansolabehere); JX-100.4. The district's SSVR levels have similarly increased across the various plans—from 53.1% non-suspense SSVR under Plan C100, to 55.1% under Plan C185, and to 56.1% under Plan C235, using 2016 general election data. 2017 Tr. 1150:19–24 (Ansolabehere); DX-837.

CD 23's Latino registration and turnout figures also defeat Plaintiffs' § 2 effects claims. Dr. Flores concluded, for example, that the percentage of Latinos registered in CD 23 under Plan C235 increased from the 2010 general election to the 2016 general election. MALC Ex. 21 at 4. Dr. Flores also found that Latinos comprised 48.2% of the

votes cast in CD 23 under Plan C235 for the 2016 general election, an increase from 46.0% for the 2012 general election. *Id.* Likewise, the total number of votes cast by Latinos in CD 23 under Plan C235 increased 20.7% from the 2012 general election to the 2016 general election, while the total number of votes cast by non-Latinos only increased 10.7% over these two elections. *Id.* at 5–7. Overall Latino turnout in CD 23 under Plan C235 also increased from 45.5% for the 2012 general election to 47.4% for the 2016 general election. *Id.* at 8; 2017 Tr. 852:20–853:8 (Flores). Dr. Ansolabehere's CD 23 turnout analyses looked only at total turnout for one election (2010 general election) and did not examine turnout for any specific racial group. 2017 Tr. 1153:10–1154:6 (Ansolabehere). And Dr. Ansolabehere did not dispute that the 2016 general election turnout for the areas moved into CD 23 under C235 (from Plan C185) was 4,084 votes more than the areas moved out of CD 23 in C235. *Id.* at 1155:15–24; DX-808.

The evidence confirms what Defendants have said throughout this case: CD 23 is a highly competitive district that can be won by either party—and by the Hispanic candidate of choice—in any given election. 2017 Tr. 1398:21–1400:1 (Alford). In 2012, Pete Gallego won by just over 9,000 votes. 2017 Tr. 853:23–854:1 (Flores). In that election, Gallego received approximately 83% of the Latino vote and 24% of the non-Latino vote. 2017 Tr. 1392:19–1393:2 (Alford). Congressman Hurd prevailed over Gallego in the 2014 and 2016 general elections, but by slim margins in both instances. 2017 Tr. 854:2–7 (Flores); 2017 Tr. 1397:16–18, 1398:14–16 (Alford). In 2014, Gallego

76

received approximately 82% of the Latino vote and 27% of the non-Latino vote. 2017 Tr. 1393:10–21 (Alford). In 2016, Gallego's support from Latino and non-Latino voters dropped—he received roughly 76% of the Latino vote and 22% of the non-Latino vote. 2017 Tr. 1394:3–15 (Alford). During the same election cycle, the Hispanic candidate of choice for president won a majority of the vote in the areas included in CD 23 under C235. 2017 Tr. 1159:3–14, 1160:16–22 (Ansolabehere). Collectively, the exogenous and endogenous elections involving CD 23 under Plan C235 reflect that the district provides Hispanic voters with the opportunity to elect their candidates of choice. 2017 Tr. 1403:2-6 (Alford).

Congressman Hurd's testimony further confirms the configuration of CD 23 under Plan C235 does not violate § 2 of the Voting Rights Act. Congressman Hurd testified that because CD 23 is a competitive congressional district—the only competitive district in Texas, and one of the five most competitive in the country—he has to engage with all potential voters in the district. 2017 Tr. 1627:21–1628:9; 1630:5–1632:6. To engage with all potential voters in CD 23, Congressman Hurd creates Spanish-language campaign materials and employs Spanish-speaking staff, winning an award for diversity in his congressional office. 2017 Tr. 1632:11–18; 1634:9–19. Apart from campaigning to all potential voters, Congressman Hurd testified to the extensive services he provides in all areas of CD 23, including services to colonias in El Paso County. 2017 Tr. 1634:20–1637:5. Congressman Hurd's efforts, which demonstrate the competitive nature of CD 23, are relevant to the totality of circumstances under § 2

because they show that Hispanic voters and citizens are not excluded from the political process; they are actively included.

