## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| SHANNON PEREZ, *et al.*,<br><br>     *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *et al.*,<br><br>     *Defendants*. | CIVIL ACTION NO.<br>SA-11-CA-360-OLG-JES-XR<br>[Lead Case] |

# QUESADA PLAINTIFFS' POST-TRIAL BRIEF

Mark P. Gaber (admitted *pro hac vice*)
1316 13th Street NW, #1
Washington, DC 20005
(715) 482-4066

J. Gerald Hebert (admitted *pro hac vice*)
J. Gerald Hebert, P.C.
191 Somervelle Street, #405
Alexandria, VA 22305
(703) 628-4673

Jessica Ring Amunson (admitted *pro hac vice*)
Jenner & Block LLP
1099 New York Avenue NW, Ste. 900
Washington, DC 20001
(202) 639-6000

Gerald H. Goldstein
Goldstein, Goldstein & Hilley
310 S. St. Mary's Street
San Antonio, TX 78205
(210) 226-1463

Donald H. Flanary, III
Flanary Law Firm
1005 South Alamo
San Antonio, TX 78210
(210) 738-8383

Jesse Gaines
P.O. Box 50093
Fort Worth, TX 76105
(817) 714-9988

*Counsel for Quesada Plaintiffs*

July 31, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

**INTRODUCTION** ............................................................................................................. 1

**SUMMARY OF ARGUMENT** ........................................................................................ 1

I.    The Record Demonstrates, as a Matter of Fact, that the Legislature Purposefully
      Discriminated in Considering and Enacting Plan C235. ....................................... 4

      A.    The Legislature Knew this Court's Interim Order Did Not Establish Plan C235's
            Legality and Its Purported Reliance on that Order Is Pretext. ........................ 4

      B.    The Legislature Intentionally Discriminated by Readopting Features of the 2011 Plan
            that the D.C. Court Had Specified as Evidence of Purposeful Discrimination. ........... 13

      C.    The Legislature Applied a Discriminatory Rule to Reject Amendments Proposing
            Minority Coalition Districts Contrary to Fifth Circuit Precedent. ................................ 17

      D.    The Legislature Acted with Discriminatory Intent in Rejecting an Alternative Plan that
            Would Remedy the Intentional Cracking of Minority Neighborhoods in DFW in Plan
            C235. ................................................................................................................ 20

      E.    Application of the *Arlington Heights* Factors Demonstrates the Legislature
            Purposefully Discriminated in Enacting Plan C235. .................................................. 26

            i.  Discriminatory Impact ....................................................................................... 26

            ii. Historical Background ......................................................................................... 28

            iii. Sequence of Events and Procedural and Substantive Deviations ........................... 29

II.   As a Matter of Law, the Discriminatory Intent Present in 2011 Infects the Offending
      Characteristics of Plan C185 that Plan C235 Retained. ......................................... 38

III.  The Legislature's Intentional Discrimination Had its Intended Effect. .............................. 41

IV.   Section 2's "Results" Prong Requires the Formation of an Additional Minority Coalition
      District in DFW. ................................................................................................... 42

**CONCLUSION** ................................................................................................................ 52

**CERTIFICATE OF SERVICE** ......................................................................................... 54

**APPENDIX 1: QUESADA PLAINTIFFS' ANSWERS TO CERTAIN QUESTIONS
[ECF NO. 1494] POSED BY THREE-JUDGE PANEL**

# TABLE OF AUTHORITIES

**Cases:**                                                                                     **Page**

*Abrams v. Johnson*, 521 U.S. 74 (1997) ...................................................................44

*Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015)........................ 24, App-6

*Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012)...............................18

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988).........................................18

*City of Port Arthur v. United States*, 459 U.S. 159 (1982)..........................................38

*Cooper v. Harris,* 137 S. Ct. 1455 (2017) ..................................................... 25, App-6

*Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998) ........................................... 39, App-8

*DTND Sierra Investments LLC v. Bank of Am., N.A.*,
    871 F. Supp. 2d 567 (W.D. Tex. 2013)...................................................................18

*Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672 (5th Cir. 2006)..........................13, 18

*Green v. Cnty. Sch. Bd.*, 391 U.S. 430 (1968) .........................................................38

*Hunter v. Underwood*, 471 U.S. 222 (1985).................................................... 38, App-5

*Johnson v. Governor of State of Fla.*, 405 F.3d 1214 (11th Cir. 2005) ................... 39, App-8

*LULAC v. Midland ISD*, 812 F.2d 1494 (5th Cir. 1987), *vacated on state law grounds*,
    829 F.2d 546 (5th Cir. 1987)...............................................................................18

*LULAC  v. Clements*, 999 F.2d 831 (5th Cir. 1993) (*en banc*) ....................................50

*North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016)............... App-6

*Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993).........................................................................................39

*Parham v. Hughes*, 441 U.S. 347 (1979)................................................................52

*Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256 (1979) .............................38

*Romer v. Evans*, 517 U.S. 620 (1996)....................................................................20

*Texas v. United States*, 887 F. Supp. 2d 133(D.D.C. 2012), *vacated on other grounds*,
    133 S. Ct. 2885 (2013) ...............................................................14, 15, 24, 25, 31

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................................46, 49

*United States v. Charleston Cty, S.C.*, 365 F.3d 341 (4th Cir. 2004) .........................50

*United States v. Fordice*, 505 U.S. 717 (1992)................................................ 38, App-1

*United States v. Virginia*, 518 U.S. 515 (1996) .....................................................38

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2017) (*en banc*) .........................5, 13, 33, 51

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977)........................................................................................26

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975)....................................................31

*White v. Weiser*, 412 US. 783 (1973)......................................................................... App-10

**Statutes**

52 U.S.C. § 10304(a)-(c)............................................................................... 17, App-4

**Other Authorities**

Tex. Sec'y of State, Election Results,
  http://elections.sos.state.tx.us/elchist164_state.htm...............................................25

## INTRODUCTION

"[T]hat, I think, is what's going to be asserted by our attorneys.  I make no such assertion on my own."  JX 26.2 at 8.  This was Chairman Seliger's defense of Plan C235's legality on the senate floor shortly before S.B. 4 was enacted as law.

This departure from the script advanced by the Attorney General's office was telling; Chairman Seliger was not describing a law intended to comply with the Voting Rights Act ("VRA") and the Constitution.  Rather, he revealed the singular aim of S.B. 4:  to execute a litigation strategy to purposefully minimize the number of minority opportunity districts while simultaneously seeking to evade liability for doing so.

The evidence on this point is compelling and illuminates a legislative process infected with discriminatory intent.  That is all the more remarkable in light of the blanket assertion of legislative privilege by the key players, and by the failure of Defendants to produce responsive documents from the redistricting chairmen until the eve of trial.  This brief sets out the record and trial evidence that proves this claim.  In addition, the Quesada Plaintiffs attach as Exhibit 1 their answers to a subset of the questions posed by the Court in its July 14, 2017 notice, ECF No. 1494.

## SUMMARY OF ARGUMENT

The record shows that Plan C235 was enacted with a discriminatory purpose in violation of the Fourteenth Amendment and Section 2 of the VRA.  That discriminatory purpose exists both as a matter of fact and law.

*First*, the factual record shows that the legislature's purpose was to prevent the formation of any additional minority opportunity districts because of race.  Throughout these proceedings, Defendants have told this Court a simplistic story: The legislature's only intent was to dutifully follow this Court's "legal advice" that the interim plan complied with the law, and any contrary

conclusion would be tantamount to accusing *this Court* of intentional discrimination in imposing the interim plan. But that simple story is simply not true. The evidence shows that, as a factual matter, the legislature did <u>not</u> think that this Court's interim Order established the plan's legality. Rather, the record shows the legislature's purported reliance on this Court's interim Order was pretext for its real goal: preventing the formation of any additional minority opportunity districts. Not only did this Court warn the legislature its analysis was preliminary and subject to change, but the Chief Legislative Counsel for the Texas Legislative Council ("TLC") publicly advised the legislature that this Court's interim Order did not establish that Plan C235 complied with the VRA or Constitution, that the alternative maps proposed by minority legislators illustrated the plans' flaws, and that failing to adopt those amendments could signal unlawful intent.

*Second*, after this Court issued its interim Order, the D.C. Court specifically identified purposefully discriminatory features, including the cracking of Southeast Arlington/Grand Prairie—a large and fast-growing minority population area in Tarrant County—in the previous plan, Plan C185. That area remained cracked in Plan C235, and the legislature reaffirmed that cracking when it enacted S.B. 4 without uniting Southeast Arlington/Grand Prairie with its nearby minority communities. By knowingly reaffirming a provision of law already deemed to have been motivated by discriminatory intent, the legislature *per se* purposefully discriminated anew.

*Third*, the chairmen of the house and senate redistricting committees imposed a rule that minority opportunity districts would only be created if they were "legally required," while simultaneously taking the position that African American/Hispanic coalition districts were not "legally required" because, although they knew that binding Fifth Circuit precedent required them, the Supreme Court had not yet decided the issue. The legislature thus acted with discriminatory intent by purposefully placing a unique impediment on minority legislators and voters: they would

2

have to wait until the Supreme Court had reason to decide the issue; binding circuit precedent would not suffice. No other class of persons or legislators is denied the benefits of binding circuit precedent.

*Fourth*, during the senate debate on S.B. 4, Chairman Seliger knowingly advanced an incorrect legal standard for determining retrogression under Section 5 of the VRA as pretext to reject an alternative plan that corrected the fracturing of minority voters in the Dallas-Fort Worth area. This purposeful misuse of the VRA to *harm* minority voters further evinced a discriminatory purpose in enacting Plan C235.

*Fifth*, the *Arlington Heights* factors support the conclusion that S.B. 4 was enacted with discriminatory intent. Plan C235 has discriminatory effects, evidenced by the disparity between the number of minority opportunity districts and the percentage of minority voters statewide. Texas has a substantial contemporary and past history of official discrimination against minority voters. The process by which Plan C235 was enacted was marked by substantial departures from normal procedures. And contemporaneous statements of legislators further demonstrated a discriminatory purpose.

*Sixth*, even if the 2013 legislature had not acted with independent discriminatory purpose, the discriminatory purpose of the 2011 legislature is imputed as a matter of law to the enactment of the discriminatory features that persist in Plan C235 from Plan C185. This Court had already concluded that the DFW congressional districts in Plan C185 were drawn "with a motive to crack and limit *minority* population within the Republican districts to curb the effect of continued minority growth . . . to ensure that the minority populations would not grow sufficiently to control the district for as long as possible." Amended Order at 134, ECF No. 1390 (emphasis in original); *id.* at 187 (Smith, J., dissenting) (agreeing with majority's conclusion that DFW districts reflected

intentional discrimination).   Likewise, the D.C. Court specifically identified as evidence of discriminatory purpose the cracking of neighborhoods in Plan C185 that remained cracked in Plan C235.  As a matter of law, voters whom the legislature targeted with this cracking in 2011 were discriminated against a second time when the legislature reaffirmed that vote dilution in 2013.

*Seventh*, the record shows that all of this discrimination had its intended effect: minority voters stranded in Anglo districts are harmed by residing in Anglo-dominated congressional districts in which their representatives are not responsive to their unique needs.

*Eighth*, and finally, although this Court should rest its decision on the evidence of intentional discrimination (both as constitutional and Section 2 violations), the "results" prong of Section 2 of the VRA independently requires the formation of a third minority coalition district in DFW.

**I.    The Record Demonstrates, as a Matter of Fact, that the Legislature Purposefully Discriminated in Considering and Enacting Plan C235.**

**A.    The Legislature Knew this Court's Interim Order Did Not Establish Plan C235's Legality and Its Purported Reliance on that Order Is Pretext.**

Defendants' entire case rests on a few cherry-picked sentences from this Court's interim Order to assert the legislature had no reason to think Plan C235 contained infirmities.  But the record shows that this purported reliance is pretext.  In fact, the legislature <u>knew</u> that this Court's interim Order did not establish Plan C235's legality.  Not only did this Court say so in its interim Order, but so did TLC's Chief Legislative Counsel Jeff Archer.

First, this Court's interim Order, *on its face*, precludes Defendants' litigation position. The Supreme Court's decision in *Perez* was issued on January 20, 2012 and this Court had to act at break-neck speed to permit the 2012 elections to move forward.  The Court explained that it was an "interim plan for the districts used to elect members in 2012" and that "[t]his interim map is not

a final ruling on the merits of *any claims* asserted by the Plaintiffs." Mar. 19, 2012 Order at 1, ECF No. 691 (emphasis added). The Court further noted that "[b]oth the § 2 and Fourteenth Amendment claims presented in this case involve difficult and unsettled legal issues as well as numerous factual disputes. . . . Further, both the trial of these complex issues and the Court's analysis have been necessarily expedited and curtailed, rendering such a standard even more difficult to apply." *Id.* at 1-2. To punctuate the point, the Court stated that it "has attempted to apply the standards set forth in *Perry v. Perez*, but emphasizes that it has been able to make only preliminary conclusions that may be revised upon full analysis." *Id.* at 2. The Court then explained that the exigency of the calendar required quick imposition of a map, and thus it would adopt the compromise plan (with minor revisions) offered by "[s]ome Plaintiffs and Intervenors." *Id.*; *see also id.* at 14. Defendants cannot plausibly contend that the Legislature had "no reason" to think there might be a legal problem with Plan C235 in light of this Court's clear warnings.

