## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

SHANNON PEREZ, *et al.*,

      *Plaintiffs*,

v.

GREG ABBOTT, *et al.*,

      *Defendants*.

CIVIL ACTION NO.
SA-11-CA-360-OLG-JES-XR
[Lead Case]

## APPENDIX: QUESADA PLAINTIFFS ANSWERS TO CERTAIN QUESTIONS [ECF NO. 1494] POSED BY THREE-JUDGE PANEL

The Quesada Plaintiffs address below a number of the questions posed by the Court on July 14, 2017. *See* ECF No. 1494. The Quesada Plaintiffs do not necessarily repeat the answers to all questions adequately addressed in the post-trial brief, but rather select those questions that seem most relevant to their legal claims and for which a specific answer seems most helpful.

1) **In its previous orders, the Court identified certain violations in Plans C185 and H283 in districts that remain unchanged in Plans C235 and H358. With respect to these violations, what open questions are there, if any?**

None. In Plan C235, CDs 27 and 35 contain the exact same population as in Plan C185. *See* Stipulation of Facts No. 1 at 11, ¶¶ 7-8, ECF No. 1442. The Court concluded CD 27 in Plan C185 violated both the intent and results prongs of Section 2, and that CD 35 was a *Shaw* violation. The intent and purpose of the drawing of CDs 27 and 35 is not eliminated merely because they were reenacted by the next legislature unchanged. *See, e.g.*, *United States v. Fordice*, 505 U.S. 717, 733-35 (1992) (legislature may not leave in place policy rooted in discrimination). Moreover, there can be no contention that the Section 2 results violation with respect to CD 27 is altered by the subsequent reenactment.

2)   **Much of the plaintiffs' presentation looks more like the remedial phase than the trial on the 2013 plans. What decisions and rulings does this panel need to make regarding the 2013 plans? If the Court finds discriminatory intent, what judgment should it enter? If it finds no discriminatory intent, what judgment should it enter? What other issues are joined and ready for decision on this phase?**

Plan C235 was enacted with discriminatory intent, as demonstrated in the Quesada Plaintiffs' post-trial brief and the evidence presented at trial. This discrimination exists independently from, and in addition to, the discriminatory intent this Court has already found with respect to Plan C185. *See* Post-Trial Brief Part I. The Court should enter judgment permanently enjoining further use of Plan C235. This is so both statewide, and with respect to DFW districts in particular. Any period for the legislature to enact a new plan should be short in duration (the legislature has already rejected invitations to enact new legislation), and the Court should conduct its own remedial proceedings, *i.e.*, reviewing parties' map submissions or appointing a special master, concurrent with the period of time allotted the legislature to enact a new plan.

In addition, the discriminatory intent this Court found with respect to Plan C185 carries forward, as a matter of law, to those discriminatory aspects that persisted in Plan C235, *e.g.*, the cracking of minority populations in DFW, illustrated in the Quesada Plaintiffs' post-trial brief in Parts I.B and II. Plan C235 should be permanently enjoined on that basis as well.

Finally, as explained in the brief, the results prong of Section 2 requires the formation of an additional minority opportunity district in Dallas County. Although a remedy for the intentional packing and cracking in DFW will achieve the same result, Section 2 provides an additional basis for this result.

3)   **Defendants appear to be asserting that any time a minority opportunity district's minority population is increased (one example was with regard to CD28 in a *Gingles* demonstration map) that this is unlawful "packing." But is there anything inherently wrong with a district having an increased or high minority population if it reflects the**

**demographics of the area, does not have the effect of dilution, and wasn't intentionally racially gerrymandered?**

No. "Packing" is not a legal violation; vote dilution is. Packing and cracking are two ways vote dilution can be achieved. If the intent or the effect of the districting at issue is not vote dilution (*e.g.*, if the high minority population in the district does not prevent the formation of an additional neighboring districts where minorities can elect their candidates of choice, or does not preclude the natural formation of such districts over the course of the decade in light of predicted minority population growth) or race did not predominate in the decision of whom to include within and without the district, then there is nothing inherently wrong in a district having a high minority population.

