# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SHANNON PEREZ, *et al.*, | ) | |
| | ) | CIVIL ACTION NO. |
| *Plaintiffs*, | ) | SA-11-CA-360-OLG-JES-XR |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## THE AFRICAN-AMERICAN CONGRESSPERSONS
## PLAINTIFF-INTERVENORS' POST-TRIAL BRIEF

TO THE HONORABLE JUDGES OF SAID COURT:

## BACKGROUND:

The African-American Congressional Intervenors consists of Congresswoman Eddie Bernice Johnson of Dallas, Congresswoman Sheila Jackson Lee of Houston and Congressman Alexander Green of Houston. The Legislature made changes in the 2013 map that included changes to the districts of all three Congresspersons. The Congresspersons are not challenging the current configuration or composition of Congressional Districts 9 and 18 in this litigation, though they support efforts to achieve additional minority representation in the Houston area that does not require changes to Congressional Districts 9 and 18. It

is their position, however, that there is overall underrepresentation of minorities in the current Congressional Plan, the Dallas Fort Worth Configuration is resulting from intentional discrimination and dilutes minority voting strength, and that CD30 is still packed and cracked and was constituted in a manner to dilute minority voting strength. The African-American Congresspersons support the new Congressional Map tendered by the Texas NAACP for the Dallas/Fort Worth Metroplex.

Congresspersons are adopting Texas NAACP's arguments on the Congressional Plan. The appendix to the brief will attempt to respond to some of the questions tendered by the Court and the brief will focus on the issues of discriminatory intent and coalition districts. See Appendix A.

## DISCRIMINATORY INTENT:

It is important to note that the "rubric for making a determination of a discriminatory purpose is the same" under Section 2 of the Voting Rights Act ("VRA") and the Fourteenth and Fifteenth Amendments. *Veasey v. Perry*, 71 F. Supp. 3d 627, at 698-99, n. 525 (citing *Village of Arlington Heights v. Metro. Housing. Dev. Corp*., 429 U.S. 252, 265-68 (1977) (constitutional test) and *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (Section 2 test; quoting *Arlington Heights*) (S.D. Tex. 2014). Once a court determines that a state actor has engaged in purposeful discrimination, the "racial discrimination [must] be eliminated root and branch." *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 437-39 (1968).

It is not necessary to prove that discrimination is the sole motivating factor for the action by the legislature, only that it is one of them. *Arlington Heights*, *supra* at 265-266. The types of evidence that might be relevant to such a consideration is broad as what courts must do is engage in a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available. Id. at 266. Whether the impact has a greater burden on one group than another is one potential starting point. Id. It is important to note that sometimes there is a clear pattern that can be explained on grounds other than race. *Arlington Heights*, supra at 266 citing several cases including *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). Congressional Intervenor and NAACP Expert, Dr. Richard Murray, in his supplementary report found in NAACP/Congressional Intervenors Exhibit 14 has provided relevant context to the question of whether there is a greater burden placed on minority voters:

> The underrepresentation remains the case today. Twenty-four of the 36 Texas congressional districts were dominated by Anglo non-Hispanic white) voters in the 2012, 2014 and 2016 General Elections. The candidates supported by these voters have not been the preferred choice of African-American or Latino voters in these districts. One district, the 23rd, is competitive, but the candidate of choice of minority voters (almost all of whom are Hispanic) lost in two of the last three elections to the Anglo electorate's candidate of choice. That leaves just 11 of the 36 Texas districts where protected minority votes have an effective opportunity to elect candidates of their choice to represent them in Washington, D.C. despite the fact that African-Americans and Latinos are now more than one-half of the state's population."

Dr. Murray notes that according to the 2015 ACS survey, Texas has 26,538,614 persons, with 10,196,367 being Hispanic and 3,070,121 being African-American. There are 11,635,757 Anglos who are not Hispanic. This means that African-Americans and Latinos are more than half of the total population and that the population of Asians, other minorities, African-Americans and Latinos is approximately 15 million out of the total population. This is nearly 60 percent of the State's population, but Anglos dominate two of three Congressional districts and have won the last two elections in another. It would appear that there is a qualifier that applies to voters that can be used here. The Anglo qualifier would be greater than one because instead of a little over 40 percent of the Congressional Districts they control the vast majority of them, while minorities, by contrast are able to control or elect their candidate of choice in 11 of 36, which is around 30 percent so the qualifier there would be less than one of course (I do not mean to indicate that there are 11 ability to elect districts but there are 11 where the minority candidate of choice prevails). Clearly, there is much value attached to the Anglo vote in this plan in contrast to the value attached to other votes.

