**Appendix A**
**ECF No. 1494 – Questions of the Court**
**Answers and Cross-References to Post-Trial Brief**

*General/Unclassified Questions*

1) In its previous orders, the Court identified certain violations in Plans C185 and H283 in districts that remain unchanged in Plans C235 and H358. With respect to these violations, what open questions are there, if any?

    Adopt position of Texas NAACP.

2) Much of the plaintiffs' presentation looks more like the remedial phase than the trial on the 2013 plans. What decisions and rulings does this panel need to make regarding the 2013 plans? If the Court finds discriminatory intent, what judgment should it enter? If it finds no discriminatory intent, what judgment should it enter? What other issues are joined and ready for decision on this phase?

    If the court finds no discriminatory intent then it should issue and immediate and permanent injunction, maintain jurisdiction to pre-clear election changes by Texas as a result based on its earlier decision and appoint someone to assist the court in this endeavor. The answer would be the same if intent is found as there would be a second decision on which to base this decision.

3) Defendants appear to be asserting that any time a minority opportunity district's minority population is increased (one example was with regard to CD28 in a *Gingles* demonstration map) that this is unlawful "packing." But is there anything inherently wrong with a district having an increased or high minority population if it reflects the demographics of the area, does not have the effect of dilution, and wasn't intentionally racially gerrymandered?

    Under certain circumstances, such districts are to be expected as naturally occurring districts.

*Questions about Evidence Presented (or Law as Applied to Specific Evidence Presented)*

7) Several witnesses relied on the rulings of the DC court, which were vacated. To what extent, if at all, can those findings be considered in determining the intent of the 2013 Legislature?

    The Legislature chose to follow and limit its correction to an order that was interim in its nature and disregard a final decision of the DC Court that was still viable at the time of the decision. Further, the case was not reversed on the merits by the Shelby County decision anyway.

8) What does the law say about whether the Legislature's discriminatory intent can be inferred from its adoption of the Court's interim 2013 plans? Some of the plaintiffs' presentation appears to criticize the Legislature for refusing to consider amendments of the Court's plan, while other parts of the presentation appear to criticize legislators and staff for even considering changes to the Court's plans. Which is the correct analysis under the law?

    One group supported the interim plans so they naturally would not want to see changes. Our position is the State is trying to run out the clock when it knew the maps were deficient. They had the decision of the DC Court which was still effective when the Legislature adopted the 2013 plan and importantly in the emails revealed by Quesada the Chairman of the Committee did have information about the 5th Circuit law on coalition districts and Rep. Turner even pointed out parts of the DC opinion on coalition districts to show they could be done and Jeff Archer, Leg. Counsel Chief, advised them of this as well.

9) How does the intent or statement or action of a legislator or staff relate to the intent of the Legislature as a whole? Does it depend at all on whether other legislators, and/or the body as a whole, was aware of the individual intent or action?

    Adopt the position of the NAACP on this issue.

10) If the Legislature allowed individual members or staff members to draw districts, why shouldn't any discriminatory intent or effect be attributed to the Legislature as a whole?

    Adopt the position of the NAACP on this issue.

11) How are minority priorities (such as, without limitation, immigration, healthcare, education) to be distinguished from priorities of the Democratic Party for purposes of attributing discriminatory intent to the Legislature, and also for purposes of identifying racial cohesion and shared communities of interest?

    Clearly, many of the issues are those that show or involve white resentment towards minorities such as immigration, the Affordable Care Act, vouchers and other educational issues. Senator West makes the point clear about the Affordable Care Act and Dr. Burton makes it clear in regards to vouchers and educational issues. Dr. Murray and Dr. Burton and Representative Toni Rose directly make the point of how Immigration is such an issue. In other words many of these issues are put up for a vote as a result of the white resentment that Murray and Burton discussed and various votes are revealing and can be definitely seen as anti-minority.

13) The Court's opinion adopting the interim maps clearly stated that the Court's work product was not complete and additional analysis was necessary. Didn't the Legislature have some affirmative duty to ensure that the Plans they voted on complied with the VRA and Constitution?

    It clearly had a duty but its intention was to run out the clock. Senator West, Representative Rose, Dr. Burton, and Dr. Murray all indicated that there was such an obligation and in the Joint Exhibits, it is clear in the House and Senate Journals that many minority Legislators felt that way.

14) For the Congressional Plan, can the fact that no amendments were accepted from minority members during the 2013 special session be evidence of discrimination if also no amendments were accepted from non-minority Democrats?

Comparators are just one way of proving discrimination. There are even cases in the employment context where something akin to totality of circumstances is the threshold. The question is whether there is enough direct and/or circumstantial evidence for one to reach the conclusion.

