# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SHANNON PEREZ, *et al.*, | ) | |
| | ) | CIVIL ACTION NO. |
| *Plaintiffs*, | ) | SA-11-CA-360-OLG-JES-XR |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

_____

**The Texas NAACP Plaintiff-Intervenors' Post-Trial Brief**
_____

# TABLE OF CONTENTS

**I.     Introduction** ...................................................................................................4

**II.     The NAACP's Standing** ..............................................................................5

**III.     The NAACP Has Established that Plans C235 and H358 Are Intentionally Racially Discriminatory** .............................................................................................................7

    **a.     Absent Meaningful Alterations of the 2011 Plan in the 2013 Legislative Process, Which Defendants' Witnesses Admit Did Not Happen, This Court's 2011 Findings Are Binding and Establish that the 2013 Plans Are Also Racially Discriminatory** ........................7

    **b.     The Legislature Had An Affirmative Duty to Ensure that the Plans They Enacted in 2014 Complied with the VRA and Constitution** ..................................................................10

    **c.     Applying the *Arlington Heights* Framework, the Evidence in this Records Leads to the Unavoidable Conclusion that the Enactment of 2013 Redistricting Plans Was Motivated by Discriminatory Intent** ..................................................................................................14

        1.     The Historical Background of the Decision ..............................................15

        2.     The Specific Sequence of Events Leading Up to the Challenged Decision ...............16

        3.     Departures from the Normal Procedural Sequence ...................................17

        4.     Legislative or Administrative History ......................................................20

        5.     Discriminatory Effects .............................................................................21

**IV.     The Section 2 Legal Framework Applicable to the NAACP's Claims** .................25

    **a.     The First Precondition** ...........................................................................................26

    **b.     The Second and Third Preconditions** ....................................................................29

        **i.     Examination of General Elections Provides the Most Probative Evidence for Determining Whether There Is Racially Polarized Voting and Whether Minority Voters Are Politically Cohesive** .............................................................................................................31

        ***ii.     Contrary to Defendants' Assertions in Closing Argument, LULAC v. Perry Does Not Suggest that Coalition Districts Can Only Be Proven Required on the Basis of Primary Election Results*** 32

    **c.     The Totality of Circumstances** .............................................................................34

        *i.     "The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the political process."* ..............................................................................35

        *ii.     "The extent to which voting in the elections of the state or political subdivision is racially polarized."* .............................................................................................................37

*iii.*  *"the extent to which the state or political subdivision has used unusually large districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."* ................................37

*iv.*  *"The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in wuch areas as education, employment and health, which hinder their ability to participate effectively in the political process."* .................................................................38

*v.*  *"Whether political campaigns have been characterized by overt or subtle racial appeals."* ....39

*vi.*  *"Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."* ..........................................................40

*vii.*  *"The extent to which members of the minority group have been elected to public office in the jurisdiction."* ...............................................................................................................................41

**V.  The Evidence in the Record Warrants Section 2 Districts in Each of the Areas where the NAACP Has Claims** ................................................................................................................................42

    **A.  The NAACP's Section 2 Claims for Congressional Districts in DFW** ....................................42

    **B.  The NAACP's Section 2 Claims for House Districts in Bell County** ...........................47

    **C.  The NAACP's Section 2 Claims for House Districts in Fort Bend County** ............................52

    **D.  The NAACP's Section 2 Claims for House Districts in Dallas County** ................................58

    **E.  The NAACP's Section 2 Claims for House Districts in Harris and Tarrant Counties** ..........61

**VI.  Conclusion** ................................................................................................................................63

## I.    Introduction

Pursuant to this Court's instructions at the end of trial, the Texas State Conference of NAACP Branches, Rev. Lawson, and Howard Jefferson (hereinafter, "the Texas NAACP" or "NAACP") respectfully submit this post-trial brief, answering the Court's questions (*see* ECF No. 1494, July 14, 2017) relevant to the NAACP's claims and highlighting the law and evidence presented in trial that supports those claims.[1]

In 2013, after this Court had made some preliminary findings on Texas' liability under Section 2 and the Constitution, and after a three-judge panel in the D.C. District Court rejected Texas's 2011 plans for failure to comply with Section 5 of the Voting Rights Act, the State, in an attempt to avoid further scrutiny of its discriminatory actions but without any intent to fully remedy the discrimination deep-seated in the maps, adopted the Court's interim Congressional plan and made only minor changes to the Court's interim State House plan, disregarding the Court's plain instructions that those interim maps did not reflect a full inquiry on the merits. Many of the districts in these maps were invalidated by the Court this year.  For six years now, voters in Texas have been subject to unconstitutional and illegal districting plans, and the 2013 enactments did not end that injury.  Instead, the 2013 plans only furthered the harm given that many of the racially discriminatory mechanisms used by the legislature were carried through in the 2013 plans.  The Texas NAACP presented ample evidence at trial that the discriminatory intent that motivated the 2011 plans was still present and a motivating factor when the legislature enacted the 2013 plans.  The NAACP furthermore presented extensive evidence that numerous additional districts are required under Section 2 of the Voting Rights Act.  This brief is submitted

---

[1] Attached to this brief as Appendix A is a full list of the Court's questions, with the NAACP Post-Trial Brief page numbers listed where the brief answers the questions posed.  Where the brief does not answer the Court's questions, those answers are provided separately in Appendix A.

in order to review that evidence under the applicable legal framework, with the ultimate conclusion being that the NAACP Plaintiffs are entitled to judgment in its favor.

## II.    The NAACP's Standing

The NAACP, Howard Jefferson and Rev. Bill Lawson have standing to bring the challenges they assert against Plans C235 and H358.  Mr. Jefferson and Rev. Lawson are both residents of Harris County, and thus have standing to challenge discriminatory districts in that county.  *See* ECF No. 900, at ¶¶ 6, 8 (Third Amended Complaint).  Even more significantly, the TX NAACP has associational standing to bring all the challenges it has asserted against both plans.  The NAACP has associational standing to challenge C235 and H358 in their entireties as violative of both Section 2 and the Fourteenth Amendment because it has over 10,000 members statewide, with approximately 66 local branches and 20 college chapters.  NAACP Pls.' 2017 Ex. 1, Decl. of Carmen Watkins, Regional Director for Region VI of the National NAACP ¶ 4 (hereinafter, "Watkins Declaration").  Specifically, counties with NAACP chapters and thus members include, but are not limited to: Harris, Tarrant, Travis, Dallas, El Paso, Ellis, Bell, Fort Bend, Bexar, McLennan, Galveston, Guadalupe, Midland, and Nueces Counties, among many others.  *Id.* at Ex. A.  The NAACP has associational standing to file suit on behalf of its members, who "would otherwise have standing to sue in their own right" as registered voters in the challenged areas. *Hancock Cty. Bd. of Superiors v. Ruhr*, 487 Fed. App'x 189, 195 (5th Cir. 2012) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010)) (NAACP had associational standing to bring a one person, one vote claim where its members "were voters from overpopulated and under-represented districts").  By participating in this lawsuit, the NAACP seeks to protect the right of African-American voters to participate in elections free from discrimination, a goal which is central and "germane to the organization's

purpose." *Id*. at 197 ("[P]rotecting the strength of votes[] and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission."). Finally, neither the claims the NAACP has asserted under the U.S. Constitution and Voting Rights Act nor the permanent injunctive relief requested requires the participation of the NAACP's individual members in this action. *See id*. at 197-98 (citing *Am. Physicians*, 627 F.3d 553) (NAACP had associational standing to bring a constitutional claim where "no factual inquiry was necessary beyond the fact that the member [wa]s a voter in" a challenged district and "the district court would not need individualized information about NAACP members" to grant injunctive relief).

Likewise, because the TX NAACP has members in each of the areas where it asserts specific intentional discrimination and Section 2 challenges, it again has associational standing to bring those claims. See NAACP 2017 Ex. 1 at ¶ 6; App. A. NAACP members who live in each of the areas where the NAACP is bringing challenges also testified. *See*, Trial Tr 7/10/17 at 362:13-14; 363:18-22 (Phyllis Jones, NAACP member in Bell County); Trial Tr. 7/11/7 at 552:20-22; 555:5-16 (Grady Prestage, NAACP member in Fort Bend County); Trial Tr. 7/11/17 at 500:11-120; 506:14-15 (Rep. Eric Johnson, NAACP member in Dallas County); Trial Tr. 7/13/17 at 1309:3-8; 1314:14-17 (Rep. Rose); Trial Tr. 7/13/17 at 1291:13-14; 1293:12-16 (Franklin Moss, NAACP member in Tarrant County); Trial Tr. 8/13/14 at 1017:11-13; 1018:9-19 (Jeff Travillion, NAACP member in Travis County).

The Watkins Declaration is similar to the declaration proffered by Elia Mendoza, Texas State LULAC Director, in support of LULAC's standing, ECF No. 1342-1 (Mar. 20, 2017), which this Court found satisfied the standing inquiry with respect to LULAC's *Larios* challenges. House Opinion, ECF No. 1365 at 116, 120 (Apr. 20, 2017). Defendants have never challenged the NAACP's standing to bring the claims asserted in their Third Amended

Complaint, and in light of the testimony of NAACP members and the declaration submitted into evidence by Carmen Watkins, this Court should rule that the NAACP Plaintiffs have standing to assert the claims they have brought in this action.

### III.    The NAACP Has Established that Plans C235 and H358 Are Intentionally Racially Discriminatory

Plans C235 and H358 enacted in 2013 are intentionally discriminatory in violation of the Equal Protection Clause of the United States Constitution and the Voting Rights Act. These plans, which were identical and nearly identical, respectively, to the Court's interim plans, were based heavily on the 2011 plans adjudicated to be rife with discriminatory intent. This discriminatory intent necessarily carries forward into the 2013 enacted plans, and given the insubstantial modifications in 2013, those 2011 findings establish impermissible intentional discrimination in the 2013 without further inquiry into the 2013 legislative process. However, the NAACP Plaintiffs and others nonetheless established through the evidence presented before this Court at trial that the 2013 legislature abdicated their duty to ensure that the enacted maps did not infringe upon the constitutional rights of Texas's citizens. Further, a careful examination of the *Arlington Heights* factors demonstrates that the failure by the Texas legislature to fulfill its constitutional duty was not based in good faith on guidance from this Court, but instead on a desire to retain as many dilutive measures from the 2011 maps as possible, utilizing this Court's opinion as pretext.

### a.    Absent Meaningful Alterations of the 2011 Plan in the 2013 Legislative Process, Which Defendants' Witnesses Admit Did Not Happen, This Court's 2011 Findings Are Binding and Establish that the 2013 Plans Are Also Racially Discriminatory

Because the challenged Congressional and House plans were based heavily on the 2011 plans, which were found by this Court to be unconstitutional, the 2011 intent continues to taint

the enactment of the 2013 redistricting plans.  Fifth Circuit precedent necessitates this

conclusion.  In *Chen v. City of Houston,* 206 F.3d 502 (5th Cir. 2000), the Court of Appeals

instructed that "in the context of Voting Rights Act suits, evidence that impermissible racial

intent had tainted the plan upon which the challenged plan was based has been allowed even

when enough time has elapsed for a substantial degree of familiarity and political reliance to

emerge."  *Id.* at 518.  To support that contention, *Chen* relies on principles laid out by the

Supreme Court in *Hunter v. Underwood*, 471 U.S. 222 (1985), where the Court found that the

discriminatory intent underlying a felony disenfranchisement provision persisted eighty years

after its enactment despite "judicial invalidations of the most obviously discriminatory

provisions." *Chen*, 206 F.3d at 521.  *Hunter* stands for the proposition that involuntary

amendments made through the judicial process do not cleanse an unconstitutional law or give a

free pass to a subsequent legislature for reenacting an unconstitutional law.  *Hunter*, 471 U.S. at

228.  Though *Chen* held that "intervening reenactment with meaningful alterations" may serve to

cleanse the racially discriminatory intent of a previous iteration of a law, no such meaningful

alteration is present here.  *Id.*  Though the Court did make substantial changes to the 2011 plans

in certain areas in crafting their interim maps, these changes are akin to the "judicial

invalidations of the most obviously discriminatory provisions" that occurred in *Hunter*, and were

highlighted in *Chen.  Id*.

