**Appendix A**
**ECF No. 1492 – Questions of the Court**
**Answers and Cross-References to Post-Trial Brief**

General/Unclassified Questions

1) In its previous orders, the Court identified certain violations in Plans C185 and H283 in districts that remain unchanged in Plans C235 and H358. With respect to these violations, what open questions are there, if any?

**There are no remaining questions of law on districts in C185 and H283 that remain unchanged in C235 and H358, respectively.  Plaintiffs are entitled to permanent injunctive relief on those districts.  *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 552 (1964) (in a one person, one vote case, district court enjoined defendant "from holding any future elections under any of the apportionment plans that it had found invalid").**

2) Much of the plaintiffs' presentation looks more like the remedial phase than the trial on the 2013 plans. What decisions and rulings does this panel need to make regarding the 2013 plans? If the Court finds discriminatory intent, what judgment should it enter? If it finds no discriminatory intent, what judgment should it enter? What other issues are joined and ready for decision on this phase?

**This Court must rule on the plaintiffs' intentional discrimination claims relating to the 2013 enactment.  If it finds that such unconstitutional intent existed, it must enter an immediate and permanent injunction.  If it finds no discriminatory intent, then the Court must turn to plaintiffs' Section 2 effects claims.  The areas in which the NAACP Plaintiffs have pending Section 2 effects claims are detailed in its post-trial brief.**

3) Defendants appear to be asserting that any time a minority opportunity district's minority population is increased (one example was with regard to CD28 in a *Gingles* demonstration map) that this is unlawful "packing." But is there anything inherently wrong with a district having an increased or high minority population if it reflects the demographics of the area, does not have the effect of dilution, and wasn't intentionally racially gerrymandered?

**This question may be relevant to some districts in the NAACP's demonstrative plans.  As a primary matter, the Texas NAACP Plaintiffs have proffered two demonstrative maps: C284 for Congress and H392 for the State House.  The NAACP would not advocate for the wholesale adoption of either plan, though, because these maps do not purport to correct every unconstitutional or otherwise illegal element in Plans C235 and H358.  Instead, because of the limits of time and the fact that the NAACP only has live**

**claims in certain regions of the state, the NAACP focused its efforts on developing demonstrative districts in areas where those live claims persist. Defendants have, at times, attempted to attack the NAACP maps for presenting flawed districts in areas of the State where the NAACP does not purport to have claims. Trial Tr. 7/12/17 at 1028:5-21 (Fairfax). Instead, in areas where the NAACP does not have claims but believes the maps nonetheless have unconstitutional or illegal flaws, they have adopted the demonstrative maps of other plaintiff groups.** *See* **NAACP Pre-Trial Brief, ECF No. 1454, at 5-7 (July 3, 2017) (adopting MALC and Rodriguez demonstrative maps in certain areas of the state). Such attacks are thus misleading. Moreover, if the demographics of an area are increasing such that a reasonably-drawn district has a higher minority population when compared to the benchmark district, so long as that district does not have a dilutive effect, there is nothing inherently problematic in the drawing of such a district.**

Questions about Claims and Defenses Asserted

4) Is the State still contesting standing as to any of the plaintiffs? If so, for which plaintiffs, on which claims, and why do they think the evidence is deficient?

**The NAACP Plaintiffs simply note that in closing arguments, the State did not identify any challenges to the NAACP Plaintiffs' standing to pursue its claims. Trial Tr. 7/15/17 at 1797:19-1798:25 (Frederick).**

5) For those Texas House districts that the Court found violated either Section 2 or the 14th Amendment, were changed in plan H358, and are not being challenged now (El Paso, the Valley), can the Court assume that no further remedy—at least in terms of map drawing—is necessary?

**There are no such districts that the NAACP Plaintiffs are no longer challenging, so this question is not applicable to the NAACP Plaintiffs' claims.**

6) Can the Court assume that any Texas House claims regarding Lubbock, Midland/Ector, and McLennan Counties have been abandoned in terms of the current challenges to H358, or are the parties relying on evidence from the 2014 proceeding?

