IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **SHANNON PEREZ, ET AL.,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **11-CA-360-OLG-JES-XR** |
| **STATE OF TEXAS, ET AL.** | § | **CONSOLIDATED ACTION** |
| | § | **[Lead case]** |
| **Defendants** | § | |

<u>**TEXAS LATINO REDISTRICTING TASK FORCE, ET AL.**</u>
<u>**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW.**</u>

## <u>TABLE OF CONTENTS</u>

I.    FINDINGS OF FACT............................................................................................1

    A.    STANDING TO CHALLENGE HD90……………………………………...1

    B.    NEIGHBORHOODS IN HD90……………………………………………...1

        1.  Sansom Park and North Beverly Hills………………………………...2

        2.  The Como Neighborhood…………………………………………...2

    C.    H358 IMPERMISSIBLY USES RACE TO ASSIGN VOTERS WITHIN OR WITHOUT HD90……………………………………………………………5

        1.  Race as a Predominant Factor………………………………………5

    D.    CHANGES TO HD90'S BOUNDARIES IN H358 INTENTIONALLY DISCRIMINATE AGAINST LATINO VOTERS………………………10

        1.  Direct Evidence of Racially Discriminatory Intent…………………………10

            a.  Rep. Burnam frequently stated that Latino voters in HD 90 vote on racial lines………………………………………………………11

            b.  Rep. Burnam belittled and expressed opposition to Latino voters' support for Latino candidates…………………………………………..11

            c.  Rep. Burnam targeted Latino voters to discourage them from using third party assistance in casting mail ballots…………………………...12

            d.  Rep. Burnam used racial stereotypes to persuade voters not to vote for Mr. Romero……………………………………………………..13

        2.  Circumstantial Evidence of Intent: Arlington Heights Factors……………...16

            a.  The Impact of the Official Action………………………………16

            b.  The Historical Background of the Decision……………………..18

            c.  The Specific Sequence of Events Leading up to the Challenged Decision……………………………………………………………26

            d.  Departures from the Normal Procedural Sequence……………………...36

      i.   Departure from the Legislature's Original Stated Goal of Passing the Court-Drawn Plans Unchanged …………………………………...36

      ii.  Limited Opportunity for Public Review…………………………...37

      iii. Limited Amendments………………………………………………38

      iv. Interactions with the Attorney General's Office…………………...38

  e.  Substantive Departures……………………………………………………..39

      i.   Redistricters Departed from Traditional Criteria Such as Avoiding Precinct Cuts and Respecting Communities of Interest……………39

      ii.  Failure to Evaluate the Burnam Amendment for Compliance with the Federal Voting Rights Act………………………………………40

      iii. Departures from the Legislature's Original Stated Goal of Passing the Court-Drawn Plans…………………………………………….42

      iv. Consideration in the Senate………………………………………..44

E.     HD90's BOUNDARIES IN H358 DILUTE LATINO VOTING STRENGTH IN VIOLATION OF SECTION 2…………………………………………………...44

  1.  Gingles Prong 1……………………………………………………………44

  2.  Gingles Prong 2 and 3: Racially Polarized Voting in Tarrant County………44

    a.  Dr. Engstrom's Qualifications…………………………………………...44

    b.  Dr. Engstrom's Methodology…………………………………………….45

    c.  Dr. Alford Praising Dr. Engstrom's Methodology………………………46

    d.  Dr. Engstrom's Conclusions on General Elections………………………47

    e.  Primary Elections Play a Critical Role in Evaluating Racially Polarized Voting………………………………………………………………………49

      i.   Dr. Engstrom's Testimony………………………………………….49

      ii.  Dr. Alford's Testimony……………………………………………..50

      iii. Dr. Lichtman's Testimony………………………………………….53

   iv. Dr. Tijerina's Testimony…………………………………………...54

   v. Dr. Murray's Testimony…………………………………………...54

   vi. African-American Congresspersons' Testimony…………………..55

  f. Tarrant County Elections…………………………………………………...56

  g. Democratic Primaries in HD90 Are Racially Polarized…………………59

  h. NAACP Witnesses Corroborating Dr. Engstrom………………………..61

  i. Tarrant County Non-Partisan Elections Are Racially Polarized…………61

  j. Dilutive Effects of Burnam Amendment in H358………………………..63

 3. Totality of the Circumstances……………………………………………...65

  a. The History of Voting-Related Discrimination in the State of Political
   Subdivision…………………………………………………………………65

  b. The Extent to Which Voting is Racially Polarized………………………66

  c. The Extent To Which The State Or Political Subdivision Has Used Voting
   Practices Or Procedures That Tend To Enhance The Opportunity For
   Discrimination Against The Minority Group, Such As Unusually Large
   Election Districts, Majority Vote Requirements, And Prohibitions Against
   Bullet Voting………………………………………………………………..67

  d. The Exclusion Of Members Of The Minority Group From Candidate
   Slating Processes……………………………………………………………67

  e. The Extent To Which Minority Group Members Bear The Effects Of Past
   Discrimination In Areas Such As Education, Employment, And Health,
   Which Hinder Their Ability To Participate Effectively In The Political
   Process……………………………………………………………………...68

  f. The Use Of Overt Or Subtle Racial Appeals In Political Campaigns…...69

  g. The Extent To Which Members Of The Minority Group Have Been
   Elected To Public Office In The Jurisdiction…………………………70

II. PROPOSED CONCLUSIONS OF LAW .........................................................73

 A. OVERVIEW OF THE RULING. ..........................................................73

3. The Court's Previous Rulings on HD90 Confirm that Creation of HD90 as an SSVR majority district, by itself, is neither illegal nor improper...................73

4. Recent Rulings of the U.S. Supreme Court Support the Creation of HD90 as a Latino Majority District…………………………………………………...76

B. HD90 IN PLAN H358 INTENTIONALLY DISCRIMINATES AGAINST LATINOS IN VIOLATION OF THE FOURTEENTH AMENDMENT (*SHAW* RACIAL GERRYMANDERING CLAIM………………………………………78

C. HD90 IN PLAN H358 INTENTIONALLY DILUTES LATINO VOTING STRENGTH IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT AND THE FOURTEENTH AMENDMENT (INTENTIONAL VOTE DILUTION CLAIM…......................................................................................84

1. Direct Evidence of Discriminatory Intent…………………………..86

2. The Discriminatory Impact of Changes to HD90 in H358………………88

3. Historical Background…………………………………………………...89

a. The 2011 Legislative Session ......................................................93

4. Sequence of Events Leading up to the Challenged Decision…..............96

5. Departures from the Normal Procedural Sequence ................................100

6. Departures from Normal Substantive Considerations ............................102

7. The Factors set out in *LULAC v. Perry* Support a Finding of Discrimination……………………………….................................................105

8. The Voting Rights Act Prohibits Intent to Dilute Latino Voting Strength in General Elections as well as Democratic Primary Elections…………...106

D. HD90 IN PLANS H358 DISCRIMINATES IN EFFECT AGAINST LATINOS IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT, 42 U.S.C. 1973, *et seq*…………………………………………………………………108

1. *Gingles* 1: Latinos are Sufficiently Numerous and Compact to Constitute the Majority of HD90.............................................................................108

2. *Gingles* 2 and 3: Racially Polarized Voting……………...………..109

a. The Importance of Primary and Non-Partisan Elections in Evaluating Racially Polarized Voting .................................................................113

3.      Totality of the Circumstances ...................................................119

4.      The Changes to HD90 in H358 Minimized Latino Voting Strength .......121

5.      The Senate Factors ...................................................................122

6.      Proportionality as a Factor in the Totality of Circumstances .................124

E.      THE LATINO TASK FORCE'S SUCCESSFUL CHALLENGE OF NUECES
        COUNTY BOUNDARIES IN PLAN C185 AND PLAN H283 SHOULD NOT
        BE REVISITED ................................................................................124

III.    CONCLUSION................................................................................127

# TABLE OF AUTHORITIES

Cases

*Adarand Constructors, Inc. v. Peña*,
   515 U.S. 200 (1995)...................................................................... 78

*Agostini v. Felton*,
   521 U.S. 203 (1997)...................................................................... 125

*Alabama Legislative Black Caucus v. Alabama*,
   135 S. Ct. 1257 (2015)............................................................ 77, 78, 79

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)............................................................... 79, 85, 86

*Bartlett v. Strickland*,
   556 U.S. 1 (2009).......................................................................... 108

*Benavidez v. City of Irving, Tex.*,
   638 F.Supp.2d 709 (N.D. Tex. 2009) ........................................ 110, 111

*Bethune-Hill v. Virginia State Bd. of Elections*,
   137 S. Ct. 788 (2017)................................................................. 77, 78

*Browning v. Navarro*,
   887 F.2d 553 (5th Cir. 1989) ........................................................ 125

*Burdick v. Takushi*,
   504 U.S. 428 (1992)...................................................................... 115

*Campos v. City of Baytown*,
   840 F. 2d 1240 (5th Cir. 1988) ...................................................... 110

*Campos v. City of Houston*,
   113 F.3d 544 (5th Cir. 1997) ......................................................... 108

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980)......................................................................... 84

*City of Mobile, Ala. v. Bolden*,
   446 U.S. 55 (1980)......................................................................... 78

*Clark v. Calhoun County, Miss.*,
   21 F.3d 92 (5th Cir. 1994) ............................................................ 119

*Clark*,
   88 F.3d ...................................................................................... 121

*Collins v. City of Norfolk*,
   816 F. 2d 932 (4th Cir. 1987) ........................................................ 110

*Cooper v. Harris*,
   137 S. Ct. 1455 (2017)............................................................ 77, 127

*E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*,
   926 F.2d 487 (5th Cir. 1991) ............................................................... 109, 112
*Fabela v. City of Farmers Branch, Tex.*,
   2012 WL 3135545 (N.D. Tex. Aug. 2, 2012)....................................... 111
*Garza v. County of Los Angeles*,
   756 F. Supp. 1298 (C.D. Cal. 1990) ............................................. 78, 79
*Garza v. County of Los Angeles*,
   918 F.2d 763 (9th Cir. 1990) ................................................................ 84
*Gomez v. City of Watsonville*,
   863 F.2d 1407 (9th Cir. 1988) ............................................................ 110
*Growe v. Emison*,
   507 U.S. 25 (1993)................................................................................ 108
*In re Felt*,
   255 F.3d 220 (5th Cir. 2001) ....................................................... 125, 126
*In re Ford Motor Co.*,
   591 F.3d 406 (5th Cir. 2009) ................................................ 125, 126, 127
*Jamison v. Tupelo, Mississippi*,
   471 F. Supp. 2d 706 (N.D. Miss. 2007).............................................. 111
*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
   4 F.3d 1103 (3d Cir. 1993)................................................................... 119
*Johnson v. DeGrandy*,
   512 U.S. 997 (1994)................................................................ 108, 114, 124
*Kilgarlin v. Martin*,
   252 F. Supp. 404 (S.D. Tex. 1966) .......................................... 65, 67, 90
*Kirksey v. Bd. of Supervisors*,
   528 F.2d 139 (5th Cir. 1977) ............................................................... 121
*LULAC v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ............................................................... 121
*LULAC v. Perry*,
   548 U.S. .................................................................. 79, 90, 105, 122
*Magnolia Bar Ass'n v. Lee*,
   793 F. Supp. 1386 (S.D. Miss. 1992).................................................. 112
*Magnolia Bar Ass'n, Inc. v. Lee*,
   994 F.2d 1143 (5th Cir. 1993) ............................................................. 111
*Massey v. Novartis Pharm. Corp.*,
   46 F. Supp. 3d 688 (W.D. Tex. 2014).................................................. 125
*Messenger v. Anderson*,
   225 U.S. 436 (1912).............................................................................. 125
*Miller v. Johnson*,
   515 U.S. 900 (1995)................................................................... 78, 79, 84

*Nixon v. Condon*,
  286 U.S. 73 (1932)................................................................................ 114

*Nixon v. Herndon*,
  273 U.S. 536 (1927)......................................................................... 114, 115

*Perez v. Abbott*,
  No. SA-11-CV-360, 2017 WL 1787454 (W.D. Tex. May 2, 2017)...................... 79, 80, 82, 84

*Propes v. Quarterman*,
  573 F.3d 225 (5th Cir. 2009) .............................................................. 125

*Rangel v. Morales*,
  8 F.3d 242 (5th Cir. 1993) ................................................................. 112

*Reynolds v. Sims*,
  377 U.S. 533 (1964)........................................................................... 90

*Rodriguez v. Harris Cnty., Tex.*,
  964 F. Supp. 2d 686 (S.D. Tex. 2013) ................................................... 111

*Rogers v. Lodge*,
  458 U.S. 613 (1982)........................................................................... 84

*Royal Ins. Co. of America v. Quinn-L Capital Corp.*,
  3 F.3d 877 (5th Cir. 1993) .......................................................... 125, 126

*Session*,
  298 F.Supp.2d ................................................................................ 122

Shaw v. Hunt,
  517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996)............................. 80

*Shaw v. Reno*,
  509 U.S. 630 (1993)....................................................................... 79, 84

*Smith v. Allwright*,
  321 U.S. 649 (1944)......................................................................... 114

*Thornburg v. Gingles*
  478 U.S. 30 (1986)………………………………………………………………passim

*United States v. City of Euclid*,
  580 F. Supp. 2d 584 (N.D. Ohio 2008)................................................... 111

*United States v. Village of Port Chester*,
  No. 06 Civ. 15173(SCR), 2008 WL 190502 (S.D.N.Y. Jan. 17, 2008)............. 111

*Valdespino v. Alamo Heights Indep. Sch. Dist.*,
  168 F.3d 848 (5th Cir. 1999) .............................................................. 108

*Vera v. Richards*,
  861 F. Supp. 1304 ........................................................................... 122

*Wesberry v. Sanders*,
  376 U.S. 1 (1964)............................................................................. 90

*Westwego Citizens for Better Gov't v. City of Westwego*,
  872 F.2d 1201 (5th Cir. 1989) ............................................................ 111

*Westwego Citizens for Better Gov't. v. Westwego*,
   946 F.2d 1109 (5th Cir. 1991) ............................................................ 112
*Whitcomb v. Chavis*,
   403 U.S., 124 (1971)........................................................................... 84
*White v. Regester*,
   412 U.S. 755 (1973)...................................................................... 92, 121

Statutes

42 U.S.C. 1973 ............................................................................... v, 108
52 U.S. Code § 10301 (b) ......................................................... 85, 106
R.S. 2294 (2011) ................................................................................. 24
R.S. 2358 (2011) ................................................................................. 24
R.S. 2361 (2011) ................................................................................. 24
R.S. 6917 (2011) ................................................................................. 24

Other Authorities

Wright et al., *Federal Practice and Procedure* § 4478, at 788 (1981)....................................... 125

# I.     FINDINGS OF FACT

## A.     STANDING TO CHALLENGE HD90

1.  The Texas Latino Redistricting Task Force Plaintiffs ("Task Force Plaintiffs") challenged the configuration of HD90 in H358 as a racial gerrymander, intentionally dilutive of Latino voting strength and dilutive in effect.  (Task Force Fourth Amended Complaint, Dkt. 891 at ¶¶ 2, 41, 78, 79).

2.  The Task Force Plaintiffs have standing to challenge House District 90 ("HD90") in H358 because at least one member of the Texas Latino Redistricting Task Force is Latino and a registered voter in HD90.  (2017 Task Force Ex. 21).

## B.     NEIGHBORHOODS IN HD90

3.  HD90 has had a majority minority population since at least the early 1980s.  (2017 Task Force. Ex. 1 at 4).

4.  During the redistricting that took place in 2003, seven heavily Latino precincts were added to HD90.  (2017 Task Force Ex. 1 at 5).

5.  Today, HD90 covers almost all of the majority-Latino neighborhoods in Tarrant County. (2017 Task Force Ex. 51).  Tarrant County as a whole remains majority Anglo.  (2017 Task Force Ex. 50).

6.  HD90 includes a portion or all of a number of neighborhoods, including the North Side, Diamond Hill, North Beverly Hills, Downtown Forth Worth, Worth Heights, South Hemphill Heights, Rosemont, Seminary Hills, Fairmount, Polytechnic Heights, Riverside, Sylvan Heights West, Scenic Bluff, Alamo Heights, and Como.  (2017 Trial Tr. 298:21 - 300:4).

7. Mr. Lon Burnam lives in the Fairmount Neighborhood, one of the neighborhoods within HD90. (2017 Trial Tr. 301:3-5; 2017 Task Force Ex. 18).

### 1.  Sansom Park and North Beverly Hills

8. Sansom Park and North Beverly Hills are in the northwest portion of HD90. (2017 Trial Tr. 351:14-16).

9. Sansom Park is a small city with approximately 4,600 residents. (2017 Trial Tr. 310:6-8). Sansom Park has a growing Latino population. (2017 Trial Tr. 310:6-8).

10. In 2011-2012, Sansom Park was largely encompassed within precinct 4138. (2017 Trial Tr. 338:11-13; 2017 Task Force Ex. 3-H). Precinct 4138 had a 2012G SSVR of 23.55%. (2017 Task Force Ex. 38 at 1).

11. Sansom Park and North Beverly Hills, although not areas with majority Latino voter registration, have a history of supporting and electing Latino candidates. (2017 Trial Tr. 315:15 - 316:25; 351:22 - 352:3). For example, Sansom Park elected Roger Chavez, a Latino, to an at-large city council seat. (2017 Trial Tr. 316:15-25).

### 2.  The Como Neighborhood

12. The neighborhood of Como is located in Tarrant County precinct 1120. (2017 Task Force Ex. 1 at 45; 2017 Task Force Ex. 17).

13. Como has an overwhelmingly non-Latino voter population. In the 2012 Democratic Primary election, Como had an SSVR of 4.4%. (2017 Task Force Ex. 15 at 1). In the 2014 Democratic Primary, Como had an SSVR of 4.62%. (2017 Task Force Ex. 11 at 1; 2017 Task Force Ex. 13 at 1).

14. Como is a predominantly African-American community. (2017 Task Force Ex. 4 at 4 ; 2017 Task Force Ex. 51).

15. Como is located to the west of Fort Worth's urban core.  (2017 Task Force Ex. 3-G at 2).

16. Como is located in Senate District 12, which contains a 24.8% Black and Hispanic voting age population and is represented by Texas Senator Jane Nelson (R).  Como is not located in Senate District 10, which contains a 42.4% Black and Hispanic voting age population and encompasses the majority of HD90.  (Tarrant County, State Senate District 10 Voting Precincts (2014), http://access.tarrantcounty.com/content/dam/main/elections/Maps/State_Senate/State_Senate_District_10.pdf; Texas Legislative Council, Precincts by District Senate District 10 (2017), http://www.fyi.legis.texas.gov/fyiwebdocs/PDF/senate/dist10/r7.pdf; Texas Legislative Council, Senate District Population Analysis, at 3 (2017), http://gis1.tlc.state.tx.us/download/Senate/PLANS172r100.pdf).

17. Como is located in Congressional District 12, which contains a 24.8% Black and Hispanic voting age population and is represented by U.S. Representative Kay Granger (R).  Como is not located in Congressional District 33, which contains a 78.5% Black and Hispanic voting age population and encompasses the majority of HD90.  (Tarrant County, United States Representative District 33 Voting Precincts (2014), http://access.tarrantcounty.com/content/dam/main/elections/Maps/US_Rep/US_Rep_33.pdf; Texas Legislative Council, Precincts by District -- Congressional District 33 (2017), http://www.fyi.legis.state.tx.us/fyiwebdocs/PDF/congress/dist33/r7.pdf; Texas Legislative Council, District Population Analysis -- Congressional Districts, at 3, 7 (2017), http://gis1.tlc.state.tx.us/download/Congress/PLANC235r100.pdf).

18. Because of its distance from the urban core of Fort Worth, Como is not located in HD95, which is represented by an African-American representative in the State House, Nicole

Collier.  (Texas Legislative Council, Incumbents By District -- House Districts, at 2 (2017), http://gis1.tlc.state.tx.us/download/House/PLANH358r350.pdf).

19. The neighborhood of Como is the precinct with the highest turnout in HD90 Democratic Primary elections with a voting rate twice as high as many other HD90 precincts.  (2017 Trial Tr. 313:14-22).  In the 2014 Democratic Primary election, Como had a turnout of 19.4%.  (2017 Task Force Ex. 39 at 1; 2017 Task Force Ex. 44 at 1).

20. In the 2014 Democratic Primary election, Como voters cast 495 votes, while the second highest turnout precinct, precinct 1132, produced only 233 votes.  (2017 Task Force Ex. 39 at 1).

21. Since 1983, Como has been a stopping point for presidential, gubernatorial, and senatorial candidates because of its high turnout.  (2017 Trial Tr. 353:4-7).

22. Como historically does not support Latino candidates in Democratic primary elections.  (2017 Task Force Ex. 1 at 45-49; 2017 Trial Tr. 313:7-13, 352:16-17).

23. Como has an unofficial endorsement process, in which a number of community leaders signal their support for a candidate, who then gains the support of the majority of the neighborhood.  (2017 Task Force Ex. 1 at 33).  Dorothy DeBose is a member of this political machine.  (2017 Task Force Ex. 1 at 34).  Rep. Burnam paid Ms. DeBose to work for his campaigns in HD90.  (2017 Task Force Ex. 1 at 49).  Before Ms. DeBose, Ms. Viola Pitts, who was known as "the mayor of Como," led the political machine.  (2017 Task Force Ex. 1 at 34-35).

24. Como was a high priority for Rep. Burnam.  He visited the neighborhood at least every couple of weeks.  (2017 Task Force Ex. 1 at 32).  He held campaign events in the neighborhood.  (2017 Task Force Ex. 1 at 32).  He block-walked the neighborhood every

election cycle. (2017 Task Force Ex. 1 at 32).  Rep. Burnam described himself as very familiar with the residents of Como. (2017 Task Force Ex. 1 at 32).  During the 2014 Democratic primary, Rep. Burnam's campaign separated Como residents into a specific phone list. (2017 Task Force Ex. 3-AM).

### C.   H358 IMPERMISSIBLY USES RACE TO ASSIGN VOTERS WITHIN OR WITHOUT HD90

#### 1.   Race as a Predominant Factor

25. During the 2013 special session, Rep. Burnam asked his Chief of Staff, Conor Kenny, to draw a map that placed Como back into HD90.  (2017 Task Force Ex. 1 at 17).  Rep. Burnam asked Mr. Kenny to draw the amendment after he heard that the House leadership would entertain amendments.  (2017 Trial Tr 634:7-24).

26. Rep. Burnam instructed Mr. Kenny to see if he could swap areas between HD90 and HD99 that would bring the Como neighborhood back into HD90.  (2017 Trial Tr. 635:6-16).

27. Mr. Kenny surmised that bringing Como into HD90 would assist Rep. Burnam in a future primary election.  (2017 Trial Tr. 644:19-23).

28. Rep. Burnam instructed Mr. Kenny on how to draw maps of HD90, including pointing to areas and instructing Mr. Kenny to add areas.  (2017 Task Force Ex. 1 at 19).  Rep. Burnam directed Mr. Kenny in drawing maps of HD90 because Rep. Burnam was familiar with the relevant neighborhoods and Mr. Kenny was not.  (2017 Task Force Ex. 1 at 27; 2017 Trial Tr.  658:10-12).

29. Mr. Kenny testified that he had only limited familiarity with the neighborhoods in HD90. (2017 Trial Tr. 658:10-12).  Mr. Kenny testified that he was not familiar with the demographic composition of the Fairmount neighborhood.  (2017 Trial Tr. 658:13-22).

Mr. Kenny testified that he was not familiar with the demographic composition of the Riverside neighborhood.  (2017 Trial Tr. 658:23-25).  Mr. Kenny testified that he was not familiar with the demographic composition of the South Side neighborhoods.  (2017 Trial Tr. 659:1-14).  Mr. Kenny testified that he was not familiar with the demographic composition of the Diamond Hill neighborhood.  (2017 Trial Tr. 659:21-23).  Mr. Kenny testified that he did not have enough familiarity with the neighborhoods of HD90 to know whether the Latino population was increasing within the neighborhoods.  (2017 Trial Tr. 659:24 - 660:5).  Mr. Kenny testified that he has not seen population figures that show the growth of the Latino community in Fort Worth over the last decade.  (2017 Trial Tr. 660:6-11).

30. While drawing the first map, Mr. Kenny looked only at population deviation; he pulled Como into HD90 and put other precincts into HD99.  (2017 Trial Tr. 637:17 - 638:1).  Mr. Kenny did not look at demographic information during the first round of map drawing.  (2017 Trial Tr. 637:25 - 638:1).

31. On June 19, 2013, Rep. Burnam made public Plan H328, his draft plan to amend SB 3 during the 2013 special session.  (2017 Task Force Ex. 30D).  Rep. Burnam's Plan H328 included the neighborhood of Como in HD90.  (2017 Task Force Ex. 3-G at 2; 2017 Task Force Ex. 1 at 29).

32. This initial plan to include Como back into HD90 brought the 2012G Total SSVR in HD90 below 50% to 48.2%.  (2017 Task Force Ex. 3-E at 2; 2017 Task Force Ex. 1 at 18; 2017 Task Force 30-F; 2017 Trial Tr. 639:8, 14-20).

33. At a later point in time, Rep. Burnam asked Mr. Kenny to go back and see if he could draw a version of HD90 that swapped more areas between HD90 and HD99 to bring the SSVR back up to the previous plan's level.  (2017 Trial Tr. 641:1-21).

34. In order to raise the SSVR in HD90 above 50%, Rep. Burnam and Mr. Kenny created a second map in which the goal, according to Rep. Burnam, was to remove "every white voter near the western boundary of the district to keep the Hispanic vote over 50%." (2017 Task Force Ex. 1 at 17).

35. Mr. Kenny did not take into account any election results as he made changes to the district; the redrawing was, in his words, "purely a demographic exercise."  (2017 Trial Tr. 664:11-15, 671:21-23; 2017 Task Force Ex. 1 at 29 ).  Rep. Burnam testified that while drawing HD90 to reach an SSVR of 50.1%, he never examined changes in election performance of the district.  (2017 Task Force Ex. 1 at 41).

36. Mr. Kenny first worked at the precinct level to raise the district SSVR, but he could not raise the SSVR to the previous level.  (2017 Trial Tr. 643:15-21).

37. Mr. Kenny then went block by block to finalize his second map using HVAP census data as a proxy for SSVR, as SSVR is not available at the block level.  (2017 Trial Tr. 643:24 - 644:1, 666:16 -667:1).

38. Rep. Burnam testified that he ignored precinct lines to "pull [Latinos] in" to HD90 and find white people to put in HD99, represented by Rep. Geren.  (2017 Task Force Ex. 1 at 27).

39. Mr. Kenny used racial shading in RedAppl, a computer application used to draw redistricting plans, to draw HD90 by including Census blocks with higher HVAP.  (2017 Trial Tr.  665:10-666:6).  Mr. Kenny went along the border between HD90 and HD 99

and brought blocks that were above 50% HVAP into HD90.  Then he took out blocks that

were under 50% HVAP.  (2017 Trial Tr.  643:6 – 644:6, 665:24 – 666:15; 2017 Task

Force Ex. 1 at 28).  When Mr. Kenny saw a block on RedAppl with an HVAP below

50%, he moved it out of HD90 regardless of other populations.  This was his procedure

for creating his second map.  (2017 Trial Tr. 665:24 – 666:15).

40. Mr. Kenny referred to his goal of adding blocks with greater than 50% HVAP and

removing blocks with less than 50% HVAP as an "operational mandate."  (2017 Trial Tr.

671:9-17).

41. In total, Rep. Burnam and Mr. Kenny split ten precincts to draw HD90's new boundaries.

(2017 Task Force Ex. 1 at 36; 2017 Task Force Ex. 3-I at 2-4; 2017 Task Force Ex. 40).

