# IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

———————————

| | |
|---|---|
| SHANNON PEREZ, et al., | Civil Action No. SA-11-CA-360-OLG-JES-XR [Lead Case] |
|       Plaintiffs, | |
| v. | |
| STATE OF TEXAS, et al., | |
|       Defendants. | |

———————————————————

| | |
|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESNTATIVES (MALC), | Civil Action No. SA-11-CA-361-OLG-JES-XR [Consolidated case] |
|       Plaintiff, | |
| v. | |
| STATE OF TEXAS, et al., | |
|       Defendants. | |

———————————————————

| | |
|---|---|
| TEXAS LATINO REDISTRICTING TASK FORCE, et al., | Civil Action No. SA-11-CA-490-OLG-JES-XR [Consolidated case] |
|       Plaintiffs, | |
| v. | |
| RICK PERRY, | |
|       Defendant. | |

———————————————————

| | |
|---|---|
| MARAGARITA V. QUESADA, et al., | Civil Action No. SA-11-CA-592-OLG-JES-XR [Consolidated case] |
|       Plaintiffs, | |
| v. | |
| RICK PERRY, et al., | |
|       Defendants. | |

———————————————————

JOHN T. MORRIS, et al.,

                Plaintiffs,

v.

STATE OF TEXAS, et al.,

                Defendants.

Civil Action No. SA-11-CA-651-OLG-JES-XR [Consolidated case]

_____

EDDIE RODRIGUEZ, et al.,

                Plaintiffs,

v.

RICK PERRY, et al.,

                Defendants.

Civil Action No. SA-11-CA-635-OLG-JES-XR [Consolidated case]

_____/

## **POST-TRIAL *AMICI CURIAE* BRIEF OF CONGRESSMAN WILLIAM BALLARD HURD, HELEN DELAVAN, HERIBERTO GONZALEZ, TIMOTHY HARDT, SYLVIA MILUSKA GONZALEZ, AND RUBEN VASQUEZ FALCON**

# **TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………1

BACKGROUND……………………………………………………………………...............2

ARGUMENT………………………………………………………………………………3

    I.    Plaintiffs have failed to prove their § 2 claim with respect to this Court's drawing of CD23, because the current district lines provide a reasonable opportunity for Hispanics to elect a representative of their choice. …………………………………………………………………….    3

    II.    Dr. Henry Flores' flawed expert testimony has little probative value and fails to establish that CD23, in its current form, dilutes minority voting strength. ………………………………………………………………… 13

        A.    Dr. Flores' report and testimony lack credibility. ……………………..13

        B.    Dr. Flores' testimony misconstrues the concept of an opportunity district. …………………………………………………………... 15

        C.    Dr. Flores' report and testimony ignores significant data, facts and variables relevant to CD23. ………………………..…………………… 17

            1.    Gallego's decreased support from Latinos……………………..17

            2.    Gallego faced different opponents in 2012 and 2016…………. 19

CONCLUSION……………………………………………………………...............21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alabama Legislative Black Caucus v. Alabama*
    135 S. Ct. 1257 (2015)..................................................................5

*Bethune-Hill v. Virginia State Bd. Of Elections*
    137 S. Ct. 788 (2017)...................................................................5

*Bone Shirt v. Hazeltine*
    461 F. 3d 1011 (8th Cir. 2006) ...................................................15

*Clark v. Calhoun Cty., Miss.*
    88 F. 3d 1393 (5th Cir. 1996) .....................................................4

*Cooper v. Harris*
    581 U.S. __ (2017); 2017 U.S. LEXIS 3214 ...............................19

*Easley v. Cromartie*
    532 U.S. 234 (2001)....................................................................5

*Hunt v. Cromartie*
    526 U.S. 541 (2001)..................................................................12

*Jeffers v. Beeve*
    895 F. Supp. 2d 920 (E.D. Ark. 2012) .........................................4

*Johnson v. De Grandy*
    512 U.S. 997 (1994)..................................................................16

*Kirksey v. Bd. of Superiors of Hinds Cty., Miss.*
    554 F. 2d 139 (5th Cir. 1977) ....................................................15

*League of United Latin American Citizens v. Perry*
    548 U.S. 399 (2006)..............................................................15, 16

*Perez v. Abbot*
    2017 U.S. Dist. LEXIS 60237 ....................................4, 5, 15, 16, 17

*Rodriguez v. Bexar County, Texas*
    385 F. 3d 853 (5th Cir. 2004) ................................................13, 14

## TABLE OF AUTHORITIES, cont'd

**Page**

## Cases

*Rollins v. Fort Bend Independent School District*
  89 F. 3d 1205 (5th Cir. 1996) ...................................................................13, 14

*Salas v. Southwest Texas Junior College District*
  964 F. 2d 1542 (5th Cir. 1992) ..................................................................4, 15

*Thornburg v. Gingles*
  478 U.S. 30 (1986)...................................................................................19, 20


## Other Authorities

Bridget Bowman
  *Democrats See New Opportunities in Texas Redistrict Case*,
  ROLL CALL (June 5, 2017) ............................................................................1

*Hurd Recognized for Commitment to Latinos*, http://goo.gl/XXRz3w........................................7

Henry Flores
  *Latinos and the Voting Rights Act: The Search for Racial Purpose*,
  (Lexington Books 2015) ................................................................................14

Karen Tumulty
  *U.S. Rep. Will Hurd is at Odds with Donald Trump. Will That Save Him in 2018?*
  TEX. TRIB. (April 25, 2017), *available at* https://goo.gl/VFnU7G. ...........................3

Tim Alberta
  *Will Hurd is the Future of the GOP—If He Can Hold on to the Toughest Seat
  in Texas*, POLITICO (May 5, 2017) ..............................................................3, 20

S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982) .......................................................20

