# In the United States District Court
## for the
## Western District of Texas

| | | |
|---|---|---|
| SHANNON PEREZ, ET AL. | § | |
| | § | |
| v. | § | SA-11-CV-360 |
| | § | |
| GREG ABBOTT, ET AL. | § | |

## ORDER ON PLAN H358

Before Circuit Judge SMITH, Chief District Judge GARCIA, and District

Judge RODRIGUEZ

This Order addresses Plaintiffs' statutory and constitutional claims

against Plan H358, enacted by the 83rd Texas Legislature in 2013.

The following Plaintiffs assert claims against Plan H358: The Texas Latino

Redistricting Task Force[1] (limited to HD90), MALC,[2] the Perez Plaintiffs,[3] and

---

[1] The Texas Latino Redistricting Task Force "is an unincorporated association of individuals and organizations committed to securing fair redistricting plans for Texas" and includes Hispanics Organized for Political Education ("HOPE"), the Mexican American Bar Association of Texas ("MABA"), the National Organization for Mexican American Rights ("NOMAR"), Southwest Voter Registration Education Project, the William C. Velasquez Institute, and Southwest Workers' Union. Docket no. 891 ¶ 4. The Task Force individual Plaintiffs include Joe Cardenas III, Florinda Chavez, Cynthia Valadez, Emelda Menendez, Alejandro Ortiz, Rebecca Ortiz, Armando Cortez, Gregorio Benito Palomino, Cesar Eduardo Yevenes, Jose Olivares, Tomacita Olivares, Renato De Los Santos, Alex Jimenez, Gilberto Torres, Socorro Ramos, and Sergio Coronado. *Id.* ¶¶ 5-20.

[2] MALC is a non-profit Latino legislative caucus established to serve the members of the Texas House of Representatives and their staffs in matters of interest to the Mexican American community of Texas. Docket no. 897 ¶ 18. MALC-1 is a list of current MALC members.

[3] Shannon Perez, Gregory Tamez, Sergio Salinas, Carmen Rodriguez, Nancy Hall, Dorothy DeBose, Jessica Farrar, Wanda F. Roberts, Richard Nguyen Le, and TJ Carson. The Perez Plaintiffs have joined with MALC in this phase of the litigation.

the NAACP Plaintiffs.[4]  At this stage of the litigation, Plaintiffs' remaining claims involve statutory claims under § 2 of the Voting Rights Act ("VRA") and constitutional claims under the Fourteenth Amendment to the United States Constitution.

## I. Background and Summary of Claims

Although the Governor called the special session to adopt the Court's interim map H309, some changes were made to the map in Dallas, Tarrant, Harris, and Webb Counties, and the Legislature incorporated those changes into Plan H358.  At second reading, Chairman Darby outlined criteria that he would apply in evaluating any proposed amendment:

> that it does not create a harm or a risk to further litigation by violating the constitution's "one person, one vote" principle regarding population deviation; that it does not dilute nor dismantle a Section 2 protected district under the Voting Rights Act or violates the Texas Constitution regarding contiguous districts or the county line rule.  If those measures can be satisfied, I want to see that it addresses a concern, for example, the splitting of a community of interest.  And finally, I'd like to see an agreement amongst the members affected.

JX-17.3 at S1-2.  After three amendments were adopted, Darby stated that they were "small tweaks to districts between members that unite communities of

---

[4] The NAACP Plaintiffs include the Texas State Conference of NAACP Branches, an association of local chapters of the NAACP, Howard Jefferson, and Rev. Bill Lawson.  Individual Plaintiff Juanita Wallace passed away in 2016.  According to the affidavit of Carmen Watkins, Regional Director for Region VI of the National NAACP, the Texas NAACP has well over 10,000 members and members who are registered to vote in almost every county.  NAACP-1.  She further attests that "the NAACP has at least one branch in each of the implicated counties," 884 members in Tarrant County, 320 members in Bell County, 1,232 members in Harris County, and 147 members in Fort Bend County.  *Id.*  She further states that she reviewed the official membership lists in each of those counties and determined that there are members who reside in CD9, CD18, CD30, CD33, and House districts 100, 109, 110, and 111 (Dallas County), 95 and 101 (Tarrant County), 54 and 55 (Bell County), and 26 and 27 (Fort Bend County).  *Id.*

interest and don't have any implications with regard to Section 2 of the Voting Rights Act or the constitution." *Id.* at S5.

The Task Force Plaintiffs bring *Shaw*-type and intentional discrimination/vote dilution claims based on the changes made to HD90 in Tarrant County.

MALC and the NAACP Plaintiffs assert § 2 results claims based on the Legislature's continued failure to draw additional minority coalition opportunity districts in Harris, Fort Bend, Dallas, and Bell Counties, as shown in their proposed demonstration Plans H391 (MALC) and H392 (NAACP). Defendants maintain their position that § 2 cannot require the creation of coalition districts, but that argument has already been rejected by this Court as inconsistent with binding Fifth Circuit authority. Defendants further contend that these districts are not required by § 2 because Plaintiffs have failed to prove the necessary cohesion among the minority groups included.

MALC also contends that the Legislature was required to draw additional Latino opportunity districts in Nueces County and Midland/Ector Counties. Defendants argue that these districts cannot be required by § 2 because their creation would violate Texas's County Line Rule. This Court has already held that § 2 of the VRA may require the State to break the County Line Rule if § 2 requires the district under the totality of circumstances.

Plaintiffs contend that the intentional discrimination found by this Court in Plan H283 remains in Plan H358, and that Plan H358 was operated or

maintained as a device to further intentional vote dilution. This Court's analysis in the Order on Plan C235 concerning the intent of the 2013 Legislature applied to both Plan C235 and Plan H358. Thus, the Court finds that the 2013 Legislature purposefully maintained the intentional discrimination contained in Plan H283 where the district lines remain unchanged or substantially unchanged. The Court will discuss the implications of its prior intent findings in the analyses of the various areas affected.

Last, Plaintiffs assert that the Legislature again acted with intent to discriminate in adopting Plan H358 in 2013 by the Legislature's continued hostility toward minority districts, pretextual use of the County Line Rule to avoid creating new Latino opportunity districts, and refusal to consider minority coalition opportunity districts, despite the minority population growth. While the Court agrees that the circumstantial evidence remains unchanged in terms of the Legislature's refusal to recognize minority growth due to its continued hostility toward minority districts as perceived Democrat districts, the Court finds that the intentional discrimination in 2013 was limited to the Legislature's intent to maintain and perpetuate (without remedy) any infirmities in the plan that already existed.[5]

## II. Analysis by County

The Court thus turns to its analysis of the various claims in each of the

---

[5] Judge Garcia and Judge Rodriguez adopt the prior fact findings and opinions and incorporate them into this Order because they are relevant to the 2013 plan claims. In this Order, Judge Smith agrees that the Court's orders on the 2011 plans are law of the case. The findings and conclusions in this order are therefore not inconsistent with what this district court panel has already decided.

specific challenged areas.

## A. Harris County

With regard to Plan H283, Plaintiffs asserted a § 2 results claim and intentional discrimination/intentional vote dilution claims. They challenged mapdrawers' failure to draw a new Latino or coalition opportunity district, despite the minority population growth, while protecting slower-growing Anglo districts. They also challenged the elimination of HD149, which they contended was a multi-ethnic coalition minority opportunity district as part of the Legislature's decision to reduce the number of districts in Harris County from 25 to 24.

In fashioning the interim plan H309, this Court found that Plaintiffs had demonstrated a likelihood of success on the merits of the § 2 claim in eastern Harris County. Specifically, the Court found that Plaintiffs had presented numerous demonstration plans illustrating that an additional compact majority-HCVAP district could be drawn there, and made a preliminary finding that creation of a new Latino opportunity district was justified by the totality of circumstances. Docket no. 690 at 8-9. The Court's interim plan thus reconfigured HD144 in the manner requested by Plaintiffs to have a majority HCVAP. *Id.* The Court also maintained HD149, finding that the § 5 claims were not insubstantial. *Id.*

In its Order on Plan H283, the Court found that Plaintiffs failed to prove intentional racial discrimination with regard to the decision to reduce the

number of districts to 24 or the elimination of HD149. Docket no. 1365 at 52-54. However, the Court found that the failure to draw an additional Latino opportunity district in Harris County violated § 2 and was intentionally racially discriminatory. The Court noted that: the member-driven process failed to consider § 2 compliance insofar as minority members were essentially shut out of the process; Hanna's recommendation to consider drawing an additional Latino opportunity district (as he was able to do) was ignored; and when faced with a map that failed to create any new Latino opportunity districts, mapdrawers decided to shuffle minority population within the minority districts to artificially (and without legal basis) inflate the SSVR and HCVAP of existing Latino ability district HD148 to claim VRA compliance, knowing that this was already a performing Latino district and that no new opportunity district was being created.[6] Docket no. 1365 at 53-57.

During the 2013 legislative session, some changes were made to HD133, HD137, and HD149 and incorporated into Plan H358. These changes were the result of Amendment 3 (Plan H318) offered by Reps. Wu, Vo, and Murphy. On the House floor, Rep. Wu stated that the amendment was agreed to by the three affected members and "swaps out sections of our districts." JX-17.3 at S4. He stated, "One of the main things it does is it helps reintegrate part of a very large Vietnamese population that has very strong language and cultural issues that

---

[6] As discussed in the Opinion on Plan H283, mapdrawers not only used their unjustified increase in SSVR and HCVAP in HD148 to defend their failure to create any new Latino districts in Harris County, they also used it to try to "offset" the loss of existing opportunity district HD33 in bad faith (an attempt that the D.C. Court properly rejected).

neither Representative Murphy nor I can really address and are better placed in Representative Vo's district so he can better represent them. This helps make this area more constitutionally sound . . . ." *Id.*; *see also* Tr1525-26. No party complains of these changes.

With regard to Plan H358, MALC[7] asserts § 2 results claims and intentional vote dilution claims based on the intentional failure to create additional coalition opportunity districts.[8] MALC's demonstration Plan H391 creates two additional coalition districts—HD132 is a Black + Hispanic CVAP coalition district and HD135 is a Black + Hispanic + Asian coalition district. JX-107; Tr32; MALC-24. Defendants contend that Plaintiffs cannot satisfy *Gingles* because minority groups do not vote cohesively in Harris County, citing the lack of evidence of cohesion in primary elections.

As noted in the Order on Plan C235, the evidence is undisputed that African Americans and Latinos choose primarily to participate in the Democratic primaries in Harris County. The undisputed evidence further shows that Latinos and African Americans are strongly cohesive in support of Democrat candidates in general elections. *See* MALC-22 Table 7 (2014 and 2016 elections). Brischetto characterized African American and Latino cohesion as "extremely high" in general elections. MALC-19 ¶ 64. Dr. Chervenak also found high levels

---

[7] The NAACP Plaintiffs do not have a claim for a new minority district in Harris County, but assert that HD149 is protected under § 2 and must be protected in any remedial map. Docket no. 1529 at 61.

[8] It is not possible to draw an additional BCVAP or HCVAP-majority district in Harris County using 2011-2015 ACS data. Tr60 (Korbel).

of cohesion between African Americans and Latinos in general elections, with each group cohesively supporting candidates of each race. NAACP-2 Table 5.

As discussed in the Order on Plan C235, however, the evidence indicates a lack of cohesion between African Americans and Latinos in the primaries. Dr. Engstrom's countywide analysis of statewide elections involving Latino and non-Latino candidates indicates lack of Democratic primary cohesion between African-American and Latino voters. African Americans and Latinos shared support for only two of six Latino candidates in Harris County between 2006 and 2010 (both groups also shared a lack of support for candidate Alvarado). Docket no. 307-1 at 16. However, in one case where both groups supported the Latino candidate (Yanez for Supreme Court Place 8), African-American support was only 52.7% and in the other case (Uribe for Land Commissioner), Latino support was only 59%. *Id.* Table 6. For three Latino candidates, African-American support for the Latino candidate was lower than "others." Docket no. 307-1 at 17-18

Dr. Brischetto did not study any primary elections. Dr. Chervenak did examine the 2016 Democratic primary in HD149 in southwest Harris County, where Asian-American candidate Hubert Vo ran against an African American. He found that a majority of African-American (56.4%) and Latino (60.6%) voters supported Vo. NAACP-2 Table 5A. But Vo also received majority support from Asian (62%) and white (55.4%) voters, meaning that all racial groups supported Vo in the primary, though none at very high levels. *Id.* Further, while HD149

is located within Harris County and is somewhat near (though not adjacent to) proposed tri-ethnic coalition district HD135, it is unclear how voting patterns in HD149 would translate to proposed HD135.

As discussed in the Court's prior orders, there was lay testimony about Hispanic and African-American coalitions in Harris County. And there was lay testimony, such as from Rogene Calvert, Sarah Winkler, Rep. Hubert Vo, and Rep. Sylvester Turner, that Asians, Latinos, and African Americans in Harris County had formed coalitions, though this testimony referred to southwest Houston, farther south than where proposed HD135 would be. Docket no. 1364 ¶¶ 410, 424-27, 451, 460, 503. Rep. Senfronia Thompson provided general testimony that African Americans, Latinos, and Asians work in cooperation together politically in Harris County.

But as it concluded with regard to the proposed congressional districts, the Court finds that there is simply insufficient evidence of cohesion to show that, when combined, Black and Hispanic voters in proposed HD132 or Black, Hispanic, and Asian voters in proposed HD135 would cohesively support their candidates of choice. Thus, the § 2 results claims in Harris County fail.

To the extent MALC, Perez Plaintiffs, or the NAACP Plaintiffs contend that discrimination found by the Court in Plan H283 remains in Plan H358,[9] the Court rejects such a claim.

---

[9] *E.g.*, docket no. 1454 at 41 (stating that it is "unclear whether all the intentional discrimination established by the NAACP and other parties has been adequately remedied"); docket no. 1529 (NAACP Post-Trial Brief) at 62 (the NAACP takes the position that "all the intentional discrimination in Harris County has not yet been remedied").

No further changes are required in Harris County.

## B. Fort Bend County

The NAACP and MALC argued that the Fort Bend County configuration in Plan H283 violated § 2 because it resulted in minority vote dilution, and that an additional minority coalition district was required. Population growth (primarily minority) in Fort Bend County resulted in the addition of a new district there, but no additional minority district was drawn.

