(Slip Opinion)                OCTOBER TERM, 2017                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ABBOTT, GOVERNOR OF TEXAS, ET AL. *v.* PEREZ ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

No. 17–586.  Argued April 24, 2018—Decided June 25, 2018*

In 2011, the Texas Legislature adopted a new congressional districting plan and new districting maps for the two houses of the State Legislature to account for population growth revealed in the 2010 census. To do so, Texas had to comply with a complicated legal regime. The Equal Protection Clause of the Fourteenth Amendment forbids "racial gerrymandering," that is, intentionally assigning citizens to a district on the basis of race without sufficient justification. *Shaw* v. *Reno*, 509 U. S. 630, 641.  But other legal requirements tend to require that state legislatures consider race in drawing districts. Like all States, Texas is subject to §2 of the Voting Rights Act of 1965 (VRA), which is violated when a state districting plan provides "less opportunity" for racial minorities "to elect representatives of their choice," *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 425.  And at the time, Texas was also subject to §5, which barred it from making any districting changes unless it could prove that they did not result in retrogression with respect to the ability of racial minorities to elect the candidates of their choice, *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. ___, ___.  In an effort to harmonize these conflicting demands, the Court has assumed that compliance with the VRA is a compelling State interest for Fourteenth Amendment purposes, see, *e.g.*, *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. ___, ___; and a State's consideration of race in making a districting decision is narrowly tailored if the State has "good reasons" for believing that its decision is necessary in order to

——————

*Together with No. 17–626, *Abbott, Governor of Texas, et al.* v. *Perez et al.*, also on appeal from the same court.

2                              ABBOTT *v.* PEREZ

Syllabus

comply with the VRA, *Cooper* v. *Harris*, 581 U. S. ___, ___.

The Texas Legislature's 2011 plans were immediately tied up in litigation and never used. The case was assigned to a three-judge court (Texas court). Texas also submitted the plans for preclearance to the District Court for the District of Columbia (D. C. court). The Texas court drew up interim plans for the State's rapidly approaching primaries, giving no deference to the Legislature's plans. Texas challenged the court-ordered plans in this Court, which reversed and remanded with instructions for the Texas court to start with the Texas Legislature's 2011 plans but to make adjustments as required by the Constitution and the VRA. The Texas court then adopted new interim plans. After the D. C. court denied preclearance of the 2011 plans, Texas used the Texas court's interim plans for the 2012 elections. In 2013, the Legislature repealed the 2011 plans and enacted the Texas court's plans (with minor modifications). After *Shelby County* v. *Holder*, 570 U. S. 529, was decided, Texas, no longer covered by §5, obtained a vacatur of the D. C. court's preclearance order. But the Texas court did not dismiss the case against the 2011 plans as moot. Instead, it allowed the plaintiffs to amend their complaint to challenge the 2013 plans and held that their challenges to the 2011 plans were live. Texas conducted its 2014 and 2016 elections under the 2013 plans. In 2017, the Texas court found defects in several of the districts in the 2011 federal congressional and State House plans (the State Senate plan is not at issue here). Subsequently, it also invalidated multiple Congressional (CD) and House (HD) Districts in the 2013 plans, holding that the Legislature failed to cure the "taint" of discriminatory intent allegedly harbored by the 2011 Legislature. And the court relied on that finding to invalidate several challenged 2013 districts. The court also held that three districts—CD27, HD32, and HD34—were invalid under §2 of the VRA because they had the *effect* of depriving Latinos of the equal opportunity to elect their candidates of choice. And it found that HD90 was a racial gerrymander based on changes made by the 2013 Legislature. It gave the state attorney general three days to tell the court whether the Legislature would remedy the violations; and if the Legislature did not intend to adopt new plans, the court would hold remedial hearings.

*Held*:

    1. This Court has jurisdiction to review the orders at issue. Pp. 11–21.

       (a) The Texas court's orders fall within 28 U. S. C. §1253, which gives the Court jurisdiction to hear an appeal from an order of a three-judge district court "granting or denying . . . an interlocutory or permanent injunction." The Texas court did not *call* its orders "injunctions," but where an order has the "practical effect" of granting or

Syllabus

denying an injunction, it should be treated as such for purposes of
appellate jurisdiction. *Carson* v. *American Brands, Inc.*, 450 U. S. 79,
83. Pp. 11–16.

(b) The text of the orders and the context in which they were is-
sued make clear that they qualify as interlocutory injunctions under
§1253.  The orders were unequivocal that the current legislative
plans "violate §2 and the Fourteenth Amendment" and that these vio-
lations "must be remedied."  And the short time frame the attorney
general was given to act is strong evidence that the court did not in-
tend to allow the elections to go ahead under the plans it had just
condemned.  The unmistakable import of these actions is that the
court intended to have new plans ready for use in this year's elec-
tions.  Texas also had reason to fear that if it tried to conduct elec-
tions under those plans, the court would infer an evil motive and
perhaps subject the State to the strictures of preclearance under §3(c)
of the VRA.  These cases differ from *Gunn* v. *University Comm. to
End War in Viet Nam*, 399 U. S. 383, where the order did not have
the same practical effect as an injunction.  Nor does it matter that
the remedy is not yet known.  The issue here is whether this year's
elections can be held under the plans enacted by the Legislature, not
whether any particular remedies should ultimately be ordered if it is
determined that the current plans are flawed.  Section 1253 must be
strictly, but sensibly construed, and here the District Court's orders,
for all intents and purposes, constituted injunctions.  Thus, §1253
provides jurisdiction. Pp. 16–21.

2. The Texas court erred in requiring the State to show that the
2013 Legislature purged the "taint" that the court attributed to the
defunct and never-used plans enacted by a prior legislature in 2011.
Pp. 21–32.

(a) Whenever a challenger claims that a state law was enacted
with discriminatory intent, the burden of proof lies with the chal-
lenger, not the State.  *Reno* v. *Bossier Parish School Bd.*, 520 U. S.
471, 481.  In redistricting cases, the "good faith of [the] state legisla-
ture must be presumed."  *Miller* v. *Johnson*, 515 U. S. 900, 915.  The
allocation of the burden of proof and the presumption of legislative
good faith are not changed by a finding of past discrimination, which
is but "one evidentiary source" relevant to the question of intent.  *Ar-
lington Heights* v. *Metropolitan Housing Development Corp.*, 429
U. S. 252, 267.  Here, the 2011 plans were repealed, and not reenact-
ed, by the 2013 Legislature.  Nor did it use criteria that arguably car-
ried forward the effects of the 2011 Legislature's discriminatory in-
tent.  Instead, it enacted, with only small changes, the Texas court
plans developed pursuant to this Court's instructions.  The Texas
court contravened these basic burden of proof principles, referring,

4                          ABBOTT *v.* PEREZ

Syllabus

*e.g.,* to the need to "cure" the earlier Legislature's "taint" and conclud-
ing that the Legislature had engaged in no deliberative process to do
so. This fundamentally flawed approach must be reversed. Pp. 21–
25.

    (b) Both the 2011 Legislature's intent and the court's interim
plans are relevant to the extent that they give rise to—or tend to re-
fute—inferences about the 2013 Legislature's intent, but they must
be weighed together with other relevant direct and circumstantial ev-
idence of the Legislature's intent. But when this evidence is taken
into account, the evidence in the record is plainly insufficient to prove
that the 2013 Legislature acted in bad faith and engaged in inten-
tional discrimination. Pp. 25–32.

    3. Once the Texas court's intent finding is reversed, there remain
only four districts that were invalidated on alternative grounds. The
Texas court's holding as to the three districts in which it relied on
§2's "effects" test are reversed, but its holding that HD90 is a racial
gerrymander is affirmed. Pp. 32–41.

    (a) To make out a §2 "effects" claim, a plaintiff must establish the
three "*Gingles* factors": (1) a geographically compact minority popula-
tion sufficient to constitute a majority in a single-member district, (2)
political cohesion among the members of the minority group, and (3)
bloc voting by the majority to defeat the minority's preferred candi-
date. *Thornburg* v. *Gingles*, 478 U. S. 30, 48–51. A plaintiff who
makes that showing must then prove that, under the totality of the
circumstances, the district lines dilute the votes of the members of
the minority group. Pp. 33–39.

    (1) The Texas court held that CD27 violates §2 because it has the
effect of diluting the votes of Nueces County Latino voters, who, the
court concluded, should have been included in a Latino opportunity
district rather than CD27, which is not such a district. Plaintiffs,
however, could not show that an additional Latino opportunity dis-
trict could be created in that part of Texas. Pp. 33–35.

    (2) The Texas court similarly erred in holding that HD32 and
HD34, which make up the entirety of Nueces County, violate §2. The
2013 plan created two districts that lie wholly within the county:
HD34 is a Latino opportunity district, but HD32 is not. The court's
findings show that these two districts do not violate §2, and it is hard
to see how the ultimate *Gingles* vote dilution standard could be met if
the alternative plan would not enhance the ability of minority voters
to elect the candidates of their choice. Pp. 35–38.

    (b) HD90 is an impermissible racial gerrymander. HD90 was not
copied from the Texas court's interim plans. Instead, the 2013 legis-
lature substantially modified that district. In 2011, the Legislature,
responding to pressure from counsel to one of the plaintiff groups, in-

Cite as:  585 U. S. ____ (2018)            5

Syllabus

creased the district's Latino population in an effort to make it a Lati-
no opportunity district.  It also moved the city of Como, which is pre-
dominantly African-American, out of the district.  When Como resi-
dents and their Texas House representative objected, the Legislature
moved Como back.  But that decreased the Latino population, so the
Legislature moved more Latinos into the district.  Texas argues that
its use of race as the predominant factor in HD90's design was per-
missible because it had "*good reasons* to believe" that this was neces-
sary to satisfy §2, *Bethune-Hill*, 580 U. S., at ___.  But it is the State's
burden to prove narrow tailoring, and Texas did not do so on the rec-
ord here.  Pp. 38–41.

No. 17–586, 274 F. Supp. 3d 624, reversed; No. 17–626, 267 F. Supp. 3d
750, reversed in part and affirmed in part; and cases remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J.,
and KENNEDY, THOMAS, and GORSUCH, JJ., joined.  THOMAS, J., filed a
concurring opinion, in which GORSUCH, J., joined.  SOTOMAYOR, J., filed a
dissenting opinion, in which GINSBURG, BREYER, and KAGAN, JJ., joined.

Cite as: 585 U. S. ____ (2018)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 17–586 and 17–626

————————

GREG ABBOTT, GOVERNOR OF TEXAS, ET AL., APPELLANTS

17–586      *v.*

SHANNON PEREZ, ET AL.

GREG ABBOTT, GOVERNOR OF TEXAS, ET AL., APPELLANTS

17–626      *v.*

SHANNON PEREZ, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

[June 25, 2018]

JUSTICE ALITO delivered the opinion of the Court.

Before us for review are orders of a three-judge court in the Western District of Texas effectively directing the State not to conduct this year's elections using districting plans that the court itself adopted some years earlier. The court developed those plans for use in the 2012 elections pursuant to our directions in *Perry* v. *Perez*, 565 U. S. 388 (2012) (*per curiam*). We instructed the three-judge court to start with the plans adopted by the Texas Legislature in 2011 but to make adjustments as required by the Constitution and the Voting Rights Act. *Id.*, at 392–396. After those plans were used in 2012, the Texas Legislature enacted them (with only minor modifications) in 2013, and the plans were used again in both 2014 and 2016.

2                          ABBOTT *v.* PEREZ

Last year, however, the three-judge court reversed its prior analysis and held that some of the districts in those plans are unlawful. After reviewing the repealed 2011 plans, which had never been used, the court found that they were tainted by discriminatory intent and that the 2013 Legislature had not "cured" that "taint."

We now hold that the three-judge court committed a fundamental legal error. It was the challengers' burden to show that the 2013 Legislature acted with discriminatory intent when it enacted plans that the court itself had produced. The 2013 Legislature was not obligated to show that it had "cured" the unlawful intent that the court attributed to the 2011 Legislature. Thus, the essential pillar of the three-judge court's reasoning was critically flawed.

When the congressional and state legislative districts are reviewed under the proper legal standards, all but one of them, we conclude, are lawful.

## I
### A

The 2010 decennial census revealed that the population of Texas had grown by more than 20% and the State was therefore apportioned four additional seats in the United States House of Representatives. C. J. S. 369a.[1] To accommodate this new allocation and the population changes shown by the census, the Legislature adopted a new congressional districting plan, as well as new districting maps for the two houses of the State Legislature.

Redistricting is never easy, and the task was especially

_____

[1] There are several appendixes in these cases. We use "App." to refer to the joint appendix filed at the merits stage. We use "C. J. S." and "H. J. S." to refer to the appendixes attached to Texas's jurisdictional statements in No. 17–586 and No. 17–626, respectively. We use "C. J. S. Findings" and "H. J. S. Findings" to refer to appellees' supplemental appendixes in No. 17–586 and No. 17–626.

complicated in Texas in 2011. Not only was the Legislature required to draw districts that were substantially equal in population, see *Perry*, *supra*, at 391–392; *Reynolds* v. *Sims*, 377 U. S. 533 (1964); *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), and to comply with special state-law districting rules,[2] but federal law imposed complex and delicately balanced requirements regarding the consideration of race.

Then, as now, federal law restricted the use of race in making districting decisions. The Equal Protection Clause forbids "racial gerrymandering," that is, intentionally assigning citizens to a district on the basis of race without sufficient justification. *Shaw* v. *Reno*, 509 U. S. 630, 641 (1993). It also prohibits intentional "vote dilution"— "invidiously . . . minimiz[ing] or cancel[ing] out the voting potential of racial or ethnic minorities." *Mobile* v. *Bolden*, 446 U. S. 55, 66–67 (1980) (plurality opinion).

While the Equal Protection Clause imposes these important restrictions, its application in the field of districting is complicated. For one thing, because a voter's race sometimes correlates closely with political party preference, see *Cooper* v. *Harris*, 581 U. S. ___, ___–___ (2017) (slip op., at 19–20); *Easley* v. *Cromartie*, 532 U. S. 234, 243 (2001), it may be very difficult for a court to determine whether a districting decision was based on race or party preference. Here, the three-judge court found that the two factors were virtually indistinguishable.[3]

At the same time that the Equal Protection Clause

—————

[2] See, *e.g.*, Tex. Const., Art. III, §25 (Senate), §26 (House).

[3] The court found: "[I]t is difficult to differentiate an intent to affect Democrats from an intent to affect minority voters. Making minorities worse off will likely make Democrats worse off, and vice versa." C. J. S. Findings 467a (citation omitted). "This correlation is so strong that [an expert] assessed whether districts were minority opportunity districts by looking at Democratic results/wins (noting that in Texas, minority candidates of choice means Democrats)." *Ibid.*

restricts the consideration of race in the districting pro-
cess, compliance with the Voting Rights Act of 1965, 79
Stat. 437, as amended, 52 U. S. C. §10301 *et seq.* (VRA),
pulls in the opposite direction: It often insists that dis-
tricts be created precisely because of race. Two provisions
of the VRA exert such demands, and in 2011, Texas was
subject to both. At that time, Texas was covered by §5 of
the VRA[4] and was thus barred from making any district-
ing changes unless it could prove that they did not result
in "retrogression" with respect to the ability of racial
minorities to elect the candidates of their choice. *Alabama
Legislative Black Caucus* v. *Alabama*, 575 U. S. ___, ___
(2015) (slip op., at 3). That showing obviously demanded
consideration of race.

On top of this, Texas was (and still is) required to com-
ply with §2 of the VRA. A State violates §2 if its district-
ing plan provides "'less opportunity'" for racial minorities
"'to elect representatives of their choice.'" *League of United
Latin American Citizens* v. *Perry*, 548 U. S. 399, 425 (2006)
(*LULAC*). In a series of cases tracing back to *Thornburg*
v. *Gingles*, 478 U. S. 30 (1986), we have interpreted this
standard to mean that, under certain circumstance, States
must draw "opportunity" districts in which minority
groups form "effective majorit[ies]," *LULAC*, *supra*, at 426.

Since the Equal Protection Clause restricts considera-
tion of race and the VRA demands consideration of race, a
legislature attempting to produce a lawful districting plan
is vulnerable to "'competing hazards of liability.'" *Bush* v.
*Vera*, 517 U. S. 952, 977 (1996) (plurality opinion). In an
effort to harmonize these conflicting demands, we have
assumed that compliance with the VRA may justify the
consideration of race in a way that would not otherwise be
allowed. In technical terms, we have assumed that com-
plying with the VRA is a compelling state interest, see,

---

[4] See *Shelby County* v. *Holder*, 570 U. S. 529 (2013).

*e.g.*, *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. ___, ___ (2017) (slip op., at 13); *Shaw* v. *Hunt*, 517 U. S. 899, 915 (1996), and that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the State has "'good reasons'" for believing that its decision is necessary in order to comply with the VRA. *Cooper*, *supra*, at ___ (slip op., at 3).

### B

Facing this legal obstacle course, the Texas Legislature in 2011 adopted new districting plans, but those plans were immediately tied up in litigation and were never used. Several plaintiff groups quickly filed challenges in the District Court for the Western District of Texas, arguing that some of the districts in the new plans were racial gerrymanders, some were based on intentional vote dilution, and some had the effect of depriving minorities of the equal opportunity to elect the candidates of their choice. This case was assigned to a three-judge court, as required by 28 U. S. C. §2284(a). (We will call this court "the Texas court" or simply "the District Court.")

The situation was further complicated by the requirement that Texas obtain preclearance of its new plans. To do this, Texas filed for a declaratory judgment in the District Court for the District of Columbia. See *Texas* v. *United States*, 887 F. Supp. 2d 133 (2012). (We will call this court "the D. C. court.") By early 2012, the D. C. court had not yet issued a decision, and Texas needed usable plans for its rapidly approaching primaries. Accordingly, the Texas court drew up interim plans for that purpose. *Perez* v. *Perry*, 835 F. Supp. 2d 209 (2011). In creating those plans, the majority of the Texas court thought that it was not "required to give any deference to the Legislature's enacted plan." *Id.*, at 213. Instead, it based its plans on what it called "neutral principles that advance

Opinion of the Court

the interest of the collective public good." *Id.*, at 212.[5]

Texas challenged those court-ordered plans in this Court, and we reversed. *Perry* v. *Perez*, 565 U. S. 388 (2012) (*per curiam*). Noting that "[r]edistricting is 'primarily the duty and responsibility of the State,'" we held that the Texas court should have respected the legislative judgments embodied in the 2011 plans to the extent allowed by the Constitution and the VRA. *Id.*, at 392–399.

We remanded the case with very specific instructions. The Texas court was told to start with the plans adopted by the Legislature but to modify those plans as needed so as "not to incorporate . . . any legal defects." *Id.*, at 394. With respect to claims under the Constitution or §2 of the VRA, the District Court was told to change a district if the plaintiffs were *likely* to succeed on the merits of their challenge. *Ibid.* And with respect to §5 claims, the court was instructed to make whatever changes were needed to obviate any legal claim that was "not insubstantial."[6] *Id.*, at 395. Thus, our instructions, in an abundance of caution, demanded changes in the challenged 2011 plans without proof that those changes were actually required by either the Constitution or the VRA.

On remand, the Texas court ordered additional briefing and heard two more days of argument. App. 29a, 35a–50a; Order in Civ. No. 11–cv–00360, Doc. No. 616. It issued two opinions, totaling more than 70 pages, and analyzed disputed districts in detail. C. J. S. 367a–423a;

---

[5] Judge Smith dissented, arguing that the majority had produced a "runaway plan" that "award[ed] judgment on the pleadings in favor of one side—a slam-dunk victory for the plaintiffs." *Perez* v. *Perry*, 835 F. Supp. 2d 209, 218 (WD Tex. 2011).

