**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

SHANNON PEREZ, ET AL.,

    *Plaintiffs,*

v.

GREG ABBOTT, ET AL.,

    *Defendants.*

Civil Action No.
SA-11-CA-360-OLG-JES-XR
[Lead Case]

---

**PLAINTIFFS' JOINT REQUEST FOR RELIEF UNDER
SECTION 3(C) OF THE VOTING RIGHTS ACT**

Plaintiffs Texas State Conference of NAACP Branches, *et al.,* the African-American Congresspersons, LULAC, *et al.,* Eddie Rodriguez, *et al.,* Shannon Perez, *et al.,* and Margarita Quesada, *et al.*, pursuant to this Court's Order issued on August 30, 2018, ECF No. 1600, respectfully request that this Court impose the limited, but critical, equitable remedy of preclearance under Section 3(c) of the Voting Rights Act of 1965, 52 U.S.C. § 10302(c), and require the State of Texas to submit for preapproval any statewide redistricting plans enacted by the State to this Court for a period to begin before the next decennial redistricting cycle and to end no sooner than five years after the entry of such a remedial order. This vital, but time-limited remedy—this Court's imposition of a preclearance requirement and retention of jurisdiction—is the most statutorily appropriate and equitable action that can ensure the State's next redistricting plans do not discriminate against minority voters, particularly in light of this Court's identification of the recent intentional discrimination employed by the State in redistricting and the persistent pattern of discriminatory governmental action in Texas directed at minority voters

for generations.

## I.      INTRODUCTION

This litigation, spanning the better part of this decade and now running up against the next round of statewide redistricting, has made it abundantly clear that absent some form of federal oversight and pre-enforcement review under the Voting Rights Act, minority voters in Texas will once again be confronted with the onerous burden of litigating strategic and persistent systemic racial discrimination, with relief that is "exceedingly slow" to come and easily undermined through enactment of different "discriminatory devices not covered by the federal decrees." *South Carolina. v. Katzenbach,* 383 U.S. 301, 314 (1966). Absent the bail-in relief requested here, the Texas Legislature, for the first time in nearly half a century,[1] will be free to redraw state legislative and congressional lines without any up-front, comprehensive federal oversight to ensure protection of the rights of Texas's minority voters. Such protection during the last decennial redistricting in 2011 may not have ended with the exact remedies the Joint Plaintiffs here sought from the courts through 2018, but it at least forced the legislature's 2013 mid-course correction of its 2011 racially discriminatory enactments. Without the tailored bail-in relief requested here, the legislature will be free to yet again start the decade with discriminatory maps and very likely end the 2020 decade with discriminatory maps, given the complex, plodding pace of piecemeal redistricting litigation.

While *Shelby County v. Holder,* 570 U.S. 529, 551 (2013), invalidated Section 4's coverage formula, this Court need not rely on "decades-old data and eradicated practices" to once again require the State of Texas to submit its voting changes for federal approval. Rather,

---

[1] Texas first came under preclearance through the 1975 amendments to the Voting Rights Act of 1965.  *See Briscoe v. Bell*, 432 U.S. 404 (1977) (discussing P.L. 94-73 (Aug. 6, 1975), 89 Stat. 400).

Section 3(c) of the Voting Rights Act allows this Court to order such equitable relief in light of its findings of violations of the Fourteenth Amendment and the very recent history of discrimination by the State and its localities intended to undermine the voting power of minority voters. *Jeffers v. Clinton,* 740 F. Supp. 585, 600 (E.D Ark. 1990), *appeal dismissed*, 498 U.S. 1129 (1991)

As this Court recently found, "Texas and its political subdivisions have had over 200 voting rights challenges since 1982," and "in every decade since 1970 Texas has passed one or more redistricting plans after the census that have been declared either unconstitutional or violations of the VRA." Findings of Fact – General and Plan C185, ECF No. 1340 at ¶ 734. The congressional and state house redistricting plans enacted by Texas following the 2010 census continued this pattern. The instant litigation was filed by aggrieved individuals and organizations in order to vindicate the voting rights of Texas's minority voters, who were – yet again – faced with State House and Congressional redistricting plans that violated their rights under the Constitution and Voting Rights Act. These challenged enactments failed to gain preclearance in time for the 2012 elections, and while the Section 5 case was pending before the D.C. District Court, this Court – with guidance from the United States Supreme Court in *Perry v. Perez,* 565 U.S. 388 (2012) – implemented remedial plans based on preliminary findings to remedy the most egregious of the alleged violations of the Constitution and Voting Rights Act. *See* Opinion, ECF No. 690 at 3, Opinion, ECF No. 691 at 10-14.

The D.C. District Court ultimately denied preclearance to the plans at issue.[2] The three-

---

[2] While the 2011 Senate redistricting plan is not at issue in the current litigation, the D.C. District Court in the Section 5 proceeding likewise identified patterns of intentional discrimination in the Senate plan relevant to this Court's inquiry, noting a secretive and exclusionary map-drawing process resulted in a plan that intentionally fractured minority populations. *See Texas v. United States,* 887 F. Supp. 2d 133, 163-66 (2012). That plan was found to violate the one-person, one-

judge panel unanimously agreed that the Congressional Plan, C185, "was enacted with discriminatory purpose," *Texas v. United States,* 887 F. Supp. 2d 133, 159 (2012) and though the court did not need to reach the issue of discriminatory intent with respect to the House Plan, H283, it nonetheless "note[d] record evidence that cause[d] concern" and could "support a finding of discriminatory purpose in enacting the State House Plan." *Id.* at 178. Rather than simply leaving the Court's remedial plans in place during the pendency of this litigation, and the appeal of the D.C. District Court's ruling on preclearance, Texas chose to repeal the 2011 Plans, and adopt this Court's remedial Congressional plan as established in 2012 and its State House plan with modifications made by the legislature in 2013. *Abbott v. Perez,* 138 S. Ct. 2305, 2316-2317 (2018). These 2013 enactments were never subject to preclearance, as *Shelby County v. Holder* invalidated Section 4's coverage formula the day before they were signed into law.

