**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **SHANNON PEREZ, ET AL.,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **11-CV-360-OLG-JES-XR** |
| **STATE OF TEXAS, ET AL.** | § | **CONSOLIDATED ACTION** |
| | § | **[Lead case]** |
| **Defendants** | § | |

**TEXAS LATINO REDISTRICTING TASK FORCE, ET AL. AND MALC
PLAINTIFFS' BRIEF IN SUPPORT OF RELIEF UNDER SECTION 3(C)
OF THE VOTING RIGHTS ACT**

In the face of Fourteenth Amendment violations arising out of Texas's enactment of its 2011 and 2013 redistricting plans, this Court is empowered to provide equitable relief under Section 3(c) of the Voting Rights Act, also known as the preclearance "bail-in" provision. *See* 52 U.S.C.A. § 10302(c). Pursuant to the Court's order of August 30, 2018 [Dkt. 1600], Plaintiffs Texas Latino Redistricting Task Force, *et al.* (Task Force Plaintiffs) and MALC respectfully submit this brief in support of their request that the Court bail in Texas for future redistricting.

Task Force Plaintiffs and Plaintiff MALC respectfully request, in accordance with section 3(c), that the Court order that Texas can enforce no reapportionment plan for Texas Legislative districts or United States congressional districts through 2030 unless and until the plan is precleared under Section 5. *See* 52 U.S.C.A. § 10302(c). Plaintiffs' requested relief is appropriate because this Court's rulings on the challenged 2011 and 2013 redistricting plans satisfy the statutory requirement that a court find "that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political

subdivision." *See id*; *see also* Dkt. 1390 at 59 n.60 ("consideration of the intentional vote dilution claims […]necessary given the request for bail-in relief"); Dkt. 1540 at 80 ("Task Force Plaintiffs' success on their HD90 *Shaw*-claim in Plan H358 require a remedy in Tarrant County."); Dkt. 1600 at 1 ("remedy for the 2020 elections is required for the unconstitutional racial gerrymandering in HD90 found by this Court in Plan H358.").

## BACKGROUND

Task Force and MALC Plaintiffs requested bail-in relief under Section 3(c) in their operative complaints.  Dkt. 891 at ¶¶ 2, 47, 89(d); Dkt. 897 at p. 20, ¶ C.  Specifically, Task Force Plaintiffs requested that the Court, "pursuant to [Section 3(c)], issue an order requiring Texas to preclear its election changes during the ten-year period following the issuance of such order."  Dkt. 891 at ¶ 89(d).  Plaintiff MALC requested "An order requiring all Defendants to comply with . . . the Section 5 preclearance requirements of the Voting Rights Act as provided by Section 3(c) of the Act[.]"  Dkt. 897, at p. 20, ¶ C.

Following trial, this Court concluded in 2017 that Texas violated the Fourteenth Amendment in its 2011 enactment of congressional and state house redistricting plans.  *See* Dkt. 1365 and 1390.  The Court found that Task Force Plaintiffs proved their intentional vote dilution claims under Section 2 Voting Rights Act and the Fourteenth Amendment in the redistricting of state house districts in El Paso County (HD78), Bexar County (HD117), Nueces County (the elimination of HD33 and the configuration of HD32 and HD34), and with regard to Plan H283 as a whole.  Dkt. 1365 at 153.  The Court also found that Task Force Plaintiffs proved their racial gerrymandering claim regarding the 2011 configuration of HD117 in Bexar County.  Dkt. 1365 at 153.  The Court also found that Plaintiff MALC's claims of intentional vote dilution under Section 2 and the Fourteenth Amendment were established in the 2011 redistricting of state

house districts in the elimination of HD 33 in Nueces County (Dkt. 1365 at 40); the drawing of HD 41 (Dkt. 1365 at 43); the drawing of HD 117 in Bexar County (Dkt. 1365 at 32); the drawing of house district in Bell County (Dkt. 1365 at 78); as well as house districts in western Dallas County and Harris County (Dkt. 1365 at 55-57, 69).  With regard to the 2011 congressional plan C185, Task Force Plaintiffs successfully "established a § 2 violation, both in terms of intent and effect, in South/West Texas" and the Dallas-Fort Worth area, and proved their intentional vote dilution and *Shaw*-type racial gerrymandering claims as to CD23 and CD26 (DFW).  Dkt. 1390 at 164-165.  Texas did not appeal this Court's orders finding intentional discrimination in C185 and H283.

