# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

| | |
|---|---|
| SHANNON PEREZ, *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION NO. |
| v. | SA-11-CA-360-OLG-JES-XR |
| STATE OF TEXAS, *et al.*, | [Lead case] |
| *Defendants.* | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST FOR RELIEF UNDER SECTION 3(C) OF THE VOTING RIGHTS ACT

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
  Attorney General

BRANTLEY STARR
Deputy First Assistant
  Attorney General

DARREN L. MCCARTY
Deputy Attorney General
  for Litigation

PATRICK K. SWEETEN
Senior Counsel for Civil Litigation

MATTHEW H. FREDERICK
Deputy Solicitor General

TODD LAWRENCE DISHER
Special Counsel for Civil Litigation

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-6407
Fax: (512) 474-2697

COUNSEL FOR DEFENDANTS

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. ii

Introduction ........................................................................................................ 1

    I.    The Plaintiffs Are Not Entitled to Section 3(c) Relief on Their Claims Against the Repealed 2011 Plans. .................................... 4

        A.    Because the 2011 plans were repealed and never implemented, the plaintiffs were never injured, and the Court never acquired subject-matter jurisdiction to enter judgment on the plaintiffs' claims. ...................................... 4

        B.    Even if claims against the 2011 plans were live, they could not support bail-in because the plaintiffs cannot secure equitable relief. ................................................................ 9

    II.    Section 3(c) Bail-In Is Not an Appropriate Remedy for Racial Gerrymandering in HD 90. ........................................................... 13

    III.    This Case Does Not Present the Extraordinary Circumstances Necessary to Justify Bail-in ......................................................... 16

        A.    Preclearance is appropriate only to combat pervasive, flagrant, rampant, and widespread discrimination against minority voters. ............................................................... 16

        B.    The plaintiffs cannot make the necessary showing of pervasive, flagrant, rampant, and widespread discrimination. ................................................................ 19

Conclusion .......................................................................................................... 26

Certificate of Service ......................................................................................... 267

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ...................................................................................*passim*

*Ala. State Fed'n of Labor, Local Union No. 103, United Bhd. of Carpenters &*
*Joiners of Am. v. McAdory,* 325 U.S. 450 (1945) ........................................ 12

*Arizonans for Official English v. Arizona,*
520 U.S. 43 (1997)................................................................................................. 5

*Beer v. United States,*
425 U.S. 130 (1976) ................................................................................... 18, 25

*Branch v. Smith,*
538 U.S. 254 (2003) .................................................................................... 4-5

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ................................................................................... 14, 23

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)............................................................................................. 10

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) ........................................................................................... 21

*Clinton v. Jeffers,*
498 U.S. 1129 (1991) .......................................................................................... 3

*Comm. on Judiciary of U.S. House of Representatives v. Miers,*
542 F.3d 909 (D.C. Cir. 2008) (per curiam)............................................. 11

*Connor v. Waller,*
421 U.S. 656 (1975) (per curiam) ............................................................... 5

*Davis v. Abbott,*
781 F.3d 207 (5th Cir. 2015)........................................................................... 6

*Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.,*
404 U.S. 412 (1972) (per curiam) ............................................................... 7

*Golden v. Zwickler,*
394 U.S. 103 (1969) ................................................................................... 11, 12

*Iron Arrow Honor Soc'y v. Heckler,*
464 U.S. 67 (1983) (per curiam) ................................................................. 5

*Jeffers v. Clinton*,
   740 F. Supp. 585 (E.D. Ark. 1990) ........................................................ 3, 22

*LULAC v. Perry*,
   548 U.S. 399 (2006) ................................................................................. 21

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................................. 10

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ................................................................................. 12

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193 (2009) ............................................................................. 3, 14

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ................................................................................. 11

*Perez v. Abbott*,
   253 F. Supp. 3d 864 (W.D. Tex. 2017) ................................................... 6

*Presley v. Etowah County Comm'n*,
   502 U.S. 491 (1992) ................................................................................. 16

*Shaw v. Reno*,
   509 U.S. 630 (1993) ........................................................................... 14, 15

*Shelby County v. Holder*,
   570 U.S. 529 (2013) ..........................................................................*passim*

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ....................................................................17, 19, 25

*Spencer v. Kemna*,
   523 U.S. 1 (1998) ..................................................................................... 13

*Terrazas v. Clements*,
   537 F. Supp. 514 (N.D. Tex. 1982) ........................................................ 20

*Tex. Emp'rs' Ins. Ass'n v. Jackson*,
   862 F.2d 491 (5th Cir. 1988) (en banc) ................................................. 11

*Thomas v. Bush*,
   No. 1:95-cv-186 (W.D. Tex. Sept. 15, 1995) .......................................... 20

*United Pub. Workers of Am. (C.I.O.) v. Mitchell*,
   330 U.S. 75 (1947) ................................................................................... 12

*United States v. W.T. Grant Co.*,
   345 U.S. 629 (1953) ................................................................................. 10

*United Transp. Union v. State Bar of Mich.*,
401 U.S. 576 (1971) ............................................................................... 11

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) (en banc) .................................................. 22

*Veasey v. Abbott*,
888 F.3d 792 (5th Cir. 2018)................................................................. 6, 7

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ................................................................................ 8

*Walls v. Miss. State Dep't of Pub. Welfare*,
730 F.2d 306 (5th Cir. 1984)................................................................. 11

*White v. Regester*,
412 U.S. 755 (1973) .............................................................................. 20

*White v. Weiser*,
412 U.S. 783 (1973) .............................................................................. 20

## Constitutional Provisions and Statutes

U.S. Const. amend. XIV ................................................................... 10, 14

U.S. Const. amend. XV .................................................................... 10, 14

52 U.S.C. § 10302(c) ....................................................................2, 9, 13

52 U.S.C. § 10303(f)(2)......................................................................... 2

Act of May 31, 1975, 64th Leg., Ch. 537, 1975 Tex. Gen. Laws 1390 ...................... 20

Act of May 10, 1983, 68th Leg., R.S., Ch. 185, 1983 Tex. Gen. Laws
756 ........................................................................................................ 20

Act of May 28, 1983, 68th Leg., R.S., Ch. 531, 1983 Tex. Gen. Laws
3086 ...................................................................................................... 20

Act of May 8, 1997, 75th Leg., Ch. 133, R.S., 1997 Tex. Gen. Laws 258 ................. 20

