## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **SHANNON PEREZ, ET AL.,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **11-CV-360-OLG-JES-XR** |
| **STATE OF TEXAS, ET AL.** | § | **CONSOLIDATED ACTION** |
| | § | **[Lead case]** |
| **Defendants** | § | |

## TEXAS LATINO REDISTRICTING TASK FORCE, ET AL., MALC AND US CONGRESSMAN HENRY CUELLAR'S REPLY BRIEF IN SUPPORT OF RELIEF UNDER SECTION 3(C) OF THE VOTING RIGHTS ACT

Plaintiffs Texas Latino Redistricting Task Force, *et al*. ("Task Force Plaintiffs"), MALC and US Congressman Henry Cuellar submit this Joint Reply Brief in Support of Relief Under Section 3(C) of the Voting Rights Act.

## INTRODUCTION

Texas and the United States argue that bail-in relief under 52 U.S.C.A. § 10302(c) ("section 3 (c) relief" or "bail-in") should be denied because: the State's intentionally discriminatory 2011 redistricting plans were blocked by court orders;  the multiple court findings of intentional discrimination in this case do not meet the legal standard for bail-in; and the Fifth Circuit decision in *Veasey v. Abbott*, 888 F.3d 792, 804 (5th Cir. 2018) forecloses relief.  For the reasons set out below, these arguments are unavailing and bail-in relief is appropriate in this case.

**ARGUMENT**

I.   Bail-in Relief is not Foreclosed Where Federal Court Orders Prevented Texas from
     Holding Elections Under its Intentionally Discriminatory 2011 Redistricting Plans

A combination of orders from federal courts in Washington D.C. and San Antonio prevented Texas from holding elections under its intentionally discriminatory 2011 redistricting plans for state house and congress.  Texas cannot now rely on those orders to argue that Plaintiffs are not entitled to bail-in relief because the discriminatory plans were not implemented.

The congressional and state house redistricting plans enacted by Texas in 2011 could not be implemented in the next elections because they failed to secure preclearance under section 5 of the Voting Rights Act.  *See* 52 U.S.C.A. § 10304.  This Court ordered new redistricting plans for 2012 that, in order to avoid discrimination, "departed significantly from the State's 2011 plans. At least 8 of the 36 congressional districts were markedly altered, and 21 districts in the plan for the Texas House were 'substantially' changed."  *Abbott v. Perez*, 138 S. Ct. 2305, 2316 (2018).

In creating the 2012 remedial redistricting plan for state house, this Court remedied what it considered a "not insubstantial"  claim of intentional discrimination under Section 5 between HD77 and HD78.  Dkt. 690 at 11.  The Court noted that its changes on the boundary of HD77 and HD78 provided "an appropriate remedy for the alleged Section 2 and Fourteenth Amendment violations." *Id.*   The Court also "modif[ied] HD 117 to address the Section 5 intentional-discrimination issues" that it found not insubstantial.  *Id*. at 6.  In the congressional plan, the Court's remedy included a new majority-minority CD33  to resolve not insubstantial claims of intentional racial discrimination.  Dkt. 691 at 36.  Several of the Court's other changes, made to address not insubstantial claims of retrogression and vote dilution, also addressed

intentional discrimination claims.  *See, e.g.* Dkt. 691 at 31 (discussing changes to the boundaries of CD23).

Several months later, on August 28, 2012, the U.S. District Court for the District of Columbia denied preclearance of the State's congressional plan in part because the plan intentionally discriminated against minority voters.  *See Texas v. United States*, 887 F. Supp. 2d 133, 161–62 (D.D.C. 2012), *vacated and remanded following Shelby*, 570 U.S. 928, (2013) "under *Arlington Heights* we find sufficient evidence to conclude that the Congressional Plan was motivated, at least in part, by discriminatory intent.  Therefore, we deny Texas declaratory judgment with respect to the Congressional Plan on this ground as well.").  With respect to the state house plan, the D.C. court also found "the full record strongly suggests that the retrogressive effect ... may not have been accidental." *Id.* at 178.

