## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SHANNON PEREZ, ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-11-CV-360 |
| | § | |
| GREG ABBOTT, ET AL., | § | |
| | § | |
| *Defendants*. | § | |

## ORDER ON REQUEST FOR § 3(c) RELIEF

Before Chief District Judge GARCIA, Circuit Judge SMITH, and District Judge RODRIGUEZ

XAVIER RODRIGUEZ, District Judge:

On this date, having heard extensive oral argument on May 2, 2019, the Court considered the Plaintiffs' request for bail-in relief under Section 3(c) of the Voting Rights Act ("VRA"). Although the Court's findings of intentional racial discrimination in violation of the Fourteenth Amendment with regard to the 2011 plans are sufficient to trigger bail-in, and although the Court has serious concerns about the State's past conduct, the various requests for discretionary relief under § 3(c) are hereby denied.

## I. Background

Section 3(c) of the VRA, entitled "Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote," empowers a court, in a proper case, to impose a preclearance remedy on states. *See Jeffers v. Clinton*, 740 F. Supp. 585, 587 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991). Section 3(c) provides:

> If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth

amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

52 U.S.C. § 10302(c).

Initially, jurisdictions not automatically subject to preclearance via the § 4 coverage formula were the subject of § 3(c) preclearance "bail-in" proceedings, since § 3(c) was intended to apply to the "so-called 'pockets of discrimination' . . . outside the States and political subdivisions as to which the prohibitions of section 4(a) [were] in effect." *See* H.R. Rep. No. 89-439 (1965), at 2454. However, "[i]t reaches denials and abridgments of the right to vote on account of race or color wherever they may occur throughout the United States." *Id.* Since the Supreme Court invalidated the § 4 coverage formula in *Shelby County v. Holder*, 570 U.S. 529 (2013), at least two federal courts have bailed in cities that were previously subject to preclearance.[1]

---

[1] *Allen v. City of Evergreen*, No. 13-0107-CG-M, 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014)(agreed bail-in order for changes to city council election districts and standards for determining voter eligibility for

Certain Plaintiffs contend that tailored bail-in relief is warranted in this case, while Defendants and the United States oppose its application.[2]   MALC and the Texas Latino Redistricting Task Force (collectively "Task Force Plaintiffs") contend that a § 3(c) remedy requiring preclearance of U.S. and Texas House plans until 2030 is appropriate because Texas committed constitutional violations that § 3(c) is meant to address. Docket no. 1604 at 7.

The NAACP, LULAC, Perez, Rodriguez, African-American Congresspersons, and Quesada Plaintiffs (collectively "NAACP Plaintiffs") move the Court to require Texas to submit for preclearance any statewide redistricting plans for a period beginning before the next decennial redistricting cycle and ending no sooner than five years after the entry of the order. Docket no. 1603. They contend that this Court's findings of intentional discrimination in the 2011 Congressional and State House plans remain in place and these findings, coupled with the historical prevalence of discrimination in voting and the "very recent history of discrimination by the State and its localities intended to undermine the voting power of minority voters," justify § 3(c) relief. Docket no. 1603 at 3-5.

Defendants and the United States raise several arguments against application of § 3(c) on the facts of this case, and further argue that relief is foreclosed by the Fifth Circuit's recent opinion in *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018).

---

municipal elections); *Patiño v. City of Pasadena*, 230 F. Supp. 3d 667, 729 (S.D. Tex. 2017) (requiring Pasadena to submit future changes to its electoral map and plan for preclearance and retaining jurisdiction until 2023).

[2] The United States previously supported imposing § 3(c) relief, but asserts that "the governing law and the circumstances of this case have changed." Docket no. 1613 at 2.

## II. Preliminary Challenges and Issues

A. <u>Ripeness and Mootness Challenges to Bail-In Relief</u>

Defendants first assert ripeness and mootness challenges to the 2011 plan claims as a basis for arguing that Plaintiffs cannot get bail-in relief. The Court rejects those arguments. Although this Court was unable to decide the full merits of the § 2 and constitutional claims in 2012 while the preclearance proceedings were pending, Plaintiffs were "aggrieved persons" under the VRA and their claims were ripe. If not, this Court would not have been instructed to order interim relief on those claims by the Supreme Court in *Perry v. Perez*, 565 U.S. 388 (2012). The Supreme Court held that this Court should examine Plaintiffs' § 2 and constitutional claims under a preliminary-injunction type standard and take care not to implement an unconstitutional interim plan. Thus, Plaintiffs' claims had to be resolved at least preliminarily and were ripe for consideration.

Nor does the fact that the 2011 plans never went into effect and were repealed by the Legislature in 2013 when the new plans were enacted render the intentional vote dilution claims and the request for bail-in relief moot, as this Court has already decided. *See, e.g.*, docket no. 1390 at 6. The Court will not repeat its prior analysis here. However, both sides argue that the recent Fifth Circuit opinion *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018) supports their position on mootness. *Veasey* was in a different procedural posture and does not control this case. But because Defendants and the United States also rely on *Veasey* to argue that § 3(c) relief is foreclosed, the Court will examine *Veasey* in detail.