### C.    Congressional District 27

The claim that Plan C235 dilutes the vote of Hispanic voters in Nueces County fails for two reasons. First, there is no evidence that the Legislature set out to diminish the voting rights of Nueces County Hispanic voters on the basis of race. Second, even if they could prove intent, the Plaintiffs cannot prove a discriminatory effect because they cannot satisfy *Gingles* based on Hispanic voters in Nueces County.

The Plaintiffs presented no evidence that the 2013 Legislature adopted CD 27, as drawn in Plan C235, for the purpose of discriminating against Hispanic voters in Nueces County. The 2013 Legislature adopted CD 27 for the same reason it adopted Plan C235 in its entirety: this Court had determined that the Plaintiffs' constitutional and § 2 claims against CD 27 were not likely to succeed on the merits. With respect to the constitutional claim, the Court's interim order identified evidence of multiple race-neutral reasons for the configuration of CD 27, but it cited no evidence of intentional discrimination. Order at 54, ECF No. 691. That a majority of the Court later changed its mind about CD 27 does not change the Legislature's purpose when it maintained the district in 2013. The record contains no evidence that the 2013 Legislature set out to harm Hispanic voters in Nueces County on account of their race or for any other reason.

Any vote-dilution claim asserted by Hispanic voters in Nueces County must fail, in any case, because the population of eligible Hispanic voters in the county is not sufficient to satisfy the first *Gingles* prerequisite. Based on the 2011–2015 ACS Special Tabulation, Nueces County contains 142,230 Hispanic voting-age citizens. DX-702 at 6. "When a minority group is not sufficiently large to make up a majority in a reasonably shaped district, § 2 simply does not apply." *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (citing *Bartlett*, 556 U.S. at 18–20). A vote-dilution claim based on the rights of Hispanic voters in Nueces County, whether based on intent or effect, necessarily fails because they are not sufficiently numerous to constitute a majority in a constitutionally apportioned congressional district. As the Court correctly noted in 2012:

> The failure to place Nueces County Hispanics in a South Texas district has not diminished Hispanic voter opportunity for § 2 purposes, since whether they are included or not, it appears that only 7 reasonably compact Latino opportunity districts can be drawn in compliance with § 2. In other words, Plaintiffs fail to demonstrate that their placement prevented them (or other Latinos) from constituting a majority in an additional district.

Order at 53, ECF No. 691. Plaintiffs have provided no evidence in the latest phase of this case to prove that including Nueces County in a different district would facilitate the creation of an additional Latino opportunity district. Without that showing, "there neither has been a wrong nor can be a remedy." *Bartlett*, 556 U.S. at 15 (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)).

### D.    Dallas/Fort Worth

Plaintiffs' vote-dilution claims involving the Dallas/Fort Worth region similarly fail. Plaintiffs have offered no evidence to establish that the Legislature, in adopting Plan C235 in 2013, intended to diminish the voting rights of minority voters in the Dallas/Fort Worth area on account of their race. The 2013 Legislature adopted the Dallas/Fort Worth configuration in Plan C235 because this Court had conducted a detailed analysis of the Plaintiffs' claims and had determined the extent to which those claims required changes to the congressional map. To that end, this Court made "substantial changes" to the Dallas/Fort Worth congressional districts, including CDs 6, 12, 26, 30, and 33. Order at 33, 36–37, ECF No. 691. This Court did so based on a finding that certain § 5 claims were "not insubstantial," while making clear it was "go[ing] no further than required" under the Supreme Court's *Perry v. Perez* decision. *Id.* at 36–38. At the same time, the Court concluded that the Plaintiffs were not likely to succeed on the merits of their § 2 claim that an additional Latino opportunity district was required to be drawn in the Dallas/Fort Worth region. *Id.* at 39. There is no evidence that the Legislature intended to harm minority voters because of their race by deciding to maintain the Dallas/Fort Worth configuration as it existed in this Court's interim map.