Second, the legislature knew that this Court's interim Order did not establish Plan C235's compliance with the VRA and the Constitution because Chief Legislative Counsel Jeff Archer told the house redistricting committee so in repeated, plain terms. A legislature's decision to reject amendments to a bill despite warnings from legal counsel that the legislation likely violates the VRA is evidence of a discriminatory purpose. *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2017) (*en banc*) ("Against a backdrop of warnings that SB 14 [Texas's Photo ID law] would have a disparate impact on minorities and would likely fail the (then extant) preclearance requirement, amendment after amendment was rejected."); *id.* at 262 (noting that counsel in Lieutenant Governor's office warned that Photo ID law was unlikely to obtain preclearance). Chairman Darby characterized the Committee as having "relied heavily" upon Mr. Archer's analysis, JX 17.3 at 8,

5

and at trial, Chairman Darby acknowledged that Mr. Archer was counsel to both him and the committee, 7/14/17 Trial Tr. (Vol. 5) at 1570.

The legislative record shows that Mr. Archer warned the House Select Redistricting Committee that the interim Order did *not* establish Plan C235's legality, that enacting the interim plans would cause continued legal jeopardy for the State, and that the alternative plans and amendments offered by minority legislators demonstrated the areas of potential legal liability.

Mr. Archer appeared for the first time at the June 12, 2013 hearing of the House Select Redistricting Committee. JX 14.4 at 6. He spoke at length about the ramifications of this Court's interim Order imposing Plan C235, the D.C. Court's opinion denying preclearance to Plan C185, whether Plan C235 was vulnerable to challenge under the VRA or Constitution, and whether the legislature could be found to have intentionally discriminated if it rejected the amendments proposed by minority legislators aimed at addressing the pending legal claims. JX 14.4 at 6-19.

Mr. Archer explained that, in imposing Plan C235 on an interim basis, this Court was in "a little bit tricky [position] because the Court had not made final determinations, . . . had not made fact findings on every issue, had not thoroughly analyzed all the evidence but they had to make some best case guesses based on the direction that the U.S. Supreme Court gave them." *Id.* at 11. Mr. Archer explained to the Committee that this Court "started with the legislatively enacted plan in all three cases and addressed voting rights violations again on an interim and impromptu basis almost, as if to say this is the best we can do now. We haven't gotten to the bottom of things." *Id.* at 11-12. Moreover, Mr. Archer explained to the Committee that the interim plan Order was "not a final ruling. These are preliminary determinations on the merits of Section 2. We're only looking at preclearance claims that are, quote, not insubstantial. In other words, [the Court] disclaimed

making final determinations under the Voting Rights Act claims that the plaintiffs had brought." *Id.* at 12.

Mr. Archer continued, explaining to the Committee that this Court was clear that "these are difficult and unsettled legal issues, there are numerous factual disputes and [the Court] essentially made it *explicitly clear* that this was an interim plan to address basically *first impression of voting rights issues.*" *Id.* at 12 (emphases added). Rep. Martinez-Fischer, a Hispanic member of the Committee, asked Mr. Archer about whether some of this Court's caution arose from the fact the D.C. Court had not yet issued its decision. *Id.* at 14. Mr. Archer responded that "if the District Court for the District of Columbia in the Section 5 preclearance litigation were to uphold or object to limited parts of the district, that may change the ultimate determination." *Id.* at 14-15; *see infra* Part I.B (D.C. Court finds portion of then-CD 33—included in interim plan's CD 6— purposefully cracked from neighboring minority communities).

Turning to the relationship between this Court's interim Order, the D.C. Court's Order denying preclearance to Plan C185, and the legislation being considered by the Committee, Mr. Archer explained that adopting Plan C235 as a permanent plan would be a risky move. Rep. Villalba, a Republican who later voted in favor of enacting Plan C235, *see* JX 17.1 at 1032, asked the following question of Mr. Archer:

> One of the questions that has come up *over and over in our testimony* is if we adopt interim plans in their current state, and now you've described for us that at least *the Court perceives there's additional work to be done*, what is essentially the effect of doing that?
>
> As a body, we adopt interim plans and, therefore, we give this plan the imprimatur of the people, right? We're the people's House and the Legislature will act and speak. If we do that and adopt these and, again, just hypothetically without any change whatsoever, it sounds to me like there's going to be at least a delta between where the interim maps are and what needs to be completed work-wise and fact finding-wise to get them to where they would be *in consonance with the existing*

> *holdings of the Supreme Court or the District Court*.  So, what is the legal effect or impact of doing that?
>
> Do we – since we – if we did that as a body, are we blessing those and somehow by having done that, are we advancing the ball or is there still work to be done?

JX 14.4 at 16-17.

Mr. Archer responded by explaining, *inter alia*, that "it's clear that legislative enactment of the plan gives it imprimatur of state law" and that "by enacting this plan or any other plan, to some extent, the Court will give greater deference to the elements of that plan than perhaps it would give to its own plan."  *Id.* at 17.  But, Mr. Archer explained, "[t]hat doesn't mean that the parts of the plan that it ultimately finds deficient are any better because the Legislature adopted them," *id.* at 17, and although it removes from contention the legal claims addressed by the interim map, "with respect to all the unaddressed issues and second guessing the Court's own determinations, you have – you haven't removed legal challenges to any of the plan on a – on a realistic level, that is," *id.* at 18.  Responding to a subsequent question from Rep. Villalba, Mr. Archer explained that "challenges to both the Court drawn fixes as well as to the background districts that were not changed in any of the plans will go forward" and "the parties to the case will continue to press issues that the Court took a [s]tab at perhaps but didn't fix."  *Id.* at 19.

Several days later, at the June 17th House committee hearing, Rep. Villalba had another exchange with Mr. Archer about the legal ramifications of enacting the interim plan as the permanent plan.

> VILLALBA:  I recognize that these maps were predicated upon previous maps that did have deficiencies.  But wasn't the San Antonio Court aware of most of those deficiencies?  And wouldn't – is it fair to say that they had made an attempt to cure the kinds of fragmentation and population deviation and other issues that we're talking about curing today?

ARCHER:        I don't think it would be fair to put those words in their mouths.  I
               don't – I think the fairest way of looking at it is they could go into a
               lot more issues than they already have –

JX 15.3 at 49.  Later, Mr. Archer explained to the Committee, in response to questions from Rep.

Villalba, that this Court, in being tasked with imposing an interim map, faced "a tension there

between what they *thought* the Voting Rights Act required and what they thought the deference

they had to give until they were *sure* what the Voting Rights Act required."  *Id.* at 52 (emphasis

added).

Later in that hearing, Rep. Villalba attempted to backtrack from his previous admission

(made a week prior) that there was a "delta" between the interim map and what the law required,

asking Mr. Archer to confirm that the proposed modifications by minority legislators were merely

for policy, not legal reasons.  Mr. Archer declined to do so.

VILLALBA:   The question is if we make changes to these maps, they're being
            made for policy purposes, not legal purposes?
ARCHER:     I can't say that.  I think you can always reduce your legal risk by
            making changes based on assessment of any witnesses or
            information you have.  So I think, again you have to assess what's –
            what will happen and what will – what do we gain to lose or win by
            enacting Plan A or Plan B?  And so I think it's fair to say by enacting
            the Court-ordered plan, you've put to bed – as we discussed in
            Houston – those issues that the Court identified so far.  *But I don't
            think you put the rest to bed.*  So if you do other thing –
VILLALBA:   You don't know what additional issues are?
ARCHER:     It's hard to identify them, but I think that *the maps people have
            proposed show where the vulnerabilities are.*
VILLALBA:   Thank you.
ARCHER:     *I think Ms. Davis' plan shows where some vulnerabilities are.*

JX 15.3 at 56 (emphases added).[1]

---

[1] This exchange between Rep. Villalba and Mr. Archer took place during the committee debate on
H.B. 3—the bill to enact the interim state house plan—but Rep. Villalba's question was clearly
about "these maps" and thus this exchange applies equally to the state house and the congressional
plans.  Rep. Davis offered amendments to both the state house and congressional plans.

After explaining to the Committee that the alternative proposals illustrated the legal vulnerabilities, Mr. Archer advised the Committee that its failure to adopt any of those proposals could be problematic: "Certainly the proposals that are made here will be at issue if the Legislature does not adopt them.  What the Court thinks of that remains to be seen."  *Id.* at 58-59; *see also* 7/14/17 Trial Tr. (Vol. 5) at 1575 (Q: "And Mr. Archer had warned the committee that rejecting these alternatives could cause legal risk, didn't he?"; Chairman Darby: "That was on the record."); Quesada-2017-73 (Defendants admitting that "in considering and enacting Plan C235 in June 2013, the Texas Legislature rejected all proposed modifications, including modifications proposed by Hispanic and African-American legislators").

At trial, Chairman Darby acknowledged being present for Mr. Archer's testimony and listening to it.  *See* 7/14/17 Trial Tr. (Vol. 5) at 1570-71.  Yet despite Mr. Archer's warnings, Chairman Darby did not budge in his public statements regarding the interim Order's legal support for enacting Plan C235 as the permanent redistricting plan.  Indeed, the response by Chairmen Darby and Seliger to the testimony of Mr. Archer and the public was to essentially plug their ears. Nearly verbatim, five different times, Chairman Darby said he "believe[d] the [interim plans were] legal and provide the voters with much needed stability going forward.  If there is a legal deficiency

---

With respect to the congressional map, Rep. Davis offered H.B. 14 (Plan C236) during the committee debate.  *See* JX 36.  During the floor debate, Rep. Davis offered Amendment 5 (Plan C251).  *See* JX 57.  Both proposals added a third minority opportunity district in DFW, which Rep. Davis explained was necessary to "fully remedy the dilution in the DFW area."  JX 17.3 at S61. In response, Rep. Darby criticized the use of coalition districts and the splitting of Nueces County. *Id.*  But this response says nothing about the need to remedy the intentional vote dilution through cracking and packing in DFW that persisted in Plan C235, which Rep. Davis's proposals sought to remedy.  The Court should thus reject the State's *post hoc* litigation position that Rep. Davis's plan might have exposed the State to a *Shaw* claim.  *See* 7/15/17 Trial Tr. (Vol. 6) at 1790-91.  The legislature never expressed that concern at the time, and visually the treatment of DFW in both Plans C236 and C251 is no worse than the appearance of CD 33 in Plan C235—and it is far less suspect than the appearance of CD 35 in Plan C235.

in these maps, I want this committee to know about it and I want to correct it." JX 10.4 at 26 (May 31, 2013 House Cmte. Hr'g); *see also* JX 11.4 at 6 (June 1, 2013 Hr'g); JX 12.4 at 5 (June 6, 2013 Hr'g); JX 13.4 at 12-13 (June 10, 2013 Hr'g); JX 14.4 at 39 (June 12, 2013 Hr'g). On the House floor, on the day of passage, Chairman Darby said "it's been my position from the start that these maps are legal. And if somebody can demonstrate to me that a district has been drawn illegally, and it can be fixed and changed, then I want to consider those amendments, and consider those changes." JX 17.3 at S5. Later, he said in an exchange with Rep. Chris Turner, "[d]o you recall, specifically, my challenge to those present? Don't just come and say you're against the interim maps—which is largely what a lot of folks did. Tell me how the maps are deficient, give me a remedy to do that, and tell me why that remedy is necessary. And that's what I asked the people to do throughout the state, and we did not always hear that type of response. [They] just said, we're against the maps." *Id.* at S54.

Of course, the onus is not on the public to explain to the legislature its legal obligations. Nonetheless, many did. *See, e.g.*, 7/13/17 Trial Tr. (Vol. 4) at 1226-28 (testimony of Comm'r Roy Brooks regarding his statement to Dallas committee hearing); JX 28 at 90 (statement of Comm'r Roy Brooks); *see also* ECF No. 1458-1 at 4 (collecting citations to legislative record of public testimony regarding legal flaws of Plan C235).[2] And Mr. Archer—the committee's counsel who testified in Chairman Darby's presence—described in plain terms the flaw in relying upon the

---

[2] Others submitted written testimony specifically directing the committees to the D.C. Court's decision, as well as to the parties' filings in this case explaining the remaining flaws. For example, the Texas NAACP attached plaintiffs' briefing, ECF Nos. 739 and 744, which detail, *inter alia*, the remaining flaws in the DFW region resulting from intentional fracturing of minority communities. *See* JX 28 at 493; JX 29 at 126-28, 139; *see also* JX 28 at 79 (public submission noting intentional discrimination finding and how Plan C235 maintains fracturing of 44,000 African Americans outside CD 33.

interim order and the fact that the alternative proposals illustrated the deficiencies.[3]  In any event, in response to Chairman Darby during the floor debate, Reps. Chris Turner, Sylvester Turner, and Trey Martinez-Fischer explained to Chairman Darby a number of deficiencies, including by page number reference to the D.C. Court's opinion.  *Id.* at S54-57.  Chairman Darby's only response, before calling a vote on the House plan, was "[w]ell, I will take your word for that."  *Id.* at S56.