**7)     Several witnesses relied on the rulings of the DC court, which were vacated. To what extent, if at all, can those findings be considered in determining the intent of the 2013 Legislature?**

S.B. 4, which enacted Plan C235, passed in the senate on June 14, 2013, and in the house on June 21, 2013. It was signed by the governor on June 26, 2013. At all relevant times, the D.C. court's decision denying preclearance, and finding that Plan C185 was the product of intentional discrimination, was in full force and effect—the D.C. court's judgment was not vacated until June 27, 2013. *See Texas v. United States*, 133 S. Ct. 2885 (U.S. June 27, 2013). The subsequent vacatur has no bearing on the legislature's intent at the time S.B. 4 was enacted. Nor would it even if the timeline were different—the vacatur had nothing to do with the D.C. Court's fact findings regarding intentional discrimination.

During closing argument, Judge Smith asked about the burden of proof in the D.C. proceeding, and whether that had an effect on the weight the decision should be afforded in this case. It does not. The D.C. court found that the evidence demonstrated intentional discrimination, not that Texas had merely failed to disprove the presence of discriminatory intent. During closing,

counsel for Defendants contended that the state had appealed the D.C. court's decision, and that

the D.C. court had lacked jurisdiction to find the presence of intentional discrimination. These

arguments are misplaced. First, as discussed above, the D.C. court's decision was in full force and

effect; court decisions under appeal are nonetheless binding. Second, the D.C. court acted within

its jurisdiction in finding the presence of intentional discrimination. The court had jurisdiction to

grant or deny preclearance, and Section 5 specifically requires preclearance be denied where the

legislature acts with a discriminatory purpose. *See* 52 U.S.C. §10304(a)-(c). The fact that Texas's

burden was to show there was *no* discriminatory purpose does not strip the court of jurisdiction to

conclude there *was* discriminatory purpose. If that's what the facts show, then the court can make

that fact finding in exercising its jurisdiction to deny preclearance. In any event, even if Texas

were right, the Supreme Court had not said so when the legislature enacted Plan C235 (nor did it

thereafter). And even if it had, the legislature would still have been aware that a court found the

presence of discriminatory intent, and would be obligated not to act in the same manner again.

**8)** **What does the law say about whether the Legislature's discriminatory intent can be inferred from its adoption of the Court's interim 2013 plans? Some of the plaintiffs' presentation appears to criticize the Legislature for refusing to consider amendments [to] the Court's plan, while other parts of the presentation appear to criticize legislators and staff for even considering changes to the Court's plans. Which is the correct analysis under the law?**

First, the premise of the question does not account for the fact that the interim plan was not

drawn by the Court, but rather the Court accepted a compromise plan, originally Plan C226 (which

had only minor technical corrections and then became Plan C235) that had been negotiated among

defendants and a few plaintiffs (over the objections of, among others, the Quesada Plaintiffs).

Second, the record shows independent discriminatory intent again in 2013, separate and

apart from the 2011 intent, as explained in Part I of the Quesada Plaintiffs' post-trial brief. As a

matter of fact, the legislature did not think it could rely upon this Court's interim order, and thus

4

it is factually incorrect to conclude that the legislature based its adoption of Plan C235 on this Court's interim order.  The Court can and should find independent discriminatory intent in 2013. It should also find, as a matter of law, that Plan C235 is infirm because it retains discriminatory aspects of Plan C185.  *See* Part II of Quesada Plaintiffs' post-trial brief.

Third, application of the *Arlington Heights* factors demonstrates that the legislature acted with intentional discrimination in 2013.

With respect to amendments, the record shows that no substantive amendments were accepted, and in particular no amendments by minority legislators to Plan C235 were accepted. That is circumstantial evidence of discriminatory intent.  That several non-substantive amendments were enacted to the state house plan does not change that.

**9)     How does the intent or statement or action of a legislator or staff relate to the intent of the Legislature as a whole?  Does it depend at all on whether other legislators, and/or the body as a whole, was aware of the individual intent or action?**

See answer to No. 10, below.

**10)    If the Legislature allowed individual members or staff members to draw districts, why shouldn't any discriminatory intent or effect be attributed to the Legislature as a whole?**