However, it is not just the actual burden placed on minority voters that is relevant to this discussion. The Legislature adopted this map around the 20th of June of 2013. It was not until June 27, 2013 that the Supreme Court handed down *Shelby County v. Holder*. *Shelby County v. Holder*, 133 S.Ct. 2612 (2013). A bi-partisan

three-Judge panel handed down a sweeping opinion involving the 2011 plan in 2012. *Texas v. United States*, 887 F.Supp.2d 133 (D.C. 2012). And in a manner somewhat supportive of the analysis done by Dr. Murray, the 3 Judge Court said that "in the section 2 context, the Court has looked to the relationship between a minority group's share of the VCAP statewide and the number of opportunity districts to help determine whether new opportunity districts must be created." *Texas*, supra at 157. The Panel noted that Latinos were underrepresented in the 2011 map by at least two districts. The court noted further in regards to the 2010 census numbers:

> "The Black and Hispanic communities currently make up 39.3% of Texas's CVAP, Joint Stipulation of Fact Paragraph 38. Thus, if districts were allocated proportionally, there would be 13 minority districts out of the 32 in the benchmark (39.3 percent of 32 is 12.6). Yet minorities have only 10 seats in the benchmark, so the representation gap is three districts. In the enacted plan, proportional representation would yield 14 ability districts (39.3% of 36 is 14.1), but there are still only 10 ability districts. Thus the representation gap in the enacted plan is four districts."

*Texas* supra at 158. C235 only provided one additional minority ability to elect district and that is CD33 in Dallas.[1] What this means is that Section 2 under-representation continues in the new map as it did at the time of the opinion in *Texas v. U.S.*, supra. Of course the Citizen Voting Age population has increased. Dr.

---

[1] Based on the information from Dr. Fairfax's report and population projections and the report of Dr. Murray in regards to the different ways that Latinos are becoming Citizens in a more rapid way, it appears that this 39.3 percent is quite low and that the 14.1 seats should be closer to 15 seats at least.

Murray elaborates further on this disparity in his trial testimony.  (Tr. p. 1241 l. 25 to p. 1242 l. 17).

In *Texas v. U.S*., the Panel indicated that there are 5 traditional areas for inquiry in determining whether racially discriminatory intent is present:   (1) discriminatory impact; (2) historical background, (3) sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) contemporaneous viewpoints expressed by the decision-makers. *Texas*, *supra* at 159.  In this case, we have already analyzed the impact and it is clear that African-Americans and Latinos are seriously underrepresented in C235.  In regards to the historical background, it is obvious that the Legislature was aware of the D.C. Court opinion, the 5th Circuit opinion on coalition districts and the concerns expressed by minority Legislators among other matters.  Notably, Dr. Richard Murray testified that the passage of the 2013 plan suggests intentional discrimination because "the legislation continued much of the 2011 plan."  (Tr. p. 1277 l. 25 to p. 1278 l. 16).

House Redistricting Committee Chairman Drew Darby testified in the trial. He testified that he voted on the 2011 map when he was not Chairman without looking at the map.  (Tr. p. 1596 ll. 21-24).  He noted that substantive amendments were not permitted.  (Transcript 7/14/17, p. 1529 l. 21 to p. 1531 l. 19).  Darby there indicates that coalition districts are not required and that the county line rule

prevented them from agreeing to changes like those proposed by minority legislators Yvonne Davis and Trey Martinez-Fischer.  In a most unusual action, the Legislature takes the position that this Court had ruled that the "interim maps remedy any violation of the Voting Rights Act or U.S. Constitutions."  (Tr. P. 1558 lines 1-21. Chairman Darby further admitted that such findings are normally done by the Legislature.  (Tr. p. 1558 ll. 18-24).  Darby acknowledges starting out the Austin hearing with a statement that the court ordered plan was legally sufficient.  (Tr. p. 1563 l. 20 to p. 1564 l. 3).  Chairman Darby acknowledges that Legislative Counsel Chief Jeff Archer spoke to them and indicated that the Court decisions were not actually final.  (Tr. p. 1570 l. 11 to p. 1571 l. 12).  Archer even noted that the plan tendered by Yvonne Davis showed some potential vulnerabilities in the Interim Map. (Tr. p. 1575 ll. 1-7).  None of these proposed changes by Rep. Davis were accepted. (Tr. p. 1575 ll. 18-22).  Chairman Darby took the position during floor debates that coalition districts were not legally required.  (Tr. p. 1576 ll. 5-7).  Chairman Darby a lawyer, then testifies that he was not aware that in the absence of a Supreme Court decision on an issue, Texas was governed by 5th Circuit precedent.  (Tr. p. 1577 ll. 6-14).  The Chairman acknowledged that all of the amendments that Representatives sought to introduce regarding the Congressional plan were made by or in behalf of minority members of the Legislature.  (Tr. p. 1594 ll. 3-10).  He also acknowledged receiving a letter from the NAACP in this process.  (Tr. p. 1595 ll. 9-14.  Chairman

Darby acknowledges talking about the letter on the floor of the House. Id. He noted that one item in the letter was a complaint that CD30 in Dallas was still packed. (Tr. p. 1595 ll. 15-29). He also acknowledges that there was a problem in C235 with racial gerrymandering in the Dallas and Fort Worth Metroplex. (Tr. p. 1595 ll. 15-29). When asked whether he recalled that a copy of the DC opinion was attached he indicated that he did not recall that but would take counsel's word for it. (Tr. p. 1595 l. 24 to p. 1596 l. 2).