15) Was there evidence that non-minority members requested substantive amendments?
Senator West indicated this, Rep. Rose indicated this and Chairman Darby acknowledged that there was an amendment that was being proposed by Representative Ancia.

16) How, if at all, should the Court consider the skill of candidates and their campaigns in evaluating performance, including the effects on turnout?

I think Dr. Chervenak's way of evaluating is the most feasibly way to do this—only considering races where candidates received at least 30 percent of the vote. Sometimes there may be issues in races such as how CD33 was created that cannot effectively be analyzed.

17) To what extent, if at all, is it appropriate for those who draw demonstration maps to use racial shading to make small changes to lines within precincts?

We adopt the position of the NAACP on this issue.

19) Is there data in the record (or on the Secretary of State website) reflecting the actual number of voters in specific primary elections? If the number of voters is very small, how does it meaningfully inform our decision on cohesion of the populations in the district as a whole, and why should we consider it in determining minority cohesion?

As Dr. Murray and Dr. Chervenak have indicated, the numbers are so small that it would not make sense to base a decision on cohesion on such data.

20) Dr. Chervenak stated that he thinks looking at racially contested elections (meaning races between candidates of different races) is very important for determining racially polarized voting. But how does this fit with the position taken

by some that the race of the candidate is irrelevant to determining the minority candidate of choice and/or the existence of racially polarized voting?

    We adopt the position of the NAACP on this question.

*Questions about Data*

21) When and for what purposes should the Court look only to Census data (and the State's use of it)? When and for what purposes should the Court look at current ACS data (and the State's use of it)? When and for what purposes should the Court look at projections (and the State's use of it)?

    We adopt the position of the NAACP on this question.

22) What does the law say about using ACS and other data that was not available in 2013, for the purpose of informing the Court's decisions as to the 2013 plans?

    We adopt the position of the NAACP on this question.

23) Would the parties agree that on the Section 2 effects (not intent) claims, current ACS (2011-2015) data and current population estimates must be used pursuant to *Gingles* because an effects claim asks whether the district, as configured, currently gives minorities the opportunity to elect the candidate of their choice. If, for example, a State undertook redistricting and implemented a plan that didn't dilute a minority opportunity district at the time but eight years later (with substantial demographic changes) the district was no longer performing as a minority opportunity district, couldn't a Section 2 effects claim be brought several years after the map's implementation? In other words, an effects claim is not tied to intent, or what data the legislature had at the time of redistricting. And using this logic, if the Court finds that CD23 is not currently performing under C235, doesn't the Court need to look at the Section 2/*Gingles* analysis based on current ACS data and current election data to determine whether it could perform as a minority opportunity district under any of the *Gingles* demonstrative plans?

    We adopt the position of the NAACP on this issue.

*Questions about Particular Areas—DFW*

28) If CD33 is currently performing as a minority opportunity district, why would the Court make any changes to that district?

In order to remedy the Constitutional and VRA violations in the area. There is a racial gerrymander in the area, the overall plan was adopted with discriminatory intent for the area and there is packing and cracking and isolating or wasting of voters or votes. This should be cured.

29) Assuming the Court finds packing in CD30, how should the Court take account of and respect the Section 2 rights of those who are removed, assuming they are moved into a district in which they cannot elect the candidate of their choice?

The Court should try as much as possible to locate displaced minority voters into areas where there voices or votes will not be wasted. However, to prevent any such change or move would make remedies in many instances impossible. It could make a mockery of the whole process if the Court's hands were so tied.

*Questions about Legal Tests (or Certain Aspects of Legal Tests)*

33) What does cohesion mean under *Gingles* 2? How is the race of the candidate relevant? What should the Court be focusing on in terms of determining whether minorities are cohesive? Does the race of the candidate factor into political cohesion? What does the fact that black voters vote for black candidates in the Democratic Primary and Hispanic voters vote for Hispanic candidates in the Democratic Primary tell us about minority political cohesion if both groups are voting in the Democratic primary for candidates who generally espouse the same political positions? Assuming cohesion is politically-based, does that require that coalition districts be drawn?

We adopt the position of the NAACP.

34) Doesn't Section 2 case law on the *Gingles* 2 factor talk about "political cohesion," rather than "racial cohesion"? If so, why would the Court look only at

6

primary elections, as Dr. Alford proffers, to determine "political cohesion" or lack thereof among minorities? Section 2 precedent seems to make clear that a minority candidate of choice doesn't need to be of the same race or ethnicity as the voters that elected him or her, yet Dr. Alford suggests that a minority does not get their "candidate of choice" unless the candidate elected is the same race or ethnicity as the voters. Please explain this inconsistency.