  Furthermore, the limited changes in the 2013 plans can easily be contrasted with a case in

the Fifth Circuit where the appeals court did find that "intervening reenactment with meaningful

alterations" cleansed the discriminatory guilt from a legislature.  In *Cotton v. Fordice*, 157 F.3d

388 (5th Cir. 1998), a felony disenfranchisement provision initially enacted with discriminatory

intent ultimately "overc[a]me its odious origin" when it was amended through "a deliberative

process" and subsequently approved by a majority of voters. *Id*. at 391. In *Cotton*, the

Mississippi legislature twice amended a constitutional provision that, when enacted in 1890,

intended to discriminate against African-Americans by disenfranchising individuals who

committed crimes that were "committed primarily by blacks." *Id*. at 391. The 1950 amendment

removed the historically "black" crime of burglary, and the 1968 amendment broadened the

scope of the provision to include rape and murder, "crimes historically excluded from the list

because they were not considered 'black crimes,'" each time requiring a two-thirds vote by both

houses of the legislature, and each requiring approval by the majority of voters. *Id*. Neither

amendment was motivated by judicial intervention. *Id*. at 391 n.8. The Texas legislature's

wholesale adoption of changes put in place by this Court to remedy constitutional defects

identified under a preliminary injunction standard is easily distinguishable from the Mississippi

legislature's removal of the discriminatory parts of a constitutional provision of its own volition,

after careful deliberation, and upon approval of a majority of voters.[2]

When this body of law is applied to the matter at hand, it is apparent that the

discriminatory intent that this Court found underlying the 2011 plans was not cleansed through

the legislature's 2013 enactment. With respect to the Congressional Districts, Defendants have

conceded and evidence was presented at trial which demonstrated that no alterations were made

to this Court's interim maps. Trial. Tr. 7/14/17 at 1573:7-11 (Darby) (noting that the enacted

congressional plan "ended up the same" as the Court's interim map). As such, all changes from

the 2011 plan constitute involuntary judicial amendments of the type that the Fifth Circuit

---

[2] Moreover, the fact that Texas largely adopted, in whole or only with minor modifications, the court-drawn interim maps does not create a safe harbor. The Fifth Circuit made this clear in *Prejean v. Foster*, 227 F.3d 504 (5th Cir. 2000), finding that it was inappropriate for the court below to accept an affidavit from the judge who drafted court-drawn plans as conclusive proof that the legislature did not have discriminatory intent in subsequently adopting those plans. The court stated that "[t]he fact that the legislature adopted Judge Turner's districting plan without modification might support an inference that racial decisions did not predominate, [but] [a]nother equally plausible inference is that the legislature was ready to adopt whatever proposal would satisfy its objective of creating black subdistricts." *Id*. at 511.

explained in *Cotton* would not cleanse discriminatory intent from an unconstitutional law.  1577 F.3d at 391 n.8.  Similarly, with respect to the House Districts, Defendants have conceded that all amendments made to the Court's interim maps were insubstantial, minor changes. Trial Tr. 7/14/17 at 1529:6-1530:9, 1550:2-8 (Darby) (calling amendments not substantial and "small tweaks"); Trial Tr. 7/10/17 at 152:1-153:4 (Martinez-Fischer) (discussing resistance to accepting substantive amendments and criteria that "made meaningful amendments impossible").  Even the amendment made to HD90, which some plaintiffs allege was a substantial change, did not benefit from the type of "deliberative process" that *Cotton* requires for the cleansing of discriminatory intent.  Representative Burnam testified that the amendment was an agreed upon exchange between himself and only two other members, Trial Tr. 7/10/17 at 212:1-19, and Chairman Darby testified that it was not considered in committee or in field hearings, but was simply revealed and adopted on the House floor. Trial Tr. 7/14/17 at 1545:15-22, 1547:21-1548:7 (Darby). This process is easily distinguishable from the process found to have cleansed discriminatory intent in *Cotton.*  Thus, because the legislature took no meaningful steps to correct or significantly alter the plans, beyond maintaining the judicial corrections of the most obvious constitutional flaws, the discriminatory intent motivating the 2011 plans carries forward as a matter of law and infects the 2013 enactment.

### b. The Legislature Had An Affirmative Duty to Ensure that the Plans They Enacted in 2014 Complied with the VRA and Constitution

Though the intentional discrimination that this Court found existed in the 2011 plans is sufficient to invalidate the 2013 plans, the enactment of this Court's interim maps without substantial change demonstrates a willful dereliction of the Texas Legislature's duty to ensure that 2013 enacted maps afforded the citizens of Texas equal protection under the law. The Fourteenth Amendment to the Constitution dictates that "[n]o state shall make or enforce any law

10

which shall. . . deny to any person within its jurisdiction the equal protection of the laws." This command necessarily imposes a duty on state lawmakers to ensure to the best of their ability that their enactments are free from the taint of discrimination. *See Lehr v. Robertson*, 463 U.S. 248, 265 (1983) ("The concept of equal justice under law requires the state govern impartially. The sovereign may not draw distinction between individuals based solely on differences that are irrelevant to a legitimate government objective."); *Bush v. Vera,* 517 U.S. 952, 1039 (1996) (Stevens, J. dissenting) ("Legislatures and elected representatives have a responsibility to behave in a way that incorporates the 'elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially.'") (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 452 (1985)).

Further, "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Branch v. Smith,* 538 U.S. 254, 262 (2003). Representative Darby, as Chairman of the House Select Committee on Redistricting during the 2013 process, recognized this duty, and further stated on the floor, and reiterated at trial, that "Chair Head has unique responsibilities" to comply with the Constitution and Voting Rights Act during the redistricting process. Joint Exhibit 12.4, at 10; Trial Tr. 1567:4-17(Darby)). The Fifth Circuit has held that the duty of the legislature to ensure that its laws do not run afoul of the Equal Protection Clause, in conjunction with the legislature's duty and responsibility in redistricting, requires the legislature to eradicate vestiges of discriminatory intent from its districting plans. *See Kirksey v. Board of Supervisors*, 554 F.2d 139, 148 (1977). In *Kirksey*, the Court analogized eliminating traces of discrimination in redistricting to the desegregation of schools, stating that "when a jurisdiction which has purposefully or intentionally created a denial of minority access to the political process adopts a plan of

11

apportionment, it is under a duty to make sure that any apportionment plan it proposes ameliorates that denial of access." *Id.* at 148 n.16; *see also Mississippi State Chapter, Operation Push v. Mabus,* 932 F.2d 400, 407-08 (5th Cir. 1991)("A legislative plan cannot remedy a violation of the Voting Rights Act if the plan itself is racially motivated. A remedy for a § 2 violation must not itself grow out of discriminatory intent.").

Defendants' position in this litigation since the enactment of C235 in 2013 has been that the State of Texas could not possibly be guilty of intentional discrimination in enacting that plan because it simply adopted the Court's interim plan, notwithstanding this Court's emphasis on the "preliminary and temporary nature of the interim plan" in its Opinion on the interim house plan dated March 19, 2012. *Perez v. Abbott,* ECF No. 690, at 12. But undermining Texas' position, the Supreme Court made clear that in developing an interim map, this Court should apply a preliminary injunction standard, making changes only "to the extent those legal challenges are shown to have a likelihood of success on the merits." 565 U.S. at 394. Furthermore, the Supreme Court noted in *University of Texas v. Camenisch* that "given the haste that is often necessary . . . a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." 451 U.S. 390, 395 (1981). Because of this less-than-complete showing at the preliminary injunction stage, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* Despite this plain law and the assertions of this Court that the interim remedy did not reflect a full ruling on the merits, Texas has persisted in claiming a safe harbor by the adoption of the Court's interim map.

But, as noted by this Court in its 2012 opinions on the interim Congressional and House plans, the interim maps which were adopted in their entirety or near-entirety were based largely

on the challenged 2011 maps, and the interim maps drawn without the benefit of complete and final findings on the merits. Opinion on Plan H309, *Perez v. Abbot,* ECF No. 690 at 12 (noting "preliminary and interim nature of the interim plan); Opinion on Plan C235, ECF No. 691 at 2 (noting that the court "has been able to make only preliminary conclusions that may be revised upon full analysis"); Trial Tr. 7/15/17 at 1775:11-1776:9 (Judge Rodriguez noting the interim nature of the maps and that the Court "didn't resolve all the problems"). The preliminary nature of the findings, coupled with the exigent circumstances under which the maps had to be drawn inevitably resulted in maps that did not purport to remedy *all* existing violations of the Constitution and Voting Rights Act, but rather incorporated unconstitutional aspects of the 2011 map that not identified at the preliminary stage. See, e.g., ECF No. 1339, at 35 (Mar. 10, 2017). As discussed in the NAACP Plaintiffs' pretrial brief, *see* ECF No. 1454, at 8-9, it is not atypical for interim maps to fall below usual constitutional standards when an election is imminently on the horizon. *See Upham v. Seamon,* 456 U.S. 37, 44 (1982) ("It is true that we have authorized District Courts to order or permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements . . . . Necessity has been the motivating factor in these situations"); *Campos v. Houston*, 984 F.2d 446, 452 (5th Cir. 1992) ("Under appropriate circumstances, even an unconstitutional plan may be implemented on an interim basis"); *Terrazas v. Clements,* 537 F. Supp. 514, 538 (N.D. Tex. 1982) ("[I]n an emergency, a district court may adopt as an interim measure a redistricting plan that otherwise may not comply with the stringent requirements for a permanent court ordered plan") (collecting cases).

Thus, it was uniquely the duty of the 2013 legislature to ensure that their enactments were consistent with the mandates of the Constitution and the Voting Rights Act. This Court heard

testimony at trial which indicated that Chairman Darby had read and was aware of the findings

of the D.C. District Court as to problematic areas of the 2011 House and Congressional maps.

Trial Tr. 7/14/17 at 1581:1-1585:24 (Darby). Additionally, this Court heard testimony that not

only did Chairman Darby read this Court's opinion on its interim maps, Trial Tr. 7/14/17 at

1559:1-1562:1 (Darby), but he also heard from Mr. Archer, chief attorney for the Texas

Legislative Council, that based on his reading of the opinions, "the Court perceives there's

additional work to be done." Trial Tr. 7/14/17 at 1572:18-15:73:15 (Darby).  Despite this, as this

Court noted, no evidence was presented to indicate that the Texas legislature undertook any

analysis to ensure that the maps it was planning to enact were void of constitutional defects. Trial

Tr. 7/15/17 at 1777:19-1778:15; 1789:25-1790:2 (Frederick). Instead, at trial the State

represented that it need not rely on the decision of the D.C. District Court in the Section 5

proceeding because "[i]t was not a final word in any sense" based on the fact that it had been

appealed. Trial Tr. 7/15/17 at 1785:12-16 (Frederick).  As this Court indicated, however, an

appeal does not invalidate the final order. Trial Tr. 7/15/17 at 1785:17-18 (Judge Rodriguez).

Further, in justifying their lack of analysis, the State indicated that they made no or only

insubstantial changes to the Court's maps because the legislature believed that the court had

fulfilled its "duty not to incorporate any legal defects." Trial Tr. 7/15/15 at 1787:22-1788:1788

(Frederick); s*ee also* Defendants' Pretrial Disclosures and Bench Brief, ECF No. 1460, at 2. The

legislature's wholesale refusal to meaningfully address and correct the illegalities persisting in

the 2011 plans lends further support to the NAACP's claims of intentional discrimination.

    **c.  Applying the *Arlington Heights* Framework, the Evidence in this Record Leads to the Unavoidable Conclusion that the Enactment of 2013 Redistricting Plans Was Motivated by Discriminatory Intent**

Claims of intentional discrimination in violation of the Fourteenth Amendment are adjudicated under the standard announced in *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 165-66 (1977). Plaintiffs are not required to produce a "smoking gun" or to prove that racial considerations predominated over all other considerations. *Id.* Instead, in *Arlington Heights*, the Supreme Court identified the kinds of indirect evidence that establish a prima facie case of intentional discrimination, including evidence of discriminatory effect, the history and events surrounding the government's actions, any departure from usual procedures, and discriminatory statements in the legislative history. *Id.* at 266-68. More recently, the Fifth Circuit further instructed that "[t]he circumstantial evidence of discriminatory intent is augmented by contemporary examples of state-sponsored discrimination in the record." *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016).

Under each of the factors that *Arlington Heights* established as relevant to ascertaining discriminatory intent, the evidence presented at trial supports a conclusion that discriminatory intent motivated the challenged legislation.

### 1. The Historical Background of the Decision

One source of circumstantial evidence relevant under *Arlington Heights* is "[t]he historical background of the decision, …particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267. Here, in the last few years, the Texas legislature has been consistent in its disregard for the constitutional rights of voters of color, such that a finding of discriminatory intent in the enactment of the 2013 plans would be of little surprise. Texas' voter identification law was found by two different courts to have a discriminatory effect. *See Veasey v. Abbott*, 71 F. Supp. 3d 627 (S.D. Tex. 2014); *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012), vacated on other grounds, 133 S. Ct. 2886 (2013). One court also found that the law was

motivated by discriminatory intent. *Veasey v. Abbott*, 2017 U.S. Dist. LEXIS 54253 * (Apr. 20, 2017); *see also*, Trial Tr. 7/12/17 at 938:25-940:21 (Lichtman); Trial Tr. 7/12/17 at 893:14-15 (Burton). Other legislation enacted by the legislature in recent years confirms this racially-hostile trend, such as sanctuary cities laws that "limit state funding to cities that prohibited police offices from inquiring into immigration status" and laws that require proof of citizenship for driver's licenses. Trial Tr. 7/12/17 at 938:25-940:21 (Lichtman). And, of course, this Court has already determined that the 2011 redistricting plans for House and Congress were motivated by discriminatory intent. Thus, the historical background to the 2013 enactment provides strong circumstantial evidence that the 2013 enactment was motivated by discriminatory intent.

2.   The Specific Sequence of Events Leading Up to the Challenged Decision

Another relevant piece of evidence on the decisionmaker's purpose is "[t]he specific sequence of events leading up to the challenged decision." *Id.* Again, here, looking at the sequence of events leading up to the 2013 enactment, it is again easy to identify circumstantial evidence of discriminatory intent. This Court issued its interim plans and opinion in support of those plans in March of 2012. *Perez v. Perry*, 891 F. Supp. 2d 808 (W.D. Tex. Mar. 19, 2012). The D.C. District issued its ruling denying Section 5 preclearance to the plans on August 28, 2012. *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012). Then, for months, the state of Texas took no action. Rep. Darby admitted there would have been time for the bill introduced in the regular session to be voted out of committee and considered on the house floor during the regular session, but that the House Committee on redistricting never met during the 2013 regular session because redistricting was not one of Darby's legislative priorities. Trial Tr. 7/14/17 at 1532:21-1533:17 (Darby). Instead, the legislature waited until the summer of 2013, in special session, to address the issue.

Rushing the enactments through with little debate and no amendment is in itself enough circumstantial evidence of discriminatory intent. As the Fourth Circuit noted in *N.C. NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016), which this Court cited in its May 2017 order, "the rushed and secretive process suggests that defendants did want to avoid scrutiny of whether their efforts in fact complied with the VRA or were intended to do so, or whether they were only creating a façade of compliance." In Texas, the process was similar, and likewise lends support to the NAACP Plaintiffs' claims that the process was motivated by discriminatory intent.