**The NAACP Plaintiffs have abandoned their claims relating to House districts in McLennan County, and never had claims relating to Lubbock and Midland/Ector Counties.**

Questions about Evidence Presented (or Law as Applied to Specific Evidence Presented)

7) Several witnesses relied on the rulings of the DC court, which were vacated. To what extent, if at all, can those findings be considered in determining the intent of the 2013 Legislature?

**At this phase in the litigation, the NAACP Plaintiffs posit that the D.C. Court's ruling was relevant to this Court's intentional discrimination analysis in two principal ways: (1) the ruling was still final and controlling until the Supreme Court invalidated the coverage formula in Shelby County v. Holder. The Texas legislature's refusal to act upon the DC's binding ruling is circumstantial evidence of its continuing intent to discriminate against voters of color in the redistricting process. (2) Even assuming Texas believed the coverage formula was likely to be invalidated, the D.C. Court's ruling still put the legislature on notice of areas where its redistricting plan was having a detrimental effect on voters of color. The legislature's refusal to address or improve the map in any of these areas is evidence that it was acting because of, not in spite of, that discriminatory effect, and is thus further evidence of intentional discrimination. Lastly, the D.C. Court's ruling on the discriminatory intent and effect of the legislature's actions in the 2011 plans was not invalidated by the Supreme Court; instead only Section 4 of the VRA was invalidated.**

8) What does the law say about whether the Legislature's discriminatory intent can be inferred from its adoption of the Court's interim 2013 plans? Some of the plaintiffs' presentation appears to criticize the Legislature for refusing to consider amendments of the Court's plan, while other parts of the presentation appear to criticize legislators and staff for even considering changes to the Court's plans. Which is the correct analysis under the law?

**See pp. 7-10 in the NAACP Plaintiffs' Post-Trial Brief.**

9) How does the intent or statement or action of a legislator or staff relate to the intent of the Legislature as a whole? Does it depend at all on whether other legislators, and/or the body as a whole, was aware of the individual intent or action?

**The statement of a legislator may speak to the intent of the legislature as a whole when it reveals that knowledge of discriminatory impact was known by the entire legislative body or should have been known by the same. In *Veasey v. Abbott*, the Fifth Circuit placed great weight on the fact that the Legislature was advised of the likely discriminatory impact by the Deputy General Counsel to the Lieutenant Governor, and on the statement of one of the bill's proponents which acknowledges that the bill's discriminatory impact was "common sense." 830 F.3d 216, 236 (5th Cir. 2016).**

10) If the Legislature allowed individual members or staff members to draw districts, why shouldn't any discriminatory intent or effect be attributed to the Legislature as a whole?

**Such intent and effect should be attributed to the legislature as a whole. Courts commonly look to evidence of the activities and intent of staff members in cases where courts must determine the intent of the legislative body itself.** *See, e.g., Easley v. Cromartie*, **532 U.S. 234, 254 (2001) (concluding that an email sent from a legislative staff member responsible for drafting districting plans to senators voting upon it stating "I have moved Greensboro Black community into the 12th, and now need to take [about] 60,000 out of the 12th. I await your direction on this," provides "some support" for district court's conclusion that racial considerations predominated in the drawing of a district's boundaries);** *Texas v. United States*, **887 F. Supp. 2d 133, 165 (D.D.C. 2012), vacated on other grounds, 133 S. Ct. 2885 (2013) (noting the court's "skepticism about the legislative process that created enacted SD 10 is further fueled by an email sent between staff members on the eve of the Senate Redistricting Committee's markup of the proposed map" that the committee report was "precooked" and the plan was set even before the hearing had been held on the proposed plan);** *Smith v. Beasley*, **946 F. Supp. 1174, 1210 (D.S.C. 1996) (examining the intent of two staff members to whom the redistricting committee delegated the responsibility of drawing the district in question).**

11) How are minority priorities (such as, without limitation, immigration, healthcare, education) to be distinguished from priorities of the Democratic Party for purposes of attributing discriminatory intent to the Legislature, and also for purposes of identifying racial cohesion and shared communities of interest?