42. Rep. Burnam's amendment cut out portions of Sansom Park by splitting precincts 4073

and 4593, in order to remove Anglo-majority blocks while maintaining Latino-majority

blocks.  (2017 Task Force Ex. 1 at 31; 2017 Task Force Ex. 3-H).

43. Rep. Burnam specifically outlined how he split precincts 4125, 4068, 4493, 4634, and

1015 in order to include Latino-majority blocks in HD90 and exclude Anglo-majority

blocks from HD90.  (2017 Task Force Ex. 1 at 36-39; 2017 Task Force Ex. 3-J at 1-3).

44. Rep. Burnam further outlined how he removed whole precincts 1674 and 1062 and

included whole precincts 1434 and 1408, in order to include Latino-majority precincts in

HD90 and remove non-Latino-majority precincts from the district.  (2017 Task Force Ex.

1 at 39-40; 2017 Task Force Ex. 3-J at 3).

45. Rep. Burnam admitted that he made changes to HD90 for the sole purpose of including

Latino-majority blocks in the district and excluding Anglo-majority blocks.  (2017 Task

Force Ex. 1 at 36-38).

46. Mr. Kenny testified that he reviewed the cut to precinct 4125 with Rep. Burnam and told Rep. Burnam that cutting 4125 in order to draw more Latinos into HD90 would be "ugly."  (2017 Trial Tr. 670:2-12).  Rep. Burnam did not express concern with the "ugly" cut and instead said that the cut was "great" because it brought more Latinos into HD90. (2017 Trial Tr. 670:2-12).

47. While making the changes to HD90, Mr. Kenny tried to involve only one other district, HD99.  (2017 Trial Tr. 666:25).

48. However, Mr. Kenny ultimately involved a third district in his redrawn map.  (2017 Trial Tr. 642:9-15, 667:2-4).  This is because Rep. Burnam had originally used a precinct north of the railroad track to connect Como to HD90 that he testified "wasn't a good match" because "there were too many white people in that district [sic]." (2017 Task Force Ex. 1 at 23).  Rep. Burnam eliminated the original connector precinct to Como and replaced it with an unpopulated precinct that was south of the railroad tracks.  Adding that precinct to HD90 involved a third district HD97, which was represented by Craig Goldman. (2017 Task Force Ex. 1 at 23; 2017 Task Force Ex. 3-J at 3).

49. The total population of the precincts split or moved whole because of race by Rep. Burnam's amendment is 33,343 individuals, including an estimated 16,429 registered voters. (2017 Task Force Exs. 3-H, 3-J, 40, 66, 69 and 70).

50. Rep. Burnam introduced his amendment on the House floor with the following comment: "[B]asically what it does is take the African American and Hispanic population out of Representative Geren's district and puts some of my Anglo population into his district. I believe it's acceptable to the author [Chairman Darby]."  (2017 Joint Ex. 17.3 at S29).

9

51. During consideration of the Burnam amendment on the House floor, Chairman Darby addressed the House: "Members, Representative Burnam has revised his amendment and it now keeps this district a Hispanic district--brings the numbers back over 50%. That was the objection. I believe Representative Geren is in favor of this amendment also, so with that I would move to accept this amendment."  (2017 Joint Ex. 17.3 at S29; 2017 Trial Tr. 1544:13 - 25).

52. Chairman Darby invoked legislative privilege and did not provide any further testimony on the nature of "the objection" or why he believed this revision cured the objection to the original Burnam amendment. (2017 Trial Tr. 1545:1-14).

### D.   CHANGES TO HD90'S BOUNDARIES IN H358 INTENTIONALLY DISCRIMINATE AGAINST LATINO VOTERS

#### 1.   Direct Evidence of Racially Discriminatory Intent

53. Fort Worth community leader Sal Espino testified that, around 2008 or 2009, he was approached by individuals who advised him to challenge Lon Burnam in the Democratic primary election for HD90.  Rep. Burnam asked to meet with Mr. Espino, who was a Fort Worth City Councilmember at the time, and at the meeting tried to dissuade Mr. Espino from running for the seat.  Mr. Espino ultimately decided not to challenge Rep. Burnam. (2017 Trial Tr. 297:12 - 298:4).

54. Prior to the 2014 Democratic Primary election, Rep. Burnam approached Ramon Romero and attempted to dissuade him from running for State Representative in HD90. (2017 Task Force Ex. 1 at 58).  Rep. Burnam met only with Mr. Romero, and no other potential challengers, to convince him not to run.   (2017 Task Force Ex. 1 at 58).

55. Rep. Burnam and Mr. Kenny referred to their initial 2013 changes to HD90 (in H328) as a "dilution of the Hispanic voting power in the district." (2017 Trial Tr. 665:2-5).

56. Rep. Burnam testified that the changes he made from the first version of his amendment to the second, which raised the SSVR to 50.1%, "didn't change the [electoral performance] numbers, but it changed the [SSVR] percentage."  (2017 Task Force Ex. 1 at 63).

57. Mr. Kenny conceded that the final map produced by him and Mr. Burnam would make it more difficult for Latinos to elect their preferred candidate in the Democratic primary if that candidate were Latino. (2017 Trial Tr. 672:24 – 673:7).

        **a.   Rep. Burnam frequently stated that Latino voters in HD 90 vote on racial lines.**

58. Rep. Burnam testified that he knew that the growing Latino population in HD90 would make it difficult for him to win Democratic primaries. (2017 Task Force Ex. 2 at 19).

59. Rep. Burnam largely attributed his loss in the 2014 Democratic Primary to the "demographic shift" in the district, saying, "people mainly tend to vote based on their own personal identity." (2017 Task Force Ex. 2 at 20).

        **b.   Rep. Burnam belittled and expressed opposition to Latino voters' support for Latino candidates.**

60. Following his loss in the Democratic primary, Mr. Burnam described himself as "a victim" of "identity politics." (2017 Task Force Ex. 2 at 27).

61. Mr. Burnam stated that in order to appeal to Latino voters he would have had to transform into a Latino, and stated that a joke in his office was that "if I would just change my name to Leon Bernal there would be no problem" getting Latino votes in HD90. (2017 Task Force Ex. 2 at 28-29).

62. Mr. Burnam stated that Latino voter support for Latino candidates was not necessarily in their best interest.  He stated, "it's about identity politics . . . [t]his district is 70%

Hispanic and people all over the world tend to vote for people they identify with that's not necessarily in their best interest." (2017 Task Force Ex. 2 at 23).

63. Mr. Burnam testified that Latino voters who voted for the Latino candidate in the HD90 2014 Democratic primary "unwittingly" voted against their interests. (2017 Task Force Ex. 2 at 25-25).

64. Mr. Burnam also stated that Latino voters did not vote in their best interest when they supported Latino candidates running in CD33 and SD10.   (2017 Task Force Ex. 2 at 26).

65. Mr. Burnam maintained that Latino voter support for Latino candidates was the result of manipulation as opposed to considered deliberation on the part of Latino voters.  (2017 Task Force Ex. 2 at 25).

66. When speaking about the 2014 Democratic primary elections in HD90, CD33, and SD10, Rep. Burnam invoked the stereotype of Latinos as uneducated and easily manipulated by maintaining that Latino voters were "directed and deceived" into voting for Latino candidates and against their own best interest. (2017 Task Force Ex. 2 at 25-26; 2017 Task Force Ex. 56; 2017 Task Force Ex. 57).

> ### c.   Rep. Burnam targeted Latino voters to discourage them from using third party assistance in casting mail ballots.

67. Ramon Romero, who is Latino, challenged Rep. Burnam in the 2014 Democratic Primary election for HD90. (2017 Trial Tr. 302:5 - 302:10; 2017 Task Force Ex. 1 at 58).

68. The volunteers and campaign workers for Mr. Romero's campaign wore blue campaign t-shirts. (2017 Task Force Ex. 3-AJ, 22).

69. During the 2014 Democratic primary for HD90, Rep. Burnam hired the Tyson organization to produce robocalls for his campaign. (2017 Task Force Ex. 2 at 2-3; 2017 Task Force Ex. 3-AO; 2017 Task Force Ex. 3-AP).

70. Rep. Burnam reviewed an email from his campaign manager with a robocall script warning elderly voters that people in blue Ramon Romero campaign t-shirts may steal their vote-by-mail ballots.  (2017 Task Force Ex. 3-AG; 2017 Task Force Ex. 47).

71. Rep. Burnam's campaign ultimately sent out a robocall warning elderly voters that people in blue t-shirts may steal their vote-by-mail ballots. (2017 Task Force Ex. 3-AG; 2017 Task Force Ex. 3-AH;  (2017 Task Force Ex. 3-AE; 2017 Task Force 3-AF; 2017 Task Force Ex. 2 at 12-13; 2017 Task Force Ex. 47).

72. Rep. Burnam was aware of his campaign sending this robocall.  (2017 Task Force Ex. 2 at 8-10).

73. The Spanish language version of this robocall was recorded by Rep. Burnam's employee, Josie Martinez, and sent out to a targeted list of Latino voters. (2017 Task Force Ex. 3-AQ; 2017 Task Force Ex. 3-AI; 2017 Task Force Ex. 2 at 11-12, 13-14).

74. Although there is evidence the robocall was sent in Spanish, Rep. Burnam could not produce any evidence that the robocall was sent in English. (2017 Task Force Ex. 2 at 16).

75. Rep. Burnam testified that he intended the robocall to make recipients reluctant to accept assistance from Ramon Romero campaign workers. (2017 Task Force Ex. 2 at 16).

76. Despite Rep. Burnam's robocall in the Spanish-speaking community warning voters not to participate in Mr. Romero's vote-by-mail ballot assistance program, Rep. Burnam ran his own vote-by-mail ballot assistance program through surrogates in the heavily non-Latino Como neighborhood. (2017 Task Force Ex. 2 at 10).

      **d.  Rep. Burnam used racial stereotypes to persuade voters not to vote for Mr. Romero**

77. During the 2014 Democratic primary for HD90, Mr. Romero's campaign held an event to get out the vote. It was held at a park across the street from the All Saint's Catholic Church, an early voting site on the north side of the district. (2017 Trial Tr. 355:16-25).

78. The All Saint's Catholic Church is an important landmark in the northside Latino community. (2017 Trial Tr. 355:22-24).

79. Flyers portraying Mr. Romero as a member of the Latin Kings Gang were distributed at the All Saint's Catholic Church across the street from Mr.Romero's get out the vote event. (2017 Trial Tr. 355:16 - 356:5).

80. The flyer was produced by the Tarrant County Good Government Political Action Committee (PAC), which was affiliated with Lon Burnam's campaign. (2017 Task Force Ex. 3-W).

81. Rep. Burnam recognized the flyers as belonging to his campaign, and the return address on the flyers was Rep. Burnam's P.O. Box. (2017 Task Force Ex. 2 at 31-32).

82. The Tarrant County Good Government PAC's Treasurer was Mary Edwards, and its only two contributors were Randy Dukes and Lynda Bredner. (2017 Task Force Ex. 3-V; 2017 Task Force Ex. 2 at 29). Mary Edwards was an employee of Rep. Burnam. (2017 Task Force Ex. 1 at 50). Rep. Burnam knew Randy Dukes both personally and professionally, and Rep. Burnam describes Lynda Bredner as a close personal friend. (2017 Task Force Ex. 1 at 50). As of February 2014, Rep. Burnam was aware of the formation of the PAC. (2017 Task Force Ex. 2 at 29-30).

83. Rep. Burnam knew that the Latin Kings is a predominantly Latino street gang. Rep. Burnam's stated intention in distributing the flyer was to give voters the impression that Mr. Romero was associated with the Latin Kings.  Rep. Burnam further testified that Mr.

14

Romero was a member of the gang and made his money through drugs. (2017 Task Force Ex. 2 at 33).

84. The flyer depicted a negative and offensive stereotype of Latinos, namely that they are gang members.  (2017 Trial Tr. 319:23 - 320:17).  The flyer insinuated that if Mr. Romero were elected, there would be more gangs and violence. (2017 Trial Tr. 357:12-14).

85. During the 2014 Democratic Primary, Rep. Burnam's website featured a graphic depicting Mr. Romero's photo in between the photos of two other candidates, with the words "Fake Democrats" superimposed over all three faces. (2017 Task Force Ex. 3-X). The candidate directly next to Mr. Romero was holding a poster of President Obama with a Hitler mustache. (2017 Task Force Ex. 3-X).

86. Mr. Kenny prepared the campaign graphic for Mr. Burnam.  (2017 Trial Tr. 680:1-2, 686:8-20). Rep. Burnam testified that he approved of the posting in some form. (2017 Task Force Ex. 2 at 35). Rep. Burnam also posted this graphic on his Facebook page. (2017 Task Force Ex. 3-Y).

87. Mr. Espino testified that the graphic was "deeply disturbing, offensive, and hateful." Mr. Espino considered the graphic to be an appeal to non-Latino voters, and African-American voters in particular, not to vote for Mr. Romero.  (2017 Trial Tr. 320:18 - 321:14).

88. Rep. Burnam testified that he hoped that these posts would be "very disturbing" to African-American voters. (2017 Task Force Ex. 2 at 37). Rep. Burnam testified that voters would "quite possibly" gain a negative impression of Mr. Romero because he was

portrayed next to a picture of President Obama with a Hitler mustache. (2017 Task Force Ex. 2 at 38).

89. Throughout his campaign, Rep. Burnam's vendor, the Tyson organization, used race-specific outreach lists and targeted voters specifically based on race, including Latinos and African Americans. (2017 Task Force Ex. 1 at 56-57; 2017 Task Force Ex. 2 at 5-6; 2017 Task Force Ex. 3-AL; 2017 Task force Ex. 3-AK).

### 2.  Circumstantial Evidence of Intent:  Arlington Heights Factors

#### a.  The Impact of the Official Action

90. The 2013 Legislature enacted a redistricting plan for the Texas House of Representatives called Plan H358, which was made public on June 21, 2013.  (2017 Task Force Ex. 45; 2017 Joint Ex. 18.1 at 17).

91. In Plan H358, the 2012G total SSVR was reduced to 50.1% from 51.1% in Plan H283. (2017 Task Force Ex. 45 at 5; 2017 Task Force Ex. 24-F at 169).

92. The Burnam amendment changed the result for Latino candidate Hector Uribe's performance in the 2010 Democratic primary for Land Commissioner from winning to losing.  Under H283 in HD90, Latino candidate Hector Uribe wins 50.7% in the 2010 Democratic primary for Land Commissioner. (2017 Task Force Ex. 24F at 94).  Under H358 in HD90, Latino candidate Hector Uribe loses the primary with 49.97% in the 2010 Democratic primary for Land Commissioner.  (2017 Task Force Ex. 68).

93. Mr. Espino testified that the changes made to the boundaries of HD90 by Rep. Burnam's amendment weaken the opportunity for Latinos to elect a candidate of their choice in the Democratic primary and make it more difficult for Latino candidates to win.  (2017 Trial Tr. 317:1-16).

94. Mr. Kenny testified that the Burnam amendment would make it more difficult for Latino voters to nominate their preferred candidate in the Democratic primary if that candidate was Latino.  (2017 Trial Tr. 672:24 – 673:7).

95. Mr. Kenny was aware that bringing Como into HD90 could help Rep. Burnam in future primaries, as Rep. Burnam referred to Como as an area with a lot of supporters.  (2017 Trial Tr. 672:15-19).  Mr. Kenny testified that Rep. Burnam would be happy that Como was back in HD90 during the next primary election.  (2017 Trial Tr. 673:8 – 674:17).

96. Mr. Kenny testified that he and Rep. Burnam referred to the first version of the amendment, which moved Como back into the district, as dilution of the Latino voting power in the district. (2017 Trial Tr. 665:2-5).

97. Although the areas removed from HD90 were majority Anglo, they had an SSVR of 20.6%, which was significantly higher than the area added to the district, which included Como and had an overall SSVR of 8.5% (2017 Task Force Ex. 9 at 2).  As a result, the addition of Como and the removal of portions of Sansom Park and North Beverly Hills had a net effect of lowering the SSVR in HD90.

98. Moreover, Sansom Park and North Beverly Hills, although not areas with majority Latino voter registration, had a history of electing Latino candidates.  (2017 Trial Tr. 315:15 - 316:25).  The Burnam amendment's replacement of Sansom Park and North Beverly Hills with Como weakened the opportunity for Latinos to elect the candidates of their choice in HD90 in two ways:  Como's higher turnout and strong vote against a Latino candidate outweighed the other neighborhoods' lower turnout and more favorable margins for Latino candidates.  (2017 Trial Tr. 317:1 - 318:3, 352:9-11).

99. Mr. Espino testified that Mr. Romero and other Latino candidates were still vulnerable in

HD90 Democratic primary elections because Mr. Romero only won in 2014 by 110

votes.  There were other Latino candidates in the 2014 Democratic Primary running for

other seats, which contributed to higher Latino turnout that year.  (2017 Trial Tr. 323:4-

18).  Mr. Jimenez testified that even though HD90 has a slight majority of SSVR, he still

thinks that it is difficult for a Latino candidate to win in HD90 under the current plan that

includes Como.  (2017 Trial Tr. 353:8-17).

### b.   The Historical Background of the Decision

100.       From the 1970s to the 1990s, a group known as the "Seventh Street Gang"

recruited and supported Anglo candidates for elected office across the Fort Worth area.

(2017 Trial Tr. 294:15 - 295:21).  The membership of the "Seventh Street Gang" was

predominantly Anglo.  (2017 Trial Tr. 295:3-5).

101.       From its creation in 1983 through 2014, HD90 was represented by Anglo state

representatives -- Doyle Willis and later Lon Burnam.  (2017 Trial Tr. 352:11-13; 2017

Task Force Ex. 1 at 35; Legislative Reference Library of Texas, Doyle Willis,

http://www.lrl.state.tx.us/legeLeaders/members/memberDisplay.cfm?memberID=%2030

8).

102.       Lon Burnam first won election to represent HD90 in 1996.  (2017 Task Force Ex.

1 at 5).  In the 1996 Democratic Primary election, Lon Burnam defeated a Latino

opponent, Francisco Hernandez, in a runoff election.  (2017 Task Force Ex. 1 at 6; 2017

Trial Tr. 301:18 - 302:10).

103.       In the late 1990s and early 2000s, an informal group of Latino political,

community, and business leaders and activists formed to recruit and advise Latino

candidates in Fort Worth.  (2017 Trial Tr. 295:22 - 296:11; 347:9-15).  Alex Jimenez was a founder of the group.  (2017 Trial Tr. 347:9-13).

104.     The informal Latino group started meeting because, at that time in the early 2000s, there were no Latino city council members, county commissioners, or state representatives in Fort Worth, and only two Latino school board trustees.  (2017 Trial Tr. 296:14 - 297:7; 347:18-22).

105.     Members of the informal Latino group believed that HD90 should be a Latino seat. (2017 Trial Tr. 347:21-25).

106.     Rep. Burnam visited a meeting of the informal Latino group to deter the members' ongoing efforts to elect Latino local officials.  (2017 Trial Tr. 348:10-17).  At that meeting, Mr. Burnam asserted that he could represent the district better than any Latino candidate that the group could recruit.  (2017 Trial Tr. 348:15-17).  The discussion grew heated, and Mr. Burnam was asked to leave the meeting.  (2017 Trial Tr. 348:18-24).

107.     Throughout his 18 years in the Legislature representing HD90, Rep. Burnam never served as the chair or vice-chair of any legislative committees.  (2017 Task Force Ex. 1 at 6-7).

108.     Rep. Burnam was the only member of the House of Representatives to vote against Rep. Craddick when Rep. Craddick ran for Speaker of the House. (2017 Task Force Ex. 1 at 54-55).  After being the only representative to vote against Speaker Craddick, Rep. Burnam was not assigned to committees that he considered desirable, such as the House Insurance Committee, but was instead placed on committees he

considered undesirable, such as the House Agriculture & Livestock Committee. (2017 Task Force Ex. 1 at 54-55).

109.    Rep. Burnam filed bills he perceived as "cutting edge" but conceded that he filed many more bills than he passed into law. (2017 Task Force Ex. 1 at 56; 2017 Task Force Ex. 3-AD).

110.    Between 1996 and 2012, Representative Burnam was not challenged in the Democratic Primary elections in HD90. (2017 Trial Tr. 301:18-24; 2017 Task Force Ex. 1 at 42).

111.    HD90 in Plan H100, the benchmark plan for the 2011 redistricting, did not contain a majority HCVAP population. However, the Latino share of CVAP had been increasing in the district, and Latinos were on the cusp of majority status. The 2005-2009 ACS estimate for HCVAP in HD90 in Plan H100 was 47.9%. (Court Fact Findings – Plan H283, Dkt. 1364 at 13-14, ¶ 69). HD90 had a 2010 total SSVR of 45%. (2017 Task Force Ex. 3-A; Defendants' Ex. D-100 (RED-202)). However, HD90 was also substantially underpopulated -- by 26,288 (-15.68%). *Id*. Mr. Espino testified that his goal for HD90 during the 2011 redistricting was for it to have an SSVR that was over 50%. (2017 Trial Tr. 309:6-22).

112.    In HD90 in Plan H100, Latino candidate Hector Uribe won 56.3% in the 2010 Democratic primary for Land Commissioner. (2017 Task Force Ex. 23G at 94).

113.    Rep. Burnam testified that the 2011 redistricting cycle was probably the first cycle in which HD90 could be created as a Latino majority district: "[I]t was clear that what we wanted to try to do is create a majority Hispanic voter surname district, and

20

[HD90] had been inching in that direction since its creation in '78. This round was probably the first time it could have actually occurred." (2017 Task Force Ex. 1 at 16).

114.        In 2011, Rep. Burnam's goal was to move out of that Latino majority district. Rep. Burnam testified that he wanted to place himself in a non-Latino majority district and create a separate Latino-majority district in Tarrant County. (2017 Task Force Ex. 1 at 10).

115.        Rep. Burnam sought to place Diamond Hill, Riverside, the Northside neighborhoods, historically Latino Southside neighborhoods, and much of the Polytechnic Heights neighborhood into a new Latino majority district in which he did not reside. (2017 Task Force Ex. 1 at 11).

116.        However, when the 2011 redistricting process started in the Legislature, and Rep. Burnam provided his desired district boundaries to the redistricting point person for the Tarrant County delegation, Rep. Charlie Geren, Rep. Burnam kept his home in a Latino HD90 but lowered Latino voting strength in the district. In H113, which Rep. Geren testified contained HD90 as proposed by Rep. Burnam, the HCVAP, based on 2005-2009 ACS data, was reduced from 47.9% to 43.2%. (Court Fact Findings – Plan H283, Dkt. 1364 at 14, ¶¶ 69, 70); 2017 Task Force Ex. 4 at 5-6; 2017 Task Force Ex. 3-D).

117.        Rep. Geren's map of Tarrant County was incorporated into the first House proposal by House Redistricting Committee Chair Burt Solomons. The Solomons Statewide House Proposal, H113, was made public on April 13, 2011. (2017 Task Force Ex. 4 at 6; 2017 Task Force Ex. 27-A, 27-B, 27-C).

118.        In response to that proposal, on April 14, 2011, the Texas Latino Redistricting Task Force proposed H115. In H115, HD90 had 51.7% HCVAP using 2005-2009 ACS

data.  HD90 also had a 46.8% total SSVR and 48.9% non-suspense SSVR.  (Court Fact Findings – Plan H283, Dkt. 1364 at 127, ¶ 627).

119.    On April 15, 2011, at the House Redistricting Committee hearing, MALDEF Staff Attorney Luis Figueroa testified in favor of Plan H115.  With respect to Tarrant County, Mr. Figueroa urged the Redistricting Committee to create a Latino CVAP majority district in HD90.  Mr. Figueroa pointed out that in HD90, H113 reduced the non-suspense SSVR from 47.2% to 41.9%. (Court Fact Findings – Plan H283, Dkt. 1364 at 126-127, ¶ 627).  During later redistricting hearings, representatives from the Task Force made additional observations about the Latino population in Tarrant County.  Joey Cardenas of LULAC and the Task Force testified that there had been significant Latino population growth in Tarrant County.  (Court Fact Findings - General and Plan C185, Dkt. 1340 at 161, ¶ 182(J)).

120.     On April 17, 2011, Rep. Solomons released a statewide substitute to his Plan H113 which increased the 2010G non-suspense SSVR to 50.1% for HD90.  Rep. Solomons' substitute plan was Plan H134.  (2017 Task Force Exhibit 43 at 5).

121.    Rep. Solomons had told Rep. Geren there would be changes to the Tarrant County map.  (2017 Task Force Ex. 4 at 8).  Rep. Burnam became aware of the map shortly after Rep. Geren did, and he expressed to Mr. Geren that he was upset.  (2017 Task Force Ex. 4 at 9).

122.    Gerardo Interiano, Counsel to Speaker of the House, testified that when the SSVR of HD90 was raised to 50%, Rep. Burnam "all of a sudden opposed the map."  (2017 Task Force Ex. 6 at 2).  Mr. Interiano further testified that he knew the changes to HD90 increased Latino voting strength because "[t]hose two facts together, that MALDEF

wanted it done and that Representative Burnam did not want it done, told me that in District 90, as a result of increasing it above 50 percent SSVR, Hispanics were going to have a much better ability to elect their candidate of choice, which could ultimately lead to Representative Burnam losing in a primary, should a Hispanic candidate from that community run against him." (2017 Task Force Ex. 6 at 1-2).

123.    Mr. Interiano testified that Rep. Burnam "wanted the community of Como to be put back into the district. That is a community that is predominantly African-American. And it was my belief that if that community were to be put back into the district[], first of all, it decreased it below 50 of SSVR and, ultimately, the African-American community would vote against the Hispanic candidate of choice." (2017 Task Force Ex. 6 at 2; *see also* 2017 Task Force Ex. 5 at 1-2).

124.    Rep. Solomons' plan was voted out of the House Redistricting Committee on April 19, 2011. (Court Fact Findings – Plan H283, Dkt. 1364 at 48, ¶ 254).

125.    Rep. Burnam was aware that Como is a high-turnout precinct. (2017 Task Force Ex. 1 at 33).

126.    On April 25, 2011, Rep. Burnam made public Plan H203, his proposed amendment to Tarrant County in the pending House map. (2017 Task Force Ex. 28-A, 28-B, 28-F). Burnam's Plan H203 once again sought to lower the SSVR of HD90. Plan H203 had a 2010G SSVR of 46.2%. (2017 Task Force Ex. 3-B at 2).

127.    The next day, on April 26, 2011, Rep. Burnam also made public Plan H236, an amendment to his proposed amendment, Plan H203. (2017 Task Force Ex. 29F). This plan had a 2010G SSVR of 46.9%, also lower than the plan being considered by the Legislature. (2017 Task force Ex. 3-C at 2).

128.     Rep. Burnam tracked Spanish Surname Voter Registration as he proposed amendments to the 2011 plans. (2017 Task Force Ex. 1 at 16).

129.     The House redistricting plan was debated on the House floor on April 27 and April 28, 2011.  (Court Fact Findings – Plan H283, Dkt. 1364 at 8, ¶ 39 and 49, ¶ 256; H.J. of Tex., 82nd Leg., R.S. 2294 (2011); H.J. of Tex., 82nd Leg., R.S. 2358 (2011)). Rep. Burnam and then-State Rep. Marc Veasey spent several hours on the House floor discussing their amendments to the proposed Tarrant County map. (2017 Task Force Ex. 1 at 12).  Rep. Burnam laid out Amendment 11(H203), a plan which he described as ugly that he said would fix HD90 and put Como back in his district.  Rep. Solomons moved to table Amendment No. 11(H203), and the proposed amendment was tabled.  (Court Fact Findings – Plan H283, Dkt. 1364 at 129, ¶ 634).  The redistricting plan passed the House on April 28, 2011, at which point all changes were completed.  (Court Fact Findings – Plan H283, Dkt. 1364 at 8, ¶ 39; H.J. of Tex., 82nd Leg., R.S. 2361 (2011)).