U.S. Census Bureau, http://www.census.gov/mycd/ (last visited June 19, 2017) ......................1

# INTRODUCTION

The trial testimony confirmed why the 23rd Congressional District (CD23) is one of the districts targeted in this redistricting litigation. Plaintiffs—various individuals and coalitions representing Democrats and minority voters—are dismayed that in a district with a 69.7% Hispanic population,[1] voters have twice elected Congressman Will Hurd, a Republican African American, to represent them. In other words, Representative Hurd is too black and too conservative; something must be wrong with the district lines. Those district lines, of course, were not drawn by the Texas Legislature, but by *this* panel, then enacted into law by a special legislative session. So unless the panel harbored discriminatory intent in drawing the map, it is impossible to say the map is unconstitutional. And yet Plaintiffs press on because, as explained by Michael Li, senior counsel at the Brennan Center for Justice: Representative Hurd's "is a Latino-controlled seat, *which would be a Democratic-controlled seat*."[2]

Representative Hurd and district residents Helen Delavan, Heriberto Gonzalez, Timothy Hardt, Sylvia Miluska Gonzalez, and Ruben Vasquez Falcon file this *amici curiae* brief in support of judgment for Defendants. As the trial testimony showed, Congressman Hurd did not win the past two elections because of line drawing; he won because he connected with CD23 constituents and represented their interests. And it is demeaning to say that Congressman Hurd cannot represent his Hispanic constituents because he is black and conservative. He has made a concerted effort to listen and respond to *all* his constituents, regardless of their race or ethnicity. As a result, his share of the Hispanic vote in counties with large numbers of Hispanic residents increased between his

---

[1] U.S. Census Bureau, https://www.census.gov/mycd/ (last visited June 19, 2017).
[2] Bridget Bowman, *Democrats See New Opportunities in Texas Redistrict Case*, ROLL CALL (June 5, 2017), *available at* https://goo.gl/k6BLRn (emphasis added).

1

initial election and his reelection. Regardless of what happens to the rest of the map, this Court should preserve the lines it drew for CD 23.

## **BACKGROUND**

Representative Will Hurd is a member of the United States House of Representatives, elected from CD 23, a district that stretches nearly 800 hundred miles, from San Antonio to El Paso, along the U.S.-Mexican border. Congressman' Hurd's district is not only the biggest in the state (and bigger than 29 states)—encompassing 29 counties and 58,000 square miles—it is easily the most competitive. The district is also 69.7% Hispanic.

Helen Delavan, Heriberto Gonzalez, Timothy Hardt, Sylvia Miluska Gonzalez, and Ruben Vasquez Falcon are all residents of CD 23 who represent the racial and ethnic diversity that make this country great: some are Hispanic and some are white. Each of them voted for Representative Hurd, crossing racial and ethnic lines.

In 2014, Representative Hurd defeated incumbent Democrat Congressman Pete Gallego by roughly 2,422 votes out of 115,429 cast. This surprised many political observers; Representative Gallego is a Hispanic former lawyer and had represented many of the congressional district's citizens as a state lawmaker. Representative Hurd simply outworked him. And Hurd did it again in 2016, this time by 3,051 votes out of 228,965 cast, in an election when Democrat Presidential nominee Hillary Rodham Clinton won the district by 4% despite Republican Presidential nominee Donald Trump prevailing in the State by a nine-point margin, 52% to 43%.

Democrats do not believe that Clinton-leaning Hispanics should vote for a conservative, black candidate; therefore, the district this Court drew must unfairly benefit the Republicans. But as *Politico* surmised, there is another explanation: Representative "Hurd is a phenom. Republicans

2

and Democrats who have witnessed his ascent say he possesses a rare combination of competence as a policymaker, responsiveness as a representative and ferocity as a campaigner."[3]

During Congressman Hurd's first term, while President Obama was still in the White House, Hurd "authored more bills that were signed into law than any other member of Congress," continues *Politico*.[4] Hurd "systematically explore[d] every parcel of his district, assemble[d] a staff that quickly became known as one of the most effective on Capitol Hill, and raise[d] copious sums of money."[5] And all this without exhibiting any fear "of bucking the GOP and the president himself, especially in the interest of his district."[6] In sum, Representative Hurd is an electoral success because of who he is, not because of his race or the political party with whom he affiliates. So of course, the Democrats want to use this Court to accomplish what they have been unable to do at the ballot box: remove Hurd from Congress. "Democrats have a price on his head,"[7] and they have put Hurd's seat in their top five "targets" for the 2018 election.[8]

## **ARGUMENT**

I.  **Plaintiffs have failed to prove their § 2 claims with respect to this Court's drawing of CD23, because the current district lines provide a reasonable opportunity for Hispanics to elect a representative of their choice.**

Plaintiffs contend that that CD23 is not a Latino opportunity district even though it has an HCVAP of 62.1%, 7/15/17 Trial Tr., p. 1627, Latino registered voters made up 55.3% of all district registered voters in 2016, Second Supplemental Report of Dr. Henry Flores, pp. 2, and Latino votes made up 48.2% of all district votes cast in 2016, *id.* at 4. Although some courts have held

---

[3] Tim Alberta, *Will Hurd is the Future of the GOP—If He Can Hold on to the Toughest Seat in Texas*, POLITICO (May 5, 2017), *available at* https://goo.gl/0oNA1u.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] Karen Tumulty, *U.S. Rep. Will Hurd is at Odds with Donald Trump. Will That Save Him in 2018?*, TEX. TRIB. (April 25, 2017), *available at* https://goo.gl/VFnU7G.

that § 2 challenges may not even be brought against a majority-minority district like CD23, *e.g.,* *Jeffers v. Beeve*, 895 F. Supp. 2d 920 (E.D. Ark. 2012), this Court rejected that view and agreed to consider a "totality of the circumstances." R.1339, 3/10/17 Order, p. 14.