The Court considered the NAACP's proposed tri-ethnic coalition district HD26 in Plan H202, but found that the NAACP had failed to establish the *Gingles* preconditions. Specifically, the districts appeared compact, but Plaintiffs had not offered evidence that the minority communities contained within the district were compact, taking into account traditional districting principles. Docket no. 1365 at 59.[10]

And even if the districts were compact, the Court found that the NAACP offered only lay testimony concerning minority cohesion in Fort Bend County, and the Court would not infer cohesion from other evidence in Harris County. *Id.* at 60. MALC's expert Dr. Brischetto provided the only expert testimony on racially polarized voting in Fort Bend County, and found cohesion among African Americans, Latinos, and Asians and polarized Anglo bloc voting. MALC-161 Table 22. But he only looked at elections in 2012, and he did not conduct a

___

[10] The Court declined to consider MALC's Plans H329 and H366 because these plans were first introduced during the 2013 legislative session and were more properly considered as part of the 2013 plan case. Docket no. 1365 at 60.

multivariate analysis of the primary elections.  Docket no. 1364 ¶ 533.[11]

To support its § 2 results claims in Fort Bend County in this phase of the litigation, MALC offers demonstration Plan H391, which creates a new majority-minority Black+Hispanic+Asian district HD26.  Tr30; MALC-24.  Plan H391 redraws HD26, HD27, HD28, and HD85 in the "Fort Bend Mix" of Fort Bend, Jackson, and Wharton Counties, and is set up to be plugged into Plan H358.  MALC-17 (Korbel 2017 Report) ¶ 26.  MALC's expert George Korbel drew the plan, and he states that HD26, HD27, and HD28 are essentially located in suburban Houston areas, the districts are simplified, the split of the City of Richmond is eliminated, and the adjacent cities of Rosenberg and Richmond are combined in HD85.  *Id.*

NAACP offers demonstration Plan H392, which creates tri-ethnic coalition district HD26, and Dr. Fairfax's testimony regarding compactness.  County Commissioner Grady Prestage also testified to the compactness of proposed HD26.  Tr567-68.  The Court agrees that NAACP's proposed HD26 is compact and satisfies the first *Gingles* precondition of numerosity when all the groups are combined.

NAACP Plaintiffs offer the expert testimony of Dr. Chervenak to show racially polarized voting.  NAACP-2 Table 4.  He examined 2012, 2014, and 2016

___

[11] In his 2014 Supplemental Report, Dr. Alford noted that Dr. Brischetto found that in Fort Bend County, Asian voters supported Democrats in the general election at an average of only 60%.  Alford 2014 Supp. Report at 17.  Hispanic support was 72.2%, while Black support was 97.8%.  MALC-161 Table 25.  Dr. Alford further highlighted the lack of evidence of cohesion in the primaries, and predicted based on minority voter behavior in other areas that these groups would not be cohesive in the primaries.  Alford 2014 Supp. Report at 21-22.

general elections in HD26, finding in each case that African Americans, Latinos, and Asians were cohesive in support of the minority candidate, while non-Hispanic whites were strongly polarized against those candidates (with support never exceeding 13%). *Id.* Dr. Chervenak testified that there had not been a contested Democratic primary in HD26 for many years. Tr422. The NAACP Plaintiffs argue that this demonstrates that voters of color are not acting in opposition to each other, and each group supports the minority candidates in the general election. They further contend that lay witness testimony supports a finding of cohesion, citing Commissioner Prestage's testimony about K.P. George (Fort Bend ISD Trustee), Neeta Sane (HCC Board of Trustees), and Q Imam (Sugarland City Council). Tr557-58.

The State contends that Plaintiffs cannot satisfy *Gingles* because there is no evidence of cohesion among Asian-American, Black, and Hispanic voters in Fort Bend County. Docket no. 1526 at 63. They note that Plaintiffs' experts did not analyze primary elections, that Dr. Murray testified that Asian-American voters in Fort Bend County tended to split their vote almost evenly between Democrats and Republicans,[12] and that lay witness testimony failed to show cohesion within the Asian population. Defendants also cite the testimony of Jacey Jetton, who testified that Asian Americans are not cohesive among themselves, with South Asian voters and Chinese voters differing in preference, Tr699, and the testimony of Commissioner Grady Prestage, who also confirmed

---

[12] Tr1274-75 (Asians were between 45 and 55% Republican); Tr1288 (Asians in Fort Bend County are more Republican than nationally).

that the Asian-American community is not "monolithic." Tr581-82.

NAACP Plaintiffs argue that the Latino community is also not monolithic, but "that does not negate their ability to obtain fair representation under the Voting Rights Act." Docket no. 1529 at 56. However, the lay witness and expert witness evidence indicates that national origin subgroups within the Fort Bend Asian community[13] may have distinct political preferences such that they cannot all be considered together in determining cohesion. Jetton testified that the Asian community did not necessarily vote cohesively, citing instances where the South Asian and Chinese communities had differed. Tr699-701. Though Jetton's testimony was not particularly compelling for several reasons, Dr. Murray also stated that "you really need to look at national origin groups in Fort Bend County, because the South Asians are much more Democratic and have been since – a lot of them since 2001, too. So it's complicated communities, and to lump them all together is somewhat problematic in terms of analysis." Tr1290. He contrasted this with Latinos in Texas, which he said are mostly of Mexican origin, which "simplifies things a lot." *Id.*

Further, there is evidence that Latinos are not cohesive with other minorities in their choice of primaries. In his 2014 report, Dr. Brischetto found that more Latino voters in Fort Bend County chose to participate in the Republican primary (2.758) in 2012 than in the Democratic primary (576). MALC-161 Table 21. This was also true in 2010, where 2,176 Hispanics chose

---

[13] Commissioner Prestage noted that the Asian population in Fort Bend County includes South Asian (Indians and Pakistanis), Chinese, and Vietnamese. Tr562.

to participate in the Republican primary, while only 1,305 participated in the Democratic primary. Joint Expert Ex. E-3 (Lichtman Report) at 5 (Table 1). In 2008, however, 9,252 Hispanics chose the Democratic primary, while only 2,715 chose the Republican primary. *Id.*

Based on his general election analysis, Dr. Brischetto noted "severe" racial bloc voting between Anglos and African Americans, between Anglos and Hispanics, and between Anglos and Asians in Fort Bend County, and concluded that "[t]here is clearly a tri-ethnic coalition in support of Democrats in the general election" in Fort Bend County. MALC-161 ¶¶ 89, 91. However, he noted that "[v]oter cohesion among Asian American voters for Democrats in general elections is . . . considerably lower (60%) in Ft. Bend. In some of the contests, however, the Asian point estimates are not reliable." *Id.* ¶ 89. The mean vote for Latinos was 72.2% and for African Americans it was 97.8%, compared to Anglo support of 5.9%. *Id.* at Table 25. Dr. Brischetto did not analyze any Fort Bend County elections in his 2017 report.

Considering all the evidence, the Court finds that Plaintiffs have failed to prove minority group cohesion sufficient for their § 2 results claims based on tri-ethnic minority coalition districts in Fort Bend County.

The Court previously rejected the NAACP's intentional vote dilution claim concerning Fort Bend County for insufficient evidence. The NAACP continues to pursue its intentional vote dilution claim in Fort Bend County, arguing that the county is reportedly the most diverse in the country, and thus the

minimization of minority voting strength, with only one of four districts having a representative of color, is circumstantial evidence of an intent to discriminate against voters of color. Docket no. 1529 at 52. In addition, the NAACP offers racial density shading maps to show that minority communities are cracked in the districts' configuration, with HD26 fragmenting a high-density Asian-American population in Sugarland and a substantial Asian-American population in the Four Corners and New Territory region. *Id.* The NAACP notes that County Commissioner Gary Prestage confirmed how Plan H358 fractures Asian-American communities, and the oddly shaped appendages reach out to grab predominantly white pockets of voters, in complete disregard for city boundaries and compactness.

The NAACP does offer circumstantial evidence of intentional vote dilution —minority communities are split, and the result is a lack of proportionality of representation (in 2010 Fort Bend County was 36.2% Anglo, yet only one district has a representative of color). And the HD26 configuration is bizarre, but some explanations were given for the districts' shapes, and Plaintiffs have failed to prove discriminatory intent as opposed to discriminatory effects. Plaintiffs' shading exhibit shows an Asian community in Meadows Place is cracked, but there was evidence that Rep. Reynolds wanted population to the north, which could account for that cracking (the specifics of this possibility were not explored). In addition, mapdrawers offered race-neutral explanations for some of the bizarre shape of HD26. The Court maintains its finding that Plaintiffs

have not shown intentional vote dilution in the Fort Bend County configuration.

No changes are required in Fort Bend County.

## C. Bell County

In the prior phase of litigation, MALC, the Perez Plaintiffs, and the NAACP Plaintiffs asserted § 2 results and intentional vote dilution claims in Bell and Lampasas Counties. The Court found no § 2 results violation in Plan H283, noting that Plaintiffs' proposed districts combined three or four different minority groups but Plaintiffs lacked the necessary evidence of such multi-ethnic cohesion. Docket no. 1365 at 75. The Court also found that, considering all the evidence, the Legislature's intentional failure to create the proposed districts was not intentional vote dilution. *Id.*

However, the Court found evidence that mapdrawers (specifically Anglo Republican HD54 incumbent Aycock) intentionally racially gerrymandered the district by cracking minority population, thus diluting the minority vote to ensure Anglo control over both remaining districts. Rather than respecting the boundaries of the City of Killeen, which included significant minority population and had been mostly within HD54 in the benchmark, he and mapdrawers split the City to divide its minority population. Plans were introduced by minority members that would have kept the City more whole, but they were rejected. Rep. Aycock, who drew the configuration, offered unconvincing and pretextual explanations for the split (such as that portions of the Killeen community were more of a community of interest with Lampasas than with the remainder of

Killeen), leading the Court to find that the decision to split Killeen and the minority community within it (removing minorities from HD54 and moving in Anglos) was to ensure that HD54 and HD55 remained Anglo-majority and to make HD54 less likely to perform for minority voters.[14]

The Plan H283 configuration of Bell and Lampasas Counties remains unchanged in Plan H358. The NAACP Plaintiffs, MALC, and the Perez Plaintiffs continue to assert § 2 results and intentional vote dilution claims. *E.g.*, Docket no. 897 (MALC) ¶ 54 (Plan H358 "unnecessarily fragments the minority community of Killeen to minimize its political impact on Texas House elections"). They contend that the violations found by this Court concerning Plan H283 remain in Plan H358.

The NAACP Plaintiffs offer Plan H392, which draws HD54 as a 30.3% Black Alone CVAP and 20.9% HCVAP coalition district, and the expert testimony of Dr. Fairfax to show compactness. JX-108.3; Tr972 (Fairfax). MALC and Perez Plaintiffs offer Plan H391, which draws HD54 as a 30.1% Black Alone CVAP and 20.4% HCVAP coalition district. JX-107.3. Plan H391

---

[14] The Court also relied on evidence of racially polarized voting in Bell County. Anglos make up 55% of the adult population in Bell County, African Americans 21%, Latinos 19%, and Asians/Others 5%. MALC-161 ¶ 70. Dr. Brischetto conducted a multivariate analysis and found that, in each of the three federal elections, "there were clear patterns of severe polarization between Anglo voters, on the one hand[,] and Latino, African American voters, and Asian voters, on the other." *Id.* ¶ 73. On average, more than 9 in 10 Anglos preferred the Republican candidate while at least 8 in 10 Latinos and Asians and about 9 in 10 African Americans supported the Democrat. *Id.*

In the 2012 HD54 election, Anglos supported Anglo Republican Jimmie Don Aycock at 88.81%, while none of the minority groups supported him (19.13% Latino support, 6.77% African-American support, and 29.9% Other (Asians) support). *Id.* Table 19. All three minority groups supported African-American Democratic candidate Brown (80.87% Latino support, 93.23% African-American support, and 70.1% Other/Asian support). *Id.* In the race for Bell County Sheriff, Anglo support for the Anglo Republican candidate was 90.43%, while Latinos (85.81%), African Americans (97.35%), and Others/Asians (87.59%) voted for the Latino Democrat. *Id.* & ¶ 75.

reunites the City of Killeen in proposed minority opportunity district HD54, respecting municipal boundaries and creating a compact district, while also equalizing population variances this Court previously found to violate one person, one vote principles. Tr20 (Korbel). These districts satisfy *Gingles'* numerosity requirement as a coalition. Both are also compact, especially MALC's district in Plan H391.

However, Defendants contend that Plaintiffs cannot satisfy *Gingles* 2 because Plaintiffs did not establish that Black and Hispanic votes in Bell County are cohesive. Although Dr. Brischetto found racially polarized voting in Bell County in the 2012 general elections he analyzed,[15] he did not analyze any Bell County elections from 2014 or 2016. Dr. Chervenak analyzed general elections in 2012, 2014, and 2016 and found racially polarized voting, but did not analyze primaries.[16] And Defendants contend that Plaintiffs' lay witness testimony does

---

[15] In his 2014 report, Dr. Brischetto found racially polarized voting in Bell County. MALC-161 Table 19. He found "[t]here is clearly a tri-ethnic coalition in support of Democrats in the general election in the two counties where African American and Asian American voters were separated in the analyses [Bell and Fort Bend Counties]. Latino, Black and Asian voters are supporting Democrats, regardless of the race of the candidate." *Id.* ¶ 89. He also found " clearly cohesive bloc voting among Anglo voters, found to be very solid in Ft. Bend and Bell counties, where Black and Asian voters are separated in the analyses. On the average, 95% of the Anglos in those counties supported the Republican candidates in the general election." *Id.*

[16] Dr. Chervenak conducted a racially polarized voting analysis for six general elections within Bell County in 2012, 2014, and 2016. NAACP-2 Table 1. He found strong cohesion (93.4 to 97.6%) among African-Americans supporting African-American candidates in both district and statewide elections, and African-Americans also strongly supported Latino candidates in the general elections (93.6 to 98.9%). Similarly, he found cohesive Latino support for Latino candidates (82.9 to 89.9%) and for African-American candidates (82.9 to 88.6%). "Other" voter support for Latino or African-American candidates never came close to a majority (13.2 to 18.3%). In the 2012 HD54 general election, African Americans gave 95.1% support to African-American candidate Brown, Latinos gave 88.6% support, and other voters gave only 18.3% support. Thus, Dr. Chervenak found, the district (HD54) and statewide elections reveal a high level of racial polarization, with African Americans and Latinos cohesive in support of both African-American and Latino candidates, while minority preferences were not shared by other voters.

not provide a basis for finding cohesion.

The Court found that the lines in Bell County were drawn with a racially discriminatory purpose, and that the minority population was intentionally split to ensure Anglo Republican voting strength in both districts in the area. That intent and harm remain in Plan H358 and must be remedied. Although Defendants argue that any intentional discrimination claim fails due to the lack of evidence that any legislator acted with a racially discriminatory purpose in voting for Plan H358 in 2013, the Court has found that the 2013 Legislature intended to continue the intentional discrimination found in Plan H283.

The Court need not decide whether Plaintiffs have proven that a coalition minority district is required under the § 2 results test. Defendants conceded during the interim map phase, with respect to DFW and CD33, that an appropriate remedy for cracking a minority population would be to reunite that population.[17] As noted, Killeen was mostly whole in Plan H100 but its minority population was then intentionally split to minimize minority voting strength. As a possible remedy, MALC's Plan H391 reunites the City of Killeen and its minority population.