[6] The Texas court was given more leeway to make changes to districts challenged under §5 because it would have been inappropriate for that court to address the "merits of §5 challenges," a task committed by statute to the District Court for the District of Columbia. *Perez*, 565 U. S., at 394.

Opinion of the Court

H. J. S. 300a–315a. While stressing the preliminary nature of its determinations, see C. J. S. 368a; H. J. S. 314a–315a, the court found that some districts required change and that others were lawful, C. J. S. 367a–423a; H. J. S. 300a–315a. The court then adopted plans for the State's congressional districts and for both houses of the State Legislature. (The plan for the State Senate is not at issue.)

Both the congressional plan and the plan for the Texas House departed significantly from the State's 2011 plans. At least 8 of the 36 congressional districts were markedly altered, and 21 districts in the plan for the Texas House were "substantially" changed. H. J. S. 314a; C. J. S. 397a–408a.

In August 2012, the D. C. court denied preclearance of the plans adopted by the Legislature in 2011, see *Texas* v. *United States*, *supra*, so the State conducted the 2012 elections under the interim plans devised by the Texas court. At the same time, Texas filed an appeal in this Court contesting the decision of the D. C. court,[7] but that appeal ultimately died for two reasons.

First, the 2011 plans were repealed. The Texas attorney general urged the Legislature to pass new redistricting plans, C. J. S. 429a, and in his view, the "best way to remedy the violations found by the D. C. court" was to "adopt the [Texas court's] interim plans as the State's permanent redistricting maps." *Id.*, at 432a. Doing so, he said, would "confirm the legislature's intent" to adopt "a redistricting plan that fully comports with the law." *Id.*, at 429a.

The Governor called a special session to do just that, and the Legislature complied. One of the legislative sponsors, Senator Seliger, explained that, although "'the Texas

---

[7]Notice of Appeal in *Texas* v. *United States*, Civ. No. 11–cv–1303, Doc. No. 234 (D DC, Aug. 31, 2012).

Legislature remains confident that the legislatively-drawn maps adopted in 2011 are fair and legal . . . , there remain several outstanding legal questions regarding these maps that undermine the stability and predictability of the electoral process in Texas.'" 274 F. Supp. 3d 624, 649, n. 40 (2017). Counsel for one of the plaintiff groups, the Mexican American Legal Defense and Education Fund (MALDEF), testified in favor of the plans. C. J. S. 436a–439a. The 2013 Legislature then repealed the 2011 plans and enacted the Texas court's interim plans with just a few minor changes. The federal congressional plan was not altered at all, and only small modifications were made to the plan for the Texas House. C. J. S. Findings 231a–232a.

On the day after the Legislature passed the new plans and the day before the Governor signed them, this Court issued its decision in *Shelby County* v. *Holder*, 570 U. S. 529 (2013), which invalidated the coverage formula in §4 of the Voting Rights Act. Now no longer subject to §5, Texas obtained a vacatur of the D. C. court's order on preclearance. 274 F. Supp. 3d, at 634–635, and n. 11.

With the never-effective 2011 plans now repealed and any preclearance issues overcome by events, the State argued in the Texas court that the plaintiffs' case against the 2011 plans was moot. In September 2013, the Texas court allowed the plaintiffs to amend their complaints to challenge the 2013 plans, but the court held that their challenges to the 2011 plans were still alive, reasoning that the repeal of the 2011 plans represented the "voluntary cessation" of allegedly unconstitutional conduct.[8]

Texas conducted its 2014 and 2016 elections under the plans that had been preliminarily approved by the Texas court and subsequently adopted (with only minor changes) by the Legislature in 2013. But in March and April 2017,

---

[8]We express no view on the correctness of this holding.

Opinion of the Court

after multiple trials, the Texas court issued a pair of rulings on the defunct 2011 plans. The court reaffirmed the conclusions it had reached in 2012 about defects in the 2011 plans, and it went further. Contrary to its earlier decision, it held that Congressional District (CD) 35 is an impermissible racial gerrymander and that CD27 violates §2 of the Voting Rights Act because it has the effect of diluting the electoral opportunities of Latino voters. C. J. S. 181a, 193a–194a. Previously, the court had provided detailed reasons for rejecting the very arguments that it now accepted. *Id.*, at 409a–423a. Similarly, the court held that multiple districts in the plan for the Texas House were the result of intentional vote dilution. These included districts in the counties of Nueces (House District (HD) 32, HD34), Bell (HD54, HD55), and Dallas (HD103, HD104, HD105). H. J. S. 275a–276a.[9]

In August 2017, having ruled on the repealed 2011 plans, the Texas court finally turned its attention to the plans then in effect—*i.e.*, the plans that had been developed by the court, adopted by the Legislature in 2013, and used in both the 2014 and 2016 elections. The court invalidated the districts in those plans that correspond to districts in the 2011 plan that it had just held to be unlawful, *i.e.*, CD27, CD35, HD32, HD34, HD54, HD55, HD103, HD104, and HD105. See 274 F. Supp. 3d 624 (2017) (No. 17–586) and 267 F. Supp. 3d 750 (2017) (No. 17–626).

In reaching these conclusions, the court pointed to the discriminatory intent allegedly harbored by the 2011

---

[9] Judge Smith again dissented, on both mootness and the merits. On mootness, Judge Smith explained that, "[s]ix years later, we are still enveloped in litigation over plans that have never been used and will never be implemented." C. J. S. 349a. On the merits, Judge Smith argued that the majority erroneously inferred a "complex, widespread conspiracy of scheming and plotting, by various legislators and staff, carefully designed to obscure the alleged race-based motive," when the intent was in fact partisan. H. J. S. 294a; C. J. S. 351a.

Legislature, and it attributed this same intent to the 2013
Legislature because it had failed to "engage in a delibera-
tive process to ensure that the 2013 plans cured any taint
from the 2011 plans."  274 F. Supp. 3d, at 645–652; 267
F. Supp. 3d, at 757.  The court saw "no indication that the
Legislature looked to see whether any discriminatory taint
remained in the plans."  274 F. Supp. 3d, at 649.  And it
faulted the State because it "did not accept [findings of the
D. C. court] and instead appealed to the Supreme Court."
*Ibid.*  Seeing no evidence that the State had undergone "a
change of heart," the court concluded that the Legisla-
ture's "decision to adopt the [District Court's] plans" was a
"litigation strategy designed to insulate the 2011 or 2013
plans from further challenge, regardless of their legal
infirmities."  *Id.*, at 649–650.  Finally, summarizing its
analysis, the court reiterated that the 2011 Legislature's
"discriminatory taint was not removed by the [2013] Legis-
lature's enactment of the Court's interim plans, because
the Legislature engaged in no deliberative process to
remove any such taint, and in fact intended any such taint
to be maintained but be safe from remedy."  *Id.*, at 686.

The Texas court's decisions about CD35 and all but
three of the Texas House districts were based entirely on
its finding that the 2013 Legislature had not purged its
predecessor's discriminatory intent.  However, the court
also held that three districts—CD27, HD32, and HD34—
were invalid under §2 of the Voting Rights Act because
they had the effect of depriving Latinos of the equal oppor-
tunity to elect their candidates of choice.  *Id.*, at 682–686;
267 F. Supp. 3d, at 775–783.  And the court found inde-
pendent proof that HD90 was a racial gerrymander.  *Id.*,
at 788–794.

The court held that violations in all these districts "must
be remedied."  274 F. Supp. 3d, at 686; see also 267
F. Supp. 3d, at 795 (describing State House district viola-
tions that "must be remedied").  Mindful that October 1

Opinion of the Court

was the deadline for the Texas Secretary of State to provide voter registration templates to the State's counties, App. 380a–381a, the court took steps to bring about prompt remedial action. In two orders issued on August 15 and 24, the Texas attorney general was instructed to advise the court, within three days, "whether the Legislature intends to take up redistricting in an effort to cure these violations." 274 F. Supp. 3d, at 686; 267 F. Supp. 3d, at 795. If the Legislature chose not to do so, the court warned, it would "hold a hearing to consider remedial plans." *Ibid.* After the Governor made clear that the State would not act, the court ordered the parties to proceed with a hearing on the congressional plan on September 5, as well as a hearing on the plan for the Texas House on September 6. 274 F. Supp. 3d, at 686; 267 F. Supp. 3d, at 795; App. 134a–136a; Defendants' Opposed Motion To Stay Order on Plan C235 Pending Appeal or Final Judgment in Civ. No. 11–cv–00360, Doc. 1538, pp. 3–4; Defendants' Opposed Motion To Stay Order on Plan H358 Pending Appeal or Final Judgment, Doc. No. 1550, pp. 4–5.

Texas applied for stays of both orders, but the District Court denied the applications. App. 134a–136a. Texas then asked this Court to stay the orders, and we granted that relief. After receiving jurisdictional statements, we postponed consideration of jurisdiction and set the cases for consolidated argument. 583 U. S. ___ (2018).

II

Before reaching the merits of these appeals, we must assure ourselves that we have jurisdiction to review the orders at issue. Appellants claim that the orders amount to injunctions and are therefore appealable to this Court under 28 U. S. C. §1253. Appellees disagree, contending that the orders do not qualify as injunctions. We hold that we have jurisdiction because the orders were effectively injunctions in that they barred Texas from using the

districting plans now in effect to conduct this year's elections.

<div align="center">A</div>

The Judiciary Act of 1789, 1 Stat. 73, "established the general principle that only final decisions of the federal district courts would be reviewable on appeal." *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 83 (1981) (emphasis deleted). But because "rigid application of this principle was found to create undue hardship in some cases," Congress created exceptions. *Ibid.* Two are relevant here. We have jurisdiction under 28 U. S. C. §1253 to hear an appeal from an order of a three-judge district court "granting or denying . . . an interlocutory or permanent injunction." Similarly, §1292(a)(1) gives the courts of appeals jurisdiction over "[i]nterlocutory orders of the district courts" "granting, continuing, modifying, refusing or dissolving injunctions," "except where a direct review may be had in the Supreme Court."

The orders in these cases fall within §1253. To be sure, the District Court did not *call* its orders "injunctions"—in fact, it disclaimed the term, App. 134a–136a—but the label attached to an order is not dispositive. We have previously made clear that where an order has the "practical effect" of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction. *Carson*, *supra*, at 83; see also *Gulfstream Aerospace Corp.* v. *Mayacamas Corp.*, 485 U. S. 271, 287–288 (1988). We applied this test in *Carson*, holding that an order that declined to enter a consent decree prohibiting certain conduct could be appealed under §1292(a)(1) because it was the practical equivalent of an order denying an injunction and threatened serious and perhaps irreparable harm if not immediately reviewed. 450 U. S., at 83–84, 86–90.

This "practical effect" rule serves a valuable purpose. If

an interlocutory injunction is improperly granted or denied, much harm can occur before the final decision in the district court. Lawful and important conduct may be barred, and unlawful and harmful conduct may be allowed to continue. Recognizing this, Congress authorized interlocutory appellate review of such orders. But if the availability of interlocutory review depended on the district court's use of the term "injunction" or some other particular language, Congress's scheme could be frustrated. The harms that Congress wanted to avoid could occur so long as the district court was careful about its terminology. The "practical effect" inquiry prevents such manipulation.

In analogous contexts, we have not allowed district courts to "shield [their] orders from appellate review" by avoiding the label "injunction." *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974). For instance, in *Sampson*, we held that an order labeled a temporary restraining order (which is not appealable under §1292(a)(1)) should be treated as a "preliminary injunction" (which is appealable) since the order had the same practical effect as a preliminary injunction. *Id.*, at 86–88.

Appellees and the dissent contend that the "practical effect" approach should be confined to §1292(a)(1), but we see no good reason why it should not apply to §1253 as well. Appellees note that we "narrowly constru[e]" §1253, *Goldstein* v. *Cox*, 396 U. S. 471, 478 (1970), but we also construe §1292(a)(1) "narrowly," *Carson*, *supra*, at 84. In addition, the relevant language in the two provisions is nearly identical;[10] both provisions serve the same purpose; and we have previously called them "analogous." *Goldstein*, *supra*, at 475.

_____

[10] In relevant part, §1253 applies to "an order granting . . . an interlocutory . . . injunction." Section 1292(a)(1) applies to "[i]nterlocutory orders . . . granting . . . injunctions." Although the similarity is obvious, the dissent perceives some unspecified substantive difference.

Opinion of the Court

The provisions are also textually interlocked. Section 1292(a)(1) does not apply where "direct review may be had in the Supreme Court," *i.e.*, where §1253 applies. If the "practical effects" test applied under §1292(a)(1) but not §1253, the consequences would be unfortunate and strange. We would have to identify the magic language needed for an order to qualify as an order granting or denying an injunction, and that standard would hardly constitute the sort of "[s]imple" rule that the dissent prizes. See *post*, at 14 (opinion of SOTOMAYOR, J.). Then, having developed that standard, we would have to apply it in any case in which a party took an appeal to us from an order of a three-judge court that clearly had the practical effect of an injunction. If we concluded that the magic-words test was not met, the order would appear to be appealable to one of the courts of appeals under §1292(a)(1). In the language of that provision, the order would be an "orde[r] of [a] district cour[t] of the United States . . . granting [an] injunctio[n]." And because this Court would lack jurisdiction under §1253, the appeal would not fall within §1292(1)'s exception for cases "where a direct review may be had in the Supreme Court." Having taken pains to provide for review in this Court, and not in the courts of appeals, of three-judge court orders granting injunctions Congress surely did not intend to produce that result.[11]

––––––––––

[11] The dissent sees nothing strange about such a result because we held in *Mitchell* v. *Donovan*, 398 U. S. 427 (1970) (*per curiam*), that we lacked jurisdiction under §1253 to hear an appeal from a three-judge court order denying a declaratory judgment. The decision in *Donovan* was based on the plain language of §1253, which says nothing about orders granting or denying declaratory judgments. By contrast, §1253 gives us jurisdiction to hear appeals from orders granting or denying injunctions.

The same goes for *Rockefeller* v. *Catholic Medical Center of Brooklyn & Queens, Inc.*, 397 U. S. 820 (1970) (*per curiam*), also cited by the dissent. In that case, the District Court issued a declaratory judgment,

Appellees argue that an order denying an injunction (the situation in *Carson*) and an order granting an injunction (the situation here) should be treated differently, Brief for Appellees in No. 17–586, p. 27, but they offer no convincing reason for doing so. No authority supports their argument. The language of §§1253 and 1292(a)(1) makes no such distinction, and we have stated that the "practical effect" analysis applies to the "granting or denying" of injunctions. *Gulfstream, supra*, at 287–288.

In addition, appellees' suggested distinction would put appellate courts in an awkward position. Suppose that a district court granted an injunction that was narrower than the one requested by the moving party. Would an appellate court (whether this Court or a court of appeals) have jurisdiction to rule on only part of that decision? Suppose the appellate court concluded that the district court was correct in refusing to give the movant all the injunctive relief it sought because the movant's entire claim was doomed to fail. Would the appellate court be limited to holding only that the lower court properly denied the relief that was withheld? The rule advocated by the appellees would needlessly complicate appellate review.[12]

Finally, appellees point in passing to Rule 65(d) of the Federal Rules of Civil Procedure, which requires that an injunction "state its terms specifically" and "describe in

_____

not an injunction. Again, the text of §1253 says nothing about declaratory judgments.

[12]The inquiry required by the practical effects test is no more difficult when the question is whether an injunction was effectively granted than it is when the question is whether an injunction was effectively denied. Lower courts have had "no problem concluding that [certain orders have] the practical effect of granting an injunction." *I. A. M. Nat. Pension Fund Benefit Plan A* v. *Cooper Industries, Inc.*, 789 F. 2d 21, 24 (CADC 1986); see also *Andrew* v. *American Import Center*, 110 A. 3d 626, 634 (D. C. 2015) ("[G]ranting a stay pending arbitration does have the 'practical effect' of enjoining the party opposing arbitration").

reasonable detail . . . the act or acts restrained or re-
quired."  Rules 65(d)(1)(B), (C); see Brief for Appellees in
No. 17–586, at 27.  But as explained in *Gunn* v. *University
Comm. to End War in Viet Nam*, 399 U. S. 383, 389, n. 4
(1970), we have never suggested that a failure to meet the
specificity requirements of Rule 65(d) would "deprive the
Court of jurisdiction under §1253."

A contrary holding would be perverse.  Rule 65(b) pro-
tects the party against which an injunction is issued by
requiring clear notice as to what that party must do or
refrain from doing.  Where a vague injunction does not
comply with Rule 65(b), the aggrieved party has a particu-
larly strong need for appellate review.  It would be odd to
hold that there can be no appeal in such a circumstance.

For these reasons, we hold that we have jurisdiction
under §1253 to hear an appeal from an order that has
the same practical effect as one granting or denying an
injunction.

## B

With these principles settled, we conclude that the
orders in these cases qualify as interlocutory injunctions
under §1253.  The text of the orders and the context in
which they were issued make this clear.

The orders are unequivocal that the current legislative
plans "violate §2 and the Fourteenth Amendment" and
that these violations "must be remedied."  274 F. Supp. 3d,
at 686; see also, *e.g.*, 267 F. Supp. 3d, at 795 ("[V]iolations
found by this Court in its Order on [the State House plan]
now require a remedy"); *ibid.* ("In Bell County, the inten-
tional discrimination previously found by the Court must
be remedied"); *ibid.* ("In Dallas County, the intentional
discrimination previously found by the Court must be
remedied").

We do not suggest that this language alone is sufficient
to show that the orders had the practical effect of enjoin-

ing use of the current plans in this year's elections, but the court did not stop with these pronouncements. As we have noted, the orders required the Texas attorney general to inform the court within three days whether the Legislature would remedy the violations, and the orders stated that if the Legislature did not intend to adopt new plans, the court would hold remedial hearings.

The short time given the Legislature to respond is strong evidence that the three-judge court did not intend to allow the elections to go ahead under the plans it had just condemned. The Legislature was not in session, so in order to take up the task of redistricting, the Governor would have been required to convene a special session— which is no small matter. And, when the Governor declined to call a special session, the court moved ahead with its scheduled hearings and invited the parties to continue preparing for them even after this Court administratively stayed the August 15 order.

The import of these actions is unmistakable: The court intended to have new plans ready for use in this year's elections. Nothing in the record even hints that the court contemplated the possibility of allowing the elections to proceed under the 2013 plans.

What is more, Texas had reason to believe that it would risk deleterious consequences if it defied the court and attempted to conduct the elections under the plans that the court had found to be based on intentional racial discrimination. In the very orders at issue, the court inferred discriminatory intent from Texas's choice to appeal the D. C. court's preclearance decision rather than immediately taking steps to bring its plans into compliance with that decision. 274 F. Supp. 3d, at 649; see Part III, *infra*. Reading such an order, Texas had reason to fear that if it tried to conduct elections under plans that the court had found to be racially discriminatory, the court would infer an evil motive and perhaps subject the State once again to

the strictures of preclearance under §3(c) of the Voting
Rights Act.[13]  This is a remedy that the plaintiffs hoped to
obtain, see, *e.g.*, App. 177a, and that the District Court
seemed inclined to consider, see C. J. S. 122a–123a (de-
clining to declare moot the challenges to the long-since-
repealed 2011 plans because "there remains the possibility
of declaratory and equitable relief under §3(c)").