This Court allowed Plaintiffs in this case to amend their complaint in order to assert challenges against the 2013 enactments and seek additional relief for their claims against the 2011 plans in light of the essential invalidation of Section 5 preclearance —namely, the relief now sought under Section 3(c) of the Voting Rights Act. ECF No. 1390 at 2-3. This Court correctly denied Defendants' motion to dismiss Plaintiffs' challenges to the 2011 plans as moot, noting that "Defendants failed to meet their burden of demonstrating that the conduct alleged to violate § 2 and the Constitution with regard to the 2011 plans could not reasonably be expected to recur," that there is no indication that the Legislature would not engage in the same conduct that Plaintiffs assert violated their rights in upcoming redistricting cycles," and that "there remains the possibility of declaratory and equitable relief under § 3(c) for some claims." *Id.* at 3.

---

vote principle, was permanently enjoined, and was replaced with a constitutional interim plan by this Court in a separate action. *See* Final Judgment, *Davis v. Perry,* No. 5:11-cv-788 (W.D. Tex. Sept. 4, 2013), ECF No. 190.

After careful consideration of the merits, this Court issued orders in early 2017 identifying intentional discrimination in the 2011 plans. These findings are unaffected by the 2018 Supreme Court ruling, and they support Plaintiffs' request for Section 3(c) relief.

This Court's rejection of mootness was undoubtedly the correct one, and comports with the Fifth Circuit's recent ruling in *Veasey v. Abbott,* 888 F.3d 792 (5th Cir. 2018), in which the Court of Appeals agreed that plaintiffs' intentional discrimination challenges to a 2011 voter ID enactment were not moot simply because the legislature enacted an ameliorative replacement during the pendency of the litigation. *Id*. at 799.  Further, although the Supreme Court held that the discriminatory intent of the 2011 legislature was erroneously imputed to the 2013 legislature, it left the findings of intentional discrimination as to the 2011 plans untouched, "express[ing] no view on the correctness of this holding." *Abbot v. Perez,* 138 S. Ct. 2305, 2318 n.8 (2018). This Court's findings of intentional discrimination in the 2011 Congressional and State House plans remain in place, and these findings – coupled with Texas's persistent history of continued intentional discrimination – amply justify Plaintiffs' request for relief under Section 3(c).  In any event, relief under Section 3(c) is available regardless of whether an underlying case challenging constitutional violations has become moot. A court has wide equitable power to order relief under Section 3(c) whenever "violations of the fourteenth or fifteenth amendment *have occurred*." 52 U.S.C. § 10302(c) (emphasis added). The subsequent mootness of litigation about a prior redistricting law does not erase the fact that a violation of fourteenth or fifteenth amendment, as a factual matter, *occurred* when the legislation was enacted. Section 3(c) is a tool to prevent *future* unconstitutional discrimination; its availability as a substantive prophylactic against that future harm cannot be thwarted by procedural technicalities related to *prior* violations that, in fact, actually occurred.

As detailed below, only the imposition of pre-enforcement review can ensure that minority voters in Texas are protected from the constitutional circumvention consistently employed by their lawmakers.

## II.   EQUITABLE RELIEF UNDER SECTION 3(c) OF THE VOTING RIGHTS ACT OF 1965

Section 3(c) of the Voting Rights Act, commonly referred to as "bail-in," allows for the "[r]etention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote," and provides:

> If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title . . . .

52 U.S.C. § 10302(c). Once there have been findings of constitutional violations within a jurisdiction, Section 3(c) explicitly empowers a court to require the jurisdiction to obtain preclearance from the court or the Attorney General for any changes to voting qualifications, practices or procedures for a period of time the court deems appropriate. Unlike the now-defunct coverage formula in Section 4, Section 3(c) is a permanent provision of the Voting Rights Act, included in the Act as originally passed in 1965. And unlike Section 4, Section 3(c) was designed by Congress to impose preclearance on jurisdictions through a "traditional case-by-case approach," H.R. Rep. No. 439, based on "current data reflecting current needs." *Shelby County v.*

*Holder,* 570 at 553. By "providing for judicial scrutiny of new or changed voting requirements, to insure against the erection of new and onerous discriminatory voting barriers by State or political subdivisions *which have been found to have discriminated*," H.R. Rep. No. 439 (emphasis added), Section 3(c) does not simply rely on a jurisdiction's long-past historical mistreatment of minority voters to impose oversight, but rather allows aggrieved parties to seek "remedies for local evils which have subsequently appeared." *Nw. Austin Mun. Util. Dist. No. One v. Holder,* 557 U.S. 193, 203 (2009) (quoting *South Carolina. v. Katzenbach,* 383 U.S. 301, 329 (1966)).

Prior to the Supreme Court's decision in *Shelby County v. Holder* invalidating the preclearance formula that placed certain jurisdictions under the purview of Section 5, federal courts utilized Section 3(c) in at least 17 cases to impose a preclearance requirement upon non-covered jurisdictions found to have violated the Fourteenth or Fifteenth Amendments to the Constitution.[3] Largely because many of these cases were resolved by consent decree, judicial guidance on the application of Section 3(c) is scant. *Jeffers v. Clinton,* 740 F. Supp. 585, remains

---

[3] (1) *United States v. Thurston County*, No. 78-0- 380 (D. Neb. May 9, 1979); (2) *McMillan v. Escambia County*, No.77-0432 (N.D. Fla. Dec. 3, 1979); (3) *Woodring v. Clarke*, No. 80-4569 (S.D. Ill. Oct. 31, 1983); (4) *Sanchez v. Anaya*, No. 82-0067M (D. N.M. Dec. 17, 1984); (5) *United States v. McKinley County*, No. 86-0029-C (D. N.M. Jan. 13, 1986); (6) *United States v. Sandoval County*, No.88-1457-SC (D. N.M. filed Dec. 5, 1988); (7) *Brown v. Board of Commissioners of the City of Chattanooga*, No. CIV-1-87-388 (E.D. Tenn. Jan. 11, 1990); (8) *Cuthair v. Montezuma-Cortez School District Number RE-1*, No. 89-C-964 (D. Col. Apr. 9, 1990); (9) *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D Ark. 1990), *appeal dismissed*, 498 U.S. 1129 (1991); (10) *Garza and United States v. Los Angeles County*, C.A. Nos. CV 88-5143 KN and CV 88-5435 KN (C.D. Cal. Apr. 26, 1991); (11) *United States v. Cibola County*, No. 93-1134-LH/LFG (D. N.M. filed Oct. 22, 1993); (12) *United States v. Socorro County*, No. 93-1244-JP (D.N.M. filed Oct. 22, 1993); (13) *United States v. Alameda County*, No. C 95-1266 (SAW) (N.D. Cal. filed Apr. 13, 1995); (14) *United States v. Bernalillo County*, No. 93-156-BB/LCS (D. N.M. filed Feb. 26, 1998); (15) *Kirke v. Buffalo County*, No. 03-CV- 3011 (D. S.D. filed Mar. 20, 2003); (16) *Blackmoon v. Charles Mix County*, No. 05-CV-4017 (D. S.D. filed Jan. 27, 2005); and (17) *United States v. Village of Port Chester*, No. 06-CV-15173 (S.D. N.Y. filed Dec. 15, 2006).

the most thorough and detailed judicial analysis of Section 3(c).