After an additional trial, this Court found in favor of Task Force Plaintiffs' racial gerrymandering claim with respect to HD90 in H358.  Dkt. 1540 at 78.  The Supreme Court of the United States affirmed this ruling.  *See Abbott v. Perez*, 138 S.Ct. 2305, 2335 (2018).

Following the Supreme Court's decision in *Abbott v. Perez*, 138 S.Ct. 2305 (2018), this Court requested the parties' positions on whether any issues remained. Dkt. 1586 at 1.  The Court also asked Task Force Plaintiffs and the State to propose a remedy to the racial gerrymander in HD90.  *Id*.  A number of Plaintiffs including Task Force Plaintiffs filed an advisory stating that attorney's fees and costs and Section 3(c) "bail-in" remained as issues.  Dkt. 1595 at 1-2.  This Court ordered further briefing regarding Section 3(c) relief.  Dkt. 1600 at 3.

## LEGAL STANDARD AND HISTORY OF RELIEF UNDER SECTION 3(C)

### I.      Section 3(c)

Under section 3(c) of the Voting Rights Act, if "the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of [any] State or political subdivision, the court, in addition to such relief as it may grant, shall

retain jurisdiction for such a period as it may deem appropriate" during which time the jurisdiction must obtain preclearance prior to implementing changes in its voting practices.[1]   52 U.S.C.A. § 10302(c).  A court that finds violations of Fourteenth or Fifteenth amendments shall, in its discretion, retain jurisdiction for an appropriate period during which the jurisdiction must preclear its voting changes with the U.S. Attorney General or the court.  *See, e.g.*, *Jeffers v. Clinton*, 740 F. Supp. 585, 599-01 (granting section 3(c) bail-in).  Violations of the Fourteenth or Fifteenth amendments are the "triggering condition" for ordering Section 3(c) preclearance.  *See id.* at 592.  Violations can include past or present discriminatory acts by a defendant and need not have been the subject of the litigation in which the section 3(c) remedy is sought.  *See id.* at 591-92.

---

1 Section 3(c) provides:

> If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

52 U.S.C.A. § 10302(c).

In enacting Section 3 (c), Congress intended for bail-in to apply to "the so-called 'pockets of discrimination'—that is, areas outside the States and political subdivisions" subject to Section 5.  *See* H.R. Rep. No. 89-439 (1965), at 2454.  Thus, Section 3(c) safeguards "against the erection of new voting barriers by States or political subdivisions which have already been found to have discriminated," even when those states or political subdivisions had not been required to preclear their election changes under Section 5.  *Id*. at 2455; S. Rep. No. 89-162, at 2458 (1965) (contains identical language to the House Report).

Both intentional vote dilution and *Shaw*-type racial gerrymandering warrant section 3(c) relief.  *See Jeffers*, 740 F. Supp. at 592 ("phrase 'violations of the fourteenth or fifteenth amendment'[..]is not limited at all").  For example, in *Jeffers v. Clinton*, a federal district court bailed in the State of Arkansas using section 3(c) after the court found that the state legislature had adopted majority-vote requirements for local elections for racially discriminatory purposes.  *Jeffers*, 740 F. Supp. at 595, 601-02 (enactment of the majority vote requirements was "a systematic and deliberate attempt to reduce black political opportunity.")  *Jeffers*, 740 F. Supp. at 595.  In *Patiño v. Pasadena*, a federal district court imposed section 3(c) preclearance after a finding of intentional dilution of Latino voting strength when a city changed its method of election.  *See Patiño v. City of Pasadena*, 230 F. Supp. 3d 667, 729 (S.D. Tex. 2017), *judgment entered*, No. CV H-14-3241, 2017 WL 10242075 (S.D. Tex. Jan. 16, 2017).