Tex. Elec. Code § 172.023(a)............................................................... 21

## Other Authorities

*Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76
Fed. Reg. 7470 (Feb. 9, 2011)............................................................... 15

H.R. Rep. No. 89-439, Additional Views of the Honorable William T.
Cahill, reprinted in 1965 U.S.C.C.A.N. 2437 (1965)............................... 18

Jonathan L. Entin, *Judicial Selection and Political Culture*, 30 Cap. U. L.
Rev. 523 (2002) .................................................................................... 18

New York Times, June 9, 1963, § 6 (Magazine), p. 80, col. 4 ...................................... 18

Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209 (2010) ......................................................................................................... 10

Note*, The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale L.J. 1992 (2010) ............................................................ 3

Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After* Tennessee v. Lane, 66 Ohio St. L.J. 177 (2005)........................................................................................................................... 22

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

|  |  |
|---|---|
| SHANNON PEREZ, *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION NO. |
| v. | SA-11-CA-360-OLG-JES-XR |
| STATE OF TEXAS, *et al.*, | [Lead case] |
| *Defendants.* | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST FOR RELIEF UNDER SECTION 3(C) OF THE VOTING RIGHTS ACT

Before a court can upset the constitutional balance by stripping the State of its sovereignty to enact voting laws, it must identify a congruent and proportional constitutional violation—specifically, that Texas has engaged in rampant, widespread, recalcitrant discrimination that is akin to what originally justified the preclearance regime in 1965 and cannot be adequately addressed by traditional judicial remedies. That is far from the case here. The plaintiffs base their request for preclearance primarily on redistricting plans that were enacted in 2011, that were never used to conduct an election, and that were repealed and replaced in 2013. The Supreme Court has held that the plans enacted in 2013 do not have the purpose or effect of denying or abridging minority voting rights. The only constitutional flaw in the existing plans

1

relates to the consideration of race in a single Texas House district to avoid dilution of Hispanic voting strength.

This case demonstrates that traditional litigation is more than adequate to identify and prevent violations of the Constitution. The Court has not hesitated to identify potential constitutional violations, and the Texas Legislature has acted promptly to address them. This shows that the State of Texas will amend its voting laws to avoid constitutional violations, not persist in evading court decrees to deprive citizens of their voting rights. The State's actions do not justify an order subjecting the State to preclearance under section 3(c) of the Voting Rights Act.

Section 3(c) provides that "[i]f in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred . . . , the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate" to ensure that no voting practice "different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that [the practice] does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or [because of membership in a language minority group]." 52 U.S.C. § 10302(c) (citation to 52 U.S.C. § 10303(f)(2) omitted). This remedy, known as "bail-in," places a State into federal receivership by automatically blocking

2

new laws related to voting and requiring the State to secure "preclearance" from federal officials before the new laws can take effect.

The text of section 3(c) makes clear that "bail-in" may be ordered only in limited circumstances. First, the U.S. Attorney General or an "aggrieved person" must initiate a lawsuit to enforce the "voting guarantees" of the Fourteenth or Fifteenth Amendment. Second, the court must find violations of the Fourteenth or Fifteenth Amendment. Third, the court must determine that the constitutional violations justify equitable relief. Fourth, the court must grant equitable relief to the plaintiffs.

Those conditions are necessary but not sufficient to justify preclearance. Preclearance is an extraordinary remedy that entails "a drastic departure from basic principles of federalism." *Shelby County v. Holder*, 570 U.S. 529, 535 (2013). Although the Supreme Court has never addressed bail-in under section 3(c),[1] it has held that the very existence of a preclearance requirement raises serious constitutional questions; therefore, courts must construe narrowly any statute that authorizes preclearance. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205-06 (2009). In striking down the preclearance coverage formula in section 4 of the Voting Rights Act, the

---

[1] *See* Note, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale L.J. 1992, 2013 n.133 (2010) ("The pocket trigger remains an issue of first impression for the Supreme Court."). The State of Arkansas appealed to the Supreme Court after a three-judge district court retained jurisdiction under section 3(c) to conduct preclearance of laws relating to majority-vote requirements in general elections. *See Jeffers v. Clinton*, 740 F. Supp. 585, 601 (E.D. Ark. 1990). The appeal was later dismissed. *See Clinton v. Jeffers*, 498 U.S. 1129 (1991) (dismissing pursuant to Supreme Court Rule 46, which provides for dismissal upon agreement of the parties or motion by petitioner or appellant).

Supreme Court held that "preclearance" remedies must be reserved for extraordinary situations, in which a jurisdiction is guilty of "'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination" that cannot be remedied through normal litigation. *Shelby County*, 570 U.S. at 554. The plaintiffs cannot possibly make that showing here, and bail-in cannot be an appropriate remedy.

## I.   THE PLAINTIFFS ARE NOT ENTITLED TO SECTION 3(C) RELIEF ON THEIR CLAIMS AGAINST THE REPEALED 2011 PLANS.

### A.   Because the 2011 plans were repealed and never implemented, the plaintiffs were never injured, and the Court never acquired subject-matter jurisdiction to enter judgment on the plaintiffs' claims.

The plaintiffs' effort to bail the State into preclearance based on the Legislature's 2011 redistricting plans fails because they cannot establish a constitutional violation. That is so for three reasons. First, because the plans were never precleared, they never became effective, and the plaintiffs' claims against them never became ripe. Second, even if the plaintiffs' claims somehow became ripe despite the lack of preclearance, those claims were moot as soon as the Legislature repealed the 2011 plans in 2013. Third, because the 2011 plans were never implemented, they never affected the plaintiffs and therefore could not have deprived them of their constitutional rights.

The 2011 plans cannot serve as the predicate for section 3(c) bail-in because they are not the subject of a justiciable "Case[]" or "Controvers[y]" within the meaning of Article III. As long as the State's plans were not precleared, the statutory and constitutional claims against them were not ripe. *See Branch v. Smith*, 538 U.S. 254, 283

4

(2003) (Kennedy, J., concurring) ("Once the District Court found no preclearance, it was premature, given this statutory scheme, for the court to consider the constitutional question. . . . Absent preclearance, a voting change is neither effective nor enforceable as a matter of federal law."); *Connor v. Waller*, 421 U.S. 656, 656 (1975) (per curiam) ("Those Acts are not now and will not be effective as laws until and unless cleared pursuant to § 5. The District Court accordingly also erred in deciding the constitutional challenges to the Acts based upon claims of racial discrimination."). And until the State's plans had been precleared, they did not cause any injury to individual plaintiffs. *Branch*, 538 U.S. at 284 (Kennedy, J., concurring) (noting that a constitutional claim against an unprecleared state plan was not reviewable: "The plan was not yet precleared and so could not cause appellees injury through enforcement or implementation.").