Ultimately this Court ruled (and Texas did not appeal from this ruling) that both the 2011 state house and congressional redistricting plans were intentionally discriminatory in violation of the Fourteenth  Amendment.  This Court's final ruling on the 2011 plans was the last step in a long journey that started in 2011 and featured findings of intentional discrimination at every step along the way.[1]  Texas cannot now argue that the very court orders that prevented Texas from implementing its discriminatory district boundaries "foreclose[] the[] use of the 2011 plans to establish the predicate constitutional violations required before considering a potential bail-in remedy under section 3(c)." Texas Br., Dkt. 1612 at 12.  The fact that the Court remedied the intentional racial discrimination in interim redistricting plans, before Texas legislatively adopted

---

[1]  Plaintiffs' claims of intentional discrimination never became moot.  *See* Dkt. 771 (Order on Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 768)); Dkt. 1104 (Order on Defendants' Motion to Dismiss (Dkt. 995)) at 19; Dkt. 1339 (Order on C185) at 2-5; and Dkt. 1387 (Order on Defendants' Motion for Summary Judgment) at 2-4.  Texas's attempt to re-hash its mootness arguments, previously rejected by the Court, is unavailing.

those plans, does not prevent the Court from concluding that the redistricting plans were intentionally discriminatory and that these violations form the basis of section 3 (c) relief.

II.  The Nature and Scope of Texas's Violations of the Fourteenth Amendment Warrant Bail-in

   a.  Bail-in Does not Require 'Pervasive,' 'Flagrant,' 'Widespread,' and 'Rampant' Discrimination

The Supreme Court's decision in *Shelby County v. Holder*, which struck down the coverage formula for section 5 of the Voting Rights Act, does not even remotely suggest that section 3 (c) is inappropriate here. *See Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013).  The holding in *Shelby* did not refer to or discuss section 3 (c) of the Act.  And the Court's observation that in 1965, Congress was faced with ""pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination . . . that clearly distinguished the covered jurisdictions from the rest of the Nation at that time" has no bearing on the test for section 3 (c) bail-in, which is set out in the statute. *Shelby County*, 570 U.S. at 554, *quoting South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).

The United States argues that Plaintiffs fail to satisfy their burden for a grant of section 3(c) relief in part because such relief "authorizes federal intrusion" into state policymaking. *See* U.S. Br. at 2 (citing *Shelby Cty., Ala.*, 570 U.S. 545).  Texas takes the *Shelby* decision further by claiming that "bail-in is foreclosed by the Court's holding in *Shelby County*" and suggesting that bail-in here requires the same evidence of discrimination that Congress saw across the South in 1965.  *See* Texas Br. at 14 n.4.

Texas's argument for its proposed standard ignores the fact that Congressional purpose differed between section 5 and section 3.  Congress intended section 3 to address discrimination in "pockets of discrimination" that the broader coverage of Section 5 did not address.  *See* H.R. Rep. No. 89-439 (1965), at 2454.  Plaintiffs' request for limited 3(c) relief is calibrated to

address the multiple violations of the Fourteenth Amendment in Texas's 2011 and 2013 redistricting plans and is precisely what Congress contemplated when it enacted section 3 (c).

Even if section 3 (c) required pervasive, flagrant, rampant, and widespread discrimination, that requirement is met here. This Court found that the 2011 state house redistricting plan overall was "the product of intentional vote dilution." Dkt. 1365 at 82-33. Regional examples showed how Plan H283 reduced minority opportunity despite "massive minority population growth." *See* Dkt. 1365 at 84. In El Paso, the Court found that Texas manipulated State House districts by "surgically" splitting multiple precincts, the purpose of which "was to increase the SSVR while simultaneously ensuring that election success rates remained minimally improved for Latinos." Dkt. 1365 at 27. In Bexar County, the Court concluded that Texas "drew [HD117] to increase SSVR while intentionally minimizing any gains in Latino electoral performance." *Id*. at 30. In Nueces County, the Court found that mapdrawers "intentionally diluted Latino voting strength by eliminating HD33 in Nueces County" and by ignoring Voting Rights Act and state law redistricting considerations in their quest to create no new opportunity districts. *Id*. at 40. The Court found that Texas intentionally diluted Latino voting strength in Harris County because "mapdrawers were using [] superficial compliance as a tool to avoid creating any new minority opportunity districts (more specifically, to defend their failure to create any) and to mask the loss of HD33 as an existing opportunity district." *Id*. at 57. In the Rio Grande Valley, the Court found that Texas mapdrawers "intentionally manipulated the SSVR and total population to dilute the Latino vote in HD41 in order to protect an incumbent who they believed would no longer be the Latino candidate of choice given his decision to switch parties." *Id*. at 46. Similarly, in Bell County, the Court found that "mapdrawers (specifically Aycock) intentionally racially gerrymandered the districts

to dilute the minority vote by moving minority population out of HD54 and moving Anglo population in, thus cracking and diluting the minority vote to ensure Anglo control over both districts." *Id*. at 76, 78.