*Veasey v. Abbott* concerned Texas's voter ID law. The State enacted SB14 in 2011, generally requiring voters to present one of five forms of government-issued identification in

order to vote. A group of plaintiffs (Marc Veasey *et al.*) challenged SB14 as intentionally racially discriminatory, and the district court permanently enjoined its implementation, finding both that it had unlawful effects under the "effects test" of § 2 of the VRA and because Texas enacted SB14 at least in part because of its adverse effect on minority voters. *Veasey*, 888 F.3d at 796 (citing *Veasey v. Perry*, 71 F. Supp. 3d 627, 694 (S.D. Tex. 2014)). On appeal, the Fifth Circuit affirmed the finding that SB14 had an unlawful disparate impact (sustaining the § 2 VRA effects claim) but reversed the discriminatory purpose determination, finding that the district court improperly relied on certain facts. The Fifth Circuit remanded for further proceedings, including a redetermination of the discriminatory purpose issue and entry of an interim remedy before the 2016 elections.

In August 2016, the district court entered an interim remedy agreed to by all parties, following the Fifth Circuit's direction to "honor the State's policy preferences to implement a photo-ID system." *Id.* Under the interim remedy, voters who lacked an SB14 ID could cast a regular ballot upon completing a Declaration of Reasonable Impediment and presenting a specified form of identification. *Id.* The interim remedy was used for the November 2016 election and remained in place pending further order of the court, with the understanding that all parties preserved their right to seek or oppose further relief. *Id.* at 796-97.

In February and March 2017, the Texas Legislature informed the district court about legislation being considered during the 2017 session "to adjust SB 14 to comply with the Fifth Circuit's decision." *Id.* at 797. However, the district court proceeded to issue an opinion on the SB14 discriminatory purpose claim on April 1, 2017, again finding that SB14 was enacted, at

least in part, for a racially discriminatory purpose. SB5 was then enacted on May 31, 2017 as a legislative remedy to cure and replace SB14, and was fashioned after the interim remedy.

Texas moved for reconsideration of the district court's discriminatory purpose finding in light of the amendment, and the plaintiffs never sought leave to amend their Complaint to add claims specifically challenging SB5. *Id.* at 797-98. The district court denied Texas's motion, and entered a remedial order permanently enjoining SB14 and SB5, vacating the interim remedy, and reinstating the pre-SB14 law that lacked any voter ID requirement. It held that the interim remedy was limited to addressing the VRA § 2 effects claim, and in light of its finding of discriminatory purpose, the interim relief was no longer appropriate and broader relief was warranted. Further, although it did not find that SB5 violated § 2 of the VRA, it reasoned that its finding of discriminatory intent warranted a wholesale injunction because SB5 was built upon the architecture of SB14. The district court then ordered commencement of a § 3(c) bail-in hearing and issued broad relief enjoining the State from enforcing SB14 and SB5. *Id.* at 798.

On appeal, Texas argued that the case had become moot by the passage of SB5 in 2017, requiring *vacatur* of the court's finding of intentional discrimination on remand. The Fifth Circuit rejected the mootness argument. Although it recognized that ordinarily a statute would become moot by the passage of a superseding law and a prior ruling would be vacated, it noted that the case was not "archetypal." *Id.* at 799. Instead, the Fifth Circuit had remanded to the district court with instructions to assume the "unwelcome obligation" of devising an interim remedy to eliminate the § 2 violations, reconsider the discriminatory purpose finding without the facts the appellate court held inapposite, and be mindful that any new law

subsequently passed would present new circumstances. *Id.* The Fifth Circuit noted that the posture was similar to *Mississippi State Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991), in which the court evaluated both the liability findings and the new law, and there was no suggestion of mootness arising from the passage of the responsive legislation, which was analyzed for its effectiveness as a proposed remedy. The Fifth Circuit recognized that the issues on appeal in *Veasey* were "the status of the state's liability for intentional discrimination against indigent minority voters, and whether the district court abused its discretion in rejecting SB5 as a remedy for the Plaintiffs' claims." *Id.*

Plaintiffs in this case assert that the Fifth Circuit's holding that issues concerning liability regarding SB14 were not mooted by the passage of SB5 in *Veasey* supports a finding that their claims against the 2011 plans were not mooted by the passage of the 2013 plans. Defendants argue that language in the opinion concerning the typical effect of a new law— mooting claims against the old law and vacating prior opinions—supports a mootness finding. But as noted, *Veasey* was in a different procedural posture from this case. The district court had made final liability determinations shortly before the passage of the new law, and the district court was therefore already at the remedy stage when the new law was passed. The principal issue was the State's continuing liability based on those final liability findings concerning SB14, and whether the new law (SB5) was an appropriate remedy.

In contrast, although this Court had made some preliminary determinations on liability, it had not made final determinations at the time the 2013 plans were enacted, and this case was not at the remedy phase. Thus, *Veasey* does not directly support Plaintiffs' position that their 2011 plan claims were not moot, though the Fifth Circuit did not dismiss the claims against

SB14 and vacate the district court's findings on liability based on the passage of SB5, as suggested by Judge Higginbotham's concurrence. But *Veasey*'s general language on mootness does not undermine this Court's conclusion that the 2011 plan claims were never mooted, as Defendants argue, given the particular posture and claims presented here.  Like *Veasey*, this is also not the "archetypal" case, and the 2011 plan claims are not moot for the reasons this Court has explained in prior orders.