Even assuming the Plaintiffs could establish that the 2013 Legislature acted with discriminatory intent through its adoption of Plan C235 (they cannot), their vote-dilution claim still must be rejected for at least two independent reasons. First, the Black

and Hispanic populations in the Dallas/Fort Worth are not sufficiently large and geographically compact that either group could comprise a majority of the citizen voting-age population in an additional congressional district. For the last six years, Plaintiffs and their experts have tried to create a Hispanic-CVAP-majority district in the Dallas/Fort Worth region, but none has been able to do so with a compact district that respects traditional redistricting criteria. In its order regarding the 2011 congressional plan, this Court noted that the Task Force Plaintiffs' Plan C190 created a Hispanic CVAP majority district in Dallas/Fort Worth but concluded that the district "show[ed] no regard for traditional districting principles such as compactness or respecting county lines, towns, cities, or voting precincts." Order at 60–72 (Mar. 10, 2017), ECF No. 1339. In their newest demonstration plans, the Plaintiffs do not even try to satisfy *Gingles* I by offering a Hispanic CVAP majority district in Dallas/Fort Worth. Instead, they rely on coalition districts that combine Hispanic and Black citizens to exceed 50% CVAP.[15] These proposed districts cannot satisfy the first *Gingles* prerequisite because § 2 does not require the States to create coalition districts.

Even if Plaintiffs could meet the first *Gingles* requisite with coalition districts, they would have to prove cohesion among different minority groups to meet the second *Gingles* prerequisite. The record refutes the existence of cohesive voting among Hispanic

---

[15] *See, e.g.*, JX-101.3 (Plan C273—CD 3 is 38.4% Hispanic CVAP and 19.6% Black CVAP; CD 33 is 30.8% Black CVAP and 23.4% Hispanic CVAP); JX-103.3 (Plan C284—CD 24 is 39.8% Hispanic CVAP and 19.1% Black CVAP; CD 33 is 29.4% Black CVAP and 22.8% Hispanic CVAP).

and Black voters in the Dallas/Fort Worth region. This lack of cohesion is established in the first instance by the results of Democratic primaries in the area. In the Democratic primary for CD 33, for example, Hispanic and Black voters did not support the same candidate in the 2012, 2014, or 2016 elections. 2017 Tr. 1368:6–1371:15 (Alford). In the 2012 primary, nearly 80% of Hispanic voters preferred Hispanic candidate Domingo Garcia, while 85% of Black voters preferred Marc Veasey. *Id.* at 1370:10–16. In the 2014 primary, Hispanic voters split their vote almost evenly among Congressman Veasey and Tom Sanchez, while Congressman Veasey received over 90% of the Black vote. *Id.* at 1370:20–1371:3. And in the 2016 primary, two-thirds of Hispanic voters supported Carlos Quintanilla, whereas over 90% of Black voters supported Congressman Veasey. *Id.* at 1371:4–9. Based on his analysis, Dr. Alford concluded that the district's Hispanic and Black voters were not cohesive in their choice of candidates. *Id.* at 1371:10–15.

The parties' expert testimony confirms the lack of cohesion among Hispanic and Black voters in the Dallas/Fort Worth area. Dr. Brischetto agreed that Dr. Engstrom's analysis showed a lack of cohesion between Black and Hispanic voters in the 2014 Democratic primary for HD 90, in which incumbent Lon Burnam faced Ramon Romero, Jr., a Latino candidate. In that race, election analyses indicate that Romero received over 75% of the Latino vote but only about 12% of the Black vote. 2017 Tr. 102:16–103:11. Dr. Chervenak concurred that Dr. Engstrom's analysis showed that nearly 80% of Hispanic voters supported Ramon Romero in the 2014 Democratic

primary for HD 90, while nearly 90% of Black voters supported Lon Burnam. 2017 Tr. 433:24–434:8. Mr. Korbel did not analyze primary elections or the extent of any cohesion between Black and Hispanic voters in primary elections; however, based on Congressman Veasey's success in the Democratic primary, Mr. Korbel did not consider CD 33 to be a district in which Hispanic voters are able to elect their candidate of choice. 2017 Tr. 41:24–42:8, 796:11–14. Similarly, Dr. Lichtman concluded that CD 33 was an effective Black opportunity district because Black voters dominate the Democratic primary; he did not assert that CD 33 was a coalition district under Plan C235. 2017 Tr. 955:12–956:4. In so concluding, Dr. Lichtman testified that Black voters in CD 33 show a strong preference for the Black candidate in Democratic primaries, *id.* at 958:10–22, and that his analysis showed a lack of cohesion between Black and Hispanic voters, *Id.* at 971:14–973:23.