Likewise, Chairman Seliger repeated the same mantra as Chairman Darby regardless of the actual evidence elicited at the hearings.  At the first hearing in April 2013, Chairman Seliger said "[t]he interim plans remedied the legal flaws found by the federal court in Washington, DC. Enacting these lawful and constitutional interim plans will help bring to a close this chapter of redistricting.  Enacting these plans will practically ensure that the ongoing litigation over Texas redistricting plans will be brought to a swift end . . . ."  JX 19.3 at § I, p. 13.  During the floor debate on the day of passage, Chairman Seliger again said: "[t]he interim plans remedy, we believe, the legal flaws found in the federal court in D.C. . . .  Enacting those plans will help bring a close this chapter of redistricting.  They will almost ensure that the ongoing litigation over the redistricting plans will be brought to a swift end . . . ."  JX 26.2 at 5.  This was his script.  When challenged, however, he refused to repeat off-script his belief in the plans' legality.  *See* JX 26.2 at 8.  These statements, in the face of plain text of the San Antonio and D.C. Courts' orders; the testimony of the Chief Legislative Counsel of the TLC, the minority legislators, and members of

---

[3] Chairman Darby's only response when confronted with the transcripts of Mr. Archer's remarks was to claim that Mr. Archer's *public* statements were not in the capacity as a lawyer to the Committee.  7/14/17 Trial Tr. (Vol. 5) at 1572.  This is weak, at best.  As Chairman Darby acknowledged, Mr. Archer was Chief Legislative Counsel and his and the committees' lawyer.  *Id.* That he was attempting to avoid waiving any attorney-client privilege with his public remarks does not alter the ramifications of those remarks, which on their face reflect legal advice and analysis. And if this is what Mr. Archer was willing to say publicly about Plan C235, one can only imagine what his private advice was.

the public; and the false claim by Chairman Darby that no one had proposed a remedy to the discriminatory features of the interim map; all defy credibility and bear the mark of purposeful discrimination. *Cf. Veasey*, 830 F.3d at 237 ("When other legislators asked Senator Fraser questions about the possible disparate impact of SB 14 [the photo ID bill], he simply replied 'I am not advised.'").

**B.    The Legislature Intentionally Discriminated by Readopting Features of the 2011 Plan that the D.C. Court Had Specified as Evidence of Purposeful Discrimination.**

The legislature intentionally discriminated by reaffirming features of Plan C235 that the D.C. Court had specified as purposefully discriminatory. "When [the legislature] enacts laws, it is presumed to be aware of all pertinent judgments and opinions of the judicial branch." *Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672, 677 (5th Cir. 2006); *see* 7/14/17 Trial Tr. (Vol. 5) at 1559 (Chairman Darby testifying that he had read the D.C. Court's opinion prior to introducing redistricting legislation in 2013). Although the D.C. Court's August 2012 Order denied preclearance to Plan C185 specifically, the D.C. Court's Opinion, and attached Findings of Fact and Conclusions of Law, specified a number of discriminatory—or potentially discriminatory—features of Plan C185 that the legislature nonetheless readopted in Plan C235.[4]

First, the D.C. Court warned that it viewed the legislature's decision not to include a Hispanic ability district in DFW to be potentially motivated by intentional discrimination. The D.C. Court explained that "[t]he parties have provided more evidence of discriminatory intent than we have space, or need, to address here. Our silence on other arguments the parties raised, such

---

[4] The pendency of the D.C. Court's opinion was explained by this Court as a reason for much of its hesitancy—this Court specifically explained that "[g]iven the exigencies of time, this Court is unable to review the entire record from the D.C. trial, but has reviewed the post-trial briefing in order to determine whether the claims are 'not insubstantial.'" ECF No. 691 at 14. Chairman Darby acknowledged this statement at trial. *See* 7/14/17 Trial Tr. (Vol. 5) at 1560.

as potential discriminatory intent in the selective drawing of CD 23 and failure to include a Hispanic ability district in the Dallas-Fort Worth metroplex, reflects only this, and not our views on the merits of these additional claims." *Texas v. United States*, 887 F. Supp. 2d 133, 161 n.32 (D.D.C. 2012), *vacated on other grounds*, 133 S. Ct. 2885 (2013); Quesada-2017-74 at 42 n.32. The legislature could not conceivably have read this and believed it had "no reason" to consider altering Plan C235 to include a Hispanic ability district in DFW.[5]

Second, in addition to the broad warning quoted above about the evidence of discrimination, the D.C. Court specifically concluded the legislature had purposefully discriminated by cracking southeast Arlington/Grand Prairie in southeast Tarrant County from surrounding minority communities—cracking that the legislature reaffirmed by enacting Plan C235. In the section of its Findings of Fact and Conclusions of Law entitled **"Discriminatory Purpose in the Congressional Plan,"** *id.* at 216 (emphasis in original), the D.C. Court cited the configuration of then-CD 33 as an example of discriminatory purpose behind the plan.

> In the Congressional Plan, this district includes all of Parker County and parts of Wise County, both of which are predominantly comprised of Anglo, suburban areas. Anglos make up 85.3% of the population in Parker County and the portion of Wise County included in CD 33 is 78.7% Anglo. In addition to those Anglo areas, CD 33 cuts into Tarrant County to include Tarrant County's fast-growing minority populations. Representative Veasey testified that enacted CD 33 "goes around southwest—underneath southeast Ft. Worth in the unincorporated Tarrant County, and then moves into Arlington, into the heavily Anglo part of Arlington,

---

[5] Texas's only defense on this point at trial was to contend that it was not possible to draw a congressional district in DFW with a *majority* HCVAP. *See, e.g.*, 7/13/17 Trial Tr. (Vol. 4) at 1233:8-10; 1235:1-10; 1236:23-1237:2 (Cross Examination of Comm'r Roy Brooks). But that is beside the point. The D.C. Court was commenting that there might be evidence that the legislature *purposefully* declined to draw a Hispanic ability district *because of race*. Whether or not such a district would be more or less than a majority HCVAP is irrelevant. The legislature's obligation not to discriminate based on race is not confined to areas where a single race majority-minority district can be drawn. If a minority opportunity district—even one with less than a majority CVAP of a single minority group—is rejected *because of race*, the Constitution and Section 2 have been violated.

> and then *picks up the fast minority growth area in Southeast Tarrant County, Arlington—southeast Arlington-Grand Prairie area*."

*Id.* at 220, ¶ 112 (emphasis added); *see also* Quesada-2017-74 at 124.  To illustrate, below is a cropped portion of Quesada Exhibit 2017-17, a map produced by TLC of Plan C185 including racial shading, with a blue box showing the area of then-CD 33 described by the D.C. Court as cracked from other minority neighborhoods and included in Anglo-dominated CD 33.



*See* Quesada-2017-17 (blue box and circle added); *see also* Fact Findings, ECF No. 1340 at 245-46, ¶ 316.  At trial, Chairman Darby identified southeast Arlington on this exhibit and agreed that in Plan C185, it was placed in then-CD 33.  *See* 7/14/17 Trial Tr. (Vol. 5) at 1583:24-1584:3.

As the map below demonstrates, Plan C235 retains this intentionally discriminatory feature.  The same "southeast Arlington-Grand Prairie area" *Texas*, 887 F. Supp. 2d at 220, ¶ 112; Quesada-2017-74 at 124, identified by the D.C. Court remains cracked from other minority neighborhoods; this time it is just included in a different Anglo-dominated district—suburban/rural CD 6, which stretches two counties southward (Ellis and Navarro).  At trial, Chairman Darby agreed that Plan C235 places southeast Arlington in CD 6.  *See* 7/14/17 Trial Tr. (Vol. 5) at 1584:4-10.



*See* Quesada-2017-18 (blue box and circle added).[6]

Plan C235 CD 6's CVAP is 60.9 percent Anglo, 19.0 percent African American, and 14.2 percent Hispanic.  *See* JX-100.3 (Report Red-116, 2011-2015 ACS Data).  Quesada Plaintiff John Jenkins, an African-American registered voter, resides in this region of southeast Arlington in CD 6—a minority region that has twice been purposefully cracked from neighboring minority communities.  *See* Stipulation No. 2, ¶ 6, ECF No. 1445.  The legislature knew that the D.C. Court had concluded it was intentionally discriminatory to crack the fast-growing minority community of southeast Arlington/Grand Prairie and place it into an Anglo-dominated district, yet it reaffirmed its original decision to do so by discriminating against minority voters in this same community again in Plan C235.[7]

Knowingly reenacting a statute containing the same characteristic just deemed purposefully discriminatory by a federal court is about as potent an example of intentional discrimination as exists.  The legislature acts with knowledge of judicial decisions, *Garrett*, 449 at 677, and Chairman Darby acknowledged having read the D.C. Court's Order, *see* 7/14/17 Trial

---

[6] The circled area of both maps above is the southwest Fort Worth/Meadow Creek area—the other large minority population area that was cracked and included in Plan C185's CD 33.  As Commissioner Brooks testified at trial, Plan C235 actually *worsened* the cracking of this area by splitting it between two Anglo-dominated districts—CDs 6 and 12.  *See* 7/13/17 Trial Tr. (Vol. 4) at 1223-24.

[7] Defendants offered no defense at trial of the legislature's decision to readopt the discriminatory cracking of southeast Arlington/Grand Prairie, and they do not offer one in their post-trial brief either.  Instead, Defendants simply ignore this issue, remarkably claiming during closing argument that "the plaintiffs have not identified a deficiency that was found in the D.C. district Court's Opinion, that was not cured by this Court's interim plan." 7/15/17 Trial Tr. (Vol. 6) at 1784.  The absence of a cure for southeast Arlington/Grand Prairie could not have been more clearly illustrated in briefing and at trial; Defendants' silence speaks volumes.

Tr. (Vol. 5) at 1559;[8] when a legislature knowingly reenacts a purposefully discriminatory law, it

has engaged in an axiomatic example of discriminatory intent.[9]

> **C.      The Legislature Applied a Discriminatory Rule to Reject Amendments Proposing Minority Coalition Districts Contrary to Fifth Circuit Precedent.**

The legislature applied a discriminatory rule for considering amendments: minority

legislators and voters were denied the benefit of binding Fifth Circuit precedent endorsing coalition

districts under Section 2 of the VRA simply because the Supreme Court had not yet decided the

issue.   That is not how the law works—unless the Supreme Court has held otherwise, the Fifth

Circuit's rule is binding in Texas.   The legislature was aware of the Fifth Circuit rule, yet it created

---

[8] While the legislature is presumed under the law to be aware of the D.C. Court's ruling, and Chairman Darby acknowledged reading it, Defendants admitted the legislature ignored the D.C. Court's ruling in their interrogatory responses, identifying this Court's interim orders as the only judicial opinions considered by the legislature in enacting Plan C235.   *See* Quesada-2017-2 at 8 (Response to Interrogatory No. 11).

[9] Defendants raise several meager objections to the relevance of the D.C. Court's decision, but they are meritless.   *See id.* at 1785.   First, the fact that in the preclearance case Texas bore the burden to prove the absence of discriminatory intent is irrelevant.   The court not only found the failure to disprove discriminatory intent, but actually affirmatively found the presence of such intent.   In light of that finding, there is nothing about the burden of proof that altered the legislature's subsequent obligation to remedy that violation in 2013.   Second, Texas's contention that the D.C. court exceeded its jurisdiction in finding discriminatory intent is both irrelevant and misplaced.   It is irrelevant because that legal argument does nothing to erase the factual finding of intent—it happened, and Texas's legal argument does not undermine the validity of the Court's factual findings when it comes to considering the legislature's intent in 2013.   The Supreme Court never concluded the D.C. Court had acted outside its jurisdiction, and so the legislature could not have ignored a binding order based solely upon the Attorney General's disagreement with that order.   And Texas's argument is misplaced because it is wrong; the D.C. Court acted within its jurisdiction.   The court had jurisdiction to grant or deny preclearance, and preclearance must be denied when the legislature acts with a discriminatory purpose.   *See* 52 U.S.C. § 10304(a)-(c).   Making a fact finding about discriminatory purpose is precisely what the statute calls upon the court to do.   Third, it is irrelevant that Texas sought to appeal the D.C. Court's decision; the preclearance order was in full force and effect until June 27, 2013—a date *after* the legislature enacted, and the governor signed, S.B. 4, and the vacatur was not with respect to the factual findings.   Texas does not get to ignore court orders simply because they have chosen to appeal them.

a unique burden for minority legislators and voters: they had to wait until the Supreme Court decided the issue. This rule was the product of intentional discrimination against minorities.