It should be.  It is important to understand the unique nature of redistricting legislation. Where legislation deals with a general policy decision—such as zoning regulations and public housing eligibility rules—the whole body may be involved in crafting the legislation or at least may have read the bill text and have formed individualized intent as to the particulars of the legislation.  *Cf. Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (noting that proving discriminatory motivation for large legislative bodies can be difficult).  Redistricting is different than such general policymaking—it involves technical and complex line drawing and decision-making, usually by a small subset of legislators, staff, or consultants.  The legislative text is

reference to a map number, whose backup is a long list of census block numbers. Under such circumstances, the appropriate focus in determining legislative intent is not a diffuse analysis of each legislator or the whole body, but rather an examination of the intent of those who actually drew the lines. That is the approach the Supreme Court has approved. *See Cooper v. Harris*, 137 S. Ct. 1455, 1466 (2017) (noting that two redistricting chairs and a consultant drew the maps, and the "General Assembly adopted the scheme the three men proposed"); *id.* at 1468-69 (examining intent based upon actions of three "mapmakers"); *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015) ("The legislators in charge of creating the redistricting plan believed, and told their technical adviser, that a primary redistricting goal was to maintain existing racial percentages in each majority-minority district, insofar as feasible."); *see* ECF No. 1515-1 at 11 (C. Turner Dep. Tr. at 155:20-156:6) ("[T]he reason the amendment was not adopted is that Chairman Darby did not accept the amendment. You know, as author of the bill, if he says the amendment is acceptable, nine times out of ten, it's going to go on the bill, whether it's redistricting or anything else. If he says it's not acceptable, then it goes to a vote, and on redistricting it ends up being a partisan vote and therefore it doesn't pass.").

Moreover, even if the intent of the legislature as a whole was to achieve partisan goals, if those actually responsible for drawing the lines used race as a tool to achieve partisan ends, that is improper racial discrimination and should be imputed to the legislature as a whole. *See Cooper*, 137 S. Ct. at 1473 n.7 ("[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics."); *North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016) ("It did so by targeting voters who, based on race, were unlikely to vote for the majority party. Even if done for partisan ends, that constituted racial discrimination.").

Finally, under *Arlington Heights*, the Court's task is not necessarily to ascertain whether individual legislators acted with improper intent. Rather, presence *Arlington Heights* factors can satisfactorily demonstrate the presence of discriminatory intent. That is particularly so here, where they work together with direct evidence to do so.

**11)    How are minority priorities (such as, without limitation, immigration, healthcare, education) to be distinguished from priorities of the Democratic Party for purposes of attributing discriminatory intent to the Legislature, and also for purposes of identifying racial cohesion and shared communities of interest?**

First, the question asks about "racial cohesion"—but that is not the proper inquiry. The *Gingles* test focuses on *political* cohesion, and the fact that African American and Hispanics have both chosen the Democratic party supports a finding of political cohesion.

Second, the premise of the question seems to assume that minorities are Democrats because of the name of the political party and not because of the issue positions. That is not so. As the evidence at trial showed, the *reason* minorities prefer Democrats is because Democrats adopt positions on issues important to minorities—positions that in many cases stem directly from their *status* as minorities. For example, the evidence at trial shows that the top policy concerns of minorities stem from the socioeconomic disparities they face as a result of their status as minorities. Commissioner Brooks testified that his minority constituents have priorities such as access to government-funded medical services and urban development funding "[b]ecause by and large minorities depend more on governmental supports than the community at-large." 7/13/17 Trial Tr. (Vol. 4) at 1221-22. That is so, as this Court has recognized, because of a long history of discrimination, which results in reduced income and education that persists to this day. *See* Fact Findings, ECF NO. 1340 at 439-42, ¶¶ 735-39; Quesada-2017-1 (Lichtman Report) at 56, Table 8 (showing worsening income and educational disparities for minorities from 2011-2015).

Minorities therefore do not support access to government-funded healthcare because they are loyal Democrats. They are economically disadvantaged because of centuries of discrimination and need access to affordable healthcare. If the parties switched views on healthcare, minorities would switch parties. Likewise, minorities do not support immigration reform because of the Democratic Party platform—they support it because it intimately affects their and their families' lives. If tomorrow the Democratic Party of Texas announced it favored a border wall and the indiscriminate arrest of undocumented immigrants, and the Republican Party came out opposed to the border wall and against the indiscriminate arrest of undocumented immigrants, minority partisan preference would undoubtedly change. Our history tells us this—African Americans used to support the Republican party prior to the execution of the Southern Strategy.

To conclude otherwise would seriously undermine the VRA and the constitutional protection against discrimination. It cannot be the case that those protections disappeared once the political parties became polarized around issues important to minorities.