Darby also acknowledged that before a bill is voted on in the Senate two-thirds of the Senators must agree for it to be moved to the floor. However, the traditional two-thirds rule was made inapplicable for the Special session. (Tr. p. 1563 ll. 7-19). In the 2013 House Journal Supplement of Thursday, June 20, 2013 Speaker Darby makes note of the irregularity of the proceeding when he says that the special session redistricting process as "telescoped-down."

The State hired outside counsel for Chairman Darby but not other members of the Committee. (Tr. P. 1566 ll. 17-19). Previously, Darby had indicated counsel would be hired for the entire Committee. (Tr. p. 1567 ll. 1-3). He also acknowledged that the Vice-Chair of the Committee, Rep. Yvonne Davis, had sought counsel as well and he directed her to the Office of the Attorney General. (Tr. p. 1594 ll. 11-17).

Senator Royce West testified in deposition that there has been a history of the Legislature not hearing minority voices in the redistricting process. (West deposition p. 21 l. 11 to p. 23 l. 5 [ECF 1471-4]). His opinion resulted from his involvement in the process. (West deposition p. 35 ll. 11-14 [ECF 1471-4]). According to Senator West the scope of the call itself was part of the discrimination because it did not permit any amendments. (West deposition p. 43 ll. 7-10 [ECF 1471-4]). Any amendments outside of the call would be out of order. (West deposition p. 43 ll. 17-23 [ECF 1471-4]). The very scope of the call prevented them from properly engaging in an analysis of whether there were violations of the Constitution or the Voting Rights Act. (West deposition p. 45 ll. 4-13 [ECF 1471-4]). West said there should have been input into what the map looked like that was submitted to the committee. (West deposition p. 47 ll. 2-7 [ECF 1471-4]). Senator West complained that C235 did not provide proper minority representation in Dallas or the Metroplex and it provided power to the suburbs instead of the urban areas because the districts went out from Dallas County like fingers. (West deposition p. 47 l. 22 to p. 49 l. 15 [ECF 1471-4]). Senator West said not including minorities in the process is evidence of intentional discrimination in the drawing of the map as well as Texas history in regards to minorities and discrimination against them. (West deposition p. 54 l. 18 to p. 55 l0 14 [ECF 1471-4]). West also indicates that disparate impact against minorities is another matter to be considered. (West deposition p. 60

l. 12 to p. 61 l. 10 [ECF 1471-4]).  West indicated that he personally felt that he was

excluded from the redistricting process in 2013.  (West deposition p. 69 l. 10 to p.

70 l. 17 [ECF 1471-4]).  Senator West did submit a proposed amendment to the 2013

redistricting bill.  Id.  He says that other members of the Senate also felt excluded

from the process.  Id.  West says the 2013 redistricting process was not open to

minority legislators.  (West deposition p, 72 ll. 14-21 [ECF 1471-4])(Dr. Murray

testified that this is an important indicator in assessing whether there was intentional

discrimination, Tr. p. 1287 ll. 2-9).  State Representative Toni Rose, a Member of

the Texas Legislative Black Caucus, testified that minority members were not able

to have any meaningful input into the development of the Congressional Plan in

2013 and that in her opinion she believes the failure to provide them input into the

plan indicates discrimination.  She said that it was apparent from the public hearings

but nothing was done about this.  (Tr. p. 1318 l. 20 to p. 1320 l. 6).  When pressed,

Senator West acknowledges that the Governor, Lieutenant Governor, Speaker and

the Committee Chairmen were aggressive opponents of Voting Rights.  (Tr. p. 78 l.

20 to p. 79 line 18).  In fact, Senator West says that the 2013 Congressional plan was

enacted to discriminate against minorities on the basis of their race.  (West

deposition p. 81 ll. 21-24 [ECF 1471-4]).  Senator West makes it clear that the

discriminators in passing this map included the Texas Legislators who passed the

map.  (Tr. p. 83 ll. 2-10).  West noted that every amendment attempted by an ethnic

minority was either tabled or defeated.  (Tr. p. 84 ll. 14-25).  Senator West indicated that he was aware that the court's opinion on the interim map did not prevent the Legislature from conducting a further analysis.  (West deposition p. 130 l. 22 to p. 131 l. 12 [ECF 1471-4]).  West indicates that stranded populations are one concern he has regarding the redistricting maps.  (West deposition p. 132 l. 10 to p. 33 l. 18 [ECF 1471-4]).  In regards to packing under C235, Senator West offers the opinion that CD30 is still packed.  (West deposition p. 134 ll. 3-6 [ECF 1471-4]).  Senator West complained that in an already working district they placed additional population within it.  (West deposition p. 134 l. 7 to p. 136 l. 1 [ECF 1471-4]).  West voted against C235.  (West deposition p. 139 ll. 13-15 [ECF 1471-4]).