    The question is political cohesion in electing candidates of choice if given the opportunity. It is contradictory to say this in regards to a primary election. Case law is clear that the color of the candidate is not essential as long as they are the candidate of choice.

35) In determining the performance of a district such as CD33, should primary elections, or general elections, or both be considered? Can you offer a consistent and legally defensible rule for deciding whether those elections are relevant for deciding racial cohesion? Do they take on increased relevance when examining coalition districts?

    We adopt the position of the NAACP on this question.

36) In looking at minority political cohesion and RPV, would the parties agree that RPV looks at whether the minority vote is successfully blocked by the Anglo vote and that Anglo bloc voting doesn't come into play until the general election? And, if minorities happen to differ on their preferred candidate at the primary, but then coalesce to elect the same candidate in the general election, haven't they shown that their political cohesion is enough to overcome the Anglo bloc voting—which is the real issue?

    It is generally the case that the general election would be the operative election to make such a determination. That would be the basic rule but there would be instances where this could be different but they are not involved in our claims in this case.

38) How, if at all, do we account for the distribution of populations across the entire state in evaluating proportionality? For that matter, is it even appropriate or required

for the Court to consider proportionality for the limited purpose of this trial on the 2013 plans?

There is no absolute requirement but as the DC court indicated in the Section 5 opinion it is something that can be referenced. Further, the issue of disparate impact is relevant to intent claims.

39) At what point does the use of race come to "predominate" in the drawing of a district, in light of the command of *Bethune-Hill* that we view the district as a whole?

We adopt the position of the Texas NAACP on this issue.

40) What does the Supreme Court mean by its repeated (including 2017) use of the term "race for its own sake"?

We are not sure of exactly how and what contexts this has generally been used but it seems clear that the United States Supreme Court desires to have some recognition in the Voting Rights Context of individuals working together. We saw this in Georgia v. Ashcroft under Section 5 but similarly the Alabama and North Carolina decisions recently have embraced the idea of not requiring certain numbers of minorities to create a seat. When we look at the facts in Cooper it appears that it was indeed race for its own sake and this very much what was done in regards to CD30 in C235 and C185 both.

41) Given that retrogression is no longer an issue, and given the Supreme Court's 2017 pronouncements on whether a 50.1% threshold is always required, does it violate Section 2 to move minorities into a crossover district such as the East Travis County district shown on multiple demonstration maps?

No, it does not. Even though retrogression may not be an issue this court has noted that the Black Community voting strength was diluted and the current configuration was designed to fracture the existing coalition between African-Americans and Latinos. This is similar to the question above about CD30 and pains should be taken to place voters in districts where they have a voice, but the many voters in Travis County are deserving of a remedy to the intentional discrimination

they have suffered and it is perfectly appropriate and necessary for there to be a remedy that would include those voters.

42) What case law informs whether the 2017 findings on intent for the 2011 plans can be used, in whole or part, to find intent for the 2013 plans?

   We adopt the position of the NAACP.

43) What does the law say about whether a § 2 results test should focus solely on whether opportunity exists when the district is drawn versus some later point in time? Must the Legislature account for later changes in the district due to population changes? In other words, to what extent is a results claim to be determined at the time of redistricting versus at some later time?

   We adopt the position of the NAACP.

44) Under the Senate factors and "totality of circumstances" analysis for a Section 2 "effects" (not intent) claim, because we're examining whether a minority opportunity district is currently performing and, if not, whether a *Gingles* district could perform, shouldn't the evidence on the Senate factors and totality of circumstances (with perhaps the exception of the "history of discrimination" factor) also be as current as possible?

   We believe the court cases make history essential.  The decisions of today must be placed in context and as Dr. Burton indicated he is trying to see if they errors of the past are still present in some form today.  Further, in Texas we know that the State has unsuccessfully fought against minorities in every round of redistricting since 1970.  It is important that there be some evidence that is recent but the court should not over emphasize the need for such evidence.  Since history itself is a Senate Factor we believe that underscores the importance of evidence in past decades as well as that which may be a bit more current.

45) The Supreme Court has directed that the first *Gingles* precondition focuses on the compactness of the minority population, taking into account traditional redistricting principles.  This makes sense in terms of looking at cities, precincts,

neighborhoods, geographical features, etc. While incumbency protection is also a traditional redistricting factor in some respects, how does it have any bearing on whether a minority population is compact? In other words, how does where the incumbents live (and thus whether they are paired) affect whether a minority population is compact?

There are competing traditional redistricting principles. There is not a hard and fast rule. Sometimes one may mean another is impossible and it may depend on the relevant facts as to the propriety of how that matter is to be answered in an individual case. However, it is clear that 14th Amendment and VRA protections (along with 15th Amendment protections too) are paramount considerations and must be factors in any such determination.