3. Departures from the Normal Procedural Sequence

Departures from the normal procedural sequence" can also be a source of evidence of improper purpose. *Id*. The Supreme Court further explained that "substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id*. This category of evidence provides the most overwhelming evidence that discriminatory intent was again a motivating factor in the enactment of both the challenged House and Congressional plans in 20145.

First, the 2013 redistricting committee was not even provided with the resources that 2011 redistricting committee received, which was a departure from a recent norm. Trial Tr. 7/10/17 at 147 (Rep. Martinez-Fischer). The 2013 process also departed from House Rules requiring every standing committee that deals with an agency to have a liaison from that agency at every hearing in the event that questions arise. Rep. Martinez-Fischer and other members requested access to the Attorney General's office, but were denied such access. Trial Tr. 7/10/17 at 148-149. Indeed, neither the Attorney General nor anyone from his office appeared before committee, but the Attorney General's office did meet with and provide counsel to the Committee Chairman and the Republican Caucus. Trial Tr. 7/10/17 at 150-51 (Rep. Martinez-

Fischer).  And, of course, when the Attorney General's Office was summoned to brief the Republican Caucus, apparently the only legal advice it gave in that entire meeting was that amendments could be accepted.  According to Rep. Darby, no one asked any other questions of the "experts" besides that.  Trial Tr. 7/14/17 at 1591:1-1593:7 (Darby).  Such a claim strains credibility, and even if true, would represent a very odd departure from standard procedure.

The House violated further its rules and the Texas Constitution in enacting S.B. 3. When the original House version of this bill was before the committee, H.B. 3, it failed to gain the necessary number of votes.  *See* JX 15.3 at 140-41 (H.B. 3 receives 9 aye votes, but 10 were required for approval).  Under Article 3, Section 34 of the Texas Constitution, "[a]fter a bill has been considered and defeated by either House of the Legislature, no bill containing the same substance, shall be passed into a law during the same session." The House Rules provide that this applies to bills considered in committee. Tex. House Rule 8, sec. 20. Rep. Thompson raised a point of order, which Chairman Darby overruled, drawing a distinction between a bill being defeated and a bill failing to pass.  *See* JX 28 at 62.

Additionally, by considering redistricting in the special session, the legislature was able to avoid the two-thirds rule in the Senate, which required two-thirds of the members to vote for a bill to be considered on the floor.  That rule was in place during 2013 regular session but not in place during the 2013 redistricting special session.  Trial Tr. 7/14/17 at 1563:7-19 (Darby).

Witnesses who testified at trial commented on the notable lack of meaningful process that marked the 2013 special session.  Trial Tr. 7/11/17 at 512 (Rep. Johnson) ("What I remember from 2013 is there not being really a process at all").  There was no effort to receive information from the legislators representing communities of color most directly impacted by the 2011 unconstitutional redistricting.  Trial Tr. 7/11/17 at 511:22-513:11 (Rep. Johnson) ("Generally,

what we'll do is we'll bring in people who have knowledge about a situation and people who have a stake in a situation . . . we engage them early in the process. And we try to come up with a policy solution based on that -- that input. I don't recall anything like that happening in 2013 with respect to redistricting."). No member of the Texas Legislative Black Caucus or any member of the Dallas delegation was asked how to improve the maps in that region. Trial Tr. 7/11/17 at 513:9-11 (Johnson); Trial Tr. 7/13/17 at 1318:20-23 (Rose). Rep. Johnson testified that other politically-important bills in that same legislative year—for example, HB 4, the water bill— received a much more meaningful process in the legislature. Trial Tr. 7/11/17 at 513:12-515:2 (Johnson)

The manner in which legislative leaders dealt with amendments was also suspect. Initially, Representative Darby was not going to allow any amendments. Trial Tr. 7/10/17 at 152 (Rep. Martinez-Fischer). Later, Darby said they would take amendments but took actions that made adopting meaningful amendments impossible. Trial Tr. 7/10/17 at 152-53 (Rep. Martinez-Fischer). When amendments were allowed, minority members' amendments were only accepted where: (1) they were insubstantial, involving only minor precinct swaps; and (2) all affected members agreed, including Anglo Republicans. Trial Tr. 7/14/17 at 1523:19-23 (Darby); *see also*, Trial Tr. 7/13/17 at 1317:22-1318:3 (Rose). Substantive amendments offered by African-American Representative Yvonne Davis (*see, e.g.,* Amendment 12 to SB 3, JX 17.1 at 47, 205) and Latino Representative Trey Martinez-Fischer (*see, e.g.,* Amendments 6 [JX17.1 at 17], 12 [JX 17.1 at 47, 205], and 14 [JX 17.1 at 208, 377] to SB 3), among others, were tabled and thus rejected. S*ee also*, Trial Tr. 7/13/17 at 1318:20 (Rose). Indeed, even a white Anglo Democrat was able to propose a successful amendment that more was more substantive than a simple

precinct swap, JX 17.1 at 23, 29 (Burnam amendment), so politics was not the motivator for such rejections.[3]

Finally, it was a significant procedural deviation that these maps were adopted in a special session called by the Governor for that explicit purpose when the legal activity that allegedly necessitated such action occurred early enough that the issue could have been dealt with during the regular session. Trial Tr. 7/12/17 at 943:5-14, (Lichtman). Redistricting was prioritized over issues that were noted by the governor to be emergencies, despite the fact that dealing with redistricting at that point could not have possible been deemed to be an emergency. Trial Tr. 7/12/17 at 944:15-23 (Lichtman). Thus, the process by which the 2013 redistricting plans were enacted was marked by significant departures from procedural and substantive norms, and this factor likewise strongly suggests that improper motives were involved in the process.

4. Legislative or Administrative History

The final piece of circumstantial evidence relevant to a discriminatory intent analysis is "[t]he legislative or administrative history…especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id*. at 268. Consistent with the other relevant circumstantial evidence, here, too, is there evidence consistent with discriminatory intent. Representative Darby expressed at nearly every hearing in floor debate that he believed the maps were legal, but when pressed about the legal context of how the maps came about and about the legal precedents by Representative Villalba, Darby refused to

---

[3] The NAACP Plaintiffs do not necessarily believe that the Burnam amendment qualifies as a substantive or significant one, and they maintain their argument that the failure of the legislature to make meaningful amendments and improvements to the interim plan renders the 2013 House plan just as constitutionally invalid as the 2011 House plan. But, to the extent that the Burnam is considered substantive, the fact that only a white Democrat was able to have adopted a substantive amendment and minority legislators were not is indicative that race, not party, was primary motive in the amendments process.

answer. Trial Tr. 7/14/17 at 1564:11-1565:25 (Darby). Rep. Darby heard testimony from Jeff Archer of the Texas Legislative Council that the interim maps were made under exigent circumstances and didn't represent a final judgment and that the court hadn't "gotten to the bottom of things," but took no action to remedy that. Trial Tr. 7/14/17 at 1570:11-1572:13 (Darby). He also heard Rep. Villalba express concerns to Mr. Archer that "the Court perceives there's additional work to be done," but offered or accepted no amendments to the congressional maps to do that additional work. Trial Tr. 7/14/17 at 1572:18-1573:15 (Darby). He likewise was present and heard Rep. Villalba discuss with Mr. Archer that some of the proposed amendments point out where legal weaknesses were in the interim maps, but these amendments were not adopted, even though Mr. Archer said it could cause legal risk. Trial Tr. 7/14/17 at 1574:5-1575:25 (Darby). Finally, Representative Darby stated during floor debate that §2 doesn't require coalition districts so coalition districts would not be considered, but Mr. Darby is an attorney and knew that the Fifth Circuit has held §2 can require coalition districts. On the stand, he implausibly stated that he did not know whether Texas was bound by the Fifth Circuit. Trial Tr. 7/14/17 at 1576:1-1578:5 (Darby). These exchanges and contemporaneous statements made by the redistricting chair indicate an awareness of and resistance to correcting the legal flaws still present in the interim maps, and that resistance is circumstantial evidence of discriminatory intent.

### 5. Discriminatory Effects

Lastly, while evidence of discriminatory effect is usually not sufficient to succeed on a Fourteenth Amendment intentional discrimination claim, the Supreme Court has acknowledged that sometimes the impact of a challenged law may be so clearly discriminatory as to allow no other explanation than it was adopted for a discriminatory purpose. *Id*. at 266. As a primary

matter, Representative Darby claimed the interim map fixed all problems identified by the D.C. Court but then acknowledged on the stand that parts of the Dallas-Fort Worth region that were identified as problematic were not changed. Trial Tr. 7/14/17 at 1581:1-1585:24 (Darby).

Indeed, parts of the map that were ruled unconstitutional by this Court remained completely unchanged in the 2013 plans, despite this Court's clear warning in the opinion on the interim maps that its ruling was only interim and based on an incomplete record and weighing of the evidence. Despite that cautioning, the Texas legislature made no effort to fix these many flaws.

For example, the configuration of CD 25 and CD 35 in C235 remains completely unchanged. The NAACP had argued that the fracturing of CD 25 and the minority communities within that district was a violation of the Fourteenth Amendment, and other plaintiffs groups argued that CD 35 was an unconstitutional racial gerrymander. This court agreed, noting that CD 35 inevitably and intentionally fractured communities of color in the areas surrounding it, as well. ECF No. 1339 at 35. Specifically, in creating unconstitutional CD 35, Ryan Downton splintered the surrounding minority communities in Travis County. *See id.* at 38 (noting that Downton admittedly "split the African-American community in East Austin because he had to include some of that population in CD35 'to create a conduit to pick up the rest of the Hispanic population in the northwest part of 35'"); *see also*, ECF No. 1340 at ¶ 413 ("In Plan C185, the dense African-American population of east Austin is divided between CD25 and CD35 . . . . The African-American population of eastern Travis County is divided among four districts (CD10, CD17, CD25, and CD35)."). The Court specifically called the African-American population in eastern Travis County "fractured." *Id.* Because this unconstitutional fracturing is unchanged in

C235, the NAACP Plaintiffs are entitled to judgment in their favor that C235 continues to unconstitutionally harm voters of color in Travis County.

Likewise, this court has ruled that the fracturing of Killeen in HD 54 in 2011 was racially discriminatory and unconstitutional, and the TX legislature made no effort to remedy this fracturing in the 2013 plan. Specifically, the Court noted that while "the Legislature's intentional failure to create the [coalition] district [HD 54] was not, standing alone, intentional vote dilution," it found that "the evidence does indicate that mapdrawers (specifically [Rep. Jimmie Don] Aycock) intentionally racially gerrymandered the districts to dilute the minority vote by moving minority population out of HD54 and moving Anglo population in, thus cracking and diluting the minority vote to ensure Anglo control over both districts." ECF No. 1365 at 76. The Court found that "Aycock's objections to minority-proposed plans were pretextual," and that his testimony providing justification for the way in which Killeen was split was not credible. *Id.* at 77; *see also* ECF No. 1364 at ¶¶ 680 (opposing an alternative plan because it utilized a land bridge even though H283 also uses a land bridge), 683 ("Aycock's assertion that it was more important to keep Lampasas County together with the City of Killeen as a community of interest than it was to keep the City of Killeen together as a community of interest is not credible."). Rather than this purported justification, the Court instead found that "the decision to split Killeen and the minority community within it was to ensure that HD54 and HD55 remained Anglo-majority, and would re-elect Republican incumbents," ECF No. 1365 at 77, the result of which was that "[m]inorities in Bell County do not have an opportunity to elect their candidate of choice in Plan H283." ECF No. 1364 at ¶ 682. Again, because the configuration of HD 54 is unchanged in H358, thus leaving the fracturing of minority voters in Killeen unremedied, the

NAACP Plaintiffs are entitled to judgment in their favor that H358 continues to be unconstitutional.

Finally, this Court found that the legislature had intentionally cracked and packed minority voters in Dallas and Tarrant Counties in the 2011 congressional plan, noting that much of the minority population in Dallas and Tarrant counties had been cracked "through bizarrely shaped fingers" that "put[] them into "Anglo-dominated" areas and that "strand[ed] urban Hispanic and African-American voters." ECF No. 1340 at ¶ 315. The Court found voters of color were fragmented "primarily among CD6, CD12, CD26, and CD33." ECF No. 1339 at 133. While the Court's interim map, and the creation of the current version of CD 33, remedied some of that cracking and packing, and examination of a racial density map illustrates that much of the cracking and packing present in 2011 still persists in the 2013 map. The map below is shaded by density of black and Latino voters at the precinct level. The darker the green shading, the higher the concentration of black and Latino residents is in that precinct. Congressional District 30 is still packed with voters of color, while voters of color in Grand Prairie, Arlington and southern Fort Worth are still stranded in Anglo-dominated districts. This continued cracking and packing, a remnant from the 2011 redistricting plans, renders the 2013 plan likewise unconstitutional.



2017 NAACP Ex. 039, at 3.

Thus, the substantial discriminatory effect that persists in the 2013 congressional and State House plans, beyond being evidence that the NAACP Plaintiffs are entitled to judgment in their favor on their vote dilution claims, is also evidence directly relevant to the NAACP's Fourteenth Amendment and intentional vote dilution claims. This is certainly one of those situations where the discriminatory effect is so obvious that an inference that it was intentional is natural and reasonable.