**See pp. 40-41 in the NAACP Plaintiffs' Post-Trial Brief.**

12) For CD23, can discriminatory intent be imputed to the 2013 Legislature for adopting this Court's addition of areas with low turnout?

**The NAACP Plaintiffs have no claims relating to CD 23, so this so this question is not applicable to the NAACP Plaintiffs.**

13) The Court's opinion adopting the interim maps clearly stated that the Court's work product was not complete and additional analysis was necessary. Didn't the Legislature have some affirmative duty to ensure that the Plans they voted on complied with the VRA and Constitution?

**See pp. 10-14 in the NAACP Plaintiffs' Post-Trial Brief.**

14) For the Congressional Plan, can the fact that no amendments were accepted from minority members during the 2013 special session be evidence of discrimination if also no amendments were accepted from non-minority Democrats?

> See pp. 19-20 in the NAACP Plaintiffs' Post-Trial Brief.

15) Was there evidence that non-minority members requested substantive amendments?

> See pp. 19-20 in the NAACP Plaintiffs' Post-Trial Brief.

16) How, if at all, should the Court consider the skill of candidates and their campaigns in evaluating performance, including the effects on turnout?

> **The performance of a district as a minority opportunity district is best informed by looking at a number of elections, so that the skill of any particular candidate or any particular campaign does not play a determinative factor in deciding whether a district is performing or not.**

17) To what extent, if at all, is it appropriate for those who draw demonstration maps to use racial shading to make small changes to lines within precincts?

> **Race can be considered in the construction of a Section 2 remedial district without running afoul of the Constitution. Race can even predominate in the drawing of district lines so long as the Voting Rights Act or some other compelling reason requires it. So long as the remedial district is still constructed to encompass a reasonably-compact minority community, there is no inherent problem in using racial shading in the construction of that demonstrative district, even if it involves the splitting of a precinct.**

18) At various points, the State has attacked the validity of data and formulas used by experts, including specifically Engstrom's data and analytical methodology. Is there any evidence that actually supports these attacks? In the 2011 phase, didn't Alford explain that there was nothing wrong with Engstrom's data or analysis?

> **The state of Texas disclaimed such attacks in closing argument. Trial Tr. 7/15/17 at 1797:13-21 (Frederick).**

19) Is there data in the record (or on the Secretary of State website) reflecting the actual number of voters in specific primary elections? If the number of voters is very small, how does it meaningfully inform our decision on cohesion of the populations in the district as a whole, and why should we consider it in determining minority cohesion?

> **That data is available on the Secretary of State's website at: http://elections.sos.state.tx.us/index.htm (last accessed July 31, 2017). As discussed on p. 32 of the NAACP Plaintiffs' Post-Trial Brief, elections where minority turnout is particularly**

5

**low are not strong evidence of voting patterns.  *See City of Columbia*, 850 F. Supp. at 418 ("It is particularly appropriate to be wary of relying on black voter behavior in low black turnout elections to determine political cohesiveness."); *see also, Campos,* 840 F.2d at 1245 (use of racially-contested elections is appropriate precisely because minority turnout is higher when there is a candidate of color on the ballot).**

20) Dr. Chervenak stated that he thinks looking at racially contested elections (meaning races between candidates of different races) is very important for determining racially polarized voting. But how does this fit with the position taken by some that the race of the candidate is irrelevant to determining the minority candidate of choice and/or the existence of racially polarized voting?

>    **See p. 32 in the NAACP Plaintiffs' Post-Trial Brief.**

Questions about Data

21) When and for what purposes should the Court look only to Census data (and the State's use of it)? When and for what purposes should the Court look at current ACS data (and the State's use of it)? When and for what purposes should the Court look at projections (and the State's use of it)?

>    **See pp. 28-29 in the NAACP Plaintiffs' Post-Trial Brief.**

22) What does the law say about using ACS and other data that was not available in 2013, for the purpose of informing the Court's decisions as to the 2013 plans?