130.     In May 2011, Rep. Burnam and Rep. Geren received a letter and a resolution from the Lake Como Neighborhood Advisory Council, complaining about Como's potential reassignment to HD99.  (2017 Task Force Ex. 3-AN; 2017 Task Force Ex. 4 at 1-3).

131.     Representative Geren testified that there was "almost threatening language in" the letter he received from Ms. DeBose, and that Ms. DeBose also called him to say "we're going to be a pain in your butt if you represent us."  (Task Force Ex. 4 at 1-3).

132.     Ms. DeBose, a community leader in Como, was paid by Mr. Burnam to work on his campaigns in HD90.  (2017 Task Force Ex. 1 at 34, 49).

133.     On June 17, 2011, Texas Governor Rick Perry signed House Bill 150, which was the State House Plan H283. (H.J. of Tex., 82nd Leg., R.S. 6917 (2011)).

134.     In H283, the final plan enacted by the 2011 Texas Legislature, HD90 had a 50.1% 2010 non-suspense SSVR. (2017 Task Force Ex. 24H).

135.     In H283, the town of Sansom Park, which has a Latino population of 54% that continues to grow, and the community of North Beverly Hills were brought into HD90. (2017 Trial Tr. 310:3-12).

136.     In H283, some Riverside neighborhoods were brought into HD90.  Riverside is a majority Latino community in northeast Ft. Worth.  (2017 Trial Tr. 310:13-21)

137.     In the southwestern portion of HD90, the predominantly non-Latino neighborhood of Como was removed.  (2017 Trial Tr. 311:13-22; 2017 Task Force Ex. 49).

138.     In the ensuing 2012 election cycle, Rep. Burnam drew a Democratic primary opponent for the first time since winning the office in 1996. (2017 Task Force Ex. 1 at 42). Rep. Burnam's opponent in the 2012 Democratic primary was Carlos Vasquez, a Latino. (2017 Trial Tr. 302:3-10; 2017 Task Force Ex. 16).

139.     Rep. Burnam believed that the changes to HD90 in 2011, which increased the Latino population in his district, created the potential for him to be challenged by a Latino opponent in the primary. (2017 Task Force Ex. 1 at 42).

140.     In the 2012 Democratic Primary election, Rep. Burnam defeated his Latino opponent Mr. Vasquez by only 159 votes (2017 Trial Tr. 302:2 - 302:4; 2017 Task Force Ex. 1 at 42; 2017 Task Force Ex. 3-K at 3).

141.     In the 2012 Democratic primary for HD90, Rep. Burnam generally won the non-Latino voter registration majority precincts, and Latino candidate Carlos Vasquez

generally won the Latino voter registration majority precincts. (2017 Trial Tr. 314:3-13; 2017 Task Force Ex. 14).

142.    Voting in the 2012 Democratic Primary for HD90 was racially polarized. (2014 Task Force Ex. 967 at 7-8).

143.    Rep. Burnam knew that he was not the Latino candidate of choice in the 2012 Democratic primary election. (2017 Task Force Ex. 1 at 44-45; 2017 Trial Tr. 314:12-13; 2017 Task Force Ex. 3-K).

### c.  The Specific Sequence of Events Leading up to the Challenged Decision

144.    Plan H309, the court-drawn interim redistricting plan for the Texas House, was made public on February 27, 2012. (2017 Task Force Exs. 26-A, 26-B, 26-C). In Plan H309, HD90 is the same as HD90 in H283. (2017 Task Force Ex. 33).

145.    On March 8, 2013, then-Attorney General Greg Abbott wrote to Speaker of the House Joe Straus, urging the legislature's enactment of the court-drawn interim maps during the regular legislative session. (Letter from Greg Abbott to Joe Straus (March 8, 2013), http://www.lrl.state.tx.us/scanned/archive/2013/20788.pdf).

146.    On the same day, Rep. Drew Darby, the Chairman for the House Redistricting Committee during the 2013 regular and special sessions, filed a statewide redistricting plan, HB 3840, which he said would have ultimately implemented the Court-ordered maps for the U.S. Congress, Texas House of Representatives, and Texas Senate on a permanent basis. (2017 Trial Tr. 1498:6, 13 - 1499:3; 2017 Trial Tr. 1504:9-24; Texas Legislature Online,

http://www.legis.state.tx.us/billlookup/History.aspx?LegSess=83R&Bill=HB3840).

147.     The Speaker of the House referred HB 3840 to the House Redistricting

Committee on March 21, 2013. (2017 Trial Tr. 1533:3).

148.     Chairman Darby testified that if a bill is referred to a committee by March 21

during a regular session, there is sufficient time for it to be voted out of committee and

considered by the full House. (2017 Trial Tr. 1533:4-11).

149.     Chairman Darby did not, however, convene any meetings of the House

Redistricting Committee during the regular session. (2017 Trial Tr. 1533:12). Chairman

Darby chose not to convene any committee meetings because, even though he was the

Chairman of the House Redistricting Committee, legislative redistricting "was not one [of

his] legislative priorities." (2017 Trial Tr. 1533:13-18).

150.     No redistricting bill passed the Legislature during the regular session in 2013.

(2017 Trial Tr. 1500:1-4).

151.     Then-Governor Perry issued a call for a special session in order to "consider

legislation which ratifies and adopts the interim redistricting plans ordered by the federal

district court as permanent plans for districts used to elect members of the Texas House

of Representatives." (2017 Trial Tr. 1500:13-18).

152.     The Legislature convened in special session on May 27, 2013 (2017 Trial Tr.

1500:25).

153.     The Texas Senate considered and passed SB 3 without amendments and sent it to

the House for consideration.  (S.J. of Texas, 83rd Leg., First C.S. 35-36 (2013),

http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=831&Bill=SB3.).

154.     As passed by the Senate and sent to the House, SB3 was a "shell bill" without substantive content.  (Text of Senate Bill 3 as Engrossed by Senate, http://www.capitol.state.tx.us/tlodocs/831/billtext/html/SB00003I.htm).

155.     After the Governor added redistricting to the special session call, Rep. Burnam immediately began thinking about changing the boundaries to HD90. (2017 Task Force Ex. 1 at 17).

156.     Rep. Burnam continued to entertain the possibility that he could represent a district that was not Latino majority.  On June 4, 2013, Plan BURNH137 was saved into Rep. Burnam's REDAPPL redistricting account.  (2017 Task Force Ex. 3-AA, 3-AB; 2017 Task Force Ex. 1 at 51-52).  In BURNH137, Rep. Burnam resided in a HD90 that contained 24.8% HCVAP and 25.9% BVAP.  (2017 Task Force Ex. 3-AC; 2017 Task Force Ex. 1 at 53-54).  Plan BURNH137 contained a Latino-majority HD93 with 70.7% HVAP. (2017 Task Force Ex. 3-AC; 2017 Task Force Ex. 1 at 53-54).  Plan BURNH137 placed Sansom Park entirely within a Latino-majority HD93. (2017 Task Force Ex. 3-Z; 2017 Task Force Ex. 1 at 54).  In Plan BURNH137, Rep. Burnam did not live in the Latino-majority HD93. (2017 Task Force Ex. 1 at 53-54).

157.     Rep. Burnam also asked Mr. Kenny to draw an amendment to HD90's boundaries.  (2017 Trial Tr 634:7-24).

158.     Rep. Burnam specifically asked Mr. Kenny to draw a map that placed Como back into HD90. (2017 Task Force Ex. 1 at 17).   Mr. Kenny was aware that bringing Como into HD90 could help Rep. Burnam in future primaries, as Rep. Burnam referred to Como as an area with a lot of supporters. (2017 Trial Tr. 672:15-19). Mr. Kenny

conceded that Rep. Burnam would be happy that Como was back in HD90 during the next primary election.  (2017 Trial Tr. 673:8 – 674:17).

159.     Rep. Burnam believed the first time he spoke with Chairman Darby about changes to HD90 was at the House Redistricting Committee field hearing in Dallas on June 6, 2013. (2017 Task Force Ex. 1 at 21).

160.     Rep. Burnam and Mr. Kenny had heard that leadership would only accept simple amendments between two or potentially three members.  (2017 Trial Tr. 635:7-10).

161.     Rep. Burnam instructed Mr. Kenny to see if he could swap areas between HD90 and HD99 that would bring the Como neighborhood back into HD90.  (2017 Trial Tr. 635:6-16).

162.     Rep. Burnam approached Rep. Geren, who represents HD99, on the floor of the House to tell him that he wanted to propose an amendment that would affect the lines between HD90 and HD99.  (2017 Task Force Ex. 4 at 10-11).  Rep. Geren testified that he thinks this conversation on the House floor happened during the pre-filing period because Chairman Darby wanted to make sure that Rep. Geren would be okay with the amendment.  (2017 Task Force Ex. 4 at 12).

163.     Rep. Burnam told Rep. Geren that he wanted Como moved back into HD90.  Rep. Geren said that was fine with him.  Rep. Burnam offered to give Rep. Geren the area around Arlington Heights High School to HD99.  (2017 Task Force Ex. 4 at 11).

164.     Rep. Burnam did not show a map of his proposal to Rep. Geren because, as explained by Rep. Geren: "he [Burnam] didn't need to. We're both very familiar with those areas." (2017 Task Force Ex. 4 at 12).

29

165.     When Rep. Burnam approached Rep. Geren about changing his district, Rep. Geren did not ask Rep. Burnam how the change might affect Latino voters' ability to elect their preferred candidate in HD90.  (2017 Task Force Ex. 4 at 13).  Rep. Geren testified that he did not think about how the change might affect the Latino voters in the district.  (2017 Task Force Ex. 4 at 14).  Rep. Burnam testified that he did not recall if they discussed whether the proposed amendment would dilute Latino voter strength in HD90.  (2017 Task Force Ex. 1 at 65).

166.     Rep. Geren was aware that Rep. Burnam had faced a primary opponent in 2012 because Rep. Burnam had asked Rep. Geren to help him raise money for the race.  (2017 Task Force Ex. 4 at 12)

167.     Rep. Burnam communicated to Chairman Darby that Rep. Geren had agreed to the changes in the amendment.  (2017 Task Force Ex. 1 at 61).

168.     Rep. Burnam communicated with Chairman Darby about his plans to amend HD90 several times before the House redistricting bill was considered on the floor. (2017 Task Force Ex. 1 at 21).

169.     On June 18, 2013, the House Redistricting Committee passed the Senate version of the bill, SB3, out of committee without amendments. (2017 Trial Tr. 1540:19 - 1541:4).  Five amendments to HB 3, the companion bill to SB 3, were offered at the June 17, 2013, committee hearing but each amendment either failed to pass or was withdrawn. (House Select Committee on Redistricting, June 17, 2013 Hearing Minutes, http://www.capitol.state.tx.us/tlodocs/83R/minutes/html/C0852013061713001.HTM). Each unsuccessful amendment was offered by a minority legislator. *Id.*

170.     On June 19, 2013, Rep. Burnam made public Plan H328, his draft plan to amend
SB 3. (2017 Task Force Ex. 30D).  Rep. Burnam's Plan H328 included the neighborhood
of Como in HD90.  (2017 Task Force Ex. 3-G at 2; 2017 Task Force Ex. 1 at 29).

171.     This initial plan to include Como back into HD90 brought the 2012G SSVR in
HD90 below 50% to 48.2%.  (2017 Task Force Ex. 3-E at 2; 2017 Task Force Ex. 1 at
18; 2017 Trial Tr. 639:8, 14-20).

172.     Rep. Burnam testified that he may have had conversations with Rep. Geren about
the SSVR of HD90 between the first HD90 plan (H328) and the second HD90 plan
(H342). (2017 Task Force Ex. 1 at 65).

173.     Chairman Darby testified that he was aware of Rep. Burnam's amendment prior
to consideration of the redistricting bill on the House floor.  (2017 Trial Tr. 1544:4-7).

174.     Rep. Burnam testified that Chairman Darby was "fixated" on the number of
Latino voters being at 50.1%.  (2017 Task Force Ex. 1 at 41).  Rep. Burnam testified that
his proposed H328 did not get discussed because it did not meet that criteria.  (2017 Task
Force Ex. 1 at 24).

175.     Rep. Burnam therefore asked Mr. Kenny to attempt to draw a map that resulted in
more swapping between HD90 and HD99 to bring the SSVR back up to the previous
plan's level.  (2017 Trial Tr. 641:1-21).

176.     In order to raise the SSVR in HD90 above 50%, Rep. Burnam and Mr. Kenny
created a second map in which the goal was to remove "every white voter near the
western boundary of the district to keep the Hispanic vote over 50%." (2017 Task Force
Ex. 1 at 17).

177.      In total, Rep. Burnam and Mr. Kenny split ten precincts to draw HD90's new boundaries. (2017 Task Force Ex. 1 at 36; 2017 Task Force Ex. 3-I at 2-4; 2017 Task Force Ex. 40).

178.      Mr. Burnam also testified that he moved whole precincts into and out of HD90 because of their race: 1674 and 1062 were excluded and 1434 and 1408 were included. (2017 Task Force Ex. 1 at 39-40; 2017 Task Force Ex. 3-J at 3).

179.      The ten precincts in 2012 that were split by H358 were: 1015, 4068, 4073, 4121, 4122, 4125, 4138, 4493, 4593, and 4634  (2017 Task Force Ex. 40).

180.      After a redistricting plan splits precincts, the precincts are divided and renumbered by the county for the next election.  The 2016 precincts that correspond to the ten precinct splits in 2012 are: 1015, 1062, 1408, 1434, 1674, 1684, 4068, 4073, 4121, 4122, 4125, 4138, 4493, 4593, 4634, 4650, 4685, 4687, 4688, 4689, 4690, 4692, and 4693.  (2017 Task Force Ex. 67, 69).

181.      The total population of the precincts split or moved whole because of race by Rep. Burnam's amendment is 33,343 individuals, including an estimated 16,429 registered voters. (2017 Task Force Ex. 3-H, 3-J, 40, 66, 69 and 70).

182.      These changes were incorporated into what became Rep. Burnam's Plan H342. (2017 Task Force Ex. 1 at 23, 25).

183.      On June 20, 2013, Rep. Burnam made public and filed Plan H342, which had a 2012G total SSVR of 50.1%. (2017 Task Force Ex. 3-F).

184.      On June 20, 2013, the full House considered the redistricting bill on the House Floor. Chairman Darby laid out the first amendment, Amendment No. 1, a floor

32

substitute to SB 3 that reflected Plan H309, the court-drawn interim map. (2017 Joint Ex. 17.3 S1; 2017 Trial Tr. 1523:4).

185.     Chairman Darby made opening remarks in which he announced the criteria on which he would evaluate pre-filed amendments to the redistricting bill.  (2017 Trial Tr. 1523:5-23).

186.     Chairman Darby stated his criteria for evaluating an amendment as follows: "that it does not create a harm or a risk to further litigation by violating the constitution's "one person, one vote" principle regarding population deviation; that it does not dilute nor dismantle a Section 2 protected district under the Voting Rights Act or violates the Texas Constitution regarding contiguous districts or the county line rule." Chairman Darby stated, "If those measures can be satisfied, I want to see that it addresses a concern, for example, the splitting of a community of interest. And finally, I'd like to see an agreement amongst the members affected." (2017 Joint Ex. 17.3 at S1-2; 2017 Trial Tr. 1523:5-23).

187.     Chairman Darby did not specifically discuss analyzing the electoral impact of proposed amendments, the effect of amendments on the ability of minorities to elect their candidates of choice, or the effect of racially polarized voting on an amendment to the court-drawn plan. (2017 Trial Tr. 1543:6-19).

188.     The House adopted four amendments to Chairman Darby's Amendment No. 1. Then the House considered Rep. Burnam's Plan H342, which was Amendment No. 8 to SB 3. (2017 Joint Ex. 17.2 at 1-2).

189.     Rep. Burnam introduced his amendment on the House floor with the following comment: "basically what it does is take the African American and Hispanic population

33

out of Representative Geren's district and puts some of my Anglo population into his district. I believe it's acceptable to the author [Chairman Darby]." (2017 Joint Ex. 17.3 at S29).

190.     During consideration of the Burnam amendment on the House floor, Chairman Darby addressed the House: "Members, Representative Burnam has revised his amendment and it now keeps this district a Hispanic district--brings the numbers back over 50%. That was the objection. I believe Representative Geren is in favor of this amendment also, so with that I would move to accept this amendment." (2017 Joint Ex. 17.3 at S29; 2017 Trial Tr. 1544:13 - 25).

191.     Chairman Darby invoked legislative privilege and did not provide any further testimony on why he believed this revision cured the objection to the original Burnam amendment. (2017 Trial Tr. 1545:1-14).

192.     Although Chairman Darby considered the redistricting bill to be a "major piece of legislation," there was no calendar rule attached to the bill. (2017 Trial Tr. 1548:8-10, 1549:13-15). Calendar rules usually require floor amendments to be filed twenty four hours ahead of time, which allows members of the public and other members of the Legislature time to review and comment on proposed amendments. (2017 Trial Tr. 1548:19 - 1549:4).

193.     The House adopted Rep. Burnam's amendment, Plan H342, on June 20, 2013. (2017 Joint Ex. 17.3 at S29). In that plan, HD90 had a 2012 total SSVR of 50.1% which was lower than the SSVR in the Court-drawn plan.   (2017 Task Force Ex. 31-C).  In the Court-drawn H309, which kept HD90's boundaries as enacted under H283 in 2011 and did not split any precincts in Tarrant County, HD90 had a 2012 total SSVR of 51.1%.

(2017 Task Force Ex. 26F at 3, 2017 Task Force Ex. 24F at 169, 2017 Task Force Ex. 33; 2017 Task Force Ex. 41).

194.     Because Rep. Burnam introduced his amendment on the House floor, the amendment was adopted without consideration in committee and without the opportunity for public testimony. (2017 Trial Tr. 1547:25 - 1548:5; 2017 Joint Ex. 17.2).

195.     After adopting Rep. Burnam's amendment, the House recessed temporarily. (2017 Trial Tr. 1551:22-24).  During that recess, members of the House Republican Caucus met with a representative from the Texas Attorney General's Office. (2017 Trial Tr. 1551:25 - 1552:18).  After returning from recess, the House did not adopt any more amendments that day.  (2017 Trial Tr. 1554:1-4).

196.     The House only adopted one additional amendment the next day on third reading of the bill, which "simply . . .  switched a few voters in [Toni Rose's] district for a few voters in the district of Representative Helen Giddings." (2017 Trial Tr. 1526:17-18, 1597:4-5).

197.     On June 22, 2013, the Texas Latino Redistricting Task Force wrote a letter to Chairman Darby and Senate Redistricting Committee Chairman Kel Seliger to express objections to the Burnam amendment's changes to HD90.  (2017 Task Force Ex. 9; (2017 Trial Tr.1556:7-15).  The Task Force wrote that "H358 reduces Latino voters' ability to elect their candidate of choice in HD90." (2017 Task Force Ex. 9 at 2). The Task Force letter informed the two committee chairmen that Plan H358 resulted "in a decrease in the SSVR of HD90 from 51.1% to 50.1%" because the plan removed a population with an SSVR of 20.6% and replaced it with a population with an SSVR of only 8.5%. (2017 Task Force Ex. 9 at 2).

35

198.    Chairman Darby made no attempt to discuss this letter with Chairman Seliger. (2017 Trial Tr. 1556:20-25).  Chairman Darby invoked legislative privilege to avoid answering whether he took any action regarding the Task Force's letter.  (2017 Trial Tr. 1556:16-19).

199.    The Senate concurred with the House amendments to SB 3 on June 23, 2013. (2017 Task Force Ex. 10 at 8; 2017 Joint Ex. 8 at 358).  Senator Seliger testified that his approach was to defer to the House and adopt SB 3 as amended by the House, because that plan pertained to the redistricting of Texas House seats.  (2017 Task Force Ex. 10 at 8).

200.    SB 3, which enacted Plan H358, was signed in both the House and Senate on June 23, 2013. (H.J. of Texas, 83rd Leg., First C.S. 1113-1114 (2013); S.J. of Texas, 83rd Leg., First C.S. 279 (2013)).

201.    The governor signed SB 3 on June 26, 2013.  (2017 Joint Ex. 8 at 358).

### d.   Departures from the Normal Procedural Sequence

#### i.   Departure from the Legislature's Original Stated Goal of Passing the Court-Drawn Plans Unchanged

202.    The Texas Legislature's stated purpose in the 2013 special session was to "consider legislation which ratifies and adopts the interim redistricting plans ordered by the federal district court as permanent plans for districts used to elect members of the Texas House of Representatives."  (2017 Trial Tr. 1500:13-18, 25).

203.    The House considered SB 3 on the House floor on June 20, 2013.  (2017 Trial Tr. 1523:4; 2017 Joint Ex. 17.1 at 2).  Despite the stated purpose of the session and the fact that no amendments had been passed in committee, Chairman Darby opened the floor to amendments. (2017 Joint Ex. 17.3 at S1-2).

36

204.     Following the adoption of Amendments 1, 2, 3, and 4, Rep. Keffer expressed his confusion about the amendments accepted by Chairman Darby because of the narrow call of the legislative session.  Rep. Keffer had served on the Redistricting Select Committee and stated that "[he] was under the impression when [they had] left the lines, because of the narrow call—because of future issues that will come up concerning the map—that any line or any change that was made would open the door for other problems or other issues that might arise as far as the San Antonio court . . . ."  (2017 Joint Ex. 17.3 at S5).

205.     Nevertheless, Chairman Darby proceeded to take amendments, claiming that it was the Legislature's inherent right to adopt and be a part of the redistricting process, not to simply "cede our state's responsibilities back to the federal government."  (2017 Joint Ex. 17.3 at S5).

### ii. Limited Opportunity for Public Review

206.     Chairman Darby considered the redistricting bill to be a "major piece of legislation."  (2017 Trial Tr. 1548:8-10).  Despite this, there was no calendar rule attached to the bill. (2017 Trial Tr. 1549:13-15).  Calendar rules usually require floor amendments to be filed twenty four hours ahead of time, allowing members of the public and other members of the Legislature time to review and comment on proposed amendments.  (2017 Trial Tr. 1548:19 - 1549:12).  Without a calendar rule, Rep. Burnam's amendment was not made available for public comment.  (2017 Trial Tr. 1548:19 - 1549:4).

207.     On June 18, 2013, the House Redistricting Committee passed the Senate version of the bill, SB3, out of committee without amendments and without the opportunity for public comment.  (2017 Trial Tr. 1540:19 - 1541:4).

208.     Community members in HD90 did not know that Rep. Burnam was proposing the change to HD90's configuration.  (2017 Trial Tr. 314:14-20).  Because it was a floor amendment, it was not considered at any of the redistricting field hearings or in committee, or made public before the day of the floor debate.  (2017 Trial Tr. 1547:25 - 1548:7).

209.     The Senate concurred with House Plan SB 3 on June 23, 2013, the same day that it was taken up in the Senate. (2017 Task Force Ex. 10 at 8).  There was no opportunity for the public to come to a hearing and comment on the amended version of SB 3.  (2017 Task Force Ex. 10 at 8).

### iii. Limited Amendments

210.     Floor debate occurred on June 20, 2017.  (2017 Trial Tr. 1523: 2-4).  The House only adopted four individual amendments prior to Rep. Burnam's amendment. (2017 Joint Ex. 17.2 at 1-2).  The House did not adopt any more amendments that day. (2017 Trial Tr. 1554:1-4).

211.     The next day, June 21, the House adopted only one amendment on the third reading of the bill, (2017 Trial Tr. 1526:17-18), which "simply . . .  switched a few voters in [Toni Rose's] district for a few voters in the district of Representative Helen Giddings." (2017 Trial Tr. 1597:4-5).

### iv. Interactions with the Attorney General's Office

212.     Chairman Darby never asked Attorney General Greg Abbott to come to the Redistricting Committee, despite conceding that he "would hope the attorney general and his staff would be responsive to all members of the legislature." (2017 Joint Ex. 17.3 at

S9).  The Committee never heard from the Attorney General or anyone on his staff about the Attorney General's position on the interim maps.  (2017 Joint Ex. 17.3 at S1-2).

213.    During a short recess on June 20, 2013, after the House adopted Rep. Burnam's amendment, members of the House Republican Caucus met with a representative from the Texas Attorney General's Office. (2017 Trial Tr. 195:17-196:2, 1551:22 - 1552:18). The Democratic Caucus was not invited to or present at that meeting, despite the fact that Democratic and minority legislators had asked Chairman Darby multiple times to speak with a representative of the Attorney General's office. (2017 Joint Ex. 17.3 S33).

### e.  Substantive Departures

#### i. Redistricters Departed From Traditional Criteria Such as Avoiding Precinct Cuts and Respecting Communities of Interest

214.    The Burnam amendment violated traditional redistricting criteria by splitting precincts and cities.  The Court-drawn Plan H309, that Rep. Burnam amended, did not split any precincts in HD90.  (2017 Task Force Ex. 41).

215.    In total, Rep. Burnam and Mr. Kenny split ten precincts in drawing HD90's new boundaries.  (2017 Task Force Ex. 1 at 36; 2017 Task Force Ex. 3-I at 2-4; 2017 Task Force Ex. 40).

216.    Rep. Burnam's amendment cut out portions of the City of Sansom Park, including by splitting precincts 4073 and 4593, in order to remove Anglo-majority blocks while maintaining Latino-majority blocks. (2017 Task Force Ex. 1 at 31; 2017 Task Force Ex. 3-H.

217.    Rep. Burnam specifically outlined how he split precincts 4125, 4068, 4493, 4634, and 1015 in order to include Latino-majority blocks and exclude Anglo-majority blocks. (2017 Task Force Ex. 1 at 36-39; 2017 Task Force Ex. 3-J at 1-3).

218.    Rep. Burnam admitted that he made these changes for the sole purpose of

including Latino-majority blocks in the district and excluding Anglo-majority blocks.

(2017 Task Force Ex. 1 at 36-38).

219.    Mr. Kenny testified that he reviewed the cut to precinct 4125 with Rep. Burnam

and told Rep. Burnam that cutting 4125 in order to draw more Latinos into HD90 would

be "ugly."  (2017 Trial Tr. 670:2-12). Rep. Burnam did not express concern with the

"ugly" cut and instead said that the cut was "great" because it brought more Latinos into

HD90. (2017 Trial Tr. 670:2-12).

220.    Rep. Burnam testified that while he believed that Rep. Geren was aware of the

split precincts created by the Burnam amendment, Rep. Geren did not ask about them.

(2017 Task Force Ex. 1 at 65).

221.    Although Como precinct 1120 was historically part of HD90, it was also located

significantly to the west of the urban core of Ft. Worth.  (2017 Task Force Ex. 3-G at 1-

2). In his amendment, Rep. Burnam was forced to use largely unpopulated precincts from

HD97 as land bridges to reach Como in order not to further decrease Latino voting

strength in HD90. (2017 Task Force Ex. 1 at 23; 2017 Task Force Ex. 3-J at 3; 2017 Trial

Tr. 642:9-15, 667:2-4).

### ii. Failure to Evaluate the Burnam Amendment for Compliance With the Federal Voting Rights Act

222.    Chairman Darby was aware of Rep. Burnam's amendment prior to consideration

of the redistricting bill on the House floor. (2017 Trial Tr. 1544:4-7).

223.    Chairman Darby also declared that he would only accept amendments to the

House redistricting bill that did not dilute or dismantle districts that were protected under

Section 2 of the Voting Rights Act. (2017 Joint Ex. 17.3 at S1-2; 2017 Trial Tr. 1523:5-23).

224.     However, aside from being "fixated" on the number of Latino voters being at 50.1%, Chairman Darby did not perform or request any functional electoral analysis of Rep. Burnam's proposed changes to HD90. (2017 Task Force Ex. 1 at 41).