To evaluate those circumstances, this Court said it would consider (1) the history of voting-related discrimination in the State or political subdivision, (2) the extent to which minority group members bear the effects of past discrimination which hinder their ability to participate effectively in the political process, (3) whether voting is polarized along racial lines, and (4) whether the inability of the protected class to elect was caused primarily by racial bloc voting or other circumstances, though a protected class is not entitled to § 2 relief simply because it turns out to vote in lower percentages than non-protected voters. *Id.* (citing *Clark v. Calhoun Cty., Miss.*, 88 F.3d 1393, 1399 (5th Cir. 1996), and *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542 (5th Cir. 1992)).

The ultimate question for purposes of § 2, then, is whether a district provides a "realistic," "reasonable," "practical," or "effective" opportunity—not a "guarantee of success"—for a protected minority group to elect a representative of its choice. *Id.* at 16 (numerous citations omitted). Predictably, Plaintiffs' experts say that CD23 does not provide electoral opportunity for minorities, ignoring the fact that over the past two elections, CD23 residents *did* elect a minority, just not a minority with the skin color and party affiliation that Plaintiffs would prefer. In the Court's March 2017 Order, it concluded that Plaintiffs had proven their § 2 claim with respect to the Legislature's 2011 plan, though Judge Smith disagreed and would have held that CD23's lines were driven not by race, but the desire to protect a Hispanic Republican incumbent. *Id.* at 29; *id.* at 181–82, 185–86 (Smith, J., dissenting).[9]

---

[9] In the first round of litigation, Plaintiffs also pursued a *Shaw*-type gerrymandering claim. Such a claim requires proof "that race was improperly used" as the "predominant factor motivating the legislature's decision to place a

Now consider the map that this Court drew and the Texas Legislature adopted in 2013. Under either a § 2 claim or a *Shaw*-type gerrymandering claim, it is Plaintiffs' burden to show that race was not just *a* factor, or even a considerable factor, but "the *predominant* factor motivating the legislature's decision" to adopt that map. *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (emphasis added). Accord, *e.g., Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (the "ultimate" decision is whether "the legislature's motive was predominantly racial, not political"). To begin, it is difficult to say that the Legislature's adoption of the redistricting map in 2013 had anything to do with race. This Court threw out the Legislature's 2011 map and drew a new one. Because a new election was quickly approaching, time was of the essence, and the Legislature sensibly chose to adopt the map this Court drew. As a matter of law, this Court should hold that a state legislature that simply adopts a special three-judge panel's redistricting map is not motivated predominantly by race. Accord 7/15/17 Trial Tr., p. 1726 (Plaintiffs' counsel conceded "there is no way to imply that we're suggesting the Court intentionally discriminated in doing this.").

Equally important, under s § 2 inquiry, it is impossible to say that CD23's Hispanic voters were unable to elect the candidate of their choice because of racial bloc voting or other circumstances. As noted above, in a State that voted for candidate Trump by 9%, CD23's voters

---

significant number of voters within or without a particular district." *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265, 1267 (2015). In the Court's March 2017 Order, it concluded that Plaintiffs had proven a *Shaw* claim because there was evidence that the Legislature subordinated traditional redistricting principles to racial goals, and because the districting plan did not survive strict scrutiny because the use of race to draw district lines did not "attempt[ ] to ensure or maintain opportunity to elect . . . or ability to elect" minority candidates. R.1339, 3/10/17 Order, p. 30–32. Judge Smith would have held that CD23's lines were driven not by race, but by the desire to protect a Hispanic Republican incumbent. *Id.* at 181–82, 186–86 (Smith, J., dissenting). Plaintiffs have *not* advanced a *Shaw*-type gerrymandering claim with respect to this Court's drawing of CD23, and if they did, that claim would fail for the same reasons that Plaintiffs are unable to prove their § 2 claim and because there is no evidence this panel used race as a predominate factor in drawing CD23's lines.

chose candidate Clinton by 4%. Presumably, Plaintiffs would say that candidate Clinton was the choice of CD23's Hispanic voters, and that voting bloc successfully selected her.

So if Congressman Hurd was not the candidate of "choice" for Hispanics, how did he make up that 4% gap? Because he successfully persuaded a significant percentage of Hispanic voters that he could represent their interests when he was elected in 2014, then demonstrated definitively that he would do so over the next two years and successfully earned reelection in 2016.

Representative Hurd has a unique background. A black conservative, he served nearly 10 years in the CIA, including tours of duty in India, Pakistan, and Afghanistan. 7/15/17 Trial Tr., p. 1623. He learned the Hindi and Urdu languages in the process. *Id.* at 1624. Representative Hurd decided to give up his career at the CIA and run for Congress because he was frustrated with the caliber of representation in Washington, D.C., and he wanted to continue serving his country. *Id.* at 1624–25.

As noted above, CD23 is gigantic—covering 29 Texas counties and an area larger than many states, *id.* at 1626–27—and extremely competitive, a "top five" target district as identified by parties and politicos, *id.* at 1628. That is why most pundits consider the district one that could vote for the candidate for *either* party in any given election. *Id.* at 1629–30. But unlike many politicians, who rely on robocalls and large-market media spend, Representative Hurd is committed to getting to know *all* his constituents. He has been to all 29 counties in CD23 multiple times; so many, that he stopped keeping track. *Id.* at 1630. And no portion of the district is too small for a visit. For example, Representative Hurd has met 72 of the 95 residents of Loving County, Texas. *Id.* at 1630.