Plaintiffs' intentional discrimination/vote dilution claims have merit, and a remedy is required in Bell County.

---

[17] Because the reunited population is not being purposefully drawn into a minority coalition district for § 2 purposes, evidence of cohesion in the primaries is unnecessary.

## D. Dallas County

In Dallas County, the Court rejected the NAACP Plaintiffs' § 2 results claims with regard to Plan H283 because they failed to meet their burden under *Johnson v. De Grandy* to show that Plan H202 contained more compact opportunity districts than Plan H283, and found that the remaining § 2 results claims were best addressed in the 2013 plan case. Docket no. 1365 at 62 n.49. And while the Court did not find racial gerrymandering or intentional vote dilution in eastern Dallas County, it did find an improper use of race to dilute Latino voting strength in western Dallas County. Specifically, the Court found that mapdrawers improperly used race to make HD103 and HD104 more Hispanic and HD105 more Anglo to protect an Anglo Republican.

The Court's interim Plan H309 did not alter the Dallas County configuration from Plan H283. However, during the 2013 legislative session, some changes were made to HD103 and HD115 through an agreed amendment (Amendment 2, Plan H324) proposed by Rep. Anchia (HD103) and Rep. Ratliff (HD115). Anchia testified that the change was requested by Rep. Ratliff, and Anchia wanted to accommodate him to maintain good relationships. Tr131-133. The amendment swapped some population between the two districts. On the House floor, Rep. Villalba explained that Rep. Anchia would receive the entire community of Farmers Branch in exchange for keeping together the Carrollton Community in HD115. JX-17.3 at 4. Chairman Darby testified (as he also stated on the House floor) that the amendment also "helped the [population]

deviations." Tr1525; JX-17.3 at 6 ("Anchia was way over the deviation, and Bennett Ratliff's district was way under. What that did—what this amendment did was help bring those deviations back into line."). No party complains about these changes.

The NAACP Plaintiffs, MALC, and the Perez Plaintiffs assert results and intentional vote dilution claims under § 2. Plaintiffs contend that certain violations found by this Court concerning Plan H283 remain in Plan H358, specifically this Court's findings concerning HD103, HD104, and HD105 in western Dallas County. NAACP Plaintiffs continue to assert "that minority voters across the county, not just in the western part of the county, were intentionally cracked and packed" beyond those identified areas. Docket no. 1529 at 58.

For the § 2 results claim, MALC's Plan H391 proposes four new minority-majority CVAP coalition districts in Dallas County. Tr31; JX-107; MALC-24. HD102 and HD107 would be Black + Hispanic coalition districts, and HD105 and HD113 would be tri-ethnic coalition districts including Asians.

NAACP Plaintiffs assert that Plan H392 "presents a configuration that corrects [the] intentional discrimination [found by the Court in Plan H283], and when the districts are drawn fairly, three additional majority-minority districts naturally occur, reflecting the population present in those areas." Docket no. 1529 at 58. Those districts are HD105 in western Dallas County, and HD102 and HD107 in eastern Dallas County. All three districts are Black + Hispanic

coalition districts, though HD105 and HD102 are Hispanic-plurality districts and HD107 is a black-plurality district. NAACP Plaintiffs contend that lay expert testimony demonstrates that the proposed districts are compact. They assert that these districts are required by § 2 and to remedy the intentional discrimination across Dallas County.

Whether § 2 requires these districts again boils down to whether minority voters in the proposed districts are politically cohesive. Plaintiffs assert that they have established racially polarized voting through expert and lay witness testimony. The evidence discussed in the Opinion on Plan C235 is equally relevant here. Dr. Chervenak examined six elections in Dallas County. NAACP-2 Table 2. His multivariate analysis revealed racially polarized voting—African Americans and Latinos are cohesive in support of African-American and Latino candidates, while other voters did not share the candidate preferences of African-American and Latino voters. In the 2016 general election for HD107 in Dallas County, Dr. Chervenak found Latinos (83.8%) and African Americans (87.5%) were cohesive in their support of Neave, while Anglos gave only 41.1% support. *Id.*

Dr. Brischetto found racially polarized voting in the five general election contests in 2014 and 2016 that he analyzed—African Americans and Latinos voted cohesively in support of three Latino Democratic candidates and Anglos were cohesive in their lack of support; Anglos gave 64 and 69.4% support to the Latino Republican candidate, while African Americans and Latinos did not

22

support those candidates. MALC-19 Table 5. Thus, "[i]n all five of these contests, African American and Latino voters were supporting the same candidates and opposing the candidates preferred by Anglo voters. The degree of cohesiveness in voting between African Americans and Latinos was extremely high in Dallas County." *Id.* ¶ 50. Plaintiffs also cite to the testimony of Rep. Eric Johnson from Dallas, who stated that African-American voters were strongly supportive of Latino House representatives currently serving in the areas encompassed in HDs 103, 104, and 105. Tr520-21.

Dr. Engstrom's analysis of general elections also found strong cohesion between African Americans and Latinos in support of the Democratic candidate, with Anglo voter support in the 20-30% range. Docket no. 307-1 Table 5. But Dr. Engstrom's analysis of primaries found that African Americans were "the least likely group to support Latino candidates in Democratic primaries." *Id.* at 15 (African American support was lower than "Other" support in six of eight primaries); *see also id.* Table 5.

Defendants note that Korbel did not consider primary cohesion when he drew the districts and did not offer any opinion on cohesion, and that MALC's expert Dr. Brischetto did not look beyond general elections. They further note that NAACP expert Dr. Chervenak did not examine primary elections in Dallas County and could not make any statements about the characteristics of Latino, African American, or Asian American candidates of choice. Tr443-45. Further, Defendants assert, to the extent the record contains any evidence regarding

23

cohesion, it shows that Black and Hispanic voters are not cohesive.

Considering all of the evidence, the Court finds, as it did in the Order on Plan C235, that Plaintiffs have failed to demonstrate the necessary cohesion for their § 2 results claims in Dallas County.

However, the Court finds that the intentional discrimination it found in western Dallas County in Plan H283 still exits in Plan H358. H309 made no changes to Dallas County. Although some changes were made in H358, these did not remove or remedy the intentional discrimination.

Accordingly, changes are necessary in Dallas County to remedy the intentional discrimination previously found by the Court in HD103, HD104, and HD105.

## E. Nueces County

MALC challenges the configuration of districts in Nueces County under § 2 and the Fourteenth Amendment. As discussed in the Court's opinion on Plan H283, it is undisputed that Nueces County had two benchmark Latino opportunity districts (HD33 and HD34, though both failed to elect Latino-preferred candidates in 2010) and part of a third district (HD32) represented by Anglo Republican Todd Hunter. Because Nueces County grew at a slightly slower rate than the statewide average, all three districts were underpopulated compared to the 2010 county population ideal. The 2010 census population entitled Nueces County to almost exactly two (2.02) districts under the County Line Rule. During the 2011 redistricting process, mapdrawers chose to

eliminate one of the Latino opportunity districts (HD33) and draw two districts wholly within Nueces County—one strongly Latino (HD34) and one a safe Anglo Republican seat (HD32) to protect incumbent Hunter.

Although the HCVAP of Nueces County was above 50%, mapdrawers did not look into whether two majority-HCVAP Latino opportunity districts could be maintained in Nueces County, either wholly within the County or by breaking the County Line Rule, despite advice from David Hanna of the Texas Legislative Council to consider those options. Instead, they relied on countywide SSVR (which was below 50%) to assert that it was mathematically impossible to draw two Hispanic districts wholly within the County, and they categorically refused to consider breaking the County Line Rule to comply with the VRA.

They then tried to offset the § 5 retrogression caused by the loss of HD33 by increasing the SSVR of two districts that were electing Democrats, HD90 and HD148, even though, as the D.C. Court held, these were already ability districts.[18] They did not consider whether § 2 required two Latino opportunity districts in Nueces County because, they believed, increasing the number of majority-SSVR (in Interiano's view) or majority-HCVAP (in Downton's view) districts statewide also precluded that claim. Thus, as this Court previously concluded, the motive for increasing the SSVR in HD90 and HD148 was not to increase Latino electoral opportunity in the spirit of the VRA, but to undermine

---

[18] As noted below in the discussion of Tarrant County, the Task Force contends in this phase of the litigation that HD90 did need an increase in HCVAP/SSVR to allow Latinos to control the Democratic Primary. Even if that is true, that was not the basis for the Legislature's actions in increasing HD90's SSVR in 2011.

Latino voting strength statewide by attempting to mask the loss of HD33 and preclude § 2 results claims.

Although Plaintiffs challenged the Nueces County configuration in Plan H283, this Court did not alter the districts in Plan H309. The Court lacked the benefit of the full record in making its preliminary determinations. Thus, at the time, the Court also focused on SSVR rather than HCVAP.[19] Further, the Court concluded that the loss of HD33 for § 5 purposes was offset by the new Latino opportunity district HD144 in the interim map. The Court could not conclude, at that time, that plaintiffs were likely to succeed on their § 2 claim because it appeared that the only way to maintain two Latino districts in Nueces County was to cut a county line, which seemed inappropriate absent a § 5 violation (which existed in Plan H283 but not H309). But the Court did not rule out a conclusion that the VRA could require a county line cut:

> This is not to say that Section 2 of the VRA could never require a county line cut. This Court can envision a situation in which the refusal to cut a county line could, even in the absence of discriminatory purpose, result in vote dilution. However, in the particular circumstances of this case, traditional redistricting principles counsel in favor of maintaining two districts in Nueces County.

Docket no. 690 at 8.

During the 2014 trial, the Task Force Plaintiffs argued for the first time that two HCVAP-majority districts could be drawn wholly within Nueces

---

[19] A review of the full record indicated that HCVAP data was available to mapdrawers before the map went to the floor, that the HCVAP of Nueces County was comfortably above 50% in 2010, that it had been above 50% since the last census in 2000, and that mapdrawers were aware of these facts, yet continued to focus on SSVR because it was below 50%.

County, but did not offer a demonstration map with such districts. The Court found that consideration of the § 2 results claim concerning Plan H283 was premature because, while mathematically two HCVAP-majority districts could be drawn in the area, no Plaintiff demonstrated whether or not two *Gingles*-compliant districts could have been drawn wholly within the County,[20] and it was improper to consider whether § 2 required a County Line Rule violation in Nueces County until that issue was decided.

However, this Court did find evidence of intentional vote dilution in the Legislature's refusal to consider whether the VRA required HD33 to be preserved and its attempted offset for the elimination of HD33 (described above) and also in the configuration of remaining HD32 and HD34. Docket no. 1365 at 37-40. The Court found that HD32 and HD34 were racially gerrymandered to dilute Latino voting strength and protect Anglo incumbent Hunter. HD34 was intentionally packed with Hispanic voters, Hunter intentionally drew out potential Hispanic rivals (both Republican and Democrat), and Hunter intentionally overpopulated HD34 and underpopulated HD32 without legitimate justification in violation of one-person, one-vote principles. The Nueces County configuration remains unchanged in Plan H358, and MALC asserts § 2 results and intentional vote dilution claims.

### ***Standing***

Although Defendants have not raised the issue, these claims require us to

---

[20] No Plaintiff submitted a proposed map or other information to support the *Gingles* preconditions for such a map.

determine whether MALC has standing. MALC's standing argument in Nueces County centers on Raul Torres, a registered voter in current HD34 and a former Texas House representative and MALC member from HD33, the eliminated Nueces County Latino opportunity district. MALC argues that it has organizational standing "to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). In this respect, MALC argues that its organizational strength and membership depend on growth, but that Plan H358 impedes this purpose by eliminating MALC member Torres and preventing potential MALC members from being elected. Docket no. 1462 at 5.

Separately from its argument on organizational standing, MALC asserts that it has associational standing, which requires that an individual MALC member have standing to sue in his or her own right. Docket no. 1462 at 2. To support this requirement, MALC points again to Torres, who "at the time of the filing of this action and the initial redistricting, had his district completely eliminated and was then paired with Anglo Republican Representative Connie Scott." *Id.* at 3.[21]

The general elements of standing are well established:

[21] MALC briefly asserts a third independent argument for standing in Nueces County (and other areas): "MALC also relies on the standing of co-Plaintiffs LULAC and NAACP in the areas of [Nueces County and others], all of whom are seeking the same relief. *See e.g. Ruiz v. Estelle*, 161 F.3d 814 ([5th Cir.] 1998)." Docket no. 1462 at 5 n.1. MALC contends *Ruiz* supports the proposition that "intervenors and similarly situated litigants may not independently require standing if one co-litigant has standing and the intervenor or co-litigant is seeking the same relief." *Id.* Even assuming *Ruiz* can be read this broadly and extends beyond the intervenor context to cover "similarly situated litigants" more generally, this argument fails because neither LULAC nor the NAACP is similarly situated with MALC in Nueces County—MALC is the only plaintiff challenging the configuration of Nueces County in Plan H358.

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted) (most alterations original).

There are two main types of standing for entities such as MALC. First, through organizational standing, "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. Organizational standing is to be distinguished from associational standing (more descriptively termed representational standing) through which "[a]n association has standing to bring suit *on behalf of its members* when [1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 181 (2000) (emphasis added).

The Court agrees that MALC has organizational standing, and alternatively, that MALC has associational/representational standing.

*organizational standing*

The Supreme Court in *Warth*, by simply recognizing that an organization may seek judicial relief from an injury to the organization itself, articulated what is often cited as the origin of organizational standing. 422 U.S. at 511. Several years later, the Supreme Court refined this concept by deciding the seminal case on this topic, *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). The relevant portion of *Havens* dealt with the standing of an organization— Housing Opportunities Made Equal ("HOME")—to bring racial steering claims against a realty company under the Fair Housing Act. *Id.* at 378-79. Relying partly on *Warth* to conduct "the same inquiry as in the case of an individual," the Supreme Court looked to the following allegations from HOME's complaint regarding its expenditures of resources to determine whether HOME alleged a sufficient injury:

> "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices."

*Id.* at 379 (internal citations to HOME's Complaint omitted). The Supreme Court held that the district court improperly dismissed for lack of standing:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id.*

Beyond this main holding, the Supreme Court made two noteworthy comments. First, the Court contrasted its finding that these allegations exceeded a simple setback to HOME's abstract interests with prior case law holding that a mere interest in a problem could not support organizational standing. *Id.* at 379 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). Second, the Supreme Court noted that HOME was not deprived of standing simply because its injury was noneconomic. *Id.* at 379 n.20.

The Fifth Circuit has applied this concept of organizational standing on many occasions, helping define its boundaries by focusing on whether a plaintiff's alleged injury is sufficiently concrete and traceable to the defendant's conduct. In *Louisiana ACORN Fair Housing v. LeBlanc*, the Fifth Circuit recognized that an organization's redirection of "some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." 211 F.3d 298, 305 (5th Cir. 2000). But outside of costs expended pursuing litigation, an organization will have organizational standing if it "prove[s] a drain on its resources resulting from counteracting the effects of the defendant's actions." *Id.*; *ACORN v. Fowler*, 178 F.3d 350, 356-62 (5th Cir. 1999).