Contending that the orders here do not qualify under
§1253, appellees analogize this case to *Gunn*, 399 U. S.
383, but there is no relevant similarity.  In *Gunn*, anti-war
protesters were charged with violating a Texas "disturbing-
the-peace statute," *id.*, at 384, and they challenged the
constitutionality of the statute in federal court.  After the
state charges were dismissed, the District Court issued a
"discursive" opinion "expressing the view that [the statute
was] constitutionally invalid."  *Id.*, at 386–387.  But the
court then refrained from going any further, "pending the
next session, special or general, of the Texas legislature, at
which time the State of Texas may, if it so desires, enact
such disturbing-the-peace statute as will meet constitu-
tional requirements."  *University Comm. to End War in
Viet Nam* v. *Gunn*, 289 F. Supp. 469, 475 (WD Tex. 1968).
The defendants appealed to this Court, and at the time of
our decision two years later, neither the Legislature nor
the District Court had taken any further action.  We
therefore held that we lacked jurisdiction under §1253.
The District Court order in that case did not have the
same practical effect as an injunction.  Indeed, it had no
practical effect whatsoever and is thus entirely different

---

[13] Section 3(c) provides that if "the court finds that violations of the
fourteenth or fifteenth amendment justifying equitable relief," the court
"shall retain jurisdiction for such period as it may deem appropriate
and during such period no voting" practice shall go into effect unless
first precleared by the court or the United States Attorney General.  52
U. S. C. §10302(c).

from the orders now before us.[14]

Appellees suggest that appellate jurisdiction is lacking in this case because we do not know at this point "what a remedy would entail, who it would affect, and when it would be implemented." Brief for Appellees in No. 17–586, at 27. The dissent makes a similar argument with respect to two of the Texas House districts. *Post*, at 13.[15] But the issue here is whether this year's elections can be held under the plans enacted by the Legislature, not whether any particular remedies would have ultimately been ordered by the District Court.

Appellees and the dissent also fret that this Court will be inundated with redistricting appeals if we accept juris-

---

[14] The other authority cited by the dissent is a footnote in *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971), a case that came to us in an exceedingly complicated procedural posture. In *Whitcomb*, the District Court held in August 1969 that Indiana's legislative districting scheme was unconstitutional, but the court made it clear that it would take no further action for two months. See *Chavis* v. *Whitcomb*, 305 F. Supp. 1364, 1392 (SD Ind. 1969). The Governor nevertheless appealed to this Court, but by the time we ruled, the Governor had taken another appeal from a later order, entered in December 1969, prohibiting the use of Indiana's current plans and requiring the use of court-created plans in the 1970 elections. See 403 U. S., at 139; Juris. Statement in *Whitcomb* v. *Chavis*, O. T. 1970, No. 92, pp. 1–3. And to further complicate matters, by the time we reviewed the case, the Indiana Legislature had enacted new plans. *Whitcomb*, 403 U. S., at 140.

This Court entertained the later appeal and reversed, but the Court dismissed the earlier—and by then, entirely superfluous—appeal, stating that, at the time when it was issued, "no judgment had been entered and no injunction had been granted or denied." *Id.*, at 138, n. 19. But that cursory conclusion has little relevance here, where the District Court's orders were far more specific, immediate, and likely to demand compliance.

[15] While we think it clear that the District Court effectively enjoined the use of these districts as currently configured for this year's elections, even if the Court had not done so, that would not affect our jurisdiction to review the Court's order with respect to all other districts.

diction here, Brief for Appellees in No. 17–626, p. 34; *post*, at 14–16, and n. 8, but there is no reason to fear such a flood. Because §1253 expressly authorizes "interlocutory" appeals, there is no question that there can be more than one appeal in a case challenging a redistricting plan. District courts sometimes expressly enjoin the use of districting plans before moving on to the remedial phase. See, *e.g.*, *Whitford* v. *Gill*, No. 3:15–cv–421, Doc. No. 190 (WD Wis., Feb. 22, 2017); *Harris* v. *McCrory*, No. 1:13–cv–949, Doc. No. 143 (MDNC, Feb. 5, 2016). But appeals from such orders have not overwhelmed our docket. Our holding here will affect only a small category of additional cases.[16]

It should go without saying that our decision does not mean that a State can always appeal a district court order holding a redistricting plan unlawful. A finding on liability cannot be appealed unless an injunction is granted or denied, and in some cases a district court may see no need for interlocutory relief. If a plan is found to be unlawful long before the next scheduled election, a court may defer any injunctive relief until the case is completed. And if a plan is found to be unlawful very close to the election date, the only reasonable option may be to use the plan one last time.

We appreciate our obligation to heed the limits of our jurisdiction, and we reiterate that §1253 must be strictly construed. But it also must be sensibly construed, and here the District Court's orders, for all intents and purposes, constituted injunctions barring the State from conducting this year's elections pursuant to a statute enacted by the Legislature. Unless that statute is uncon-

---

[16]The dissent cites exactly two cases (*Gunn* and *Whitcomb*) decided during the past half-century in which a party attempted to take an appeal to this Court from a three-judge court order holding a state statute unconstitutional but declining to issue an injunction.

stitutional, this would seriously and irreparably harm[17] the State, and only an interlocutory appeal can protect that State interest. See *Carson*, *supra*, at 89–90. As a result, §1253 provides jurisdiction.

## III

We now turn to the merits of the appeal. The primary question is whether the Texas court erred when it required the State to show that the 2013 Legislature somehow purged the "taint" that the court attributed to the defunct and never-used plans enacted by a prior legislature in 2011.

## A

Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State. *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 481 (1997). This rule takes on special significance in districting cases.

Redistricting "is primarily the duty and responsibility of the State," and "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller* v. *Johnson*, 515 U. S. 900, 915 (1995) (internal quotation marks omitted). "[I]n assessing the sufficiency of a challenge to a districting plan," a court "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Id.*, at 915–916. And the "good faith of [the] state legislature must be presumed." *Id.*, at 915.

The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. "[P]ast discrimination cannot, in

---

[17]The dissent argues that we give "short shrift" to the irreparable harm question, *post*, at 16, but the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State, see, *e.g.*, *Maryland* v. *King*, 567 U. S. 1301 (2012) (ROBERTS, C. J., in chambers).

the manner of original sin, condemn governmental action
that is not itself unlawful." *Mobile*, 446 U. S., at 74 (plu-
rality opinion). The "ultimate question remains whether a
discriminatory intent has been proved in a given case."
*Ibid.* The "historical background" of a legislative enact-
ment is "one evidentiary source" relevant to the question
of intent. *Arlington Heights* v. *Metropolitan Housing
Development Corp.*, 429 U. S. 252, 267 (1977). But we
have never suggested that past discrimination flips the
evidentiary burden on its head.

Neither the District Court nor appellees have pointed to
any authority that would justify shifting the burden. The
appellees rely primarily on *Hunter* v. *Underwood*, 471
U. S. 222 (1985), but that case addressed a very different
situation. *Hunter* involved an equal protection challenge
to an article of the Alabama Constitution adopted in 1901
at a constitutional convention avowedly dedicated to the
establishment of white supremacy. *Id.*, at 228–230. The
article disenfranchised anyone convicted of any crime on a
long list that included many minor offenses. *Id.*, at 226–
227. The court below found that the article had been
adopted with discriminatory intent, and this Court accepted
that conclusion. *Id.*, at 229. The article was never re-
pealed, but over the years, the list of disqualifying offenses
had been pruned, and the State argued that what re-
mained was facially constitutional. *Id.*, at 232–233. This
Court rejected that argument because the amendments
did not alter the intent with which the article, including
the parts that remained, had been adopted. *Id.*, at 233.
But the Court specifically declined to address the question
whether the then-existing version would have been valid if
"[re]enacted today." *Ibid.*

In these cases, we do not confront a situation like the
one in *Hunter*. Nor is this a case in which a law originally
enacted with discriminatory intent is later reenacted by a
different legislature. The 2013 Texas Legislature did not

Opinion of the Court

reenact the plan previously passed by its 2011 predecessor. Nor did it use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature. Instead, it enacted, with only very small changes, plans that had been developed by the Texas court pursuant to instructions from this Court "not to incorporate . . . any legal defects." *Perry*, 565 U. S., at 394.

Under these circumstances, there can be no doubt about what matters: It is the intent of the 2013 Legislature. And it was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature acted with invidious intent.

The Texas court contravened these basic principles. Instead of holding the plaintiffs to their burden of overcoming the presumption of good faith and proving discriminatory intent, it reversed the burden of proof. It imposed on the State the obligation of proving that the 2013 Legislature had experienced a true "change of heart" and had "engage[d] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans." 274 F. Supp. 3d, at 649.

The Texas court's references to the need to "cure" the earlier Legislature's "taint" cannot be dismissed as stray comments. On the contrary, they were central to the court's analysis. The court referred repeatedly to the 2013 Legislature's duty to expiate its predecessor's bad intent, and when the court summarized its analysis, it drove the point home. It stated: "The discriminatory taint [from the 2011 plans] was not removed by the Legislature's enactment of the Court's interim plans, because the Legislature engaged in no deliberative process to remove any such taint, and in fact intended any such taint to be maintained but be safe from remedy." *Id.*, at 686.[18]

_____

[18]The dissent attempts to rehabilitate this statement by focusing on

The dissent labors to explain away all these references to the 2013's Legislature's supposed duty to purge its predecessor's allegedly discriminatory intent, but the dissent loses track of its own argument and characterizes the District Court's reasoning exactly as we have. Indeed, the dissent criticizes us on page 33 of its opinion for saying precisely the same thing that it said 11 pages earlier. On page 33, the dissent states:

> "[T]he majority quotes the orders as requiring proof that the Legislature "'engage[d] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'" But the District Court did not put the burden on Texas to make that affirmative showing." *Post*, at 33 (quoting *supra*, at 23, in turn quoting 274 F. Supp. 3d, at 649; citations omitted).

But earlier, the dissent itself describes the District Court's analysis as follows:

> "Despite knowing of the discrimination in its 2011 maps, 'the Legislature did not engage in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'" *Post*, at 22 (quoting 274 F. Supp. 3d, at 649).

And this is not just a single slip of the pen. The dissent writes that the District Court was required "to assess how

_____

the last part of this sentence, in which the District Court stated that the Legislature "intended [the] taint to be maintained but safe from remedy." *Post*, at 33–34. In making this argument, the dissent, like the District Court, refuses to heed the presumption of legislative good faith and the allocation of the burden of proving intentional discrimination. We do not dispute that the District Court purportedly found that the 2013 Legislature acted with discriminatory intent. The problem is that, in making that finding, it relied overwhelmingly on what it perceived to be the 2013 Legislature's duty to show that it had purged the bad intent of its predecessor.

Opinion of the Court

the 2013 Legislature addressed the known discrimination that motivated" the districts approved by that Court in 2012. *Post*, at 31. The dissent quotes the District Court's statement that "'there is no indication that the Legislature looked to see whether any discriminatory taint remained in the plans.'" *Post*, at 23 (quoting 274 F. Supp. 3d, at 649). And there is also this: "Texas was just 'not truly interested in fixing any remaining discrimination in [its 2011 maps].'" *Post*, at 22 (quoting 274 F. Supp. 3d, at 651, n. 45). The District Court's true mode of analysis is so obvious that the dissent cannot help but repeat it. And that approach was fundamentally flawed and demands reversal.

While a district court's finding of fact on the question of discriminatory intent is reviewed for clear error, see *Cromartie*, 532 U. S., at 242, whether the court applied the correct burden of proof is a question of law subject to plenary review, *U. S. Bank N. A.* v. *Village at Lakeridge, LLC*, 583 U. S. ___, ___ (2018) (slip op., at 5); *Highmark Inc.* v. *Allcare Health Management System, Inc.*, 572 U. S. ___, ___ (2014) (slip op., at 4). And when a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand. *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 501 (1984) ("An appellate cour[t has] power to correct errors of law, including those that . . . infect . . . a finding of fact that is predicated on a misunderstanding of the governing rule of law").

### B

In holding that the District Court disregarded the presumption of legislative good faith and improperly reversed the burden of proof, we do not suggest either that the intent of the 2011 Legislature is irrelevant or that the plans enacted in 2013 are unassailable because they were previously adopted on an interim basis by the Texas court. Rather, both the intent of the 2011 Legislature and the

Opinion of the Court

court's adoption of the interim plans are relevant to the extent that they naturally give rise to—or tend to refute— inferences regarding the intent of the 2013 Legislature. They must be weighed together with any other direct and circumstantial evidence of that Legislature's intent. But when all the relevant evidence in the record is taken into account, it is plainly insufficient to prove that the 2013 Legislature acted in bad faith and engaged in intentional discrimination.[19]  See, *e.g.*, *Ricci* v. *DeStefano*, 557 U. S. 557, 585 (2009); *McCleskey* v. *Zant*, 499 U. S. 467, 497 (1991).  There is thus no need for any further prolongation of this already protracted litigation.

The only direct evidence brought to our attention suggests that the 2013 Legislature's intent was legitimate. It wanted to bring the litigation about the State's districting plans to an end as expeditiously as possible. The attorney general advised the Legislature that the best way to do this was to adopt the interim, court-issued plans. The sponsor of the 2013 plans voiced the same objective, and the Legislature then adopted the court-approved plans.

On its face, this explanation of the Legislature's intent is entirely reasonable and certainly legitimate. The Legislature had reason to know that any new plans it devised were likely to be attacked by one group of plaintiffs or another.  (The plaintiffs' conflicting positions with regard to some of the districts in the plans now before us bear this out.)  Litigating districting cases is expensive and time consuming, and until the districts to be used in the next election are firmly established, a degree of uncertainty clouds the electoral process. Wishing to minimize these effects is understandable and proper.

––––––––––––
[19]The dissent is simply wrong in claiming over and over that we have not thoroughly examined the record.  See *post*, at 18–19, 26, 27, 30, 34, 42, 46.  The dissent seems to think that the repetition of these charges somehow makes them true.  It does not.  On the contrary, it betrays the substantive weakness of the dissent's argument.

The court below discounted this direct evidence, but its reasons for doing so are not sound. The court stated that the "strategy" of the 2013 Legislature was to "insulate [the plans] from further challenge, regardless of [the plans'] legal infirmities." 274 F. Supp. 3d, at 650; see also *id.*, at 651, n. 45. But there is no evidence that the Legislature's aim was to gain acceptance of plans that it knew were unlawful.[20] Indeed, there is no evidence that the Legislature thought that the plans were invalid—and as we will explain, the Legislature had sound reasons to believe just the opposite.[21]

The District Court found it significant that the Legislature must have realized that enacting the interim plans would not "end the litigation," because it knew that at least some plaintiffs would pursue their challenges anyway. *Id.*, at 651, n. 45. But even if, as seems likely, the Legislature did not think that all the plaintiffs would immediately abandon all their claims, it does not follow

---

[20]The dissent and the District Court attach much meaning to the attorney general's use of the term "insulate" when he advised the Legislature to adopt the District Court's plans to avoid further legal challenge. Setting aside that the word "insulate" is a common term used to describe minimizing legal concerns, the context of the letter makes clear that the attorney general was trying to make the point that adopting these plans was the best method of obtaining legal compliance, not the start of a grand conspiracy to trick the District Court. Indeed, if his plan was to dupe the District Court, shouting it to the world in a public letter was an odd way to go about it.

[21]In any event, the Texas court was simply wrong that Texas believed its plans would be free from any legal challenge. 274 F. Supp. 3d 624, 651 (2017). Texas consistently acknowledged that effects claims would continue to be available and responded in detail to those arguments in both the District Court and this Court. See Brief for Appellants 64; Defendants' Post-Trial Brief, Doc. No. 1526, p. 53. Moreover, Texas has not argued that intentional discrimination claims are unavailable; it has instead argued that intent must be assessed with respect to the *2013 Legislature*, the Legislature that actually enacted the plans at issue.

Opinion of the Court

that the Legislature was insincere in stating that it adopted the court-approved plan with the aim of bringing the litigation to a close. It was reasonable for the Legislature to think that approving the court-approved plans might at least reduce objections and thus simplify and expedite the conclusion of the litigation.[22] That MALDEF, counsel for one of the plaintiff groups, testified in favor of the plans is evidence that the Legislature's objective was reasonable. C. J. S. 436a–439a.

Not only does the direct evidence suggest that the 2013 Legislature lacked discriminatory intent, but the circumstantial evidence points overwhelmingly to the same conclusion. Consider the situation when the Legislature adopted the court-approved interim plans. First, the Texas court had adopted those plans, and no one would claim that the court acted with invidious intent when it did so. Second, the Texas court approved those plans only after reviewing them and modifying them as required to comply with our instructions. Not one of the judges on that court expressed the view that the plans were unlawful. Third, we had directed the Texas court to make changes in response to any claims under the Equal Protection Clause and §2 of the Voting Rights Act if those claims were merely likely to prevail. *Perry*, 565 U. S., at 394. And the Texas court was told to accommodate any claim under §5 of the VRA unless it was "insubstantial." *Id.*, at 395. Fourth, the Texas court had made a careful analysis of all the claims, had provided a detailed examination of individual districts, and had modified many districts. Its

—————————

[22]The 2013 Legislature had no reason to believe that the District Court would spend four years examining moot plans before reversing its own previous decisions by imputing the intent of the 2011 Legislature to the 2013 Legislature. At the very least, the 2013 Legislature had good reason to believe that adopting the court-approved plans would lessen the time, expense, and complexity of further litigation (even if that belief turned out to be wrong).

work was anything but slapdash. All these facts gave the Legislature good reason to believe that the court-approved interim plans were legally sound.

Is there any evidence from which a contrary inference can reasonably be drawn? Appellees stress the preliminary nature of the Texas court's approval of the interim plans, and as we have said, that fact is relevant. But in light of our instructions to the Texas court and the care with which the interim plans were developed, the court's approval still gave the Legislature a sound basis for thinking that the interim plans satisfied all legal requirements.

The court below and the dissent infer bad faith because the Legislature "pushed the redistricting bills through quickly in a special session." 274 F. Supp. 3d, at 649. But we do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith (a concept to which the dissent pays only the briefest lip service, *post*, at 21). The "special session" was necessary because the regular session had ended. As explained, the Legislature had good reason to believe that the interim plans were sound, and the adoption of those already-completed plans did not require a prolonged process. After all, part of the reason for adopting those plans was to avoid the time and expense of starting from scratch and leaving the electoral process in limbo while that occurred.[23]

The District Court and the dissent also err when they charge that Representative Darby, the chair of the Texas

───────────

[23]Moreover, in criticizing the Legislature for moving too quickly, the dissent downplays the significant time and effort that went into consideration of the 2013 plans. Legislative committees held multiple field hearings in four cities, Tr. 1507 (July 14, 2017), and the legislative actors spent significant time considering the legislation, as well as accepting and rejecting amendments, see, *e.g.*, Joint Exh. 17.3, p. S29; Joint Exh. 24.4, p. 21.