The *Jeffers* court addressed whether statewide equitable relief under Section 3(c) was appropriate in light of its finding that Arkansas' 1981 state legislative redistricting plans "diluted the votes of black citizens in violation of Section 2 of the Voting Rights Act." 740 F. Supp. at 586.[4] Recognizing that "authority is scant" and noting that at the time there had been "no reported case discussing the standards for imposing preclearance," the *Jeffers* court nonetheless embraced its duty to use Section 3(c) when such relief was sought and thus endeavored to lay out a framework for consideration of its application. *Id.* at 600. That court described the task before it as consisting of two determinations: "(1) whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State or any of its political subdivisions; and (2) whether, if so, the remedy of preclearance should be imposed." *Id.* at 587.

The *Jeffers* court first addressed the threshold matter of constitutional violations, and determined that the plain language of Section 3(c) required it to consider any proffered instances of voting-related discrimination found to have occurred within the state—not only those alleged in the litigation at issue—to determine whether preclearance was warranted. Although the *Jeffers* plaintiffs had asserted that the Arkansas state legislative redistricting plans were intentionally discriminatory in violation of the Fourteenth and Fifteenth Amendments, the district court held that plaintiffs failed to carry their burden in proving discriminatory motive. However, in rejecting defendants' view that only constitutional violations actually pleaded in the complaint could serve as a basis for awarding relief under Section 3(c), the district court turned to the plain

---

[4] It is worth noting that in addition to Arkansas, the state of New Mexico was also subject to a statewide Section 3(c) preclearance requirement under a consent decree for a period of ten years after a three-judge panel found that the New Mexico state legislative redistricting plan violated the Voting Rights Act. *See Sanchez v. Anaya,* Civ. No. 8200067M (D.N.M. 1984), *Jeffers,* 740 F. Supp. at 600.

language of the statute and noted:

> The phrase "violations of the fourteenth or fifteenth amendment justifying equitable relief," which the statute uses as the triggering condition for preclearance, is not limited at all. If, in the course of their attack on the 1981 plan of apportionment, plaintiffs have succeeded in showing other constitutional violations, and if those violations under equitable principles . . . are sufficiently serious and widespread to justify the drastic remedy of preclearance, we do not think the statute should be read in such a crabbed way as to rule out such relief as a matter of law. Certainly the words of the statute do not require such a reading, and it would be inconsistent with its broad remedial purpose.

*Id.* at 592. The Court, therefore, considered the other evidence of intentional discrimination put forth by plaintiffs in support of their 3(c) request, including recent cases within the jurisdiction that resulted in findings of intentional discrimination, *id.* at 592, the discriminatory "pattern formed by the[] enactments" imposing and upholding majority-vote requirements that intentionally reduce black political opportunity, *id.* at 594-95, and the actions of local officials taken "for the purpose of thwarting black political opportunity," *id.* at 595. The court reasoned that it was appropriate to consider both state and local constitutional violations because "[t]he statute does not say that the State or its officials must be guilty of the violations, but only that the violations must 'have occurred *within the territory'* of the State." *Id.* at 600.

After identifying multiple constitutional violations, the court then undertook to determine whether those constitutional violations warranted the imposition of preclearance. The court laid out a non-exhaustive list of questions to guide its consideration, including: (1) "Have the violations been persistent and repeated?" (2) "Are they recent or distant in time?" (3) "Are they the kinds of violations that would likely be prevented, in the future, by preclearance?" (4) Have they already been remedied by judicial decree or otherwise?" (5) "How likely are they to recur?" (6) Do political developments, independent of this litigation, make recurrence more or less likely?" *Id.* at 601. With these questions, and more generally, the court urged an aggressively

protective approach, noting that "[t]he whole purpose of the Fourteenth and Fifteenth Amendments and of the Voting Rights Act is to override state action" directed at undermining the right to vote. *Id.*  After considering the wealth of evidence of persistent intentional discrimination by the State historically and by its sub-jurisdictions, the *Jeffers* court ordered into effect narrowly tailored relief under Section 3(c), retaining jurisdiction over the 1991 state legislative redistricting plan for 60 days after enactment, and imposing a preclearance requirement for any state law having to do with a majority-vote requirement in general elections "until further order of this Court." *Id.* at 602.

Since *Shelby County,* federal courts have issued orders under Section 3(c) placing two jurisdictions previously covered under Section 5 back under the federal preclearance requirement: Evergreen, Alabama, *Allen v. City of Evergreen,* No. 13-0107-CG-M, 2014 U.S. Dist. LEXIS 191739, at *4 (S.D. Ala. Jan. 13, 2014) (requiring under Section 3(c) that any changes pertaining to Evergreen city council election districts and procedures or municipal election eligibility be submitted for preclearance until December 31, 2020), and Pasadena, Texas, *Patino v. City of Pasadena,* 230 F. Supp. 3d 667, 729 (S.D. Tex. 2017) (requiring under Section 3(c) that the city of Pasadena submit future changes to its electoral map for preclearance and suggesting a period of five years "as a starting point").

As explained in more detail below, relief under Section 3(c) is especially appropriate under the circumstances before this Court. Joint Plaintiffs are the "aggrieved person[s]" that Section 3(c) contemplates. Plaintiffs are minority voters and organizations advancing their interests who have suffered injuries under the Constitution and Voting Rights Act due to the discriminatory and dilutive redistricting practices that Texas employed following during the 2010 redistricting cycle. Beyond the findings of intentional discrimination in the 2011

redistricting plans, there are ample racially-discriminatory constitutional violations that have taken place within the state of Texas in recent history, as identified by this Court and many others, and this Court "cannot ignore the pattern formed by these enactments." *Jeffers*, 740 F. Supp. at 594. As noted by this Court, even when constrained by Section 5's protections, Texas still acted contrary to federal law, and the elimination of pre-enforcement review in the wake of *Shelby County* has only served to embolden those seeking to exclude minority voters from the political process, *see, infra* § III.2. The pernicious and persistent racial discrimination against minority voters in redistricting in Texas is certainly an "extraordinary problem" that amply justifies the imposition of preclearance under Section 3(c).