In *Jeffers*, the court established a six-factor analysis for determining when the section 3(c) remedy is appropriate:

> Have the violations been persistent and repeated? Are they recent or distant in time? Are they the kinds of violations that would likely be prevented, in the future, by preclearance? Have they already been remedied by judicial decree or otherwise? How likely are they to recur? Do political developments, independent of this litigation, make recurrence more or less likely?

*Jeffers*, 740 F. Supp. at 601.  The *Jeffers* court also carefully weighed the constitutional right to vote against the state's sovereignty interest and concluded that requiring preclearance was appropriate because the state's intentional racial discrimination in voting required "strong action."  *Id*.

## II.     Courts' Use of Section 3(c)

As Task Force Plaintiffs described in their July, 22, 2013 Advisory [Dkt. 823 at 4-8], between 1979 and 2007, courts ordered section 3(c) remedies in two states (Arkansas and New Mexico), twelve counties, two cities, and two school districts.  *See* Dkt. 823, App. A; *see also* Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale L.J. 1992, 2010 (2010).  Courts have tailored section 3(c) remedies both with respect to the time period and the scope of election changes subject to preclearance.  *See* Dkt. 823 at 5.  For example, New Mexico signed a consent decree, following protracted litigation, under which the state was required to preclear its redistricting plans for 10 years. Crum, *Pocket Trigger* at 2011-12 (citing *Sanchez v. Anaya*, No. 82-0067M, slip op. P 8 (D.N.M. Dec. 17, 1984) (consent decree); s*ee also* Consent Decree, *United States v. Village of Port Chester*, No. 06-15173 (S.D.N.Y. Dec. 22, 2009) (Dkt. 119 at 5-6).

Following the Supreme Court's in *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), federal courts have bailed in two jurisdictions—Evergreen, Alabama, and Pasadena, Texas— under section 3(c).[2]  *See* Edward K. Olds, *More Than "Rarely Used": A Post-Shelby Judicial Standard for Section 3 Preclearance*, 117 Colum. L. Rev. 2185, 2197 (2017).  In *Patiño v. Pasadena*, the district court concluded "that Pasadena officials intentionally discriminated against Latinos in diluting their voting strength" and ordered Pasadena to submit future

---

[2] *See Allen v. City of Evergreen*, Civil No. 13–107, Docket Entry No. 82 (S.D. Ala. Jan. 13, 2014) (agreed bail-in order.

redistricting changes for preclearance through the 2020 redistricting cycle.  *Patiño v. City of Pasadena*, 230 F. Supp. 3d at 729, *judgment entered*, No. CV H-14-3241, 2017 WL 10242075 (S.D. Tex. Jan. 16, 2017).  *See also id.* at 728 (concluding that Pasadena had "violated the Fourteenth Amendment's guarantee of equal protection by intentionally discriminating against Latinos and disproportionately diluting their voting power" by converting two single member districts to at-large seats).

The court in *Patiño* ordered that it would retain "jurisdiction for six years to review before enforcement any change to the election map or plan that was in effect in Pasadena" prior to the unconstitutional change to the electoral system.  *Patino v. City of Pasadena*, No. CV H-14-3241, 2017 WL 10242075, at *2 (S.D. Tex. Jan. 16, 2017).  The court noted that preclearance was "particularly appropriate because the City seized on, and used, the absence of preclearance to avoid the statutory and constitutional limits on redistricting."  *Patiño*, 2017 WL 10242075, at *2.

## **ARGUMENT**

### I.       **Relief Under Section 3(c) is Appropriate in This Case**

A section 3(c) remedy is appropriate here because Texas committed constitutional violations that section 3(c) is meant to address and because examination of those violations under the *Jeffers* factors indicates that such relief is appropriate.  This Court has concluded that Texas's intentional dilution of Latino voting strength and placing of Latino voters into or out of districts based on their race violated the Fourteenth Amendment.  *See* Dkt. 1340, 1364, 1365, and 1390. The circumstances surrounding these violations of the Fourteenth Amendment demonstrate that bail-in relief is necessary to protect Latino voters' rights.

a.  Texas violated the Fourteenth Amendment by intentionally diluting minority voting power and racially gerrymandering districts

The widespread and systematic nature of the Fourteenth Amendment violations in the 2011 congressional and state house redistricting plans demonstrates that Texas sought to thwart growing Latino voting strength across the state.