Even if the plaintiffs' claims against the 2011 plans had become ripe at some point, those claims were unquestionably mooted when the 2011 plans were repealed. "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (per curiam). And Article III requires that "an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). The 2011 plans never injured the plaintiffs because they were never implemented, and they cannot injure plaintiffs now or at any certainly impending point in the future because they have been repealed for more than five years. The Supreme Court's decision in

5

*Abbott v. Perez* refutes any argument that claims against the 2011 plans remained live because certain districts were incorporated in the Legislature's 2013 redistricting plans.[2] MALC, LULAC, and the NAACP Plaintiffs were therefore right to concede in the Supreme Court that "any challenge to the continued use of Plan H283 would be moot." Motion to Dismiss or Affirm of Appellees Mexican American Legislative Caucus, et al. at 1, *Abbott v. Perez*, 138 S. Ct. 2305 (2018) (No. 17-626), 2017 WL 5953490. That is equally true of their challenge to Plan C185, and it forecloses their use of the 2011 plans to establish the predicate constitutional violations required before considering a potential bail-in remedy under section 3(c).

Recent Fifth Circuit authority confirms that the plaintiffs' claims against the 2011 plans are moot. In *Davis v. Abbott*, 781 F.3d 207, 220 (5th Cir. 2015), the Fifth Circuit held that claims against Texas's 2011 Senate redistricting plans "became moot" when the 2013 Legislature "repealed the 2011 plan and adopted the district court's interim plan in its place." *See also Perez v. Abbott*, 253 F. Supp. 3d 864, 974-82 (W.D. Tex. 2017) (Smith, J., dissenting). The Fifth Circuit's recent decision in the Texas voter-ID litigation, *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018), does not support the plaintiffs' attempt to avoid that conclusion. There, the court recognized that "[o]rdinarily, a

---

[2] Although the Supreme Court declined to address the merits of the plaintiffs' voluntary-cessation argument, 138 S. Ct. 2305, 2317 n.8 (2018), it recognized that the plaintiffs' claims against the 2011 plans were moot, *see id.* at 2328 n.22 ("The 2013 Legislature had no reason to believe that the District Court would spend four years examining moot plans before reversing its own previous decisions by imputing the intent of the 2011 Legislature to the 2013 Legislature.").

6

lawsuit challenging a statute would become moot by the legislature's enactment of a superseding law." *Id.* at 799 (citing *Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414 (1972) (per curiam)). It found that "[t]his *appeal* is not moot," *id.* (emphasis added), because the district court had enjoined the State's existing voter-ID law, which had been amended to remedy the plaintiffs' claims against the previous statute. The Fifth Circuit's conclusion that it had jurisdiction to review a permanent injunction against an existing statute does not imply that the plaintiffs' claims against the repealed 2011 plans remain live.

If anything, the Texas voter-ID litigation confirms that the plaintiffs are not entitled to any relief, let alone bail-in, on their claims against the repealed 2011 plans. There, the Fifth Circuit reversed and rendered the district court's injunction, holding that the Legislature's amendment to the voter-ID statute provided "a generous, tailored remedy" for the plaintiffs' claims. *Id.* at 801. And because the State acted promptly to address claims that the preexisting law had a discriminatory effect, the Fifth Circuit held that there was "no equitable basis for subjecting Texas to ongoing federal election scrutiny under Section 3(c)." *Id.* at 804. Consistent with the Fifth Circuit's order, the district court then entered final judgment dismissing the plaintiffs' claims. *See* Final Judgment, *Veasey v. Abbott*, No. 2:13-cv-193 (S.D. Tex. Sept. 17, 2018), ECF No. 1125.

The plaintiffs' request for bail-in under section 3(c) does not change the jurisdictional analysis. Bail-in is not a claim for relief; it is a supplemental remedy. The right to a remedy does not arise until the plaintiff prevails on a live claim, and thus

cannot substitute for Article III injury. As the Supreme Court has held, "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). In *Vermont Agency*, the Court rejected the notion that a *qui tam* relator's interest in recovering a monetary reward can provide Article III standing, explaining that the relator's bounty for bringing the *qui tam* suit is not related to any concrete injury-in-fact to the relator. To provide standing "[t]he interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right." *Id.* at 772. A *qui tam* relator's potential bounty cannot provide standing because it does not remedy an invasion of the relator's personal legal rights—"the 'right' he seeks to vindicate does not even fully materialize until the litigation is completed and the relator prevails." *Id.* at 772-73.

The same goes for a voting-rights plaintiff's interest in seeing a State bailed into preclearance under section 3(c). The "right" to seek bail-in does not materialize until the litigation concludes and a plaintiff prevails on the merits of a constitutional claim that satisfies Article III's case-or-controversy requirement. Here, any threat of injury from the 2011 redistricting plans disappeared when the Legislature repealed them. The prophylactic remedy of bail-in cannot substitute for the lack of an Article III injury. Without an Article III injury, the plaintiffs cannot secure a judgment on their claims against the 2011 plans; without a judgment, the plaintiffs cannot secure equitable relief; and without equitable relief against the 2011 plans, those plans cannot provide the

8

foundation for bail-in under section 3(c). *See* 52 U.S.C. § 10302(c) ("If . . . the court finds that violations of the fourteenth or fifteenth amendment *justifying equitable relief* have occurred within the territory of such State or political subdivision, the court, *in addition to such relief as it may grant*, shall retain jurisdiction . . . ." (emphases added)).

### B. Even if claims against the 2011 plans were live, they could not support bail-in because the plaintiffs cannot secure equitable relief.

The plaintiffs' argument for bail-in would fail even if the Court had jurisdiction, and even if the plaintiffs could prove a constitutional violation, because any violation based on the 2011 plans would not meet the statutory criteria for bail-in. Section 3(c) expressly requires that the Court find "violations of the fourteenth or fifteenth amendment justifying equitable relief." *Id.* To satisfy this statutory precondition, the plaintiffs must point to an existing constitutional violation that demands the exercise of the Court's equitable powers to stop it. The plaintiffs cannot satisfy this requirement because the statutes creating the 2011 plans no longer exist.