Texas similarly purposefully limited Latino voting opportunity in congressional Plan C185.  In CD23, Texas acted with the "intent to provide Hispanic voters less opportunity to participate in the political process and elect their candidates of choice."  Dkt. 1390 at 29.  Texas's mapdrawer "used race to increase the SSVR and HCVAP of CD23 to create the facade of a Latino opportunity district, while he intentionally manipulated Hispanic voter cohesion and turnout to reduce the performance of the district for Hispanic candidates of choice."  *Id*. at 22.  The State's creation of that façade in CD23, including splitting a county with higher Latino voter turnout, and formed the basis of the *Shaw*-type racial gerrymandering violation found by the Court.  *See id*. at 30-32.  The Court also found that Texas intentionally diluted Latino voting strength and placed voters in voting districts based on race in the Dallas-Fort Worth Metroplex.  *Id.*  at 57-58, 108, 165.

In 2013, even when limiting itself to a handful of amendments to the interim state house redistricting plan, Texas again failed to avoid discriminating against Latino voters.  As this Court concluded, and the Supreme Court affirmed, Texas intentionally discriminated on the basis of race in HD90.  *See Abbott v. Perez*, 138 S.Ct. at 2335; *see also* Dkt. 1540 (Order on H358) at 78.

Texas's violations of the Fourteenth Amendment across the state in 2011 and 2013 are exactly the type of violations that Congress had in mind when it enacted Section 3(c) and Texas's systematic creation of district boundaries to disadvantage the growing Latino electorate warrants bail in relief.  *See, e.g. Patiño*, 2017 WL 10242075, at *2 n.4 (section 3(c) preclearance

"ensures the City cannot immediately return to a map and plan that thwarts Latinos on the cusp of an electoral majority.").

    b.  Texas and the U.S. Improperly Exclude Racial Gerrymandering From Fourteenth Amendment Jurisprudence

*Shaw*-type racial gerrymandering violates the Fourteenth Amendment by discriminating against voters on the basis of their race. The essential legal principle underlying a *Shaw* claim is that the Equal Protection Clause of the Fourteenth Amendment prohibits a jurisdiction from "separat[ing] its citizens into different voting districts on the basis of race," without a compelling state interest. *See Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) *citing Miller v. Johnson*, 115 S. Ct. 2475, 2486 (1995). Racial gerrymandering offends the Fourteenth Amendment and intentional vote dilution and vote denial also offend it.

As explained by the Supreme Court in *Shaw*, the Equal Protection Clause's "central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race. . . . Laws that explicitly distinguish between individuals on racial grounds fall within the core of that prohibition." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (internal citations omitted). This Court similarly observed, "A racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect, even if the reason for the racial classification is benign or remedial. " Dkt. 691 at 43 (citing Shaw v. Hunt, 517 U.S. 899, 904-05 (1996).

Both intentional vote dilution and *Shaw*-type racial gerrymandering warrant section 3(c) relief. *See Jeffers*, 740 F. Supp. at 592 ("phrase 'violations of the fourteenth or fifteenth amendment'[..]is not limited at all"). Texas and the United States cite no authority suggesting that racial gerrymandering falls outside the scope of the Fourteenth Amendment's protections or outside the scope of the bail-in statute.

III.   The Fifth Circuit's ruling in *Veasey v. Abbott* does not Foreclose 3(c) Relief

Although both Texas and the United States claim that *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018), controls here, *Veasey* is inapposite.   First, there was no violation of the Fourteenth or Fifteenth Amendment in *Veasey*.   *See Veasey v. Abbott*, 830 F.3d 216, 272 (5th Cir. 2016) (reversing "district court's judgment that SB 14 was passed with a racially discriminatory purpose"); *see also Veasey*, 888 F.3d at 801 (court erred in "presuming, without proof, that any invidious intent behind SB 14 necessarily carried over to and fatally infected SB 5").