That this is so is further supported by the Supreme Court's decision in *Abbott v. Perez*, even though the Supreme Court expressed no direct opinion on the mootness issue. *See Abbott v. Perez*, 138 S. Ct. 2305, 2317 & n.8 (2018) (noting that this Court reasoned that the repeal of the 2011 plans represented the "voluntary cessation" of allegedly unconstitutional conduct, and stating, "We express no view on the correctness of this holding.").[3] After the 2013 plans were enacted, the claims before the Court included claims that the Texas Legislature intentionally maintained the discriminatory aspects of the 2011 plans when it enacted the 2013 plans (as well as an additional claim by the Texas Latino Redistricting Task Force that the Legislature violated the Fourteenth Amendment when it racially gerrymandered the changes to HD90 in 2013 (the *Shaw*-type claim)). Resolution of the discriminatory purpose claims required the Court to determine the ways in which the Legislature purposefully discriminated in 2011 as well as the ways in which the Legislature did so in 2013. *See Abbott*, 138 S. Ct. at 2327 ("[B]oth the intent of the 2011 Legislature and the court's adoption of the interim plans are relevant to the extent that they naturally give rise to—or tend to refute—inferences

---

[3] Although the Supreme Court later referred to the 2011 plans as "moot plans" in a footnote, 138 S. Ct. at 2328 n.22, that reference does not mean that the Court believed the claims against those plans were moot. Plans can be moot without the claims against those plans being moot.

regarding the intent of the 2013 Legislature."). Thus, the discriminatory intent of the Legislature in 2011 was necessarily examined.

Upon examination, this Court found that the Texas Legislature intentionally discriminated in 2011 in numerous and significant ways. The Court then found that the Legislature intentionally maintained the racially discriminatory aspects of the 2011 Texas House and Congressional plans when it enacted the interim plans in 2013, and that its true purpose in enacting the plans was not to comply with the VRA but to insulate itself from further liability for the discriminatory aspects of the plans, including potential bail-in relief. Though the Supreme Court reversed this Court's holding that the Legislature intentionally discriminated in 2013, it never addressed or in any way called into question this Court's findings as to the Legislature's discriminatory purpose in enacting the 2011 plans. Whether the Legislature violated the Fourteenth Amendment by intentionally discriminating against minority voters in 2011 has always remained a central issue of this litigation. Having found that it did, as required by the circumstances of this litigation, the Court must now determine whether bail-in relief is appropriate based on those findings.

B. Whether bail-in relief requires a final determination with accompanying relief?

Defendants further contend that Plaintiffs may not obtain bail-in relief because it is only a supplemental remedy and may not be imposed until a plaintiff prevails on a live claim. Relatedly, they argue that the Court cannot find that "violations of the fourteenth or fifteenth amendment . . . have occurred" as a result of the 2011 plans because they were never used and Plaintiffs were never injured by them. Docket no. 1612 at 8-9. The Court rejects these arguments.

The language of § 3(c) states that the Court may provide bail-in "in addition to such relief as it may grant." This Court has granted Plaintiffs relief in the form of an injunction against the use of the 2011 plans[4] and the issuance of interim remedy plans.[5] Thus, bail-in relief would be "in addition to such relief." Moreover, no court has held that bail-in relief may be awarded only upon a final judgment on a claim presented in the case accompanied by an award of final equitable relief on that claim. In its prior briefing on the application of § 3(c) in this case, the United States stated that "[n]othing in the statute's text supports Texas's argument that Section 3(c) relief can be imposed only after a final judgment of intentional discrimination" and "[s]o long as 'the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred,' the court can impose relief under Section 3(c)." Docket no. 827 at 5 n.4. In the leading case on bail-in relief, *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990), the court held that the plaintiffs failed to establish that the 1981 Arkansas reapportionment plan was motivated by a racially discriminatory purpose, but it nevertheless considered and found other constitutional violations that justified a limited preclearance remedy.

Further, the scope of § 3(c) indicates that a court may find that violations of the fourteenth amendment occur when the Legislature enacts plans in violation of those amendments, regardless of whether they are never implemented because plaintiffs successfully obtain preliminary or interim relief and the Legislature then voluntarily amends the plans. Surely it contemplates situations in which the court enjoins a challenged law from ever taking

---

[4] The Court enjoined the use of Plan H283 and Plan C185 and the parties "agreed that the relief . . . [would] be effective as a permanent injunction." Docket no. 380.

[5] Docket no. 681 (Plan C235) and docket no. 682 (Plan H309).

effect because it violates voting rights guaranteed by the Constitution and then issues additional bail-in relief to prevent future attempts to circumvent those same voting rights. Courts need not permit elections to proceed under an unconstitutional and discriminatory plan to award bail-in relief.

The remaining arguments center on whether the facts of this case justify the extraordinary remedy of bail-in, including specifically whether the necessary pre-conditions exist in terms of what types of violations (and by whom) count as triggers and whether they are significant enough to justify bail-in. Thus, the Court now turns to its analysis of whether bail-in relief can and should be awarded in this case.

### III. Merits Analysis of Request for Bail-in Relief

The most thorough analysis and discussion in the case law of § 3(c) and its requirements remains *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990), which imposed bail-in relief on the State of Arkansas.[6] There, the district court framed the inquiry as (1) whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State or its political subdivisions, and (2) whether, if so, the remedy of preclearance should be imposed. The Court will apply this same general framework.

A. Whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State or its political subdivisions?

To trigger bail-in, § 3(c) requires that (a) violations of the Fourteenth or Fifteenth Amendments (b) justifying equitable relief (c) have occurred (d) within the State or its political subdivisions. 52 U.S.C. § 10302(c). The Court first considers what types of violations

---

[6] Two recent cases have addressed § 3(c), but neither expended much analysis in deciding to impose relief, *Patiño v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017), or reject it, *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).

of the Fourteenth of Fifteenth Amendments may act as a trigger to impose bail-in relief upon the State of Texas as requested. This inquiry requires us to decide (1) whether *Shaw*-type violations or other Fourteenth Amendment violations aside from those requiring intentional racial animus may be considered, (2) whether this Court's findings of intentional racial voting discrimination in 2011 may be a trigger, (3) whether Texas's constitutional violations in addition to those made the subject of this suit may be a trigger, (4) the extent to which violations by political subdivisions inside Texas may be considered; and (5) the extent to which DOJ preclearance objections may be considered.

1.   *Shaw*-type violations in HD90 in 2013 and other Fourteenth Amendment violations that lack a finding of intentional racial discrimination

The Task Force Plaintiffs and Defendants contest whether the *Shaw*-type racial gerrymandering found in HD90 in the 2013 plans could trigger bail-in as a "violation of the voting guarantees of the Fourteenth Amendment," or whether bail-in relief must be limited to violations based on findings of invidious racially discriminatory purpose.[7] The Task Force notes that the statutory language "is not limited." Both types of claims are based on violations of the Fourteenth Amendment, but a *Shaw*-type claim does not require a racially discriminatory purpose; it requires only an improper focus on race, regardless of discriminatory motive.

The *Jeffers* court concluded that the statute imposes a requirement of proof of conscious racial discrimination, with a preponderance of the evidence burden of proof. *Jeffers*,

---

[7] No court seems to have directly considered this question, and a law review note poses it as an open question. Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 YALE L.J. 1992, 2035 (June 2010).

740 F. Supp. at 589. And the United States has consistently asserted that a finding of a violation of the voting guarantees of the Fourteenth Amendment requires a finding of intentional voting discrimination. *See* docket no. 827 at 3. The Court agrees, and concludes that triggering violations for bail-in relief must be violations of Fourteenth and Fifteenth Amendment protections against intentional racial discrimination in voting. Thus, a *Shaw*-type Fourteenth Amendment claim, without a finding of racially discriminatory purpose, is not a finding that supports bail-in relief. Unlike an intentional vote dilution claim, a *Shaw*-type racial gerrymandering claim is not focused on abridging the right to vote, but on an improper use of race regardless of discriminatory purpose, and § 3(c) aims to remedy voting changes that have the purpose and effect "of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10302(c).[8] Because the violation found in HD90 in 2013 was a racial gerrymander without an accompanying finding of intentional discrimination, it will not trigger bail-in relief.

The Court also rejects a conclusion that malapportionment and/or one person, one vote ("*Larios*-type claims") under the Fourteenth Amendment may trigger bail-in relief, absent any finding of purposeful racial discrimination underlying the population deviations. *See Blackmoon v. Charles Mix Cty*., 505 F. Supp. 2d 585, 592 (D.S.D. 2007) (finding malapportionment Fourteenth Amendment claim insufficient to trigger bail-in relief because without establishing racial discrimination, it would be "nonsensical" to require the State to

---

[8] The Court is further persuaded by Defendants' argument that a *Shaw*-type voting claim was not yet recognized by the Supreme Court when § 3(c) was enacted. Docket no. 1612 at 15 (noting that the Supreme Court first recognized *Shaw*-type racial gerrymandering claims in 1993 in *Shaw v. Reno*, 509 U.S. 630 (1993), and thus Congress did not have those claims in mind when it enacted and amended the § 3 remedial provisions of the VRA).

prove that any future change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or [language group]").

Similarly, *Shaw*-type violations and § 2 violations found in Texas's past apportionment plans are insufficient bases for bail-in relief. Thus, although Texas has been found to have violated § 2 and committed *Shaw*-type violations of the Fourteenth Amendment in more recent districting cycles, those will not trigger bail-in relief. Although the Supreme Court noted in 2006 that Texas's actions with regard to congressional district 23 bore "the mark of intentional discrimination," the Court did not make affirmative findings of a Fourteenth Amendment violation, instead resting its holding on a § 2 effects claim. *LULAC v. Perry*, 548 U.S. 399, 440 (2006).

2.   this Court's findings of intentional voting discrimination in the 2011 plans

The Court thus turns to whether an award of bail-in relief can be triggered by its findings of intentional discrimination with regard to the 2011 plans. This Court found that Texas's 2011 Congressional and State House plans were both motivated by racially discriminatory purpose. Docket no. 1390 (Order on Plan C185); docket no. 1340 (Fact Findings for Order on Plan C185); docket no. 1365 (Order on Plan H283); docket no. 1364 (Fact Findings for Order on Plan H283).