Lay witness testimony also confirmed that Hispanic and Black voters are not cohesive in the Dallas/Fort Worth region. Tarrant County Commissioner Roy Brooks stated that in the CD 33 primary and other elections, Black and Hispanic voters have supported different candidates. 2017 Tr. 1237:3–25. Franklin Moss acknowledged that in Democratic primary elections in Tarrant County, Black and Hispanic voters are less likely to vote for the same candidates. 2017 Tr. 1307:11–14. And Alex Jimenez testified that in Tarrant County, Black voters would rather support Anglo candidates than Hispanic candidates. 2017 Tr. 359:18–21. In Dallas County, Representative Anchia acknowledged that he had experienced tension between Blacks and Hispanics in the

83

redistricting context during his time on the Dallas School Board. 2017 Tr. 136:5–8. Elizabeth Alvarez Bingham testified that minority groups do not vote cohesively in Dallas County. *See* Bingham Depo. at 113:7–18, Defendants' Deposition Designations, ECF No. 1460-6 at 77–78.

There is no legal basis for the Court to redraw CD 33. In adopting Plan C235 as the interim map for the 2012 election cycle, this Court noted that CD 33's contours were drawn to "address[ ] the 'not insubstantial' § 5 claims of cracking and packing and the application of neutral redistricting criteria." Order at 38, ECF No. 691. The Legislature decided to maintain that configuration in the 2013 enacted map. Plaintiffs have not established that the Legislature acted unlawfully by making that determination or that there is anything illegal in CD 33's configuration today. Instead, certain Plaintiffs seek to redraw CD 33 simply because it is not performing for Hispanic voters as they hoped it would, while certain Plaintiffs would increase the percentage of Black voters and reduce the percentage of Hispanic voters to ensure Black voters' control over the district. Neither theory provides a reason to declare CD 33's current configuration unlawful, and Plaintiffs offer nothing to establish otherwise.

## V. PLAINTIFFS FAILED TO PROVE THAT RACE WAS THE PREDOMINANT FACTOR IN ANY DECISION MADE BY THE 2013 LEGISLATURE.

Some of the Plaintiffs bring racial gerrymandering claims, alleging that the 2013 Legislature violated the Fourteenth Amendment by focusing on race to an impermissible extent in drawing certain districts. In *Shaw v. Reno*, the Supreme Court

held that a plaintiff can challenge "a reapportionment statute . . . by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." 509 U.S. at 649.

The Plaintiff's burden is a "demanding one." *Miller*, 515 U.S. at 928 (O'Connor, concurring). Strict scrutiny is not triggered by "the mere presence of race in the mix of decision making factors." *Chen v. City of Houston*, 206 F.3d 502, 514 (5th Cir. 2000). "To invoke strict scrutiny, a plaintiff must show that the State has relied on race in *substantial* disregard of customary and traditional districting practices." *Id.* at 506 (citing *Miller*, 515 U.S. at 928). Specifically, the plaintiff must prove that race was "the 'predominant factor' motivating the legislature's districting decision." *Hunt*, 526 U.S. at 547.

## A.    Plaintiffs Cannot Prove Racial Gerrymandering in Plan C235.

Plaintiffs cannot prove that the 2013 Legislature relied predominantly on race when it drew the boundaries of any district in Plan C235 because the 2013 Legislature did not draw any district boundaries when it enacted Plan C235. The Legislature adopted the district boundaries as they were drawn in the existing plan. Because it did not draw the boundaries of any district, the 2013 Legislature did not make a "decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. There is certainly no basis to conclude that "race for its own sake" was "the overriding reason," *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017), for choosing Plan C235 or any particular district in the plan.