As this Court has already recognized, "[t]he Fifth Circuit addressed this issue more than twenty-five years ago and recognized that minority groups may be aggregated to meet the first *Gingles* precondition." ECF No. 1365 at 12; *see LULAC v. Midland ISD*, 812 F.2d 1494, 1500 (5th Cir. 1987), *vacated on state law grounds*, 829 F.2d 546 (5th Cir. 1987); *Campos v. City of Baytown*, 840 F.2d 1240, 1244-45 (5th Cir. 1988). The Fifth Circuit "is a strict *stare decisis* court," *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777, 782 (5th Cir. 2012), and thus "*Campos* is binding precedent," and must be "follow[ed] . . . in the absence of authority to the contrary," ECF No. 1365 at 15.

The legislature knew that binding Fifth Circuit precedent endorsed the view that Section 2 of the VRA can require the formation of minority coalition districts. First, as a matter of law, the legislature is presumed to be aware of relevant judicial decisions. *See e.g.*, *Garrett*, 449 at 677; *DTND Sierra Investments LLC v. Bank of Am., N.A.*, 871 F. Supp. 2d 567, 575 (W.D. Tex. 2013) ("The Legislature is presumed to know existing law when it enacts a statute."). Second, the evidence at trial showed that the legislative leadership knew as a matter of fact that the Fifth Circuit rule required the formation of coalition districts. The files of Chairman Darby's office contained annotated notes highlighting (literally—with yellow highlighting, underlining, and an asterisk) the fact that although the Supreme Court had not yet spoken, the Fifth Circuit required coalition districts under Section 2 of the VRA:

18

> *Section 2*
>
> A principal provision of the Voting Rights Act, section 2 applies nationwide and prohibits, among other things, purposeful discrimination in redistricting. In certain cases, it also requires that section 2 districts be drawn.
>
> *Section 2 district*
>
> Named for section 2 of the Voting Rights Act and also known as a *Gingles* district after the seminal Supreme Court case. Sometimes also called an opportunity district or a majority minority district.
>
>  A section 2 district must be drawn when there is racially polarized voting and a geographically compact district can be created in which the adversely affected minority group makes up more than 50% of the CVAP population. The Supreme Court has not yet ruled on whether two or more minority groups can be aggregated to reach the 50% CVAP threshold, though the Fifth Circuit has said that they can.

Quesada-2017-91 at 2.  And although he equivocated at first, Chairman Darby (who is a lawyer) acknowledged at trial that the Fifth Circuit's case law applied to Texas.  *See* 7/14/17 Trial Tr. (Vol. 5) at 1577-78.  When asked whether "[m]inority representatives who offered Section 2 coalition districts had their plans voted down because there was no Supreme Court precedent requiring it," Chairman Darby responded "I think the record speaks for itself on what happened to the amendments offered with regard to those matters."  *Id.* at 1578.

Indeed, it does.  The record shows that Chairmen Darby and Seliger rigidly applied a rule that minority coalition districts would not be permitted because they were not "legally required" despite Fifth Circuit precedent to the contrary.  When asked at trial whether "[d]uring the floor debates [he] took the position that Texas was not required to create coalition districts," Chairman Darby testified that "I believe I stated that on the record," and agreed that "no amendments with Section 2 coalition districts were accepted by the House," *Id.* at 1576; *see also* JX 17.3 at S41 (Chairman Darby, during floor debate: "It would be a coalition district . . . it's not legally required to assemble that district in that configuration").  Likewise, during the senate floor debate, Chairman Seliger had the following exchange with Senator West:

> WEST:   Okay so, let me just make sure I understand.  If, indeed, there was an amendment that allowed for minority underrepresented groups to elect a candidate of its choice, you would be supportive of that?
>
> SELIGER:   No, Sir, not necessarily.  Not unless it is required by the law.

JX 26.2 at A-10; *see also* JX 24.4 at § II, p. 4 (SEN. SELIGER: "Senator Garcia, with a great deal of respect for your legal training and experience, is it your assertion that a coalition district, in which no minority has over 50 percent, is compelled by the Voting Rights Act?").

The Fourteenth Amendment guarantees "equal protection of the laws."  U.S. Const. amend. XIV § 1.  The legislature's rule precluding minority coalition districts constituted a literal violation of that guarantee by creating a system of unequal application of law: minority legislators and voters were denied the benefit of circuit precedent merely because no Supreme Court case had decided the question of coalition districts. That is not how the law is supposed to work—legal rights do not only arise from Supreme Court precedent, and there was no such corollary rule for legislation sponsored by non-minority legislators—whether in this special session or any other session.  *Cf. Romer v. Evans*, 517 U.S. 620, 633-34 (1996) ("A law declaring that it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense.  The guaranty of equal protection of the laws is a pledge of the protection of equal laws." (internal quotation marks omitted)).  This unequal rule of law—and the legislature's adherence to it despite knowing it contravened binding circuit precedent—constituted intentional discrimination against minority legislators and voters.

### D.   The Legislature Acted with Discriminatory Intent in Rejecting an Alternative Plan that Would Remedy the Intentional Cracking of Minority Neighborhoods in DFW in Plan C235.

The legislature acted with discriminatory intent in rejecting an alternative plan that would remedy the intentional cracking of minority voting strength in the DFW region.  On June 14, 2013, the Senate deliberated on passage of SB 4—the bill to enact Plan C235.  At several points

throughout the day, Chairman Seliger debated with Sen. Royce West, an African-American senator from Dallas who also served on the Senate Select Redistricting Committee.

Sen. West offered an amendment he explained was required by law to remedy the intentional discrimination of cracking minority neighborhoods in DFW into adjoining Anglo districts. That amendment, Floor Amendment 3, redrew only DFW-area districts and included a third minority opportunity district to elect a candidate of choice of Hispanic voters. JX 26.2 at 33. Sen. West explained that under Plan C235, suburban and rural districts "kind of dart into the urban counties and take up that [minority] population." *Id.* at 34; *see id.* (explaining that under Plan C248, CD 33 would continue to elect African American candidate of choice because "we increase, there were some stranded African Americans in one of the other contiguous districts, we're taking those in my map and putting in that particular district."); *id.* at 37 ("[W]hat those districts are doing that are contiguous to 33 and 30, they're darting in, taking ethnic minority population that would be of no political consequences to them because of the sheer numbers."). Moreover, Sen. West explained that it was necessary to remedy the cracking of minority voters in DFW because there had been "a finding of intentional discrimination." *Id.* at 36.[10]

Chairman Seliger urged the rejection of Sen. West's amendment. His basis for doing so, however, was an obviously pretextual use of the Voting Rights Act to avoid remedying the intentional cracking and packing in DFW. Chairman Seliger contended that Sen. West's

---

[10] Sen. West and others had repeatedly requested the Senate hold a hearing in Dallas so the committee could address DFW-specific concerns. *See, e.g.*, JX 29 at 16 (Letter from Sen. West); JX 21.4 at § I, p. 43; JX 24.4 at § II, p. 8; JX 26.2 at 5-6, 13-14. During the floor debate, Chairman Seliger responded that the House Committee held a hearing in Dallas, JX 26.2 at 13; Sen. West explained in response that it was a departure from regular process for the Senate to rely upon House hearings, *id.* Chairman Seliger commented that the House Dallas hearing transcript would be available for the Court to review in the future, *id.*, but acknowledged *he* had not reviewed it in determining whether Plan C235's DFW configuration was legal, *id.* at 14.

amendment would be retrogressive and in violation of the Section 5 of the VRA because it would reduce CD 30's African American population by 5.5 percent—"the very definition of retrogression under Section 5." *Id.* at 35-36.[11]

Sen. West then responded that Chairman Seliger was wrong in light of the "finding of intentional discrimination." *Id.* at 36. Chairman Seliger ignored that explanation, and reasserted "[t]his appears to be the sort of retrogression that we must avoid, and yet you put it in your map." *Id.*; *see id.* ("Is retrogression okay if it's proposed by you, but not okay if it's proposed by me?"). The senators then had this exchange:

| | |
|---|---|
| WEST: | Okay. Why do you think it's retrogressive? |
| SELIGER: | Because, as I've said, it reduces the, what did I say, the Black citizen voting age population in, from 46 point, I'm sorry, the Black voting age population from 46.4 to 41.8, and reduces the Black citizen voting age population from 53.5 to 48 percent. |
| WEST: | Do you agree with me in a Section 5 analysis that you must go beyond mere population data to include such factors as minority voter registration, minority voter turnout, election history, and majority, minority-majority voting behaviors? |
| SELIGER: | Ah, I am, I'm sorry, *I neither agree or disagree but certainly agree that is your assertion.* At the same time, I think there could be accusation that it's retrogressive and, therefore, I must move to table the amendment. |
| WEST: | And as you're moving to table the amendment, I think that what Senator Watson said few minutes ago, this is, I won't say it was preordained, I'll say it's been predetermined. |

*Id.* at 37.

There are a number of problems here, and they begin with Chairman Seliger's contradictory positions with respect to whether Plan C235 complied with the Voting Rights Act. When initially asked by Sen. West whether he thought Plan C235 complied with Section 5, Chairman Seliger responded "that, I think, is what's going to be asserted by our attorneys. I make

---

[11] Although Chairman Seliger does not specify that he is referring to CD 30, the Black VAP and CVAP figures he cites are those of CD 30, not CD 33. *See* JX 100.3.

no such assertion on my own." JX 26.2 at 8; *id.* (SEN. WEST: Okay, so this bill does or does not comport with current law, that's all I'm asking"; SEN. SELIGER: "You're asking for a legal decision, and I don't make those, Senator West. I'm not a lawyer.").[12] Chairman Seliger's position changed, however, when Sen. West introduced an amendment to remedy the purposefully discriminatory cracking of minority populations identified by the D.C. Court. At that point, Chairman Seliger quickly offered a legal opinion announcing what he claimed to be "the very definition of retrogression under Section 5." *Id.* at 35-36.

Importantly, Chairman Seliger's definition of retrogression under the Voting Rights Act was wrong, and the record indicates he knew that. First, two days prior, Sen. Garcia had explained, in an exchange with Chairman Seliger, that the actual Section 5 test was not a bright-line population determination. *See* JX 24.4 at § II, p. 3 (SEN. GARCIA: "The functional analysis, and that's the key here, the functional analysis established by the Department of Justice, and the District Court in District of Columbia, makes clear . . . there is no bright (line) number for minority opportunity."). Second, Sen. West explained that to him again during their exchange on the Senate floor. Third, this Court, in the very March 2012 Order on which Defendants purport to rely, explicitly rejected Chairman Seliger's professed definition of a simple numerical test for measuring retrogression under Section 5. *See* ECF No. 691 at 7-8; Quesada-2017-85 at 7-8 ("The D.C. Court held that the proper comparison is the minority group's *ability to elect* under the benchmark and enacted plans. The D.C. Court rejected Texas's position that the standard for

---

[12] Chairman Seliger's professed ignorance is peculiar, in light of his insistence that the bill include legislative findings announcing the plan's legality. When Sen. Zaffirini sought to strip the Legislative Findings from S.B. 4 regarding the professed legality of the map, Chairman Seliger exclaimed that "this amendment guts the bill and I oppose it, and think we should vote nay on the amendment," JX 24.4 at § I, p. 13, and during the floor debate explained he agreed with the sentiment expressed in Section 2 of S.B. 4 that "these maps satisfy the requirements to be legal maps." JX 26.2 at 26.

determining retrogressive effect should include an evaluation of voting population demographics alone." (emphasis in original)).