**13)    The Court's opinion adopting the interim maps clearly stated that the Court's work product was not complete and additional analysis was necessary. Didn't the Legislature have some duty to ensure that the Plans they voted on complied with the VRA and Constitution?**

Yes, it did, both as a matter of fact and as a matter of law. It had a duty as a matter of fact because this Court told the legislature in its interim order its analysis was not final and because Mr. Archer pointedly explained that fact to the legislature. It had a duty as a matter of law because there were judicial findings of intentional discrimination that were not fixed by Plan C235. Where a prior system is the result of discriminatory purpose, its remaining vestiges must be eliminated through a "deliberative process." *See Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1224-26 (11th Cir. 2005); *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998).

14) **For the Congressional Plan, can the fact that no amendments were accepted from minority members during the 2013 special session be evidence of discrimination if also no amendments were accepted from non-minority Democrats?**

The record reflects that the only amendments to Plan C235 that were rejected were those offered by minority members. During closing argument, the only exception offered by Defendants was an amendment offered by Anglo Democrat Senator Watson, but as counsel for Defendants noted, the legislature never voted on that proposal because it was withdrawn. *See* 7/15/17 Trial Tr. (Vol. 6) at 1792-93. Where the only substantive amendments that were actually rejected were those of minorities, that remains evidence of discriminatory intent. The salience of that fact cannot be eliminated simply because Anglos did not offer amendments that received votes (particularly where the majority party as a rule did not offer any amendments whatsoever to permit a comparison).

15) **Was there evidence that non-minority members requested substantive amendments?**

See answer to No. 14.

17) **To what extent, if at all, is it appropriate for those who draw demonstration maps to use racial shading to make small changes to lines within precincts?**

Examples of appropriate use of racial shading include to demonstrate that *Gingles* prong 1 can be satisfied and to demonstrate that intentional vote dilution through cracking and packing can be remedied.

19) **Is there data in the record (or on the Secretary of State's website) reflecting the actual number of voters in specific primary elections? If the number of voters is very small, how does it meaningfully inform our decision on cohesion of the populations in the district as a whole, and why should we consider it in determining minority cohesion?**

Primary election results for 1992 to present are available on the Secretary of State's Website. *See* http://elections.sos.state.tx.us/index.htm. Primary elections are of limited value in determining whether Section 2 coalition districts must be formed because 1) the proper test is of

"political cohesion," which is better informed by the choice of party primary, rather than the choice of candidates within that primary, and 2) turnout is exceedingly low in primaries. As discussed in the Quesada Plaintiffs' post-trial brief, *see* pp. 46-68, the evidence shows that general election results are far more important for ascertaining political cohesion, even when primary election results are included in the analysis.

Primary election results are useful for ascertaining the performance of a district in determining the extent to which legitimate state legislative choices must be respected when imposing a remedial map. For example, the evidence, including primary turnout and results, demonstrates that CD 33 is a performing African American opportunity district; African Americans are able to nominate their preferred candidate, Marc Veasey, and together with Hispanic voters, cohesively elect him in general elections. *See, e.g.*, 7/12/17 Trial Tr. (Vol. 3) at 957-59 (testimony of Dr. Lichtman). The legislature's choice to have an African American performing district in Tarrant County was legitimate and should be respected in the event a remedial map is drawn, with necessary changes in order to remedy the intentional vote dilutive cracking in areas around current CD-33—changes that naturally (or by virtue of the Section 2 results test) lead to the formation of an additional minority opportunity district in Dallas County. *See White v. Weiser*, 412 US. 783, 795-96 (1973).

**28)    If CD33 is currently performing as a minority opportunity district, why would the Court make any changes to that district?**

CD 33 is performing as an African American opportunity district. 7/12/17 Trial Tr. (Vol. 3) at 957-59 (testimony of Dr. Lichtman); Quesada-2017-1 (Lichtman Report) at 10-11. The legislature's choice to place an African American opportunity district in Tarrant County, represented by a member of Congress from Tarrant County, was legitimate. The problem is not with CD 33 in a vacuum, but rather the fact that substantial minority population outside CD 33

(and CD 30) remained fractured and stranded in Anglo-dominated districts. The Quesada Plaintiffs' Demonstrative Plan C273 proves that this retained cracking—which was done intentionally—is vote dilutive; an additional minority opportunity district can be formed by remedying this cracking. *See* JX 101.1; 7/12/17 Trial Tr. (Vol. 3) at 954-55 (Lichtman testimony), Therefore, changes in DFW must be made to correct this constitutional and VRA violation. But those changes can properly be made in a way that respects the legislature's legitimate decisions to have African American opportunity districts in Tarrant County (CD 33) and Dallas County (CD 30). *See White*, 412 U.S. at 795-96.