Dr. Vernon Burton provided a thorough analysis of the Senate Factors.  In fact, Dr. Murray noted that the thoroughness in his report found in Exhibit 14.  Dr. Burton's Report, NAACP/Congressional-Intervenor Exhibit 23, indicates that minorities have sued the State of Texas successfully in regards to redistricting in every decennial census redistricting effort since 1970.  Dr. Burton notes the cases in footnote 51 of his most recent report.  (See Tr. p. 881 l. 4, and 887 ll. 13-23).  After doing a report for the 2011 trial, Dr. Burton focused on whether the State's discrimination had continued since that time and he concluded that it had.  (Tr. p. 872 l. 24 to p. 873 l. 6).  Dr. Burton went back over a century and indicated that in each major voting rights change that was made by the Texas Legislature they

claimed that it was to combat voter fraud the same as the Legislature did as recently as 2011 when it passed the most recent Voter Identification bill. (Tr. p. 874 l. 5 to p. 875 l. 18). Dr. Burton noted that the Legislature adopted the 2013 plans without considering the opinion in *Texas v. U.S.*. Dr. Burton says there are open discriminatory practices in Texas and discrimination is a continuing problem in Texas. (Tr. p. 883 l. 19 to p. 884 l. 3). Dr. Burton noted that socio-economic disparities are increasing instead of decreasing in Texas. (Tr. p. 885 l. 17 to p. 886 l. 19). Socio economic disparities make it more difficult for minorities to vote than Anglos. (Tr. p. 884 l. 14). Dr. Burton's report addressed discrimination against African-Americans and Latinos in areas of public life including education, employment, housing, and transportation. Importantly, health and education are two of the areas also cited by Senator West. Dr. Burton noted that with the educational deficiencies suffered by minorities that this would inhibit their political participation. (Burton Report p. 37). Further, Dr. Burton indicated that the educational disparities suffered by African-Americans and Latinos interact directly with the requirements of the voter identification law. (Burton Report p. 39).

Dr. Burton's summary included the following opinion:

> Section 2 of the Voting Rights Act requires that plaintiffs prove that minority voters do not have an equal opportunity to participate in the electoral process and elect candidates of their choice. To show the lack of opportunity, they need to investigate 'a totality of circumstances,' that is an examination of the evidence of discrimination. This report has looked very specifically at the

Senate Factors used to define whether or not citizens have an equal opportunity. A survey of the history of racial discrimination in regard to voting, education, and public accommodations in Texas shows that politics in Texas have been shaped by racial considerations in the years before 1965 and has consistently continued to be substantially affected by racial considerations during the decades since through to this decade. The State's continued efforts to institute discriminatory voter identification laws and racially discriminatory redistricting must also be considered in determining the intention of the Texas Legislature in adopting the Congressional and House Redistricting Maps in 2013, C235 and H358."

(Burton report p. 55). Dr. Burton then concludes:

The voter laws passed in 2011 and 2013 are no different as the white majority in Texas were reacting to multiple events that it viewed as an extreme crises, to include: the transition of Texas to a majority-minority state, the high voter registration and turnout, and the election of the first African-American President."

Burton report pp. 55-56.

Dr. Murray sums it all up most accurately, in a manner that can best explain

the testimony and actions of Chairman Darby when he says that:

"The state has taken a minimalist position with regard to addressing serious problems identified by this court with respect to the congressional and state house redistricting map enacted in 2011 and largely preserved by C235. The state's strategy is to run out the clock, keeping the flawed interim map in place until after a new census in 2020. This stalling tactic, which leaves African American and Latino populations seriously underrepresented in Austin and Washington is, in my opinion, further evidence of procedures that enhance the opportunity for discrimination."

Dr. Murray investigated the Senate Factor in regards to voting procedures that

enhance the opportunity for discrimination. In that regard, he included the Voter

Identification Law and the elimination of straight ticket voting, (Tr. p. 1252 l. 11

to p. 1253 l. 20).  Dr. Murray also noted that there was a recent incident of voter intimidation in Harris County when County Clerk Stan Stanart warned voters about consequences if they used the alternative method of voting as a result of the voter identification litigation.  (Tr. p. 1281 l. 2 to p. 1282 l. 7).

## COALITION DISTRICTS:

It is important to note that hostility against minorities in Texas is not limited to one group as it exists against African-Americans and Latinos.  Senator Royce West testified in his deposition that African-Americans and Latinos in Dallas/Fort Worth have common interests.  (West deposition p. 113 ll. 17-20 [ECF 1471-4]).  Among those common interests in employment, immigration, politics and economic issues.  (West deposition p. 113 ll. 21-25 [ECF 1471-4]).  He further indicated that the common interests include educational opportunities, affordable healthcare, and community.  He said that Latinos and African-Americans tend to vote for the same candidates in the Metroplex.  (West deposition p. 114 l. 22 to p. 115 l. 9 [ECF 1471-4]).  Expert George Korbel noted that African-Americans and Latinos live in the same neighborhoods.  (Tr. p. 825 ll. 17-23).