## IV.    The Section 2 Legal Framework Applicable to the NAACP's Claims

Section 2 of the Voting Rights Act of 1965 prohibits what is known as "vote dilution" in redistricting plans. A plaintiff may prove a Section 2 claim by first establishing the three

*Gingles* preconditions: (1) that the minority group in question is "sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is "politically cohesive"; and (3) that the "majority votes sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 427 U.S. 30, 50-51 (1986). If the three *Gingles* preconditions are proven, a reviewing court must then determine whether the "totality of circumstances" indicates that minority voters have been denied equal opportunity to participate in the political process. *Johnson v. DeGrandy*, 512 U.S. 997, 1009-12 (1994). Section 2 also prohibits intentional discrimination or intentional vote dilution, just as the Fourteenth Amendment does.

### a. The First Precondition

To satisfy the first *Gingles* precondition, plaintiffs must show "the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice. *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994). More recently, the Supreme Court has further defined that precondition as requiring plaintiffs to demonstrate there is "sufficiently large and geographically compact enough to constitute a majority in some reasonably configured legislative district." *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017). The Fifth Circuit's interpretation of the first prong of *Gingles* requires that plaintiffs show that minority voters in a proposed district will comprise a majority of the citizen voting age population in the district. *See Perez v. Pasadena I.S.D.*, 165 F.3d 368 (5th Cir. 1999), *cert. denied*, 528 U.S. 1114 (2000).

When examining a demonstrative district under the first prong of Gingles, a court will look to see whether the minority community is reasonable compact and the extent to which the district complies with race-neutral traditional redistricting criteria, but perfect compliance is not

required.  S*ensley v. Albritton,* 385 F.3d 591, 595-98 (5th Cir. 2004) (holding that the first

*Gingles* factor requires plaintiffs to show that their map comports with traditional redistricting

principles, but not addressing the degree to which the demonstration maps must comply with

these principles).  Such compliance certainly does not supersede the need to remedy violations of

the Voting Rights Act or constitution.  *See, e.g., Georgia State Conference of NAACP v. Fayette*

*County Bd. of Comm'rs*, 996 F.Supp.2d 1353, 1359 (N.D. Ga. 2014) ("[T]he Court-created plan

should follow the traditional redistricting principles, though these principles have less

precedence than the requirements of the Constitution and Voting Rights Act."); *Larios v. Cox*,

314 F.Supp.2d 1357, 1360 (N.D. Ga. 2004) ("Plainly, the requirements of the Constitution and

the Voting Rights Act took precedence over any traditional redistricting principles."  Indeed,

where the "selection and application of the traditional redistricting principles chosen by the

County dilutes their voting power, it would be unfair to require Plaintiffs to draw maps in strict

accordance with the county's priorities. Under this scheme, the entire Section 2 analysis is

infected by which traditional redistricting principles the county has prioritized, thereby

precluding any meaningful view of dilutive effect, if any, of the County's choice and application

of its chosen redistricting principles." *Rodriguez v. Harris County, Texas*, 964 F. Supp 2d 686

(S.D. Tex. 2013), aff'd *Gonzalez v. Harris Cty. Tex.*, 601 F. App'x. 225 (5th Cir. Feb 9, 2015).

"While the Plaintiffs are obligated to show that their maps comply with traditional redistricting

principles, Plaintiffs are not required to prioritize those principles in the same manner as

Defendants."  *Rodriguez*, 964 F. Supp. 2d at 746.

And furthermore, the failure to protect incumbents does not doom a *Gingles*

demonstrative district.  *Fayette County*, 996 F. Supp. at 1363 ("The consideration of a traditional

redistricting principle like incumbent protection is subordinate to the goal of remedying the § 2 violation and the requirements of the Constitution.").

With respect to the data appropriate for analyzing whether a proposed district satisfies the first prong of *Gingles*, post-enactment population and election data is relevant to the Section 2 inquiry because "given the long term nature and extreme costs necessarily associated with voting rights cases, it is appropriate to take into account elections occurring subsequent to trial." *Westwego Citizens for Better Gov't*, 906 F.2d 1042, 1045 (5th Cir. 1990) (per curiam); *see also Collins v. City of Norfolk*, 883 F.2d 1232, 1243 (4th Cir. 1989) (elections subsequent to 1984 trial considered by trial and appellate court). Moreover, the Supreme Court and a broad array of lower courts have recognized that an "effects" analysis under Section 2 requires a "searching practical evaluation of the past *and present* reality" of the challenged electoral system in operation. *Gingles*, 478 U.S. at 45 (emphasis added). Understanding that "present reality" requires an assessment of the actual current conditions in which a redistricting plan operates, which in turn requires the most recent evidence available. Thus, courts evaluating voting laws under Section 2 and Section 5 (when it was in effect), routinely looked to post-enactment evidence, included population data. *See, e.g., Brown v. Detzner*, 895 F. Sup. 2d 1236 (M.D. Fla. 2012); *Texas v. Holder*, No. 12-218, slip op. at 10 (D.D.C. June 5, 2013) (order granting motion to compel production of post-enactment documents and communication); *Favors v. Cuomo*, 11-CV-5632, slip op. at 9-15 (E.D.N.Y. Aug. 27, 2013) (memorandum and order granting motion to compel production of responsive post-enactment documents); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 2013 WL 690496, No. 11-CV0562, at *2 (E.D. Wis. Feb. 25, 2013) (ordering that the scope of discovery include post-enactment evidence). There is simply no requirement, in

*Gingles* or in any other Section 2 case, that plaintiffs pleading a Section 2 case are limited to the population data available to the legislature at the time of redistricting.

Beyond that, courts are not limited to considering updated data prepared by the Census Bureau. This Court has already recognized that population projections or other non-governmental population data may be used to satisfy the first prong of *Gingles*, assuming that the party proposing its usage satisfies the court of its reliability. *See* ECF No. 1339 at 76-77 (Mar. 10, 2017); *see also, Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999) (affirming district court's reliance on post-decennial census changes in housing stock in analysis of first prong of *Gingles*); *Johnson v. DeSoto Co. Bd. of Commissioners*, 204 F.3d 1335, 1341-42 (11th Cir. 2000) (affirming district court's reliance on post-decennial census voter registration data in analysis of first *Gingles* prong).

### b.  The Second and Third Preconditions

The second and third *Gingles* prongs are usually referred to, jointly, as "racially polarized voting"—that is, plaintiffs must demonstrate that minority voters support one candidate, while white voters support an opposing and often winning candidate. But the second prong of *Gingles* has received extra attention in this litigation because of the issue of coalition districts. This Court has recognized the clear directive of the Fifth Circuit that coalition districts can be compelled under the Voting Rights Act if the minority groups comprising the coalition are cohesive. *See League of United Latin Am. Citizens Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (*rehearing en banc*), *cert. denied* 114 S. Ct. 878 (1994) ("[i]f blacks and Hispanics vote cohesively, they are legally a single minority group); *Overton v. City of Austin*, 871 F.2d 529, 538 (5th Cir. 1989) (concluding that Section 2 permitted the court to order as remedy a district in which Mexican-Americans, although not a majority, could be aggregated

29

with blacks to achieve such a result, if the two groups could be shown to be politically cohesive and that Anglos voted in bloc); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) ("minority groups may be aggregated for purposes of claiming a Section 2 violation"); *Campos v. City of Baytown*, 840 F.2d 1240, 1244-45 (5th Cir. 1988) ("a (coalition) minority group is politically cohesive if it votes together") *reh'g denied*, 849 F.2d 943, *cert denied*, 492 U.S. 905 (1989); *League of United Latin Am. Citizens Council No. 4386 v. Midland ISD*, 812 F.2d 1494, 1501-02 (5th Cir. 1987), *vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc). Thus, the question becomes: what is minority cohesion and how do plaintiffs prove it?

Put most simply, "a minority group is politically cohesive if it votes together." *Campos v. Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). More expansively, "[t]he second *Gingles* precondition, whether the minority group is politically cohesive, explores the extent to which a group of voters shares the same beliefs, ideals, principles, agendas, and concerns, 'such that they generally unite behind or coalesce around particular candidates and issues.' In other words, the political cohesiveness inquiry is designed to examine the extent to which the minority group has distinctive minority group interests such that the affected minority group has a preferred candidate." *Rodriguez,* 964 F.Supp. 2d at 75. There is no requirement, however, that certain perfect cohesion or cohesion in primary elections be proven in order to legally satisfy the requirements for a coalition district. And, indeed, the fact that Gingles focus on political cohesion only supports this conclusion. *See, e.g., NAACP v. City of Columbia*, 850 F.Supp. 404, 417 (1993) ("Therefore, the clear impact of Justice Brennan's plurality opinion [in *Gingles*] is that political cohesion means that a significant percentage of the minority population is aligned behind a certain political candidate or agenda.").

    **i.** **Examination of General Elections Provides the Most Probative Evidence for Determining Whether There Is Racially Polarized Voting and Whether Minority Voters Are Politically Cohesive**

As a primary matter, Section 2 of the Voting Rights Act is focused on the opportunity for voters of color to <u>elect</u> the candidates of their choosing.  The Supreme Court in *Gingles* stated plainly: "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into *minority and white* voting practices." *Gingles*, 478 U.S. at 56 (emphasis added).   That is, the inquiry is not whether voters of color might sometimes have different first choice preferences in the primary nominating a candidate for a general election— the inquiry is focused on whether the minority group acts as a politically cohesive unit.  If they are politically cohesive in a general election, that satisfies the inquiry in *Gingles*.  *See also*, *Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 278 (2nd Cir. 1994) (upholding use of general election data to determine coalitional cohesive voting), vacated and remanded on other grounds, 512 U.S. 1283 (1994).

The Fourth Circuit in particular is in agreement, noting "candidates who receive 99+% of the black vote in general elections are the black-preferred candidate *in that election,* regardless of their level of support in the primary. We reject the proposition that success of a minority-preferred candidate in a general election is entitled to less weight when a candidate with far greater [minority] support was defeated in the primary. Such a view is grounded in the belief that minority voters essentially take their marbles and go home whenever the candidate whom they prefer most in the primary does not prevail, a belief about minority voters that we do not share."

*Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 615 (4th Cir. 1996), *cert. denied*, 520 U.S. 1229 (1997).  That appeals court also explained "acceptance of this argument would require that we carry forward the candidates' black-preferred status from the primary to the general election, when the Voting rights Act is clearly concerned with whether blacks have an equal opportunity to elect the candidate of their choice in both nominations and elections."

Additionally, general elections provide more probative evidence of minority voting patterns because participation is so much higher and more accurately reflects the voting patterns of the entire group.  *See City of Columbia*, 850 F. Supp. at 418 ("It is particularly appropriate to be wary of relying on black voter behavior in low black turnout elections to determine political cohesiveness."); *see also, Campos,* 840 F.2d at 1245 (use of racially-contested elections is appropriate precisely because minority turnout is higher when there is a candidate of color on the ballot).

Finally, it is generally accepted that racially contested election also provide the most probative data for examining whether voting is racially polarized.  This is not, however, to imply that the preference for such elections reflects an assumption that the minority candidate is always the candidate preferred by voters of color.  That is not the case.  Rather, focusing on racially contested elections is proper because "minority turnout increase[s] dramatically when there [is] a candidate who [is] a member of the minority group."  *Campos*, 840 F.2d at 1245.

### ii. *Contrary to Defendants' Assertions in Closing Argument, LULAC v. Perry Does Not Suggest that Coalition Districts Can Only Be Proven Required on the Basis of Primary Election Results*

Defendants' representation in closing argument that *LULAC v. Perry*, 548 U.S. 399 (2006), stands for the proposition that consideration of primary elections is critical for a determination of cohesion in coalition districts was a mischaracterization of facts explained and

conclusions reached in that case.  As a primary matter, the district at issue in that litigation—

Congressional District 24 represented by Anglo Democrat Martin Frost—was quite different

than any districts being advocated under Section 2 by Plaintiffs in this case.  In *LULAC*, CD 24

was an African-American influence district—the district was not majority black and Latino, and

African Americans comprised only comprised 25.7% of the district's CVAP.  *Id*. at 443.

      At the trial court level, the district court heard contradicting evidence that the district was

one in which African Americans were able to elect their candidate of choice, and evidence that

white Anglo Democrats dominated the district and black voters would not be able to elect their

candidate of choice if that candidate were black.  Looking to primary elections, the District Court

concluded, however, that African-Americans could not elect their candidate of choice in the

primary election.  In support of that conclusion, the trial court "relied on testimony that the

district was drawn for an Anglo Democrat, the fact that Frost had no opposition in any of his

primary elections since his incumbency began, and District 24's demographic similarity to

another district where an African-American candidate failed when he ran against an Anglo."  *Id*.

at 444.

      Thus, the question was whether an existing district that did not elect a minority candidate

was a protected Section 2 district, not whether Section 2 compelled the creation of coalition

districts, as is the case in most of districts the NAACP seeks to have drawn as Section 2 remedy

districts.  Additionally, the Supreme Court did not make any statements as to the validity or

reliability of utilizing primary data to determine minority voting cohesion in §2 challenges;

rather, they simply concluded that the district court heard trial testimony supporting both the

defendant and the plaintiff's description of a district, and "we cannot say that it erred in crediting

the testimony that endorsed the latter interpretation." *Id.* at 444.  The Supreme Court has stated

on numerous occasions that "the very premise of clear error review is that there are often 'two permissible' – because two 'plausible'—'views of the evidence.'" *Harris v. Cooper,* 137 S. Ct. 1455, 1468 (2017) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). That is, because the Supreme Court simply deferred to the district court's review of uncontested primary elections in concluding that it was not able to determine whether a white Democrat was the candidate of choice of black voters, that case does not stand for the proposition that Defendants propose it does.