>    **See pp. 28-29 in the NAACP Plaintiffs' Post-Trial Brief.**

23) Would the parties agree that on the Section 2 effects (not intent) claims, current ACS (2011-2015) data and current population estimates must be used pursuant to *Gingles* because an effects claim asks whether the district, as configured, currently gives minorities the opportunity to elect the candidate of their choice. If, for example, a State undertook redistricting and implemented a plan that didn't dilute a minority opportunity district at the time but eight years later (with substantial demographic changes) the district was no longer performing as a minority opportunity district, couldn't a Section 2 effects claim be brought several years after the map's implementation? In other words, an effects claim is not tied to intent, or what data the legislature had at the time of redistricting. And using this logic, if the Court finds that CD23 is not currently performing under C235, doesn't the Court need to look at the Section 2/*Gingles* analysis based

on current ACS data and current election data to determine whether it could perform as a minority opportunity district under any of the *Gingles* demonstrative plans?

**See pp. 28-29 in the NAACP Plaintiffs' Post-Trial Brief.**

24) To what extent should the Court weigh the HCVAP as distinguished from the turnout in determining whether it is an opportunity district?

**Not applicable to the NAACP Plaintiffs' claims.**

Questions about Particular Areas—HD90

25) We heard testimony from Lon Burnam and Conor Kenney that they went along the border of HD90 and HD99 and moved people solely on the basis of race to get the SSVR of the district back above 50%. Do we know how many people/voters this affected and is this a "significant number of voters" to show that race predominated in the decision to place a "significant number of voters" within and without the district for purposes of a *Shaw* analysis?

**Not applicable to the NAACP Plaintiffs' claims.**

26) What evidence was before or was considered by the Legislature in 2013 for it to believe that HD90 needed to have over 50% SSVR?

**Not applicable to the NAACP Plaintiffs' claims.**

27) Does the fact that Romero won the racially contested primary and then won the general election in HD90 in 2014 establish that HD90 in Plan H358 is a Latino opportunity district? If so, what legal basis would there be for making any changes to the district just because Romero is "vulnerable"?

**Not applicable to the NAACP Plaintiffs' claims.**

Questions about Particular Areas—DFW

28) If CD33 is currently performing as a minority opportunity district, why would the Court make any changes to that district?

**See pp. 24-25 in the NAACP Plaintiffs' Post-Trial Brief.  Additionally, this Court is obligated to eliminate racial discrimination "root and branch," just as is the legislature itself.** *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, **402 U.S. 1, 15 (1971).  The Court**

**should correct the continued packing and fragmentation of voters of color in Dallas and Tarrant Counties. Doing so requires modifications to current CD33, even though it does perform as a minority opportunity district.**

29) Assuming the Court finds packing in CD30, how should the Court take account of and respect the Section 2 rights of those who are removed, assuming they are moved into a district in which they cannot elect the candidate of their choice?

**Looking at a map that remedies the intentional packing and cracking in the DFW region, such as the NAACP's demonstrative congressional map, when voters of color are moved out of the packed CD 30, there is every likelihood that they will be moved into the new minority opportunity district between CD 30 and CD 33. However, the U.S. Supreme Court has been clear that no individual voter of color has an inalienable right to be in a Section 2 district.** *See Shaw v. Hunt*, **517 U.S. 899, 917 fn. 9 (1996) ("This does not mean that a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown. States retain broad discretion in drawing districts to comply with the mandate of § 2.");** *Cooper v. Harris*, **137 S. Ct. 1455, 1463, 1460-61 (2017) (finding that black voters were packed beyond what was necessary to comply with the VRA and affirming a lower court's order to redraw the racially-gerrymandered districts, thus of necessity moving black voters out of majority black districts*). **While this Court should of course be concerned about the dilutive effect of (and sometimes the discriminatory intent behind) stranding large numbers of voters of color in districts where they cannot elect their candidate of choice, this does not prevent the Court from ordering packed districts to be unpacked. That is precisely the effect of the ruling in North Carolina in** *Cooper v. Harris*.

Questions about Particular Areas—Nueces County
30) Korbel testified that you cannot draw two HCVAP-majority Latino opportunity districts wholly within Nueces County (i.e., without breaking the County Line Rule) in a Texas House plan. Does anyone dispute this assertion?