225.     Rep. Burnam did not recall any conversations with Chairman Darby about how the proposed changes to HD90 would affect the Latino ability to elect their preferred candidate. (2017 Task Force Ex. 1 at 42).

226.     Chairman Darby did not testify whether he looked at voting patterns in the Democratic primary election of HD90, invoking legislative privilege. Chairman Darby did not testify regarding his understanding of the Burnam amendment's effect on Latino voting ability in HD90, invoking legislative privilege.  (See 2017 Trial Tr. 1550:9 - 1551:18).

227.     Rep. Burnam testified that Rep. Geren also did not inquire about Latino ability to elect beyond the 50% SSVR threshold. (2017 Task Force Ex. 1 at 65).

228.     Rep. Burnam himself claimed he did not examine the effect of his changes on Latinos' ability to elect candidates of their choice. (2017 Task Force Ex. 1 at 41).

229.     On June 20, 2013, in his opening remarks on the House Floor on the consideration of amendments to SB 3, Chairman Darby did not discuss analyzing the electoral impact of proposed amendments. (2017 Trial Tr.1543:6-10).

230.     In his floor statements, Chairman Darby did not discuss analyzing the effect of proposed amendments on the ability of minorities to elect their candidate of choice. (2017 Trial Tr. 1543:11-14).

231.     In his floor statements, Chairman Darby did not discuss analyzing whether there was racially polarized voting in the affected areas. (2017 Trial Tr. 1543:15-19).

232.     Nevertheless, Chairman Darby testified that he was "vaguely" aware that Texas had been found to violate the Voting Rights Act or the Constitution in previous redistricting cycles.  (2017 Trial Tr. 1535:10-18).

233.     Chairman Darby testified that he was  "vaguely" aware that the Department of Justice blocked the Texas Senate House and congressional redistricting plans as discriminatory against minority voters in 1982. (2017 Trial Tr. 1535:19-23).

234.     Chairman Darby testified that he was "vaguely" aware that the U.S. Department of Justice under Section 5 of the Voting Rights Act blocked the State House redistricting plan as discriminatory against minority voters in 1991. (2017 Trial Tr. 1535:24 - 1536:3).

235.     Chairman Darby testified that he was "vaguely" aware that the U.S. Department of Justice under Section 5 of the Voting Rights Act blocked the State House redistricting plan as discriminatory against minority voters in 2001. (2017 Trial Tr. 1536:4-9).

236.     Chairman Darby testified that he was "vaguely" aware that about seven years before the 2013 redistricting session, the U.S. Supreme Court in LULAC v. Perry found the Texas congressional redistricting plan to have violated Section 2 of the Voting Rights Act because it diluted Latino voting strength in Congressional District 23. (2017 Trial Tr. 1536:10-16).

### iii. Departure from the Legislature's Original Stated Goal of Passing the Court-Drawn Plans

237.     The special session convened on May 27, 2013, with the stated purpose to "consider legislation which ratifies and adopts the interim redistricting plans ordered by

the federal district court as permanent plans for districts used to elect members of the Texas House of Representatives." (2017 Trial Tr. 1500:13-18, 25).

238.     The House considered SB 3 on the House floor on June 20, 2013. (2017 Trial Tr. 1523:4). Despite the stated purpose of the session and the fact that no amendments had been passed in committee, Chairman Darby opened the floor to pre-filed amendments. (2017 Joint Ex. 17.3 at S1-2).

239.     Following the adoption of Amendments 1, 2, 3, and 4, Rep. Keffer expressed his confusion about the amendments accepted by Chairman Darby because of the narrow call of the legislative session. Rep. Keffer had served on the Redistricting Select Committee and stated that "[he] was under the impression when [they had] left the lines, because of the narrow call—because of future issues that will come up concerning the map—that any line or any change that was made would open the door for other problems or other issues that might arise as far as the San Antonio court . . . ".  (2017 Joint Ex. 17.3 at S5).

240.     Chairman Darby responded to Rep. Keffer's concern during the consideration of amendments on the House floor by saying, "it's been my position from the start that these maps are legal. And if somebody can demonstrate to me that a district has been drawn illegally, and it can be fixed and changed, then I want to consider those amendments, and consider those changes." (2017 Joint Ex. 17.3 at S5). Chairman Darby continued by reassuring the House floor that the amendments being considered "don't have any implications with regard to Section 2 of the Voting Rights Act or the constitution." (2017 Joint Ex. 17.3 at S5).

241.    Chairman Darby stated it was the Legislature's inherent rights to adopt and be a part of the redistricting process, not to simply cede one more time to the federal government. (2017 Joint Ex. 17.3 at S5).

### iv.  Consideration in the Senate

242.    The Senate concurred with House Plan SB 3 on June 23, 2013, the same day that it was taken up in the Senate. (2017 Task Force Ex. 10 at 8).  Senator Seliger's approach was simply to adopt the House amendments to SB 3 without further review because it was the House redistricting plan.  (2017 Task Force Ex. 10 at 8).

### E.    HD90's BOUNDARIES IN H358 DILUTE LATINO VOTING STRENGTH IN VIOLATION OF SECTION 2

#### 1.  *Gingles* Prong 1

243.    In Plan H283, HD90 had an HCVAP of 54.4% (+/- 1.8%) according to the U.S. Census 2011-2015 ACS.  (2017 Task Force Ex. 24-D at 3).  Plan H283 demonstrates that Latinos are "sufficiently large and geographically compact to constitute a majority" of HD90.

244.    In Plan H100, the benchmark plan, HD90 had a HCVAP of 50.7% (+/- 1.9%) according to the U.S. Census 2011-2015 ACS.  (2017 Task Force Ex. 23-D at 3).  Plan H100 also demonstrates that Latinos are "sufficiently large and geographically compact to constitute a majority" in HD90.

#### 2.  *Gingles* Prongs 2 and 3: Racially Polarized Voting in Tarrant County

##### a.  Dr. Engstrom's Qualifications

245.    Defendant the State of Texas stipulated to the qualifications of Dr. Engstrom at trial in 2011. (2011 Trial Tr. 490:7-10).

246.     Dr. Richard Engstrom is a visiting research fellow at the Social Sciences Research

Institute at Duke University. (2017 Task Force Ex. 19 at 1).

247.     Prior to his time at Duke University, Dr. Engstrom was a professor of political

science at the University of New Orleans for 35 years. He started as an assistant professor

and left as a research professor and an endowed professor. (2011 Trial Tr. 487:19-22).

248.     Dr. Engstrom has been published numerous times on the interaction of minorities

in electoral arrangements. His research has been cited by the United States Supreme

Court in several opinions. (2011 Trial Tr. 487:23 - 488:16).

249.     Dr. Engstrom has been an advisor to governmental bodies to consult redistricting

commissions in Illinois and Pennsylvania. He has also served as a consultant to the Texas

House of Representatives, a joint committee on redistricting for the Mississippi

legislature, as well as to the president pro tem of the South Carolina Senate. (2011 Trial

Tr. 488:17 - 489:19).

250.     Dr. Engstrom served as a court-appointed expert in a redistricting case involving

the Dallas city council.  (2011 Trial Tr. 489:20-22).

### b.  Dr. Engstrom's Methodology

251.     Dr. Engstrom employed both bivariate and multivariate analyses. He compared

Latinos with non-Latinos in a bivariate analysis. He compared Latinos, African-American

and others in his multivariate analysis. (2017 Task Force Ex. 48 at 10-11).

252.     Dr. Engstrom employed ecological inference, a statistical methodology, in order

to determine whether there was racially polarized voting in Texas. (2017 Task Force Ex.

48 at 9-10).

253.     Dr. Engstrom used ecological inference (EI) because it is the superior methodology in use today. (2017 Task Force Ex. 48 at 10).

254.     Dr. Engstrom's bivariate analysis of elections from 2006-2016 used, to estimate the racial composition of voters in each election, the precinct-level lists of voters who turned out in the elections that were flagged for Spanish surnames. He obtained these data from the Texas Legislative Council. For multivariate analysis that included other ethnic groups, Dr. Engstrom used Census CVAP data. (2017 Task Force Ex. 48 at 9-11).

255.     Dr. Engstrom reported the confidence intervals for his estimates of candidate support in general elections as well as Democratic primaries.  The point estimates reported by Dr. Engstrom provide the best estimate of the true value.  The confidence intervals show the range of results within a 95% certainty. Dr. Engstrom testified that the "further you go to the ends of the confidence interval the less likely that is to be the true value. The best estimate of the true value is the point estimate[.]"  (2011 Trial Tr. 500:17 - 501:10).

### c.  Dr. Alford Praising Dr. Engstrom's Methodology

256.     The State's expert witness Dr. Alford testified that he respected Task Force expert Dr. Engstrom's ecological inference methods and his 2017 report on racially polarized voting. (2017 Trial Tr. 1425:1-11).

257.     Dr. Alford testified that Dr. Engstrom's analysis spanning 2006 to 2016 across various reports is reliable.  (2017 Trial Tr. 1425:15-18).

258.     Dr. Alford testified that Dr. Engstrom's analysis is broad in both its geographic and temporal scope.  (2017 Trial Tr. 1425:19-21; 2017 Defendant Ex. 878 at 11).

259.      According to Dr. Alford, Dr. Engstrom "did the best job of covering geography and using the best methodology." (2011 Trial Tr. 1765:8-16).

260.      Dr. Alford, testified that Dr. Engstrom is prominent in his field, that his report is credible and that Dr. Engstrom chose a good methodology to use in his report. (2011 Trial Tr. 1858:16-1859:9).

261.      The State's expert witness, Dr. Alford, built the table in his report around Dr. Engstrom's results. (2011 Trial Tr. 1765:8-16).

### d.  Dr. Engstrom's Conclusions on General Elections

262.      Dr. Engstrom testified that voting is racially polarized between Latino and non-Latino voters in Tarrant County in general elections.  (2017 Task Force Ex. 19 at 6-10; Ex. 48 at 19-31).

263.      In the 2016 General election for Supreme Court Place 5, bivariate estimates show that in Tarrant County, candidate Dori Contreras Garza received 97.0% of Latino support and 36.6% of non-Latino support.  (2017 Task Force Ex. 19 at 19; Ex. 48 at 22-24).

264.      In the 2016 General election for Supreme Court Place 9, bivariate estimates show that in Tarrant County, candidate Eva Guzman received 2.0% of Latino support and 59.2% of non-Latino support.  (2017 Task Force Ex. 19 at 19; Ex. 48 at 24-25).

265.      In the 2014 General election for Lt. Governor, bivariate estimates show that in Tarrant County, candidate Leticia Van de Putte received 86.3% of Latino support and 40.3% of non-Latino support.  (2017 Task Force Ex. 19 at 19; Ex. 48 at 25-27).

266.      In the 2014 General election for Land Commissioner, bivariate estimates show that in Tarrant County, candidate George P. Bush received 8.9% of Latino support and 59.1% of non-Latino support.  (2017 Task Force Ex. 19 at 19; Ex. 48 at 27-28).

267.     In the 2014 General election for Supreme Court Place 7, bivariate estimates show that in Tarrant County, candidate Gina Benavides received 89.8% of Latino support and 38.9% of non-Latino support.  (2017 Task Force Ex. 19 at 19; Ex. 48 at 29-30).

268.     In the 2012 General election for U.S. Senate, bivariate estimates show that in Tarrant County, candidate Ted Cruz received 5.3% of Latino support and 58.7% of non-Latino support.  (2014 Task Force Ex. 968 at 11; Aug. 2014 Trial Tr. 482:4-10).

269.     In the 2010 General election for Lt. Governor, bivariate estimates show that in Tarrant County, candidate Linda Chavez-Thompson received 94.8% of Latino support and 35.4% of non-Latino support.  (2011 Task Force Ex. 392 at 52).

270.     In the 2010 General election for Land Commissioner, bivariate estimates show that in Tarrant County, candidate Hector Uribe received 95.7% of Latino support and 35.6% of non-Latino support.  (2011 Task Force Ex. 392 at 52).

271.     In the 2010 General election for Supreme Court Place 9, bivariate estimates show that in Tarrant County, candidate Eva Guzman received 6.8% of Latino support and 60.0% of non-Latino support.  (2011 Task Force Ex. 392 at 52).

272.     In the 2008 General election for U.S. Senate, bivariate estimates show that in Tarrant County, candidate Rick Noriega received 98.1% of Latino support and 39.4% of non-Latino support.  (2011 Task Force Ex. 392 at 51).

273.     In the 2008 General election for Supreme Court Place 8, bivariate estimates show that in Tarrant County, candidate Linda Yanez received 99.0% of Latino support and 40.1% of non-Latino support.  (2011 Task Force Ex. 392 at 52).

274.     In the 2008 General election for Criminal Court, bivariate estimates show that in Tarrant County, candidate Molina received 98.6% of Latino support and 39.1% of non-Latino support.  (2011 Task Force Ex. 392 at 52).

275.     In the 2006 General election for Lt. Governor, bivariate estimates show that in Tarrant County, candidate Alvarado received 97.9% of Latino support and 36.5% of non-Latino support.  (2011 Task Force Ex. 392 at 51).

276.     In the 2006 General election for Supreme Court Place 4, bivariate estimates show that in Tarrant County, candidate Medina received 43.7% of Latino support and 76.0% of non-Latino support.  (2011 Task Force Ex. 392 at 51).

277.     In the 2006 General election for Criminal Court, bivariate estimates show that in Tarrant County, candidate Molina received 99.8% of Latino support and 39.6% of non-Latino support.  (2011 Task Force Ex. 392 at 51).

### e.  Primary Elections Play a Critical Role in Evaluating Racially Polarized Voting

#### i.     Dr. Engstrom's Testimony

278.     Dr. Engstrom testified that it is important to analyze primary elections in order to determine the extent to which racially polarized voting may be disadvantaging Latino candidates in Democratic primaries.  (2011 Trial Tr. 497:25 – 498:9).

279.     Primary elections are significant because the Latino candidate of choice can be eliminated or filtered out from the competition at the primary phase.  (2011 Trial Tr. 497:25 – 498:9, Aug. 2014 Trial Tr. 491:2 – 492:6).  If the Latino candidate of choice were defeated in the primary election, then Latino voters would not have the opportunity to elect their candidate of choice in the general election, even if Latinos ultimately voted for the general election winner.  (Aug. 2014 Trial Tr. 491:13-23).

49

280.     Dr. Engstrom testified that, in such a situation, he would not consider the general election winner to be the Latino candidate of choice, because the Latino candidate of choice would already have been filtered out of the competition.  (Aug. 2014 Trial Tr. 491:24 – 492:6).

281.     Dr. Engstrom testified that polarization in the primary election between Latino and non-Latino voters could affect the outcome of that primary for the Latino candidate of choice.  (Aug. 2014 Trial Tr. 497:7-17).

282.     Dr. Engstrom testified that, within the Texas counties that he examined for this case, African-American and Latino voters are not cohesive within Democratic Primaries and thus are more likely than not to oppose each other's preferred candidates in those elections.  (Aug. 2014 Trial Tr. 489:18 – 490:4).

### ii.     Dr. Alford's Testimony

283.     The state's witness, Dr. Alford, testified that cohesion in the Democratic Primary informs the second prong of *Gingles*. (2017 Trial Tr. 1363:14-17). Dr. Alford characterized primary voters as the most representative and politically active of their parties. (2017 Trial Tr. 1364:12-14).

284.     Dr. Alford testified that it was empirically crucial to include analysis of the Democratic primary.  (2017 Trial Tr. 1425:22-25).  Dr. Alford stated that simply looking at a general election fails to consider whether the minority voters were able to nominate their candidate of choice during the primary. (2017 Trial Tr. 1358:13-21).  Dr. Alford testified that looking at primary elections is useful to determine whether that preliminary process of nominating a candidate might block or filter out the actual candidate of choice. (2017 Trial Tr. 1359:6-18).

285.     Dr. Alford further explained that "it's particularly useful [to look at primary elections] for a variety of reasons," including "cohesion independent of partisanship," "opportunity to achieve ethnic representation," and whether the preliminary process of nominating a candidate might block or filter out the actual candidate of choice. (2017 Trial Tr. 1357:7-1359:10).  Dr. Alford testified that by not looking at Latino voters' ability to advance their candidates of choice out of primary elections, "the Hispanic population is being used as filler" to elect non-Hispanic democrats.  (2017 Trial Tr. 1383:16-17).

286.     Dr. Alford considered it ironic that the growing Latino population in Texas could be used to justify redrawing districts that would not create true Latino opportunity districts because Latino voters would not be able to advance their candidates of choice out of Democratic primaries.  (2017 Trial Tr. 380:1-16).  He stated that failing to look at Latino ability to elect in primary elections is "missing precisely the point that everyone was concerned about at the beginning of this, [which] is how could a new plan fail to represent -- how could you have divided the state so as to not represent all that Hispanic growth?" (2017 Trial Tr. 1383:22 – 1384:1).

287.     Dr. Alford cited approvingly to the  conclusion of Dr. Lichtman, the Quesada Plaintiff's expert that a district, such as CD33 which Dr. Lichtman analyzed, could not be considered a performing district unless the minority's candidate of choice emerges from the primary.  (2017 Trial Tr. 1359:6-18).

288.     Dr. Alford testified that combining minorities that are not cohesive does not create a "district that provides opportunity for a single group -- a single combined group." (2017 Trial Tr. 1376:25 - 1377:2).

289.     To explain why it is important to analyze a minority group's ability to advance their candidate of choice out of primary elections, Dr. Alford provided the following example:   "in the old south, blacks and whites voted Democratic in the general election, even though, in that election, the Democrats that blacks were voting for were not, for the most part, individuals favorable to the interests of blacks in the south."  (2017 Trial Tr. 1382:15-19).

290.     Dr. Alford cited Dr. Engstrom's conclusions that, in the Texas counties examined by Dr. Engstrom for this case, African Americans have a distinct tendency to vote for candidates competing with the candidates preferred by Latinos in primary elections. (2017 Defendant Ex. 878 at 9-10).

291.     Dr. Alford testified that Dr. Murray's concerns about lack of participation in primary elections are not problematic in assessing African American and Latino cohesion in Democratic primary elections because both minorities vote heavily in Democratic primary elections. (2017 Trial Tr. 1363:5-13).  Dr. Alford stated that this consideration applies to State House districts as well as Congressional districts.  (2017 Trial Tr. 1384:24 - 1385:8).  Dr. Alford later pointed out that although primary voters are only a subset of the population, it "is the subset whose political preferences and political cohesion, or lack of it, are going to govern what happens in that process." (2017 Trial Tr. 1462:23-25).

292.     Dr. Alford testified that it is important to analyze primary elections because "[i]t allows us to see what voting behavior looks like without a partisan cue."  (2017 Trial Tr. 1357:10-11).

293.     Dr. Alford further highlighted the functional importance of looking at primary
elections because they are an "an integral part of the process that produces the outcome
of the district," and "[t]hey do actually tell us about preferences expressed in an actual
election where candidates run for office, represent their policy positions, make clear
which neighborhoods they live in."  (2017 Trial Tr. 1461:22 - 1461:25).

### iii.     Dr. Lichtman's Testimony

294.     Dr. Lichman testified that he analyzes primary elections when examining racial
polarization. (2017 Trial Tr. 971:2-5).

295.     In CD33 in C235, Latinos constitute 43.6% of the CVAP and 39.2% of the voter
registration (2016 total SSVR).  African Americans comprise 23.7% of the CVAP.  (2017
Joint Ex. 100.3, 100.6).

296.     Dr. Lichtman testified that he was able to classify CD33 an African American
opportunity district only by demonstrating that the district will perform for African
Americans during primary voting. (2017 Trial Tr. 1359:10-18). In his analysis of CD33,
Dr. Lichtman found that African American turnout in the primary elections dwarfed that
of Hispanics.  Dr. Lichtman concluded that because African Americans are a majority of
the turnout in the Democratic primary, they are able to nominate candidates of their
choice. (2017 Trial Tr. 955:12-956:4).

297.     Dr. Lichtman analyzed the 2014 primary election in CD33 and found that 99% of
African American voters supported Marc Veasey, the African American candidate, and
76% of Latino voters supported a different candidate. (2017 Trial Tr. 972:24-973:20). Dr.
Lichtman testified this was not the only time he had seen this in Texas. (2017 Trial Tr.
973:21-23).

298.     Dr. Lichtman testified that he has found instances in Texas where African American voters and Latino voters did not share the same candidate of choice in primary elections. (2017 Trial Tr. 971:14-21).

### iv.     Dr. Tijerina's Testimony

299.     Dr. Andres Tijerina, who testified regarding the historical experience of Mexican Americans in Texas, presented evidence regarding the use of the White Man's Primary in Texas in the early 1900's to deny Latinos the opportunity to elect their candidate of choice. (Expert Report of Andres Tijerina, admitted as Joint Expert Report EX-10 on 9/6/11, Dkt. 341).

300.     Dr. Tijerina explained that the Progressives "used the 'White Man's Primary' to exclude Mexican American voting in the Democratic Primary elections, which in a one-party state, pre-empted the general election." *Id*. at 12.

301.     Dr. Tijerina quoted the *Carrizo Springs Javelin* in June 12, 1914 describing the success of the Dimmit County White Man's Primary Association: "[it] absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards." *Id*.

### v.     Dr. Murray's Testimony

302.     Dr. Richard Murray, testifying for the NAACP and the African American Congresspersons, warned that balancing Latino and African Americans evenly in a Democratic district will produce "tension in Democratic primaries," even when Latinos and African Americans vote cohesively for candidates in the general election. (Aug. 15, 2014 Aug. 2014 Day 5 Tr. corrected, 1493:13-1494:2, Oct. 6, 2014)

303.        Dr. Murray further argued that the configuration of CD18 in C185 threatened the

viability of CD18 as an African American district:  "I think it has the potential, although

it's a performing African American district under Plan C185, to move in the direction of

having significant tension or friction between the faster-growing Hispanic population,

many of whom are middle class Hispanics in this district and a pretty high percentage of

citizen Hispanics, and the somewhat older and currently dominant African American

voters."  (Aug. 2014 Trial Tr. 1394:19-1395:3).

304.        Dr. Murray testified in 2011 that "people tend to vote for some of their own

group, particularly in a primary or a non-partisan election" and that there is no consistent

cohesion between African-Americans and Latinos in primary elections.  (2011 Trial Tr. at

1061:13-1063:9.)

### vi.        African-American Congresspersons Testimony

305.        Congressman Al Green testified that "tension districts" occur when Latino and

African American populations are closely balanced:  "When equilibrium exists, then it

could easily be the case that each party wants to have the same opportunity. So that's

when you have unnecessary tension." (2011 Trial Tr. at 1367:2-8; see also *id.* at 1365:5-

14, 1367:9-1368:13).

306.        Congresswoman Eddie Bernice Johnson similarly described "tension districts" as

districts in which "you have a large number of people and you unfairly pile them

together, then it creates tension, because everybody wants representation. They want to

be able to identify some of the people that look like them, . . . to represent them." (2011

Trial Tr. at 1290:16-20)

307.     Both Congressman Al Green and Congresswoman Johnson criticized the addition of growing Latino areas to historically African American districts (such as districts 9, 18 and 30) as creating the potential for "tension districts." (2011 Trial Tr. 1367:2-8, 1365:5-14, 1367:9-1368:13, 1303:19-1304:2).

### f. Tarrant County Primary Elections

308.     Voting is racially polarized between Latino and non-Latino voters in Tarrant County in Democratic Primary elections. (2011 Trial Tr. 507:8-18).

309.     Dr. Engstrom testified that in Tarrant County, African-Americans supported the Latino candidate in general elections if the Latino candidate was the Democratic nominee.  However, they were not supportive of Latino candidates generally in the Democratic primaries.  African-Americans, and all other voters, shared the candidate preference of Latinos in only two of seven elections and supported only one of the seven Latino candidates in the races analyzed by Dr. Engstrom. (2011 Trial Tr. 507:8-18; 2011 Task Force Ex. 392 at 53-54; 2014 Task Force Ex. 967; 2017 Task Force Ex. 19 at 28).

310.     Although the confidence intervals reported by Dr. Engstrom for his estimates of candidate support in Democratic primaries are larger than for general elections (reflecting the smaller number of voters participating in Democratic primaries), they show at a 95% level of certainty that African American voters supported the Latino Democratic primary candidate in only one of seven elections.  (2011 Trial Tr. 507:8-18; 2011 Task Force Ex. 392 at 53-54; 2014 Task Force Ex. 967; 2017 Task Force Ex. 19 at 28).

311.     In the 2014 Democratic Primary election for Governor, multivariate estimates show that in Tarrant County, candidate Reynaldo "Ray" Madrigal received 26.5% of

Latino support, 0.1% of African-American support, and 1.7% of other voters' support. (2017 Task Force Ex. 19 at 20; 2017 Task Force Ex. 48 at 18).

312.      In the 2010 Democratic Primary election for Land Commissioner, multivariate estimates show that in Tarrant County, candidate Hector Uribe received 64.3% of Latino support, 24.1% of African-American support, and 35.4% of other voters' support.  (2011 Task Force Ex. 392 at 54).

313.      In the 2010 Democratic Primary election for Lt. Governor, multivariate estimates show that in Tarrant County, candidate Linda Chavez-Thompson received 73.3% of Latino support, 42.9% of African-American support, and 39.6% of other voters' support. (2011 Task Force Ex. 392 at 54).

314.      In the 2008 Democratic Primary election for U.S. Senate, multivariate estimates show that in Tarrant County, candidate Rick Noriega received 72.4% of Latino support, 66.0% of African-American support, and 51.5% of other voters' support.  (2011 Task Force Ex. 392 at 53).

315.      In the 2008 Democratic Primary election for Supreme Court Place 7, multivariate estimates show that in Tarrant County, candidate Cruz received 79.4% of Latino support, 27.6% of African-American support, and 31.2% of other voters' support.  (2011 Task Force Ex. 392 at 54).

316.      In the 2010 Democratic Primary election for Supreme Court 8, multivariate estimates show that in Tarrant County, candidate Linda Yanez received 85.0% of Latino support, 42.2% of African-American support, and 40.5% of other voters' support.  (2011 Task Force Ex. 392 at 54).

317.     In the 2006 Democratic Primary runoff for Lt. Governor, multivariate estimates show that in Tarrant County, candidate Alvarado received 66.1% of Latino support, 30.4% of African-American support, and 47.5% of other voters' support.  (2011 Task Force Ex. 392 at 53).

318.     In the elections analyzed by Dr. Engstrom, the one instance in which the point estimate for African American support for the Latino candidate is estimated below 50% but reaches above 50% within the range of the confidence interval is the 2006 Democratic Primary for Lt. Governor, which featured an estimate for two Latino candidates combined. (2011 Task Force Ex. 392 at 53).  In the runoff for that same election, in which there was only one Latino candidate, the 95% confidence interval is below 50%.  *Id.*  Thus, Dr. Engstrom's conclusions regarding patterns of candidate support by race are largely unaffected by sample size and the associated confidence intervals.

319.     Maps displaying precinct level election results in Tarrant County further confirm Dr. Engstrom's conclusions regarding racially polarized voting in the Democratic Primary.

320.     In the July 2012 Democratic Primary runoff election for Congressional District 33, looking only at precincts in Tarrant County, in general Latino voter registration majority precincts voted for Latino candidate Domingo Garcia and non-Latino voter registration majority precincts voted for non-Latino candidate Marc Veasey.  (2017 Task Force Ex. 52; 2017 Trial Tr. 302:11 - 303:2).

321.     In the March 2014 Democratic Primary for Congressional District 33, looking only at precincts in Tarrant County, in general Latino voter registration majority precincts

voted for Latino candidate Tom Sanchez and non-Latino voter registration majority precincts voted for non-Latino candidate Marc Veasey. (2017 Task Force Ex. 54; 2017 Trial Tr. 303:3 - 303:13).