It is a result of that commitment that the Congressman visits all the "places that nobody expects [him] to show up," places where someone of his "political affiliation" is not supposed to

travel. *Id.* at 1631. He does this "to show that I care[ ], to understand [his constituents'] concerns." *Id.* And when he does (sometimes at events where Democrat-elected officials are speaking as well, *id.* at 1638), his background as a former CIA officer resonates with constituents, many of whom are concerned about issues like national security, terrorism, and border security. *Id.* Representative Hurd's philosophy is that he represents "everyone, even if they don't vote for me." *Id.* at 1631–32. That is why, during the 114th Congress, he had four *million* interactions with constituents via email, phone, and snail mail, not including some 400 public events (54 town halls, 13 tele-town halls, etc.). *Id.* at 1632–33.

Although the Congressman reaches out to constituents in every partisan and demographic group, he has placed a particular focus on Hispanic constituents and the issues which they consider important:

- The Congressman uses campaign materials in Spanish and English. *Id.* at 1632.

- More than a third of the Congressman's staff are Spanish-language speakers. *Id.* at 1634. For his efforts, the Hispanic Lobbyist Association presented Representative Hurd with the *Poder Award* in recognition for his leadership in promoting diversity with his congressional staff. *Id.* at 1634; accord *Hurd Recognized for Commitment to Latinos*, available at https://goo.gl/XXRz3w.

- Congressman Hurd helped create the Hispanic-Serving Institutions Caucus. This is "a caucus of members of Congress who have Hispanic-serving institutions in their district." *Id.* at 1635.

- The Representative sits on the board of the Congressional Hispanic Leadership Institute, with a goal of hiring more Latino interns in D.C. offices and helping them move up the ladder into key roles across Congress. *Id.*

- CD23 constituents are beneficiaries of the Congressman's effort to improve local infrastructure, training and education. *Id.* at 1635–36.

- The Congressman sits on the U.S.-Mexico Interparliamentary dialogue to ensure the communities in his district are heard on issues involving cross-border trade and NAFTA. *Id.* at 1636.

- Representative Hurd has procured millions of dollars for "colonias," Texas-Mexico border towns that may lack basic necessities such as potable water, sewer systems, electricity, paved roads, and safe and sanitary housing. *Id.* at 1636–37.

In short, the Congressman did not run for office to get the honorary congressional "pin"; he ran for office to help the community, and he has done exactly that with particular success on subjects that most matter to his constituents. *Id.* at 1638.

As a result of these efforts—not because of this Court's redistricting plan—Representative Hurd won four counties in the 2016 election where there was a Spanish Surname Voter Registration (SSVR) majority, including the counties of Uvalde and Pecos. *Id.* at 1637. And although CD23 remains among the most competitive districts in the country, he welcomes that competitiveness in his district "because it forces people to talk to a broader group of folks." *Id.* at 1639. It also results in more diverse candidates running for office, candidates who are going to be responsive to CD23's diverse community. *Id.*

In closing statements following the trial testimony regarding the Texas Legislature's 2013 adoption of the redistricting map this Court drew, Plaintiffs' counsel summarized this Court's previous holdings as focusing on a single question: "do the Latinos have [the] opportunity to elect whom they want?" *Id.* at 1694. The answer to that question is unequivocally yes. In the 2016 presidential election, Latinos in CD23 successfully selected candidate Hillary Clinton, even though the State overwhelming selected candidate Donald Trump.

As for Representative Hurd, Plaintiffs' counsel was forced to concede that the Congressman received nearly 1/5th of the Hispanic vote in CD23 in the last election cycle. *Id.* Based on his 2% margin of victory, if Representative Hurd had lost even 10% of that Hispanic voting bloc, he would have lost the election. The conclusion that the Court should draw from these number and Representative Hurd's testimony is that if CD23 Hispanics vote as a bloc, they *are* able to elect the candidate of their choice. But the reality—apparently offensive to Plaintiffs and their counsel—

8

is that a significant number of CD23 Hispanics *want* Will Hurd as their Congressman, even though he is a black Republican.

Plaintiffs' counsel says that if "I tell you two plus two equals five, I don't need 20, 30 experts to tell you how it got there. Because you know it's the wrong answer." *Id.* at 1695. But 1/5th of CD23 Hispanics choosing Congressman Hurd to be their Representative is not the same as saying 2 + 2 = 5, unless you're a politico who is so jaundiced that you believe the color of a candidate's skin is the primary measure of whether he is the candidate of choice for a minority voter. What the testimony and data shows is that Congressman Hurd works extraordinarily hard for all his constituents, including his Hispanic constituents. And if a significant number of Hispanic voters—who made up more than 48% of all votes cast in the 2016 CD23 congressional election— did *not* prefer Representative Hurd, it would have been statistically impossible for him to be elected.

What really turns Plaintiffs' attack on its head is that this is not a situation where a white majority picked a white candidate at the expense of a Hispanic candidate. Congressman Hurd is himself a racial minority. Under Plaintiffs' theory of how voters choose candidates (based on their race and ethnicity), it should be impossible for the Congressman to win any election in CD23; African-Americans make up a tiny fraction of CD23 registered voters. The fact that the Congressman has won two consecutive election cycles is the strongest possible testament regarding how CD23 voters choose their candidates.

Regarding this Court's questions to be addressed at the conclusion of trial, there are precious few directed at the 23rd District, but Congressman Hurd urges the Court to answer them as follows:

Q12.   For CD23, can discriminatory intent be imputed to the 2013 Legislature for adopting this Court's addition of areas with low turnout?

A.    No. There is no evidence in the record that that 2013 Legislature adopted this Court's redistricting map with respect to CD23 with any discriminatory intent or, for that matter, any intent related to race at all.