In *Fowler*, the court addressed the standing of a voter advocacy organization to force state compliance with the National Voter Registration Act ("NVRA"). 178 F.3d at 356-62. The court concluded that neither litigation costs

nor expenditures made to monitor state compliance with the NVRA supported organizational standing because these injuries were not fairly traceable to the state. *Id*. at 358-59. But for some claims, the court found that the organization had standing based on its voter registration activities, the cost of which increased out of a need to "counteract[ ] the effects of [the state's] alleged failure to implement [the NVRA]." *Id*. at 360-61; *see also Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (affirming a district court's finding of standing for the Louisiana NAACP because the head of its voter registration efforts personally conducted registration drives to counteract a state's alleged noncompliance with the NVRA, even though the NAACP itself may not have spent any money to conduct these drives).

Still, not all diversions of resources counteracting a defendant's conduct establish an injury in fact. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238-39 (5th Cir. 2010). In *City of Kyle*, the court concluded that organizations had not suffered an injury in fact arising from a city's new housing ordinances where they failed to explain how their activities, "which basically boil[ed] down to examining and communicating about developments in local zoning and subdivision ordinances, differ[ed] from [their] routine lobbying activities." *Id*. at 238. Further, the court considered the plaintiffs' failure to identify specific projects that were delayed or curtailed as a result of resources being diverted to the challenged ordinances. *Id*. The court characterized the plaintiffs' alleged injuries as simple setbacks to the organizations' abstract interests rather than

perceptible impairments to their abilities to carry out their purposes, despite the fact that the plaintiffs commissioned a $15,000 study on the impact of the challenged ordinance. *Id.* at 238-39.

The Fifth Circuit has also indicated that a conflict between the defendant's conduct and the organization's mission is necessary but not sufficient to establish organizational standing. *Fowler*, 178 F.3d at 361-62 ("[U]nless it [is] clear that an organization's stated goals [are] 'at loggerheads' with a defendant's conduct, 'it is entirely speculative whether the defendant's conduct is impeding the organization's activities.'" (quoting *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996)). This requirement was satisfied in *Fowler* where the voter advocacy organization's purpose of increasing the political power of low and moderate income people was at odds with the state's alleged failure to facilitate voter registration. *Id.*

This Court is aware of no redistricting case in which an organizational plaintiff has based its standing on an injury to itself, as described in *Havens*. Nor is this Court aware of any redistricting decisions rejecting such a theory. But while *Havens* and many other decisions on organizational standing deal with the Fair Housing Act, nothing in *Havens* limits organizational standing to such challenges. Indeed, as noted above, the Fifth Circuit and other courts have extended this concept of organizational standing beyond the housing context. *E.g.*, *Fowler*, 178 F.3d at 356-62 (the NVRA); *Schedler*, 771 F.3d at 836-37 (same); *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320,

1336-37 (N.D. Ga. 2012) (same). Most importantly for present purposes, despite not dealing specifically with redistricting claims of the type asserted in this case, courts have consistently found standing under *Havens* for organizations to challenge alleged violations of § 2 of the VRA and the Fourteenth Amendment.

A majority of the Supreme Court has accepted this approach in the § 2 context. In *Crawford v. Marion County Election Board*, the Seventh Circuit found that the Indiana Democratic Party had organizational standing to assert § 2 and Fourteenth Amendment claims against an Indiana voter ID law because it "injure[d] the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote. *See Havens*[, 455 U.S. at 378]." 472 F.3d 949, 951 (7th Cir. 2007). Subsequently, a splintered Supreme Court affirmed the Seventh Circuit's grant of summary judgment against the plaintiff's claims on the merits. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 188-89 (2008). In doing so, five justices across two opinions explicitly approved of the Seventh Circuit's standing analysis. *Id.* at 189 n.7 (Stevens, J., joined by Roberts, C.J., and Kennedy, J., announcing the judgment of the Court); *id.* at 209 n.2 (Souter, J., joined by Ginsburg, J., dissenting).

Other circuit and district courts have unanimously reached similar conclusions on organizational standing for § 2 and Fourteenth Amendment claims. *See, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2265 (2017) (finding organizational

standing to bring § 2 and Fourteenth Amendment claims against a state law restricting absentee ballots and in-person voting assistance because the organization planned to expend resources to counteract the law's effect on the African-American community). In one case, for example, the Democratic Party of Virginia alleged § 2 and Fourteenth Amendment claims against a Virginia voter ID law. *Lee v. Va. State Bd. of Elections*, 155 F. Supp. 3d 572, 575-76 (E.D. Va. 2015), *on reconsideration*, 3:15CV357-HEH, 2016 WL 6921611 (E.D. Va. Feb. 2, 2016). At the pleadings stage, the district court found that the Party sufficiently alleged its organizational standing based on expected expenditures of additional resources and longer lines at polling places. *Id.* at 579. The court added that the Party also "claim[ed] direct injury to its raison d'être—electing candidates who support the democratic platform, as opposed to the individualized interests of its members." *Id.* at 578.

Following a trial, the court found that the Party proved its standing and its injury, "primarily in the form of diversion of time, talent, and resources to educate their voters and implement the requirements of the Virginia voter identification law." *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va. 2016). Without mentioning standing, the Fourth Circuit affirmed. 843 F.3d 592 (4th Cir. 2016).

The only case indicating a contrary result is *Lopez v. Merced County, California*, in which the court granted summary judgment for lack of organizational standing against the Mexican American Political Association's §

5 claims because the Association failed to proffer evidence "that [it] ha[d] suffered organizational harm, including any evidence that [it] actually diverted significant organizational resources in an effort to assure Hispanic voter rights." 1:06-CV-1526OWWDLB, 2008 WL 170696, at *8 (E.D. Cal. Jan. 16, 2008). But *Lopez* was a summary judgment decision where the Association's claim to organizational standing foundered not because it was invalid as a matter of law but because the Association failed to meet its evidentiary burden. And as noted, other courts have unanimously recognized this application of organizational standing in the § 2 context.

Plan H358, like Plan H283, eliminates the district of former MALC member Raul Torres. At trial, MALC presented the testimony of Representative Rafael Anchia, the present chairman of MALC. Anchia testified that MALC has "dual purposes." Tr117. One purpose is to represent Latinos in Texas, and one is to grow MALC's membership. *Id*. Defendants presented no contrary evidence on MALC's purposes. On the basis of this evidence, MALC has organizational standing to challenge Plan H358's configuration of Nueces County, which perpetuates the elimination of HD33. MALC's injury due to this configuration is hardly speculative—MALC's loss of a member was caused directly by the elimination of Torres's district.

This is not a case where the Court must assess the expenditure of resources to counteract a certain enactment's effect to determine whether there is a sufficient injury; nor is this a case where MALC's nonmonetary efforts in

counteracting the Plan are at issue. Instead, the injury here is as direct as can be—MALC's very existence, its raison d'être, depends on its membership and growing that membership, and Plan H358's treatment of Nueces County reduced that membership by eliminating Torres's district and deliberately placing Torres in a district he could not win. *See Lee*, 155 F. Supp. 3d at 578. As a result, MALC has organizational standing to challenge Plan H358 in Nueces County.

*associational/representational standing*

The Court also finds alternatively that MALC has representational standing for its Nueces County claims. As mentioned, "[a]n association has standing to bring suit on behalf of its members when [1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth*, 528 U.S. at 181. MALC easily satisfies the second and third prongs because the district lines are important to MALC's purposes of growing its membership and representing Latinos in Texas, and this litigation, like other similar redistricting cases, has proceeded without the participation of individual members. Accordingly, the only issue for associational standing is whether MALC has a member who would have standing to sue in his or her own right.

The only current MALC member in Nueces County is Abel Herrero, the representative for HD34 in Plan H358. MALC-1 at 3. Herrero is also a voter in

HD34.  As discussed above, Nueces County in Plan H358 includes two districts, HD32 and HD34.  HD34, Herrero's district, is a Latino opportunity district.  Thus, Herrero's standing (and therefore MALC's representational standing through Herrero) must exist even though Herrero lives in a Latino opportunity district in Plan H358.

"No circuit has developed a framework specifically for a Section 2 standing inquiry."  *Pope v. Cty. of Albany*, No. 1:11-CV-0736 LEK/CFH, 2014 WL 316703, at *5 n.13 (N.D.N.Y. Jan. 28, 2014).  As a result, this Court will look to the alleged injury and determine whether it is sufficiently concrete, causally connected to the Defendants' conduct, and redressable.  *Lujan*, 504 U.S. at 560-61.  *Pope*, in which a district court found that minority plaintiffs residing in existing majority-minority districts had standing to bring vote dilution claims based on the possibility of drawing an additional majority-minority district, is the most analogous authority in conducting this analysis.  2014 WL 316703. at **5-6.

"Nothing in [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."  42 U.S.C. § 1973(b).  This concept of proportional representation, which refers to "the success of minority candidates, as distinct from the political or electoral power of minority voters" is expressly *not* the right guaranteed by § 2.  *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).  Therefore, lack of proportional representation alone cannot be the alleged injury in a § 2 vote dilution plaintiff's

claim to standing.  *See Pope*, 2014 WL 316703 at *5.

The Court in *Pope* contrasted "proportional representation" as that term was used by the Court in *De Grandy* with "substantial proportionality of political opportunity," which it defined as "per capita voting power on par with the majority."  *Id.*  A denial of this proportional opportunity under the existing voting system, said the court in *Pope*, was the "putative injury" suffered by a minority bringing a § 2 claim.  *Id.*  The *Pope* court concluded that "supported allegations that Plaintiffs reside in a reasonably compact area that could support additional MMDs [majority-minority districts] sufficiently proves standing for a Section 2 claim for vote dilution" because the personalized injury is "that the apportionment of 4 MMDs to the sufficiently numerous and geographically compact minority population, as opposed to the 5 MMDs that Plaintiffs contend are required by the VRA, dilutes Plaintiffs' individual voting power—including those in existing MMDs."  *Id.*

Supporting this conclusion is other Supreme Court language, not cited by the *Pope* court, indicating that the injury suffered by a § 2 plaintiff asserting a claim that additional minority opportunity districts are required goes beyond the boundaries of a single district and includes a geographic area.  In *Shaw v. Hunt*, the Court stated that "[i]f a § 2 violation is proved for a particular area, it flows from the fact that individuals in this area 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' 42 U.S.C. § 1973(b)."  517 U.S. 899, 917 (1996).

In *De Grandy*, the Court recited "how manipulation of district lines can dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door." 512 U.S. at 1007 (citing *Voinovich v. Quilter*, 507 U.S. 146, 153-54 (1993)).

Thus, while the Court has said that § 2 rights are individual rights and not the right of the minority group as a whole, a claim that an additional minority opportunity district is required concerns individuals in a particular geographic area. As described in *De Grandy*, the basis of such a § 2 results claim in the single-member district context is typically cracking or packing (or a combination of them). The claim will generally thus involve two or more districts within the geographic area where minority population is cracked or one or more districts in which the minority population is packed (and from which additional districts could be drawn), or some combination.[22] A voter such as MALC member Abel Herrero, who lives in HD34, essentially lives in an allegedly packed district because MALC's claim is that the Latino population in the area is sufficient for two Latino opportunity districts, but the plan contains only one. *See, e.g., Barnett v. City of Chicago*, No. 92 C 1683, 1996 WL 34432, at *5 (N.D. Ill. Jan.

---

[22] In *LULAC v. Perry*, 548 U.S. 399, 437, 504 (2006), Justice Kennedy stated that the question was "whether line-drawing dilutes the voting strength of the Latinos in District 23," disagreeing with Chief Justice Roberts' framing of the § 2 inquiry as "whether line-drawing in the challenged area as a whole dilutes minority voting strength." But the focus of this disagreement was not whether additional minority opportunity districts could be drawn in West Texas, but whether CD23 had been impermissibly diluted.

29, 1996) (finding standing where "[p]laintiffs allege that many of their class members live in packed wards which could be redrawn into non-excessive majority African American wards"). Thus, the claim focuses on Herrero's district in the context of the broader geographic area.

For these reasons, this Court agrees with the conclusion of *Pope* and holds that plaintiffs who reside in a reasonably compact area that could support an additional minority opportunity district have standing to pursue § 2 claims, even if they currently reside in an opportunity district. Herrero would have standing to bring these claims in his own right, and thus MALC has representational standing to assert these claims.

In sum, MALC has standing to bring its challenges to Plan H358's configuration of Nueces County on two theories. First, MALC has organizational standing based on the loss of Raul Torres's seat in HD33 and its resulting loss of a member. Second, MALC has associational standing to represent the interests of its members because MALC member Abel Herrero would have standing to sue in his own right.

### *Analysis of the Merits*

Having determined that MALC has standing to assert its claims, the Court considers its § 2 results claim. MALC offers two demonstration plans: Plan H400 and Plan H391. In Plan H400, Korbel drew two majority-HCVAP districts (55.2% HCVAP HD32 and 59.9% HCVAP HD34 using 2011-2015 ACS data) wholly within Nueces County, but found their performance on his exogenous

election index to be so low as to indicate a lack of real electoral opportunity in both districts. Tr28; MALC-13 at 2. HD32 performed in 7/35 statewide elections (both state and federal), and HD34 performed in 0/35 statewide elections between 2010 and 2016. Tr28; MALC-13.

Despite its lower SSVR (ranging from 47.2% in 2010 to 47.7% in 2016), HD32 performed for Democrats (presumed to be the minority preferred candidate) in 4/5 elections in presidential election year 2012 and 3/8 in presidential election year 2016, but not at all in the non-presidential years, when Latino voter turnout is typically lower. MALC-13. And despite its higher (and increasing) SSVR (ranging from 50% in 2010 to 51.9% in 2016), HD34 did not perform at all in any year. *Id.*

Therefore, in Plan H391, Korbel "open[ed] up the county line" to draw two districts that would perform sufficiently to create "effective" Latino opportunity districts. Tr28; MALC-17 (Korbel Report) ¶ 80. The simplest way to accomplish this would be by adding Hispanic population from another county to a Nueces County district or placing Nueces County Anglo population in a district based outside Nueces County, either of which would break the Nueces County line only once. But Korbel testified that he could not create two effective districts by breaking the county line only once, and thus he maintained HD34 in a configuration very similar to that in Plan H358, removed Anglo Nueces County population and joined it with HD30 in Aransas, Calhoun, and Victoria Counties, and then joined the remainder of Nueces County in HD32 with all of Kleberg

County.[23]  Tr29; MALC-17 ¶¶ 80-82.  This resulted in two districts with higher HCVAP than in Plan H400: HD32 in this plan is 61.2% HCVAP and HD34 is 66.4%.  We are not informed of the specific performance of HD34, but since it maintains its general location and high HCVAP (66.4%) and SSVR (59.2%), presumably it would perform effectively.  Proposed new HD32 performs 0/10 in 2010, 4/5 in 2012, 2/12 in 2014, and 6/8 in 2016 on Korbel's index.  MALC-24.