House Redistricting Committee at the time in question, "'willfully ignored those who pointed out deficiencies'" in the plans. *Post*, at 22 (quoting 274 F. Supp. 3d, at 651, n. 45). This accusation is not only misleading, it misses the point. The Legislature adopted the interim plans in large part because they had the preliminary approval of the District Court, and Darby was open about the fact that he wanted to minimize amendments to the plans for that reason. See, *e.g.*, Joint Exh. 17.3, pp. S1–S2. That Darby generally hoped to minimize amendments—so that the plans would remain legally compliant—hardly shows that he, or the Legislature, acted with discriminatory intent. In any event, it is misleading to characterize this attitude as "willfu[l] ignor[ance]." The record shows that, although Darby hoped to minimize amendments, he did not categorically refuse to consider changes. This is illustrated by his support for an amendment to HD90, which was offered by the then-incumbent, Democrat Lon Burnam, precisely because it fixed an objection raised by the Mexican-American Legal Caucus (MALC) that the district's Latino population was too low. 267 F. Supp. 3d, at 790.[24]

The Texas court faulted the 2013 Legislature for failing to take into account the problems with the 2011 plans that the D. C. court identified in denying preclearance, *ibid.*, but the basis for that criticism is hard to understand. One of the 2013 Legislature's principal reasons for adopting the court-approved plans was to fix the problems identified by the D. C. court. The attorney general advised the Legislature to adopt the interim plans because he thought that was the "best way to remedy the violations found by

---

[24]The dissent tries to minimize the relevance of this amendment by arguing that it turned HD90 into a racial gerrymander. See *post*, at 23, n. 12. But again this is misleading. The Legislature adopted changes to HD90 at the behest of *minority groups*, not out of a desire to discriminate. See Part IV–B, *infra*. That is, Darby was *too* solicitous of changes with respect to HD90.

the D. C. court." C. J. S. 432a. Chairman Darby similarly stated that the 2013 plans fixed the errors found by the D. C. court, Tr. 1498, 1584–1585 (July 14, 2017), as did Senator Seliger, Joint Exh. 26.2, p. A–5.

There is nothing to suggest that the Legislature proceeded in bad faith—or even that it acted unreasonably—in pursuing this strategy. Recall that we instructed the Texas court, in developing the interim plans, to remedy any §5 claim that was "not insubstantial." *Perry*, 565 U. S., at 395. And that is just what the interim plans, which the Legislature later enacted, attempted to do. For instance, the D. C. court held that the congressional plan had one too few "ability to elect" districts for Latinos, largely because of changes to CD23, *Texas*, 887 F. Supp. 2d, at 156–159; the interim plan (and, by extension, the 2013 plan) amended CD23, C. J. S. 397a–399a. Similarly, in the plan for the Texas House, the D. C. court found §5 retrogression with respect to HD35, HD117, and HD149, *Texas*, *supra*, at 167–175, and all of those districts were changed in the 2013 plans, H. J. S. 305a–307a, 312a.

Although the D. C. court found that the 2011 Legislature acted with discriminatory intent in framing the congressional plan, that finding was based on evidence about districts that the interim plan later changed. The D. C. court was concerned about the intent reflected in the drawing of CDs 9, 18, and 30, but all those districts were amended by the Texas court. *Texas*, *supra*, at 159–160; C. J. S. 406a–408a. With respect to the plan for the Texas House, the D. C. court made no intent findings, but its areas of concern were generally addressed by the Texas court and the 2013 plans. Compare *Texas*, *supra*, at 178 (noting evidence of unlawful intent in HD117), with H. J. S. 307a (amending HD117).[25]

_____

[25] In assessing the significance of the D. C. court's evaluation of intent, it is important not to forget that the burden of proof in a preclear-

Opinion of the Court

It is indicative of the District Court's mistaken approach that it inferred bad faith from Texas's decision to take an appeal to this Court from the D. C. court's decision denying preclearance. See 274 F. Supp. 3d, at 649 ("Defendants did not accept [these findings] and instead appealed to the Supreme Court"). Congress gave the State the right to appeal, and no bad motive can be inferred from its decision to make use of this right—unless of course the State had no reasonable grounds for appeal. Before our decision in *Shelby County* mooted Texas's appeal to this Court from the D. C. court's preclearance decision, Texas filed a jurisdictional statement claiming that the D. C. court made numerous errors, but the Texas court made no attempt to show that Texas's arguments were frivolous.

As a final note, appellees assert that the 2013 Legislature should have either defended the 2011 plans in litigation or gone back to the drawing board and devised entirely new plans, Brief for Appellees in No. 17–626, at 45, but there is no reason why the Legislature's options should be limited in this way. It was entirely permissible for the Legislature to favor a legitimate option that promised to simplify and reduce the burden of litigation. That the Legislature chose this course is not proof of discriminatory intent.

## IV

Once the Texas court's intent finding is reversed, there remain only four districts that were invalidated on alternative grounds. For three of these districts, the District Court relied on the "effects" test of §2. We reverse as to each of these, but we affirm the District Court's final holding that HD90 is a racial gerrymander.

---

ance proceeding was on the State. *Texas* v. *United States*, 887 F. Supp. 2d 133, 151 (DC 2012). Particularly where race and partisanship can so often be confused, see *supra*, at 3, and n. 3, the burden of proof may be crucial.

### A

To make out a §2 "effects" claim, a plaintiff must establish the three so-called "*Gingles* factors." These are (1) a geographically compact minority population sufficient to constitute a majority in a single-member district, (2) political cohesion among the members of the minority group, and (3) bloc voting by the majority to defeat the minority's preferred candidate. *Gingles*, 478 U. S., at 48–51; *LULAC*, 548 U. S., at 425. If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group. *Id.*, at 425–426.

### 1

The Texas court held that CD27 violates §2 of the VRA because it has the effect of diluting the votes of Latino voters in Nueces County. C. J. S. 191a. CD27 is anchored in Nueces County (home to Corpus Christi) and follows the Gulf of Mexico to the northeast before taking a turn inland to the northwest in the direction of Austin. Nueces County contains a Latino population of roughly 200,000 (a little less than one-third the size of an ideal Texas congressional district), and the court held that the Nueces County Latinos should have been included in a Latino opportunity district, rather than CD27, which is not such a district. The court found that an area centered on Nueces County satisfies the *Gingles* factors and that, under the totality of the circumstances, the placement of the Nueces County Latinos in CD27 deprives them of the equal opportunity to elect candidates of their choice. C. J. S. 181a–195a.

The problem with this holding is that plaintiffs could not establish a violation of §2 of the VRA without showing that there is a "'possibility of creating more than the existing number of reasonably compact'" opportunity districts. *LULAC*, *supra*, at 430. And as the Texas court itself found, the geography and demographics of south and

west Texas do not permit the creation of any more than the seven Latino opportunity districts that exist under the current plan. 274 F. Supp. 3d, at 684, and n. 85.

Attempting to get around this problem, the Texas court relied on our decision in *LULAC*, but it misapplied our holding. In *LULAC*, we held that the State should have created six proper Latino opportunity districts but instead drew only five. 548 U. S., at 435. Although the State claimed that the plan actually included a sixth opportunity district, that district failed to satisfy the *Gingles* factors. 548 U. S., at 430. We held that a "State's creation of an opportunity district for those without a §2 right offers no excuse for its failure to provide an opportunity district for those with a §2 right." *Ibid.*

Here, the Texas court concluded that Texas committed the same violation as in *LULAC*: It created "an opportunity district for those without a §2 right" (the Latinos in CD35), while failing to create such a district "for those with a §2 right" (the Latinos of Nueces County). *Ibid.* This holding is based on a flawed analysis of CD35.

CD35 lies to the north of CD27 and runs along I–35 from San Antonio up to Austin, the center of Travis County. In the District Court's view, the Latinos of CD35 do not have a §2 right because one of the *Gingles* factors, majority bloc voting, is not present. The Court reached this conclusion because the non-Latino voters of Travis County tend to favor the same candidates as the great majority of Latinos. There are two serious problems with the District Court's analysis.

First, the Court took the wrong approach in evaluating the presence of majority bloc voting in CD35. The Court looked at only one, small part of the district, the portion that falls within Travis County. 274 F. Supp. 3d, at 683; C. J. S. 175a–176a. But Travis County makes up only 21% of the district. We have made clear that redistricting analysis must take place at the district level. *Bethune-*

*Hill*, 580 U. S., at ___ (slip op., at 12). In failing to per-
form that district-level analysis, the District Court went
astray.

Second, here, unlike in *LULAC*, the 2013 Legislature
had "good reasons" to believe that the district at issue
(here CD35) was a viable Latino opportunity district that
satisfied the *Gingles* factors. CD35 was based on a con-
cept proposed by MALDEF, C. J. S. Findings 315a–316a,
and the Latino Redistricting Task Force (a plaintiff group)
argued that the district is mandated by §2. C. J. S. 174a.
The only *Gingles* factor disputed by the court was majority
bloc voting, and there is ample evidence that this factor is
met. Indeed, the court found that majority bloc voting
exists throughout the State. C. J. S. Findings 467a. In
addition, the District Court extensively analyzed CD35 in
2012 and determined that it was likely not a racial gerry-
mander and that even if it was, it likely satisfied strict
scrutiny. C. J. S. 415a. In other words, the 2013 Legisla-
ture justifiably thought that it had placed a viable oppor-
tunity district along the I–35 corridor.

2

The District Court similarly erred in holding that HD32
and HD34 violate §2. These districts make up the entirety
of Nueces County, which has a population that is almost
exactly equal to twice the population of an ideal Texas
House district. (It can fit 2.0295 ideal districts. H. J. S.
Findings 91a.) In 2010, Latinos made up approximately
56% of the voting age population of the county. *Ibid.* The
2013 plan created two districts that lie wholly within the
county; one, HD34, is a Latino opportunity district, but
the other, HD32, is not. 267 F. Supp. 3d, at 767.

Findings made by the court below show that these two
districts do not violate §2 of the Voting Rights Act. Under
*Gingles*, the ultimate question is whether a districting
decision dilutes the votes of minority voters, see *LULAC*,

Opinion of the Court

*supra*, at 425–426, and it is hard to see how this standard
could be met if the alternative to the districting decision at
issue would not enhance the ability of minority voters to
elect the candidates of their choice.

The only plaintiff that pressed a §2 claim with respect to
HD32 and HD34 was MALC, 267 F. Supp. 3d, at 767, and
as the District Court recognized, that group's own expert
determined that it was not possible to divide Nueces
County into more than one *performing* Latino district. In
his analysis, the expert relied on Nueces County election
returns for statewide elections between 2010 and 2016.
*Id.*, at 775–776. Based on this data, he calculated that
when both HD32 and HD34 were maintained as Latino-
majority districts, one performed for Latinos in only 7 out
of 35 relevant elections, and the other did so in *none* of the
35 elections. *Ibid.* In order to create two performing
districts in that area, it was necessary, he found, to break
county lines in *multiple* places, *id.*, at 778, but the District
Court held that "breaking the County Line Rule" in the
Texas Constitution, see Art. III, §26, to "remove Anglos
and incorporate even more Hispanics to improve electoral
outcomes goes beyond what §2 requires." 267 F. Supp. 3d,
at 783. So if Texas could *not* create two performing dis-
tricts in Nueces County and did *not* have to break county
lines, the logical result is that Texas did not dilute the
Latino vote.

The court refused to accept this conclusion, but its rea-
sons for doing so cannot stand up. As an initial matter,
the court thought that the two districts would have to be
redrawn based on its finding regarding the intent of the
2013 Legislature,[26] and it therefore deferred a final deci-

⎯⎯⎯⎯⎯⎯

[26]The District Court also purported to find a violation of the "one
person, one vote" principle in Nueces County, 267 F. Supp. 3d 750, 783
(2017); H. J. S. 254a–255a, but that finding was in actuality a restate-
ment of its racial discrimination finding. The population deviations
from the ideal are quite small (-0.34% in HD32 and 3.29% in HD34, *id.*,

Opinion of the Court

sion on the §2 issue and advised the plaintiffs to consider at the remedial phase of the case whether they preferred to have two districts that might not perform or just one safe district. *Id.*, at 783. The court's decision cannot be sustained on this ground, since its finding of discriminatory intent is erroneous.

The only other reason provided by the court was the observation that MALC "failed to show" that two majority-Latino districts in Nueces County would not perform. *Id.*, at 782. This observation twisted the burden of proof beyond recognition. It suggested that a plaintiff might succeed on its §2 claim because its expert failed to show that the necessary factual basis for the claim could not be established.[27] Courts cannot find §2 effects violations on

_____

at 254a), and the District Court relied solely on the "evidence of the use of race in drawing the lines in Nueces County" to find a one person, one vote violation. *Id.*, at 255a; see also *id.*, at 254a ("[T]he State intentionally discriminated against minority voters by overpopulating minority districts and underpopulating Anglo districts"). Even assuming that a court could find a one person, one vote violation on the basis of such a small deviation, cf. *Brown* v. *Thomson*, 462 U. S. 835, 842–843 (1983) (noting that deviations under 10% are generally insufficient to show invidious discrimination), the District Court erred in relying on its unsound finding regarding racial discrimination.

Moreover, plaintiffs rejected any separate one person, one vote claims before the District Court, Tr. 22 (July 10, 2017), and they have not mentioned such a claim as a separate theory in their briefing in this Court.

[27] The District Court's belief that simple Latino majorities in Nueces County might be sufficient to create opportunity districts—and that Texas should have known as much—conflicts with other parts of its decision. With respect to numerous other districts, the District Court *chided* Texas for focusing on bare numbers and not considering real opportunity to elect. See, *e.g.*, C. J. S. 134a ("[T]he court rejects [the] bright-line rule that any HCVAP-majority district is by definition a Latino opportunity district" because it "may still lack real electoral opportunity" (internal quotation marks omitted)); H. J. S. 121a (Texas "increase[d the Latino population] while simultaneously ensuring that election success rates remained minimally improved").

38              ABBOTT *v.* PEREZ

Opinion of the Court

the basis of *uncertainty*.  In any event, if even the District
Court remains unsure how to draw these districts to com-
ply with §2 (after six years of litigation, almost a dozen
trials, and numerous opinions), the Legislature surely had
the "'broad discretion'" to comply as it reasonably saw fit
in 2013, *LULAC, supra*, at 429.

   The dissent charges us with ignoring the District
Court's "'intensely local appraisal'" of Nueces County,
*post*, at 43, but almost none of the "findings" that the
District Court made with respect to HD32 and HD34
referred to present local conditions, and none cast any
significant light on the question whether another oppor-
tunity district is possible at the present time.  For in-
stance, what the dissent describes as Texas's "long 'history
of voting-related discrimination,'" *ibid.*, in no way under-
mines—or even has any logical bearing on—the conclu-
sions reached by MALC's expert about whether Latino
voters would have a real opportunity to elect the candi-
dates of their choice if the county was divided into two
districts with narrow majorities of Latino citizens of voting
age.  The same is true with respect to the District Court's
findings regarding racially polarized voting in the county
and Latinos' "continuing pattern of disadvantage relative
to" non-Latinos.  267 F. Supp. 3d, at 779 (internal quota-
tion marks omitted). Perhaps recognizing as much, both
the District Court and the dissent point to the anticipated
future growth in the percentage of eligible voters of Latino
descent, but the districts now at issue would not necessar-
ily be used beyond 2020, after which time the 2020 census
would likely require redistricting once again.

                           B

   HD90 is a district in Tarrant County that, unlike the
other districts at issue in this appeal, was not copied from
the District Court's interim plans.  Instead, the 2013
Legislature substantially modified the district developed

by the District Court, and the District Court held that the 2013 Legislature's creation is an invalid racial gerrymander. 267 F. Supp. 3d, at 794.

In drawing HD90, the Legislature was pulled in opposite directions by competing groups. In 2011, the Legislature, responding to pressure from MALDEF, increased the Latino population of the district in an effort to make it a Latino opportunity district. H. J. S. Findings 258a–262a. In the process of doing so, the Legislature moved the community of Como, which is predominantly African-American, out of the district. But Como residents and the member of the Texas House who represented the district, Lon Burnam, objected, and in 2013, the Legislature moved Como back into the district. 267 F. Supp. 3d, at 788–789. That change was opposed by MALC because it decreased the Latino population below 50%. App. 398a–399a. So the Legislature moved Latinos into the district to bring the Latino population back above 50%. 267 F. Supp. 3d, at 789–790.

In light of these maneuvers, Texas does not dispute that race was the predominant factor in the design of HD90, but it argues that this was permissible because it had "'*good reasons* to believe'" that this was necessary to satisfy §2 of the Voting Rights Act." *Bethune-Hill*, 580 U. S., at ___ (slip op., at 14).

Texas offers two pieces of evidence to support its claim. The first—that one of the plaintiffs, MALC, demanded as much—is insufficient. A group that wants a State to create a district with a particular design may come to have an overly expansive understanding of what §2 demands. So one group's demands alone cannot be enough.

The other item of evidence consists of the results of the Democratic primaries in 2012 and 2014. In 2012, Representative Burnham, who was not the Latino candidate of choice, narrowly defeated a Latino challenger by 159 votes. And in 2014, the present representative, Ramon

Opinion of the Court

Romero, Jr., beat Burnam by 110 votes. See Brief for
Appellants 70. These election returns may be suggestive,
but standing alone, they were not enough to give the State
good reason to conclude that it had to alter the district's
lines solely on the basis of race. And putting these two
evidentiary items together helps, but it is simply too thin a
reed to support the drastic decision to draw lines in this
way.

We have previously rejected proffers of evidence that
were at least as strong as Texas's here. For example, in
*Cooper*, 581 U. S., at ___ (slip op., at 11), we analyzed
North Carolina's justification for deliberately moving
"African-American voters" into a district to "ensure . . . the
district's racial composition" in the face of its expansion in
size. North Carolina argued that its race-based decisions
were necessary to comply with §2, but the State could
point to "no meaningful legislative inquiry" into "whether
a new, enlarged" district, "created without a focus on race,
. . . could lead to §2 liability." *Id.*, at ___ (slip op., at 15).
North Carolina pointed to two expert reports on "voting
patterns throughout the State," but we rejected that evi-
dence as insufficient. *Id.*, at ___, n. 5 (slip op., at 15, n. 5).
Here, Texas has pointed to no actual "legislative inquiry"
that would establish the need for its manipulation of the
racial makeup of the district.

By contrast, where we have accepted a State's "good
reasons" for using race in drawing district lines, the State
made a strong showing of a pre-enactment analysis with
justifiable conclusions. In *Bethune-Hill*, the State estab-
lished that the primary mapdrawer "discussed the district
with incumbents from other majority-minority districts[,]
. . . considered turnout rates, the results of the recent
contested primary and general elections," and the district's
large prison population. 580 U. S., at ___ (slip op., at 15).
The State established that it had performed a "functional
analysis," and acted to achieve an "informed bipartisan

Opinion of the Court

consensus." *Id.*, at ___ (slip op., at 14).  Texas's showing
here is not equivalent.

  Perhaps Texas could have made a stronger showing, but
it is the State's burden to prove narrow tailoring, and it
did not do so on the record before us.  We hold that HD90
is an impermissible racial gerrymander.  On remand, the
District Court will have to consider what if any remedy is
appropriate at this time.

<div align="center">

\*      \*      \*

</div>

  Except with respect to one Texas House district, we hold
that the court below erred in effectively enjoining the use
of the districting maps adopted by the Legislature in 2013.
We therefore reverse with respect to No. 17–586; reverse
in part and affirm in part with respect to No. 17–626; and
remand for proceedings consistent with this opinion.

<div align="right">

*It is so ordered.*

</div>

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 17–586 and 17–626

————————

## GREG ABBOTT, GOVERNOR OF TEXAS, ET AL., APPELLANTS

17–586                    *v.*

### SHANNON PEREZ, ET AL.

## GREG ABBOTT, GOVERNOR OF TEXAS, ET AL., APPELLANTS

17–626                    *v.*

### SHANNON PEREZ, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS

[June 25, 2018]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I adhere to my view that §2 of the Voting Rights Act of 1965 does not apply to redistricting. See *Cooper* v. *Harris*, 581 U. S. ___, ___ (2017) (concurring opinion) (slip op., at 1) (citing *Holder* v. *Hall*, 512 U. S. 874, 922–923 (1994) (THOMAS, J., concurring in judgment)). Thus, §2 cannot provide a basis for invalidating any district, and it cannot provide a justification for the racial gerrymander in House District 90. Because the Court correctly applies our precedents and reaches the same conclusion, I join its opinion in full.