## III.   FINDINGS OF INTENTIONAL DISCRIMINATION WITHIN THE STATE OF TEXAS JUSTIFYING EQUITABLE RELIEF

As a threshold matter, Section 3(c) requires findings "that violations of the Fourteenth or Fifteenth Amendment justifying equitable relief have occurred within the territory of such State" before the imposition of preclearance is appropriate. This Court need not look beyond its own Orders to find ample constitutional violations targeting Texas's minority voters sufficient to justify subjecting the State to bail-in under Section 3(c). Indeed, the findings of this Court with respect to the 2011 Congressional and State House redistricting plans demonstrate an "'ingenious defiance of the Constitution'" that the Supreme Court has held justifies federal oversight. *Shelby County,* 570 U.S. at 535 (quoting *Katzenbach,* 383 U.S. at 309). Moreover, a thorough analysis under Section 3(c) requires that this Court also look beyond the four-corners of the pleadings in this case to consider the historical prevalence of intentional discrimination against minority voters in Texas and other recent instances of intentional discrimination that demonstrate a pattern unlikely to be broken without an order of bail-in. The findings of intentional discrimination against minority voters within the State of Texas are nearly too numerous to count, for as long as

redistricting plans have been subject to judicial review, courts have found that Texas's redistricting plans have violated federal law. *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973); *McDaniel v. Sanchez*, 452 U.S. 130 (1981); *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982); *Upham v. Seamon*, 456 U.S. 37 (1982); *Balderas v. State of Texas*, No. 6:01CV158, 2001 U.S. Dist. LEXIS 25740 (E.D. Tex. 2001); *LULAC v. Perry*, 548 U. S. 399 (2006); *Perez v. Perry*, 132 S. Ct. 934; 181 L. Ed. 2d 900; 2012 U.S. LEXIS 908 (2012); *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012).   Looking to findings reasonably contemporaneous with those at issue sheds light on the strategic and systematic nature of voter discrimination in Texas.   Indeed, state and local actions taken following the elimination of the coverage formula that subjected Texas to preclearance under Section 5 provide buttressing examples of unconstitutional intentional discrimination for this Court's consideration, and significantly, demonstrate the bleak state of access to the political process that awaits minority voters in the coming years if Texas is left, unrestrained by pre-enforcement review, to redistrict according to its historic pattern of purposely minimizing the voting power of minorities.

### 1.   Findings of Intentional Discrimination in the 2011 Redistricting Plans

After a thorough review of the evidence, this Court issued two opinions, accompanied by hundreds of pages of fact-finding, in which it concluded that Texas's 2011 Congressional and State House Plans were each motivated at least in part by discriminatory intent in violation of the Fourteenth Amendment of the Constitution.[5] These opinions contain sufficient findings of

---

[5] It is worth noting that, in addition to its findings of intentional discrimination, this Court identified additional violations of the Fourteenth Amendment with *Shaw*-type racial gerrymandering violations and violations of the one-person, one-vote guarantee of the Equal Protection Clause. *See* ECF No. 1390 at 164-65 (*Shaw*-type equal protection violations found as to CD 35, CD 23 and CD26), ECF No. 1365 at 153 (*Shaw*-type equal protection violation in

intentional discrimination against Texas's minority voters to justify retaining jurisdiction and placing Texas under preclearance pursuant to Section 3(c) of the Voting Rights Act. This Court's findings reflect two principal strategies through which the 2011 map drawers intentionally diluted minority voting strength to the benefit of Anglo Republican incumbents: (1) through traditional packing and cracking of minority communities of interest, and (2) through the artificial inflation of SSVR to create the façade of VRA compliance. These strategies, taken together with a full *Arlington Heights* analysis of all the circumstantial evidence supporting a conclusion that the 2011 plans were motivated by discriminatory purpose, led this Court to make the following conclusions: that "Defendants acted at least in part with a racially discriminatory motive in enacting Plan C185, and with regard to the districts in DFW in particular," ECF No. 1390 at 146, as well as "in El Paso County (HD78), Bexar County (HD117), Nueces County (the elimination of HD33 and the configuration of HD32 and HD34), HD 41 in the Valley, Harris County, Western Dallas County (HD103, HD104, and HD105), Tarrant County (HD90, HD93), Bell County (HD54), and with regard to Plan H283 *as a whole*," ECF No. 1365 at 153. Indeed, Texas gained four congressional districts on the basis of minority population growth, ECF No. 1340 at 14-15, ¶¶ 31-33, yet minorities did not gain effective representation in any additional congressional districts under the 2011 plans.  These findings established that the two plans violated not only Section 2 of the VRA but also the Fourteenth Amendment.

The most notable instance of cracking and packing took place in C185's configuration of DFW, where this Court concluded that "intentional minority vote dilution was a motivating factor in the drawing of district lines . . . and that mapdrawers intentionally diluted minority

---

HD117, *Larios*-type one person, one vote violations in Nueces County, Hidalgo County, and Bell/Lampasas County). By its plain text, Section 3(c) allows for consideration of each of these constitutional violations when weighing the propriety of bail-in relief.