This Court found that the 2011 enactment (Plan H283) overall was "the product of intentional vote dilution."  Dkt. 1365 at 82-33.  Regional examples showed how Plan H283 reduced minority opportunity despite "massive minority population growth."  *See* Dkt. 1365 at 84.  In El Paso, the Court found that Texas manipulated State House districts by "surgically" splitting multiple precincts, the purpose of which "was to increase the SSVR while simultaneously ensuring that election success rates remained minimally improved for Latinos." Dkt. 1365 at 27.  In Bexar County, the Court concluded that Texas "drew [HD117] to increase SSVR while intentionally minimizing any gains in Latino electoral performance."  *Id*. at 30.  In Nueces County, the  Court found that mapdrawers "intentionally diluted Latino voting strength by eliminating HD33 in Nueces County" and by ignoring Voting Rights Act and state law redistricting considerations in their quest to create no new opportunity districts.  *Id*. at 40.  The Court found that Texas intentionally diluted Latino voting strength in Harris County because "mapdrawers were using [] superficial compliance as a tool to avoid creating any new minority opportunity districts (more specifically, to defend their failure to create any) and to mask the loss of HD33 as an existing opportunity district."  *Id*. at 57.  In the Rio Grande Valley, the Court found that Texas mapdrawers "intentionally manipulated the SSVR and total population to dilute the Latino vote in HD41 in order to protect an incumbent who they believed would no longer be the Latino candidate of choice given his decision to switch parties."  *Id*. at 46.  Similarly, in Bell County, the Court found that "mapdrawers (specifically Aycock) intentionally racially gerrymandered the districts to dilute the minority vote by moving minority population out of

HD54 and moving Anglo population in, thus cracking and diluting the minority vote to ensure Anglo control over both districts." *Id*. at 76, 78.

Texas similarly limited Latino voting opportunity in congressional Plan C185.  In CD23, Texas acted with the "intent to provide Hispanic voters less opportunity to participate in the political process and elect their candidates of choice."  Dkt. 1390 at 29.  Texas's mapdrawer "used race to increase the SSVR and HCVAP of CD23 to create the facade of a Latino opportunity district, while he intentionally manipulated Hispanic voter cohesion and turnout to reduce the performance of the district for Hispanic candidates of choice."  *Id*. at 22.  The State's creation of that façade in CD23, including splitting a county with higher Latino voter turnout, formed the basis of the *Shaw*-type racial gerrymandering violation found by the Court.  *See id*. at 30-32.  The Court also found that Texas intentionally diluted Latino voting strength and placed voters in voting districts based on race in Nueces County and the Dallas-Fort Worth Metroplex. *Id.*  at 57-58, 108, 165.

Texas's systematic creation of district boundaries to disadvantage the growing Latino electorate warrants bail in relief.  *See, e.g. Patiño*, 2017 WL 10242075, at *2 n.4 (section 3(c) preclearance "ensures the City cannot immediately return to a map and plan that thwarts Latinos on the cusp of an electoral majority.").

In 2013, even when limiting itself to a handful of amendments to the interim state house redistricting plan, Texas again failed to avoid discriminating against Latino voters.  As the Supreme Court concluded, Texas violated the Fourteenth Amendment's prohibition on drawing districts with race as a predominant factor and without a compelling interest.  *See Abbott v. Perez*, 138 S.Ct. at 2335; *see also* Dkt. 1540 (Order on H358) at 78.  Section 3(c) relief applies to *Shaw* racial gerrymandering because such gerrymandering violates the Fourteenth Amendment

by discriminating against voters on the basis of their race.   The essential legal principle underlying a *Shaw* claim is that the Equal Protection Clause of the Fourteenth Amendment prohibits a jurisdiction from "separat[ing] its citizens into different voting districts on the basis of race," without a compelling state interest.   *See Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) *citing Miller v. Johnson*, 115 S. Ct. 2475, 2486 (1995).