Even if the Court could somehow exercise jurisdiction over claims against the 2011 plans, it would be impossible to find that "violations of the fourteenth or fifteenth amendment . . . *have occurred*" as a result of those plans. *See* 52 U.S.C. § 10302(c) (emphasis added). The 2011 plans were never precleared, and they were never used to conduct an election. Violations of the Fourteenth or Fifteenth Amendments do not occur until a State actually "deprive[s]" or "den[ies]" a person of due process or equal protection, or "denie[s]" or "abridge[s]" a citizen's right to vote on account of race. *See*

U.S. Const. amends. XIV, § 1, XV, § 1. The enactment of a law subject to a preclearance requirement does not result in a "violation" of the Fourteenth or Fifteenth Amendment, and the 2011 plans were repealed before they could "deprive" or "deny" or "abridge[]" the rights of any person or citizen. *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1260-61 (2010) (contrasting the First Amendment, which is violated upon the enactment of a speech-restricting law, with the remaining provisions of the Bill of Rights, which are not violated until the executive acts). The plaintiffs are not "aggrieved" by the 2011 plans because the plans never applied to the plaintiffs.

And even if the plaintiffs could somehow establish a constitutional violation, they could not show that equitable relief is necessary to prevent some future harm. "The purpose of an injunction is to prevent future violations . . . . But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 n.3 (1994) ("Under general equity principles, an injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a 'cognizable danger of recurrent violation.'" (quoting *W.T. Grant*, 345 U.S. at 633)); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement

10

that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974))); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 584 (1971) ("An injunction can issue only after the plaintiff has established . . . that the defendant, if not enjoined, will engage in such conduct."); *Walls v. Miss. State Dep't of Pub. Welfare*, 730 F.2d 306, 325 (5th Cir. 1984) ("Ordinarily, a court may not enjoin conduct that is neither threatened nor imminent."). If plaintiffs cannot make that showing, then courts should withhold prospective relief even if they have subject-matter jurisdiction.

A declaratory judgment against the repealed 2011 plans is also improper. Declaratory relief is not appropriate to address a challenged law, policy, or contract where there is no threat of enforcement.[3] In *Golden v. Zwickler*, 394 U.S. 103 (1969), for example, the plaintiff challenged a New York law that prevented him from "distribut[ing] anonymous literature" about a specific congressman. *Id.* at 104. During the pendency of litigation, however, the congressman left politics with no plans to return. *Id.* at 106. Nonetheless, the district court declared the challenged law unconstitutional. *Id.* at 107. The Supreme Court reversed, holding that the district court

---

[3] A declaratory judgment against a government official "is the functional equivalent of an injunction," *Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (per curiam). Thus, where an injunction against government officials is barred, so is a declaratory judgment. *See, e.g.*, *Tex. Emp'rs' Ins. Ass'n v. Jackson*, 862 F.2d 491, 506 (5th Cir. 1988) (en banc).

should have dismissed the claim. *Id.* at 108, 110. "It was not enough," the Court explained, that the plaintiff desired an "adjudication of unconstitutionality." *Id.* at 109. Rather, because the plaintiff was no longer at risk of being subject to the law, there was no longer "a substantial controversy . . . of sufficient immediacy . . . to warrant the issuance of a declaratory judgment." *Id.* at 108. Put simply, "[i]t would be an abuse of discretion for this Court to make a pronouncement on the [validity] of a state statute," unless "it plainly appeared" necessary. *Ala. State Fed'n of Labor, Local Union No. 103, United Bhd. of Carpenters & Joiners of Am. v. McAdory*, 325 U.S. 450, 471 (1945).

The Legislature's repeal of the 2011 redistricting plans leaves nothing for this Court to redress through declaratory or injunctive relief. The power of federal courts "to pass upon the constitutionality" of state or federal statutes "arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference." *Golden*, 394 U.S. at 110 (quoting *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89–90 (1947)); *cf. Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("We have no power per se to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act."). The federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). The 2011 plans will have no effect on the

plaintiffs because the statutes that created them have been repealed. It is unnecessary and therefore inappropriate to issue a declaratory judgment on the validity of the 2011 plans, let alone grant injunctive relief.

The absence of any ground for declaratory or injunctive relief dooms the plaintiffs' attempt at bail-in based on the 2011 plans. The statute provides that if the court finds a constitutional violation that justifies equitable relief, "the court, in addition to such relief as it may grant," may consider judicial preclearance. 52 U.S.C. § 10302(c). The only logical antecedent to the word "such" is the phrase "justifying equitable relief," which appears earlier in the sentence and is the only mention of "relief" in section 3(c). The text of the statute thus plainly provides that a federal court must grant some form of equitable relief (other than bail-in) to cure an existing constitutional violation before it may grant bail-in "in addition to" that relief. Section 3(c) does not allow a bail-in remedy to stand in for the predicate equitable relief on which bail-in depends.

## II. SECTION 3(C) BAIL-IN IS NOT AN APPROPRIATE REMEDY FOR RACIAL GERRYMANDERING IN HD 90.

The only constitutional violation that the plaintiffs can identify is the Legislature's reliance on racial data in 2013 to modify the boundaries of HD90. But that violation does not support bail-in for at least two reasons. First, the constitutional defect in HD90 did not have the purpose or effect of diminishing Hispanic voting strength. Second, a preclearance regime would not prevent similar violations. If section 3(c) were interpreted to authorize bail-in in these circumstances, it would not be an appropriate

exercise of congressional enforcement power under the standard applied in *Shelby County*.[4]

The configuration of HD90 does not support the plaintiffs' request for preclearance because it does not reflect an effort to abridge or deny minority voting rights. The 2013 Legislature initially amended HD90 to bring the Como community back into the district, as its residents had requested after Como was removed in 2011. *See Abbott v. Perez*, 138 S. Ct. at 2334. The Legislature then adopted an additional amendment to HD90 "offered by the then-incumbent . . . precisely because it fixed an objection . . . that the district's Latino population was too low." *Id.* at 2329. While the use of race to address that objection was deemed a racial gerrymander under *Shaw v. Reno*, 509 U.S. 630 (1993), this Court rejected the claim that the Legislature engaged in intentional vote dilution. *See* Order on Plan H358 at 80 (ECF No. 1540). Affirming this Court's finding that the use of race was not narrowly tailored to a compelling governmental interest, the Supreme Court nonetheless made clear that the Legislature's