Second, *Veasey*'s discussion of section 3 turned on a lack of findings not present here. Texas did not appeal this Court's extensive findings related to intentional discrimination in the 2011 redistricting plans and those findings appropriately form the basis of a bail-in order in this case.   In addition, this Court made specific findings of intentional racial discrimination in HD90 in 2013 and those findings were affirmed by the Supreme Court.   *See Abbott*, 138 S. Ct. at 2335. By contrast, in *Veasey* the Fifth Circuit explained that "deficiencies in the court's remedial findings came about[...]because the Plaintiffs never actually challenged SB 5 in pleadings or evidence during the remedial phase").   *Veasey*, 888 F.3d at 802.

Furthermore, in enacting section 3(c), Congress envisioned that bail-in under this provision would  supplement, not replace, whatever other relief a Court may order to address the violations.   *See*  52 U.S.C.A. § 10302(c) (if "the court finds that violations of the fourteenth or fifteenth amendment [...] the court, *in addition to such relief* as it may grant, shall retain jurisdiction[...]") (emphasis added).   Thus, even if this Court remedied the State's intentional discrimination in its 2012 interim plans, and Texas later adopted those plans, the Court's findings related to intentional discrimination are sufficient for granting 3(c) relief.

*Veasey*'s conclusion that that 3(c) relief was not warranted because of Texas's action with respect to voter ID merely shows that courts may exercise discretion afforded by the bail-in statute.  *Veasey* does not stand for the proposition that remedying a constitutional violation in redistricting is limited to redrawing district boundaries.  A new redistricting plan, even if adopted by Texas, does not preclude this Court from granting additional prospective relief under the bail-in provision.  Even Texas admits this.  See Dkt. 1612 at 7 ("Bail-in is not a claim for relief; it is a supplemental remedy.").  *See also e.g. Patino v. City of Pasadena*, No. CV H-14-3241, 2017 WL 10242075  (S.D. Tex. Jan. 16, 2017) (ordering limited 3 (c) relief in addition to changing redistricting boundaries).

## CONCLUSION

For the reasons stated here and in their earlier briefs, the Task Force Plaintiffs, MALC and Congressman Cuellar respectfully request that the Court require preclearance, under section 3(c), of all redistricting plans enacted by the State of Texas until 2030.

DATED: February 12, 2019                    Respectfully submitted,

MEXICAN AMERICAN LEGAL DEFENSE
    AND EDUCATIONAL FUND

*/s/ Nina Perales*
Nina Perales
TX Bar No. 24005046
Ernest I. Herrera
TX Bar No. 24094718
*Denise Hulett
CA Bar No. 121553
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
FAX (210) 224-5382

*Admitted *Pro Hac Vice*

COUNSEL FOR PLAINTIFFS TEXAS
LATINO REDISTRICTING TASK
FORCE, RUDOLFO ORTIZ, ARMANDO
CORTEZ, SOCORRO RAMOS,
GREGORIO BENITO PALOMINO,
FLORINDA CHAVEZ, CYNTHIA
VALADEZ, CESAR EDUARDO
YEVENES, SERGIO CORONADO,
GILBERTO TORRES, RENATO DE LOS
SANTOS, JOEY CARDENAS, ALEX
JIMENEZ, EMELDA MENENDEZ,
TOMACITA OLIVARES, JOSE
OLIVARES, ALEJANDRO ORTIZ, AND
REBECCA ORTIZ

Attorneys for Texas Latino Redistricting Task
Force, *et al.*


/s/ Jose Garza
JOSE GARZA
Texas Bar No. 07731950
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 78209 (210) 392-2856
garzpalm@aol.com

Martin Golando
The Law Office of Martin Golando
405 N. St. Mary's, Suite 700
San Antonio, Texas 78209
210-892-8543

Attorneys for the Mexican American Legislative
Caucus

/s/ Rolando L. Rios
ROLANDO L. RIOS

SBN: 16935900
110 E. Broadway, # 355
San Antonio, Texas 78205
Ph: (210) 222-2102
Fax: (210) 222-2898
E-mail:rrios@rolandorioslaw.com

Attorney for Plaintiff-Intervenor Henry Cuellar

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2019, I served a copy of the foregoing document on all counsel who are registered to receive NEFs through this Court's CM/ECF system. All attorneys who are not registered to receive NEFs have been served via email.

*/s/ Nina Perales*
Nina Perales