With regard to the Texas House Plan, Plan H283, the Court found that the overall plan was the product of intentional vote dilution and that it was based on "invidious discriminatory purpose." Docket no. 1365 at 83 ("The Court agrees that the overall configuration of Plan H283 is the product of intentional vote dilution" and "[t]he impact of the plan was certainly to reduce minority voting opportunity statewide, resulting in even less proportional

14

representation for minority voters."), *id.* at 84 ("[T]he Court finds invidious discriminatory purpose underlies Plan H283."). The Court further found that districts in many counties across Texas were the product of intentional discrimination/intentional vote dilution, including El Paso County, *id.* at 27-28 ("the Court finds that mapdrawers intentionally diluted the Latino vote in violation of § 2 of the VRA and the Fourteenth Amendment with regard to HD78"); Bexar County, *id.* at 32 ("the Court finds that mapdrawers intentionally diluted the Latino vote in HD117 in violation of § 2 and the Fourteenth Amendment"); Nueces County, *id.* at 38-40 (mapdrawers intentionally eliminated HD33 in Nueces County and "offset" the loss of a Latino opportunity district by unnecessarily inflating the SSVR of an already performing district in Harris County, thus intentionally diluting Latino voting opportunity and also intentionally racially gerrymandered the remaining Nueces County districts to further undermine Latino voting strength); Hidalgo County, *id.* at 43 ("the Court finds that HD41 was drawn in part with racially discriminatory (dilutive) motive" and that "mapdrawers intentionally used race to draw the district to perform less favorably for Latinos" such that "the configuration of HD41 is racially discriminatory and constitutes intentional vote dilution in violation of § 2 and the Fourteenth Amendment"); Harris County, *id.* at 56 ("The Court finds that there is persuasive evidence of intentional vote dilution in Harris County."); Dallas County, *id.* at 66-67 ("The Court does find . . . that Plaintiffs have proven an improper use of race in western Dallas County to dilute Latino voting strength" and "intentional vote dilution in Dallas County violates § 2 and the Fourteenth Amendment."); Tarrant County, *id.* at 71 ("The Court finds that mapdrawers acted with racially discriminatory intent to dilute Latino voting strength in Tarrant County."); and Bell County, *id.* at 78 ("The Court thus finds

evidence of intentional vote dilution in Bell County in violation of § 2 of the VRA and the Fourteenth Amendment.").

In the Opinion on Plan C185, this Court found that in CD23 the State intentionally split the large Hispanic county of Maverick County and the City of Eagle Pass to exclude politically active Hispanics who would not support the Republican incumbent, while adding in all or parts of more Anglo counties, but nevertheless taking care to maintain SSVR and HCVAP levels above 50%. These actions were designed to maintain theoretical opportunity while simultaneously manipulating district population to decrease its potential effectiveness for Latinos. Docket no. 1390 at 20. Mapdrawers manipulated Latino cohesion and turnout to pursue the "nudge factor" proposal and create the façade of a Latino opportunity district. *Id.* at 20-23. It was undisputed that Latino performance in CD23 decreased, and the Court found that CD23 was purposefully racially discriminatory. *Id.* at 23, 28-29.

In the Dallas-Fort Worth metroplex, the Court found that "race was used as a proxy for political affiliation, and that this was done intentionally to dilute minority voting strength." Docket no. 1390 at 131. Specifically, mapdrawers intentionally wasted minority (and therefore presumed Democrat) votes in CD30 by packing, while increasing Anglo (and therefore presumed Republican) voting strength in neighboring districts, and they further intentionally cracked minority population in the metroplex to limit minority population within the Republican districts to curb the effect of continued minority growth throughout the decade. *Id.* at 131-33. The Court found persuasive evidence that mapdrawers intentionally "packed and cracked" on the basis of race with the intent to dilute minority voting strength, and thus acted with intentionally racially discriminatory purpose. *Id.* at 134.

The Court concludes that these findings of "violations of the Fourteenth Amendment" do qualify as triggers for § 3(c) bail-in relief. These are recent findings of purposeful racial discrimination by the State affecting significant numbers of minority voters statewide.

3. findings of intentional discrimination in the *Veasey* voter ID litigation and whether *Veasey* precludes an award of bail-in in this case

The next issue is whether the district court's recent findings of intentional discrimination in the *Veasey* voter ID litigation may also be considered, and whether the holding in *Veasey* itself precludes bail-in relief in this case. On remand, the district court in *Veasey* found that Texas purposefully discriminated when it enacted the first voter ID bill (SB 14) in 2011. This finding was not disturbed on the second appeal. Rather, the Fifth Circuit held only that "because SB 5 constitutes an effective remedy for the only deficiencies testified to in SB 14, and it essentially mirrors an agreed interim order for the same purpose, the State has acted promptly following this Court's mandate, and there is no equitable basis for subjecting Texas to ongoing federal election scrutiny under Section 3(c)." *Veasey*, 888 F.3d at 804.