This is particularly true as to the configuration of CD 35. Even if there were evidence that the 2013 Legislature relied predominantly on race in adopting CD 35—and there is not—its reliance on race would satisfy strict scrutiny because it had good reasons to believe that failure to create a Latino opportunity district in central Texas would violate § 2 (and § 5) of the Voting Rights Act. In *Bethune-Hill*, the Supreme Court clarified that strict scrutiny "does not require the State to show that its action was 'actually . . . necessary' to avoid a statutory violation, so that, but for its use of race, the State would have lost in court." *Id.* at 801 (citing *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1274 (2015)). "Rather, the requisite strong basis in evidence exists when the legislature has '*good reasons* to believe' it must use race in order to satisfy the Voting Rights Act, 'even if a court does not find that the actions were necessary for statutory compliance.'" *Id.* (quoting *Alabama Legislative Black Caucus*, 135 S. Ct. at 1274). As the Court explained, imposing a higher burden "would afford state legislatures too little breathing room, leaving them 'trapped between the competing hazards of liability' under the Voting Rights Act and the Equal Protection Clause." *Id.* at 802.

## B.    The Task Force Plaintiffs Have Failed to Prove Racial Gerrymandering in House District 90.

The Task Force Plaintiffs claim that the Legislature violated the Fourteenth Amendment because Plan H358 "uses race as a predominant factor to allocate Latino voters into and out of HD 90." Fourth Amended Complaint ¶ 78, ECF No. 889-1. But the Task Force Plaintiffs' claim is based entirely on the actions of Conor Kenny,

Representative Lon Burnam's chief of staff during the 2013 legislative session. Even if the evidence showed that Kenny relied predominantly on race in drafting an amendment to HD 90, which it does not, he had good reason to believe that consideration of race was necessary to avoid a potential violation of the Voting Rights Act. And in any case, there is no evidence that any member of the Legislature knew about Kenny's reliance on race. As a result, the Task Force Plaintiffs failed to prove that the 2013 Legislature relied predominantly on race when it accepted Representative Burnam's amendment to HD 90.

During the 2013 special session, Representative Burnam instructed Kenny to draft an amendment to HD 90 that would return Como to the district by exchanging population with the adjacent HD 99. 2017 Tr. 635:3–13 (Kenny). Kenny testified that he was the only person in Representative Burnam's office who drew redistricting plans in 2013. *Id.* at 636:18–23. Representative Burnam's goal was to put Como back in HD 90. *Id.* at 635:22–24. Kenny drafted two amendments in an effort to achieve that goal. In his initial draft, Kenny put the Como precincts into HD 90 and moved other precincts from HD 90 to HD 99 to equalize population. *Id.* at 637:17–638:1. He did not review any demographic information when he created his initial draft amendment. *Id.* at 637:25–638:1.

Kenny provided his initial draft to Martin Golando, who served as counsel to MALC and as a member of Representative Trey Martinez Fischer's staff. *Id.* at 638:5–10, 661:19–22. After reviewing the draft, Mr. Golando informed Kenny that MALC

could not support the amendment because it substantially diluted Hispanic voting strength in HD 90. He also informed Kenny that the SSVR in HD 90 needed to be greater than 50% to secure MALC's support. *Id.* at 638:18–22, 662:4–12. In Kenny's initial draft, HD 90's SSVR was 48.2%. *Id.* at 639:14–17; DX-799. Kenny therefore believed that reducing HD 90's SSVR below 50% could be problematic, and his goal was to preserve minority voting power in HD 90, not reduce it. 2017 Tr. 640:6–20.