Fourth, the D.C. Court, in its final judgment denying preclearance—a case in which Chairman Seliger was a witness and in which the opinion includes his name twenty-five times—reiterated its rejection of this view of Section 5. *See Texas*, 887 F. Supp. 2d at 140; Quesada-2017-74 at 6 ("As we explained in our summary judgment opinion, ensuring that a proposed plan will not undo the gains minority voters have achieved in electoral power requires a multi-factored, functional analysis. A single-factor inquiry, such as the test Texas proposed relying on racial and ethnic population statistics alone, is inconsistent with precedent and too limited to provide an accurate picture of the on-the-ground realities of voting power.").[13] Fifth, Mr. Archer had already advised the legislature in 2011 that Section 5 was not a mathematical exercise, *see* Fact Findings, ECF No. 1340 at 53-54, ¶ 96(F); *see also id.* at 430 ¶ 712 (mapdrawers in 2011 were of view that "districts above 40% BVAP were treated as African-American districts rather than coalition districts"), and David Hanna, on whom Chairman Seliger relies for advice in redistricting, *id.* at 43, ¶ 89, "encouraged election analysis because there are shortcomings in the demographic analysis . . . one would want to conduct election analysis to determine whether a district was performing or not," *id.* at 432-33, ¶ 718. And sixth, the D.C. Court had already concluded that CD 30 in Plan C185 was *packed* and on that basis the product of purposeful discrimination. Quesada-2017-74 at 126, ¶ 120; *see also* ECF No. 1340 at 251, ¶ 331. In the 2012 election, Congresswoman

---

[13] Were there any remaining doubt on the point, the Supreme Court has subsequently agreed that the *plain text* of Section 5 requires a functional analysis. *See Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1272 (2015) ("Section 5 . . . does not require a covered jurisdiction to maintain a particular numerical minority percentage. It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice. That is precisely what the language of the statute says.").

Eddie Bernice Johnson, CD 30's representative, received 78.82 percent of the vote, a margin of nearly 130,000 votes.[14]   In light of all of this, it is hard to believe that Chairman Seliger *truly* thought Sen. West's amendment, which reduced the African-American CVAP of CD 30 by 5.5 points to 48 percent, threatened the ability of African-American voters to elect their candidate of choice.  Defendants chose not to call Chairman Seliger to testify at trial.[15]

The legislative record reflects Chairman Seliger used a purposeful misunderstanding of Section 5 as pretext to avoid remedying the intentional packing and cracking of minority voters in DFW.  If a legal mistake cannot support a racial gerrymander, *see Cooper v. Harris,* 137 S. Ct. 1455, 1472 (2017) ("But neither will we approve a racial gerrymander whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake."), then a *purposeful* legal mistake in the service of maintaining minority vote dilution surely qualifies as improper intentional discrimination.

---

[14] *See* Tex. Sec'y of State, Election Results, http://elections.sos.state.tx.us/elchist164_state.htm.

[15] The D.C. Court questioned Chairman Seliger's credibility in its decision denying preclearance. *See Texas*, 887 F. Supp. 2d at 200-01, ¶ 16; Quesada-2017-74 at 102-03 ("In his pre-filed written direct testimony, Chairman Seliger claimed that he relied on these experts to 'inform me if the demographics, performance, or any other attribute of a proposed district would raise concerns under the Voting Rights Act.   To the contrary, these experts testified before the Senate Redistricting Committee that they did not 'provide[] verbal or written guidance or []opinion to the committee regarding whether [the proposed Congressional plans were] in compliance with Section 5' because they were not asked to do so." (internal citations omitted; alterations in original); *id.* ¶ 17 ("Chairman Seliger also admitted during the floor debate that the Senate Redistricting Committee Outside Experts he hired had not seen the Congressional Plan until it was released in committee and that these experts had not evaluated the plan for compliance with the VRA."). Despite the D.C. Court's finding in this regard and his contradictory floor statement, at his subsequent deposition, Chairman Seliger declined to acknowledge any "substantive" error in his testimony provided the D.C. Court.  *See* ECF No. 1455-3 (K. Seliger Depo. Tr. at 103:8-104:2).

E.    Application of the *Arlington Heights* Factors Demonstrates the Legislature Purposefully Discriminated in Enacting Plan C235.

The *Arlington Heights* factors support the conclusion that the legislature acted with discriminatory intent in enacting Plan C235.  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977).  The *Arlington Heights* Court identified several factors useful in assessing discriminatory intent: 1) disparate impact of the action, 2) historical background for invidious discrimination, 3) the sequence of events leading to the action, 4) departures from the normal procedural sequence or substantive departures, and 5) the legislative history, including contemporaneous statements.  *Id.*; *see also* ECF No. 1390 at 113.  As this Court has recognized, "[c]onsideration of the *Arlington Heights* factors, when viewed in totality with the entire record evidence, may support a finding of intentional racial discrimination, even where the individual factors considered alone are not compelling."  ECF No. 1390 at 135.

i.    **Discriminatory Impact**

Plan C235 has a discriminatory impact.  In redistricting cases, courts look to the proportionality—or lack thereof—as evidence of discriminatory impact.  "[T]he law is clear that 'the impact of the official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions."  *Id.* at 137 (quoting *Reno v. Bossier Parish Sch. Dist.*, 520 U.S. 471, 488 (1997)).   Therefore, "a jurisdiction that enacts a plan having a dilutive impact is more likely to have acted with a discriminatory intent to dilute minority voting strength than a jurisdiction whose plan has no such impact."  *Id.*

Dr. Lichtman testified as to Plan C235's dilutive impact at trial.  He explained that the 2008 to 2012 ACS data, which was available at the time the legislature enacted Plan C235, showed that

African Americans and Latinos constituted 39.5 percent of Texas's citizen voting age population ("CVAP"). 7/12/17 Trial Tr. (Vol. 3) at 927. On a proportional basis, Dr. Lichtman testified that this would translate into 14 congressional districts in which minorities could elect their preferred candidates. *Id.* He further testified that African American comprised 13 percent of the statewide CVAP, or 4.7 districts, and Hispanics comprised 26.5 percent of the statewide CVAP, or 9.5 districts. *Id.* All minorities, Dr. Lichtman explained, were 43 percent of CVAP, or 15.5 districts, while Anglos comprised 57 percent of statewide CVAP, or 20.5 districts. *Id.* at 927-28; *see also* Quesada-2017-1 (Lichtman Report) at 5, ¶ 8.

Under Plan C235, Dr. Lichtman testified that there is a significant lack of proportionality. Hispanics only have the opportunity to elect their preferred candidates in 7 districts—a proportional underrepresentation of 2.5 districts. *Id.* at 928. African Americans have the opportunity to elect their preferred candidates in 4 districts—a proportional underrepresentation of .7 of a district. *Id.* And Anglos have an effective opportunity in 25 districts—an *over*representation of 4.5 districts. *Id.*; *see also* Quesada-2017-1 (Lichtman Report) at 6-7, ¶ 11.

Dr. Lichtman also concluded there was substantial disproportionality in the Dallas-Fort Worth area particularly, with Hispanic and African American CVAP constituting 39.5 percent of the two-county area, but with minority voters only able to elect their preferred candidates in 2 of the 8 districts comprising significant parts of Dallas and Tarrant Counties. *Id.* at 935, 937. On the other hand, Anglos have significant over-representation—controlling the outcomes in 6 of the 8 districts. *Id.* at 937. Moreover, Dr. Ansolabehere explained the numbers another way: 93 percent of Anglo CVAP in Dallas and Tarrant Counties reside in the 6 white-controlled districts, while 55 percent of African Americans and Hispanics reside in the 2 minority-controlled districts. 7/13/17 Trial Tr. (Vol. 4) at 1095. Minority voters are dispersed into Anglo districts, while the same is not

true of Anglo voters. And as a visual inspection of the minority population in DFW shows, *see, e.g.*, Quesada-2017-16, this is not explainable by geographic dispersion of minority population—to the contrary, the minority population in DFW is rather concentrated.

### ii.    Historical Background

This Court has already concluded that there is a significant past and recent historical background of discrimination in Texas. *See* Findings of Fact, ECF No. 1340 at 439-41, ¶¶ 733-41; Amended Order, ECF No. 1390 at 140-41. That conclusion related to the evidence prior to the 2011 enactment of Plan C185. As Dr. Lichtman testified at trial, that history of discrimination continued unabated in the two years between that plan and the adoption of Plan C235 in 2013. As the D.C. Court concluded in 2012, the 2011 congressional and state senate plans were enacted with intentional discrimination. *See* 7/12/17 Trial Tr. (Vol. 3) at 939; Quesada-2017-74 at 38, 43. Texas "stood alone among all the state in the union" to have any of its redistricting plans denied preclearance. 7/12/17 Trial Tr. (Vol. 3) at 939 (testimony of Dr. Lichtman). In 2011, the Texas legislature also enacted its voter identification law, which has also been found to have been passed for a discriminatory purpose. *Id.* Likewise, the legislature sought to limit funding to cities that prohibited police officers from inquiring about immigration status, and passed a measure "requiring proof of citizenship for driver's licenses." *Id.* at 940; *see also* Quesada-2017-1 (Lichtman Report) at 20, 22.

The continued discrimination post-2011 has left its mark. As Dr. Lichtman testified, education and income gaps between Anglos and minorities persist. These socioeconomic characteristics matter because they "directly affect[] the ability of minorities to participate in the political process and to elect candidates of their choice. Problems with education, health, income, unemployment are a barrier to voter turnout. They affect the ability to recruit candidates, to finance

28

campaigns, and thus are – interact with any other discriminatory system to magnify the effects of that discrimination." *Id.* at 942. The data shows that since 2011, things "haven't gotten better in terms of these socioeconomic disparities. Sadly, if anything, they've gotten slightly worse." *Id.*; *see also* Quesada-2017-1 (Lichtman Report) at 21 ¶ 34, 56 (Table 8).

### iii.    Sequence of Events and Procedural and Substantive Deviations

The sequence of events leading to Plan C235's enactment and the procedural and substantive deviations from the norm indicate a discriminatory purpose behind S.B. 4. The evidence shows that unlike normal legislation—and in particular redistricting legislation—the Attorney General's office developed the idea behind the legislation, its content, and its legislative findings—all before a bill was written or a legislative hearing was held. The evidence shows this effort had two goals: 1) to avoid the creation of any new minority opportunity districts and 2) to evade responsibility for doing so by pretending to rely on this Court's "legal advice" in its interim Order. As discussed above, substantial direct evidence shows the legislature did not rely on this Court's Order and acted solely with the intent to minimize minority opportunity districts. Nonetheless, the Court could infer as much from the significant circumstantial evidence of the strange sequence of events and deviations from the norm, described below.

*First*, the idea and substance of S.B. 4 (along with the other two redistricting bills) was developed in the Attorney General's office, not the legislature. The record shows that Chairman Darby did not introduce legislation to enact the interim plans until Speaker Joe Straus received a letter, on March 8, 2013, from then-Attorney General Greg Abbott urging that course of action during the regular session. *See* Quesada-2017-57 (March 8, 2017 Letter); 7/14/17 Trial Tr. (Vol. 4) at 1558 (testimony of Chairman Darby acknowledging legislation introduced same day letter was received). Redistricting is generally a legislative function; it is not normal for the Attorney

General's office to dictate the drawing of district lines.  *See* 7/12/17 Trial Tr. (Vol. 3) at 948 (Dr. Lichtman, testifying that "I have not in my experience found this to be a normal practice at all").

*Second*, not only did the idea and substance of the legislation originate in the Attorney General's office, but so did the legislative findings that accompanied the bill.  On March 7, 2017— the day before the legislation was introduced, and well before any fact-finding hearing occurred— the Attorney General's office emailed Chairman Darby's staff with the concept and draft language for the legislative findings.  *See* Quesada-2017-84.  This is not normal procedure, as Chairman Darby himself admitted at trial:

> Q.    And Mr. Clay advises Mr. Modglin that he should insert the statement of intent into the bill claiming that this Court had ruled that the interim maps "remedy any violation of the Voting Rights Act or U.S. Constitutions," right?
> A.    That is the statement of the intent.
> Q.    And so the statement of intent made it into the bill, right?
> A.    I haven't checked the exact language, but substantially all of that went into the bill.
> Q.    And you're aware that the statement of intent was removed from the Senate Bill, the one bill that everyone agreed was lawful?
> A.    Correct.
> Q.    Legislative findings are usually found by the legislature, aren't they?
> A.    Yes . . . .

7/14/17 Trial Tr. (Vol. 5) at 1558:5-20.

Both the process and substance of these findings are a departure from the normal process. As a procedural matter, as Chairman Darby acknowledged, it is abnormal for the Attorney General to dictate to the legislature what its purpose and conclusions are.  *Id.*  It is all the more abnormal for that to happen before legislation has even been introduced, and well before a legislative hearing has occurred—the event at which one would expect the legislature to obtain information that would inform and provide a basis for its legislative findings.  Courts "need not in equal protection cases accept at face value assertions of legislative purpose, when an examination of the legislative

30

scheme and its history demonstrates that the asserted purpose could not have been the goal of the legislation." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975).  The Court should look particularly askance here, where the legislature did not even develop the legislative findings, but rather the Attorney General's office did—in the context of ongoing litigation about racial discrimination—prior to the bill's introduction.  *Cf. Texas*, 887 F. Supp. 2d at 224 (discussing email between senate parliamentarian and David Hanna, in which parliamentarian "inquired about pre-doing the committee report,"—a suggestion Mr. Hanna rejected as "[n]o bueno . . . [because] RedAppl time stamps everything when it assigns a plan.  Doing it Thursday would create a paper trial that some amendments were not going to be considered at all.  Don't think that is good idea for preclearance" (quotation marks and citation omitted)).