**29)**  **Assuming the Court finds packing in CD30, how should the Court take account of and respect the Section 2 rights of those who are removed, assuming they are moved into a district in which they cannot elect the candidate of their choice?**

It is important to understand that the legal violation is vote dilution; packing is the way that improper result is achieved. Vote dilution occurs where packing (or cracking) causes a reduction in the number of minority opportunity districts—*i.e.*, in the absence of the packing (or cracking), an *additional* minority opportunity district could be formed—or where it prevents such a district from forming over the course of the subsequent decade in light of predicted minority population growth.

The packing in CD 30, and the cracking in the areas surrounding CD 30 and CD 33, prevent a third minority opportunity district from forming in Dallas County. *See, e.g.*, JX 101.1 (CD 3 in Quesada Demonstrative Plan C273). Therefore, in order to redress the actual legal violation (the vote dilutive prevention of another minority opportunity district being formed), voters who are moved out of CD 30 to unpack it must generally be moved into a new minority opportunity district. This is the only way to redress the legal violation. Importantly, CD 30 cannot be unpacked by generally moving minority voters into a neighboring Anglo-dominated district. To do so would

be to *multiply* the improper vote dilution by cracking those voters and continuing to prevent the formation of an additional minority opportunity district.  Vote dilution exists—and must be remedied—where the cracking and packing reduces the number of minority opportunity districts.

Defendants appeared to contend at trial that it would be improper to move African American voters from CD 30 into CD 3 in Quesada Demonstrative Plan C273—presumably based upon their supposition that those voters had chosen Congresswoman Eddie Bernice Johnson in CD 30 based upon her race, and the data shows a Hispanic candidate is likely to prevail in proposed CD 3.  *See, e.g.*, 7/12/17 Trial Tr. (Vol. 3) at 979-80.  This argument is misplaced.  Defendants are wrong to suggest the individual voters must be polled to determine whether they would prefer to be placed in districts likely to elect African American or Hispanic candidates.  *See id.* at 980 (Q: "And you haven't talked to any of those African American voters to see how they would feel about moving into a Hispanic opportunity district?"  A: "No.").  As this Court explains in Question No. 34, "Section 2 precedent seems to make clear that a minority candidate of choice doesn't need to be of the same race or ethnicity as the voters that elected him or her."  And the evidence shows that Hispanics and African Americans are politically cohesive in Texas, and in DFW in particular.

The Constitution and the VRA require that changes be made to CDs 30 and 33, to the extent necessary, to remedy the improper vote dilution in DFW.  That can and should be done while respecting the legislature's generally legitimate choice to have African American performing districts (CDs 30 and 33).

**\*For Question Nos. 33-35, please see post-trial brief at Part IV, and response to Question No. 19 above.**

**38)    How, if at all, do we account for the distribution of populations across the entire state in evaluating proportionality?  For that matter, is it even appropriate or required for the Court to consider proportionality for the limited purposes of this trial on the 2013 plans?**

Proportionality is relevant to intent, and that relevance is not lessened because this trial is about the 2013 plans.  One might view it as less important, given that intentional discrimination is easily established here through other evidence—for example, the legislature declined to correct specific violations identified as purposefully discriminatory by the D.C. Court.  But it is nonetheless relevant, as it always is in these cases.

In theory, the distribution of minority population across the State—if in fact that population were uniquely dispersed—might lessen the importance of proportionality as a consideration.  But as the Quesada Demonstration Plan C273 demonstrates, a plan with far less disparity can be drawn, which shows that geographic distribution does not explain the disparity in Plan C235.  *See* 7/12/17 Trial Tr. (Vol. 3) at 933 (Lichtman testimony) ("[I]f you find . . . a substantial gap between the seats based on proportionality and the actual number of seats in which various groups have the opportunity or ability to elect candidates of their choice.  That's a pretty loud alarm bell, and that's particularly the case when, in fact, there are reasonable means that were not taken or even considered to remedy the disproportion and expand opportunities for minority voters in the state.").

**42)  What caselaw informs whether the 2017 findings on intent for the 2011 plans can be used, in whole or in part, to find intent for the 2013 plans?**

This question is addressed, and the caselaw cited, in Part II of the post-trial brief.  But the legislature's improper intent in 2013 is not merely an issue of carry-over from 2011—as Part I demonstrates, there was independent purposeful discrimination in 2013.  But together, it is clear that these violations must be remedied.