Dr. Murray noted that polarized voting is alive and well in Texas.  Dr. Burton notes that "race is a central feature of politics in Texas."  (Burton Report p. 40).  Dr. Burton notes that the realignment of African-Americans and Latinos to the Democratic Party was "based on an old issue.  Southern whites, even today, continue

to be antagonistic towards policies designed to promote the political, economic, and social progress of minorities." (Burton report p. 41). He notes that race is always an issue in Texas campaigns and that this has been true from the beginning. Burton notes that this is a direct result of the Southern Strategy employed nationwide. (Note that Dr. Murray indicated the same in his 2011 report). In this plan, "Negro-Democratic mutual identification" was important for the building of a white Republican Party in the South." (Burton report p. 42). One of the Senate Factors involving racial appeals has importance here. Instead of overt political appeals, the appeals made in concert with this Southern Strategy became implicit or subtle. (Burton report pp. 42-43). Appeals were made like forced busing, states rights, etc. (Burton report p. 44). Welfare queen, lazy, criminal, taking advantage, corruption, fraud, etc. became the new terms. Importantly the Congressional Intervenors and the NAACP introduced exhibits in the 2011 round that had such appeals such as the ones that had State Representative Chris Turner shaded with an added gap in his teeth, the references to welfare, expensive cars and even one showing the Rep. in bed with the President. The flags of Mexico and China were on some of the exhibits. Dr. Burton notes others such as a mailer with pictures of President Obama and minority representatives including Congresswoman Sheila Jackson Lee and Mario Gallegos and it said "Birds of a Feather Flock Together". Dr. Burton noted a City Council race with a Latino opponent where a flier from the opponent's campaign

suggested if you vote for his Hispanic opponent the community will become more like Mexico. Even the 2014 Republican Party Platform in Texas included such appeals as it demanded the restoration of Confederate plaques to the Texas Supreme Court Building and it opposed tuition for undocumented immigrants brought to the United States as children. Burton notes that even campaigns of statewide officials had such implicit racial appeals in 2014. (Burton Report p. 46). Burton notes that such implicit appeals were prominent throughout the debates regarding Texas new voter Identification Law passed in 2011. Texas then Lieutenant Governor, according to Burton, linked the need for such a bill to his stance in support of tough immigration laws. (Burton report p. 48). When Representative Riddle, one of the staunch supporters of SB14, was asked about any instances of such voter fraud she was aware of she noted that she once saw a Spanish-speaking Latina woman receive help with voting." This is incredulous. He even noted the King Street Patriots and their use of a sign with the picture of a Black Man with a sign complaining that he was only able to vote once. Burton noted that in 2013 a Dallas Tea Party leader, Ken Emmanuelson, stated, "the Republican Party does not want black people to vote if they are going to vote 9 to 1 for Democrats."

Dr. Murray noted that the tone of the 2016 Presidential campaign is similarly instructive. Equating immigrants from Mexico to rapists and drug smugglers the then candidate and now President Trump used language that "no presidential

candidate since George C Wallace had used." Murray described those opening statements by Candidate Trump as shocking. (Tr. p. 1256 ll. 1-16). Murray indicates that white racial resentment is one of the reasons for President Trump's success according to ANES survey data and Alan I. Abramowitz. (Murray Report p, 7). He notes that there is a wide gap between white Republicans and white Democrats in terms of racial resentment. According to the data, Candidate Trump used racist appeals against African-Americans and Latinos. However, despite those racist appeals Candidate Trump received 75 percent of the white vote in Texas. (Murray report p. 9). Murray testified that Trump won the well-educated white and affluent neighborhoods but by less margins that Republicans normally get, but "once you got out of those upscale, well-educated white neighborhoods, mostly in inner cities, Trump got record support from white voters. In counties like Orange County, Texas, he got more votes than any Republican for President, and in most rural, smaller town, counties of our state. So the electorate became terrifically polarized with outer suburban, smaller city, rural whites voting overwhelmingly for Trump." (Tr. p. 1257 l. 2 to p. 1258 l. 6). However, Latinos voted in record numbers with record shares of their vote for Trump's opponent Hillary Clinton. Murray conducted an inquiry to determine if the national trends for Latino voters were present in Texas and he found that they were. He found sharp increases in voting in El Paso and Hidalgo Counties. Murray conducted a homogenous precinct analysis of predominately Latino

precincts in Harris County and see if the movement away from Republicans was illustrated and he determined that it was and that it confirmed the other studies on the issue regarding Latino movement away from the Republican Party. The votes for Republicans in those precincts went from an average of 35.4 in 2008, to 29.3 in 2012, down to 21.5 in 2016. According to Murray, 81 percent of Latinos believed candidate Trump's appeals were racist. (Tr. p. 1254 l. 13 to p. 1255 l. 9). Murray also found this to be true in regards to Asian voters. He noted that effective coalition districts like House District 137 and House District 149 could be now created.

Dr. Murray has detailed the fact that there has been increasing cohesion between African-American voters since 2004, but the continued increase in cohesion actually accelerated in 2016. (Tr. p. 1245 l. 221 to p. 1246 l. 15. Murray noted that the trend has lasted since 2004 but may have actually started beforehand. Murray indicated that this last election suggests a potential for a Goldwater effect in regards to many of the few Latino voters who voted Republican moving away from the Republicans like the effect the Goldwater campaign had on African-American voters moving away from them. (Tr. p. 1259 l. 7 to p. 1260 l. 4).