### c.   The Totality of Circumstances

Even after proving that the three *Gingles* preconditions are present, plaintiffs must further demonstrate that a Section 2 is warranted to remedy vote dilution under the totality of the circumstances. When determining whether vote dilution has occurred under the totality of circumstances, courts generally are guided by the so-called "Senate Factors" or *Zimmer* factors identified in a United States Senate report accompanying the reauthorization of the Voting Rights Act in 1982. A Court must make a searching examination of the past and present political realities, even though it will be the rare case in which plaintiffs have established the *Gingles* preconditions that they cannot also show that, in the totality of circumstances, minority voters have less opportunity than Anglo voters to participate in the electoral process and to elect candidates of their choice. *See Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006); *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 983-984 (1st Cir. 1995); *Jenkins v. Reed Clay Consol. Sch. Distr. Bd. of Educ.*, 4 F.3d 1103, 1116 n. 666, 1135-36 (3rd Cir. 1993).

The factors elucidated by Congress that are relevant to Section 2 liability are: the extent of any history of official discrimination that touched the minority group members' rights to register, to vote, or otherwise to participate in the democratic process; the extent to which voting

is racially polarized; the extent to which potentially discriminatory practices or procedures, such as unusually large election districts, majority vote requirements, or anti-single-shot provisions, have been used; if there is a candidate slating process, whether minority candidates have been denied access to it; the extent of any discrimination against minorities in education, employment and health, which might hinder their ability to participate effectively in the political process; whether political campaigns have been characterized by overt or subtle racial appeals; the extent to which minority group members have been elected to public office; whether there is a lack of responsiveness on the part of elected officials to the minority group's particularized needs; and whether the policy supporting the use of the voting policy or practice is tenuous. *Gingles*, 482 U.S. at 36-37 (citing S. Rep. No. 97-17, at 28-29, 1982 U.S. Code Cong. & Admin. News 177). Courts do not require that all these factors be present, or even that a certain number of them be satisfied. S. REP. No. 97-417, at 29.

The NAACP will review briefly here the totality of circumstances evidence established at trial that is applicable to all its claims, and will, in the district-specific sections, review the totality of circumstances evidence specific to that region.

      i.   *"The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the political process."*

While Texas has a long and sad history of racial discrimination in voting, which is relevant under the totality of circumstances analysis, recent legislative action and court rulings confirm that "discrimination continues in Texas." Trial Tr. 7/12/17 at 941:10-17 (Lichtman) Indeed, "Texas has not departed from its longstanding, consistent, and, thus far, unceasing pattern and custom of passing election laws that make it harder for African-American, Latino or Hispanic, and other minority citizens to vote. Quite to the contrary, Texas recent laws represent

a clear continuation of Texas history of racial discrimination in voting." Trial Tr. 7/12/17 at 872:2-872:9 (Burton).

It is important to analyze older events dating back to 1964, because it shows a continuing pattern of minority voter suppression that is irrelevant to political party affiliation. For each of these major periods, the party in power used voter fraud as their rationale, and each time the courts found that their true intent was racially discriminatory. Trial Tr. 7/12/17 at 874:5-875:10 (Burton).

First, minorities were banned from voting in primaries under state law. Trial Tr. 7/12/17 at 875:20876:4 (Burton). Once that was struck down, "they changed - that is, the State of Texas changed the primaries to say the primary was not part of the state but was part of a Democratic party, tried to get Republicans also to do primaries," and voters of color were excluded that way. Trial Tr. 7/12/17 at 876:4-876:8 (Burton). The Supreme Court invalidated the white primary in *Smith v. Allwright*, holding that "the purpose of it was to exclude minorities." Trial Tr. 7/12/17 876:9-876:14 (Burton).

Texas did not have a literacy test, which is why it was not covered by the original 1965 Voting Rights Act, "[b]ut what they did do is they had, in fact, rules that you could not help someone who was illiterate." Trial Tr. 7/12/17 876:20-876:22 (Burton). This prohibition was struck down in 1970 when a court found that it was, in effect, a literacy requirement. Trial Tr. 7/12/17 876:22-877:3 (Burton).

Likewise, Texas has a history of implementing a poll tax as a means to discriminate against voters of color. "[T]he sort of reason given was to prevent fraud and corruption. But as it was stated several times, the primary reason behind it, in fact, was to disenfranchise and keep minorities from voting, and some poor whites as well, as the later Senate Factor 5 shows,

because of -- the people who were least likely to be able to pay it are minorities, poor people and others." Trial Tr. 7/12/17 at 877:7-877:22 (Burton). Immediately after the poll tax was invalidated, "the state legislature did a constitutional reregistration, said that everybody had to be reregistered, knowing that that would get rid of a lot of minority votes." Trial Tr. 7/12/17 at 880:3-880:5 (Burton). The asserted justification was to prevent fraud and guarantee purity at the ballot box, but again, this was simply another attempt to disenfranchise voters of color, and was likewise invalidated. Texas voter ID requirement, struck down by the Fifth Circuit last year, is modern day evidence of the continuing official discrimination against minority voters. Trial Tr. 7/12/17 at 939:4-11 (Lichtman). Finally, it highly relevant than in every redistricting cycle in Texas since 1970, courts have found that that the Texas legislature disadvantaged minorities in terms of representation. (Burton 7/12/17 881:8-882:23). Per this Court's rulings in March and April of this year, that trend continues.

ii. *"The extent to which voting in the elections of the state or political subdivision is racially polarized."*

As essentially expert who has testified in this case agrees, voting in Texas is racially polarized. *See, e.g.,* Quesada 2017 Ex. 1 (Lichtman Report), Rodriguez Ex. 955 (Ansolabehere Report), MALC 2017 Ex. 19 (Brischetto Report); NAACP 2017 Ex. 002 (Chervenak Report). A majority of Anglo voters generally do not support the candidates of choice of voters of color. *Id.* Indeed, this pattern is only becoming more marked. Elections in the state are becoming more polarized between white and minority voters, and observers are also noticing an increasing cohesiveness between African-American voters and Latino voters. Trial Tr. 7/13/17 at 1245:13-1247:9 (Murray).

iii. *"the extent to which the state or political subdivision has used unusually large districts, majority vote requirements, anti-single shot provisions, or*

> *other voting practices or procedures that may enhance the opportunity for*
> *discrimination against the minority group."*

Recent legislative action has enacted or codified voting practices and procedures that enhance the opportunity for discrimination against minority voters. The state legislature recently removed the century-old straight ticket voting option, which was heavily used by voters of color. Trial Tr. 7/13/17 at 1252:5-1253:14 (Murray). The legislature also only made minor tweaks to voter identification law, despite many courts criticizing it as discriminatory. Trial Tr. 7/13/17 at 1253:15-1254:12 (Murray). These statewide actions establish the presence of this Senate Factor as well, while county level actions also contribute to the substantial opportunity for discrimination against voters of color. *See, e.g.*, Trial Tr. 7/13/17 at 1281:25-1282:7 (Murray) (citing specific events that occurred in Harris County with respect to the voter ID issue that he believed to be discriminatory).

> iv. *"The extent to which members of the minority group in the state or*
> *political subdivision bear the effects of discrimination in such areas as*
> *education, employment and health, which hinder their ability to*
> *participate effectively in the political process."*

The next Senator Factor is also widely present in Texas. There are gaps in income and education between Anglos and minorities which are the result of "long-standing, ongoing lingering discrimination" that "directly affects the ability of minorities to participate in the political process and to elect candidates of their choice. Problems with education, health, income, unemployment are a barrier to voter turnout. They affect the ability to recruit candidates, to finance campaigns, and thus are – interact with any other discriminatory system to magnify the effects of that discrimination." Trial Tr. 7/12/17 at 942:3-11 (Lichtman). Indeed, since this Court

last accepted evidence in 2014, socioeconomic disparities have gotten slightly worse since the last phase of trial. Trial Tr. 7/12/17 at 942:19-25 (Lichtman).

Specifically, disparities in educational attainment persist, and there are several documented instances in Texas of opposition to school integration.  Trial Tr. 7/12/17 at 885:19-886:19; 885:21-885:23 (Burton).  Many scholars concur in finding that there is a "new resegregation" that has come about following new housing patterns, private schools, and changes of that nature.  Trial Tr. 7/12/17 at 885:24-886:3 (Burton).  Indeed, statistics show that education disparities are getting worse between Anglos and African-Americans and Hispanics 7/12/17 at 886:8-886:10 (Burton).  This may be due in part to the higher rates of disciplinary action and expulsion against African-American and Hispanic children compared to Anglo children for similar offenses and how that relates to graduation, and how that can impact how likely children are to participate in the electoral process later on in life.  Trial Tr. 7/12/17 at 886:11-886:18 (Burton)

Likewise, racial disparities in employment persist in Texas, with higher rates of unemployment among African-Americans and Hispanics as compared to Anglos, and recent evidence of racial discrimination in employment, particularly in government employment Trial Tr. 7/12/17 at 886:23-887:4 (Burton).  All of these factors impact the ability of citizens of color to participate in the political process, and thus are relevant to a totality of the circumstances consideration.

     v.   *"Whether political campaigns have been characterized by overt or subtle racial appeals."*

While candidates and campaigns rarely use the types of overt racial appeals that marked campaign language a few decades ago, there is still widespread use of coded language that in fact still represents the same sort of appeals to Anglo voters and their implicit biases.   Trial Tr.

7/12/17 at 891:13-893:4 (Burton).  People understand the context of subtle racial appeals and how they develop, thanks to their prevalence in the current political climate.  Trial Tr. 7/12/17 at 889:13-889:23 (Burton).

Debate around immigration has become racially coded.  Immigration itself, and the idea of fraud related to that, has been painted in a way that is intended to trigger implicit racial bias that makes people view immigrants as the "other." Trial Tr. 7/12/17 at 890:3-891:9 (Burton).  In the most recent presidential campaign, in Texas and nationwide, now-President Trump made explicit appeals to racial resentment in low-income white populations. Trial Tr. 7/13/17 1256:1-1259:4 (Murray).  Additionally, Republican Congressman Marchant, an Anglo from the DFW region, made statements such as: "Immigration overhaul is very unpopular in my district... if you give the legal right to vote to 10 Hispanics in my district, seven to eight of them are going to vote Democrat." Congressman Marchant made these statements approximately a week before the enactment of plan C235 by a congressman in the DFW area and though not a part of the legislature, his comments are nonetheless significant because congresspersons can have a significant impact on how their districts are drawn in Texas. Trial Tr. 7/12/17 at 951:8-952:22 (Lichtman).  The racial rhetoric surrounding immigration can properly be viewed under this totality of circumstances rubric.  Finally, Dr. Lichtman noted that the term "states' rights," commonly used in Texas, is considered a "mask for discriminatory practices" and this kind of language was present around the time C235 was enacted. Trial Tr. 7/12/17 at 949:4-950:15 (Lichtman).  Thus, this Senate Factor is also present in Texas.

> vi.  *"Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."*

In its opinions of March and April 2017, this Court recognized that Anglo Republican representatives were not responsive to the needs or interests of minority voters. *See, e.g.,* ECF No. 1340, at ¶ 742 (Mar. 10, 2017); ECF No. at 554 (Apr. 20, 2017). It also acknowledged that the NAACP Report cards were an effective barometer for determining which members of Congress support the interests of the African-American community." ECF No. 1340, at ¶ 742. Anglo representatives received, on average, considerably lower scores than their colleagues of color on the NAACP legislative report cards 7/13/17 at 1260:24-1261:4; 1263:13-1264:6 (Murray). All of this is evidence of the presence of this Senate Factor.

       vii.   *"The extent to which members of the minority group have been elected to public office in the jurisdiction."*

While such proportionality is not dispositive in a challenge to single-member districting, it is a relevant fact in the totality of the circumstances to be analyzed . . ." *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994). Proportionately, according to 2008-2012 ACS data that would have been available to the legislature in 2013: Anglos made up 57% of CVAP which translates to 20.5 Anglo congressional districts, and minorities made up 43% which translates to 15.5 districts. However, in the 2013 plan, there were 25 Anglo districts. Anglos were overrepresented by 5.5 districts, Hispanics were underrepresented by 3 districts, and African Americans were underrepresented by .8 (or 1) district. 7/12/17 at 926:22-928:23 (Lichtman). And, of course, in Texas, there has been a surge in Hispanic citizen voting age population, and the census data significantly understate that presence, meaning the disproportionality is even worse than it appears. Trial Tr. 7/13/17 1248:4-7 (Murray). Again, yet another Senate Factor is present, and an analysis of the totality of the circumstances amply establishes that Section 2 relief is warranted.

V.    **The Evidence in the Record Warrants Section 2 Districts in Each of the Areas where the NAACP Has Claims**

Applying this legal framework to the NAACP Plaintiffs' claims and evidence they presented in this phase and the 2014 phase of this case, this Court should find that the NAACP Plaintiffs have proven all the elements of a Section 2 claim in each of the areas where such claims were raised.

A.    **The NAACP's Section 2 Claims for Congressional Districts in DFW**

The map proffered by the NAACP Plaintiffs demonstrates a lawful configuration of congressional districts in Dallas Fort Worth Metroplex—a configuration that remedies all the intentionally-discriminatory cracking and packing that still mars C235 even after this Court's partial remedy. The NAACP's Plan C284 creates an additional minority opportunity district (District 24) in the region and maintains District 30 as an African-American opportunity district and District 33 as a minority opportunity district. The NAACP's proposed configuration of congressional districts could be ordered on that basis alone. However, the NAACP Plaintiffs have also satisfied all of the *Gingles* preconditions and demonstrated that, under the totality of circumstances, a Section 2 remedy is warranted.