**Not applicable to the NAACP Plaintiffs' claims.**

31) Assuming the Texas County Line Rule must yield to federal law, can two HCVAP majority Latino opportunity districts be drawn?

**Not applicable to the NAACP Plaintiffs' claims.**

32) Regarding Nueces County and elsewhere, does the law allow packing of so-called "stranded" Hispanic voters into an already-performing district?

**Not applicable to the NAACP Plaintiffs' claims.**

Questions about Legal Tests (or Certain Aspects of Legal Tests)

33) What does cohesion mean under *Gingles* 2? How is the race of the candidate relevant? What should the Court be focusing on in terms of determining whether minorities are cohesive? Does the race of the candidate factor into political cohesion? What does the fact that black voters vote for black candidates in the Democratic Primary and Hispanic voters vote for Hispanic candidates in the Democratic Primary tell us about minority political cohesion if both groups are voting in the Democratic primary for candidates who generally espouse the same political positions? Assuming cohesion is politically-based, does that require that coalition districts be drawn?

**See pp. 29-30 in the NAACP Plaintiffs' Post-Trial Brief.**

34) Doesn't Section 2 case law on the *Gingles* 2 factor talk about "political cohesion," rather than "racial cohesion"? If so, why would the Court look only at primary elections, as Dr. Alford proffers, to determine "political cohesion" or lack thereof among minorities? Section 2 precedent seems to make clear that a minority candidate of choice doesn't need to be of the same race or ethnicity as the voters that elected him or her, yet Dr. Alford suggests that a minority does not get their "candidate of choice" unless the candidate elected is the same race or ethnicity as the voters. Please explain this inconsistency.

**See pp. 29-30 in the NAACP Plaintiffs' Post-Trial Brief.**

35) In determining the performance of a district such as CD33, should primary elections, or general elections, or both be considered? Can you offer a consistent and legally defensible rule for deciding whether those elections are relevant for deciding racial cohesion? Do they take on increased relevance when examining coalition districts?

**See pp. 29-30 in the NAACP Plaintiffs' Post-Trial Brief.**

36) In looking at minority political cohesion and RPV, would the parties agree that RPV looks at whether the minority vote is successfully blocked by the Anglo vote and that Anglo bloc voting doesn't come into play until the general election? And, if minorities happen to differ on their preferred candidate at the primary, but then coalesce to elect the same candidate in the general election, haven't they shown that their political cohesion is enough to overcome the Anglo bloc voting—which is the real issue?

**See pp. 29-30 in the NAACP Plaintiffs' Post-Trial Brief.  With respect to RPV, the NAACP Plaintiffs agree that is often, though not always, the case.  Anglo bloc voting can still be present and detrimental in Democratic primaries.  But the NAACP Plaintiffs agree that minority voters coalescing in a general election to overcome Anglo bloc voting presents**

9

a quintessential case of a coalition district providing minority voters the opportunity to elect their candidates of choice.

37) What does the law say about adding an area such as Como to a district such as HD90, which is a performing district in the general elections with or without the addition of that area? Can discriminatory intent be inferred from that change, under established law?

**Discriminatory intent can be inferred from actions that have a discriminatory effect or have a discriminatory motivation. Without commenting on merits of any HD 90 claims, it is also possible that such additions can be legitimately motivated by nondiscriminatory reasons such as responsiveness to voters' requests and respect for communities of interest—that is, restoring Como to a district it has long been a part of based on requests from residents of Como. However, if there is evidence that the moving of areas would have or did have a discriminatory effect, then inferring discriminatory intent would be reasonable.**

38) How, if at all, do we account for the distribution of populations across the entire state in evaluating proportionality? For that matter, is it even appropriate or required for the Court to consider proportionality for the limited purpose of this trial on the 2013 plans?

**See p. 41 in the NAACP Plaintiffs' Post-Trial Brief.**

39) At what point does the use of race come to "predominate" in the drawing of a district, in light of the command of *Bethune-Hill* that we view the district as a whole?