322.    In the March 2014 Democratic Primary for Senate District 10, in general Latino voter registration majority precincts of the district voted for Latino candidate Mike Martinez and non-Latino voter registration majority precincts voted for non-Latino candidate Libby Willis. (2017 Task Force Ex. 56; 2017 Trial Tr. 303:14 - 303:23; 349:19-22, 350:18-25).

### g.  Democratic Primaries in HD90 Are Racially Polarized

323.    Dr. Engstrom further concluded that voting is racially polarized between Latino and non-Latino voters in HD90 in Democratic Primary elections. (2017 Task Force Ex. 19 at 11; Ex. 48 at 33).

324.    Voting in the 2012 Democratic Primary for HD90 was racially polarized.  In the 2012 Democratic Primary, multivariate estimates show that Latino candidate Carlos Vasquez received 65.7% of Latino support, 37.7% of African-American support, and 30.2% of other voters' support.  (2014 Task Force Ex. 967 at 7-8).

325.    In the 2012 Democratic primary for HD90, Rep. Burnam generally won the non-Latino voter registration majority precincts, and Latino candidate Carlos Vasquez generally won the Latino voter registration majority precincts.  (2017 Trial Tr. 314:3-13; 2017 Task Force Ex. 58).

326.    In the 2014 Democratic Primary, multivariate estimates show that Latino candidate Ramon Romero received 78.2% of Latino support, 12.6% of African-American support, and 24.3% of other voters' support.  (2017 Task Force Ex. 48 at 33).

327.	In the March 2014 Democratic Primary in HD90, in general Latino voter registration majority precincts voted for Latino candidate Ramon Romero and non-Latino voter registration majority precincts voted for non-Latino candidate Lon Burnam (2017 Task Force Ex. 12; 2017 Trial Tr. 318:15-21; 2017 Task Force Ex. 55).

328.	In the 2014 Democratic Primary for HD90, Como, precinct 1120, was the highest turnout precinct, with 471 votes. (2017 Trial Tr. 319:13-15). Rep. Burnam won the Como precinct, 1120, with 383 out of 471 votes. (2017 Task Force Ex. 1 at 58; 2017 Task Force Ex. 11). Mr. Romero received 19% of Como's votes, compared to 81% for Mr. Burnam. (2017 Trial Tr. 319:7-12).

329.	Mr. Espino testified that HD90 almost always elects the Democratic candidate, making the Democratic Primary the dispositive election in the District. (2017 Trial Tr. 307:17-20).

330.	Dr. Alford excerpted Dr. Engstrom's analysis of the Democratic primaries in his 2017 report, specifically Table 3. (2017 Trial Tr. 1425:1-1426:4; 2017 Defendant Ex. 878 at 10, 27).

331.	Dr. Alford does not characterize HD90 in H358 as a minority coalition district. (2017 Trial Tr. 1426:21-23).

332.	Dr. Alford observed that non-Hispanic voters in HD90 did not give a majority of their votes to the Latino-preferred candidate of their choice in Democratic primaries. (2017 Trial Tr. 1426:24-1427:3; 2017 Defendant Ex. 878 at 32).

333.	Dr. Morgan Kousser testified that in the elections he analyzed, Latinos and African-Americans were not cohesive within the Democratic Primary. (2011 Trial Tr. at 265:15-18).

60

### h.  NAACP Witnesses Corroborating Dr. Engstrom

334.      Franklin Moss, a former Fort Worth City Councilman for 13 years, testified that

he had seen political races in Tarrant County where African-American and Latino voters

did not vote together. (2017 Trial Tr. 1292:22-23, 1307:3-9).

335.      Mr. Moss further testified that examples of African-American and Latino voters

not voting together would be more likely to occur in Democratic primaries. (2017 Trial

Tr. 1307:11-14).

336.      Mr. Moss also testified that all things being equal, African-American voters in

Tarrant County would prefer to have an African-American official represent them. (2017

Trial Tr. 1307:15-18).

337.      Tarrant County Commissioner Roy Charles Brooks testified that he has seen

African-American voters and Latino voters prefer different candidates in Democratic

Primary elections, and he agreed that the 2012 Democratic Primary for CD33 was an

example of one such election. (2017 Trial Tr. 1237:3-10). Commissioner Brooks testified

that in the 2012 Democratic Primary for CD33, a majority of African-American voters

preferred African-American candidate Marc Veasey, whereas a majority of Latino voters

preferred Latino candidate Domingo Garcia. (2017 Trial Tr. 1237:19-25).

### i.  Tarrant County Non-Partisan Elections Are Racially Polarized

338.      Mr. Jimenez testified that in his 33 years living in Fort Worth, he had never "seen

any local elections where a non-Hispanic [precinct] supported a Hispanic." (2017 Trial

Tr. 351:4-6).

339.      In the May 2014 nonpartisan election for Fort Worth City Council District 9, in

general Latino voter registration majority precincts voted for Latino candidates Juan

Rangel and Margot Garza, and non-Latino voter registration majority precincts voted for

non-Latino candidates Bernie Scheffler, Ann Zadeh, Steve Lasater, and Greg Hughes.

(2017 Task Force Ex. 59, 2017 Trial Tr. 303:24 - 304:10)

340.     In the May 2015 nonpartisan election for Fort Worth City Council District 2, in

general Latino voter registration majority precincts voted for Latino candidate Salvador

Espino and non-Latino voter registration majority precincts voted for non-Latino

candidate Steve Thornton (2017 Task Force Ex. 60, 2017 Trial Tr. 304:11-23, 350:12-17,

351:1-6).

341.     In the March 2016 Democratic Primary for Congressional District 33, in general

Latino voter registration majority precincts voted for Latino candidate Carlos Quintanilla

and the non-Latino voter registration majority precincts voted for non-Latino candidate

Marc Veasey.  (2017 Task Force Ex. 57, 2017 Trial Tr. 304:24 - 305:8, 349:23-350:5,

351:1-6).

342.     In the May 2017 nonpartisan election for Fort Worth ISD District 9, in general

Latino voter registration majority precincts voted for Latina candidate Pilar Candia and

non-Latino voter registration majority precincts voted for non-Latino candidate Ashley

Paz.  (2017 Task Force Ex. 62, 2017 Trial Tr. 305:9 - 305:23)

343.     In the May 2017 nonpartisan election for Fort Worth ISD District 8, in general

Latino voter registration majority precincts voted for Latino candidate Anael Luebanos

and non-Latino voter registration majority precincts voted for non-Latino candidate Jason

Brown (2017 Task Force Ex. 61, 2017 Trial Tr. 305:24 - 306:11, 350:6-11, 351:4-6).

344.     In the June 2017 nonpartisan election for Fort Worth Council District 2, in general

Latino voter registration majority precincts voted for Latino candidate Carlos Flores and

non-Latino voter registration majority precincts voted for non-Latino candidate Steve Thornton (2017 Task Force Ex. 53, 2017 Trial Tr. 306:12 - 307:13)

### j.  Dilutive Effects of Burnam Amendment in H358

345.      Como precinct 1120 historically does not support Latino candidates in the Democratic primary.  Como does cast a majority of its votes for the Democratic candidate in the General election. (2017 Task Force Ex. 1 at 45-49; 2017 Trial Tr. 313:7-13, 352:15-17).

346.      In Como precinct 1120, in the March 4, 2014 Democratic Primary, Latino candidate Reynaldo Madrigal won 21 out of 495 votes for Governor.  (2017 Task Force Ex. 39 at 1).

347.      In Como precinct 1120, in the March 2, 2010 Democratic Primary, Latina candidate Linda Chavez-Thompson won 80 out of 158 votes for Lieutenant Governor (winning the precinct by one vote).  (2017 Task Force Ex. 3-L at 2).

348.      In Como precinct 1120, in the March 2, 2010 Democratic Primary, Latino candidate Hector Uribe won 64 out of 157 votes for Commissioner of the General Land Office. (2017 Task Force Ex. 3-M at 2 (Burnam Depo. Ex. 24).

349.      In Como precinct 1120, in the March 4, 2008 Democratic Primary, Latino candidate Rick Noriega won 350 out of 806 votes for U.S. Senator.  (2017 Task Force Ex. 3-N at 2).

350.      In Como precinct 1120, in the March 4, 2008 Democratic Primary, Latino candidate Baltasar Cruz garnered 242 out of 781 votes for Supreme Court Justice Place 7. (2017 Task Force Ex. 3-O at 2).

351.       In Como precinct 1120, in the March 4, 2008 Democratic Primary, Latina candidate Linda Reyna Yanez garnered 310 out of 752 votes for Supreme Court Justice Place 8.   (2017 Task Force Ex. 3-P at 2).

352.       In Como precinct 1120, in the March 4, 2006 Democratic Primary election for Lieutenant Governor, Latina candidate Maria Luisa Alvarado garnered 41 out of 271 votes, and Latino candidate Adrian de Leon garnered 93 out of 271 votes.  (2017 Task Force Ex. 3-Q at 2).

353.       Mr. Espino testified that the changes made to the boundaries of HD90 by Rep. Burnam's amendment effectively weaken the opportunity for Latinos to elect a candidate of their choice in the Democratic Primary and make it more difficult for Latino candidates to win.  (2017 Trial Tr. 317:1-16).

354.       Mr. Espino testified that Mr. Romero and other Latino candidates were still vulnerable in HD90 Democratic Primary elections because Mr. Romero only won by 110 votes in 2014.  There were Latino candidates running for other seats in the 2014 Democratic Primary in Tarrant County, which contributed to higher Latino turnout that year. (2017 Trial Tr. 323:4-18).

355.       Mr. Kenny conceded that his map made it more difficult for Latino voters to nominate their preferred candidate in the HD90 Democratic Primary if that candidate was Latino. (2017 Trial Tr. 672:24 – 673:7).

356.       Rep. Burnam testified that the changes he made from the first version of his amendment to the second, which raised the SSVR to 50.1%, "didn't change the [electoral performance] numbers, but it changed the [SSVR] percentage."  (2017 Task Force Ex. 1 at 63).

357.     Although the areas removed from HD90 were majority Anglo, they had an SSVR of 20.6%, which was significantly higher than the area added to the district, which included Como and had an overall SSVR of 8.5%. (2017 Task Force Ex. 9 at 2).  As a result, the addition of Como and the removal of portions of Sansom Park and North Beverly Hills had a net effect of lowering the SSVR in HD90.

358.     Moreover, Sansom Park and North Beverly Hills, although majority non-Latino voter registration majority areas, had a history of electing Latino candidates.  (2017 Trial Tr. 315:15 - 316:25). The Burnam amendment's replacement of Sansom Park and North Beverly Hills with Como weakened the opportunity for Latinos to elect the candidates of their choice in HD90 because Como's higher turnout against a Latino candidate outweighs Sansom Park and North Beverly Hills' lower turnout and more favorable margins for Latino candidates.   (2017 Trial Tr. 317:1 - 318:3, 352:9-11).

### 3. Totality of the Circumstances (Senate Factors)

#### a.  The history of voting-related discrimination in the State or political subdivision

359.     Latinos in Tarrant County experienced statewide discriminatory practices in the area of voting, including the poll tax, use of dilutive multimember districting for State House seats, and intentional race-based redistricting of congressional districts in Tarrant County in Plan C185.  *See Kilgarlin v. Martin*, 252 F. Supp. 404, 439 (S.D. Tex. 1966), *rev'd sub nom. Kilgarlin v. Hill*, 386 U.S. 120, 87 S. Ct. 820, 17 L. Ed. 2d 771 (1967) (describing use of 8 multi-member districts in Tarrant County for Texas House). *See Perez v. Abbott*, No. SA–11–CV–360, WL 1787454, at *47-50 (W.D. Tex. May 2, 2017) (finding *Shaw*-type racial gerrymandering in Tarrant County given the use of race in drawing CD26 in violation of the Equal Protection Clause).

65

360.     The Task Force Plaintiffs incorporate by reference their proposed Findings of

Fact 180-229 from their 2014 Post-trial Proposed Findings of Fact and Conclusions of

Law. (Dkt. 1274 28-35, ¶¶ 180-229).

361.     Tarrant County also features present-day discrimination against Latino voters and

candidates. *See Perez v. Abbott*, No. SA–11–CV–360, WL 1787454, at *51-69 (W.D.

Tex. May 2, 2017) (finding that the Texas Legislature intentionally diluted Latino voting

strength and acted with a racially discriminatory motive in drawing CD26, which

includes parts of Tarrant County).

362.     When Mr. Romero challenged Rep. Burnam for the Democratic party nomination

in HD90 in 2014, Mr. Burnam's campaign made robocalls in Spanish to discourage

Latino voters from accepting mail ballot assistance from Romero campaign workers and

to suggest that accepting assistance with a mail ballot could result in that ballot being

stolen.  (*See supra* ¶¶ 67-76).

363.     At the same time, Rep. Burnam ran his own vote-by-mail ballot assistance

program through surrogates in the heavily non-Latino Como neighborhood. (2017 Task

Force Ex. 2 at 10).

### b.  The extent to which voting is racially polarized

364.     The Task Force Plaintiffs incorporate by reference their proposed Findings of

Fact ¶¶ 92-120 from their 2014 Post-trial Proposed Findings of Fact and Conclusions of

Law  demonstrating that voting is racially polarized in Tarrant County and HD90. (Dkt.

1274 at 13-18, ¶¶ 92-120).

365.     The Task Force Plaintiffs also incorporate by reference their proposed Findings of

Fact ¶¶ 245-358 from Part IV, Section B of this document, "*Gingles* Prongs 2 and 3:

Racially Polarized Voting in Tarrant County."

> **c.  The extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting**

366.     Tarrant County employed multi-member seats for its State House districts until

the 1970's.  *See Kilgarlin v. Martin*, 252 F. Supp. 404, 439 (S.D. Tex. 1966), *rev'd sub*

*nom. Kilgarlin v. Hill*, 386 U.S. 120, 87 S. Ct. 820, 17 L. Ed. 2d 771 (1967) (describing

use of 8 multi-member districts in Tarrant County).

> **d.  The exclusion of members of the minority group from candidate slating processes**

367.     From the 1970s to the 1990s, a group known as the Seventh Street gang would

recruit and support Anglo candidates for office across the Fort Worth area.  (2017 Trial

Tr. 294:21 - 295:21).

368.     When a group of Latino local leaders formed a group to recruit and advise Latino

candidate to run for office in the late 1990s and early 2000s, Rep. Burnam visited a

meeting of the informal Latino group to tell them he didn't believe they needed to be

meeting.  (2017 Trial Tr. 348:10-17).  At that meeting, Mr. Burnam asserted that he could

represent the district better than any Latino candidate that the group could recruit.  (2017

Trial Tr. 348:15-17).  The discussion grew heated, and Mr. Burnam was asked to leave

the meeting.  (2017 Trial Tr. 348:18-24).

369.     Around 2008 or 2009, Lon Burnam met with then-Fort Worth City
Councilmember Sal Espino; Mr. Espino testified that Mr. Burnam indicated that he did
not want Mr. Espino to challenge his HD90 seat. (2017 Trial Tr. 297:12 - 298:4).

370.     Prior to the 2014 Democratic Primary election, Rep. Burnam approached Mr.
Romero and attempted to dissuade him from running for State Representative. (2017
Task Force Ex. 1 at 58 (Burnam Vol. 1)).  Mr. Romero was the only individual Rep.
Burnam met with in this capacity. (2017 Task Force Ex. 1 at 58).

> **e.  The extent to which minority group members bear the effects of past
> discrimination in areas such as education, employment, and health,
> which hinder their ability to participate effectively in the political
> process**

371.     The Task Force Plaintiffs incorporate by reference their proposed Findings of
Fact ¶¶ 240-290, ¶¶ 343-348, ¶¶ 355-367 from their 2014 Post-trial Proposed Findings of
Fact and Conclusions of Law.  (Dkt. 1274 at 37-43, ¶¶ 240-290; 51-52, ¶¶ 343-348; 53-
55, ¶¶ 355-367).

372.     In his 2011 testimony, Alex Jimenez recalled his youth when Mexican Americans
were subjected to wage discrimination but continued to work under discriminatory
conditions because it was the only work available. (2011 Trial Tr. 563:1-23).

373.     During his early working career Mr. Jimenez recalled that his supervisor thought
it was appropriate to call Mr. Jimenez "Pepper Belly," and Mr. Jimenez just had to look
the other way. (2011 Trial Tr. 565:2-11).

374.     When Mr. Jimenez first started working professionally, he was introduced as a
"helper" by his Anglo colleague who held the same position and had identical
educational credentials. (2011 Trial Tr. 567:10-13).

375.     When Mr. Jimenez earned a promotion to vice president at TXU, he received a

number of calls accusing him of filling a quota. (2011 Trial Tr. 567:25-568:19).

376.     Mr. Jimenez recalled having to call banks in advance to establish checking

accounts because if he let his ethnicity be the bank's first impression, opening an account

became an ordeal. One bank, where he had cashed checks previously, required him to

produce ID while cashing an Anglo coworker's check without hesitation. (2011 Trial Tr.

565:18-566:22).

### f.   The use of overt or subtle racial appeals in political campaigns

377.     When Mr. Romero, who is Latino, challenged Rep. Burnam in the 2014

Democratic Primary election for HD90, Rep. Burnam's campaign and its supporters

distributed political flyers suggesting that Mr. Romero was a member of the Latin Kings

street gang.  (*See supra* ¶¶ 77-84).

378.     The flyer depicted a negative and offensive stereotype of Latinos, namely that

they are gang members.  (2017 Trial Tr. 319:23 - 320:17).  The flyer insinuated that if

Mr. Romero were elected, there would be more gangs and violence. (2017 Trial Tr.

357:12-14).

379.     During the 2014 Democratic Primary, Rep. Burnam's website featured a graphic

depicting Mr. Romero's photo in between the photos of two other candidates, with the

words "Fake Democrats" superimposed over all three faces. (2017 Task Force Ex. 3-X).

The candidate directly next to Mr. Romero was holding a poster of President Obama with

a Hitler mustache. (2017 Task Force Ex. 3-X).

380.     Mr. Espino testified that the graphic was "deeply disturbing, offensive, and

hateful." Mr. Espino considered the post to be an appeal to non-Latino voters, and

African-American voters in particular, not to vote for Mr. Romero.  (2017 Trial Tr. 320:18 - 321:14).

381.     Rep. Burnam testified that he hoped that these posts would be "very disturbing" to African-American voters. (2017 Task Force Ex. 2 at 37). Rep. Burnam thought that voters would possibly gain a negative impression of Mr. Romero because he was portrayed next to a picture of President Obama with a Hitler mustache. (2017 Task Force Ex. 2 at 38).

382.     Latino elected officials in Fort Worth are derogatorily referred to as the "Mexican Mafia." (2017 Trial Tr. 298:5 -298:20).

### g.  The extent to which members of the minority group have been elected to public office in the jurisdiction

383.     Mr. Espino and Mr. Jimenez both testified that it is very difficult for Latino candidates in the Fort Worth area to garner non-Latino votes. (2017 Trial Tr. 307:24 - 308:5, 358:15-17).  In HD90, Mr. Espino testified that without at least 50% SSVR, the Latino candidate cannot win a racially contested Democratic primary. (2017 Trial Tr. 307:24 - 308:5). Mr Espino testified:  "In the Democratic Primary I have always had a rule of [thumb] that if you're in a Democratic Primary . . . you at least need to be at least 50 percent plus voter registration to even have a shot to win. And there is racially polarized voting because it's very difficult for a Latino candidate to get non-Hispanic voters to vote for them." *Id.*

384.     From its creation in 1983 through 2014, HD90 was represented by Anglo state representatives -- Doyle Willis and later Lon Burnam.  (2017 Trial Tr. 352:11-13; 2017 Task Force Ex. 1 at 35; Legislative Reference Library of Texas, Doyle Willis,

http://www.lrl.state.tx.us/legeLeaders/members/memberDisplay.cfm?memberID=%2030
8).

385.        In the late 1990s and early 2000s, an informal group of Latino political,

community, and business leaders and activists formed to recruit and advise Latino

candidates in Fort Worth.  (2017 Trial Tr. 295:22 - 296:11; 347:9-15).  The informal

Latino group started meeting because, at that time in the early 2000s, there were no

Latino city council members, county commissioners, or state representatives in Fort

Worth, and only two Latino school board trustees.   (2017 Trial Tr. 296:14 - 297:7;

347:18-22).

386.        The HCVAP of Tarrant County is 16.9%.  (2017 Task Force Ex. 50).

387.        Of the nine Fort Worth City Councilmembers, only one, Carlos E. Flores, is a

Latino. (Fort Worth City Government, http://fortworthtexas.gov/government/ (last visited

July 30, 2017)).

388.        There are no Latinos who represent a portion of Tarrant County in the U.S. House

of Representatives. (Tarrant County, *Elected Officials Representing Tarrant County as of*

*June 01, 2017*, at 1-2 (2017)

http://access.tarrantcounty.com/content/dam/main/elections/MISC/elected_officials.pdf

(2017)).

Of the 137 total elected officials who represent Tarrant County at the federal, state, and

county level, only 11 (8.0%) have Latino surnames. (Tarrant County, *Elected Officials*

*Representing Tarrant County as of June 01, 2017* (2017)

http://access.tarrantcounty.com/content/dam/main/elections/MISC/elected_officials.pdf

(2017)).

## II.  PROPOSED CONCLUSIONS OF LAW

### A.      OVERVIEW OF THE RULING[1]

In 2013, the State of Texas enacted boundaries to Texas House District 90 ("HD90") that departed from the previous House redistricting plan H283 and this Court's interim redistricting plan for the Texas House of Representatives, H309.  The State's changes to HD90 used race to assign voters into and out of HD90, purposefully weakened Hispanic voting strength in the district, and deployed a mechanical racial quota to give the impression that Hispanic voting strength was unchanged.

The changes to HD90 were conceived by the incumbent in order to bolster his ability to defeat a Latino-preferred challenger in the Democratic primary.  The changes to HD90 were reviewed and discussed by the senior member of the Tarrant County House delegation as well as the Chairman of the House Redistricting Committee, who offered the amended boundaries for HD90 on the House floor and urged their passage.

The State's use of race to assign voters into and out of HD90 in H358 violated the Fourteenth Amendment (racial gerrymandering/*Shaw* claim).  The State's changes to HD90 further purposefully discriminated against Latino voters in violation of the Fourteenth Amendment and Section 2 of the Voting Rights Act by weakening their voting strength in order to preserve an incumbent who was not Latino-preferred (intentional vote dilution).  The State's changes to HD90 also weakened Latino voting strength in violation of Section 2's effects standard.

### 1.  The Court's Previous Rulings on HD90 Confirm that Creation of HD90 as an SSVR majority district, by itself, is neither illegal nor improper

---

[1] This section also responds to the Court's question number 2 in Questions from the Three-Judge Panel to be Addressed at the Conclusion of Trial (Dkt. 1494).

In its April 2017 order, this Court concluded that the State improperly claimed HD90 in H283 as a "new" Latino ability district for the purpose of diluting Latino voting strength in Texas.  The Court explained, "redistricters believed they could offset the elimination of HD33 for § 5 purposes by increasing the SSVR of HD90[.]"  *Perez v. Abbott*, SA–11–CV–360, WL 1450121, *45 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 32-33 n. 22].   The Court further observed that "§ 2 of the VRA does not permit offsets."  *Id*.

Texas's reliance on HD90 in H283 to offset the elimination of HD33 in Nueces County was improper because Texas asserted the offset to justify a statewide plan that diluted Latino voting strength statewide.  However, absent the improper assertion of offset, the creation of HD90 as an SSVR majority district in H292 was not illegal or improper.[2]

In Plan H100, the benchmark plan for the 2011 redistricting, HD90 did not contain a majority HCVAP population but the Latino share of CVAP had been increasing in the district and Latinos were on the cusp of majority status.

At the beginning of the 2011 redistricting cycle, the 2005-2009 American Community Survey estimate for HCVAP in HD90 was 47.9%. (FOF 111).  HD90 had a 2010 total SSVR of 45%. (2017 Task Force Ex. 3-A; FOF 111).  However, HD90 was also substantially under populated -- by 26,288 people (-15.68%).  *Id.*

The representative of HD90 at the time, Lon Burnam, conceded that 2011 was probably the first redistricting cycle in which it was possible for HD90 to be a Latino CVAP majority district. (FOF 113). Nevertheless, in the 2011 redistricting process, Mr. Burnam proposed to *reduce* HD90's HCVAP from 47.9% to 43.2% and the total SSVR from 45% to 40%. *Perez v. Abbott*, SA–11–CV–360, WL 1450121, *36 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 70].

---

[2] No party alleges in a live complaint that the creation of HD90 as an SSVR majority district, by itself, violated the Voting Rights Act or the U.S. Constitution.

(FOF 116). .  At the same time, Mr. Burnam sought to dissuade Latinos who might challenge him in the Democratic primary for HD90.  (FOF 53)..  Mr. Burnam claimed to local Latino leaders that he could represent the district better than any Latino candidate that they could recruit. (FOF 106).

Tarrant County Latino community advocates and elected officials wanted HD90 to be redistricted in 2011 as a Latino-majority district.  (FOF 105, 111).  HD90 had never been represented by a Latino, and in 1996 a Latino candidate had run for the Democratic nomination in HD90 and been defeated by Lon Burnam.  (FOF 101, 102).  Although HD90 voted Democratic in general elections, local Latino leaders believed that HD90 needed an SSVR majority in order for a Latino candidate to win the Democratic primary. (FOF 339).  A history of racially polarized voting in Ft. Worth area Democratic primaries and nonpartisan elections, as well as active discouragement of Latino candidates for office by local Democratic leadership, supported the conclusion of Latino leaders that Latino voters in HD90 needed a Latino majority to nominate and elect their candidates of choice.  Local Latino leaders' intent to raise the Latino population of HD90 to a majority of CVAP and voter registration was not improper but was instead aimed at 1) providing the opportunity for Latinos to nominate and elect their candidate of choice within a context of racially polarized voting and 2) pushing back against an attempt by the incumbent in the 2011 redistricting cycle to weaken Latino voting strength in the district.

The Texas Latino Redistricting Task Force, the membership of which includes Latino Tarrant County residents, advocated for an HD90 with a majority HCVAP. (FOF 119).

The Texas Legislature decided to create HD90 as a majority SSVR district. (FOF 120, 133-34).  However, the Legislature went further, claiming that the increased Latino population

in HD90 in Plan H283 served as an offset for the elimination of HD33 in Nueces County under section 5 of the Voting Rights Act.  The Task Force objected strongly to this assertion by Texas but continued to advocate for an HCVAP majority HD90.  In an April 27, 2011 letter to House and Senate Redistricting Committee Chairmen Solomons and Seliger, the Task Force wrote:

> Adding Latino voters to Districts 90 and 148 does raise the SSVR but does not create new Latino opportunity districts that can offset the loss of District 33. Thus Plan H153 reduces the number of districts in which Latinos can elect their candidates of choice.  By contrast, the Texas House plan offered by the Texas Latino Redistricting Task Force adds Latino population to Districts 90 and 148 and also creates three additional Latino majority opportunity districts.

(2014 Task Force Ex. 227 [Dkt. 320-2 at 68-74]).[3]

This Court has ruled that HD90 cannot serve as an offset for the loss of HD33 under sections 2 or 5 of the Voting Rights Act and that Texas increased the SSVR of HD90 for an improper purpose.  *See Perez v. Abbott*, SA–11–CV–360, WL 1450121, *16-18 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 32-33 n. 22, 71, 84]).  At the same time, the Court also determined that in H283, "claims that HD90 and HD95 were packed are not supported by the evidence."  *See Perez v. Abbott*, SA–11–CV–360, WL 1450121, *36 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 71].  These two rulings, taken together, mean that HD90 can be a Latino majority district, but not for an improper purpose.[4]

## 2.   Recent Rulings of the U.S. Supreme Court Support the Creation of HD90 as a Latino Majority District

---

[3] *See also Perez v. Abbott*, SA-11-CV-360, WL 1450121, *28, n.43 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 56 n. 43] ("The Court notes that Perales did not "repudiate" MALDEF's assertion that the SSVR/HCVAP of HD148 could or should be increased above 50%. Rather, she asserted that increasing the SSVR/HCVAP of existing ability districts HD90 and HD148 could not offset the loss of HD33 because they were existing ability districts, and that additional Latino opportunity districts were still required.")