Q23.    Would the parties agree that on the Section 2 effects (not intent) claims, current ACS (2011-2015) data and current population estimates must be used pursuant to *Gingles* because an effects claim asks whether the district, as configured, currently gives minorities the opportunity to elect the candidate of their choice. If, for example, a State undertook redistricting and implemented a plan that didn't dilute a minority opportunity district at the time but eight years later (with substantial demographic changes) the district was no longer performing as a minority opportunity district, couldn't a Section 2 effects claim be brought several years after the map's implementation? In other words, an effects claim is not tied to intent, or what data the legislature had at the time of redistricting. And using this logic, if the Court finds that CD23 is not currently performing under C235, doesn't the Court need to look at the Section 2/*Gingles* analysis based on current ACS data and current election data to determine whether it could perform as a minority opportunity district under any of the *Gingles* demonstrative plans?

A.    Congressman Hurd does not agree that current data and current population estimates must be used to evaluate a *Gingles* effects claim. It is not reasonable for a state legislature to anticipate population shifting at the time it enacts a redistricting plan. If at implementation the plan was performing as a minority opportunity district, then it is legally irrelevant that the district later fails to so perform. The legislature will have to address that performance in the next redistricting cycle.

Nonetheless, this Court need not decide whether a *Gingles* effects claim should be decided based on data available at the time a redistricting map was enacted or data available at the time of the challenge, because the data from the 2016 election conclusively demonstrates that CD23 performed as a minority opportunity district. Assuming that CD23's Hispanic voters preferred Hillary Clinton as their presidential candidate, they were successful in selecting her in a state that voted overwhelming from Donald Trump. Conversely, the evidence does not support Plaintiffs' claim that Congressman Hurd was not a preferred candidate of CD23's Hispanic voting bloc. Hispanic votes made up more than 48% of all the ballots cast in the 2016 election, and nearly 1/5th of those Hispanic votes were cast for Congressman Hurd. His victory was not the product of a district that was "not performing" as a minority opportunity district, it was the product of a significant segment of the majority-minority voting bloc choosing to select him as their preferred candidate. In addition, Congressman Hurd is a racial minority; the problem is that his skin is not the color preferred by Plaintiffs and their counsel.

Q24.    To what extent should the Court weigh the HCVAP as distinguished from the turnout in determining whether [CD23] is an opportunity district?

10

A.  The Court should place heavy emphasis on the HCVAP in determining whether CD23 is an opportunity district, as opposed to focusing on the turnout. Turnout can be a wildly fluctuating statistic, one that depends heavily on the election cycle and the candidates. HCVAP is relatively static, one changing only when there are population shifts. CD23's HCVAP of 62.1%, 7/15/17 Trial Tr., p. 1627, is more than adequate to make CD23 a minority opportunity district. In fact, Plaintiffs' expert conceded that the HCVAP levels for CD23 are "*higher* than [other] districts that [Plaintiffs] recognize as Hispanic opportunity districts." 7/13/17 Trial Tr., pp. 1150–51 (emphasis added). Plaintiffs just don't like the result: that a significant number of Hispanic voters select Representative Hurd. In the words of Plaintiffs' expert, his analysis "*always* treats the Democrat candidate as "the Hispanic candidate of choice." *Id.* at 1161 (emphasis added).

But the result would be the same even if the Court considered CD23's turnout. As Plaintiffs' expert determined, Latino votes made up 48.2% of all district votes cast in 2016. Second Supplemental Report of Dr. Henry Flores, p. 4. Accordingly, unless Plaintiffs can show that the 51.8% of non-Latino voters consistently vote in such a way as to deny a minority candidate from being elected, all their claims involving CD23 necessarily fail. Plaintiffs cannot make that showing on the record presented here. First, CD23 voters *did* elect a minority candidate, Congressman Hurd. Second, Congressman Hurd could not have prevailed but for significant support from the Hispanic community, and his support among Hispanic voters actually *increased* from the 2014 to the 2016 election. 7/14/17 Trial Tr., p. 1394, even with a markedly higher Hispanic-voter turnout. And in the one election Congressman Hurd did not win, the so-called "Latino-preferred candidate" did. 7/15/17 Trial Tr., p. 1743. Whether measured by HCVAP or by turnout, CD23 performed as a minority opportunity district in the 2016 election.

In sum, Plaintiffs are unable to prove a § 2 claim with respect to CD23, because the facts show that CD23 continues to be a minority opportunity district. Representative Gallego, the supposed Hispanic candidate of choice, won the 2012 congressional election. The "2016 electorate [wa]s more Hispanic than the 2012 electorate. The proportion Hispanic in the turned-out vote has gone up. . . . So the proportion Hispanic has gone up. That would seem to suggest that he might win that election. He doesn't win the election." That is because his "support among both Hispanics and Anglos has dropped." 7/14/17 Trial Tr., p. 1398. In sum, CD23 "is a competitive district that can elect Hispanic candidates of choice," *id.*, and in 2014 and 2016, a significant percentage of Hispanic voters chose Congressman Hurd.

Conversely, it is not possible to say "that Representative Gallego was defeated because of increased racial polarization in the district." *Id.* at 1400. Representative Gallego was defeated in an election in which the raw number of Anglo and Hispanic votes in his favor both went up. *Id.* at 1401. In 2016, Hispanics simply gave less support to Representative Gallego on a percentage basis "than they did in 2012 and 2014." *Id.* Had Representative Gallego received the same percentage level of Hispanic support as he did in 2012 or 2014, he would have won the 2016 election. Congressman Hurd's victory in 2016 was not the product of racially-motivated redistricting; it was the product of increasing Hispanic support. The ultimate outcome of the election "could have been determined by Hispanic voters . . . regardless of how the Anglo voters performed." *Id.* at 1401–02. Thus, CD 23 is "a district that can elect either a Democrat or a Republican; it can elect either an Hispanic or an African-American . . . . There's no modern example of it electing an Angleo." *Id.* at 1402. CD "provides Hispanic voters with the opportunity to elect their candidates of choice." *Id.* at 1403.