To establish its claim, MALC must first establish the three *Gingles* preconditions: (1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.  *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  If MALC satisfies these three preliminary requirements, it must then satisfy the ultimate § 2 inquiry by showing from the "totality of the circumstances" that Hispanics have less opportunity than do other members of the electorate to participate in the electoral process and elect candidates of their choice.

The first *Gingles* precondition includes the requirements of numerosity and geographical compactness.  For the numerosity requirement, the Court agrees with the Second Circuit in *Pope v. Albany County*, that a plaintiff need

---

[23] MALC's demonstration Plan H295 also breaks the Nueces County line two times–first by joining part of San Patricio County with HD34, and second by removing part of Nueces County population and joining it with HD32 in Aransas County.  And demonstration Plan H205 took a similar approach, yet broke the county line a third time by joining some Nueces County population with HD43 to the south.

only show a simple majority of the relevant minority group (here, HCVAP) at the first *Gingles* step. "[T]his initial majority-minority inquiry serves a useful gate-keeping role by identifying, in broad terms, when a minority group has at least 'the *potential* to elect representatives in the absence of the challenged structure or practice.'" 687 F.3d 565, 575 (2d Cir. 2012) (quoting *Gingles*, 478 U.S. at 50 n.17). The court there noted that

> [t]he relative size of a minority group's majority in a district may well be among the totality of circumstances that can inform the ultimate determination of vote dilution and the appropriate remedy. But it is simply the fact, not the size, of a minority group's majority presence in a proposed district that permits a plaintiff to satisfy the first of *Gingles*'s preliminary requirements.

*Id.* at 574.[24] Thus, concerns about whether Hispanics have a "realistic" potential to elect representatives considering such things as voter registration rates and turnout "may well warrant careful consideration when a court reviews the totality of the circumstances in deciding the ultimate *Gingles* inquiry . . . [and] may also inform the appropriate remedy for a Section 2 violation." *Id.* at 575. Both of MALC's demonstration maps include two districts with greater than 50% HCVAP and thus satisfy the numerosity threshold.

In Plan H400, Nueces County is divided into two compact districts— HD32 and HD34. Although Corpus Christi is split, its population is too large to be

---

[24] The Second Circuit indicated that its position was in accord with the Fifth Circuit's decision in *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991). The Fifth Circuit did not expressly decide this issue, but did say that the "potential to elect" is all that is required under § 2 such that "[a]ll that must be shown is that 'the minority's voting age population exceeds 50%.'" *Id.* at 1117 n.9. However, the Court also referred to testimony that the minority-preferred candidate would have won, and noted that "it is entirely proper to refer to evidence other than census data to establish the 'potential to elect.'" *Id.* at 1117 & n.10.

placed entirely within one district, and it is likewise split in Plan H358. In Plan H391, HD34 tracks most of existing HD34, changing some boundaries only within Corpus Christi, and it includes Rep. Herrero's residence. Thus it can be said to respect the traditional redistricting principle of respecting existing district lines and member/constituent relationships. And the County Line Rule dictates that the remainder of Nueces County be joined with an entire county, and thus, under the strictures of the County Line Rule, HD32 reflects a compact community insofar as it connects the remaining Nueces County population to the whole of adjoining Kleberg County. But the fact that Plan H391 must also then excise Anglo population in two distinct areas in Nueces County (from both HD32 and HD34) joined only by water is troubling. If all that were required was to add adjoining similar Hispanic population from Kleberg County that would otherwise be separated solely by operation of the County Line Rule, the case for compactness would be much more compelling.[25] However, the Court will assume for sake of argument that Plan H391 also demonstrates compactness.[26]

The second and third *Gingles* requirements have already been established

---

[25] For example, if an identifiable compact community straddled the county line and thus would be divided solely by operation of the County Line Rule, keeping that community whole to provide voting opportunity where it would otherwise be lacking would present a strong case. However, MALC's demonstration maps indicate that creating two "effective" districts is not so simple. In MALC's demonstration Plan H205, Nueces County is placed into *five* districts. In MALC's Plan H295, HD32 takes part of Nueces County in two separate areas as well as part of San Patricio County, and HD34 spills out of Nueces County into the northern and eastern portions of San Patricio County.

[26] The Court notes that in MALC's demonstration Plan H201—its Whole County Plan that minimized county line breaks (it has three)—MALC left HD33 and HD34 wholly within Nueces County and then excised 6% of Nueces County's population (that was 76% Anglo) and joined it with HD32. However, rather than excising a whole area, it cherry picks several distinct areas along the Corpus Christi coast. But it demonstrates that, in the earlier phase, MALC proposed a plan with only one county line break related to Nueces County.

for Nueces County. This Court found legally significant racially polarized voting between Latinos and non-Latinos in Nueces County. Docket no. 1390 at 48. After examining the data and conclusions provided by several experts, the Court found that Latinos in Nueces County are highly cohesive, and that Anglos vote as a bloc usually to defeat minority preferred candidates.[27]

The updated expert analysis continues to show high levels of racially polarized voting in Nueces County. *E.g.*, MALC-22 Table 3. Plaintiffs have also provided expert testimony from Dr. Brischetto showing racially polarized voting in Kleberg County and the 52 South Texas counties, which includes Kleberg County. Brischetto 2014 Report Table 7; MALC-22 Table 4.

The Court thus turns to the totality of circumstances analysis. As noted, the County Line Rule would dictate that two districts be drawn wholly within Nueces County. When MALC's expert attempted to draw two HCVAP-majority districts, he felt that Latinos were essentially worse off than under Plan H358 because one district would not perform at all and one performed poorly (compared to Plan H358, where one district does perform consistently for Latinos[28]). Thus, the logic goes, application of the County Line Rule, combined

---

[27] The Court found extreme levels of racially polarized voting, and noted that, even if Defendants correctly argued that Plaintiffs must prove a non-partisan/racial basis for the polarization, Plaintiffs sufficiently did so by demonstrating racially polarized voting in the primaries. Dr. Engstrom analyzed both general elections and primaries and found legally significant racially polarized voting in both. Dr. Alford, Defendants' expert, endorsed Dr. Engstrom's methodology and report, and agreed that the levels of bloc voting (levels in the 90/10 range) found by Dr. Engstrom were legally significant. Docket no. 1390 at 50-51 n.50.

[28] HD34 performance in Plan H358 is 5/10 in 2010, 5/5 in 2012, 10/12 in 2014, and 8/8 in 2016 under Korbel's index. MALC-13; Tr26-28. HD32 does not perform at all.

with other factors, is responsible for the vote dilution, and the County Line Rule must yield. But the Court finds that while MALC may have shown that Hispanics are entitled to two opportunity districts in Nueces County, it has failed to show that the County Line Rule must yield.

As this Court explained in its opinion on Plan H283, the VRA can require the State to violate the County Line Rule. Docket no. 1365 at 16-21. Traditional districting principles such as the County Line Rule may be subordinated to race to remedy a § 2 violation, so long as it is no more than reasonably necessary to comply with § 2. *Id.*

MALC contends that the two districts wholly within Nueces County shown in Plan H400 do not provide electoral opportunity because they do not perform sufficiently on Korbel's exogenous election index, and thus the County Line Rule must yield to allow creation of districts with better performance. This Court has already concluded that the results of an exogenous election index alone will not determine opportunity. Such indices often do not mirror endogenous election performance, though in demonstration districts we do not have the benefit of actual elections in the district to study. Rather than just relying on an exogenous election index to measure opportunity, the Court must conduct an intensely local appraisal to determine whether real electoral opportunity exists.

The totality of the circumstances inquiry directs us to consider the Senate factors. "Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to

its share of the population in the relevant area." *LULAC*, 548 U.S. at 426. Although statewide Hispanics lack proportionality, in Nueces County they are around 56% of the relevant population (CVAP) and they have one of two (50%) of districts. Creating a second district would result in over-representation in Nueces County, but Hispanics statewide would still be under-represented.

Turning to the Senate factors, the Court need not again review the history of voting-related discrimination. Texas has a long history of such discrimination, and the Court found intentional vote dilution in the Legislature's enactment of the 2011 plan.

Another key Senate factor is the extent of racially polarized voting in the political subdivision. As discussed above, not only does racially polarized voting exist in Nueces County and its house district elections, the level is high, and the high degree of Anglo bloc voting plays a role in the defeat of Hispanic candidates. Dr. Engstrom found that, in the general elections, Latino support for the Latino Democratic candidate consistently exceeded 90%, while non-Latino support ranged between 7.5% and 17.6%. Docket no. 307-1 Table 2. This is similar to polarization levels that the Supreme Court characterized as "especially severe" in *LULAC v. Perry*, 548 U.S. 399, 427 (2006) (noting that 92% of Latinos voted against Bonilla while 88% of non-Latinos voted for him).

In the 2010 general election in HD33, in which incumbent Solomon Ortiz, Jr. was defeated, Latinos supported Ortiz with 92.3% support, while non-Latinos gave only 11% support. Ortiz lost the election, receiving 47.49% (11,306 votes)

of the vote to Torres's 52.51% (12,499 votes), a margin of only 1,200 votes. Latinos were only 45.08% of the turned out vote. Docket no. 1364 ¶ 234.

There was also extreme polarization in the 2012 HD34 general election, where Latinos supported Herrero with 95.55%, while non-Latinos gave only 11.09% support. MALC-161 Table 4. Non-Latinos voted cohesively in favor of Anglo incumbent Connie Scott with 88.91% of the vote, and Latino support was 4.45%. *Id.* Despite this extreme polarization, Herrero won the election with 57.17% (25,482) of the vote to Scott's 42.83% (19,088 votes). Countywide, Dr. Brischetto found that less than half (44.1%) of voters in the 2012 general election were Latino. MALC-161 ¶ 46 & Table 3 (approximately 42,000 voters were Latino and 53,000 were non-Latino). The Spanish Surname turnout (SSTO) was 55.1%. D-109 at 57. Hispanics were 68.2% of the CVAP in HD34 using 2011-2015 ACS data.

Another Senate factor is the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. There was evidence in the prior phase showing that Hispanics, including in Nueces County, suffer a "continuing pattern of disadvantage" relative to non-Hispanics.[29] They suffer disparities in health, income/employment, and education, and these disparities are strongly associated with

---

[29] Docket no. 1364 ¶ 286. Korbel examined updated data and found that the information had not materially changed, and "[t]he large financial, educational, employment and social gap remains." MALC-17 at 2. Expert testimony also tied those lingering effects to past discrimination.

lower rates of registration, voting, and participation in the political system. *See* docket no. 1390 at 27; docket no. 1364 ¶ 286.

Thus, statewide, Hispanics generally have substantially lower voter turnout than do Anglos, often attributed to the lingering effects of past discrimination. *E.g.*, Joint Expert Ex. E-3 (Lichtman Report) ¶ 11.[30] But there are significant turnout differences across counties. Countywide, Dr. Brischetto found that less than half (44.1%) of voters in the 2012 general election were Latino. MALC-161 ¶ 46 & Table 3 (approximately 42,000 voters were Latino and 53,000 were non-Latino). And Dr. Engstrom's analysis of the 2010 HD33 general election in which Ortiz lost showed that Latinos were 45.08% of the turned-out vote. Docket no. 307-1 at 26. Thus, it appears that Latinos are turning out to vote in Nueces County at lower rates than non-Hispanics.[31]

Defendants contend that Latinos have been elected to public office in the jurisdiction in high numbers, demonstrating equal opportunity. The evidence shows that there have been a significant number of Latinos in elected office in Nueces County, including the county attorney, district clerk, three of eight district court judges, and three of eight Corpus Christi council members. Docket no. 1364 ¶ 285. And Latinos, such as Abel Herrero and Raul Torres, have been elected to house districts.

---

[30] Dr. Lichtman found the percentage of Hispanic VAP participating in elections was 14% statewide, and that it ranged from 4% to 19% of the VAP in the counties he studied. But he did not look at Nueces County. And he notes that this percentage is from the VAP, not the CVAP, and thus reflects the much lower citizenship rates for Latinos in certain areas.

[31] In 2011, the SSVR in Nueces County was just below 50%. The Court is not aware of any evidence showing the countywide SSVR% in 2013 or more recently.

"The Report notes also that evidence demonstrating . . . that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." *LULAC*, 548 U.S. at 426 (quoting *Gingles*, 478 U.S. at 44-45). MALC contends that the Legislature has a newfound appreciation for the County Line Rule and is using it pretextually to avoid creating Latino opportunity districts. The Court finds that the County Line Rule is a legitimate and important traditional districting principle in Texas. *See Clements v. Valles*, 620 S.W.2d 112 (Tex. 1981). Even though MALC presented evidence through its expert Korbel that the Legislature has not always adhered so strictly to the County Line Rule in the past, a violation of the County Line Rule could result in litigation on that basis. Though the Legislature used the County Line Rule for its political advantage in 2011 and 2013, the Court finds that it nevertheless must be respected unless § 2 requires otherwise.

Based on an analysis of the *Gingles* requirements and the totality of the circumstances, the Court finds that MALC has demonstrated that an additional compact minority district could be drawn in Nueces County—Plan H358 has one, when two could be drawn. Although Hispanic voters in Nueces County have a § 2 right to an additional district, the main question presented is whether it entitles them to a configuration such as that in Plan H400 (two HCVAP-majority districts that are poorly performing or not yet performing) or a configuration such as that in Plan H391, where the County Line Rule is broken to create two

"effective" districts.[32]  To find that Plan H391 is appropriate, the Court must conclude that subordinating the County Line Rule is necessary to comply with § 2.  But the Court concludes that Plaintiffs have not adequately demonstrated that they lack equal opportunity in a configuration such as that in Plan H400 such that a county line break is necessary.

Certainly the high levels of racially polarized voting and the lingering effects of past discrimination affecting voter turnout weigh in MALC's favor. This Court previously discussed how Plaintiffs could assert that HCVAP-majority districts do not present real electoral opportunity due to racially polarized voting and lower registration and turnout caused by the lingering effects of official discrimination.  But there is simply not enough evidence to conclude that the districts in Plan H400 do not provide real electoral opportunity.