Cite as: 585 U. S. ____ (2018)          1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 17–586 and 17–626

————————

## GREG ABBOTT, GOVERNOR OF TEXAS, ET AL., APPELLANTS

17–586          *v.*

SHANNON PEREZ, ET AL.


## GREG ABBOTT, GOVERNOR OF TEXAS, ET AL., APPELLANTS

17–626          *v.*

SHANNON PEREZ, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS

[June 25, 2018]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE KAGAN join, dissenting.

The Court today goes out of its way to permit the State of Texas to use maps that the three-judge District Court unanimously found were adopted for the purpose of preserving the racial discrimination that tainted its previous maps. In reaching its desired result, the majority commits three fundamental errors along the way.

First, the majority disregards the strict limits of our appellate jurisdiction and reads into the District Court orders a nonexistent injunction to justify its premature intervention. Second, the majority indulges Texas' distorted reading of the District Court's meticulous orders, mistakenly faulting the court for supposedly shifting the burden of proof to the State to show that it cured the taint of past discrimination, all the while ignoring the clear language and unambiguous factual findings of the orders

SOTOMAYOR, J., dissenting

below.  Third, the majority elides the standard of review
that guides our resolution of the factual disputes in these
appeals—indeed, mentioning it only in passing—and
selectively parses through the facts.  As a result of these
errors, Texas is guaranteed continued use of much of its
discriminatory maps.

   This disregard of both precedent and fact comes at
serious costs to our democracy.  It means that, after years
of litigation and undeniable proof of intentional discrimi-
nation, minority voters in Texas—despite constituting a
majority of the population within the State—will continue
to be underrepresented in the political process.  Those
voters must return to the polls in 2018 and 2020 with the
knowledge that their ability to exercise meaningfully their
right to vote has been burdened by the manipulation of
district lines specifically designed to target their commu-
nities and minimize their political will.  The fundamental
right to vote is too precious to be disregarded in this man-
ner.  I dissent.

<div align="center">

I

A

</div>

   The first obstacle the majority faces in its quest to in-
tervene in these cases is jurisdictional.  The statute that
governs our jurisdiction over these appeals is 28 U. S. C.
§1253, which provides that "any party may appeal to the
Supreme Court from an order granting or denying . . . an
interlocutory or permanent injunction in any civil action,
suit or proceeding required by any Act of Congress to be
heard and determined by a district court of three judges."
Unlike the more typical certiorari process, for cases falling
within §1253, appellate review in this Court is mandatory.
That is why, until today, this Court has repeatedly recog-
nized and adhered to a "long-established rule" requiring
"strict construction" of this jurisdictional statute "to pro-
tect our appellate docket."  *Stainback* v. *Mo Hock Ke Lok*

SOTOMAYOR, J., dissenting

*Po*, 336 U. S. 368, 375, 378 (1949); see, *e.g., Gonzalez* v. *Automatic Employees Credit Union*, 419 U. S. 90, 98 (1974) (noting that "only a narrow construction" of our jurisdiction under §1253 "is consonant with the overriding policy, historically encouraged by Congress, of minimizing the mandatory docket of this Court in the interests of sound judicial administration"); *Gunn* v. *University Comm. to End War in Viet Nam*, 399 U. S. 383, 387 (1970) (similar); *Goldstein* v. *Cox*, 396 U. S. 471, 477–478 (1970) (rejecting a construction of §1253 that would "involve an expansion of [our] mandatory appellate jurisdiction," even where the statutory text "is subject to [that] construction," in light of "canon of construction" requiring that §1253 be "narrowly construed"); *Phillips* v. *United States*, 312 U. S. 246, 248–250 (1941) (explaining that §1253 is an "exceptional procedure" and that "inasmuch as this procedure . . . brings direct review of a district court to this Court, any loose construction . . . would defeat the purposes of Congress . . . to keep within narrow confines our appellate docket").

In line with that command, this Court has held that a ruling on the merits will not suffice to invoke our mandatory appellate jurisdiction in the absence of an order granting or denying an injunction. In fact, even if a three-judge district court unequivocally indicates that a state law must be enjoined as it stands, we have required more before accepting mandatory review. For example, the Court in *Gunn* found no jurisdiction where the three-judge District Court held that a Texas disturbing-the-peace statute was "'impermissibly and unconstitutionally broad,'" concluded that the plaintiffs were "'entitled to their declaratory judgment to that effect, and to injunctive relief against the enforcement of [the statute] as now worded, insofar as it may affect the rights guaranteed under the First Amendment,'" and stayed the mandate to allow the State to, "'if it so desires, enact such disturbing-the-peace statute as will meet constitutional require-

ments.'"  399 U. S., at 386.  Despite the District Court's
resolution of the merits and its clear indication that,
unless amended, the disturbing-the-peace statute would
be enjoined, this Court dismissed an appeal from the State
for want of jurisdiction, concluding that the District Court
merely wrote a "rather discursive *per curiam* opinion" and
"there was no order of any kind either granting or denying
an injunction—interlocutory or permanent."  *Id.,* at 387.
The Court explained that, in addition to the congressional
command to "'keep within narrow confines our appellate
docket,'" other "policy considerations" counseled limiting
"our power of review," including "that until a district court
issues an injunction, or enters an order denying one, it is
simply not possible to know with any certainty what the
court has decided."  *Id.,* at 387–388.  Those considerations,
the Court thought, were "conspicuously evident" in that
case, where the opinion did not specify, for instance, exactly
what was to be enjoined or against whom the injunction
would run.  *Id.,* at 388.

Similarly, *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971),
concerned a redistricting challenge in which a three-judge
District Court held that "a redistricting of [the challenged
county was] necessitated" and "that the evidence adduced
. . . and the additional apportionment requirements set
forth by the Supreme Court call[ed] for a redistricting of
the entire state as to both houses of the General Assem-
bly," *Chavis* v. *Whitcomb*, 305 F. Supp. 1364, 1391 (SD
Ind. 1969).  Recognizing "that the federal judiciary func-
tions within a system of federalism which entrusts the
responsibility of legislative apportionment and districting
primarily to the state legislature," the District Court
afforded the Governor "a reasonable opportunity to call a
Special Session of the General Assembly of the State of
Indiana so that it may enact legislation to redistrict the
State and reapportion the legislative seats in the General
Assembly in accordance with federal constitutional re-

quirements and in compliance with [its] opinion." *Id.,* at 1392. The District Court gave the State a little over two months to enact new statutes "to remedy the improper districting and malapportionment." *Ibid.* When the Governor appealed from that order, this Court dismissed for want of jurisdiction because "at [the] time no judgment had been entered and no injunction had been granted or denied." 403 U. S.*,* at 138, n. 19. The findings of liability on the merits and the unequivocal indication that the redistricting and malapportionment violations had to be remedied were not enough.

## B

Straightforward application of this precedent compels the conclusion that this Court lacks jurisdiction over these appeals. Here, Texas appeals from two orders entered by the three-judge District Court on August 15 and 24, 2017. Those orders concern the constitutional and statutory challenges to Texas' State House and federal congressional redistricting plans, enacted by the Texas Legislature (hereinafter Legislature) in 2013 (hereinafter the 2013 maps). As relevant here, the orders concerned Texas House districts in Bell County (HD54 and HD55), Dallas County (HD103, HD104, and HD105), Nueces County (HD32 and HD34), and Tarrant County (HD90), as well federal congressional districts encompassing Nueces County (CD27) and parts of Travis County (CD35). The District Court concluded that plaintiffs had proved intentional discrimination as to HD54, HD55, HD103, HD104, HD105, HD32, HD34, and CD27.[1] It also concluded that

---

[1] The Fourteenth Amendment and §2 of the Voting Rights Act of 1965 prohibit intentional "vote dilution," *i.e.,* purposefully enacting "a particular voting scheme . . . 'to minimize or cancel out the voting potential of racial or ethnic minorities,' an action disadvantaging voters of a particular race." *Miller* v. *Johnson*, 515 U. S. 900, 911 (1995) (citations omitted).

SOTOMAYOR, J., dissenting

plaintiffs had proved a "results" violation under §2 of the
Voting Rights Act as to HD32, HD34, and CD27,[2] and had
established a racial gerrymandering claim as to HD90 and
CD35.[3]

Having ruled on the challengers' statutory and constitu-
tional claims, the District Court stated that all but one of
the "violations must be remedied by either the Texas
Legislature or [the District] Court." 274 F. Supp. 3d 624,
686 (WD Tex. 2017); see also 267 F. Supp. 3d 750, 795
(WD Tex. 2017).[4] With respect to the §2 results violation
concerning HD32 and HD34, however, the District Court
noted that it had yet to decide "whether §2 requires a
remedy for this results violation." *Id.,* at 783, 795. The
District Court then ordered "the [Texas] Office of the
Attorney General to file a written advisory within three
business days stating whether the Legislature intends to
take up redistricting in an effort to cure these violations
and, if so, when the matter will be considered." 274
F. Supp. 3d, at 686; see also 267 F. Supp. 3d, at 795. The
court went on: "If the Legislature does not intend to take
up redistricting, the [District] Court will hold a hearing to
consider remedial plans" on September 5 and 6, 2017,
respecting the congressional and Texas House districts.
274 F. Supp. 3d, at 686–687; see also 267 F. Supp. 3d, at
795. "In preparation for the hearing[s]," the District Court

——————

[2] The §2 "results" test focuses, as relevant here, on vote dilution ac-
complished through cracking or packing, *i.e.,* "the dispersal of [a pro-
tected class of voters] into districts in which they constitute an ineffec-
tive minority of voters or from the concentration of [those voters] into
districts where they constitute an excessive majority." *Thornburg* v.
*Gingles,* 478 U. S. 30, 46, n. 11 (1986).

[3] The Fourteenth Amendment "limits racial gerrymanders" and "pre-
vents a State, in the absence of 'sufficient justification,' from 'separat-
ing its citizens into different voting districts on the basis of race.'"
*Cooper* v. *Harris,* 581 U. S. ___, ____ (2017) (slip op., at 1).

[4] The various appendixes are abbreviated herein consistent with the
majority opinion. See *ante,* at 2, n. 1.

ordered the parties to confer and to "take immediate steps
to consult with their experts and mapdrawers and pre-
pare" maps to present at those hearings. 274 F. Supp. 3d,
at 687; 267 F. Supp. 3d, at 795.

The District Court went no further. Though there had
been a determination on the merits that Texas violated
both the Equal Protection Clause and §2 of the Voting
Rights Act with respect to a number of districts in the
2013 maps, the District Court did not enjoin use of the
2013 maps for the upcoming 2018 elections. For instance,
with respect to the congressional map, the District Court
explained that its order "only partially address[d]" the
challengers' claims, as it had "bifurcated the remedial
phase" from the merits phase. 274 F. Supp. 3d, at 687.
Importantly, in denying Texas' motions for a stay, the
District Court took care to make abundantly clear the
scope of its orders: "Although the [District] Court found
violations [in the congressional and Texas House maps],
the [District] Court has not enjoined [their] use for any
upcoming elections." App. 134a–136a.

That is the end of the inquiry under our precedent, as
our past cases are directly on point. Like in *Gunn* and
*Whitcomb*, the District Court issued a ruling on the merits
against the State. Like in *Gunn* and *Whitcomb*, the Dis-
trict Court was clear that those violations required a
remedy. Like in *Gunn* and *Whitcomb*, the District Court
stayed its hand and did not enter an injunction, instead
allowing the State an opportunity to remedy the viola-
tions. Therefore, like in *Gunn* and *Whitcomb*, this Court
lacks jurisdiction under §1253 because there is "no order
of any kind either granting or denying an injunction—
interlocutory or permanent." *Gunn*, 399 U. S., at 387.[5]

——————

[5] Contrary to what the majority contends, whether *Whitcomb* involved
an "exceedingly complicated procedural posture" has no effect on
whether, at the time the State first appealed, the District Court had

### C

#### 1

Despite this precedent, the majority nonetheless con-
cludes that our intervention at this early stage is not only
authorized, but mandatory. None of the justifications that
the majority offers for deviating from our precedent is
persuasive.

The majority justifies its jurisdictional overreach by
holding that §1253 mandates appellate review in this
Court if a three-judge district court order "has the 'practi-
cal effect' of granting or denying an injunction." *Ante,* at
12. It reasons that the Court has "previously made clear
that where an order has the 'practical effect' of granting or
denying an injunction, it should be treated as such for
purposes of appellate jurisdiction." *Ibid.* That reasoning,
however, has no application here. Whereas this Court has
applied the "practical effect" rule in the context of the
courts of appeals' appellate jurisdiction under 28 U. S. C.
§1292(a)(1), it has never applied it to questions of its own

———————

granted or denied an injunction for purposes of §1253 jurisdiction.
*Ante,* at 19, n. 14. Nor was the order at issue in *Whitcomb* less "spe-
cific" or less "likely to demand compliance" than the orders at issue in
these appeals. *Ibid.* The District Court in *Whitcomb,* like here, issued
an order on the merits finding the State liable and unambiguously
holding that a remedy was required. *Chavis* v. *Whitcomb,* 305 F. Supp.
1364, 1391–1392 (SD Ind. 1969). The District Court discussed how the
Indiana Legislature might go about redistricting. *Ibid.* Also, the
orders here were no more "immediate" than the order in *Whitcomb.*
*Ante,* at 19, n. 14. As in *Whitcomb,* the District Court here first at-
tempted to defer to the State to redistrict, and nothing in the record
suggests that the court would not have allowed the Texas Legislature a
reasonable amount of time to redistrict had the State decided to take
up the task, as the District Court did in *Whitcomb.* To the extent the
majority relies on the 3-day deadline contained in the orders below,
that deadline was solely for the Texas attorney general to inform the
District Court whether the Legislature intended to take up redistrict-
ing; it was not a deadline to enact new maps. See *infra,* at 17–18.
*Whitcomb* is thus not distinguishable in any relevant respect.

SOTOMAYOR, J., dissenting

mandatory appellate docket under §1253. That explains why the only cases the majority can round up to support its position concern jurisdiction under §1292(a)(1). *Ante,* at 12 (citing *Carson* v. *American Brands, Inc.,* 450 U. S. 79, 83–84 (1981), and *Gulfstream Aerospace Corp.* v. *Mayacamas Corp.,* 485 U. S. 271, 287–288 (1988)).

This distinction matters a great deal. Courts of appeals generally have jurisdiction over direct appeals from the district courts. See 15A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3901, p. 13 (3d ed. 2005) ("Courts of appeals jurisdiction extends to nearly every action that might be taken by a district court"). In contrast, exercising mandatory review over direct appeals in this Court is a truly "exceptional procedure," *Phillips,* 312 U. S., at 248, in no small part due to our "necessarily finite docket," 16B Wright, Federal Practice and Procedure §4003, at 19. Reading §1253 broadly risks transforming that exceptional procedure into a routine matter, when our precedent commands a strict construction precisely so that we can "'keep within narrow confines our appellate docket.'" *Goldstein,* 396 U. S., at 478.

Brushing that distinction aside, the majority contends that "we also construe Section 1292(a)(1) 'narrowly,'" and have referred to the statutes as "'analogous.'" *Ante,* at 13. True, but that is no response to the jurisdictional obstacle of §1253. The command from our precedent is not simply one to undertake the same narrow interpretation as we do for §1292(a)(1). Rather, our "long-established rule" requires "strict construction" of §1253, *Stainback,* 336 U. S., at 378, so that even where the statutory text could be read to expand our mandatory appellate docket, this Court will not adopt that reading if a narrower construction is available, *Goldstein,* 396 U. S., at 477–478. That "strict construction" rule exists for a purpose specific to this Court: to protect our "carefully limited appellate jurisdiction." *Board of Regents of Univ. of Tex. System* v. *New Left Ed.*

SOTOMAYOR, J., dissenting

*Project*, 404 U. S. 541, 543 (1972). Unlike the courts of appeals, which hear cases on mandatory jurisdiction regularly, this Court hears cases on mandatory jurisdiction only rarely. The majority nowhere grapples with that vital contextual distinction between §1253 and §1292(a)(1). Nor does the majority acknowledge that, in interpreting §1253, this Court has itself recognized that distinction, noting that "this Court *above all others* must limit its review of interlocutory orders." *Goldstein*, 396 U. S., at 478 (emphasis added).

### 2

Looking to escape that pitfall in its reasoning, the majority turns to the text of the two jurisdictional statutes. But the text provides no refuge for its position. The majority first states that "the relevant language in the two provisions is nearly identical." *Ante,* at 13. But whereas §1253 provides for appeal "from an order granting or denying . . . an interlocutory or permanent injunction," §1292(a)(1) provides for appeal from "[i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." It is a stretch, to say the least, to characterize these provisions as "nearly identical." *Ante,* at 13.

Next, the majority contends that §1253 and §1292(a)(1) are "textually interlocked," *ante,* at 14, in that §1292(a)(1) provides for appeal to the courts of appeals, "except where a direct review may be had in the Supreme Court." In its view, this demonstrates that the "practical effect" rule must apply under §1253. The majority reasons that "the consequences would be unfortunate and strange" otherwise, imagining that an order from a three-judge district court that had the practical effect of an injunction but did not invoke §1253 jurisdiction would "appear to be appealable to one of the courts of appeals" in light of the "except" clause, a result "Congress surely did not intend" given

SOTOMAYOR, J., dissenting

that it took "pains to provide for review in this Court, and not in the courts of appeals, of three-judge court orders granting injunctions." *Ante,* at 14.

This reasoning rests on a mistaken premise. Congress did not provide for review of *every* three-judge court order in this Court. It provided for review of only certain narrow categories of orders, *i.e.,* those granting or denying an injunction. There is nothing "unfortunate" or "strange" about the proposition that orders from a three-judge court that do not fall within these narrow categories of actions made directly appealable to this Court can be appealed only to the courts of appeals. In fact, this Court itself has recognized as much. See, *e.g., Rockefeller* v. *Catholic Medical Center of Brooklyn & Queens, Inc.,* 397 U. S. 820 (1970) (*per curiam*) ("The judgment appealed from does not include an order granting or denying an interlocutory or permanent injunction and is therefore not appealable to this Court under 28 U. S. C. §1253. The judgment of the District Court is vacated and the case is remanded to that court so that it may enter a fresh decree from which timely appeal may be taken to the Court of Appeals" (citation omitted)); see also *Mitchell* v. *Donovan,* 398 U. S. 427, 431–432 (1970) (*per curiam*) (concluding that "this Court lacks jurisdiction of the appeal" under §1253 and directing "the District Court [to] enter a fresh order . . . thus affording the appellants an opportunity to take a timely appeal to the Court of Appeals").[6]   And to the extent a party

──────────

[6]The majority opinion attempts to distinguish *Donovan* and *Rockefeller* by stating that the decisions there were "based on the plain language of §1253, which says nothing about orders granting or denying declaratory judgments." *Ante,* at 14–15, n. 11. But of course, "the plain language of §1253" also "says nothing about" noninjunctive orders, like the ones issued by the District Court below. Notably, the order at issue in *Rockefeller* looked similar to the orders on appeal here: There, the three-judge District Court declined to enter an injunction only because "the state ha[d] shown a desire to comply with applicable federal requirements," but its order nevertheless clearly resolved the merits

prematurely appeals to the court of appeals an order that
would otherwise fall within §1253, *e.g.,* if Texas had ap-
pealed the August 15 and 24 orders to the Court of Ap-
peals for the Fifth Circuit, that court surely will be more
than capable of identifying as much and instructing the
party to wait for an actual injunction before bringing an
appeal to this Court.