voting strength in order to gain partisan advantage." Amended Order on Plan C185, ECF No. 1390 at 125. To achieve that end, this Court found that mapmakers utilized racial shading to split numerous precincts on the basis of race in order to construct the districts in DFW. Findings of Fact – General and Plan C185, ECF No. 1340 at ¶¶ 310-313, ¶ 334. Specifically, this Court found that C185 "pack[ed] CD30, the only minority district, by increasing its minority population even though it was already consistently performing and there was no indication that increased minority population was needed to maintain its ability to elect." ECF No. 1340 at ¶ 314. This Court further found that "Plan C185 divide[d] ('crack[ed]') the remaining urban and suburban minority population in Dallas and Tarrant Counties through bizarrely shaped fingers and put[] them into Anglo-dominated rural and suburban districts where their influence is minimized . . . . protecting Anglo Republicans at the expense of minority voters." *Id.* at ¶ 315. Although this Court noted that the districts in DFW exhibited "an overlap between cracking and packing Democrats and cracking and packing minorities," *id.,* it nonetheless found that the evidence before it "persuasively demonstrate[d] that mapdrawers intentionally packed and cracked on the basis of race (using race as a proxy for voting behavior) with the intent to dilute minority voting strength." *Id.* at 134. On this, the Court was unanimous. *See* Amended Order on Plan C185, ECF No. 1390 at 187 (Smith, J., dissenting) ("Relatively little about the 2011 Congressional redistricting passes the smell test as to DFW, the largest metropolitan area in Texas with 6.4 million residents in 2010 but where the apparent choice of minority voters in 2010 was reflected only in CD30 . . . ."). Mapmakers also "cracked," or intentionally fragmented districts that empowered minority communities to elect their candidates of choice in the House Plan, H283. In Nueces County, this Court found that "redistricting leadership eliminated an existing Latino opportunity district," HD33, without considering what was required by the VRA

and "without replacing it elsewhere." Order on Plan H283, ECF No. 1365 at 37. In addition to this fragmentation, mapdrawers "intentionally packed Hispanic voters into HD32 to minimize their number and influence in HD 34 and protect [incumbent representative] Hunter." *Id.* at 39. And likewise, in Bell County, this Court found that mapmakers' "decision to split Killeen and the minority community within it was to ensure that HD54 and HD55 remained Anglo-majority" and to "ma[k]e it more difficult for minority voters in HD 54 to elect their candidate of choice." *Id.* at 77.

The second significant strategy that mapmakers employed to intentionally dilute minority voting strength involved "gain[ing] political advantage by disadvantaging Hispanic voters through use of the 'nudge factor.'" ECF No. 1390 at 126, *see also* ECF No. 1364 at 61. The "nudge factor" allowed mapmakers to create "districts that would appear to be Latino opportunity districts because their demographic benchmarks were above a certain level," but using low-turnout Hispanic precincts such that the district "would elect a candidate who was not the Hispanic candidate of choice." ECF No. 1340 at ¶ 55. This Court found that, in addition to using the "nudge factor" to craft districts that violated Section 2 of the VRA in Plan C185, ECF No. 1390 at 57, the tactic was also employed to intentionally dilute minority voting strength all throughout Plan H283. See ECF No. 1365 at 26-27 (noting that Downton's changes in El Paso County "were designed to appear to comply with § 5 by increasing the SSVR of HD78, but without increasing or ensuring Latino ability to elect," in order to "protect the Republican incumbent elected in 2010, who was not the Latino candidate of choice"), *id.* at 30 (finding that in Bexar County, "Interiano worked to draw a district with exactly 50.1% SSVR to maintain its appearance as a Latino opportunity district and avoid retrogression under the mapdrawers' majority-SSVR assertion, while minimizing Hispanic turnout"), *id.* at 45-46 (holding that

"mapdrawers intentionally used race to draw [HD41] to perform less favorably for Latinos," and "intentionally manipulated SSVR and total population to dilute the Latino vote in HD41 in order to protect an incumbent who they believed would no longer be the Latino candidate of choice given his decision to switch parties"), *id.* at 56-57 (finding that in Harris County, "[r]edistricting leadership feigned VRA compliance but used it to undermine minority voting strength instead of truly complying with the act . . . as a tool to avoid creating any new minority opportunity districts . . . ."), *id.* at 69 (finding that "the motive was to dilute Latino voting strength in West Dallas County by unnecessarily placing Latinos in HD103 and HD104 while simultaneously making HD105 more Anglo to protect the Anglo Republican incumbent . . . ."), *id.* at 71 (holding that "increasing the SSVR of HD90 was merely superficial compliance with the VRA, invoked in bad faith to actually undermine Latino voting strength").

Additionally, this Court conducted a full analysis of the factors articulated in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252 (1997), and found that the factors "further buttress a conclusion of intentional discrimination" in both Plan C185 and Plan H283. ECF No. 1390 at 134, ECF No. 1365 at 84. This Court looked to the impact of the plans, noting that "the law is clear that 'the impact of the official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." ECF No. 1390 at 137 (quoting *Shaw v. Reno,* 520 U.S. at 134). This Court found that although [a]pproximately 89% of the 4.2 million population growth in Texas between 2000 and 2010 was attributable to minorities," and "[m]apdrawers and legislators were aware of the extensive minority population growth . . . . neither the House map nor the congressional map reflected that growth in terms of the number of minority opportunity districts orminority ability to elect districts." ECF No. 1340 at ¶ 666. Although this Court noted that "long-past" history of racial

discrimination has minimal probative value, the court noted, for context, that "the Fifth Circuit recognized that restrictive and discriminatory voting laws have typically been enacted (by both political parties) in response to a perception of increased voting power by emerging demographic groups." *Id.* at 140. As to recent instances of intentional discrimination in voting, this Court further noted that "[t]he actions that 'bore the mark of intentional discrimination' in *LULAC v. Perry* were carried out in 2003 by the Republican-dominated legislature, and are similar to the actions Plaintiffs complain were taken in 2011 with regard to CD23 and CD27." *Id.* at 142 (quoting *LULAC v. Perry,* 548 U.S. 399, 440 (2006)), *see also* ECF No. 1365 at 32-33 n.22 (citing *LULAC v. Perry* in discussing the treatment of Nueces County house districts). Then looking to "the sequence of events leading up to the challenged decision," this court highlighted that "the Texas Legislature enacted its 2011 redistricting plans in the context of strong racial tension and heated debate about Latinos, Spanish-speaking people, undocumented immigration and sanctuary cities, and the contentious voter ID law." ECF No. 1390 at 142. Finally, as to substantive and procedural departures, this Court pointed to the fact that mapdrawers were not receptive to the input of minority legislators or members of the public, and further stated that "the rushed and secretive process suggests that Defendants did want to avoid scrutiny of whether their efforts in fact complied with the VRA or were intended to do so, or whether they were only creating a façade of compliance." *Id.* at 144.