Texas's violations of the Fourteenth Amendment across the state in 2011 and 2013 are exactly the type of violations that Congress had in mind when it enacted Section 3(c).

> b.   Circumstances surrounding Texas's violations in 2011 and 2013 justify 3(c) relief under *Jeffers* factors

The *Jeffers* factors support ordering 3(c) relief in this case.   Texas's violations of the Fourteenth Amendment in redistricting in 2011 and 2013 (1) have been persistent and repeated and (2) are the kind that would be prevented by preclearance in the future.   *See Jeffers*, 740 F. Supp. at 601.   Since the expansion of section 5's preclearance requirement to Texas in 1975, Texas has enacted one or more racially discriminatory redistricting plans in each redistricting cycle.   *See* Dkt. 823 at 9-10, n.5.   The violations have been repetitive and persistent.   For example, Texas enacted three discriminatory redistricting plans in just over one decade.   *See* Dkt. 1365, 1390, 1540; *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 403, 440 (2006) (Texas in 2003 "took away the Latinos' opportunity because Latinos were about to exercise it [and this redistricting] bears the mark of intentional discrimination").

This same history demonstrates that preclearance is an effective mechanism for preventing racial discrimination in Texas because it has worked in the past.   *See id.* (noting that preclearance blocked discriminatory redistricting plans in 1991, 2001 and 2011).

Texas's intentional discrimination in redistricting has also been recent.   *See Jeffers*, 740 F. Supp. at 601 ("Are [violations] recent or distant in time?").   This Court concluded that Texas

enacted intentionally discriminatory redistricting plans in the most recent redistricting cycle and also in a mid-decade redistricting in 2013, the latter of which is still in effect.  *Id*. at 594, 601 (legislation "subjecting municipal offices in all cities and towns to a majority-vote requirement" the year before decision established "beyond a doubt" that violations were recent").

Not all of the violations of the Fourteenth Amendment have been remedied by judicial decree.  *See Jeffers*, 740 F. Supp. at 601 (asking if violations have been remedied).  The racial gerrymander of HD90 in 2013 has yet to be remedied by Texas.  Even after the Supreme Court's affirmance of this Court's finding of racial gerrymandering, Texas filed an advisory stating that no remedy was necessary.  The Court ordered that it would take up a remedy for HD90 if the Texas Legislature does not take up a bill remedying HD90 by the 45th day of the next regular legislative session.  As of now, HD90 remains unrepaired.

Moreover, Texas is likely to discriminate against Latino voters again.  The circumstance that motivated the recent discriminatory redistricting plans—substantial growth of the Latino community—is unlikely to slow.  *See Jeffers*, 740 F. Supp. at 601 (asking whether violations are likely to recur).  The State's leadership has not indicated a change in course.  In fact, the Texas Attorney General who provided legal advice in support of the discriminatory 2011 redistricting plans became the Governor who signed the discriminatory 2013 state house redistricting plan into law.  Governor Abbott will be the State's chief executive in 2021 when Texas takes up redistricting again.[3]

Finally, there is no court order presently in place to prevent Texas from violating Latino voters' constitutional rights in redistricting.  *See, e.g., Sanchez v. Anaya*, No. 82-0067M (D.N.M. Dec. 17, 1984) (consent decree).

---

[3] "Greg Abbott wins 2nd term as statewide GOP candidates sweep," Austin-American Statesman, https://www.statesman.com/news/20181106/greg-abbott-wins-2nd-term-as-statewide-gop-candidates-sweep (updated Nov. 7, 2018) (accessed Nov. 17, 2018) ("Gov. Greg Abbott was elected to a second term Tuesday…").

For these reasons, under the *Jeffers* factors, section 3(c) bail-in is appropriate here.