---

[4] The Supreme Court has not decided whether congressional enforcement of the Fifteenth Amendment is reviewed for congruence and proportionality or for rationality. *See Nw. Austin*, 557 U.S. at 204 (declining to answer the question because "[t]he Act's preclearance requirements and its coverage formula raise serious constitutional questions under either test"). The Court need not resolve that question here because bail-in is foreclosed by the Court's holding in *Shelby County*. But the Court has consistently held that when Congress acts to enforce the Fourteenth Amendment, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). And there is no basis in the constitutional text to apply a different standard of review when Congress acts to enforce the Fifteenth Amendment. *Compare* U.S. Const. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."), *with* U.S. Const. amend. XV, § 2 ("The Congress shall have power to enforce this article by appropriate legislation.").

amendments to HD90 did not discriminate against minority voters. *Abbott v. Perez*, 138 S. Ct. at 2329 n.24 ("The Legislature adopted changes to HD90 at the behest of *minority groups*, not out of a desire to discriminate. . . . That is, [Chairman] Darby was *too* solicitous of changes with respect to HD90.").

The finding of racial gerrymandering in HD90 does not support the plaintiffs' request for bail-in for the additional reason that preclearance would not have prevented the implementation of Plan H358 based on a *Shaw* violation. Racial gerrymandering is not "exactly the type of violation[] that Congress had in mind when it enacted Section 3(c)," Task Force Br. at 10, as the Supreme Court did not recognize *Shaw* claims until 1993. More to the point, racial gerrymandering is not the type of violation that federal officials had in mind when they enforced the preclearance regime under section 5 of the Voting Rights Act. The Department of Justice's most recent guidance on preclearance under section 5 provides: "The Attorney General may not interpose an objection to a redistricting plan on the grounds that it violates the one-person one-vote principle, on the grounds that it violates *Shaw v. Reno*, 509 U.S. 630 (1993), or on the grounds that it violates Section 2 of the Voting Rights Act." *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76 Fed. Reg. 7470, 7470 (Feb. 9, 2011). To bail Texas into preclearance based on its use of race to preserve Hispanic voting strength in HD90 would not only be unwarranted, it would be ineffective.

Because traditional litigation is adequate to address the defect in HD90, the extraordinary remedy of bail-in under section 3(c) is plainly inappropriate under *Shelby*

15

*County*. There, the Court made clear that subjecting a State to preclearance requires "a determination that exceptional conditions still exist justifying such an 'extraordinary departure from the traditional course of relations between the States and the Federal Government.'" *Shelby County*, 570 U.S. at 557 (quoting *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 500-01 (1992)). A single instance of racial gerrymandering based on an effort to prevent dilution of Hispanic voting strength in one of one hundred and fifty Texas House districts does not come close to the "'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination" necessary to satisfy that standard. *Id.* at 554.

## III. THIS CASE DOES NOT PRESENT THE EXTRAORDINARY CIRCUMSTANCES NECESSARY TO JUSTIFY BAIL-IN.

### A. Preclearance is appropriate only to combat pervasive, flagrant, rampant, and widespread discrimination against minority voters.

The Supreme Court has held that a regime that "require[s] States to obtain federal permission before enacting any law relating to voting" represents "a drastic departure from basic principles of federalism." *See id.* at 534. Given the grave constitutional concerns that arise from placing a State into federal receivership, section 3(c)'s bail-in remedy must be reserved for the most extraordinary circumstances. In *Shelby County*, the Supreme Court threw out Congress's reauthorization of a preclearance regime because the legislative record failed to show "anything approaching the 'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination that faced Congress in 1965, and that clearly distinguished the covered jurisdictions from the rest of the Nation at that time." *Id.* at 554. The Constitution demands no less of a showing when a court decides to take the

16

extraordinary (and constitutionally questionable) step of placing a State into federal receivership.

To justify a preclearance regime, plaintiffs must do more than show a single constitutional violation or even multiple constitutional violations; they must show that the targeted jurisdiction is so determined to evade the commands of the Fourteenth or Fifteenth Amendment that its citizens will be unable to protect their rights through traditional litigation. That is precisely what Congress faced in 1965. *See, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) ("Despite the earnest efforts of the Justice Department and of many federal judges, these new laws have done little to cure the problem of voting discrimination."); *id.* at 314-15 (summarizing specific instances in which judicial remedies had failed to redress voting discrimination and noting Congress's conclusion that the ineffectiveness of existing law provided "the essential justification for the pending bill"). Preclearance was justified only because "case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting." *Id.* at 328.

Traditional litigation was inadequate in 1965 not only because local officials employed "obstructionist tactics," *id.*, but also because federal judges refused to enforce existing civil rights laws. At that time, many federal district judges in the South had received their appointments through the patronage of Senators who supported racial segregation. *See* Jonathan L. Entin, *Judicial Selection and Political Culture*, 30 Cap. U. L. Rev. 523, 545 n.194 (2002); New York Times, June 9, 1963, § 6 (Magazine), p. 80, col. 4

("The delay engaged by the courts in handling . . . civil-rights issues is hardly surprising when one considers that a number of Federal District Judges are segregationists."). In those circumstances, case-by-case litigation did not provide an adequate remedy for Fifteenth Amendment violations in covered jurisdictions—especially when the decision whether to issue an immediate preliminary injunction rests largely in the discretion of the district court. *E.g.*, H.R. Rep. No. 89-439, Additional Views of the Honorable William T. Cahill, reprinted in 1965 U.S.C.C.A.N. 2437, 2484, 2485 (1965) ("I am fully aware of the problems which the Department of Justice has encountered in trying racial cases before some Federal judges in the South whose opinions can only be explained by the supremacy of personal, social predilections over well-established law.").

Traditional litigation was inadequate even when plaintiffs prevailed because jurisdictions refused to comply with federal court orders, instead erecting new obstacles to minority voting. Congress devised preclearance to thwart the "common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." *Beer v. United States*, 425 U.S. 130, 140 (1976). The Supreme Court upheld the original preclearance regime because defendants would simply alter their laws to evade federal court orders. "Even when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests designed to prolong the existing disparity between white and Negro registration." *Katzenbach*, 383 U.S. at 314. Explaining that "exceptional

18

conditions can justify legislative measures not otherwise appropriate," *id.* at 334, the Court held that preclearance was appropriate to combat "widespread resistance to the Fifteenth Amendment," *id.* at 337.