Contrary to Defendants' and the United States' assertions, the Fifth Circuit did not reject bail-in relief solely because the State acted promptly to enact the remedy plan that mirrored the interim relief, nor did it hold that any time the State does so, bail-in relief is precluded. Rather, the Fifth Circuit found bail-in relief inappropriate because the district court had ordered relief that was too broad and untailored. The Fifth Circuit expressly noted that the relief ordered "far exceed[ed] the scope of the actual violations found by the court" and that "under the circumstances of th[e] case, the court had no legal or factual basis to invalidate SB 5, and its contemplation of Section 3(c) relief accordingly fail[ed] as well." *Id.* at 801. Those circumstances included that "SB 14 was racially discriminatory against only the subset of

indigent minority voters and did not affect the vast majority of Texas voters of all races," and that courts "are bound by the requirement to tailor injunctive relief." *Id.* The Court emphasized that "relief must be tailored" more than once. *Id.* at 800. Thus, the district court found discriminatory intent, but it affected only a small subset of minority voters rather than the vast majority of Texas minority voters. In addition, the Fifth Circuit found no evidence of any continuing discriminatory effect on minority voters, rendering potential bail-in relief an untailored, overly broad remedy.

This case, in contrast, involves findings of intentionally discriminatory behavior affecting minority voters statewide rather than the subset of indigent minority voters. Numerous counties were drawn with the purpose to dilute minority voting strength in the Texas House plan, as well as CD23 and numerous congressional districts in the Dallas-Fort Worth metroplex in the Congressional plan. Though the Supreme Court may have found no discriminatory purpose in 2013, it did not undermine the findings of purposeful discrimination in 2011. These recent, statewide violations of the Fourteenth Amendment by the State are the type to appropriately trigger the bail-in remedy against the State, and the bail-in remedy sought by Plaintiffs would appropriately redress the violation. Thus, *Veasey* does not foreclose bail-in relief in the circumstances of this case.

The United States further asserts that, because the discrimination findings in *Veasey* could not support bail-in relief in that case, they cannot be used to support it in this case. The Court disagrees. Nothing in *Veasey* precludes consideration of the district court's findings of intentional discrimination as support for application of § 3(c) relief in this case. The discrimination finding in *Veasey* was insufficient to support 3(c) relief in that case because of

its limited effect, but that purposeful discrimination may nevertheless be considered by this Court in deciding whether to award bail-in relief in this case. Although this Court would find it a stretch to award bail-in relief based solely on violations found in other cases, as the *Jeffers* court did, consideration of the *Veasey* court's findings of intentional discrimination in the second step of the bail-in analysis is certainly appropriate.

4. recent findings of intentional discrimination by political subdivisions

Plaintiffs also urge the Court to consider *Patiño v. City of Pasadena*, 230 F. Supp. 3d 667, 729 (S.D. Tex. 2017), a recent case finding intentional discrimination and imposing preclearance on the City of Pasadena, Texas. On the issue of whether other constitutional violations could be considered as triggers, including those by political subdivisions, the *Jeffers* court held that the phrase "violations of the fourteenth or fifteenth amendment justifying equitable relief" is "not limited at all," such that if the plaintiffs succeeded in showing other constitutional violations besides those alleged in their attack on the apportionment plan made the basis of the suit, preclearance would not be ruled out if the violations were sufficiently serious and widespread to justify the drastic remedy of preclearance. *Jeffers*, 740 F. Supp. at 592. It further held that the statute does not require "that the State or its officials must be guilty of the violations, but only that the violations must 'have occurred *within the territory*' of the State." *Id.* at 600 (emphasis in original). Thus, it approved consideration of both state and local government violations. *Id.*

However, the Court finds that these violations should at most provide relevant context to the second step of the bail-in analysis, and not be used as a trigger for bail-in relief. The State was not a party to the discrimination or the litigation in *Patiño*. The reference to finding

violations "within the territory of such State or political subdivision" refers back to the initial clause of § 3(c), which provides that relief is available "in any proceeding . . . to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision." 52 U.S.C. 10302. Thus, it simply makes clear that political subdivisions such as cities may be subjected to § 3(c) relief based on their own violations, and does not mean that a State may be subjected to bail-in based on violations by its political subdivisions.

5. objections to preclearance by the Department of Justice in § 5 proceedings

The fact that the Department of Justice has lodged numerous § 5 objections against Texas's redistricting plans over the years does not establish that violations of the Fourteenth or Fifteenth Amendment have occurred. A jurisdiction seeking preclearance must prove that its proposed voting change has neither the purpose nor the effect of denying or abridging the right to vote on account of race or color. The jurisdiction bears the burden of persuasion on both points. *Reno v. Bossier Parish Sch. Bd. (Bossier II)*, 528 U.S. 320, 328 (2000). A mere finding of discriminatory effect or "retrogression" does not amount to a constitutional violation, which requires an additional showing of discriminatory intent. And an objection based on discriminatory purpose shows only that the State failed to carry its burden of proof in the preclearance proceedings.[9] Such an objection does not demonstrate that a state actually engaged in any intentional discrimination in violation of the Fourteenth Amendment under the traditional burden of proof. *See Perez*, 138 S. Ct. at 2330 n.25 (citations omitted) ("In assessing the significance of the D.C. court's evaluation of intent, it is important not to forget

---

[9] In 2006, Congress amended § 5 to include "any discriminatory purpose." The Supreme Court had previously construed § 5 as extending only to retrogressive intent, and not discriminatory intent generally. *Reno v. Bossier Parish Sch. Bd. (Bossier II)*, 528 U.S. 320, 329 (2000); *Beer v. United States*, 425 U.S. 130 (1976).

that the burden of proof in a preclearance proceeding was on the State.  Particularly where race and partisanship can so often be confused, . . . the burden of proof may be crucial.").