After consulting with Mr. Golando, Kenny prepared a second draft amendment to address concerns about SSVR levels in the initial draft. *Id.* at 641:15–21. Representative Burnam gave Kenny three instructions for the second draft amendment: (1) return Como to HD 90; (2) ensure that HD 90's SSVR was equal to or greater than its SSVR level in Plan H309; and (3) make changes only to HD 90 and HD 99. *Id.* at 641:15–21, 642:9–19, 644:12–15. Kenny initially attempted to meet those objectives by drafting at the precinct level, but he eventually drafted at the Census block level because he believed it was necessary to address concerns about SSVR in HD 90. *Id.* at 643:15–644:6. Because he was trying to preserve Latino voting strength in HD 90, Kenny looked for Census blocks along the border of HD 90 and HD 99 that had high concentrations of Hispanic voting-age population. *Id.* at 643:22–644:18. In his second draft, Kenny increased HD 90's SSVR to 50.1%. *Id.* at 648:24–649:5; DX-800. He did not believe that he could further increase SSVR in HD 90 while complying with Representative Burnam's instruction to return Como to HD 90 and limit changes to HD 90 and HD 99. *Id.* at 649:22–650:6. Kenny testified that he did not intend to discriminate against Latinos when he drafted proposed amendments to HD 90. *Id.* at 656:18–21. After he completed his second draft, he provided a copy to Representative

88

Burnam and to Representative Geren's office. After that, Kenny had no further involvement in the process. *Id.* at 646:22–647:5.

There is no evidence that Representative Geren, Chairman Darby, or any other member of the Legislature knew how the proposed amendment to HD 90 was drafted. On the contrary, Kenny testified that he had no communications with Representative Geren's office at the time he provided the draft amendment, and he did not recall any communications with Representative Geren's staff regarding redistricting generally. *Id.* at 647:11–19. Nor did Kenny recall having any communications with Chairman Darby's staff during the 2013 special session. *Id.* at 648:2–4. Kenny testified that he did not communicate with legislators (other than Burnam) at any point during his drafting of proposed amendments to HD 90. *Id.* at 695:3–10.

Representative Burnam submitted his proposal for HD 90, incorporating Kenny's second draft, as Plan H342 through a floor amendment. *Id.* at 648:17–23. Burnam's floor amendment was accepted without objection. *Id.* at 694:19–21; JX-17.1 at 206, 212; JX 17.3 at S29. Even if Kenny's limited reliance on racial data to avoid a potential VRA problem could establish that race predominated in the creation of that amendment, and it cannot, Kenny's actions cannot be attributed to the Legislature as a whole without evidence that members of the Legislature were aware of the manner in which Kenny drafted the amendment. Because there is no such evidence, the Task Force Plaintiffs' racial-gerrymandering claim fails.

## CONCLUSION

The Court should enter judgment for Defendants on all claims.

Date: July 31, 2017                                    Respectfully submitted.


KEN PAXTON                                             /s/ Patrick K. Sweeten
Attorney General of Texas                             PATRICK K. SWEETEN
                                                      Senior Counsel for Civil Litigation

JEFFREY C. MATEER
First Assistant Attorney General                      ANGELA V. COLMENERO
                                                      Chief, General Litigation Division

BRANTLEY D. STARR
Deputy First Assistant                                MATTHEW H. FREDERICK
   Attorney General                                   Deputy Solicitor General

JAMES E. DAVIS                                         TODD LAWRENCE DISHER
Deputy Attorney General                               Special Counsel for Civil Litigation
   for Litigation
                                                      ADAM N. BITTER
                                                      Assistant Attorney General

                                                      J. SETH JOHNSON
                                                      Assistant Attorney General

                                                      ANNE MARIE MACKIN
                                                      Assistant Attorney General

                                                      OFFICE OF THE ATTORNEY GENERAL
                                                      P.O. Box 12548 (MC 059)
                                                      Austin, Texas  78711-2548
                                                      Tel.: (512) 936-6407
                                                      Fax: (512) 474-2697

                                                      COUNSEL FOR DEFENDANTS

90

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this filing was sent on July 31, 2017, via the Court's electronic notification system and/or email to the following counsel of record:

DAVID RICHARDS
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
512-476-0005
davidr@rrsfirm.com

RICHARD E. GRAY, III
Gray & Becker, P.C.
900 West Avenue, Suite 300
Austin, TX 78701
512-482-0061/512-482-0924 (facsimile)
Rick.gray@graybecker.com
**ATTORNEYS FOR PLAINTIFFS PEREZ, DUTTON, TAMEZ, HALL, ORTIZ, SALINAS, DEBOSE, and RODRIGUEZ**

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
210-392-2856
garzpalm@aol.com