It is not just the odd process behind these findings, though.  They also reflect a substantive departure from the norm.  TLC counsel David Hanna testified at a senate hearing that he was unaware of such a finding being included in previous redistricting legislation.  JX 24.4 at 11.  When Senator Zaffirini offered an amendment during a committee hearing to remove the legislative findings from the three redistricting bills, Chairman Seliger adamantly objected, proclaiming that "this amendment guts the bill and I oppose it, and think we should vote nay on the amendment," JX 24.4 at § I, p. 13.  This statement suggests that the purpose of the legislation was to create a litigation argument to evade liability for purposefully blocking the creation of additional minority opportunity districts—how could an amendment that affects *zero* district lines "gut" the legislation?  When the amendment reached the senate floor, the senate agreed to strip the language from the senate redistricting plan—the one plan everyone actually thought was lawful—yet refused to eliminate the language from the other two bills that minority legislators contended were *un*lawful.  *See* 7/14/17 Trial Tr. (Vol. 5) at 1558 (testimony of Chairman Darby); JX 26.1 at 27.

31

When confronted with this oddity on the senate floor, Chairman Seliger explained only that "[t]his amendment is different because it takes on a different context in this map." JX 26.2 at 27. The difference, of course, was the ongoing—and future—litigation. And the disparate treatment of the bills, coupled with the process by which the findings were generated, strongly suggests they were pretext for the litigation, and did not reflect any real conclusions of the legislature. *See also* 7/13/17 Trial Tr. (Vol. 3) at 944 (testimony of Dr. Lichtman that disparate treatment of findings in three plans was "very, very odd and very indicative of what was going on with respect to intent"); Quesada-2017-1 (Lichtman Report) at 31-32, ¶¶ 52-53. Of course, it is also significant that the legislature rejected all amendments to Plan C235 offered by minority legislators, *see* Quesada-2017-73 at 3 (Response to RFA No. 10)—amendments Mr. Archer told the legislature highlighted the legal flaws and that, if rejected, could cause legal jeopardy, *see* JX 15.3 at 56, 58-59; 7/14/17 Trial Tr. (Vol. 5) at 1575 (Chairman Darby testimony).

*Third*, it was abnormal for redistricting legislation to be enacted during a special session, rather than during the regular session. *See* 7/12/17 Trial Tr. (Vol. 3) at 943 (testimony of Dr. Lichtman that "the adoption of something very significant—congressional redistricting plan, affects the state, affects the nation—in a special session" "stands out here in terms of a procedural deviation"). Special sessions are not common, but rather are to "respond to a particular crisis." Quesada-2017-1 (Lichtman Report) at 29 ¶ 49 (quoting University of Texas handbook on Texas politics); Quesada-2017-48. As Dr. Lichtman explained, "[t]here certainly was no crisis or particular problem regarding redistricting in May or June of 2013," and the redistricting special session was prioritized over a public policy issue for which the governor had declared a crisis—transportation. 7/12/17 Trial Tr. (Vol. 3) at 943; Quesada-2017-1 (Lichtman Report) at 30-31 ¶ 50. Moreover, the restrictive nature of the Governor's Call for the special session was unusual.

*See* Quesada-2017-6.  As Sen. Davis testified at the first Senate hearing of the special session, "[i]f we are limited by the Call to end where we began, it seems to have created a false expectation that the input would actually produce any sort of meaningful consideration in terms of the outcome." JX 20.4 at § I, p. 18.  Even Chairman Darby lamented during the final floor debate, "keep in mind, we've had a telescoped-down, if you will, process, and we're trying to move this process within the call that the governor issued to us."  JX 17.3 at 17.  This is not the normal redistricting process.

  *Fourth*, because redistricting was considered during a special session, the Senate did not follow its normal rule of a blocker bill and a two-thirds requirement.  *See Veasey*, 830 F.3d at 238 (identifying suspension of two-thirds rule as a procedural departure suggesting intentional discrimination).  The record indicates minority senators and members of the public repeatedly complained about the lack of availability of the two-thirds rule in these proceedings.  *See, e.g.*, JX 19.3 at § II, p. 6 (expressing concern during the regular session of the possibility that the Senate could "bypass our Two-Thirds Rule, the only real legislative protection that African-Americans and Latino voters have in this process.); *id.* § II, p. 7 (Sen. Watson, testifying that "I could see where a court . . . could look at the fact that a long-standing rule and tradition that protects and is built to protect the minority, when it is circumvented is some evidence and it would be in my view some evidence of purposeful efforts to discriminate"); JX 20.4 at § II, p. 3; JX 21.4 at 34; JX 26.2 at 24 (Chairman Seliger admitting that "if the regular rule that requires there to be, or tradition that requires there to be a motion to suspend the rules in order to take up a bill . . . the Two-Thirds Rule . . . [were followed,] those that represent over 60 percent of the Hispanic population and a majority of the Black and Hispanic population would be in a position to prevent such a bill coming to the floor if that tradition were being followed."); 7/14/17 Trial Tr. (Vol. 5) at 1563 (testimony of Chairman Darby acknowledging that two-thirds rule applied during the regular session, at which

point "Senate did not vote that bill," but that rule was not applied in the special session).  Indeed, the record suggests that the interim plans were not adopted during the regular session precisely because of the two-thirds rule:

> WATSON:  [D]uring the regular session of the Legislature, at that point in time, that bill was blocked from coming to the floor.
>
> SELIGER:  I'm not aware of a block or anything else.  All I'm aware is, was, I was given a hearing in front of the State Affairs Committee, there was not a vote taken in the State Affairs Committee, and what went into that consideration I was not privy to.
>
> WATSON:  Oh, so you don't know whether there was a block on the congressional map during the regular session of the Legislature?
>
> SELIGER:  No, I suspect you'd be the authority on that, but nobody said anything to me about it.

JX 26.2 at 22.

Similarly, the House declined to follow its ordinary process of employing a Calendar Rule for the filing of amendments.  *See* JX 17.3 at 12 (Rep. Martinez-Fischer noting to Rep. Darby that, absent a Calendar Rule, "when we're doing this on the floor in real time, we don't know that the map is as perfectly drawn as we might think it is.  And so, I'm concerned about that.  I'm troubled that you don't find it concerning"); *id.* at 15.  Calendar Rules have normally been used in redistricting in the House, *see* Findings of Fact, ECF No. 1340 at 57-59, ¶¶ 101-02, and Rep. Darby has testified that when one is used, it requires amendments to be filed with 24 hours' notice, to allow the public and the members to understand its contents.  *See* 7/14/17 Trial Tr. (Vol. 5) at 1548-49.  This reflects the hurried process by which the redistricting legislation was passed.

*Fifth*, both Chairmen Darby's and Seliger's handling of legal advice and committee technical resources was unusual and differed between minority and Anglo legislators.  At the May 31, 2013 house committee hearing, Republican Rep. Villalba asked Chairman Darby to "elucidate for us a little on some of the precedents" because, he said, "[i]f we meet certain test and standards, procedures and protocols and we check the necessary boxes, that ultimately the exercise results in

a map or maps that meet the constitutional standards. So I would like to talk about those standards." JX 10.4 at 32. In response, Chairman Darby stated that he was not a redistricting attorney and would not discuss those standards, but rather that "it is the intent of the Chair to discuss hiring counsel that will advise this committee." *Id.*

That was on May 31st. There was a hearing the next day, June 1st, but Chairman Darby had nothing to say about obtaining committee counsel. *See* JX 11.4. A week later, however, Chairman Darby announced at the June 6th hearing that TLC had retained legal counsel for *him*, but that this counsel would not be shared with other committee members, an arrangement to which minority legislators objected. JX 12.4 at 9-13. But evidence produced for the first time during the course of trial—a draft script prepared by Chairman Darby—showed that he knew at least by June 1st that he, not the committee, was being provided legal counsel:

> House Select Committee on Redistricting                    June 1, 2013
>
> *The Select Committee on Redistricting will now come to order.*
>
> I also want to let you know as Chairman that I have hired Michael Morrison and David Guinn as outside council to advise me on the legality of proposed map changes.

Quesada-2017-87.

At trial, Chairman Darby admitted that, in fact, he knew *prior* to June 1st of this arrangement:

> Q:    [H]ad you obtained counsel by June 1st?
> A:    Morrison and Guinn had signed a contract with leg. Council before June 1st.
> Q:    And when did you become aware that they had signed that contract?
> A:    I don't recall specific time.
> Q:    But it was prior to preparing this –
> A:    Yes.

. . .

Q      You did not go on the public record to inform the committee until the June
       6th hearing, right?

A:     I can't recall specifically, but I don't think I informed the committee till
       June 6.

7/14/17 Trial Tr. (Vol. 5) at 1568-69. So two committee hearings passed—including the one at

which he claimed to be seeking to hire committee counsel—before the committee was informed

what Chairman Darby already knew: he had sought his own counsel, not counsel for the

committee. *Cf.* Amended Order at 144, ECF No. 1390 (noting that misleading comments by then-

Chairman Solomons to his minority colleagues was evidence of discriminatory intent).

At the subsequent hearing on June 10th, Rep. Darby reported that those attorneys had

"asked . . . to be allowed to withdraw their counsel" of him, JX 13.4 at 4-5, and that with respect

to legal counsel for the committee going forward, "those resources are best found at the Texas

Legislative Coun[cil]," *id.* at 5. At the same hearing, Chairman Darby confirmed his refusal to

seek testimony or advice for the committee from the Attorney General's office, JX 13.4 at 67, and

finally at the June 12th hearing, Chairman Darby announced that Mr. Archer was available as a

resource witness to provide counsel. JX 14.4 at 6.

During the House floor debate, Chairman Darby confirmed that he refused to ask the

Attorney General or his staff to come before the Committee, but that the Attorney General's staff

had, that day, met with the Republican caucus exclusively. JX 17.3 at 37-41. He then had the

following exchange with Reps. Davis and Chris Turner:

Y. DAVIS:    That's not my question either. My question is, do you think it would
             have been of value to the select committee to have heard from the
             attorney general as a committee in terms of what the concerns the
             state has to consider? Would you think that would've been—

DARBY:       I think that would have been helpful.

C. TURNER:   To follow up on Representative Davis's questioning just now, I
             understand that you didn't ask the attorney general to come and
             appear before the committee. Did the attorney general's office,

| | |
|---|---|
| | however, make itself available as a resource witness before the committee? |
| DARBY: | Not that I'm aware of. |
| C. TURNER: | Isn't it typical that when an agency is going to be impacted or involved in proposed legislation, that an agency typically sends representatives to be available as a resource should the committee have questions? |
| DARBY: | Correct, but we're— |
| C. TURNER: | That didn't happen in— |
| DARBY: | That did not happen. |

JX 17.3 at S35.

In the Senate, Chairman Seliger refused to answer questions about whether "Committee counsel and the Attorney General" advised him about the legality of Plan C235, despite acknowledging that the Committee counsel of which he spoke, Mr. Heath, was "counsel to the Committee, individually and collectively," when Sen. Watson suggested the committee members' attorney-client relationship with Mr. Heath precluded Chairman Seliger from claiming privilege. JX 26.2 at 8, 21.

None of this is normal. And taken together and applied against the *Arlington Heights* factors, the evidence demonstrates a clear and discriminatory purpose behind the 2013 redistricting legislation: to prevent minorities from gaining any further ability to elect their preferred candidates.[16]

---

[16] The statements of Chairmen Seliger and Darby highlighted throughout this brief also demonstrate the final *Arlington Heights*—contemporaneous statements of members of the legislative body—suggest intentional discrimination. As another example, while he was attending a hearing, Chairman Seliger chose to make fun of members of the public testifying before the committee: "In redistricting hearing. One witness said gerrymandering started in 2008, another in 2003. Moon landing was faked." Quesada-2017-58.

## II.    As a Matter of Law, the Discriminatory Intent Present in 2011 Infects the Offending Characteristics of Plan C185 that Plan C235 Retained.

Even if the legislative record for the 2013 special session were not replete with independent evidence of intentional discrimination (which it is), the discriminatory purpose that motivated the 2011 plan persists, as a matter of law, with respect to the offending provisions carried over into Plan C235.  Discriminatory purpose can exist both in the original enactment of legislation and when the legislature "reaffirms" a law motivated by discrimination.  *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  And once a court determines that a state actor has engaged in purposeful discrimination, "the racial discrimination [must] be eliminated root and branch."  *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 437-39 (1968).  In *City of Port Arthur v. United States*, 459 U.S. 159, 168 (1982), the Supreme Court affirmed the invalidation, pursuant to Section 5 of the VRA, of both a purposefully discriminatory redistricting plan *and* the city's later-enacted remedial plan as a "reasonable hedge against the possibility that the [remedial] scheme contained a purposefully discriminatory element."  Thus, a subsequent enactment can retain the original law's discriminatory purpose even after its "more blatant discriminatory" portions are removed.  *Hunter v. Underwood*, 471 U.S. 222, 232-33 (1985); *see also United States v. Fordice*, 505 U.S. 717, 733-35 (1992) (holding that "facially neutral" education policy did not remove the "discriminatory taint" of prior policy mandating segregated higher education system and that state "may not leave in place policies rooted in its prior officially segregated system").  Moreover, the law requires that victims of discrimination be placed in "the position they would have occupied in the absence of discrimination," *United States v. Virginia*, 518 U.S. 515, 547 (1996) (quotation marks omitted).  That right is not lessened simply because the number of victims of purposeful discrimination is reduced in the later enactment.