Former Fort Worth City Councilperson Frank Moss testified that he works with Community Frontline with Latinos and Anglos to address issues of importance in the community. (Tr. p. 1294 l. 18 to p. 1295 l. 8). In 2014, African-Americans supported the Latino community to ensure that a Latino was elected to District 2 of

the Fort Worth City Council. (Tr. p. 1297 ll. 1-13). This is a district that is predominately Black (and Black and Hispanic) inside the loop and predominately white outside the loop. (Tr. p. 1297 to p. 1298 l. 3). African-Americans traditionally support the Latino candidate in that district. (Tr. p. 1298 ll. 4-6).

Representative Toni Rose from Dallas testified that her dad, a former Justice of the Peace, got involved in politics as a result of Pancho Medrano. (Tr. p. 1308 l. 24 to p. 1309 l. 11). She said her family has worked closely with the Latino community for many years. (Tr. p. 1309 ll. 12-23). And she has worked with the Latino community since she graduated from college via the NAACP and League of Women Voters. (Id). Police shootings have been an area of common interest. (Tr. p. 1309 l. 24 to p. 1310 l. 10). Such as the Latino community members who supported the African-Community in reference to the shooting of Jordan Edwards, the African-American had done so in the past including instances such as the shooting death of Santos Rodriquez a 12 year old Latino. (Tr. p. 1310 ll. 11-18). She has an Advisory Council for her State Representative position and Latinos and African-Americans are on it. (Tr. p. 1310 l. 19 to p. 1311 l. 5). Representative Rose that interaction with this group and her work experience have led her to understand that similar issues face the two communities and meld them together. (Tr. p. 1311 ll. 6-16). She points out poverty, racial profiling, and immigration as issues of common concern. (Id). She also indicated that there is indeed a countywide coalition

between African-American and Latino voters. According to Representative Rose, there are many Latinos and African-Americans elected countywide and neither could be elected without the other. (Tr. p. 1311 l.17 to p. 1312 l. 3). She noted that some of these candidates had contested primaries. (Tr. p. 1321 ll. 7-17). Exhibit 46 of the African-American Congresspersons and the NAACP shows too that there were many positions in the Democratic Primary where Latinos were not contested by African-Americans, including Representative Ancia who has a district similar to CD33. Dr. Alford suggested without any real analysis that the coalition districts proposed by the different Plaintiff groups would end up in this huge number of African-American seats. It is curious why he reached such a conclusion. Back in 2011 Dr. Alford testified that African-Americans needed 40 percent of the Voting Age population to elect their candidate of choice. (2011 Transcript p. 1847 ll. 11-22). On cross examination he conceded it may be as low as 35 percent but he would not concede 30 percent. (2011 Transcript page 1953 ll. 2-17). Of course, he is now telling this court that something approximating 30 percent would present an African-American opportunity district. Such an extreme opinion should have no weight with this court.

Representative Rose indicated that the NAACP Map, C284, is a good map and does a great job of combining important communities of interest. Of particular note to Representative Rose was the fact the minority State House Districts in Dallas

would be in Congressional Districts that are held by minority Congresspersons. (p. 1312 l. 7 to p. 1312 l. 21). She talked about the sensitivity to the issues impacting the community that some of the Congresspersons do not have and she gave immigration as a specific example of an issue a constituent had where the Congressperson was not responsive. Representative Rose also noted that it puts Balch Springs back in Congressional District 30 where it will join with Pleasant Grove. (Tr. p. 1313 l. 22 to p. 1314 l. 13). Representative Rose said those communities have the same parks, recreations center and other services. (Id.). She noted that the scores of a Latino Congressperson from Texas with a 90 on the NAACP Report Card evidenced the support of Latinos for issues of concern to African-Americans. (Tr. p. 1315 ll. 11-20). Representative Rose noted how the African-American community rose up against SB4 and supported the Latino community in regards to their concerns with this Legislation. (Tr. p. 1315 l. 21 to p. 1316 l. 4). Rose even commented on some of the white communities that were removed from CD30 so that it could be further packed, indicating that these communities being put back in CD30 was a good thing as there were issues of common interest. (Tr. p. 1316 ll. 5-20).

NAACP/Congressional Intervenor Expert Dr. Tony Fairfax indicated that the HCVAP for Latinos in the new CD24 coalition district would be 41.70 percent compared to 19.55 percent BCVAP. The HCVAP was about 39, 80 in 2013 and is

projected to be 43.66 in 2017.  The BCVAP started at 19.40 in 2013 in his Table 5.8 and ends at 19.69.  This means of course that the HCVAP is growing much faster than the BCVAP, as the BCVAP would only have increased in 2017 by only .29 since 2013 while the HCVAP would have increased 3.86 percent.  The increase in African-American CVAP would be approximately 5600 voters in this time period while the Latino increase in HCVAP would be nearly 24,000. NAACP/Congressional Intervenor Expert Edward E. Chervenak, found in his multi-variate analysis that Representatives Ancia and Rose, and Senator West were accurate in saying that African-Americans and Latinos have a coalition in Dallas County.  The African-American preference for both Latino and African-American candidates is shared by Latino voters while other voters did not have the same preferences.