The NAACP's expert analyzed districts in Plan C284 to determine whether those districts satisfied the first prong of *Gingles*. First, as mentioned above, there is an additional majority minority district in the region. CD24 is majority black plus Latino district, and Latinos make up a plurality of the voters with 39.8% HCVAP using the 201102915 ACS 5-year data set. NAACP 2017 Ex. 004, at 11 (Fairfax Report). Additionally, Mr. Fairfax performed the same type of population projections he performed in 2014, that this Court noted could be considered in the 2013 case. Trial Tr. 7/13/17 at 1017:6-9. That analysis showed that today, in 2017, CD 24 is 43.66% HCVAP, and that the Latino population is growing at a much faster rate than is the black

42

population in the district.  NAACP 2017 Ex. 004, at 33.  While this is a true coalition minority opportunity district, this district will elect the Latino candidate of choice and it is very likely that candidate will be Latino.

Mr. Fairfax also looked at a number of traditional redistricting criteria to make sure that the minority opportunity districts in the region in C284 encompassed reasonably compact minority communities.  CD 33 is now entirely contained with Tarrant County and is significantly more compact than it is in the current plan C235.  *Id*. at 12.  CD 24 is also a reasonably compact district, by mathematical scores.  While it does contain a portion of Tarrant County, it is a predominantly Dallas-based district.  *Id*.  Moving CD 33 entirely into Tarrant County will resolve some of the tensions between Dallas and Fort Worth interests that have marked recent elections, and will give Tarrant County one congressional district entirely within its county boundaries.  Trial Tr. 7/13/17 at 1305:6-21 (Moss).  It is problematic that Tarrant County, which has more than enough population to support more than one congressional district all on its own, is so carved up in the current plan.  *Id*.  Even though CD 24 does contain a portion of Tarrant County, it is small, and the congruous nature of the communities included in the district will mitigate any potential regional conflict.

The NAACP's new district also respects political subdivisions, including VTDs, municipalities and counties.  The NAACP's minority districts split fewer counties overall.  Trial Tr. 7/13/17 at 1020:2-6.  CD 24 splits only one VTD, which is quite low for a congressional district.  Trial Tr. 7/13/17 at 1020:7-10.  Although the population will need to be zeroed out, it is likely that can be done without splitting additional VTDs, or perhaps just splitting one more.  *Id*. When looking at split places (cities, towns and census-designated places), CD 24, the additional

minority opportunity district, split less than half the number of places split by the district in C235 (17 v. 8 split places).  NAACP 2017 Ex. 004, at 13.

Finally, when examining the number of neighborhood splits using a prominent commercial database that identifies neighborhoods, Mr. Fairfax found that the NAACP's demonstrative minority districts, on the whole, respected neighborhoods to the same extent, if not slightly more, than did the benchmark plan.  *Id.*  Thus, the NAACP's demonstrative plan, and in particular, the additional Gingles district, demonstrates a high level of respect for traditional redistricting criterial.

Additionally, looking at the areas encompassed by the NAACP's CD 24, that district encompasses much of the same areas in current House Districts 103 and 104, which are historic and politically active Latino communities and currently elect Latino representatives.  Trial Tr. 7/11/17 at 524:17-526:15 (Johnson); *see also*, Trial Tr. 7/13/17 at 1312:22-1313:4 (Rose) (NAACP's proposed CD 24 unites in one district the areas represented by State House Representatives Anchia and Alonzo).

Moving then to the second prong of *Gingles*, the evidence in the record demonstrates that black and Latino voters are politically cohesive and can be treated as one minority group for purposes of creating a coalition district.  The NAACP's expert Dr. Edward Chervenak examined a number of state House and statewide elections in Dallas and Tarrant Counties.  For the statewide elections, he selected elections from 2014 and 2016 (that is, since the last time the Court took evidence in this case) where there was an African-American or Latino candidate running against an Anglo candidate.  2017 NAACP Ex. 002, at 2.  In each of those elections examined in both counties, Dr. Chervenak's analysis demonstrated that black and Latino voters voted cohesively in support of the minority candidate, and that Anglo voters did not support the

candidate preferred by black and Latino voters. *Id*. at 6-8. That is, voting was racially polarized and minority voters were politically cohesive. *Id.* at 6-8, 16-17. The same pattern was present in the State House elections he examined. *Id.* at 16-17. Lay testimony in both the 2014 and 2017 trials in this action buttressed Dr. Chervenak's conclusions, as numerous witnesses testified at trial to the ways in which black and Latino voters in the DFW region had supported the same candidates, whether the candidate was black or Latino. Trial Tr. 7/11/17 at 519:2-521:4 (Johnson); Trial Tr. 7/13/17 at 1311:17-1312:3 (Rose); Trial Tr. 7/13/17 at 1293:6-11 (Moss).

Dr. Alford's study does not undermine this conclusion for several reasons. First, broad conclusion that black and Latino voters are not cohesive is not supported by the very data upon which he relies. When looking at statewide elections where neither black nor Latino voters were internally cohesive, he often concluded that those black and Latino voters voted in opposition to each other even where one of the minority groups did not have an identifiable preferred candidate. Trial Tr. 7/14/17 at 1471:3-1471:1 (Alford). This demonstrates Dr. Alford's bias. Additionally, he performed no analyses of his own, relying on the Attorney General's office to perform endogenous inference analyses of CD 33 primaries in recent years. Given the central role that the AG's office has played in urging the legislature to abdicate its duties to draw fully legal and constitutional maps, this bias requires a complete discounting and discrediting of Dr. Alford's testimony. Trial Tr. 7/14/17 at 1416:25-1420:1 (Alford). Finally, the results of primary elections in one district, where black and Latino voters are indisputable cohesive in the general elections that actually elect the representative, is inconsistent with *Gingles'* directions that cohesion need not be perfect. *Gingles*, 478 U.S. at 56.

Finally, an examination of the totality of circumstances in the DFW region further supports the need for a Section 2 remedy district. In 2014, this Court heard testimony that

African-American and Latino voters in Dallas County face many of the same hurdles in day to day life. These communities suffer from lack of access to health care, lack of fair educational opportunities and persistent economic disparities. Trial Tr., 7/17/14 at 1134:1-1135:5 (Magdaleno). Schools in Dallas County are still highly segregated, with black and Latinos being concentrated in some schools, and Anglos in others. Trial Tr. 7/15/14 at 572:2-9 (Wallace). The challenges facing black and Latino residents alike that would interfere with political participation, including lack of access to healthcare, poverty and racial profiling persist today. Trial Tr. 7/13/17 at 1311: 6-16 (Rose); see also, Trial Tr. 7/11/17 at 521:22-523:24 (Johnson) (when voters of color face the disparate health issues, school issues, and other socioeconomic challenges that they do, it is harder to get those voters engaged and participating in the political process.)

In Tarrant County, NAACP member Mr. Moss testified to the presence of several Senate Factors. Residents of color in Tarrant County suffer disproportionately from healthcare issues, residual effects from past discrimination, that affect their ability to participate in the political process, from HIV, asthma and diabetes. Trial Tr. 7/13/17 1295:9-1296:25, 1299:7-1299:15 (Moss). Just as in other parts of the state, when individuals in Tarrant County are sick, voting becomes a lower priority than survival, and dealing with these health challenges impedes voter engagement efforts. Furthermore, some Latino residents in Tarrant County have difficulty served by regional hospitals because of their immigration status. Trial Tr. 7/13/17 1296:5-1296:22 (Moss). While these individuals are not yet eligible to vote, the financial impact on their families who may include citizens can have lasting effects on political participation.

Minority residents of Tarrant County bear the effects of past discrimination in education through inadequate allocation of resources to minority schools, programming, curriculum

development, quality of facilities, and educational materials.  Trial Tr. 7/13/17 1298:7-1299:6

(Moss).  The same is true with employment, which is largely a result of disparities in educational

opportunities.  Trial Tr. 7/13/17 1299:16-1299:21 (Moss).  Like with health disparities, the

aforementioned disparities in education and employment hinder their ability to effectively

participate in the political process Trial Tr. 7/13/17 1299:22-1300:11 (Moss).

Voting intimidation and discrimination are also still present in the region.  In the most

recent election, African-American precinct judges were resigning from their posts because

election observers were making them uncomfortable with accusations of voter fraud and other

intimidating efforts.  Trial Tr. 7/13/17 1300:12-1301:3 (Moss). And finally, in the DFW area,

Anglos are vastly overrepresented with 6/8 (75%) of the congressional districts, while only

accounting for about 60% of the citizen voting age population. Trial Tr. 7/12/17 at 937:5-938:17

(Lichtman).

Thus, based on all of this evidence, the NAACP has satisfied the *Gingles* preconditions

and demonstrated that, examining the totality of circumstances, a Section 2 remedy in the

region's congressional plan is warranted.

### B.  The NAACP's Section 2 Claims for House Districts in Bell County

The map proffered by the NAACP Plaintiffs demonstrates a lawful configuration of

House District 54 in Bell County—a configuration that remedies all the intentionally-

discriminatory cracking of Killeen that this Court identified in the 2011 map and that remained

unchanged in the 2013 map.  *See* ECF 1365 at 78 (Apr. 20, 2017).  Again, the NAACP's

proposed configuration of HD 54 could be ordered on the basis that remedies that constitutional

flaw alone.  However, the NAACP Plaintiffs have also satisfied all of the *Gingles* preconditions

and demonstrated that, under the totality of circumstances, a Section 2 remedy is warranted in Bell County.

First, the NAACP's version of HD54 in H392 is majority black and Latino, where it is majority Anglo in the current plan. Thus, the NAACP has demonstrated that it is possible to draw an additional minority opportunity district. Mr. Fairfax analyzed the district for compliance with the first prong of *Gingles*, and found that it was a district that respected traditional redistricting criteria and encapsulated a reasonably compact minority community. The compactness ratios for the NAACP's HD 54 are within the range of the other minority districts measured in his report and in the benchmark plan and thus the district is reasonably compact by mathematical measures. NAACP 2017 Ex. 004, at 19 (Fairfax Report). Likewise, the NAACP's HD54 exhibits a comparable level of respect for political subdivisions as does the current version. HD 54 splits 4 places (cities, towns and census designated places) in the benchmark plan, and it splits 4 places in the NAACP's plan. *Id.* Additionally, Mr. Fairfax noted that the NAACP's HD 54 is a Killeen-based district, including 97.7% of the city. It in includes part of Belton, which is the county seat and is part of the Killeen-Temple-Fort Hood metropolitan statistical area, which indicates that the areas are regionally aligned and have common interests. *Id.*

Phyllis Jones, a long-time resident of and community organizer in Bell County described how the district drawn by the NAACP represents a community of interest, particularly when compared to the current configuration. Ms. Jones testified to the many shared interests of voters of color in the district. The portion of Belton that is in the district shares many economic similarities with Killeen, and is very diverse, like Killeen itself. Trial Tr. 379:4-15 (Jones). Ms. Jones does substantial amounts of organizing work in Belton as well as Killeen, so she is aptly

situated to appreciate their similarities.  Trial Tr. 7/10/17 at 365:22-366:14; 380:10-14 (Jones).

The district as drawn by the NAACP runs along the Route 190 corridor, which even the state's

witness Representative Scott Cosper admitted is a community of interest.  Trial Tr. 7/11/17 at

612: 8-11 (Cosper).  Many residents of Belton, particularly the portion included in the NAACP's

version of the district, work on Fort Hood.  Trial Tr. 7/10/17 at 378:8-10 (Jones).  Indeed, traffic

between Belton and the Killeen/Fort Hood region has become so heavy that that portion of Route

190 has now been designated as Interstate 14.  Trial Tr. 7/10/17 at 379:16-380:9 (Jones).  While

the NAACP's version of the district does split Harker Heights, it does so because the portion

excluded does not share economic interests with the rest of the district (it is an area where

wealthier retired officers have settled).  Trial Tr. 396:12-22 (Jones).

    In contrast, the district as it exists now cannot be reasonably said to combine

communities of interest.  Lampasas County is very rural and predominantly Anglo.  Many of its

residents are very conservative, racial tensions run high there (affecting the very small number of

residents of color there).  Trial Tr. 7/10/17 at 381:6-382:20 (Jones).  This Court has previously

recognized that Lampasas County and Killeen do not share commonalities.  *See* ECF 1364 at 138

(¶ 138) (Apr. 20, 2017).

    Representative Cosper's testimony that the NAACP's version of HD 54 did not reflect a

community of interest or a reasonably compact minority community is not credible.

Representative Cosper is a first-term Republican representative of the district who wants to keep

being elected.  A change in the district that would substantially increase the minority population

would undoubtedly make it hard for him to be re-elected, particularly because has taken

positions on bills that the minority community does not support, such as the sanctuary cities bill

and many others.  Trial Tr. 7/11/17 at 617:25-619:16 (Copser); *see also*, Trial Tr. 7/10/17 at

49

376:8-377:2 (Jones).  Because of that self-interest, the Court should not give Rep. Cosper's

testimony much weight.  Additionally, Rep. Cosper complains about the inclusion of Belton in

the NAACP's demonstrative district, but his district already contains part of Belton.  Trial Tr.

7/11/17 at 616:6-10.  He incredibly asserts that rural and predominantly Anglo Lampasas County

has more in common with Killeen than does a very diverse, working class portion of Belton.

Trial Tr. 7/11/17 at 602:3-9 (Cosper).  Additionally, his assertions that black and Latino voters

do not vote together is undermined by both Dr. Chervenak's study and by the fact that he admits

now knowing how much support HD 54 candidate Claudia Brown, an African American,

received in her contest against Jimmie Don Aycock.  Trial Tr. 7/11/17 at 616:21-617:4 (Cosper).

Finally, he claims that the NAACP's district excludes extra territorial jurisdictions (ETJs) from

HD 54 that are areas of high growth on the outskirts of Killeen, but he offers no explanation of

why that matters.  Trial Tr. 7/11/17 at 606:10-607:16.  Indeed, to the extent those ETJs are

indeed areas of high growth, they are included in current HD 54 which is already overpopulated,

so their inclusion only exacerbates population inequality in the district.  See ECF No. 1365 at 74

(Apr. 20, 2017).