**The NAACP Plaintiffs do not believe that the Supreme Court's ruling in *Bethune-Hill* in any way altered the long-established standard for determining whether race predominated in the drawing of a district. Racial predominance determinations have always been fact-bound and, in the absence of direct evidence, informed by a variety of types of circumstantial evidence. A court must weigh the totality of that circumstantial evidence, and the Supreme Court in *Bethune-Hill* simply corrected the district court's legally erroneous and myopic focus on whether parts of a district appeared compact or parts of a district respected other traditional redistricting criteria, even when other parts of a district plainly disregarded it <u>and</u> direct evidence supported a conclusion that race was a primary motivator in the district composition.**

40) What does the Supreme Court mean by its repeated (including 2017) use of the term "race for its own sake"?

**Again, the NAACP Plaintiffs do not think that more recent use of the phrase "race for its own sake" means anything different than when it was first used in *Bush v. Vera*. That phrase is most often used in casesi where there is some direct evidence that legislators**

**were making redistricting decisions based on certain racial goals or quotas. In Alabama, the state legislature would not accept a map that dropped the BVAP below the benchmark. In Virginia, the legislature aspired to draw each district that elected a black representative to 55% BVAP. In North Carolina, the legislature was committed to a maximization policy. In each of those cases, the state legislature openly set a racial goal. That was the use of race for its own sake, and the fact that other considerations may have come into play did not detract from the direct evidence of racial predominance in the decision making process.**

41) Given that retrogression is no longer an issue, and given the Supreme Court's 2017 pronouncements on whether a 50.1% threshold is always required, does it violate Section 2 to move minorities into a crossover district such as the East Travis County district shown on multiple demonstration maps?

    **No. Restoring the crossover district in East Travis County is the appropriate remedy for the intentional fracturing and racial gerrymandering identified in the 2011 congressional plan. Moreover, such a conclusion is consistent with the Supreme Court's recent pronouncement in *Cooper v. Harris*, 137 S. Ct. 1455 (2017). *Cooper* necessitates that the majority black congressional districts in North Carolina, that had been previously performing as crossover districts, be unpacked and reconstituted as crossover districts. Had there been a Section 2 problem with that, the Court would not have upheld the district court's ruling in that case.**

42) What case law informs whether the 2017 findings on intent for the 2011 plans can be used, in whole or part, to find intent for the 2013 plans?

    **See pp. 7-14 in the NAACP Plaintiffs' Post-Trial Brief.**

43) What does the law say about whether a § 2 results test should focus solely on whether opportunity exists when the district is drawn versus some later point in time? Must the Legislature account for later changes in the district due to population changes? In other words, to what extent is a results claim to be determined at the time of redistricting versus at some later time?

    **See pp. 27-29 in the NAACP Plaintiffs' Post-Trial Brief.**

44) Under the Senate factors and "totality of circumstances" analysis for a Section 2 "effects" (not intent) claim, because we're examining whether a minority opportunity district is currently performing and, if not, whether a *Gingles* district could perform, shouldn't the evidence on the Senate factors and totality of circumstances (with perhaps the exception of the "history of discrimination" factor) also be as current as possible?

**See pp. 34-42 in the NAACP Plaintiffs' Post-Trial Brief.  Not necessarily, although there is ample current evidence in the record regardless.  The totality of circumstances inquiry focuses on whether vote dilution exists and whether a Section 2 remedy is warranted.  By focusing too narrowly on very recent evidence, the Court could miss a larger and more obvious pattern of minority voters' inability to participate meaningfully in the political process.  Just as the examination of one election would not be a sufficient basis by which to conclude that minority voters do or do not have the opportunity to elect their candidate of choice, so too could the Court be unable to reliably determine whether a Section 2 remedy is appropriate by too narrowly limiting the Senate Factors evidence it decides to consider.**

45) The Supreme Court has directed that the first *Gingles* precondition focuses on the compactness of the minority population, taking into account traditional redistricting principles. This makes sense in terms of looking at cities, precincts, neighborhoods, geographical features, etc. While incumbency protection is also a traditional redistricting factor in some respects, how does it have any bearing on whether a minority population is compact? In other words, how does where the incumbents live (and thus whether they are paired) affect whether a minority population is compact?

**See pp. 27-28 in the NAACP Plaintiffs' Post-Trial Brief.**