[4] No party has raised a *Shaw*-type racial gerrymandering claim against HD90 in H283.  See Dkt. 1365 at 87 n. 65.

There is nothing inherently wrong with a district having an increased minority population if it reflects the demographics of the area, does not have the effect of dilution and wasn't intentionally racially gerrymandered. In the case of HD90, the goal of local Latino leaders to draw together Latino majority precincts that would provide Latinos the opportunity to nominate and elect their preferred candidate of choice, and fend off the incumbent's plan to reduce Latino voting strength, was entirely proper.[5]

Recent Supreme Court decisions do not prohibit, but indeed support, the creation of HD90 as a Latino majority district. On the one hand, they reaffirm that districts are vulnerable to *Shaw*-type claims when redistricters rely on numerical demographic targets purportedly to comply with the Voting Rights Act without undertaking the functional analysis actually required by the Act. *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 802 (2017); *Cooper v. Harris*, 137 S. Ct. 1455, 1468–69 (2017); *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1272 (2015). On the other hand, they affirm that in some circumstances a certain demographic percentage might be necessary for voters to have a "functional working majority." *Bethune-Hill*, 137 S. Ct. at 802.

In *Alabama Legislative Black Caucus*, the Supreme Court reversed a decision upholding districts created with "mechanical racial targets" on the theory that such targets were required to prevent retrogression under § 5 of the Voting Rights Act. *Alabama Legislative Black Caucus*, 135 S. Ct. at 1267. The Court reaffirmed that prevention of retrogression "does not require a covered jurisdiction to maintain a particular numerical minority percentage" but instead "requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice." *Id.* at 1272. Accordingly, the Court held that, in most instances, a demographic

---

[5] This section also responds to question number 3 in Questions from the Three-Judge Panel to be Addressed at the Conclusion of Trial (Dkt. 1494).

target will not equate to compliance with the Voting Rights Act. But in *Bethune-Hill*, the Supreme Court clarified that "*Alabama* did not condemn the use of [demographic] targets to comply with § 5 in every instance." *Bethune-Hill*, 137 S. Ct. at 802. Indeed, the Court held that, given a functional analysis, the record in that case "support[ed] the [Virginia] legislature's conclusion that this was one instance where a 55% BVAP was necessary for black voters to have a functional working majority." *Id.*

Each of these decisions involved *Shaw*-type claims, and there are no *Shaw*-type claims asserted against HD90 in Plan H283. *See Perez v. Abbott*, SA–11–CV–360, WL 1450121, *85-87 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 69–71, 85–87]. Therefore, these decisions themselves neither prohibit nor require the creation of HD90 as a majority-SSVR district. However, these decisions—*Bethune-Hill* in particular—support the use of demographic percentages that reflect real conditions and ability to elect to guide the creation of HD90 as a Latino majority district.

### B. HD90 IN PLAN H358 INTENTIONALLY DISCRIMINATES AGAINST LATINOS IN VIOLATION OF THE FOURTEENTH AMENDMENT (*SHAW* RACIAL GERRYMANDERING CLAIM)

The Fourteenth Amendment forbids intentional discrimination in legislative line-drawing. C*ity of Mobile, Ala. v. Bolden*, 446 U.S. 55, 66 (1980).  Although typically courts defer to legislative redistricting, that deference is overcome by evidence of race-based decision making. *Miller v. Johnson,* 515 U.S. 900, 915 (1995) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 218 (1995)), *Garza v. County of Los Angeles*, 756 F. Supp. 1298, 1349 (C.D. Cal. 1990), *aff'd*, 918 F.2d 763 (9th Cir. 1990).

There are two distinct claims of intentional discrimination in redistricting.  The first challenges the use of race as a basis for separating voters into districts and was first recognized

in *Shaw v. Reno*, 509 U.S. 630 (1993). *See also Miller v. Johnson*, 515 U.S. at 911. The second claim targets actions "disadvantaging voters of a particular race," and is "analytically distinct" from claims under the *Shaw v. Reno* line of cases. *See Miller v. Johnson*, 515 U.S. 900, 911 (1995) (explaining distinction between claims).

A *Shaw*-type racial gerrymandering claim turns on whether "race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015) ("*Alabama*"); *see also Perez v. Abbott*, No. SA-11-CV-360, 2017 WL 1787454, at *15 (W.D. Tex. May 2, 2017) [Dkt. 1390 at 30]. The plaintiff's evidentiary burden is "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Alabama* at 1267.

In H358, the direct and circumstantial evidence surrounding the Burnam amendment establish that the State assigned voters into and out of HD90 because of their race. The State's actions are unlawful even if the State can point to other, purportedly non-racial purposes. *See LULAC v. Perry*, 548 U.S. at 441; *Garza v. County of L.A.*, 756 F. Supp. 1298, 1349 (C.D. Cal. 1990) *aff'd*, 918 F.2d 763 (9th Cir. 1990) ("racial discrimination is not just another competing consideration.") (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

The State's actions are also unconstitutional regardless of their effect on minority ability to elect in the challenged district. The *Shaw* line of cases challenged districts that were created to provide minority opportunity to elect. The Supreme Court made clear, however, that even if

racial gerrymanders are motivated by good intentions, they are unconstitutional solely because they assign voters to districts on the basis of race.

Furthermore, the fact that HD90 in H358 contains a majority HCVAP, or that the plan overall contains a certain number of Latino opportunity districts, does not foreclose a *Shaw* claim with respect to HD90.  Earlier in this case, this Court recognized:

The Supreme Court has never held that a State's creation of a certain number of HCVAP-majority districts forecloses all relief, and nothing in the Supreme Court's precedents indicates that Plaintiffs may not still challenge . . . whether they comply with the Equal Protection Clause. In fact, Shaw v. Hunt, 517 U.S. 899, 916 n.8, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), indicates that Plaintiffs may challenge whether the minority districts drawn in the State's plan were lawfully drawn[.]

*Perez v. Abbott*, No. SA-11-CV-360, 2017 WL 1787454, at *5 (W.D. Tex. May 2, 2017).

In *Alabama*, the Court recognized "that the legislature had deliberately moved black voters into [certain] majority-minority districts" to achieve a numerical target of black voters. *Alabama* at 1266-67.  In its decision on Plan C185, this Court concluded that when Ryan Downton "moved certain populations of Hispanics into CD23 to increase its SSVR and HCVAP numbers" without respect for traditional redistricting principles, "race was the predominant motive in the decision to include significant numbers of Latino voters into CD23, triggering strict scrutiny."  *Perez v. Abbott*, No. SA-11-CV-360, 2017 WL 1787454, at *16, n.22 (W.D. Tex. May 2, 2017) [Dkt. 1390 at 31].

Here, Rep. Burnam directed his staffer Conor Kenney to use REDAPPL to, according to Rep. Burnam, remove "every white voter near the western boundary of the district to keep the Hispanic vote over 50%." (FOF 34). Rep. Burnam further testified that he ignored precinct lines to "pull [Latinos] in" to HD90 and find white people to put in neighboring Anglo-majority HD99.  (FOF 38).

Mr. Kenny did not take into account any election results as he made changes to the district; the redrawing was, in his words, "purely a demographic exercise." (FOF 35). Mr. Kenny testified that he redistricted block by block to finalize his second map using Hispanic Voting Age Population (HVAP). (FOF 37).

Mr. Kenny used racial shading in RedAppl to include in HD90 Census blocks with higher HVAP. (FOF 39). Mr. Kenny redistricted along the border between HD90 and HD 99 and brought blocks that were above 50% HVAP into HD90. Then he took blocks that were under 50% HVAP out of HD90. (FOF 39). When Mr. Kenny saw a block on RedAppl with an HVAP below 50%, he moved it out of HD90 regardless of other populations. (FOF 39). Mr. Kenny referred to his goal of adding blocks with greater than 50% HVAP and removing blocks with less than 50% HVAP as an "operational mandate." (FOF 40).

In total, Rep. Burnam and Mr. Kenny split ten precincts to draw HD90's new boundaries. (FOF 41). Rep. Burnam's amendment:

- cut out portions of Sansom Park by splitting precincts 4073 and 4593, in order to remove Anglo-majority blocks while maintaining Latino-majority blocks. (FOF 42);

- split precincts 4125, 4068, 4493, 4634, and 1015 in order to include Latino-majority blocks in HD90 and exclude Anglo-majority blocks from HD90. (FOF 43).

- removed whole precincts 1674 and 1062 and included whole precincts 1434 and 1408 in order to include Latino-majority precincts in HD90 and remove non-Latino-majority precincts from the district. (FOF 44).

81

Rep. Burnam admitted that he made changes to HD90 for the sole purpose of including Latino-majority blocks in the district and excluding Anglo-majority blocks.  (FOF 45).

Mr. Kenny testified that he reviewed the cut to precinct 4125 with Rep. Burnam and told Rep. Burnam that cutting 4125 in order to draw more Latinos into HD90 would be "ugly." (FOF 46).  Rep. Burnam did not express concern with the "ugly" cut and instead said that the cut was "great" because it brought more Latinos into HD90.  (FOF 46).

The total population of the precincts split or moved whole because of race by Rep. Burnam's amendment is 33,343 individuals, including an estimated 16,429 registered voters.[6] (FOF 49).

In places where it employs race-based redistricting, HD90 in Plan H358 splits precincts, divides communities of interest and does not advance partisan interests – flaunting traditional redistricting criteria.

The racial purpose of Rep. Burnam in crafting HD90 in H358 is attributed to the Legislature as a whole, particularly where, as here, the senior member of the Tarrant County House delegation reviewed and approved the district lines, and the Chairman of the House Redistricting Committee reviewed, laid out before the House and urged passage of the district lines.[7] *See Perez v. Abbott*, SA–11–CV–360, WL 1450121, *43 (W.D. Tex. Apr. 20, 2017) ("[A]lthough various mapdrawers drew different portions of the map, they did so with authority from the Legislature, and thus their motives, knowledge, and intent must be imputed to the Legislature when it enacted the plan." (FOF 162-168, 173-174, 189-191).

---

[6] This responds to question number 25 in Questions from the Three-Judge Panel to be Addressed at the Conclusion of Trial (Dkt. 1494).

[7] This responds to question number 9 in Questions from the Three-Judge Panel to be Addressed at the Conclusion of Trial (Dkt. 1494).

Texas lacks any compelling reason for the race based redistricting in its changes to HD90. The undisputed evidence shows that the changes to HD90 flowed first from Rep. Burnam's attempt to reduce Latino voting strength in the Democratic primary HD90 while still maintaining the appearance of a Latino majority district, then the further imposition by legislative leadership of a 50.1% mechanical target for HD90's SSVR without regard to its effect on Latino voters' ability to nominate and elect their preferred candidate.

Rep. Burnam testified that Chairman Darby was "fixated" on the number of Latino voters being at 50.1%. (FOF 174). After reaching this 50.1% goal however, Rep. Burnam testified that his changes "didn't change the [electoral performance] numbers, but it changed the [SSVR] percentage." (FOF 187). Nevertheless satisfied, Chairman Darby addressed the House: "Members, Representative Burnam has revised his amendment and it now keeps this district a Hispanic district--brings the numbers back over 50%. That was the objection. I believe Representative Geren is in favor of this amendment also, so with that I would move to accept this amendment." (FOF 51).

Chairman Darby invoked legislative privilege and did not provide any further testimony on the nature of "the objection" or why he believed this revision cured the objection to the original Burnam amendment. (FOF 52). Chairman Darby did not perform or request any functional electoral analysis of Rep. Burnam's proposed changes to HD90. (FOF 224).

Thus, the changes to HD90 simultaneously met the mechanical target of 50.1% SSVR and maintained the electoral performance numbers favored by Rep. Burnam that would help him in the Democratic primary.

Similar to the Court's conclusion that HD117 was racially gerrymandered, here Chairman Darby rejected Rep. Burnam's first draft of the HD90 amendment because it did not maintain an

SSVR of 50.1%, without regard for any impact the amendment would have on Hispanic opportunity to elect. (FOF 173-174, 189-191). *See also Perez v. Abbott*, SA–11–CV–360, WL 1450121, *45 (W.D. Tex. Apr. 20, 2017) ("Solomons rejected the proposal because maintaining the racial quota *while at the same time ensuring the least possible Hispanic opportunity* was paramount. Accordingly, redistricters lacked a compelling state interest for their use of race.").

### C.   HD90 IN PLAN H358 INTENTIONALLY DILUTES LATINO VOTING STRENGTH IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT AND THE FOURTEENTH AMENDMENT (INTENTIONAL VOTE DILUTION CLAIM)

A non-*Shaw* claim of intentional discrimination in redistricting asserts that the jurisdiction "enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Perez v. Abbott*, SA–11–CV–360, WL 1787454, *45 (W.D. Tex. May 2, 2017) [Dkt. 1390 at 96]. *See also City of Mobile v. Bolden*, 446 U.S. 55 (1980) *superseded in part by statute on other grounds* by 42 U.S.C. § 1973; *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (redistricting plan violates the Fourteenth Amendment if "'conceived or operated as purposeful device to further racial discrimination' by minimizing, canceling out or diluting the voting strength of racial elements in the voting population.'") (quoting *Whitcomb v. Chavis*, 403 U.S., 124, 149 (1971)); *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) (same).[8]

Section 2 (b) of the Voting Rights Act provides:

A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to *nomination or election* in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members

---

[8] Both *Shaw* and *Miller* acknowledge these differences. *See Miller v. Johnson*, 515 U.S. 900, 911 (1995); *Shaw v. Reno*, 509 U.S. 630, 651-52 (1993).

have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S. Code § 10301 (b) (emphasis added).

Thus, pursuant to the Voting Rights Act, minority vote dilution can occur in the primary or general election.

Courts have long recognized that public decision-making bodies, like the State of Texas, can have more than one motive when enacting a statute. *See Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.").

The Court in *Arlington Heights* continued:

> In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Id.* at 265-266.

In *Arlington Heights*, the Supreme Court explained that when determining whether racially discriminatory intent or purpose is a motivating factor behind an official action, a court must make "a sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights,* 429 U.S. at 266.

The Court explained further that, in addition to direct evidence, circumstantial evidence of discriminatory intent includes:

- the impact of the official action, *i.e.* whether it "bears more heavily on one

85

race than another" and whether "a clear pattern, unexplainable on grounds other than race emerges from the effect of the state action even when the governing legislation appears neutral on its face;"

- the historical background of the decision;

- the specific sequence of events leading up to the challenged decision;

- departures from the normal procedural sequence;

- substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" and

- The legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Arlington Heights,* 429 U.S. at 264-68.

As shown below, application of the Arlington Heights factors to this case demonstrates that the State's changes to HD90 were motivated by the intent to dilute Latino voting strength in violation of the Fourteenth Amendment.

### 1.  Direct Evidence of Discriminatory Intent

Mr. Burnam recognized, and stated publicly, that Latino voters in HD 90 vote on racial lines.  Rep. Burnam testified that he knew that the growing Latino population in HD90 would make it difficult for him to win Democratic primaries. (FOF 58).   Rep. Burnam largely attributed his loss in the 2014 Democratic Primary to the "demographic shift" in the district, saying, "people mainly tend to vote based on their own personal identity." (FOF 59).

Rep. Burnam tried to discourage Latino candidates from challenging him in the Democratic primary for HD90.  Around 2008 or 2009, Rep. Burnam asked to meet with Mr. Espino, who was then a Fort Worth City Councilmember, and at the meeting tried to dissuade Mr. Espino from running for the seat.  (FOF 53).  Prior to the 2014 Democratic Primary election, Rep. Burnam approached Ramon Romero and attempted to dissuade him from running for State Representative in HD90. (FOF 54).  Rep. Burnam met only with Mr. Romero, and no other potential challengers, to convince him not to run.   (FOF 54).

Mr. Burnam belittled and expressed opposition to Latino voters' support for Latino candidates.  Following his loss in the Democratic primary, Mr. Burnam described himself as "a victim" of "identity politics." (FOF 60).  Mr. Burnam stated that in order to appeal to Latino voters he would have had to transform into a Latino, and stated that a joke in his office was that "if I would just change my name to Leon Bernal there would be no problem" getting Latino votes in HD90. (FOF 61).

Mr. Burnam stated that Latino voter support for Latino candidates was not necessarily in their best interest.  He stated, "it's about identity politics . . . [t]his district is 70% Hispanic and people all over the world tend to vote for people they identify with that's not necessarily in their best interest." (FOF 62).  Mr. Burnam testified that Latino voters who voted for the Latino candidate in the HD90 2014 Democratic primary "unwittingly" voted against their interests. (FOF 63). Mr. Burnam also stated that Latino voters did not vote in their best interest when they supported Latino candidates running in CD33 and SD10.  (FOF 64).

Mr. Burnam maintained that Latino voter support for Latino candidates was the result of manipulation as opposed to considered deliberation on the part of Latino voters.  (FOF 65). When speaking about the 2014 Democratic primary elections in HD90, CD33, and SD10, Rep.

Burnam invoked the stereotype of Latinos as uneducated and easily manipulated by maintaining that Latino voters were "directed and deceived" into voting for Latino candidates and against their own best interest. (FOF 66).

At the same time, Mr. Burnam targeted Latino voters to discourage them from using third party assistance in casting mail ballots and portrayed his primary challenger as a member of a Latino street gang in order to dissuade voters from supporting his primary challenger. (FOF 67-84).

## 2.   The Discriminatory Impact of Changes to HD90 in H358

Rep. Burnam and Mr. Kenny referred to their initial 2013 changes to HD90 (in H328) as a "dilution of the Hispanic voting power in the district." (FOF 96). Rep. Burnam testified that the changes he made from the first version of his amendment to the second, which raised the SSVR to 50.1%, "didn't change the [electoral performance] numbers, but it changed the [SSVR] percentage." (FOF 56).

The Burnam amendment, which was incorporated into H358, reduced the total SSVR of HD90 from 51.1% to 50.1%. (FOF 91). The Burnam amendment changed the result for Latino candidate Hector Uribe's performance in the 2010 Democratic primary for Land Commissioner from winning to losing. Under H283 in HD90, Latino candidate Hector Uribe wins 50.7% in the 2010 Democratic primary for Land Commissioner. (FOF 92). Under H358 in HD90, Latino candidate Hector Uribe loses the primary with 49.97% in the 2010 Democratic primary for Land Commissioner. (FOF 92)).

Mr. Espino testified that the changes made to the boundaries of HD90 by Rep. Burnam's amendment weaken the opportunity for Latinos to elect a candidate of their choice in the Democratic primary and make it more difficult for Latino candidates to win. (FOF 93).   Mr.

Espino further testified that Mr. Romero and other Latino candidates were still vulnerable in HD90 Democratic primary elections because Mr. Romero only won in 2014 by 110 votes. There were other Latino candidates in the 2014 Democratic Primary running for other seats, which contributed to higher Latino turnout that year.  (FOF 99).

Mr. Kenny testified that the Burnam amendment would make it more difficult for Latino voters to nominate their preferred candidate in the Democratic primary if that candidate was Latino.  (FOF 94).  Mr. Jimenez testified that even though HD90 has a slight majority of SSVR, he still thinks that it is difficult for a Latino candidate to win in HD90 under the current plan that includes Como.  (FOF 99).

Moreover, Sansom Park and North Beverly Hills, although not areas with majority Latino voter registration, had a history of electing Latino candidates.  (FOF 98).  The Burnam amendment's replacement of Sansom Park and North Beverly Hills with Como weakened the opportunity for Latinos to elect the candidates of their choice in HD90 in two ways:  Como's higher turnout and strong vote against a Latino candidate outweighed the other neighborhoods' lower turnout and more favorable margins for Latino candidates.  (FOF 98, 346-359).

Mr. Kenny was aware that bringing Como into HD90 could help Rep. Burnam in future primaries, as Rep. Burnam referred to Como as an area with a lot of supporters.  (FOF 95).  Mr. Kenny testified that Rep. Burnam would be happy that Como was back in HD90 during the next primary election.  (FOF 95). Although the areas removed from HD90 were majority Anglo, they had an SSVR of 20.6%, which was significantly higher than the area added to the district, which included Como and had an overall SSVR of 8.5%.  (FOF 97).  As a result, the addition of Como and the removal of portions of Sansom Park and North Beverly Hills had a net effect of lowering the SSVR in HD90.

### 3.      Historical Background

Texas did not engage in consistent decennial redistricting until the U.S. Supreme Court declared in 1964 that malapportioned election districts violate the Fourteenth Amendment. *See Wesberry v. Sanders*, 376 U.S. 1 (1964); *Reynolds v. Sims*, 377 U.S. 533 (1964); s*ee also Kilgarlin v. Martin*, 252 F. Supp. 404, 410 (S.D. Tex. 1966) *rev'd sub nom. Kilgarlin v. Hill*, 386 U.S. 120 (1967).

In every redistricting cycle from 1972 to 2011, Texas enacted one or more statewide redistricting plans that discriminated against Latino voters.  In April and May of 2017, this Court concluded that the State's 2011 redistricting plans for Texas House and Congress discriminated against Latino voters. *Perez v. Abbott*, SA–11–CV–360, WL 1450121, *43 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 85]; *Perez v. Abbott*, SA–11–CV–360, WL 1787454, *78-79 (W.D. Tex. May 2, 2017) [Dkt. 1390 at 164-65].

In 2006, the U.S. Supreme Court struck down the Texas congressional redistricting plan because it diluted Latino voting strength in violation of section 2 of the Voting Rights Act. The Court found that Texas had improperly reduced the voting strength of Latinos in CD23 to protect an incumbent who was not Latino-preferred and noted that the reduction of Latino voting strength bore "the mark of intentional discrimination that could give rise to an equal protection violation." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006).

In the 2001 round of redistricting in Texas, the U.S. Department of Justice objected to parts of the state House plan because they caused an impermissible retrogression in Hispanic voting strength.  (PL Ex. 229, at p. 4).  Specifically, the 2001 state House plan eliminated a Latino district in Bexar County and reduced Latino voting strength in House Districts 35, 38, and 74. (PL Ex. 229 at p. 8).  The federal district court in *Balderas v. Texas*, No. 6:01-CV-158

(W.D. Tex. Nov. 28, 2001), modified the state House plan to remedy the discrimination by Texas.  (PL Ex. 229).

In 1991, the U.S. Department of Justice blocked the state House redistricting plan because it "exhibit[ed] a pattern of districting decisions that appears to minimize Hispanic voting strength through packing or fragmenting Hispanic population concentrations unnecessarily."  (PL Ex. 1102 at 3).   The U.S. Department of Justice found that:   the redistricting plan reduced Latino voting strength in a House district in El Paso in order to protect a white incumbent; in Cameron and Hidalgo counties the redistricting plan reduced the Latino voting strength of a Latino district to protect a white incumbent; in Bexar County the redistricting plan packed Latino voters into HD118 and reduced Latino voting strength in HD117 to 50.9% HVAP; in South Texas the redistricting plan drew House districts in an east-west manner which over-concentrated Latino voting strength in districts to the south;  and in Dallas County the redistricting plan reduced Latino voting strength in the one Latino majority district. (PL Ex. 1102 at 3-4).

In 1982, the U.S. Department of Justice blocked the Texas congressional redistricting plan because it diluted Latino voting strength.  Specifically, the plan created two adjacent congressional districts in South Texas, one of which was 80.4% Mexican American and the other which was 52.9% Mexican American. (US Ex. 226).   In 1982, the U.S. Department of Justice also blocked the state Senate redistricting plan because it "unnecessarily fragment[ed] minority concentrations in such a manner as to dilute the voting strength of the minority communities."  (PL Ex. 1099 at 2).  The U.S. Department of Justice found that in Bexar County the state Senate plan removed a substantial number of Mexican Americans and added a

larger number of Anglos to an underpopulated district and diluted Latino voting strength.   (PL Ex. 1099 at 2-3).

In 1976 the U.S. Department of Justice blocked the Texas House redistricting plan because it fractured Latino voting strength in Nueces County.  (PL Ex. 1100).  That same year, the U.S. Department of Justice also blocked the Texas House redistricting plan because it fractured minority voting strength in Jefferson and Tarrant counties.  (PL Ex. 1101 at 2-3).

In 1973, the U.S. Supreme Court invalidated the Texas House plan because it discriminated against Latino and African American voters in violation of the Fourteenth Amendment to the U.S. Constitution.  *White v. Regester*, 412 U.S. 755 (1973).  (2011 Tr. at 434:21-435:4)

In the 1980's and 1990's, the U.S. Department of Justice interposed Section 5 objections to Texas election laws beyond redistricting, including:  the adoption of at-large voting for hospital districts (1989); failure to provide Spanish language versions of registration forms and instructions (1995); and allowing agency employees to reject voter registration applications (1995).  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 30, ¶ 188] (U.S. Ex. 234)).

The history of redistricting in Texas demonstrates that the State has consistently used legislative line-drawing to minimize the opportunity of Latinos to elect the candidates of their choice.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 30-35, ¶¶ 189-229]).

In Tarrant County, from the 1970s to the 1990s, a group known as the "Seventh Street Gang" recruited and supported Anglo candidates for elected office across the Fort Worth area. (FOF 100).  The membership of the "Seventh Street Gang" was predominantly Anglo.  (FOF 100).

From its creation in 1983 through 2014, HD90 was represented by Anglo state representatives -- Doyle Willis and later Lon Burnam.  (FOF 100).

Lon Burnam first won election to represent HD90 in 1996 after defeating a Latino opponent, Francisco Hernandez, in a runoff election.  (FOF 102).

When an informal group of Latino leaders formed in the late 1990s and early 2000s to recruit and advise Latino candidates in Fort Worth, Rep. Burnam visited a meeting of the group to deter the members' ongoing efforts to elect Latino local officials.  At that meeting, Mr. Burnam asserted that he could represent HD90 better than any Latino candidate that the group could recruit.  The discussion grew heated, and Mr. Burnam was asked to leave the meeting.  (FOF 103-06).

### a.    The 2011 Legislative Session

As the Texas Legislature took up redistricting in the 2011 session, Latino leaders in Ft. Worth wanted HD90 to be a majority Latino district so that it could nominate and elect the Latino preferred candidate.  (FOF 105).

Rep. Burnam testified that the 2011 redistricting cycle was probably the first cycle in which HD90 could be created as a Latino majority district, explaining "This round was probably the first time it could have actually occurred."  (FOF 113).

Rep. Burnam's goal was to move himself out of HD90 into a different Democratic district.  Rep. Burnam testified that he wanted to place his residence in a non-Latino majority district and create a separate Latino-majority district in Tarrant County.  (FOF 114).  Rep. Burnam wanted to place Diamond Hill, Riverside, the Northside neighborhoods, historically Latino Southside neighborhoods, and much of the Polytechnic Heights neighborhood into a new Latino majority district in which he did not reside.  (FOF 115).

93

However, when the 2011 redistricting process started in the Legislature, Rep. Burnam changed his approach.  The desired district boundaries provided by Rep. Burnam to the redistricting point person for the Tarrant County delegation, Rep. Charlie Geren, kept Rep. Burnam's home in a Latino HD90 but lowered Latino voting strength in the district.  In H113, which Rep. Geren testified contained HD90 as proposed by Rep. Burnam, the HCVAP was reduced from 47.9% to 43.2%.  (FOF 116).