Additional trial testimony shows that Plaintiffs' attack on the 23rd Congressional District has very little to do with minority-candidate opportunity or what Hispanic constituents want. Instead, it has everything to do with ensuring that Congressman Hurd will lose. *E.g.,* 7/11/17 Trial Tr., pp. 742–43 (Plaintiffs' witness George Korbel has drawn his own district lines to ensure that CD23 "consistently performs" by ensuring that Congressman Hurd always loses the election). Plaintiffs' strategy is a race-based attack that itself runs afoul of Supreme Court precedent. *E.g., Hunt v. Cromartie*, 526 U.S. 541, 547 (Thomas, J.) ("strict scrutiny applies" to any redistricting plan "if race was the 'predominant factor' motivating the . . . districting decision"). This Court should reject that attack and uphold the CD23 lines as this Court drew them and the Legislature enacted them in 2013.

12

II. **Dr. Henry Flores' flawed expert testimony has little probative value and fails to establish that CD23, in its current form, dilutes minority voting strength.**

With regard to their vote dilution claims as they pertain to CD23, Plaintiffs place primary emphasis on the expert reports and trial testimony of Dr. Henry Flores. The MALC Plaintiffs fought vigorously for the inclusion of Dr. Flores as a testifying expert witness, arguing that "[a]t the very least, [his] testimony has the tendency to make more probable the fact of CD23's manipulation with improper racial purpose; and this fact would be of consequence in finding Defendants' liable for violations of § 2 and the Fourteenth Amendment." Plaintiff MALC's Response in Opposition to Motion to Exclude Expert Witness Testimony of Dr. Henry Flores (Dkt. No 1466), at 2. Yet the data presented in Dr. Flores' Second Supplemental Report (Dkt. No. 1443-1), and the conclusions he makes both in that report and during his testimony at trial, fail to account for significant facts and variables that negate Plaintiffs' vote-dilution claims and reinforce CD23's status as a Hispanic opportunity district.

A. **Dr. Flores' report and testimony lack credibility.**

This is not the first time that Dr. Flores has attempted to use a selective data set to comport with a myopic narrative of racial discrimination or vote dilution on behalf of redistricting plaintiffs. Such deficiencies have not been lost on judges in the Fifth Circuit and in district courts throughout Texas, including this Court. In *Rodriguez v. Bexar County, Tex.*, 385 F.3d 853 (5th Cir. 2004), a case that dealt with a challenge to Bexar County's redistricting plan, Dr. Flores' analysis led the Fifth Circuit to conclude that "Dr. Flores's calculation errors were significant and systematic, and produced a substantially flawed analysis." *Rodriguez*, 385 F.3d at 863. Further, "this is not the first time that this court has found substantial errors in Dr. Flores's work." *Rodriguez*, 385 F.3d 863, n. 11 (citing *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1214–15 (5th Cir.1996) ("FBISD demonstrated inconsistencies in Dr. Flores's data and showed that some of Dr. Flores's

methodologies made his results inaccurate or unreliable. Dr. Flores manually corrected exhibits while testifying and admitted to other errors FBISD and the district court identified. Dr. Flores's testimony also indicated that his analysis was incomplete and slanted in support of the black plaintiffs.... Dr. Flores ... [was] forced to concede that several of [his] opinions were either suspect or incorrect.")). The Fifth Circuit in *Rollins* "upheld the district court's decision to discredit Dr. Flores's findings and theories on the basis of numerous errors in his analysis. *Rodriguez*, 385 F.3d 863, n. 11 (citing *Rollins*, 89 F.3d at 1219).

Of course, Dr. Flores' flawed testimony in previous redistricting cases does not automatically render his analysis deficient here. (Those deficiencies were brought to light during cross-examination and will be discussed below.) But it is revealing that Plaintiffs would rush to add Dr. Flores as a trial expert at the 11th hour when he had unquestionably already made up his mind about CD23, and the legislature's motivations in drawing it, in his most recent book, *Latinos and the Voting Rights Act: The Search for Racial Purpose*, published in 2015 and presumably written well before that. In the final chapter, titled *Strategic Racism Uncovered*, Dr. Flores concludes that "[m]ore than 600,000 individuals residing along the jurisdictional boundaries of CD23 were manipulated in order to achieve the desired outcome" and that "[t]his resulted in a congressional district that showed an increase in the Latino majority population but would turn out at a lower rate creating favorable electoral conditions for the Republican congressional candidate." HENRY FLORES, LATINOS AND THE VOTING RIGHTS ACT: THE SEARCH FOR RACIAL PURPOSE 261 (Lexington Books 2015).

Plaintiffs were apparently confident that there was little chance Dr. Flores would allow data gathered from CD23 elections subsequent to his book release to negate one of the book's primary conclusions regarding CD23. Perhaps this is why Dr. Flores' report and testimony

downplays the significance of data showing increased Latino voter turnout in CD23 between 2010 and 2014 in midterm elections and 2012 and 2016 in presidential years (*see* Flores Second Supplemental Report, Table 2), and discounts the fact that the Latino candidate of choice, former Congressman Gallego, lost almost 5% of his Latino support from 2012 to 2016 despite the overall increased voter turnout of Latinos. 7/12/17 Trial Tr., pp. 852-53. Such a selective accounting of critical data renders Dr. Flores an unreliable witness.