Nueces County was estimated to be about 56% HCVAP in 2010.  Docket no. 1364 ¶ 237.  Its growth between 2000 and 2010 was Hispanic growth, as both African-American and Anglo population declined, and its HCVAP continues to climb.  *Id.*  Hispanics are being elected to countywide offices and as house district representatives, indicating a lack of barriers to candidacy and election. Although Dr. Brischetto found that, given the high levels of racially polarized voting, minorities generally win in districts only if the combined minority VAP exceeded 66%, his analysis also showed Abel Herrero won HD34 with HCVAP

---

[32] A third option is to maintain the current configuration (one safe district and one not).

levels of 59.4% in 2004 and 2008. MALC-165; MALC-166 Table 1. In Plan H400, proposed HD34 has an HCVAP of 59.9%. Although the HCVAP in proposed HD32 is lower at 55.2%, that district provides opportunity, at least in presidential election years, under Korbel's index.[33]

Further, whether Hispanics win elections is not the same thing as whether they have the *opportunity to win* elections. *LULAC*, 548 U.S. at 428 ("The circumstance that a group does not win elections does not resolve the issue of vote dilution."). In 2008, HD33 (60.4% HCVAP) and HD34 (58.2% HCVAP) were performing Latino opportunity districts with total SSVR of 54.3% and 53.6%, respectively.[34] D-100. In 2010, they were still Latino opportunity districts, but the Latino-preferred candidate lost (though by only 1,193 votes and 2,037 votes). Korbel's analysis was the only election analysis of the proposed districts in Plan H400. Most of the elections in his index did not involve a *Latino* Democrat candidate, who would presumably be the Latino-preferred candidate. Such elections would be more probative because Latinos would have a "horse in the race."

In addition, Korbel only looked at statewide races and no county races. Districts may perform quite differently in local elections than they do in state and federal elections. Thus, we know that Democrats in statewide elections and

---

[33] In *Salas v. Southwest Texas Jr. College District*, 964 F.2d 1542, 1556 (5th Cir. 1992), the Fifth Circuit held that the fact that Hispanics were 53% of registered voters was "persuasive evidence that Hispanic voters are not deterred from participation in the political process because of the effects of prior discrimination, including unemployment, illiteracy, and low income."

[34] In 2012, Herrero easily defeated Scott in the reconfigured "safe" Latino opportunity district HD34, and has not had a challenger since.

federal elections (President and U.S. Senate) would generally lose in these proposed districts, but we do not know how they might perform in local elections with Latino candidates. It is conceivable that, in competitive local races with Latino candidates, Hispanic voters would mobilize in significantly higher numbers.

Moreover, in Plan H400, both HD32 and HD34 include demographic distributions strongly favoring Hispanic voters. In HD32, with 55.2% HCVAP, there are approximately 68,700 Hispanic citizens of voting age and only 55,800 non-Hispanics.[35] Thus, there are approximately 13,000 more Hispanic citizens of voting age than all other groups combined. In HD34, with 59.9% HCVAP, there are approximately 73,500 Hispanic citizens of voting age, compared to 49,000 non-Hispanics.[36] Thus, there are approximately 24,500 more Hispanic citizens of voting age than all other groups combined. These numbers translate into a significant advantage in house district elections, given that in none of the elections analyzed by Korbel did more than approximately 50,000 total voters even participate in either HD32 or HD34, and in non-presidential election years the number was closer to 30,000 voters.[37] In other words, if these Hispanic

[35] 2011-2015 ACS data show approximately 124,510 citizens of voting age in HD32, 55.2% of whom (68,729) are Hispanic. MALC-13 (Red-116 Report) at 5. Thus, the Court counts the remainder (~55,800) as non-Hispanic.

[36] 2011-2015 ACS data show approximately 122,645 citizens of voting age in HD34, 59.9% of whom (73,464) are Hispanic. MALC-13 (Red-116 Report) at 5. Thus, the Court counts the remainder (~49,200) as non-Hispanic.

[37] In presidential election years, voter turnout levels were around 50%. In 2008, the HD32 turnout was 50,567 voters and the HD34 turnout was 53,493 voters. MALC-13 at 7. In 2012, the HD32 turnout was 46,044 voters and the HD34 turnout was 51,757 voters. *Id.* at 17. In 2016, HD32 had 47,927 voters and HD34 had 56,626 voters. *Id.* at 21.

citizen voting age persons registered and turned out (and voted cohesively), they could easily control elections.

As noted, Korbel found that HD32 performed 0/10 in 2010, 4/5 in 2012, 0/12 in 2014, and 3/8 in 2016, with the unsurprising trend that performance for Latinos increased significantly in presidential election years. Although Korbel did not include 2008 in his chart, he did include the underlying election data, and using his criteria, the Latino-preferred candidate (Democrat) received more votes than the Republican candidate in 8 of 8 elections. MALC-13 at 10. Similarly, although Democrats won no elections in HD34 in 2010 through 2016 in Korbel's index, they received more votes than Republican candidates in 4 of 8 elections in 2008 (and lost two by margins of .2 and .4%). *Id.* This also indicates that the districts provide potential to elect.

Although it cannot be denied that Hispanics suffer the effects of lingering discrimination and that this affects their voting and turnout, the Court finds that Hispanics have equal opportunity in two districts drawn wholly within Nueces County (or at least MALC has failed to show that they do not).[38] These

---

In non-presidential years, total voter turnout was around 30%. In 2010, there were 29,044 voters in HD32 and 32,965 voters in HD34. MALC-13 at 11. In 2014, HD32 had 27,250 voters and HD34 had 30,825 voters. *Id.* at 22. Given these numbers of total voters, the fact that Hispanics have 13,000 more citizen voting age persons in HD32 and 24,500 more in HD34 than all non-Hispanics combined is significant.

[38] In *Gingles*, the Supreme Court noted that, "[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." 478 U.S. at 50 n.17 (emphasis in original). Similarly, if they possess the potential to elect (real electoral opportunity) even with application of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. That Latino voters might be more successful under districts drawn without the strictures of the County Line Rule is not the relevant focus under § 2.

districts may not be the best configuration for minority success, but the "ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success." *LULAC*, 548 U.S. at 428. Based on the evidence before the Court, breaking the County Line Rule twice to remove Anglos and incorporate even more Hispanics to improve electoral outcomes goes beyond what § 2 requires.

In sum, Nueces County had two minority opportunity districts, but they could not be maintained in their benchmark configurations due to population loss. Rather than exploring whether two HCVAP-majority districts wholly within Nueces County should be drawn, the Legislature drew one safe district for Hispanics and one safe district for incumbent Republican Todd Hunter. The evidence shows that two HCVAP-districts could have been drawn that would provide Hispanics with equal electoral opportunity, and that § 2 could require those two districts. But the evidence does not show that the Legislature was required to break the County Line Rule to draw what Plaintiffs consider to be "effective" districts.

Thus, the Court must consider whether § 2 requires a remedy for this results violation. In addition, the Court previously found that the Legislature intentionally discriminated and violated one person, one vote principles in configuring the HD32/HD34 border in Plan H358, and that discrimination was purposefully maintained in Plan H358. That intentional discrimination requires a remedy.

This does not necessarily mean that two districts must be drawn in Nueces

County as proposed in Plan H400. In *Georgia v. Ashcroft*, 539 U.S. 461, 480 (2003), the Supreme Court discussed the choice between "creating 'safe' districts . . . or a greater number of districts in which it is likely, although perhaps not quite as likely . . . , that minority voters will be able to elect their candidates." It noted,

> Either option will present the minority group with its own array of electoral risks and benefits, and presents hard choices about what would truly maximize electoral success. On one hand, a smaller number of safe majority-minority districts may virtually guarantee the election of a minority group's preferred candidate in those districts. Yet even if this concentration of minority voters in a few districts does not constitute the unlawful packing of minority voters, such a plan risks isolating minority voters from the rest of the State, and risks narrowing political influence to only a fraction of political districts. And while such districts may result in more "descriptive representation" because the representatives of choice are more likely to mirror the race of the majority of voters in that district, the representation may be limited to fewer areas. On the other hand, spreading out minority voters over a greater number of districts creates more districts in which minority voters may have the opportunity to elect a candidate of their choice. Such a strategy has the potential to increase "substantive representation" in more districts, by creating coalitions of voters who together will help to achieve the electoral aspirations of the minority group. It also, however, creates the risk that the minority group's preferred candidate may lose.

*Id.* at 480-81 (internal quotations and citations omitted). Thus, Plaintiffs should consider their preferred configuration for the remedy stage. But, as noted, the intentional discrimination previously found (and the one person, one vote violation) requires a remedy.

## F. Midland/Ector Counties

MALC has consistently contended that a new Latino opportunity district

was required in Midland and Ector Counties. No new Latino opportunity districts were considered or drawn in Midland/Odessa because the proposed HCVAP-majority districts all broke the County Line Rule. During the prior phase of litigation, MALC offered four plans that proposed a new Latino opportunity district in the Midland/Ector County area—Plans H205, H295, H329, and H360. In its Opinion on Plan H283, the Court found that Plaintiffs failed to prove the first *Gingles* precondition for the proposed districts in Plan H205 and H295 because they failed to demonstrate a compact minority population. The Court found that Plan H329 and Plan H360 were best considered in the 2013 plan trial phase because these plans were first introduced during the 2013 legislative session. In the 2013 session, the Legislature continued its steadfast refusal to consider any districts that would cause a County Line Rule violation, and no new Latino opportunity districts were drawn in the Midland/Odessa area. *See, e.g.*, JX-15.3 at 126.

MALC continues to pursue its § 2 results claims. It notes that Hispanic growth requires a Latino opportunity district in Midland and Ector Counties despite the fact that its creation would violate the County Line Rule. MALC relies on Plan H329 and Plan H360, and now additionally offers Plan H321, a plan proposed by Rep. Martinez Fischer during the 2013 session. Tr175 (Martinez-Fischer); MALC-28 (plan map and data). MALC contends that HD81, which was 51.7% HCVAP using the ACS data available to the Legislature at the time, combines a "vibrant community of interest of cohesive Latino

neighborhoods in Midland and Odessa" with seven other whole counties and dividing no other county line except Midland and Ector Counties. Docket no. 1525 at 16-17.

Plan H329 proposed HD81 with 55.3% HCVAP and 53.7% SSVR. MALC-14 at S47; MALC-96. In Plan H329, proposed HD81 takes in part of Midland and Ector Counties and large portions of West Texas, while HD82 takes in the remainder of Midland and Ector Counties. MALC also offers Plan H360 as a plug-in plan. MALC-91 (map). HD81 in this plan includes Ward, Crane, Upton, and minority parts of Ector and Midland Counties. Proposed HD81 is 50.1% HCVAP using 2008-2012 ACS data. MALC-93. HD82 takes the remainder of Ector County and Midland County and pairs them with Dawn, Martin, Andrews, and Winkler Counties. Korbel testified that the minority populations of Midland and Odessa are only about 12 to 15 miles apart. TrJ1396. Plan H360 has no VTD splits. TrJ1398 (Korbel).

MALC's proposed districts satisfy the numerosity requirement and MALC offers strong evidence that the minority population is compact (especially as demonstrated by Plan H360 and the testimony of Luis Sanchez). *See LULAC*, 548 U.S. at 435 (members of a racial group in different areas could share similar interests and therefore form a compact district "if the areas are in reasonably close proximity"). MALC also offered testimony showing racially polarized voting between Latinos and non-Latinos in Midland and Ector Counties. TrJ947, TrJ969; MALC-161 (2014) (Brischetto).

But the Court cannot reach the merits of this claim (or any intentional vote dilution claim based on the failure to draw this district) because MALC lacks standing, and it is the only Plaintiff that has pled this claim. Although the Perez Plaintiffs have joined MALC (and LULAC has joined the Perez Plaintiffs for certain House claims) in this phase for litigation purposes, only MALC has pled a claim for vote dilution in Midland/Ector Counties, such that MALC cannot rely on the Perez Plaintiffs or LULAC for standing.[39]

MALC's arguments for standing to bring its claims in Midland/Ector Counties are essentially the same as its arguments for standing in Nueces County. Docket no. 1462 at 12. In particular, MALC argues that it has organizational standing to seek a remedy for an injury to itself as an organization and that it has representative/ associational standing to sue on behalf of its members. As discussed above, MALC prevailed on both of these arguments with respect to Nueces County. But applying the same principles from that discussion, MALC's arguments fail in Midland/Ector Counties.

MALC does not fully describe how its claim to organizational standing would apply in Midland/Ector Counties. But the claim to standing here on this basis is far weaker than in Nueces County, where the changes to the House Plan directly caused MALC's membership to decrease because of the loss of Raul Torres's seat. In order to claim that Plan H358's configuration of Midland and

---

[39] The NAACP notes that it has members in Midland County, but the NAACP also did not plead a claim for a § 2 Latino opportunity district in Midland, so MALC cannot rely on the NAACP members' standing. Perhaps recognizing this, MALC seeks to rely on NAACP member standing only in Fort Bend, Harris, Dallas, Nueces, and Bell Counties. Docket no. 1462 at 5 n.1.

Ector Counties injures it, MALC must argue that the configuration prevents MALC membership from growing. This basis for standing is too speculative, as it relies on the *possibility* that if such a district were drawn, it would elect someone who would then join MALC. Further, accepting this argument would mean that MALC would have similar standing in any county in which it argued that a district should be drawn that might elect a Latino. Unlike in Nueces County, where the record clearly demonstrates that the removal of HD33 decreased MALC's membership by ousting Torres, there has been no similar effect here. This theory does not support standing.

MALC's claim to representational standing in Midland/Ector Counties likewise fails. MALC argues that its "membership in the West Texas area includes a Latino member," without further elaboration. Docket no. 1462 at 12. Reviewing MALC's membership list, MALC has numerous members in the "West Texas area," particularly in the El Paso area. MALC-1. But the "West Texas area" is vast, and MALC has no members who represent districts containing any part of Midland or Ector County. The only MALC member who might be affected by MALC's proposed changes to these districts is HD74 representative Poncho Nevarez. In Plan H321, HDs 81 and 82 (containing Midland and Ector Counties) are reconfigured to slightly affect the northeast corner of Nevarez's HD74. In Plan H329, HD74 grows in the northeast to extend through Ward, Crane, and Upton Counties and encompass southern portions of Midland and Ector Counties. That Nevarez's district might be affected by the drawing of a

new opportunity district is not alone sufficient to give MALC standing at the liability phase.

MALC has not put on evidence of where Nevarez resides within HD74, which would allow the Court to determine whether Nevarez himself lives in an area that is directly affected by either change. In any event, Nevarez resides in a Hispanic opportunity district in HD74. Thus, Nevarez's individual standing must be similar to that of Abel Herrero in Nueces County, who lives in an opportunity district yet has standing because of the packing in his district. But the essence of MALC's claim is that the Hispanic population in Midland/Ector Counties is cracked, not packed, and Nevarez does not live in the cracked area. And there is no allegation that Nevarez's district is packed and that unpacking it would create additional Latino opportunity. MALC's own demonstration plans would increase the HVAP of HD74.[40] Stated differently, no MALC member suffers an injury in HD74 under Plan H358 because the evidence shows that the district is more "packed" under Plans H321 and H329 than it is in Plan H358.