3

The majority attempts to bolster its jurisdictional con-
clusion with a passing reference to the "valuable purpose"
served by the "practical effect" rule, *i.e.,* preventing dis-
trict courts from manipulating proceedings by avoiding
labeling their orders as "injunctions."   *Ante,* at 12–13.
Notably, the majority cites no evidence for the proposition
that district courts are engaging in any kind of manipula-
tion.   Nor is there any indication that the District Court
here attempted to manipulate the proceedings by shield-
ing its orders from appellate review.   Instead, the District
Court carefully adhered to a common practice in cases
implicating important state interests, staying its hand as
to the remedy to allow the State an opportunity to act, as
happened in *Gunn* and *Whitcomb.*

More important, the majority ignores the "valuable
purposes" served by the longstanding rule requiring strict
construction of §1253.   Not only does it comply with the
congressional command to "'keep within narrow confines
our appellate docket,'" but without strict enforcement of
the requirement that an order grant or deny an injunction,
"it is simply not possible to know with any certainty what
the court has decided."   *Gunn*, 399 U. S., at 387–388.
Such clarity "is absolutely vital in a case where a federal
court is asked to nullify a law duly enacted by a sovereign

––––––––

against the State.  See *Catholic Medical Center of Brooklyn & Queens,
Inc.* v. *Rockefeller*, 305 F. Supp. 1268, 1271 (EDNY 1969).

State." *Id.,* at 389.  Orders coming to this Court on direct appeal under the "practical effect" rule will more often than not lack that clarity.

In these cases, for instance, what does the majority read the "practical effect" of the orders to have been with respect to HD32 and HD34?  The District Court held that the challengers had "not proven that §2 requires breaking the County Line Rule" in the Texas Constitution, Art. III, but that "§2 could require" drawing two majority-HCVAP[7] districts.  267 F. Supp. 3d, at 783, 795.  Does the majority read that to mean that the §2 results violation could potentially go without a remedy?  If so, there would have been no obstacle to use of the 2013 maps for those districts even after a remedial phase.  Or does the majority read that to mean that the challengers still had more to show before the District Court "would" redraw the districts that §2 "could" require to be redrawn?  And what is the effect of the conclusion respecting the County Line Rule on the potential remedy for the intentional vote dilution holding as to HD32 and HD34?  The majority conveniently avoids confronting this lack of clarity by ignoring the relevant record, instead stating without explanation that it believes "it clear that the District Court effectively enjoined use of these districts as currently configured." *Ante,* at 19, n. 15.  But it cannot escape the reality that its rule will "needlessly complicate appellate review," *ante,* at 15, given that "it is simply not possible [absent an injunction] to know with any certainty what the court has decided," *Gunn,* 399 U. S., at 388.

I do not disagree that "lack of specificity in an injunctive order would [not] alone deprive the Court of jurisdiction under §1253." *Id.,* at 389, n. 4; see also *ante,* at 16 (quoting *Gunn*).  "But the absence of any semblance of effort by the District Court to comply with [the specificity required

_____

[7] "HCVAP" stands for Hispanic citizen voting age population.

of injunctive orders under the Federal Rules] makes clear
that the court did not think its [orders] constituted an
order granting an injunction." *Gunn*, 399 U. S., at 389.  If
any doubt remained as to the effect of the orders here,
moreover, the District Court explicitly assured the parties
that, even though it had found violations, it was not en-
joining use of the 2013 maps for the upcoming elections.
App. 134a–136a.

Finally, it is axiomatic that "administrative simplicity is
a major virtue in a jurisdictional statute."  *Hertz Corp.* v.
*Friend*, 559 U. S. 77, 94 (2010).

> "Complex jurisdictional tests complicate a case . . . .
> Complex tests produce appeals and reversals, [and]
> encourage gamesmanship . . . .  Judicial resources too
> are at stake [as] courts benefit from straightforward
> rules under which they can readily assure themselves
> of their power to hear a case.  Simple jurisdictional
> rules also promote greater predictability."  *Ibid.* (cita-
> tions omitted).

Simple is thus the name of the game when it comes to
jurisdictional rules.  The rule in the majority opinion is
anything but.  Although the majority claims that a mere
"finding on liability cannot be appealed unless an injunc-
tion is granted or denied," *ante,* at 20, the rule it embraces
today makes it hard to understand when a finding on
liability would not be read, as the majority does here, as
having the "practical effect" of an injunction.  It is a worri-
some prospect that, after today, whenever a three-judge
district court expresses that a statutory or constitutional
violation must be remedied, the party held liable will
straightaway file an appeal in this Court and assert juris-
diction under §1253, even where the district court is clear
that no injunction has issued.[8]

----

[8]The majority guarantees that there is "no reason to fear such a

The majority opinion purports to add a limit by distin-
guishing between unappealable orders that find a plan
"unlawful long before the next scheduled election" or "very
close to the election date," and those (presumably) appeal-
able orders that are entered neither "long before" nor "very
close" to the next election. *Ante,* at 20.[9]  What does that
even mean?  The orders at issue here were entered about
15 months before the 2018 elections, and according to the
majority fall within the not "long before" but not "very
close" appealable range.  Why this is so, however, the
majority never says.  Without any definitions for its
boundary posts, courts will be left to wonder:  What about
orders entered 17 or 18 months before an election?  Are
those considered "long before" so they would be unappeal-
able?  And are orders entered 14, 13, or 12 months before
the election similarly unappealable because they were
entered "very close" to the election date?  And what does
the majority mean by "the election date"?  Does that in-
clude primaries?  What about registration deadlines, or

——————
flood" of appeals from three-judge district court orders because "appeals
from [orders expressly enjoining redistricting plans] have not over-
whelmed our docket."  *Ante,* at 20.  But of course, its jurisdictional
ruling applies to all §1253 cases, not just those involving redistricting.
The majority also makes much of the fact that only "two cases (*Gunn*
and *Whitcomb*) decided during the past half-century" have involved the
scenario at issue here, *i.e.,* an effort to invoke our mandatory jurisdic-
tion to review "a three-judge court order holding a state statute uncon-
stitutional but declining to issue an injunction."  *Ante,* at 20, n. 16.  The
majority never stops to consider, however, that one reason so few cases
have come to the Court in this posture may be that *Gunn* and *Whit-
comb* drew clear jurisdictional lines that litigants easily understood—
the same clear lines the majority erases today.

  [9]The majority believes these "long before" and "very close" limits
guide district courts' determinations about whether to enter an injunc-
tion.  *Ante,* at 20.  Presumably the majority would resort to the same
indeterminate limits in determining whether, in its view, a noninjunc-
tive order had the "practical effect" of an injunction such that it would
be justified to accept an appeal under §1253.

16                    ABBOTT *v.* PEREZ

                SOTOMAYOR, J., dissenting

ballot-printing deadlines?  It is not uncommon for there to
be, at any given time, multiple impending deadlines relat-
ing to an upcoming election.  Thinking through the many
variations of jurisdictional disputes that will arise over the
years following this novel reading of §1253 should be
enough to stop the majority from rewriting our long estab-
lished jurisprudence in this area.

   After today, our mandatory appellate docket will be
flooded by unhappy litigants in three-judge district court
cases, demanding our review.  Given the lack of predict-
ability, the rule will incentivize appeals and "encourage
gamesmanship." *Hertz Corp.*, 559 U. S., at 94.  The Court
will no doubt regret the day it opened its courthouse doors
to such time-consuming and needless manipulation of its
docket.

                         D

   Even if the majority were correct to import the "practi-
cal effect" rule into the §1253 context, moreover, that
would still not justify the Court's premature intervention
in these appeals for at least two reasons.  First, while
taking from *Carson* the "practical effect" rule it likes, the
majority gives short shrift to the second half of that case,
in which the Court was explicit that "[u]nless a litigant
can show that an interlocutory order . . . might have a
'serious, perhaps irreparable, consequence,' and that the
order can be 'effectually challenged' only by immediate
appeal, the general congressional policy against piecemeal
review will preclude interlocutory appeal."  450 U. S., at
84.  Texas has made no showing of a "serious, perhaps
irreparable consequence" requiring our immediate inter-
vention, nor has Texas shown that the orders could not be
"effectually challenged" after the remedial stage was
completed.  In fact, when Texas sought a stay of those
orders before this Court, the 2018 elections were more
than a year away.  For the majority, however, it is enough

that the District Court found the Texas redistricting maps to be in violation of federal law. *Ante,* at 20–21. That cursory application of *Carson*, in particular whether the injunctions the majority reads into the August 15 and 24 orders could be "effectually challenged" absent immediate appeal to this Court, deprives that limit to our jurisdiction of much of its meaning when assessing Texas' request for our intervention in these cases. Nothing in our precedent supports that truncated approach. And in any event, if Texas wanted review of the orders after any injunction was entered by the District Court, it could have asked this Court for an emergency stay.

Second, the August 15 and 24 orders at issue here simply did not have the "practical effect" of enjoining Texas' use of the 2013 maps. The majority thinks otherwise in part because the District Court noted that the violations "'must be remedied.'" *Ante,* at 16. In addition, the majority believes that "Texas had reason to fear that if it tried to conduct elections under plans that the court had found to be 'racially discriminatory,' the court would infer an evil motive and perhaps subject the State once again to the strictures of preclearance under §3(c) of the Voting Rights Act." *Ante,* at 17–18. But the majority forgets that the District Court made explicit that "[a]lthough [it] found violations [in the 2013 maps], [it] ha[d] not enjoined [their] use for any upcoming elections." App. 134a–136a. That the District Court requested the Texas attorney general to advise it, within "three business days," whether "the Legislature intends to take up redistricting in an effort to cure [the] violations," 274 F. Supp. 3d, at 686; 267 F. Supp. 3d, at 795, does not undermine that unequivocal statement. Nothing in that language indicates that the District Court required the Legislature to "redraw both maps *immediately*" or else "the court would do so itself." Brief for Appellants 20 (emphasis in original). Instead, recognizing "that the federal judiciary functions within a

SOTOMAYOR, J., dissenting

system of federalism which entrusts the responsibility of legislative . . . districting primarily to the state legislature," *Whitcomb*, 305 F. Supp., at 1392, the District Court gave Texas an opportunity to involve its Legislature and asked for a simple statement of intent so that the court could manage its docket accordingly. This request for a statement of intent, which was necessary for the District Court to manage its own docket, does not transform the orders into injunctions.

As to the second point, if Texas had any "fear" regarding the use of its maps, despite having been explicitly told that the maps were not enjoined, that would still not be enough. This Court recognized in *Gunn* that the State in that case, faced with the order declaring its statute unconstitutional, "would no doubt hesitate long before disregarding it." 399 U. S., at 390. That hesitation was not enough in *Gunn* to magically transform an order into an injunction for purposes of §1253, and nothing about these cases justifies the majority taking out its wand today. Whatever "fear" Texas had does not transform the August 15 and 24 orders into injunctions. And absent an injunction, this Court lacks jurisdiction over these appeals. The cases should thus be dismissed.

II

Having rewritten the limits of §1253, the majority moves to the merits. There again the Court goes astray. It asserts that the District Court legally erred when it purportedly shifted the burden of proof and "required the State to show that the 2013 Legislature somehow purged the 'taint' that the court attributed to the defunct and never-used plans enacted by a prior legislature in 2011." *Ante,* at 21. But that holding ignores the substantial amount of evidence of Texas' discriminatory intent, and indulges Texas' warped reading of the legal analysis and

factual record below.[10]

## A

Before delving into the content of the August 15 and 24 orders, a quick recap of the rather convoluted history of these cases is useful. In 2011, the Texas Legislature redrew its electoral districts. Various plaintiff groups challenged the 2011 maps under §2 of the Voting Rights Act and the Fourteenth Amendment, and those lawsuits were consolidated before the three-judge District Court below pursuant to 28 U. S. C. §2284(a). Because Texas then was subject to preclearance under §5 of the Voting Rights Act, the 2011 maps did not take effect immediately, and Texas filed a declaratory action in the District Court for the District of Columbia to obtain preclearance.

"Faced with impending election deadlines and un-precleared plans that could not be used in the [2012] election, [the District] Court was faced with the 'unwelcome obligation' of implementing interim plans so that the primaries could proceed." 274 F. Supp. 3d, at 632. In January 2012, this Court vacated the first iteration of those interim maps in *Perry* v. *Perez*, 565 U. S. 388, 394–395 (2012) (*per curiam*), finding that the District Court failed to afford sufficient deference to the Legislature. In February 2012, the District Court issued more deferential interim plans, but noted that its analysis had been expedited and curtailed, and that it had only made preliminary conclusions that might be revised on full consideration. C. J. S. 367a–424a; H. J. S. 300a–315a.

In August 2012, the D. C. District Court denied preclearance of the 2011 maps. *Texas* v. *United States*, 887 F. Supp. 2d 133 (2012). It concluded that the federal congressional map had "retrogressive effect" and "was

---

[10]Because the Court reaches the merits of these appeals despite lacking jurisdiction, this dissent addresses that portion of the majority opinion as well.

20                    ABBOTT *v.* PEREZ

SOTOMAYOR, J., dissenting

enacted with discriminatory intent," *id.,* at 159, 161, and
that the State House map was retrogressive and that "the
full record strongly suggests that the retrogressive effect
. . . may not have been accidental," *id.,* at 178. Texas
appealed, and the case was eventually dismissed following
*Shelby County* v. *Holder,* 570 U. S. 529 (2013) (holding
unconstitutional the formula used to subject States to the
preclearance requirement).

In June 2013, the Texas Governor called a special legis-
lative session, and that same month the Legislature
adopted the 2012 interim maps as the permanent maps for
the State. The Legislature made small changes to the
maps, including redrawing the lines in HD90, but the
districts at issue in these appeals all remained materially
unchanged from the 2011 maps.

The District Court in these cases denied Texas' motion
to dismiss the challenges to the 2011 maps, and the chal-
lengers amended their complaints to assert claims respect-
ing the 2013 maps. In April and May 2017, the District
Court held that districts in Texas' 2011 maps violated §2
and the Fourteenth Amendment. The August 15 and 24
orders respecting the 2013 maps followed.

                           B

The majority believes that, in analyzing the 2013 maps,
the District Court erroneously "attributed [the] same
[discriminatory] intent [harbored by the 2011 Legislature]
to the 2013 Legislature" and required the 2013 Legisla-
ture to purge that taint. *Ante,* at 9–10. The District Court
did no such thing. It engaged in a painstaking analysis of
discriminatory intent under *Arlington Heights* v. *Metro-
politan Housing Development Corp.,* 429 U. S. 252 (1977),
which is critical to understanding why, as explained in
Part II–D, *infra,* the District Court did not improperly
presume that the Legislature acted with discriminatory
intent.

SOTOMAYOR, J., dissenting

Under *Arlington Heights*, "in determining whether racially discriminatory intent existed," this Court considers "circumstantial and direct evidence" of: (1) the discriminatory "impact of the official action," (2) the "historical background," (3) the "specific sequence of events leading up to the challenged decision," (4) departures from procedures or substance, and (5) the "legislative or administrative history," including any "contemporary statements" of the lawmakers. 429 U. S., at 266–268. Although this analysis must start from a strong "presumption of good faith," *Miller* v. *Johnson*, 515 U. S. 900, 916 (1995), a court must not overlook the relevant facts. This Court reviews the "findings of fact" made by the District Court, including those respecting legislative motivations, "only for clear error." *Cooper* v. *Harris*, 581 U. S. ___, ___–___ (2017) (slip op., at 3–4); see also *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985). The Court therefore "may not reverse just because we 'would have decided the [matter] differently. . . . A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Harris*, 581 U. S., at ___ (slip op., at 4).

The District Court followed the guidance in *Arlington Heights* virtually to a tee, and its factual findings are more than "plausible" in light of the record. To start, there is no question as to the discriminatory impact of the 2013 plans, as the "specific portions of the 2011 plans that [the District Court] found to be discriminatory or unconstitutional racial gerrymanders continue unchanged in the 2013 plans, their harmful effects 'continu[ing] to this day.'" 274 F. Supp. 3d, at 649 (alteration in original). Texas, moreover, has a long "history of discrimination" against minority voters. *Id.,* at 648, n. 37. "In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost." *Texas*, 887 F. Supp. 2d, at 161.

There is also ample evidence that the 2013 Legislature knew of the discrimination that tainted its 2011 maps.

SOTOMAYOR, J., dissenting

"The 2013 plans were enacted by a substantially similar Legislature with the same leadership only two years after the original enactment." 274 F. Supp. 3d, at 648, n. 37. The Legislature was also well aware that "the D. C. court concluded that [its 2011] maps were tainted by evidence of discriminatory purpose," H. J. S. 443a, and despite the District Court having warned of the potential that the Voting Rights Act may require further changes to the maps, "the Legislature continued its steadfast refusal to consider [that] possibility," 274 F. Supp. 3d, at 649.

Turning to deliberative process—on which the majority is singularly focused, to the exclusion of the rest of the factors analyzed in the orders below, see Part II–D, *infra*—the District Court concluded that Texas was just "not truly interested in fixing any remaining discrimination in the [maps]." 274 F. Supp. 3d, at 651, n. 45. Despite knowing of the discrimination in its 2011 maps, "the Legislature did not engage in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans."[11] *Id.,* at 649. For instance, Representative Darby, a member of the redistricting committee, "kept stating that he wanted to be informed of legal deficiencies so he could fix them," but "he did not himself seek to have the plan evaluated for deficiencies and he willfully ignored those who pointed out deficiencies, continuing to empha-

---

[11] The majority is correct that our reference to these findings in the District Court orders below is "not just a single slip of the pen." *Ante,* at 24. That is because these findings form part (though not the whole) of the comprehensive analysis that led the District Court to conclude that the 2013 Legislature acted with the specific intent to further the discrimination in its 2011 maps. Full consideration of that analysis, as I have endeavored to do here, requires review of those findings, and when read in the context of the full factual record and legal reasoning contained in the orders below, it is clear that these statements do not come close to suggesting what Texas and the majority read into them, *i.e.,* that the District Court somehow shifted the burden of proof to require Texas to show that it cured the taint from its past maps.

size that he had thought 'from the start' that the interim plans were fully legal." *Id.,* at 651, n. 45.[12] The Legislature made no substantive changes to the challenged districts that were the subject of the 2011 complaints, and "there is no indication that the Legislature looked to see whether any discriminatory taint remained in the plans." *Id.,* at 649. In fact, the only substantive change that the Legislature made to the maps was to add *more* discrimination in the form of a new racially gerrymandered HD90, as the majority concedes. *Ante,* at 39–41.