This Court, relying on the abundant evidence before it, the *Arlington Heights* factors, and the history of racially polarized voting in Texas concluded that in crafting both Plan H283 and C185, "redistricters acted to undermine minority voting strength," purposefully and in violation of the Voting Rights Act and the Fourteenth Amendment to the Constitution. ECF No. 1365 at 85, ECF No. 1390 at 145. Even while subject to federal oversight through Section 5, Texas

engaged in this "ingenious defiance of the Constitution," *Katzenbach,* 383 U.S. at 309, and but for the pre-enforcement review that prevented at least some of the most insidiously manipulated districts from going into effect, Plaintiffs would have suffered far greater injury. As this Court correctly noted in denying Defendants' motion to dismiss the 2011 claims as moot, "there is no indication that the Legislature would not engage in the same conduct that Plaintiffs assert violated their rights in upcoming redistricting cycles," ECF No. 1390 at 2, and the repercussions of that likely result will be all the worse if this Court does nothing to restrain Texas's ability to enact and enforce maps that intentionally violate the law to the detriment of minority voters. The findings of egregious intentional discrimination in the 2011 plans, including the submersion of minority voting strength disguised as compliance with the Voting Rights Act, is exactly the kind of "onerous discriminatory voting barrier[]" against which Section 3(c) was intended to provide a barrier. H.R. Rep. No. 439.[6]

## 2. Other Findings of Intentional Discrimination

Though this Court's own findings of intentional discrimination in the 2011 Congressional and State House Plans alone warrant the imposition of a Section 3(c) preclearance requirement on the State of Texas, other courts' findings of intentional discrimination committed by the State of Texas and its subjurisdictions are also relevant and informative, especially to the extent that they provide this Court with further insight as to how the State of Texas treats its minority voters

---

[6] Though it utilized a different burden of proof as required under Section 5 of the VRA, the D.C. District Court's findings relating to intentional discrimination as to the very same redistricting plans in *Texas v. United States* further bolster this Court's findings justifying bail-in. 887 F. Supp. 2d 133, 159, 178 (D.D.C. 2012) (finding that the Congressional Plan was "enacted with discriminatory purpose," and that with respect to the House Plan, "the full record strongly suggests that the retrogressive effect . . . found may not have been accidental."). Additionally, although not at issue here, the D.C. District Court's findings of intentional discrimination as to the 2011 Senate plans also support an order by this Court placing Texas under Section 3(c) bail-in for all statewide redistricting plans. *Id.* at 166 (holding that "the Senate Plan was enacted with discriminatory purpose as to SD 10).

when its legislation need not satisfy Section 5's non-retrogression standard.  As noted by the *Jeffers* court, instances of intentional discrimination committed by both State and local actors must be considered, as "[c]ities, counties, and other local subdivisions are mere creatures of the State." 740 F. Supp. at 592.

Not a decade has gone by since the Voting Rights Act was first enacted without a federal court ruling that Texas had violated its mandates or the mandates of the United States Constitution, *see, supra* 9-10. Notably, the Department of Justice lodged objections to Texas's statewide redistricting plans as retrogressive no fewer than eight times in the twenty-seven years that Texas was subject to preclearance under Section 5, and lodged 207 objections total against voting changes made within Texas' boundaries during that time – more total objections than any other state subject to preclearance.[7]

The congressional district plan that immediately preceded the 2011 plan at issue also unsurprisingly faced judicial scrutiny for violating the rights of Texas' minority voters. As this Court noted in its Amended Order on Plan C185, the 2011 Legislature's attempts to circumvent the true requirements of the VRA bear a striking resemblance to the 2003 Legislature's actions with respect to CD 23 that the Supreme Court stated "could give rise to an equal protection violation" in *LULAC v. Perry,* 548 U.S. at 440. In *LULAC,* the Supreme Court noted that "District 23's Latino voters were poised to elect their candidate of choice," and "[i]n response to the growing participation that threatened Bonilla's incumbency, the State divided the cohesive Latino community. . . . " *Id.* at 439. "In essence," the Supreme Court recounted, "the State took away the Latinos' opportunity because Latinos were about to exercise it." *Id.* 440. The Court noted that this distorted concept of incumbency protection was made all the more

---

[7] *See Voting Determination Letters for Texas,* The United States Department of Justice, https://www.justice.gov/crt/voting-determination-letters-texas (last visited Nov. 16, 2018).

constitutionally suspect by the Texas Legislature's "use of race to create the façade of a Latino district." *Id.* at 441. Despite this rebuke by the Supreme Court, the 2011 Legislature employed the same tactic on a statewide scale in multiple plans a mere seven years later. Texas has demonstrated an apparent determination not to come into compliance with federal law, but instead, to even more artfully evade it. The findings of the *LULAC* Court, documenting the pernicious pattern of Texas' voting-related discrimination, further support the need for this Court to award Plaintiffs relief under Section 3 (c).

As detailed in Plaintiffs' Joint Advisory to the Court on Issues Relating to Section 3(c) of the Voting Rights Act, (July 22, 2013), ECF No. 788 at 22-25, the myriad cases in which the Attorney General has lodged objections against Texas jurisdictions under Section 5 provide further examples of intentionally discriminatory behavior aimed at harming minority voters. Especially illuminating is Texas's behavior surrounding the post-*Shelby County* reinstitution of a voter ID requirement, SB14, that was previously objected to by the Attorney General, *See* Objection Letter from Thomas E. Perez, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Keith Ingram, Director of elections, Office of the Texas Secretary of State (March 12, 2012), and denied preclearance by a three-judge panel. *Texas v. Holder,* 888 F. Supp. 2d 113, 121 (D.D.C. Aug. 30, 2012). Despite the Attorney General's assertion that "the specter of in-person voter fraud is a chimera meant to mask the discriminatory purpose" behind Texas's voter ID requirement, and despite the fact that the three-judge panel held that the law would have a retrogressive effect on minority voters, Texas began to enforce the requirement on June 25, 2013 – the day that *Shelby County* invalidated the coverage formula under Section 4 of the VRA. 570 U.S. at 557.

In the appeal of a district court's ruling that the 2011 and 2013 voter ID laws were

"imposed with an unconstitutional discriminatory purpose," *Veasey v. Perry,* 71 F. Supp. 3d 627 (S.D. Tex. 2014), the Fifth Circuit had the opportunity to articulate some of the types of evidence that would support an intentional discrimination finding.  Although in that procedural posture, the Fifth Circuit found that the district court relied too heavily on non-contemporaneous evidence of intentional discrimination, *Veasey v. Abbott,* 830 F.3d 216, 232 (5th Cir. 2016), the appeals court nonetheless noted that "the record also contained evidence that could support a finding of discriminatory intent," and addressed that circumstantial evidence. *Id.* at 235-36. Specifically, the Fifth Circuit noted that "drafters and proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities, and that they nonetheless passed the bill without adopting a number of proposed ameliorative measures." *Id.* at 236. Further, the court found that there was "evidence that could support a finding that the Legislature's race-neutral reason of ballot integrity offered by the state [was] pretextual." *Id.* at 237.