## II. Appropriate Relief Includes Preclearance of Reapportionment Until 2030

Because *Jeffers* calls for a balance of state sovereignty and voters' rights, Plaintiffs note that Section 3(c) relief requiring preclearance of redistricting plans is more limited than the broader preclearance that section 4 of the Voting Rights Act imposed on Texas. *See Jeffers*, 740 F. Supp. At 601 (court balanced "the interest of the plaintiffs in vindication of their constitutional right to vote, […] and the interest of the defendants in maintaining the sovereignty of the State."). However, preclearance for a decade of redistricting (including mid-decade redistricting) is an important first step toward protecting minority voters in the next decade.

Litigating claims of intentional vote dilution and racial gerrymandering is costly and time-consuming for voters. The instant litigation began in 2011, included two appeals to the U.S. Supreme Court, and the case is in the remedial stage 7 years later. Most if not all of this cost and delay would have been avoided by Section 5 preclearance. To the extent that bail-in constitutes "a departure from the fundamental principle of equal sovereignty," bail-in is justified by "current needs." *See Shelby Cty*, 133 S. Ct. at 2622 (when considering question of departure from equal sovereignty, "current burdens and must be justified by current needs"). Bail-in is also appropriate because the State's Latino voters continue to struggle to close the gap in registration and voting when compared to Anglo voters. *Compare* Dkt. 1390 (due to a history of discrimination, Latinos in Texas have "lower rates of voter registration, voting, and running for elective office") *with Shelby Cty*, 133 S. Ct. at 2625 ("[v]oter turnout and registration rates now approach parity," and "minority candidates hold office at unprecedented levels").

Bail-in of Texas through 2030 will also prevent a mid-decade redistricting designed to thwart growing Latino voting strength. *See Patiño*, 2017 WL 10242075, at *2 (six-year period

of preclearance ensured "the City cannot immediately return to a map and plan that thwarts Latinos on the cusp of an electoral majority.").  Task Force Plaintiffs requested 10 years in their complaint, but section 3(c) relief requiring preclearance of all reapportionment plans until 2030 (11 years from 2019) would cover the period until the next Census is conducted.

## CONCLUSION

Section 3(c) of the Voting Rights Act serves an important purpose in preventing discrimination where it has occurred recently and persistently, and such relief is appropriate and necessary in this case.  Task Force and MALC Plaintiffs respectfully request that the Court require preclearance, under section 3(c), of all redistricting plans enacted by the State of Texas until 2030.

DATED: November 30, 2018                    Respectfully submitted,

MEXICAN AMERICAN LEGAL DEFENSE
 AND EDUCATIONAL FUND

*/s/ Nina Perales*
Nina Perales
TX Bar No. 24005046
Ernest I. Herrera
TX Bar No. 24094718
*Denise Hulett
CA Bar No. 121553
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
FAX (210) 224-5382
Admitted *Pro Hac Vice*

COUNSEL FOR PLAINTIFFS TEXAS
LATINO REDISTRICTING TASK
FORCE, RUDOLFO ORTIZ, ARMANDO
CORTEZ, SOCORRO RAMOS,
GREGORIO BENITO PALOMINO,
FLORINDA CHAVEZ, CYNTHIA
VALADEZ, CESAR EDUARDO
YEVENES, SERGIO CORONADO,

GILBERTO TORRES, RENATO DE LOS
SANTOS, JOEY CARDENAS, ALEX
JIMENEZ, EMELDA MENENDEZ,
TOMACITA OLIVARES, JOSE
OLIVARES, ALEJANDRO ORTIZ, AND
REBECCA ORTIZ


*/s/ Jose Garza*
JOSE GARZA
Texas Bar No. 07731950
Law Office of Jose Garza
7414   Robin Rest Dr.
San Antonio, Texas 78209 (210) 392-2856
garzpalm@aol.com

Martin Golando
The Law Office of Martin Golando
405 N. St. Mary's, Suite 700
San Antonio, Texas 78209
210-892-8543

Attorneys for the Mexican American Legislative
Caucus


## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of November, 2018, I served a copy of the foregoing document on all counsel who are registered to receive NEFs through this Court's CM/ECF system. All attorneys who are not registered to receive NEFs have been served via email.

*/s/ Ernest I. Herrera*
Ernest I. Herrera