### B. The plaintiffs cannot make the necessary showing of pervasive, flagrant, rampant, and widespread discrimination.

Even if the plaintiffs could establish that the redistricting plans challenged here had violated their constitutional right to vote, they could not show the pervasive, flagrant, widespread, and rampant discrimination necessary to support a preclearance regime. The plaintiffs cannot bolster their attempt to bail Texas into preclearance by citing violations of nonconstitutional requirements such as the "nonretrogression" doctrine, nor is it sufficient (or relevant) to point to constitutional violations that can be remedied in section 2 proceedings. The plaintiffs' attack on the State of Texas makes no effort to maintain these distinctions, and much of the evidence that they cite undercuts their case by demonstrating how section 2 litigation can be used to counter these supposed constitutional violations. In any event, there is no indication of "systematic resistance to the Fifteenth Amendment," *id.* at 328, necessary to support the original preclearance regime. To the extent that contemporary evidence reveals a pattern, it is one of good-faith efforts to comply with the Constitution by accepting, and often adopting, court-ordered remedies designed to prevent the denial or abridgement of voting rights.

Past redistricting cycles do not support the plaintiffs' request for bail-in because they do not demonstrate pervasive and flagrant constitutional violations. *Cf.* Plaintiffs' Joint Request at 12 (relying on findings "that Texas's redistricting plans have violated federal law"). Of the cases cited by the plaintiffs, only two involved findings that the Texas Legislature enacted constitutionally infirm plans. *See White v. Weiser*, 412 U.S. 783, 790–93 (1973) (finding congressional districts malapportioned under Article I § 2); *White v. Regester*, 412 U.S. 755, 765–70 (1973) (finding two multimember districts unconstitutional under an effect-based theory of Fourteenth Amendment liability). And previous redistricting cycles show that the State has consistently worked to reconcile its electoral maps with court orders, adopting court-ordered plans in whole or in part in all but one decennial redistricting cycle since 1970.[5]

The alleged constitutional violations they identify show that traditional lawsuits under the Constitution or section 2 of the Voting Rights Act are more than adequate to protect voting rights in Texas. Any aggrieved party (or the Department of Justice)

---

[5] *See, e.g.*, Act of May 31, 1975, 64th Leg., R.S., Ch. 537, 1975 Tex. Gen. Laws 1390 (adopting a court-ordered congressional redistricting plan with a modification to the boundary between two districts); Act of May 10, 1983, 68th Leg., R.S., Ch. 185, 1983 Tex. Gen. Laws 756 (adopting modifications to the LRB's 1981 House redistricting plan ordered in *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982)); Act of May 28, 1983, 68th Leg., R.S., Ch. 531, 1983 Tex. Gen. Laws 3086 (enacting court-ordered congressional plan from *Seamon v. Upham* with changes to seven districts); Act of May 8, 1997, 75th Leg., R.S., Ch. 133, 1997 Tex. Gen. Laws 258 (enacting a Texas House settlement plan entered in *Thomas v. Bush*, No. 1:95-cv-186 (W.D. Tex. Sept. 15, 1995), with minor changes to Collin, Jefferson, and Williamson Counties). These bills are available, together with every redistricting bill introduced in the Texas Legislature between 1881 and 2013, from the Legislative Reference Library of Texas at http://www.lrl.state.tx.us/legis/redistricting/redistrictingBills.cfm (last visited Jan. 29, 2019).

can sue in federal court and immediately demand a preliminary injunction or temporary restraining order—if the challenged practice is indeed constitutionally problematic. The plaintiffs do not suggest that the federal courts will fail to provide relief if it is warranted, nor could they. In *LULAC v. Perry*, 548 U.S. 399 (2006), for example, private litigants successfully challenged a portion of a congressional redistricting plan under section 2. And there is no reason to believe that the plaintiffs would have been unable to secure preenforcement review of the 2011 redistricting plans in this case without preclearance. Indeed, redistricting legislation provides substantial opportunity for preenforcement review because electoral districts must be in place long before any election occurs. *See, e.g.*, Tex. Elec. Code § 172.023(a) (providing that applications for the general primary election ballot must be filed by "the second Monday in December of an odd-numbered year").

Section 5 objections do not support the plaintiffs' case, either, *cf.* Plaintiffs' Joint Request at 19, because a denial of preclearance under section 5 does not prove that a constitutional violation occurred. A finding of discriminatory effect or "retrogression" is not a constitutional violation. *See, e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55 (1980) (plurality op.). And an objection based on discriminatory purpose shows only that the covered jurisdiction failed to prove the absence of discriminatory purpose to the satisfaction of the Attorney General—a standard that does not necessarily incorporate constitutional rules. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. at 2330 n.25 ("In assessing the significance of the D.C. court's evaluation of intent, it is important not to forget that

the burden of proof in a preclearance proceeding was on the State."); Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After* Tennessee v. Lane, 66 Ohio St. L.J. 177, 192 (2005) ("A number of DOJ objections over the years have been based on the DOJ's aggressive theories about how Section Five should be enforced.").

And violations by subjurisdictions such as cities and counties cannot support the plaintiffs' request for bail-in because they are not attributable to the State of Texas. Relying on *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990), the plaintiffs argue that "instances of intentional discrimination committed by both State and local actors must be considered, as '[c]ities, counties, and other local subdivisions are mere creatures of the State." Plaintiffs' Joint Request at 19 (quoting *Jeffers*, 740 F. Supp. at 592). They maintain, for example, that the State should be bailed in based on constitutional violations by the City of Pasadena. *See id.* at 21-22; Task Force Br. at 6-7. But bailing in the State of Texas could not be a congruent and proportional remedy for intentional discrimination by Pasadena (which has already been bailed into preclearance) or by any governmental entity other than the State itself. The State is not responsible for the acts of other governmental entities, and bailing in the State would not prevent other jurisdictions from violating the Constitution. *Cf. Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016) (en banc) ("[I]n a state with 254 counties, we do not find the reprehensible actions of county officials in one county . . . to make voting more difficult for minorities to be probative of the intent of legislators in the Texas Legislature . . . ."). To the extent

*Jeffers* suggests otherwise, it provides dubious authority in light of *Northwest Austin* and *Shelby County*, among other decisions from the past three decades. *See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

The Task Force Plaintiffs' ad hominem attack on the Governor is uncalled for and unfounded. Their claim that Governor Abbott "signed the discriminatory 2013 state house redistricting plan into law," Task Force Br. 11, is simply incorrect: back in 2013, he was serving as the State's Attorney General. And then-Attorney General Abbott urged the Texas Legislature to enact this Court's remedial plans "to remedy the violations found by the D.C. Court" and adopt redistricting plans that complied with the Constitution and the Voting Rights Act. *Abbott v. Perez*, 138 S. Ct. at 2317. That Governor Abbott led the State's effort to remedy every plausible defect in the 2011 plans hardly counsels in favor of preclearance.