     6.  the Court finds sufficient violations to potentially trigger bail-in.

The Court has found violations of the Fourteenth Amendment with regard to the 2011 plans, and concludes that these findings are sufficient to trigger bail-in as a potential remedy. The Court now considers whether it will order such relief.

**B.  Whether the remedy of preclearance should be imposed.**

The *Jeffers* court noted that the statute does not simply require "violations" of the Fourteenth Amendment, but "violations justifying equitable relief." *Jeffers*, 740 F. Supp. at 601. Moreover, a finding that violations have occurred does not automatically mean that bail-in relief should be imposed; rather, whether it should be imposed is governed by traditional principles of equitable discretion. *Id*. The *Jeffers* court listed six, non-exhaustive, relevant factors for courts to consider in exercising their discretion, including: "Have the violations been persistent and repeated? Are they recent or distant in time? Are they the kinds of violations that would likely be prevented, in the future, by preclearance? Have they already been remedied by judicial decree or otherwise? How likely are they to recur? Do political developments, independent of this litigation, make recurrence more or less likely?" *Id*. These factors remain relevant today and have been considered by the Court. But the Court must also consider the Supreme Court's and Fifth Circuit's recent guidance on preclearance.

The Supreme Court first upheld the constitutionality of § 5 in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966). The Court noted that the VRA "create[d] stringent new remedies for voting discrimination where it persists on a pervasive scale, and in addition the

statute strengthens existing remedies for pockets of voting discrimination elsewhere in the country." *Id.* at 308. The legislative history revealed that "Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution," and Congress concluded that "sterner and more elaborate measures" were necessary to uphold voting rights because case-by-case litigation against voting discrimination had proved insufficient. *Id.* at 309.

In 2009, the Supreme Court questioned the ongoing constitutionality of § 5 and its coverage formula after its reauthorization in 2006 in *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009), but did not decide the issue. In that opinion, the Court noted that the VRA had achieved historic accomplishments, but recognized that § 5 imposes substantial federalism costs. *Id.* at 202-03.

In *Shelby County v. Holder*, the Supreme Court invalidated the coverage formula in § 4 of the VRA, but left § 5 and the § 3 remedies, including bail-in, intact. But in doing so, the Court stressed that § 5's requirement for "[s]tates to obtain federal permission before enacting any law related to voting" was "a drastic departure from basic principles of federalism," and burdens imposed by the Act must be justified by current needs. *Shelby County*, 570 U.S. at 535, 542. "The Federal Government does not . . . have a general right to review and veto state enactments before they go into effect." *Id.* at 542.

Highlighting that "federalism secures to citizens the liberties that derive from the diffusion of sovereign power" the Court emphasized that "the Framers of the Constitution intended the States to keep for themselves . . . the power to regulate elections." *Id.* at 543 (internal quotation marks and citations omitted). "Drawing lines for congressional districts is .

. . 'primarily the duty and responsibility of the State.'" *Id.* at 543. Because the imposition of preclearance results in a system where "one State waits months or years and expends funds to implement a validly enacted law," while "its neighbor can typically put the same law into effect immediately, through the normal legislative process," and further applies substantive standards quite different from those governing states not subject to preclearance, such "strong medicine" can only be justified in exceptional circumstances. *Id.* at 544–45, 535. Importantly for our purposes, although the Supreme Court did not invalidate § 5 in *Shelby County*, it noted that arguments that the preclearance requirement was unconstitutional have "a good deal of force," given the improvements in minority voter turnout, registration, and office-holder rates, the rarity of blatantly discriminatory evasions of federal decrees, and the fact that discriminatory tests and devices had been banned for over 40 years. *Id.* at 547.

In the wake of *Shelby County*, courts have been hesitant to grant § 3(c) relief. For example, in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), the Fourth Circuit declined the plaintiffs' request for § 3(c) relief, despite concluding that "that the North Carolina General Assembly enacted the challenged provisions of the [election] law with discriminatory intent" targeting African Americans in numerous ways,[10] in violation of the Fourteenth Amendment. *Id.* at 215, 219. Without much analysis, the Court explained that "[s]uch remedies are rarely used" and were "not necessary" in light of the court's injunction against North Carolina's omnibus election reform law. *Id.* at 241. The Court cited *Conway School District v. Whilhoit*, 854 F. Supp. 1430 (E.D. Ark. 1994), which noted

---

[10] These included photo ID, early voting, same-day registration, out-of-precinct voting, and preregistration.

that "[t]he preclearance remedy is rarely used, only being utilized in such a 'systematic and deliberate' case as *Jeffers*." *Id.* at 1442.

Moreover, although this Court has concluded that *Veasey* does not automatically preclude imposition of bail-in relief, *Veasey* also counsels strongly against its imposition here. The Supreme Court overturned this Court's findings of discriminatory intent with regard to the 2013 plans. Thus, as in *Veasey*, there are no findings of discriminatory intent or Fourteenth Amendment violations concerning the plan currently in place. The Supreme Court also held that the 2013 Legislature did not "use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature," and essentially found the current plans to be free of constitutional infirmities. *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). Although this Court may disagree about the lingering effects of discrimination from the 2011 plans, the clear import of the Supreme Court's opinion is that nothing further remains to be remedied, and this Court is bound to follow that opinion. In addition to considering whether any infirmities remain, *Veasey* further instructs this Court to consider that the State acted promptly to adopt the interim plans to remedy any potential violations.