MARK W. KIEHNE
RICARDO G. CEDILLO
Davis, Cedillo & Mendoza
McCombs Plaza
755 Mulberry Ave., Ste. 500
San Antonio, TX 78212
210-822-6666/210-822-1151 (facsimile)
mkiehne@lawdcm.com
rcedillo@lawdcm.com

JOAQUIN G. AVILA
P.O. Box 33687
Seattle, WA 98133
206-724-3731/206-398-4261 (facsimile)
jgavotingrights@gmail.com
**ATTORNEYS FOR MEXICAN AMERICAN LEGISLATIVE CAUCUS**

GERALD H. GOLDSTEIN
DONALD H. FLANARY, III
Goldstein, Goldstein and Hilley
310 S. St. Mary's Street
San Antonio, TX 78205-4605
210-226-1463/210-226-8367 (facsimile)
ggandh@aol.com
donflanary@hotmail.com

PAUL M. SMITH, MICHAEL B. DESANCTIS, JESSICA RING AMUNSON
Jenner & Block LLP
1099 New York Ave., NW
Washington, D.C. 20001
202-639-6000

J. GERALD HEBERT
191 Somervelle Street, # 405
Alexandria, VA 22304
703-628-4673
hebert@voterlaw.com

JESSE GAINES
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com
**ATTORNEYS FOR PLAINTIFFS QUESADA, MUNOZ, VEASEY, HAMILTON, KING and JENKINS**

LUIS ROBERTO VERA, JR.
Law Offices of Luis Roberto Vera, Jr.
1325 Riverview Towers
San Antonio, Texas 78205-2260
210-225-3300
lrvlaw@sbcglobal.net

91

NINA PERALES
MARISA BONO
Mexican American Legal Defense
and Education Fund
110 Broadway, Suite 300
San Antonio, TX 78205
210-224-5476/210-224-5382 (facsimile)
nperales@maldef.org
mbono@maldef.org

MARK ANTHONY SANCHEZ
ROBERT W. WILSON
Gale, Wilson & Sanchez, PLLC
115 East Travis Street, Ste. 1900
San Antonio, TX 78205
210-222-8899/210-222-9526 (facsimile)
masanchez@gws-law.com
rwwilson@gws-law.com
**ATTORNEYS FOR TEXAS LATINO
REDISTRICTING TASK FORCE,
CARDENAS, JIMENEZ, MENENDEZ,
TOMACITA AND JOSE OLIVARES,
ALEJANDRO AND REBECCA ORTIZ**

JOHN T. MORRIS
5703 Caldicote St.
Humble, TX 77346
281-852-6388
johnmorris1939@hotmail.com
**JOHN T. MORRIS, PRO SE**

MAX RENEA HICKS
Law Office of Max Renea Hicks
101 West Sixth Street Suite 504
Austin, TX 78701
512-480-8231/512/480-9105 (facsimile)
**ATTORNEY FOR PLAINTIFFS CITY OF
AUSTIN, TRAVIS COUNTY, ALEX
SERNA, BEATRICE SALOMA, BETTY F.
LOPEZ, CONSTABLE BRUCE ELFANT,
DAVID GONZALEZ, EDDIE
RODRIGUEZ, MILTON GERARD
WASHINGTON, and SANDRA SERNA**

GEORGE JOSEPH KORBEL
Texas Rio Grande Legal Aid, Inc.
1111 North Main
San Antonio, TX 78213
210-212-3600
korbellaw@hotmail.com
**ATTORNEYS FOR INTERVENOR-
PLAINTIFF LEAGUE OF UNITED
LATIN AMERICAN CITIZENS**

ROLANDO L. RIOS
Law Offices of Rolando L. Rios
115 E Travis Street, Suite 1645
San Antonio, TX 78205
210-222-2102
rrios@rolandorioslaw.com
**ATTORNEY FOR INTERVENOR-
PLAINTIFF HENRY CUELLAR**