This rule is consistent with "the 'well settled' rule that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice'" because "'repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.'" *Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (quoting *City of Mesquite v. Alladin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). In *City of Jacksonville*, that principle was all the more relevant because "[t]here is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; *it has already done so*." *Id.* (emphasis added). "Nor does it matter that the new ordinance differs in certain respects from the old one. *City of Mesquite* does not stand for the proposition that it is only the possibility that the *selfsame* statute will be enacted that prevents a case from being moot. . . . The new ordinance may disadvantage [petitioners] to a lesser degree than the old one, . . . [but] it disadvantages them in the same fundamental way." *Id.* (emphasis in original). The same is true here. And if a repealed law can still be challenged and enjoined because of the *threat* it will be reenacted in whole or part, it would make scant sense to preclude a court from probing the original law's intent when the law *actually is* reenacted and is challenged. The law does not permit a state to evade liability for discrimination by attempting to bifurcate its discriminatory intent and the discriminatory effects of its legislation into two successive enactments. Rather, to remove the discriminatory taint of a prior enactment, a subsequent legislature must engage in a "deliberative process" and ensure that the new statute does not continue the same discriminatory effects. *See Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1224-26 (11th Cir. 2005); *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998). That did not happen here.

Although Defendants rest their case on the fact this Court originally imposed the interim plan, Rep. Villalba admitted that the Supreme Court's *Perez* decision meant "that these maps were predicated upon previous maps that did have deficiencies."  JX 15.3 at 49.  Those deficiencies were later detailed by the D.C. Court and deemed to be purposefully discriminatory, and yet were reenacted in the same discriminatory fashion by the legislature—fully advised by its counsel and by the plain text of the judicial decisions that doing so would yield new claims of intentional discrimination.  As Dr. Lichtman shows in his report, much of the cracking this Court found with respect to the 2011 Plan carried forward into Plan C235:

**DFW Minority Neighborhood Fractures Retained in Plan C235**



Quesada-2017-1 (Lichtman Report) at 61, Map 5; *see also supra* Part I.B (regarding southeast Arlington/Grand Prairie); 7/13/17 Trial Tr. (Vol. 4) at 1095 (Ansolabehere testimony that 95% of Anglos reside in Anglo-controlled DFW districts, while only 55% of minorities reside in minority-controlled districts); *id.* at 1098-99 (Ansolabehere testimony regarding splits in Irving and Grand Prairie); *id.* at 1100-01 (Ansolabehere testimony regarding cracking in Arlington); *id.* at 1104-05, 1197 (Ansolabehere testimony regarding cracking of Meadowbrook); *id.* at 1105 (Ansolabehere

testimony regarding cracking of Como); *id.* at 1114 (Ansolabehere testimony that compactness score for CD 33 demonstrates cracking).

Tens of thousands of Texas minority voters remain the victims of intentional discrimination because of the legislature's knowing failure to remedy the purposeful discrimination that two federal courts have explicitly identified. The law imputes the 2011 legislature's discriminatory intent onto the 2013 legislature for knowingly reaffirming Plan C185's discriminatory features.

**III.    The Legislature's Intentional Discrimination Had its Intended Effect.**

The legislature's intentional discrimination with respect to Plan C235 had its intended effect. No new minority opportunity districts were created to correct the cracking and packing in DFW that remains from the 2011 plan, CDs 27 and 35 are unchanged, and CD 23 remains shy of a true Hispanic opportunity district. And this harms minorities. This Court has already concluded that minority voters experience discriminatory effects by being placed in Anglo districts. *See* Fact Findings, ECF No. 1340 at 249-50, ¶¶ 324-26; 443 ¶ 712. That fact was confirmed again at trial. Tarrant County Commissioner Roy Brooks, whose commissioner precinct overlaps with four congressional districts (CDs 6, 12, 25, and 33), testified about the importance of members of Congress to him and his constituents. *See* 7/13/17 Trial Tr. (Vol. 4) at 1221. In particular, Commissioner Brooks testified that his constituents—many of whom are minorities—are affected by "[h]ealthcare issues like Medicaid, Medicare and CHP, veterans health services, Community Development Block Grants, which is a HUD program for redevelopment of central city areas and a lot others." *Id.* at 221. He explained the importance of these issues to minorities, and the problem with them being cracked into Anglo-controlled congressional districts:

> Q.    And in your experience, are these issues important to your minority constituents?
> A.    Yes.
> Q.    Why is that?

> A.    Because by and large minorities depend more on governmental supports than the community at-large.
>
> Q:    And have you been able to convince the members of Congress from your commissioner precinct to support these measures?
>
> A:    Congressman Veasey certainly does.
>
> Q:    And what about the other members?
>
> A:    We – I have a friendly and cordial relationship with all of them, but they tend to vote with the Republican leadership of the Congress, and that leadership vote is contrary to the issues of my community.  Friendship is not the issue.  It's the vote that counts.

*Id.* at 1222.   Representative Rose likewise testified that "it's best to be represented by a congressional member who ha[s] the same interest that you have" and that her office would be contacted by constituents who lived in Anglo Republican congressional districts on immigration issues because those congressman "would not be able to assist them or be responsive, I should say, to their issues."  7/13/17 Trial Tr. (Vol. 4) at 1313; *id.* at 1314 (Rep. Rose testifying that NAACP report card reflects responsiveness of members of Congress to constituents' needs); *see also* Quesada-2017-61 (Congressman Kenny Marchant (R, CD 24) explaining that immigration reform "is very unpopular in my district . . . [t]he Republican primary voters, they're being pretty vocal with me on this subject, [and] . . . if you give the legal right to vote to 10 Hispanics in my district, seven to eight of them are going to vote Democrat").

## IV.    Section 2's "Results" Prong Requires the Formation of an Additional Minority Coalition District in DFW.

This Court can and should conclude that, as a matter of fact, the legislature intentionally discriminated in 2013 by packing and cracking minority voters in DFW to dilute their votes.  It should remedy that injury by creating what is a naturally occurring minority opportunity district in DFW, such as CD 3 in the Quesada Plaintiffs' demonstrative plan C273.  Regardless, however, Section 2 of the VRA independently requires the creation of such a coalition district to prevent discriminatory results.

*First*, under the first prong of the *Gingles* test, the Quesada Plaintiffs have demonstrated that a geographically compact minority population can form the majority of the population in a second Dallas County based districts, such as CD 3 in the Quesada Plaintiffs' demonstrative plan. This is shown both by the overall compactness of the proposed district, as well as the compactness of the minority population within the proposed district:



JX 101.1; Quesada-2017-19 (orange shading equals minority population of 70-100%, light orange 60-69.9%, and green 50-59.9%).  In the Quesada Plaintiffs' Demonstrative Plan C273, CD 3 has a Hispanic CVAP of 38.4% and an African American CVAP of 19.6%, with a combined Hispanic/African American CVAP of 58%.  JX 101.3.  CD 3 in Plan C273 is also compact—its rubber band score is .611, which would rank more compact than 12 of the current districts in Plan C235, and the district's Perimeter to Area score is .140, which would rank more compact than 11 of the current districts in Plan C235.  *Compare* JX 101.10 *with* 100.10.[17]

_____

[17] The creation of CD 3 in Plan C273 creates minimal disruption to other DFW districts, but those changes make many of the neighboring districts more compact than in Plan C235.  For example, CD 30's rubber band score improves from .760 to .770, and its Perimeter to Area score improves from .180 to .229.  CD 33's rubber band score improves from .430 to .556, and its Perimeter to Area score improves from .045 to .108. CD 32's rubber band score improves from .617 to .705, and its Perimeter to Area score improves from .125 to .240.  CD 6's rubber band score improves

The Quesada Plaintiffs' Demonstrative Plan C273 also ensures that other traditional redistricting criteria are respected, particularly as compared to Plan C235.  *See Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that Section 2 "compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." (quotation marks omitted)).  For example, under Quesada Demonstration Plan C273, the communities of South Irving and Grand Prairie in Dallas County are united in CD 3, whereas these communities are split among CDs 24, 30, and 33 under Plan C235, with South Irving being in the same congressional district—CD 24—as Hebron in Collin County:




*Compare* DX 887 at 6 (Plan C235 in DFW) *with* DX 888 at 7 (Plan C273 in DFW).  Defendants' own witness on the issue of communities of interest in Dallas County, Elizabeth Alvarez-Bingham, testified that as far as communities of interest go, South Irving has more in common with Grand Prairie than it does with Collin County.  *See* ECF No. 1514-2 at 11 (E. Alvarez-Bingham Depo.

from .764 to .806, and its Perimeter to Area score improves from .215 to .246. *Compare* JX 100.10 *with* JX 101.10.

Tr. at 144:8-17) (Q: "With respect to South Irving, . . . in your view, does South Irving have more in common in terms of communities of interest as you've defined it today, with Grand Prairie or with Collin County?"  A: "Grand Prairie. . . .").

Moreover, under Plan C273, CD 33, which is represented by Congressman Marc Veasey, is moved entirely into Tarrant County, whereas it currently spans significant portions of both Tarrant and Dallas Counties.  In doing so, Plan C273 unites the cracked minority communities of Tarrant County, for example by taking in the Southeast Arlington/Grand Prairie area of Tarrant County, Meadowbrook (which currently is excised from CD 33 by the sharp knife-like intrusion from CD 6 shown below), Southwest Fort Worth/Meadow Creek, and Como:



*Compare* DX 887 at 4 (Plan C235 in Tarrant Co.) *with* DX 888 at 5 (Plan C273 in Tarrant Co.); *see also* 7/13/17 Trial Tr. (Vol 4) at 1104-05 (Ansolabehere testimony regarding communities of interest of Como and Meadowbrook); *id.* at 1223-24 (Brooks testimony regarding Southwest Fort Worth/Meadow Creek).  Based on the compactness scores and respect for traditional redistricting principles, such as communities of interest, Quesada Demonstration Plan C273 shows that the new minority coalition district, CD 3, satisfies the first *Gingles* prong.

*Second*, under the second *Gingles* prong, the Quesada Plaintiffs have demonstrated that the Hispanic and African American voters in proposed CD 3 are "politically cohesive." *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986); *see* 7/13/17 Trial Tr. (Vol. 4) at 1201 (Ansolabehere testimony that black and Hispanic voters in current CD 33 "vote cohesively in the general elections in these areas to elect their preferred candidates"); *see* Rodriguez Ex. 2017-955 (Ansolabehere Report) at 62 (Table 9) (showing that in Dallas County, in past three statewide elections, 100% of African Americans and 68.4-81.7% of Hispanics voted for Democratic candidate, while 22.4-38.8% of Anglo voters did). In Texas, voting is racially polarized, and Hispanic and African American voters prefer Democratic candidates while Anglo voters prefer Republican candidates, Fact Findings, ECF No. 1340 at 420 ¶ 688, 421-24 ¶¶ 691-95, 428 ¶ 708, demonstrating political cohesion between African American and Hispanic voters, *id.* at 417, ¶¶ 681-82, 418 ¶ 684.