Murray noted that it is possible to draw a new map in the Houston area that would elect a Latino without impacting Congressional Districts 9 and 18.  (Tr. p. 1252 ll. 6-9).  He indicated that the changes to the 9th and 185h in the 2013 map should not be changed.  (Tr. p. 1251 ll. 12-21).  He indicated that it was possible to also provide similar protection to CD29 the other Latino opportunity district.  Dr. Murray provided detailed guidance about the areas of Latino growth in Houston outside of those protected areas where a new seat can be drawn.  (Tr. p. 1283 to p. 1284 l. 3.

Dr. Murray indicated that CD33 is a performing coalition district.

Dr. Murray noted that on the NAACP Report Cards, reflecting issues impacting the African-American community, that all Republicans received an F and no Republican received a grade above F.  (Tr. p. 1263 l. 13 to p. 1264 l. 7).  He said the top Republican received a 21, while the Democrats generally received 90 and above.  For example, the report card in Exhibit 40 includes important votes for racial and ethnic minorities such as healthcare reform, private school vouchers, voter identification, immigration overhaul and the confirmation of Tom Perez as United States Secretary of Labor on the Senate Side and the Elementary and Secondary Education Overhaul and a Delay on the Affordable Care Act on the House side.  Senator West indicated that the State's decision in regards to the Affordable Care Act was discriminatory.

**PRAYER:**

There is a world of evidence that supports discrimination in the adoption of the 2013 Map.  The Legislature disregarded the law of the 5th Circuit and the cries of minority lawmakers in 2013.  They limited the scope of the 2013 redistricting discussion in a manner to where no substantive amendments would be permitted.  They knowingly misinterpreted the Court's clear ruling in this case, treating it as if the Court had indicated that there were no other remedies to be had and that its word was intended to be final.  The House Redistricting Chair admits to being apprised by

the NAACP of how C235 continued to pack minorities in CD30 and how it continued a racial gerrymander in the Dallas/Fort Worth Metroplex. Representative Martinez-Fisher, Rose and Senator West all felt excluded from the process and Experts say that is evidence of discrimination. There were unusual charges in the process to limit amendments and the concerns of persons who appeared at public hearings were completely disregarded. Further, each and every amendment on the House side that was attempted to the Redistricting Map for the Congress was made by on in behalf of a minority member. The diminished value of the African-American and Latino votes compared to Anglos is revealing and shows a disparate impact as to them.

In regards to coalition districts, it is clear that historically both African-Americans and Latinos have been discriminated against in Texas. At times, the discrimination may have been a little different but frequently it was the same--especially since the 20th century. White voters in Texas, according to the reliable data, are hostile to both of them and voted in record numbers for a candidate who showed outward hostility to both communities. The Senate Factors analyses indicate serious socio economic disparities that relate to both communities that impact their ability to participate in the electoral process. Because others are discriminatory against them we find that they live in the same communities and suffer similar problems. They have joined together in communities like Dallas and Fort Worth to

work together.  It seems the height of hypocrisy to grab a few examples of unique political races where there might have been a difference in the primary and blow a huge hole in the political interests of each community by destroying the clear and unmistakable coalition that they have.  They have been forced from one party by hostility and racial resentment and are seeking to do the best they can as all other Americans.  These individuals should not be penalized for their Association as the First Amendment to the United States Constitution clearly protects their right of association.  The Voting Rights Act is about electing the candidate of your choice. Primaries involve nominations and not elections.  Further, if this court were to hold that coalition districts were not cognizable under the VRA then it would also blow a huge hole in the act and eliminate many of its protections.  Racism causes individuals to need to work together for protection and live in the same areas but the State wants to use sordid means to destroy the coalition and continue white domination.  How can it be that you penalize individuals for doing just that by twisting the meaning of the Voting Rights Act and turning it on its head because such an interpretation will frustrate and not further the purposes behind the law.

DATED: July 31, 2017.                              Respectfully submitted,

                                                          _/s/ **Gary L. Bledsoe**_____
                                                          Gary L. Bledsoe
                                                          The Bledsoe Law Firm PLLC
                                                          State Bar No. 02476500
                                                          7901 Cameron Road,
                                                          Bldg. 3 Suite 3-360

Austin, Texas 78754
Telephone: 512-322-9992
Fax: 512-322-0840
Garybledsoe@sbcglobal.net

*Attorney for the Congresspersons
Eddie Bernice Johnson, Sheila
Jackson Lee, and Alexander Green*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via the

Court's electronic notification system or email to the following on July 31, 2017:

PATRICK SWEETEN
Patrick.sweeten@oag.state.tx.us
MATTHEW HAMILTON FREDERICK
matthew.frederick@oag.state.tx.us
ANGELA V. COLMENERO
angela.colmenero@oag.state.tx.us
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711
(512) 463-2120
(512) 320-0667 (facsimile)

ATTORNEYS FOR DEFENDANTS STATE OF TEXAS, RICK PERRY, HOPE
ANDRADE, DAVID DEWHURST, AND JOE STRAUS

Anita S. Earls
N.C. State Bar No. 15597
(Admitted Pro Hac Vice)
Allison J. Riggs
N.C. State Bar No. 40028
(Admitted Pro Hac Vice)
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Fax: 919-323-3942
Anita@southerncoalition.org
Allison@southerncoalition.org