     Then, moving to the second and third prongs of *Gingles*, Dr. Chervenak again examined

statewide and endogenous elections in Bell County to ascertain the levels of racially polarized

voting and minority political cohesion.  Dr. Chervenak looked at a recent general election where

an African American candidate challenged the Anglo incumbent.  2017 NAACP Ex. 002, at 15.

In that endogenous election, black and Latino voters strongly supported the African-American

candidate, while white voters strongly opposed the black candidate.  *Id*. at 5-6, 15.  The same

pattern was appreciable in the exogenous elections he examined in Bell County: in each of those

five recent statewide elections, African-American and Latino voters voted cohesively, regardless

of whether the candidate was African American or Latino. *Id.* White voters did not support the candidate of choice preferred by minority voters. *Id.* Thus, Dr. Chervenak concluded that voting in Bell County was racially polarized and that minority voters were politically cohesive. *Id.* at 6. Lay testimony supported Dr. Chervenak's conclusions. Ms. Jones testified that since she last testified, African-American city council member Shirley Fleming was only able to win election in a majority-Anglo city council district because of the strong support she garnered from both Latino and African-American voters. Trial Tr. 7/10/17 at 372:3- 373:22 (Jones). Ms. Fleming received exceptionally high levels of support from Latino voters because of the efforts she made to engage Latino voters with her political campaign where they had never been before so invited to engage. Trial Tr. 7/10/17 at 372:13-373:8 (Jones). Ms. Jones reviewed precinct level election results to confirm that Ms. Fleming won in heavily minority precincts and lost in more predominantly Anglo precincts, but her strong support in communities of color carried her to victory. Trial Tr. 7/10/17 at 373:15-22 (Jones).

Importantly, neither Dr. Alford nor any other expert relied upon by Defendants has ever examined any elections in Bell County. To the extent that Defendants allege that partisanship, rather than race, explains the racially polarized voting in Bell County, it is their burden to provide statistical evidence that would support such an allegation. *Teague v. Attala County*, 92 F.3d 283, 291 (5th Cir. 1996) (plaintiffs do not bear the burden of disproving race-neutral causes for polarization until defendants make a plausible showing to rebut the presumption of racial bias). Having examined no elections in that county, Defendants cannot meet their burden.

Finally, consideration of the totality of circumstances supports the creation of a Section 2 remedial House District in Bell County. In 2014, Ms. Jones testified that, based on her experience as an election judge, she had witnessed voters of color being subject to intimidate and

51

disparate treatment that impeded their ability to participate in the political process. Trial Tr. 7/18/14 at 1699:2-1703:6 (Jones). That trend persisted through 2017, with communities of color facing additional hurdles to political participation from mid-decade redistricting in the city of Killeen and inadequate education of affected voters by the city of Killeen. Trial Tr. 7/10/17 at 374:12-375:22 (Jones). The NAACP Plaintiffs have carried their burden in establishing that a Section 2 remedy is warranted in the configuration of State House districts in Bell County, and the Court should enter judgment in their favor on that claim.

### C. The NAACP's Section 2 Claims for House Districts in Fort Bend County

Although this Court concluded that plaintiffs had not provided sufficient evidence in the 2011 phase of this case that the configuration of HD 26 was racially discriminatory, that configuration remains unchanged in the 2013 plan and the NAACP Plaintiffs have provided the court with additional information in support of that claim.

First, the county is very diverse, reportedly the most diverse county in the country, and even Defendants' witness acknowledged that. Trial Tr. 7/11/17 at 698:20-699:14 (Jetton). The minimization of minority voting strength in the configuration of the county's districts—where only one district has a representative of color—is circumstantial evidence of an intent to discriminate against voters of color. Moreover, the NAACP has presented racial density shading maps to further demonstrate the intentional cracking of minority communities in the district's configuration. As can be seen below, the southeastern boundary of HD 26 fragments into multiple pieces a high-density Asian American population in Sugarland. It also fractures a less-high density, but still substantial, Asian-American population in the Four Corners and New Territory region.



Commissioner Grady Prestage, a longtime member of the Fort Bend County Commission and an individual experienced in state legislative redistricting, reviewed the NAACP's map and the current map. With respect to the current map, confirmed what the racial density map shows, pointing out how the current configuration of HD 26 fractures Asian-American communities from each other, and how the oddly-shaped appendages reach out to grab predominantly white pockets of voters, in complete disregard for city boundaries and compactness. On the basis of this additional evidence, this Court should find that the configuration of HD 26 is intentionally discriminatory in violation of the Fourteenth Amendment and Voting Rights Act.

The NAACP's demonstrative map corrects the intentional fracturing of Asian-American voters described above. But, even if the Court does not find the way in which HD 26 was drawn

53

to be intentionally discriminatory, the NAACP has satisfied all the necessary *Gingles* preconditions in order to be entitled to a remedial district under Section 2 of the Voting Rights Act.

Again, NAACP expert Mr. Fairfax analyzed the NAACP's demonstrative district to assess compliance with the first *Gingles* precondition. He noted that the NAACP's plan creates an additional majority minority district—according to the 2011-2015 ACS 5-year data set, HD 26 in the NAACP plan is 30.4% Asian CVAP, 13.1% HCVAP, and 11.3% BCVAP. Thus, the district is plurality Asian-American. 2017 NAACP Ex. 004, at 15. The benchmark version of the district is majority Anglo. *Id.* The NAACP's version of the district is substantially more compact than the current version by every mathematical measure Mr. Fairfax examined. Looking at the functional compactness of the district, Mr. Fairfax also noted that the district is a Sugarland-based district, with 94.5% of the city within the district. *Id.* at 17. The only portions of Sugarland excluded are very spindly annexations to the city that would have rendered the district extremely non-compact had they been included in the district. Trial Tr. 7/11/17 at 470:22-471:5 (Fairfax). Moreover, the district also includes 100% of the population of Greatwood, 100% of the population of New Territory, and 97.6% of the population of Four Corners, all of which are bedroom communities surrounding Sugarland. 2017 NAACP Ex. 004, at 17. In fact, both New Territory and Four Corners are going to be annexed into Sugarland by the end of the year. Trial Tr. 7/11/17 at 568:1-12 (Prestage). Thus, the NAACP's demonstrative district reflects a functionally-compact minority community.

Additionally, the NAACP's demonstrative district demonstrates respect for political subdivisions. The NAACP's version of HD 26 split only 3 precincts, and it split fewer places (cities, towns and census-designated places) than does the current version of the district (11 splits

in the current district, 7 splits in the NAACP's demonstrative version). 2017 NAACP Ex. 004, at

17. Finally, Commissioner Prestage confirmed Mr. Fairfax's analysis. He described how the

very compact configuration of HD 26 offered by the NAACP encompasses an easily

recognizable community of interest—one that is very diverse and whose residents share many

common interests. Trial Tr. 7/11/17 at 567:8-568:23 (Prestage).

Then, turning the second and third prongs of Gingles, the NAACP has likewise satisfied

those two preconditions for obtaining relief under Section 2. Dr. Chervenak examined a number

of endogenous elections, and the same five statewide exogenous elections he examined in other

counties. 2017 NAACP Ex. 002, at 8-10. In each of the past three general elections for HD 26,

voters of color have exhibited high levels of cohesion with each other, regardless of the race of

the candidate running. *Id*. at 10, 18. In each election, the Anglo Republican candidate was not

the candidate of choice of black, Latino, or Asian-American voters. *Id*. at 18. Whether the

candidate running opposite the Anglo incumbent, Rick Miller, was Asian-American or African-

American, voters of color still cohesively supported that candidate. *Id.* Dr. Chervenak noted

that there had not been a contested Democratic primary in HD 26 for many years. Trial Tr.

7/11/17 at 422:1-10 (Chervenak). Unlike in *LULAC v. Perry*, this lack of contested primaries is

of no relevance to whether a particular candidate is preferred by voters of color. Voters of color

have supported challengers in HD 26 of several difference racial or ethnic backgrounds, and the

fact that the primaries are not contested is just evidence that voters of color are not acting in

opposition to each other. Dr. Chervenak's examination of the statewide exogenous elections

confirmed his conclusion from his analysis of endogenous elections: whether the candidate was

black or Latino, all voters of color (African American, Latino and Asian American) cohesively

supported that candidate. 2017 NAACP Ex. 002, at 8-10. And in both the endogenous and

exogenous elections, Anglo voters did not support the candidates preferred by minority voters, establishing that voting is racially polarized in the county. *Id*. at 10.

Commissioner Prestage's testimony provides additional confirmation of Dr. Chervenak's findings. Mr. Prestage, an African-American elected official with years of political involvement, based on elections in which he has been involved observed very noticeable trends in minority voting patterns. South Asian voters are trending strongly democratic. While the Asian American community is not monolithic or completely uniform, neither is the Latino community, and that does not negate their ability to obtain fair representation under the Voting Rights Act. Commissioner Prestage has recruited, supported and endorsed several Asian-American candidates in recent years, including K.P. George, who serves as a trustee for the Fort Bend Independent School District, Neeta Sane, who was elected to serve on the Board of Trustees of Houston Community College, and Q Imam, a candidate for Sugarland City Council. Trial Tr. 7/11/17 at 557:17-559:10 (Prestage). Based on his deep ties in the African American community, he was able to state definitively that African American voters vote cohesively with Asian-American voters in support of Asian-American candidates. Commissioner Prestage has also received substantial support from Asian Americans and Latinos in his district. Trial Tr. 7/11/17 at 563:1-10 (Prestage). And, just like with Bell County, Defendants, nor any expert upon which they rely, has ever examined any elections in Fort Bend County. Trial Tr. 7/14/17 at 1404:13-16 (Alford). With that complete lack of statistical evidence, they have again failed to satisfy their burden to demonstrate partisanship, not race, best explains the racial voting patterns observed in the county. *See Teague,* 92 F.3d at 291. Thus, the weight of this evidence establishes that the NAACP has satisfied its burden under *Gingles*.

Defendants presented the testimony of Fort Bend County Republican Party Chairman Jacey Jetton apparently to refute that Asian Americans are politically cohesive. Mr. Jetton has only lived in Fort Bend County for four years, making his testimony about the racial voting patterns in the county much less reliable than Commissioner Prestage's testimony. *Compare* Trial Tr. 7/11/17 at 702:5-7 (Jetton has lived in Fort Bend County since mid-2014) *with* Trial Tr. 7/11/17 at 553:2-9 (Prestage has lived in Fort Bend County since 1981). As discussed below, Dr. Chervenak's analysis also flatly contradicts Mr. Jetton's testimony, and statistically analysis of minority voting cohesion is more probative than lay testimony. See ECF No. 1365, at 60 (Apr. 20, 2017). Mr. Jetton had no information about the voting patterns of black and Latino voters in the county. Trial Tr. 7/11/17 at 703:10-16 (Jetton). In concluding that Asian Americans are not politically cohesive, he never reviewed precinct-level election results. Trial Tr. 7/11/17 at 703:25-704:3; 705:19-22 (Jetton ). He in fact had no personal knowledge on the topic at all, relying solely on reports he received from Republican political campaigns and what he read on online social media platforms. Trial Tr. 7/11/17 at 703:17-24; 704:8705:18 (Jetton). Finally, Mr. Jetton produced an analysis of the 2016 general elections in Fort Bend County—an analysis that he approved and has distributed widely—which in fact further undermine his claims that Asian Americans are not cohesive. Trial Tr. 7/11/17 at 706:9-707:15 (Jetton). That study indicated that Asian Americans were overwhelmingly united in opposing Donald Trump, and that their support for Republican candidates picked up only slightly on down-ticket races. Trial Tr. 7/11/17 at 707:1-9 (Jetton). . For what little value Mr. Jetton's testimony and evidence carries, it only supports, not undermines, the NAACP's case.

Finally, looking to the totality of circumstances evidence only confirms the propriety of a Section 2 remedy here. Racial appeals in voting are still common even today in Fort Bend

County.  A significant portion of the Asian American population in the county is Muslim, and Muslim candidates have faced ethnic and religious hostility in recent municipal campaigns in the city.  Trial Tr. 7/11/17 at 566:4-22 (Prestage).  As proven by Dr. Chervenak's analysis, voting is racially polarized.  2017 NAACP Ex. 002, at 10.  Commissioner Prestage confirms that even to this day, he is not able to win Anglo votes in his County Commission races.  Trial Tr. 7/11/17 at 564:23-565:9 (Prestage).  Finally, Commissioner Prestage noted that despite the fact that the county is majority minority, voters of color are rarely able to elect their candidates of choice to countywide seats.  Moreover, the county's House delegation is almost entirely and disproportionately white, with only one of the four representatives from the county being a person of color.  Trial Tr. 7/11/17 at 565:10-17 (Prestage).  Given the explosive growth in residents of color, the discriminatory effect of this disproportionality in represent only continues to grow.  Trial Tr. 7/11/17 at 561:5-22 (Prestage)

### D.  The NAACP's Section 2 Claims for House Districts in Dallas County

In its decision on the 2011 State House plan, this Court ruled that House districts were unconstitutionally drawn in the western part of Dallas County in order to undermine Latino voting strength in HD 105.  See ECF No. 1365, at 66-69 (Apr. 20, 2017).  The NAACP continues to assert that minority voters across the county, not just in the western part of the county, were intentionally cracked and packed beyond the instance identified by the Court in its April 2017 opinion.  The NAACP demonstrative plan presents a configuration that corrects that intentional discrimination, and when the districts are drawn fairly, three additional majority-minority districts naturally occur, reflecting the population present in those areas.  Those districts are district 105 in western Dallas County and districts 102 and 107 in eastern Dallas County. In addition to remedying that intentional discrimination across the county, the NAACP has

additionally shown the additional majority-minority coalition districts in their demonstrative plan are compelled under Section 2 of the Voting Rights Act.