In his retrogression memos of April 7 and April 12, 2011, David Hanna advised Bonnie Bruce, Gerardo Interiano and Ryan Downton that the reduction of SSVR in HD90 could potentially create a retrogression issue. Mr. Hanna recommended that the redistricters restore the SSVR of HD90, explaining "further consideration should be given to see whether the level of SSVR in the proposed plan can be raised to come closer to the level in the current plan."  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 124, ¶ 812]).

In response to H113, on April 14, 2011, the Texas Latino Redistricting Task Force proposed H115.  In H115, HD90 had a 51.7% HCVAP using 2005-2009 ACS data.  HD90 also had a 46.8% total SSVR and 48.9% non-suspense SSVR.  (FOF 118).

On April 17, 2011, Rep. Solomons released a statewide substitute to his Plan H113 which increased the 2010G non-suspense SSVR to 50.1% for HD90.  Rep. Solomons' substitute plan was Plan H134.  (FOF 120).  When Rep. Burnam became aware of the map he was upset.  (FOF 121).

Gerardo Interiano, Counsel to Speaker of the House, testified that when the SSVR of HD90 was raised to 50%, Rep. Burnam "all of a sudden opposed the map."  (FOF 122).  Mr. Interiano further testified that he knew the changes to HD90 increased Latino voting strength because "[t]hose two facts together, that MALDEF wanted it done and that Representative

94

Burnam did not want it done, told me that in District 90, as a result of increasing it above 50 percent SSVR, Hispanics were going to have a much better ability to elect their candidate of choice, which could ultimately lead to Representative Burnam losing in a primary, should a Hispanic candidate from that community run against him."  (FOF 122).

After Chairman Solomons raised the SSVR of HD90, Mr. Hanna removed the concern about HD90 from his retrogression analysis.  Mr. Hanna did not characterize HD90 in the enacted plan as a "new" Latino opportunity district. (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 125, ¶ 817]).

Following passage of the House redistricting plan out of committee, Rep. Burnam tried twice more, unsuccessfully, to amend the boundaries of HD90 to reduce the SSVR and bring the neighborhood of Como back into HD90.  Mr. Interiano testified that Rep. Burnam "wanted the community of Como to be put back into the district. . . And it was my belief that if that community were to be put back into the district[], first of all, it decreased it below 50 of SSVR and, ultimately, the African-American community would vote against the Hispanic candidate of choice."  (FOF 123).

A Como resident who was paid by Mr. Burnam in his political campaigns wrote a letter to Rep. Geren with "almost threatening language" saying that Como should be put back in HD90. (FOF 130, 132).  That same resident called Mr. Geren to say "we're going to be a pain in your butt if you represent us."  (FOF 131).

The final version of HD90 enacted by Texas in 2011 contained a majority HCVAP and SSVR (Plan H283).   Texas also claimed, improperly, that HD90 was an offset for the elimination of HD33 in Nueces County.  The court-drawn interim redistricting plan for the

Texas House carried forward the boundaries of HD90 as they were enacted in H283. (FOF 144).

In the ensuing 2012 election cycle, Rep. Burnam drew a Democratic primary opponent for the first time since winning the office in 1996. (FOF 138). Rep. Burnam's opponent in the 2012 Democratic primary was Carlos Vasquez, a Latino. (FOF 138).

Rep. Burnam believed that the changes to HD90 in 2011, which increased the Latino population in his district, created the potential for him to be challenged by a Latino opponent in the primary. (FOF 139).

In the 2012 Democratic Primary election, Rep. Burnam defeated his Latino opponent Mr. Vasquez by only 159 votes. (FOF 140).

Voting in the 2012 Democratic Primary for HD90 was racially polarized. (FOF 142). Rep. Burnam generally won the non-Latino voter registration majority precincts, and Latino candidate Carlos Vasquez generally won the Latino voter registration majority precincts. (FOF 141).

Rep. Burnam knew that he was not the Latino candidate of choice in the 2012 Democratic primary election. (FOF 143).

### 4.  Sequence of Events Leading up to the Challenged Decision

The specific sequence of events leading up to the creation of HD90 in H358 and the amendment's legislative history reveal that the Burnam amendment was drawn behind closed doors with the goal of limiting Latino voting strength, and was subsequently reviewed by legislative leadership before Chairman Darby urged the House membership to adopt the amendment.

Although then-Attorney General Greg Abbott urged the Texas Legislature to adopt the court-drawn interim plans for Congress and State House, the 2013 Regular Session ended without legislators holding a hearing in the House Redistricting Committee or enacting a bill. (FOF 145-50).

Then-Governor Perry issued a call for a special session to "consider legislation which ratifies and adopts the interim redistricting plans ordered by the federal district court as permanent plans for districts used to elect members of the Texas House of Representatives." (FOF 151).

Rep. Burnam specifically asked Mr. Kenny to draw a map that placed Como back into HD90.  (FOF 158).  Mr. Kenny was aware that bringing Como into HD90 could help Rep. Burnam in future primaries, as Rep. Burnam referred to Como as an area with a lot of supporters.  (FOF 158). Mr. Kenny conceded that Rep. Burnam would be happy that Como was back in HD90 during the next primary election.  (FOF 158).

Rep. Burnam secured the agreement of Rep. Geren to swap geography between their two districts. (FOF 163).  Rep. Geren was aware that Rep. Burnam had faced a primary opponent in 2012 because Rep. Burnam had asked Rep. Geren to help him raise money for the race.  (FOF 166).

Rep. Burnam communicated with Chairman Darby about his plans to amend HD90 several times before the House redistricting bill was considered on the floor.  (FOF 168). Chairman Darby testified that he was aware of Rep. Burnam's amendment prior to consideration of the redistricting bill on the House floor.  (FOF 173).

Rep. Burnam testified that Chairman Darby was "fixated" on the number of Latino voters being at 50.1%.  (FOF 174).  Rep. Burnam testified that his proposed first draft, H328,

did not get discussed on the house floor because it did not meet that criteria.  (FOF 174).  In order to raise the SSVR in HD90 above 50%, Rep. Burnam and Mr. Kenny created a second map in which the goal was to remove "every white voter near the western boundary of the district to keep the Hispanic vote over 50%." (FOF 176).

In total, Rep. Burnam and Mr. Kenny split ten precincts to draw HD90's new boundaries. (FOF 177). Mr. Burnam also testified that he moved whole precincts into and out of HD90 because of their race: 1674 and 1062 were excluded and 1434 and 1408 were included.  (FOF 178).

The total population of the precincts split or moved whole because of race by Rep. Burnam's amendment is 33,343 individuals, including an estimated 16,429 registered voters. (2017 Task Force Exs. 3-H, 3-J, 40, 66, 69 and 70).

These changes were incorporated into what became Rep. Burnam's Plan H342. (FOF 182).  On June 20, 2013, the full House considered the redistricting bill on the House Floor. That say day, Rep. Burnam made public and filed Plan H342, which had a 2012G total SSVR of 50.1%.  (FOF 183).

Despite the Attorney General's request that the Legislature pass the court-drawn plans, The House adopted four amendments to Chairman Darby's bill.  Then the House considered Rep. Burnam's Plan H342.  (FOF 145, 188).

Rep. Burnam introduced his amendment on the House floor with the following comment: "basically what it does is take the African American and Hispanic population out of Representative Geren's district and puts some of my Anglo population into his district. I believe it's acceptable to the author [Chairman Darby]."  (FOF 189).

During consideration of the Burnam amendment on the House floor, Chairman Darby addressed the House: "Members, Representative Burnam has revised his amendment and it now keeps this district a Hispanic district--brings the numbers back over 50%. That was the objection. I believe Representative Geren is in favor of this amendment also, so with that I would move to accept this amendment."  (FOF 190).

Chairman Darby invoked legislative privilege and did not provide any further testimony on why he believed this revision cured the objection to the original Burnam amendment.  (FOF 191).

Although Chairman Darby considered the redistricting bill to be a "major piece of legislation," there was no calendar rule attached to the bill.  (FOF 192). Calendar rules usually require floor amendments to be filed twenty four hours ahead of time, which allows members of the public and other members of the Legislature time to review and comment on proposed amendments.  (FOF 192).

The House adopted Rep. Burnam's amendment, Plan H342, on June 20, 2013.  (FOF 193). In that plan, HD90 had a 2012 total SSVR of 50.1% which was lower than the SSVR in the Court-drawn plan.  (FOF 193).  The House only adopted one additional amendment the next day on third reading of the bill, which "simply . . .  switched a few voters in [Toni Rose's] district for a few voters in the district of Representative Helen Giddings."  (FOF 196).

Because Rep. Burnam introduced his amendment on the House floor, the amendment was adopted without consideration in committee and without the opportunity for public testimony.  (FOF 194).

On June 22, 2013, the Texas Latino Redistricting Task Force wrote a letter to Chairman Darby and Senate Redistricting Committee Chairman Kel Seliger to express objections to the

99

Burnam amendment's changes to HD90.  (FOF 197).  The Task Force wrote that "H358 reduces Latino voters' ability to elect their candidate of choice in HD90."  (FOF 197).  The Task Force letter informed the two committee chairmen that Plan H358 resulted "in a decrease in the SSVR of HD90 from 51.1% to 50.1%" because the plan removed a population with an SSVR of 20.6% and replaced it with a population with an SSVR of only 8.5%.  (FOF 197).

Chairman Darby made no attempt to discuss this letter with Chairman Seliger.  (FOF 198).  Chairman Darby invoked legislative privilege to avoid answering whether he took any action regarding the Task Force's letter.  (FOF 198).

The Senate concurred with the House amendments to SB 3 on June 23, 2013.  (FOF 199).  Senator Seliger testified that his approach was to defer to the House and adopt SB 3 as amended by the House, because that plan pertained to the redistricting of Texas House seats. (FOF 199).

The governor signed SB 3 on June 26, 2013.  (FOF 201).

### 5.  Departures from the Normal Procedural Sequence

The Texas Legislature departed from the normal procedural sequence by taking up the Governor's call to adopt the court-drawn plans, then modifying those plans.  Even members debating the redistricting bill on the House floor did not understand the sudden change in course.  Following the adoption of Amendments 1, 2, 3, and 4, Rep. Jim Keffer (R) expressed his confusion about the amendments accepted by Chairman Darby because of the narrow call of the legislative session.  Rep. Keffer had served on the Redistricting Select Committee and stated that "[he] was under the impression when [they had] left the lines, because of the narrow call— because of future issues that will come up concerning the map—that any line or any change that was made would open the door for other problems or other issues that might arise as far as the San Antonio court . . . "  (FOF 204).

Nevertheless, Chairman Darby proceeded to take amendments, claiming that it was the Legislature's inherent right to adopt and be a part of the redistricting process, not to simply "cede our state's responsibilities back to the federal government."  (FOF 205).

The Legislature further departed from the normal procedural sequence of making amendments public and providing an opportunity for public comment.  On June 18, 2013, the House Redistricting Committee passed the Senate version of the bill, SB3, out of committee without amendments and without the opportunity for public comment.  (FOF 207).  Because the Burnam amendment was a floor amendment, it was not considered at any of the redistricting field hearings or in committee, or made public before the day of the floor debate.  (FOF 208). Community members in HD90 did not know that Rep. Burnam would propose a change in HD90's configuration.  (FOF 208).

Although Chairman Darby considered the redistricting bill to be a "major piece of legislation," there was no calendar rule attached to the bill. (FOF 206).  Calendar rules usually require floor amendments to be filed twenty-four hours ahead of time, allowing members of the public and other members of the Legislature time to review and comment on proposed amendments.  (FOF 206).  Without a calendar rule, Rep. Burnam's amendment was not made available for public comment.  (FOF 206).  The Senate concurred with House Plan SB 3 on June 23, 2013, the same day that it was taken up in the Senate. (FOF 209).  There was no opportunity for the public to come to a hearing and comment on the amended version of SB 3.  (FOF 209).

The Legislature also departed from the normal procedural sequence when the House redistricting committee refused to amend the bill, then Chairman Darby announced he would take amendments on the floor, then the Legislature only accepted one amendment after the Burnam amendment. (FOF 203-205, 210-211).

Finally, the Legislature also departed from the normal procedural sequence by restricting access to legal advice from the Texas Attorney General's office. During a short recess on June 20, 2013, after the House adopted Rep. Burnam's amendment, members of the House Republican Caucus met with a representative from the Texas Attorney General's Office. (FOF 213). The Democratic Caucus was not invited to or present at that meeting, despite the fact that Democratic and minority legislators had asked Chairman Darby multiple times to speak with a representative of the Attorney General's office. (FOF 213).

### 6.      Departures from Normal Substantive Considerations

The Texas Legislature departed from normal substantive considerations by failing to review the Burnam amendment for its effects on Latino opportunity to elect. A legislature always has an affirmative duty to ensure that the plans it adopts comply with the federal Voting Rights Act and the Constitution, even when it adopts preliminary redistricting plans drawn by a court. Where, as in the case of HD90, the Legislature considered changes to the Court drawn plan, the obligation to ensure compliance with the Voting Rights Act and the Constitution was even greater because a court had not given even preliminary consideration to the proposed new boundaries.[9]

On the House floor, Chairman Darby declared that he would only accept amendments to the House redistricting bill that did not dilute or dismantle districts that were protected under Section 2 of the Voting Rights Act. (FOF 223).

However, aside from being "fixated" on the number of Latino voters being at 50.1%, Chairman Darby did not perform or request any functional electoral analysis of Rep. Burnam's

---

[9] This paragraph responds to question 13 of Questions from the Three-Judge Panel to be Addressed at the Conclusion of Trial (Dkt. 1494).

proposed changes to HD90. (FOF 224).  Rep. Burnam did not recall any conversations with Chairman Darby about how the proposed changes to HD90 would affect the Latino ability to elect their preferred candidate. (FOF 225).

Chairman Darby did not testify whether he looked at voting patterns in the Democratic primary election of HD90, invoking legislative privilege. (FOF 226). Chairman Darby did not testify regarding his understanding of the Burnam amendment's effect on Latino voting ability in HD90, invoking legislative privilege. *Id.* Rep. Burnam testified that Rep. Geren also did not inquire about Latino ability to elect beyond the 50% SSVR threshold. (FOF 227).  Rep. Burnam himself claimed he did not examine the effect of his changes on Latinos' ability to elect candidates of their choice. (FOF 228).

On June 20, 2013, in his opening remarks on the House Floor on the consideration of amendments to SB 3, Chairman Darby did not discuss analyzing the electoral impact of proposed amendments. (FOF 229).  In his floor statements, Chairman Darby did not discuss analyzing the effect of proposed amendments on the ability of minorities to elect their candidate of choice or analyzing whether there was racially polarized voting in the affected areas.  (FOF 230-31).

Nevertheless, Chairman Darby testified that he was "vaguely" aware that Texas had been found to violate the Voting Rights Act or the Constitution in previous redistricting cycles.  (FOF 232-36).

During the House floor debate, when questioned by a colleague about whether taking amendments could jeopardize the legal status of the House redistricting plan, Chairman Darby responded by saying that the amendments being considered "don't have any implications with regard to Section 2 of the Voting Rights Act or the constitution."  (FOF 240).

The Legislature also departed from using traditional redistricting criteria such as avoiding splitting precincts and communities of interest.  The Court-drawn Plan H309, that Rep. Burnam amended, did not split any precincts in HD90.  (FOF 214).  The Burnam amendment split ten precincts in drawing HD90's new boundaries.  (FOF 215).

Rep. Burnam's amendment also cut out portions of the City of Sansom Park, including by splitting precincts 4073 and 4593, in order to remove Anglo-majority blocks while maintaining Latino-majority blocks.  (FOF 216).

Rep. Burnam specifically outlined how he split precincts 4125, 4068, 4493, 4634, and 1015 in order to include Latino-majority blocks and to exclude Anglo-majority blocks. (FOF 217).  Rep. Burnam admitted that he made these changes for the sole purpose of including Latino-majority blocks in the district and excluding Anglo-majority blocks.  (FOF 218).

Mr. Kenny testified that he reviewed the cut to precinct 4125 with Rep. Burnam and told Rep. Burnam that cutting 4125 in order to draw more Latinos into HD90 would be "ugly." (FOF 219).  Rep. Burnam did not express concern with the "ugly" cut and instead said that the cut was "great" because it brought more Latinos into HD90.  *Id.*

Rep. Burnam testified that while he believed that Rep. Geren was aware of the split precincts created by the Burnam amendment, Rep. Geren did not ask about them. (FOF 220). Although Como precinct 1120 was historically part of HD90, it was also located significantly to the west of the urban core of Ft. Worth.  (FOF 221).  In his amendment, Rep. Burnam was forced to use largely unpopulated precincts from HD97 as land bridges to reach Como in order not to further decrease Latino voting strength in HD90.  *Id.*

The Legislature further departed from normal substantive considerations in taking amendments to the court-drawn interim plan.  If the purpose of the special legislative session

was to provide a legal safe harbor for Texas by enacting the court-drawn interim plans, Texas departed from that substantive goal by amending H309.

### 7. The Factors set out in *LULAC v. Perry* Support a Finding of Discrimination

In *LULAC v. Perry*, the Supreme Court observed that in CD23 "the State took away Latinos' opportunity because Latinos were about to exercise it" and that the revision of CD23 "bears the mark of intentional discrimination that could give rise to an equal protection claim." *LULAC*, 548 U.S. at 440.  The factors identified by the Supreme Court in *LULAC v. Perry* as indicative of intentional discrimination are present in the revisions to HD90 in H358.

First, Latino voters in HD90 "were poised to elect their candidate of choice."  *LULAC*, 548 U.S. at 438.  The incumbent, who was not Latino preferred, had been challenged in the 2012 Democratic primary and held on to his seat by only 159 votes.  (FOF 140).

Second, Latinos in HD90 "were becoming more politically active."  *LULAC*, 548 U.S. at 438.  In HD90, the HCVAP was close to 50% and the SSVR was 45%.   (FOF 105, 111).  Increased voting by Latinos threatened the incumbent.

Third, the changes to HD90 reduced Latino voters' ability to elect their candidate of choice.  *LULAC*, 548 U.S. at 424-25, 427.  (FOF 90-99).

Fourth, the Burnam amendment intentionally drew HD90 to have a nominal majority for political reasons.  *LULAC*, 548 U.S. at 424-25.  Rep. Burnam crafted HD90 with 50.1% SSVR but conceded that the increase in SSVR did not change the political performance of the district which favored Rep. Burnam's reelection. (FOF 51, 357). Chairman Darby was "fixated" with raising the SSVR in HD90 but did not examine any effect of the new district boundaries on Latino opportunity to elect.  (FOF 174, 224).

**8.      The Voting Rights Act Prohibits Intent to Dilute Latino Voting Strength in General Elections as well as Democratic Primary Elections**

The fact that the changes to HD90 in H358 were driven by intent to dilute Latino voting strength in the Democratic Primary does not make vote dilution legal or permissible in any way. Section 2 of the Voting Rights Act specifically protects Latino voters' right to equal opportunity in the "the political processes leading to *nomination or election* in the State or political subdivision[.]" 52 U.S. Code § 10301(b) (emphasis added).

The process of electing a candidate of choice to the Texas House of Representatives includes both the primary and general election.  In order to be elected, a Latino candidate of choice must first prevail in the primary election then win the general election.

Dr. Engstrom testified that primary elections are significant because the Latino candidate of choice can be eliminated or filtered out from the competition at the primary phase.  (FOF 279).  If the Latino candidate of choice were defeated in the primary election, then Latino voters would not have the opportunity to elect their candidate of choice in the general election, even if Latinos ultimately voted for the general election winner.  *Id.*  Dr. Engstrom testified that, in such a situation, he would not consider the general election winner to be the Latino candidate of choice, because the Latino candidate of choice would already have been filtered out of the competition.  (FOF 280).

Dr. Alford similarly testified that simply looking at a general election fails to consider whether the minority voters were able to nominate their candidate of choice during the primary.  (FOF 284).  Dr. Alford testified that looking at primary elections is useful to determine whether that preliminary process of nominating a candidate might block or filter out the actual candidate of choice. *Id.*  Dr. Alford testified that by not looking at Latino voters' ability to advance their

candidates of choice out of primary elections, "the Hispanic population is being used as filler" to elect non-Hispanic Democrats.  (FOF 285).

Dr. Alford considered it ironic that the growing Latino population in Texas could be used to justify redrawing districts that would not create true Latino opportunity districts because Latino voters would not be able to advance their candidates of choice out of Democratic primaries.  (FOF 286).  He stated that failing to look at Latino ability to elect in primary elections is "missing precisely the point that everyone was concerned about at the beginning of this, [which] is how could a new plan fail to represent -- how could you have divided the state so as to not represent all that Hispanic growth?" *Id.*

To explain why it is important to analyze a minority group's ability to nominate their candidate of choice, Dr. Alford provided the following example: "in the old south, blacks and whites voted Democratic in the general election, even though, in that election, the Democrats that blacks were voting for were not, for the most part, individuals favorable to the interests of blacks in the south."  (FOF 289).

Dr. Alan Lichtman, who testified as an expert witness for the Quesada plaintiffs, testified that a minority group must be able to nominate its preferred candidate in the party primary in order for the district to be considered an opportunity district. (FOF 287, 294-98).

Dr. Andres Tijerina, who testified for the Task Force Plaintiffs regarding the historical experience of Mexican Americans in Texas, presented evidence regarding the use of the White Man's Primary in Texas in the early 1900's to deny Latinos the opportunity to elect their candidate of choice. (FOF 299).

Dr. Tijerina explained that the Progressives "used the 'White Man's Primary' to exclude Mexican American voting in the Democratic Primary elections, which in a one-party state, pre-

empted the general election."  (FOF 300).   Dr. Tijerina quoted the Carrizo Springs Javelin in

June 12, 1914 describing the success of the Dimmit County White Man's Primary Association:

"[it] absolutely eliminates the Mexican vote as a factor in nominating county candidates, though

we graciously grant the Mexican the privilege of voting for them afterwards."   (FOF 301).

### D. HD90 IN PLANS H358 DISCRIMINATES IN EFFECT AGAINST LATINOS IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS        ACT,        42 U.S.C. 1973, *et seq*

#### 1. *Gingles* 1: Latinos are Sufficiently Numerous and Compact to Constitute the Majority of HD90

As demonstrated by the configuration of HD90 in H115, H283/309 and H292, Latinos in

Tarrant County are sufficiently numerous and compact to constitute the CVAP majority of a

state house district.  *See Gingles*, 487 U.S. at 50-51; *Johnson v. DeGrandy*, 512 U.S. 997, 1008

(1994) ("When applied to a claim that single-member districts dilute minority votes, the first

*Gingles* precondition requires the possibility of creating more than the existing number of

reasonably compact districts with a sufficiently large minority population to elect candidates of

its choice.")[10]  HD90 in Plan H283/309 contained an HCVAP of 54.4% (+/- 1.8%) according to

the U.S. Census 2011-2015 ACS. (FOF 243).  Thus, the first *Gingles* precondition is satisfied.

*See Gingles*, 487 U.S. at 50-51; *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994); *see also See*

*Bartlett v. Strickland*, 556 U.S. 1, 12 (2009); *Campos v. City of Houston*, 113 F.3d 544, 548 (5th

Cir. 1997); *Valdespino v. Alamo Heights Indep. Sch. Dist*., 168 F.3d 848 (5th Cir. 1999).

---

[10] Although the *Gingles* test was developed in litigation over an at-large election system, it also applies in redistricting cases where a plan is challenged for failure to draw a sufficient number of majority minority districts.  *Growe v. Emison*, 507 U.S. 25, 39-41 (1993).

This Court has already found that HD90 is not packed, *i.e.* there is not the possibility of creating an additional HCVAP majority district in Tarrant County. *See Perez v. Abbott*, SA–11–CV–360, WL 1450121, *36 (W.D. Tex. Apr. 20, 2017) [Dkt. 1365 at 71].

### 2. *Gingles* 2 and 3: Racially Polarized Voting

The State concedes that voting is racially polarized in Texas (with the caveat that the State is not prepared to concede that there is racially polarized voting in Nueces and Kleberg counties). (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 93-94]).   Dr. Alford, the State's expert, testified in 2014 that he did not do any work on matters related to the State House and in 2017 offered no independent analysis of voting in Tarrant County House elections (relying instead on the Task Force expert's conclusions). (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 18];*see also* Ex. E-17; 2017 Defendant Ex. 878 at 9-10).

Prong two of the *Gingles* test requires plaintiffs to demonstrate that Latinos are politically cohesive, while *Gingles* prong three requires plaintiffs to demonstrate that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate. *See Gingles*, 478 U.S. at 51.   In practice, the two inquiries merge into the concept of racially polarized voting. *See, e.g.*, *E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991).

Racially polarized voting is a practical inquiry into whether racial voting patterns impede the election of minority-preferred candidates.   Thus, the Supreme Court noted in Gingles, "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Gingles*, 478 U.S. at 50.  Similarly, the standard for bloc voting is whether "the white majority votes *sufficiently as*

*a bloc* to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, to defeat the minority's preferred candidate." *Id.* (emphasis added) (internal citations omitted).

In the *Gingles* analysis, political cohesion is judged "primarily on the basis of the voting preferences expressed in actual elections." *Gomez v. City of Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988). Evidence of racially polarized voting "establishes both cohesiveness of the minority group and the power of white bloc voting to defeat the minority's candidates." *Id.* at 1415 (citing *Collins v. City of Norfolk*, 816 F. 2d 932, 935 (4th Cir. 1987)) (internal quotation marks omitted). Whether Latinos are cohesive is not a question to be determined "prior to and apart from a study of polarized voting." *Campos v. City of Baytown*, 840 F. 2d 1240, 1244 (5th Cir. 1988).

Because ballots are secret, experts estimate group voting behavior using statistical analyses. One such analysis is ecological inference. The Latino Redistricting Task Force Plaintiffs' expert, Dr. Richard Engstrom, used ecological inference to measure the presence of racially polarized voting. (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 110, 165-168]). "[Ecological inference] is similar to [ecological regression], but abandons the assumption of linearity that ER relies upon." *Benavidez v. City of Irving, Tex.*, 638 F.Supp.2d 709, 724 (N.D. Tex. 2009). "This methodology was developed subsequent to the *Gingles* decision, and was designed specifically for the purpose of arriving at estimates in this type of case." *Id.* (crediting testimony of Dr. Richard Engstrom).

The State's expert witness, Dr. John Alford, expressed "faith in Dr. Engstrom and . . . confidence that [ecological inference] would give us the most stable picture we could get." (2011 Tr. 1859:3-4). Ecological inference is an accepted method of analysis. *See, e.g.*,

110

*Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 768 (S.D. Tex. 2013); *Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 723 (N.D. Tex. 2009); *Jamison v. Tupelo, Mississippi*, 471 F. Supp. 2d 706, 713 (N.D. Miss. 2007); *United States v. Village of Port Chester,* No. 06 Civ. 15173(SCR), 2008 WL 190502, at *11 (S.D.N.Y. Jan. 17, 2008); *United States v. City of Euclid,* 580 F. Supp. 2d 584, 596 (N.D. Ohio 2008).

Dr. Engstrom analyzed racially contested elections because they provide the most probative evidence of racially polarized voting.  *See Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993) ("This court has repeatedly stated that, when statistical evidence is used to establish legally significant white bloc voting, the most probative elections are generally those in which a minority candidate runs against a white candidate." (citing *Westwego Citizens for Better Gov't v. City of Westwego,* 872 F.2d 1201, 1208 n.7 (5th Cir. 1989)).  The State's expert, Dr. Alford, agreed that elections in which both candidates are Anglo not do not reveal anything about the impact of ethnic voting, because Latinos cannot express an ethnic preference when there are two white candidates opposing each other.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  162]).[11]

Dr. Engstrom analyzed voting patterns in Tarrant County, among other areas of Texas. (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  113-152]).