**B. Dr. Flores' testimony misconstrues the concept of an opportunity district.**

As this panel noted in its March 10, 2017 Order concerning the 2011 maps, "access to the political process, aside from population statistics, is the criteria by which a court determines illegal or unconstitutional vote dilution." *Perez v. Abbot*, March 10, 2017 Order (Dkt. No. 1339), at 13 (citing *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1549, 1551 (5th Cir. 1992)). This Court and others have stated that while a 50%+ majority Hispanic voting age population like CD23 "always provides a theoretical opportunity" under a totality of the circumstances analysis, it must be a "'realistic opportunity,' 'reasonable opportunity,' 'practical opportunity,' [and] 'effective opportunity.'" *Perez v. Abbot*, March 10, 2017 Order (Dkt. No. 1339), at 16 (citing *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1023 (8th Cir. 2006); *Kirksey v. Bd. of Superiors of Hinds Cty., Miss.*, 554 F.2d 139, 150 (5th Cir. 1977). A "protected class is not entitled to § 2 relief merely because it turns out to vote in a lower percentage than non-protected voters." March 10, 2017 Order (Dkt. No. 1339), at 16 (citing *Salas*, 964 F.2d at 1556).

This panel also confirmed that "§ 2 does not guarantee electoral success for minority-preferred candidates." *Perez v. Abbot*, March 10, 2017 Order (Dkt. No. 1339), at 16. In *League of United Latin American Citizens v. Perry*, the Supreme Court concluded that "to the extent the District Court suggested that District 23 was not a Latino opportunity district in 2002 simply

15

because [former Republican Congressman] Bonilla prevailed, it was incorrect." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("*LULAC*") (internal citations omitted). The *LULAC* Court added that "[t]he circumstance that a group does not win elections does not resolve the issue of vote dilution. We have said that 'the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.'" *LULAC*, 548 U.S. at 428 (citing *Johnson v. De Grandy*, 512 U.S. 997, 1014, n. 11 (1994)). Such precedent led this panel to "[r]eject[] Plaintiffs' position that a district provides opportunity only if the district would allow minority voters to elect their candidate of choice more than 50% of the time in an exogenous election index." March 10, 2017 Order (Dkt. No. 1339), at 17. "Section 2 does not require that minority-preferred candidates would win some number of exogenous statewide elections in a proposed district," and that "[s]uch a requirement is not compatible with the Supreme Court's directives that § 2 requires a searching, practical inquiry specific to the facts of each case." March 10, 2017 Order (Dkt. No. 1339), at 17.

In this case, Plaintiffs have suggested that former-Congressman Gallego's failure to win two out of three razor-thin margin elections somehow proves that CD23 is not a district where Latinos have a "real opportunity." Specifically, Dr. Flores testified that "if Mr. Gallego is the Latino candidate of choice and Latinos are voting at a higher rate and they still can't win in that district, that means the district itself may look like a Latino majority district but it's not performing as such, because he had been winning before." 7/12/17 Trial Tr., p. 850. But this line of reasoning, centered on the idea that a "district provides opportunity only if the district would allow minority voters to elect their candidate of choice more than 50% of the time in an exogenous election index," was expressly rejected by this Court. March 10, 2017 Order (Dkt. No. 1339), at 17. And Dr. Flores' parochial focus on former Congressman Gallego's election losses as a barometer to determine

Latino performance and opportunity in CD23, runs counter to the Supreme Court's and this Court's conclusions that real opportunity is not a guarantee of electoral success for minority-preferred candidates.

Dr. Flores is wrong to argue that CD23 is "not performing as [Latino majority district]" simply because former Congressman Gallego lost the 2014 and 2016 general elections, and "because he had been winning before." Aside from the fact that "winning before" is in reference to a single general election victory in CD23 by Gallego in 2012, the relevant analysis does not depend solely on former Congressman Gallego's wins and losses over a single presidential election cycle. That approach is incompatible with the Supreme Court's "directives requiring that § 2 requires a searching, practical inquiry specific to the facts of each case," March 10, 2017 Order (Dkt. No. 1339), at 17, and, as discussed below, disregards numerous legally significant facts and variables, such as former Congressman Gallego's competing against different candidates in 2012 and 2016, the quality of those candidates, and the increased Latino percentage support for Congressman Hurd and decreased Latino percentage support for former Congressman Gallego from 2012 to 2016.

### C. Dr. Flores' report and testimony ignore significant data, facts and variables relevant to CD23.

In his Second Supplemental Report and during his trial testimony, Dr. Flores failed to account for numerous probative data points and variables in his analysis. Defendants exposed these deficiencies during Dr. Flores' cross and the direct examination of Dr. John Alford.

#### 1. Gallego's decreased support from Latinos

Dr. Flores concludes that "future candidates of the Latino voters' choice will find it impossible to prevail in CD23 unless the percent of Latino registered voters is substantially increased or non-Latinos reduce their bloc voting against the Latino preferred candidate," Flores

Report (Dkt. No. 1443-1), at 12, citing his observation that "non-Latinos have dramatically reduced their support for the Latino preferred candidate, [former Congressman Gallego], from 2012 to 2016." *Id*. Dr. Flores' conclusion is fatally flawed. As an initial matter, Dr. Flores' conclusion is completely undercut by the reality that the Latino preferred candidate for President, Hillary Clinton, won the district resoundingly by 4% *under the current map*.

Second, Dr. Flores' analysis fails to consider at all that former Congressman Gallego's percentage Latino support decreased from "86.9 to 82.0 between the 2012 and 2016 elections." 7/14/17 Trial Tr., p. 1400. Instead, Dr. Flores focuses solely on Gallego's decreased support from *non*-Latinos from "20.8 to 14.0 percent," 7/14/17 Trial Tr., p. 1400, as the reason for Gallego's loss in 2016. That discrepancy was exposed on cross-examination.

It should also be noted that Dr. Flores' analysis compares Latino and non-Latino data using several performance metrics, but "with regard to the non-Latino category," Dr. Flores does not provide a "breakout between the different ethnicities in that category." 7/12/17 Trial Tr., p. 852. Therefore, all of Dr. Flores' analysis concerning "non-Latino" registration, turnout, and overall performance, actually includes "all ethnicities other than Latino voters," with no examination "specifically about Latinos versus the Anglos in that non-Latino category." 7/12/17 Trial Tr., p. 853.