HD74 is the only district home to a MALC member that could possibly be affected by the alleged vote dilution through cracking in Midland/Ector Counties. But the representative and resident of that district suffers no apparent harm from that vote dilution. For these reasons, MALC does not have standing to pursue its claims in Midland/Ector Counties, and these claims are dismissed.

---

[40] Under the challenged Plan H358, HD74 has a HVAP of 76.6%; under Plan H321, HVAP increases to 77.3%; under Plan H329, HVAP increases further to 78.5%.

## G. Bexar County

This Court altered HD117 in Plan H309, and that new configuration remains in Plan H358. In its Opinion on Plan H283, the Court found that any § 2 effects claims in Bexar County were remedied and were thus moot, but it also found that Plaintiffs proved their intentional vote dilution and discrimination claims under § 2 and the Fourteenth Amendment regarding HD117. Plaintiffs succeeded on their "nudge factor" claims with regard to HD117 insofar as mapdrawers intentionally and successfully minimized Hispanic voter registration and turnout to decrease Hispanic performance.[41]

MALC[42] asserts claims that Plan H358 did not fully remedy the intentional discrimination in HD117, and proposes changes shown in Plan H391. Docket no. 1462 at 12-13; Tr55-56 (Korbel). MALC's expert opined that the 2014 election returns show that HD 117 "does not perform sufficiently for Hispanic citizens to elect their candidate of choice" and "[g]iven the finding of discriminatory intent with respect to HD 117, a full remediation is appropriate." Tr804; MALC-17 (Korbel Report) ¶ 86. Korbel bases his conclusion that HD117 did not sufficiently perform for Latinos to elect their candidate of choice on endogenous election results in 2014 because the Latino candidate of choice did not prevail in 2014. Tr804.[43] He stated that the exogenous election results were

---

[41] The Court also found that the Task Force Plaintiffs succeeded in their *Shaw*-type racial gerrymandering claim with regard to HD117.

[42] MALC member Philip Cortez resides in HD117. MALC-1 at 3.

[43] Philip Cortez won two of three elections since this Court modified HD117 in Plan H309. Tr56-57. Dr. Brischetto's EI analysis of five statewide general elections found continued racially

"not particularly helpful." *Id.* MALC proposes the configuration in Plan H391, which "strengthens the electoral performance of HD 117." *Id.* ¶ 87.

This Court remedied the nudge factor claim in Plan H309 and returned HD117 to opportunity status. The fact that HD117 did not perform in 2014 does not show that it was not fully remedied—even before application of the "nudge factor," HD117 did not always perform for Latino-preferred candidates, as evidenced by Garza's win in 2010. There is no evidence from which to conclude that the intentional discrimination found by this Court continues in HD117 in Plan H358.

No further changes are required in Bexar County.

## H. Tarrant County

In its Opinion on Plan H283, the Court rejected Plaintiffs' packing and cracking claims. However, the Court found that mapdrawers increased the SSVR of HD90 in bad faith (to claim offset for the loss of HD33) and to simultaneously shore up the Anglo population of HD93.

In 2011, during the "member-driven" redistricting process, the Tarrant County delegation submitted an agreed map, and Rep. Lon Burnam (HD90) and Rep. Marc Veasey (HD95) approved their districts. Later in the process, mapdrawers and redistricting leadership decided to increase the SSVR of HD90 above 50% in an attempt to offset the loss of Latino opportunity district HD33

---

polarized voting in Bexar County in 2014 and 2016, with Latino voters cohesively supporting the Democratic candidate between 80.6 and 81.6% and Anglo voters supporting the Republican candidate at 76.1% and 82.8%. Tr85; MALC-22 Table 8.

in Nueces County for § 5 purposes. They increased the SSVR by manipulating population based solely on race, including by removing the predominantly African-American community known as Lake Como.[44]

MALDEF had advocated for the HCVAP in HD90 to be increased, and the Task Force Plaintiffs argue now that there was nothing wrong legally with raising the SSVR in HD90 in 2011.[45] Regardless of whether § 2 required that the SSVR in HD90 be raised in 2011 so that Latinos could control Democratic primaries, it is clear that the Legislature's motive for the change was to undermine Latino opportunity rather than enhance it. There is no indication that the Legislature undertook any analysis of whether HD90 was a performing district or whether it needed an increase in SSVR to become a performing district.[46] Rather, they increased its SSVR because it was already electing a

---

[44] This Court's Order noted that, in increasing the SSVR of HD90, mapdrawers fixated solely on the 50% racial target and moved a significant number of individuals on the basis of race:

> There is undisputed evidence that mapdrawers manipulated the population based on race, removing some areas and swapping out population to increase the SSVR of HD90 from 40/41.9% in Plan H113 to 47.9/50.1%. There is little indication that they cared about traditional redistricting factors or maintaining communities of interest; they were only concerned with raising the SSVR to 50.1%. The district became the most underpopulated district in the plan. The African–American community of Como was removed from HD90 and placed into a Republican district represented by Anglo Rep. Geren. Other population was swapped between HD90 and HD95, and between HD90 and HD93. Overall, substantial Anglo population was removed (approximately 12,000 total population and 11,000 VAP), while Black+Hispanic total population and B+HVAP was increased.

Docket no. 1365 at 70.

[45] In this phase of the litigation, the Task Force has argued that Lon Burnam was not the Latino candidate of choice. However, in 2011 the Task Force also advocated for the Legislature to increase the HCVAP/SSVR in HD148, where there appears to be no dispute that Jessica Farrar was the Latino candidate of choice.

[46] Burnam had been HD90's representative since 1996. Tr205 (Burnam). Between 1996 and 2012, Burnam did not draw a challenger in the Democratic Primary. Tr226-27 (Burnam). Rep. Veasey had stated on the House floor that HD90 was already a performing opportunity district, and there is no indication that the Legislature believed otherwise.

Democrat, so raising the SSVR would not cost them politically, and they attempted to use the increase to offset the loss of HD33. The D.C. Court properly rejected this claim, noting that "all the experts' election analyses show[ed] that" that it was already an ability district. *Texas v. United States*, 887 F. Supp. 2d 133, 176 (D.D.C. 2012). They also used the increase in HD90 to try to pre-empt any § 2 claims based on the failure to increase the number of Latino opportunity districts statewide. The changes to HD90 also allowed them to shore up the Anglo population of HD93. Docket no. 1365 at 71.

Reps. Burnam and Veasey opposed the changes during the 2011 session, particularly the removal of Como from HD90. Burnam stated on the floor that the district had essentially been the same since its creation in 1978, and he and Veasey both argued that Como should be in HD90. Burnam's proposed amendment to return Como to HD90 was tabled.[47]

The Tarrant County configuration from Plan H283 remained unchanged in Plan H309. However, changes were made during the 2013 session to HD90, HD97, and HD99 and incorporated into Plan H358. The main change returned the Como community to HD90. The Task Force Plaintiffs bring claims targeted at this change.

The NAACP Plaintiffs, MALC, and Perez/LULAC Plaintiffs bring claims for intentional discrimination in Tarrant County. No party advocates for the creation of an additional minority opportunity district under the § 2 results test,

---

[47] A complete description of what transpired is included in the Court's fact findings, docket no. 1364 ¶¶ 619-634.

but they contend that the intentional discrimination/vote dilution found by this Court in Tarrant County requires a remedy that maintains or enhances minority opportunity. Their proposed remedies are shown in Plan H391 (MALC)[48] and Plan H392 (NAACP).[49] Because those plans and arguments go to remedy rather than liability, the Court will consider them at the remedial phase. The Court thus turns to the Task Force's claim regarding changes made to HD90 in Plan H358.

## I. HD90

The Texas Latino Redistricting Task Force challenges HD90 in plan H358 as both a racial gerrymander (a *Shaw*-type claim) and as dilutive of Latino voting strength in violation of § 2 and the Fourteenth Amendment. Docket no. 891 ¶¶ 41, 78-79; docket no. 1468.

After the 2011 session in which the SSVR of HD90 was increased in part by removing Como from the district, Como residents had written to and called Burnam expressing their desire to be returned to his district. Tr231 (Burnam). Both Geren and Burnam knew that Como's residents wanted to be in Burnam's

---

[48] MALC's Plan H391 redraws all of the districts in Tarrant County and "eliminates or reduces the splitting" of numerous cities within the County. MALC-17 (Korbel Report) ¶ 62. Korbel states that Plan H358 contains three performing minority opportunity districts (HD90, HD95, and HD101), and that while two are compact, HD90 arguably is not. *Id.* ¶ 66. According to Korbel, Plan H391 proposes four "minority opportunity districts" in Tarrant County—majority-BCVAP (50.8%) HD95, majority-HCVAP (51.1%) HD90, and B+HCVAP-majority coalition district HD101, and HD93, which would not be a coalition district because its H+BCVAP is below 50% (27% BCVAP and 15.9% HCVAP) but would provide electoral opportunity. *Id.* ¶¶ 67-71.

[49] The NAACP contends that HD101 is a minority coalition district protected by § 2 and that any remedy for found violations in Tarrant County should preserve this district. Docket no. 1529 at 61. In NAACP demonstration Plan H392, HD95 is converted from 49.3% BCVAP to 51.7% BCVAP. HD90 remains HCVAP-majority and HD101 remains H+BCVAP majority.

district. *Id.*; D-731 (letter sent from Como community leader Dorothy DeBose to Burnam, expressing a desire to be returned to Burnam's district; a copy was also sent to Geren. Tr631 (Kenney)). Burnam too wanted Como back in his district. Tr231 (Burnam).

In the 2012 Democratic Primary, a Latino candidate, Carlos Vasquez, challenged Burnam. Burnam attributed the removal of Como from his district as the reason he drew a challenger in 2012 for the first time in 16 years. Tr227. Burnam won the primary by 159 votes and went on to win the general election in November 2012. TF-58; Tr312 (Espino). Vasquez received 70.6% of the Hispanic vote. D-424 at 20. Burnam received 74.3% of the Anglo vote and 62.3% of the African American vote. *Id.*

In the 2013 special session, Burnam successfully returned Como to his district. Burnam instructed his chief of staff Conor Kenney to draw an amendment to return Como to HD90. According to Kenney, Burnam provided two initial instructions—keep the amendment simple by involving only two (or maybe three) members,[50] and bring Como back into HD90. Tr635 (Kenney). Working from these instructions, Kenney created an initial draft map—Plan H328—with an SSVR of 48.2%, a decrease from the 2011 Plan. Tr639 (Kenney); Tr210 (Burnam); D-799. Kenney sought an "informal kind of temperature check" on this draft from Representative Martinez-Fischer and Martin Golando of MALC, who expressed concerns over the low SSVR. Tr638 (Kenney).

---

[50] This was to comply with Chairman Darby's constraints on proposed amendments.

Kenney began re-working Plan H328 while keeping an eye on SSVR, which he discussed with Burnam. Tr640-41 (Kenney). Burnam instructed Kenney to "draw a version that does a little more swapping between 90 and 99 that restores the SSVR level back up to . . . the plan that we were amending." Tr641 (Kenney). Kenney started by swapping whole precincts between the districts, but quickly began trading populations at the block level, using racial shading and HVAP as a proxy for SSVR. Tr643-44 (Kenney). Kenney said he "spent hours trading things back and forth," and tracked SSVR as he went. Tr649 (Kenney). Kenney never considered election or political data outside of SSVR. Tr645 (Kenney). The finished product—Plan H342—had an SSVR of 50.1%, which was a decrease from the 2011 Plan but nevertheless met the 50% target. D-800 at 2. In Kenney's opinion, this configuration represents the highest possible SSVR when working under Burnam's other two instructions of returning Como and swapping only with HD99. Tr649-50 (Kenney).

In Burnam's words,

> The first [map] that we drew [H328] that got Como in there had too much of an impact on the Hispanic percentage of voters, and so we really made some ugly lines to—basically we got rid of every white voter near the western boundary of the district to keep the Hispanic vote over 50 percent, but to get Como back into the district [in H342].

Tr210. Burnam added that "there were too many white people" in H328's HD90. Tr212. According to Burnam, the purpose of moving white voters into HD99 was to create a 50+% SSVR district. Tr217.

Burnam's descriptions of the use of race to create a 50%+ SSVR district

were not limited to generalities. *See* Tr215-16 (Burnam) ("[I]s it correct to say that from your first amendment in 2013 till your second amendment in 2013 you attempted to bring up the [SSVR] by removing white voters from the district?" . . . "Correct."). Burnam identified boundaries in the following neighborhoods and precincts that were split or relocated entirely in order to remove Anglo population from HD90: Samson Park, Montgomery Plaza Redevelopment, Precinct 4068, Precinct 4493, Precinct 1015, and Precinct 1674. Tr217-18, 222-26. In other cases, Hispanic areas were brought into HD90 to increase SSVR; Burnam identified portions of Precincts 4125, 1434, and 1408 as examples. Tr222, Tr225. Furthermore, Burnam testified that minimizing population deviation in the district was "lost in the process" because "we had to deal with taking as many white folks out as we could." Tr215.

The finished version (Plan H342 or "the Burnam amendment") modified only the western boundary of the district by mostly trading populations with HD99 in an effort to return Como to HD90 while also keeping HD90's SSVR above 50%. But the amendment also affected the boundaries of a third district—HD97, which borders HD90 to its south and west. Precinct 1472 in HD97 is an area of railroad tracks and contains no population. In order to make Como (in Precinct 1120 to the immediate north) contiguous with the rest of HD90, Burnam's amendment placed this portion of HD97 into HD90. Tr213 (Burnam). Representative Craig Goldman of HD97 agreed with this change. Tr213 (Burnam). In a second spot on HD90's western boundary, HD97 moves

Precinct 1434 into HD90. Burnam provided the only evidence regarding the reason for this change: "It's low income and Hispanic." Tr225 (Burnam).

On June 20, 2013, Rep. Burnam offered the final version—Amendment No. 8 (Plan H342)—on second reading. Rep. Burnam stated,

> The original amendment has the intent of returning the neighborhood [Como] to District 90 that has always been in District 90 since the federal court created it back in 1978. The amendment to the amendment corrects some numbers a little bit. It has an impact on Craig Goldman's district, but the precinct that is added into my district has no population; it's just a connector precinct. It has an impact on Chairman Geren's district, but basically what it does is take the African American and Hispanic population out of Representative Geren's district and puts some of my Anglo population into his district. I believe it's acceptable to the author.

JX-17.3 at 29. Chairman Darby then stated, "Members, Representative Burnam has revised his amendment and it now keeps this district a Hispanic district—brings the numbers back over 50 percent. That was the objection. I believe Representative Geren is in favor of this amendment also, so with that I would move to accept this amendment." JX-17.3 at 29. It was adopted.