    The absence of a true deliberative process was coupled

---

    [12]The majority again engages in its own factfinding, without reference to the fact that our review is for clear error only, when it decides that the District Court was wrong in concluding that Representative Darby willfully ignored the deficiencies in the 2013 maps. The legislative hearing that the District Court cited, see 274 F. Supp. 3d, at 651, n. 45, shows, *inter alia,* that Representative Darby: told certain members of the Legislature that changes to district lines would not be considered; rejected proposed amendments where there was disagreement among the impacted members; rejected an amendment to the legislative findings that set out the history underlying the 2011 maps and related court rulings; acknowledged that the accepted amendments did not address concerns of retrogression or minority opportunity to elect their preferred candidates; and dismissed concerns regarding the packing and cracking of minority voters in, *inter alia,* HD32, HD34, HD54, and HD55, stating simply that the 2012 court had already rejected the challengers' claims respecting those districts but without engaging in meaningful discussion of the other legislators' concerns. See Joint Exh. 17.3, pp. S7–S9, S11, S30–S35, S39–S43, S53. Instead of addressing what is evident from the 64-page hearing transcript, the majority fixates on the single fact that Representative Darby accepted an amendment for the redrawing of the new (racially gerrymandered) HD90, believing that this fact somehow erases or outweighs all the evidence in the record showing that Representative Darby was not interested in addressing concerns regarding the interim plans. *Ante,* at 29–30, and n. 24. Even if Representative Darby was in fact responsive to minority concerns regarding the composition of HD90—which the record contradicts, see 267 F. Supp. 3d, at 791, 793—that does not undermine the weight of *all* of the evidence in the record regarding his intent with respect to the enactment of the 2013 maps as a whole.

with a troubling sequence of events leading to the enactment of the 2013 maps. Specifically, "the Legislature pushed the redistricting bills through quickly in a special session," 274 F. Supp. 3d, at 649, despite months earlier having been urged by the Texas attorney general to take on redistricting during the regular session, *id.,* at 634; see also H. J. S. 440a. By pushing the bills through a special session, the Legislature did not have to comply with "a two-thirds rule in the Senate or a calendar rule in the House," 274 F. Supp. 3d, at 649, n. 38, and it avoided the "full public notice and hearing" that would have allowed "'meaningful input' from all Texans, including the minority community," H. J. S. 444a. In addition, "necessary resources were not allocated to support a true deliberative process." 274 F. Supp. 3d, at 649. For instance, the House committee "did not have counsel when the session started." *Ibid.,* n. 39.

Nor can Texas credibly claim to have understood the 2012 interim orders as having endorsed the legality of its maps so that adopting them would resolve the challengers' complaints. In its 2012 interim orders, "the [District] Court clearly warned that its preliminary conclusions . . . were not based on a full examination of the record or the governing law and were subject to revision" "given the severe time constraints . . . at the time" the orders were adopted. *Id.,* at 650. The District Court also explained that the "claims presented . . . involve difficult and unsettled legal issues as well as numerous factual disputes." C. J. S. 367a. During the redistricting hearings, chief legislative counsel for the Texas Legislative Council in 2013, Jeff Archer, advised the Legislature that the District Court "'had not made full determinations, . . . had not made fact findings on every issue, had not thoroughly analyzed all the evidence'" and had "'made it explicitly clear that this was an interim plan to address basically first impression of voting rights issues.'" 274 F. Supp. 3d,

at 650 (alterations in original); see also App. 441a–442a (testimony that interim plans were "impromptu" and "preliminary" and that the District Court "disclaimed making final determinations"). Archer explained that although the Legislature had "'put to bed'" challenges regarding "'those issues that the [District] Court identified so far,'" it had not "'put the rest to bed.'" 274 F. Supp. 3d, at 651, n. 45; see also App. 446a–447a (advising that, "on a realistic level," the Legislature had not "removed legal challenges" and that adopting the interim maps "in no way would inoculate the plans").

There was substantial evidence that the 2013 Legislature instead adopted the interim plans as part of a "strategy [that] involved adopting the interim maps, however flawed," to insulate (and thus continue to benefit from) the discriminatory taint of its 2011 maps. 274 F. Supp. 3d, at 651. Texas hoped that, by adopting the 2012 interim maps, the challengers "would have no remedy, and [the Legislature] would maintain the benefit of such discrimination or unconstitutional effects." *Ibid.* That strategy originated with the Texas attorney general, who was responsible for defending the State in the redistricting challenges. *Id.,* at 650, and n. 41. He advised the Legislature that adopting the interim plans was the "'best way to avoid further intervention from federal judges'" and to "'*insulate* [Texas'] redistricting plans from further legal challenge.'" *Id.,* at 650 (emphasis added); see also H. J. S. 443a. The Texas attorney general also drafted the "legislative fact findings accompanying the plans, *before* the Legislature had engaged in any fact findings on the bills," stating that the 2012 interim plans "complied 'with all federal and state constitutional provisions or laws applicable to redistricting plans.'" 274 F. Supp. 3d, at 650, n. 41 (emphasis added). That the legislative factfindings were predrafted by the attorney defending Texas in these redistricting challenges—purporting to conclude that the

26              ABBOTT *v.* PEREZ

2012 interim plans complied with the law, when in fact
the evidence showed that the Legislature did not engage
in a true deliberative process or meaningfully consider
evidence of the legality of the plans so that it could have
endorsed such factfindings—demonstrates that the adop-
tion of the interim plans was a mere pretext to insulate
the discriminatory benefits of the 2011 plans. That ex-
plains why legislators thought that removal of those fact
findings would "'gu[t] the bill.'" *Ibid.*

   In the end, having presided over years of litigation and
seeing firsthand all of the evidence, the District Court
thought it clear that Texas' "strategy involved adopting
the interim maps, however flawed" so that the challengers
"would have no remedy, and [Texas] would maintain the
benefit of such discrimination and unconstitutional ef-
fects." *Id.,* at 651. It is hard to imagine what a more
thorough consideration of the *Arlington Heights* factors in
these cases would have looked like. Review of the District
Court's thorough inquiry leads to the inescapable conclu-
sion that it did not err—let alone clearly err—in conclud-
ing that the "Legislature in 2013 intentionally furthered
and continued the existing discrimination in the plans."
274 F. Supp. 3d, at 652.

                          C

   In contrast to that thorough *Arlington Heights* inquiry,
the majority engages in a cursory analysis of the record to
justify its conclusion that the evidence "overwhelmingly"
shows that Texas acted with legitimate intent. *Ante,* at
28. Two critical things are conspicuously missing from its
analysis: first, consideration of the actual factual record
(or most of it, anyway),[13] and second, meaningful consid-

———————

   [13]The majority contends in passing that its analysis takes account of
"all the relevant evidence in the record," *ante,* at 26, and n. 19, appar-
ently believing that stating it explicitly somehow makes it true. It does
not. The District Court orders in these cases are part of the public

SOTOMAYOR, J., dissenting

eration of the limits of our review of facts on these appeals.[14]

The majority first makes reference to the fact that the Texas attorney general "advised the Legislature that the best way to [end the redistricting litigation] was to adopt the interim, court-issued plans," a position repeated by the sponsor of the plans. *Ante,* at 26. And in its view, it was reasonable for the Legislature to believe that adopting the interim plans "might at least reduce objections and thus simplify and expedite the conclusion of the litigation." *Ante,* at 28. The majority also states that "there is no evidence that the Legislature thought that the plans were invalid." *Ante,* at 27. In reaching those findings, however, the majority ignores all of the evidence in the record that demonstrates that the Legislature was aware of (and ignored) the infirmities in the maps, that it knew that adopting the interim plans would not resolve the litigation concerning the disputed districts, and that it nevertheless moved forward with the bills as a strategy to "insulate" the discriminatory maps from further judicial scrutiny and perpetuate the discrimination embedded in the 2012 interim maps. See Part II–B, *supra.*

Instead of engaging with the factual record, the majority opinion sets out its own view of "the situation when the Legislature adopted the court-approved interim plans." *Ante,* at 28. Under that view, "the Legislature [had] good reason to believe that the court-approved interim plans

———————

record and readers can therefore judge for themselves.

[14] The majority never explains why it believes it appropriate to engage in what amounts to *de novo* review of the factual record. Presumably, it justifies its *de novo* review with its claim of legal error as to the finding of invidious intent. See Part II–D, *infra.* But even if the majority were correct that the District Court improperly shifted the burden to the State to disprove invidious intent, the proper next step would have been to remand to the District Court for reconsideration of the facts in the first instance under the correct legal standard.

were legally sound," particularly in light of our remand instructions in *Perry*, 565 U. S. 388. *Ante,* at 28–29. The majority nowhere considers, however, the evidence regarding what the Legislature *actually* had before it concerning the effect of the interim orders, including the explicit cautionary statements in the orders and the repeated warnings of the chief legislative counsel that the interim plans were preliminary, incomplete, and impromptu.[15] See Part II–B, *supra.*

The majority finds little significance in the fact that the Legislature "'pushed the redistricting bills through quickly in a special session,'" reasoning that a special session was needed "because the regular session had ended." *Ante,* at 29. That of course ignores the evidence that the Legislature disregarded requests by the Texas attorney general, months earlier, to take up redistricting during the regular session, that proceeding through a special session permitted the Legislature to circumvent procedures that

———————

[15] The majority is also just flat wrong on its characterization of the interim orders. With respect to all but two of the challenged State House districts, the discussion in the interim orders states only in general terms that the District Court "preliminarily [found] that any [§2] and constitutional challenges do not have a likelihood of success, and any [§5] challenges are insubstantial," emphasizing the "preliminarily nature of [its] order." H. J. S. 303a, 307a–309a. With respect to the congressional districts, the District Court opined that the "claims are not without merit" and were "a close call," but ultimately concluded that the challengers had not at that time demonstrated a likelihood of success on the merits. C. J. S. 409a, 419a. The District Court nevertheless emphasized that there remained "unsettled legal issues as well as numerous factual disputes" such that the interim map was "not a final ruling on the merits of any claims." C. J. S. 367a. It is a stretch to characterize these interim orders as providing "a careful analysis of all the claims," *ante,* at 28, and borderline disingenuous to state that, despite repeated and explicit warnings that its rulings were not final and subject to change, the District Court was somehow "reversing its own previous decisions" when it finally did render a final decision, *ante,* at 28, n. 22.

SOTOMAYOR, J., dissenting

would have ensured full and adequate consideration, and that resources were not sufficiently allocated to permit considered review of the plans. See Part II–B, *supra*.

Finally, the majority sees nothing wrong with the fact that the Legislature failed "to take into account the problems with the 2011 plans that the D. C. court identified in denying preclearance." *Ante,* at 30. It maintains that the purpose of adopting the interim plans was to "fix the problems identified by the D. C. court," and reasons that the interim maps did just that by modifying any problematic districts. *Ibid.* But of course the finding of discriminatory intent rested not only on what happened with particular districts. Rather, the evidence suggested that discriminatory motive permeated the entire 2011 redistricting process, as the D. C. court considered that "Texas has found itself in court every redistricting cycle [in the last four decades], and each time it has lost"; that "Black and Hispanic members of Congress testified at trial that they were excluded completely from the process of drafting new maps, while the preferences of Anglo members were frequently solicited and honored"; that the redistricting committees "released a joint congressional redistricting proposal for the public to view only after the start of a special legislative session, and each provided only seventy-two hours' notice before the sole public hearing on the proposed plan in each committee"; that minority members of the Texas Legislature "raised concerns regarding their exclusion from the drafting process and their inability to influence the plan"; and that the Legislature departed from normal procedure in the "failure to release a redistricting proposal during the regular session, the limited time for review, and the failure to provide counsel with the necessary election data to evaluate [Voting Rights Act] compliance." 887 F. Supp. 2d, at 161. The majority also ignores the findings of retrogression concerning the previous version of CD25, which of course are relevant to the

30                    ABBOTT *v.* PEREZ

challengers' claims about CD27 and CD35 in this litiga-
tion and were not addressed in the 2012 interim plans.
See Part III–A, *infra.* That the 2012 interim maps ad-
dressed some of the deficiencies identified by the D. C.
court in the preclearance litigation does not mean that the
Legislature in 2013 was free to wholly disregard the sig-
nificance of other evidence of discrimination that tainted
its 2011 maps and were entrenched in the 2012 interim
maps.

Even had the majority not ignored the factual record, it
still would be wrong in concluding that the District Court
erred in finding that the 2013 Legislature acted with the
intent to further and benefit from the discrimination in
the 2011 maps. In light of the record before this Court,
the finding of invidious intent is at least more than "'plau-
sible'" and thus "must govern." *Harris,* 581 U. S., at ___
(slip op., at 4). The majority might think that it has a
"better view of the facts" than the District Court did, but
"the very premise of clear error review is that there are
often 'two permissible'—because two 'plausible'—'views of
the evidence.'" *Id.,* at ___–___ (slip op., at 9–10).

                            D

The majority resists the weight of all this evidence of
invidious intent not only by disregarding most of it and
ignoring the clear-error posture, but also by endorsing
Texas' distorted characterizations of the intent analysis in
the orders below. Specifically, the majority accepts Texas'
argument that the District Court "reversed the burden of
proof" and "imposed on the State the obligation of proving
that the 2013 Legislature had experienced a true 'change
of heart' and had 'engage[d] in a deliberative process to
ensure that the 2013 plans cured any taint from the 2011
plans.'" *Ante,* at 23 (alteration in original). The District
Court did no such thing, and only a selective reading of
the orders below could support Texas' position.

SOTOMAYOR, J., dissenting

It is worth noting, as a preliminary matter, that the majority does not question the relevance of historical discrimination in assessing present discriminatory intent. Indeed, the majority leaves undisturbed the longstanding principle recognized in *Arlington Heights* that the "'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent." *Ante,* at 22 (quoting *Arlington Heights*, 429 U. S., at 267). With respect to these cases, the majority explicitly acknowledges that, in evaluating whether the 2013 Legislature acted with discriminatory purpose, "the intent of the 2011 Legislature . . . [is] relevant" and "must be weighed together with any other direct and circumstantial evidence" bearing on intent. *Ante,* at 26.

If consideration of this "'historical background'" factor means anything in the context of assessing intent of the 2013 Legislature, it at a minimum required the District Court to assess how the 2013 Legislature addressed the known discrimination that motivated the drawing of the district lines that the Legislature was adopting, unchanged, from the 2011 maps. Therefore, the findings as to whether the 2013 Legislature engaged in a good-faith effort to address any known discrimination that tainted its 2011 plans were entirely apposite, so long as the District Court "weighed [this factor] together with any other direct and circumstantial evidence" bearing on the intent question, and so long as the burden remained on the challengers to establish invidious intent. *Ante,* at 26.

The majority faults the District Court for not adequately engaging in that weighing and giving too "central" a focus to the historical factor in its intent analysis. *Ante,* at 23; see also *ante,* at 23–24, n. 18. That alleged "central" focus, the majority contends, led the District Court to shift the burden of proof on the intent inquiry away from the challengers, instead requiring Texas to show that the Legislature cured its past transgressions. *Ante,* at 23. Those

SOTOMAYOR, J., dissenting

conclusions can only be supported if, as Texas and the majority have done, one engages in a highly selective reading of the District Court orders.

To begin, entirely absent from the majority opinion is any reference to the portions of the District Court orders that unequivocally confirm its understanding that the burden remained on the challengers to show that the 2013 Legislature acted with invidious intent.    The District Court was explicit that the challengers bore the burden to "establish their claim by showing that the Legislature adopted the plans with a discriminatory purpose, maintained the district lines with a discriminatory purpose, or intentionally furthered preexisting intentional discrimination." 274 F. Supp. 3d, at 646; see also *id.,* at 645 (discussing Circuit precedent regarding the showing needed for "a plaintiff [to] meet the purpose standard").[16]

Even when it does look at the actual language of the orders, the majority picks the few phrases that it believes support its argument, choosing to disregard the rest. For instance, the majority quotes the District Court order as

———————

[16]The majority spends some time distinguishing *Hunter* v. *Underwood,* 471 U. S. 222 (1985), adamant that it does not support "shifting the burden" as it purports the District Court did below. *Ante,* at 22. But the District Court agreed that *Hunter* was distinguishable and did not rely on it to support any sort of burden-shifting. As the majority explains, *Hunter* involved a state constitutional provision adopted with discriminatory intent that, despite pruning over the years, the State never repealed. *Ante,* at 22 (citing 471 U. S., at 229, 232–233). The District Court discussed the differences between *Hunter* and these cases, namely, that *Hunter* "did not involve a later reenactment . . . which is what [Texas] now claims cleanses the plans." 274 F. Supp. 3d, at 647. It noted the important distinction that, "'when a plan is reenacted—as opposed to merely remaining on the books like the provision in *Hunter*—the state of mind of the reenacting body must also be considered.'" *Id.,* at 648. That the majority ignores that the District Court did not, as it suggests, rely on *Hunter* as controlling is another example of how it conveniently overlooks the District Court's express legal analysis.

having required Texas to show that the 2013 Legislature had a "'change of heart.'" *Ante,* at 23 (quoting 274 F. Supp. 3d, at 649). When that sentence is read in full, however, it is evident that the District Court was not imposing a "duty to expiate" the bad intent of the previous Legislature, as the majority contends, *ante,* at 23, but instead was describing what the weighing of the direct and circumstantial evidence revealed about the motivations of the 2013 Legislature: "The decision to adopt the interim plans was not a change of heart concerning the validity of [the challengers'] claims . . . —it was a litigation strategy designed to insulate the 2011 or 2013 plans from further challenge, regardless of their legal infirmities." 274 F. Supp. 3d, at 649–650.

Likewise, the majority quotes the orders as requiring proof that the Legislature "'engage[d] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'" *Ante,* at 23 (quoting 274 F. Supp. 3d, at 649). But the District Court did not put the burden on Texas to make that affirmative showing. Instead, that partial quote is lifted from a sentence in which the District Court, having held a trial on these factual issues, concluded that the challengers had met their burden to show that "the Legislature did not engage in a deliberative process," which it supported later in that paragraph with findings that the Legislature "pushed the redistricting bills through quickly in a special session" without allocating the "necessary resources . . . to support a true deliberative process." 274 F. Supp. 3d, at 649.

The majority finally asserts that the District Court "drove the point home" when it "summarized its analysis" as follows: "'The discriminatory taint [from the 2011 plans] was not removed by the Legislature's enactment of the Court's interim plans, because the Legislature engaged in no deliberative process to remove any such taint, and in fact intended any such taint to be maintained but

safe from remedy.'" *Ante,* at 23 (quoting 274 F. Supp. 3d,
at 686). The majority no doubt hopes that the reader will
focus on the portion of the sentence in which the District
Court concludes that the discriminatory taint found in the
2011 maps "'was not removed'" by the enactment of the
interim maps "'because the Legislature engaged in no
deliberative process to remove any such taint.'" *Ante,* at
23 (quoting 274 F. Supp. 3d, at 686).[17]  But the majority
ignores the import of the remaining part of the sentence,
in which the District Court held that the Legislature "in
fact intended any such taint to be maintained but be safe
from remedy." 274 F. Supp. 3d, at 652; see also *id.,* at 686.
The majority also conveniently leaves out the sentence
that immediately follows: "The Legislature in 2013 inten-
tionally furthered and continued the existing discrimina-
tion in the plans." *Id.,* at 652.  When read in full and in
context, it is clear that the District Court remained fo-
cused on the evidence proving the intent of the 2013 Legis-
lature to shield its plans from a remedy and thus further
the discrimination, rather than simply presuming invidi-
ous intent from the failure to remove the taint, as the
majority claims.

In selectively reviewing the record below, the majority
attempts to shield itself from the otherwise unavoidable
conclusion that the District Court did not err.  If forced to
acknowledge the true scope of the legal analysis in the
orders below, the majority would find itself without sup-
port for its insistence that the District Court was singu-
larly focused on whether the Legislature "removed" past

---

[17] Notably, the majority takes no issue with that first conclusion, *i.e.,*
that the enactment of the interim plans does not, on its own, insulate
the 2013 plans from challenge.  It explicitly notes that the opinion does
not hold that "the 2013 [plans] are unassailable because they were
previously adopted on an interim basis by the Texas court," noting that
such a factor is relevant insofar as it informs the inquiry into the intent
of the 2013 Legislature. *Ante,* at 25–26.

SOTOMAYOR, J., dissenting

taint. And then the majority would have to contend with the thorough analysis of the *Arlington Heights* factors, Part II–B, *supra*, that led the District Court to conclude that the 2013 Legislature acted with invidious intent.