On remand, the district court again found that the voter ID law was intentionally discriminatory.  Although the district court was reversed, the Fifth Circuit's more recent remand opinion,  unlike its 2016 opinion, did not specifically address whether the district court below had appropriately weighed the evidence of intentional discrimination before it, 888 F.3d 792, 800 (5th Cir. 2018), and the sequence of events and the evidence of intentional discrimination identified by the district court and Fifth Circuit are nonetheless probative in this Court's assessment of the propriety of imposing Section 3(c) preclearance.

Even more recently, the Southern District of Texas placed the city of Pasadena under preclearance pursuant to Section 3(c) of the Voting Rights Act based on findings that "Pasadena's 2014 change from an eight single-member district map and plan to a six single-member district and two at-large position map and plan for electing its City Council"

intentionally diluted the votes of Latino citizens in violation of Section 2 of the Voting Rights Act as well as the Fourteenth Amendment. *Patino v. City of Pasadena,* 230 F. Supp. 3d 667, 675 (2017). The *Patino* court considered the evidence before it through the *Arlington Heights* framework, and in discussing the sequence of events leading up to the decision, the Court noted that despite acknowledgement by the Mayor of Pasadena that the Justice Department likely would have objected to the at-large scheme for diluting Latino voting strength, he nonetheless gave an interview in November of 2013, stating that "he proposed changing to the 6-2 mixed map and plan promptly after the *Shelby County* decision 'because the Justice Department can no longer tell Pasadena what to do.'" *Id.* at 698. Without the cover of Section 5, Pasadena was emboldened to, and indeed did, adopt an election scheme for its City Council that intentionally diluted the votes of its growing number Latino citizens in order to garner partisan advantage – much like the State of Texas itself attempted to in both 2003, *LULAC,* 548 U.S. at 440, and 2011, ECF No. 1365, ECF No. 1390.

After evaluating these factors as well as the deviation from usual procedures and standards, historical instances of discrimination in Pasadena, and the shifting political demographic of the city, the *Patino* court concluded that Pasadena intentionally discriminated against Latino voters in violation of the Fourteenth Amendment. Based on this finding, the court granted plaintiffs' request for preclearance under Section 3(c), suggesting a period of no less than five years "because it is likely enough time for demographic trends to overcome concerns about dilution from redistricting." *Patino,* 230 F. Supp. 3d at 728-29. The city agreed to be subjected to federal preclearance for a period of seven years - until 2023 - via settlement.[8] This

---

[8] Alexa Ura, *Pasadena drops appeal, will remain under federal oversight of election laws,* The Texas Tribune (Oct. 3, 2017), https://www.texastribune.org/2017/10/03/pasadena-remain-under-federal-oversight-election-laws/

Court should follow in the footsteps of the district court in *Patino,* and acknowledge that the remedy of federal oversight is necessary to adequately protect minority voters from a majority that is not only determined to maintain power, but has also demonstrated a willingness to subvert the Constitution and principles of federal law in order to do so.

## IV.   THE   IDENTIFIED   CONSTITUTIONAL   VIOLATIONS   JUSTIFY   IMPOSITION OF PRECLEARANCE UNDER THE *JEFFERS* FRAMEWORK

Though this account of voting-related constitutional violations perpetrated within the State of Texas is certainly not exhaustive, it nonetheless makes clear that under the framework laid out by the court in *Jeffers v. Clinton,* 740 F. Supp. at 601, and in order to effectuate the purpose of the Fourteenth and Fifteenth Amendments and of the Voting Rights Act, this Court should award Plaintiffs bail-in relief under Section 3(c). *Jeffers*' first inquiry is whether "the violations have been persistent and repeated," *id.,* and with respect to Texas, the answer is a resounding "yes." Though the Supreme Court in *Shelby County,* 570 U.S. at 552, has decried the use of long-past history in noting that 'history did not end in 1965," the instances of intentional discrimination before this court demonstrate that Texas has persistently subjugated the voting rights of people of color since long before 1965, and has continued unceasingly ever since. This also addresses *Jeffers*' second inquiry – whether the constitutional violations "are recent or distant in time." Consistent with the Fifth Circuit's guidance in *Veasey* to afford more weight to "recent history" of discrimination, the findings above, issued as recently as mid-2017, demonstrate that constitutional violations potentially persist within Texas at this very moment.

Turning to the third inquiry under *Jeffers*, whether the constitutional violations identified are "the kinds of violations that would likely be prevented, in the future, by preclearance," it is abundantly clear that preclearance is the *only* mechanism by which to prevent such discriminatory voting procedures from going into effect. This must necessarily be the case, as

these are the kinds of violations that *were* prevented by preclearance in the *past,* prior to the invalidation of Section 4's preclearance formula. For example, but for preclearance, the 2011 Congressional and State House Plans would have gone into immediate effect, and Plaintiffs in the instant case would have had to carry the burden of overcoming a presumption of good faith on the part of the legislature to remedy even the most flagrant violations of the Constitution that this Court had occasion to remedy in the preliminary stages of this litigation. Answering the fourth *Jeffers* inquiry - whether the constitutional violations "have already been remedied by judicial decree or otherwise" – further reveals the enormous hurdles in place for a Plaintiff seeking to adjudicate Texas's longstanding and systemic scheme of constitutional violations on a case-by-case basis: this case, though initiated in 2011, remains ongoing, and Plaintiffs continue to seek relief from this court with only one federal election remaining before the next decennial census.