The history of this litigation provides the best evidence that preclearance is neither necessary nor justified based on current conditions. Even assuming that the allegations of discrimination against the 2011 redistricting plans had merit, Texas responded to interim findings of possible discrimination not by enacting a "slightly modified discriminatory practice" but by adopting plans patterned after court-ordered plans designed to correct potential legal violations. The 2013 plans addressed every claim this Court found to have a likelihood of success under section 2 or the Constitution, and every claim this Court found to be "not insubstantial" under the now-defunct section 5 standard—a standard far beneath the preponderance-of-evidence

standard required to prove a constitutional violation. The Supreme Court has now confirmed that the Legislature did not engage in intentional discrimination when it enacted those plans, *id.* at 2327, and that none of the districts carried over from the 2011 plans violate the Constitution or the Voting Rights Act, *id.* at 2329-30.

The plaintiffs must produce evidence that violations of the Fourteenth and Fifteenth Amendment will go unremedied or undeterred absent a preclearance requirement; otherwise the preclearance requirement serves no purpose and cannot justify the severe federalism costs that will be imposed by placing a State into federal receivership. Signaling that they cannot possibly meet this demanding burden, the plaintiffs attempt to shift it to the State. The plaintiffs maintain that bail-in is justified because the State has failed to prove "that the Legislature would not engage in the same conduct that Plaintiffs asserted violated their rights in upcoming redistricting cycles." Plaintiffs' Joint Request at 24. Even if that were the test for mootness—and it is not— it is certainly not the standard that applies to bail-in under section 3(c). Under the plaintiffs' reasoning, Texas must be subjected to preclearance unless it can affirmatively show that future legislatures will not violate the Fourteenth or Fifteenth Amendment. But *Shelby County* conclusively refutes the notion that States may be subjected to preclearance based on vague speculation that their legislatures might conceivably run afoul of the Constitution in the future.

The State's actions bear no resemblance to the 1960s-style "common practice . . . of staying one step ahead of the federal courts by passing new discriminatory voting

24

laws," *cf. Beer*, 425 U.S. at 140, or the "systematic resistance to the Fifteenth Amendment," *Katzenbach*, 383 U.S. at 328, that justified preclearance in 1965. Rather than "staying one step ahead" by evading federal court orders, Texas has followed this Court's lead by adopting remedial plans designed to eliminate any violation of the Constitution or the Voting Rights Act. A preclearance regime is constitutionally tolerable only when a State shows, through the sort of "'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination that faced Congress in 1965," *Shelby County*, 570 U.S. at 554, that it is so determined to deny its citizens' voting rights that not even a federal injunction will stop it. The plaintiffs cannot make that showing here.

25

## CONCLUSION

The request for bail-in under section 3(c) should be denied.

Date: January 29, 2019                    Respectfully submitted.


                                            /s/ Patrick K. Sweeten
KEN PAXTON                                 PATRICK K. SWEETEN
Attorney General of Texas                  Senior Counsel for Civil Litigation

JEFFREY C. MATEER                          MATTHEW H. FREDERICK
First Assistant                            Deputy Solicitor General
   Attorney General
                                           TODD LAWRENCE DISHER
BRANTLEY STARR                             Special Counsel for Civil Litigation
Deputy First Assistant
   Attorney General                        OFFICE OF THE ATTORNEY GENERAL
                                           P.O. Box 12548 (MC 059)
DARREN L. MCCARTY                          Austin, Texas  78711-2548
Deputy Attorney General                    Tel.: (512) 936-6407
   for Litigation                          Fax: (512) 474-2697


                                           COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this filing was sent on January 29, 2019, via the Court's electronic notification system and/or email to the following counsel of record:

DAVID RICHARDS
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
512-476-0005
davidr@rrsfirm.com

RICHARD E. GRAY, III
Gray & Becker, P.C.
900 West Avenue, Suite 300
Austin, TX 78701
512-482-0061/512-482-0924 (facsimile)
Rick.gray@graybecker.com
**ATTORNEYS FOR PLAINTIFFS PEREZ, DUTTON, TAMEZ, HALL, ORTIZ, SALINAS, DEBOSE, and RODRIGUEZ**

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209
210-392-2856
garzpalm@aol.com

MARK W. KIEHNE
RICARDO G. CEDILLO
Davis, Cedillo & Mendoza
McCombs Plaza
755 Mulberry Ave., Ste. 500
San Antonio, TX 78212
210-822-6666/210-822-1151 (facsimile)
mkiehne@lawdcm.com
rcedillo@lawdcm.com

JOAQUIN G. AVILA
P.O. Box 33687
Seattle, WA 98133
206-724-3731/206-398-4261 (facsimile)
jgavotingrights@gmail.com
**ATTORNEYS FOR MEXICAN AMERICAN LEGISLATIVE CAUCUS**

GERALD H. GOLDSTEIN
DONALD H. FLANARY, III
Goldstein, Goldstein and Hilley
310 S. St. Mary's Street
San Antonio, TX 78205-4605
210-226-1463/210-226-8367 (facsimile)
ggandh@aol.com
donflanary@hotmail.com

PAUL M. SMITH, MICHAEL B. DESANCTIS, JESSICA RING AMUNSON
Jenner & Block LLP
1099 New York Ave., NW
Washington, D.C. 20001
202-639-6000

J. GERALD HEBERT
191 Somervelle Street, # 405
Alexandria, VA 22304
703-628-4673
hebert@voterlaw.com

JESSE GAINES
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com
**ATTORNEYS FOR PLAINTIFFS QUESADA, MUNOZ, VEASEY, HAMILTON, KING and JENKINS**

LUIS ROBERTO VERA, JR.
Law Offices of Luis Roberto Vera, Jr.
1325 Riverview Towers
San Antonio, Texas 78205-2260
210-225-3300
lrvlaw@sbcglobal.net