Although the Court concluded above that it could and should also consider the intentional discrimination findings made in the underlying voter ID litigation itself, it does little to bolster the foundation for bail-in. While this was another recent act of intentional discrimination by the State, as the *Veasey* court noted, it affected only a small portion of minority voters (indigent minority voters), and there was no indication that its effects had not been fully remedied. Thus, the Court finds an insufficient basis upon which to award the requested bail-in relief.

To be clear, however, the Court has grave concerns about Texas's past conduct. During the 2011 legislative session, Texas engaged in traditional means of vote dilution such as cracking and packing in drawing districts, and also utilized newer methods of dilution and suppression such as using the "nudge factor" and passing voter ID requirements.

The existence of high levels of racially polarized voting across Texas cannot be disputed,[11] nor is there any indication that the levels of racially polarized voting are decreasing. This Court and others have recognized that "the presence of racially polarized voting provides a strong incentive for intentional discrimination, commonly through vote dilution…." Docket no. 1390 at 120 (quoting *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214, 222 (4th Cir. 2016)).

In addition to racially polarized voting, it is undisputed that minority population levels are markedly increasing, and "restrictive and discriminatory voting laws have typically been enacted (by *both* political parties) in response to a perception of increased voting power by emerging demographic groups." Docket no. 1390 at 141. Given the fact of changing population demographics, the likelihood increases that the Texas Legislature will continue to find ways to attempt to engage in "ingenious defiance of the Constitution"[12] that necessitated the preclearance system in the first place.[13] At the hearing on § 3(c) relief, counsel for the

---

[11] As this Court noted, Defendants did not dispute that people of different races vote differently from one another, and that minorities tend to vote Democrat while Anglos generally tend to vote Republican. Docket no. 1390 at 120 n.104.

[12] *So. Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966).

[13] For example, the State recently engaged in the dubious voter-purge, sending a list of approximately 95,000 registered voters to counties advising them to investigate their citizenship and eligibility to vote. *Texas LULAC v. Whitley*, SA-19-CV-74. Out of 98,000 new American voters on the list, the Secretary of State almost immediately recognized that 25,000 names should not have been included, and by February 27 only

State was asked whether the State would commit to conduct future redistricting proceedings by a fair and open process.  Counsel responded that to answer the question, he needed to know how those terms are defined before committing to a specific process.[14]  That response is disappointing.   Irrespective of whether an employee of the State's executive branch is empowered, in open court, to commit the Legislature to a particular process, we warn that, given the record produced in 2011, the State must implement a process that, by any reasonable definition, is "fair and open".

Nevertheless, the Court concludes that ordering preclearance on the current record would be inappropriate, given the recent guidance from the Supreme Court and the Fifth Circuit. It is time for this round of litigation to close. *Abbott*, 138 S. Ct. at 2327 ("There is thus no need for any further prolongation of this already protracted litigation.").

Even without being subject to preclearance, Texas must still comply with the requirements of the Fourteenth Amendment and § 2 of the VRA in the upcoming redistricting

---

approximately 80 had been identified as being ineligible to vote. This case was recently settled, and thus there are no final determinations concerning whether this voter purge was motivated at least in part by purposeful racial discrimination.

[14] [JUDGE RODRIGUEZ]: Will the state of Texas stipulate that this next go-around after the census data is released that you will have full, fair, transparent public hearings after the census data is released and that there will be full, fair, transparent hearings held with maps visible for the public to see and actual hearings as opposed to what took place in 2011 with votes held in public with ample notice. Will the state agree to all that?

MR. FREDERICK: I couldn't even begin to consider it until I knew exactly what full, fair, and open meant. . . .

[JUDGE RODRIGUEZ]: No, no. And so what I mean by the process is what didn't take place the last time around. We didn't have hearings. We had hearings before a census map was released -- census data was released. So that was of no value to anybody. And then when hearings did take place, they were held in unusual locations with last-minute notices on holidays. So, you know, that's the kind of behavior the state engaged in last time, and I'm asking you to stipulate on behalf of the state, if you can so stipulate, that you won't do that again. And if you can't, then why shouldn't I award 3(c)relief?

MR. FREDERICK: Two responses. I can't stipulate because I do not -- because the terms are not defined. I don't know what I would be stipulating to. The reason that that can't support 3(c)relief is doing a bad job in a complicated process is so far from the necessary level of deliberate constitutional defiance that is necessary for preclearance that it just doesn't get close ….

Docket no. 1629 (May 10, 2019 hearing transcript).

cycle, and undoubtedly its plans will be subject to judicial scrutiny. Texas would be well advised to conduct its redistricting process openly, with the understanding that consideration of bail-in is always an option for whatever federal court or courts may be tasked with review of future legislative actions.  On this record and under current law, however, bail-in is denied.

It is SO ORDERED.

SIGNED this 24th day of July, 2019 on behalf of the Three-Judge Panel.

XAVIER  RODRIGUEZ
UNITED STATES DISTRICT JUDGE