GARY L. BLEDSOE
Law Office of Gary L. Bledsoe
316 W. 12th Street, Ste. 307
Austin, TX 78701
512-322-9992/512-322-0840 (facsimile)
garybledsoe@sbcglobal.net
**ATTORNEY FOR INTERVENOR-
PLAINTIFFS TEXAS STATE
CONFERENCE OF NAACP
BRANCHES, TEXAS LEGISLATIVE
BLACK CAUCUS, EDDIE BERNICE
JOHNSON, SHEILA JACKSON-LEE,
ALEXANDER GREEN, HOWARD
JEFFERSON, BILL LAWSON, and
JUANITA WALLACE**

VICTOR L. GOODE
Asst. Gen. Counsel, NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-5120
410-580-5120/410-358-9359 (facsimile)
vgoode@naacpnet.org
**ATTORNEY FOR TEXAS STATE
CONFERENCE OF NAACP BRANCHES**

STEPHEN E. MCCONNICO
SAM JOHNSON
S. ABRAHAM KUCZAJ, III
Scott, Douglass & McConnico
One American Center
600 Congress Ave., 15th Floor
Austin, TX 78701
512-495-6300/512-474-0731 (facsimile)
smcconnico@scottdoug.com
sjohnson@scottdoug.com
akuczaj@scottdoug.com
**ATTORNEYS FOR PLAINTIFFS CITY OF
AUSTIN, TRAVIS COUNTY, ALEX
SERNA, BALAKUMAR PANDIAN,
BEATRICE SALOMA, BETTY F. LOPEZ,
CONSTABLE BRUCE ELFANT, DAVID
GONZALEZ, EDDIE RODRIGUEZ, ELIZA
ALVARADO, JOSEY MARTINEZ,
JUANITA VALDEZ-COX, LIONOR
SOROLA-POHLMAN, MILTON GERARD
WASHINGTON, NINA JO BAKER,
and SANDRA SERNA**

Karen M. Kennard
2803 Clearview Drive
Austin, TX 78703
(512) 974-2177/512-974-2894 (facsimile)
karen.kennard@ci.austin.tx.us
**ATTORNEY FOR PLAINTIFF
CITY OF AUSTIN**

DAVID ESCAMILLA
Travis County Asst. Attorney
P.O. Box 1748
Austin, TX 78767
(512) 854-9416
david.escamilla@co.travis.tx.us
**ATTORNEY FOR PLAINTIFF
TRAVIS COUNTY**

ROBERT NOTZON
1507 Nueces Street
Austin, TX 78701
512-474-7563/512-474-9489 (facsimile)
robert@notzonlaw.com

ALLISON JEAN RIGGS
ANITA SUE EARLS
Southern Coalition for Social Justice
1415 West Highway 54, Ste. 101
Durham, NC 27707
919-323-3380/919-323-3942 (facsimile)
anita@southerncoalition.org
**ATTORNEYS FOR TEXAS STATE
CONFERENCE OF NAACP
BRANCHES, EARLS, LAWSON,
WALLACE, and JEFFERSON**

DONNA GARCIA DAVIDSON
PO Box 12131
Austin, TX 78711
512-775-7625/877-200-6001 (facsimile)
donna@dgdlawfirm.com
**ATTY FOR DEFENDANT STEVE
MUNISTERI**

CHAD W. DUNN
K. SCOTT BRAZIL
Brazil & Dunn
4201 FM 1960 West, Suite 530
Houston, TX 77068
281-580-6310/281-580-6362 (facsimile)
chad@brazilanddunn.com
scott@brazilanddunn.com
**ATTORNEYS FOR INTERVENOR-
DEFS TEXAS DEMOCRATIC PARTY
and BOYD RICHIE**

ROBERT L. PITMAN, JOCELYN SAMUELS,
T. CHRISTIAN HERREN, JR., TIMOTHY F.
MELLETT, BRYAN SELLS, JAYE ALLISON
SITTON
DANIEL J. FREEMAN
MICHELLE A. MCLEOD
U.S. Department of Justice
Civil Rights Division, Voting Rights
Room 7254 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
 (202) 305-4355; (202) 305-4143
**ATTORNEYS FOR THE
UNITED STATES**


  /s/   Patrick K. Sweeten
PATRICK K. SWEETEN