Defendants contend that African Americans and Hispanics are not cohesive, because in two Democratic primary elections (2012 and 2016) in CD 33, Hispanic primary voters preferred the Hispanic candidate, while African American primary voters preferred the African American candidate. This single-minded focus on these two primary elections is misplaced. As this Court has already concluded, general election results are significantly more instructive on the issue of minority political cohesion than are primary elections. *See* Fact Findings, ECF No. 1340 at 427-28 ¶¶ 700-02. Indeed, this Court has found that in particular with respect to Dallas and Tarrant Counties. *Id.* ¶ 701 ("In Harris, Dallas, and Tarrant Counties, the turnout patterns, number of contested elections, and comparative competitiveness in outcomes show that the general election is the critical contest."). At trial, the reason this is so became clear. As Defendants' expert Dr. Alford admitted, in CD 33, the general election turnout ranged from 28.2% in 2014 to 53.6% in 2016, while the Democratic primary turnout ranged from 1.3% in 2014 to 8.6% in 2016. 7/14/17

Trial Tr. (Vol. 5) at 1454. In terms of actual numbers of voters, that translated into 12,410 Hispanic

voters in the 2014 Democratic primary in CD 33, and 46,358 Hispanic voters in the 2014 general

election. *Id.* at 1456-57. In the 2016 CD 33 primary, 8,328 of 12,400 Hispanics who turned out

voted for the Hispanic candidate, Mr. Quintanilla. *Id.* at 1458. In the 2016 general election, 38,756

of 46,358 Latinos voted for Marc Veasey. *Id.* at 1459; *see also* Fact Findings, ECF No. 1340 at

250 ¶ 329 (noting that "home factor" contributes to primary election results in CD 33, given

Veasey's residence in Tarrant County and opponents' residence in Dallas County). As Dr. Alford

acknowledged, the number of Hispanics who chose to vote for the African American candidate in

the general election far surpasses the number that even turned out for the primary:

> Q:   Dr. Alford, then, based on the document that we just reviewed, more than
> three times as many Latinos chose to turn out in support of Marc Veasey in
> 2016 general election than even turned out in the 2016 primary, is that
> correct?
> A:   That sounds right.
> Q:   So it's hardly the case that Latinos are walking away from the electoral
> process after their first choice candidate loses the primary, is that correct?
> A:   That's correct.
> Q:   They're coming out in far greater numbers to support Marc Veasey in the
> general election; is that correct?
> A:   That's correct.
> Q:   And they're joining with large numbers of black voters to support Marc
> Veasey in the general election; is that correct?
> A:   That's correct.

*Id.* at 1460.

Indeed, even if Congressman Veasey was the second choice for those 8,328 Hispanics in

2016, that means that he was the first—and only—choice of over 30,000 Hispanics in 2016. They

were so cohesive in their support with African Americans that they were not even compelled to

register a vote in the primary. So the 2016 data actually shows that Marc Veasey was the first and

*only* choice of 65.6% of Hispanic voters, the second choice of 17.9% of Hispanic voters, and not

the choice of 16.4% of Hispanic voters. And from that, Defendants somehow contend Hispanic

and African Americans are not politically cohesive in Dallas and Tarrant Counties. That makes absolutely no sense.[18]

Moreover, the *Gingles* prong two test is about *political* cohesion. The most important data point on that score is *which party's primary* African Americans and Hispanics select. There is no dispute that they cohesively select the Democratic primary, and the Democratic candidate in the general election. Dr. Alford admitted as much at trial, acknowledging that "one way for minorities to show that they are politically cohesive is to coalesce around a major political party." 7/14/17 Trial Tr. (Vol. 5) at 1443. The evidence in this case shows that African American and Hispanic voters in DFW are politically cohesive, both in their choice of political parties, but also in their choice of candidates.

*Third*, the evidence shows that in the portions of newly proposed CD 3 in Quesada Demonstration Plan C273 that are not currently represented by either Eddie Bernice Johnson (CD 30) or Marc Veasey (CD 33), white bloc voting usually prevents minorities from electing their candidates of choice. For example, 22.2% of the population in CD 3 under Quesada Demonstration Plan C273 comes from Plan C235's CD 24. *See* DX 900. CD 24 is represented by Anglo Republican Congressman Kenny Marchant, and an ecological regression analysis of voting patterns in CD 24 shows that in 2016, Congressman Marchant's Democratic opponent received 100% of the African American vote and 68% of the Hispanic vote, yet only 23% of the Anglo vote. *See* Rodriguez-2017-955 (Ansolabehere Report) at 58 (Table 6). Whites thus voted as a bloc, 77% for Congressman Marchant, to defeat minorities' candidate of choice. The same was true in the 2014 race; 82% of whites voted for Mr. Marchant. *Id.* Mr. Marchant won with 56%

---

[18] This illogical conclusion is explained somewhat by Dr. Alford's admission that he did not even analyze general elections—his conclusion regarding the lack of cohesiveness was based solely on primary elections in CD 33. *Id.* at 1448.

of the total vote in 2016 and 65% of the total vote in 2014. *Id.* at 57 (Table 5). The 2016 and 2012 presidential elections in CD 24 showed the same pattern. In 2016, the Democratic candidate received 30% of the Anglo vote in CD 24, 100% of the African American vote, and 72% of the Hispanic vote. *Id.* at 59 (Table 7A). Yet the Democratic candidate only received 47% of the total two-party vote. *Id.* at 55 (Table 3). In 2012, only 18% of Anglos in CD 24 voted for the Democratic candidate—82% voted for the Republican candidate. *Id.* And the pattern was the same for governor and senator in 2014—70% of Anglos in CD 24 voted for the Republican candidate for governor in 2014 and 82% voted for the Republican candidate for senator in 2014. *Id.* at 60 (Table 7B). In fact, in *every* election studied, the white bloc in CD 24 prevented the minorities' preferred candidate from prevailing. The average victory percentage for statewide Republican candidates in CD 24 from 2010-2016 was 58%. *Id.* at 55 (Table 3). Thus, for the portion of proposed CD 3 in Quesada Demonstration Plan C237 that are not currently represented by a minority candidate of choice, prong 3 of *Gingles* is established—whites usually vote as a bloc to prevent minorities' preferred candidate from being elected.

Defendants contend that party, not race, is the reason for racial polarization in Texas, and therefore prong three of *Gingles* is not met because the racial polarization is not "legally significant." They are wrong, both on the law and the facts. First, as the Supreme Court has explained, "under the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." *Gingles*, 478 U.S. at 63 (plurality opinion); *see id.* at 100 (O'Connor, J., concurring) (agreeing with plurality that cause other than race may not be offered). Indeed, the Court specifically rejected the argument that "racially polarized voting refers to voting patterns that are in some way *caused by race*, rather than to voting patterns that are merely *correlated with race of the voter* . . . [because] the reasons black and white

49

voters vote differently have no relevance to the central inquiry of § 2." *Id.* (emphases in original).[19]

Second, as Dr. Alford admitted at trial, "it is possible for a person's decision to choose a certain political affiliation or for certain partisan affiliations to be motivated by his or her race" and "it's possible that a person would choose a political party that he believes to endorse policies more favorable to members of his racial group." *Id.* at 1444-45. As the Supreme Court explained in *Gingles*, this is not even the proper analysis for prong three. Nonetheless, the evidence at trial supports the conclusion that in Texas, minorities support Democratic candidates *because* of their race. As Commissioner Brooks testified, issues like Medicaid and Medicare funding, veterans' health services, and urban economic development are important to *minorities* "[b]ecause by and large minorities depend more on governmental supports than the community at-large," and Congressman Veasey supports these measures while Republican members of Congress in DFW do not. *See, e.g.*, 7/13/17 Trial Tr. (Vol. 4) at 1221-22. That support is because of the substantive issues, not the name of the party associated with the candidate espousing the views favorable to minorities. African American and Hispanic voters' support for Democratic candidates is thus attributable to their race, not some partisan concerns untethered to their race. The evidence demonstrates that *Gingles* prong three is satisfied for proposed CD 3in Quesada Demonstration Plan C273.

---

[19] Defendants rely upon the Fifth Circuit's decision in *LULAC v. Clements*, 999 F.2d 831, 849-59 (5th Cir. 1993) (*en banc*) for this proposition. *See* Quesada-2017-73 at 3 (Response to Interrogatory No. 1). The Fifth Circuit's analysis, however, is in direct conflict with the Supreme Court's admonition in *Gingles*, and for that reason has been rejected by the other circuits. *See, e.g.*, *United States v. Charleston Cty, S.C.*, 365 F.3d 341, 348 (4th Cir. 2004) (noting that *LULAC* decision was contrary to *Gingles* and other circuits' holdings). It is notable that Defendants rely upon Fifth Circuit precedent when it is directly *contradicted* by binding Supreme Court precedent, yet refuse to adhere to Fifth Circuit precedent on coalition districts when there is *no* contrary Supreme Court precedent. *See supra* Part I.C.

*Finally*, the evidence shows that under the totality of the circumstances, there is a Section 2 right for a coalition district such as proposed CD 3 in Quesada Demonstration Plan C273. As this Court has already concluded:

> A searching practical evaluation of "past and present reality" and a functional view of the political processes indicates that the political processes are not equally open to Hispanics. Texas's history of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the democratic process is well documented . . . . Similarly, as discussed, the evidence indicates that Latinos bear the effects of past discrimination in areas such as education and employment/income, which hinder their ability to participate effectively in the political process.

Amended Order, ECF No. 1390 at 54. The updated evidence shows the same continues to be true for African American and Hispanic voters. As Dr. Lichtman testified, the evidence shows that with respect to education and employment/income, the gap between Anglos and minorities has actually gotten worse since 2011. *See* 7/12/17 Trial Tr. (Vol. 3) at 942; Quesada-2017-1 (Lichtman Report) at 21 ¶ 34, 56 (Table 8). The history of voting related discrimination has worsened since 2011—two federal courts have found the State to have purposefully discriminated in redistricting—and particularly in the DFW area—and another has concluded that the State purposefully discriminated in enacting a voter ID bill. The *en banc* Fifth Circuit found evidence to support that ruling, and concluded the law had discriminatory effects. *See Veasey*, 830 F.3d at 234-35. And racial appeals in political campaigns have worsened. As Dr. Murray testified, the current president targeted Americans of Mexican descent, including a federal judge, throughout his presidential campaign. *See* 7/13/17 Trial Tr. (Vol. 4) at 1256-57. Defendants' own witness, Elizabeth Alvarez-Bingham, agreed that the president made overt and subtle racial appeals during his campaign about Mexican immigrants and Judge Curiel. ECF No. 1514-2 at 18 (E. Alvarez-Bingham Depo. Tr. at 204-05).

51

Under the totality of the circumstances, there is a Section 2 right for an additional minority opportunity district in DFW, such as proposed CD 3 in Quesada Demonstration Plan C273

\* \* \* \*

The 2013 special session had a singular purpose: to prevent minorities from electing their candidates of choice, and to use this Court's interim Order as pretext to avoid legal liability for doing so. The facts show that the legislature <u>knew</u> this Court's interim Order did not provide the necessary support for Plan C235, that the legislature <u>knew</u> that specific flaws identified by the D.C. Court had not been remedied, that the legislature <u>knew</u> alternative plans proposed by minority legislators illustrated Plan C235's legal flaws, and that the legislature <u>knew</u> binding law required it to consider the creation of coalition districts.  The State's entire case rests on a counterfactual, pretextual litigation position.  This Court should make that crystal clear in its findings of fact so this pretext does not prevail on review.  Texas's attempt to cloak itself in the protection of a presumption of constitutionality, *see* 7/15/17 Trial Tr. (Vol. 6) at 1784, soundly fails in light of the facts of the case.  *See Parham v. Hughes*, 441 U.S. 347, 351 (1979) ("The presumption is not present when a State has enacted legislation whose purpose or effect is to create classes based upon racial criteria . . . .").  The time has come to put to bed this latest unfortunate chapter of purposeful discrimination in Texas.

## CONCLUSION

The Court should find the entirety of Plan C235, and DFW in particular, to be the product of intentional discrimination in violation of the Fourteenth Amendment and Section 2 of the VRA, and that Section 2 requires creation of a third minority opportunity district in DFW.

Dated: July 31, 2017                    Respectfully submitted,

                                        J. GERALD HEBERT (admitted *pro hac vice*)
                                        J. Gerald Hebert P.C.
                                        191 Somervelle Street, #405
                                        Alexandria, VA 22305
                                        703-628-4673
                                        hebert@voterlaw.com

                                        /s/ Mark P. Gaber
                                        MARK P. GABER (admitted *pro hac vice*)
                                        1316 13th St. NW, #1
                                        Washington, DC 20005
                                        (715) 482-4066
                                        mark.gaber@gmail.com

                                        GERALD H GOLDSTEIN (No. 08101000)
                                        Goldstein, Goldstein and Hilley
                                        310 S. St. Mary's Street
                                        San Antonio, TX 78205-4605
                                        210-226-1463/210-226-8367 (facsimile)
                                        ggandh@aol.com

                                        DONALD H. FLANARY, III (No. 24045877)
                                        Flanary Law Firm
                                        1005 South Alamo
                                        San Antonio, TX 78210
                                        210-738-8383/210-738-9426 (facsimile)
                                        donflanary@hotmail.com

                                        JESSICA RING AMUNSON (admitted *pro hac vice*)
                                        Jenner & Block LLP
                                        1099 New York Ave. NW, Ste. 900
                                        Washington, DC 20001
                                        202-639-6000/202-639-6066 (facsimile)
                                        jamunson@jenner.com

                                        JESSE GAINES
                                        P.O. Box 50093
                                        Fort Worth, TX 76105
                                        817-714-9988

                                        *Attorneys for the Quesada Plaintiffs*

                                        53

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2017, I served a copy of the foregoing on counsel of record via the Court's CM/ECF system.

.

*/s/ Mark P. Gaber*
MARK P. GABER