Robert Notzon
Law Office of Robert S. Notzon
State Bar Number 00797934
1507 Nueces Street
Austin, TX 78701

512-474-7563
512-474-9489 fax
Robert@NotzonLaw.com

ATTORNEYS FOR TEXAS STATE CONFERENCE OF NAACP BRANCHES,
EARLS, LAWSON, WALLACE, and JEFFERSON

Victor L. Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
Telephone: 410-580-5120
Fax: 410-358-9359
vgoode@naacpnet.org

ATTORNEY FOR TEXAS STATE CONFERENCE OF NAACP BRANCHES

TIMOTHY F. MELLETT
T. CHRISTIAN HERREN, JR.
BRYAN L. SELLS
JAYE ALLISON SITTON
DANIEL J. FREEMAN
MICHELLE A. MCLEOD
Attorneys
Voting Section, Civil Rights Division
U.S. Department of Justice
Room 7254 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 305-4355

ATTORNEYS FOR PLAINTIFF UNITED STATES

DAVID RICHARDS
Texas Bar No. 1684600
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
512-476-0005

davidr@rrsfirm.com

RICHARD E. GRAY, III
State Bar No. 08328300
Gray & Becker, P.C.
900 West Avenue, Suite 300
Austin, TX 78701
512-482-0061
512-482-0924 (facsimile)
Rick.gray@graybecker.com

ATTORNEYS FOR PLAINTIFFS PEREZ, DUTTON, TAMEZ, HALL, ORTIZ, SALINAS, DEBOSE, and RODRIGUEZ

JOSE GARZA
Texas Bar No. 07731950
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
210-392-2856
garzpalm@aol.com

JOAQUIN G. AVILA
P.O. Box 33687
Seattle, WA  98133
206-724-3731
206-398-4261 (facsimile)
jgavotingrights@gmail.com
Served via electronic mail

ATTORNEYS FOR MEXICAN AMERICAN LEGISLATIVE CAUCUS

NINA PERALES
Texas Bar No. 24005046
nperales@maldef.org
ERNEST HERRERA
eherrera@maldef.org
Mexican American Legal Defense
and Education Fund
110 Broadway, Suite 300

San Antonio, TX 78205
(210) 224-5476
(210) 224-5382 (facsimile)

ATTORNEYS FOR PLAINTIFFS TEXAS LATINO REDISTRICTING TASK
FORCE, CARDENAS, JIMENEZ, MENENDEZ, TOMACITA AND JOSE
OLIVARES, ALEJANDRO AND REBECCA ORTIZ

ROLANDO L. RIOS
Law Offices of Rolando L. Rios
115 E Travis Street
Suite 1645
San Antonio, TX 78205
210-222-2102
rrios@rolandorioslaw.com

ATTORNEY FOR INTERVENOR-PLAINTIFF HENRY CUELLAR

MAX RENEA HICKS
Law Office of Max Renea Hicks
101 West Sixth Street
Suite 504
Austin, TX 78701
(512) 480-8231
512/480-9105 (fax)
rhicks@renea-hicks.com

ATTORNEY FOR PLAINTIFFS CITY OF AUSTIN, TRAVIS COUNTY, ALEX
SERNA, BEATRICE SALOMA, BETTY F. LOPEZ, CONSTABLE BRUCE
ELFANT, DAVID GONZALEZ, EDDIE RODRIGUEZ, MILTON GERARD
WASHINGTON, and SANDRA SERNA

CHAD W. DUNN
chad@brazilanddunn.com
K. SCOTT BRAZIL
scott@brazilanddunn.com
Brazil & Dunn
4201 FM 1960 West, Suite 530
Houston, TX 77068
281-580-6310

281-580-6362 (facsimile)

ATTORNEYS FOR INTERVENOR-DEFENDANTS TEXAS DEMOCRATIC
PARTY and BOYD RICHIE

JESSICA RING AMUNSON
jamunson@jenner.com
Jenner & Block LLP
1099 New York Ave., NW
Washington, D.C. 20001
202-639-6000

J. GERALD HEBERT
191 Somervelle Street, # 405
Alexandria, VA 22304
703-628-4673
hebert@voterlaw.com

ATTORNEYS FOR PLAINTIFFS QUESADA, MUNOZ, VEASEY,
HAMILTON, KING, and JENKINS

LUIS ROBERTO VERA, JR.
Law Offices of Luis Roberto Vera, Jr. & Associates
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205-2260
210-225-3300
irvlaw@sbcglobal.net

GEORGE JOSEPH KORBEL
Texas Rio Grande Legal Aid, Inc.
1111 North Main
San Antonio, TX  78213
210-212-3600
korbellaw@hotmail.com

ATTORNEYS FOR INTERVENOR-PLAINTIFF LEAGUE OF UNITED LATIN
AMERICAN CITIZENS

*/s/ Gary L. Bledsoe*

Gary L. Bledsoe,
*Attorney for the Congresspersons Eddie Bernice
Johnson, Sheila Jackson Lee, and Alexander Green*