As with all of the NAACP's other claims, Mr. Fairfax examined whether the districts the NAACP proposed in H358 complied with the first prong of *Gingles*. He noted that compared to the current configuration of Dallas County districts, the NAACP plan for Dallas County created 3 additional majority minority districts. According to the 2011-2015 ACS 5-year data set, District 105 is 38.7% HCVAP and 12.1% BVCAP; District 102 is 31.9% HCVAP and 19.5% BCVAP; and District 107 is 17.7% HCVAP and 33.8% BCVAP. 2017 NAACP Ex. 004, at 21. When Mr. Fairfax examined the population projections for these districts, he found that each of the districts had the following 2017 populations: District 105 is 42.63% HCVAP and 12.33% BVCAP; District 102 is 35.14% HCVAP and 19.87% BCVAP; and District 107 is 19.50% HCVAP and 34.45% BCVAP. 2017 NAACP Ex. 004, at 39-40. These projections further indicate that in the Latino plurality districts, the Latino population is growing at a much higher rate than the African American population. 2017 NAACP Ex. 004, at 39-41 (Fairfax Report).

Mr. Fairfax also examined whether the NAACP's districts complied with traditional redistricting criteria. With respect to compactness, the NAACP's minority districts viewed as a whole are more mathematically compact than districts in the benchmark plan in at least two of the three mathematical measures Mr. Fairfax utilized. 2017 NAACP Ex. 002, at 22. In regards to respect for political subdivisions, the NAACP's plan remarkably split zero precincts. When it came to split places (cities, towns and census-designated places), while some districts in the NAACP plan split more places and some districts split fewer, he concluded that as a whole, H392, the NAACP's plan, demonstrated a comparable respect for political subdivisions when compared to the benchmark. *Id*. at 23-24. When Mr. Fairfax analyzed the respect for

neighborhoods as well-recognized communities of interest, he concluded that the districts of interest in H392 demonstrated more respect for keeping neighborhoods whole than did the corresponding districts in the benchmark plan. *Id*. at 24.

Representative Johnson testified that, based on his deep familiarity with the regions encompassed in the NAACP's additional minority opportunity districts, these districts encompassed relatively compact minority communities and communities of interest. He first explained that the areas encompassed in House Districts 103, 104 and 105 (the existing two Latino opportunity districts and a new Latino-plurality minority opportunity district) were historic and politically active Latino communities. Trial Tr. 7/11/17 at 524:6-526:15 (Johnson). He further testified that while these areas also had a smaller, though substantial, African-American population, African-American voters were strongly supportive of the Latino House Representatives currently serving there. See, e.g., Trial Tr. 7/11/17 at 520:23-521:4 (Johnson).

Rep. Johnson was also highly familiar with the areas in the NAACP's HD 102 and 107. He noted that the NAACP's version of HD 102 in fact encompassed much of the area currently in HD 107, and so that district made sense in that regard. Trial Tr. 7/11/17 at 530:22-531:2 (Johnson). With respect to House District 107, he had driven the entire length of the district. Rep. Johnson described some of the historic African-American communities in that district, including Hamilton Park. Trial Tr. 7/11/17 at 527:2-529:17; 536:17-537:5 (Johnson). He further noted how voters of color in that proposed district would greatly benefit from the configuration proposed by the NAACP because right now, those voters, considered to be too far east to be part of Dallas proper, are fragmented amongst Dallas-based districts. Trial Tr. 528:5-529:17 (Johnson). Living in a sort of no-man's land between Dallas and municipalities in the eastern part of the county, these voters lack representation focused specifically on their needs. Trial Tr.

7/11/17 at 528:8-14; 529: 11-17 (Johnson).  They are residents who have chosen to live in that part of the county specifically for the low housing costs and easy access to employment hubs. Trial Tr. 7/11/17 at 528:20-529:10 (Johnson).  Thus, based on Rep. Johnson's years of political experience, he concluded that this district did reflect a relatively compact minority community, and one that captured a community of interest much in need of representation.

Moving again to the second and third prongs of *Gingles*, Dr. Chervenak's analysis of Dallas County elections, as recounted in the section of this trial brief addressing the NAACP's congressional claims in the DFW region, are applicable to the NAACP's state house claims as well.  *See supra* Section V(A).  That analysis demonstrated that black and Latino voters are politically cohesive in Dallas County.  Additionally, Dr. Chervenak examined the recent election in House District 107, where black and Latino voters voted cohesively in support of the Latina candidate, Victoria Neave.  2017 NAACP Ex. 002, at 16.  And again, the same lay testimony that confirmed Dr. Chervenak's statistical analysis with respect to the NAACP's congressional claims in the region also support the NAACP's state house claims in Dallas County.  *See supra* Section V(A).

### E.  The NAACP's Section 2 Claims for House Districts in Harris and Tarrant Counties

In its most recently amended complaint, ECF No. 900, the NAACP has a live claim that House District 101 in Tarrant County and House District 149 in Harris County are protected under Section 2 of the Voting Rights Act and the Fourteenth Amendment.  *See* ECF No. 900, at ¶¶ 22, 46, 48-52, 56, 60, 64.  While the State has not yet attempted to dismantle these House Districts, the consistent position it has taken throughout the course of this litigation is that it is under no obligation to protect or preserve a coalition district.  *See* Congress Op., ECF No. 1339, at 59.

Based on its April 2017 ruling on the 2011 House Plan, it is possible, or even likely, that regardless of the outcome of challenges to the 2013 House Plan, house districts in these counties will likely need to be redrawn. The NAACP takes the position that while it prevailed at the interim stage of the litigation in forcing Texas to redraw HD 149, all the intentional discrimination in Harris county has not yet been remedied. When county plan is redrawn, the NAACP wants to preserve that success. Thus, even while the Court ruled that challenges to HD 149 in the 2011 plan were moot, the evidence provided by the NAACP will be relevant and useful during the remedy stage in order to avoid further harm to districts that elect the candidates of choice of voters of color. The same is true with HD 101—the NAACP's position is that it is a protected minority coalition district, and that illegalities in House Districts in Tarrant County identified by this Court in the 2011 plan can be satisfied without sacrificing this district. Again, the evidence relevant to HD 101 introduced by the NAACP is relevant to the remedial proceedings.

The evidence on these two districts that the NAACP proffered was through Dr. Chervenak, who examined elections in both districts. In a HD 101 primary election, his analysis demonstrated that the black candidate was not the candidate of choice of minority voters, 2017 NAACP Ex. 002, at 8, thus distinguishing that district from the Martin Frost district consisted in *LULAC v. Perry*. Likewise, he also examined a HD 101 general election where a Latino Republican challenged the Anglo Democratic incumbent. *Id.* There again, while Latino voters did not exhibit a high level of cohesiveness, a large portion of them supported Representative Turner, the Anglo Democratic incumbent, and a vast majority of black voters supported him. *Id.* at 8, 17. That, in conjunction with Dr. Chervenak's unequivocal results from his examination of

exogenous elections in the county, *id.* at 17, confirm that black and Latino voters are cohesive in that district and that it is a protected minority coalition district.

Likewise, in HD 149 in Harris County, Dr. Chervenak's examination of endogenous and exogenous elections confirmed that this district is one that should be treated as a minority coalition district.  In general elections in HD 149, he observed a high level of cohesion amongst black, Latino and Asian-American voters.  *Id.* at 11-13.  In one primary election where an African-American candidate challenged Representative Vo, the Asian-American incumbent, a majority of voters in each minority group—black, Latino and Asian-American—preferred Rep. Vo.  *Id.* at 11, 20.  Thus, minority voters are cohesive in that district, and it should be protected in remedial proceedings.

## VI.    Conclusion

Based on the applicable law and voluminous evidence elicited at trial, the Texas NAACP Plaintiffs respectfully request that this Court enter judgment in its favor, order the creation of the remedial districts necessary to address the Texas NAACP's claims, and otherwise provide the full remedy allowed under the law.

Dated: July 31, 2017.

Respectfully submitted,

  /s/ Allison J. Riggs
Anita S. Earls
N.C. State Bar No. 15597
(Admitted Pro Hac Vice)
Allison J. Riggs
N.C. State Bar No. 40028
(Admitted Pro Hac Vice)
Jaclyn Maffetore
N.C. State Bar No. 50849
(Admitted Pro Hac Vice)
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101

Durham, NC 27707
Telephone: 919-323-3380
Fax: 919-323-3942
Anita@southerncoalition.org
Allison@southerncoalition.org

Robert Notzon
Law Office of Robert S. Notzon
State Bar Number 00797934
1502 West Avenue
Austin, Texas 78701
512-474-7563
512-852-4788 fax
Robert@NotzonLaw.com

Victor L. Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
Telephone: 410-580-5120
Fax: 410-358-9359
vgoode@naacpnet.org

*Attorneys for the Texas State Conference of*
*NAACP Branches and Rev. Lawson*

  /s/ Gary L. Bledsoe
Gary L. Bledsoe
State Bar No. 02476500
7901 *Cameron Road*, Building 3-360
Austin, Texas 78754
Telephone: 512-322-9992
Fax: 512-322-0840
Garybledsoe@sbcglobal.net

*Attorney for Howard Jefferson*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via the Court's electronic notification system or email to the following on July 31, 2017:

JOHN GORE
TIMOTHY F. MELLETT
T. CHRISTIAN HERREN, JR.
JAYE ALLISON SITTON
DANIEL J. FREEMAN
MICHELLE A. MCLEOD
Attorneys
Voting Section, Civil Rights Division
U.S. Department of Justice
Room 7254 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 305-4355

ATTORNEYS FOR PLAINTIFF UNITED STATES

PATRICK K. SWEETEN
Senior Counsel for Civil Litigation
Office of the Texas Attorney General
Texas Bar No. 00798537
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-0150
(512) 936-0545 (fax)

*Attorney for the State of Texas, Greg*
*Abbott, and Rolando Pablos*

DAVID RICHARDS
Texas Bar No. 1684600
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
512-476-0005
davidr@rrsfirm.com

RICHARD E. GRAY, III
State Bar No. 08328300
Gray & Becker, P.C.
900 West Avenue, Suite 300

Austin, TX 78701
512-482-0061
512-482-0924 (facsimile)
Rick.gray@graybecker.com

ATTORNEYS FOR PLAINTIFFS PEREZ, DUTTON, TAMEZ, HALL, ORTIZ, SALINAS, DEBOSE, and RODRIGUEZ

JOSE GARZA
Texas Bar No. 07731950
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
210-392-2856
garzpalm@aol.com

JOAQUIN G. AVILA
P.O. Box 33687
Seattle, WA  98133
206-724-3731
206-398-4261 (facsimile)
jgavotingrights@gmail.com
Served via electronic mail

ATTORNEYS FOR MEXICAN AMERICAN LEGISLATIVE CAUCUS

NINA PERALES
Texas Bar No. 24005046
nperales@maldef.org
ERNEST HERRERA
eherrera@maldef.org
Mexican American Legal Defense
and Education Fund
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
(210) 224-5382 (facsimile)

ATTORNEYS FOR PLAINTIFFS TEXAS LATINO REDISTRICTING TASK FORCE, CARDENAS, JIMENEZ, MENENDEZ, TOMACITA AND JOSE OLIVARES, ALEJANDRO AND REBECCA ORTIZ

ROLANDO L. RIOS
Law Offices of Rolando L. Rios
115 E Travis Street
Suite 1645

San Antonio, TX 78205
210-222-2102
rrios@rolandorioslaw.com

ATTORNEY FOR INTERVENOR-PLAINTIFF HENRY CUELLAR


MAX RENEA HICKS
Law Office of Max Renea Hicks
101 West Sixth Street
Suite 504
Austin, TX 78701
(512) 480-8231
512/480-9105 (fax)
rhicks@renea-hicks.com

ATTORNEY FOR PLAINTIFFS CITY OF AUSTIN, TRAVIS COUNTY, ALEX SERNA,
BEATRICE SALOMA, BETTY F. LOPEZ, CONSTABLE BRUCE ELFANT, DAVID
GONZALEZ, EDDIE RODRIGUEZ, MILTON GERARD WASHINGTON, and SANDRA
SERNA

CHAD W. DUNN
chad@brazilanddunn.com
K. SCOTT BRAZIL
scott@brazilanddunn.com
Brazil & Dunn
4201 FM 1960 West, Suite 530
Houston, TX  77068
281-580-6310
281-580-6362 (facsimile)

ATTORNEYS FOR INTERVENOR-DEFENDANTS TEXAS DEMOCRATIC PARTY and
BOYD RICHIE

JESSICA RING AMUNSON
jamunson@jenner.com
Jenner & Block LLP
1099 New York Ave., NW
Washington, D.C. 20001
202-639-6000

J. GERALD HEBERT
191 Somervelle Street, # 405
Alexandria, VA 22304
703-628-4673
hebert@voterlaw.com

ATTORNEYS FOR PLAINTIFFS QUESADA, MUNOZ, VEASEY,  HAMILTON, KING and JENKINS

LUIS ROBERTO VERA, JR.
Law Offices of Luis Roberto Vera, Jr. & Associates
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205-2260
210-225-3300
irvlaw@sbcglobal.net

GEORGE JOSEPH KORBEL
Texas Rio Grande Legal Aid, Inc.
1111 North Main
San Antonio, TX  78213
210-212-3600
korbellaw@hotmail.com

ATTORNEYS FOR INTERVENOR-PLAINTIFF LEAGUE OF UNITED LATIN AMERICAN CITIZENS

 /s/ Allison J. Riggs
Allison J. Riggs
Attorney for Texas NAACP and Rev. Bill Lawson