In order to tailor his inquiry most closely to voter behavior, Dr. Engstrom used 2012 and 2010 data on voters who cast ballots derived from polling place sign-in sheets and matched by the Texas Secretary of State to Spanish-surnamed voter lists.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  111]).  For earlier years, Dr. Engstrom relied on data showing the

---

[11] This paragraph also responds to the Court's question number 20 in Questions from the Three-Judge Panel to be Addressed at the Conclusion of Trial (Dkt. 1494).

number of Spanish-surnamed and non-Spanish-surnamed voters in each precinct.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  111]).  Dr. Engstrom also performed a multivariate analysis which relied on citizen voting age population by precinct in order to estimate candidate preferences of Latinos, African Americans and Others (primarily Anglos).  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  111]).  Dr. Engstrom conducted bi-variate and multivariate analysis in Tarrant County.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 165]; Ex. E-7, Engstrom Corr. Rebuttal Report at 25; 2017 Task Force Ex. 48 at 10-11).

Dr. Alford, the State's expert witness, stated that "Engstrom's analysis uses the best combination of modern statistical techniques and quality data."  (Ex. E-17, Alford Expert Report, at 11).  For his study, Dr. Engstrom examined exogenous and endogenous elections, both of which provide important information when determining whether voting is polarized along racial lines.  *See Magnolia Bar Ass'n v. Lee*, 793 F. Supp. 1386, 1399 (S.D. Miss. 1992), *aff'd*, 994 F.2d 1143 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 555 (1993); *Westwego Citizens for Better Gov't. v. Westwego*, 946 F.2d 1109, 1120 n.15 (5th Cir. 1991); *E. Jefferson Coalition for Leadership Dev. v. Parish of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991); *see also Rangel v. Morales*, 8 F.3d 242, 247 (5th Cir. 1993) (district court erred by failing to consider exogenous elections "when it had only one endogenous election from which to consider the third *Gingles* factor").  The exogenous elections analyzed by Dr. Engstrom included racially contested statewide elections held from 2006-2016.

The State's expert, Dr. Alford, testified that he respected Task Force expert Dr. Engstrom's ecological inference methods and his 2017 report on racially polarized voting.  (FOF 256).  Dr. Alford testified that Dr. Engstrom's analysis spanning 2006 to 2016 across various reports is reliable.  (FOF 257).  Dr. Alford testified that Dr. Engstrom's analysis is broad in both

its geographic and temporal scope.  (2017 Trial Tr. 1425:19-21; 2017 Defendant Ex. 878 at 11 (Alford Report)).  According to Dr. Alford, Dr. Engstrom "did the best job of covering geography and using the best methodology."  (2011 Trial Tr. 1765:8-16 (Alford)).

Dr. Alford, testified that Dr. Engstrom is prominent in his field, that his report is credible and that Dr. Engstrom chose a good methodology to use in his report.  (2011 Trial Tr. 1858:16-1859:9 (Alford)).  The State's expert witness, Dr. Alford, built the table in his report around Dr. Engstrom's results.  (2011 Trial Tr. 1765:8-16 (Alford)).

With respect to exogenous elections in Tarrant County, Dr. Engstrom concluded that Latinos voted cohesively in general and primary elections.  (FOF 262-277; 2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  96, 101-112, 113-152]).  He further concluded that in general elections, Latino preferences are shared by African Americans but not by others.  In the Democratic primary elections, Latino preferences were not consistently shared by the rest of the primary voters.  (FOF 96, 101-112, 113-152 (2011 Trial Tr. 507:8-18 (Engstrom)); 2017 Task Force Ex. 48).

### a. The Importance of Primary and Non-Partisan Elections in Evaluating Racially Polarized Voting

It is well-settled that triers of fact in voting rights cases examine primary elections when evaluating whether voting is racially polarized.  For example, the U.S. Supreme Court in *Gingles* reviewed and approved of the district court's examination of primary elections as well as general elections.  *Thornburg v. Gingles*, 478 U.S. 30, 58–61 (1986) (approving of district court's review of 16 primary elections to conclude that "black voters' support for black candidates was overwhelming in almost every election [and] on average, 81.7% of white voters did not vote for any black candidate in the primary elections").

In a series of cases striking down White Primary laws in Texas, the U.S. Supreme Court rejected the argument that "[p]rimaries . . . are political party affairs" and because "officers of government cannot be chosen at primaries [the 14th, 15th and 17th] Amendments are applicable only to general elections where governmental officers are actually elected." *Smith v. Allwright*, 321 U.S. 649, 657 (1944); *see also Nixon v. Herndon*, 273 U.S. 536 (1927), *Nixon v. Condon*, 286 U.S. 73 (1932). Instead, the Court held that "the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution." *Id.* at 661–62.

The racially polarized voting analysis asks whether those who cast ballots do so in a polarized manner. Because elections are decided by those who turn out to vote, voting is polarized or not because of the behavior of voters who cast ballots. It impossible to determine whether those who do not vote would vote in a polarized manner, and it is inappropriate to look beyond actual votes cast to suggest that non-voters would vote differently than voters in actual elections.

*Johnson v. De Grandy*, 512 U.S. 997 (1994), does not undermine this proposition. In *De Grandy*, the Supreme Court declined to require that more majority minority districts be included in a redistricting plan because there was already a proportionate number of majority minority districts. At the same time, *De Grandy* affirmed the remedial purpose of majority minority districts. *De Grandy*, 512 U.S. 997, 1020 (1994) (recognizing that "the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity").

Although *DeGrandy* observed that in Anglo majority districts, minority voters can "pull, haul, and trade" to elect a second choice candidate, (*id.*), *De Grandy* does not stand for the

proposition that the Voting Rights Act contemplates minority voters electing their second or third choice candidate in opportunity districts. Quite the opposite, *DeGrandy* stands for the proposition that minority voters should have the opportunity to elect their preferred candidate when the section 2 factors are met.

Within HD90, a majority of voters prefer the Democratic nominee in general elections. (FOF 329). As a result, the Democratic primary is the dispositive election in HD90. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 444 (1992) (Kennedy, J., dissenting) (recognizing Democratic primary election in Hawaii as the "dispositive election for many offices"). It is therefore critical to examine whether polarized voting in Democratic primary elections leads to a submergence of a cohesive Latino vote that denies Latino voters the opportunity to elect their preferred candidates. It is important to examine voting pattern within the Democratic primary to ensure that Latinos are not "den[ied] a vote at the primary election that may determine the final result." *Nixon v. Herndon*, 273 U.S. 536, 540 (1927).

Dr. Engstrom testified that it is important to analyze primary elections in order to determine the extent to which racially polarized voting may be disadvantaging Latino candidates in Democratic primaries. (2011 Trial Tr. 497:25 – 498:9 (Engstrom)).

Dr. Engstrom testified that polarization in the primary election between Latino and non-Latino voters could affect the outcome of that primary for the Latino candidate of choice. (Aug. 2014 Trial Tr. 497:7-17 (Engstrom)).

The state's witness, Dr. Alford, testified that cohesion in the Democratic Primary informs the second prong of *Gingles*. (2017 Trial Tr. 1363:14-17). Dr. Alford characterized primary voters as the most representative and politically active of their parties. (2017 Trial Tr. 1364:12-

115

14).  Dr. Alford testified that it was empirically crucial to include analysis of the Democratic primary.  (2017 Trial Tr. 1425:22-25).

Dr. Alford further explained that "it's particularly useful [to look at primary elections] for a variety of reasons," including "cohesion independent of partisanship," "opportunity to achieve ethnic representation," and whether the preliminary process of nominating a candidate might block or filter out the actual candidate of choice.  (FOF 285).

Dr. Alford testified that concerns about lack of participation in primary elections are not problematic in assessing African-American and Latino cohesion in Democratic primary elections because both minorities vote heavily in Democratic primary elections.  (2017 Trial Tr. 1363:5-13).  Dr. Alford stated that this consideration applies to State House districts as well as Congressional districts.  (2017 Trial Tr. 1384:24 - 1385:8).  Dr. Alford later pointed out that although primary voters are only a subset of the population, it "is the subset whose political preferences and political cohesion, or lack of it, are going to govern what happens in that process."  (2017 Trial Tr. 1462:23-25).

Dr. Alford testified that it is important to analyze primary elections because "[i]t allows us to see what voting behavior looks like without a partisan cue."  (2017 Trial Tr. 1357:10-11).

Dr. Lichman, expert witness for the Quesada plaintiffs, testified that he analyzes primary elections when examining racial polarization.  (2017 Trial Tr. 971:2-5 (Lichtman)).

Dr. Engstrom testified that in Tarrant County, voting is racially polarized between Latino and non-Latino voters in Democratic primary elections.  (FOF 308-318). Dr. Engstrom testified that African Americans supported the Latino candidate in general elections if the Latino candidate was the Democratic nominee.  However, they were not supportive of Latino candidates generally in the Democratic primaries.  African Americans, and all other voters, shared the

116

candidate preference of Latinos in only two of seven elections and supported only one of the seven Latino candidates in the races analyzed by Dr. Engstrom.  (2011 Trial Tr. 507:8-18 (Engstrom); 2011 Task Force Ex. 392 at 53-54 (2011 Engstrom Corrected Rebuttal Report); 2014 Task Force Ex. 967 (2014 Engstrom Report); 2017 Task Force Ex. 19 at 28 (2017 Engstrom Report); FOF 262-277, 308-322).

Although the confidence intervals reported by Dr. Engstrom for his estimates of candidate support in Democratic primaries are larger than for general elections (reflecting the smaller number of voters participating in Democratic primaries), they show at a 95% level of certainty that African-American voters supported the Latino Democratic primary candidate in only one of seven elections.

Dr. Alford excerpted Dr. Engstrom's analysis of the Democratic primaries in his 2017 report, specifically Table 3.  (FOF 330).

Dr. Lichtman testified that he has found instances in Texas where African-American voters and Latino voters did not share the same candidate of choice in primary elections. (FOF 298).  Dr. Lichtman analyzed the 2014 primary election in CD33 and found that 99% of African American voters supported Marc Veasey, the African-American candidate, and 76% of Latino voters supported a different candidate.  (FOF 297). Dr. Lichtman testified this was not the only time he had seen this in Texas.  (FOF 297).

Dr. Richard Murray, testifying for the NAACP and African-American Congresspersons, warned that balancing Latino and African Americans evenly in a Democratic district will produce "tension in Democratic primaries," even when Latinos and African Americans vote cohesively for candidates in the general election.  (FOF 302-304).  Dr. Murray, as well as Congressman Al Green and Congresswoman Eddie Bernice Johnson, criticized the addition of

growing Latino areas to historically African-American districts (such as districts 9, 18 and 30) as creating the potential for "tension districts" because of different candidate preferences among Latinos and African Americans.  (FOF 307).

Tarrant County resident and former Ft. Worth City Councilman Salvador Espino testified that in general, Latino majority precincts support Latino candidates in the Democratic primary and non-Latino majority precincts do not support Latino candidates in the Democratic primary. (FOF 319-22).

Dr. Engstrom also examined the 2012 and 2014 Democratic primary elections in HD90 and concluded that they were polarized between Latinos and non-Latinos as well as between Latinos and African Americans.  (FOF 323-26).  In 2014, when the Como neighborhood was included in HD90, the Como precinct 1120 was the highest turnout precinct, with 471 votes. (FOF 328). Rep. Burnam won the Como precinct, 1120, with 383 out of 471 votes.  (FOF 328). Mr. Romero received 19% of Como's votes, compared to 81% for Mr. Burnam.  (FOF 328).

Franklin Moss, a former Fort Worth City Councilman for 13 years who is African Ameircan, testified that he had seen political races in Tarrant County where African-American and Latino voters did not vote together.  (FOF 334).  Mr. Moss further testified that examples of African-American and Latino voters not voting together would be more likely to occur in Democratic primaries. (FOF 335).  Mr. Moss also testified that all things being equal, African-American voters in Tarrant County would prefer to have an African-American official represent them.  (FOF 336).

Tarrant County Commissioner Roy Charles Brooks, who is African American, testified that he has seen African-American voters and Latino voters prefer different candidates in Democratic Primary elections, and he agreed that the 2012 Democratic Primary for CD33 was an

example of one such election. (FOF 337). Commissioner Brooks testified that in the 2012 Democratic Primary for CD33, a majority of African-American voters preferred African-American candidate Marc Veasey, whereas a majority of Latino voters preferred Latino candidate Domingo Garcia. (FOF 337).

Tarrant County non-partisan elections are also racially polarized.  Mr. Alex Jimenez testified that in his 33 years living in Fort Worth, he had never "seen any local elections where a non-Hispanic [precinct] supported a Hispanic."  (FOF 338).  In the following recent non-partisan election, in general Latino voter registration majority precincts voted for Latino candidates and non-Latino voter registration majority precincts voted for non-Latino candidates:  the May 2014 nonpartisan election for Fort Worth City Council District 9; the May 2015 nonpartisan election for Fort Worth City Council District 2; the May 2017 nonpartisan election for Fort Worth ISD District 9; the May 2017 nonpartisan election for Fort Worth ISD District 8; and the June 2017 nonpartisan election for Fort Worth Council District 2.   (FOF 338-40, 342-44).

### 3.    Totality of the Circumstances

Establishing the three *Gingles* preconditions is necessary but not sufficient to prove a Voting Rights Act violation.  *See Johnson v. DeGrandy*, 507 U.S. 997, 1011 (1994).  However, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances."   *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 97 (5th Cir. 1994)   (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)).

In addition to the *Gingles* preconditions, the court may also examine the factors enumerated in the Senate Judiciary Committee Report to Section 2 and adopted by the Supreme Court in *Gingles*, 473 U.S. at 36, 37, 44-45, to determine whether, under the totality of the

circumstances, the challenged practice or structure results in a lack of equal opportunity for Latinos to participate in the political process and to elect candidates of their choice.[12]

There is no requirement that all seven factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. at 29. "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, 'minimized or canceled out.'" *Id.* at 29 n. 118. The Court in *Gingles* explained that the Senate factors must be applied with an eye toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120.

Because "courts have recognized that disproportionate educational, employment, income levels and living conditions arising from past discrimination tend to depress minority political participation, . . . plaintiffs need not prove any further causal nexus between their disparate socio-

---

[12] These factors include, but are not limited to:

(1)     the extent of any history of official discrimination in the state or political subdivision     affecting     the right of a member of a minority group to register, vote, or participate in         the democratic process;

(2)     the extent to which voting in government elections is racially polarized;

(3)     the extent to which the state or political subdivision has used voting practices or  procedures that tend to enhance the opportunity for discrimination against the minority         group (for example, unusually large election districts, majority vote requirements,         prohibitions against bullet voting);

(4)     exclusion of minorities from a candidate slating process;

(5)     the extent to which minority group members in the state or political subdivision bear     the effects of past discrimination in areas such as education, employment, and health,         which hinder their ability to participate effectively in the political process;

(6)     the use of overt or subtle racial appeals in political campaigns;

(7)     the extent to which minorities have been elected to public office in the  jurisdiction.

 Additional factors are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29; *see also Gingles*, 478 U.S. at 48 n.15.

economic status and the depressed level of political participation."  S. Rep. at 29 n. 114 (citing *White v. Regester*, 412 U.S. 755, 768 (1973) and *Kirksey v. Bd. of Supervisors*, 528 F.2d 139,145 (5th Cir. 1977); *see also Clark*, 88 F.3d at 1399; *LULAC v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (Senate Report does not "insist[] upon a causal nexus between socioeconomic status and depressed participation").

### 4.    The Changes to HD90 in H358 Minimized Latino Voting Strength

As an initial matter, the changes made by Texas to HD90 operated to minimize Latino voting strength.  (FOF 345-52).   Mr. Espino testified that the changes made to the boundaries of HD90 by Rep. Burnam's amendment effectively weaken the opportunity for Latinos to elect a candidate of their choice in the Democratic Primary and make it more difficult for Latino candidates to win.  (FOF 353).  Mr. Espino testified that Mr. Romero and other Latino candidates were still vulnerable in HD90 Democratic Primary elections because Mr. Romero only won by 110 votes in 2014.   There were also Latino candidates running for other seats in the 2014 Democratic Primary in Tarrant County, which contributed to higher Latino turnout that year. (FOF 354).

Mr. Kenny conceded that his map made it more difficult for Latino voters to nominate their preferred candidate in the HD90 Democratic Primary if that candidate was Latino.  (FOF 355).  Rep. Burnam testified that the changes he made from the first version of his amendment to the second, which raised the SSVR to 50.1%, "didn't change the [electoral performance] numbers, but it changed the [SSVR] percentage."  (FOF 356).  Although the areas removed from HD90 were majority Anglo, they had an SSVR of 20.6%, which was significantly higher than the area added to the district, which included Como and had an overall SSVR of 8.5%. (FOF 357).

As a result, the addition of Como and the removal of portions of Sansom Park and North Beverly Hills had a net effect of lowering the SSVR in HD90.

Moreover, Sansom Park and North Beverly Hills, although majority non-Latino voter registration majority areas, had a history of electing Latino candidates. (FOF 358). The Burnam amendment's replacement of Sansom Park and North Beverly Hills with Como weakened the opportunity for Latinos to elect the candidates of their choice in HD90 because Como's higher turnout against a Latino candidate outweighs Sansom Park and North Beverly Hills' lower turnout and more favorable margins for Latino candidates. (FOF 358).

### 5.    The Senate Factors

In *LULAC v. Perry*, the Supreme Court noted that the "'the long history of discrimination against Latinos and Blacks in Texas' . . . may well 'hinder their ability to participate effectively in the political process'" and found a section 2 violation under the totality of the circumstances. *LULAC v. Perry*, 548 U.S. 399, 439-40, 442 (quoting *Session*, 298 F.Supp.2d, at 473, 492 and *Gingles*, 478 U.S., at 45).

The Supreme Court explained:

> Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and the restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the state as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act.    Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions.

*LULAC v. Perry*, 548 U.S. 399, 439-40 (2006) (quoting *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994)).

122

Dr. Andres Tijerina, an historian and expert in Texas Mexican American history, testified in this case that there exists a long history of discrimination against Latinos in Texas and that Latinos bear the present effects of that discrimination in the form of lower rates of political participation.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  178, 191, 196-200, 204, 208, 246, 247, 258-269, 339-347, 358- 364, 414]; Ex. E-10 [Dkt. 149-6, at 32]).  Much of that discrimination, including the poll tax, refusal to register voters, segregated public facilities, segregated schools and employment discrimination, has been experienced by Latino voters still living today.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at 192, 194, 305-310, 312, 313, 320, 322-323, 325, 348, 365-373, 385-386, 388, 391]; Ex. E-10 [Dkt. 149-6, at 32]).

The legacy of historical discrimination persists today in the form of lower socio-economic status for Latinos in Texas.  Dr. Jorge Chapa, a demographer and specialist in Latino population studies, testified that even among third- and subsequent-generation Latinos living in Texas, educational achievement and earnings lag far behind Anglos.  (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  244, 245];  Ex. E-1, at p. 4).  Dr. Chapa presented data showing that Latino voter turnout rates remain below that of Anglos in Texas.   (2014 Task Force Proposed Findings of Fact [Dkt. 1274 at  247, 249, 252]; Ex. E-1 at p. 16).

Ft. Worth resident Alex Jimenez testified at trial about his personal experiences with discrimination against Latinos.   (FOF 371-76).   The State did not contest the Task Force Plaintiffs' evidence of the present effects of past racial discrimination and offered no conclusions regarding the lingering effects of prior discrimination in the Latino community.  (Task Force 2014 FOF 248).  Mr. Jimenez also testified regarding the existence of an Anglo slating group in Ft. Worth, in which Anglo businesspersons and community leaders recruited other Anglos to run for office.  (FOF 367). More recently, HD90 elections were characterized by racial appeals (FOF

377-382) and attempts by the non-Latino preferred candidate to deter Latino voters from using third party assistance to cast mail ballots in the Democratic primary.  (FOF 67-76).

### 6.    Proportionality as a Factor in the Totality of Circumstances

Whether or not Latinos constitute the majority in a number of districts proportional to their population "is a relevant fact in the totality of circumstances."  *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

HD90 is one of 11 House districts in Tarrant County (9.1%).  The HCVAP of Tarrant County is 16.9%.  (FOF 386).     Thus, the one Latino-majority House district is less than proportional representation for Latinos in Tarrant County.

The lack of proportionality in Latino opportunity districts in the Tarrant County House plan supports Plaintiffs' section 2 claim.

### E.   THE LATINO TASK FORCE'S SUCCESSFUL CHALLENGE OF NUECES COUNTY BOUNDARIES IN PLAN C185 AND PLAN H283 SHOULD NOT BE REVISITED

The Court's determinations in its March 10 and April 20 orders that Defendants are liable under § 2 and the Fourteenth Amendment for the discriminatory configurations of CD27 in Plan C185 and of HD32 and HD34 in Plan H283 constitute law of the case.  As a result, Texas is liable for these exact configurations that were carried forward into Plans C235 and H358.  The Texas Latino Redistricting Task Force Plaintiffs successfully challenged these boundaries in the 2011 redistricting plans.  *See* Task Force Pls.' Fourth Am. Complaint, Dkt. 891 ¶ 37.  Pursuant to the law of the case doctrine, the Court should not revisit these findings of liability but should instead find liability for the discriminatory configurations' continued implementation under the present plans.

The law of the case doctrine provides that "a court should not reopen issues decided in earlier stages of the same litigation." *Agostini v. Felton*, 521 U.S. 203, 236 (1997) (citing *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)); *see also Massey v. Novartis Pharm. Corp.*, 46 F. Supp. 3d 688, 691 (W.D. Tex. 2014) ("The existence of a prior ruling invokes the law-of-the-case doctrine, which provides that settled issues will not be revisited during the pendency of a lawsuit." (citing *In re Ford Motor Co.*, 591 F.3d 406 (5th Cir. 2009))).   "The law of the case doctrine requires that courts not revisit the determinations of an earlier court unless '(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work . . . manifest injustice.'" *In re Ford Motor Co.*, 591 F.3d 406, 411–12 (5th Cir. 2009) (quoting *Propes v. Quarterman*, 573 F.3d 225, 228 (5th Cir. 2009)).   The doctrine was "developed to 'maintain consistency and avoid [needless] reconsideration of matters once decided during the course of a single continuing lawsuit.'" *Royal Ins. Co. of America v. Quinn-L Capital Corp.*, 3 F.3d 877, 880 (5th Cir. 1993) (alteration in original) (quoting Wright et al., *Federal Practice and Procedure* § 4478, at 788 (1981)).   Moreover, the doctrine "applies not only to issues decided explicitly, but also to everything decided 'by necessary implication.'" *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001) (citing *Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir. 1989)).

The Court's findings of liability for Defendants' configuration of CD27 in Plan C185 and for Defendants' configurations of HD32 and HD34 in Plan H283 are law of the case.   In particular, in its Order on Plan C185, the Court ruled that "Plaintiffs have established a § 2 violation, both in terms of intent and effect, in South/West Texas;" that "Nueces County Hispanics . . . have proved their § 2 results and intentional vote dilution claims;" and that "[t]he

configuration[] of . . . CD27 . . . in Plan C185 [is] therefore invalid."  Am. Order on Plan C185, Dkt. 1390 at 57–58.  In its Order on Plan H283, meanwhile, the Court ruled that "redistricters intentionally diluted Latino voting strength by eliminating HD33 in Nueces County;" and that "[g]iven the existence of racially polarized voting and the history of discrimination and its legacy in Nueces County, and considering the totality of circumstances, the elimination of an existing Latino opportunity district and ensuing racial gerrymandering in Nueces County is intentional vote dilution in violation of § 2 of the VRA and the Fourteenth Amendment."  Order on Plan H283, Dkt. 1365 at 40.

As the Court has noted, the configuration of CD27 in Plan C185 remains unchanged in Plan C235, Dkt. 1390 at 5, and the configurations of HD32 and HD34 in Plan H283 remain unchanged in Plan H358, Dkt. 1365 at 33.  Especially here, where the Texas Legislature did not assess the lawfulness of these configurations prior to reenacting them, the boundaries remain discriminatory in Plans C235 and H358.  *See In re Felt*, 255 F.3d at 225; Defs.' Supp. Brief Addressing *Cooper v. Harris* and *Bethune-Hill v. Virginia State Board of Elections*, Dkt. 1413 at 14 (claiming that the Legislature "simply adopted wholesale the interim congressional plan drawn by this Court in 2012," Plan C235).

Finding liability for the same Nueces County district configurations in Plans C235 and H358 would "maintain consistency" with the Court's earlier rulings on Plans C185 and H283 and would "avoid [needless] reconsideration."  *Royal Ins. Co. of America v. Quinn-L Capital Corp.*, 3 F.3d at 880 (alteration in original) (internal quotation marks omitted).  Moreover, the exceptions outlined in the law of the case doctrine do not apply here.  First, evidence in the 2017 trial was not substantially different with respect to Nueces County.  *In re Ford Motor Co.*, 591 F.3d at 411.  The same evidence that supported the Court's finding of liability with respect to

126

CD27 in Plan C185 supports the Court's corresponding finding as to Plan C235.    Any differences in evidence, for example updates to demographic data, only support the Court's earlier ruling.    Second, no "controlling authority has since made a contrary decision of the law" that would undermine the Court's earlier ruling.    *Id.* at 411–12.    Indeed, to the extent that recent Supreme Court decisions bear on the Court's findings of liability with respect to the 2013 plans, they merely underscore the legal deficiencies of the unchanged and unevaluated configurations.    *See, e.g.*, *Cooper v. Harris*, No. 15-1262, 2017 WL 2216930 ("Cooper slip op."), at \*13 (May 22, 2017) (holding that a state must "carefully evaluate" whether there are legal deficiencies in its proposed maps prior to enactment).    Third, the Court's determinations were not clearly erroneous, and it would be improper for the Court to review its own determinations at this point for clear error.    *In re Ford Motor Co.*, 591 F.3d at 412.

With respect to the Task Force claims, the only remaining questions with respect to the violations in Plans C185 and H283 in districts that remain unchanged in Plans C235 and H358 are questions of remedy.[13]

## III.    CONCLUSION

For the foregoing reasons, the Task Force Plaintiffs respectfully request that the Court find that HD90 in Plan H358 illegally and unconstitutionally discriminates against Latino voters.


DATED: July 31, 2017                                  Respectfully submitted,

                                                      MEXICAN AMERICAN LEGAL DEFENSE
                                                       AND EDUCATIONAL FUND

                                                      */s/ Nina Perales*
                                                      Nina Perales

---

[13] This sentence responds to the Court's question number 1 in Questions from the Three-Judge Panel to be Addressed at the Conclusion of Trial (Dkt. 1494).

TX Bar No. 24005046
Ernest I. Herrera
TX Bar No. 24094718
Celina Moreno
TX Bar No. 24074754
*Denise Hulett
CA Bar No. 121553
*Kip M. Hustace
CA Bar No. 310048
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
FAX (210) 224-5382

Admitted *Pro Hac Vice*

COUNSEL FOR PLAINTIFFS TEXAS
LATINO REDISTRICTING TASK
FORCE, RUDOLFO ORTIZ, ARMANDO
CORTEZ, SOCORRO RAMOS,
GREGORIO BENITO PALOMINO,
FLORINDA CHAVEZ, CYNTHIA
VALADEZ, CESAR EDUARDO
YEVENES, SERGIO CORONADO,
GILBERTO TORRES, RENATO DE LOS
SANTOS, JOEY CARDENAS, ALEX
JIMENEZ, EMELDA MENENDEZ,
TOMACITA OLIVARES, JOSE
OLIVARES, ALEJANDRO ORTIZ, AND
REBECCA ORTIZ

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2017, I served a copy of the foregoing document on all counsel who are registered to receive NEFs through this Court's CM/ECF system. All attorneys who are not registered to receive NEFs have been served via email.

*/s/ Nina Perales*
Nina Perales

128