Third, the fact that both non-Latino *and* Latino support for former Congressman Gallego decreased by statistically significant margins between 2012 and 2016 cuts against Plaintiffs' and Dr. Flores' assertion that he "was defeated because of increased racial polarization in the district." 7/14/17 Trial Tr., p. 1400. Between 2012 and 2016, Representative Gallego received decreasing percentage support from both Hispanic *and* Anglo voters. 7/14/17 Trial Tr., p. 1400. Racial "polarization occurs when the groups move in *opposite* directions, not when they move in the same

18

direction." 7/14/17 Trial Tr., p. 1400-01. In reality, "if Representative Gallego in 2016 had received the level of Hispanic cohesion that he got in 2012, much less in 2014 when it was higher, in either of those cases that would have erased the 3,000-vote margin and he would have won." 7/14/17 Trial Tr., p. 1401. So Congressman Gallego lost in 2016 "because of a decline in support among both of those groups," 7/14/17 Trial Tr., p. 1401, not because he merely lost support from non-Latinos, as Dr. Flores argues. The Supreme Court has made clear that "longtime voting patterns are highly probative of racial polarization." *Cooper v. Harris*, 581 U.S. __, slip op. at 15 (2017) (citing *Gingles*, 478 U.S. at 57). If the data is indicative of any pattern here, it is that CD23 has become less racially polarized than when Gallego won in 2012.

### 2. *Gallego faced different opponents in 2012 and 2016*

Dr. Flores' conclusions regarding CD23 also fail to adequately account for the legally significant variable that former Congressman Gallego faced two distinctly different opponents in 2012 and 2016. During cross-examination, Dr. Flores agreed that "the quality of a candidate might have something to do with whether someone wins or loses an election," and that "the type of campaign someone ran might have something to do with whether or not someone wins or loses an election." 7/12/17 Trial Tr., p. 854. Dr. Flores also acknowledged that "there are differences between Representative Hurd and [Gallego's 2012 opponent, former Congressman] Canseco," but admitted that his analysis "didn't control for the differences between Representative Hurd and Canseco." 7/12/17 Trial Tr., p. 854-55. And when pressed by defense counsel, despite his lack of recognition for this important variable in his report and during Plaintiffs' direct examination, Dr. Flores conceded that it is "possible that Will Hurd might have just been a better candidate." 7/12/17 Trial Tr., p. 855.

19

To be fair, it was likely too fact intensive and laborious for Dr. Flores to quantify the statistical consequences of Congressman Hurd's regular outreach to all 29 counties in CD23 and his results-driven service to all of his constituents regardless of race or party affiliation. But elections, especially in extremely competitive districts like CD23, are won and lost in large part by the quality and competency of the officeholder or candidate. As noted above, Representative Hurd is clearly an unusually high-quality and competent candidate.

Plaintiffs would have this Court hold that Congressman Hurd's election victories were entirely a result of discriminatory district lines. That argument not only ignores the fact that Congressman Hurd earned through hard work almost 5% more of the Latino vote between 2012 and 2016, it also reduces the CD23 electorate to racially mono-focused and robotic citizens that are unable to appreciate the diligence, responsiveness, independence, and productivity of their elected officials. The Senate Committee on the Judiciary's Report accompanying Congress' 1982 extension of the Voting Rights Act "clearly stated that one factor that could have probative value in § 2 cases was 'whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.'" *Gingles*, 478 U.S. at 101 (citing S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), p. 29). If any Member of Congress could be considered the opposite of unresponsive, it would be Congressman Hurd, and "Republicans and Democrats who have witnessed his ascent say he possesses a rare combination of competence as a policymaker, responsiveness as a representative and ferocity as a campaigner."[10] Congressman Hurd's effectiveness as an officeholder and candidate and his responsiveness to constituents are what makes him so popular in CD23 and are the reasons behind his election victories—not CD23's geographic lines.

---

[10] Tim Alberta, *Will Hurd is the Future of the GOP—If He Can Hold on to the Toughest Seat in Texas*, POLITICO (May 5, 2017), *available at* https://goo.gl/0oNA1u.

## **CONCLUSION**

For the foregoing reasons, Representative Hurd, Helen Delavan, Heriberto Gonzalez, Timothy Hardt, Sylvia Miluska Gonzalez, and Ruben Vasquez Falcon respectfully request that this Court (1) reject Plaintiffs' challenges to this Court's redistricting plan with respect to CD23, and (2) ensure that CD23's current district lines be maintained in their entirety.

Respectfully submitted,


Dated: July 31, 2017                    /s/ Terry L. Scarborough
                                        Kent R. Hance
                                        State Bar No. 08881000
                                        Terry L. Scarborough
                                        State Bar No. 17716000
                                        V. Blayre Peña
                                        State Bar No. 24050372
                                        HANCE SCARBOROUGH, LLP
                                        400 W. 15th Street, Ste. 950
                                        Austin, Texas 78701
                                        512.479.8888
                                        512.482.6891
                                        khance@hslawmail.com
                                        tscarborough@hslawmail.com
                                        bpena@hslawmail.com

                                        John J. Bursch (*pro hac vice* admission pending)
                                        BURSCH LAW PLLC
                                        9339 Cherry Valley Ave SE, #78
                                        Caledonia, Michigan 49316
                                        616.450.4235
                                        jbursch@burschlaw.com

                                        Charles R. Spies (*pro hac vice* admission pending)
                                        James E. Tyrrell III (*pro hac vice* admission pending)
                                        CLARK HILL PLC
                                        1001 Pennsylvania Ave NW
                                        Suite 1300 South
                                        Washington, DC 20004
                                        202.772.0909
                                        cspies@clarkhill.com
                                        jtyrrell@clarkhill.com

                                        *Counsel for Amici Curiae*