The first election under this new map, which included the Burnam Amendment, was the 2014 Democratic Primary, in which Ramon Romero, Jr. challenged Burnam. By all accounts, the race was a hostile one—the Task Force presented evidence of fliers, phone calls, and online posts that highlight this hostility. *E.g.*, Tr319-20 (Espino testifying about Latin Kings flier); Tr321 (Espino testifying about Fake Democrats image). In Como's Precinct 1120, Burnam won 383 votes of 471 votes cast. TF-39 at 2; Tr317 (Espino). But Romero defeated Burnam by 110 total votes. D-920 at 3. According to Dr.

Engstrom's multivariate analysis of the race, Romero received 78.2% of the Latino vote, 12.6% of the African-American vote, and 24.3% of the remaining votes. TF-19 at 31. After defeating Burnam in the 2014 primary, Romero went on to win the general election. Tr341-42 (Espino). Since then, Romero has not faced a challenger in the primary. Tr342-43 (Espino).

The Task Force Plaintiffs argue that Burnam returned Como to HD90 to protect himself against a Latino challenger in the Democratic primary, and thus to intentionally dilute Latino voting strength. They assert that the heavily African-American community of Como was not likely to support a Latino challenger, that Burnam knew this, and that Burnam wanted Como back at least in part for that reason. They further assert a *Shaw*-type racial gerrymandering claim because, regardless of intent, the changes to HD90 were predominantly based on race without a compelling state interest. The Court finds that the Task Force has standing to assert both claims because at least one member of HOPE is a registered Latino voter in HD90. Docket no. 1314-1 at 3; TF-21.[51]

The Court first considers the Task Force's *Shaw*-type claim. The Court does not find that returning Como to HD90 was a race-based decision—Burnam did not wish to return Como to HD90 because its residents were African-American but rather because they were a high turnout area that had been in his

---

[51] In its previous opinion on the 2011 Congressional Plan, this Court held that "the Task Force has associational standing based on the standing of the individual members of its constituent organizations such as HOPE and NOMAR." Docket no. 1390 at 94 n.82 (collecting cases).

district since its creation, had supported him, and wanted to be returned. But the changes to HD90 between Plan H328 and Plan H342 to ensure that its SSVR was above 50% were dictated solely by race. Burnam and Kenney methodically scanned the western border of the district, cutting out majority-Anglo areas precisely because they were Anglo and drawing in majority-Hispanic areas precisely because they were Hispanic. These changes are described in detail above, with both Burnam and Kenney explicitly acknowledging the use of race in their method and Burnam speaking candidly about there being "too many white people" in HD90.

Neither Burnam nor Kenney examined election results while making these changes. Tr671 (Kenney). Furthermore, neither Burnam nor Kenney identified other traditional redistricting criteria that would have justified these changes, and such criteria were subordinated to the goal of increasing SSVR. The amendment contains numerous precinct splits that further this goal and no others. *See* TF-3I (Red375 Report for Plan H358 showing 10 split precincts in HD90). In short, the testimony of both Burnam and Kenney is strong direct evidence that race was the predominate factor motivating the decision of which individuals to place within and without HD90.

The Court next considers whether the changes involved a "significant" number of voters and whether race predominated as to the district as a whole. *See Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015) (plaintiff must demonstrate that race was the predominant factor motiving the

legislature's decision to place "a significant number of voters within or without a particular district"); *Bethune-Hill v. Virginia State Bd. Of Elections*, 137 S. Ct. 788, 800 (2017) (the ultimate inquiry is the legislature's predominant motive for the design of the district as a whole). In *Bethune-Hill*, the Court noted that

> [t]he ultimate object of the inquiry . . . is the legislature's predominant motive for the design of the district as a whole. A court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context. Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target. A holistic analysis is necessary to give that kind of evidence its proper weight.

137 S. Ct. at 800.

In this case, the Burnam amendment did not draw a new district but instead was limited to making changes only along a portion of the district because of Chairman Darby's rules for amendments. Because of these rules, Burnam and his staff could not have made changes to the district as a whole, though they made changes all along the western border of HD90 where it adjoined HD99. Most of the other borders of the district were altered in 2011 by the racially motivated changes between Plan H113 and Plan H153 to increase the SSVR of 50% as well. *See* docket no. 1364 ¶ 629 (fact finding describing changes made to HD90 to increase the SSVR in 2011). Taken together, the race-based changes between Plan H113 and Plan H358 affect most portions of the district and thus the design of the district as a whole, and the changes

unquestionably involve a significant number of voters.

Even accepting Defendant's position that we may consider only the 2013 changes, the Court finds that a significant number of voters were subject to racial classifications and that race predominated as to the district as a whole. It is undisputed that the express racial target of 50.1% SSVR applied to the district as a whole in 2013. And all of the changes made between Plan H328 and Plan H342 were solely motivated by race to achieve that district-wide racial target. We know this ultimately resulted in 7,067 persons being added to HD99 and 7,035 persons being removed from HD90, for a total of 14,102 persons being moved solely as a result of racial gerrymandering.[52] 14,102 is the *minimum* number of voters subjected to racial gerrymandering because that is the number of voters that were ultimately moved. However, the population of the entire border between HD90 and HD99 was considered for movement between the districts, and an unknown number of persons were *kept in* their respective districts based on their race, and thus also subjected to racial classifications.

The ideal size of a House district is 167,637, making 14,102 about 8.4% of a district's total population. The Court finds that 14,000 voters (8.4% of ideal district population) is a significant number of voters.[53] And because those voters

---

[52] These numbers are shown in the Red-100 reports for Plan H328 and Plan H342. In Plan H328, the total population of HD90 was 166,719; in Plan H342 it was 159,684. In Plan H328, the total population of HD99 was 163,406; in Plan H342 it was 170,473. HD90 went from .55% underpopulated to 4.74% underpopulated. HD99 went from 2.52% underpopulated to 1.69% overpopulated.

[53] The Task Force contends that the total population of the precincts split or moved whole because of race by Burnam's amendment is 33,343 individuals, including an estimated 16,429 registered voters. Docket no. 1530 ¶¶ 49, 180, 181. Defendants do not refute this assertion.

were assigned into and out of HD90 to meet the district-wide racial target, race was the predominant factor in the design of the district as a whole in 2013.

Defendants ground their defense in the idea that Kenney and Burnam's intent cannot be imputed to the legislature. In Defendants' view, "Kenney's actions cannot be attributed to the Legislature as a whole without evidence that members of the Legislature were aware of the manner in which Kenney drafted the amendment." Docket no. 1526 at 89. Even if this is a correct statement of the law, the legislators who voted for Burnam's amendment were aware of how the district was constructed, or at least aware enough that his intent can be imputed to them. As noted above, Rep. Burnam introduced the amendment by noting "it . . . take[s] the African American and Hispanic population out of Representative Geren's district and puts some of my Anglo population into his district." JX-17.3 at S29. Later, Chairman Darby stated that Rep. Burnam's amendment "br[ought] the numbers back over 50%." *Id.*

Those statements are enough, in our view, to let legislators know they were voting for a racial gerrymander. Rep. Burnam's comments are as naked a confession as there can be to moving voters into and out of districts purely on the basis of race, and we cannot say that statements made on the House floor during the consideration of an amendment cannot fairly put legislators on notice of the contents of the amendment. We therefore reject Defendants' lack of intent argument as to the racial gerrymandering claims.

Having found that race predominated, the Court applies strict scrutiny to

the use of race in HD90.  Under strict scrutiny, the challenged plan is invalid unless the State shows that it is narrowly tailored to achieve a compelling government interest.  *Bush v. Vera*, 517 U.S. 952, 959, 976 (1996).  For a racial classification to serve a compelling interest, the Legislature must have a strong basis in evidence to support that interest before it implements the classification.  *Shaw v. Hunt*, 517 U.S. 899, 910 (1996).

Defendants have articulated no compelling government interest that the use of race may have been serving other than "avoid[ing] a potential VRA problem."  Docket no. 1526 at 89.[54]  But such a vague goal is not a strong basis in evidence that the VRA required such use of race.  Burnam and Chairman Darby apparently believed that HD90 should have an SSVR above 50%, but the evidence shows that no one considered the legal significance of the 50% SSVR target in terms of compliance with the VRA.  There is no evidence that any legislator or staffer evaluated racially polarized voting in HD90 or the amendment's effect on Latino voting ability in HD90.  Burnam did not consider any changes in election performance or how primary results might change.  Tr226 (Burnam).  Burnam added that Darby was simply "fixated on the number," meaning the 50% SSVR target.  Tr226 (Burnam).

Although Darby explained on the floor that the new plan "brings the numbers back over 50 percent," there was no accompanying explanation for why this could be required.  Darby offered no testimony to clarify his remarks at the

---

[54] The Court's previous opinion and fact findings on the 2011 changes explain why the race-based changes to HD90 in 2011 were not justified by a compelling state interest.

June 20, 2013 hearing at which the Burnam amendment was adopted. Tr1545 (Darby). Nor did he ever explain the goal of the 50% target or any electoral impact of the amendment to the legislators on the floor.[55] And Darby continually invoked legislative privilege to decline providing any meaningful testimony as to the potential significance of a 50% SSVR threshold or whether he considered any other meaningful election metrics. Tr1545-48, 1550-51 (Darby). As for Kenney, he did not review election data or political data outside of SSVR. Tr645, 671 (Kenney).

In short, there is no evidence showing that the State's use of race in setting and working toward the 50% SSVR target had a strong basis in evidence. Because the use of race in drawing HD90 was not narrowly tailored to achieve a compelling government interest, the Task Force succeeds on its *Shaw* claim in HD90.

The Court's finding that the Legislature violated *Shaw* rests on changes made to HD90 after Como was moved back into HD90, and thus remedying that violation would not necessarily remedy the Task Force's intentional vote dilution claim premised on the initial decision to include Como in HD90. Accordingly, the Court must decide the Task Force Plaintiffs' intentional vote dilution claim as well.

The Court concludes that the Task Force has failed to carry its burden of showing discriminatory intent to minimize, cancel out, or dilute the Latino vote

---

[55] The Burnam amendment was not introduced in committee; it was first introduced on the floor, and thus was never considered in committee or in a hearing.

in HD90.  Although there was some evidence indicating that Burnam may have been concerned about drawing a Latino challenger in the Democratic primary, the overall evidence persuasively demonstrates that his motive was not to dilute Latino voting strength but to simply return Como to his district.  It was a high turnout neighborhood that had been in the district since its creation and had consistently and overwhelmingly supported him throughout his time as HD90's representative.

Likewise, the evidence shows that Como's residents generally valued having Burnam as their representative and were unhappy with the 2011 change that put them in Geren's district.  Dorothy DeBose, president of Como's Neighborhood Advisory Council, said in her letter to Burnam and Geren that "[c]oncern or being steamed is a great understatement of how frustrated and perturbed the Lake Como Community is at the idea of being removed from District 90." D-731.  She described this move as a "tragedy," highlighting Como's history in HD90 since 1978.  D-731.  Both Burnam and Geren knew of Como's desire to be returned to Burnam's district, and Geren agreed to the change.  Despite returning Como, Burnam's amendment took steps to maintain the SSVR of HD90 at above 50%, as he had been directed to, but did not attempt to engineer the changes to dilute performance for Latino-preferred candidates in primaries or general elections.  Although the SSVR was reduced from Plan H309, Kenney stated that it could not be increased further given the constraints, Tr649-50, and the Court does not find that Kenney or Burnam reduced the SSVR

to dilute Latino voting strength.

In short, the return of Como to HD90, rather than being a purposefully discriminatory device meant to minimize, cancel out, or dilute the Latino vote, was simply meant to bring Como back to its long-held place in HD90, where its constituents wanted to be.  Burnam's knowledge that the change might also benefit him against a Hispanic primary challenger does not translate to discriminatory motive on these facts.  Accordingly, the Task Force's intentional vote dilution claim in HD90 fails because of a lack of a discriminatory intent.

The Court's prior findings that the Legislature intentionally discriminated with regard to HD90 and HD93 in Plan H283 and the Task Force Plaintiffs' success on their HD90 *Shaw*-claim in Plan H358 require a remedy in Tarrant County.

## Summary and Conclusion

As explained in the Order on Plan C235, the Legislature in 2013 purposefully maintained the intentional discrimination in Plan H283.  Thus, violations found by this Court in its Order on Plan H283 and not sufficiently altered in Plan H358 now require a remedy, including specifically in Bell County, Dallas County, Nueces County, and Tarrant County.  The Court otherwise rejects Plaintiffs' intentional discrimination and § 2 results claims directed against the 2013 enactment except that it finds a § 2 results claim in Nueces County and a *Shaw*-type violation in HD90 in Tarrant County.

In sum, Harris County, Fort Bend County, and Bexar County require no

further changes.

MALC lacks standing to pursue its claims in Midland and Ector Counties, and thus no changes are required there.

In Bell County, the intentional discrimination previously found by the Court must be remedied, affecting the configuration of HD54 and HD55.

In Dallas County, the intentional discrimination previously found by the Court must be remedied, affecting the configuration of HD103, HD104, and HD105.

In Nueces County, the intentional discrimination previously found by the Court must be remedied, affecting the configuration of HD32 and HD34. In addition, the Court finds that MALC has proven a § 2 results violation insofar as two compact HCVAP-majority opportunity districts could be drawn within Nueces County, but MALC has not proven that § 2 requires breaking the County Line Rule to draw such districts.

In Tarrant County, the intentional discrimination previously found by the Court must be remedied, affecting HD90 and HD93. In addition, although the Court rejects the Task Force's intentional vote dilution claim in HD90, the Court finds that the Task Force established its *Shaw*-type racial gerrymandering claim for the district. That violation also requires a remedy.

It is therefore ORDERED that the Office of the Attorney General file a written advisory within three business days stating whether the Legislature intends to take up redistricting in an effort to cure these violations and, if so,

when the matter will be considered.

If the Legislature does not intend to take up redistricting, the Court will hold a hearing to consider remedial plans beginning on **September 6, 2017 at 8:30 a.m.** in Courtroom 1. In preparation for the hearing, the parties must take immediate steps to consult with their experts and mapdrawers and prepare statewide plans that remedy the violations listed above.

The parties must confer and address objections and concerns, to the extent possible, prior to the hearing. If both sides agree upon a remedial plan, they should notify the Court, but the hearing will nevertheless proceed so the parties can present the plan on the record. If the parties cannot agree, they should be prepared to offer, support, and defend their proposed remedial plan(s) at the hearing. Plaintiffs and Defendants will be permitted to offer up to four alternative remedial plans per side, and Plaintiffs may (but are not required) to jointly offer plan(s).

The parties should consult with Texas Legislative Council, to the extent necessary, to upload their proposed remedial plans into DistrictViewer and ensure that all relevant data is available to all parties and the Court. If the parties intend to rely on data or analysis that is not available through TLC, they must provide that data to all other parties as soon as that data is available.

It is further ORDERED that Texas Legislative Council staff be present at the remedial hearing for technical assistance in the parties' presentation of their proposed plans through DistrictViewer or other available means.

SIGNED this 24th day of August, 2017,


_____/s/_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE
*on behalf of the panel*