## III

The majority fares no better in its district-by-district analysis. In line with the theme underlying the rest of its analysis, the majority opinion overlooks the factual record and mischaracterizes the bulk of the analysis in the orders below in concluding that the District Court erred in finding a §2 results violation as to CD27, HD32, and HD34. I first address CD27, and then turn to HD32 and HD34.

## A
### 1

To put in context the objections to the District Court's conclusion regarding CD27, a brief review of the District Court's factual findings as to that district is necessary. Before 2011, CD27 was a Latino opportunity district, *i.e.,* a majority-HCVAP district with an opportunity to elect a Hispanic-preferred candidate. When the Legislature reconfigured the district in 2013, it moved Nueces County, a majority-HCVAP county, into a new Anglo-majority district to protect an incumbent "who was not the candidate of choice of those Latino voters" and likely would have been "ousted" by them absent the redistricting. C. J. S. 181a, 191a. The District Court found that the "placement of Nueces County Hispanics in an Anglo-majority district ensures that the Anglo majority usually will defeat the minority-preferred candidate, given the racially polarized voting in the area." *Id.,* at 189a–190a. It also found that "the political processes are not equally open to Hispanics" in Texas as a result of its "history of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the demo-

cratic process [that] is well documented," and that "Latinos bear the effects of past discrimination in areas such as education and employment/income, which hinder their ability to participate effectively in the political process." *Id.,* at 190a–191a. Given those findings, the District Court concluded that the newly constituted CD27 "has the effect of diluting Nueces County Hispanic voters' electoral opportunity." *Id.,* at 191a.

Texas nevertheless contended (and maintains here) that no §2 results violation existed because only "seven compact Latino opportunity districts could be drawn in South/West Texas," *id.,* at 181a, and that all seven districts already existed under its maps. To explain how it counted to seven, Texas pointed to the creation of CD35 as a supposed new Latino opportunity district that joined Travis County Hispanics with Hispanics in San Antonio. The District Court agreed that only seven such districts could be drawn in the area, but rejected Texas' invocation of CD35 as a defense. The District Court concluded that because Travis County "[did] not have Anglo bloc voting," 274 F. Supp. 3d, at 683, §2 did not require the placement of Travis County Hispanics in an opportunity district, C. J. S. 176a; see also *Thornburg* v. *Gingles*, 478 U. S. 30, 51 (1986). The District Court found that Texas had moved Travis County Hispanics from their pre-2011 district, CD25, to the newly constituted CD35, not to comply with §2, but "to use race as a tool for partisan goals . . . to intentionally destroy an existing district with significant minority population (both African American and Hispanic) that consistently elected a Democrat (CD25)." 274 F. Supp. 3d, at 683. Thus, it concluded that "CD35 was an impermissible racial gerrymander because race predominated in its creation without furthering a compelling state interest." *Ibid.*

Importantly, the District Court concluded that, without CD35, Texas could have drawn one more Latino oppor-

SOTOMAYOR, J., dissenting

tunity district in South/West Texas that included Nueces
County Hispanics. C. J. S. 181a; see also *id.,* at 190a
("Plaintiffs have thus shown that a district could be drawn
in which Hispanics, including Nueces County Hispanics,
are sufficiently numerous and geographically compact to
constitute a majority HCVAP"); *id.,* at 192a ("Numerous
maps also demonstrated that accommodating the §2 rights
of all or most Nueces County Hispanic voters would not
compromise the §2 rights of any other voters, and in fact
including it substantially accommodates the §2 rights of
Hispanic voters in South/West Texas"). Indeed, "[p]lans
were submitted during the legislative session and during
this litigation that showed that seven compact districts
could be drawn that included all or most Nueces County
Hispanic voters but not Travis County voters." *Id.,* at
181a, n. 47.

### 2

Nothing in the record or the parties' briefs suggests that
the District Court clearly erred in these findings of fact,
which unambiguously support its conclusion that there is
a §2 results violation with respect to CD27. Nevertheless,
the majority offers two reasons for reversing that conclu-
sion. First, the majority contends that the District Court
erred because "in evaluating the presence of majority bloc
voting in CD35," it "looked at only one, small part of the
district, the portion that falls within Travis County."
*Ante,* at 34. It cites to *Bethune-Hill* v. *Virginia State Bd.
of Elections*, 580 U. S. ___, ___ (2017) (slip op., at 12), an
equal protection racial gerrymandering case, for the prop-
osition "that redistricting analysis must take place at the
district level." *Ante,* at 34. According to the majority,
then, the District Court should have looked at the exist-
ence of majority bloc voting in CD35 as a whole after the
2011 redistricting.

But the majority confuses the relevant inquiry, as well

38          ABBOTT *v.* PEREZ

as the relevant timeline. The particular §2 question here does not concern the status of Travis County Latinos in the newly constituted CD35 after the 2011 redistricting. Rather, it concerns the status of Travis County Latinos in the old CD25, prior to the 2011 redistricting. That is because the challengers' §2 claim concerns the choices before the Legislature *at the time of the 2011 redistricting*, when it was deciding which Latinos in South/West Texas to place in the new opportunity district to be created in that area of the State. The Legislature chose to include Travis County Latinos in an opportunity district at the expense of the Nueces County Latinos, who were instead moved into a majority-Anglo district. So the question is whether, knowing that Nueces County Latinos indisputably had a §2 right, the Legislature's choice was nevertheless justified because the Travis County Latinos also had a §2 right that needed to be accommodated. In other words, did the Legislature actually create a new §2 opportunity district for persons with a §2 right, or did it simply move people without a §2 right into a new district and just call it an opportunity district? To answer that question, the status of Travis County Latinos in 2011 is the only thing that matters, and the District Court thus correctly focused its inquiry on whether bloc voting existed in Travis County *prior* to the 2011 redistricting, such that Travis County Latinos could be found to have a §2 right. Whether the newly constituted CD35 *now* qualifies as a §2 opportunity district—an inquiry that would, as the majority suggests, call for district-wide consideration—is beside the point.

Second, the majority reasons that "the 2013 Legislature had 'good reasons' to believe that [CD35] was a viable Latino opportunity district that satisfied the *Gingles* factors." *Ante,* at 35. For this, the majority cites to the fact that the district "was based on a concept proposed by MALDEF" and that one group of plaintiffs "argued that the district [was] mandated by §2," and vaguely suggests

SOTOMAYOR, J., dissenting

that, contrary to the District Court's finding, "there is ample evidence" of majority bloc voting in CD35. *Ibid.*[18]

The majority forgets, yet again, that we review factual findings for clear error. *Harris*, 581 U. S., at ___–___ (slip op., at 3–4). Indeed, its analysis is too cursory even for *de novo* review. The majority does not meaningfully engage with the full factual record below. Instead, it looks only to the handful of favorable facts cited in Texas' briefs. Compare Brief for Appellants 46 with *ante,* at 35. Had the majority considered the full record, it could only have found that the District Court cited ample evidence in support of its conclusion that the Legislature had no basis for believing that §2 required its drawing of CD35. In fact, the District Court noted that Texas in 2011 "actually asserted that CD35 is not required by §2," C. J. S. 174a, n. 40, that the main plan architect testified that he was not sure whether §2 required drawing the district, and that testimony at trial showed that the district was drawn because, on paper, it would fulfill the requirement of being majority-HCVAP while providing Democrats only one new district, and "not because all of the *Gingles* factors were satisfied," *id.,* at 178a–179a, n. 45. The District Court also concluded that "there is no evidence that any member of the Legislature . . . had any basis in evidence for believing that CD35 was required by §2 other than its HCVAP-majority status." *Ibid.*

Had the majority properly framed the inquiry and applied the clear-error standard to the full factual record, it could not convincingly dispute the existence of a §2 results violation as to CD27. Texas diluted the voting strength of Nueces County Latinos by transforming a minority-

——————

[18] The majority also believes that the interim orders gave the Legislature cover with respect to CD35, *ante,* at 35, forgetting that the District Court explicitly and repeatedly warned the parties that its interim orders did not resolve all factual and legal disputes in the cases.

SOTOMAYOR, J., dissenting

opportunity district into a majority-Anglo district.   The
State cannot defend that result by pointing to CD35,
because its "creation of an opportunity district for [Travis
County Latinos] without a §2 right offers no excuse for its
failure to provide an opportunity district for [Nueces
County Latinos] with a §2 right." *League of United Latin
American Citizens* v. *Perry*, 548 U. S. 399, 430 (2006)
(*LULAC*).[19]

B

1

I turn now to HD32 and HD34.  Before the 2011 redis-
tricting, Nueces County had within it two Latino oppor-
tunity districts and part of one Anglo-represented district.
267 F. Supp. 3d, at 767.  Due to slower population growth
reflected in the 2010 census, however, Nueces County was
entitled to have within it only two districts.  Accordingly,
during the 2011 redistricting, the Legislature opted to
"eliminate one of the Latino opportunity districts . . . and
draw two districts wholly within Nueces County—one

_____

[19] It is worth noting that Texas' efforts to suppress the voting
strength of minority voters in Nueces County eerily mirror the actions
this Court invalidated as a violation of §2 in *LULAC*, 548 U. S. 399.
Like in *LULAC*, "a majority-Hispanic district that would likely have
elected the Hispanic-preferred candidate was flipped into an Anglo-
majority district to protect a candidate that was not preferred by the
Hispanic voters." C. J. S. 182a; see also *LULAC*, 548 U. S., at 427–429.
And like in *LULAC*, Texas attempted to defend that curtailment of
minority voters' rights by pointing to the creation of another supposed
opportunity district.  274 F. Supp. 3d, at 684–685; *LULAC*, 548 U. S., at
429.  In finding a §2 results violation, the Court concluded that the
"vote dilution of a group that was beginning to . . . overcome prior
electoral discrimination . . . cannot be sustained."  *Id.,* at 442.  The
Court also rejected Texas' defense, holding that its "creation of an
opportunity district for those without a §2 right offers no excuse for its
failure to provide an opportunity district for those with a §2 right."  *Id.,*
at 430.  In line with *LULAC*, the Court should hold that Texas has once
again contravened §2 in its drawing of CD27.

strongly Latino (HD34) and one a safe Anglo Republican seat (HD32) to protect [an] incumbent." *Ibid.* "Based on an analysis of the *Gingles* requirements and the totality of the circumstances," however, the District Court found that the Legislature could have drawn two compact minority districts in Nueces County. *Id.,* at 780. Namely, the evidence demonstrated that it was possible to draw a map with "two districts with greater than 50% HCVAP," that "Latinos in Nueces County are highly cohesive, and that Anglos vote as a block usually to defeat minority preferred candidates." *Id.,* at 777–778.

The District Court then considered two proposed configurations for those districts: one with two HCVAP-majority districts located wholly within Nueces County, and another that required breaking the County Line Rule. *Id.,* at 777. The challengers preferred the latter configuration because, according to their expert, "an exogenous election index" revealed that the two HCVAP-majority districts wholly within Nueces County did "not perform sufficiently." *Id.,* at 778. The District Court did not accept that expert's assessment at face value. Instead, it explained that "an exogenous election index alone will not determine opportunity," and so evaluated the expert testing and ample other evidence and ultimately concluded that the challengers had "not adequately demonstrated that they lack equal opportunity in [an alternative] configuration . . . such that a county line break is necessary." *Id.,* at 778, 781. Thus, although it found that "two HCVAP-districts could have been drawn that would provide Hispanics with equal electoral opportunity, and that §2 could require those two districts," because §2 did not require the challengers' requested remedy (*i.e.,* breaking the County Line Rule), the District Court had to "consider whether §2 requires a remedy" and directed the challengers to "consider their preferred configuration for the remedy stage" that was to follow (before Texas prematurely appealed).

42                     ABBOTT *v.* PEREZ

                  SOTOMAYOR, J., dissenting

*Id.,* at 783.

                            2

   The majority purports to accept these factual findings,
and contends that they "show that [HD32 and HD34] do
not violate §2." *Ante,* at 35.  Specifically, the majority
points to the fact that the challengers' "own expert deter-
mined that it was not possible to divide Nueces County
into more than one *performing* Latino district" without
breaking the County Line Rule, a remedy the District
Court concluded was not required by §2. *Ante,* at 36 (em-
phasis in original).  "So if Texas could *not* create two per-
forming districts in Nueces County and did *not* have to
break county lines," the majority reasons, "the logical
result is that Texas did not dilute the Latino vote." *Ibid.*
(emphasis in original).  In its view, a districting decision
cannot be said to dilute the votes of minority voters "if the
alternative to the districting decision at issue would not
enhance the ability of minority voters to elect the candi-
dates of their choice." *Ibid.*

   At bottom, then, the majority rests its conclusion on one
aspect of the challengers' expert evidence, *i.e.,* that it was
not possible to place within Nueces County more than one
performing Latino district without breaking county lines.
The majority acknowledges the District Court's finding
that the challengers had "'failed to show' that two majority-
Latino districts in Nueces County would not perform,"
but waves away that finding by concluding that the Dis-
trict Court "twisted the burden of proof beyond recogni-
tion" by "suggest[ing] that a plaintiff might succeed on its
§2 claim because its expert failed to show that the neces-
sary factual basis for the claim could not be established."
*Ante,* at 37.  That conclusion is only possible because the
majority closes its eyes to significant evidence in the rec-
ord and misrepresents the District Court's conclusion
about the potential for creating two performing Latino-

SOTOMAYOR, J., dissenting

majority districts in Nueces County.

The majority, of course, is right on one thing: The District Court recognized that the challengers' expert opined that the two HCVAP-majority districts would not perform based on the results of an exogenous election index. See *ante,* at 36. But the majority ignores that the District Court rejected that expert's conclusion because "the results of an exogenous election index alone will not determine opportunity," as "[s]uch indices often do not mirror endogenous election performance." 267 F. Supp. 3d, at 778. Instead of "just relying on an exogenous election index to measure opportunity," the District Court "conduct[ed] an intensely local appraisal to determine whether real electoral opportunity exists." *Ibid.*

That "intensely local appraisal" resulted in a lengthy analysis that considered, among other facts: that Texas had a long "history of voting-related discrimination"; that "racially polarized voting exist[s] in Nueces County and its house district elections, the level is high, and the high degree of Anglo bloc voting plays a role in the defeat of Hispanic candidates"; "that Hispanics, including in Nueces County, suffer a 'continuing pattern of disadvantage' relative to non-Hispanics"; that population growth in the county "was [driven by] Hispanic growth" and that the "HCVAP continues to climb"; that the districts "include demographic distributions strongly favoring Hispanic voters," and that the "numbers translate into a significant advantage in house district elections"; and that data analysis showed that "performance for Latinos increased significantly in presidential election years," which "indicates that the districts provide potential to elect." *Id.,* at 778–782.[20]

————————

[20]The majority contends that the District Court did not engage in a sufficiently local analysis because it cited to the statewide history of discrimination against minority voters, the continuing disadvantage of

SOTOMAYOR, J., dissenting

The District Court's focus on the history of the county as well as its potential performance going forward was an important point of departure from the challengers' expert, who considered only the former.  See *LULAC*, 548 U. S., at 442 (noting "a significant distinction" in analysis of what district performance "'had been'" compared to "how it would operate today . . . given the growing Latino political power in the district").  The District Court also found the expert's analysis lacking in other key respects.  Namely, the District Court noted that one of the majority-HCVAP districts "provides opportunity, at least in presidential election years"; that "[m]ost of the elections in [the exogenous election] index did not involve a *Latino* Democrat candidate"; and that the expert "only looked at statewide races and no county races," even though it was "conceivable that, in competitive local races with Latino candidates, Hispanic voters would mobilize in significantly higher numbers."  267 F. Supp. 3d, at 781 (emphasis in original).

Based on this review of the evidence, the District Court concluded "that Hispanics have equal opportunity in two districts drawn wholly within Nueces County (or at least [the challengers] failed to show that they do not)."  *Id.,* at 782.  It further explained that, whereas the "evidence shows that two HCVAP-districts could have been drawn that would provide Hispanics with equal electoral opportunity, . . . the evidence does not show that the Legislature was required to break the County Line Rule to draw what [the challengers] consider to be 'effective' districts."  *Id.,* at 783.

When read in the context of the full analysis just detailed, it is clear that the District Court was not

---

Latino voters, and racially polarized voting.  *Ante,* at 38.  The majority not only misapprehends the importance of that statewide evidence to the local appraisal, but again ignores the many other factual findings and analysis that are specific to Nueces County and thus problematic for its conclusion.  See *supra*, at 44–45.

"twist[ing] the burden of proof," *ante,* at 37, when it observed that the challengers "failed to show that" the two HCVAP-majority districts drawn wholly within Nueces County would not perform. That statement plainly refers to the challengers' failure to rebut the finding that the two districts wholly within Nueces County provided equal electoral opportunity to Hispanics, as they needed to do to show that §2 required breaking the County Line Rule. If anything is "twisted . . . beyond recognition," *ibid.,* it is the majority opinion's description of the District Court's findings. For while relying on a reference to what the challengers' expert opined, the majority wholly ignores the District Court's lengthy discussion rejecting that opinion on the basis of other evidence in the record.[21]

This Court has been clear that "the ultimate right of §2 is equality of opportunity." *Johnson* v. *De Grandy*, 512 U. S. 997, 1014, n. 11 (1994). The District Court found that two HCVAP-majority districts drawn wholly within Nueces County provided such "equality of opportunity," and its findings of fact are not clearly erroneous. Only by selectively reading the factual record and ignoring the relevant analysis of those facts can the majority escape the §2 results violation that flows from those findings.

———————

[21] Contrary to what the majority suggests, the District Court did not believe that "simple Latino majorities in Nueces County might be sufficient to create opportunity districts" based only on "bare numbers." *Ante,* at 37, n. 27. Consistent with its rebuke of Texas elsewhere in the opinion for advocating a "bright-line rule that any HCVAP-majority district is by definition a Latino opportunity district" because it "may still lack 'real electoral opportunity,'" C. J. S. 134a, the District Court in its analysis of HD32 and HD34 was clear that the challengers "could assert that [the] HCVAP-majority districts do not present real electoral opportunity due to racially polarized voting and lower registration and turnout caused by the lingering effects of official discrimination." 267 F. Supp. 3d, at 781. Based on its review of that evidence, it concluded that the two majority-HCVAP districts drawn within Nueces County provided minority voters equal electoral opportunity. *Id.,* at 783.

46                    ABBOTT *v.* PEREZ

SOTOMAYOR, J., dissenting

### IV

The Equal Protection Clause of the Fourteenth Amendment and §2 of the Voting Rights Act secure for all voters in our country, regardless of race, the right to equal participation in our political processes. Those guarantees mean little, however, if courts do not remain vigilant in curbing States' efforts to undermine the ability of minority voters to meaningfully exercise that right. For although we have made progress, "voting discrimination still exists; no one doubts that." *Shelby County*, 570 U. S., at 536.

The Court today does great damage to that right of equal opportunity. Not because it denies the existence of that right, but because it refuses its enforcement. The Court intervenes when no intervention is authorized and blinds itself to the overwhelming factual record below. It does all of this to allow Texas to use electoral maps that, in design and effect, burden the rights of minority voters to exercise that most precious right that is "preservative of all rights." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 370 (1886); see *Husted* v. *A. Philip Randolph Institute*, 584 U. S. ___, ___ (2018) (SOTOMAYOR, J., dissenting) (slip op., at 5) ("Our democracy rests on the ability of all individuals, regardless of race, income, or status, to exercise their right to vote"). Because our duty is to safeguard that fundamental right, I dissent.