This Court has explicitly answered the final two questions posed by the *Jeffers* court – "how likely are [the constitutional violations] to recur, and whether "political developments, independent of this litigation, make recurrence more or less likely." In its determination that Plaintiffs' challenges to the 2011 plan were not moot, the district court noted that, because Section 5 of the Voting Rights Act could no longer serve to prevent Texas from unilaterally enacting redistricting legislation, "Defendants failed to meet their burden of demonstrating that the conduct alleged to violate § 2 and the Constitution with regard to the 2011 plans could not reasonably be expected to recur . . ." and that "there is no indication that the Legislature would not engage in the same conduct that Plaintiffs asserted violated their rights in upcoming redistricting cycles." ECF No. 1390 at 2. In all likelihood, absent the imposition of bail-in under Section 3(c), it will be the new normal for minority voters in Texas with well-founded and

24

provable constitutional claims to sustain irreparable injury throughout the decade while the "perpetrators of the evil" benefit from "the advantage of time and inertia" that piecemeal litigation of institutionalized racial discrimination places upon them. *Katzenbach,* 383 U.S. at 328.

In a jurisdiction like Texas, which has consistently engaged in intentional discrimination since its inception, and which year after year attempts to sharpen and hone its ability to violate the law in more covert and artful ways, the Constitution's promise of equal protection under the laws requires the imposition of Section 3(c) preclearance. While it may constitute a "departure from basic principles of federalism" *Shelby County,* 570 U.S. at 534, to allow this Court to retain jurisdiction under Section 3(c), it is an equally if not greater departure from basic principles of democracy to allow the State of Texas to carry on in crafting new and inventive ways to undermine Texas voters' most fundamental right to participate in our political system in violation of the Constitution. "The whole purpose of the Fourteenth and Fifteenth amendments and of the Voting Rights Act is to override state action" that flies in the face of the principles of equality that they serve to uphold, "and undue deference to state sovereignty cannot be permitted to thwart this purpose." *Jeffers v. Clinton*, 704 F. Supp. at 601. Moreover, the narrowness of the relief sought—this Court's review for the next redistricting cycle only—strikes an appropriate balance between those federalism concerns with this Court's duty to enforce the guarantees of the Constitution to protect minority voters.  The relief sought here, just like the relief granted in *Jeffers* and *Pasadena*, is narrowly tailored to addressing an immediate problem, and it should be granted.

## V.      CONCLUSION

For all of these reasons, Joint Plaintiffs respectfully request that this Court grant the

remedial relief sought for the intentional violations of the Fourteenth Amendment identified by this Court in the 2011 Congressional and State House plans, and that this relief—this Court's continued to jurisdiction to review before implementation any statewide redistricting plans— continue for a term no less than five years.

       Dated: November 30, 2018.

                                      Respectfully submitted,

                                   /s/ Allison J. Riggs
                                  Allison J. Riggs
N.C. State Bar No. 40028
(Admitted Pro Hac Vice)
Jaclyn A. Maffetore
N.C. State Bar No. 50849
(Admitted Pro Hac Vice)
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Fax: 919-323-3942
Allison@southerncoalition.org
Jaclyn@southerncoalition.org

Robert Notzon
Law Office of Robert S. Notzon
State Bar Number 00797934
1502 West Avenue
Austin, Texas 78701
512-474-7563
512-852-4788 fax
Robert@NotzonLaw.com

Victor L. Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
Telephone: 410-580-5120
Fax: 410-358-9359
vgoode@naacpnet.org

*Attorneys for the Texas State Conference of NAACP Branches, Lawson and Wallace*

  /s/ Gary L. Bledsoe           

Gary L. Bledsoe
State Bar No. 02476500
7901 *Cameron Road*, Building 3-360
Austin, Texas 78754
Telephone: 512-322-9992
Fax: 512-322-0840
Garybledsoe@sbcglobal.net

*Attorney for Howard Jefferson and Congresspersons Sheila Jackson Lee, Alexander Green, and Eddie Bernice Johnson*

  /s/ Renea Hicks            

Attorney at Law
State Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231 – Telephone
rhicks@renea-hicks.com

PERKINS COIE LLP
Marc Erik Elias*
Bruce V. Spiva*
Aria C. Branch*
*Admitted Pro Hac Vice
700 Thirteenth Street N.W., Suite 600
Washington, DC 20005-3960
(202) 434-1609
MElias@perkinscoie.com

Abha Khanna*
Admitted Pro Hac Vice
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
(206) 359-8312
(206) 359-9312 FAX
AKhanna@perkinscoie.com

*Attorneys for Plaintiffs Eddie Rodriguez, Milton Gerard Washington, Bruce Elfant,*

*Balakumar Pandian, Alex Serna, Betty F. Lopez, Beatrice Saloma, Lionor Sorola-Pohlman, Eliza Alvarado, Juanita Valdez-Cox, Josey Martinez, and Nina Jo Baker*

J. GERALD HEBERT (admitted *pro hac vice*)
J. Gerald Hebert P.C.
191 Somervelle Street, #405
Alexandria, VA 22305
703-628-4673
hebert@voterlaw.com

/s/ Mark P. Gaber
MARK P. GABER (admitted *pro hac vice*)
P.O. Box 34481
Washington, DC 20043
(715) 482-4066
mark.gaber@gmail.com

GERALD H GOLDSTEIN (No. 08101000)
Goldstein, Goldstein and Hilley
310 S. St. Mary's Street
San Antonio, TX 78205-4605
210-226-1463/210-226-8367 (facsimile)
ggandh@aol.com

DONALD H. FLANARY, III (No. 24045877)
Flanary Law Firm
1005 South Alamo
San Antonio, TX 78210
210-738-8383/210-738-9426 (facsimile)
donflanary@hotmail.com

JESSICA RING AMUNSON (admitted *pro hac vice*)
Jenner & Block LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
202-639-6000/202-639-6066 (facsimile)
jamunson@jenner.com

JESSE GAINES
P.O. Box 50093
Fort Worth, TX 76105

817-714-9988

*Attorneys for the Quesada Plaintiffs*

/s/ David Richards

DAVID RICHARDS
Texas Bar No. 1684600
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
512-476-0005
davidr@rrsfirm.com

*Attorney for Plaintiffs Perez, et al.*

/s/ Luis Roberto Vera, Jr.

Luis Roberto Vera, Jr.
LULAC National General counsel
SBN: 20546740
THE LAW OFFICES OF LUIS ROBERTO
VERA, JR & ASSOCIATES
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205-2260
210-225-3300 office 210-225-2060 fax

*Attorney for Plaintiffs LULAC, et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of November, 2018, I filed a copy of the foregoing for service on counsel of record in this proceeding through the Court's CM/ECF system.

/s/ Allison J. Riggs
Allison J. Riggs