NINA PERALES
MARISA BONO
Mexican American Legal Defense
and Education Fund
110 Broadway, Suite 300
San Antonio, TX 78205
210-224-5476/210-224-5382 (facsimile)
nperales@maldef.org
mbono@maldef.org

MARK ANTHONY SANCHEZ
ROBERT W. WILSON
Gale, Wilson & Sanchez, PLLC
115 East Travis Street, Ste. 1900
San Antonio, TX  78205
210-222-8899/210-222-9526 (facsimile)
masanchez@gws-law.com
rwwilson@gws-law.com
**ATTORNEYS FOR TEXAS LATINO
REDISTRICTING TASK FORCE,
CARDENAS, JIMENEZ, MENENDEZ,
TOMACITA AND JOSE OLIVARES,
ALEJANDRO AND REBECCA ORTIZ**

JOHN T. MORRIS
5703 Caldicote St.
Humble, TX 77346
281-852-6388
johnmorris1939@hotmail.com
**JOHN T. MORRIS, PRO SE**

MAX RENEA HICKS
Law Office of Max Renea Hicks
101 West Sixth Street Suite 504
Austin, TX 78701
512-480-8231/512/480-9105 (facsimile)
**ATTORNEY FOR PLAINTIFFS CITY OF
AUSTIN, TRAVIS COUNTY, ALEX
SERNA, BEATRICE SALOMA, BETTY F.
LOPEZ, CONSTABLE BRUCE ELFANT,
DAVID GONZALEZ, EDDIE
RODRIGUEZ, MILTON GERARD
WASHINGTON, and SANDRA SERNA**

GEORGE JOSEPH KORBEL
Texas Rio Grande Legal Aid, Inc.
1111 North Main
San Antonio, TX  78213
210-212-3600
korbellaw@hotmail.com
**ATTORNEYS FOR INTERVENOR-
PLAINTIFF LEAGUE OF UNITED
LATIN AMERICAN CITIZENS**

ROLANDO L. RIOS
Law Offices of Rolando L. Rios
115 E Travis Street, Suite 1645
San Antonio, TX 78205
210-222-2102
rrios@rolandorioslaw.com
**ATTORNEY FOR INTERVENOR-
PLAINTIFF HENRY CUELLAR**

GARY L. BLEDSOE
Law Office of Gary L. Bledsoe
316 W. 12th Street, Ste. 307
Austin, TX  78701
512-322-9992/512-322-0840 (facsimile)
garybledsoe@sbcglobal.net
**ATTORNEY FOR INTERVENOR-
PLAINTIFFS TEXAS STATE
CONFERENCE OF NAACP
BRANCHES, TEXAS LEGISLATIVE
BLACK CAUCUS, EDDIE BERNICE
JOHNSON, SHEILA JACKSON-LEE,
ALEXANDER GREEN, HOWARD
JEFFERSON, BILL LAWSON, and
JUANITA WALLACE**

VICTOR L. GOODE
Asst. Gen. Counsel, NAACP
4805 Mt. Hope Drive
Baltimore, MD  21215-5120
410-580-5120/410-358-9359 (facsimile)
vgoode@naacpnet.org
**ATTORNEY FOR TEXAS STATE
CONFERENCE OF NAACP BRANCHES**

STEPHEN E. MCCONNICO
SAM JOHNSON
S. ABRAHAM KUCZAJ, III
Scott, Douglass & McConnico
One American Center
600 Congress Ave., 15th Floor
Austin, TX 78701
512-495-6300/512-474-0731 (facsimile)
smcconnico@scottdoug.com
sjohnson@scottdoug.com
akuczaj@scottdoug.com
**ATTORNEYS FOR PLAINTIFFS CITY OF
AUSTIN, TRAVIS COUNTY, ALEX
SERNA, BALAKUMAR PANDIAN,
BEATRICE SALOMA, BETTY F. LOPEZ,
CONSTABLE BRUCE ELFANT, DAVID
GONZALEZ, EDDIE RODRIGUEZ, ELIZA
ALVARADO, JOSEY MARTINEZ,
JUANITA VALDEZ-COX, LIONOR
SOROLA-POHLMAN, MILTON GERARD
WASHINGTON, NINA JO BAKER,
and SANDRA SERNA**

KAREN M. KENNARD
2803 Clearview Drive
Austin, TX 78703
(512) 974-2177/512-974-2894 (facsimile)
karen.kennard@ci.austin.tx.us
**ATTORNEY FOR PLAINTIFF
CITY OF AUSTIN**

DAVID ESCAMILLA
Travis County Asst. Attorney
P.O. Box 1748
Austin, TX 78767
(512) 854-9416
david.escamilla@co.travis.tx.us
**ATTORNEY FOR PLAINTIFF
TRAVIS COUNTY**

ROBERT NOTZON
1507 Nueces Street
Austin, TX 78701
512-474-7563/512-474-9489 (facsimile)
robert@notzonlaw.com

ALLISON JEAN RIGGS
ANITA SUE EARLS
Southern Coalition for Social Justice
1415 West Highway 54, Ste. 101
Durham, NC 27707
919-323-3380/919-323-3942 (facsimile)
anita@southerncoalition.org
**ATTORNEYS FOR TEXAS STATE
CONFERENCE OF NAACP
BRANCHES, EARLS, LAWSON,
WALLACE, and JEFFERSON**

DONNA GARCIA DAVIDSON
PO Box 12131
Austin, TX 78711
512-775-7625/877-200-6001 (facsimile)
donna@dgdlawfirm.com
**ATTORNEY FOR DEFENDANT
STEVE MUNISTERI**

CHAD W. DUNN
K. SCOTT BRAZIL
Brazil & Dunn
4201 FM 1960 West, Suite 530
Houston, TX 77068
281-580-6310/281-580-6362 (facsimile)
chad@brazilanddunn.com
scott@brazilanddunn.com
**ATTORNEYS FOR INTERVENOR-
DEFS TEXAS DEMOCRATIC PARTY
and BOYD RICHIE**

JOHN M. GORE
TIMOTHY F. MELLETT
DANIEL J. FREEMAN
JAYE ALLISON SITTON
U.S. Department of Justice
Civil Rights Division, Voting Rights
Room 7254 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
 (202) 305-4355; (202) 305-4143
**ATTORNEYS FOR THE
UNITED STATES**

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN

30